# Exhibit 107

CONFIDENTIAL
Dorthe Pannerup Madsen - September 30, 2021

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
MASTER DOCKET 18-MD-2865(LAK)

_____
                                          )
IN RE:                                    )
                                          )
CUSTOMS AND TAX ADMINISTRATION OF         )
THE KINGDOM OF DENMARK                    )
(SKATTEFORVALTNINGEN) TAX REFUND          )
SCHEME LITIGATION                         )
                                          )
_____)


C O N F I D E N T I A L


VIDEO DEPOSITION OF
DORTHE PANNERUP MADSEN
Copenhagen, Denmark
Thursday, September 30, 2021




Reported by: CHRISTINE MYERLY

Page 22

1  March 2014, right?
2      MR. OXFORD:  Objection to form.
3      A      Yes, the few members of staff that
4  were left.
5  BY MR. DULBERG:
6      Q      When you took over, did you become
7  aware of a number of problems related to SKAT's
8  administration of dividend withholding tax?
9      MR. OXFORD:  Objection to form.
10     A      What are you referring to
11 specifically?
12 BY MR. DULBERG:
13     Q      We can circle back to that in a
14 bit.  At any point prior to her retirement, did
15 Ms. Rømer talk to you about any problems or
16 challenges related to dividend withholding tax?
17     MR. OXFORD:  Objection to form.
18     A      As I said earlier, I got no --
19         (Danish clarification.)
20     THE INTERPRETER:  Hang on one moment,
21 please.
22         (Danish clarification.)
23     THE INTERPRETER:  I was just asking about
24 a word I said just -- I translated this with
25 "information" earlier, and it is maybe better to use

Page 23

1  information of substance.  What the witness did say
2  was, "I did mention earlier that I was given no
3  information of substance on this issue."
4  BY MR. DULBERG:
5      Q      This issue meaning dividend
6  withholding tax?
7      MR. OXFORD:  Objection to form.
8      A      Correct.
9  BY MR. DULBERG:
10     Q      From anyone?
11     A      Not from a single person.
12     Q      Did that surprise you?
13     MR. OXFORD:  Objection to form.
14     A      Yes.  But Lisbeth Rømer had
15 already retired.
16 BY MR. DULBERG:
17     Q      How do you explain the fact that
18 you received no substance or information about
19 dividend withholding tax before you were asked to
20 lead that group?
21     MR. OXFORD:  Objection to the form.
22     A      Well, I can't explain that.  I was
23 just asked to be responsible for those members of
24 staff and handle the transfer of tasks from Hoeje
25 Taalstrup to Jutland.

Page 24

1  BY MR. DULBERG:
2      Q      Did you ever discuss with
3  Ms. Rømer the problem that SKAT did not have enough
4  employees working on dividend withholding tax?
5      MR. OXFORD:  Objection to form.
6      A      No, we did not discuss that.
7  BY MR. DULBERG:
8      Q      Can you turn in your binder to
9  Exhibit 3981.  Is this an e-mail you received from
10 Ms. Rømer in November 2013?
11     A      Correct.
12     Q      She wrote, "We are very vulnerable
13 with only one person on refunds and dividend tax
14 respectively."  Do you see that?
15     MR. OXFORD:  Objection.
16     A      Yes, I see that.
17 BY MR. DULBERG:
18     Q      What did you understand her to be
19 saying in that sentence?
20     MR. OXFORD:  Objection to form.
21     A      We had challenges when it came to
22 entering in the declarations that we received.  So,
23 Lisbeth and I would bring paper declarations with us
24 on the train when we traveled to Jutland.  And then
25 employees, staff, under Kaj Steen would then enter

Page 25

1  the information into the system.
2  BY MR. DULBERG:
3      Q      There was one employee responsible
4  for refunds, is that correct?
5      MR. OXFORD:  Objection to form.
6      A      Yes, one left.
7      Q      Is that Sven Nielsen?
8      A      Correct.
9  BY MR. DULBERG:
10     Q      He was the only employee
11 responsible for processing requests for refund of
12 dividend withholding tax between 2013 and 2015?
13     MR. OXFORD:  Objection to form.
14     A      Yes.  Towards the end of 2014 and
15 the beginning of 2015, we started training staff in
16 taking over this task.  And those members of staff
17 came from Kaj Steen.
18 BY MR. DULBERG:
19     Q      Were those members of staff
20 processing reclaim requests before August 2015?
21     A      Yes, we started training --
22 training them towards the end of 2014.
23     Q      Before you started training the
24 additional staff, the only person responsible for
25 processing reclaim requests was Sven Nielsen?

CONFIDENTIAL
Dorthe Pannerup Madsen - September 30, 2021

8 (Pages 26 to 29)

Page 26

1      MR. OXFORD: Objection to form.
2      A    Correct.
3  BY MR. DULBERG:
4      Q    He was responsible for processing
5  thousands of requests per year, correct?
6      A    Yes.
7      Q    Investors were requesting billions
8  of krone of refunds, correct?
9      MR. OXFORD: Objection to form.
10     A    He processed the applications,
11 yes.
12 BY MR. DULBERG:
13     Q    Those applications sought billions
14 of krone, correct?
15     MR. OXFORD: Objection to the form.
16     A    Well, in the end it turned out to
17 be quite a bit of money, yes.
18 BY MR. DULBERG:
19     Q    What did you do to -- if anything,
20 to supervise his work?
21     MR. OXFORD: Objection to form.
22     A    First of all, I reported to my
23 vice director that this was a very vulnerable area.
24 And I was told that I could not use any other
25 members of my staff on these tasks because all of

Page 27

1  us, including both managers and staff, were to be
2  moved from Hoeje Taalstrup to Jutland.
3      So the only thing I could do was to look
4  into whether we could move any of these tasks to
5  Jutland. So, some of the tasks that we were facing
6  regarding dividend tax that would require a
7  special -- specialized skill set as a caseworker was
8  then moved away from our unit.
9  BY MR. DULBERG:
10     Q    For how long was Sven Nielsen the
11 only person responsible for processing dividend
12 withholding reclaim requests?
13     MR. OXFORD: Objection to form.
14     A    Until towards the end of 2014 when
15 we started training additional staff.
16 BY MR. DULBERG:
17     Q    How about on the other end, was he
18 the only person processing reclaim requests in 2012
19 and 2013?
20     MR. OXFORD: Objection to the form.
21     A    No. Back then there were many
22 more members of staff. I remember drafting a memo
23 that I sent to my vice director, called René Frahm
24 Jørgensen, showing that there were or at least had
25 been 12 members of staff who participated in tasks

Page 28

1  to do with refund applications.
2  BY MR. DULBERG:
3      Q    By 2013, that number had dwindled
4  to just one, correct?
5      MR. OXFORD: Objection to form.
6      A    Yes, because SKAT became the
7  subject of severe cutbacks, which resulted in
8  dismissal of staff, and for some, they were given a
9  voluntary retirement arrangement.
10 BY MR. DULBERG:
11     Q    Now, you mentioned informing René
12 Frahm Jørgensen that dividend withholding tax was a
13 very vulnerable area, correct?
14     MR. OXFORD: Objection to form.
15     A    Correct. I did that every month.
16 BY MR. DULBERG:
17     Q    Are you referring to the monthly
18 probability checks, plausibility checks that you
19 sent him?
20     MR. OXFORD: Objection to form.
21     A    Yes.
22
23 BY MR. DULBERG:
24     Q    In addition to sending those
25 monthly documents, did you have occasion to speak

Page 29

1  with Mr. Jørgensen about how vulnerable dividend
2  withholding tax was?
3      MR. OXFORD: Objection to form.
4      A    Yes. We talked about this on
5  several occasions, discussing the fact that this was
6  not doing -- this area was not doing that great.
7  BY MR. DULBERG:
8      Q    What did you mean when you
9  described it as vulnerable?
10     A    I was referring to the limited --
11 limited number of staff working in this area, and
12 the substantial job in front of them.
13     Q    Is it fair to say that the team
14 responsible for dividend withholding tax was
15 significantly understaffed?
16     MR. OXFORD: Objection to the form.
17     A    That is absolutely correct, but
18 management was aware of this.
19 BY MR. DULBERG:
20     Q    Management did nothing to address
21 it during your time, correct?
22     MR. OXFORD: Object to the form. Asked
23 and answered.
24     A    The only thing that was done was
25 to move the tasks to Jutland.

Page 150

1    (Exhibit 4006 was marked for identification.)
2    A    I do recognize this.
3    Q    Is this the list of controls and
4 procedures that your team prepared in connection
5 with the review of dividend withholding tax refund
6 applications?
7    A    Yes.
8    Q    Was it your understanding that
9 Mr. Nielsen and his team applied these procedures in
10 reviewing each and every dividend withholding tax
11 refund application during the time he reported to
12 you?
13   A    Yes.
14        MR. DULBERG:  Objection.
15 BY MR. OXFORD:
16   Q    You have a binder in front of you.
17 Can I ask you to turn to Exhibit 4003.  This should
18 be the e-mail exchange between you and Mr. Orla
19 Kristensen that Mr. Dulberg asked you about.  Do you
20 have that document?
21   A    Yes.
22   Q    Mr. Dulberg asked you about a
23 statement at the top of the page that says
24 something -- withdrawn.  Mr. Dulberg asked you about
25 a statement four lines down from the top of the

Page 151

1 page, "It is not your fault, it is the system's."
2 Do you see that?
3        THE WITNESS:  Yes.
4    Q    Do you remember the questions that
5 Mr. Dulberg asked you about that?
6    A    Yes.
7    Q    Is it correct that these words I
8 have just mentioned, "It is not your fault, it is
9 the system's," those are Mr. Kristensen's words,
10 correct?
11   A    Yes, these are all his words.
12   Q    They are not your words?
13   A    No, not my words.
14   Q    By the time you were sent home in
15 2015, Ms. Madsen, had you learned how the fraud was
16 carried out?
17        MR. DULBERG:  Objection.
18   A    Not in details, but fake
19 applications and documentation had been submitted.
20 BY MR. OXFORD:
21   Q    Do you have any knowledge about
22 any system SKAT could have put in place to prevent
23 the fraud?
24        MR. DULBERG:  Objection.
25   A    No, not to my knowledge.

Page 152

1 BY MR. OXFORD:
2    Q    Do you have any knowledge about
3 any resources SKAT could have spent to prevent the
4 fraud?
5        MR. DULBERG:  Objection.
6    A    No.
7 BY MR. OXFORD:
8    Q    Mr. Dulberg also asked you about
9 some monthly accounting approvals that you prepared
10 and signed, do you remember that?
11   A    Yes.
12   Q    In particular, it is Exhibit 394
13 if you need to look at it.
14        THE INTERPRETER:  394?
15   Q    Sorry, 3984.
16   A    Got it.
17   Q    Actually, I may have the wrong
18 exhibit.  You don't need to have 3984 in front of
19 you.  Let me just clear up the record.
20        Mr. Dulberg asked you about the monthly
21 accounting approvals that you prepared.  Do you
22 remember that topic?
23   A    Yes.
24   Q    And he asked you about some
25 language in those reports that describe the dividend

Page 153

1 withholding tax unit as vulnerable?
2    A    Yes.
3    Q    Did you mean, by using that word,
4 that you considered that SKAT was vulnerable to
5 dividend withholding tax fraud?
6    A    No.
7    Q    What did you mean when you used
8 the phrase, "vulnerable in those approvals"?
9    A    I meant that there were very few
10 employees and that Sven was handling the refund
11 applications.  I worried what would happen if he
12 were to fall ill.  We had nobody to put in his
13 place.
14   Q    Mr. Dulberg also asked you if you
15 considered the monthly accounting approvals you
16 prepared to be a warning.  Do you remember those
17 questions?
18   A    I do remember the question.  I
19 remember this as a status of the work situation at
20 the end of that month.
21   Q    So, is it fair to say that you did
22 not consider, Ms. Madsen, your monthly accounting
23 approvals to be a warning to anyone at SKAT?
24        MR. DULBERG:  Objection.
25   A    No, it was not a warning.

Page 162

1  BY MR. DULBERG:
2       Q    Those are the only items under the
3  heading "Verification of Application," correct?
4       MR. OXFORD:  Object to the form.
5       A    Yes.  But there is also control
6  and reconciliation of amount.
7  BY MR. DULBERG:
8       Q    And the reference to control means
9  that the amount of repayment has been calculated
10 correctly in relation to the relevant double
11 taxation convention, correct?
12      MR. OXFORD:  Object to the form.  You are
13 misstating the document, Drew.
14      A    Yes.
15 BY MR. DULBERG:
16      Q    And then the amount had to be
17 calculated correctly based on the documents
18 supporting it, right?
19      MR. OXFORD:  Objection to form.
20      A    Correct.
21 BY MR. DULBERG:
22      Q    Nowhere in this guide does it say
23 anything about beneficial ownership, correct?
24      MR. OXFORD:  Objection to form.
25      A    It does not, correct.

Page 163

1  BY MR. DULBERG:
2       Q    Nowhere in this guide does it say
3  anything about whether the shareholder had purchased
4  the shares from a borrower of securities, correct?
5       MR. OXFORD:  Object to the form.
6       A    No, it does not.
7  BY MR. DULBERG:
8       Q    It also doesn't ask whether the
9  shareholder had loaned his shares or her shares,
10 correct?
11      MR. OXFORD:  Object to the form.
12      A    No.  But that was not something
13 for us to control.
14 BY MR. DULBERG:
15      Q    It also doesn't ask or include
16 some means of figuring out whether the applicant had
17 sought a refund for the same shares that a different
18 applicant had also sought a refund for, right?
19      MR. OXFORD:  Objection to the form.
20      A    Correct.
21 BY MR. DULBERG:
22      Q    And so the task that Mr. Nielsen
23 was carrying out was making sure that the right
24 papers were in the envelope and that the math was
25 done correctly, is that fair?

Page 164

1       MR. OXFORD:  Objection to form.  You are
2  mischaracterizing what is at least a three-page
3  document.
4       A    I would say that that is a
5  somewhat glib characterization of the job he did,
6  which I feel was done correctly.
7  BY MR. DULBERG:
8       Q    Under section 6 of this exhibit,
9  at the bottom, it says, "The reporting in 3-S
10 ensures that the total payment does not exceed the
11 total declared dividend tax."  Do you see that?
12      A    Correct.
13      Q    And then it says, "However, due to
14 a system error in 3-S, it is not possible to carry
15 out this check in all cases."  Correct?
16      A    Correct.  This was a system error
17 that had been reported to the relevant office and
18 they were working on it.
19      Q    Did you know at any time during
20 your employment by SKAT that SKAT had paid out more
21 in withholding tax than it had collected in
22 connection with certain dividend distributions?
23      MR. OXFORD:  Object to the form.
24      A    No, I did not know.
25 BY MR. DULBERG:

Page 165

1       Q    You were speaking with Mr. Oxford
2  about your understanding of the alleged fraud, and
3  you mentioned fake documentation.  Do you recall
4  that?
5       A    Yes.
6       Q    Sitting here today, can you
7  identify which documents were allegedly fake?
8       MR. OXFORD:  Objection to form.
9       A    I cannot tell the difference
10 between a right one and a fake one.
11 BY MR. DULBERG:
12      Q    Do you know the type of document
13 that you understand to have been false or
14 fraudulent?
15      A    No, I do not know.
16      Q    And you don't know one way or
17 another whether in fact U.S. pension plans submitted
18 false documents to SKAT, right?
19      MR. OXFORD:  Objection to form.
20      A    No, I have no knowledge about
21 that.
22      MR. DULBERG:  I have nothing further.
23
24
25