# Exhibit 109

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____
                              )
                              )
In re                         )
                              )
CUSTOMS AND TAX ADMINISTRATION )   MASTER DOCKET
OF THE KINGDOM OF DENMARK     )   18-MD-2865 (LAK)
(SKATTEFORVALTNINGEN) TAX     )
REFUND SCHEME LITIGATION      )
                              )
This document relates         )
To:   All cases               )
_____)


C O N F I D E N T I A L


VIDEO DEPOSITION OF
LISBETH ROMER
Copenhagen, Denmark
Thursday, June 3, 2021
10:00 a.m.   (CEST)


Taken at:
Offices of Poul Schmith
Kammeradvokaten, Kalvebod Brygge 32,
1560 Copenhagen V, Denmark
And WebEx via New York



Reported by:   FREDERICK WEISS, CSR, CM

Page 46

1  it depended on what we did. If we sent it up in
2  the head office, they would look into it.
3  Everything is depending on what we are observing
4  in our work for dividend tax.
5        But if I wanted a control
6  investigation, I had to wait, if it was a decision
7  of whether or not it was in headquarters, and that
8  could go quite smoothly.
9  BY MS. MCCARTHY:
10       Q.   When you say a "control
11  investigation" --
12       A.   Yeah.
13       Q.   -- what do you mean?
14       A.   That is you had to make an audit,
15  an audit.
16       Q.   An audit of the reclaim?
17       A.   I'm not thinking of reclaim. I'm
18  thinking more of the general dividend tax things.
19       Q.   Can you give me an example of what
20  you would use to do a controlled investigation of?
21       A.   For instance, you could declare one
22  figure and you could tell the recipient had
23  received another figure. And if we -- if we, by
24  chance, because we couldn't see it right away, but
25  by chance we could see something was wrong, then

Page 47

1  you had to go and investigate the bookkeeping of
2  the company.
3        And we were not dressed for that.
4  We were not educated to do that.
5        Q.   All right. So you had to send that
6  out to another unit --
7        A.   Yes.
8        Q.   -- called control?
9        A.   Yes.
10       Q.   Okay. And when you -- and how many
11  times did you do that? Was that a frequent or
12  rare occurrence?
13       A.   It was -- we had good contacts.
14  And at one stage, we made them have a full -- a
15  full survey of a certain year where they
16  investigated 68,000 companies, and found errors
17  and payments in 20,000 of them.
18       Q.   Okay. That's -- so that -- that's
19  one that you recall --
20       A.   Yes.
21       Q.   -- having them do?
22       A.   Yes.
23       Q.   How about individual shareholder
24  issues? Did you send those to control?
25            MR. WEINSTEIN: Objection to form.

Page 48

1  What individual shareholder issues are you
2  referring to?
3  BY MS. MCCARTHY:
4        Q.   You may answer.
5        A.   We didn't have much chance by
6  ourselves. Only to see it, we should stumble over
7  it if we should do something, and that was not
8  always the case.
9            And we had these piles of paper
10  that we were keying in, loads of paper.
11           So it was -- it was not an audit
12  group. It was a keying in group, and then a
13  refund of dividend.
14           But the main purpose of our office
15  was to have the declarations of the different
16  companies put in place.
17       Q.   The declarations of the dividends
18  paid to shareholders?
19       A.   Yes.
20       Q.   And that was so that you could make
21  sure the proper amount of withholding tax was paid
22  into SKAT, correct?
23       A.   Yes.
24       Q.   Into the Danish treasury?
25       A.   Yes.

Page 49

1        Q.   Is it fair to say that since the
2  mid-2000s, you had concerns that SKAT was issuing
3  refunds blindly?
4        A.   Blindly to some extent that we
5  didn't have any registration of the shareholders,
6  but not blindly as we had this third-party
7  declaration -- invoice from the banks.
8            So we felt that what we asked
9  for -- for the person to claim a refund was
10  actually the Claimant, and then an invoice from
11  the bank, they should tally, and then the
12  signature of the country saying, "This person or
13  this company is a taxpayer in this country."
14       Q.   And you --
15       A.   So we could see it was a
16  double-treaty country that we were talking about.
17       Q.   And you just described the claim
18  form --
19       A.   Yes.
20       Q.   -- that foreign taxpayers would
21  use --
22       A.   Yes.
23       Q.   -- to claim a refund, correct?
24            MR. WEINSTEIN: Objection to form.
25  She described more than just a claim form. She

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

14 (Pages 50 to 53)

Page 50

1  described a number of documents.
2  BY MS. MCCARTHY:
3      Q.   The process you just described,
4  ma'am, is what is referred to as the form scheme,
5  correct?
6      A.   Yes.
7      Q.   And I know that "scheme" is used
8  for other types of claims?
9      A.   Yes.
10     Q.   And that just means a program or a
11 method, right?
12     A.   Mm-Hmm.
13     Q.   Yes?
14     A.   Yeah.
15     Q.   It doesn't mean something negative?
16     A.   No.
17     Q.   So when I use the word "scheme"
18 today, I am not talking about something bad.  I am
19 just talking about a program, correct?
20     A.   Correct.
21     Q.   Okay.
22          THE INTERPRETER:  Correct.
23 BY MS. MCCARTHY:
24     Q.   Okay.  So you have said a few times
25 that you relied upon the third-party

Page 51

1  representations that were made --
2      A.   Yes.
3      Q.   -- in documents provided to SKAT,
4  correct?
5      A.   Yes.
6      Q.   But was there any way for you to
7  confirm the information provided to you by the
8  third parties?
9      A.   Then we should contact the bank to
10 have them certify it.
11     Q.   Did you do that?
12     A.   We have done it, yeah.
13     Q.   Was that a regular thing that you
14 did?
15     A.   No.  No.  Because as I told you,
16 what we do with the banks is so important that we
17 have to rely on them.  And unless we immediately
18 can see that this might not be correct, and of
19 course banks do also make mistakes, and we -- they
20 do things.
21          But then we can normally see it.
22 If it doesn't look strange, we don't -- we don't
23 go to the bank.
24     Q.   Okay.  And you said that you were
25 getting lots and lots of paper, right, that had to

Page 52

1  be reviewed?
2      A.   Yes.
3      Q.   And did that -- did that workload
4  increase over time?
5      A.   Yes.  Yes.
6      Q.   And your staffing did not increase?
7      A.   No.
8      Q.   So it's correct, is it not, that
9  you had a concern that SKAT was paying reclaims
10 that it should not have paid?
11     A.   I didn't have the concern.  I
12 didn't feel that it was happening.  But I said
13 that there is a possibility that it might happen.
14     Q.   So you recognized a risk, correct?
15     A.   I saw there could be a risk as we
16 depend on the banks.
17     Q.   And is there any chance that your
18 superiors within SKAT were unaware of that
19 potential risk?
20     A.   No.
21     Q.   In fact, you have said that it was
22 written all over the wall in neon, correct?
23     A.   Yes.  Yes.
24     Q.   You told them repeatedly of this
25 risk, correct?

Page 53

1      A.   Correct.
2      Q.   Okay.  Are you familiar with the
3  December 2017 report prepared by the law firm
4  Bech-Bruun?
5      A.   I have seen it.
6      Q.   And that was a report into the
7  circumstances regarding SKAT's payment of dividend
8  tax refunds, right?
9      A.   Yes.
10     Q.   And are you aware that the report
11 has a specific section about you and the work that
12 you did?
13     A.   I have seen it, yes.
14     Q.   And in fact, the report says things
15 like you were a driving force in focusing on the
16 problems in the dividend tax area?
17     A.   Yes.
18          MR. WEINSTEIN:  Objection to form.
19 BY MS. MCCARTHY:
20     Q.   Do you agree with that --
21     A.   Yes.
22     Q.   -- statement?
23     A.   I do.
24     Q.   You were the driving force, right?
25     A.   I was the driving force.  There

Page 58

1        (Court reporter clarification.)
2        THE WITNESS: Flew.
3        A.   It is not a certain amount that the
4   company is giving out as dividend. It differs
5   from year to year. And so it's rather difficult
6   to know beforehand how much should we expect. If
7   things are going well, you expect more. But you
8   are not certain which company is doing well or
9   not.
10       And then we had the financial
11  crisis, and Danish banks were not allowed to pay
12  out dividends for some years. And of course, that
13  has an impact on all the dividends that we are
14  talking about.
15       It is -- you have to be very
16  interested in your work and to have a good nose
17  for what is happening in society to be able to
18  deal with this.
19       And I have said that I think -- I
20  really think that if the group of the good people
21  we were had been there, we would have discovered
22  this fraud before. That is my point of view.
23       But I was not there, and the others
24  were not there. There was only one left.
25

Page 59

1   BY MS. MCCARTHY:
2        Q.   Why did that happen? Why was your
3   group disbanded?
4        A.   Because --
5        MR. WEINSTEIN: Objection to form.
6        THE WITNESS:
7        A.   -- when we started in 1970 with the
8   withholding tax system, a lot of people were
9   employed, and many of those were still in my
10  group.
11       So if they were employed in '70, in
12  '10 or a little after, they were supposedly going
13  home, be retired.
14       So they saw a chance of -- and we
15  had -- we had installed a new keying-in system for
16  the companies, so we didn't have these piles of
17  paper anymore, everything was going into the
18  machine by the company.
19       So a lot of our tasks had
20  disappeared. And so they said: "Go home. We are
21  not starting a new one. We are not starting a new
22  group."
23       And actually, the refund of
24  dividend tax was almost the only task left as the
25  companies now were doing the work we had done

Page 60

1   before by keying in the declaration and
2   recipients.
3        (Court reporter clarification.)
4        THE WITNESS: Recipients. Sorry.
5   BY MS. MCCARTHY:
6        Q.   What was Sven left to do then?
7        A.   Refund.
8        Q.   So he had to still review the --
9   the applications, correct?
10       A.   Yes.
11       Q.   And he was doing that all by
12  himself?
13       A.   Yes.
14       Q.   Did he have a supervisor?
15       A.   Yes.
16       Q.   Do you know who that was?
17       A.   I'm not sure because there were
18  several people involved. And I didn't follow when
19  I left. I left. So I didn't know how the daily
20  work was when I had gone.
21       Q.   So -- imagine that it was fairly
22  frustrating for you to raise the concerns that you
23  raised within SKAT and to not have -- not to be
24  taken seriously?
25       MR. WEINSTEIN: Objection to form.

Page 61

1        THE WITNESS:
2        A.   I must say that we also managed to
3   get a lot of things through. This keying-in
4   self-system was solving a lot of problems. Wow.
5   We got it made. And a lot of other things that
6   were troubling our work, we also had changed into
7   the better.
8        The forms, when we arrived, had one
9   page, and a second page where the tax authority of
10  the country where the recipient is living, on the
11  second page. So you could switch the first page
12  and nobody would know.
13       So we made it all in one page, so
14  it happens in one page.
15       I mean, small things, but we were
16  trying to tighten up loopholes and -- and get rid
17  of difficulties.
18       Q.   Mm-hmm.
19       A.   And then, of course, when you have
20  some victories, it's easier to continue than only
21  if you had notes all the time.
22       Q.   Right. When you testified before
23  the Commission, you expressed your frustration
24  about not being listened to by your superiors,
25  correct?

Page 78

```
 1  listed companies give to SKAT regarding
 2  shareholders?
 3       A.    They don't do it.  It is the
 4  VP Securities that do it.
 5       Q.    All right.  So is that a gap
 6  then --
 7       A.    No.
 8       Q.    -- in the information --
 9       A.    No.
10       Q.    -- that -- if you could let me
11  finish the question.
12             Because what I'm hearing is that if
13  the shareholder has an account in a Danish bank,
14  then VP Securities is able to report to SKAT what
15  amount of dividend was given to a specific
16  shareholder, correct?
17       A.    Correct.
18       Q.    However, if it's a foreign
19  shareholder without a Danish account and they
20  invest in a listed company, that the listed
21  company does not provide the shareholder
22  information to SKAT, correct?
23       A.    Correct.
24             MR. WEINSTEIN:  Objection to form.
25
```

Page 79

```
 1  BY MS. MCCARTHY:
 2       Q.    Is -- and I was asking you if that
 3  constituted then a gap in information to SKAT?
 4       A.    But it was as it had always been.
 5  It was as it has always been.  Since the system
 6  was put in place in the '80s, we didn't have any
 7  information about shareholders not having a depot
 8  in Denmark.
 9       Q.    Okay.  So that was something
10  that -- that if SKAT then received a reclaim
11  application by a foreign shareholder without a
12  Danish bank account, how could you verify their --
13  that that shareholder received a dividend?
14       A.    I could only verify it by his claim
15  and by the invoice from the bank telling that he
16  had received that amount of dividend.
17       Q.    Okay.
18             MS. MCCARTHY:  So if we could go to
19  Exhibit 3051, if you could mark that,
20  Mr. Reporter.
21             3051 should be a form, Claim to
22  Relief from Danish dividend Tax.
23             Oh, I'm so sorry, it's 3016.  I
24  apologize.  I know, I sent you to -- I sent you to
25  a very big document.  I meant to send you to a
```

Page 80

```
 1  very short document.
 2             (Exhibit 3016 marked for
 3  identification.)
 4  BY MS. MCCARTHY:
 5       Q.    Ms. Romer, do you see that
 6  document?
 7       A.    Yes.
 8       Q.    Do you recognize it?
 9       A.    Yes.
10       Q.    What is it?
11       A.    It is the form to Claim Relief from
12  Danish Dividend Tax.
13       Q.    And is this -- was this form
14  provided by SKAT in different languages?
15       A.    Yes.
16       Q.    And this is the English form,
17  correct?
18       A.    Yes.
19       Q.    Okay.  And is this the form that
20  you were talking about earlier today --
21       A.    Yes.
22       Q.    -- that a shareholder would fill
23  out when they were asking for --
24       A.    Refund.
25       Q.    -- refund of the tax withheld by
```

Page 81

```
 1  SKAT, correct?
 2       A.    Correct.
 3       Q.    Okay.  And so can you go over again
 4  for us what the circumstances needed to be in
 5  order for a shareholder to use this specific form?
 6             MR. WEINSTEIN:  Objection to form.
 7             THE WITNESS:
 8       A.    Of course.  The shareholder should
 9  be a shareholder who was a beneficial owner of the
10  shares at the time where the dividend was decided
11  at the general assembly; and should be living in a
12  country with which Denmark had a double-taxation
13  treaty.
14             And should be a taxpayer in the
15  country that he was claiming he came from, as we
16  had different tax percentages in different tax --
17  double taxation agreements.  It was also important
18  that it was the right country that he claimed to
19  be taxpayer in.
20  BY MS. MCCARTHY:
21       Q.    Okay.  And before approving a
22  refund, SKAT would review the information provided
23  on this form, correct?
24       A.    Yes.
25       Q.    Okay.  And who was the employee
```

Page 82

1  that worked with you who was responsible for
2  reviewing these forms?
3     A.   That was Mr. Sven that we talked
4  about before.
5     Q.   Sven Nielsen?
6     A.   Yes.
7     Q.   N-I-E-L-S-E-N?
8     A.   Yes.
9     Q.   Okay. And was Mr. Nielsen always
10 the person responsible for reviewing this form?
11    A.   Yes.
12    Q.   In the entire time you worked in
13 Accounting II?
14    A.   Yes.
15    Q.   Was there anyone else that did
16 this?
17    A.   Yes, there were people helping
18 because the amount was increasing. And different
19 from the group helped him out with this.
20    Q.   Did you ever review these and help
21 him out?
22    A.   No. No.
23    Q.   But you were familiar with the
24 form?
25    A.   Yes.

Page 83

1     Q.   Okay. And could Mr. Nielsen read
2  English?
3     A.   Yes.
4     Q.   Okay. And SKAT paid refunds only
5  if the information on the form was filled out,
6  correct?
7     A.   Yes.
8     Q.   And the required documentation was
9  attached?
10    A.   Yes.
11    Q.   All right. Did SKAT do anything to
12 verify the information on the forms?
13    A.   But that was the thing, that we had
14 to rely on the information we got. You have the
15 Claimant, and then you had the certification from
16 the financial institution that the dividend was
17 paid to this person.
18    Q.   Okay. So it was -- the best you
19 could -- all you could do was rely on what was
20 provided to SKAT?
21    A.   Yes.
22         MR. WEINSTEIN: Objection to form.
23 BY MS. MCCARTHY:
24    Q.   And if the information was
25 completely filled out and the attaching documents

Page 84

1  were there --
2     A.   Supporting.
3     Q.   -- supporting documents, then the
4  refund would be paid, correct?
5     A.   Yes.
6     Q.   And was this the same form that was
7  used from -- in the time that you were in
8  Accounting II?
9     A.   We improved the form, as I told,
10 that the certification from the tax authorities
11 was on a separate page which we found was not so
12 clever. And therefore, we put it together so that
13 it could all be in one page.
14    Q.   And were you -- what was the
15 concern that you had by having the certification
16 on a separate page?
17    A.   You can substitute the first page.
18         (Court reporter clarification.)
19         THE WITNESS:
20    A.   You can substitute the first page
21 without the tax authorities knowing what you are
22 doing.
23 BY MS. MCCARTHY:
24    Q.   Okay. So that change in your form
25 then was to try to reduce the risk of fraud,

Page 85

1  right?
2     A.   Yeah.
3     Q.   Okay. If we can just go through
4  the form quickly. The form says that the claim is
5  made for refund of Danish dividend tax, and then
6  it gives the total Danish kroner being sought at
7  the very top, right?
8     A.   Yes.
9     Q.   Did the reviewers do anything to
10 independently verify the accuracy of the total
11 Danish kroner amount?
12    A.   We calculated -- not always. That
13 depended on the amount and the situation.
14         But we calculate it, of course, if
15 they had calculated the right way and if they had
16 used the right percentage from the double-taxation
17 treaty. And...
18    Q.   Okay. So it might depend upon the
19 country?
20    A.   Yes.
21    Q.   And the agreement between
22 Denmark --
23    A.   Yes.
24    Q.   -- and that country?
25         Are you familiar with the

Page 86

1  double-taxation treaty between Denmark and the
2  United States?
3       A.    I have fortunately forgotten,
4  sorry.
5       Q.    Was there a time when you were
6  familiar with it?
7       A.    Yeah.  When paragraph 10 was
8  introduced.
9       Q.    Paragraph 10?
10            THE INTERPRETER:  Section 10.
11            THE WITNESS:
12      A.    Section 10 was introduced when the
13 pension schemes in the States.  I think it was in
14 '10 it was introduced.
15 BY MS. MCCARTHY:
16      Q.    Okay.  Can you tell us about
17 Section 10?
18      A.    Yes.  But it was giving fully tax
19 exemption for pension schemes in the States.
20      Q.    Do you know when that went into
21 effect?
22      A.    '10.
23      Q.    2010?
24      A.    I think it was in '10.
25      Q.    Okay.  When Section 10 went into

Page 87

1  effect, did you see any increase in pension plans
2  making reclaim applications?
3       A.    Yes.
4       Q.    Was it a significant increase or
5  just a little bump?
6       A.    It was a significant increase.  And
7  I recall that this was new land for us, and we
8  would make a lot of new pension schemes.  And we
9  were curious, so we tried to look up the different
10 things.
11            But yeah, when something new
12 happens, you try to get familiar with things.  And
13 that we did, and it was -- it was a lot of extra
14 work at that time.
15      Q.    So when you say "we," who tried to
16 look them up?
17      A.    Those who were working with
18 refunds, Sven and his helpers.
19      Q.    How many people did that entail?
20      A.    I think there were two more than
21 Sven, two more, maybe three.
22      Q.    And did you participate in this
23 research?
24      A.    We were always -- we were having a
25 lot of meetings talking about what we were doing,

Page 88

1  so we were very familiar with what happened in our
2  little group and following each other.
3             So I was informed.
4       Q.    Okay.  You were informed.  But did
5  you participate in doing the research?
6       A.    No.
7       Q.    So it was Sven and maybe two other
8  people?
9       A.    Maybe two or three other people,
10 yes.
11      Q.    Do you know who the other two or
12 three were?  Do you remember?
13      A.    I remember the two of them.  There
14 was one called Bente.
15            THE INTERPRETER:  B-E-N-T-E.
16            THE WITNESS:  Fridberg.
17            THE INTERPRETER:  Last name,
18 Fridberg, F-R-I-D-B-E-R-G.
19            THE WITNESS:  And I think Jette
20 Hansen.
21            THE INTERPRETER:  And second,
22 Jette, J-E-T-T-E, last name Hansen, H-A-N-S-E-N.
23 BY MS. MCCARTHY:
24      Q.    And so those three people, I am not
25 going to repeat their names, all worked in

Page 89

1  Accounting II, correct?
2       A.    Yes.
3       Q.    What -- other than -- other than
4  helping in this research or pension plans, what
5  were each of their roles?
6       A.    Oh, but they had different roles in
7  all the paper, rekeying in all the documents that
8  we had at that time.
9       Q.    Because this was before TastSelv
10 went into effect, right?
11      A.    Yes.  Yes.
12      Q.    So you were receiving paper in --
13      A.    Lots of paper, lots of paper.
14      Q.    Did these dividend claim forms, did
15 those continue to be submitted in paper by the
16 time you retired?
17      A.    Yes.
18      Q.    Okay.  Was there an effort to make
19 these electronically available?
20      A.    No.  We didn't have that on our
21 agenda.
22      Q.    Okay.  So this paper continued?
23      A.    Yes.
24      Q.    Right.  And going back to the
25 Section 10 when US pension plans were given full

Page 198

BY MS. MCCARTHY:
 Q.   So the first -- the first one that I asked you to read, is it fair that it says that: "The dividend tax can be refunded before the tax is paid or reported to SKAT." Right?
 A.   Yes.
 Q.   Okay. And you agree with that finding, right?
 A.   Yes.
 Q.   And the second one is: "The use of omnibus accounts means that several dividend notes are printed."
 And then it says: "Swift messages for a single share."
 (Court reporter clarification.)
 THE WITNESS:
 A.   Yes.
BY MS. MCCARTHY:
 Q.   There is no check as to whether dividend tax is requested more than once per share, right?
 A.   Yes.
 Q.   And do you agree with that?
 A.   That's possible.
 Q.   So that's a possible risk?

Page 199

 A.   Yes.
 Q.   And then the next bullet point is: "There are no checks in connection with refund requests as to whether the investor is actually a shareholder and whether the investor is, in fact, liable for tax in Denmark or not."
 A.   Yes.
 Q.   Do you agree with that?
 A.   We only have the claim and the bank statement.
 Q.   And then finally, it says: "It does not appear that the previous investigations initiated by SKAT have been followed up on."
 Do you agree with that?
 A.   Yes.
 Q.   And was that a source of frustration for you?
 A.   Yes.
 Q.   And is that something that you spent a lot of time trying to get people to listen to these issues?
 A.   Yes.
 Q.   Did you have any expectation that after this audit, there would be any changes in -- implemented within the dividend process?

Page 200

 A.   Of course, the first one was rectified, right?
 Q.   Mm-Hmm.
 A.   So that was one.
 Q.   Okay. And that was rectified when? This is in 2009.
 A.   Wasn't it '12? I think it was.
 Q.   Okay. So three years later?
 A.   Are we on '10?
 Q.   This is, right, 2010, two years later.
 A.   Yes.
 Q.   Correct.
 A.   And the others, there were no -- that was what the Trace actually blocked that we should do anything about it ourselves in Denmark, unfortunately.
 Q.   Okay. So the other issues were deferred --
 A.   Yes.
 Q.   -- for the passage of the Trace project?
 A.   Yes.
 Q.   Okay. Was there a working group that was created after this audit?

Page 201

 A.   Yes, I think there was.
 Q.   Did you participate in that working group?
 A.   If there was a working group, I participated. But there were so many, and I can't remember which one was which one. Sorry.
 Q.   When you say there were so many working groups, can you give us a sense of how many working groups you participated in?
 A.   Every time we have any internal audit, we were making -- work in groups. And as we didn't have the power ourselves to do anything, and as we were not the luckiest in tax to have somebody to send it to, it took time and not many changes were made.
 So after the next audit we started a new working group with new people, because now we had reorganized everything. So it was uphill. But we tried, and we got something through, eventually.
 Q.   In 2012, you got it changed --
 A.   Yes.
 Q.   -- that helped --
 A.   But the TastSelv.
 Q.   The what?