# Exhibit 97

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
 2           Master docket No. 18-MD-2865(LAK)
                  Case Nos. 18-cv-09505
 3    _____
                                             )
 4    IN RE:                                 )
                                             )
 5    CUSTOMS AND TAX ADMINISTRATION OF      )
      THE KINGDOM OF DENMARK (SKATTEFOR      )
 6    VALTNINGEN) TAX REFUND SCHEME          )
      LITIGATION,                            )
 7                                           )
      _____)
 8

 9

10

11

12

13

14         REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

15                        EXAMINATION OF

16                        DAVID SCHULMAN

17                     DATE: October 21, 2020

18

19

20

21

22

23

24

25          REPORTED BY:  MICHAEL FRIEDMAN, CCR
```

1    she was designated as my representative and I
2    had complete faith in first Dan and then
3    Stacey.
4             And literally, the only
5    conversations we ever had would be sometime
6    in the spring when I would call her up and
7    say, "How much did the plans make last year,"
8    and eventually she would produce a number.
9    But there was never any discussion about what
10   the plan was specifically doing or how that
11   number was derived.
12            So that's all the color I can give
13   you.
14        Q   Why did you need to designate
15   Stacey Kaminer as a representative?
16        A   Because I did not want to be
17   involved in all of the paperwork, and I
18   certainly could not be involved in any of the
19   investment decisions because I wasn't
20   knowledgeable about what was going on, and
21   it -- my recordkeeping is less than terrific,
22   and I went under the assumption that all of
23   the records that would be kept would be kept
24   by Kamco or Acer or whoever it was at the
25   time.

1          And, in fact, that was the case,
2   and I never did see -- outside of documents
3   to sign, I never did see any statements or
4   transactions or anything like that.  So it
5   really was important to me to have Stacey
6   have the freedom to do those things.
7       Q    You said before that these were
8   low-risk trades.
9            Right?
10      A    Yes.
11      Q    And how did you -- how were you
12  comfortable that they were low-risk trades?
13      A    I was told that the positions were
14  hedged to make the risk as low as physically
15  possible.
16      Q    What does that mean, "to make the
17  risk as low as physically possible?"
18      A    I don't know how I would explain
19  that.  The transactions were very short-term,
20  and the positions were hedged in some way, so
21  they were -- of course, no hedge is ever a
22  hundred percent perfect, so there was always
23  risk involved.  But that's what my
24  understanding of low-risk was.
25           I mean, outside of a black swan

```
1        Q    And you didn't ask any follow-up
2   questions of why you needed to sign them?
3        A    No.
4        Q    Did she provide any explanations?
5        A    Not that I recall, no.
6        Q    Is this -- is it your usual
7   practice to sign documents without reviewing
8   them first?
9        A    Only if the person who's giving me
10  the documents and telling me it's okay to
11  sign them tells me that it's okay, and I
12  trust them.
13       Q    Did you trust Stacey Kaminer?
14       A    Absolutely.
15       Q    Why did you trust Stacey Kaminer?
16       A    Because she had proven to me over
17  the years that she was a straight shooter.
18  And I had given her the -- the right to
19  handle all of the paperwork for me.
20            So I had no reason not to sign
21  something that she said I should sign.
22       Q    When you say you gave her the right
23  to handle all of the paperwork for you, what
24  paperwork are you talking about?
25       A    Anything that has to do with this
```

1      A    I think on an e-mail.
2      Q    And what is the date of this
3  e-mail?
4      A    I have no idea.  I'm sure the
5  e-mail came from Stacey or via Stacey, so she
6  would have copies of all that information.
7      Q    When you said earlier that you had
8  given Stacey the right to handle all of the
9  paperwork related to the strategy for the
10 plans, how do you give her that right?
11     A    I'm pretty sure at some point I
12 signed the power of attorney.
13     Q    When was that?
14     A    No idea.
15     Q    Do you recall the circumstances of
16 signing that power of attorney?
17     A    No.
18     Q    How is it that you decided to sign
19 that power of attorney?  Was it your idea or
20 Stacey's?
21     A    I think, at some point, we probably
22 had a brief discussion where I said I want
23 her to make all of the decisions for the
24 account, and to handle all the paperwork,
25 which is why her office address is the

```
 1    address that all my documents were sent to,
 2    because I didn't have any interest in seeing
 3    them.
 4             And maybe, at that point, she sent
 5    me a power of attorney, but I don't recall.
 6       Q    So do you know what ED&F Man is?
 7       A    I know they're a broker.  I know we
 8    were involved with them.
 9             I found out after the lawsuit that
10    they were our broker when we did the trades
11    in question.  I guess that's about it.
12             I mean, I'm sure I signed some
13    ED&F Man documents.
14       Q    When you say that they were the
15    broker for the plan, what does that mean?
16       A    That's a good question.  I really
17    don't know.
18             I mean, I think they were the
19    people who -- I don't know if they handled
20    the trading or Stacey handled the trading,
21    but my understanding was that they were the
22    money behind -- they supplied the balance
23    sheet to support the trades.
24             So broker, maybe it's the wrong
25    terminology, but as I've said before, I'm not
```

```
 1    necessary if the -- if there was already a
 2    power of attorney giving Stacey power to act
 3    for the plans?
 4           MR. BLESSINGTON:  Object to form.
 5       You may answer.
 6       A    I don't know, I guess ED&F Man
 7    asked for it.
 8       Q    This says in Paragraph 1.2 that
 9    "Acer has the authority, without limitation,
10    to purchase and sell and in other ways deal
11    in the investment selected by the customer."
12           Is that right?
13       A    (Witness reviewing.)
14       Q    1.2A?
15       A    I'm reading it, but -- the way you
16    read it -- maybe I'm reading it wrong -- it
17    sounded like I was going to deal with ED&F
18    Man, which certainly was not true.  I never
19    spoke to ED&F Man ever.
20           I assume -- I thought that what
21    this read, it was that Acer, being Stacey
22    Kaminer, accepted the appointment with the
23    ability to trade with full power and
24    authority.
25       Q    So that meant that Acer and Stacey
```

David Schulman - October 21, 2020

Page 137

```
 1       A    I don't know.
 2       Q    So that's -- I guess what I'm
 3  trying to understand is who had the authority
 4  to decide what trades the plan would enter
 5  into, if it would --
 6            MR. BLESSINGTON:  Valerie, if I
 7       may, are you talking about as it relates
 8       to ED&F Man?
 9            MS. CAHAN:  Yes.
10            MR. BLESSINGTON:  Okay.
11       A    I don't know.  I assume it was
12  Stacey, but I don't know.
13       Q    So was it your responsibility to
14  know who could act on behalf of the plan as
15  the trustee?
16       A    Yes.  That's why I signed the power
17  of attorney to Acer.
18       Q    So did Acer have -- so Acer had the
19  authority to choose which trades the plan
20  would enter into at ED&F Man?
21       A    They had full authority, yes.
22       Q    Did Acer have the authority to
23  obtain financing on behalf of the plans?
24            MR. BLESSINGTON:  Object as to
25       form.  You may answer.
```

1           But I can absolutely say without a
2    doubt that I never knew anything about it.  I
3    had never -- I never knew there was such a
4    thing as Danish trades.
5        Q   When was the first you learned that
6    your plan had made trades in Danish
7    securities?
8        A   Either when Stacey had called to
9    tell me about the lawsuit or when I received
10   the lawsuit.
11       Q   Did Stacey or anyone else at Acer
12   ever provide you with summaries of trading
13   that had been done by the plans?
14       A   Never.
15       Q   Did they ever provide you with any
16   statements showing returns or account
17   holdings?
18       A   No.
19       Q   How much money did the plans put in
20   the ED&F Man account to pay for them?
21           MR. BLESSINGTON:  Object as to
22       form.
23           MR. BINDER:  Objection to form.
24       A   I don't know.
25       Q   Would you have done that yourself

```
 1    or would somebody else have been able to put
 2    money in the account at ED&F Man?
 3              MR. BLESSINGTON:  Object as to
 4         form.
 5              MR. BINDER:  Objection.
 6         A    I never had any direct contact with
 7    anyone at ED&F, so it could not possibly have
 8    been me if it happened.
 9         Q    Did anyone else have the -- have
10    the ability to put assets of the plan in an
11    account at ED&F Man?
12         A    Stacey.
13         Q    Did Stacey have the ability to
14    make -- excuse me.
15              Did Stacey have the ability to move
16    the assets of the plan in accounts other than
17    at ED&F Man?
18              MR. BLESSINGTON:  Object as to
19         form.
20         A    She had full authority.
21         Q    Based on what?
22         A    The power of attorney that I gave
23    her.
24         Q    Is that a different power of
25    attorney than the one that we looked at
```

David Schulman - October 21, 2020

Page 198

```
1        A    No idea.
2        Q    Did you authorize the applications
3    to SKAT?
4        A    I did not.
5        Q    So are you saying that the
6    applications were made without authorization?
7        A    Well, Stacey had authorization to
8    act on behalf of the plans.  I don't know if
9    she's the one who made the applications, or
10   if ED&F Man made the applications, or one of
11   these other people who I do not know, like
12   Knox or Santander or whatever.
13            I don't know who made the
14   applications, but no one asked me.  But
15   Stacey would be acting as my agent.
16       Q    Can you look at Exhibit 837,
17   please?
18            MS. CAHAN:  Mark this as 837.
19            (Whereupon the above mentioned was
20       marked for Identification.)
21       A    Okay.  I'm looking at it.
22       Q    And take a minute and look through
23   this whole document.
24       A    Okay.
25       Q    Do you -- have you ever seen
```

```
1    this -- any of the documents in here before?
2         A    (Witness reviewing.)
3              No.
4         Q    So this is -- this Exhibit 837 is
5    all of the reclaim applications submitted by
6    the Riverside plan to SKAT.
7         A    Okay.
8         Q    Did you see these before they were
9    submitted to SKAT?
10        A    I did not.
11        Q    And looking through, have you seen
12   any of the documents in here before?
13        A    Let me just go back to the power of
14   attorney.  No, I have not.
15        Q    Okay.  So looking at page 1 of the
16   document, are you -- were you aware that on
17   or around March 26, 2014, this collection of
18   documents was submitted to SKAT on behalf of
19   your plan, the Riverside plan?
20        A    I was not aware.
21        Q    Can you turn to page 3, please?
22             MR. BLESSINGTON:  Page what?
23             MS. CAHAN:  Three of the document.
24        A    Wait.  Three.
25             MR. BLESSINGTON:  Can you see that?
```

David Schulman - October 21, 2020

Page 200

```
1              THE WITNESS:  Yeah, I can see it.
2        A    (Witness reviewing.)
3              Which one is page 3?  The top or
4    the bottom?
5        Q    It's the Bates number ending 18379.
6        A    79?  There it is.  Okay.
7              All right.  I'm looking at it.
8        Q    Do you know what this document is?
9        A    I do not.
10       Q    So, see at the top, it says "Claim
11   to Relief from Danish Dividend Tax?"
12       A    I see that.
13       Q    And do you see, at the top, it says
14   the claim is made for a total of 1.2 million
15   Danish krones?
16       A    Yes, I see that.
17       Q    Do you have any sense of how much
18   that was in U.S. dollars?
19       A    None.  I meant to look it up after
20   the lawsuit, but I never did.
21       Q    Well, I can tell you that that was
22   about $236,000 on March 26, 2014.
23       A    Okay.
24       Q    Have you ever seen any other
25   versions of this form?
```

David Schulman - October 21, 2020

Page 201

```
1        A    Not that I recall.
2        Q    And you see at the top, it says --
3   it gives the address of the plan as 5532
4   Lillehammer Lane, in Park City, Utah?
5        A    That's correct.
6        Q    Why did the plan use that address?
7        A    We decided to use that address so
8   that Stacey could handle all of the
9   paperwork.  I think I said that about five
10  hours ago.
11       Q    But where else did the plan use
12  that address?
13       A    No idea.
14       Q    Why did the plan need to use this
15  address on this application so that Stacey
16  could handle the paperwork?
17       A    So she could make all of the
18  transactions and control the paperwork flow
19  and file the documents that needed to be
20  filed, and sent me the papers that needed to
21  be signed, so that all information would go
22  to her rather than to me.
23       Q    Can you turn to the next page,
24  please?  It's titled "Tax Voucher," and it
25  says ED&F Man at the top.
```

David Schulman - October 21, 2020

Page 202

```
1        A    Okay.  I see it.
2        Q    Have you ever seen a document like
3   this before?
4        A    No.
5        Q    Looking at this document, what do
6   the following dates refer to?
7             What does the "ex date" refer to?
8             MR. BINDER:  Objection to form.
9             MR. BLESSINGTON:  You can answer.
10       A    My understanding of an "ex date" is
11  the date on which the securities trade
12  without the dividend.
13       Q    What is your understanding of what
14  a "record date" is?
15       A    That is really bizarre, because my
16  understanding of a record date is that's the
17  date where the ownership of the securities,
18  that's the cutoff time.  If you buy -- if you
19  buy or settle the securities after that date,
20  you're not of record on the ex date.
21            And how that can be four months
22  later, I couldn't possibly guess.  Maybe it's
23  a European thing.  I don't know anything
24  about European securities, so I couldn't give
25  you a good answer, but it appears to be very
```