# Exhibit 140



Neutral Citation Number: [2021] EWHC 974 (Comm)

Case No: CL-2018-000297

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Rolls Building, Fetter Lane, London EC4A 1NL

Date: 27 April 2021

**Before** :

**MR JUSTICE ANDREW BAKER**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

|  |  |
|---|---|
| **SKATTEFORVALTNINGEN (the Danish Customs and Tax Administration)** | **Claimant** |
| - and - |  |
| **SOLO CAPITAL PARTNERS LLP (in special administration) and many others** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Michael Fealy QC, Jamie Goldsmith QC, Abra Bompas, James Ruddell, James Fox &**
**K V Krishnaprasad** (instructed by **Pinsent Masons LLP**) for the **Claimant**
**Nigel Jones QC, Lisa Freeman & Laurence Page** (instructed by **Meaby & Co**) for the
**Sanjay Shah Defendants**
**Alison Macdonald QC, Tom De Vecchi, Luke Tattersall & Sophia Dzwig** (instructed by
**DWF Law**) for **the DWF Defendants**
**Philip Baker QC** (instructed by **David Rosen**, solicitor and general counsel) for **Acupay**
**System LLC**
**Adam Zellick QC & Ian Bergson** (instructed by **Reed Smith LLP**) for **Messrs Knott &**
**Hoogewerf**
**Daniel Edmonds** (instructed by **Stewarts Law**) for **the PS/GoC Defendants**
**Jas Bains**, **Daniel Fletcher**, **Jonathan Godson**, **Mankash Jain** and **Anthony Patterson**
appeared in person
The **Edo Barac Defendants**, **ED&F Man Capital Markets Ltd**, **Indigo Global Partners Ltd**,
and the **HK Defendants**, were represented by their respective solicitors, **Brown Rudnick LLP**,
**Rosenblatt Ltd**, **Keystone Law LLP** and **Howard Kennedy LLP**
The **Other Defendants** did not appear and were not represented at this trial

Hearing dates: 22, 23, 24, 25 March 2021

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This is a reserved judgment to which CPR PD 40E has applied.
Copies of this version as handed down may be treated as authentic.

**Covid-19 Protocol:**
This judgment was handed down by the judge remotely by circulation to the parties'
representatives by email and release to Bailii. The date and time for hand-down is deemed to
be 10.00 am on 27 April 2021.


.............................

MR JUSTICE ANDREW BAKER

**Mr Justice Andrew Baker :**

**Introduction**

1.    The claimant is the Danish national tax authority, which (without deciding the point) I understand to mean it is not a separate legal person from the Kingdom of Denmark. I refer to the claimant as 'SKAT' without by doing so deciding any question of its true legal nature or identity going beyond what I have just said.

2.    SKAT claims to have been induced by misrepresentations, over a three-year period from August 2012 to July 2015, to pay out as tax refunds it was not liable to pay, over DKK12.5 billion (c.£1.5 billion), 90% or more of which in the second half of that period, from March 2014. Five separate Claims have been consolidated into one action: CL-2018-000297 (70 defendants); CL-2018-000404 (25 defendants); CL-2018-000590 (8 defendants); CL-2019-000487 (9 defendants); and CL-2020-000369 (7 defendants). Allowing for overlap (some defendants are party to more than one Claim), in total 114 defendants were named. Taking account of common legal representation where that exists, at the time of this first preliminary issue trial, there were 21 separate legal teams from 18 firms of solicitors responding to SKAT's various claims, representing between them 74 of the defendants.

3.    The remaining 40 defendants, at the time of this trial hearing, were:

(i)    14 individuals litigating in person;

(ii)    12 corporate defendants litigating without representation (one of which, Acupay System LLC, acting by its general counsel, who is a qualified solicitor, instructed leading counsel for this preliminary issue argument though in general it does not presently have external legal representation);

(iii)    7 corporate defendants against whom judgment in default had been entered;

(iv)    3 corporate defendants that no longer exist (2 dissolved, 1 liquidated);

(v)    1 corporate defendant which had not yet acknowledged service;

(vi)    2 defendants (1 individual and 1 corporation) with whom SKAT had settled; and

(vii)    1 individual defendant against whom SKAT had discontinued.

4.    I was appointed as designated judge for the litigation, pursuant to section D4 of the Commercial Court Guide, in good time before the first main CMC in January 2020, at and after which I have sought actively to manage the case, with Bryan J initially, Foxton J more recently, as alternate. I described the structure of SKAT's claims and what they would involve in a ruling at the second main CMC in July 2020, [2020] EWHC 2022 (Comm). The main case management decision taken then, for the reasons given in that judgment, was that there should be three trial hearings:

(i)    Firstly, the trial of a preliminary issue whether SKAT's claims offend against 'Dicey Rule 3', which states that:

> "*English courts have no jurisdiction to entertain an action:*
> *(1) for the enforcement, either directly or indirectly, of a penal, revenue or other public law of a foreign State; or*
> *(2) founded upon an act of state*"
> (*Dicey, Morris & Collins on the Conflict of Laws,* 15th Ed., R5-019)".

This is the judgment on that first trial, the 'Revenue Rule Trial', for which the issue ordered to be tried is in these terms:

> "*Are any of SKAT's claims, as alleged, inadmissible in this court under the rule of law stated, e.g., as Dicey Rule 3 (Dicey, Morris & Collins on the Conflict of Laws, 15th Ed., para 5R-019)? If so, which claims are inadmissible and why?*"

(ii) Secondly, the 'Validity Trial', a trial of preliminary issues defined to determine foundational aspects of SKAT's allegations that the tax refund claims it says it should not have paid were not valid claims under Danish tax law. The Validity Trial has been fixed for 4-6 weeks in Michaelmas Term 2021.

(iii) Thirdly, the 'Main Trial', a massive final trial that, subject to further orders hereafter splitting it up or managing how and when different parts of the case will be considered at trial, would be designed to determine all remaining issues across all the claims SKAT has made. The Main Trial has been fixed to commence at the start of Hilary Term 2023 and to occupy the whole of 2023 plus Hilary Term 2024.

5.    SKAT submitted that the Revenue Rule Trial had to proceed, or ought to proceed, on the basis that it will prove the essential facts of its case at trial, in particular because of the way that the issue for trial was defined (see paragraph 4(i) above). That submission generated rather more heat than light, including at a pre-trial review hearing. The real issue was whether it would be fair to seek to resolve a disputed point of fact, if it would be necessary to do so in order to judge whether Dicey Rule 3 applied so as to defeat some or all of SKAT's claims, on the basis of the factual material put before the court on this trial, in the light of its case management history. In the event, I have not found it necessary to resolve contentious matters of fact to reach a final decision concerning Dicey Rule 3.

*Background*

6.    The case concerns Danish withholding tax ('WHT') deducted at source by Danish companies because under Danish tax law they had to pay SKAT 27% of dividends they declared, paying out for shareholders, net of that deduction, only 73% of the declared dividend. SKAT maintains a system for processing and paying claims for WHT refunds to which foreign (non-Danish) resident parties may be entitled under Danish tax legislation giving effect to Denmark's obligations under double taxation agreements ('DTAs') concluded by it, including DTAs particularly relevant to this litigation with the USA and Malaysia. For instance, a tax-exempt US pension plan with shares in (say) Carlsberg A/S such that it received 73% of a declared dividend on that investment would be entitled to claim a full refund of the 27% WHT paid by Carlsberg to SKAT in respect of those shares.

7.    The WHT refund system as operated by SKAT included more than one scheme. This case concerns the 'Forms Scheme', which operated by reference to a standard paper form produced by SKAT, Form No. 06.003, which had to be completed and submitted by post with supporting documents, for approval or rejection by SKAT's 'Accounting 2' department, managed at the material time by Mr Sven Nielsen. An example of a Form 06.003 was exhibited to my judgment on a summary judgment application brought by Goal Taxback Ltd ('Goal'), one of the defendants accused only of negligence, [2020] EWHC 1624 (Comm), [2020] 4 WLR 98.

8.    SKAT says it received under the Forms Scheme, and in error approved and paid, thousands of WHT refund claims that were not valid claims, in that the transactions (or purported transactions) relating to shares in Danish companies that underlay the claims did not give the applicants the WHT refund entitlement they claimed, at all (in most cases), or in the amount claimed (in some cases). By its claims, SKAT therefore seeks the return of amounts it says it was wrongly induced to pay out as tax refunds.

9.    As I have just done, I shall refer variously, in discussing SKAT's claims, to the 'return' of a tax refund wrongly paid, or to SKAT seeking to 'claw back' or 'recoup' such a refund. I think that a natural use of language, but to be clear (and of course) I do not mean the return to SKAT *in specie* of anything it transferred, or the delivery to SKAT of anything that was ever its property in Denmark. The case concerns payments by bank transfer made by SKAT by way of tax refund (as it thought). Such payments do not involve a transfer of ownership of any kind in any property owned by the payor. They involve the discharge of a debt owed to the payor by its bank and the creation of a debt owed to the payee by its bank, via intermediate 'transfers' in the inter-bank payment system.

10.   The principal focus of the main fraud allegation is the activity of Mr Sanjay Shah through his business, Solo Capital Partners LLP ('Solo'), together with other entities associated or said to be associated with Solo, at the time an apparently reputable financial services operation authorised and regulated by the FSA, later the FCA. There are further significant fraud allegations relating to the activities of individuals initially employed within Solo who, it is said by SKAT, came to use the same or similar, and allegedly fraudulent, methods of procuring SKAT to make payments using the Forms Scheme. I shall refer compendiously to the WHT applications alleged by SKAT to have been fraudulent as the 'Solo etc Applications'.

11.   The fraud allegation, and associated allegations of conspiracy, says at its core that the WHT refund claims in which defendants who are said to have been dishonest had an involvement were bad claims, and that those defendants must have realised that at the time. The primary focus, of all the causes of action said by SKAT to arise, is the information said by SKAT to be conveyed to it by a completed WHT refund claim form and the documents sent with it, and what SKAT's Accounting 2 department did with that information. It is said that misrepresentations were made thereby to SKAT that induced the approval and payment of claims, in particular because of a strong culture in Denmark of presuming the taxpayer's honesty in its dealings with SKAT.

12.   There are also claims by SKAT against various parties (e.g. Goal, as mentioned in paragraph 7 above) alleging only a liability in negligence. They include claims against parties, such as Goal, that played a part in the submission to SKAT of Solo etc Applications involving WHT refund claims now alleged to have been dishonest, and

also claims relating to WHT refund claims organised by ED&F Man Capital Markets Ltd in which no allegation of dishonesty is made against anyone ('ED&F Man Applications'). Finally, for the purposes of this introduction, there are claims by SKAT against various parties alleged to have received proceeds of or derived from SKAT's mistaken payment (as it alleges) of WHT refund claims, founded upon allegations of 'knowing receipt' or unjust enrichment. Those claims include 'proprietary claims', in which SKAT claims that assets belonging to defendants that are traceably the proceeds of fraud against it are held on trust for SKAT.

13. As well as being different in not being said to have involved dishonesty by anyone, the ED&F Man Applications differ from the Solo etc Applications in that SKAT advances a case, it may be strictly in the alternative, that is different to its case in respect of the Solo etc Applications. For most of the ED&F Man Applications (336 of 400) SKAT advances a case that if (which SKAT does not admit) the WHT refund applicant in question obtained Danish dividends, then they (the applicant) were the party with a tax liability in respect of which WHT at 27% was deducted at source, but ED&F Man and not the applicant was the beneficial owner of dividends, and for that reason the applicant was not entitled to the WHT refund paid (or any refund). In most of those cases (320 of 336), ED&F Man does not admit that any refund was paid that was not due. In the other 16 cases, ED&F Man admits that the full refund claimed and paid was not due, but says these were excessive refund claims only, where applicants with valid claims for lesser refunds sought and were paid by SKAT a full refund and therefore received more than they were due. (In the remaining 64 instances (of 400), ED&F Man admits that the applicant did not receive the dividend referred to in the refund claim and so had no valid refund claim at all.)

*Dicey Rule 3*

14. The basis for Dicey Rule 3 has been a subject for debate. The editors of *Dicey* submit that the reason foreign revenue claims are not entertained is that the assertion of such claims is an extension of a sovereign power of taxation and, *per* Lord Keith of Avonholm in *Government of India v Taylor* [1955] A.C. 491, 511: "*an assertion of sovereign authority by one State within the territory of another, as distinct from a patrimonial claim by a foreign sovereign, is (treaty or convention apart) contrary to all concepts of independent sovereignties*". I respectfully agree that that is a sound basis, and the true basis, for the rule, at all events so far as it could apply in this case.

15. A *dictum* of Learned Hand J in *Moore v Mitchell* (1929) 30 F. (2d) 600, at 604 is also often cited, including by Lord Keith, *ibid*, which has two facets: first, and akin to Lord Keith's own formulation, that "*to pass upon the provisions for the public order of another State is, or at any rate should be, beyond the powers of the court; it involves the relations between the States themselves, with which courts are incompetent to deal, and which are intrusted to other authorities*"; second, that to 'pass upon' such provisions "*may commit the domestic State [i.e. through its courts] to a position which would seriously embarrass its neighbour. ... No court ought to undertake an inquiry which it cannot prosecute without determining whether those laws [i.e. for the public order of another State] are consonant with its own notions of what is proper*".

16. Contrary to certain of the submissions by the defendants, the second facet of Learned Hand J's rationale does not arise here. It does *not* mean that SKAT's claims stand to

be dismissed because (if this be the case) the court, in order to determine them, might have to consider whether SKAT's WHT refund application system was incompetently designed or administered, or whether Mr Nielsen did an incompetent job, or perhaps even was dishonest. There is no question here of sitting in judgment over the propriety, assessed by some standard set by this court, of the Danish tax legislation that falls to be considered, or the DTAs concluded by the Kingdom of Denmark with various counterparties. The question is whether SKAT's claims seek, directly or indirectly, to enforce that tax legislation or in some other way the exercise of Danish sovereign authority.

17.     The following high level statements of principle were agreed:

(i)     Dicey Rule 3 is not a rule of jurisdiction, despite the language in which it is articulated in *Dicey*. It is a substantive rule of English law leading to the dismissal of claims falling within it, on the ground that the court will not entertain them because they involve an attempt to have the court enforce extra-territorially the exercise of sovereign authority.

(ii)    The rule demands an analysis of the substance of the claim rather than the form: the court must look past the cause(s) of action pleaded, or even (though not relevant here) the identity of the claimant, to the substance of the right sought to be vindicated, or the nature of the acts or actions upon which the claim is founded.

(iii)   Dicey Rule 3 is a rule of English law applicable whether or not English law will govern the merits more generally by reference to English law conflict of laws rules; and it is for the court to decide for itself whether, given its substance, a claim falls within Dicey Rule 3. That is not a question for Danish law, for example, even if in this case Danish law is the governing law of a particular claim.

(iv)    Whether Dicey Rule 3 applies in this case involves a question of characterisation, for any given claim, whether it is a claim to enforce, directly or indirectly, Danish revenue law, so as to fall within (as it has often been called) the rule in *Government of India* (after *Government of India v Taylor*, *supra*) and/or whether in some other way it amounts in substance to an attempt to exercise sovereign power extra-territorially.

(v)     There is a distinction to be drawn between "*an exercise of sovereign power and an action brought by a sovereign state which might equally be brought by an individual to recover losses for damage to property*" (*Mbasogo v Logo* [2006] EWCA Civ 1370, [2007] QB 846 at [67]). The latter of these has been referred to, after *inter alia* Lord Keith in *Government of India*, as a 'patrimonial' claim; "*when a state owns property in the same way as a private citizen there is no impediment to recovery*" (*Iran v Barakat Galleries Ltd* [2007] EWCA Civ 1374, [2009] QB 22 at [136]).

(vi)    There is a distinction between mere recognition of foreign penal, revenue or other public laws, or sovereign acts, including recognising the effects or consequences of the past exercise of sovereign power in the sovereign territory, for example the vesting of title to property by an act of expropriation

completed in the territory of the expropriating sovereign, on the one hand, and enforcement, on the other hand. Dicey Rule 3 is not designed to preclude or prohibit the former.

18.     It follows that Dicey Rule 3 is not avoided because SKAT's claims are for damages, personal restitutionary remedies, or proprietary remedies in respect of traceable proceeds, and the defendants are not the WHT refund applicants themselves. Dicey Rule 3 would apply to a damages claim against a party involved in the submission by a taxpayer of erroneous tax returns or in a tax evasion scheme for that taxpayer, even if the defendant's conduct involved all the ingredients of a private law cause of action, such as a damages claim for a tort, because in substance the claim would seek to enforce the underlying right to tax the miscreant taxpayer. Likewise if Dicey Rule 3 would apply, in a case of tax refunds wrongly claimed, to the foreign sovereign's claim against the refund applicant erroneously paid, then a claim by the foreign sovereign against those culpably involved in the making of the claim is equally inadmissible in this court. This was also common ground.

19.     I have included as an Appendix a fuller summary of the arguments set out by the parties in their written submissions and developed in oral argument in relation to Dicey Rule 3. The significance of this preliminary issue to the case and the resources devoted to it notwithstanding, the point raised on Dicey Rule 3 is ultimately a narrow one, and the arguments on both sides became a touch repetitive or tangential. I have not lengthened this judgment, therefore, by dealing *seriatim* with every individual argument advanced; but in preparing it, I carefully re-read and considered all of them.

*Brussels-Lugano*

20.     By the 'Brussels-Lugano regime', I refer to the system for the allocation of jurisdiction over defendants and the mutual recognition and enforcement of judgments in 'civil and commercial matters', under the Brussels Regulation (recast), Regulation (EU) 1215/2012, and the Lugano Convention. Many of the defendants were domiciled in Brussels-Lugano member states when these proceedings were served on them ('Brussels-Lugano defendants').

21.     Article 1(1) of the Brussels Regulation (recast) provides that it applies "*in civil and commercial matters whatever the nature of the court or tribunal. It shall not extend, in particular, to revenue, customs or administrative matters or to the liability of the State for acts and omissions in the exercise of State authority (acta iure imperii)*"; Article 1(1) of the Lugano Convention, to similar effect so far as material, provides that the Convention applies "*in civil and commercial matters whatever the nature of the court or tribunal. It shall not extend, in particular, to revenue, customs or administrative matters.*"

22.     SKAT argued that: (i) this is a 'civil and commercial matter', not a 'revenue, customs or administrative matter', under Article 1(1); and (ii) it is therefore not possible to invoke Dicey Rule 3 to dismiss its claims against Brussels-Lugano defendants, because to do so would be to decline to exercise a jurisdiction conferred by the Brussels-Lugano regime otherwise than in accordance with its rules. If that were correct, then any claims falling within Dicey Rule 3 would proceed against Brussels-Lugano defendants while being dismissed against other defendants.

23.     That response to reliance by Brussels-Lugano defendants on Dicey Rule 3 has the capacity to arise because:

  (i)     it is *acte clair* under the Brussels-Lugano regime that its concept of 'civil and commercial matters' – and therefore its companion concept of a 'revenue, customs or administrative matter' – is an autonomous concept that cannot differ from member state to member state,

          whereas

  (ii)    albeit a substantial element of its *raison d'etre* is an understanding that the inadmissibility of, e.g., tax claims, in the courts of a state other than the state claiming tax, is part of an accepted international order, Dicey Rule 3 is a rule of English law and its scope need not match precisely that of a 'revenue, customs or administrative matter' within Article 1(1) of the Brussels-Lugano regime, especially since there is a focus in the ECJ/CJEU jurisprudence on Article 1(1) upon matters that Dicey Rule 3 would treat as matters of form rather than substance.

**Dicey Rule 3**

*Authorities*

24.     A very early *dictum* often cited, expressing the rule that the court will not give effect to a suit to recover foreign tax, is that of Lord Mansfield CJ in *Holman v Johnson* (1775) 1 Cowp 341, at 343: "*There are a great many cases which every country says shall be determined by the laws of foreign countries where they arise. But I do not see how the principles on which that doctrine obtains are applicable to the present case. For no country ever takes notice of the revenue laws of another.*" To similar effect, *per* Abbott CJ in *James v Catherwood* (1823) 3 Dow & Ry KB 190 at 191: "*... in a British court we cannot take notice of the revenue laws of a foreign State.*"

25.     The language of never 'taking notice' of foreign revenue laws should not be taken too far. English law sets its face against actions that, in substance, have the effect, directly or indirectly, of *enforcing* here, extra-territorially, a foreign revenue law, for the benefit of the foreign sovereign authority (see, e.g., *re Visser, Queen of Holland v Drukker* [1928] Ch 877, *per* Tomlin J at 883-884).

26.     In 1950, the authorities as they then stood led Kingsmill Moore J to conclude as follows in *Buchanan v McVey* [1955] AC 516 (approved by the House of Lords in, and reported as a note to, *Government of India*), namely that:

        "*[The cases on penal laws] would seem to establish that it is not the form of the action or the nature of the plaintiff that must be considered, but the substance of the right sought to be enforced; and that if the enforcement of such right would even indirectly involve the execution of the penal law of another State, then the claim must be refused. I cannot see why the same rule should not prevail where it appears that the enforcement of the right claimed would indirectly involve the execution of the revenue law of another State, and serve a revenue demand.*" (*ibid*, at 527)

27.     The suit in *Buchanan v McVey* was not brought by the Revenue, but by Mr McVey's former company, asset-stripped by him so as to frustrate the Revenue, and its liquidator. The cause of action pleaded was not for payment of taxes, or even for a liability of Mr McVey's to the Revenue in respect of the non-payment by the company of taxes. It was for an account of moneys due to the company from Mr McVey on account of his breaches of duty as director, trustee and agent. But the rule of law recognised and applied in the case, and endorsed by the House of Lords in *Government of India*, required the court to look past those matters – they were matters of form, not substance – to see that though "*... it is sought to enforce a personal right, but as that right is being enforced at the instigation of a foreign authority, and would indirectly serve claims of that foreign authority of such a nature as are not enforceable in the courts of this country [i.e. claims for unpaid taxes], relief cannot be given.*" (*ibid*)

28.     *Government of India* itself was less indirect – the substance was closer to the surface – in that the foreign sovereign power pursuing its right to tax was the plaintiff, and the foundation of the claim was expressly its unpaid tax demand. The defendant was not the taxpayer company, but its liquidator in a voluntary liquidation, and the proceedings, under rule 108 of the Companies (Winding-up) Rules 1949, sought to reverse his refusal to admit the plaintiff's proof of debt in the liquidation. The decision was that the plaintiff's claim for the debt in question could not be enforced in the English courts, and the refusal of the proof of debt was therefore sound upon a proper construction of s.302 of the Companies Act 1948 concerning matters for which a liquidator had to make provision in a liquidation. As Viscount Simonds put it at [1955] AC 508, "*the company ... could not on the day before its resolution to wind up became effective have been sued by the Indian Government for the recovery of tax in the courts of this country. But it is said that from the moment that the company went into liquidation the situation changed, the old rule of law was abrogated, and our courts became the means of collecting the taxes of a foreign power*"; the decision was that s.302 of the 1948 Act brought about no such change.

29.     The case actually decided in *Buchanan v McVey*, i.e. that of an asset-stripped company or its liquidator suing the company's former owner for breaches of the latter's duties to the company, in substance to secure the recovery by a foreign sovereign tax authority of taxes due from and unpaid by the company, came before the English courts in *QRS 1 ApS et al v Frandsen* [1999] 1 WLR 2169. The Court of Appeal confirmed that Dicey Rule 3 applies to such a case (though it seems from the judgment of Simon Brown LJ at 2173F-G that the contrary was not seriously argued).

30.     SKAT reminds the court often that it claims to be the victim of fraud, not only of negligent or unblameworthy conduct. Not so, as regards the ED&F Man Applications, where fraud or dishonesty is not alleged at all. But in any event, in my view, the fact that in some of its causes of action against some of the defendants SKAT alleges fraud or dishonesty by those defendants, or by others in circumstances that are said to result in a liability on the part of those defendants, does not assist SKAT on the characterisation issue raised by Dicey Rule 3.

31.     Thus, for example, the issue of characterisation when comparing this case to *Government of India* itself, was encapsulated in a submission by SKAT that a claim to recover money incorrectly paid out by a tax authority, ostensibly by way of tax refund, on the faith of misrepresentations, is not properly to be characterised as the

imposition of a tax or a claim otherwise arising under a foreign revenue law, alternatively is not properly so characterised if the payee of the ostensible refund had not originally paid the tax ostensibly refunded. The defendants contend to the contrary. The point now is that the formulation of the rival contentions, and thus the question of characterisation, has no reference to the nature or degree of any fault required for liability upon any given cause of action relied on by SKAT under the system of law that in general governs it.

32.     A plea to the character of the wrongful act, by reference to the nature or degree of fault involved in it, or to any consequent lack of sympathy the court might be invited to have for the defendant pursued abroad by the sovereign claimant, or sympathy for the claimant, has never been admitted as relevant. Thus, in *Buchanan v McVey*, considered above, Mr McVey engaged in a dishonest (at 522, "*highly fraudulent*") scheme to enable his company to evade tax; in *Mbasogo v Logo*, *supra*, considered in more detail below, the allegation was of a conspiracy to overthrow the lawful sovereign and government of Equatorial Guinea by a private armed coup.

33.     The rule of law as a consequence of Dicey Rule 3, and of the essence of the public policy that rule reflects, is that *so far as concerns ordinary private law causes of action as a possible means of redress*, parties amenable to the jurisdiction of this court may engage in dishonest conduct whereby to defraud a foreign sovereign tax authority in respect of its tax-collecting activities and, as Kingsmill Moore J put it in *Buchanan*, at 517, "*snap [their] fingers in the face of a disgruntled [foreign] Revenue.*" That was said as part of the judge's description of the intent behind Mr McVey's exercise in corporate asset-stripping and personal relocation to Ireland, the imposition on his companies by the Finance Act 1943 of an element of retroactive taxation having, as the judge put it, *ibid*, "*called forth the resources of his ingenuity*".

34.     The decision in the case, endorsed and relied on by the House of Lords in establishing the rule in *Government of India*, was that in an Irish court, Mr McVey could indeed snap his fingers at the Scottish Revenue exactly as he had planned; and if that be thought unacceptable to the foreign sovereign (in that case, the British Crown), the remedy was to seek a solution in the public international law arena by Treaty, Convention or other inter-state cooperation or mutual assistance, if any be available (for example, in modern times, by EU legislative instruments such as the Mutual Assistance Recovery Directive (Tax etc.), Directive 2010/24/EU ('MARD')). That is the way to ensure – which, again, is at the heart of the public policy given effect by Dicey Rule 3 – that if (for example) English companies are to be pursued here by tax demands from SKAT, then in a reciprocal and equivalent way Danish companies may be pursued there by tax demands from HMRC (or, if not so, only because an asymmetrical supranational arrangement has been concluded, in which case the asymmetry would be a matter of sovereign choice on the part of the Crown, acting by HMG). In short, there is no cause of action under English law, which in this respect overrides ordinary choice of law rules (see paragraph 17(iii) above), for fraud on a foreign revenue.

35.     That is not to say a foreign sovereign tax authority cannot bring a fraud claim here. Not every fraud against a foreign sovereign tax authority will be a fraud on the foreign revenue for which it is responsible. It will depend on the nature and subject matter of the fraud. A claim by SKAT alleging against a contractor that it had dishonestly overcharged SKAT for work done or services supplied, using inflated

invoices overstating what was done or the time spent, would be governed by the ordinary rules of the law of contract, tort/delict, restitution, or as the case may be depending on the cause of action pursued, of the system of law that applied under ordinary choice of law rules; that would not be "*a claim that, by its nature, involves the assertion of a sovereign right*", but a claim arising "*from acts that may be done not only by the King, but also by anyone else: "actus qui a rege sed ut a quovis alio fiant"*", to quote *Mbasogo v Logo*, *supra*, at [43], adopting an articulation of the essential nature of a patrimonial claim that may be brought by a foreign sovereign as much as by a private party in an article by Dr Mann, "*The International Enforcement of Public Rights*" (1987) 19 New York University Journal of International Law and Politics 603, at 629-630. Dr Mann there concluded that "*Careful assessment and delimitation is required. The decision will not always be an easy one. Nor will the results always be universally approved, for in many cases they will depend upon legal judgment or instinct. What should not be open to dispute is the starting point and the purpose of the reasoning. ... The true question is whether in substance the claim asserts a public right.*"

36.     The notion of a patrimonial claim capable of arising as much for a private party as for a foreign sovereign and therefore admissible when pursued by the latter as much as when pursued by the former, in contradistinction to an inadmissible sovereign claim, has been developed in relation to claims of wrongful interference with goods. Where the foreign sovereign seeks only to vindicate a title to goods in the same way as might a private party with the same kind of title to goods, the claim will be admissible, even if the title was acquired through the territorial exercise of a sovereign power, e.g. by expropriation or confiscation completed within the sovereign's territory.

37.     In that context, the rule of English law is that effect will only be given to a title purportedly conferred by a foreign penal or tax law or power (for example a prerogative power of forfeiture or confiscation) if the goods had been reduced into the possession of the sovereign whilst within their territory to perfect their title. Where that had never occurred, a claim here for wrongful interference with the goods founded upon title said to be derived from the foreign public law or exercise of sovereign power is inadmissible as an attempt, in substance, to give that law or exercise of power extra-territorial effect.

38.     In *Brokaw et al v Seatrain UK Ltd* [1971] 2 QB 476 household effects belonging to Mr and Mrs Shaheen, who were liable to tax in the US as citizens and residents there, were carried from the US to Southampton by the US-flagged *Transoregon*, owned by Seatrain Lines Inc, a US company, consigned to Interdean Ltd, an English company, for ultimate delivery to Mr and Mrs Shaheen's son-in-law, Mr Brokaw. The US Treasury served a notice of levy on the shipowners demanding that they surrender Mr and Mrs Shaheen's belongings, with a view to securing the payment of taxes by them. The notice of levy was served when the ship was on the high seas.

39.     The US Government's claim to be awarded possession of Mr and Mrs Shaheen's belongings was denied, though in form it was not a claim for payment of any tax debt. The cargo had never been in the US Government's possession; any claimed right to possession derived solely from US tax law giving effect under US law to the notice of levy. The claim therefore failed as being, in substance, a claim for the enforcement here of that foreign revenue law. Lord Denning MR explained the decision as follows, at 482G-H:

"*It is well established in English law that our courts will not give their aid to enforce, directly or indirectly, the revenue law of another country. ... The United States Government submit that that rule only applies to actions in the courts of law by which a foreign government is seeking to collect taxes, and that it does not apply to this procedure by notice of levy, which does not have recourse to the courts. I cannot accept this submission. If this notice of levy had been effective to reduce the goods into the possession of the United States Government, it would, I think, have been enforced by these courts, because we would then be enforcing an actual possessory title. There would be no need for the United States Government to have recourse to their revenue law.*";

and at 483C-D, having concluded that the notice of levy was not sufficient to reduce the cargo into the possession of the US Government:

"*... the United States Government are seeking the aid of these courts. They come as claimants in these interpleader proceedings. By doing so they are seeking the aid of our courts to collect tax. It is not a direct enforcement (as it would be by action for tax in a court of law), but it is certainly indirect enforcement by seizure of goods. It comes within the prohibition of our law whereby we do not enforce directly or indirectly the revenue law of another country.*"

40.     In *A-G of New Zealand v Ortiz* [1984] AC 1, the Government of New Zealand (the effective plaintiff) was refused delivery up of a great carved totaro wood door, an important Maori artefact, that had been exported from New Zealand in breach of the New Zealand Historic Articles Act 1962, s.12(2) of which provided for such unlawfully exported artefacts to be forfeited to the state. The final decision in the case, by the House of Lords, was that s.12(2) did not purport to vest any title to the door in the state without its being seized.

41.     The Court of Appeal had also taken that view of s.12(2), differing from Staughton J at first instance. In his speech in the House of Lords, with which the other Law Lords agreed without adding anything, Lord Brightman did not consider whether New Zealand's claim would still have failed if s.12(2) had been to different effect. The Court of Appeal dealt fully with that question, *obiter*, concluding that indeed the claim would still have failed:

(i)      Lord Denning MR concluded, at 24E, G-H, after a masterly review of the law, that: "*... if any country should have legislation prohibiting the export of works of art, and providing for the automatic forfeiture of them to the state should they be exported, then that falls into the category of "public laws" which will not be enforced by the courts of the country to which it is exported, or any other country, because it is an act done in the exercise of sovereign authority which will not be enforced outside its own territory*"; "*The retrieval of such works of art must be achieved by diplomatic means. Best of all, there should be an international convention on the matter where individual countries can agree and pass the necessary legislation.*"

(ii)     Ackner LJ put it thus, *ibid* at 33H-34C: "*... the claim is made by the Attorney-General on behalf of the state. It is not a claim by a private individual. Further, the cause of action does not concern a private right which demands reparation or compensation. It concerns a public right – the preservation of*

> *historic articles within New Zealand – which right the state seeks to vindicate. … The vindication is sought through confiscation. … It seems to me to be wholly unreal to suggest that when a foreign state seeks to enforce these forfeiture provisions in another country, it is not seeking to enforce a foreign penal statute. No doubt the general purpose of the Act of 1962 is to preserve in New Zealand its historic articles. However, this does not mean that a suit to enforce the forfeiture provisions contained in section 12 is not a suit by the state to vindicate the public justice.*"

(iii)    O'Connor LJ agreed with both.

42.    In *Mbasogo v Logo*, *supra*, at [41], before quoting from and agreeing with Dr Mann as I mentioned in paragraph 35 above, the Court of Appeal said that: "*The importance of the speech of Lord Keith in <u>Government of India</u> … and the judgment of Lord Denning MR in … <u>Ortiz</u> … is that they both sought to explain the rationale for the well established rule that the courts will not enforce the penal and revenue laws of another country. In short, it is that the courts will not enforce or otherwise lend their aid to the assertion of sovereign authority by one state in the territory of another. The assertion of such authority may take different forms. Claims to enforce penal or revenue laws are good examples of acts done by a sovereign by virtue of his sovereign authority ("jure imperii"). In each case, it is necessary to see whether the relevant act is of a sovereign character. Penal and revenue laws are assumed to be of a sovereign character.*"

43.    More recently, considering and explaining the decisions in *Brokaw* and *Ortiz*, the Court of Appeal in *Government of Iran v Barakat*, *supra*, held that title to certain antiquities, and an immediate right to possession, vested in Iran prior to their removal to England, an illegal export according to Iranian law. The claim here founded upon that title therefore did not fail on the basis of Dicey Rule 3. There was a distinction to be drawn by reference to how the foreign sovereign claimed to have acquired the title it asserted to justify a claim to goods situated abroad at the time of the suit:

> "*148. … the distinction between the two categories of case, those where the foreign state will be able to claim its property in England even if it has not reduced it into its possession, and those where it may not claim unless it has reduced the property into its possession, depends on the way in which it has acquired ownership. If it has acquired title under public law by confiscation or compulsory process from the former owner then it will not be able to claim the property in England from the former owner or his successors in title unless it has had possession. If it has taken the property into its possession then its claim will be treated as depending on recognition; if it has not had possession it will be seeking to exercise its sovereign authority.*
>
> *149. But in these proceedings Iran does not assert a claim based on its compulsory acquisition from private owners. It asserts a claim based upon title to antiquities which form part of Iran's national heritage, title conferred by legislation that is nearly 30 years old. This is a patrimonial claim, not a claim to enforce a public law or to enforce sovereign rights. We do not consider that this is within the category of case where recognition of title or the right to possess under the foreign law depends upon the state having taken possession.*"

44.     The subject matter in *Barakat* was found objects of antiquity and value with no known or identifiable owner, i.e. treasure trove. Title in such objects as found, and any question of an immediate right to possession of them in the hands of the finder, was governed by Iranian law as the *lex situs*; the Iranian legislation referred to by the Court of Appeal at [149] was part of that law. There was no extra-territorial enforcement of sovereign authority, in the sense eschewed by Dicey Rule 3, in proceeding to determine the claim brought here from the starting point, as a matter of Iranian legal fact, that pursuant to that legislation the Iranian State owned and had an immediate right to possession of the artefacts, at and from the moment they were found, just as there would have been no difficulty of admissibility of the claim if the legislation had conferred title upon the owner of the land on which they were found, if they had been found on privately owned land, and that owner had been the plaintiff. Either way, the founding original tort, committed in Iran, was a conversion by the finder in keeping the artefacts for themselves upon finding them.

45.     The Iranian legislation, therefore, was not by nature confiscatory. Though there were provisions in the legislation that were penal in nature, indeed it was "*in large part penal in that it created criminal offences with criminal penalties for unlawfully excavating or dealing with antiquities*", the provisions in relation to ownership of antiquities when found, which were all that Iran needed, "*were not penal or confiscatory. They did not take effect retroactively. They did not deprive anyone who already owned antiquities of their title to them. They altered the law as to the ownership of antiquities that had not yet been found, with the effect that these would all be owned by the state, subject to the entitlement of the chance finder to a reward*" (*ibid*, at [111]).

46.     If the rule of Iranian law for treasure trove had been 'finders, keepers', but an Iranian statute had rendered the artefacts liable to forfeiture to the state in certain subsequent circumstances, e.g. an unlicensed export as in *Ortiz*, then Dicey Rule 3 would have applied. If that had been the case, the Court of Appeal said, *obiter*, that as a matter of policy a claim by a state to recover antiquities forming part of its national heritage should not then be shut out by Dicey Rule 3. More precisely, the view expressed (at [163]) was that as a matter of public policy Dicey Rule 3 should not ground a "*refusal to recognise the title of a foreign state, conferred by its law, to antiquities unless they had come into the possession of such state ...*". Read in context, this seems to me to be a view, *obiter*, contrary to the view taken, also *obiter*, in *Ortiz*, that the English court *would* give extra-territorial effect to foreign confiscatory legislation if it served the interest of the protection of the foreign State's cultural heritage. It will not be necessary to consider at any length that more difficult aspect of *Barakat*.

47.     In *Barakat*, where the claim was for wrongful interference with goods, the effect of applying Dicey Rule 3 (had it applied) was described as a refusal to *recognise* a title conferred by foreign law; so it is not correct to say without more that the essence of Dicey Rule 3 is a dichotomy between recognising and enforcing a foreign law or its effects. A claim founded upon and vindicating Iran's title to found objects was enforced here, and that title was derived from the Iranian treasure trove legislation. The cases arising out of alleged wrongful interference with goods also indicate that it is not sufficient, for Dicey Rule 3 to apply, that a foreign law relied on by the claimant to establish its title to sue is penal (confiscatory) in character.

48.     The point that emerges from these authorities, leaving aside the controversial invocation of public policy, *obiter*, in *Barakat*, is that under English law the exercise of a sovereign penal (confiscatory) power is not accepted as being capable of vesting ownership of or a right to possession in goods *extra-territorially*, i.e. of granting proprietary or possessory title to goods situated beyond that sovereign's borders at the time of the (purported) vesting of title. As Dr Mann put it in "*Prerogative Rights of Foreign States and the Conflict of Laws*" (1955) 40 Tr Gro Soc 25, at p.27: "*The distinction between the application and the enforcement of foreign laws ... is a fruitful one, provided the term "enforcement" is understood in a narrow sense. Every law that is being applied may be said to be enforced. The peculiar enforcement envisaged [by Dicey Rule 3] pre-supposes that it is a foreign State or one of its instrumentalities that asserts before an English Court the public authority conferred upon it by its own law.*"

49.     *Williams and Humbert Ltd v W&H Trade Marks (Jersey) Ltd* [1986] 1 AC 368 was therefore similar to the wrongful interference cases, but *a fortiori*, relating to shares rather than goods. English and Spanish companies pursued claims that existed prior to and independently of certain expropriation decrees vesting control over the Spanish companies in the Kingdom of Spain. It did not offend Dicey Rule 3 to admit those claims. The Spanish state ownership of the Spanish companies, achieved through expropriation, was not material to the claims, and in any event the expropriation had been completed in Spain, so the English court was not being asked to grant relief by which, directly or indirectly, the Kingdom of Spain might attain it.

50.     The decision in *Williams and Humbert Ltd* says nothing on the question of characterisation that arises in this case, but observations of Lord Mackay of Clashfern about *Buchanan v McVey* and *Government of India* were relied on by SKAT. Lord Mackay said this, at 440D-441A:

> "*From the decision in the <u>Buchanan</u> case ... counsel for the appellants sought to derive a general principle that even when an action is raised at the instance of a legal person distinct from the foreign government and even where the cause of action relied upon does not depend to any extent on the foreign law in question nevertheless if the action is brought at the instigation of the foreign government and the proceeds of the action would be applied by the foreign government for the purposes of a penal revenue or other public law of the foreign State relief cannot be given. ... Most important there was [in <u>Buchanan</u>] an outstanding revenue claim in Scotland against the company which the whole proceeds of the action apart from the expenses of the action and the liquidation would be used to meet. No other interest was involved. ...*
>
> *Having regard to the questions before this House in <u>Government of India</u> ... I consider that it cannot be said that any approval was given by this House to the decision in the <u>Buchanan</u> case except to the extent that it held that there is a rule of law which precludes a state from suing in another state for taxes due under the law of the first state. No countenance was given ... to the suggestion that an action in this country could be properly described as the indirect enforcement of a penal or revenue law in another country when no claim under that law remained unsatisfied. The existence of such unsatisfied claim to the satisfaction of which the proceeds of the action will be applied appears to me to be an essential*

> *feature of the principle enunciated in the* <u>Buchanan</u> *case ... for refusing to allow the action to succeed.*"

51.     That explanation of *Buchanan v McVey* and *Government of India* supports the defendants' argument in this case, subject to the prior question, which is the real question here, whether SKAT's unsatisfied claim to recoup what it paid out by mistake is to be regarded for the purposes of Dicey Rule 3 as a revenue claim. The claim that in *Buchanan* the liquidator's suit sought in substance indirectly to enforce was the Revenue's claim against the company for unpaid tax. That was, without room for argument concerning characterisation, an "*outstanding revenue claim*" or a "*claim under [a foreign revenue] law [that] remained outstanding*". Lord Mackay cannot sensibly be taken to have been expressing a view on the point raised by this case, and not raised by or considered in *Williams and Humbert Ltd*, which is whether, as the defendants say, there is no material distinction for the purpose of Dicey Rule 3, between a claim for tax due and unpaid, and a claim for the return of a tax refund mistakenly granted and paid.

52.     If the defendants are right about that, then SKAT's unsatisfied claims for the return by the WHT refund applicants of tax refunds wrongly paid to them fulfil Lord Mackay's requirement. If not, then Lord Mackay's requirement is not fulfilled, but that will be because of the decision as to characterisation made now, not because what Lord Mackay said somehow already decided it.

53.     Whether it is material to distinguish between, on the one hand, taxes due and unpaid, and, on the other hand, tax refunds or credits wrongly granted and not returned, was considered but in a different context by some of their Lordships in *Revenue and Customs Commissioners v Total Network SL* [2008] UKHL 19, [2008] 1 AC 1174. In that case, HMRC sued a Spanish company alleging participation in VAT missing trader carousel frauds. The claim was for damages for an unlawful means conspiracy causing loss to the Revenue.

54.     In a missing trader carousel fraud against the UK VAT system: Company X, in another EU member state, would sell goods to Company Y, in the UK, a zero-rated supply for VAT purposes; Company Y would sell to Company Z in the UK, charging VAT; Company Z would sell to Company X, zero-rated; and Company Y would become the missing trader by failing to account in the UK for the VAT charged to Company Z.

55.     There might be more intra-UK sales, not just a single sale, Y to Z; one or more of the UK links in the chain, other than Y, might be privy to the fraud, but not necessarily; that is true even of Z, i.e. they need not necessarily be privy. Ignoring any profit margins, likely to be very small, in any links in the sales chain, and since the goods start and finish with X, the substantial net value transfer is from HMRC to X/Y, the dishonest traders, through Z paying VAT to Y and claiming that amount from HMRC but Y not paying VAT to HMRC. It might be thought natural to see HMRC's loss as the VAT not paid by Y, if a failure by a tax authority to collect tax can be seen as a loss for the purposes of a common law damages claim; or it might be said that the dishonest scheme causes HMRC to pay money away to Z, a loss to HMRC in the amount paid which would be repaired by a recovery from Y but which, if unrepaired, is the loss for which damages may be awarded. If Z is privy, it may not be difficult, in addition, to construct a case around implied representations in its VAT return

inducing HMRC to make a refund, again so as to argue that HMRC's loss is that refund.

56.     There was an argument that by the damages claim HMRC was "*levying money for or to the use of the Crown*" without legislative basis, contrary to article 4 of the Bill of Rights (1689). That argument was rejected – pursuing a damages claim, even if the loss was a loss of tax revenue, was not itself the levying of tax under article 4 – but the House of Lords divided 3:2 on whether the Value Added Tax Act 1994 ('the VAT Act') created a code so exhaustively defining HMRC's rights and remedies in relation to VAT as to preclude the claim. Lord Scott, Lord Walker and Lord Mance said it did not; Lord Hope and Lord Neuberger dissented.

57.     SKAT relied on *Total Network* in its written submissions, and Acupay responded in some detail, but I do not think it assists in deciding the issue in this case. Foreign taxation was not involved; *Total Network* is not a case on Dicey Rule 3 at all.

58.     In *HMRC v Shahdadpuri et al* [2011] SGCA 30, a claim by HMRC alleging involvement in VAT carousel frauds said to have been masterminded by a Danish company, Sunico ApS, was struck out on the basis that it offended against Dicey Rule 3. The Singapore Court of Appeal allowed an appeal, reasoning that the law was not clear enough for a strike-out and saying:

        (i)     at [39]-[40], that the decision in *Total Network* "*was not a ruling that <u>as a general principle of law</u>, any conspiracy claim for carousel fraud was not a prerogative claim for tax or the levying of tax*", and "*was arrived at in the context of a <u>purely domestic</u> dispute governed by UK law … . It does not necessarily follow that under Singapore law, the Appellant's claim … which is similar to the claim in <u>Total Network</u> would not be regarded as an indirect revenue claim or as a claim to enforce the interests of the UK government*"; and

        (ii)    at [42], that "*… the Appellant's central interest in bringing the Present Claim was to recover the money which it had paid to the Exporter pursuant to the latter's claim for reimbursement of input tax. But, this still raised the question of whether the Appellant's claim could legitimately be characterised as an action to enforce the sovereign rights or interests of a foreign state. … This was a novel and complex issue of law which … merited a fuller consideration of the revenue rule and/or the rule against enforcing the sovereign rights of a foreign state (given, especially, the evolving environment of increasing cooperation between states to combat transnational crime)*".

59.     The VAT carousel frauds alleged against Sunico ApS were also considered by the CJEU, in the context of the Brussels-Lugano regime, and I deal with the CJEU's decision below (at paragraph 142*ff*). In a Case Comment on *Sunico* (C-49/12, *Revenue and Customs Commissioners v Sunico ApS* [2014] QB 391) that referred also to *Total Network* and certain US decisions, "*The enforcement of foreign revenue laws*" (2014) 130 LQR 353, Lord Collins took it to be plain that a claim by a foreign revenue authority brought in an English court for damages in respect of a VAT carousel fraud on that foreign revenue would be "*an inadmissible claim for the indirect enforcement of foreign taxes*" (*ibid* at 354). I refer to Professor Briggs' writing when considering *Sunico*. He puts forward argument on its consequences for *QRS v Frandsen*, *supra*,

not all of which I accept. At this point, I note that Prof Briggs seems to agree (as his argument assumes without demur) that the tort claims made in *Sunico* (which were the same as those made in *Total Network*) are within the scope of Dicey Rule 3 on the law as it stands, given the approval of *Buchanan v McVey* by the House of Lords in *Government of India*.

60.     That brings me finally, and on the facts most exotically, to the claim by the President and Government of Equatorial Guinea that Simon Mann, a former British Army officer turned private security contractor and mercenary, was part of a plot to seize control of Equatorial Guinea, intent on seizing control of the state and its assets, especially its oil and gas reserves, killing or abducting the President, Teodore Mbasogo, and installing in his place Severo Moto, a national of Equatorial Guinea living in Spain. The losses for which damages were claimed comprised (1) costs incurred in responding to or otherwise by reason of the conspiracy alleged, including costs incurred in the detention and prosecution of suspects and costs of increased security in the country, and (2) damage to the nation's commercial activities causing economic loss, including through delay to major infrastructure projects (see [2007] QB 846 at [19] on 862-864, quoting from the particulars of claim in the English proceedings).

61.     In *President of the State of Equatorial Guinea et al v The Royal Bank of Scotland International et al* [2006] UKPC 7, the Privy Council allowed an appeal from the Guernsey Court of Appeal, restoring a *Norwich Pharmacal* order granted at first instance in support of the substantive claim to be pursued in England. In doing so, however, their Lordships:

(i)      expressed disquiet (at [23]) that no point had been taken on whether the *Norwich Pharmacal* claim should have been dismissed under Dicey Rule 3;

(ii)     said (at [24]) it was "*well arguable that the claims which the appellants say they wish to make in the English proceedings represent an exercise of sovereign authority, namely the preservation of the security of the state and its ruler*", the issue being "*whether the "central interest" of the state bringing the action is governmental in nature*" (a reference to the approach of the High Court of Australia in the *Spycatcher* case, *A-G (United Kingdom) v Heinemann Publishers Australia Pty Ltd* (1988) 165 CLR 30 at 46); and

(iii)    therefore (see at [28]), though they restored the *Norwich Pharmacal* order, directed that it be suspended pending a decision in the English court on the viability of the substantive claim.

62.     That decision came in *Mbasogo v Logo*, *supra*, and was that the claim fell to be dismissed under Dicey Rule 3. The main conclusion of principle, *ibid* at [50], was that:

"*The critical question is whether in bringing a claim, a claimant is doing an act which is of a sovereign character or which is done by virtue of sovereign authority; and whether the claim involves the exercise or assertion of a sovereign right. If so, then the court will not determine or enforce the claim. On the other hand, if in bringing the claim the claimant is not doing an act which is of a sovereign character of by virtue of sovereign authority and the claim does not*

> *involve the exercise or assertion of a sovereign right and the claim does not seek to vindicate a sovereign act or acts, then the court will both determine and enforce it. ... In deciding how to characterise a claim, the court must of course examine its substance, and not be misled by appearances ... .*"

63.    The Court of Appeal concluded at [63] that "*none of the pleaded claims is enforceable in our courts. Just as a claim for taxes is "an extension of the sovereign power" to use the words of Lord Keith in <u>Government of India</u> ... [at] 511, so too is a claim for relief (damages and an injunction) arising from the claimants' exercise of sovereign power in responding to the alleged attempted coup by the defendants.*"

64.    That conclusion was said at [64]-[66] to be fortified by policy considerations around the undesirability of the court sitting in judgment over aspects of the claimants' conduct in their response to the attempted coup they alleged. I agree with Mr Fealy QC that this invocation of a species of comity concern was not a ground for the decision, which rested squarely "*on the distinction ... between an exercise of sovereign power and an action brought by a sovereign state which might equally have been brought by an individual to recover losses for damage to property*" (*ibid* at [67]). The degree to which entertaining a claim might tend to a need to consider matters it might be thought unseemly for the English court to decide, because they seem more apt for international relations between sovereigns, might inform a decision on the issue of characterisation; but that does not make a potential for embarrassing HMG in international relations a ground for rejecting a claim if, properly characterised, it is not, in substance, a claim to give extra-territorial effect to foreign public laws or sovereign powers.

65.    That reading of the basis of decision in *Mbasogo* is confirmed by *Barakat*, *supra*, where (at [123]) the Court of Appeal concluded that: "*... the <u>Mbasogo</u> case ... is not ... a case involving the attempted enforcement of foreign public law. Although the court approved the residual category of "other public law" [i.e. in Dicey Rule 3 as stated in the textbook] the <u>ratio</u> is that a claim involving the exercise or assertion of a sovereign right is not justiciable. This is not far removed from the test adopted by the High Court of Australia [in <u>Spycatcher</u>], and the Court of Appeal [in <u>Mbasogo</u>] accepted, at para 50, the correctness of the expression of opinion by the Privy Council [in <u>Equatorial Guinea v RBS</u>], which itself appears to give some approval to [that] test ...*"

66.    It is inherent in the Court of Appeal's decision in *Mbasogo* (paragraph 62 above) that, in the context of Dicey Rule 3, *how loss was suffered* is an aspect of identifying the substance of the claim, in order to determine whether it is sovereign in character. That is confirmed and reinforced by how the Court of Appeal dealt with the heads of loss alleged, at [58]-[59]:

> "*58.   The special damages claimed ... are in respect of losses incurred as a direct result of their response to the alleged conspiracy. ... With one possible exception, they are losses which could only be suffered by the governing body of the state. They arose as a direct result of the government's decisions as to how to respond to the conspiracy and (subject to the possible exception) are of a kind that could not be suffered by anyone else.*

> *59.    The possible exception is [the plea] that, as a result of the defendants' actions, projects for roads and other civil engineering works were delayed by reason of the exodus of foreign nationals "in the wake of the coup". In our judgment, it is artificial to describe these losses as property losses caused by the defendants' actions and treat them as if they were similar in kind to, for example, the cost of repairing a government building damaged in the course of a coup. It is clear from ... the pleading that it was not the defendants' action alone which caused the foreign nationals to leave. It was the claimants' declaration of a state of emergency and the security checks carried out ... which affected the willingness and ability of foreign nationals to continue working in Equatorial Guinea. In our view, on a proper analysis, the [subject] losses do not fall into a different category from the other losses.*"

67.    I therefore accept a submission by Ms Macdonald QC that in considering the question of characterisation raised by Dicey Rule 3, the mechanism of harm is important – how it is said that allegedly wrongful conduct caused the harm in respect of which the claimant pursues a claim, including the nature (character) of any actions (including decisions) of the sovereign that were involved. It may indeed be central to the analysis in a claim brought by a sovereign entity against private parties alleging tortious conduct (e.g. deceit, conspiracy, negligence), as it was in *Mbasogo*. How the claim is put against the defendants is treated by Dicey Rule 3 as a matter of form rather than substance. The whole point of the rule, exemplified by *Buchanan v McVey* or *Mbasogo*, is to look past the fact that the claim has been framed in a way that a claim might be framed between private parties, treating that as a matter of form, to examine and identify the central interest served by the pursuit of the claim. Considering the mechanism of harm, as alleged, including the sovereign function (if any) involved therein, at the level of the factual detail of the particular case (not in the abstract as, for example, 'additional personnel costs' or 'payments induced by fraud'), is both appropriate and likely to be unavoidable in that exercise.

68.    In *Mann* (1987), *supra*, some consideration is given to the characterisation, for the purpose of Dicey Rule 3, of certain types of claim by sovereign authorities for the return of benefits conferred on private parties. There is criticism of a decision in Germany to refuse as inadmissible a claim by the Dutch State to recoup unemployment benefits alleged to have been obtained fraudulently by a defendant who had emigrated to Germany (*ibid*, at 613-614). The true issue, it is argued, "*should have been whether the Dutch claim involved the assertion of Dutch sovereign power within Germany*"; and it is submitted that it did not. Dr Mann then generalised the thought (*ibid*, at 617*ff*), suggesting a category of claim that should not be caught by Dicey Rule 3, namely where a foreign state or public authority "*asserts a public right that in substance is so close to a private right that there should be no objection against its enforcement.*" He returned to the Dutch unemployment benefits case (*ibid*, at 624-625) to compare it to *Regierungspraesident Land Nordrhein-Westfalen v Rosenthal* 17 A.D.2d 145, 232 N.Y.S.2d 963, in which a defendant had received payments to which he was not entitled under a German indemnification law, section 7 of which entitled Nordrhein-Westfalen to repayment: "*The action succeeded. The Appellate Division acknowledged that section 7 created a public right, but held that "[t]he object of the action is not 'vindication of the public justice', but 'reparation to one aggrieved.'*" This, indeed, is the decisive point: damages for fraud were in issue.*"

69.    Other examples identified by Dr Mann included: a claim by the Municipality of
       Vienna to recoup the cost of work carried out on the defendant's house in his absence
       to prevent danger to adjoining properties; a defendant in receipt of social security
       subject to a conditional obligation to repay if later having the means to do so; student
       'loans' ("*education expenses advanced by the state on the condition that the student
       repay them by instalments once he begins to receive a salary*"). In such cases, Dr
       Mann suggested (*ibid*, at 618-619):

       "… *a state's claim should be allowed to succeed because it concerns payment
       for, or repayment of, a benefit that was voluntarily accepted. While the claim may
       have its basis in the state's sovereign rights, its substance is of a commercial or
       private law character. Thus, the state should be allowed to maintain a claim for
       repayment when it discharges the defendant's liabilities by paying maintenance
       to the defendant's spouse or child, or when it pays damages to the victim of an
       accident and then through assignment seeks indemnification from the defendant-
       wrongdoer.*

       *Perhaps the decisive feature of all these cases is that in the last resort the claim
       arises due to the defendant's voluntary act, or to phrase it differently, the
       defendant could have avoided the assertion of claims against him. Municipal
       Council of Sydney v Bull illustrates this distinction. In that case, an Australian
       municipality carried out improvements of a road on which the defendant's house
       was situated. By virtue of a local statute, the municipality held the defendant
       liable for a proportionate contribution payment. The claim in England failed
       because, among other reasons, it concerned a charge analogous to a tax.
       Although the defendant derived some advantage from the plaintiff's work, the
       benefit was imposed upon the defendant independently of his own will. Therefore,
       there is a marked difference between Bull and the Vienna case …, where the
       municipality acted for the benefit or at the (imputed) request of the defendant.*"
       (*Municipal Council of Sydney v Bull* is reported at [1909] 1 KB 7.)

70.    Dr Mann's comment that in the *Nordrhein-Westfalen* case what was decisive was that
       the claim was for damages for fraud is over-stated, if it means that where a claim is so
       framed it cannot fall within Dicey Rule 3. I do not imagine that was Dr Mann's intent,
       however, for that would be to judge on form, not substance, and as Dr Mann put it 30
       years earlier (*Mann* (1955), *supra*, at 35): "*It is … certain that in these matters the
       Court will not allow itself to be misled by appearances: on the contrary, it will
       investigate whether what the plaintiff asserts is in substance a prerogative right the
       direct or indirect enforcement of which is being sought. Thus if in truth a prerogative
       right is being asserted, the Court will reject it, although the claimant is a person other
       than the foreign State and although the claim sounds in contract or in tort.*"

71.    I did not understand Mr Fealy QC to submit that where SKAT alleges fraud (or
       conspiracy to defraud), that without more, i.e. the mere fact that SKAT so frames the
       claim, takes the claim in question outside Dicey Rule 3. However, he did rely on Dr
       Mann's discussion of payments for, or repayments of, benefits conferred by a public
       body, together with *Briggs* (2014), "*Private International Law in English Courts*", at
       3.193, contrasted with a Scottish case mentioned by Dr Mann, *Metal Industries
       (Salvage) Ltd v Owners of the S.T. "Harle"* 1062 S.L.T. 114, to submit that claims
       arising out of the defendant's voluntary act, where the defendant could have avoided

the assertion of the public body's claim, should always be held to fall outside the Rule.

72.     In my judgment, that takes Dr Mann's thought too far. The question raised by each of the examples Dr Mann considered is whether the public authority's particular claim, framed as a claim for payment for or repayment of a benefit conferred, is in substance a claim to tax the defendant (or to levy payment from him akin to tax), *given the nature of the benefit allegedly conferred and how it was conferred*. In none of the examples did the benefit itself have anything to do with taxation; an alleged obligation to pay for (or repay) a non-tax benefit looks like taxation only where, as in *Municipal Council of Sydney v Bull*, it is imposed by an exercise of sovereign authority over the defendant. In this jurisdiction today, we would immediately identify the claim in *Bull*, and reject it accordingly, as effectively a claim for council tax, albeit made under a specific local law providing for a particular public road improvement scheme rather than under legislation that was by name a taxation statute.

73.     That SKAT's submission takes Dr Mann's observations too far can also be seen by marking that the decision by an international investor to invest in Danish shares is a voluntary act. That would not allow SKAT to pursue the investor here for dividend tax, if SKAT did not operate a WHT scheme in relation to dividend tax. Dicey Rule 3 would lead straightforwardly to the dismissal of the claim. Then take the case of an excessive refund claim by such an investor, where there is a WHT scheme, pursuant to which he receives a tax refund payment to which he was not entitled. Suppose 27% WHT and a full refund, but a true refund entitlement of only 12% (i.e. a true tax rate for the investor, taking into account an applicable DTA, of 15%). When SKAT pursues the investor for the excessive refund, there is on any view a serious argument that it is, in substance, seeking thereby to enforce its right to tax the investor at 15%, the upshot of the WHT collection and excessive refund having been that the investor was taxed at the time at 0%. That making the application for a full refund was a voluntary act on the part of the investor is to my mind neither here nor there in judging that argument.

74.     So while, in the case of a non-tax benefit conferred at the request of the defendant, Dr Mann suggested that the request rather than any sovereign authority should be seen as, in substance, the source of any alleged obligation to pay for, or return, the benefit, that suggestion does not address the question of characterisation of a claim to recoup a tax refund wrongly paid out. As a result, it is not necessary to express a view on the correctness of Dr Mann's particular examples, but for instance, the proper characterisation of student 'loan' repayment obligations may be a nice one, given the functional equivalence of student loans to an additional income tax upon graduates, depending on earnings.

*Applicable Principles*

75.     I draw from that review of the authorities the following principles:

        (i)     A claim is not admissible before this court if, in substance, it is a claim directly or indirectly to enforce the Kingdom of Denmark's sovereign right to tax dividends declared by Danish companies.

(ii)    That may be the substance of a claim though it is not, in point of form, a claim for a tax debt or a claim against a party that was or could be a tax debtor.

(iii)   The substance of the claim is not determined by the private law cause(s) of action pleaded, indeed the relevant issue of substance over form arises at all only when, and because, the claim is framed in that way, that being a matter of form in this context, as is the identity of the claimant (though that aspect does not arise in the present case).

(iv)   Rather, the substance of the claim is determined by the central interest, in bringing the claim, of the sovereign by whom it is brought or in whose interests, directly or indirectly, it is brought.

(v)    The mechanism by which harm is said to have been suffered, in respect of which a claim seeks reparation, is material to consider, and may be important, in judging whether the central interest in bringing that claim is a sovereign (governmental) interest rather than a patrimonial (private law) interest.

(vi)   There is no rule of law that the voluntary act of the defendant, in engaging with the foreign sovereign, takes a case outside Dicey Rule 3 or disapplies it, though the nature of any interaction between defendant and sovereign will be one circumstance to be considered in deciding what right or interest, in substance, the claim serves to vindicate.

*Application to the Facts*

76.    The *Kildeskattelovens* (Danish Withholding Tax Act, 'the WHT Act') is at the heart of SKAT's case. It provides the foundation for all of SKAT's claims, as pleaded, without reliance on which none of SKAT's claims could exist or be formulated.

77.    By s.2(1).6 of the WHT Act, legal persons not tax resident in Denmark are liable to tax under that Act on dividends obtained from Danish companies (other than investment companies) within the scope of s.16A(1)-(2) of the *Ligningsloven* (Danish Tax Assessment Act), read with s.2(1)(c) of the *Selskabsskatteloven* (Danish Corporation Tax Act). The tax residency concept for that purpose is that of s.1(1) of the WHT Act, rendering liable to tax under the Act (i) Danish (permanent) residents, (ii) those resident in Denmark for at least six months in the tax year in question, (iii) certain categories of person serving or residing aboard Danish-registered ships and (iv) Danish public servants posted abroad. By s.2(11), the general rate of tax under s.2(1).6 is set at 27%.

78.    By s.65(1) of the WHT Act, the general obligation of a Danish company resolving to pay or credit to shareholders a dividend is to withhold 27% of the dividend, the section providing that the amount withheld is called a 'dividend tax'. The company's obligation, a revenue law liability for the purposes of Dicey Rule 3, is to pay the dividend tax to SKAT. The Danish Minister for Taxation is empowered by s.65(3) of the WHT Act to make rules providing for dividend tax not to be withheld from dividends that are not taxable income in the recipient's hands and for the publication of a database of companies and associations entitled to receive dividends without any dividend tax withholding.

79.     Then s.69B(1) of the WHT Act provides, so far as material, as follows:

> "*If a person who is liable to pay tax pursuant to section 2 hereof ... has received dividends ..., of which tax at source has been withheld pursuant to sections 65-65D which exceeds the final tax under a double taxation treaty ..., the amount must be repaid within six months from the receipt by [SKAT] of a claim for repayment. If repayment is made after this time, the taxpayer is entitled to interest [at a specified rate].*"

80.     That primary provision, specifying SKAT's obligation to make WHT refund payments, is complemented by s.69B(2), providing that if SKAT cannot check whether the conditions for repayment of WHT have been met, due to the circumstances of the proposed recipient, the six-month payment period is interrupted until those circumstances "*no longer prevent control*", and by s.69B(3), providing that if SKAT assesses that payment as claimed will involve an obvious risk of loss, it may require security from the recipient, but only if the claim is disputed and not finally decided by an administrative appeals body or the courts.

81.     The concept and structure is clear:

(i)     dividend tax is an income tax;

(ii)     a dividend payee not tax resident in Denmark is liable to dividend tax at 27%, an extra-territorial imposition of income tax by the Danish state, sometimes referred to as a 'limited' tax liability because it is limited to a particular source of income, but (I should be clear) by using the term 'dividend payee' I do not mean to express any view on when precisely there will be liability to tax, upon the proper construction of s.2(1).6 of the WHT Act, that being a contentious issue in the litigation not for determination now;

(iii)     the obligation on a Danish company to pay SKAT dividend tax of 27% of a declared dividend is a tax obligation imposed on the company by the Kingdom of Denmark, a simple tax levy based on domicile;

(iv)     payment of that tax by the company to SKAT will operate to discharge the dividend tax liability of those taxable on the receipt of the dividend in question, but as in (ii) above without by that meaning to express any view on who precisely is so taxable;

(v)     an entitlement under s.65 of the WHT Act is therefore an entitlement to a dividend tax refund, and a payment under s.65 is appropriately called a refund or repayment although, by the nature of a withholding tax regime, the refund payee will not have made the dividend tax payment to SKAT in respect of which the refund was granted;

(vi)     the WHT refund applicant will be claiming by its application that as regards the referenced dividend, the 27% dividend tax payment that SKAT will have received from the company will have been a payment discharging a dividend tax liability owed by it (the applicant) under s.2(1).6 of the WHT Act;

(vii)    acceptance and payment by SKAT of a WHT refund application is therefore an acceptance of the applicant as a taxpayer pursuant to the WHT Act, and an agreement to pay, and payment of, a sum of money to the applicant *qua* dividend tax refund.

82.    SKAT says in most of its claims that it was misled into *mistakenly* treating the refund applicant as having paid tax on the dividends in question, and the issue as regards Dicey Rule 3 is whether the fact that SKAT claims to have been misled in that way affects the proper characterisation of the substance of its claims. The exceptions, where the mistake alleged is different but still concerns the incidence or amount of tax liabilities, relate to ED&F Man Applications. As I noted in paragraph 13 above, for most of those (336 of 400), SKAT advances an alternative claim (arising if, which SKAT does not admit, dividends were received) that the WHT applicant was rightly treated as having paid tax but wrongly treated as entitled to a refund (because, SKAT says, if dividends were received, they were received beneficially for ED&F Man), and for 16 of those cases there is also a further alternative claim that if (as ED&F Man says) they were only excessive refund applications, then the WHT applicant was rightly treated as having paid tax but wrongly treated as entitled to a full refund where only a partial refund was due.

83.    That the WHT Act provides the foundation for every claim made by SKAT in these proceedings means this case is not like a theft or robbery of cash from a SKAT vault, or a loss of SKAT's cash caused by actionable negligence in circumstances in which it was simply beside the point that SKAT was the Danish sovereign tax authority or that the cash may have been received in payment of taxes. Some of their Lordships in *Total Network* drew a comparison between theft or robbery of cash and the torts alleged in that VAT carousel fraud case, but that was to assess whether HMRC had power to pursue private law claims, not whether a VAT carousel fraud claim brought here by a foreign sovereign tax authority should be treated like a theft claim so as to fall outside Dicey Rule 3.

84.    Nor is this case like that of a cyber-attack, or the suborning of a SKAT employee, to gain access to a SKAT bank account from which to take a payment, or negligent advice to SKAT on how it might invest its funds, or a dishonest investment trick such as inducing SKAT to put funds into a Ponzi scheme.

85.    In all the examples in paragraphs 83 and 84 above, SKAT could say it had suffered loss of the same kind in the same way as might a private individual. It would not be necessary or material for SKAT to mention the WHT Act, or any other Danish taxing statute or sovereign power, to found its claim. It would be a contrivance if defendants referred to the WHT Act (or other Danish revenue laws), or SKAT's status as sovereign tax authority, to suggest that taxation was, in substance, the interest served by the pursuit of the claim.

86.    In this case, by contrast, every cause of action against every defendant starts with and must be pleaded by reference to the delivery (or prospective delivery, for conspiracy allegations) of a completed Form 06.003, as required by SKAT for a "Claim to Relief from Danish Dividend Tax", and the foundational allegation that accepting and paying that claim was (or would be) a mistake, SKAT being induced by the applicant's information erroneously to conclude that the tax refund claimed was due under s.69B(1) of the WHT Act.

87. The defendants' essential point is not simply that the source of SKAT's funds is taxation. It is that making dividend tax refund payments is an integral part of SKAT's function as sovereign tax authority, and the return of a payment made by way of dividend tax refund is in substance a payment of tax, SKAT's entitlement to which, if any, derives from its power to tax Danish company dividends in the first place. That characterisation of substance, the defendants argue, should not be affected by the fact that, if SKAT is right on the facts (including as to Danish tax law) it was wrong to make the refund payment it now seeks to claw back. The WHT refund system is an aspect of the Danish system of dividend tax collection; a claim to recoup a WHT refund payment is a claim to reduce the amount of WHT given back; and a claim to reduce the amount of WHT given back is, in substance, a claim to increase the amount of dividend tax taken in. As will become apparent, I agree.

88. The decided cases on Dicey Rule 3 to date have not considered the case of a tax refund wrongly paid by a sovereign tax authority and a claim to recoup that erroneous payment, or compensation for it. The point for decision now is exactly that, i.e. whether Dicey Rule 3 should be held to cover such a case, and the arguments for and against are the same whether they are seen as arguments about extending (or not) the rule in *Government of India* on the extra-territorial collection of taxes, or as arguments over whether the recovery of tax refunds falls within the principle underlying Dicey Rule 3 and giving it content, namely that claims are not admissible that in substance (whatever the form) seek to enforce extra-territorially a foreign revenue law or other exercise of sovereign authority.

89. If a claim seeking a recovery in respect of a tax refund payment made through error induced by misrepresentation by the refund applicant is, by nature, a claim seeking directly or indirectly to enforce a foreign revenue law, that is so as much where the misrepresentation is dishonest as where it is innocent or negligent, just as a claim for tax unpaid following an under-reporting of, or total failure to report, taxable income, or an excessive or invalid claim of deductible expenses, is a tax claim whether the mis-declaration or failure to declare is honest, careless or dishonest. Depending on the rules of the system of law that would govern it, and the nature and circumstances of the particular defendant, fault of some kind or degree may be required for liability on a private law cause of action, if available; but that is a different point.

90. In saying that, I put to one side misrepresentation as to identity, on which it is not necessary to take a view to decide the present case. Mistakes as to identity can be seen as conceptually different to other errors and a decision that Dicey Rule 3 applies in the present case does not have to mean that it would apply to a case where SKAT's claim was not founded on an allegation that it had made a payment to Party A, intending to pay a tax refund to which, in error, it had assessed Party A to be entitled, but on an allegation that it had made a payment to Party B mistakenly thinking it was paying Party A (as it happens intending to pay a tax refund to Party A). Without deciding the point, I can see how it might be said in the latter case that in substance, the fact that the payment was thought to be by way of tax refund was immaterial, and SKAT was not by the claim seeking to vindicate any exercise by it of sovereign authority in relation to tax, even if the opposite is true in the present case.

91. Similarly to paragraph 89 above, if as SKAT said in its alternative submission its proprietary claims should not be regarded as claims directly or indirectly to enforce Danish revenue law, that would not be because (if this be so) such proprietary claims

arise only where there has been a fraud, meaning that SKAT would have to prove fraud to establish those claims; it would be because they were regarded as cases of retrieving SKAT's property rather than as cases of enforcing foreign revenue law, even though the loss was incurred by the making of tax refund payments in error. If, as the defendants say, that last factor – the way in which the loss was suffered – means that SKAT's resulting proprietary claims are foreign revenue claims for the purposes of Dicey Rule 3 just as much as their claims for damages or unjust enrichment, then that is so whether or not the extraction of payment from SKAT was achieved dishonestly.

92.    It follows also that it does not matter whether in principle, as SKAT submitted by reference to *Barakat* (see paragraph 46 above), arguments of public policy can be raised against the application of Dicey Rule 3 to a case of a type falling within its scope, or whether, as the defendants submitted, the Rule is absolute, i.e. the relevant rule of public policy is that claims of such a character as to fall within the Rule are never admitted. The only countervailing public policy suggested was that of combatting or giving redress in respect of fraud, yet that has never ousted the Rule or prevented a type of claim from falling within it that otherwise would. For completeness, I venture to suggest that the proper role for a public policy argument of the kind considered, *obiter*, in *Barakat*, is only in assessing whether Dicey Rule 3 is to be extended to a category of foreign public law or species of prerogative or similar power not covered by existing authority. Where, by reference to the type of foreign law or power being considered, Dicey Rule 3 applies, it would be "*unwise … to attempt to discriminate between those claims which [the courts] would and those which they would not enforce. Safety lies only in universal rejection*", *per* Kingsmill Moore J in *Buchanan v McVey*, *supra*, at 529.

93.    SKAT cannot avoid Dicey Rule 3 by pointing to the fact that it is not suing here the WHT refund applicants themselves, whose refund applications SKAT says it paid wholly or partly in error (see paragraph 18 above); and conversely if claims against the applicants themselves, to recoup the erroneous refunds, would not fall within Dicey Rule 3, then neither would any of the claims made here against other parties alleging an involvement in the making of the refund applications or the receipt of funds or other enrichment deriving therefrom. The argument on Dicey Rule 3 can and should be determined upon how claims against the allegedly wrongly paid applicants, to recoup the payments made by SKAT, would stand under the Rule. Indeed, such claims are made in the proceedings, in that a few of the defendants here were WHT refund applicants, even if for the most part litigation against applicants themselves is before courts or tribunals in other jurisdictions.

94.    In my judgment, applying the principles set out in paragraph 75 above, such claims do fall within Dicey Rule 3, as submitted by the defendants, because this case is properly to be characterised as an attempt by SKAT:

(i)    to vindicate its right, a creature of Danish tax law under the WHT Act and DTAs concluded by Denmark, to retain Danish company dividend tax collected by way of WHT except where refund claims are made to it by qualifying applicants under s.69B of the WHT Act,

and therefore

(ii)    indirectly to enforce Denmark's underlying sovereign right, given effect by the WHT Act, to tax Danish company dividends.

95.    The making of payments by way of WHT refunds pursuant to the WHT Act, and, as a resulting practical necessity, the creation and operation of a system for the making and processing of WHT refund applications, is an integral part of the taxing of Danish corporate dividends. It is a key element of the assessment and collection by SKAT of the amount that Danish law entitles it to take as tax, as an exercise of the sovereign authority of the Kingdom of Denmark, from such dividends. The taxation of dividends under the WHT Act is, in substance, a single exercise of sovereign authority to take in tax a proportion of declared Danish company dividends, the true entitlement from time to time being a function of the tax rate set by the WHT Act (27% at all times material to SKAT's claims), the international distribution of entitlements to receive dividends (in whatever sense that is required by s.2(1).6 of the WHT Act so as to create a liability to tax), and the terms of any DTAs concluded by the Kingdom of Denmark that are rendered pertinent by that distribution.

96.    Collecting 27% up front and making available to non-residents a refund application system is no doubt convenient to SKAT. WHT schemes of this type, as Mr Baker QC submitted, may be seen as creatures of the international understanding that revenue laws will not be enforced extra-territorially except as may be provided for by supranational legal instruments entitling the taxing sovereign to international assistance. SKAT's right and interest are the same whether or not the technique of WHT and a refund application system is used. Where that technique is used, *ex hypothesi* the initial collection (here, 27% of dividends, collected from companies declaring them) is conditional by nature because of SKAT's obligation to pay a partial or total refund if eligibility conditions are satisfied.

97.    An obligation and a right will generally be opposite sides of a single legal coin; and in my judgment that is the case here. To say that SKAT is obliged to pay a WHT refund if eligibility conditions are satisfied is to say that SKAT is entitled to keep, as tax, what it collected up front only to the extent that those eligibility conditions are not satisfied. A conditional entitlement to keep, as tax, amounts collected up front, in effect pending final assessment of the tax due, is conceptually and functionally the same as an entitlement to assess and collect tax due by reference to those eligibility conditions; and it is that entitlement to keep as tax what it had collected up front that SKAT seeks to enforce by its claims.

98.    SKAT's claim to recover from a WHT reclaim applicant an amount it had assessed as payable, and had therefore paid, by way of tax refund, founded on the proposition that the assessment was in error, is conceptually and functionally the same, for SKAT, as a claim for tax due and unpaid. It is, in substance, a tax claim. As part of that characterisation, it seems to me the defendants are correct to say that the acceptance and payment of funds by way of tax refund, in response to a WHT refund application, is an exercise of sovereign authority. That it is an assessment carried out, application by application, by Danish state tax officials, rather than the prior act of making the law those officials are seeking to apply, does not change that characterisation of their conduct.

99.    The substance of SKAT's claims is in my judgment that by conduct of a kind ordinarily regarded as actionable in tort, the defendants have diverted from SKAT

amounts to which it was entitled as dividend tax on Danish corporate dividends. The mechanism by which that was done, on SKAT's case, was that of WHT refund applications that SKAT was misled into accepting and paying. But in the context of Dicey Rule 3, that is a matter of form, once it is accepted (as is now long established, and was common ground before me) that in the field of foreign tax claims, Dicey Rule 3 is not restricted to claims by a foreign sovereign tax authority against a defendant alleging, in terms, a liability on the part of that defendant for unpaid tax. The question, under Dicey Rule 3, whether the substance here is an attempt by SKAT directly or indirectly to enforce the Kingdom of Denmark's sovereign right to tax Danish corporate dividends, arises only and precisely because SKAT is not pursuing, in that narrow and formal sense, a claim for unpaid tax.

100.    I agree with SKAT that on its case, as alleged, at all events for the Solo etc Applications (the position for the ED&F Man Applications is more complex): the WHT refund applicant was not a person liable to tax under s.2(1).6 of the WHT Act on the dividend referenced in the application, as SKAT assessed them to have been, and the applicant therefore did not have a primary tax liability that was discharged by a WHT payment received by SKAT from a Danish company. That does not mean Dicey Rule 3 is inapplicable, though it may mean that the sense in which SKAT's claims seek to enforce Danish sovereign taxation rights is a degree more indirect than in other cases. It is just another way of saying that the case involves payments made by way of tax refund said not to have been due and raises for decision whether claims to recoup such payments should be treated any differently than claims for tax due but unpaid, from the perspective of Dicey Rule 3.

101.    SKAT said as a further consequence of that premise (*viz.* that the WHT refund applicant had not been a person liable to tax under s.2(1).6 of the WHT Act as regards the dividend in question) that "*As a result, none of the proceeds of the present action will go to discharge any such tax or other public law liability in Denmark*". I agree that a recovery now from a WHT refund applicant (or, by extension, a recovery of damages from a defendant who was not the applicant) where the applicant never had a primary tax liability under s.2(1).6 of the WHT Act cannot discharge such a liability. If SKAT's quoted contention was intended to go further than that, it merely asserts the result desired by SKAT, begging the question for decision, which is whether the return of a tax refund payment erroneously paid, the error being that no tax refund was due as SKAT had thought when paying, should be seen as different in kind for the purpose of Dicey Rule 3.

102.    What SKAT's claims seek to do is repair the hole in its dividend tax take for the years in question caused by its misjudgment of its obligations to make tax refund payments pursuant to s.69B(1) of the WHT Act. Its claims, framed as private law causes of action, that it was induced into making that misjudgment by actionable conduct on the part of the defendants, define the grounds upon which SKAT proposes that the defendants could be required by the court to repair that hole, if the claims be admissible. They do not mean that SKAT's real or central interest in bringing those claims is not the repair of that hole, which is a purely sovereign interest.

103.    SKAT pleads that Danish tax legislation does not empower it to raise tax assessments against the WHT refund applicants that would have force under Danish law (subject to any rights of challenge before a Danish tax tribunal). I understand that to be contentious, but I do not need to resolve the point. If SKAT is right on it, the Danish

legislature has not given SKAT, as it might have done, a separate public law mechanism for pursuing its relevant entitlement, so that (like HMRC in the *Total Network* case) SKAT has to use private law causes of action, if it can, to pursue that entitlement. That does not change the proper characterisation of the substance under Dicey Rule 3; it does not mean that English law must allow a cause of action for this (alleged) fraud, given that substance.

104.    If anything, consideration of that aspect of the matter reinforces the characterisation of SKAT's claims as, in substance, claims indirectly to enforce sovereign tax rights. It would be quite natural if Danish tax legislation granted a power of assessment, binding on the recipient, subject to any tax law appeals processes, in respect of tax refunds SKAT concluded to have been wrongly granted. If it did, then when issuing administrative decisions revoking its decisions to accept WHT refund applications (as SKAT did – it matters not whether it did so in every instance), SKAT could have raised concomitant tax assessments. It would seem perfectly fitting for Danish law, and SKAT, in that way to treat SKAT's claim to claw back the WHT refund payments as a tax demand. I do not accept the submission Mr Fealy QC made in reply that had the Danish tax legislation empowered SKAT to assess for repayment in the manner here being considered, its resulting claim founded upon an exercise of that power, if brought here, would not be rejected under Dicey Rule 3. In my view, plainly it would be so rejected, but the logic of SKAT's position indeed required it to submit otherwise as Mr Fealy QC's submission acknowledged.

105.    Were I wrong in concluding that it is not necessary to resolve whether SKAT is empowered under Danish tax law to assess WHT refund applicants for sums paid to them in error as tax refunds, but rather resolving that point would determine whether Dicey Rule 3 applied, then I would wish to explore with the parties how most efficiently to resolve it as an extension of the Revenue Rule Trial. I would be interested in particular to see whether that could sensibly be achieved this summer, to conclude this phase of the litigation in good time before the Validity Trial listing. As it is, my conclusion that the point does not need to be resolved means that a final decision on Dicey Rule 3 can be made now, without any finding on that particular point of Danish law.

106.    It is to my mind telling that SKAT formulated its key argument as follows:

        "*... a claim to recover money incorrectly paid out by a tax authority on the faith of misrepresentations is not properly characterised as the imposition of a "tax" (or as a claim otherwise arising under "revenue" law). Such a claim, if brought under ordinary principles of private law, does not constitute the compulsory imposition by the state of a public law liability on a subject to pay money or transfer property to the state, to which the state otherwise has no interest.*"

        (i)    Firstly, SKAT omits a key characteristic of the case, namely that it concerns money paid out by a tax authority *by way of tax refund*. Thus SKAT over-generalises so as to beg the question whether overpaying by mistake for, say, office supplies, and making a payment mistakenly assessed to be due by way of tax refund, should be regarded as equivalent when characterising the central interest involved in the making of a claim to recoup the payment.

(ii)   Secondly, SKAT's submission in terms relies on form to characterise substance ("*Such a claim, if brought under ordinary principles of private law ...*", my emphasis).

(iii)  Thirdly, the submission is inconsistent with the well-established scope of Dicey Rule 3. Returning again to *Buchanan v McVey*, for instance, the claims against Mr McVey did not impose on him, if well founded, a public law liability as a British subject to pay money to the British Crown; but they were brought indirectly to enforce the Revenue's claim to tax his asset-stripped company.

(iv)   Thus, SKAT's key submission, on analysis, does not answer, rather it substantially dodges, the question of characterisation that has to be answered to determine whether Dicey Rule 3 applies in this case. Of itself, that cannot mean the defendants' answer to that question must be correct, but it suggests at least that it is more difficult than SKAT's submissions sought to portray to identify why the defendants' answer is wrong. In the event, as I have sought to explain, I have concluded that the defendants' answer is correct.

107.   The mechanism of alleged wrongdoing, then, may be the making of WHT refund applications conveying misinformation. But the central interest of SKAT in bringing the claim, and the right that in substance SKAT seeks to enforce by what are, in point of form, private law claims, is SKAT's interest and right in collecting what was due to it by way of dividend tax for the tax years in question. Dicey Rule 3, a mandatory rule of English law as *lex fori*, has the effect that there is no cause of action for a fraud on a foreign revenue, and I agree with the defendants' submission that at its highest SKAT here claims to have been the victim of such a fraud. It cannot sensibly say in relation to the claims pursued here that it was the victim of a fraud such as might be committed against a private individual or corporate entity. *A fortiori*, there is no cause of action for negligently causing loss to a foreign revenue.

108.   As I said in paragraph 35 above, that is not to say that SKAT could never pursue here a claim for damages for a tort committed against it because it is a sovereign tax authority. Leaving aside, as I am in this judgment, any subtlety over whether strictly SKAT is a legal person in its own right at all, SKAT may be the victim of a tort that is not a tort against the Danish *fisc*. On one view, that is what the argument on the scope of Dicey Rule 3 comes down to. Considering the nature of SKAT's pleaded claims, in substance SKAT is alleging torts against the Danish *fisc*, with the collection and management of which SKAT is charged, rather than torts against SKAT as a legal person conducting personal or business affairs akin to those that might be conducted by a private party. There is no cause of action in this court for torts against a foreign revenue.

109.   If it is preferred to consider the question by considering the legal relationship involved, the legal relationship of WHT refund applicant and tax authority is that of taxpayer and sovereign taxation authority. That is the relationship created by the submission to SKAT of WHT refund applications, at all events where they are accepted and paid by SKAT. If it be appropriate to apply an ordinary private law analysis to that relationship, it might be said to have been voidable if induced, as SKAT says it was, by misrepresentation. But that does not mean it was not, by nature, while it existed, a taxpayer-tax authority relationship.

110.    I do not overlook that in respect of the Solo etc Applications (but not the ED&F Man Applications), SKAT has pleaded that the transactions underlying and generating the dividend vouchers issued by custodians that were submitted to SKAT with 06.003 Forms were 'manufactured', 'fictitious', or 'sham'. The primary substance of that plea is not that no transactions were entered into, but rather that given their terms and effect (in particular, taking the package of transactions as a whole) they did not create such rights, or result in any such payment or payment entitlement in respect of dividends, as might have qualified the WHT refund applicant to a refund payment from SKAT under s.69B(1) of the WHT Act.

111.    SKAT says that closed loops of share sale and share lending transactions were put in place between parties none of whom had or would ever acquire any interest in or rights relating to shares in the Danish company in question, apart from any interest or rights generated by the transactions in the loop. Those transactions, it is said, therefore did not create any such interest or rights as might make for a valid WHT refund claim. The dispute about that is the central validity issue in the litigation as regards the Solo etc Applications, relevant defendants contending as they do that a bare contractual right to acquire shares as provided for by the transaction structures used *did* result in an eligible WHT refund claim.

112.    That does not in my view alter the proper characterisation of SKAT's resulting claims, for the purpose of Dicey Rule 3. It remains the case that their fundamental premise is SKAT's contention that the WHT applications it accepted at the time had not qualified the applicants to the refunds sought and paid; SKAT is still, in substance, suing to recover (compensation for) making tax refund payments it was not obliged to make. From the perspective of Dicey Rule 3, those are in my view foreign revenue claims.

113.    That is my conclusion also as regards the one way in which the 'fictitious' or 'sham' transactions plea is put by SKAT that might be said not to fit the description in paragraphs 110-111 above. SKAT goes as far as to say that the transactions were (purportedly) concluded without any intention to create legal relations so as to be contracts at all. Even in that case, the substance remains that the WHT refund applicants were claiming to be, and were assessed by SKAT to be, limited Danish taxpayers eligible for a tax refund. The character or quality of the payment made by SKAT, and of the return thereof (or compensation equivalent thereto) now sought by SKAT, is the same. It is inherent in, and of the essence of, the 'central interest' test for ascertaining the substance of a claim brought by or in the interests of a foreign sovereign, that the character or quality of the sovereign's relevant activity is the most material consideration.

114.    This strongest version of SKAT's case – alleging that the 'transactions' were not contracts at all – is ultimately just a particular way of accusing the WHT applicants of having not merely claimed incorrectly to be limited Danish taxpayers eligible for a tax refund, but pretended to be such (i.e. made that claim knowing it to be an incorrect claim). That does not change the character or quality of SKAT's relevant activity. In accepting and paying the WHT refund claim, and now in claiming to reverse the same, even if in point of form that claim is presented by reference to the ingredients of private law causes of action, SKAT was and is acting as the Danish sovereign tax authority in the interests of the Danish *fisc*, and not as a private party could or might act. The central interest in pursuit of which SKAT brings these claims remains that of

taxing Danish company dividends properly (accurately) in accordance with Danish tax law and DTAs, a purely sovereign interest.

115.    If that be correct generally, as I have concluded that it is, SKAT argued that its proprietary claims nonetheless fall outside Dicey Rule 3. They seek, SKAT submitted, only the recovery of SKAT's property so as to be patrimonial claims such as were considered in the wrongful interference cases culminating in *Barakat*. I do not agree. At this point in the analysis, it is important to be precise in the use of proprietary language (*cf* paragraph 9 above). SKAT's relevant claims are to equitable ownership of assets belonging to certain of the defendants, on the basis that they represent the traceable proceeds of payments made by SKAT by mistake induced by fraud. SKAT does not sue to vindicate some title it had, and claims still to have, in an asset that was situated in Denmark when SKAT acquired its title. If an analogy is to be drawn with the wrongful interference cases, the case is on the *Brokaw / Ortiz* side of the line, not the *Barakat / Williams & Humbert* side of the line.

116.    The proprietary interests asserted are remedial in nature. They require SKAT first to establish one or more of the alleged personal liabilities the pursuit of which I have concluded offends against Dicey Rule 3. It would not have assisted in *Buchanan v McVey* to allege that Mr McVey's companies had proprietary claims founded upon dishonest breaches of fiduciary duty; and indeed he *was* sued alleging a liability to account *inter alia* as trustee (see [1955] AC at 520), and on the facts (*ibid* at 518-519) it seems that some at least of the funds Mr McVey dishonestly extracted from his company, so as to evade the Revenue, were put to his personal use. If that did not save the claims against Mr McVey from the operation of Dicey Rule 3, then neither can SKAT's assertion of proprietary rights in some of its claims save those claims from the Rule if otherwise it applies in this type of case.

117.    Although I apprehend it was legitimate to use the language of SKAT seeking a 'return' of WHT refund payments when examining the central interest behind SKAT's claims, as required for a consideration of Dicey Rule 3, that does not mean Mr Fealy QC was correct to contend as he did that by its proprietary claims SKAT is merely seeking the return of its property, as a private legal person might whose property has been converted. In this case, SKAT had and has no property rights it can ask this court to vindicate but that it first succeed before the court on claims the pursuit of which is denied to it by Dicey Rule 3.

*Conclusion*

118.    For the reasons set out above, my conclusion is that all of SKAT's claims are, in substance, claims seeking to enforce here the Kingdom of Denmark's sovereign right to tax dividends declared by Danish companies, and the WHT and WHT refund systems established by the WHT Act, the Danish tax statute by which that right is given specific content. The central interest of SKAT, and of the Kingdom of Denmark in whose interests the claim is brought (if it is meaningful to distinguish between SKAT and the Danish state), in bringing all these claims, is to vindicate that sovereign right and have it enforced indirectly here.

119.    Though SKAT has framed its claims as private law causes of action, what those claims seek, in substance, is payment to SKAT of amounts of dividend tax it failed to take in the tax years in question, it not being right to distinguish when characterising

substance for the purpose of Dicey Rule 3 between dividend tax never paid and dividend tax conditionally collected as WHT but paid away by SKAT by way of WHT refunds. SKAT's claim against the WHT refund applicants for the WHT refund to be returned is, in substance, a claim to tax. Such claims are not admissible in this court. Or again – if this is saying anything different – the central interest in SKAT bringing its claims here is to vindicate its right to pay WHT refunds only where applicable revenue law eligibility conditions are satisfied, in other words its right to keep, as tax, 27% of Danish company dividends except where those conditions are satisfied.

120.    In that way, considering substance rather than form, SKAT's claims seek indirectly to enforce here Danish revenue law. Unless the Brussels-Lugano regime mandates a different outcome for SKAT's claims against Brussels-Lugano defendants, all of SKAT's claims fall to be dismissed by operation of Dicey Rule 3.

*Coda – MARD et al.*

121.    On the view I have taken, it is not necessary to consider a further argument advanced principally by Mr Baker QC, so I shall deal with it only briefly and not in any detail, though that may do a disservice to the expert skill with which Mr Baker QC developed the point. The argument, in essence, was that in line with a long public international law history, the cross-border recovery of tax refunds wrongfully procured is seen as or assumed to be a matter of revenue law requiring to be dealt with (if at all) by supranational legal instrument.

122.    Mr Baker QC submitted, for example, going back to a 1925 League of Nations experts' report, "*Double Taxation and Tax Evasion*" (Document F.212, February 1925), that for at least a century, "*abuse of claims for relief from taxation, in as much as we are dealing both with exemption from and repayment of tax*" (*ibid* at p.23), has been seen as a cross-border problem requiring a public international law solution.

123.    The cross-border solution presently adopted by the EU is MARD. By Article 2(1)(a), it applies *inter alia* "*to claims relating to ... (a) all taxes and duties of any kind levied by or on behalf of a Member State ...*". Mr Fealy QC submitted that a claim by SKAT to recover from a WHT refund applicant a WHT refund paid out in error would not fall within the scope of MARD. That is, I think, an impossible submission on the language of Article 2(1)(a). I cannot imagine Denmark wishing to advance it but that it was perceived to assist its desire to avoid the operation of Dicey Rule 3 in this litigation.

124.    There were points of detail, with which I shall not lengthen this judgment, as to whether the substantive provisions of MARD would afford SKAT (or, it may be, the Kingdom of Denmark acting by a different instrumentality) an effective remedy for the recovery from payees domiciled in the EU or the UK* of WHT refunds erroneously paid out. Whether or not they would, I think it inconceivable that a request for assistance in respect of recovering a WHT refund said by the requesting tax authority to have been wrongly paid out could or would be resisted on the ground that it fell outside the scope of MARD as defined by Article 2(1)(a).

*    MARD has effect in the UK for an extended period, beyond the EU exit transitional period that expired at the end of 2020.

125. Whether SKAT could have made use of MARD, or could still do so, against EU or UK domiciled parties, it could and did make use of Article 26(1) of the US-Denmark DTA, so as to obtain information from the IRS in connection with SKAT's claims, though that mutual assistance provision covers only "*such information as is relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention …, including information relating to the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention*". Rather starkly, SKAT has confirmation from the IRS that it may disclose the information provided in these proceedings because the view has been taken that they are concerned with the administration of a Danish tax falling within the scope of the Convention (which, in context, must mean Danish state income tax as referred to in Article 2(1)(b)(i) of the DTA).

126. The IRS's view that by these proceedings this court is (in the language of Article 26(1) of the DTA) "*involved in the assessment, collection, or administration of [or] the enforcement or prosecution in respect of*" Danish income tax no doubt does not bind SKAT, or the court; and if the IRS provided their assistance on a mistaken basis, so be it, that would not render the evidence obtained by SKAT inadmissible or the proceedings here an abuse. That said:

(i)  It is not obvious that the IRS's view might be wrong. On the language of Articles 27.1, 27.4 and 27.9 of the US-Denmark DTA, a claim by Denmark to be repaid an amount erroneously paid to a US party by way of WHT refund seems to be treated as a "*revenue claim*", and acceptance by the US of an application by Denmark for its collection is to be treated by the US as a tax assessment under US law against the party from whom collection is sought:

"*Art 27.1    The Contracting States undertake to lend assistance to each other in the collection of taxes referred to in Article 2 (Taxes Covered), together with interest, costs, additions to such taxes, and civil penalties, referred to in this Article as a "revenue claim".*

*Art 27.4    Where an application for collection of a revenue claim in respect of a taxpayer is accepted*

  *a)  by the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received; and*

  *b)  by Denmark, the revenue claim shall be treated by Denmark as an assessment under Danish laws against the taxpayer as of the time the application is received.*

*Art 27.9    Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto.*"

(ii)  Mr Baker QC's main point was that the court can and should take comfort, from the way the US-Denmark DTA has been naturally and successfully invoked, that the claims brought here do indeed serve, as the central interest

behind their pursuit, the Kingdom of Denmark's sovereign rights of taxation rather than interests of a private law character.

127.   In my judgment, there is something in Mr Baker QC's point, even though Mr Fealy QC was also correct to submit that there need not be a perfect antithesis between the scope of Dicey Rule 3, as regards foreign taxes, and the scope of any given supranational instrument relating to cross-border taxation. There is something in Mr Baker QC's point nonetheless because it focuses not so much on the specifics of whether a particular cross-border instrument does apply but on an overarching international understanding that clawing back tax refunds or credits or reliefs is taxation. Since that was my conclusion, so far as concerns Dicey Rule 3, in any event, I shall not attempt the intellectual gymnastics of saying whether Mr Baker QC's point had enough about it to tip the argument on Dicey Rule 3 in his favour if he had not been winning it anyway.

*Coda – Buchanan v McVey again*

128.    I said in paragraph 88 above that the prior authorities on Dicey Rule 3 do not decide the case of a claim to recoup a tax refund said to have been paid in error. That was in fact common ground. A theme of this judgment, though, is the need to confront the implications of the doctrine of indirect enforcement (of *inter alia* foreign revenue laws), and the idea of a central interest served by the bringing of private law claims, first strikingly illustrated by *Buchanan v McVey*, as approved by the House of Lords in *Government of India* (even if, as I remarked in paragraph 28 above, there was a degree less indirectness on the facts in the latter case).

129.   If my analysis of the implications of the case law on Dicey Rule 3 as it stands is correct, then SKAT's difficulty, ultimately, may be the turn English law thus took in 1955, which is not something that SKAT said it wished to question, or that I would be entitled to question. Indeed, Mr Fealy QC confirmed SKAT's position to be that "*Dicey Rule 3, as a matter of common law, is the same now as it was 50 years ago*".

**Brussels-Lugano**

130.   SKAT submitted that (i) these proceedings are a 'civil and commercial matter' under the Brussels-Lugano regime and (ii) the English court therefore cannot dismiss SKAT's claims against Brussels-Lugano defendants by reference to Dicey Rule 3. For (i), SKAT accepted that the use of public powers can transform what would otherwise be a civil or commercial matter into a public law matter outside the Brussels-Lugano regime, but said that was so only if public powers would be used so as to rely on substantive or procedural rules of law applicable in the litigation that confer special privileges upon the claimant by reason of its status as a public body or upon evidence deployed by the claimant by reason of its public powers source. There has been and could be no such use of public law powers in these proceedings. For example, material obtained by SKAT through the use of public law powers, such as through assistance from foreign tax authorities under DTAs, would be treated like any other documentary evidence. For (ii), SKAT argued that to refuse to admit its claims under Dicey Rule 3 would derogate from and impair the effectiveness of the Brussels-Lugano regime.

131.   The defendants say that the Brussels-Lugano regime is irrelevant. It governed the question whether SKAT could bring Brussels-Lugano defendants before the court, given the types of claims that as a matter of form SKAT has pleaded, but not whether those claims are of a type this court will admit or uphold. Dicey Rule 3 is a rule of substance, not a rule as to jurisdiction in the sense dealt with by the Brussels-Lugano regime. If that is wrong, then the defendants argued that:

(i)    essentially for the same reasons as they said led to the application of Dicey Rule 3 at common law, these proceedings should be recognised as a revenue matter and not a 'civil and commercial matter' under the Brussels-Lugano regime, and

(ii)   even if that would not otherwise be correct, it becomes correct, i.e. these proceedings must be seen as a public law matter, not a civil and commercial matter, because of the use by SKAT of public law powers in the investigation and gathering of evidence, and its use of some of the information and evidence gathered as a result, for the purpose of, and in the course of, the proceedings.

*Compatibility of Dicey Rule 3*

132.   I note at the outset that the Brussels-Lugano regime's concept of a 'civil and commercial matter', and by contrast a 'revenue, customs or administrative matter', is a classification of types of court proceedings. That is clear from the full language of the first sentence of Article 1(1) – the subject matter of the Brussels-Lugano regime is "*civil and commercial matters whatever the nature of the court or tribunal*" (my emphasis). The Brussels-Lugano regime then ensures that in civil or commercial proceedings, as opposed to criminal proceedings or (civil rather than criminal) public law proceedings, a common set of rules will apply in all Brussels-Lugano member states as regards personal jurisdiction (i.e. whether a particular defendant can be sued in a particular court) and the recognition and enforcement of resulting judgments.

133.   It is well established that Article 1(1) is to be given an autonomous meaning, but it may be observed that its origins lie in continental legal systems in which public law proceedings are not classified as civil matters, whereas here public law proceedings (e.g. judicial review) would generally be classified as a species of civil proceedings. Thus, the inapplicability of the Brussels-Lugano regime to 'revenue, customs or administrative matters' is because they are treated as not 'civil and commercial matters'. They are not excepted types of 'civil and commercial matters' requiring to be excluded by Article 1(2) if the regime is not to apply to them (as with, e.g., bankruptcy or arbitration).

134.   The purpose of the Brussels-Lugano regime is not the harmonisation of the substantive laws of member states, i.e. their rules of law determining whether a claim will succeed or fail, or their choice of law rules for ascertaining the system of law whose substantive rules of law govern any given claim. The former, so far as material to this case, given the causes of action alleged, have not been subject to EU harmonisation; the latter, again so far as material, are harmonised by the Rome II Regulation, Regulation (EC) No 864/2007, on the law applicable to non-contractual obligations.

135.   In *In re Norway's Application (Nos. 1 & 2)* [1990] 1 AC 723, the House of Lords had
       to consider letters rogatory issued by a Norwegian court requesting the examination of
       two witnesses before the English court for the purpose of a tax claim in respect of
       Norwegian taxes being pursued in the Norwegian court against the estate of a wealthy
       Norwegian shipowner. The central question was whether the proceedings in Norway
       were "*proceedings in any civil or commercial matter*" within s.9(1) of the Evidence
       (Proceedings in Other Jurisdictions) Act 1975, because by s.1(b) of that Act the power
       that was sought to be exercised was only available if the evidence sought was to be
       obtained "*for the purposes of civil proceedings*" in the requesting court, and s.9(1)
       was the applicable definition of "*civil proceedings*".

136.   In that purely English law context, the House of Lords concluded that the 1975 Act
       distinguished by ss.1(b)/9(1) between civil and criminal proceedings, and did not have
       in mind any further distinction between private law and public law matters (*cf*
       paragraph 133 above). Meanwhile, Dicey Rule 3 was not engaged, even though the
       ultimate goal was avowedly the recovery of foreign tax, because, *per* Lord Goff at
       809F-G, "*I cannot see any extraterritorial exercise of sovereign authority in seeking
       the assistance of the courts of this country in obtaining evidence which will be used
       for the enforcement of the revenue laws of Norway in Norway itself.*" The House of
       Lords' decision thus confirms, as Mr Fealy QC submitted, that Dicey Rule 3 does not
       apply merely because there is some connection between a claim brought here and
       foreign tax or a foreign revenue system; the nature of the connection needs to be
       examined to assess whether, in substance, the claim is, directly or indirectly, an
       attempt to enforce here the foreign sovereign's right to tax.

137.   In paragraph 29 above, I referred to *QRS v Frandsen* for its confirmation that the case
       of an asset-stripped company or its liquidator suing the company's former owner for
       breaches of the latter's duties to the company, in substance to secure the recovery by a
       foreign sovereign tax authority of taxes due from and unpaid by the company, fell
       within Dicey Rule 3. The matter arose on an application by the defendant to strike out
       the claims against him of his former companies on the ground that they were bound to
       fail. The claims were struck out at first instance; the Court of Appeal dismissed an
       appeal.

138.   The Court of Appeal confirmed that Dicey Rule 3 applied, indeed the contrary was
       barely argued, as I noted in paragraph 29 above. The substantial argument against the
       striking out of the claims, therefore, was not that Dicey Rule 3 would not apply to
       them at common law, but was instead an argument that:

       (i)    the proceedings were a 'civil and commercial matter', not a 'revenue, customs
              or administrative matter', within Article 1(1) of the Brussels Convention (then
              the governing Brussels-Lugano instrument);

              and

       (ii)   it was incompatible with the Brussels Convention to apply Dicey Rule 3 to
              dismiss a claim, and therefore impossible to strike a claim out as bound to fail
              by reference to the Rule.

139.  The Court of Appeal concluded:

(i)  that the proceedings were a 'revenue [etc] matter' and not a 'civil and commercial matter' for the purpose of the Brussels Convention, in that:

(a)  the claims brought were in substance (though not in form) indirect revenue claims, as had been held in relation to such claims in *Buchanan v McVey*, the plaintiffs having sought to argue that they were private law claims "*not merely in form but in substance*" (see at 2174F-G), and

(b)  the consequent characterisation of the claims as revenue matters would be accepted (the Court of Appeal suggested) by all member states under the Convention (see at 2177C);

and, *obiter*

(ii)  that had the proceedings been a 'civil and commercial matter' for the purpose of the Brussels Convention, then the claims could not have been struck out, on the logic that "*under article 2 there is jurisdiction to bring [the claims] in England against the defendant as someone domiciled here, [and therefore] rule 3 of Dicey & Morris cannot properly be invoked so that the court immediately then declines to exercise its jurisdiction: such an application of rule 3 of Dicey & Morris would clearly "impair the effectiveness of the Convention""*, *per* Simon Brown LJ at [1999] 1 WLR 2178C-D, stating the plaintiffs' argument which at 2178E he said was "*plainly right*".

140.  Commenting on *QRS v Frandsen* in *The British Year Book of International Law 1999*, Professor Briggs argued for a reconsideration of Dicey Rule 3 in which a claim such as that in *Buchanan v McVey* or *QRS v Frandsen* would be admitted (*ibid*, at pp.341-343). Prof Briggs' comment as regards the Brussels Convention (*ibid*, at p.343-344) was that:

(i)  the conclusion that the proceedings were a 'revenue [etc] matter' was debateable, and

(ii)  the notion that Dicey Rule 3 would be displaced by a conclusion that the proceedings were a 'civil and commercial matter' was wrong.

On the latter aspect, Prof Briggs' view was expressed in trenchant terms but on rather complex reasoning: "*Now it must be conceded that the question was artificial, and that Simon Brown LJ was dealing with it only for good measure. But it is inconceivable that he was right. If revenue matters had been within the scope of the Convention, it is as certain as certain can be that they would have been made subject to exclusive jurisdiction of the taxing State. ... That no such exclusive jurisdiction was created for revenue claims is perhaps the clearest indication that such claims were always intended to be outside the scope of the Convention. ... [As] there is no exclusive jurisdiction, nor Webb exception [a reference to C-294/92, Webb v Webb [1994] ECR I-1717], it would be unacceptable for them to be brought within the scope of the Convention. It was therefore an exercise in artificiality for Simon Brown LJ to opine that Rule 3 would have been required to be set aside, for there was never*

*any plausible chance that an English court should have been asked to enforce a Danish tax law.*"

141.   The Editors of *Dicey* also take the view that Simon Brown LJ's *obiter* view in *QRS v Frandsen* is wrong, but for a simpler reason. Dicey Rule 3, they say, is not affected by the Brussels-Lugano regime, the contrary view expressed by Simon Brown LJ being "*open to the criticism that Rule 3 ... is not really a rule of jurisdiction, but a substantive rule of law*" (15th Edition, para 5-022). The 15th Edition of *Dicey* pre-dates the decision of the CJEU in *Sunico* (C-49/12, *Revenue and Customs Commissioners v Sunico ApS* [2014] QB 391), to which I turn next; but the view I have just quoted has not been altered in the *Dicey* Supplement noting that decision.

142.   In *Sunico*, the CJEU considered claims brought by HMRC alleging missing trader VAT carousel frauds that also led to the litigation in Singapore in *HMRC v Shahdadpuri* (see paragraph 58 above). The substantive claims, for damages at common law for an alleged tortious conspiracy to defraud, were pursued here against defendants domiciled in Denmark. HMRC also brought ancillary proceedings in Denmark to attach assets with a view to enforcing any damages judgment obtained in England. Those Danish proceedings were objected to on the basis that they were a 'revenue [etc] matter' excluded from the Brussels Regulation, Regulation No 44/2001, then the Brussels-Lugano instrument in force. The Danish court referred the matter to the CJEU.

143.   The CJEU applied a principle stated in these terms, at [34]-[35], namely that "*although certain actions between a public authority and a person governed by private law may come within the scope of Regulation No 44/2001, it is otherwise where the public authority is acting in the exercise of its public powers ...*" and that "*to determine whether that is the case in a dispute such as that in the main proceedings [i.e. the Danish ancillary relief proceedings], it is necessary to examine the basis of, and the detailed rules applicable to, the action brought by the commissioners, in the United Kingdom, before the High Court of Justice ...*". Thus, the Brussels-Lugano classification of the Danish proceedings for ancillary relief was to be that of the English proceedings to which they were ancillary.

144.   Focusing exclusively on matters of form, as they would be characterised by Dicey Rule 3, at [36]-[40], the CJEU concluded at [41]-[43], essentially, that because the claim was framed in tort and not as a claim under a tax law, the proceedings were a 'civil and commercial matter' and not a 'revenue [etc] matter' for the purpose of Article 1(1) of the Brussels Regulation, so long as "*the commissioners were in the same position as a person governed by private law in their action against Sunico and the other non-residents sued in the High Court of Justice*" (*ibid* at [43]). That last qualification harks back to the requirement, within the principle stated at [35], to examine the rules applicable to the action brought by HMRC, to see whether it was a public law claim after all. It concerns the possibility of the use of sovereign (public law) powers in connection with proceedings that would otherwise be a 'civil and commercial matter' transforming them into public law proceedings.

145.   The CJEU considered it a matter for the referring Danish court, not clear on the material before the CJEU, whether HMRC was in the same position as would be a private litigant in the English proceedings. I was shown that the Danish court concluded, when the proceedings resumed before it, that HMRC was materially *not* in

the same position as a private litigant, but that decision seems to have been based upon a misunderstanding of the 'public law powers' qualification, the meaning and extent of which was clarified by the later CJEU decisions in C-597/17, *BUAK Bauarbeiter-Urlaubs u.Abfertigungskasse v Gradgenistvo Korana d.o.o.* [2019] I.L.Pr. 12, and C-73/19, *Belgische Staat v Movic BV*. I shall come back to that below.

146. For now, what matters is that this 'public law powers' qualification within the CJEU case-law on the meaning of 'civil and commercial matters' reinforces the view that it has reference to the type of proceedings before the court, and that the substantive rules of law (including choice of law rules to determine the system of law that will govern the decision) by which claims properly brought before the court (so far as concerns the court's jurisdiction over the defendants) either succeed or fail are a matter for the national court (save where they have been harmonised by other instruments, e.g. Rome II).

147. I agree with the Editors of *Dicey* that Dicey Rule 3 is a substantive rule of English law unaffected by the Brussels-Lugano regime. As is clear from the oldest of *dicta* (see paragraph 24 above), Dicey Rule 3 has never concerned personal jurisdiction in the conflict of laws sense, i.e. which defendants can be brought before the court to answer a claim of a given type. Rather, it is a rule of English law, available to be invoked by a defendant amenable to the jurisdiction of the court when answering a suit. It is an overriding or mandatory rule of English law as the *lex fori*, a substantive rule of law that applies even if the applicable choice of law rule says that, in general, the suit in question is not governed by English law.

148. Dicey Rule 3 has sometimes been referred to as a rule of judicial self-restraint whereby the court declines to exercise the jurisdiction it has, but that is to distinguish it from rules of non-justiciability that identify questions the court is incapable of addressing; and, that said, the label of justiciability has also been used (in *Mbasogo v Logo*, for example). Labels ought not to be determinative, but for what they may be worth, I have preferred 'admissibility': English law, as a mandatory rule of the *lex fori* overriding ordinary choice of law rules, does not admit claims that are, in substance, attempts by a foreign sovereign, directly or indirectly, to exercise their sovereign power through the English courts. I do not agree with a submission SKAT made on the compatibility issue that Dicey Rule 3 is, or is akin to, a doctrine of *forum conveniens*. Nor was that SKAT's submission when addressing Dicey Rule 3, the submission there, with which I agree, being that "*the existence of parallel proceedings may engage the forum non conveniens doctrine. It may engage the res judicata doctrine or the abuse or process doctrine, but it doesn't engage Dicey Rule 3.*"

149. The decision of the Court of Appeal in *QRS v Frandsen* that the proceedings there were not a 'civil and commercial matter' appears to me to be inconsistent with the CJEU's decision in *Sunico*, subject to the use of public powers point, and therefore no longer binding on me, although it was part of the *ratio*. But in my judgment, the decision in the case, to strike out the claims, was still correct because, contrary to the view expressed, *obiter*, by Simon Brown LJ, the classification of proceedings as a 'civil and commercial matter' or a 'revenue [etc] matter' for the purpose of applying the Brussels-Lugano regime does not touch the question whether Dicey Rule 3 applies so as to defeat the claim.

150.    There is of course an overlap: there will be claims the form of which would make proceedings upon them a 'revenue matter' under the Brussels-Lugano regime and the substance of which from the point of view of Dicey Rule 3, because it matches the form, would engage the Rule. But precisely because Dicey Rule 3 is a rule of substance, the applicability of which is determined by reference to an assessment that looks beyond the way in which a claim is framed, whereas the Brussels-Lugano classification is formalistic, as Mr Goldsmith QC for SKAT accepted, a claim may be, in substance, a revenue claim, from the perspective of Dicey Rule 3, brought in proceedings that are a 'civil and commercial matter' from the perspective of the Brussels-Lugano regime. In my view, there is nothing in that regime that purports to exclude the application of Dicey Rule 3 to such a case.

151.    The Brussels-Lugano classification of proceedings is also used by the Rome II Regulation, which thus also applies in 'civil and commercial matters' and not in 'revenue [etc] matters'. It follows from *Sunico*, again subject to the use of public powers point, that proceedings pursuing claims in tort for damages for a VAT carousel fraud, or proceedings pursuing causes of action such as those pleaded in *Buchanan v McVey* and *QRS v Frandsen*, will be, and, given the causes of action pleaded by SKAT, these proceedings are, a 'civil and commercial matter' within the Brussels-Lugano regime and the Rome II Regulation. Dicey Rule 3 continues to operate however, and if applicable will lead to the dismissal of the claims brought, because (a) the Brussels-Lugano regime does not preclude such a dismissal and (b) even if under Rome II the governing law is, in general, not English law, Dicey Rule 3, if applicable, will apply under Article 16, which provides that: "*Nothing in this Regulation shall restrict the application of the provisions of the law of the forum in a situation where they are mandatory irrespective of the law otherwise applicable to the non-contractual obligation.*"

152.    Following *Sunico*, Prof Briggs proposed in "*Private International Law in English Courts*" (2014), at 2.118, that *QRS v Frandsen* must now be regarded as wrongly decided, i.e. the claim in that case now could not be struck out under Dicey Rule 3. That view is also taken by *Cheshire, North & Fawcett*, "*Private International Law*", 15th Ed. at pp.125-126. Prof Briggs' argument was that because proceedings upon a claim for damages for a VAT carousel fraud would be a 'civil and commercial matter' (see *Sunico*):

(i)     a foreign court's judgment upon such a claim would have to be enforced under the Brussels-Lugano regime "*and the contention that the enforcement of the judgment would involve the enforcement of a foreign penal law is apparently irrelevant unless it triggers a defence in terms of public policy*", and

(ii)    "*It ought to follow that a claim by a company against a corporate officer who has stolen or diverted corporate assets may be brought and the relevant rule of foreign law applied, even if the company is bringing the claim at the behest of a receiver or administrator ... with a view to discharging the tax liability of the company ...*";

and at 2.119, Prof Briggs proposed, as further consequence, that "*Where, therefore, the court has personal jurisdiction over a claim according to the Brussels I Regulation, or is required by the rules set out in the Rome I or Rome II Regulation to apply a particular foreign law, the proposition that the court may still invoke a*

*common law principle of English private international law to derail the conclusion which it is heading towards must surely be wrong.*"

153.    I respectfully disagree with those views. *Sunico* may mean that a foreign judgment on a VAT carousel fraud damages claim would have to be enforced here subject only to a public policy defence (it is not necessary to take a final view on that), but Dicey Rule 3 is by nature an English law public policy rule. In any event, in my view it does not follow from the proposition that such a judgment would have to be enforced (if that were the position) that an English court seized of the foreign sovereign authority's claim could not apply Dicey Rule 3 to dismiss it.

154.    The view that it "*must surely be wrong*" to invoke Dicey Rule 3 where Rome II provides for a system of law other than English law to be the governing law of a claim is tempered somewhat later in the same paragraph, 2.119. Prof Briggs acknowledges that the issue is not foreclosed without more by characterising the proceedings as a 'civil and commercial matter', but rather, as he says, the question then arises "*whether the application of a rule of Danish law that a wrongdoer pay compensation for his wrong would, in circumstances in which the indirect but admitted beneficiary of doing so would be the Danish tax authority, be contrary to the fundamental principles of English law, or be contrary to a rule of English law which is of fundamental importance to the legal system.*" Prof Briggs contends that "*It is hard to see how the answer to that question could be an affirmative one, though the point would, no doubt, be liable to be argued. But, as is always the case, the important thing is to formulate the right question.*"

155.    I agree with that last observation, of course, the importance of formulating the correct question. On the point itself, I respectfully do not find it difficult to see how the answer to the question Prof Briggs identified as the right question to ask should be in the affirmative, and that is how I answer it. Although, as I have noted above, Dicey Rule 3 did not require the rejection of the claim in *In re Norway's Application (Nos 1 & 2)*, it was described by Lord Goff at 808D as a "*fundamental rule of English law*", a description I respectfully adopt.

156.    It is apparent from Prof Briggs' writing that he would have English law reconsider radically the scope of Dicey Rule 3, restricting it so far as concerns revenue laws to causes of action that are, in terms, claims for sums due under a foreign tax law and so, e.g., departing from *Buchanan v McVey*. That is not a path open to me even if SKAT proposed it and I had an inclination to follow it. Assuming however that there might be room to debate the appropriate breadth of the rule, that does not affect its nature and importance. Even if some may feel it is of wider scope than it should be, that does not make it any less fundamental a rule of English law, as *lex fori*, that is to say it is no less a mandatory and overriding principle of English law, applicable even though English choice of law rules provide generally for a different system of law to govern a claim, if, as at all events Prof Briggs contends, there is room to debate whether its scope should be reconsidered. Here, as I have said, the English choice of law rules in question, in this litigation, are those of the Rome II Regulation; and Article 16 of Rome II caters for a rule such as Dicey Rule 3.

157.    This issue of compatibility – or "*The inter-action of English and EU law*" – is given thoughtful consideration in *Dickinson*, "*Acts of state and the frontiers of private (international) law*" (2018) 14 J.Pr.Int.L 1, at 25*ff*. Professor Dickinson notes, at 26,

that "*the subject matter of proceedings may be characterised as "civil and commercial", and within the material scope of the EU instruments [Brussels-Lugano, Rome I and Rome II], notwithstanding that a governmental or other sovereign act is in some sense "in play"*", and mentions Blair J's decision in *The Law Debenture Trust Corporation plc v Ukraine* [2017] EWHC 655 (Comm), at [258]-[313], that the English law act of state doctrine as explained in *Belhaj et al v Straw et al* [2017] UKSC 3 still fell to be applied although the Rome I Regulation governed the question of applicable law, the issue being whether a contract was voidable for duress.

158.    At 26-27, Prof Dickinson turns to Dicey Rule 3, *QRS v Frandsen* and *Mbasogo v Logo*. He proposes (as I have concluded) that the Court of Appeal's view in *QRS v Frandsen* that "*the Brussels Convention ... did not apply to a claim to recover [damages for] lost tax revenue by means of a private law action*" cannot sit with *Sunico*, and suggests that the claim in *Mbasogo* could not have been said to fall outside Brussels-Lugano, which I think is also correct: the claim was framed as a private law claim for damages for a tortious conspiracy to injure; the sovereign interest in play (and sufficient, as the Court of Appeal held, to engage Dicey Rule 3) would not have changed the rules of the litigation game if the claim had not been struck out. I note that it does not appear to have occurred to anyone involved in *Mbasogo v Logo* (or to the Privy Council in *President of Equatorial Guinea*) that the Brussels-Lugano regime had anything to say on whether the claim should be struck out under Dicey Rule 3. If the incompatibility argument be correct, however, the claim in *Mbasogo v Logo* should not have been struck out against defendants domiciled here.

159.    Prof Dickinson continues thus:

"*In cases of this kind, there is undoubtedly a potential dissonance between EU and English law. The European Court has held that the rules of private international law contained in the relevant EU legislative instruments are mandatory and exhaustive in character. Furthermore, the principle of effectiveness in EU law operates to restrain the application of rules of domestic law if their application would be such as to make the application of a relevant provision of EU law impossible or excessively difficult, even though the domestic rules in question may be of a different character to those harmonised by EU law.*"; citing, *inter alia*, C-159/02, *Turner v Grovit* [2004] ECR I-3565 at [29], for that last proposition.

160.    At 28, Prof Dickinson notes that in *Lucasfilm v Ainsworth* [2011] UKSC 39, [2012] 1 AC 208, *obiter* at [112], Lord Collins and Lord Walker appear to take the view that Brussels-Lugano could not require the English court to adjudicate on its primary merits a claim that the English law act of state doctrine would hold to be non-justiciable here. The claim there was for infringement of a foreign copyright and was held to fall outside the act of state doctrine. Prof Dickinson is critical of the reasoning of Lord Collins and Lord Walker, to the extent it suggested that it would be "*contrary to international law (or, perhaps more accurately, put the United Kingdom in breach of international law)*" for the English court to be required, by virtue of the Brussels-Lugano regime, to adjudicate upon a claim it would otherwise have said was non-justiciable under the act of state doctrine (*ibid*, at 29), and therefore proposes that the questions properly to be addressed are these:

"*First, is the rule of English law relied on of such a character that its application is excluded in terms by the relevant EU instrument? Secondly, assuming a negative answer to the first question, does the application of the rule of English law relied on nevertheless make it impossible or excessively difficult to apply any relevant provision within an EU legislative instrument, so as to engage the principle of effectiveness?*"

161.    At 30-35, Prof Dickinson discusses those two questions, as regards the act of state doctrine (rather than Dicey Rule 3), concluding that the first is to be answered in the negative but suggesting that there is a strong argument for answering the second in the affirmative. I agree with the first conclusion, and do not need to take a view on the second. That discussion leads Prof Dickinson, at 35*ff*, to turn back to Dicey Rule 3 and to suggest that the Editors of *Dicey* "*too readily reject the contention that the mandatory and exhaustive nature of the rules of jurisdiction, applicable law and recognition and enforcement of judgments within the Brussels I, Rome I and Rome II Regulations, coupled with [the] principle of effectiveness under EU law, dictate that the rules and principles falling within the scope of the Rule will operate in such cases only at the margins, when those instruments incorporate rules of national law or permit derogation on public policy or other grounds.*" The more fully considered resolution of the compatibility issue he suggests is "*that the first limb of Rule 3 is best understood as a choice of law rule covering the range of matters which, for reasons which have their roots in the constitution, fall within the exclusive dominion of English public law. In such cases, a foreign legal rule is incapable of creating a right of a kind that is actionable in the English courts.*"

162.    I agree, and apprehend that this essentially matches the conclusion to which I have come. So far as material to the present case, Dicey Rule 3 operates in the realm of the Rome II Regulation, and its continued application by the English court in proceedings notwithstanding that they are a 'civil and commercial matter' for Brussels-Lugano and Rome II purposes is authorised by Article 16 of Rome II.

*Civil and commercial matter or revenue matter*

163.    In point of form, SKAT has commenced ordinary civil litigation in this court, and has pleaded only private law causes of action. Whether or not, as I have concluded, the claims are to be regarded for the purpose of Dicey Rule 3 as claims brought, in substance, indirectly to enforce Danish tax law and/or sovereign authority, these proceedings are a 'civil and commercial matter' for the purpose of the Brussels-Lugano regime, unless the use of public powers qualification in the CJEU case-law concerning that concept makes them public law proceedings after all.

164.    I have effectively explained that already in dealing, above, with the question of the compatibility of Dicey Rule 3 with EU law. In short, if *QRS v Frandsen* remained good law to the effect (essentially) that 'revenue [etc] matters' within Article 1(1) of the Brussels-Lugano regime encompassed any proceedings in which the claim fell foul of Dicey Rule 3, then the position would be different. My conclusion on Dicey Rule 3 would then also dictate the answer on Article 1(1). But *QRS v Frandsen* is not now authority for that proposition, because it is inconsistent with the decision of the CJEU in *Sunico*. Unless the use of public powers qualification expressed in *Sunico* and clarified by the decisions in *BUAK* and *Movic* changes things, these proceedings are a 'civil and commercial matter', not a 'revenue [etc] matter', within Article 1(1),

*even though* they are proceedings in which SKAT pursues claims that are inadmissible here under Dicey Rule 3.

*Use of public powers*

165.   There was an ambiguity in *Sunico* about the nature of the use of public powers qualification upon its basic doctrine of judging whether proceedings are a 'civil and commercial matter' by the way in which the claim in question has been framed. The ambiguity arose in this way:

(i)     The established case-law by the time of *Sunico* had already established, as A-G Kokott put it in her opinion at [41], that in order to say whether proceedings relate to civil and commercial matters, "*it is ... necessary to identify the legal relationship between the parties to the dispute and to examine the basis and the detailed rules governing the bringing of the action ...*". The legal relationship asserted by the claim, and the basis for and rules governing the pursuit of the claim, must both not have a public law nature, if the proceedings are to be a 'civil and commercial matter'.

(ii)    In relation to the basis for and rules governing the pursuit of the claim, it was submitted (*ibid* at [44]) that HMRC were not exercising powers going beyond those of ordinary civil litigation: "*The same procedural rules apply as for anyone else, and the proceedings are governed by civil procedure. In particular, contrary to customary practice in the exercise of public powers and especially in tax law, the commissioners cannot ... enforce and execute the claim but must pursue it through the general courts of law.*"

(iii)   A-G Kokott, at [45], noting that HMRC had used public law powers not available to a private litigant to obtain information from the Danish authorities, expressed the opinion that "*if it were admissible in national procedural law for the commissioners to use that information and evidence obtained in the exercise of its powers in the proceedings before the High Court of Justice, the commissioners would not be acting against the defendants as a private person. Whether and to what extent that is the case must be determined by the referring court.*"

(iv)    Depending on what A-G Kokott meant by it being "*admissible ... for the commissioners to use that information*", that may have been a view that if evidence obtained using a public law power (e.g. through Treaty request for assistance from a fellow sovereign) can be adduced in the proceedings, then they cannot be a 'civil and commercial matter'.

(v)     If that was A-G Kokott's meaning, then the Court expressed the public law powers qualification rather differently, noting at [42] that it could not say whether evidence obtained using public law powers had been used in the proceedings, and concluding at [43] that it was "*for the referring court to ascertain whether that was the case and, if appropriate, whether the commissioners were in the same position as a person governed by private law in their action against Sunico and the other non-residents sued in the High Court of Justice.*"

(vi)   In my view, the sense of "*if appropriate*" in that formulation of principle is "*if so*". The Court was saying that it is *not* enough, as A-G Kokott might be taken to have suggested, that evidence obtained using a public law power could be deployed in the proceedings. What is required to transform what appear to be civil and commercial proceedings into something else is the use of such material in such a way as to change the character of the process.

(vii)  However, the Court prefaced what it said at [43] (as quoted in (v) above) with "*... as the Advocate General has stated at point 45 of her opinion*". If that were endorsement of more than A-G Kokott's view that the case had to be referred back to the Danish court, and if A-G Kokott was suggesting a wider test for when the use of public powers will take a case outside the Brussels-Lugano regime, then it might be considered that the Court endorsed her wider test, even though the Court's own formulation would seem to indicate otherwise.

166.   It is not necessary to decide how far the CJEU's reference to A-G Kokott's view was intended to go, or exactly what A-G Kokott meant by her [45]. That is because the subsequent decisions in *BUAK* and *Movic*, *supra*, make clear that the relevant doctrine is narrower than A-G Kokott might be read as suggesting. The use of public law powers unavailable to a private entity, to investigate and gather evidence that can be deployed in support of a claim is, without more, irrelevant to the classification of the proceedings as a 'civil and commercial matter' or 'revenue [etc] matter'. What tips the scales, if present, is deployment of material such that, under the substantive or procedural rules that will be applied by the national court, it has some different status, as deployed by the public body litigant, than it would have if deployed by a private entity.

167.   The real touchstone, in other words, is whether the rules of the litigation game will be different, because the public body is what it is or because of its use of public law powers in relation to the claim (and I note that is how, in effect, A-G Saugmandsgaard Øe understood the CJEU case-law in C-186/19, *Supreme Site Services GmbH v Supreme Headquarters Allied Powers Europe* [2021] 1 WLR 955 at 971-972, [89]-[92]). SKAT being able to use public law powers that a private litigant would not have in connection with the claims it has brought here does not change the rules of the game in this litigation. For example, it does not turn what would be the burden upon a private legal person as claimant to prove the ingredients of each cause of action asserted into some sort of limited judicial review of SKAT's decisions that the WHT refund applicants had not been entitled to the WHT refunds SKAT paid that are now the subject of its claims in the litigation.

168.   In *BUAK*, claims were brought by an Austrian public body to pursue annual leave pay for non-resident workers. The determinative question was not whether BUAK had and/or exercised public law powers to investigate and/or pursue the claim. As the CJEU later put it in *Movic*, at [56]: "*to hold that proceedings brought by a public authority are outside the scope of [the Brussels Regulation (recast)] merely because of the use by that authority of evidence gathered by virtue of its public powers would undermine the practical effectiveness of one of the models of implementation of consumer protection envisaged by the EU legislature [in which], in contrast to the [model] in which it is the administrative authority itself that determines the consequences that are to follow from an infringement, ... the public authority is*

*assigned the task of defending the interests of consumers before the courts*". What mattered was whether the claims brought would fall to be judged in the same way as they would if brought by individual workers or a private law collective body taking action on workers' behalf.

169.    It was contentious between the parties whether under a certain provision of the applicable Austrian statute, "*the court's powers are limited to a simple examination of the conditions for the application of that provision, with the result that, if those conditions are satisfied, the court cannot carry out a detailed examination of the accuracy of the claim relied on by BUAK*" (*BUAK*, at [57]). The decision of the CJEU, at [60]-[61], was that if and only if that *was* the position, that would place BUAK "*in a legal position which derogates from the rules of general law regulating the exercise of an action for payment, by attributing a constitutive effect to the determination by it of the claim and by excluding ... the possibility for the court hearing such an action to control the validity of the information on which that determination is based*", so that in pursuing the claim BUAK would be acting "*under a public law prerogative of its own conferred by law*" and the proceedings would be a public law matter (in effect judicial review proceedings) and not a 'civil and commercial matter'.

170.    By contrast, BUAK's powers of investigation did *not* confer a public law character on the proceedings; they did not influence "*the capacity in which BUAK acts in the context of a procedure such as that in the main proceedings*" and did not "*modify the nature or determine the evolution thereof*" (*ibid* at [64]).

171.    Most recently, in *Movic*, proceedings were commenced by Belgian public authorities aimed at determining and stopping unfair commercial practices in the context of live event ticket resales. The CJEU confirmed that by nature such proceedings were 'civil and commercial matters', subject to the use of public powers qualification (*ibid*, at [42]-[43]). The rules by which the court would judge whether the Belgian authorities had a sufficient interest to bring the claim were comparable to the rules that would apply were such a claim brought by a private law consumer protection association (*ibid*, at [[48]-[51]]).

172.    Critically for my purpose, at [55]-[58], the CJEU rejected the contention that the use by the Belgian authorities of their own reports and investigative findings, generated through public powers, meant that the proceedings were public law proceedings and not a 'civil and commercial matter' after all.  In particular, the principle was clearly stated as follows at [57]: "*Only where, due to the use to which a public authority has put certain pieces of evidence, it is not specifically in the same position as a person governed by private law in the context of a similar action, would it be appropriate to make a finding that such an authority has, in a particular case, exercised public powers.*"

173.    The proceedings brought by the Belgian authorities were therefore a 'civil and commercial matter', notwithstanding the availability and use of public law investigative, evidence-gathering or evidence-generating powers, except only that, at [62], "*as regards the application by the Belgian authorities to the referring court that it should be granted the power to determine future infringements simply by means of a report issued, on oath, by an official of the Directorate-General for Economic Inspection, ..., such an application cannot be said to come within the scope of 'civil*

*and commercial matters', as that application relates in actual fact to special powers that go beyond those arising from the ordinary legal rules applicable to relationships between private individuals.*"

174. In the present litigation, I agree with the defendants that it is, as they put it, blindingly obvious that SKAT made use, and might well have continued to make use, of powers it has as a sovereign tax authority that no private litigant would have, to investigate and obtain evidence that it could use if it wished in the litigation and has to a material extent already used in the litigation. On the authority of *BUAK* and *Movic*, however, that is beside the point. SKAT was neither attempting nor able to change the rules of the litigation game, either as to the substantive rules of law that would apply in determining its claims, or as regards the procedural rules applicable in the litigation, or as regards the status or effect of any of the evidence it might deploy or disclose. SKAT was not by this litigation pursuing public law proceedings, in which liabilities are determined as if this were a judicial review of SKAT's actions, decisions or exercise of public law powers, rather than upon the same legal basis, substantive and procedural, as claims of the kind it seeks to pursue, e.g. for damages for deceit or for negligence, brought by a private law entity.

*Conclusion*

175. That brings me full circle to Dicey Rule 3. It can apply (and, I have concluded, does apply), notwithstanding that in form SKAT does not assert tax law causes of action and that these are civil litigation proceedings subject to the ordinary rules of such proceedings, because Dicey Rule 3, as an overriding rule of English law as the *lex fori*, looks beyond such matters of form to examine the substance, in the sense of the central interest in bringing the claim of the sovereign authority by which or in whose interests the claim is brought (and I have concluded that the central interest here is the Kingdom of Denmark's sovereign right to tax Danish company dividends). But the fact that SKAT asserted, in point of form, only private law causes of action, not tax claims, in civil litigation proceedings that are subject to the ordinary rules of such proceedings, means the proceedings are a 'civil and commercial' matter, not a 'revenue [etc] matter' within Article 1(1) of the Brussels-Lugano regime.

176. To the extent that SKAT relied on the Brussels-Lugano regime as the basis for this court having jurisdiction over the Brussels-Lugano defendants that have been sued, including it may be for serving proceedings out of the jurisdiction, in my judgment it was right to do so. But its having been entitled to do so did not oust or disapply Dicey Rule 3 in respect of those defendants.

**Result**

177. The result is that by the application of Dicey Rule 3 in these proceedings, all of SKAT's claims fall to be dismissed.

## SKAT – Revenue Rule Trial

### Appendix:

### Rival Contentions on Dicey Rule 3

**SKAT**

178.    SKAT made the following substantive points about Dicey Rule 3:

(i)     A foreign state can sue in the English courts for recovery of state property or compensation for its loss.

(ii)    Dicey Rule 3 is only concerned with the *enforcement* of sovereign rights. Mere *recognition* of a foreign rule of law or its effect falls outside Dicey Rule 3. In the revenue law context, for the Rule to apply there must be an outstanding and unsatisfied foreign tax claim sought to be satisfied by the claim brought here. It is irrelevant if, in connection with or as background to the claim advanced, there was a sovereign act that had already been completed or a previously satisfied sovereign claim.

(iii)   If SKAT's claims do not infringe the rule in *Government of India*, there are no proper grounds to say that they infringe any wider principle. Given the revenue nature of the case (stated in general terms), the rule in *Government of India* states and delimits the relevant policy of English law, so that if the claim is not within that rule there is no reason to subject it to any further scrutiny. No defendant points to any non-revenue sovereign power as providing the foundation of the claim.

(iv)    The rule in *Government of India* is absolute: if the claim is in substance (directly or indirectly) a revenue claim, there is no room for discretion on the part of the English court to adjudicate the claim.

(v)     However, there is a public policy exemption in the wider rule: a claim will not infringe Dicey Rule 3 if it would be contrary to public policy for the Court to decline to hear it.

179.    SKAT argued that its claims are of the same character as claims that could be bought by a private law entity that made payments in response to fraud, false representations of fact or otherwise by mistake; it is not claiming for unpaid taxes, and no outstanding tax debts are pursued by these claims. It is irrelevant that the sums paid by SKAT may in some sense represent the proceeds of sums originally collected as taxes, or that the relevant inducement by the defendants was for SKAT to pay a tax refund. If that is not sufficient to take all of its claims outside Dicey Rule 3, then on any view its proprietary claims are not caught, in which SKAT asserts that traceable proceeds of fraud are held on trust for it.

180.    SKAT says in its claim that the dividend arbitrage trading transactions or purported transactions upon which the Solo etc Applications or the ED&F Man Applications were based did not result in the beneficial ownership of shares or receipt of dividends

net of WHT deductions required for the WHT refund claims in question to have been valid claims on the part of the applicants making the claims. Thus, SKAT says, the WHT applicants had not been liable to tax in Denmark; the tax, a refund in respect of which was claimed, had not been withheld from the applicants making the refund claims, so no withheld tax could validly be reclaimed by them; there is no claim (by SKAT) that those applicants had or have an unpaid tax liability under Danish law, there was no relevant tax relationship; any obligation SKAT mistakenly considered itself to owe was the consequence of the applicants' voluntary conduct in applying for a WHT refund, rather than an exercise of sovereign authority to tax them. As such, the claims do not directly or indirectly enforce Danish revenue law.

181.   SKAT contended that neither do their claims constitute the exercise or assertion of a sovereign right for the purpose of Dicey Rule 3 more broadly. That the Danish tax regime was the setting for a fraud *on* SKAT (or the setting for the non-fraud defendants' negligence or receipt of funds) does not mean that the claim involves the exercise or assertion of a sovereign right *by* SKAT. The running of a tax system is not a sovereign act; the relevant refunds, and therefore SKAT's losses, are due to administrative acts triggered by the applicants' misstatements, not the exercise of sovereign power, and this is a patrimonial claim for the recovery of state property, or compensation for its loss, not a claim to enforce sovereign rights.

182.   SKAT again submitted, in the alternative, that if that is not sufficient to take all of its claims outside Dicey Rule 3, then on any view its proprietary claims are not caught by it.

183.   The use of public investigative powers cannot engage Dicey Rule 3, the sole focus of which is the nature of the claim brought. It is irrelevant whether the claimant has used sovereign powers to obtain information or evidence with a view to deploying it in support of SKAT's claims, or which has been, will be, or could be so deployed.

184.   If SKAT's claims are patrimonial claims, they are admissible in an English court even if the issues that will fall to be determined in them have the potential for embarrassment that an English court may have to rule on the soundness of the administration of the Danish tax system, or the competence (or perhaps even the honesty) of officials involved in that administration. The court is called upon to make findings critical of public institutions of foreign states on occasion. Just as the 'act of state' doctrine must not "*degenerate into a mere immunity against international embarrassment*" (*Belhaj*, *supra*, *per* Lord Sumption JSC at [240]), so Dicey Rule 3 is not concerned with causing or not causing international offence or embarrassment, it is concerned with the type of claim being brought.

185.   Whether there are alternative remedies under international tax instruments, for example MARD, or bilateral arrangements such as individual DTAs, is nothing to the point. They provide additional rights and do not purport to remove rights that a sovereign entity would otherwise have. They may be concluded against a background of the general international unavailability of private law actions for the extra-territorial recovery of taxes, but they do not purport to define the limits of any such doctrine under any given domestic legal system. SKAT's position was that these alternative routes for vindicating its rights to recover (the value of) WHT refunds erroneously paid in fact were not available to it, but even if they were, enforcement

through MARD or international treaty, and enforcement in private law, are not mutually exclusive – they are not the opposite sides of a single coin.

**Defendants**

186.    The nine defendants or defendant groups who made submissions in this trial, written or oral or both, pursued arguments that overlap or complement each other. They divide into two lines of attack, and all the defendants participated to a degree in each:

    (i)    SKAT's claims are revenue claims in disguise (i.e. fall foul of the rule in *Government of India*);

    (ii)    only a sovereign power would be in the position to bring the claims SKAT brings (i.e. the claim is born of the exercise of sovereign powers rather than being a patrimonial claim).

187.    There were also arguments about the rationale for Dicey Rule 3, which it was said should influence the conclusion in a number of ways.

*Disguised Revenue Claim*

188.    Acupay dealt in some detail with the mechanism and workings of cross-border taxation and WHT schemes in particular. There are sovereign choices to be made on how to levy tax on dividends declared by companies liable to taxation in the sovereign's state while honouring DTAs the sovereign may have concluded. At the material time, the Danish sovereign choice, so far as material, was for SKAT to receive as tax 27% of dividends declared by a Danish company, paid by the company to SKAT, i.e. a WHT system, and to operate a WHT refund system available to legal persons tax resident in states with which Denmark had concluded a DTA (the primary focus in this case being Denmark's DTAs with the USA and Malaysia).

189.    The Sanjay Shah Defendants presented the most detailed analysis of SKAT's claims, as pleaded by SKAT, though the defendants were all agreed on their conclusions. The claims bought by SKAT are premised on allegations of erroneous refunds of WHT paid to the WHT applicants. On SKAT's pleaded case, these refunds were paid because the applicants misrepresented to SKAT matters relevant to their entitlement to a payment under Denmark's WHT refund system administered by SKAT. So the foundation and basis for all of the claims made is an allegedly erroneous assessment by SKAT of the applicants' liability to tax, in light of the information provided. The substance of SKAT's claims, whatever their form (i.e. whatever private law causes of action it says the facts of the case may fit), is to enforce an element of the Danish dividend tax regime enacted by Danish tax legislation and administered by SKAT as the Danish sovereign tax authority.

190.    Further, the alleged invalidity of the WHT reclaim applications is the founding premise for all of SKAT's various claims here, rather than being sufficient in itself to justify those claims, only because the claims brought here are not the simple claims against the WHT refund applicants for a return of refunds wrongly paid to them that is the most obvious cause of action SKAT might have. A direct attempt to claw back tax refund payments made to WHT refund applicants would be, in substance, an attempt to collect tax. What are in essence revenue claims within Dicey Rule 3 do not have a

different character because SKAT has sued in respect of it parties against whom additional ingredients must be established for there to be liability.

191.    Acupay submitted that it makes no sense from a tax lawyer's perspective to distinguish between an action to recover unpaid tax and an action to recover a WHT refund. This is as true, the defendants submitted, of SKAT's claims for proprietary remedies as it is of claims for damages or personal restitutionary remedies. Those 'proprietary claims' are still revenue claims, because they all depend on the prior finding as to the true position under Danish tax law and the voidability, on the basis thereof, of decisions by SKAT to make tax refund payments (or as to the amounts to be paid as tax refunds). The possible vesting of beneficial entitlements in SKAT in assets situated outside Denmark, as a remedy in respect of SKAT's having been induced to make tax refund payments in error, is an extra-territorial enforcement of SKAT's rights in relation to its WHT refund system, i.e. sovereign rights under Danish tax law, just as much as would be an award of damages.

192.    Messrs Knott & Hoogewerf also raised the point that, under English law, it is at least an open question whether there is a constructive trust prior to the court imposing one where equity requires it as a remedy. As such, SKAT may not currently have a proprietary right to the funds paid out. This was raised not to resolve the issue, but to reinforce the point on characterisation.

193.    Messrs Knott & Hoogewerf further submitted that SKAT's claims constitute the enforcement of Danish revenue law because they are premised on an allegation of a contravention of that law; but when tested, that added nothing to the debate. It was accepted on their behalf, certain language in their written submissions notwithstanding, that SKAT's claims did not allege breach of an obligation imposed on the WHT refund applicants by the WHT Act in submitting, if they did, invalid WHT refund claims. The sense in which there was a 'contravention' of Danish tax law was that, as alleged by SKAT, the WHT refund applicants had induced tax refund payments to be made by SKAT in circumstances when they should not have been paid, which just returns the argument to the question whether English law should characterise SKAT's resulting claim to claw back its payment as a tax claim, for the purpose of Dicey Rule 3. This was therefore, in reality, the same argument as made by Messrs Fletcher, Jain and Godson, summarised in the next paragraph.

194.    Messrs Fletcher, Jain and Godson, representing themselves, argued that the natural characterisation of SKAT's claim is to say it sues for a tax fraud, and pointed out that in a number of other jurisdictions that is how SKAT itself has categorised the case. The effect of Dicey Rule 3, they submitted, as epitomised by cases such as *Buchanan v McVey*, is that there is no cause of action in the English court for fraud on a foreign revenue, any more than for the collection of foreign tax debts. SKAT, they submitted, seeks artificially to re-characterise the case as one of commercial fraud.

195.    Those defendants variously addressed also, at least in outline, their respective contentions on the merits why their US pension plans (in the case of Mr Fletcher and Mr Godson) or Malaysian (Labuan) companies (in the case of Mr Jain) *were*, they say, relevant beneficial owners entitled to dividend payments in a sense sufficient to be able to claim to have had dividend tax withheld by operation of the Danish WHT system so as to found valid claims for refunds under that system; and they noted that

the validity of their entities' positions is the subject of pending Danish tax tribunal proceedings (or court proceedings on appeal therefrom).

196.    As I explained after hearing those submissions, and so that there was no need for SKAT to take up time replying to them, the correctness or otherwise of those submissions is beyond the scope of this trial. That debate, or important particular elements of it at least, is the subject matter of the Validity Trial fixed for later this year for any of SKAT's claims that survive this first preliminary issue trial. The fact that that is the foundational debate underpinning all of SKAT's claims is relevant for present purposes, the essential question being whether that means that SKAT is, in substance, seeking outside the Kingdom of Denmark to enforce Danish revenue law or otherwise to vindicate the exercise of Danish sovereign power.

*Uniquely Sovereign Circumstances*

197.    The defendants pointed to matters they say indicate that SKAT's position is and can only be that of a sovereign authority, not a position that in substance could arise for a private litigant. As Ms Macdonald QC put it in the course of her oral submissions, the proper question is "*the importance of the mechanism by which the loss was sustained and whether there was a sovereign mechanism or sovereign decision in play."* This is preferable to SKAT's formalistic distinction between a wrong extracting a payment from SKAT, and a wrong causing SKAT to be underpaid, in which the former does not engage Dicey Rule 3 while the latter does. She also submitted that for Dicey Rule 3 to apply sovereign acts or decisions need not have been the sole cause of loss; *Mbasogo v Logo* shows that it is sufficient if sovereign decisions or acts are one of several contributing causes.

198.    The indicia, then, that SKAT's claims are sovereign, not patrimonial, were said to be these, namely that:

(i)     SKAT is a function of the Danish Government, and is acting on behalf of the Kingdom of Denmark.

(ii)    Imposing, administering and giving refunds of tax are sovereign acts which could not be delegated. A private individual could not suffer loss by paying out tax refunds not properly due (or not properly due in the full amount paid out).

(iii)   SKAT's claims are advanced on the basis of SKAT's statutory right to tax in its capacity as the competent fiscal authority of Denmark. This is a paradigmatic exercise of sovereignty, with no non-governmental interest involved.

(iv)    The losses are the Danish Treasury's, and any amount recovered will be for the Danish Treasury, not just in the formal sense that since SKAT is an organ of the Danish state, all 'its' assets in fact belong to the Kingdom of Denmark, but in the sense that recoveries from this litigation will rightly be considered to be direct credits to the Danish *fisc*, repairing a net under-collection of dividend taxes for the tax years in question so that it is properly in line (as SKAT alleges it was not at the time) with the DTAs Denmark then had in place. It is to be noted that SKAT acknowledges it must give credit for any recoveries

made from the WHT applicants following determination of the validity (or as SKAT says, invalidity) of their refund claims by the Danish tax tribunal system (or on appeal therefrom).

(v)    SKAT seeks to infer falsity from its own preliminary decisions taken under Danish law annulling its previous decisions to accept the WHT Applications. The claim relies on SKAT's own sovereign acts.

(vi)   The claims critically and necessarily invoke SKAT's sovereign powers and allege that the WHT refunds paid out were not properly due under Danish law; and in pursuit of those claims SKAT has used and can be expected to use investigative powers and entitlements to mutual assistance from foreign sovereign authorities that only a sovereign might possess.

199.   SKAT used sovereign powers to gather information as to how large sums came to be paid out by way of (as it says) WHT refunds that it was not liable to make, and relied on information so obtained when seeking and obtaining freezing orders and an order in Dubai giving it access to a mass of Solo-related documents, and when pleading its claims. The defendants argued that this gives the proceedings a sovereign character and that SKAT cannot avoid that conclusion by noting that there may have been routes by which a private party could have obtained the same evidence.

*Comity*

200.   The Sanjay Shah, Lui and DWF Defendants, and Acupay, supported their various submissions by raising the issue of comity. I did not understand any of them to be contending for a freestanding rule that a claim must be dismissed, or Dicey Rule 3 must be treated as applicable, if it would infringe notions of comity to entertain the claim. The defendants thus appeared to me ultimately all to share the stance adopted by Messrs Knott & Hoogewerf, namely that comity is an aspect of the single, unitary rule that is Dicey Rule 3 and its need to characterise a claim as either sovereign or patrimonial, the greater the seeming affront to comity the more likely the conclusion that as a matter of substance the claim is sovereign in nature.

201.   In oral argument the DWF Defendants took the lead on the comity issue, whatever its relevance to the present decision. Dicey Rule 3 is predicated on a foundational principle of public international law, *viz.* that there are territorial limits to sovereignty. The live issues in these proceedings would inevitably mean this court making judgments on the legality and adequacy of Danish sovereign acts on Danish soil. This would require the English court, in substance, to sit in judgment over the internal affairs of the Danish sovereign state, in breach of the principle of comity.

202.   As an adjunct to this argument, the Sanjay Shah and DWF Defendants submitted that the court ought to consider the claim as a whole, by which they meant not just SKAT's pleaded case but also the matters raised in the various Defences. If that be right, then the defendants pointed to the following matters which, they say, would have to be determined at a full trial of all issues:

(i)    whether there had been a valid, lawful and reasonable exercise of sovereign power to tax by Denmark;

(ii) whether SKAT, as the Danish tax authority, was aware of market practice in trading and owning shares and receiving dividends relevant to the operation of any WHT system;

(iii) whether SKAT failed to interpret, apply and adhere to Danish and international tax law and its own guidelines or failed to take account of prevalent market practice;

(iv) whether SKAT's WHT reclaim procedure was inadequate, including the vetting and oversight of the implementation of that regime;

(v) whether the actions, decisions and internal administrative procedures undertaken to approve the relevant WHT refunds and later reverse those same decisions were adequate or lawful;

(vi) whether despite making available and participating in Danish tax tribunal proceedings to determine the validity of the WHT refund applicants' claims, the Kingdom of Denmark should not have treated these matters as tax matters at all;

(vii) whether SKAT's interpretation of Denmark's obligations under the relevant DTAs was correct and whether Denmark's treaty obligations thereunder were complied with;

(viii) whether Denmark's differential treatment of Danish and non-Danish resident taxpayers under the WHT Act is compatible with the Article 63 TFEU, the free movement of capital.

203. Further, Acupay submitted that Dicey Rule 3 ensures cross-border assistance is kept in its proper place with regards to the separation of powers. Cross-border assistance should be the exclusive preserve of arrangements between states on the international plane, which can regulate these issues by agreement between them, including appropriate safeguards. This includes bi-lateral treaties, multilateral conventions and MARD.

*Act of State*

204. The DWF Defendants, supported by the Sanjay Shah Defendants, further submitted in writing that the 'act of state' doctrine applies to render SKAT's claims non-justiciable, by which I understood them to be referring to the second of the rules of law sometimes given that label, as described by Lord Neuberger in *Belhaj*, *supra*, at [122]. But this was not developed separately in oral argument, and in my judgment cannot provide a defence against claims brought by SKAT, disavowing its acceptance of WHT tax refund claims as having been by mistake induced by misrepresentation and asking the court to consider and determine whatever issues properly arose. If SKAT's claims are to be dismissed on the basis of an overriding conflict of laws rule, it must be Dicey Rule 3, not the act of state doctrine.

*Discretion*

205.    The defendants made common cause that if (as a matter of substance) SKAT's claims fall within Dicey Rule 3, then there is no room for a further exercise of discretion, or assessment as a matter of public policy, as to whether or not the claims should be enforced here. The Rule is an absolute, exclusionary rule, and represents the applicable public policy. That Denmark may lose this case because of it is nothing to the point. The Rule supports and respects the practice of international relations between sovereigns.