# Exhibit 8_A

**In re**

**CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND LITIGATION**

Expert Report of

Stephen E. Shay

December 31, 2021

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................................................ 3

    A.    Engagement and Assignment................................................................... 3

    B.    Qualifications ............................................................................................ 4

    C.    Independence ............................................................................................ 6

    D.    Information Considered ............................................................................ 6

    E.    Summary of Conclusions ......................................................................... 6

    F.    Structure of This Report......................................................................... 10

II.    FACTUAL BACKGROUND AND LEGAL CONTEXT ............................. 11

    A.    Facts ....................................................................................................... 11

    B.    SKAT Learns of and Investigates the Alleged Fraud ........................... 14

    C.    The Litigations ....................................................................................... 18

        1.    The U.S. Litigations.................................................................... 18

        2.    Non-U.S. Litigations .................................................................. 20

III.    CONTEXTUALIZING THE REVENUE RULE IN U.S. TAX LAW AND
        TAX TREATY POLICY ............................................................................ 22

    A.    Overview................................................................................................ 22

    B.    The Revenue Rule Principle in the United States.................................. 24

        1.    National Tax Enforcement in a Global Economy....................... 24

        2.    The Revenue Rule in the United States ...................................... 26

        3.    SKAT's Claim ............................................................................ 28

    C.    The U.S. Cross-Border Dividend Withholding Tax Regime ................ 32

    D.    Mutual Assistance Under U.S. International Tax Agreements............... 46

        1.    Overview..................................................................................... 46

        2.    U.S. Bilateral Income Tax Treaties – Mutual Assistance and
               Dividend Withholding ................................................................ 47

    E.    Tax Information Exchange Agreements ................................................. 55

IV.    THE REVENUE RULE, SEPARATION OF POWERS, AND RESPECT FOR
        SOVEREIGNTY......................................................................................... 57

    A.    Separation of Powers ............................................................................. 57

        1.    The Standard ............................................................................... 57

2.      The Policy Equivalence of a Return of a Tax Refund and
        Collection of an Underpaid Tax .............................................. 58

3.      Practical Consequences of Revenue Rule Inapplicability to
        Recovery of a Tax Refund ..................................................... 61

B.      Intrusion in Foreign Country's Sovereignty ............................. 64

1.      The Standard .......................................................................... 64

2.      Determining the Tax Refund Claim ....................................... 65

V.      CONCLUSIONS ............................................................................. 68

APPENDIX A – CURRICULUM VITAE ................................................. 70

APPENDIX B – DOCUMENTS CONSIDERED ...................................... 80

## I.     INTRODUCTION

### A.     Engagement and Assignment

1.    Counsel for Defendants has retained me to provide context and background on the role the "revenue rule" plays in the design and implementation of U.S. international tax law and treaty policy from the perspective of a former Executive Branch policymaker who has served as a senior international tax official in the U.S. Treasury Office of Tax Policy in the Reagan and Obama Administrations, and as a practitioner and scholar who has studied and written on this subject.

2.    The purpose of this Report is to assist the Court in its assessment of how entertaining Plaintiff Skatteforvaltningen's ("SKAT's") fraud and related claims for return of tax refunds would:

2.1.    intersect with policies underlying the design of U.S. international tax law governing the administration and enforcement of tax on items of taxable income paid to nonresidents;

2.2.    relate to the existing limited collection assistance treaty provisions in the U.S. network of bilateral income tax treaties, including the treaty with Denmark, and the reservation contained in the collection assistance provisions in the multilateral Council of Europe/OECD [1] Convention on Mutual Administrative Assistance in Tax Matters (the "Convention"), each of which has received advice and consent of the U.S. Senate; and

2.3.    potentially affect future Legislative and Executive Branch policy considerations, including:

i.    future Executive Branch negotiations and diplomacy with respect to collection assistance in international treaties; and

---

[1] Organisation for Economic Co-operation and Development.

       ii.     the scope of Executive Branch authority to negotiate collection assistance provisions in future executive agreements.

**B.     Qualifications**

3.    I am the Paulus Endowment Senior Tax Fellow and Adjunct Professor at Boston College Law School.[2]  For this engagement, I am acting as a consultant for Ropes & Gray LLP ("Ropes") in Boston, Massachusetts.  I was an international tax partner at Ropes from 1987 to 2009, when I retired from the firm to join the Obama Administration as Deputy Assistant Secretary for International Tax Affairs in the U.S. Department of the Treasury ("DAS International Tax").

4.    As DAS International Tax, I served as the U.S. delegate to the reconstituted G20/OECD Global Forum for Transparency and Exchange of Information in Tax Matters (when it opened to non-OECD participation and expanded to 130+ countries).  Among other responsibilities, I was actively engaged in the passage of the Foreign Account Tax Compliance Act and had oversight responsibility for the U.S. tax treaty network.

5.    On leaving the Treasury in 2011, I joined the faculty of Harvard Law School as a Professor of Practice.  I have taught U.S. tax law courses as a Lecturer at Yale Law School, Oxford University's MSc. in Taxation and the Leiden International Tax Institute.  I was the International Bureau of Fiscal Documentation ("IBFD") Professor in Residence in Amsterdam for 2015.

6.    In the course of my private practice at Ropes, I regularly represented U.S. multinational corporations and private equity sponsors on cross-border tax planning and controversy matters.  During this period, I served as Associate Reporter for the American Law Institute's Federal Income Tax Project: International Aspects of United States Income

---

[2] The opinions expressed in this Report are my own and do not necessarily represent the views of any institution with which I am affiliated.

Taxation II, Proposals of the American Law Institute on United States Income Tax Treaties.[3]

7.    From 1982 to 1987, I served in the Office of International Tax Counsel at the U.S. Department of the Treasury, including in the role of International Tax Counsel.[4] I actively participated in the enactment of the international provisions of the Tax Reform Act of 1986 and in the negotiation of bilateral income tax treaties.  I served as the U.S. delegate to the negotiation of the 1988 Council of Europe and OECD Multilateral Convention for Mutual Assistance in Tax Matters.

8.    I currently serve on the Executive Committee of the New York State Bar Association Tax Section and the Leadership Council of the Harvard Law School Wilmer Hale Legal Services Center.  I am a Fellow of the American College of Tax Counsel and Member of the College's Amicus Committee.  I am also a past President of the American Tax Policy Institute Board of Trustees and have been active in the American Bar Association Tax Section as a Council Director and Chair of the Committee on Foreign Activities of U.S. Taxpayers.  I am a Life Member of the American Law Institute.

9.    I received my B.A. from Wesleyan University in 1972 and a J.D. and M.B.A. from Columbia University in 1976.  I am a member of the Bars of Massachusetts and New York.[5]

10.    I have written scholarly, policy-focused, and practitioner articles on international taxation and have testified numerous times before Congressional tax-writing and investigatory committees.  I have been retained as an expert on U.S. and international taxation by U.S. and Canadian law firms, the Australian Commissioner of Taxation, the New Zealand Crown Counsel, and the Irish Office of the Revenue Commissioners, and have testified as

---

[3] Exhibit 1 (American Law Institute, FEDERAL INCOME TAX PROJECT - INTERNATIONAL ASPECTS OF UNITED STATES INCOME TAXATION II (1992) (Reporters David R. Tillinghast & Hugh J. Ault and Associate Reporter Stephen E. Shay)).

[4] There was no DAS International position in the Office of International Tax Policy at that time. The International Tax Counsel was the senior exclusively international tax position.

[5] I am not admitted to practice law in Denmark or any foreign country.

an expert in courts in the U.S, Ireland, and New Zealand and before international arbitration tribunals.

11.    My curriculum vitae is attached as Appendix A.

### C.    Independence

12.    I am providing my services as an expert on international taxation policy in my capacity as a consultant to Ropes & Gray LLP.  Working under my direction, attorneys at Ropes have assisted me in the preparation of this Report.  Ropes bills on a time and materials basis for work in connection with this assignment.  My Ropes hourly rate for this assignment is $1,930 for 2021.  Payment for my services does not depend in any way on my opinions expressed herein or the outcomes in this matter.

13.    I am independent from the parties and their legal advisors.  I confirm my genuine belief in the opinions expressed herein.

### D.    Information Considered

14.    In preparation of this Report, I have reviewed a large number of documents, including record factual documents, supplied by counsel to Defendants.  I have engaged in discussions with counsel to Defendants.  To gain a more thorough background for this proceeding, I have also reviewed the pleadings and prior decisions in this case.

15.    In preparing this Report, I relied upon the information cited herein and considered the material listed in Appendix B.  I have included as exhibits, following Appendix B, copies of information or documents that I relied upon that may not be readily accessible to the reader.  I have also relied on my own knowledge, experience and understanding of U.S. international tax law and international tax treaties.

### E.    Summary of Conclusions

16.    This Report offers conclusions from my perspective as a former tax policymaker and treaty negotiator regarding the implications of allowing SKAT's fraud and associated common law claims to proceed on U.S. international tax policy, tax treaty negotiation, and tax diplomacy.

17.     This Report contains overviews of the revenue rule in U.S. jurisprudence, the design of U.S. and Danish international tax laws governing source taxation of dividends paid to non-residents, collection assistance provisions contained in the U.S. network of bilateral income tax treaties and the Convention, and the role of tax information exchange agreements. This background is context for my conclusions. At a high-level, the relevant contextual information explains that:

17.1.   U.S. courts have applied the revenue rule to bar direct and indirect enforcement of a foreign sovereign's tax claims in U.S. courts to protect separation of powers and preserve international tax and foreign policy considerations for the Executive and Legislative Branches. Further, U.S. courts have applied the revenue rule to preserve respect for foreign nations' sovereignty. *See infra* Part III.B.

17.2.   U.S. international tax policy has developed against the backdrop of the revenue rule and takes its limits on collection assistance into account. *See infra* Parts III.B.3 & III.C.

i.      Tax sovereigns take different policy-based approaches to the design of their tax administration and enforcement systems, including with respect to the taxation of dividends paid to nonresidents.

ii.     Certain countries, including Denmark, have implemented "withholding tax reclaim systems" for payments of income to nonresidents whereby tax is withheld on items of income (*e.g.*, dividends) by withholding agents, the amounts are paid over to the taxing authority, and nonresidents must claim treaty-protected amounts as refunds by providing documentation to the taxing authority.

iii.    Other countries, including the United States, have a "relief at source system" whereby nonresidents claim reduced rates under an applicable income tax treaty by providing the withholding agent with documentation enabling the withholding agent to withhold the tax at a reduced rate and obviating the

need for the nonresident to make a claim for a tax refund to the taxing authority.

iv.   The decision of which withholding system to use is a policy decision that rests on multiple factors.  Opportunities for tax avoidance using financial instruments routinely employed in financial markets exist under both systems, and sovereigns respond to such avoidance in different ways based on their respective policy considerations.

17.3.   Like U.S. international tax policy, U.S. treaty policy also has developed with the revenue rule operating in the background and takes its limits on collection assistance into account.  *See infra* Parts III.D-III.E.

i.   The United States has agreed to broad collection assistance provisions in only six in-force bilateral income tax treaties, generally excluding assistance in relation to a U.S. citizen or entity.  The U.S. treaty with Japan, however, authorizes collection in relation to an individual U.S. national in a case of fraud.

ii.   In 26 bilateral income tax treaties, the United States and the treaty partner have authorized collection assistance only to ensure that treaty relief is not afforded to those not entitled to it.

iii.   Thirty-five in-force bilateral income tax treaties do not provide for any collection assistance.

18.   With this context as background, I reach the following conclusions:

18.1.   Accepting SKAT's claim would upend a carefully structured regime for collection assistance that would open U.S. courts to myriad claims for assistance with return of tax refunds by foreign sovereigns in the matters covered by this case and others.  This risks interference with U.S. international tax policymaking and diplomacy.

18.2.   For purposes of international tax enforcement policy, there is no relevant distinction between a sovereign's demand for repayment of an inappropriate tax refund and a

sovereign's claim for collection of unpaid tax. Allowing SKAT's common law claims to proceed here would give rise to an asymmetry whereby treaty and non-treaty countries with tax reclaim withholding systems would be afforded unilateral judicial collection assistance (in other words, civil lawsuits) against U.S. nationals in U.S. courts for recovery of tax refunds, whereas the United States would be deprived of the assurance of reciprocal benefits in the other jurisdiction in seeking under withheld U.S. tax under its relief at source withholding system. A sovereign's tax and enforcement policy decisions underlying its design of its cross-border income tax withholding system should not affect revenue rule analysis. *See infra* Part IV.A.2.

18.3.    The foreign relations decision of whether to assist another country in revenue collection, including from U.S. citizens, should be the province of the Executive Branch consistent with the taxing and treaty consent authority of the Legislative Branch. Unilateral judicial collection assistance—as would occur if SKAT's claim proceeds—would encroach on decisions that are primarily the province of the Executive and Legislative Branches and implicate separation of powers concerns that the revenue rule is designed to avoid. This would deprive the Executive Branch of the ability to determine which countries it should assist in collection and materially alter the balance negotiated between sovereigns in existing bilateral income tax treaties. *See infra* ¶¶ 78-79.

18.4.    Allowing SKAT's case to proceed would materially reduce the United States' ability to negotiate collection assistance provisions in bilateral treaties, multilateral instruments, and executive agreements to the extent the other country is granted unrestricted access to U.S. court to recover refunds that would meet the treaty or agreement partner's collection assistance objectives. Such unilateral judicial collection assistance would not come with standard treaty protections, including assurance of reciprocal benefits, the ability to evaluate collection assistance partners on a country-by-country basis, the requirement of finality of the claim under the law of the treaty partner, limitations of collection assistance to cases involving non-U.S. nationals, the ability to cabin collection procedures to U.S.

administrative processes used for the collection of taxes, and the ability to decline to assist with collection on public policy grounds determined by the Executive Branch. It also could have the effect of significantly burdening U.S. courts with tax claims by foreign sovereigns. *See infra* Part IV.A.3.

18.5.  Finally, adjudicating SKAT's case would require application of Danish law with respect to entitlement to a tax refund under the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Den.-U.S., Aug. 19, 1999, as amended by Protocol signed May 2, 2006 (the "Treaty"), [6] including the determination of beneficial ownership of the dividends under Article 3(2) of the Treaty. A legal determination of the definition of beneficial ownership is inherently intrusive to treaty policy considerations. A U.S. court's interpretation and application of Danish tax law in applying the Treaty by its nature would be an intrusion on Denmark's sovereignty. That intrusion is specifically avoided by treaties requiring that assistance be limited to claims finally determined in the requesting country and foreclosing review of the claim by the requested country. *See infra* Part IV.B.2.

## F.  Structure of This Report

19.  The structure of this Report is as set out in the Table of Contents. Part II provides factual background and the legal context of SKAT's claims in this litigation as relevant to this Report. Part III contextualizes the revenue rule in U.S. international tax law and tax treaty policy. Part IV describes the ramifications of SKAT's case for U.S. international tax and treaty policy and their likely impact on the political branches' existing policy and framework for international collection assistance and ongoing U.S. international tax policy, treaty policy, and tax diplomacy. Part V sets out my conclusions.

---

[6] Exhibit 2 (Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Den.-U.S., Aug. 19, 1999, T.I.A.S. 13056, as amended by Protocol signed May 2, 2006 [hereinafter "Treaty"]); Exhibit 3 (Protocol Amending the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Den.-U.S., May 2, 2006, T.I.A.S. 07-1228 [hereinafter "Protocol"]). For ease of reference, attached to this Report as Exhibit 4 is a combined version of the Treaty and Protocol published by IBFD that integrates the Protocol's amendments to the Treaty into a single document.

## II.    FACTUAL BACKGROUND AND LEGAL CONTEXT

### A.    Facts[7]

20.    Plaintiff SKAT, the Customs and Tax Administration of the Kingdom of Denmark, is "the agency responsible for assessing and collecting taxes in Denmark and issuing tax refunds to claimants under certain double taxation treaties between Denmark and other countries."[8] Under the Treaty, a U.S. pension fund that qualifies for the benefits of the Treaty and is the beneficial owner of a dividend is exempt from Danish tax on the dividend.[9]

21.    Under the applicable Danish dividend withholding tax regime, the Danish company issuing the dividend or its agent automatically withholds Danish tax of 27% of the gross amount of a Danish dividend paid to shareholders, regardless of whether that tax is actually owed.[10] This is a final tax on a nonresident unless the dividend is attributable to a Danish business of the nonresident taxed by Denmark on a net basis or the nonresident beneficial owner of the dividend is entitled to a lower rate by treaty.[11]  Under Article 10(2)(b) of the Treaty, since January 1, 2001, the country from which the dividend is paid is not entitled to charge a tax on the dividend above 15% where the dividend is beneficially owned by a resident of the other contracting state that satisfies the conditions of the limitation on benefits article.[12] In such cases, SKAT is obliged to refund 12% of the withheld tax (27% - 15% = 12%).

---

[7] The following facts are from material in the record and are believed to be uncontroverted.  The purpose of this description of facts is to establish the context in which the Court must determine whether the revenue rule applies, though as explained in this Report, the Court's decision will have ramifications far beyond this case for the United States as well as for other countries.  No inferences drawn from the facts or descriptions of law in this Report are intended to express a legal opinion on the application of the revenue rule in this case.

[8] Exhibit 5 (*In re Skat Tax Refund Scheme Litigation*, 356 F.Supp.3d 300, 308 (S.D.N.Y. 2019) [hereinafter "Motion to Dismiss Opinion"]).  For purposes of this Report, I accept that the Motion to Dismiss Opinion accurately describes the complaints and their allegations.  I express no opinion as to the legal analysis or outcome of the Motion to Dismiss Opinion, nor do I adopt the characterization of facts as set forth in the Motion to Dismiss Opinion or SKAT's complaints.  *See also* Exhibit 6 (Am. Compl. & Demand for Jury Trial ¶ 16, ECF No. 58 [hereinafter "Am. Compl."]).

[9] Exhibit 2 (Treaty, *supra* note 6, at arts. 10(3)(c), 22(2)(e)).

[10] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 307-08); *see also* Exhibit 6 *(*Am. Compl., *supra* note 8, at ¶ 37); Exhibit 7 (Jakob Bundgaard, *Withholding Tax in the Era of BEPS, CIVs and Digital Economy – Denmark Report*, *in* IFA Cahiers 2018 – Volume 103B 14 (IFA 2018)); *see infra* III.C for a fuller description of the global custody system for cross-border ownership of stocks and the U.S. and Danish regimes for administering tax withholding.

[11] Exhibit 7 (Bundgaard, *supra* note 10, 7-8, 13, 15-16).

[12] Exhibit 2 (Treaty, *supra* note 6, at arts. 10(2)(b), 22(1), 29).

Under Article 10(3)(c) of the Treaty, since February 1, 2008, a dividend is exempt from taxation by the country from which the dividend is paid where the dividend is beneficially owned by a pension plan of the other contracting state that satisfies the qualifications of Article 22(2)(e) of the Treaty.[13]  In such cases, under the Danish withholding regime, SKAT is obliged to refund all or part of the withheld tax.[14]

22.     "[D]efendants are U.S. pension plans, their authorized representatives, and, in at least one case, the incorporator involved in creating plans."[15]  Payment agents and broker custodians involved in the alleged underlying conduct are not named as defendants in SKAT's complaints in this action.[16]  SKAT alleges that, between 2012 and August 2015, the Defendants submitted tax refund applications that included a claim form seeking refunds of dividend taxes (*i.e.*, claiming treaty relief).[17]

    22.1.    Documents reflect that the U.S. pension fund defendants ("USPFs") were set up as employee benefit plans/trusts, were U.S. residents for tax purposes, intended to

---

[13] *Id.* at art. 10(3)(c), 22(2)(e); Exhibit 3 (Protocol *supra* note 6, at art. V(2)(b)).  The beneficial owner limitation was used in the original treaty's Article 10, which article was wholly replaced in the Protocol.  As discussed *infra* ¶ 90.1 this raises the issue whether, if there is a difference in accepted meaning of "beneficial owner" between those two dates for Danish tax law purposes, which date (or a third date such as the date of the dividend) is relevant.  The revised Article 10 substituted by the Protocol included two significant policy changes, the adoption of a zero tax rate on dividends paid to (i) qualifying corporate shareholders with 80% or more in voting power, and (ii) qualifying pension funds.

[14] See Exhibit 5 (Motion to Dismiss Opinion), *supra* note 8, at 308; *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶ 39); *see also* Exhibit 2 (Treaty, *supra* note 6, at arts. 10(3)(c), 22(2)(e); *infra* ¶¶ 49, 58).  The U.S. withholding system and its policies are described *infra* ¶¶ 50-56 and contrasted with the Danish withholding system *infra* ¶ 58.

[15] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 308); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 16-35).

[16] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8 at 308); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 9(b)-(c)).  However, as discussed, *infra*, certain of the U.S. pension plan defendants have brought third-party complaints against their broker custodian, ED&F Man Capital Markets Ltd.  *See infra* ¶ 30.

[17] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 308-09); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 42-49); In particular, SKAT alleges that "[b]etween August 20, 2012 and September 17, 2014, the Defendants in this action caused 327 separate withholding tax refund claims to be submitted to SKAT, representing that fourteen claimants were entitled to refunds totaling DKK 820,015,992.76, or at least $120,615,000 (US)."  Exhibit 6 (Am. Compl., *supra* note 8, at ¶ 54.]).

qualify under 26 U.S.C. ("I.R.C.") § 401(a), and intended to be exempt from U.S. taxation under I.R.C. § 501(a).[18]

22.2. A reclaim agent or payment agent (*e.g.*, Goal Taxback Limited) for each USPF submitted a reclaim form to SKAT on behalf of the USPF in order to obtain a refund of the dividend tax withholding under the Treaty.[19]

22.3. The reclaim form bore SKAT's logo, was entitled "Claim to Relief from the Danish Dividend Tax," and listed the applicable USPF as beneficial owner.[20]

23. The reclaim applications reflect that the reclaim form was submitted to SKAT with the following attachments:

23.1. A Dividend Credit Advice[21] prepared by the USPF's broker-custodian (*e.g.*, Solo Capital Partners LLP ("Solo")). Certain Solo Dividend Credit Advices state that the broker-custodian "ha[s] credited your account" with a "payment [that] represents the dividend as shown below," and listing information including the security name, ex date, record date, pay date, dividend per share, number of shares owned, the amount of the gross dividend, the withholding tax, and the net dividend paid;[22]

---

[18] *See, e.g.*, Exhibit 8 (SKAT_MDL_00000391); Exhibit 9 (WH_MDL_00331778); Exhibit 10 (SKAT_MDL_00000346); Exhibit 11 (WH_MDL_00033719); Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265430, SKAT_MDL_001_00265435, and SKAT_MDL_001_00265440); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414003 and SKAT_MDL_001_00414007).

[19] *See, e.g.*, Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265426-28[, SKAT_MDL_001_00265433, SKAT_MDL_001_00265438, and SKAT_MDL_001_00265443); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00413998-4000, and SKAT_MDL_001_00414005).

[20] *See, e.g.*, Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265426-28); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00413998-99).

[21] I understand from counsel that some reclaim applications attached a Tax Voucher instead of a Dividend Credit Advice.

[22] *See, e.g.*, Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265429, SKAT_MDL_001_00265434, and SKAT_MDL_001_00265439); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414001-02 and SKAT_MDL_001_00414006).

23.2.    A Form 6166 from the U.S. Internal Revenue Service ("IRS") certifying that, "to the best of [the IRS'] knowledge, the [USPF] is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a), and is a resident of the United States of America for purposes of U.S. taxation;"[23]

23.3.    A power of attorney from the USPF in favor of the reclaim agent.[24]

24.    SKAT paid the refund payments to the USPFs' reclaim agents.[25]

## B.    SKAT Learns of and Investigates the Alleged Fraud

25.    In June 2015, "SKAT received information indicating that certain claimants may have submitted fraudulent tax refund claims based on the double taxation treaty between Denmark and Malaysia."[26]  In August 2015, SKAT "stopped paying all claims for refunds of dividend withholding tax while it investigated the fraudulent scheme."[27]

26.    From November 2015 through June 2018, SKAT sought information from the United States and had periodic meetings with the IRS under the authority of Article 26(1) of the Treaty.[28]

---

[23] *See, e.g.*, Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265430, SKAT_MDL_001_00265435, and SKAT_MDL_001_00265440); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414003 and SKAT_MDL_001_00414007).

[24] *See, e.g.*, Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265431-32, SKAT_MDL_001_00265436-37, and S SKAT_MDL_001_00265441-42); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414004 and SKAT_MDL_001_00414008-09).

[25] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 308-09); Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 43-44).

[26] Exhibit 6 (Am. Compl., *supra* note 8, at ¶ 6).

[27] *Id.* at ¶ 8.  The quoted language does not mean and should not be taken to suggest that SKAT had determined in 2015 that the scheme was fraudulent (as SKAT now alleges).

[28] Exhibit 14 (Exhibit 3962 to Tr. of Dep. of Gry Ahlefeld-Engel, *In re Customs & Tax Admin. of Kingdom of Den. (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-md-28865-LAK (S.D.N.Y Sept. 24, 2021) [hereinafter "Ahlefeld-Engel Dep. Ex. 3962"], at ¶ 36.2); Exhibit 15 (Ex. AJS27 to the Eighth Witness Statement of Alan John Sheeley, *Skatteforvaltningen (The Danish Customs & Tax Admin.) v. Solo Capital Partners LLP & Ors* [2021] EWHC 974 (Comm) [hereinafter "AJS27"]).  *See also* Exhibit 16 (Tr. of Dep. of Christian Ekstrand at 163-72, 285-94, *In re Customs & Tax Admin. of Kingdom of Den. (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-cv-09797 (S.D.N.Y. May 6-7, 2021) [hereinafter "Ekstrand Dep. Tr."]); Exhibit 17 (SKAT_MDL_001_00468547_T).

26.1.   In particular, Article 26(1) of the Treaty provides in part:

> The competent authorities of the Contracting States shall exchange such information as is relevant for carrying out the provisions of [the Treaty] or of the domestic laws of the Contracting States concerning taxes covered by the [Treaty] insofar as the taxation thereunder is not contrary to the [Treaty], including information relating to the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by [the Treaty].[29]

26.2.   Further, such disclosure is restricted to "persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the [Treaty] or the oversight of the above."[30] Finally, "[s]uch persons or authorities shall use the information only for such purposes," including "in public court proceedings."[31]

26.3.   Under this exchange of information process, representatives of SKAT and the IRS met regarding SKAT's investigation.[32] These meetings and communications involved representatives of each country's competent authority as well as each country's single point of contact for the Joint International Taskforce on Shared Intelligence and Collaboration ("JITSIC").[33] JITSIC is organized by the OECD's

---

SKAT continues its effort to discover the facts through broad discovery in this proceeding. *See, e.g.,* Pls. Mot. to Compel, ECF No. 678.

[29] Exhibit 2 (Treaty, *supra* note 6, at art. 26(1)).

[30] *Id.* at art. 26(1). Note that art. 26(4) expands for purposes of the article the taxes covered by the Treaty "to taxes of every kind imposed by a Contracting State." *Id.* at art. 26(4).

[31] *Id.* at art. 26(1).

[32] *See* Exhibit 14 (Ahlefeld-Engel Dep. Ex. 3962, *supra* note 28 at ¶ 33.1) (SKAT statement that, "[b]etween November 2015 and June 2018, SKAT had periodic communications (including at certain meetings) with the Internal Revenue Services of the United States of America (the "**IRS**") by which SKAT requested and was provided with information pursuant [*sic*] Article 26 of the Denmark/USA Double Taxation Agreement (the "**IRS Material**")" (emphasis in original)); Exhibit 18 (Tr. of Dep. of Lill Drost at 90-102, *In re Customs & Tax Admin. of the Kingdom of Den. (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-md-2865-LAK (S.D.N.Y. Oct. 1, 2021) [hereinafter "Drost Dep. Tr."]); Exhibit 16 (Ekstrand Dep. Tr., *supra* note 28, at 163-72; 285-94; SKAT_MDL_001_00468547_T).

[33] Exhibit 18 (Drost Dep. Tr., *supra* note 32, at 90-102); Exhibit 16 (Ekstrand Dep. Tr., *supra* note 28, at 163-72; 285-94; Exhibit 17 (SKAT_MDL_001_00468547_T).

Forum on Tax Administration to bring "together members of the world's national tax administrations that have committed to more effective and efficient ways to deal with tax avoidance. JITSIC offers a platform to enable its members to actively collaborate within the legal framework of effective bilateral and multilateral conventions and tax information exchange agreements – sharing their experience, resources and expertise to tackle the issues they face in common."[34]

26.4.    SKAT stated that the purpose of these requests was:

> to assist it to come to informed views as to:

>> (i) whether to accept pending applications for the refund of dividend withholding tax, which are not the subject of this claim (but included some applications on behalf of US pension plans who made other WHT applications that are the subject of the claim and which SKAT considered might be fraudulent); and/or

>> (ii) whether SKAT's previous administrative decisions to accept WHT applications on behalf of US pension plans were wrong as a matter of Danish tax or administrative law (including because SKAT had been defrauded) and/or issuing preliminary or final administrative decisions annulling such prior administrative decisions; and/or

>> (iii) the circumstances in which claims for a refund of dividend withholding tax should be accepted in the future (including what, if any, changes should be made to SKAT's processes and procedures).[35]

26.5.    The IRS agreed with SKAT's description of the purpose of SKAT's requests. In October 2020, the IRS granted SKAT, through its counsel, "consent to disclose IRS documents pertaining to the Dividend Withholding Tax Refund scheme worked between the United States (U.S.) tax administration and the Danish Customs and

---

[34] *Joint International Taskforce on Shared Intelligence and Collaboration*, IRS, https://www.irs.gov/businesses/international-businesses/joint-international-tax-shelter-information-centre (last visited Dec. 22, 2021).

[35] Exhibit 14 (Ahlefeld-Engel Dep. Ex. 3962, *supra* note 28 at ¶ 33.1(b)(i)-(iii)).

Tax administration, ("SKAT")" in the [U.K. Litigation (as defined in ¶ 32, *infra*)].[36] The IRS confirmed its view of SKAT's request in its October 2020 response to SKAT's request to disclose information received under the Treaty by citing the Treaty's "confidentiality and use restrictions set forth in Article 26."[37]  In its response, the IRS justified its authorization to SKAT to use the information in the U.K. Litigation on the grounds that those proceedings "arise out of and are inextricably linked to a dividend tax fraud scheme.  Consequently, for purposes of the [Treaty], they are judicial proceedings concerning the administration of covered taxes, and the disclosure of information in those proceedings would be for tax administration purposes."[38]

26.6.    The processes described in ¶¶ 26.1-26.5 are specified in Article 26 of the Treaty and follow longstanding U.S. policy and international practice of limiting treaty information exchange to information "relating to the . . . collection of, the enforcement or prosecution in respect of, . . . the taxes covered by the Convention" and disclosure of that information only to persons, including courts, involved in the same.[39]  This treaty-based approach balances the policy goals of reciprocal international cooperation while restricting the exchange to treaty partner countries that are trusted to preserve the confidentiality of taxpayer information consistent with the provisions of the treaty.

27.    I am advised by counsel for Defendants that in 2017, SKAT wrote to many of the Solo and ED&F Man Capital Market Ltd. ("ED&F Man") Applicants advising of its intent to rescind its original determinations and made a demand for repayment.[40]  I am further advised that

---

[36] Exhibit 15 (AJS27, *supra* note 28, at K1/58/2).

[37] *Id*. at K1/58/3.

[38] *Id.*

[39] Exhibit 2 (Treaty, *supra* note 6, at 26(1)).

[40] *See, e.g.*, Exhibit 19 (Decision – Withdrawal of Prior Decisions to Refund Dividend Taxes 2, 16-17, Apr. 6, 2018, ECF. No. 36-5) ("SKAT is not demanding payment of the incorrectly issued dividend tax refund in connection with this decision.  This is a departure from the previously proposed decision that SKAT sent to Bradley on March 24, 2017.").

in April, 2018, SKAT wrote to many of the applicants a second time and instead purported to withdraw its intent to demand repayment of the refunded dividend tax.[41]  I am further advised by counsel that several revocation letters issued by SKAT on April 17, 2018 stated that "on behalf of SKAT, legal counsel for the Danish government is going to send a writ with a demand for reimbursement and compensation."[42]  Finally, counsel for Defendants advised that the amount to be recovered by SKAT did not change.

## C.    The Litigations

28.    Following its change in approach described in ¶ 27, I am advised by counsel for Defendants that SKAT filed over 500 lawsuits in courts around the world—including in the United States, the United Kingdom., Dubai, and Malaysia—relating to claims to recover amounts paid pursuant to reclaim applications.  SKAT asserts different causes of action against defendants having different roles in the alleged misconduct in the various jurisdictions.

### 1.    The U.S. Litigations

29.    Beginning in May 2018, SKAT filed complaints in this Court and courts around the United States.[43]  On October 3, 2018,140 actions pending in 11 districts were consolidated into the present multidistrict litigation.[44]  I am advised by counsel for Defendants that since that time, SKAT filed an additional 45 actions in the MDL.

29.1.    SKAT "claims that the defendants defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies

---

[41] *See, e.g.*, *id.* ("Thus, SKAT's decisions to refund dividend taxes to Bradley are based on false premises.  For this reason, SKAT is withdrawing its prior decisions to refund dividend taxes.").

[42] *See, e.g.*, *id.*

[43] The first complaints were filed on May 4, 2018.  *See* Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The Bradley London Pension Plan, et al*, No. 1:18-cv-04047 (S.D.N.Y. May 4, 2018), ECF No. 1; Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The DMR Pension Plan et al,* No. 1:18-cv-04049 (S.D.N.Y. May 4, 2018), ECF No. 1; Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The Houston Rocco LLC 401K Plan et al*, No. 1:18-cv-04050 (S.D.N.Y. May 4, 2018), ECF No. 1; Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The Proper Pacific LLC 401K Plan et al*, No. 1:18-cv-04051 (S.D.N.Y. May 4, 2018), ECF No. 1; Compl. & Demand for Jury Trial, *Skatteforvaltningen v. The LBR Capital Pension Plan et al;* No. 1:18-cv-04052 (S.D.N.Y. May 4, 2018), ECF No. 1.

[44] Transfer Order, *In re: Customs and Tax Admin. of the Kingdom of Den. (SKAT) Tax Refund Scheme Litig.*, No. 1:18-md-02865-LAK (J.P.M.L. Oct. 3, 2018), ECF No. 1.

that had paid dividends net of withholding tax.  In fact, the complaints allege, the defendants did not own those stocks and had had no taxes withheld from any dividends.  Nevertheless, the defendants allegedly obtained many millions of dollars in tax refunds from the Danish treasury under false and fraudulent pretenses."[45]  SKAT alleges that it "paid out approximately $2.1 billion as a result of this fraudulent tax refund scheme."[46]

29.2.    SKAT brought these actions for damages asserting variously six state common law claims against Defendants: (1) fraud; (2) aiding and abetting fraud; (3) payment by mistake; (4) unjust enrichment; (5) money had and received; and (6) negligent misrepresentation.[47]

30.    Certain USPFs and associated individual defendants in the instant litigation have, in turn, brought third-party complaints against their broker custodian, ED&F Man alleging *inter alia*, fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty, promissory estoppel, unjust enrichment, equitable indemnification, and contribution.[48]  While SKAT has not sued ED&F Man in the United States, it has sued ED&F Man (for negligence, but not fraud) in the United Kingdom, as discussed more fully below in Paragraph 32.[49]

---

[45] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 307-308); *see also* Exhibit 6 (Am. Comp., *supra* note 8, at ¶¶ 54-117).

[46] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 309); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶ 2).  The same number was used in the U.K. litigation, described *infra* ¶ 32, suggesting that the number is a global estimate.  *See infra* note 58.

[47] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 309); *see also* Exhibit 6 (Am. Compl., *supra* note 8, at ¶¶ 118-48). SKAT has alleged civil conspiracy against one Defendant.  *See* Compl., *Skatteforvaltningen v. Michael Ben-Jacob*, No. 1:21-cv-05339, (S.D.N.Y. June 16, 2021), ECF No. 1.

[48] *See, e.g.*, Third Party Compl., *Del Mar Asset Mgmt. Sav. & Ret. Plan, et. al. v. ED&F Man Cap. Mkts. Ltd.*, No. 18-md-2865 (S.D.N.Y. Nov. 5, 2019), ECF No. 220; *In re Customs & Tax Admin. of the Kingdom of Den. (SKAT) Tax Refund Litig.*, Nos. 18-md-2865, 18-md-5053, 2020 U.S. Dist. LEXIS 3064 at *1-2 (S.D.N.Y. Jan. 7, 2020).

[49] *See infra* ¶ 32.

## 2.    Non-U.S. Litigations

31.    The instant litigation presents one set of claims against a subset of actors alleged to be involved in the alleged fraud.   The following summaries of the non-U.S. litigations highlight the variety of claims against other parties that SKAT has brought around the world in connection with the same pattern of conduct.   This Report's discussion of the policies underlying the revenue rule takes account of these other claims as well as third-party claims in the instant litigation.

32.    Beginning in March 2018, SKAT filed a series of complaints that, ultimately through amendments and further filings, named 114 separate defendants in the United Kingdom. These complaints were consolidated in the Commercial Court, Queen's Bench Division of the High Court of Justice of England and Wales (the "U.K. Litigation").[50]  An April 27, 2021 decision was rendered in the U.K. Litigation ("the April 2021 U.K. Decision") dismissing SKAT's claims against all parties.[51]  I understand that that dismissal is the subject of a pending appeal which is scheduled to be heard by the English Court of Appeal, civil division, of the High Court of Justice of England and Wales on January 25, 2022.   The parties to the U.K. Litigation include Sanjay Shah ("Shah"), his business, Solo, and certain individuals employed by Solo,[52] which served as certain of the USPFs' broker custodian;[53] certain other corporate parties including Goal Taxback Ltd.,[54] which served as certain of

---

[50] Exhibit 20 (*Skatteforvaltningen (The Danish Customs & Tax Admin.) v. Solo Capital Partners LLP & Ors* [2021] EWHC 974 (Comm) [2], (Baker J) (Eng.) [hereinafter "April 2021 U.K. Decision"]).

[51] For purposes of this Report, I accept that the April 2021 U.K. Decision accurately describes the relevant U.K. actions and their allegations.   I express no opinion as to the legal analysis or outcome of the April 2021 U.K. Decision, nor do I adopt the characterization of facts as set forth in the April 2021 U.K. Decision.

[52] Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶¶ 9-10).

[53] Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265429, SKAT_MDL_001_00265434, and SKAT_MDL_001_00265439); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00414001-02 and SKAT_MDL_001_00414006).

[54] Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶¶ 7, 12).

the USPFs' reclaim agent;[55] and ED&F Man,[56] which was associated with certain refund applications that Solo was not.[57]

32.1. According to the April 2021 U.K. Decision, SKAT alleged that it was induced by misrepresentations from August 2012 to July 2015 to pay out tax refunds for which it was not liable, totaling over DKK 12.5 billion, or approximately £1.5 billion.[58] The April 2021 U.K. Decision explains that certain double taxation agreements ("DTAs"), "including DTAs particularly relevant to this litigation with the USA and Malaysia," provide certain foreign (non-Danish) resident parties the right to receive a refund of withholding tax deducted at source by Danish companies.[59]

32.2. The April 2021 U.K. Decision explains that "[t]he primary focus, of all the causes of action said by SKAT to arise, is the information said by SKAT to be conveyed to it by a completed [dividend tax] refund claim form and the documents sent with it, and what SKAT[] . . . did with that information."[60] The April 2021 U.K. Decision states that, "[b]y its claims, SKAT therefore seeks the return of amounts it says it was wrongly induced to pay out as tax refunds."[61]

32.3. According to the April 2021 U.K. Decision, SKAT brought a fraud claim (and associated conspiracy claim) against only the Solo defendants.[62] SKAT alleged negligence, mistaken payments, knowing receipt, and unjust enrichment against the

---

[55] *See, e.g.,* Exhibit 12 (SKAT_MDL_001_00265426 at SKAT_MDL_001_00265426-28, SKAT_MDL_001_00265433, SKAT_MDL_001_00265438, and SKAT_MDL_001_00265443); Exhibit 13 (SKAT_MDL_001_00413998 at SKAT_MDL_001_00413998-4000, and SKAT_MDL_001_00414005).

[56] Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, ¶ 13).

[57] *Id.* SKAT does not allege fraud or dishonesty with respect to the ED&F Man Applications. *Id.* at ¶ 30.

[58] *Id.* at ¶ 2. The U.S. and U.K. complaints share substantial similarities. SKAT asserts essentially the same aggregate amount of incorrect refunds (translated into U.S. dollars) in its complaint in this litigation without specifying or estimating the aggregate amounts at issue in other countries.

[59] *Id.* at ¶ 6.

[60] *Id.* at ¶ 11.

[61] *Id.* at ¶ 8.

[62] *Id.* at ¶ 11.

Solo defendants and certain other parties.[63]  Accordingly, there are defendants (specifically, the non-Solo defendants, including ED&F Man) facing only non-fraud claims in the U.K. Litigation.

33.    According to news reports, SKAT has also pursued claims in Dubai and Malaysia.[64]  The claims in Dubai were against Shah and two of his companies.[65]

## III.    CONTEXTUALIZING THE REVENUE RULE IN U.S. TAX LAW AND TAX TREATY POLICY

### A.    Overview

34.    U.S. international tax law and regulations are drafted, and U.S. bilateral income tax treaties are negotiated, against the background of the common law principle, referred to as the "revenue rule," which "prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws."[66]  An international agreement to which the United States is a party may overcome the revenue rule while imposing standards and limitations that protect the tax and enforcement policy interests of each country.[67]  The

---

[63] *Id.* at ¶¶ 11-13.

[64] Exhibit 21 (Richard Crump, *Denmark Suffers Blow to Dubai Arm of $2B Tax Fraud Case*, LAW360 TAX AUTHORITY (Aug. 13, 2020, 9:08 PM), https://www.law360.com/tax-authority/articles/1300939/denmark-suffers-blow-to-dubai-arm-of-2b-tax-fraud-case (last accessed Dec. 29, 2021)).

[65] *Id.*

[66] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 310), citing Exhibit 22 (*Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 130-31 (2d Cir. 2001)).  As the United States said in the *Pasquantino* oral argument before the Supreme Court: ". . . what becomes left [of revenue rule jurisprudence in the 20th century] are sovereignty cases where a country is seeking to exert its sovereign power inside the United States or inside a foreign country -- the United States, itself, tried it once in Canada -- to collect taxes. And countries said, 'We're not going to do that. We're going to leave it to the treaty process.'"  Exhibit 23 (Tr. of Oral Arg. at 46:12-18, *Pasquantino v. U.S.*, 544 U.S. 349 (2005) (No. 03-72)).

[67] "The [revenue] rule avoids involving the judiciary in making judgments about foreign tax policies and procedures and interwoven foreign policy considerations, and it leaves the Executive Branch and the Senate free to decide through the treaty-making process the extent to which exceptions to that [revenue rule] principle should be recognized." Exhibit 24 (Brief for U.S. et al. as Amicus Curiae Supporting the Court at 7, *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir. 2001) (No. 01-1317) [hereinafter "U.S. *Canada* Cert. Amicus Brief"]). This brief was submitted in response to the Court's order inviting the Solicitor General to express the views of the United States regarding whether the Supreme Court should grant Canada's petition for writ of certiorari to review the Second Circuit's decision in Exhibit 22, *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103 (2d Cir. 2001), which is discussed throughout this Report, *see infra* ¶ 41.1.  *See* Exhibit 24 (U.S. *Canada* Cert. Amicus Brief at 1).  In addition to the Acting Solicitor General, Assistant Attorneys General, and Department of Justice Attorneys, the U.S. *Canada* Cert. Amicus Brief was filed by William H. Taft, IV, Legal Advisor to the Department of

revenue rule encourages reliance on reciprocal international agreements instead of unilateral judicial assistance. These agreements allow international cooperation to be restricted to countries identified by the United States as appropriate treaty partners, to be subject to limitations consistent with U.S. policies and norms, and to imbue discretion in the Executive Branch responsible for making and carrying out tax policy and enforcing the tax law.[68]

35.    In order to contextualize the discussion of how SKAT's claims in the instant litigation intersect with the topics covered in this Part III of the Report, I first describe the role the revenue rule plays in the U.S. tax system, how the revenue rule has been applied in U.S. cases, and, from a policy perspective, the strained nature of SKAT's claim in relation to the revenue rule.

36.    Subsequent sections of Part III of the Report will describe:

36.1.    the structure of U.S. international tax law governing the imposition, administration, and enforcement of the tax on items of taxable income paid to nonresidents, how it contrasts with the Danish system, and how the relationship between the two sovereigns' systems is mediated by the revenue rule;

36.2.    collection assistance treaty provisions in the existing U.S. network of bilateral income tax treaties, including the treaty with Denmark, and the multilateral Convention, and their relation to the revenue rule; and

36.3.    the role of tax information exchange agreements ("TIEAs") authorized by Congress and entered into as executive agreements, and the potential to expand the legislative grant to authorize collection assistance provisions incorporating safeguards as a

---

State and George B. Wolfe, Deputy General Counsel to the Department of Treasury. As such, it is indicative of the position of tax policymakers and treaty negotiators at that time.

[68] The U.S. *Canada* Cert. Amicus Brief (Exhibit 24), is the last occasion I am aware of where multiple affected agencies of the Federal government have expressed views of the government publicly on the role of revenue rule in a case brought by a foreign government. In my experience, views expressed by multiple Federal agencies before a court in a case such as *Canada* are the product of an inter-agency process, which usually includes representatives of the Office of the Solicitor General, and are not changed without undertaking a similar process. I endeavor to reference the U.S. *Canada* Cert. Amicus Brief where the views expressed in that brief are relevant to my discussion of policy.

means to quickly and efficiently expand international collection assistance, including with countries that are not currently parties to a bilateral income tax treaty.

## B.    The Revenue Rule Principle in the United States

### 1.    National Tax Enforcement in a Global Economy

37.    The economy is global, but governments are national.  The ability of any government to function rests on the ability of its tax system to generate revenue.  For that reason, tax systems are granted extraordinary powers,[69] afforded unique protections,[70] and subject to special obligations.[71]  This reflects recognition of the importance of maintaining public trust in the tax system and supporting revenue collection.

37.1.    Maintaining taxpayer trust in and public support for the tax system is an ongoing U.S. policy concern in order to maintain a high level of voluntary tax compliance. While intangible, U.S. voluntary tax compliance is a national asset.

37.2.    Protecting revenue collection and maintaining public confidence in its tax system is a critical sovereign function.

38.    The administration and enforcement of a tax system in the modern era inevitably takes an international cast, but starts from a national base.  Cross-border administration and enforcement operates within the constraints of national jurisdiction.  Because of the limits of that jurisdiction, tax systems and tax authorities increasingly rely on international cooperation, most significantly with respect to information exchange by international

---

[69] Subtitle F of the Internal Revenue Code houses the provisions that provide the authority and means to administer and enforce U.S. Federal taxes.  *See* I.R.C. §§ 6001 – 7874.

[70] For example, the so-called Tax Anti-Injunction Act adopted in 1867 at the federal level and the Tax Injunction Act adopted in 1937 in relation to the states seek to protect the enforcement ability of the respective tax systems.  Tax Injunction Act, 28 U.S.C. § 1341.  As another example, it is a criminal offense to use force or threats of force against a U.S. officer or employee to impede or obstruct a tax investigation.  I.R.C. § 7212.  It also is a criminal offense for certain senior Executive Branch officials, including the President, the Vice President, and the Secretary of the Treasury, "to request, directly or indirectly, any officer or employee of the Internal Revenue Service to conduct or terminate an audit or other investigation of any particular taxpayer with respect to the tax liability of such taxpayer."  I.R.C. § 7217.

[71] The IRS is required to protect the confidentiality of taxpayer information and its employees are subject to criminal penalties for unauthorized disclosures of taxpayer information.  I.R.C. §§ 6103, 7213, 7213A.

agreement.[72]  Collection assistance by reciprocal agreement also has expanded, though not to the same degree as information exchange.  While the United States has been slower to advance collection assistance, it has concluded 35 bilateral income tax treaties that include collection assistance provisions.[73]  The revenue rule has been an important element in achieving the sought-after U.S. policy of balancing its interests in assisting other countries, protecting taxpayer rights, and preserving control over commitment of U.S. enforcement and collection resources.[74]

39.     This policy balance is achieved uniquely through international agreement-based mutual assistance.  The revenue rule plays a critical structural role in constraining unilateral and potentially open-ended judicial assistance and in encouraging mutual agreements.

    39.1.     An important reason for the revenue rule is to restrict unilateral use by potentially any foreign government, democratic or otherwise, of U.S. courts to enforce extraterritorially its tax laws against persons or property over which the U.S. courts may have jurisdiction.[75]

    39.2.     The effect of revenue rule preclusion is to channel U.S. administrative and judicial assistance through bilateral (or multilateral) agreements.[76] This, in turn, allows the Legislative and Executive Branches to balance protections of individual rights and U.S. tax, economic, and foreign relations interests against the gains that come from international cooperation in tax administration and enforcement.[77]

---

[72] International cooperation in information exchange based on agreements has become a global norm.  This is evidenced by the presence of information exchange provisions in bilateral treaties; the development and global adoption of TIEAs that expand the range of countries exchanging information to those that may not have reason for a bilateral income tax treaty; and the broad adoption of the OECD and Council of Europe Multilateral Convention for Mutual Assistance in Tax Matters.  *See* Exhibit 25 (Perla Gyöngyi Végh, *OECD: Towards a Better Exchange of Information*, EUR. TAX'N, 394-99 (2002)).

[73] *See infra* ¶¶ 64-69.

[74] *See id.*

[75] *See infra* ¶¶ 40-41, 83-87.

[76] *See infra* ¶¶ 61-74.

[77] *See infra* ¶¶ 81-88.

39.3.   Subject to the common law boundaries of, *inter alia*, the revenue rule, foreign sovereigns are accorded access to U.S. courts in much the same way as other litigants.

    i.   In recognition of their sovereign status, moreover, foreign sovereigns are granted broad immunity from suit in U.S. courts unless the suit involves commercial activity with a link to the United States and subject to certain other exceptions.[78]

    ii.   The availability of U.S. courts to foreign sovereigns is balanced, however, by the revenue rule.  In *Republic of Colombia v. Diageo North America, Inc.*, for example, the claims brought by a foreign sovereign based on its commercial activities were not barred by the revenue rule because they "do not involve the kind of moral and political judgments that the tax or revenue laws typically involve."[79]  On the other hand, the claims of the Republic of Colombia for damages relating to lost (*i.e.*, unpaid) liquor taxes were barred by the revenue rule.[80]

## 2.    The Revenue Rule in the United States

40.   Historically, the common law revenue rule precluded foreign sovereigns from using U.S. courts to enforce their tax judgments or unadjudicated tax claims.[81]  U.S. courts emphasize the revenue rule's purposes "to ensure respect for sovereignty by keeping courts out of the

---

[78] *See* Foreign Sovereign Immunity Act, 28 U.S.C. §§ 1602-08 ("FSIA").  FSIA provides the sole basis for obtaining subject matter jurisdiction over suits against foreign sovereigns.  *See Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 611 (1992); *see also* 28 U.S.C. § 1330; *id.* § 1604. The history of Foreign Sovereign Immunities Act has been found to support the "restrictive" view of sovereign immunity under the FISA statute governing a sovereign's exposure to U.S. courts.  *Argentina*, 504 U.S. at 612-13.

[79] *Republic of Colombia v. Diageo N. Am., Inc.*, 531 F.Supp.2d 365, 386 (E.D.N.Y. 2007).

[80] *Id*. at 394.

[81] *See Her Majesty the Queen in Right of the Province of British Columbia v. Gilbertson,* 597 F.2d 1161, 1166 (9th Cir. 1979) (holding that the revenue rule bars courts of the United States from enforcing a judgment for taxes by courts of a foreign government); Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 134-35 (holding Canada's RICO claim was barred by the revenue rule)); Exhibit 26 (*Pasquantino v. U.S.*, 544 U.S. 349, 351-52 (2005)) (finding wire fraud case brought by the U.S. Executive Branch distinguishable from a case brought by a foreign government to collect tax revenue in that the revenue rule did not bar the U.S. executive from seeking to punish criminal fraud within its own borders); Exhibit 27 (Restatement (Fourth) of Foreign Relations Law § 489 cmt. a (Am. Law Inst. 2018)).

business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices" and "to preserve separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement, which can implicate foreign relations and are better left to the political branches of government."[82]

41.     Two leading cases concerning the enforcement of extraterritorial tax claims frame how the U.S. application of the revenue rule protects these interests.

41.1.   In *Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, the Second Circuit affirmed the dismissal of Canada's action brought under the Racketeer Influenced and Corrupt Organizations ("RICO") Act claiming lost tax revenue as damages.[83]

   i.    The Canadian government argued that the lost tax revenue was an injury to business or property for purposes of the civil RICO statute.  The Second Circuit was unpersuaded by this interpretation as the U.S. court nonetheless would have to make a determination on "the validity of the Canadian revenue laws," a determination that the court considered prohibited by the revenue rule.[84]

   ii.   The Second Circuit explained that the revenue rule "has been defended on several grounds, including respect for sovereignty . . . and separation of powers."[85]  As to the policy protecting the separation of powers, the Second

---

[82]Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 310), citing Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 111-13).  *See also* Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 113-14) ("Tax laws embody a sovereign's political will . . . They mirror the moral and social sensibilities of a society . . . '[C]ourts have observed that the rule prevents foreign sovereigns from asserting their sovereignty within the borders of other nations, thereby helping nations maintain their mutual respect and security."); Exhibit 26 (*Pasquantino*, 544 U.S. at 369 *citing U.S. v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936)) ("In our system of government, the Executive is 'the sole organ of the federal government in the field of international relations.'").

[83] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 105-06).

[84] *See id*. at 108 ("[T]o pursue its claim for damages relating to lost tax revenue, Canada will have to prove, and the Court will have to pass on, the validity of the Canadian revenue laws and their applicability hereto and the Court would be, in essence, enforcing Canadian revenue laws.  Enforcing foreign revenue laws is precisely the type of meddling in foreign affairs the Revenue Rule forbids.").

[85] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 136).

Circuit noted that "[t]he conduct of foreign relations is committed largely to the Executive Branch, with power in the Legislative Branch to, *inter alia*, ratify treaties with foreign sovereigns. The doctrine of separation of powers prohibits federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch." [86] The Second Circuit explained the revenue rule's policy of protecting sovereignty as one preventing courts from passing judgment on the moral and political choices embodied in a foreign sovereign's tax policy.[87]

41.2.   *Pasquantino v. U.S.* held that the U.S. government's criminal case brought under the federal wire fraud statute was *not* barred by the common law revenue rule.[88] The Supreme Court pointed to the distinction between a foreign government bringing an action to recover its tax revenue and the U.S. government bringing an action to punish "fraudulent domestic criminal conduct" occurring in the United States.[89] The Supreme Court noted that where the U.S. government acts to enforce its own laws, the policy reasons behind the revenue rule described in the preceding paragraph are not implicated.[90]

### 3.    SKAT's Claim

42.   SKAT's theory appears to be that once taxes are refunded, even though induced by allegedly fraudulent tax refund claims on SKAT-prescribed tax reclaim forms, the case to

---

[86] *Id.* at 114.

[87] *Id.* at 112-13. As in the present case, Canada also asserted common law fraud claims in the U.S. District Court for the Northern District of New York (the "District Court"). In granting the motion to dismiss the RICO claims, the District Court also declined to exercise supplemental jurisdiction over the common law fraud action. *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 103 F. Supp. 2d 134, 155 (N.D.N.Y. 2000). The Second Circuit's decision affirming dismissal of Canada's RICO claims effectively mooted the common law fraud supplemental jurisdiction request.

[88] Exhibit 26 (*Pasquantino*, 544 U.S. at 354-55).

[89] *Id.* at 362-65.

[90] *Id.* at 364.

recover the refund falls outside of the revenue rule and its purposes because SKAT "do[es] not seek unpaid taxes."[91]

43.     To my knowledge, a claim based on the position that a tax refund inoculates the proceeding from its revenue origins for purposes of the revenue rule is novel, at least in the United States. [92]

43.1.   But for the refund aspect, the claim in this case bears a similarity to Canada's claim in *Attorney General of Canada*.  If in *Attorney General of Canada* the tax evasion were accomplished by the filing of a false tax return claiming a refund without any prior payment of tax, as happens in the United States,[93] there is nothing to suggest that the Second Circuit would have reached a different conclusion merely because the mechanism was a fraudulently induced tax refund instead of nonpayment in the first instance.

43.2.   The recovery of an incorrect withholding tax refund and the collection of an under withheld tax amount are merely different means to the same end of revenue collection: a determination that taxes should or should not be paid under a nation's tax laws. From a policy perspective, revenue collection and revenue protection through recovery of incorrect tax refunds cannot be de-linked in a functioning tax system.[94]

---

[91] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 311).

[92] This essentially is the same claim as was made in the U.K. litigation in relation to "Dicey Rule 3," which is the U.K. reference to the revenue rule.  Exhibit 28 (A.V. Dicey, et al., *The Conflict of Laws* 5R-019-5-020, (15th ed. 2010)). The April 2021 U.K. Decision indicates that the claim was equally novel in the U.K. courts.  Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶ 88) ("The decided cases on Dicey Rule 3 to date have not considered the case of a tax refund wrongly paid by a sovereign tax authority and a claim to recoup that erroneous payment, or compensation for it.").

[93] *See, e.g.*, *United States v. Wardell*, 218 Fed. App'x 695, 696 (10th Cir. 2007) (in a sentencing appeal, the Court recited the underlying facts: "While incarcerated in a Colorado state prison, Wendel R. Wardell and other prisoners engaged in a scheme to obtain fraudulent tax refunds by submitting false tax returns. The scheme involved submitting false tax returns in their own names, and in the names of other inmates, to obtain refunds to which they were not entitled. Wardell was eventually convicted of seventeen counts of tax fraud and one count of conspiracy").

[94] *See infra* ¶¶ 77-80.

43.3.    As an everyday U.S. example, consider the U.S. mechanism for withholding income taxes on wages and compensation paid to employees.  Employers withhold at a rate of tax, based on level of income and exemptions, and pay those amounts over to the IRS.[95]  Employees may claim refunds of over-withheld income taxes on their individual income tax returns based on many factors (*i.e.*, credits, deductions).[96]  Refunds paid with respect to individual income tax returns are often processed automatically, with review only for form, execution, and mathematical accuracy.[97]  The IRS may subsequently audit the taxpayer, determine that more tax is due, and seek a return of the previously paid refund of withheld income taxes via either the (1) deficiency procedure set forth in I.R.C. §§ 6211-6215 or (2) a civil action to recover any portion of the tax that was erroneously refunded under I.R.C. § 7405.[98]  Both avenues for the recovery of the previously paid refund are revenue claims.

44.    SKAT appears to put weight on an applicant's not having previously paid tax.[99]  That element fails as a meaningful distinction for determining whether recouping a tax refund constitutes tax enforcement.

---

[95] I.R.C. § 3402.

[96] Exhibit 29 (Bittker & Lokken, FEDERAL TAXATION OF INCOME, ESTATES, AND GIFTS ¶ 114.7 (Thomas Reuters/Tax & Accounting, 2d/3d ed. 1993-2019, with updates through November 2021) (online version accessed on Checkpoint (www.checkpoint.riag.com), [Dec. 28, 2021])).

[97] Exhibit 30 (Bittker, McMahon & Zelenak, FEDERAL INCOME TAXATION OF INDIVIDUALS ¶ 47.01 (Thomas Reuters/Tax & Accounting, 3d ed. 2002, with updates through November 2020) (online version accessed on Checkpoint (www.checkpoint.riag.com), [Dec. 28, 2021])).

[98] *Beer v. Comm'r*, 733 F.2d 435, 436-37 (6th Cir. 1984) (per curiam) (affirming Tax Court decision sustaining IRS determination that petitioner was liable for deficiencies arising out of wrongful refunds of taxes withheld from wages and holding that suit to recover erroneous refund does not preclude IRS use of deficiency procedures); *see also Brown v. Comm'r.*, Tax Ct. Dkt. No. 10823-95, 97 T.C.M. 567 (RIA), at *6-7 (Dec. 23, 1997) ("A suit for a recovery of an erroneous refund under section 7405 is merely one of several remedies . . . . It is a civil action brought in the name of the United States and does not preclude an alternative remedy; namely, the determination of a deficiency by the Commissioner. [] It has been firmly established in our tax law that the Commissioner may proceed through the deficiency route where there has been an erroneous refund as in this case.") (internal citations omitted); *Lock v. Comm'r*; Nos. 23762-14S, 24629-14S; T.C. Summ. Op. 2017-10 (upholding IRS deficiencies seeking returns of refunds of taxes withheld from wages).

[99] *See* Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 311). Clearly, non-payment of tax (and non-filing of a tax return) is not relevant to a revenue rule analysis as the foreign government RICO cases for lost tax revenues demonstrate. *See, e.g.*, *Colombia*, 531 F.Supp.2d at 394-95.

44.1.   There are situations where the tax law creates a right to refund that is separated from payment of tax, as in the case of a wholly or partially refundable tax credit.[100] A claimant may file for a refund of the tax credit amount without having previously paid tax.  There are situations where timing may require the filing of a refund claim for a carryover of a loss or nonrefundable credit when the payment of tax purportedly offset was incorrect and not actually paid.  In such circumstances, the tax authority will seek to recoup the refund of the tax credit or for the carryover via the applicable tax enforcement process.  Recovery of an incorrect tax refund in these cases implicates tax enforcement as much as collection of additional tax.

44.2.   In a case where the law has (advertently or not) created a duplicate (or an ambiguous) right to a refund, there may be a legitimate claim for refund without a prior payment of tax.  For instance, determining which person should be treated as the beneficial owner of a dividend in the case of stock lending has been a recurring problem in the tax law.[101]   Where in the case of a stock loan the tax law is ambiguous or deficient in identifying a single tax owner as between the stock lender and the stock borrower, both applicants may have a plausible claim in law to a refund of tax, though only one will have paid the tax.[102]  This may be a mistake of the legislature, and may give rise to a double benefit, but that does not mean it is necessarily incorrect as a legal matter.[103]  In such case, one of the claimants will not have paid the tax, and if the tax authority honors the claims of both, it may seek return of one or both of the tax refunds via its tax enforcement process.

---

[100] Examples of refundable credits for individuals in the U.S. are the earned income tax credit (I.R.C. § 32), the child tax credit (I.R.C. § 24), the American opportunity (education) credit (I.R.C. § 25A), and the recovery rebate tax credit (I.R.C. § 6428).

[101] *See infra* note 121.

[102] *See infra* ¶¶ 51-52 for a discussion of a stock loans and equity swap derivative transaction used in the U.S. market and subsequently addressed by I.R.C. § 871(m).

[103] *See Gitlitz v. Comm'r.*, 531 U.S. 206 (2001) (upholding a S corporation shareholder loss for stock basis increased by cancellation of indebtedness income excluded from tax gross income). The result in *Gitlitz* was overruled by an amendment to the relevant Code provision preventing excluded cancellation of indebtedness income of an S corporation from increasing shareholder basis.  Job Creation and Worker Assistance Act of 2002, Pub. L. No. 107-147, § 402, 116 Stat. 21, 40 (2002) (amending then I.R.C. § 108(d)(7)).

45.     From a policy perspective, adopting the position that recovering an incorrect tax refund, whether of a prepaid tax or not, is not tax enforcement does not pass muster.

    45.1.   The facts of this case occur wholly within the Danish tax system.  The alleged fraudulent claim for refund is made to SKAT, the Danish authority that assesses and collects taxes.  The refund claim uses SKAT tax refund forms and procedures to claim a refund under the Treaty.  SKAT's initial determination was that a refund was warranted under the provisions of the Treaty and Danish law. SKAT's claim for recovery is a conclusion that the conditions of the Treaty, including applicable Danish law, for the tax refund were not satisfied.

    45.2.   There is nothing about this case that as a policy matter is not tax enforcement.  The sovereign interest in protecting against incorrect tax refunds is central to administering and maintaining the public's trust in a tax system.

46.     The following two sections set out the context in which the revenue rule operates, first in the design and operation of the U.S. regime for taxing U.S. corporations' dividends paid to nonresidents and enforcing the tax in Section C, and second in relation to collection assistance provisions employed in U.S. bilateral income tax treaties in Section D.  The objective is to evaluate how narrowing the application of the revenue rule would affect positions taken by the United States in its laws and treaties in relation to cross-border interactions with other countries.  Section E briefly discusses TIEAs, executive agreements that are a potential instrument for expanding collection assistance to countries that are not currently parties to a bilateral income tax treaty but would be a desirable collection assistance partner.

### C.     The U.S. Cross-Border Dividend Withholding Tax Regime

47.     The scope of enforcement jurisdiction and the revenue rule underlie how and the extent to which the United States taxes non-U.S. persons on U.S. source dividends (and other items of "fixed and determinable annual and periodical" income (FDAP)) not effectively

connected with a U.S. trade or business.[104]  The United States imposes a tax on the gross
amount of such income and collects the tax through withholding at source.[105]

48.     The internationally accepted system of having the payor of a dividend or other income (or
its agent) withhold a gross basis tax at source addresses directly the inability of
the source country (here, the United States), absent a treaty, to collect taxes not paid
voluntarily by a nonresident having no presence in the United States or assets subject to
U.S. jurisdiction.  Without direct enforcement jurisdiction, and because of international
acceptance of principles underlying the revenue rule limiting the extraterritorial exercise
of sovereign tax enforcement, the United States generally would not be able to obtain
international judicial assistance absent a treaty or international agreement.

49.     The United States and Denmark each tax dividends paid to nonresident shareholders, but
under different regimes for administering the tax.  Both systems employ withholding for
collecting tax on gross dividend amounts.  While both systems require applicants to make
a claim for entitlement to reduced tax rates, the United States employs a system of relief at
source based on documentation and Denmark employs a withholding tax reclaim system,
based on documentation.[106]  In this respect, Denmark's approach is similar to other
countries that also employ a tax reclaim system in respect of dividends, however, the details
of each country's underlying substantive legal rules and enforcement skills capacity matter.
As will be discussed in the context of U.S. tax law, these differences in approach reflect
tax policy decisions taking into account multiple factors, including the related substantive
tax laws and what may be thought of as the tax compliance culture of the country
involved.[107]

---

[104] I.R.C. §§ 871(a)(1), 881(a)(1).

[105] *Id.* §§ 1441, 1442.  *See generally,* Exhibit 31 (Stephen E. Shay, J. Clifton Fleming, Jr. & Robert J. Peroni, *The David R. Tillinghast Lecture: 'What's Source Got to Do With It?' Source Rules and U.S. International Taxation*, 56 TAX L. REV. 81, 121-28, 135-36 (2003)).

[106] *See* Treas. Reg. § 1.1441-1(a).  In certain situations, not relevant here, the Danish system mimics a relief at source system where certain taxpayers are entitled to exemptions from or reductions to withholding tax on dividends without submitting a reclaim.  *See* Exhibit 7 (Bundgaard, *supra* note 10, at 14).

[107] The reasons for Denmark's revenue loss in this case should await the outcome of ongoing investigations and review in Denmark.  They likely will be found to have multiple causes, including a combination of failures to remedy defects

50.    This section first describes the structure of the U.S. system of taxation and withholding based on relief at source in broad terms and observes how that structure intersects with the revenue rule. It then briefly describes the Danish system applicable to foreign shareholders like the USPFs, shows the potential for asymmetry of burdens on the other country under the two systems, and explains how the revenue rule promotes reciprocity by encouraging cooperation through bilateral agreement.[108]

50.1.    The United States requires withholding agents to withhold taxes on dividends at a rate of 30% unless reliable documentation substantiates that a lower rate (*e.g.*, by reason of a treaty) is proper.[109]  A withholding agent that does not withhold and pay required amounts of tax will be liable for the payments, as well as penalties and interest.[110]  Withholding agents are those with control, receipt, custody, disposal, or payment of certain items of income of a nonresident.[111]

50.2.    When insufficient taxes are withheld and the IRS has jurisdiction over withholding agents but not the nonresident shareholder, withholding agent liability serves as an important backstop for the IRS to collect applicable taxes.  More than one person

---

in substantive tax law provisions addressing equity lending and derivatives, as well as failures to design or implement basic financial controls and disciplines in making tax refunds.  *See* discussion of U.S. dividend withholding enforcement experiences, *infra* ¶¶ 51-52.

[108] *See* Exhibit 32 (William S. Dodge, *Breaking the Public Law Taboo*, 43 HARV. INT'L L. J. 161, 163 (2002)) ("With respect to governmental claims, which would include tax law, criminal prosecutions, and the government's civil enforcement of antitrust and securities laws, the political branches should provide for the reciprocal enforcement of foreign public law through treaties, and courts should not enforce foreign public law in suits by governments in the absence of such treaties, because courts are institutionally incapable of ensuring reciprocity.").

[109] Treas. Reg. § 1.1441-1(b)(1).

[110] Treas. Reg. §§ 1.1441-1(b)(7)(i) and 1.1441-1(b)(7)(iii). For example, a "withholding agent must withhold 30 percent of any payment of an amount subject to withholding made to a payee that is a foreign person unless it can reliably associate the payment with documentation upon which it can rely to treat the payment as made to a payee that is a U.S. person or as made to a beneficial owner that is a foreign person entitled to a reduced rate of withholding." Treas. Reg. § 1.1441-1(b)(1).

[111] Treas. Reg. § 1.1441-7(a). This description does not get into the details of the qualified intermediary (QI) system. For a description, *see* Exhibit 33 (*Issues Involving Banking Secrecy Practices & Wealthy American Taxpayers: Hearing Before Subcomm. on Select Revenue Measures of the H. Comm on Ways & Means*, 111 Cong. (March. 31, 2009) (statement of Stephen E. Shay)); Exhibit 29 (Bittker & Lokken, *supra* note 96, at ¶ 67.4.6); Exhibit 34 (S. I. Langbein, FEDERAL INCOME TAXATION OF BANKS & FINANCIAL INSTITUTIONS ¶ 14.08[2] (Thomas Reuters/Tax & Accounting, 7th ed. 2002, with updates through November 2021) (online version accessed on Checkpoint (www.checkpoint.thomsonreuters.com) [Dec. 28, 2021])).

in a chain of payees of dividends may be a withholding agent.[112]  In this case, the IRS may pursue any of the potential agents.[113]

50.3.   On the other hand, the withholding agent is protected from liability for taxes to the extent that it applies the processes in the Treasury regulations designed to assure reliability of the documentation or to rely on regulatory presumptions largely designed to protect the fisc.[114]  If the withholding agent has actual knowledge or reason to know that liability is *greater* than what is indicated by documentation (or presumptions), the withholding agent is exposed to liability irrespective of the documentation received (or presumption).[115]

50.4.   The U.S. regulations accordingly incentivize withholding agents to avoid exposure to liability for under withholding by protecting withholding agents that withhold unless proper documentation rebuts the presumption of withholding applicability.[116]  On the other side of the equation, foreign investors who are direct or indirect clients of the withholding agent generally do not want to file tax returns with the IRS, even if necessary to claim refunds in the case of over withholding. This provides an incentive for the withholding agent to engage in appropriate diligence to obtain client documentation that is correct in the first instance.  In the author's experience, U.S. global custodians' back offices provide substantial technical support to foreign banks and foreign investors and their representatives

---

[112] I.R.C. §§ 1441(a), 1442(a); Treas. Reg. § 1.1441-7(a)(2).  This includes a foreign person meeting the definition of withholding agent.

[113] Under I.R.C. § 1463, if a withholding agent fails to withhold but the tax is paid, the withholding agent remains potentially liable for applicable interest and penalties.  In a chain of securities custody for stock in a U.S. public company, there always will be a financial institution within reach of U.S. enforcement jurisdiction.  Stocks are held through the Depositary Trust Corporation (DTC) whose members are domestic banks or bank branches acting as custodians. Normal commercial practice is to contractually assign the obligation to withhold tax to a person in the payment chain with that capability.  *See U.S. Tax Withholding Services*, DTCC, https://www.dtcc.com/settlement-and-asset-services/global-tax-services/us-tax-withholding-services (last accessed Dec. 21, 2021).

[114] Treas. Reg. § 1.1441-1(b)(3)(ix)(A).

[115] Treas. Reg. § 1.1441-1(b)(3)(ix)(B), *Id.* § 1.1441-6(b)(1).  *See also* Exhibit 35 (Richard E. Andersen, ANALYSIS OF UNITED STATES INCOME TAX TREATIES ¶ 9.02 (Thomas Reuters/WG&L, with updates through November 2021) (accessed on Checkpoint (www.checkpoint.riag.com), [Dec. 28, 2021])).

[116] *See*, *e.g.*, Treas. Reg. § 1.1461-1(e).

that are direct and indirect clients regarding a myriad of documentation and related tax compliance matters.

50.5.   The policy decision to adopt relief at source is based on multiple considerations. These include:

i.   It minimizes the burden on payments in the U.S. capital markets, which are the largest in the world involving billions of dollars of cross-border income payments on average each business day.[117]

ii.   The reliance on withholding agents shifts substantial portions of the cost burden from the government to private financial institutions that provide services.[118]  The banking industry in turn seeks to pass on the cost to the customers that benefit from the efficiencies of the market.

iii.   The compliance benefits from this structure include placing a diligence obligation on the financial institutions with incentives described previously to assure quality.   The Qualified Intermediary ("QI") system in turn endeavors to shift this obligation to the institution with the closest relationship with the beneficial owner.[119]

---

[117] In 2019, $1.125 trillion of U.S.-source FDAP income was reported paid to nonresidents.  IRS Statistics of Income, Foreign Recipients of U.S. Income Under Chapter 3 Withholding Tbl 1. Forms 1042S, 2019 (cell C10). Assuming 260 business days, that would result in payments exceeding $4 billion each day.

[118] In 1982-1983 the banking industry defeated an initiative spearheaded by Senator Bob Dole to impose a 10% withholding tax on interest.  In response, Senator Dole promoted and saw passage of the interest and dividend back-up withholding regime that has been the domestic counterpart to cross-border withholding and now FATCA.  Exhibit 36   (*Interest     Withholding     Requirement     Repealed*, 39     CQ     ALMANAC     (1984) http://library.cqpress.com/cqalmanac/cqal83-1198852).  All of these regimes place the primary cost burden initially on the banking industry—a point that was not lost on Senator Dole.  *See, e.g.*, Exhibit 37 (Julia Malone, *Storm over withholding     still     rumbling*, THE     CHRISTIAN     SCI.     MONITOR     (Mar.     24,     1983), https://www.csmonitor.com/1983/0324/032458.html#).

[119] *See supra* note 111, Exhibit 33 (*Issues Involving Banking Secrecy Practices & Wealthy American Taxpayers: Hearing Before Subcomm. on Select Revenue Measures of the H. Comm on Ways & Means*, 111 Cong. (March. 31, 2009) (statement of Stephen E. Shay)) for references to descriptions of the QI system.  *See also* Exhibit 31 (Shay, Fleming and Peroni, *supra* note 105, at 124-127).

51.   The United States, like Denmark, has had to respond to the tax enforcement difficulties presented by stock lending and equity trading strategies.  The history to 2008 of successive U.S. steps to address tax avoidance relating to dividend withholding tax is referred to in the hearing documents for the Permanent Subcommittee on Investigations ("PSI") 2008 Hearing on Dividend Tax Abuse.[120]  The steps taken by the United States to protect against dividend withholding tax avoidance include the following (the third step was subsequent to and an outcome of the PSI hearing):

51.1.   modifying source rules (to address a stock lending dividend withholding tax avoidance strategy);[121]

51.2.   requiring a minimum equity holding period to qualify for double taxation relief (to address certain trading around dividend dates);[122] and

51.3.   looking through the substance of derivative positions (to address dividend withholding tax avoidance using derivative positions).[123]

52.   A transaction addressed by the most recent of these rules is the following:

52.1.   Example: Foreign owner A ("FO-A") of U.S. equity X lends the X shares in advance of a dividend to a foreign affiliate, foreign owner B ("FO-B") resident in

---

[120] Exhibit 38 (*Dividend Tax Abuse: How Offshore Entities Dodge Taxes on U.S. Stock Dividends: Hearing Before Permanent S. Subcomm. on Investigations of the S. Comm. of Homeland Security and Gov'tal Affs.*, 110 Cong. (2008) [hereinafter "Dividend Tax Abuse Hearing"]).

[121] *See* Treas. Reg. § 1.861-3(a)(6).  First proposed in 1992, 57 Fed. Reg. 860 (Jan. 9, 1992), and finalized in 1997 (T.D. 8735 (Oct. 6, 1997)), the U.S. adopted a source rule that treats a substitute dividend payment on a stock loan as U.S. source income classified as a dividend.  As a result, when a dividend is paid on U.S. stock loaned by an offshore shareholder to a U.S. person (usually a bank or other financial institution) and the U.S. borrower is obligated to make a "substitute payment" of the same amount to the stock lender, that substitute payment is subject to withholding in the same manner as a U.S. dividend to the stock lender.  The same rule applies to a stock sale-repurchase (repo) transaction. Following issuance of the regulations, the Treasury issued I.R.S. Notice 97-66, 1997-2 C.B. 328, to address a concern with cascading U.S. withholding on a foreign-to-foreign securities loan. For example, foreign owner A (FO-A) of U.S. equity X lends the X shares to foreign owner B (FO-B) who receives dividends.  The dividend to B is subject to withholding tax and B's substitute payment to FO-A also is subject to withholding tax.   I.R.S. Notice 97-66 ameliorated the risk of an excessive second withholding tax, but in such a way that it left exposed to dividend tax avoidance other transactions.  *See supra* ¶ 54.

[122] *See* I.R.C. § 901(k) (1997).

[123] *See* I.R.C. § 871(m) (2010).

a country subject to a U.S. dividend withholding rate at least equal to the rate that would apply to FO-A's country of residence.[124]  FO-B sells the X shares to a U.S. financial institution and enters into a total return equity swap with a financial institution as counterparty in which FO-B agrees to pay the U.S. financial institution (the counterparty) amounts at an agreed rate on the equity value of the shares plus any depreciation in value of the shares, and the counterparty pays FO-B amounts based on the dividends and any appreciation on X shares.[125]  FO-B in turn pays substitute dividend payments to FO-A without withholding.[126]  Some time after the dividend FO-B terminates the equity swap with the U.S. financial institution (the counterparty) and purchases X shares to close out the stock loan from FO-A.

52.2.    Following adoption of I.R.C. § 871(m), the dividend equivalent payment portion of the equity swap would be characterized as a U.S. source dividend and therefore subject to withholding.  These are examples of policy decisions that the United States implemented to combat dividend withholding tax avoidance.

53.    The U.S. approach to avoidance generally is to adopt a specific legislative response.  An alternative approach used by some countries is to adopt a "general anti-avoidance rule."[127]  Whichever approach is taken is a policy response that is based on a mix of factors that are specific to a country's legal system and culture of tax compliance.[128]

---

[124] Under this condition, I.R.S. Notice 97-66 would by its terms excuse FO-B's substitute payment to FO-A from withholding. Commentators argued that this was an inappropriate application of I.R.S. Notice 97-66 in the context of this example, but that argument did not align with market practice.

[125] The dividend equivalent payment on an equity swap was treated as foreign source income not subject to withholding under Treas. Reg. 1.863-7 (prior to its 2013 amendment in T.D. 9572 to conform to I.R.C. § 871(m)).

[126] Exhibit 38 (Dividend Tax Abuse Hearing, *supra* note 120, at 4 (statement of Sen. Levin)).

[127] Exhibit 39 (Richard Krever, *Chapter 1: General Report GAARS* , *in* GAARs–A KEY ELEMENT OF TAX SYSTEMS IN THE POST-BEPS TAX WORLD (M. Lang, et al. eds. 2015) ¶ 1.1) ("Quite possibly no other feature of tax law provides a better insight into a nation's tax psyche than its anti-avoidance rules.").

[128] *See, e.g.*, *id.*; Exhibit 40 (Hoon Lee & Candice M. Turner, *Anti-avoidance measures of general nature and scope– GAAR and other rules–United States Report*, *in* IFA CAHIERS 2018 - VOLUME 103A 6-7 (IFA 2018)).

54.    The United States follows a beneficial owner concept for withholding tax reductions for dividends under treaties (as well as in its domestic law unilateral exemption for so-called portfolio interest).[129]

54.1.    Under the Treaty, which is similar in this respect to most U.S. bilateral income tax treaties, the definition of a term, not otherwise defined in the Treaty, including beneficial owner, is governed by Article 3(2).[130]  The term "beneficial owner" is not defined in the Treaty and has not been the subject of a competent authority agreement under Article 25.  Article 3(2) of the Treaty provides that:

> [A]ny term not defined therein shall, unless the context otherwise requires, … have the meaning which it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

This is standard language in U.S. bilateral income tax treaties and reflects U.S. practice.

54.2.    One question is whether the "context" would support a different definition than a domestic law definition.  Some commentators argue for an "international definition" of beneficial owner, freed from domestic law, in order to promote uniformity of treaty interpretation.[131]  As seen from the technical explanation of the Treaty, the United States has not adopted such an approach.[132] Several reasons likely explain this.

---

[129] See I.R.C. §§ 871(h), 881(c); Treas. Reg. §§ 1.1441-1, 1.1441-6.  For this reason, U.S. withholding regulations implement beneficial owner standards separately for domestic statutory law and for treaty purposes.

[130] Exhibit 2 (Treaty, *supra* note 6, art. 3(2)); *see also* Exhibit 41(I.R.S., Technical Explanation to *id.*).

[131] Exhibit 42 (Philip Baker, *Beneficial Ownership: After Indofood*, VI GITC REV. 15, 23 (2007)) ("What the term needed was a 'international fiscal meaning' rather than a meaning that depended on the domestic law of the country where the issue arose." (footnote omitted)); Exhibit 43 (Robert Danon, *Clarification of the Meaning of "Beneficial Owner" in the OECD Model Tax Convention–Comment on the April 2011 Discussion Draft*, 65 BULL. INT'L TAX'N 437, 441 (2011)) ("First, the OECD should make it very clear that beneficial ownership is a treaty concept that leaves no room for the application of the domestic law of the source state.").

[132] *See infra* ¶ 54.3. As explained by John Avery-Jones, "[u]nless the competent authorities agree to a common interpretation, article 3(2) of the OECD Model means that common interpretation in the sense of a term having an autonomous meaning can arise only if the context otherwise requires the domestic law meaning not to be applied,

i.    First, the OECD Model Commentary to Article 10 on beneficial ownership has shifted over time.  From 1977, the Commentary was designed to prevent nominees and agents from claiming treaty benefits in place of their principals.  The OECD Model Commentary took a different turn in 2003 to incorporate an anti-treaty abuse purpose into the beneficial owner condition.[133] The OECD Model Commentary on "beneficial owner" was modified again in 2014 to clarify that use of beneficial owner did not pre-empt other approaches to protecting against treaty abuse,[134] which was long the U.S. position as reflected in its incorporation of a separate limitation on benefits article in its tax treaties since the early 1980s.[135] The 2014 OECD Model Commentary also confirmed that a payment to an agent acting for a beneficial owner resident in a treaty jurisdiction was not denied treaty relief merely by being paid to a nominee or agent.[136] The U.S. approach has been consistent with these positions.  U.S. practice is to take account of OECD Model Commentary that is relevant to an issue (which can include later

---

which, because of the need to keep the treaty relieving provisions in line with the domestic law tax charge, is likely to be infrequent.  Judging from the US experience, where the power to make mutual agreements on interpretation that override the rest of article 3(2) is contained in about 38 of their treaties since 1982, this power is also likely to be used infrequently."  Exhibit 44 (John Avery-Jones, TREATY INTERPRETATION, GLOBAL TAX TREATY COMMENTARIES (IBFD 2018) at ¶ 1.1.2.2).

[133] Exhibit 45 (OECD Comm. on Fiscal Affs., *OECD Income & Cap. Model Convention & Comment.*, comment. to Art. 10, ¶¶ 12-12.1 (IBFD Jan. 28, 2003) [hereinafter "2003 OECD Comment."]).  This change was based on the 2002 report.  Exhibit 46 (OECD, *Restricting the Entitlement to Treaty Benefits*, 8 ISSUES IN INT'L TAX'N 7, 26-31 (2003)).  At the same time, the 2003 changes to the OECD Commentary clarified that domestic law anti-abuse rules applied in relation to treaties.  *See* 2003 OECD Comment., *supra* note 133, at comment. to Art. 1, ¶¶ 9.1-9.5, 22.-22.2.  This had long been the U.S. position.

[134] Exhibit 47 (OECD Comm. on Fiscal Affs., *The 2014 Update to the OECD Model Tax Convention*, comment. to Art. 10, ¶ 12.5 (July 15, 2014) [hereinafter "2014 OECD Comment."]) ("Whilst the concept of 'beneficial owner' deals with some forms of tax avoidance (*i.e.* those involving the interposition of a recipient who is obliged to pass on the dividend to someone else), it does not deal with other cases of treaty shopping and must not, therefore, be considered as restricting in any way the application of other approaches to addressing such cases.").

[135] All U.S. treaties ratified since 1986 have included a limitation on benefits article.  Since the 1986 Act adoption of a statutory limitation on benefits rule overriding treaties in I.R.C. § 884, all U.S. treaties that did not have a limitation on benefits article have been re-negotiated.  Exhibit 48 (The OECD Comm. on Fiscal Affs., *Model Tax Convention on Income & on Capital 2017 (Full Version)*, art. 29 (Nov. 21, 2017) [hereinafter "2017 OECD Model Treaty"]), Art. 29 added a broad "principal purpose text" limitation on benefit provision in Article 29.

[136] Exhibit 47 (2014 OECD Comment., *supra* note 134, at comment. to Art. 10, ¶ 12.2).

versions of the OECD Model Commentary), but not to be bound by it.[137] Other countries may take different approaches.

ii.   A second reason is that the United States has regularly advocated for international standards to mirror its own rules.[138]

iii.  A third reason is that in treaties since the early 1980s, the United States' negotiating position has been to authorize the competent authority to agree (under the mutual agreement article) on a specific meaning of a term and to give that meaning precedence over domestic law (in Article 3(2)).[139] This approach assures that any deviation from domestic law is for a specific objective and is not open-ended.

54.3.  The U.S. Technical Explanation to the Treaty's 2006 Protocol revising Article 10 provides, consistent with Article 3(2), with respect to beneficial owner:

> The term 'beneficial owner' is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (*i.e.*, the source country). The beneficial owner of the dividend for purposes of Article 10 is the person to which the dividend income is attributable for tax purposes under the laws of the source State. [140]

54.4.  In determining to whom dividend income is attributable for tax purposes, the United States looks to the person who includes the income for U.S. tax purposes. This

---

[137] For a leading example of use of OECD Model Commentary in applying a treaty provision, *see Taisei Fire & Marine Ins. Co., Ltd. v. Comm'r*, 104 T.C. 535 (1995). Since the U.S. does not rely on the OECD Model Commentary as authority, it avoids the issue of which commentary was relevant. For example, should it be the commentary at the date the treaty was signed? The date the provision is added to a treaty? The date of the transaction?

[138] In the current negotiations for a global minimum tax, the public statements to date have included approaches that would accommodate differences between the U.S. global intangible low tax income (GILTI) regime, I.R.C. §§ 250, 951A, and the OECD's specification of its Pillar 2 proposal. OECD/G20 BASE EROSION & PROFIT SHIFTING PROJECT--STATEMENT ON A TWO-PILLAR SOLUTION TO ADDRESS THE TAX CHALLENGES ARISING FROM THE DIGITALISATION OF THE ECONOMY (2021), https://www.oecd.org/tax/beps/statement-on-a-two-pillar-solution-to-address-the-tax-challenges-arising-from-the-digitalisation-of-the-economy-october-2021.pdf.

[139] *See* Exhibit 49 (Model Convention for the Avoidance of Double Taxation & the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital, U.S., art 3(2), June 16, 1981); Exhibit 35 (Andersen, *supra* note 115, at ¶ 2.04[2]).

[140] Exhibit 50 (I.R.S., Technical Explanation to Protocol, *supra* note 6, at art. II ¶ 2).

determination is informed by U.S. substance over form doctrines such as assignment of income,[141] as well as incorporating rules authorized by regulations, including regulations under I.R.C. § 7701(l) incorporating specified anti-conduit principles.[142]

54.5.   The U.S. domestic law definition of beneficial owner for withholding purposes is defined similarly, but with greater elaboration, in the withholding regulations.[143]

54.6.   The meaning of "beneficial owner" under the OECD Model Commentary is uncertain.[144]  Its meaning is developed by each country in light of its tax policies and the role the term plays in its tax law.  The United States has used legislative and regulatory rules to avoid placing weight on determinations of beneficial owner. Other countries rely on less bright line approaches.  The choice essentially is one of policy (informed by local tax culture).

---

[141] *Lucas v. Earl*, 281 U.S. 111, 114-15 (1930).

[142] To make a tax lawyer's life difficult, the I.R.C. § 7701(l) anti-conduit regulations are found under I.R.C. § 881. *See* Treas. Reg. § 1.881-3.

[143] Treas. Reg. § 1.1441-1(c)(6)(i) provides:

> **(6) Beneficial owner—(i) General rule.** This paragraph (c)(6) defines the term beneficial owner for payments of income other than a payment for which a reduced rate of withholding is claimed under an income tax treaty. The term beneficial owner means the person who is the owner of the income for tax purposes and who beneficially owns that income. A person shall be treated as the owner of the income to the extent that it is required under U.S. tax principles to include the amount paid in gross income under section 61 (determined without regard to an exclusion or exemption from gross income under the Internal Revenue Code). Beneficial ownership of income is determined under the provisions of section 7701(l) and the regulations under that section and any other applicable general U.S. tax principles, including principles governing the determination of whether a transaction is a conduit transaction. Thus, a person receiving income in a capacity as a nominee, agent, or custodian for another person is not the beneficial owner of the income. In the case of a scholarship, the student receiving the scholarship is the beneficial owner of that scholarship. In the case of a payment of an amount that is not income, the beneficial owner determination shall be made under this paragraph (c)(6) as if the amount were income.

Special rules apply to foreign partnerships, foreign simple trusts, and foreign grantor trusts, and other foreign trusts and foreign estates.  Treas. Reg. § 1.1441-1(c)(6)(ii).  Payments covered by a treaty are subject to a different regulation that in form defers to the treaty, but by reason of the treaty definition rules similar to those in the Treaty, the definition of beneficial owner effectively is directed back to domestic law beneficial owner rules.  *See* Treas. Reg. § 1.1441-6.

[144] Charl du Toit, a student of the beneficial owner concept for over 20 years, summarizes the state of the literature at the end of 2021: "There has been a big increase in articles, commentaries and court cases on beneficial ownership the last number of years, with the only points of agreement probably being that the term is controversial and its meaning uncertain."  Exhibit 51 (Charl P. du Toit, *Beneficial Owner: The Enigma Storms Ahead*, 75 Bull. Int'l Tax'n 11/12, 2 (2021)).

55.    U.S. substantive law changes, such as adoption of the anti-conduit regulations and the legislative fixes described above in relation to dividend tax avoidance, have had meaningful effect in part because of the shared incentives of withholding agents under the U.S. regime to implement what have been increasingly complex rules.

56.    Several observations are relevant regarding the U.S. taxation of dividend payments to nonresidents and the relief at source approach to withholding:

56.1.    U.S. withholding agents effectively share with the IRS an interest in assuring accurate tax collection.   The volumes of payments in the U.S. markets are substantial and the risks from errors are substantial.[145]

56.2.    The U.S. relief at source regime causes withholding agents to emphasize upfront quality controls to minimize the need for manual interventions and thereby achieve payment efficiencies.   It also minimizes the circumstances in which there are underpayments of taxes.

56.3.    From the perspective of the U.S. government, in the case of under withholding, the joint and several liability of withholding agents for the tax largely assures that there are assets subject to U.S. tax enforcement jurisdiction from which to collect the tax without having to resort to foreign collection assistance.

56.4.    The U.S. withholding regime enhances the effectiveness of substantive law anti-abuse rules and doctrines because the withholding agents' direct and indirect contractual relationships with beneficial owners allow withholding agents to require customers, as a condition of maintaining an account, to provide information necessary to implement the law.

57.    International acceptance of the revenue rule or an analogue generally has been presumed in designing the relevant tax law (a tax on gross income) as well as withholding procedures.

---

[145] In 2019, $1.125 trillion of U.S.-source FDAP income was reported paid to nonresidents of which $115 billion was subject to withholding, resulting in tax withheld and paid over totaling of $21 billion.  IRS Statistics of Income, *supra* note 117.

The procedures presuppose that collection assistance for additional tax will not be available in the absence of a treaty or international agreement.

58.     A relief at source system such as that used in the United States contrasts with a tax reclaim system, such as the one employed by Denmark.  Under Denmark's tax reclaim system, once the withholding agent withholds and pays over the maximum taxes that could be due to the revenue authority, the withholding agent and indeed the entire withholding chain between the issuer of the stock and the investor appear to be out of the picture.[146]  Upon receipt of a reclaim application, SKAT determines whether it is entitled to retain the tax it has received from the withholding agent, whether a refund of this tax is due, or whether further investigation is warranted.  Following that determination, SKAT refunds any amounts determined to be over-withheld directly to the applicant or applicant's reclaim agent.[147]

58.1.   Under a tax reclaim system it is the responsibility of the revenue authority, in this case SKAT, to get the tax refund right.

58.2.   Where taxes are refunded incorrectly by a tax reclaim country to a person outside the enforcement jurisdiction of that country, the tax reclaim country's recourse appropriately is collection assistance under a treaty or other international agreement.

58.3.   In contrast, allowing SKAT's case to recoup allegedly incorrect tax reclaims to proceed here would allow a tax reclaim country to file suit in U.S. courts without regard to the revenue rule.  Where, as in the case of Denmark, a country's dividend withholding tax regime uses a reclaim system, this policy decision should not avoid the reach of the revenue rule merely because its policy results in tax enforcement after an incorrect refund.

i.      In the U.K. Litigation, SKAT's counsel submitted that SKAT could not make a claim under the European Union's Mutual Assistance Recovery

---

[146] Exhibit 7 (Bundgaard, *supra* note 10, at 9, 13).

[147] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 308-09); Exhibit 6 (Am. Compl. *supra* note 8, ¶¶ 43-44).

Directive, Directive 2010/24/EU, ("MARD").[148]  Regardless of whether or not claims for return of incorrect tax refunds are eligible for collection assistance under a treaty or supranational legislation such as EU laws, SKAT's theory in this case would permit requests for judicial assistance (in other words, civil lawsuits) from every country completely independent of whether they were a party to a treaty with collection assistance.

ii.    If, contrary to the view of SKAT's U.K. counsel, reclaim of an incorrect tax refund *were* within scope of the MARD or another international collection assistance agreement, not applying the revenue rule to bar claims for erroneous tax refunds would provide access to foreign courts in addition to the ability to seek relief under MARD.  It is possible under this approach that a foreign government could have the option of either making a request for assistance under a treaty *or* seeking assistance through the courts (or both, either simultaneously or sequentially).

59.    SKAT's view is that Denmark and any similarly situated tax reclaim country would have access to courts of other countries to recoup mistaken tax refunds because "they do not seek unpaid taxes."[149]  In contrast, a relief at source country, like the United States, would be barred by the revenue rule for the equivalent claim of under withheld taxes because it would be a claim for unpaid taxes.

59.1.    This would give rise to a material asymmetry in application of judicial collection assistance based upon the sovereign's policy decisions in designing and implementing its tax administrative and enforcement system.

---

[148] Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶ 123).  Justice Baker observed: "I think it inconceivable that a request for assistance in respect of recovering a WHT refund said by the requesting tax authority to have been wrongly paid out could or would be resisted on the ground that it fell outside the scope of MARD as defined by Article 2(1)(a)."  *Id.* at ¶ 124.  SKAT presumably would not be bound by a counsel's statement should it later determine that a claim would be eligible for treaty assistance.

[149] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 311).

59.2.    This asymmetry is also at odds with reciprocity, which is an important factor in international tax relations generally and is a fundamental factor underlying international tax treaties and agreements (as discussed in the next section).[150]

59.3.    As a practical matter, it also is an untenable distinction.[151]

60.    The potential implications of such an asymmetry on U.S. positions in international tax legislation, collection assistance under treaties, and on use of U.S. judicial resources is taken up in Part IV of this Report.

### D.    Mutual Assistance Under U.S. International Tax Agreements

#### 1.    Overview

61.    U.S. international tax diplomacy in relation to negotiation of its bilateral and multilateral tax treaties and agreements also operates against the background of the revenue rule.[152]  As a result of negative legislative reaction to collection assistance in the post-World War II period and extending to present (at possibly lower levels of antagonism), the United States to date has authorized only narrowly drawn collection provisions in agreements that have received approval of the Senate.

62.    This section of the Report provides an overview of U.S. positions taken in relation to collection assistance in bilateral income tax treaties and the Convention.  The discussion at

---

[150] *See* Exhibit 52 (Brian Arnold, *Reciprocity as a Fundamental Principle of Tax Treaties: Meaningless Platitude, Interpretative Guideline or Misguided Policy?*, *in* THINKER, TEACHER, TRAVELER: REIMAGINING INTERNATIONAL TAX – ESSAYS IN HONOR OF DAVID ROSENBLOOM 2.1-2.3 (Georg Kofler, Ruth Mason, and Alexander Rust eds., IBFD 2021)) (observing that commentaries to both the OECD and UN Model Conventions acknowledge that some countries may not be able to provide collection assistance called for under Article 27 of the conventions (including for policy or administrative reasons) and such countries should not include Article 27 in their treaties. "In this context reciprocity is a factor in deciding whether to include Article 27 in a treaty; however, once the contracting states agree to include that provision in their treaty, it operates on a reciprocal basis").  Arnold also observes that treaty reciprocity is formal and does not require equivalent effects in both countries. *Id.* at 25. In my experience, substantive reciprocity is evaluated in connection with the overall decision whether to enter into a treaty with a particular country.

[151] *See* discussion, *infra* ¶¶ 77-87.

[152] As stated by the United States in its amicus brief filed in connection with the *cert* petition in *Att'y Gen. of Canada*: "The revenue rule is not only a well-established feature of the common law and of international law; it provides the background understanding against which the United States has entered into treaties that address the extent to which a foreign nation may seek assistance from the United States and its courts in enforcing its tax claims." Exhibit 24 (U.S. *Canada* Cert. Amicus Brief, *supra* note 67, at 9 (*citing* S. Exec. Rep. No. 1, 82d Cong., 1st Sess. 21 (1951))).

Part IV considers the implications for U.S. negotiating positions regarding assistance in collection if this case were to proceed.

### 2. U.S. Bilateral Income Tax Treaties – Mutual Assistance and Dividend Withholding

63. The United States has 67 bilateral income tax treaties in force.[153] These treaties obtain source-country taxation relief for its residents where there is risk of double taxation.[154] These treaties also support the administration and enforcement of the two countries' tax laws through exchanges of information for tax purposes and in certain cases, as discussed below, collection assistance.[155]

    63.1. Unlike most other countries, the United States generally does not enter into a treaty with a country, such as a low tax investment hub or "tax haven," where there does not exist a risk of double taxation of income.[156]

---

[153] *See* IRS, Tax Treaty Tables, Tbl 3, available at https://www.irs.gov/pub/irs-utl/Tax_Treaty_Table%203.pdf (last accessed Dec. 22, 2021). The U.S. treaty with Bermuda is not included in that it is limited in scope and only applies to insurance enterprises. U.S. bilateral income tax treaties generally follow the pattern of the OECD Model, but also include rules to address specific U.S. policies or limitations. A U.S. model treaty is issued by the U.S. Treasury in part to indicate where U.S. negotiating positions differ from the OECD Model. In some cases, these positions are "red lines" because the Senate will not ratify a treaty without the provision. The U.S. Treasury consults with the Senate Foreign Relations Committee and the Congressional tax writing committees to assess views on treaty issues.

[154] The purposes of U.S. bilateral income tax treaties are to promote closer economic cooperation between the two countries and to eliminate possible barriers to trade and investment caused by overlapping taxing jurisdictions of the two countries. Treaties accomplish this by reducing or eliminating double taxation of income earned by residents of each country from sources within the other country, while not creating opportunities for double non-taxation, and by preventing avoidance or evasion of the taxes of the two countries. *See* Exhibit 53 (I.R.S., *Preamble to 2016 U.S. Model Income Tax Convention* (Feb. 17, 2016)); Exhibit 54 (Staff of J. Comm. on Tax'n, Explanation of Proposed Income Tax Treaty between the United States and Poland, 1 (JCX-68-14, June 17, 2014)); *see also* Exhibit 55 (S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. 32 (2015) (statement of Robert B. Stack, Deputy Assistance Sec'y for Int'l Tax Affs., Dep't of Treasury)) (highlighting several policy goals in negotiating international tax treaties, which include to ensure reciprocal benefits to each country, to take into account the compatibility of the other country's tax system and to prevent abuse of treaties to ensure the United States will be able to successfully negotiate with other countries in the future to "secure for U.S. persons the benefits of reductions in source-country tax on their investments in that country.").

[155] TIEAs are discussed in the next section.

[156] Exhibit 35 (Andersen, *supra* note 115, at ¶ 1.01) (noting purpose of tax treaties focuses on reduction of double taxation). Where there have been exceptions and treaties have been entered into, for example, with a tax haven, those treaties generally have been terminated (*e.g.*, treaties with the British Virgin Islands (1983), the Netherlands Antilles (1987 (articles except the interest article and its ancillary provisions). *See id.* at ¶ 1.04[6][a]]) or renegotiated so their use as a treaty shopping conduit is constrained (*e.g.*, the treaty with Barbados (2004) and the Netherlands (1994)). In other investment hub cases, the treaty adopts stringent limitations on benefits rules (e.g., the treaty with Malta (2008)).

63.2. In its bilateral income tax treaties, the United States provides reciprocal source taxation relief for inbound investment from the treaty partner country.[157]

　　i.　In the case of dividends, under U.S. treaties the country from which the dividend derives (the source country) generally is allowed to impose a tax up to a prescribed rate, with different rate caps applying based on the classification of the beneficial owner of the share.[158]

　　ii.　In the United States' treaties with Australia, Belgium, Denmark, Finland, France, Germany, Japan, Mexico, New Zealand, Sweden, and the United Kingdom, each at Article 10(3), a direct dividend is exempt from source country tax provided an 80% ownership threshold (50% in the case of the Japanese treaty) and certain other conditions are satisfied. Where the country of residence of the beneficial owner also may tax the dividend, it commits to provide relief from double taxation for the tax imposed by the source country.[159]

　　iii.　In certain U.S. treaties, including the treaty with Denmark, a pension plan may be entitled to exemption from source taxation as well.[160]

63.3. U.S. bilateral income tax treaties employ limitation on benefits articles designed to prevent or mitigate "treaty shopping" (where third-country residents could use

---

As discussed in the next section, the United States does not limit countries with which it would enter into a TIEA, which is an executive agreement.

[157] The United States is a large net capital exporter of foreign direct investment and a large net importer of portfolio capital. IMF Data, *Outward Direct Investment Position, Top 10 Reporting Economies in the World, US Dollars, Millions, 2019*, INT'L MONETARY FUND, https://data.imf.org/?sk=40313609-F037-48C1-84B1-E1F1CE54D6D5&sId=1482249019300 (last accessed Dec. 21, 2021); IMF Data, *Inward Direct Investment Position, Top 10 Reporting Economies in the World, US Dollars, Millions, 2019*, INT'L MONETARY FUND, https://data.imf.org/?sk=40313609-F037-48C1-84B1-E1F1CE54D6D5&sId=1482247616261 (last accessed Dec. 21, 2021).

[158] If the beneficial owner is an individual or a corporation that owns less than 10% of the issuer's stock, the rate is usually 15%. If the beneficial owner is a corporation owning 10% or more of the stock the "direct dividend" rate is usually 5%.

[159] *See*, *e.g.*, Exhibit 2 (Treaty, *supra* note 6, at art. 23).

[160] *Id.* at art. 10(3)(c) added in the 2006 Protocol. *See* Exhibit 3 (Protocol, *supra* note 6).

treaty partner entities to obtain source treaty relief indirectly) that generally are stricter than anti-treaty shopping provisions found in non-U.S. income tax treaties.[161]

64.    The administrative provisions of treaties authorize assistance directly between the two countries' tax authorities.  Not only is this generally more efficient than relying on judicial assistance, it takes precedence over the revenue rule.[162]  Accordingly, under an income tax treaty, one country's tax authority will exchange tax information with the other country's tax authority to administer and enforce taxes covered by the treaty, as well as other taxes.[163] The administrative assistance articles, like others, are reciprocal in form and authorize administrative assistance between the treaty countries' respective tax authorities in each direction.  U.S. judicial assistance in collection of a foreign tax judgment normally is precluded outside of a treaty by state adoption of one of the versions of the Uniform Foreign Money-Judgments Recognition Acts or the revenue rule.[164]

---

[161] *Compare* Exhibit 56 (Convention for the Avoidance of Double Taxation & the Prevention of Tax Evasion with Respect to Taxes on Income, U.S., art. 22 (2016) [hereinafter "2016 U.S. Model Treaty"]) *with* Exhibit 48 (2017 OECD Model Treaty, *supra* note 135, at art. 29).

[162] A TIEA, the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters, and 28 U.S.C. § 1782, as well as a tax treaty can overcome this limitation in the case of taxes to the extent of the scope of the agreement.  Collection assistance in relation to taxes is not afforded under a TIEA or the Hague Convention.

[163] *See* Exhibit 2 (Treaty, *supra* note 6, at art. 26(4)) (exchange of information for tax purposes is not limited to taxes covered by the treaty, as set out in Art. 2.)  *See* below in respect of collection assistance.

[164] Exhibit 57 (Uniform Foreign Money-Judgments Recognition Act § 1(2) (Unif. L. Comm'n 1962)) (defining "foreign judgment" as a money judgment "other than a judgment for taxes, a fine or other penalty, or a judgment for support in matrimonial or family matters"); Exhibit 58 (Uniform Foreign-Country Money Judgments Recognition Act § 3(b) (Unif. L. Comm'n 2005)) (providing that the act does not apply "to the extent that the judgment is: (1) a judgment for taxes; (2) a fine or other penalty; (3) a judgment for divorce, support, or maintenance, or other judgment rendered in connection with domestic relations").  The 1962 Uniform Foreign Money-Judgements Recognition Act is applied in 11 states including the U.S. Virgin Islands while the 2005 Uniform Foreign-Country Money Judgments Recognition Act has been adopted by 29 states including the District of Columbia.  *See Foreign-Country Money Judgements Recognition Act 2005*, UNIF. L. COMM'N, https://www.uniformlaws.org/committees/community-home?communitykey=ae280c30-094a-4d8f-b722-8dcd614a8f3e&tab=groupdetails (last visited Dec. 9, 2021); *Foreign-Country Money Judgements Recognition Act 1962*, UNIF. L. COMM'N, https://www.uniformlaws.org/committees/community-home?CommunityKey=9c11b007-83b2-4bf2-a08e-74f642c840bc (last visited Dec. 9, 2021).  In a state that has not adopted a version of the Uniform Foreign Money Judgment Recognition Act that excludes taxes, the revenue rule would apply.  *See, e.g.*, *Bullen v. Her Majesty's Gov't of the U.K.*, 553 So. 2d 1344, 1345 (Fla. Dist. Ct. App. 1989).  Florida's Uniform Out-of-country Foreign Judgment Recognition Act became effective on January 1, 1995, after the 1989 *Bullen* decision.  *See* Uniform Out-of-country Foreign Money-Judgement Recognition Act, 1994 Fla. Laws ch. 239.

65. Of 67 in-force U.S. bilateral income tax treaties, all provide for assistance through exchange of information, but 35 lack any provision for collection assistance.[165] The remaining 32 treaties take two general approaches to authorizing assistance in collection, which I will refer to as Category 1 and Category 2.

    65.1. Twenty-six Category 1 U.S. treaties[166] authorize collection assistance only to assure that treaty relief is not going to a person not entitled to its benefits.[167]

    65.2. Six Category 2 U.S. treaties include a broad assistance in collection article that extends beyond assistance to collect amounts necessary to ensure that relief from tax under the treaty does not inure to the benefit of persons not entitled to the relief.

---

[165] The treaty with the former USSR applies to nine countries formerly a part of the USSR.

[166] The Category 1 treaties are with Austria, Australia, Belgium, Cyprus, Egypt, Estonia, Finland, Germany, Greece, Hungary, Iceland, Indonesia, Italy, Jamaica, Korea, Latvia, Lithuania, Luxembourg, New Zealand, Norway, Philippines, Romania, South Africa, Sri Lanka, Trinidad and Tobago, and the United Kingdom. Exhibit 35 (Andersen, *supra* note 115, at ¶ 24.03[1][b][i] Tbl 24-5).

[167] For example, Article 26(1) of the U.S.-Belgium income tax treaty provides:

    Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such taxes imposed by that other Contracting State as will ensure that any exemption or reduced rate of tax granted under this Convention by that other Contracting State shall not be enjoyed by persons not entitled to such benefits.

Exhibit 59 (Convention for the Avoidance of Double Taxation and Prevention of Fiscal Evasion to Taxes on Income, Belg.-U.S., art. 26(1), Nov. 27, 2006, T.I.A.S. 07-1228.2). Paragraph 2 of Article 26 of the Belgian treaty provides the limitation that a Contracting State is not obligated to carry out measures different from what it would use in collection of its own taxes or that would be contrary to its sovereignty, security or public policy. *Id.* at art. 26(2).

This version of collection assistance is found in the exchange of information article of Exhibit 56, the 2016 U.S. Model Treaty, *supra* note 161, at art. 26(7). The 2016 U.S. Model Treaty generally sets out preferred U.S. positions, but deviations are made to take account of the circumstances of relations with individual treaty partner countries. A similar scope of collection assistance is set out in the OECD Model Treaty Commentary as an alternative to the broader collection assistance of 2017 OECD Model Treaty, at art. 27. *See* Exhibit 48 (2017 OECD Model Treaty, *supra* note 135, at comment. to art. 27 ¶¶ 10-14). Article 27(9) of the Treaty has language similar to that used in a Category 1 treaty, but because paragraph 8 of Article 27 forbids its application to a person who was a U.S. citizen or entity for the taxable period for which the claim is made, it addresses, for example, claims against persons in other countries. *See* Exhibit 2 (Treaty, *supra* note 6, at arts. 27(8), 27(9)). Exhibit 60, the I.R.S., Technical Explanation to the U.S. Model Income Tax Convention of Sept. 20, 1996, art. 27(9), provides as an example: "For example, if a U.S. source dividend is paid to an addressee in a treaty partner, the withholding agent probably will withhold at the treaty's portfolio dividend rate of 15 percent. If, however, the addressee is merely acting as a nominee on behalf of a third country resident, paragraph 9 would obligate the other Contracting State to withhold and remit to the United States the additional tax that should have been collected by the U.S. withholding agent."

i. In five of the six Category 2 treaties, assistance is excluded in relation to a claim against a citizen of the requested state or a company, estate, or trust that derives its status as such under the law of the requested state.[168] The treaty with Denmark is one of the five treaties, which means that the two nations have fundamentally agreed that Danish nationals will not be subject to suit in Denmark for U.S. tax claims, while U.S. nationals will not be subject to suit in U.S. courts for Danish tax claims. Accordingly, the SKAT cases against U.S. citizen and entity defendants would be precluded from assistance by the terms of the Treaty.[169]

ii. In the sixth Category 2 treaty with Japan, the exception from assistance for an individual that is a "national" (which includes a citizen) of a requesting state is carved back in Article 27(2)(b) and does *not* apply, *inter alia*, if the individual has filed a fraudulent claim for refund. The collection provision was added to the 2003 U.S. treaty with Japan (the "U.S.—Japan Treaty") in the 2013 Protocol and was characterized to the Senate Foreign Relations Committee as a "significant" departure from previous bilateral treaties, the U.S. model treaty, and the OECD model treaty.[170] The provision makes no distinction between a fraudulent claim for refund of a tax that has been paid and a refund for a tax that was never paid.

66. While Denmark is precluded from treaty collection assistance under the Treaty with respect to U.S. nationals, the U.S.—Japan Treaty, as amended by the Protocol signed in 2013 and ratified in 2019, illustrates that the United States has negotiated an exception that

---

[168] These five Category 2 treaties are with Canada, Denmark, France, the Netherlands, and Sweden. *See* Exhibit 2 (Treaty, *supra* note 6, at art. 27(8)).

[169] It is public record that SKAT has employed the collection assistance article in the case of a Danish citizen resident in the United States. The United States defended SKAT's right to do so against collateral attack in Federal court. *Dileng v. Comm'r*, 157 F.Supp.3d 1336 (N.D. Ga. 2016).

[170] Exhibit 55 (S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. 34 (2015) (statement of Robert B. Stack, Deputy Assistant Sec'y for Int'l Tax Affs., Dep't of Treasury)); Exhibit 61 (Protocol Amending the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, Japan-U.S., art. XIII, Nov. 6, 2003, T.I.A.S. 19-830 (2019) [hereinafter "Japanese Protocol"]).

authorizes assistance for claims against U.S. citizens in the case of fraudulent claims for tax refunds under the treaty.[171]

66.1.   This evidences that it would be possible for Denmark to seek an amendment to the Treaty to provide for collection assistance in relation to SKAT's claims for return of incorrect tax refunds in this case.[172]

66.2.   The Japan protocol also strongly suggests that the United States would not consider a case involving a fraudulent (or incorrect) refund of tax as outside the scope of a collection assistance article.  Indeed, the distinction between an underpaid tax and an excessive claim for tax refund is not a customary boundary for application of tax laws for reasons of practical tax administration.[173]

67.   The broad contours of the history of U.S. income tax treaty collection assistance may be summarized as follows.

67.1.   In four early treaties from the 1930s and 1940s, the United States committed to broad collection assistance.[174]

67.2.   In order to achieve ratification of a successor 1946 U.S.—France Treaty, under pressure from "private interests" who objected to French tax collection from U.S. persons, a Supplementary Protocol was negotiated and ratified in 1948 reinstating

---

[171] Like the U.S. withholding regime, the Japanese withholding system allows relief at source.  If, however, there is over withholding on the initial payment, an applicant may file a tax refund claim through the withholding agent.  The refund of tax on a dividend is paid by the Japanese tax authority to the withholding agent, which in turn pays the shareholder.  Exhibit 62 (Naoki Matsuda, *Withholding tax in the era of BEPS, CIVs and digital economy – Japanese report, in* IFA CAHIERS 2018 - VOLUME 103B 5-23 (2018) (IBFD 2018)).  Procedural differences from the Danish system would not affect the ability to craft a comparable treaty exception for Denmark.

[172] An amendment to add or modify collection assistance may apply retrospectively to tax debts arising before entry into force of the treaty.  *See, e.g.*, Exhibit 48 (2017 OECD Model Treaty, *supra* note 135, at comment. to art. 27, ¶14).  If Denmark were to retain its formal position that the return of a refund is not a payment of tax and is concerned that a return of refund would not be covered by the collection provision, this concern could be addressed in the definition of tax claim used in the treaty.  If Denmark is unable to bring a claim because of procedural aspects of Danish law, such as an inability to render a tax assessment in respect of an incorrect tax refund, those deficiencies presumably could be remedied by Danish domestic legislation or regulation as the case may be.

[173] *See* discussion, *supra* ¶¶ 43-44.

[174] These treaties were with Denmark, France, the Netherlands, and Sweden.

the nationality limitation on collection assistance (of Article 22) of the 1939 U.S. —France Treaty.[175]  Accordingly, citizens, corporations, or other entities of the requested state were outside the reach of collection assistance with respect to requesting state taxes.  Until the exception added in the 2013 Protocol to the U.S.—Japan Treaty ratified in 2019, no currently in-force treaty with a Category 2 collection article permitted collection assistance for a collection claim against a U.S. citizen or entity.

67.3.  In 1951, the Senate adopted an understanding that broad collection provision treaties proposed with Greece, Norway, and South Africa, would be applied so as to conform to the standard found in treaties with Norway and Switzerland that each government "would assist in collecting the other's taxes only to the extent necessary to insure that the provisions of the convention would not be enjoyed by persons not entitled to its benefits."[176]  This corresponds to Category 1 collection articles described above.

67.4.  From 1951 to the 2019 ratification of the 2013 Protocol to the U.S.—Japan Treaty, only the 1995 Protocol to the U.S.—Canada Treaty adopted a Category 2 provision and included the exclusion from collection assistance for claims against contracting state citizens, corporations, and entities.[177]

68.  The U.S. posture toward collection assistance in most, but not all, treaties—and, in the few treaties with broader collection assistance, crafting clear exceptions for U.S. citizens, corporations, and entities—demonstrates the reluctance of the political branches of

---

[175] *See* Exhibit 63 (Message from the President transmitting Supplementary Protocol with France Relating to Taxes on Estates and Inheritances, *reprinted in* 1 Staff of J. Comm. on Tax'n, LEGISLATIVE HISTORY OF U.S. TAX CONVENTIONS 1133, 1135 (1962)).

[176] Exhibit 64 (Comm. on Foreign Relations, S. Exec. Rep. No. 12 (84 Cong., 1st Sess.) Exhibit 1 (1955) *reprinted in* 2 Staff of J. Comm. on Tax'n, LEGISLATIVE HISTORY OF U.S. TAX CONVENTIONS, at 1667-68 (1962)).

[177] Exhibit 65 (Revised Protocol Amending the 1980 Tax Convention with Canada, Can.-U.S., art 15, Mar. 17, 1995, S. EXEC. DOC. NO. 104-4 (adding art. XXVI A)).  Paragraph 8 sets out the exclusion for nationals of the requested state.  *See Retfalvi v. U.S.*, 930 F. 3d 600 (4th Cir. 2019) (upholding District Court dismissal of challenge to the constitutionality of treaty authorizing the United States to collect unpaid income taxes on behalf of Canada against a lawful permanent resident of the United States).

government to accept expansive collection of foreign taxes from U.S. nationals, except as necessary to protect the boundaries of treaty relief.[178]

69.    These treaty positions were adopted against the background of the revenue rule.[179]  If SKAT's case were deemed to fall outside the revenue rule, it would open U.S. courts to claims for relief based on allegations of improper refunds in a broad range of cases not restricted to the dividend withholding tax scenario.  Indeed, there would be no limiting principle preventing foreign tax authorities from seeking recovery in U.S. courts for tax refunds to which the recipient was allegedly not entitled, whether on grounds of fraud or otherwise.  It is difficult to reconcile such a restrictive view of the revenue rule with Congressional determinations to limit treaty collection assistance to cases covered by the treaties.[180]

### 3.    Council of Europe/OECD Convention on Mutual Administrative Assistance in Tax Matters

70.    The multilateral Convention was developed by the Council of Europe and the OECD as an instrument devoted to facilitating international cooperation among tax administrators, including by mutual assistance extending from exchange of information to the recovery of

---

[178] *See* Exhibit 55 (S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. 32 (2015) (statement of Robert B. Stack, Deputy Assistant Sec'y for Int'l Affs., Dep't of Treas.)) (noting while collection assistance provisions are "part of the international norm of tax treaty policy . . . this has not been a policy that the Treasury Department has followed as a general matter, largely because of . . . concerns that such treaty obligations could lead to a disproportionate amount of additional burden on the IRS without the commensurate benefit to the U.S. fisc.").

[179] *See* Exhibit 24 (U.S. *Canada* Cert. Amicus Brief, *supra* note 67, at 11) ("[T]he revenue rule has served as the foundation for United States tax treaties"); *see id.* at 9 (citing S. Exec. Rep. No. 1, 82d Cong., 1st Sess. 21 (1951)) ("The revenue rule is not only a well-established feature of the common law and of international law; it provides the background understanding against which the United States has entered into treaties that address the extent to which a foreign nation may seek assistance from the United States and its courts in enforcing its tax claims.").

[180] Exhibit 66 (Technical Explanation to the Convention with Respect to Taxes on Income and on Capital, Can.-U.S., art. 15, Sept. 26, 1980, T.I.A.S. 11087, as amended by the Protocol, signed June 14, 1983 and the Protocol, signed March 28, 1984) ("Finally, given the close cooperation already developed between the United States and Canada in the exchange of tax information, the U.S. and Canadian negotiators concluded that the potential benefits to both countries of obtaining assistance would be immediate and substantial and would far outweigh any cost involved."). In terms of the 2013 Japan Protocol ratified in 2019 Senators noted that collection assistance provisions are reviewed "on a case-by-case basis, and [the U.S.] will commit to such treaty provisions if, based on a thorough consultation with the IRS, [they] conclude that establishing collection assistance obligations with a particular country would on balance enhance the collection of U.S. taxes."  Exhibit 55 (S. Exec. Rep. No. 114-1, 114th Cong., 2d Sess. 33 (2015) (statement of Robert B. Stack, Deputy Assistance Sec'y for Int'l Tax Affs., Dep't of Treasury)).

foreign tax claims.[181]  The Convention was first opened for signature in 1988 to any member of the OECD or Council of Europe.[182]  The Convention's assistance in recovery provisions did not exclude application to the requested state's nationals.  Consistent with the U.S. position with respect to collection assistance as reflected in its bilateral income tax treaties, the Senate consented to the Convention subject to a reservation to Section II of the Convention authorizing assistance in recovery.[183]

### E.    Tax Information Exchange Agreements

71.    In addition to bilateral income tax treaties, which include exchange of information articles,[184] the United States has entered into TIEAs with other countries that allow the U.S. competent authority and the competent authority of the TIEA partner to exchange information regarding tax matters to provide assistance in the administration and enforcement of their respective domestic tax laws.[185]

71.1.    Because it addresses administrative assistance and not avoidance of double taxation, a TIEA may be entered into with any country, without regard to the kinds of taxes it imposes or whether there is risk of double taxation.

71.2.    Countries with low income tax rates or indeed no income taxes have entered into TIEAs.  In some cases the objective is to obtain a benefit, in others to avoid being

---

[181] *Convention on Mutual Administrative Assistance in Tax Matters*, OECD, https://www.oecd.org/tax/exchange-of-tax-information/convention-on-mutual-administrative-assistance-in-tax-matters.htm (last accessed Dec. 22, 2021). The treaty was an early example of modern multilateral cooperation in tax enforcement.

[182] I was the person in the Treasury Office of International Tax Counsel serving as the U.S. delegate to the negotiations of the text of the Mutual Assistance Convention.

[183] *See* Exhibit 67 (William S. Dodge, *Chapter 3: The Penal and Revenue Rules, State Law, and Federal Preemption*, *in* FOREIGN COURT JUDGEMENTS AND THE UNITED STATES LEGAL SYSTEM (Paul B. Stephan ed., 2014) 54, 76 (quoting Convention on Mutual Administrative Assistance in Tax Matters, art. 11, 27 I.L.M. 1160, 1168 (1988)) (noting U.S. "entered a reservation to Article 11 so that it would not be obligated 'to recover tax claims of [other signatories] as if they were its own tax claims'").

[184] *See, e.g.*, Exhibit 2 (Treaty, *supra* note 6, art. 26).

[185] I.R.S., *Tax Information Exchange Agreements (TIEAs)*, U.S. DEP'T OF TREASURY, https://home.treasury.gov/policy-issues/tax-policy/tax-information-exchange-agreements-tieas (last accessed Dec. 21, 2021).  The United States has TIEAs with jurisdictions that do not have an income tax, *e.g.*, Bermuda and the Cayman Islands.

subject to blacklists and other sanctions by countries seeking to counter what are considered harmful tax practices by the countries with low or no income taxes.[186]

72.    The first U.S. TIEA was entered into with Dominica under the authority of the Caribbean Basin Initiative, which added I.R.C. § 274(h)(6)(C) authorizing the tax information agreement.[187]  The requirement of a TIEA was a condition for the country to qualify for the so-called "convention tax deduction," which permitted tax deductions for attending meetings in specified foreign countries under the same standards as for meetings in the United States.[188]

73.    The authority for a TIEA was extended beyond Caribbean Basin countries by an authorization enacted as part of the 1984 foreign sales corporation ("FSC") legislation in I.R.C. § 927(e)(3).[189]  As an executive agreement authorized by legislation, a TIEA may be negotiated, entered into force, and implemented more quickly than a treaty.[190]

74.    TIEA statutory authorizations do not include the possibility of mutual assistance in collection.[191]  In support of the view that collection assistance is appropriately implemented

---

[186] *Harmful Tax Competition: An Emerging Global Issue*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT (1998), https://www.oecd.org/ctp/harmful/1904176.pdf) (last accessed Dec. 20, 2021); *see also* OECD, *Countering Offshore Tax Evasion: Some Questions and Answers on the Project*, 28 Sept. 2009 (available at https://www.oecd.org/ctp/exchange-of-tax-information/42469606.pdf) (last accessed Dec. 20, 2021).

[187] I.R.C. § 274(h)(6)(C).  Exhibit 68 (Agreement for the Exchange of Information with Respect to Taxes, Dominica-U.S., Oct. 1, 1987, T.I.A.S. 11543).

[188] I.R.C. § 274(h)(6)(D).  I was the person in the Treasury Office of International Tax Counsel with the primary responsibility for drafting I.R.C. §274(h)(3) in 1983.  I worked with Richard Owens and James Springer of the Department of Justice to draft the form of tax information agreement used with Caribbean Basin Initiative beneficiary countries (as defined in I.R.C. § 274(h)(6)(B)).

[189] I.R.C. § 927(e)(3).  *See* Exhibit 69 (Susan C. Morse, *Why FATCA Intergovernmental Agreements Bind the U.S. Government*, 70 TAX NOTES INT'L 245 (Apr. 15, 2013)).

[190] The U.S. currently has 34 TIEAs in force.  *See I.R.S., Country-by-Country Reporting Jurisdiction Status Table*, IRS (Nov. 20, 2021), https://www.irs.gov/businesses/country-by-country-reporting-jurisdiction-status-table; Exhibit 70 (Jason R. Connery, Seth Green & Kimberly Tan Majure, *Current Status of U.S. Tax Treaties and International Tax Agreements*, 50 T.M.I.J. (BNA) (Dec. 3, 2021)) (as of 2021 the U.S. has TIEAs with Antigua and Barbuda, Argentina, Aruba, the Bahamas, Barbados, Bermuda, Brazil, the British Virgin Islands, the Cayman Islands, Colombia, Curacao, Costa Rica, Dominica, the Dominican Republic, Gibraltar, Grenada, Guernsey, Guyana, Honduras, Hong Kong, Isle of Man, Jamaica, Jersey, Liechtenstein, Marshall Islands, Mauritius, Mexico, Monaco, Netherlands Antilles, Panama, Peru, Singapore, St. Lucia, and Trinidad & Tobago).

[191] I was Deputy International Tax Counsel and the person in the Treasury Office of International Tax Counsel with primary responsibility for drafting I.R.C. §927(e)(3).

by agreement,[192] it would be possible for Congress to authorize by legislation the addition of collection assistance provisions to TIEAs or to authorize separate collection assistance agreements, with such limitations and protections as specified or delegated to the executive's discretion in the legislative grant of authority.

## IV.    THE REVENUE RULE, SEPARATION OF POWERS, AND RESPECT FOR SOVEREIGNTY

75.    This Court has identified two justifications for the revenue rule: "[T]o preserve separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement, which can implicate foreign relations and are better left to the political branches of government;" and "[T]o ensure respect for sovereignty by keeping courts out of the business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices."[193]  This Part will assess from the perspective of a former policymaker in relation to each justification the implications of allowing SKAT's claims to be made in U.S. courts.

### A.    Separation of Powers

#### 1.    The Standard

76.    *Attorney General of Canada* outlines the factors to guide a determination of when separation of powers considerations counsel judicial deference to the political branches of government.  "The doctrine of separation of powers prohibits the federal courts from excursions into areas committed to the Executive Branch or the Legislative Branch."[194]

76.1.    The Second Circuit identified extraterritorial tax enforcement as directly implicating relations between the United States and other countries, and judicial involvement in such enforcement risking U.S. courts being "drawn into issues and

---

[192] *See supra* note 183.

[193] Exhibit 5 (Motion to Dismiss Opinion, *supra* note 8, at 310 (citations omitted)).

[194] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 114, quoting *In re Austrian and German Holocaust Litig.,* 250 F.3d 156, 163–64 (2d Cir.2001) (per curiam)).

disputes of foreign relations policy that are assigned to—and better handled by—the political branches of government."[195]

76.2.    Moreover, the Second Circuit recognized that the political branches of our government had intended to "define and limit the parameters of any assistance given with regard to the extraterritorial enforcement" of another country's tax laws.[196]

### 2.    The Policy Equivalence of a Return of a Tax Refund and Collection of an Underpaid Tax

77.    As explained above, SKAT's claim to recoup an allegedly incorrect tax refund in a tax reclaim withholding system is functionally indistinguishable from a claim for underpaid tax in a relief at source withholding tax system.  There is no relevant difference for purposes of tax enforcement.

77.1.    In a tax reclaim withholding system, the country receiving the tax withheld is entitled to keep as tax only what the applicant is not eligible to claim as a refund. In a relief at source withholding system, the applicant is entitled to keep only what it does not owe as tax.

77.2.    In each case, the analysis is the same: what amount of tax is due the government and what is the government obligated to pay the applicant?[197]

---

[195] *Id.*  The Court recognized that "the arguments for judicial reserve are quite strong" with respect to "the extraterritorial collection of taxes by a foreign sovereign." *Id.* at n. 9.

[196] *Id.* at 115.

[197] Justice Baker articulated this point in the April 2021 U.K. Decision:

> To say that SKAT is obliged to pay a WHT refund if eligibility conditions are satisfied is to say that SKAT is entitled to keep, as tax, what it collected up front only to the extent that those eligibility conditions are not satisfied. A conditional entitlement to keep, as tax, amounts collected up front, in effect pending final assessment of the tax due, is conceptually and functionally the same as an entitlement to assess and collect tax due by reference to those eligibility conditions; and it is that entitlement to keep as tax what it had collected up front that SKAT seeks to enforce by its claims.

Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶ 97).

77.3.  The alleged fraudulent claim for refund is made using SKAT tax refund procedures and only could be made against SKAT.  The claim is a creature of the Danish tax system.[198]  Moreover, there is no relevant policy difference between this case and a case in which a fraudulent tax return had been filed claiming that no tax is due and a refund is owed.  In both cases, the claim is made to the tax authority and the result is a loss of revenue.  As a policy matter, there is nothing about this case that is not tax enforcement in the same way as an underpayment of tax.

77.4.  In each case, whether or not accompanied by allegations of fraud, the claim for recovery, whether of unpaid tax or return of a tax refund, is a tax enforcement action brought by a sovereign acting in its capacity as such.  The sovereign's revenue loss is the same in both cases whether the case involves fraud or non-fraud error.

78.  Also as explained above with respect to an allegedly fraudulent tax reclaim, the government interest in pursuing its return, irrespective of whether tax was previously paid, is as much to protect government revenues as a recovery of underpaid taxes.

78.1.  This is the clear implication of the U.S.—Japan Treaty provision allowing collection assistance against a U.S. citizen in the case of a foreign government claim for recovery of a fraudulent tax refund.[199]  There is no distinction in that provision between whether the fraud is in relation to a tax that had been paid or a fraud with no basis other than filing a tax form.[200]

78.2.  From the perspective of a former tax policymaker, whether to extend the benefit of such a provision to other countries should be the province of the Executive Branch under authority from or with the advice and consent of the Legislative Branch.  That is the only way to set out limits in advance to assure reciprocity and capacity to execute the policy.

---

[198] *See supra* ¶ 45.1.

[199] *See* Exhibit 61 (Japanese Protocol, *supra* note 170, at art. XIII).

[200] *Id.*

79.    There are suggestions in deposition testimony (as well as in the U.K. Litigation) that SKAT does not have a legal basis in Denmark to pursue the return of an incorrectly paid tax refund.[201]  Regardless of whether Denmark has a domestic legal basis to pursue claims for incorrect tax refunds, from a policy perspective the structure of the other country's tax administration and enforcement processes should not affect the determination whether the return of an incorrect tax refund is the enforcement of a tax law for purposes of a revenue rule analysis.[202]  That an applicant is nonresident and the country's enforcement has procedural deficiencies should not, as a policy matter, result in allowing that country to shift its tax enforcement burden to the residence country of the nonresident (or to other countries where the nonresident may hold assets).  At a minimum, a policy decision to provide such assistance should be one for the Executive and Legislative Branches.

79.1.    The policy concern is greater where the result would be an asymmetric burden on the residence country.

i.    It would be reasonable for the residence country to expect the other country to repair the deficiency in its own legislation or process.

ii.    Another alternative in the present case would be to negotiate an amendment to the Treaty's collection assistance provisions along the lines of the 2013 protocol to the Treaty with Japan.

iii.    These policy responses would have little force if Denmark has unilateral access to U.S. courts.

79.2.    Importantly, what constitutes a revenue claim is a question of U.S. law, not one of foreign practice.[203]

---

[201] *See infra* ¶ 27; Exhibit 16 (Ekstrand Dep. Tr., *supra* note 28, at 83:4-20); Exhibit 20 (April 2021 U.K. Decision, *supra* note 50, at ¶ 103).

[202] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 131, *quoting* 1 Dicey & Morris, THE CONFLICT OF LAWS 91 (13th ed. 2000)) ("Indirect enforcement occurs when a foreign State (or its nominee) in form seeks a remedy, not based on the foreign rule in question, but which in substance is designed to give it extra-territorial effect . . . .").

[203] *See Huntington v. Attrill*, 146 U.S. 657, 683 (1892) (In relation to whether a law is penal: "The test is not by what name the statute is called by the legislature or the courts of the state in which it was passed, but whether it appears, to

80.     From a former tax policymaker's perspective, there is no policy basis to treat an incorrect tax refund in a tax reclaim withholding system differently from an under withheld tax in a relief at source withholding system.

### 3.     Practical Consequences of Revenue Rule Inapplicability to Recovery of a Tax Refund

81.     For purposes of assessing the practical impact of excluding recovery of tax refunds from the scope of the revenue rule, there is no principled way to cabin the exception that SKAT proposes in the instant litigation to dividend withholding in tax reclaim systems, nor to cases of fraud.[204]  Accordingly, the assessment of the practical import of a narrow application of the revenue rule must be viewed in the context of cases involving incorrect refunds generally.

82.     It is self-evident that if the revenue rule is applied with such a narrow scope, the value of the fraud exception for individuals in the U.S.—Japan treaty is diminished for the party that bargained for it, as well as the value of the concession by the United States in agreeing to it.  Along the same lines, the United States would obtain fewer benefits in exchange for agreeing to the same concession in a future treaty or executive agreement.

83.     From the perspective of a former negotiator, the effect of a narrow revenue rule as a general matter would reduce the ability of the United States to negotiate for collection assistance to the extent that another country's access to U.S. courts (here, in tax refund recovery cases) already substantially addresses the other country's needs for collection assistance.

83.1.   To the extent another country has access to U.S. courts on a unilateral basis, either where the country is not a party to an income tax treaty or would have access without regard to whether there also is a treaty with collection assistance, the United

---

the tribunal which is called upon to enforce it, to be, in its essential character and effect, a punishment of an offense against the public, or a grant of a civil right to a private person"); *see also* Exhibit 27 (Restatement (Fourth) of Foreign Relations Law § 489 Reporters' Note 4 (Am. Law Inst. 2018)).

[204] It is noteworthy that the American Law Institute's 1992 study recommended that collection assistance be expanded, not by cutting back on the revenue rule, but by agreement.  Exhibit 1 (Tillinghast, Ault & Shay, *supra* note 3, at 124) (recommending that "[t]he United States should include in income tax treaties with selected treaty partners provisions authorizing reciprocal judicial recognition and enforcement of tax judgments rendered by courts of the treaty partner").

States loses the benefit of standard protections found in tax treaty collection assistance articles including reciprocal treatment by the treaty partner.[205]

83.2.    These protections may include exceptions to assistance that in some cases may be exercised at the discretion of the Executive Branch.  Standard protections, which would not necessarily apply in a case unilaterally initiated in a court, include, but may not be limited to:

i.    A requirement of finality of determination of the claim under the law of the requesting state;[206]

ii.    Limitation of collection assistance to cases involving non-U.S. nationals;[207]

iii.    The ability to limit collection procedures to those administrative processes used in collection of U.S. taxes;[208]

iv.    The ability to decline to assist on public policy grounds; and

v.    The ability to decline a request "if the applicant State has not pursued all appropriate collection in its own jurisdiction or in those cases where the administrative burden for the requested State is disproportionate to the benefit to be derived by the applicant State."[209]

---

[205] As articulated by the United States in its amicus brief in the cert. petition in *Attorney General of Canada*: "when a court enforces a foreign tax claim, it cannot ensure that the United States will enjoy a reciprocal privilege in the foreign country's courts. Indeed, judicial enforcement of foreign tax claims would deprive the Executive Branch of leverage to secure such reciprocity through the negotiation of bilateral treaties." Exhibit 24 (U.S. *Canada* Cert. Amicus Brief, *supra* note 67, at 10).  *See also Republic of Honduras v. Phillip Morris Cos., Inc.*, 341 F.3d 1253, 1259 (11th Cir. 2003) ("The political branches undisputedly have not entered into any type of tax treaty with any of the Republics that would allow the Republics to enforce their tax claims underlying this suit in this country.").

[206] While it is not clear that SKAT has litigated the cases before this Court to a final determination (as Treaty article 27(2) would prescribe) in Denmark, the Treaty would require Danish certification to that effect. Once accepted, the U.S. would proceed to collection.  *See Dileng*, 157 F. Supp. 3d at 1342-43, 1345-46.

[207] This condition is not satisfied in some if not all the cases before this Court.

[208] This is a burden limitation measure that will not necessarily be the same in unilateral judicial collection assistance.

[209] Exhibit 41 (I.R.S., Technical Explanation to Treaty, *supra* note 130, at art. 27(12)). The determination of when public policy is a basis for refusal has diplomatic implications for relations between countries that properly are the

84.    An additional foreign relations interest is to evaluate each potential collection assistance partner on a country-by-country basis.

85.    In addition to being a favored investment location for global capital generally, the United States is a safe haven for investment by residents of countries with internal crime and security issues and countries with autocratic, unreliable, or corrupt governance. Accordingly, many potential foreign taxpayers (in relation to the country that is the source of the income) may have assets within the reach of U.S. courts.[210]  These taxpayers may come from countries that the United States would not want to assist as a foreign relations matter.[211]

86.    The cases before the Court, along with recently filed claims by another government's tax authority, Belgium,[212] are a possible foreshadowing of the potential for increased case burdens on the U.S. judicial system and costs placed on the U.S. fisc from considering SKAT's claim outside of the revenue rule.  Cases brought in other countries in this same matter could, if a judgment were reached, be brought in the United States to collect on the judgment if defendant assets were located here.  The burden on the judicial system of additional cases if SKAT's case is allowed to proceed likely would be more than *de minimis*. This is the kind of situation intended to be addressed in treaty provisions that authorize the

---

province of the Executive Branch.  *See supra* note 180.  The evaluation of benefits and burden of collection assistance is not available in unilateral judicial collection assistance.

[210] Yet again, as observed by the United States in its amicus brief in the cert. petition in *Att'y Gen. of Canada*: "Indeed, if Canada's RICO suit were deemed permissible here, the doors to United States courts would also apparently be open to RICO treble damages actions by countries far less friendly to the United States, based on tax systems of questionable compatibility with our own, and perhaps against a background in which the political branches had rejected or been unable to secure any reciprocal treaty obligations to assist in tax collection efforts.  The court of appeals therefore correctly concluded that a claim such as petitioner's RICO claim for tax loss is barred by the revenue rule."  Exhibit 24 (U.S. *Canada* Cert. Amicus Brief, *supra* note 67, at 14).

[211] *See, e.g.*, countries described in I.R.C. § 901(j)(2)(A)(i)-(iv).

[212] *See* Compl., *Kingdom of Belgium, Federal Public Service Finance v. Michelle Investments LLC Pension Plan, et. al.*, No. 1:21-cv-06405 (S.D.N.Y. July 27, 2021), ECF No. 1; Compl., *Kingdom of Belgium, Federal Public Service Finance v. Delvian LLC Pension Plan, et. al.*, No. 1:21-cv-06404 (S.D.N.Y. July 27, 2021), ECF No. 1; Compl., *Kingdom of Belgium, Federal Public Service Finance v. Lion Advisory Inc. Pension Plan, et. al.*, No. 1:21-cv-06402 (S.D.N.Y. July 27, 2021), ECF No. 1; Compl., *Kingdom of Belgium, Federal Public Service Finance v. Xiphias LLC Pension Plan, et. al.*, No. 1:21-cv-06392 (S.D.N.Y. July 27, 2921), ECF No. 1.

requested country to weigh whether the burden on it is disproportionate to the benefit to be derived by the applicant country.[213]

87.  To the extent that the application of the revenue rule is restricted, access to U.S. courts is opened to all countries—including those not having treaties with the United States.[214]  This may make it more difficult to negotiate a new treaty with a non-treaty country that may desire collection assistance.  Suppose, hypothetically, that collection assistance was a significant interest for Brazil, a country with which the United States has long pursued a treaty while seeking conditions so far found unacceptable to Brazil.  If recovery of refund claims were a significant interest, allowing Brazil unilateral judicial assistance in U.S. courts would diminish the value of collection assistance and could make successful negotiation more difficult.

88.  Allowing SKAT's claim to proceed would require adoption of a restricted revenue rule that would materially affect and in substance encroach on decisions that are primarily the province of the Executive and Legislative Branches.

### B.    Intrusion in Foreign Country's Sovereignty

#### 1.    The Standard

89.  The second justification for the revenue rule is to ensure respect for another country's sovereignty.  Tax laws are expressions of sovereign action and keeping courts out of adjudicating and enforcing foreign countries' tax laws protects against incursion into those decisions.[215]

89.1.  An early expression of the second justification is the rationale of Judge Learned Hand in *Moore v Mitchell* where he said:

---

[213] *See, e.g.*, Exhibit 2 (Treaty, *supra* note 6, at art. 27(12)(b)).

[214] Again, as observed by the United States in its amicus brief in the cert. petition in *Att'y Gen. of Canada*: "[J]udicial enforcement of foreign tax claims that are not authorized by treaty would intrude on the Executive Branch's treaty-making authority as well as the specific policy judgments reflected in particular treaties. Those considerations fully justify the continued application of the revenue rule."  Exhibit 24 (U.S. *Canada* Cert. Amicus Brief, *supra* note 67, at 10).

[215] Exhibit 22 (*Att'y Gen. of Canada*, 268 F.3d at 111).

While the origin of the exception in the case of penal liabilities does not appear in the books, a sound basis for it exists, in my judgment, which includes liabilities for taxes as well. Even in the case of ordinary municipal liabilities, a court will not recognize those arising in a foreign state, if they run counter to the 'settled public policy' of its own. Thus a scrutiny of the liability is necessarily always in reserve, and the possibility that it will be found not to accord with the policy of the domestic state. This is not a troublesome or delicate inquiry when the question arises between private persons, but it takes on quite another face when it concerns the relations between the foreign state and its own citizens or even those who may be temporarily within its borders.[216]

89.2. Judge Hand's articulation does not suggest that the intrusion into the other foreign country's sovereign role need be problematic in each case under consideration. The second justification is that applying (not merely recognizing) the other country's law (after *Pasquantino*, more than incidentally) is inherently problematic.

89.3. The Supreme Court in *Pasquantino* observed in dicta that U.S. courts are capable of applying foreign law to resolve "incidental" foreign law issues.[217] While the American Law Institute observes that concern about encroaching on sovereignty "has little force when a court is asked simply to enforce a foreign tax judgment," it distinguishes that case from needing "to determine the tax claim in the first instance."[218]

## 2. Determining the Tax Refund Claim.

90. What SKAT seeks in this litigation goes much further than recognizing a foreign tax judgment or incidental application of Danish tax and treaty law. It essentially requires the Court to determine the tax claim in the first instance.

90.1. In determining whether a person claiming a given refund did so correctly or even in good faith, a court would be required to determine not only how the Treaty and Denmark's own domestic law should apply, but also how the Treaty would apply

---

[216] *Moore v. Mitchell*, 30 F. 2d 600, 604 (2d Cir. 1929).

[217] Exhibit 26 (*Pasquantino*, 544 U.S. at 370) ("Rule 26.1 gives federal courts sufficient means to resolve the incidental foreign law issues they may encounter in wire fraud prosecutions.").

[218] Exhibit 27 (Restatement (Fourth) of Foreign Relations Law § 489 Reporters' Note 2 (Am. Law Inst. 2018)).

to a resident of the treaty partner (*i.e.*, whether dividend tax was payable by that resident under Danish law and the Treaty and, if so, how much dividend tax was payable).

90.2.   Such determinations would be inherently intrusive into Denmark's interest in interpreting and applying its own tax law, particularly where, as appears to be the case, the operation of Danish law is unsettled or changing.[219]

91.   Another reason for concern over allowing unilateral judicial collection assistance in this case is that a decision adverse to the applicant regarding treaty relief is normally within the scope of the Treaty's Article 25 mutual agreement procedure.[220]   Even if not asserted in this case, pursuing a recovery of a tax refund is no different than the denial of a tax refund. After denial by Denmark, it would be possible for the claimant to take its case to its competent authority for resolution between the two countries under the mutual agreement procedure.

91.1.   Initiating competent authority assistance generally occurs before recourse to a court in the event the decision is negative.[221] If Denmark is permitted to pursue judicial collection under a fraud theory, the mutual agreement process under the Treaty would be undermined.

91.2.   Denmark has made use of the Treaty's exchange of information provisions in investigating the conduct underlying this case.[222]   It would be inconsistent with the design and spirit of the Treaty for a restricted application of the revenue rule to allow a country to obtain information under the exchange of information article and

---

[219] *See supra* ¶ 44.2.

[220] In the reverse case where the United States is the source of the dividend, the taxpayer would have the further possibility of judicial review if competent authority denied treaty relief.  *See Starr Int'l Co., Inc. v. U.S.*, 910 F.3d 527 (D.C. Cir. 2018) (taxpayer allowed to challenge IRS competent authority denial of discretionary treaty eligibility for dividend tax refund in tax refund case).

[221] *See, e.g.*, Rev. Proc. 2015-40 (Procedures for Requesting Competent Authority Assistance under Tax Treaties).

[222] *See supra* ¶ 26.

then pre-empt a mutual agreement process by pursuing the same case under a different guise in a unilateral judicial proceeding.

92.    SKAT's complaint asserts that the USPFs did not own the shares, but the reclaims included documents prepared by the USPF's broker-custodians indicating the number of shares and the dividend amounts received.  Certain of those documents state that the broker-custodian "ha[s] credited your account" with a "payment [that] represents the dividend" reflected in the document.[223]

93.    Depending on the relevant governing law, a person may be the beneficial owner of shares for tax purposes—for example, on a dividend record date—without having title recorded in that person's name.[224]

93.1.    A party could acquire shares as a contractual matter and be treated as the owner on a brokerage firm's records, for example, over a dividend record date but prior to settlement.

93.2.    There are a variety of ways in which the risk of "long" exposure to the shares could be hedged and that shares could be used to generate income subsequent to settlement (including a stock loan or a share repurchase agreement), none of which would necessarily cause the shares to be recorded in the name of the economic owner.

93.3.    In modern financial markets, attribution of ownership can be complex.  As observed previously, this includes ownership without having an entitlement to or book entry ownership of shares (*e.g.*, a total return equity swap).[225]  Countries may rely on the concept of beneficial ownership, as set out in treaties, to ground their tax analysis, and their approaches to beneficial ownership differ.[226]

---

[223] *See supra* ¶ 23.1.

[224] Indeed, in many cases of stock beneficial ownership, the applicant would not have record ownership of the shares.

[225] *See supra* ¶ 52.1.

[226] Exhibit 71 (Charl du Toit, *The Evolution of the Term "Beneficial Ownership" in Relation to International Taxation over the Past 45 Years*, 64 BULL. INT'L. TAX'N. 10 (2010), Journals IBFD).

94.     A legal determination of how beneficial owner should be defined and applied in a sophisticated financial context is inherently intrusive to tax treaty policy considerations.

94.1.   If reference is to be made to an OECD definition, an issue arises whether the operative OECD definition is the definition in place as of the date the term is agreed for use in the treaty (1999), as of the date the term is agreed for the specific provision being applied (2006), or as of the time of the payments of the dividends (2012–2015).[227]

94.2.   If there is no authoritative Danish law on this question, but solely tax authority practice (*e.g.*, if it is customary for the tax authority to follow the OECD definition), whether or not to accept that practice as authoritative is a legal decision infused with policy concerns.

95.     These are necessarily intrusive legal analyses that go far beyond simply providing recognition to foreign tax law. In my judgment, it would rankle the United States for a foreign court to, in essence, advise how U.S. tax law should be interpreted and applied. This is precisely why treaty-based tax collection assistance requires the tax claim to be determined by the country whose tax issues are implicated.[228]

## V.     CONCLUSIONS

96.     From the perspective of a former policymaker, permitting SKAT's fraud, unjust enrichment, and related claims to proceed in U.S. courts without exclusion by the revenue rule would affect U.S. negotiating positions and complicate the Executive Branch's ability to negotiate and complete treaties that would be ratified by the Congress. This would

---

[227] The OECD interpretation of beneficial owner has evolved between these three dates. *Compare* Exhibit 72 (OECD Comm. on Fiscal Affs., *Comments. on the Articles of the Model Tax Convention*, comment. to art. 10 (1998)); Exhibit 73 (OECD Comm. on Fiscal Affs., *Income & Capital Model Convention and Comment.*, comment. to art. 10 (July 15, 2005)); Exhibit 74 (OECD Comm. on Fiscal Affs., *Model Tax Convention on Income & Capital*, comment. to art. 10 (July 22, 2010); Exhibit 47 (2014 OECD Comment., *supra* note 134, at comment. to art. 10). *See supra* ¶ 54.2.

[228] *See, e.g.*, Exhibit 2 (Treaty, *supra* note 6, Article 27(2)):

"2. An application for assistance in the collection of a revenue claim shall include a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted."

implicate the separation of powers justification for the revenue rule, as opening the door to unilateral judicial collection assistance would encroach on decisions that are primarily the province of the Legislative and the Executive Branches.  The context of the SKAT case also implicates the second justification for the revenue rule: to avoid a risk that a court would intrude on Danish sovereignty in applying Danish tax law.

I affirm my genuine belief in the opinions expressed in this Report.

I reserve the right to update or modify this Report for additional information that may come to my attention, including information that was unavailable as of the date of this Report.

Executed this 31st day of December 2021 at Cambridge, Massachusetts.

By: Stephen E. Shay

## APPENDIX A – CURRICULUM VITAE

STEPHEN E. SHAY

E-mail: stephen.e.shay@gmail.com
Mobile: +1 (617) 413-4231

Stephen Shay is the Paulus Endowment Senior Tax Fellow at Boston College Law School. Mr. Shay is a former U.S. Treasury Deputy Assistant Secretary for International Tax Affairs and a retired partner of Ropes & Gray, LLP.

Mr. Shay has taught U.S. tax law courses as a Professor of Practice at Harvard Law School, as an Adjunct Professor at Boston College Law School, and as a Lecturer at Yale Law School, Oxford University (MSc. in Taxation) and the Leiden International Tax Institute. Mr. Shay was the IBFD (Amsterdam) Professor in Residence for 2015.

Mr. Shay consults for international organizations and private parties and has testified as an expert before judicial and arbitral tribunals on behalf of governments and private litigants. Mr. Shay has been retained as an expert or as a testifying expert witness by the revenue authorities of Australia, Ireland and New Zealand and by private parties in investor-state arbitrations with Canada and Russia. Mr. Shay has served as an expert consultant to the International Monetary Fund on tax policy missions to Dominica, Kenya, Switzerland, Tanzania and Uganda. He provides pro bono technical assistance to governments of low income countries through the auspices of the International Senior Lawyers Project. Mr. Shay has had extensive practice experience in the international tax area and while in active practice was recognized as a leading practitioner in Chambers Global: The World's Leading Lawyers, Chambers USA: America's Leading Lawyers, The Best Lawyers in America, Euromoney's Guide to The World's Leading Tax Advisers and Euromoney's, Guide to The Best of the Best.

During his two tours of U.S. government service, Mr. Shay actively participated in the development and enactment of international provisions in the Tax Reform Act of 1986 and in 2010 the Foreign Account Tax Compliance Act (FATCA), as well as other international tax legislation. He was the U.S. delegate to the negotiation of the 1988 Council of Europe and OECD Multilateral Convention for Mutual Assistance in Tax Matters and in 2009 – 2010 he served as the U.S. delegate to the G20/OECD's Global Forum for Transparency and Exchange of Information in Tax Matters. He has had principal responsibility for the U.S. tax treaty network, and has served as a treaty negotiator.

Mr. Shay serves on the Executive Committee of the New York State Bar Association Tax Section and the Leadership Council of the Harvard Law School Wilmer Hale Legal Services Center. He is a Fellow of the American College of Tax Counsel and Member of the College's Amicus Committee. Mr. Shay is a past President of the American Tax Policy Institute Board of Trustees and has been active in the American Bar Association Tax Section as a Council Director and Chair of the Committee on Foreign Activities of U.S. Taxpayers, in the American Law Institute as a Life Member and an Associate Reporter and in the Taxes Committee of the International Bar Association.

Mr. Shay is a 1972 graduate of Wesleyan University, and he earned his J.D. and his M.B.A. from Columbia University in 1976. He is admitted to practice in New York and Massachusetts.

## EXPERIENCE

**Paulus Endowment Senior Tax Fellow**                    2021
**Adjunct Professor**                                     2020
**Boston College Law School**, Chestnut Hill, Massachusetts

**Lecturer on Law**                                       2019-2020
**Senior Lecturer on Law**                                2015 – 2019
**Professor of Practice**                                 2011 – 2015
Harvard Law School, Cambridge, MA

**Professor-in-Residence**
International Bureau of Fiscal Documentation, Amsterdam    2015

**Deputy Assistant Secretary, International Tax Affairs**   2009 – 2011
U.S. Department of the Treasury, Washington, DC

**Partner**                                               1987 – 2009
Ropes & Gray, LLP, Boston, MA

**International Tax Counsel, Deputy International Tax Counsel,** 1982 – 1987
**Associate International Tax Counsel, Attorney Advisor**
U.S. Department of the Treasury, Washington, DC

**Associate Attorney**, Coudert Brothers, New York, NY    1979 – 1981
**Associate Attorney**, Reavis & McGrath, New York, NY    1976 – 1979

## TEACHING EXPERIENCE AND COURSES

**Boston College Law School,** Chestnut Hill, Massachusetts    2019-2021
Courses:
- Tax Policy
- International Tax

**Lecturer; Senior Lecturer on Law; Professor of Practice**    2011-2020
**Harvard Law School**, Cambridge, MA
Courses:
- Taxation – 4 credits
- International Aspects of U.S. Federal Income Taxation – 4 and 3 credits
- Seminar in Tax Law, Policy and Practice (Co-taught with Daniel Halperin) – 1 credit
- Problem Solving Workshop (One section of required first year January term course teaching 6 practice-oriented case studies) – 2 credits
- Upper class reading group: The Evolving Architecture of International Taxation – 1 credit
- First year reading group: The Federal Tax System and the U.S. Social Safety Net – Non-credit

**Oxford University Faculty of Law,** Oxford, United Kingdom     2017, 2019, 2021
Course: U.S. International Taxation (MSc in Taxation)

**Leiden International Tax Program,**     2017-2021
Leiden, The Netherlands
Course: U.S. International Tax Law

**Lecturer in Law, Harvard Law School,** Cambridge, MA     2002–2003,
Course: International Aspects of U.S. Federal Income Taxation     2005–2008

**Lecturer, Yale Law School,** New Haven CT,     2004, 2019
Course: U.S. Aspects of International Income Taxation

## EDUCATION

Columbia University School of Law and School of Business, New York, NY
J.D. and M.B.A., 1976

Wesleyan University, Middletown, CT
B.A., 1972

## PUBLICATIONS

*The Deceptive Allure of Taxing "Residual Profits,"* 75 BUL. INT'L TAX'N No. 11/12 (2021)

*Legal Fictions, Elections and Tax Law Boundaries* in THINKER, TEACHER, TRAVELER: REIMAGINING INTERNATIONAL TAX (ESSAYS IN HONOUR OF DAVID ROSENBLOOM), Ch. 40 (IBFD 2021))

*Addressing an Opaque Foreign Income Subsidy With Expense Disallowance*, 172 TAX NOTES FEDERAL 699 (Aug. 2, 2021), 103 TAX NOTES INTERNATIONAL 573 (Aug. 2, 2021)

INTRODUCTION TO UNITED STATES INTERNATIONAL TAXATION - 7TH ED. (Wolters Kluwer 2021) (with James R. Repetti and Diane Ring)

*Turning to the Government (for PPP Money) in Time of Need*, 168 TAX NOTES FEDERAL 841 (Aug. 3, 2020)

*Why R&D Should Be Allocated to Subpart F and GILTI*, 167 TAX NOTES FEDERAL 2081 (June 22, 2020), 98 TAX NOTES INTERNATIONAL 1393 (June 22, 2020) (with Reuven S. Avi-Yonah, Patrick Driessen, J. Clifton Fleming, Jr. and Robert J. Peroni)

*Is Unilateral Formulary Apportionment Better than the Status Quo?* (with J. Clifton Fleming, Jr. and Robert J. Peroni), in Krever, ed., THE ALLOCATION OF MULTINATIONAL BUSINESS INCOME: REASSESSING THE FORMULARY APPORTIONMENT OPTION (Kluwer 2020)

*A GILTI High-Tax Exclusion Election Would Erode the U.S. Tax Base*, 165 TAX NOTES FEDERAL 1129 (Dec. 6, 2019)

*Expanded Worldwide Versus Territorial Taxation after the TCJA*, 161 TAX NOTES 1173 (Dec. 3, 2018) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*The US International Tax Reforms: Competition and Convergence, Pay-Offs and Policy Failures*, 46 INTERTAX 905 (Nov. 2018)

RETHINKING INTERNATIONAL INVESTMENT GOVERNANCE: PRINCIPLES FOR THE 21ST CENTURY (Columbia Center for Sustainable Development 2018) (with Emma Aisbett, Bernali Choudhury, Olivier de Schutter, Frank Garcia, James Harrison, Song Hong, Lise Johnson, Mouhamadou Kane, Santiago Peña, Matthew Porterfield, Susan Sell, and Louis T. Wells)

*Foreword: International Tax Policy in a Disruptive Environment,* 72 BUL. INT'L TAX'N 191 (2018) (with Allison Christians and Wolfgang Schon)

*Incorporating a Minimum Tax in a Territorial System*, 157 TAX NOTES 73 (Oct. 2, 2017) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

IFA CAHIERS 2017 - VOLUME 102A: *Assessing BEPS: Origins, Standards, and Responses* – General Report (Co-General Reporter with Allison Christians) (IBFD 2017)

*Getting From Here to There: The Transition Tax Issue*, 154 TAX NOTES 69 (April 3, 2017) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Defending Worldwide Taxation and Addressing Inversions with a Shareholder-Based Definition of Corporate Residence*, 6 BRIGHAM YOUNG UNIVERSITY LAW REVIEW 1681 (2017) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*R&D Tax Incentives – Growth Panacea or Budget Trojan Horse?* 69 TAX LAW REV. 419 (2016)) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Two Cheers for the Foreign Tax Credit, Even in the BEPS Era*, 91 TULANE LAW REVIEW 1 (2016) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*An Overview of Transfer Pricing in Extractive Industries* (Chapter 6 in Philip Daniel, Michael Keen and Artur Swistak (eds.), INTERNATIONAL TAXATION AND THE EXTRACTIVE INDUSTRIES (Routledge 2016))

*Treasury's Unfinished Work on Corporate Expatriations*, 150 TAX NOTES 933 (Feb. 22, 2016) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Designing a 21st Century Corporate Tax — An Advance U.S. Minimum Tax On Foreign Income and Other Measures to Protect the Base*, 17 FLA. TAX REV. 669 (2015) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Getting Serious About Cross-Border Earnings Stripping: Establishing an Analytical Framework*, 93 N. C. LAW REV. 673 (2015) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*The Truthiness of "Lockout:" A Review of What We Know*, 146 TAX NOTES 1393 (Mar. 16, 2015)

*Lessons the United States Can Learn From Other Countries' Territorial Systems for Taxing Income of Multinational Corporations*, Urban Institute Tax Policy Center (Jan. 21, 2015) (with Rosanne Altshuler and Eric Toder)

*Formulary Apportionment in the U.S. International Income Tax System: Putting Lipstick on a Pig*? 36 MICH. J. INT'L LAW 1 (2014) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Mr. Secretary, Take the Tax Juice Out of Corporate Expatriations*, 144 TAX NOTES 473 (2014)

*Base Erosion and Profit Shifting: A Roadmap for Reform*, 68 BUL. INT'L TAX'N 275 (2014) (with Hugh J. Ault and Wolfgang Schon)

*Theory, Complications, and Policy: Daniel Shaviro's Fixing U.S. International Taxation*, JERUSALEM REV. LEGAL STUD. (2014)

*Territoriality in Search of Principles: The Camp and Enzi Proposals*, 141 TAX NOTES 173 (2013) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Preface*, Yariv Brauner and Miranda Stewart, eds. (2013) TAX LAW AND DEVELOPMENT (Edward Elgar: Cheltenham, UK)

*Designing a U.S. Exemption System for Foreign Income When the Treasury is Empty*, 13 FLA. TAX REV. 397 (2012) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Daunting Fiscal and Political Challenges for U.S. International Tax Reform*, BULL.FOR INT'L TAX'N 229 (2012)

*Jobs, Deficit Reduction, Revenues and Fundamental Tax Reform*, 133 TAX NOTES 213 (2011)

*Worse Than Exemption*, 59 EMORY LAW J. 79 (2009) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Commentary: Ownership Neutrality and Practical Complications*, 62 TAX LAW REV. 401 (2009).

American Bar Association Tax Section, Task Force on International Tax Reform, *Report of the Task Force on International Tax Reform*, 59 TAX LAWYER 649 (2006) (principal draftsman)

*The David R. Tillinghast Lecture: 'What's Source Got to Do With It?' Source Rules and U.S. International Taxation*, 56 TAX LAW REV. 81 (2003) (with Robert J. Peroni and J. Clifton Fleming, Jr.)

*Reform and Simplification of the U.S. Foreign Tax Credit Rules*, 31 TAX NOTES INT'L 1145 (2003) and 101 TAX NOTES 103 (2003) (with Robert J. Peroni and J. Clifton Fleming, Jr.)

*Fairness in International Taxation: The Ability-to-Pay Case for Taxing Worldwide Income*, 5 FLA. TAX REV. 299 (2001) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*An Alternative View of Deferral: Considering a Proposal to Curtail, Not Expand, Deferral*, 20 TAX NOTES INT'L 547 (2000) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Deferral: Consider Ending It, Instead of Expanding It*, 86 TAX NOTES 837 (2000) (with J. Clifton Fleming, Jr. and Robert J. Peroni)

*Taking Territorial Taxation to Task*, 20 TAX NOTES INT'L 1178 (2000) (with Robert J. Peroni and J. Clifton Fleming, Jr.)

*Qualified Intermediary Status, Act III:  Rev. Proc. 2000-12's Final Qualified Intermediary Agreement and Amendments to Final Withholding Rules*, 29 TAX MGMT. INT'L J. 403 (2000) (with Susan C. Morse and Christopher J. Peters)

*Getting Serious About Curtailing Deferral of U.S. Tax on Foreign Source Income*, 52 SMU LAW REV. 455-530 (1999) (with Robert J. Peroni and J. Clifton Fleming, Jr.)

*Qualified Intermediary Status: A New Withholding Role for Foreign Financial Institutions Under Final U.S. Withholding Regulations*, 27 TAX MGMT INT'L J. 3 (1998) (with Susan C. Morse)

*Selected International Aspects of Tax Reform Proposals*, 51 U. MIAMI L. REV. 1029 (1997) (with Victoria P. Summers), *reprinted in* A COMPREHENSIVE ANALYSIS OF CURRENT CONSUMPTION TAX PROPOSALS (American Bar Association, 1997)

*Revisiting U.S. Anti-Deferral Rules*, 74 TAXES 1042 (1996)

*Taxation Policy*, (with Elinore J. Richardson), in Pritchard, ed., ECONOMIC DEVELOPMENT, FOREIGN INVESTMENT AND THE LAW: ISSUES OF PRIVATE SECTOR INVOLVEMENT FOREIGN INVESTMENT AND THE RULE OF LAW IN A NEW ERA, (Kluwer 1996)

*IRS Makes Flip Transactions Taxable*, 5 INT'L TAX REV. 17 (1994)

*Re-examining Chapter 3 Income Tax Withholding and the Role of the Withholding Agent*, Alpert and van Raad, eds., ESSAYS ON INTERNATIONAL TAXATION (Kluwer 1993)

*Final Section 367(e) Regs. Improve on Temp. Regs., But Policy Concerns Remain*, 4 J. INT'L TAX'N 244 (1993)

*Final Dual Consolidated Loss Regs. Still Have Some High Hurdles*, 4 J. INT'L TAX'N 52 (1993) (with Rom P. Watson)

*Dispute Resolution Faces Numerous Obstacles*, 3 INT'L TAX REV. 15 (1992)

The American Law Institute, FEDERAL INCOME TAX PROJECT - UNITED STATES INCOME TAX TREATIES (American Law Institute 1992) (Associate Reporter to Reporters David R. Tillinghast, Esq. and Professor Hugh J. Ault)

*Section 864(e) and the Allocation of Expenses Under the Temporary Regulations*, 18 TAX MGMT. INT'L J. 239 (1989)

*The Post-TAMRA Treatment of U.S. Shareholders of PFICs: Part I*, 70 J. TAX'N 296 (1989)

*The Post-TAMRA Treatment of U.S. Shareholders of PFICs: Part II*, 70 J. TAX'N 374 (1989)

*Section 864(e) and the Allocation and Apportionment of Interest Expense Under the Proposed Regulations*," 17 TAX MGMT. INT'L J. 51 (1988)

*The Controversial CFC Interest Netting Rule in the Proposed Interest Allocation Regulations*, 17 TAX MGMT. INT'L J. 25 (1988)

## TESTIMONY (AS PRIVATE WITNESS) BEFORE CONGRESS AND PRESIDENTIAL ADVISORY PANEL

Committee on Finance, U.S. Senate, Hearing on International Tax Reform (October 3, 2017)

Committee on Finance, U.S. Senate, Hearing on Building a Competitive U.S. International Tax System (March 17, 2015)

Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, U.S. Senate, Hearing on Offshore Profit Shifting and the Internal Revenue Code – Part II (Apple Inc.) (May 21, 2013)

Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, U.S. Senate, Hearing on Offshore Profit Shifting and the Internal Revenue Code – Part I (Microsoft and HP) (Sept. 20, 2012)

Subcommittee on Select Revenue Measures of the Ways and Means Committee, U.S. House of Representatives, Hearing on Issues Involving Banking Secrecy Practices and Wealthy American Taxpayers (March 31, 2009)

Committee on Finance, U.S. Senate, Hearing on the Foundation of International Tax Reform: Worldwide, Territorial, and Something in Between (June 26, 2008)

Committee on Ways and Means, U.S. House of Representatives, Hearing on Fair and Equitable Tax Policy for America's Working Families (September 6, 2007)

Subcommittee on Select Revenue Measures of the Ways and Means Committee, U.S. House of Representatives, Hearing on U.S. International Competitiveness (June 23, 2006)

President's Advisory Panel on Federal Tax Reform, Panel on International Income Taxation (May 13, 2005)

Committee on Finance, United States Senate, Hearing on International Competitiveness (July 16, 2003)

Committee on Ways and Means, U.S. House of Representatives, Hearing on WTO Extraterritorial Income Decision (February 28, 2002)

Subcommittee on Oversight of the Committee on Ways and Means, U.S. House of Representatives, Hearing on Expatriates (March 27, 1995)

## NAMED LECTURES

Klaus Vogel Lecture, University of Vienna (2017): "Balancing Competition and Coordination in International Taxation"

The Fourth Richard Crawford Pugh Lecture on Tax Law and Policy, University of San Diego (2013): "Coherence and International Taxation"

The David R. Tillinghast Lecture on International Taxation, New York University (2001): "What's Source Got to Do With It? Source Rules and U.S. International Taxation"

## IMF PAPERS

Tanzania, International Corporate Tax (November 2018) (with Victoria Perry and Sebastian Beer)

Switzerland, Selected Issues: Taxation of Corporations in Switzerland (May 31, 2018) (with Shafik Hebous)

Uganda, Selected Issues: Issues in International Taxation (June 2017) (with Victoria Perry and Li Liu)

Kenya, A Review of International Taxation (January 2017) (with Victoria Perry and Li Liu)

Uganda, Tax Policy: Issues in a Changing Economy (July 2011) (with Victoria Perry, Jack Grigg, and Artur Swistak)

**AMICUS BRIEFS**

**Brief Of Amici Curiae J. Richard Harvey, Leandra Lederman, Ruth Mason, Susan Morse, Stephen Shay And Bret Wells, In Support Of Respondent-Appellant,** *Altera Corporation and Subsidiaries, Petitioner-Appellee v. Commissioner of Internal Revenue, Respondent-Appellan*t, On Appeal to Ninth Circuit Court of Appeals from Decisions of the United States Tax Court (No. 16-70496 and No. 16-70497) (filed July 1, 2016)

**Supplemental Brief of Amici Curiae Reuven Avi-Yonah, Lily Batchelder, Joshua Blank, Noel Cunningham, Victor Fleischer, Ari Glogower, David Kamin, Mitchell Kane, Michael Knoll, Rebecca Kysar, Leandra Lederman, Zachary Liscow, Ruth Mason, Susan Morse, Daniel Shaviro, Stephen Shay, John Steines, David Super, Clinton Wallace, Bret Wells in Support of Respondent-Appellant Commissioner,** *Altera Corporation and Subsidiaries, Petitioner-Appellee v. Commissioner of Internal Revenue, Respondent-Appellant*, On Appeal to Ninth Circuit Court of Appeals From Decisions of the United States Tax Court (No. 16-70496 and No. 16-70497) (filed Sept. 28, 2018)

**EXPERT REPORTS**

**Tax Expert for Commissioner of Taxation:** [*Names Redacted*] *v. Commissioner of Taxation* (Federal Court of Australia – under seal) (Report filed 2019)

**Tax Expert for Revenue Commissioners:** [*Names Redacted*] *v. Revenue Commissioners* (Tax Appeals Commission AC Ref: 17TACD2019) (Report filed 2019; hearing testimony 2019)

**Tax Expert for Bilcon of Delaware:** *Bilcon of Delaware et al v. Government of Canada* (Permanent Court of Arbitration) (Report filed 2017)

**Tax Expert for Dell, Inc.**: *In re: Appraisal of Dell, Inc.* (Court of Chancery, State of Delaware (Consolidated, C.A. No.: 9322-VCL) (Report filed 2015)

**Tax Expert**, confidential arbitration (Permanent Court of Arbitration, The Hague) (Reports filed 2015 and 2019; hearing testimony 2019)

**Tax Expert for New Zealand Crown Counsel**:
*Deutsche Finance New Zealand Limited & ANOR v. The Commissioner of Inland Revenue* (CIV 2006-404-2535 - High Court of New Zealand, Auckland Registry) (Report filed 2007)

*Deutsche (MMKTRPS) Holdings New Zealand Limited & ORS v. The Commissioner of Inland Revenue* (CIV 2007-404-367 - High Court of New Zealand, Auckland Registry) (Report filed 2007)

*BNZ Investments Ltd. v. CIR* (HC WN CIV 2004-485-1059) [15 July 2009] Wild J

**Tax Expert for Bank of America**: *Enrico Bondi, Plaintiff, v. Bank of America Corporation* (05 CIV 4015 (LAK), U.S. District Court for the Southern District of New York, *In re Parmalat Securities Litigation*)

**Tax Expert for RoDa Drilling Company**: *RoDa Drilling Company et al. v. Siegal et al.* (CIVIL DOCKET FOR CASE #: 4:07-cv-00400-GKF-FHM, U.S. District Court for the Northern District of Oklahoma (Tulsa)) (Report filed 2009)

**Tax Expert for Cadwalader, Wickersham & Taft**: *Simchoni, et al. v. John Guest (U.S.A.), Inc., et al.* (CIVIL DOCKET FOR CASE #: 94-cv-2886, 95-cv-4383, U.S. District Court for the District of New Jersey) (Report filed 1996)

## Working Papers Posted on SSRN

*Tax Reform – Process Failures, Loopholes and Wealth Windfalls* (Working paper)

*Treasury Can Close a Potential Loophole in the Treatment of Deferred Foreign Income in the Tax Cuts and Jobs Act – Will It Act?* (Working paper)

## APPENDIX B – DOCUMENTS CONSIDERED

In addition to the materials cited in this Report, I considered the materials listed in this Appendix B.

**Record Factual Material**

- MBJ-STOR_0007019

- WH_MDL_00356221 - WH_MDL_00356223

- Exhibit 1 to Letter to Judge Kaplan, *In re Customs & Tax Admin. of the Kingdom of Den. (SKAT) Tax Refund Litig.*, No. 1:18-md-02865-LAK (S.D.N.Y. Sept. 3, 2021), ECF No. 660-1

- Tr. of Dep. of Leif N. Jeppesen, *In re Customs & Tax Admin. of Kingdom of Den. (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-md-2865-LAK (S.D.N.Y. Sept. 27, 2021)

- Dep. Tr. of Anne Munksgaard, *In re Customs & Tax Admin. of Kingdom of Den. (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-cv-09797 (S.D.N.Y. June 9, 2021)

- Pl.'s Resp. & Objs. to Defs.'s 1st Reqs. for Admiss., *In re Customs & Tax Admin. of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-md-2865-LAK (S.D.N.Y. Apr. 28, 2021)

- Pl.'s Resp. & Objs. to Defs.'s 2d Reqs. for Admiss., *In re Customs & Tax Admin. of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 18-md-2865-LAK (S.D.N.Y. July 15, 2021)

**Court Filings: Instant Litigation**

- Consol. Defs.' Mem. of Law in Supp. of Their J. Mot. to Dismiss the Compls. Pursuant to F.R.C.P. 12(b)(1), 12(b)(6) and 9(b), *In re SKAT Tax Refund Scheme Litig.*, No. 1:18-cv-4047-LAK (S.D.N.Y. Aug. 15, 2018), ECF No. 35

- Pl.'s Mem. of Law in Opp'n to the Consol. Defs.' Mot. to Dismiss the Compls., *In re SKAT Tax Refund Scheme Litig.*, No. 1:18-cv-4047 (S.D.N.Y. Oct. 1, 2018), ECF No. 47

- Consol. Defs.' Mem. of Law in Reply to Pl.'s Opp'n to Consol. Defs.' Mot. to Dismiss the Compls., *In re Customs & Tax Admin. of the Kingdom of Den. (SKAT) Tax Refund Litig.*, No. 1:18-md-2865-LAK (S.D.N.Y. Oct. 30, 2018), ECF No. 58

## Case Law

- *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991)

- *Eur. Cmty. v. RJR Nabisco, Inc*., 355 F.3d 123 (2d Cir. 2004)

- *Rep. of Austria v Altmann,* 541 U.S. 677 (2004)

- *Rep. of Ecuador v. Philip Morris Cos., Inc.*, 188 F.Supp.2d 1359 (S.D. Fla. 2002)

- SKM2021.121.ØLR, Sec. 14, B-2152-10 (Eastern High Court (Denmark)) (Feb. 24, 2012), available at https://skat.dk/skat.aspx?oid=2035604 and translated via Google translate

- *U.S. v. Trapilo*, 130 F.3d 547 (2d Cir. 1997)

- *Warren v. Warren,* 75 So. 35 (Fla. 1917)

## Legislative History

- 1 Staff of J. Comm. on Tax'n, LEGISLATIVE HISTORY OF U.S. TAX CONVENTIONS (1962)

- 2 Staff of J. Comm. on Tax'n, LEGISLATIVE HISTORY OF U.S. TAX CONVENTIONS (1962)

## Treaties

- Protocol Amending the Convention of 22 November 1995 for the Avoidance of Double Taxation with Respect to Taxes on Income & on Capital and with Respect to Taxes on Estates & Inheritances & on Gifts & Concerning Assistance in Tax Matters, Den.-Ger., Oct. 1, 2020

- I.R.S., Technical Explanation to the U.S. Model Income Tax Convention of Sept. 20, 1996.

## Articles

- Bobby W.M. Lindsay, *Re-evaluating the Revenue Law Rule and the Non-Enforcement of Foreign Tax Claims* (Univ. Glasgow Sch. Law Working Paper, 2020)

- Brenda Mallinak, *The Revenue Rule: A Common Law Doctrine for the Twenty-First Century*, 16 DUKE J. COMP. & INT'L L. 79 (2006)

- J. Pablo Gardea, *Dissonant Taxation: How the Revenue Rule & Income Tax - Treaties Lead to Incongruities in International Revenue Collection*, 49 GEO. J. INT'l L. 1175 (2018)

- John Avery Jones, *Enforcement of Foreign Revenue Debts: Bullen and Garner v. UK,* 3 & 4 BRIT. TAX REV. 109 (1991)

- *Judge Confirms Initial Victory for Denmark in $2.1B Tax Fraud Case*, Hughes Hubbard & Reed (Jan. 18, 2019), https://www.hugheshubbard.com/news/judge-confirms-initial-victory-for-denmark-in-2-1b-tax-fraud-case

- Louise Parker, *Mutual Assistance in the Collection of Taxes*, 71 BULL. INT'L. TAX. 9 (2017)

- Michael Lang & Florian Brugger, *The Role of the OECD Commentary in Tax Treaty Interpretation*, 23 AUSTL. TAX FORUM 95 (2008)

- Philip Baker, *The Transnational Enforcement of Tax Liabilities*, 5 BRIT. TAX REV. 313 (1993)

**Court Filings: Other Litigations**

- Submission on Dicey Rule 3 on Behalf of Acupay System LLC (UK Branch), Skatteforvaltningen (The Danish Customs And Tax Administration) v Solo Capital Partners LLP & Ors [2021] EWHC 974 (Comm)

- Response Written Submissions of Acupay System LLC (UK Branch) In Relation to Dicey Rule 3, Skatteforvaltningen (The Danish Customs And Tax Administration) v Solo Capital Partners LLP & Ors [2021] EWHC 974 (Comm)

- Brief for the U.S. in Opposition, *Pasquantino v. U.S.*, 544 U.S. 349 (2005) (No. 03-725)

- Brief for the U.S., *Pasquantino v. U.S.*, 544 U.S. 349 (2005) (No. 03-725)

# Exhibit 1

# FEDERAL INCOME TAX PROJECT

# INTERNATIONAL ASPECTS OF UNITED STATES INCOME TAXATION II

## PROPOSALS ON UNITED STATES INCOME TAX TREATIES

Adopted by

## THE AMERICAN LAW INSTITUTE

At San Francisco, California
May 13, 1991



PHILADELPHIA, PA.
THE AMERICAN LAW INSTITUTE
1992

COPYRIGHT © 1992

By

THE AMERICAN LAW INSTITUTE

All rights reserved
Printed in the United States of America

Library of Congress Catalog Card Number: 87-72373

ISBN 0-8318-5369-7

**Federal Income Tax Project**

**International Aspects of United States Income Taxation II**

### REPORTERS

Hugh J. Ault, Boston College Law School, Newton, Massachusetts
David R. Tillinghast, New York, New York

### ASSOCIATE REPORTER

Stephen E. Shay, Boston, Massachusetts

### CONSULTANTS*

M. Bernard Aidinoff, New York, New York [to 1989]
George W. Beatty, Washington, District of Columbia
David H. Brockway, Washington, District of Columbia
Harvey P. Dale, New York University School of Law, New York, New York
Pamela Brooks Gann, Duke University School of Law, Durham, North Carolina
Joseph H. Guttentag, Washington, District of Columbia
Randall K. C. Kau, New York, New York [from 1989]
Richard O. Loengard, Jr., New York, New York
Andreas F. Lowenfeld, New York University School of Law, New York, New York
J. Roger Mentz, Washington, District of Columbia
John S. Nolan, Washington, District of Columbia
Sidney I. Roberts, New York, New York
H. David Rosenbloom, Washington, District of Columbia
Leslie J. Schreyer, New York, New York
Leonard B. Terr, Washington, District of Columbia [from 1989]

### INTERNATIONAL CONSULTANTS*

Brian J. Arnold, Faculty of Law, University of Western Ontario, London, Ontario, Canada
John F. Avery Jones, London, England
Kees van Raad, The Hague, The Netherlands

### LIAISONS*

Carl L. Estes II, Houston, Texas, for the American Bar Association Section of Taxation
Robert J. Patrick, Jr., Washington, District of Columbia, for the U.S. Branch of the International Fiscal Association

*As of May 13, 1991

### Comment

The benefits of exchange of information under a treaty should be obtainable while protecting the legitimate rights and interests of taxpayers. Providing taxpayers with notice and an administrative opportunity to object before information is supplied to a treaty partner (or a simultaneous examination, which can be expected to lead to exchanges of information, is commenced) reasonably balances governmental interests and taxpayer rights.

The administrative review procedure should be expeditious and grounds for taxpayer objection should be limited, for example, to cases in which the information exchanged would disclose a commercial or professional secret or would otherwise be manifestly unfair to the taxpayer (*e.g.,* because the information is clearly inaccurate). The Internal Revenue Service also should have discretion not to give notice to a taxpayer if there is reasonable cause to believe giving notice may lead to attempts to thwart an examination or investigation.[371]

### 2. *Reciprocal Enforcement of Tax Claims*

The principle that one country will not assist in the collection of another's taxes is said to derive from Lord Mansfield's dictum in 1775 that "no country ever takes notice of the revenue laws of another."[372] However, cases actually applying this dictum in common law countries were not decided until the last half of the twentieth century.[373] Although there is relatively little case law on this subject in the United States, this common law rule was upheld in *Her Majesty the Queen ex. rel. British Columbia v. Gilbertson.*[374]

---

[371]*Cf., e.g.,* Section 7609(g).

[372]*Holman v. Johnson,* 98 Eng. Rep. 1120, 1121 (1775).

[373]*See Government of India v. Taylor,* 1955 App. Cas. 491 (1955); *United States v. Harden,* 41 D.L.R.2d 721, 63-2 U.S.T.C. ¶ 9768 (Sup.Ct. Canada 1963).

[374]597 F.2d 1161 (9th Cir. 1979). *But see* note 383.

Traditional objections to enforcement of tax claims are based on concerns relating to extraterritorial enforcement, lack of reciprocity, and both substantive and procedural due process.

Currently, four U.S. treaties contain provisions under which the United States could be required to assist in collecting foreign taxes from foreign persons,[375] but these have been wholly unused in practice. Other treaties have limited provisions authorizing the collection of tax for the purpose of ensuring that treaty benefits are enjoyed only by persons entitled to them.[376] These provisions are principally directed at preventing resident nominees of non-residents from claiming entitlement to treaty-reduced withholding tax rates and are enforced by the United States solely by requesting voluntary compliance.[377]

In an era of global business activities and financial markets a rule flatly barring enforcement of all foreign tax claims — to the extent it now exists in the United States — is no longer justified.[378] Such enforcement could be undertaken in two ways: through judicial enforcement of foreign tax judgments or through the application of domestic tax collection procedures. As to the former, a foreign government can already come into a U.S. court to enforce a foreign judgment based on a breach of contract;[379] and it is not evident why it should not be able to do the same to enforce a final tax determination. When a judgment is enforced in a U.S. court, the taxpayer will have notice and a right to be heard, and may raise constitutional due process defenses. For example, a United States court may decline to recognize a foreign judgment if: (i) the foreign judicial system does not provide an impartial tribunal or procedures compatible with due process of law; (ii) the court's jurisdiction over the defendant is deficient; or (iii) the defendant did not receive adequate notice of the proceeding.[380] Thus, due process concerns are substantially addressed if collection is undertaken through judicial enforcement of a judgment under the authority of a provision of a reciprocal bilateral treaty with a country whose tax and legal system has appropriate due process safeguards.[381] If the foreign judgment is reduced to a judgment of a U.S. court, it will have the same priority as that of any unsecured creditor.[382] The foreign government would be required to enforce collection of its claim in the same manner as any private litigant.[383]

In contrast, more complex and difficult issues are raised by the prospect of administrative enforcement of foreign tax judgments, which would require the application of domestic tax collection procedures to such judgments as though they

---

[375]These are *Denmark* (Art. XVIII, para. 1), *France* (Art. 27, para. 1), *Netherlands* (Art. XXII, para. 1), and *Sweden* (Art. XVII). The provisions expressly exclude collection of foreign taxes from U.S. citizens and corporations.

[376]*See U.S. Model Treaty* Art. 26, paras. 4 and 5.

[377]*See* discussion of enforcement issues in PART TWO, Section IV.

[378]*Compare Restatement Third* § 483 Reporters' Note 2.

[379]*See generally* Uniform Foreign Money-Judgments Recognition Act, 13 U.L.A. 261-275 (1986) and cases cited therein; *Restatement Third* §§ 481-82.

[380]Uniform Foreign Money-Judgment Recognition Act § 4, 13 U.L.A. 268 (1986); *Restatement Third* § 482.

[381]*See* Johnson, Nirenstein & Wells, *Reciprocal Enforcement of Tax Claims Through Tax Treaties*, 33 TAX LAW. 469 (1980); Note, *Dispute Resolution Under Tax Treaties: Current and Proposed Methods*, 24 TEX. INT'L L. J. 367 (1989). To the extent that there is any doubt that a full hearing on due process issues would otherwise be available, such a requirement could be drafted into the treaty provision itself.

[382]*See, e.g.,* Albrecht, *The Enforcement of Taxation Under International Law*, 1953 BRIT. Y. B. INT'L L. 454, 470.

[383]In *Bullen & Garner v. United Kingdom*, 553 So. 2d 1344 (Fla. App. 4th Dist. 1989), the defendant, while engaging in business in the United Kingdom, had collected amounts of value added tax but failed to pay these over to the Government. In due course, an insolvency proceeding had been brought in the English court, which had declared the defendant insolvent and rendered a judgment in favor of the Government. The Florida court allowed the United Kingdom to levy on a Florida asset of the defendant in enforcement of that judgment. It is questionable whether this can correctly be characterized as the enforcement of a tax claim as such. The amounts at issue represented funds collected on behalf of the Government and owed to the Government as a result. It is not clear whether English law would treat these funds as a trust fund, as would be the case in the United States; but the nature of the debt is quite similar and the judgment rendered in England in the Government's favor was apparently no different from that which would have been rendered in favor of any type of creditor.

were final tax determinations of domestic tax liability. Since these procedures have been constructed against the background of U.S. judicial procedures, they could fairly be applied only if it were clear that the treaty partner's tax procedures satisfy U.S. due process standards both in general and in application to the specific case involved. It is not evident how this could be done in the course of applying administrative collection procedures. Moreover, there are complex issues to be resolved regarding use of administrative tax collection procedures for a claim that is not accorded the special priority and treatment given to a domestic tax claim.[384] In the absence of any experience with such procedures, no recommendation is made with respect to administrative assistance in collection.

### Recommendation

The United States should include in income tax treaties with selected treaty partners provisions authorizing reciprocal judicial recognition and enforcement of tax judgments rendered by courts of the treaty partner. To the extent necessary to assure appropriate judicial review of due process and fairness issues, such provisions should specify the terms and conditions on which such recognition and enforcement will be available.

### Comment

Treaty authorization of recognition and judicial enforcement of foreign tax claims is a long overdue change of the common law rule barring enforcement of foreign tax claims. Due process and reciprocity concerns should play a primary role in determining whether to modify this traditional policy with respect to each particular treaty partner; and the specific terms and conditions upon which enforcement will take place

may appropriately be made part of the treaty provision, if this is considered necessary to assure satisfaction of due process and fairness concerns. Certainly there are, however, treaty partners whose tax and judicial systems are sufficiently similar to those of the United States to warrant reciprocal recognition of tax claims under appropriate conditions.

---

[384] *See* OECD Mutual Assistance Convention Art. 15 (foreign tax claim given no priority). The United States has entered a reservation with respect to the collection provisions of this Convention. See note 35, *supra.*

# Exhibit 2

# DOUBLE TAXATION

## Taxes on Income

**Convention Between the**

**UNITED STATES OF AMERICA**

**and DENMARK**

Signed at Washington August 19, 1999

with

Protocol



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# DENMARK

## Double Taxation:  Taxes on Income

*Convention signed at Washington August 19, 1999;*
*Transmitted by the President of the United States of America*
        *to the Senate September 21, 1999 (Treaty Doc. 106-12,*
        *106th Congress, 1st Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
        *November 3, 1999 (Senate Executive Report No. 106-9,*
        *106th Congress, 1st Session);*
*Advice and consent to ratification by the Senate*
        *November 5, 1999;*
*Ratified by the President December 28, 1999;*
*Instruments attesting to completion of entry into force*
        *procedures exchanged at Washington March 24 and 31, 2000;*
*Entered into force March 31, 2000.*
*With protocol.*

CONVENTION
BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE KINGDOM OF DENMARK
FOR THE AVOIDANCE OF DOUBLE TAXATION
AND THE PREVENTION OF FISCAL EVASION
WITH RESPECT TO TAXES ON INCOME

The Government of the United States of America and the Government of the Kingdom

of Denmark, desiring to conclude a Convention for the avoidance of double taxation and the

prevention of fiscal evasion with respect to taxes on income, have agreed as follows:

-2-

ARTICLE 1

<u>General Scope</u>

1.  Except as otherwise provided in this Convention, this Convention shall apply to persons who are residents of one or both of the Contracting States.

2.  This Convention shall not restrict in any manner any benefit now or hereafter accorded:

> a) by the laws of either Contracting State; or

> b) by any other agreement between the Contracting States.

3.  Notwithstanding the provisions of subparagraph 2 b):

> a) the provisions of Article 25 (Mutual Agreement Procedure) of this Convention exclusively shall apply to any dispute concerning whether a measure is within the scope of this Convention, and the procedures under this Convention exclusively shall apply to that dispute; and

> b) unless the competent authorities determine that a taxation measure is not within the scope of this Convention, the non-discrimination obligations of this Convention exclusively shall apply with respect to that measure, except for such national treatment or most-favored-nation obligations as may apply to trade in goods under the General Agreement on Tariffs and Trade.  No national treatment or most-favored-nation obligation under any other agreement shall apply with respect to that measure.

> c) For the purpose of this paragraph, a "measure" is a law, regulation, rule, procedure, decision, administrative action, or any similar provision or action.

4.  Notwithstanding any provision of the Convention except paragraph 5 of this Article, a Contracting State may tax its residents (as determined under Article 4 (Residence)), and by reason of citizenship may tax its citizens, as if the Convention had not come into effect.  For this purpose, the term "citizen" shall include a former citizen or long-term resident whose loss of such status had as one of its principal purposes the avoidance of tax (as defined under the laws of the Contracting State of which the person was a citizen or long-term resident), but only for a period of 10 years following such loss.

5. The provisions of paragraph 4 shall not affect:

a) the benefits conferred by a Contracting State under paragraph 2 of Article 9 (Associated Enterprises), paragraphs 7 and 8 of Article 13 (Capital Gains), paragraphs 1 c), 2 and 5 of Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support Payments), and Articles 23 (Relief from Double Taxation), 24 (Non-Discrimination), and 25 (Mutual Agreement Procedure); and

b) the benefits conferred by a Contracting State under Articles 19 (Government Service), 20 (Students and Trainees) and 28 (Diplomatic Agents and Consular Officers), upon individuals who are neither citizens of, nor have been admitted for permanent residence in, that State.

## ARTICLE 2

### Taxes Covered

1. The existing taxes to which this Convention applies are:

a) in the United States:

(i) the Federal income taxes imposed by the Internal Revenue Code (but excluding social security taxes); and

(ii) the Federal excise taxes imposed with respect to private foundations;

b) in Denmark:

(i) the income tax to the State (indkomstskatten til staten);

(ii) the municipal income tax (den kommunale indkomstskat);

(iii) the income tax to the county municipalities (den amtskommunale indkomstskat); and

(iv) taxes imposed under the Hydrocarbon Tax Act (skatter i henhold til kulbrinteskatteloven).

2. The Convention shall apply also to any identical or substantially similar taxes which are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. The competent authorities of the Contracting States shall notify each other of

- 4 -

any significant changes that have been made in their respective taxation laws or other laws affecting their obligations under the Convention, and of any official published material concerning the application of this Convention, including explanations, regulations, rulings, or judicial decisions.

## ARTICLE 3

### General Definitions

1. For the purposes of this Convention, unless the context otherwise requires:

a) the term "person" includes an individual, an estate, a trust, a partnership, a company and any other body of persons;

b) the term "company" means any body corporate or any entity which is treated as a body corporate for tax purposes according to the laws of the state in which it is organized;

c) the terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" mean respectively an enterprise carried on by a resident of a Contracting State, and an enterprise carried on by a resident of the other Contracting State; the terms also include an enterprise carried on by a resident of a Contracting State through an entity that is treated as fiscally transparent in that Contracting State;

d) the term "international traffic" means any transport by a ship or aircraft, except when such transport is solely between places in a Contracting State;

e) the term "competent authority" means:

(i) in the United States: the Secretary of the Treasury or his delegate; and

(ii) in Denmark:  the Minister for Taxation or his authorized representative;

f) the term "United States" means the United States of America, and includes the states thereof and the District of Columbia; such term also includes the territorial sea thereof and the sea bed and subsoil of the submarine areas adjacent to that territorial sea, over which the United States exercises sovereign rights in accordance with international

−5−

law; the term, however, does not include Puerto Rico, the Virgin Islands, Guam or any other United States possession or territory.

g) the term "Denmark" means the Kingdom of Denmark, including any area outside the territorial sea of Denmark which in accordance with international law has been or may hereafter be designated under Danish laws as an area within which Denmark may exercise sovereign rights with respect to the exploration and exploitation of the natural resources of the sea-bed or its subsoil and the superjacent waters and with respect to other activities for the exploration and economic exploitation of the area; the term "Denmark" does not comprise the Faroe Islands or Greenland;

h) the term "national of a Contracting State," means:

(i) any individual possessing the nationality or citizenship of that State; and

(ii) any legal person, partnership or association deriving its status as such from the laws in force in that State;

i) the term "qualified governmental entity" means:

(i) any person or body of persons that constitutes a governing body of a Contracting State, or of a political subdivision or local authority of a Contracting State;

(ii) a person that is wholly owned, directly or indirectly, by a Contracting State or political subdivision or local authority of a Contracting State, provided it is organized under the laws of the Contracting State, its earnings are credited to its own account with no portion of its income inuring to the benefit of any private person, and its assets vest in the Contracting State, political subdivision or local authority upon dissolution; and

(iii) a pension trust or fund of a person described in clause (i) or (ii) that is constituted and operated exclusively to administer or provide pension benefits described in Article 19 (Government Service);

provided that an entity described in clause (ii) or (iii) does not carry on commercial activities.

−6−

2.  As regards the application of the Convention at any time by a Contracting State any term not defined therein shall, unless the context otherwise requires, or the competent authorities agree to a common meaning pursuant to the provisions of Article 25 (Mutual Agreement Procedure), have the meaning which it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

ARTICLE 4

Residence

1.  Except as provided in this paragraph, for the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, citizenship, place of management, place of incorporation, or any other criterion of a similar nature.

a) The term "resident of a Contracting State" does not include any person who is liable to tax in that State in respect only of income from sources in that State or of profits attributable to a permanent establishment in that State.

b) A legal person organized under the laws of a Contracting State and that is generally exempt from tax in that State and is established and maintained in that State either:

(i) exclusively for a religious, charitable, educational, scientific, or other similar purpose; or

(ii) to provide pensions or other similar benefits to employees, including self-employed individuals, pursuant to a plan

is to be treated for purposes of this paragraph as a resident of that Contracting State.

c) A qualified governmental entity is to be treated as a resident of the Contracting State where it is established.

d) An item of income, profit or gain derived through an entity that is fiscally transparent under the laws of either Contracting State shall be considered to be derived by a resident of a State to the extent that the item is treated for purposes of the taxation

law of such Contracting State as the income, profit or gain of a resident.

2. Where by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, then his status shall be determined as follows:

a) the individual shall be deemed to be a resident of the State in which he has a permanent home available to him; if such individual has a permanent home available to him in both States, he shall be deemed to be a resident of the State with which his personal and economic relations are closer (center of vital interests);

b) if the State in which the individual has his center of vital interests cannot be determined, or if he has no permanent home available to him in either State, he shall be deemed to be a resident of the State in which he has an habitual abode;

c) if the individual has an habitual abode in both States or in neither of them, he shall be deemed to be a resident of the State of which he is a national;

d) if he is a national of both States or of neither of them, the competent authorities of the Contracting States shall endeavor to settle the question by mutual agreement.

3. Where by reason of the provisions of paragraph 1 a person other than an individual is a resident of both Contracting States, the competent authorities of the Contracting States shall by mutual agreement endeavor to settle the question and to determine the mode of application of the Convention to such person.

4. A United States citizen or an alien lawfully admitted for permanent residence in the United States is a resident of the United States, but only if such person has a substantial presence, permanent home or habitual abode in the United States.


## ARTICLE 5

### Permanent Establishment

1. For the purposes of this Convention, the term "permanent establishment" means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

2. The term "permanent establishment" includes especially:

–8–

    a) a place of management;

    b) a branch;

    c) an office;

    d) a factory;

    e) a workshop; and

    f) a mine, an oil or gas well, a quarry, or any other place of extraction of natural resources.

    3. A building site or construction or installation project, or an installation or drilling rig or ship used for the exploration of natural resources, constitutes a permanent establishment only if it lasts, or the activity continues for, more than 12 months. For the purpose of this paragraph, activities carried on by an enterprise related to another enterprise, within the meaning of Article 9 (Associated Enterprises), shall be regarded as carried on by the enterprise to which it is related if the activities in question:

    a) are substantially the same as those carried on by the last-mentioned enterprise; and

    b) are concerned with the same project or operation;

except to the extent that those activities are carried on at the same time.

    4. Notwithstanding the preceding provisions of this Article, the term "permanent establishment" shall be deemed not to include:

    a) the use of facilities solely for the purpose of storage, display, or delivery of goods or merchandise belonging to the enterprise;

    b) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage, display, or delivery;

    c) the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;

    d) the maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise, or of collecting information, for the enterprise;

    e) the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character;

-9-

f) the maintenance of a fixed place of business solely for any combination of the activities mentioned in subparagraphs a) to e) of this paragraph, provided that the overall activity of the fixed place of business resulting from the combination is of a preparatory or auxiliary character.

5. Notwithstanding the provisions of paragraphs 1 and 2, where a person -- other than an agent of an independent status to whom paragraph 6 applies -- is acting on behalf of an enterprise and has and habitually exercises in a Contracting State an authority to conclude contracts in the name of the enterprise, that enterprise shall be deemed to have a permanent establishment in that State in respect of any activities which that person undertakes for the enterprise, unless the activities of such person are limited to those mentioned in paragraph 4 which, if exercised through a fixed place of business, would not make this fixed place of business a permanent establishment under the provisions of that paragraph.

6. An enterprise shall not be deemed to have a permanent establishment in a Contracting State merely because it carries on business in that State through a broker, general commission agent, or any other agent of an independent status, provided that such persons are acting in the ordinary course of their business as independent agents.

7. The fact that a company that is a resident of a Contracting State controls or is controlled by a company that is a resident of the other Contracting State, or which carries on business in that other State (whether through a permanent establishment or otherwise), shall not constitute either company a permanent establishment of the other.


ARTICLE 6

Income from Real Property

1. Income derived by a resident of a Contracting State from real property (including income from agriculture or forestry) situated in the other Contracting State may be taxed in that other State.

2. The term "real property" shall have the meaning which it has under the law of the Contracting State in which the property in question is situated. The term shall in any case include property accessory to real property, livestock and equipment used in agriculture and

forestry, rights to which the provisions of general law respecting landed property apply, usufruct of real property, and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources; ships, boats and aircraft shall not be regarded as real property.

3. The provisions of paragraph 1 shall apply to income derived from the direct use, letting, or use in any other form of real property.

4. The provisions of paragraphs 1 and 3 shall also apply to the income from real property of an enterprise and to income from real property used for the performance of independent personal services.

5. A resident of a Contracting State who is liable to tax in the other Contracting State on income from real property situated in the other Contracting State may elect for any taxable year to compute the tax on such income on a net basis as if such income were business profits attributable to a permanent establishment in such other State. Any such election shall be binding for the taxable year of the election and all subsequent taxable years unless the competent authority of the Contracting State in which the property is situated agrees to terminate the election.

## ARTICLE 7

### Business Profits

1. The business profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein. If the enterprise carries on business as aforesaid, the business profits of the enterprise may be taxed in the other State but only so much of them as is attributable to that permanent establishment.

2. Subject to the provisions of paragraph 3, where an enterprise of a Contracting State carries on business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the business profits which it might be expected to make if it were a distinct and independent enterprise engaged in the same or similar activities under the same or similar conditions. For

this purpose, the business profits to be attributed to the permanent establishment shall include only the profits derived from the assets or activities of the permanent establishment.

3. In determining the business profits of a permanent establishment, there shall be allowed as deductions expenses which are incurred for the purposes of the permanent establishment, including a reasonable allocation of executive and general administrative expenses, research and development expenses, interest, and other expenses incurred for the purposes of the enterprise as a whole (or the part thereof which includes the permanent establishment), whether incurred in the State in which the permanent establishment is situated or elsewhere.

4. No business profits shall be attributed to a permanent establishment by reason of the mere purchase by that permanent establishment of goods or merchandise for the enterprise.

5. For the purposes of the preceding paragraphs, the profits to be attributed to the permanent establishment shall be determined by the same method year by year unless there is good and sufficient reason to the contrary.

6. Where business profits include items of income which are dealt with separately in other Articles of this Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.

7. For the purposes of this Convention, the term "business profits" means income from any trade or business, including income derived by an enterprise from the performance of personal services, and from the rental of tangible personal property.

8. In applying paragraphs 1 and 2 of Article 7 (Business Profits), paragraph 6 of Article 10 (Dividends), paragraph 3 of Article 11 (Interest), paragraph 3 of Article 12 (Royalties), paragraph 3 of Article 13 (Capital Gains), Article 14 (Independent Personal Services), and paragraph 2 of Article 21 (Other Income), any income or gain attributable to a permanent establishment or fixed base during its existence is taxable in the Contracting State where such permanent establishment or fixed base is situated even if the payments are deferred until such permanent establishment or fixed base has ceased to exist.

- 12 -

## ARTICLE 8

### Shipping and Air Transport

1.  Profits of an enterprise of a Contracting State from the operation in international traffic of ships or aircraft shall be taxable only in that State.

2.  For the purposes of this Article, profits from the operation of ships or aircraft include profits derived from the rental of ships or aircraft on a full (time or voyage) basis.  They also include profits from the rental of ships or aircraft on a bareboat basis if such ships or aircraft are operated in international traffic by the lessee, or if the rental income is incidental to profits from the operation of ships or aircraft in international traffic.  Profits derived by an enterprise from the inland transport of property or passengers within either Contracting State, shall be treated as profits from the operation of ships or aircraft in international traffic if such transport is undertaken as part of international traffic.

3.  Profits of an enterprise of a Contracting State from the use, maintenance or rental of containers (including trailers, barges, and related equipment for the transport of containers) used in international traffic shall be taxable only in that State.

4.  The provisions of paragraphs 1 and 3 shall also apply to profits from the participation in a consortium, a pool, a joint business, or an international operating agency.

5.  Notwithstanding the provisions of subparagraph 2 f) and paragraph 3 of Article 5 (Permanent Establishment), the profits of an enterprise of a Contracting State from the transport by ships or aircraft of supplies or personnel to a location where offshore activities in connection with the exploration or exploitation of natural resources are being carried on in the other Contracting State, or from the operation of tugboats and similar vessels in connection with such activities, shall be taxable only in the first-mentioned State.


## ARTICLE 9

### Associated Enterprises

1.  Where

    a) an enterprise of a Contracting State participates, directly or indirectly, in the management, control, or capital of an enterprise of the other Contracting State, or

-13-

b) the same persons participate directly or indirectly in the management, control, or capital of an enterprise of a Contracting State and an enterprise of the other Contracting State,

and in either case conditions are made or imposed between the two enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which, but for those conditions, would have accrued to one of the enterprises, but by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly.

2. Where a Contracting State includes in the profits of an enterprise of that State, and taxes accordingly, profits on which an enterprise of the other Contracting State has been charged to tax in that other State, and the other Contracting State agrees that the profits so included are profits that would have accrued to the enterprise of the first-mentioned State if the conditions made between the two enterprises had been those which would have been made between independent enterprises, then that other State shall make an appropriate adjustment to the amount of the tax charged therein on those profits.  In determining such adjustment, due regard shall be had to the other provisions of this Convention and the competent authorities of the Contracting States shall if necessary consult each other.


ARTICLE 10

Dividends

1. Dividends paid by a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State the tax so charged shall not exceed:

a) 5 percent of the gross amount of the dividends if the beneficial owner is a company which holds directly at least 10 percent of the share capital of the company paying the dividends;

- 14 -

b)  15 percent of the gross amount of the dividends in all other cases.

This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3.  Subparagraph a) of paragraph 2 shall not apply in the case of dividends paid by a United States Regulated Investment Company (RIC) or United States Real Estate Investment Trust (REIT).  In the case of dividends from a RIC, subparagraph b) of paragraph 2 shall apply. In the case of dividends paid by a REIT, subparagraph b) of paragraph 2 shall apply only if:

a)  the beneficial owner of the dividends is an individual holding an interest of not more than 10 percent in the REIT;

b)  the dividends are paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent of any class of the REIT's stock; or

c)  the beneficial owner of the dividends is a person holding an interest of not more than 10 percent in the REIT and the REIT is diversified.

4.  Notwithstanding paragraph 2, dividends may not be taxed in the Contracting State of which the payor is a resident if the beneficial owner of the dividends is a resident of the other Contracting State that is a qualified governmental entity that does not control the payor of the dividend.

5.  The term "dividends" as used in this Article means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subject to the same taxation treatment as income from shares by the laws of the State of which the payor is a resident.

6.  The provisions of paragraphs 1 and 2 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State of which the payor is a resident, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the dividends are attributable to such permanent establishment or fixed base.  In such case, the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

-15-

7. A Contracting State may not impose any tax on dividends paid by a resident of the other State, except insofar as the dividends are paid to a resident of the first-mentioned State or the dividends are attributable to a permanent establishment or a fixed base situated in that State, nor may it impose tax on a corporation's undistributed profits, except as provided in paragraph 8, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in that State.

8. A corporation that is a resident of one of the States and that has a permanent establishment in the other State or that is subject to tax in the other State on a net basis on its income that may be taxed in the other State under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Capital Gains) may be subject in that other State to a tax in addition to the tax allowable under the other provisions of this Convention. Such tax, however, may be imposed on only the portion of the business profits of the corporation attributable to the permanent establishment and the portion of the income referred to in the preceding sentence that is subject to tax under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Capital Gains) that, in the case of the United States, represents the dividend equivalent amount of such profits or income and, in the case of Denmark, is an amount that is analogous to the dividend equivalent amount.

9. The tax referred to in paragraph 8 may not be imposed at a rate in excess of the rate specified in subparagraph a) of paragraph 2.


ARTICLE 11

<u>Interest</u>

1. Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2. The term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums or prizes attaching to such securities, bonds, or debentures, and all other income that is subjected to the same taxation treatment as income

-16-

from money lent by the taxation law of the Contracting State in which the income arises. Income dealt with in Article 10 (Dividends) and penalty charges for late payment shall not be regarded as interest for the purposes of this Article.

3.  The provisions of paragraph 1 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State in which the interest arises, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the interest is attributable to such permanent establishment or fixed base.  In such case the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

4.  Where, by reason of a special relationship between the payor and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payor and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount.  In such case, the excess part of the payments shall remain taxable according to the laws of each State, due regard being had to the other provisions of this Convention.

5.  Notwithstanding the provisions of paragraph 1:

a)  interest paid by a resident of a Contracting State and that is determined with reference to receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor or a related person or to any dividend, partnership distribution or similar payment made by the debtor to a related person, and paid to a resident of the other State also may be taxed in the Contracting State in which it arises, and according to the laws of that State, but if the beneficial owner is a resident of the other Contracting State, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph b) of paragraph 2 of Article 10 (Dividends); and

b)  interest that is an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit may be taxed by each State in accordance with

- 17 -

its domestic law.

## ARTICLE 12

### Royalties

1. Royalties arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2. The term "royalties" as used in this Article means:

a) any consideration for the use of, or the right to use, any copyright of literary, artistic, scientific or other work (including computer software, cinematographic films, audio or video tapes or disks, and other means of image or sound reproduction), any patent, trademark, design or model, plan, secret formula or process, or other like right or property, or for information concerning industrial, commercial or scientific experience; and

b) gain derived from the alienation of any property described in subparagraph a), provided that such gain is contingent on the productivity, use or disposition of the property.

3. The provisions of paragraph 1 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State in which the royalties arise, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the royalties are attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

4. Where, by reason of a special relationship between the payor and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to the use, right, or information for which they are paid, exceeds the amount which would have been agreed upon by the payor and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each

-18-

Contracting State, due regard being had to the other provisions of this Convention.

ARTICLE 13

Capital Gains

1. Gains derived by a resident of a Contracting State that are attributable to the alienation of real property situated in the other Contracting State may be taxed in that other State.

2. For the purposes of this Article, the term "real property situated in the other Contracting State" shall include:

        a)  real property referred to in Article 6 (Income from Real Property);

        b)  a United States real property interest; and

        c)  an equivalent interest in real property situated in Denmark.

3. Gains from the alienation of personal property that are attributable to a permanent establishment that an enterprise of a Contracting State has in the other Contracting State or that are attributable to a fixed base that is available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services, and gains from the alienation of such a permanent establishment (alone or with the whole enterprise) or of such a fixed base, may be taxed in that other State.

4. Notwithstanding the provisions of paragraph 3, gains derived by an enterprise of a Contracting State from the alienation of ships, boats, aircraft, or containers operated or used in international traffic or personal property pertaining to the operation or use of such ships, boats, aircraft, or containers shall be taxable only in that State.

5. Gains derived by an enterprise of a Contracting State from the deemed alienation of an installation, drilling rig, or ship used in the other Contracting State for the exploration for or exploitation of oil and gas resources may be taxed in that other State in accordance with its law, but only to the extent of any depreciation taken in that other State.

6. Gains from the alienation of any property, other than that referred to in paragraphs 1 through 5, shall be taxable only in the Contracting State of which the alienator is a resident.

7. If a resident of a Contracting State is subject to income taxation in both Contracting

States on a disposition of property and is treated as having alienated property with respect to which a gain is recognized under the income tax laws of the other Contracting State, then the resident not otherwise required to do so may elect in his annual return of income for the year of the alienation to be liable to tax in the residence State in that year as if he had, immediately before that time, sold and repurchased such property for an amount equal to its fair market value at that time. Such an election shall apply to all property described in this paragraph that is alienated by the resident in the taxable year for which the election is made or at any time thereafter.

8. Where a resident of a Contracting State alienates property in the course of a corporate or other organization, reorganization, amalgamation, division or similar transaction and profit, gain or income with respect to such alienation is not recognized for the purpose of taxation in that State, the competent authority of the other Contracting State may agree, if requested to do so by the person who acquires the property, in order to avoid double taxation and subject to terms and conditions satisfactory to such competent authority, to defer the recognition of the profit, gain or income with respect to such property for the purpose of taxation in that other State until such time and in such manner as may be stipulated in the agreement.


ARTICLE 14

Independent Personal Services

1. Income derived by an individual who is a resident of a Contracting State in respect of the performance of personal services of an independent character shall be taxable only in that State, unless the individual has a fixed base regularly available to him in the other Contracting State for the purpose of performing his activities. If he has such a fixed base, the income attributable to the fixed base that is derived in respect of services performed in that other State also may be taxed by that other State.

2. For purposes of paragraph 1, the income that is taxable in the other Contracting State shall be determined under the principles of paragraph 3 of Article 7 (Business Profits).

- 20 -

## ARTICLE 15

### Dependent Personal Services

1. Subject to the provisions of Articles 16 (Directors' Fees), 18 (Pensions, Social Security, Annuities, Alimony and Child Support Payments), and 19 (Government Service), salaries, wages and other remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2. Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

    a) the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in any twelve month period commencing or ending in the taxable year concerned; and

    b) the remuneration is paid by, or on behalf of, an employer who is not a resident of the other State; and

    c) the remuneration is not borne by a permanent establishment or a fixed base which the employer has in the other State.

3. Notwithstanding the preceding provisions of this Article, remuneration described in paragraph 1 that is derived by a resident of a Contracting State in respect of an employment as a member of the regular complement of a ship or aircraft operated in international traffic shall be taxable only in that State.

## ARTICLE 16

### Directors' Fees

Directors' fees and other similar payments derived by a resident of a Contracting State in his capacity as a member of the board of directors of a company which is a resident of the other Contracting State may be taxed in that other State.

−21−

ARTICLE 17

Artistes and Sportsmen

1.  Income derived by a resident of a Contracting State as an entertainer, such as a theater, motion picture, radio, or television artiste, or a musician, or as a sportsman, from his personal activities as such exercised in the other Contracting State, which income would be exempt from tax in that other Contracting State under the provisions of Articles 14 (Independent Personal Services) and 15 (Dependent Personal Services), may be taxed in that other State, except where the amount of the gross receipts derived by such entertainer or sportsman, including expenses reimbursed to him, or borne on his behalf, from such activities does not exceed twenty thousand United States dollars ($20,000) or its equivalent in Danish kroner for the taxable year concerned.

2.  Where income in respect of activities exercised by an entertainer or a sportsman in his capacity as such accrues not to the entertainer or sportsman himself but to another person, that income may, notwithstanding the provisions of Articles 7 (Business Profits) and 14 (Independent Personal Services), be taxed in the Contracting State in which the activities of the entertainer or sportsman are exercised, unless the entertainer or sportsman establishes that neither the entertainer or sportsman nor persons related thereto participate directly or indirectly in the profits of that other person in any manner, including the receipt of deferred remuneration, bonuses, fees, dividends, partnership distributions, or other distributions.

ARTICLE 18

Pensions, Social Security, Annuities, Alimony

and Child Support Payments

1.  Subject to the provisions of paragraph 2 of Article 19 (Government Service),

a)  Except as provided in subparagraph b), pension distributions arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in the State in which they arise;

b)  If, prior to the time of entry into force of this Convention, a person was a resident of a Contracting State and was receiving pension distributions arising in the

- 22 -

other Contracting State, that person shall be taxable on pension distributions referred to in subparagraph a) only in the first-mentioned Contracting State;

   c) Pension distributions shall be deemed to arise in a Contracting State only if paid by a pension scheme established in that State.

   d) For purposes of this paragraph, pension distributions means pension distributions and other similar remuneration, whether paid periodically or as a single sum.

  2. Notwithstanding the provisions of paragraph 1, payments made by a Contracting State under provisions of the social security or similar legislation of that Contracting State to a resident of the other Contracting State or to a citizen of the United States shall be taxable only in the first-mentioned State.

  3. Annuities derived and beneficially owned by an individual resident of a Contracting State shall be taxable only in that State. The term "annuities" as used in this paragraph means a stated sum paid periodically at stated times during a specified number of years or for life under an obligation to make the payments in return for adequate and full consideration (other than services rendered).

  4. Alimony paid by a resident of a Contracting State, and deductible therein, to a resident of the other Contracting State shall be taxable only in that other Contracting State. The term "alimony" as used in this paragraph means periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, which payments are taxable to the recipient under the laws of the State of which he is a resident.

  5. Periodic payments, not dealt with in paragraph 4, for the support of a child made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, paid by a resident of a Contracting State to a resident of the other Contracting State, shall be taxable only in the first-mentioned Contracting State.

- 23 -

## ARTICLE 19

### Government Service

1. Notwithstanding the provisions of Articles 14 (Independent Personal Services), 15 (Dependent Personal Services), 16 (Directors' Fees) and 17 (Artistes and Sportsmen):

a) Salaries, wages and other remuneration, other than a pension, paid from the public funds of a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority in the discharge of functions of a governmental nature shall, subject to the provisions of subparagraph b), be taxable only in that State;

b) such remuneration, however, shall be taxable only in the other Contracting State if the services are rendered in that State and the individual is a resident of that State who:

(i) is a national of that State; or

(ii) did not become a resident of that State solely for the purpose of rendering the services.

2.     a) Any pension paid from the public funds of a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority in the discharge of functions of a governmental nature (other than a payment described in paragraph 2 of Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support Payments)) shall, subject to the provisions of subparagraph b), be taxable only in that State;

b) such pension, however, shall be taxable only in the other Contracting State if the individual is a resident or a national of that State.

3. The provisions of Articles 15 (Dependent Personal Services), 16 (Directors' Fees), 17 (Artistes and Sportsmen) and 18 (Pensions, Social Security, Annuities, Alimony and Child Support Payments) shall apply to remuneration and pensions in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof.

- 24 -

## ARTICLE 20

### Students and Trainees

Payments received by a student, apprentice, or business trainee who is, or was immediately before visiting a Contracting State, a resident of the other Contracting State, and who is present in the first-mentioned State for the purpose of his full-time education at an accredited educational institution, or for his full-time training, shall not be taxed in that State, provided that such payments arise outside that State, and are for the purpose of his maintenance, education or training.  The exemption from tax provided by this Article shall apply to an apprentice or business trainee only for a period of time not exceeding three years from the date he first arrives in the first-mentioned Contracting State for the purpose of his training.  The provisions of this paragraph shall not apply to income from research if such research is undertaken not in the public interest but primarily for the private benefit of a specific person or persons.

## ARTICLE 21

### Other Income

1. Items of income beneficially owned by a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State.

2. The provisions of paragraph 1 shall not apply to income, other than income from real property as defined in paragraph 2 of Article 6 (Income from Real Property), if the beneficial owner of such income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein, or performs in the other State independent personal services from a fixed base situated therein, and the income is attributable to such permanent establishment or fixed base.  In such case the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

−25−

ARTICLE 22

Limitation of Benefits

1.  A resident of a Contracting State shall be entitled to the benefits of this Convention only to the extent provided in this Article.

2.  A resident of a Contracting State shall be entitled to all the benefits of this Convention only if such resident is:

a)  an individual;

b)  a Contracting State, a political subdivision, or local authority thereof, or an agency or instrumentality of that State, subdivision, or authority;

c)  a company if:

(i)  all the shares in the class or classes of shares representing more than 50 percent of the vote and value are listed on a recognized stock exchange and are substantially and regularly traded on one or more recognized stock exchanges;

(ii)  one or more taxable nonstock corporations entitled to benefits under paragraph g) own shares representing more than 50 percent of the voting power of the company and all other shares are listed on a recognized stock exchange and are substantially and regularly traded on one or more recognized stock exchanges; or

(iii)  at least 50 percent of each class of shares in the company is owned, directly or indirectly, by five or fewer companies entitled to benefits under clause (i) or (ii), or any combination thereof, provided that in the case of indirect ownership, each intermediate owner is a person entitled to benefits of the Convention under this paragraph;

d)  a charitable organization or other legal person described in subparagraph b)(i) of paragraph 1 of Article 4 (Residence);

e)  a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan, provided that more than 50

percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State; or

f)  a person, other than an individual, if

(i)  on at least half the days of the taxable year, persons described in subparagraphs a), b), c), d), or e) own, directly or indirectly (through a chain of ownership in which each person is entitled to the benefits of the Convention under this paragraph), at least 50 percent of the beneficial interest in such person (or, in the case of a company, at least 50 percent of the vote and value of the company's shares); and

(ii)  less than 50 percent of the person's gross income for the taxable year is paid or accrued, in the form of deductible payments, directly or indirectly, to persons who are not residents of either Contracting State (unless the payment is attributable to a permanent establishment situated in either State);

g)  in the case of Denmark, a taxable nonstock corporation if

(i)  the amount paid or accrued in the form of deductible payments in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a), b), c)(i), c)(iii) by virtue of c)(i), d) or e), does not exceed 50% of the amount of its gross income (excluding its tax-exempt income); and

(ii)  the amount paid or accrued, in the form of both deductible payments and non-deductible distributions, in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a), b), c)(i), c(iii) by virtue of c(i), d), or e), does not exceed 50% of the amount of its total income (including its tax-exempt income).

3.    a)  A resident of a Contracting State not otherwise entitled to benefits shall be entitled to the benefits of this Convention with respect to an item of income derived from the other Contracting State if:

(i)  the resident is engaged in the active conduct of a trade or business in the first-mentioned Contracting State;

(ii)  the income is connected with or incidental to the trade or business in the first-mentioned Contracting State; and

(iii)  the trade or business is substantial in relation to the activity in the other State generating the income.

b)  For purposes of this paragraph, the business of making or managing investments will not be considered an active trade or business, unless the activity is banking, insurance or securities activities carried on by a bank, insurance company, or registered securities dealer.

c)  Whether a trade or business is substantial for purposes of this paragraph will be determined based on all the facts and circumstances.  In any case, however, a trade or business will be deemed substantial if, for the preceding taxable year, or for the average of the three preceding taxable years, the asset value, the gross income, and the payroll expense that are related to the trade or business in the first-mentioned State equal at least 7.5 percent of the resident's (and any related parties') proportionate share of the asset value, gross income and payroll expense, respectively, that are related to the activity that generated the income in the other State, and the average of the three ratios exceeds 10 percent.  In determining the above ratios, assets, income, and payroll expense shall be taken into account only to the extent of the resident's direct or indirect ownership interest in the activity in the other State.  If neither the resident nor any of its associated enterprises has an ownership interest in the activity in the other State, the resident's trade or business in the first-mentioned State shall be considered substantial in relation to such activity.

d)  Income is derived in connection with a trade or business if the activity in the other State generating the income is a line of business that forms part of or is complementary to the trade or business.  Income is incidental to a trade or business if it facilitates the conduct of the trade or business in the other State.

4.        a)  A company that is a resident of a Contracting State shall also be entitled to

all of the benefits of the Convention if:

> (i)  at least 95 percent of the aggregate vote and value of all its shares is owned, directly or indirectly, by seven or fewer persons that are residents of Member States of the European Union, or  of the European Economic Area, or of parties to the North American Free Trade Agreement (NAFTA) that, in any case, meet the requirements of subparagraph c), or any combination thereof; and

> (ii)  less than 50 percent of the company's gross income for the taxable year is paid or accrued, in the form of deductible payments, directly or indirectly, to persons who are not residents of Member States of the European Union, or of the European Economic Area, or of parties to the North American Free Trade Agreement that, in any case, meet the requirements of subparagraph c), or any combination thereof.

b)  However, a company otherwise entitled to benefits under subparagraph a) will not be entitled to the benefits of this Convention if that company, or a company that controls such company, has outstanding a class of shares:

> (i)  the terms of which, or which is subject to other arrangements that, entitle its holders to a portion of the income of the company derived from the other Contracting State that is larger than the portion such holders would receive absent such terms or arrangements; and

> (ii)  50 percent or more of the vote or value of which is owned by persons who are not residents of a Member State of the European Union or the European Economic Area or a party to the North American Free Trade Agreement that, in any case, meet the requirements of subparagraph c), or any combination thereof.

c)  For purposes of subparagraphs a) and b), a person will be treated as a resident of a Member State of the European Union or of the European Economic Area or of a party to the North American Free Trade Agreement only if such person:

> (i)  would be entitled to the benefits of a comprehensive income tax

- 29 -

convention in force between any Member State of the European Union or of the European Economic Area or a party to the North American Free Trade Agreement and the Contracting State from which the benefits of this Convention are claimed, provided that if such other convention does not contain a comprehensive limitation on benefits article (including provisions similar to those of subparagraphs c) and f) of paragraph 2 and paragraph 3 of this Article), the person would be entitled to the benefits of this Convention under the principles of paragraph 2 if such person were a resident of one of the Contracting States under Article 4 (Residence) of this Convention; and

(ii)  with respect to income referred to in Articles 10 (Dividends), 11 (Interest) or 12 (Royalties), would be entitled under such other convention to a rate of tax with respect to the particular class of income for which benefits are being claimed under this Convention that is at least as low as the rate applicable under this Convention.

5.  A resident of one of the Contracting States that derives from the other Contracting State income mentioned in Article 8 (Shipping and Air Transport) and that is not entitled to the benefits of this Convention because of the foregoing paragraphs, shall nevertheless be entitled to the benefits of this Convention with respect to such income if at least 50% of the beneficial interest in such person (or in the case of a company, at least 50% of the aggregate vote and value of the stock of such company) is owned directly or indirectly:

a)  by persons described in subparagraphs a), b), c), d), or e) of paragraph 2, or citizens of the United States, or individuals who are residents of a third state; or

b)  by a company or combination of companies the stock of which is primarily and regularly traded on an established securities market in a third state, provided that such third state grants an exemption under similar terms for profits as mentioned in Article 8 (Shipping and Air Transport) of this Convention to citizens and corporations of the other Contracting State either under its national law or in common agreement with that other Contracting State or under a convention between that third state and the other Contracting State.

6.  The following rules and definitions shall apply for purposes of this Article:

    a)  in measuring "gross income", as used in subparagraph f) of paragraph 2, the term means gross income for the first taxable period preceding the current taxable period, provided that the amount of gross income for the first taxable period preceding the current taxable period shall be deemed to be no less than the average of the annual amounts of gross income for the four taxable periods preceding the current taxable period;

    b)  the term "deductible payments"

      (i)  as used in subparagraphs f) and g) of paragraph 2 and subparagraph a) of paragraph 4 includes payments for interest or royalties, but does not include payments at arm's length for the purchase or use of or the right to use tangible property in the ordinary course of business or remuneration at arm's length for services performed in the Contracting State in which the person making such payments is a resident; and

      (ii)  as used in subparagraph g) of paragraph 2 also includes deductible distributions made by a taxable nonstock corporation.

Types of payments may be added to, or eliminated from, the exceptions mentioned in the preceding definition of "deductible payments" by mutual agreement of the competent authorities;

    c)  For the purposes of this Article, the term "recognized stock exchange" means:

      (i)  the NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange for purposes of the U.S. Securities Exchange Act of 1934;

      (ii)  the Copenhagen Stock Exchange and the stock exchanges of Amsterdam, Brussels, Frankfurt, Hamburg, London, Paris, Stockholm, Sydney, Tokyo and Toronto;

      (iii)  any other stock exchanges agreed upon by the competent

-31-

authorities of both Contracting States;

d)  the term "engaged in the active conduct of a trade or business" in a Contracting State as used in paragraph 3, applies to a person that is directly so engaged, or is a partner in a partnership that is so engaged, or is so engaged through one or more associated enterprises (wherever resident);

e)  the term "taxable nonstock corporation" as used in paragraph 2 means a foundation that is taxable in accordance with paragraph 1 of Article 1 of the Danish Act on Taxable Nonstock Corporations (fonde der beskattes efter fondsbeskatningsloven).

f)        (i)  For the purposes of paragraph 2, the shares in a class of shares are considered to be substantially and regularly traded on one or more recognized stock exchanges in a taxable year if:

(1)  trades in such class are effected on one or more of such stock exchanges other than in de minimis quantities during every quarter; and

(2)  the aggregate number of shares or units of that class traded on such stock exchange or exchanges during the previous taxable year is at least 6 percent of the average number of shares or units outstanding in that class (including shares held by taxable nonstock corporations) during that taxable year.

(ii)  For purposes of determining whether a company satisfies the requirements of clause (c)(ii) of paragraph 2, clause (i) of this subparagraph shall be applied as if all the shares issued by the company were one class of shares, and shares held by taxable nonstock corporations will be considered outstanding for purposes of determining whether 6 percent of the outstanding shares have been traded during a taxable year.

7.  A resident of a Contracting State that is not entitled to the benefits of the Convention under the provisions of the preceding paragraphs of this Article shall, nevertheless, be granted the benefits of the Convention if the competent authority of the other Contracting State so determines.

ARTICLE 23

Relief from Double Taxation

1. In accordance with the provisions and subject to the limitations of the law of the

United States (as it may be amended from time to time without changing the general principle

hereof), the United States shall allow to a resident or citizen of the United States as a credit

against the United States tax on income:

a) the income tax paid or accrued to Denmark by or on behalf of such resident

or citizen; and

b) in the case of a United States company owning at least 10 percent of the

voting stock of a company that is a resident of Denmark and from which the United

States company receives dividends, the income tax paid or accrued to Denmark by or on

behalf of the payor with respect to the profits out of which the dividends are paid.

c)    (i) Subject to the provisions of clause (ii), in the case of a resident or

national of the United States subject to the taxes imposed by the Hydrocarbon

Tax Act that are referred to in subparagraph b)(iv) of paragraph 1 of Article 2

(Taxes Covered), the United States shall allow as a credit against the United

States tax on income, the appropriate amount of tax paid or accrued to

Denmark by or on behalf of such resident or national pursuant to the

Hydrocarbon Tax Act on oil and gas extraction income from oil or gas wells in

Denmark. However, the appropriate amount allowed as a credit shall not

exceed the product of the maximum statutory United States tax rate applicable

to such resident or national for such taxable year, and the amount of income

separately assessed under the Hydrocarbon Tax Act.

(ii) The appropriate amount is also subject to any other limitations

imposed by the law of the United States, as it may be amended from time to

time, that apply to creditable taxes under section 901 or 903 of the Internal

Revenue Code for persons claiming benefits under this Convention. Any taxes

paid on income assessed separately under the Hydrocarbon Tax Act in excess

of the appropriate amount may be used only as a credit in another taxable year,

and only against United States tax on income assessed separately under the Hydrocarbon Tax Act.

(iii)  The provisions of clauses (i) and (ii) shall apply separately, in the same way, to the amount of tax paid or accrued to Denmark pursuant to the Hydrocarbon Tax Act on (1) Danish source oil related income not described in clause (i); and (2) other Danish source income.

For the purposes of this Article, the Danish taxes referred to in paragraphs 1(b) and 2 of Article 2 (Taxes Covered) shall be considered income taxes and shall be allowed as a credit against the United States tax on income, subject to all the provisions and limitations of this paragraph.

2.  Where a United States citizen is a resident of Denmark:

a)  with respect to items of income that under the provisions of this Convention are exempt from United States tax or that are subject to a reduced rate of United States tax when derived by a resident of Denmark who is not a United States citizen, Denmark shall allow as a credit against Danish tax only the tax paid, if any, that the United States may impose under the provisions of this Convention, other than taxes that may be imposed solely by reason of citizenship under the saving clause of paragraph 4 of Article 1 (General Scope);

b)  for purposes of computing United States tax on those items of income referred to in subparagraph a), the United States shall allow as a credit against United States tax the income tax paid to Denmark after the credit referred to in subparagraph a); the credit so allowed shall not reduce the portion of the United States tax that is creditable against the Danish tax in accordance with subparagraph a); and

c)  for the exclusive purpose of relieving double taxation in the United States under subparagraph b), items of income referred to in subparagraph a) shall be deemed to arise in Denmark to the extent necessary to avoid double taxation of such income under subparagraph b).

3.  In the case of Denmark, double taxation shall be avoided as follows:

a)  When a resident of Denmark derives income which, in accordance with the provisions of this Convention, may be taxed in the United States, Denmark shall allow

as a deduction from the tax on the income of that resident an amount equal to the income tax paid in the United States;

       b) Such deduction shall not, however, exceed that part of the income tax, as computed before the deduction is given, which is attributable to the income that may be taxed in the United States.

       c) When a resident of Denmark derives income which, in accordance with the provisions of this Convention, shall be taxable only in the United States, Denmark may include this income in the tax base but shall allow as a deduction from income tax that part of the income tax which is attributable to the income derived from the United States.

For the purposes of this paragraph, the United States taxes referred to in paragraphs 1(a) and 2 of Article 2 (Taxes Covered) shall be considered income taxes, and shall be allowed as a credit against the Danish tax on income.


## ARTICLE 24

### Non-Discrimination

    1. Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which citizens of that other State in the same circumstances, particularly with respect to taxation of worldwide income, are or may be subjected. This provision shall also apply to persons who are not residents of one or both of the Contracting States.

    2. The taxation on a permanent establishment or fixed base that a resident or enterprise of a Contracting State has in the other Contracting State shall not be less favorably levied in that other State than the taxation levied on enterprises or residents of that other State carrying on the same activities. The provisions of this paragraph shall not be construed as obliging a Contracting State to grant to residents of the other Contracting State any personal allowances, reliefs, and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents.

-35-

3. Except where the provisions of paragraph 1 of Article 9 (Associated Enterprises), paragraph 4 of Article 11 (Interest), or paragraph 4 of Article 12 (Royalties) apply, interest, royalties and other disbursements paid by an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable profits of such enterprise, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State. Similarly, any debts of an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable capital of the first-mentioned resident, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State.

4. Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned State are or may be subjected.

5. Nothing in this Article shall be construed as preventing either Contracting State from imposing a tax as described in paragraph 8 of Article 10 (Dividends).

6. The provisions of this Article shall, notwithstanding the provisions of Article 2 (Taxes Covered), apply to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof.


ARTICLE 25

Mutual Agreement Procedure

1. Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States and the time limits prescribed in such laws for presentation of claims for refund, present his case to the competent authority of the Contracting State of which he is a resident or national.

2. The competent authority shall endeavour, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual

agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention.  Any agreement reached shall be implemented notwithstanding any time limits in the domestic law of the Contracting States.  Assessment and collection procedures shall be suspended during the pendency of any mutual agreement proceeding.

3.  The competent authorities of the Contracting States shall endeavour to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention.  In particular the competent authorities of the Contracting States may agree:

a)  to the same attribution of income, deductions, credits, or allowances of an enterprise of a Contracting State to its permanent establishment situated in the other Contracting State;

b)  to the same allocation of income, deductions, credits, or allowances between persons;

c)  to the same characterization of particular items of income, including the same characterization of income that is assimilated to income from shares by the taxation law of one of the Contracting States and that is treated as a different class of income in the other State;

d)  to the same characterization of persons;

e)  to the same application of source rules with respect to particular items of income;

f)  to a common meaning of a term;

g)  to advance pricing arrangements; and

h)  to the application of the provisions of domestic law regarding penalties, fines, and interest in a manner consistent with the purposes of the Convention.

They may also consult together for the elimination of double taxation in cases not provided for in the Convention.

4.  The competent authorities also may agree to increases in any specific dollar amounts referred to in the Convention to reflect economic or monetary developments.

5.  The competent authorities of the Contracting States may communicate with each

-37-

other directly for the purpose of reaching an agreement in the sense of the preceding paragraphs.

ARTICLE 26

Exchange of Information

1.  The competent authorities of the Contracting States shall exchange such information as is relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention insofar as the taxation thereunder is not contrary to the Convention, including information relating to the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention.  The exchange of information is not restricted by Article 1 (General Scope).  Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention or the oversight of the above.  Such persons or authorities shall use the information only for such purposes.  They may disclose the information in public court proceedings or in judicial decisions.

2.  In no case shall the provisions of paragraph 1 be construed so as to impose on a Contracting State the obligation:

a)  to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

b)  to supply information which is not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State; or

c)  to supply information which would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public).

3.  Notwithstanding paragraph 2, the competent authority of the requested State shall

have the authority to obtain and provide information held by financial institutions, nominees or persons acting in an agency or fiduciary capacity, or respecting interests in a person. If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall obtain that information in the same manner and to the same extent as if the tax of the first-mentioned State were the tax of that other State and were being imposed by that other State, notwithstanding that the other State may not, at that time, need such information for purposes of its own tax. If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, and writings), to the same extent such depositions and documents can be obtained under the laws and administrative practices of that other State with respect to its own taxes.

4. For purposes of this Article, the Convention shall apply, notwithstanding the provisions of Article 2 (Taxes Covered), to taxes of every kind imposed by a Contracting State.

ARTICLE 27

Administrative Assistance

1. The Contracting States undertake to lend assistance to each other in the collection of taxes referred to in Article 2 (Taxes Covered), together with interest, costs, additions to such taxes, and civil penalties, referred to in this Article as a "revenue claim."

2. An application for assistance in the collection of a revenue claim shall include a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

3. A revenue claim of the applicant State that has been finally determined may be accepted for collection by the competent authority of the requested State and, subject to the provisions of paragraph 7, if accepted shall be collected by the requested State as though such

revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes.

4. Where an application for collection of a revenue claim in respect of a taxpayer is accepted

    a) by the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received; and

    b) by Denmark, the revenue claim shall be treated by Denmark as an assessment under Danish laws against the taxpayer as of the time the application is received.

5. Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State, based on any such rights that may be available under the laws of either Contracting State. If, at any time pending execution of a request for assistance under this Article, the applicant State loses the right under its internal law to collect the revenue claim, the competent authority of the applicant State shall promptly withdraw the request for assistance in collection.

6. Subject to this paragraph, amounts collected by the requested State pursuant to this Article shall be forwarded to the competent authority of the applicant State. Unless the competent authorities of the Contracting States otherwise agree, the ordinary costs incurred in providing collection assistance shall be borne by the requested State and any extraordinary costs so incurred shall be borne by the applicant State.

7. A revenue claim of an applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested State.

8. No assistance shall be provided under this Article for a revenue claim in respect of a taxpayer to the extent that the taxpayer can demonstrate that

    a) where the taxpayer is an individual, the revenue claim relates to a taxable period in which the taxpayer was a citizen of the requested State, and

    b) where the taxpayer is an entity that is a company, estate or trust, the

- 40 -

revenue claim relates to a taxable period in which the taxpayer derived its status as such an entity from the laws in force in the requested State.

9. Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto.

10. Nothing in this Article shall be construed as imposing on either Contracting State the obligation to carry out administrative measures of a different nature from those used in the collection of its own taxes or that would be contrary to its public policy (ordre public).

11. The competent authorities of the Contracting States shall agree upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States.

12. The requested State shall not be obliged to accede to the request of the applicant State:

    a) if the applicant State has not pursued all appropriate collection action in its own jurisdiction; or

    b) in those cases where the administrative burden for the requested State is disproportionate to the benefit to be derived by the applicant State.

## ARTICLE 28

### Diplomatic Agents and Consular Officers

Nothing in this Convention shall affect the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements.

- 41 -

## ARTICLE 29

### Entry into Force

1. The Contracting States shall notify each other when the requirements for the entry into force of this Convention have been complied with.

2. The Convention shall enter into force on the date of the receipt of the later of such notifications, and its provisions shall have effect:

    a) in respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;

    b) in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Convention enters into force.

3. Subject to paragraph 4, the Convention between Denmark and the United States for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income signed at Washington, D.C., on May 6, 1948 (hereinafter referred to as "the 1948 Convention") shall cease to have effect when the provisions of this Convention take effect in accordance with paragraph 2 or 4.

4. Where the 1948 Convention would have afforded any person any greater relief from tax than this Convention, the 1948 Convention shall, at the election of any person that was entitled to benefits under the prior Convention, continue to have effect in its entirety for one year after the date on which the provisions of this Convention would otherwise first have effect pursuant to paragraph 2.

5. The 1948 Convention shall terminate on the last date on which it has effect in accordance with the foregoing provisions of this Article.

- 42 -

ARTICLE 30

<u>Termination</u>

This Convention shall remain in force until terminated by a Contracting State. Either Contracting State may terminate the Convention by giving notice of termination through diplomatic channels.  In such event, the Convention shall cease to have effect:

      a)  in respect of taxes withheld at source, for amounts paid or credited after the expiration of the 6-month period beginning on the date on which notice of termination was given; and

      b)  in respect of other taxes, for taxable periods beginning on or after the expiration of the 6-month period beginning on the date on which notice of termination was given.

- 43 -

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Convention.

DONE at Washington in the English language, this 19th day of August , 1999.

FOR THE GOVERNMENT OF THE                 FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:                 KINGDOM OF DENMARK:

## PROTOCOL

At the signing today of the Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income ("the Convention"), the undersigned have agreed on the following provisions, which shall form an integral part of the Convention.

1. Scandinavian Airlines System (SAS) is a consortium within the meaning of Article 8 (Shipping and Air Transport), its participating members being SAS Danmark A/S, SAS Norge ASA and SAS Sverige AB.  In order to avoid the problems inherent in operating in the United States through a consortium, the members of the consortium in 1946 established a New York corporation, Scandinavian Airlines System, Inc. (SAS, Inc.) to act on their behalf in the United States pursuant to an agency agreement dated September 18, 1946.  A similar agreement was entered into by SAS directly and SAS, Inc., on March 14, 1951.  Pursuant to the agency agreement, SAS, Inc., is authorized to perform only such functions as SAS assigns to it, all in connection with international air traffic.  Under that agreement, all revenues collected by SAS, Inc., are automatically credited to SAS. Operation expenses incurred by SAS, Inc., are debited to SAS in accordance with the terms of the agency agreement.  SAS is obligated under the terms of the agency agreement to reimburse SAS, Inc. for all of its expenses irrespective of the revenues of SAS, Inc.  SAS, Inc., does not perform any functions except those connected with or incidental to the business of SAS as an operator of aircraft in international traffic.

In view of the special nature of the SAS consortium and in view of the agency agreement as described above, the United States for purposes of Article 8 (Shipping and Air Transport) of the Convention shall treat all of the income earned by SAS, Inc., that is derived from the operation in international traffic of aircraft as the income of the SAS consortium.

2. This Convention may be extended either in its entirety or with any necessary modifications to any part of Denmark to which the Convention does not apply and which imposes taxes substantially similar in character to those to which the Convention applies.  Such extension shall take effect from such date, shall be subject to such modification and conditions as may be specified in a supplementary Convention agreed between the Contracting States, and shall enter into force in accordance with their constitutional procedures.

- 2 -

3.  Articles 7 (Business Profits) and 24 (Non-Discrimination) shall not prevent Denmark from continuing to tax permanent establishments of United States insurance companies in accordance with section 12, paragraph 3, of the Danish Company Tax law nor shall it prevent the United States from continuing to tax permanent establishments of Danish insurance companies in accordance with section 842(b) of the Internal Revenue Code.

4.          a)  A payment shall be treated as a pension distribution under paragraph 1 of Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support Payments) if it is a payment under a pension scheme recognized for tax purposes in the Contracting State where the pension scheme is established.

b)  For this purpose, pension schemes recognized for tax purposes shall include the following and any identical or substantially similar schemes which are imposed after the date of signature of the Convention:

(i)  Under United States law, qualified plans under section 401(a) of the Internal Revenue Code, individual retirement plans (including individual retirement plans that are part of a simplified employee pension plan that satisfies section 408(k), individual retirement accounts, individual retirement annuities, section 408(p) accounts, and Roth IRAs under section 408A), section 403(a) qualified annuity plans, and section 403(b) plans.

(ii)  Under the law of Denmark, pension schemes under Section I of the Act on Taxation of Pension Schemes (pensionsbeskatningslovens afsnit I).

- 3 -

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective

Governments, have signed this Protocol.

DONE at Washington in the English language, this 19th day of August , 1999.

FOR THE GOVERNMENT OF THE                FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:                KINGDOM OF DENMARK:

# Exhibit 3

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 07-1228

# DOUBLE TAXATION

## Taxes on Income

**Protocol Between the**

**UNITED STATES OF AMERICA**

**and DENMARK**

Amending the Convention of August 19, 1999

Signed at Copenhagen May 2, 2006

with

A Related Exchange of Notes



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
 evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# DENMARK

## Double Taxation:  Taxes on Income

*Protocol amending the convention of August 19, 1999.*
*Signed at Copenhagen May 2, 2006;*
*Transmitted by the President of the United States of America*
*        to the Senate September 29, 2006 (Treaty Doc. 109-19,*
*        109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
*        October 31, 2007 (Senate Executive Report No. 110-3,*
*        110th Congress, 1st Session);*
*Advice and consent to ratification by the Senate*
*        November 16, 2007;*
*Ratified by the President December 21, 2007;*
*Entered into force December 28, 2007.*
*With a related exchange of notes.*

PROTOCOL

AMENDING THE CONVENTION BETWEEN

THE GOVERNMENT OF THE KINGDOM OF DENMARK

AND THE GOVERNMENT OF THE UNITED STATES OF AMERICA

FOR THE AVOIDANCE OF DOUBLE TAXATION

AND THE PREVENTION OF FISCAL EVASION

WITH RESPECT TO TAXES ON INCOME

The Government of the Kingdom of Denmark and the Government of the United States of America, desiring to amend the Convention between the Government of the Kingdom of Denmark and the Government of the United States of America for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, signed at Washington on August 19, 1999 (hereinafter referred to as "the Convention"),

Have agreed as follows:

## ARTICLE I

Paragraph 4 of Article 1 (General Scope) of the Convention is omitted and the following paragraph is substituted:

"4.    Except to the extent provided in paragraph 5, this Convention shall not affect the taxation by a Contracting State of its residents (as determined under Article 4 (Residence)) and its citizens.  Notwithstanding the other provisions of this Convention, a former citizen or long-term resident of a Contracting State may, for the period of ten years following the loss of such status, be taxed in accordance with the laws of that Contracting State."

## ARTICLE II

1.    Article 10 (Dividends) of the Convention shall be omitted and the following shall be substituted:

## "ARTICLE 10

### Dividends

1.    Dividends paid by a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2.    However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident, and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed:

a)    5 percent of the gross amount of the dividends if the beneficial owner is a company which holds directly at least 10 percent of the share capital of the company paying the dividends;

b)    15 percent of the gross amount of the dividends in all other cases.

This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3.       Notwithstanding the provisions of paragraph 2, such dividends shall not be taxed in the Contracting State of which the company paying the dividends is a resident if the beneficial owner is:

a)       a company that is a resident of the other Contracting State that has owned, directly or indirectly through one or more residents of either Contracting State, shares representing 80 percent or more of the voting power in the company paying the dividends for a 12-month period ending on the date on which entitlement to the dividends is determined and:

(i)      satisfies the conditions of clause (i),(ii) or (iii) of subparagraph c) of paragraph 2 of Article 22 (Limitation of Benefits);

(ii)     satisfies the conditions of clauses (i) and (ii) of subparagraph f) of paragraph 2 of Article 22, provided that the company satisfies the conditions described in paragraph 4 of that Article with respect to the dividends;

(iii)    is entitled to benefits with respect to the dividends under paragraph 3 of Article 22; or

(iv)    has received a determination pursuant to paragraph 7 of Article 22 with respect to this paragraph; or

b)       a qualified governmental entity that is a resident of the other Contracting State and that does not control the payor of the dividend; or

c)       a pension fund, which is described in subparagraph e) of paragraph 2 of Article 22 (Limitation of Benefits), that is a resident of the other Contracting State, provided that such dividends are not derived from the carrying on of a business by the pension fund or through an associated enterprise.

4. a)       Subparagraph a) of paragraph 2 and subparagraph a) of paragraph 3 shall not apply in the case of dividends paid by a U.S. Regulated Investment Company (RIC) or a U.S. Real Estate Investment Trust (REIT). In the case of dividends paid by a RIC, subparagraph b) of paragraph 2 and subparagraphs b) and c) of paragraph 3 shall apply. In the case of dividends paid by a REIT, subparagraph b) of paragraph 2 and subparagraphs b) and c) of paragraph 3 shall apply only if:

(i)      the beneficial owner of the dividends is an individual or pension fund, in either case holding an interest of not more than 10 percent in the REIT;

> (ii)   the dividends are paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent of any class of the REIT's stock; or
>
> (iii)   the beneficial owner of the dividends is a person holding an interest of not more than 10 percent in the REIT and the REIT is "diversified."

The rules of this paragraph shall also apply to dividends paid by companies resident in Denmark that are similar to the United States companies referred to in this paragraph. Whether companies that are residents of Denmark are similar to the United States companies referred to in this paragraph will be determined by mutual agreement of the competent authorities.

b)   For purposes of this paragraph, a REIT shall be diversified if the value of no single interest in real property exceeds 10 percent of its total interests in real property. For the purposes of this rule, foreclosure property shall not be considered an interest in real property. Where a REIT holds an interest in a partnership, it shall be treated as owning directly a proportion of the partnership's interests in real property corresponding to its interest in the partnership.

5.   The term "dividends" as used in this Article means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subject to the same taxation treatment as income from shares by the laws of the State of which the payor is a resident.

6.   The provisions of paragraphs 2 and 3 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State, of which the company paying the dividends is a resident, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the dividends are attributable to such permanent establishment or fixed base. In such case, the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

7.   A Contracting State may not impose any tax on dividends paid by a company which is not a resident of that State, except insofar as the dividends are paid to a resident of that Contracting State or the dividends are attributable to a permanent establishment or a fixed base situated in that State, nor may it impose tax on a corporation's undistributed profits, except as provided in paragraph 8, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in that State.

8.      A company that is a resident of a Contracting State and that has a permanent establishment in the other Contracting State, or that is subject to tax in that other Contracting State on a net basis on its income that may be taxed in that other State under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Capital Gains) may be subject in that other Contracting State to a tax in addition to the tax allowable under the other provisions of this Convention. Such tax, however, may be imposed on only the portion of the business profits of the corporation attributable to the permanent establishment, and the portion of the income referred to in the preceding sentence that is subject to tax under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Capital Gains) that, in the case of the United States, represents the dividend equivalent amount of such profits or income and, in the case of Denmark, is an amount that is analogous to the dividend equivalent amount.

9.      The tax referred to in paragraph 8 shall not be imposed at a rate exceeding the rate specified in subparagraph a) of paragraph 2.  In any case, it shall not be imposed on a company that:

a)      satisfies the conditions of clause (i), (ii) or(iii) of subparagraph c) of paragraph 2 of Article 22 (Limitation of Benefits);

b)      satisfies the conditions of clauses i) and ii) of subparagraph f) of paragraph 2 of Article 22, provided that the company satisfies the conditions described in paragraph 4 of that Article with respect to an item of income, profit or gain described in paragraph 8 of this Article;

c)      is entitled under paragraph 3 of Article 22 to benefits with respect to an item of income, profit or gain described in paragraph 8 of this Article; or

d)      has received a determination pursuant to paragraph 7 of Article 22 with respect to this paragraph."


ARTICLE III

Subparagraph b) of paragraph 2 of Article 19 (Government Service) of the Convention is amended by omitting the words "a resident or a national" and substituting "a resident and a national".

ARTICLE IV

Article 22 (Limitation of Benefits) of the Convention shall be omitted and the following Article substituted:

"ARTICLE 22

Limitation of Benefits

1.    A resident of a Contracting State shall be entitled to benefits otherwise accorded to residents of a Contracting State by this Convention only to the extent provided in this Article.

2.    A resident of a Contracting State shall be entitled to all the benefits of this Convention only if such resident is:

a)    an individual;

b)    a Contracting State, a political subdivision, or local authority thereof, or an agency of instrumentality of that State, subdivision, or authority;

c)    a company, if:

   (i)    its principal class of shares (and any disproportionate class of shares) is regularly traded on one or more recognized stock exchanges, and either:

      A)    its principal class of shares is primarily traded on a recognized stock exchange located in the Contracting State of which the company is a resident (or, in the case of a company resident in Denmark, on a recognized stock exchange located within the European Union or in any other European Economic Area state or, in the case of a company resident in the United States, on a recognized stock exchange located in another state that is a party to the North American Free Trade Agreement); or

      B)    the company's primary place of management and control is in the Contracting State of which it is a resident;

   (ii)    in the case of a company that is a resident of Denmark, one or more taxable nonstock corporations entitled to benefits under subparagraph g) own shares representing more than 50 percent of the voting power of the company and all other shares are listed on a recognized stock exchange and are primarily traded on a recognized stock exchange located within the European Union or in any other European Economic Area state; or

   (iii)    at least 50 percent of the aggregate voting power and value of the shares (and at least 50 percent of any disproportionate class of shares) in the company are owned

directly or indirectly by five or fewer companies entitled to benefits under clause (i) or (ii), or any combination thereof, provided that, in the case of indirect ownership, each intermediate owner is a resident of either Contracting State;

d)    a charitable organization or other legal person described in subparagraph b)(i) of paragraph 1 of Article 4 (Residence) of this Convention,

e)    a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan, provided that more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State; or

f)    a person other than an individual, if:

(i)    on at least half the days of the taxable year at least 50 percent of each class of shares or other beneficial interests in the person is owned, directly or indirectly, by residents of the Contracting State of which that person is a resident that are entitled to the benefits of this Convention under subparagraph a), subparagraph b), clause i) of subparagraph c), or subparagraphs d) or e) of this paragraph, provided that, in the case of indirect ownership, each intermediate owner is a resident of that Contracting State; and

(ii)    less than 50 percent of the person's gross income for the taxable year, as determined in the person's State of residence, is paid or accrued, directly or indirectly, to persons who are not residents of either Contracting State entitled to the benefits of this Convention under subparagraph a), subparagraph b), clause i) of subparagraph c), or subparagraphs d) or e) of this paragraph in the form of payments that are deductible for purposes of the taxes covered by this Convention in the person's State of residence (but not including arm's length payments in the ordinary course of business for services or tangible property and payments in respect of financial obligations to a bank that is not related to the payor);

g)    in the case of Denmark, a taxable nonstock corporation if:

(i)    the amount paid or accrued in the form of deductible payments (but not including arms length payments in the ordinary course of its activities of a charitable nature and authorized by the Danish laws on taxable non-stock companies (lov om erhvervsmæssige fonde and lov om fonde og visse foreninger) for services or tangible property) in the taxable year and in each of the preceding three taxable

years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a) or b), clause (i) of subparagraph c), or subparagraphs d) or e), does not exceed 50 percent of its gross income, as determined under Danish law (excluding its tax-exempt income); and

(ii)    the amount paid or accrued, in the form of both deductible payments (but not including arms length payments in the ordinary course of its activities of a charitable nature and authorized by the Danish laws on taxable non-stock companies (lov om erhvervsmæssige fonde and lov om fonde og visse foreninger) for services or tangible property) and non-deductible distributions, in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a) or b), clause (i) of subparagraph c), or subparagraphs d) or e), does not exceed 50 percent of the amount of its total income (including its tax-exempt income).

3.    A company that is a resident of a Contracting State shall also be entitled to the benefits of the Convention if:

a)    at least 95 percent of the aggregate voting power and value of its shares (and at least 50 percent of any disproportionate class of shares) is owned, directly or indirectly, by seven or fewer persons that are equivalent beneficiaries; and

b)    less than 50 percent of the company's gross income, as determined in the company's State of residence, for the taxable year is paid or accrued, directly or indirectly, to persons who are not equivalent beneficiaries, in the form of payments (but not including arm's length payments in the ordinary course of business for services or tangible property and payments in respect of financial obligations to a bank that is not related to the payor), that are deductible for the purposes of the taxes covered by this Convention in the company's State of residence.

4.a)    A resident of a Contracting State will be entitled to benefits of the Convention with respect to an item of income derived from the other State, regardless of whether the resident is entitled to benefits under paragraph 2 or 3 of this Article, if the resident is engaged in the active conduct of a trade or business in the first-mentioned State (other than the business of making or managing investments for the resident's own account, unless these activities are banking, insurance or securities activities carried on by a bank,

insurance company or registered securities dealer), and the income derived from the other Contracting State is derived in connection with, or is incidental to, that trade or business.

      b)      If a resident of a Contracting State derives an item of income from a trade or business activity in the other Contracting State, or derives an item of income arising in the other Contracting State from an associated enterprise, subparagraph a) of this paragraph shall apply to such item only if the trade or business activity in the first-mentioned State is substantial in relation to the trade or business activity in the other State. Whether a trade or business activity is substantial for purposes of this paragraph will be determined based on all the facts and circumstances.

      c)      In determining whether a person is "engaged in the active conduct of a trade or business" in a Contracting State under subparagraph a) of this paragraph, activities conducted by persons connected to such person shall be deemed to be conducted by such person. A person shall be connected to another if one possesses at least 50 percent of the beneficial interest in the other (or, in the case of a company, at least 50 percent of the aggregate vote and at least 50 percent of the aggregate value of the shares in the company or of the beneficial equity interest in the company) or another person possesses, directly or indirectly, at least 50 percent of the beneficial interest (or, in the case of a company, at least 50 percent of the aggregate vote and at least 50 percent of the aggregate value of the shares in the company or of the beneficial equity interest in the company) in each person. In any case, a person shall be considered to be connected to another if, based on all the relevant facts and circumstances, one has control of the other or both are under the control of the same person or persons.

5.      A resident of one of the Contracting States that derives from the other Contracting State income mentioned in Article 8 (Shipping and Air Transport) and that is not entitled to the benefits of this Convention because of the foregoing paragraphs, shall nevertheless be entitled to the benefits of this Convention with respect to such income if at least 50 percent of the beneficial interest in such person (or, in the case of a company, at least 50 percent of the aggregate vote and value of the stock of such company) is owned directly or indirectly:

      a)      by persons described in subparagraphs a) or b), or clause (i) of subparagraph c), or subparagraphs d) or e) of paragraph 2, or citizens of the United States, or individuals who are residents of a third state; or

     b)     by a company or combination of companies the stock of which is primarily and regularly traded on an established securities market in a third state;

provided that such third state grants an exemption under similar terms for profits as mentioned in Article 8 (Shipping and Air Transport) of this Convention to citizens and corporations of the other Contracting State either under its national law or in common agreement with that other Contracting State or under a convention between that third state and the other Contracting State.

     6.     Notwithstanding the preceding provisions of this Article, where an enterprise of Denmark derives interest or royalties from the United States, and the income consisting of such interest or royalties is exempt from taxation in Denmark because it is attributable to a permanent establishment which that enterprise has in a third state, the tax benefits that would otherwise apply under the other provisions of the Convention will not apply to such income if the tax that is actually paid with respect to such income in the third state is less than 60 percent of the tax that would have been payable in Denmark if the income were earned in Denmark by the enterprise and were not attributable to the permanent establishment in the third state. Any interest or royalties to which the provisions of this paragraph apply may be taxed in the United States at a rate that shall not exceed 15 percent of the gross amount thereof. The provisions of this paragraph shall not apply if:

     a)     in the case of interest, the income derived from the United States is derived in connection with, or is incidental to, the active conduct of a trade or business carried on by the permanent establishment in the third state (other than the business of making, managing or simply holding investments for the person's own account, unless these activities are banking or securities activities carried on by a bank or registered securities dealer); or

     b)     in the case of royalties, the royalties are received as compensation  for the use of, or the right to use, intangible property produced or developed by the permanent establishment itself.

     7.     A resident of a Contracting State that is not entitled to benefits pursuant to the preceding paragraphs of this Article shall, nevertheless, be granted benefits of the Convention if the competent authority of the other Contracting State determines that the establishment, acquisition or maintenance of such person and the conduct of its operations did not have as one of its principal purposes the obtaining of benefits under the Convention. The competent authority of the other Contracting State shall consult with the competent authority of the first-mentioned State before denying the benefits of the Convention under this paragraph.

8.    For the purposes of this Article,

a)    the term "principal class of shares" means the ordinary or common shares of the company, provided that such class of shares represents the majority of the voting power and value of the company. If no single class of ordinary or common shares represents the majority of the aggregate voting power and value of the company, the "principal class of shares" is that class or those classes that in the aggregate represent a majority of the aggregate voting power and value of the company.

b)    the term "disproportionate class of shares" means any class of shares of a company resident in one of the States that entitles the shareholder to disproportionately higher participation, through dividends, redemption payments or otherwise, in the earnings generated in the other State by particular assets or activities of the company;

c)    the term "shares" shall include depository receipts thereof;

d)    the term "recognized stock exchange" means:

    (i)    the NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under the U.S. Securities Exchange Act of 1934;

    (ii)    the Copenhagen Stock Exchange;

    (iii)    the stock exchanges of Amsterdam, Brussels, Frankfurt, Hamburg, Helsinki, London, Oslo, Paris, Stockholm, Sydney, Tokyo and Toronto; and

    (iv)    any other stock exchanges agreed upon by the competent authorities of the Contracting States.

e)    the term "taxable nonstock corporation" as used in paragraph 2 means a foundation that is taxable in accordance with paragraph 1 of Article 1 of the Danish Act on Taxable Nonstock Corporations (fonde der beskattes efter fondsbeskatningsloven);

f)    (i)    for the purposes of paragraph 2, the shares in a class of shares are considered to be regularly traded on one or more recognized stock exchanges in a taxable year if:

    (A)    trades in such class are effected on one or more of such stock exchanges other than in de minimis quantities during every quarter; and

    (B)    the aggregate number of shares or units of that class traded on such stock exchange or exchanges during the previous taxable year is at least 6

percent of the average number of shares or units outstanding in that class (including shares held by taxable nonstock corporations) during that taxable year; and

(ii)    for purposes of determining whether a company satisfies the requirements of clause c) (ii) of paragraph 2, clause (i) of this paragraph shall be applied as if all the shares issued by the company were one class of shares and shares held by taxable nonstock corporations will be considered outstanding for purposes of determining whether 6 percent of the outstanding shares have been traded during a taxable year.

g)    a company's primary place of management and control will be in the State of which it is a resident only if executive officers and senior management employees exercise day-to-day responsibility for more of the strategic, financial and operational policy decision making for the company (including its direct and indirect subsidiaries) in that State than in any other state, and the staffs conduct more of the day-to-day activities necessary for preparing and making those decisions in that State than in any other state;

h)    the term "equivalent beneficiary" means a resident of a member  state of the European Union or of any other European Economic Area state or of a party to the North American Free Trade Agreement, or of Switzerland, but only if that resident:

(i)    A)    would be entitled to all the benefits of a comprehensive convention for the avoidance of double taxation between any member state of the European Union or any other European Economic Area state or any party to the North American Free Trade Agreement, or Switzerland, and the State from which the benefits of this Convention are claimed under provisions analogous to subparagraphs a), b), clause i) of subparagraph c) or subparagraphs d) or e) of paragraph 2 of this Article, provided that if such convention does not contain a comprehensive limitation on benefits article, the person would be entitled to the benefits of this Convention by reason of subparagraph a), b), clause i) of subparagraph c) or subparagraphs d) or  e) of paragraph 2 of this Article if such person were a resident of one of the States under Article 4 (Residence) of this Convention; and

B)    with respect to income referred to in Article 10 (Dividends), 11 (Interest) or 12 (Royalties) of this Convention, would be entitled under such convention to a rate of tax with respect to the particular class of income for

which benefits are being claimed under this Convention that is at least as low as the rate applicable under this Convention; or

(ii)    is a resident of a Contracting State that is entitled to the benefits of this Convention by reason of subparagraph a), b), clause i) of subparagraph c) or subparagraphs d) or e) of paragraph 2 of this Article.

For the purposes of applying paragraph 3 of Article 10 (Dividends) in order to determine whether a person, owning shares, directly or indirectly, in the company claiming the benefits of this Convention, is an equivalent beneficiary, such person shall be deemed to hold the same voting power in the company paying the dividend as the company claiming the benefits holds in such company;

i)    with respect to dividends, interest or royalties arising in Denmark and beneficially owned by a company that is a resident of the United States, a company that is a resident of a member state of the European Union will be treated as satisfying the requirements of subparagraph h)(i) B) for purposes of determining whether such United States resident is entitled to benefits under this paragraph if a payment of dividends, interest or royalties arising in Denmark and paid directly to such resident of a member state of the European Union would have been exempt from tax pursuant to any directive of the European Union, notwithstanding that the income tax convention between Denmark and that other member state of the European Union would provide for a higher rate of tax with respect to such payment than the rate of tax applicable to such United States company under Article 10 (Dividends), 11 (Interest), or 12 (Royalties) of this Convention."

## ARTICLE V

1.    The Contracting States shall notify each other when the requirements for the entry into force of this Protocol have been complied with.

2.    This Protocol shall enter into force upon the date of the receipt of the later of such notifications, and its provisions shall have effect:

a)    in respect of taxes withheld at source, on income derived on or after the first day of the second month next following the date on which the Protocol enters into force; and

b)    in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Protocol enters into force.

3.    This Protocol shall remain in force for so long as the Convention shall remain in force.

IN WITNESS WHEREOF the undersigned, duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Copenhagen on the second day of May, 2006, in the English language.

FOR THE GOVERNMENT OF THE
KINGDOM OF DENMARK

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA

EMBASSY OF THE
UNITED STATES OF AMERICA

Copenhagen, May 2, 2006

Excellency:

I have the honor to refer to the Protocol signed today between the Government of the United States of America and the Government of the Kingdom of Denmark Amending the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, and to confirm, on behalf of the Government of the United States of America, the following understandings reached between our two Governments.

In reference to clause a) (iv) of paragraph 3 of Article 10 (Dividends) of the Convention, as amended by the Protocol, it is understood that the U.S. competent authority generally will exercise its discretion to grant benefits under such paragraph to a company that is a resident of Denmark if:

1) the company meets the requirements of paragraph 4 of Article 22 (Limitation of Benefits) regarding the active conduct of a trade or business in Denmark;

2) the company meets the base erosion test of clause f) (ii) of paragraph 2 of Article 22; and

3) more than 80 percent of the voting power and the value of the shares in the company is owned by one or more taxable nonstock corporations that meet the requirements of subparagraph h) of paragraph 2 of Article 22.

However, the competent authority may choose not to grant benefits pursuant to this paragraph if he determines that a significant percentage or amount of the income qualifying for benefits under such paragraph will inure to the benefit of a private person who is not a resident of Denmark.

His Excellency
　　Per Stig Møller,
　　　　Minister of Foreign Affairs,
　　　　　　The Kingdom of Denmark.

- 2 -

In reference to paragraph 4 of Article 10 (Dividends) of the Convention, as amended by the Protocol, it is understood that a Danish undertaking for collective investment in transferable securities that is required to currently distribute its income will be treated as a company that is similar to a U.S. regulated investment company for purposes of this paragraph, while such an undertaking that is permitted to accumulate its income will not be so treated.

If this is in accordance with your understanding, I would appreciate an acknowledgment from you to that effect.

Accept, Excellency, the renewed assurances of my highest consideration.

Copenhagen, 2nd May, 2006

Excellency:

I have the honor to acknowledge receipt of your note of 2nd May, 2006, which reads as follows:

"I have the honor to refer to the Protocol signed today between the Government of the United States of America and the Government of the Kingdom of Denmark Amending the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, and to confirm, on behalf of the Government of the United States of America, the following understandings reached between our two Governments.

In reference to clause a) (iv) of paragraph 3 of Article 10 (Dividends) of the Convention, as amended by the Protocol, it is understood that the U.S. competent authority generally will exercise its discretion to grant benefits under such paragraph to a company that is a resident of Denmark if:

1) the company meets the requirements of paragraph 4 of Article 22 (Limitation of Benefits) regarding the active conduct of a trade or business in Denmark;

2) the company meets the base erosion test of clause f) (ii) of paragraph 2 of Article 22; and

3) more than 80 percent of the voting power and the value of the shares in the company is owned by one or more taxable nonstock corporations that meet the requirements of subparagraph h) of paragraph 2 of Article 22.

However, the competent authority may choose not to grant benefits pursuant to this paragraph if he determines that a significant percentage or amount of the income qualifying for benefits under such paragraph will inure to the benefit of a private person who is not a resident of Denmark.

In reference to paragraph 4 of Article 10 (Dividends) of the Convention, as amended by the Protocol, it is understood that a Danish undertaking for collective investment in transferable securities that is required to currently distribute its income will

be treated as a company that is similar to a U.S. regulated investment company for purposes of this paragraph, while such an undertaking that is permitted to accumulate its income will not be so treated.

      If this is in accordance with your understanding, I would appreciate an acknowledgment from you to that effect.

Accept, Excellency, the renewed assurances of my highest consideration."

      I have the honor to confirm that the foregoing understandings are also shared by the Government of the Kingdom of Denmark.

      Accept, Excellency, the renewed assurances of my highest consideration.

Kristian Jensen

To Ambassador James P. Cain
Embassy of the United States

# Exhibit 4

**Denmark - United States**

**Income Tax Treaty**

(as amended through 2006)

---

**Status:** In Force

**Conclusion Date:** 19 August 1999.

**Entry into Force:** 31 March 2000.

**Effective Date:** 1 January 2001 (see Article 29 ).

**Note:**

A protocol signed on 2 May 2006 entered into force on 28 December 2007 and is effective as of 1 January 2008 for other taxes and 1 February 2008 for withholding taxes. The protocol is incorporated into the main text of the treaty.

---

**CONVENTION BETWEEN**
**THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND**
**THE GOVERNMENT OF THE KINGDOM OF DENMARK**
**FOR THE AVOIDANCE OF DOUBLE TAXATION AND**
**THE PREVENTION OF FISCAL EVASION**
**WITH RESPECT TO TAXES ON INCOME**

**Preamble**

The Government of the United States of America and the Government of the Kingdom of Denmark, desiring to conclude a Convention for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income, have agreed as follows:

**Article 1**

**General scope**

1. Except as otherwise provided in this Convention, this Convention shall apply to persons who are residents of one or both of the Contracting States.

2. This Convention shall not restrict in any manner any benefit now or hereafter accorded:

(a)  by the laws of either Contracting State; or

(b)  by any other agreement between the Contracting States.

3. Notwithstanding the provisions of subparagraph 2(b):

(a)  the provisions of Article 25 (Mutual agreement procedure) of this Convention exclusively shall apply to any dispute concerning whether a measure is within the scope of this Convention, and the procedures under this Convention exclusively shall apply to that dispute; and

(b)  unless the competent authorities determine that a taxation measure is not within the scope of this Convention, the non-discrimination obligations of this Convention exclusively shall apply with respect to that measure, except for such national treatment or most-favored-nation obligations as may apply to trade in goods under the General Agreement on Tariffs and Trade. No national treatment or most-favored-nation obligation under any other agreement shall apply with respect to that measure.

(c)  For the purpose of this paragraph, a "measure" is a law, regulation, rule, procedure, decision, administrative action, or any similar provision or action.

4. Except to the extent provided in paragraph 5, this Convention shall not affect the taxation by a Contracting State of its residents (as determined under Article 4 (Residence)) and its citizens. Notwithstanding the other provisions of this Convention, a former citizen or long-term resident of a Contracting State may, for the period of ten years following the loss of such status, be taxed in accordance with the laws of that Contracting State.

5. The provisions of paragraph 4 shall not affect:

(a)  the benefits conferred by a Contracting State under paragraph 2 of Article 9 (Associated enterprises), paragraphs 7 and 8 of Article 13 (Capital gains), paragraphs 1(c), 2 and 5 of Article 18 (Pensions, social security, annuities, alimony and child support payments), and Articles 23 (Relief from double taxation), 24 (Non-discrimination), and 25 (Mutual agreement procedure); and

---

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(b) the benefits conferred by a Contracting State under Articles 19 (Government service), 20 (Students and trainees) and 28 (Diplomatic agents and consular officers), upon individuals who are neither citizens of, nor have been admitted for permanent residence in, that State.

## Article 2

### Taxes covered

1. The existing taxes to which this Convention applies are:

(a) in the United States:

  (i)   the Federal income taxes imposed by the Internal Revenue Code (but excluding social security taxes); and

  (ii)  the Federal excise taxes imposed with respect to private foundations;

(b) in Denmark:

  (i)   the income tax to the State (indkomstskatten til staten);

  (ii)  the municipal income tax (den kommunale indkomstskat);

  (iii) the income tax to the county municipalities (den amtskommunale indkomstskat); and

  (iv)  taxes imposed under the Hydrocarbon Tax Act (skatter i henhold til kulbrinteskatteloven).

2. The Convention shall apply also to any identical or substantially similar taxes which are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. The competent authorities of the Contracting States shall notify each other of any significant changes that have been made in their respective taxation laws or other laws affecting their obligations under the Convention, and of any official published material concerning the application of this Convention, including explanations, regulations, rulings, or judicial decisions.

## Article 3

### General definitions

1. For the purposes of this Convention, unless the context otherwise requires:

(a) the term "person" includes an individual, an estate, a trust, a partnership, a company and any other body of persons;

(b) the term "company" means any body corporate or any entity which is treated as a body corporate for tax purposes according to the laws of the state in which it is organized;

(c) the terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" mean respectively an enterprise carried on by a resident of a Contracting State, and an enterprise carried on by a resident of the other Contracting State; the terms also include an enterprise carried on by a resident of a Contracting State through an entity that is treated as fiscally transparent in that Contracting State;

(d) the term "international traffic" means any transport by a ship or aircraft, except when such transport is solely between places in a Contracting State;

(e) the term "competent authority" means:

  (i)   in the United States: the Secretary of the Treasury or his delegate; and

  (ii)  in Denmark: the Minister for Taxation or his authorized representative;

(f) the term "United States" means the United States of America, and includes the states thereof and the District of Columbia; such term also includes the territorial sea thereof and the sea bed and subsoil of the submarine areas adjacent to that territorial sea, over which the United States exercises sovereign rights in accordance with international law; the term, however, does not include Puerto Rico, the Virgin Islands, Guam or any other United States possession or territory;

(g) the term "Denmark" means the Kingdom of Denmark, including any area outside the territorial sea of Denmark which in accordance with international law has been or may hereafter be designated under Danish laws as an area within which Denmark may exercise sovereign rights with respect to the exploration and exploitation of the natural resources of the sea-bed or its subsoil and the superjacent waters and with respect to other activities for the exploration and economic exploitation of the area; the term "Denmark" does not comprise the Faroe Islands or Greenland;

(h) the term "national of a Contracting State", means:

  (i)   any individual possessing the nationality or citizenship of that State; and

  (ii)  any legal person, partnership or association deriving its status as such from the laws in force in that State;

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(i)    the term "qualified governmental entity" means:

    (i)    any person or body of persons that constitutes a governing body of a Contracting State, or of a political subdivision or local authority of a Contracting State;

    (ii)    a person that is wholly owned, directly or indirectly, by a Contracting State or political subdivision or local authority of a Contracting State, provided it is organized under the laws of the Contracting State, its earnings are credited to its own account with no portion of its income inuring to the benefit of any private person, and its assets vest in the Contracting State, political subdivision or local authority upon dissolution; and

    (iii)    a pension trust or fund of a person described in clause (i) or (ii) that is constituted and operated exclusively to administer or provide pension benefits described in Article 19 (Government service); provided that an entity described in clause (ii) or (iii) does not carry on commercial activities.

2. As regards the application of the Convention at any time by a Contracting State any term not defined therein shall, unless the context otherwise requires, or the competent authorities agree to a common meaning pursuant to the provisions of Article 25 (Mutual agreement procedure), have the meaning which it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

**Article 4**

**Residence**

1. Except as provided in this paragraph, for the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, citizenship, place of management, place of incorporation, or any other criterion of a similar nature.

(a)    The term "resident of a Contracting State" does not include any person who is liable to tax in that State in respect only of income from sources in that State or of profits attributable to a permanent establishment in that State.

(b)    A legal person organized under the laws of a Contracting State and that is generally exempt from tax in that State and is established and maintained in that State either:

    (i)    exclusively for a religious, charitable, educational, scientific, or other similar purpose; or

    (ii)    to provide pensions or other similar benefits to employees, including self-employed individuals, pursuant to a plan, is to be treated for purposes of this paragraph as a resident of that Contracting State.

(c)    A qualified governmental entity is to be treated as a resident of the Contracting State where it is established.

(d)    An item of income, profit or gain derived through an entity that is fiscally transparent under the laws of either Contracting State shall be considered to be derived by a resident of a State to the extent that the item is treated for purposes of the taxation law of such Contracting State as the income, profit or gain of a resident.

2. Where by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, then his status shall be determined as follows:

(a)    the individual shall be deemed to be a resident of the State in which he has a permanent home available to him; if such individual has a permanent home available to him in both States, he shall be deemed to be a resident of the State with which his personal and economic relations are closer (center of vital interests);

(b)    if the State in which the individual has his center of vital interests cannot be determined, or if he has no permanent home available to him in either State, he shall be deemed to be a resident of the State in which he has an habitual abode;

(c)    if the individual has an habitual abode in both States or in neither of them, he shall be deemed to be a resident of the State of which he is a national;

(d)    if he is a national of both States or of neither of them, the competent authorities of the Contracting States shall endeavor to settle the question by mutual agreement.

3. Where by reason of the provisions of paragraph 1 a person other than an individual is a resident of both Contracting States, the competent authorities of the Contracting States shall by mutual agreement endeavor to settle the question and to determine the mode of application of the Convention to such person.

4. A United States citizen or an alien lawfully admitted for permanent residence in the United States is a resident of the United States, but only if such person has a substantial presence, permanent home or habitual abode in the United States.

**Article 5**

**Permanent establishment**

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

1. For the purposes of this Convention, the term "permanent establishment" means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

2. The term "permanent establishment" includes especially:

(a)   a place of management;

(b)   a branch;

(c)   an office;

(d)   a factory;

(e)   a workshop; and

(f)   a mine, an oil or gas well, a quarry, or any other place of extraction of natural resources.

3. A building site or construction or installation project, or an installation or drilling rig or ship used for the exploration of natural resources, constitutes a permanent establishment only if it lasts, or the activity continues for, more than 12 months. For the purpose of this paragraph, activities carried on by an enterprise related to another enterprise, within the meaning of Article 9 (Associated enterprises), shall be regarded as carried on by the enterprise to which it is related if the activities in question:

(a)   are substantially the same as those carried on by the last- mentioned enterprise; and

(b)   are concerned with the same project or operation; except to the extent that those activities are carried on at the same time.

4. Notwithstanding the preceding provisions of this Article, the term "permanent establishment" shall be deemed not to include:

(a)   the use of facilities solely for the purpose of storage, display, or delivery of goods or merchandise belonging to the enterprise;

(b)   the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage, display, or delivery;

(c)   the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;

(d)   the maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise, or of collecting information, for the enterprise;

(e)   the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character;

(f)   the maintenance of a fixed place of business solely for any combination of the activities mentioned in subparagraphs (a) to (e) of this paragraph, provided that the overall activity of the fixed place of business resulting from the combination is of a preparatory or auxiliary character.

5. Notwithstanding the provisions of paragraphs 1 and 2, where a person -- other than an agent of an independent status to whom paragraph 6 applies -- is acting on behalf of an enterprise and has and habitually exercises in a Contracting State an authority to conclude contracts in the name of the enterprise, that enterprise shall be deemed to have a permanent establishment in that State in respect of any activities which that person undertakes for the enterprise, unless the activities of such person are limited to those mentioned in paragraph 4 which, if exercised through a fixed place of business, would not make this fixed place of business a permanent establishment under the provisions of that paragraph.

6. An enterprise shall not be deemed to have a permanent establishment in a Contracting State merely because it carries on business in that State through a broker, general commission agent, or any other agent of an independent status, provided that such persons are acting in the ordinary course of their business as independent agents.

7. The fact that a company that is a resident of a Contracting State controls or is controlled by a company that is a resident of the other Contracting State, or which carries on business in that other State (whether through a permanent establishment or otherwise), shall not constitute either company a permanent establishment of the other.

**Article 6**

**Income from real property**

1. Income derived by a resident of a Contracting State from real property (including income from agriculture or forestry) situated in the other Contracting State may be taxed in that other State.

2. The term "real property" shall have the meaning which it has under the law of the Contracting State in which the property in question is situated. The term shall in any case include property accessory to real property, livestock and equipment used in agriculture and forestry, rights to which the provisions of general law respecting landed property apply, usufruct of real

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

property, and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources; ships, boats and aircraft shall not be regarded as real property.

3. The provisions of paragraph 1 shall apply to income derived from the direct use, letting, or use in any other form of real property.

4. The provisions of paragraphs 1 and 3 shall also apply to the income from real property of an enterprise and to income from real property used for the performance of independent personal services.

5. A resident of a Contracting State who is liable to tax in the other Contracting State on income from real property situated in the other Contracting State may elect for any taxable year to compute the tax on such income on a net basis as if such income were business profits attributable to a permanent establishment in such other State. Any such election shall be binding for the taxable year of the election and all subsequent taxable years unless the competent authority of the Contracting State in which the property is situated agrees to terminate the election.

## Article 7

### Business profits

1. The business profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein. If the enterprise carries on business as aforesaid, the business profits of the enterprise may be taxed in the other State but only so much of them as is attributable to that permanent establishment.

2. Subject to the provisions of paragraph 3, where an enterprise of a Contracting State carries on business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the business profits which it might be expected to make if it were a distinct and independent enterprise engaged in the same or similar activities under the same or similar conditions. For this purpose, the business profits to be attributed to the permanent establishment shall include only the profits derived from the assets or activities of the permanent establishment.

3. In determining the business profits of a permanent establishment, there shall be allowed as deductions expenses which are incurred for the purposes of the permanent establishment, including a reasonable allocation of executive and general administrative expenses, research and development expenses, interest, and other expenses incurred for the purposes of the enterprise as a whole (or the part thereof which includes the permanent establishment), whether incurred in the State in which the permanent establishment is situated or elsewhere.

4. No business profits shall be attributed to a permanent establishment by reason of the mere purchase by that permanent establishment of goods or merchandise for the enterprise.

5. For the purposes of the preceding paragraphs, the profits to be attributed to the permanent establishment shall be determined by the same method year by year unless there is good and sufficient reason to the contrary.

6. Where business profits include items of income which are dealt with separately in other Articles of this Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.

7. For the purposes of this Convention, the term "business profits" means income from any trade or business, including income derived by an enterprise from the performance of personal services, and from the rental of tangible personal property.

8. In applying paragraphs 1 and 2 of Article 7 (Business profits), paragraph 6 of Article 10 (Dividends), paragraph 3 of Article 11 (Interest), paragraph 3 of Article 12 (Royalties), paragraph 3 of Article 13 (Capital gains), Article 14 (Independent personal services), and paragraph 2 of Article 21 (Other income), any income or gain attributable to a permanent establishment or fixed base during its existence is taxable in the Contracting State where such permanent establishment or fixed base is situated even if the payments are deferred until such permanent establishment or fixed base has ceased to exist.

## Article 8

### Shipping and air transport

1. Profits of an enterprise of a Contracting State from the operation in international traffic of ships or aircraft shall be taxable only in that State.

2. For the purposes of this Article, profits from the operation of ships or aircraft include profits derived from the rental of ships or aircraft on a full (time or voyage) basis. They also include profits from the rental of ships or aircraft on a bareboat basis if such ships or aircraft are operated in international traffic by the lessee, or if the rental income is incidental to profits from the operation of ships or aircraft in international traffic. Profits derived by an enterprise from the inland transport of property or passengers within either Contracting State, shall be treated as profits from the operation of ships or aircraft in international traffic if such transport is undertaken as part of international traffic.

3. Profits of an enterprise of a Contracting State from the use, maintenance or rental of containers (including trailers, barges, and related equipment for the transport of containers) used in international traffic shall be taxable only in that State.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

4. The provisions of paragraphs 1 and 3 shall also apply to profits from the participation in a consortium, a pool, a joint business, or an international operating agency.

5. Notwithstanding the provisions of subparagraph 2(f) and paragraph 3 of Article 5 (Permanent establishment), the profits of an enterprise of a Contracting State from the transport by ships or aircraft of supplies or personnel to a location where offshore activities in connection with the exploration or exploitation of natural resources are being carried on in the other Contracting State, or from the operation of tugboats and similar vessels in connection with such activities, shall be taxable only in the first-mentioned State.

**Article 9**

**Associated enterprises**

1. Where

(a) an enterprise of a Contracting State participates, directly or indirectly, in the management, control, or capital of an enterprise of the other Contracting State, or

(b) the same persons participate directly or indirectly in the management, control, or capital of an enterprise of a Contracting State and an enterprise of the other Contracting State,

and in either case conditions are made or imposed between the two enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which, but for those conditions, would have accrued to one of the enterprises, but by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly.

2. Where a Contracting State includes in the profits of an enterprise of that State, and taxes accordingly, profits on which an enterprise of the other Contracting State has been charged to tax in that other State, and the other Contracting State agrees that the profits so included are profits that would have accrued to the enterprise of the first-mentioned State if the conditions made between the two enterprises had been those which would have been made between independent enterprises, then that other State shall make an appropriate adjustment to the amount of the tax charged therein on those profits. In determining such adjustment, due regard shall be had to the other provisions of this Convention and the competent authorities of the Contracting States shall if necessary consult each other.

**Article 10**

**Dividends**

1. Dividends paid by a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident, and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed:

a) 5 percent of the gross amount of the dividends if the beneficial owner is a company which holds directly at least 10 percent of the share capital of the company paying the dividends;

b) 15 percent of the gross amount of the dividends in all other cases.

This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3. Notwithstanding the provisions of paragraph 2, such dividends shall not be taxed in the Contracting State of which the company paying the dividends is a resident if the beneficial owner is:

a) a company that is a resident of the other Contracting State that has owned, directly or indirectly through one or more residents of either Contracting State, shares representing 80 percent or more of the voting power in the company paying the dividends for a 12-month period ending on the date on which entitlement to the dividends is determined and:

(i) satisfies the conditions of clause (i),(ii) or (iii) of subparagraph c) of paragraph 2 of Article 22 (Limitation of Benefits);

(ii) satisfies the conditions of clauses (i) and (ii) of subparagraph f) of paragraph 2 of Article 22, provided that the company satisfies the conditions described in paragraph 4 of that Article with respect to the dividends;

(iii) is entitled to benefits with respect to the dividends under paragraph 3 of Article 22; or

(iv) has received a determination pursuant to paragraph 7 of Article 22 with respect to this paragraph; or

b) a qualified governmental entity that is a resident of the other Contracting State and that does not control the payor of the dividend; or

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

c)   a pension fund, which is described in subparagraph e) of paragraph 2 of Article 22 (Limitation of Benefits), that is a resident of the other Contracting State, provided that such dividends are not derived from the carrying on of a business by the pension fund or through an associated enterprise.

a)   Subparagraph a) of paragraph 2 and subparagraph a) of paragraph 3 shall not apply in the case of dividends paid by a U.S. Regulated Investment Company (RIC) or a U.S. Real Estate Investment Trust (REIT). In the case of dividends paid by a RIC, subparagraph b) of paragraph 2 and subparagraphs b) and c) of paragraph 3 shall apply. In the case of dividends paid by a REIT, subparagraph b) of paragraph 2 and subparagraphs b) and c) of paragraph 3 shall apply only if:

(i)    the beneficial owner of the dividends is an individual or pension fund, in either case holding an interest of not more than 10 percent in the REIT;

(ii)   the dividends are paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent of any class of the REIT's stock; or

(iii)  the beneficial owner of the dividends is a person holding an interest of not more than 10 percent in the REIT and the REIT is "diversified."

The rules of this paragraph shall also apply to dividends paid by companies resident in Denmark that are similar to the United States companies referred to in this paragraph. Whether companies that are residents of Denmark are similar to the United States companies referred to in this paragraph will be determined by mutual agreement of the competent authorities.

b)   For purposes of this paragraph, a REIT shall be diversified if the value of no single interest in real property exceeds 10 percent of its total interests in real property. For the purposes of this rule, foreclosure property shall not be considered an interest in real property. Where a REIT holds an interest in a partnership, it shall be treated as owning directly a proportion of the partnership's interests in real property corresponding to its interest in the partnership.

5. The term "dividends" as used in this Article means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subject to the same taxation treatment as income from shares by the laws of the State of which the payor is a resident.

6. The provisions of paragraphs 2 and 3 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State, of which the company paying the dividends is a resident, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the dividends are attributable to such permanent establishment or fixed base. In such case, the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

7. A Contracting State may not impose any tax on dividends paid by a company which is not a resident of that State, except insofar as the dividends are paid to a resident of that Contracting State or the dividends are attributable to a permanent establishment or a fixed base situated in that State, nor may it impose tax on a corporation's undistributed profits, except as provided in paragraph 8, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in that State.

8. A company that is a resident of a Contracting State and that has a permanent establishment in the other Contracting State, or that is subject to tax in that other Contracting State on a net basis on its income that may be taxed in that other State under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Capital Gains) may be subject in that other Contracting State to a tax in addition to the tax allowable under the other provisions of this Convention. Such tax, however, may be imposed on only the portion of the business profits of the corporation attributable to the permanent establishment, and the portion of the income referred to in the preceding sentence that is subject to tax under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Capital Gains) that, in the case of the United States, represents the dividend equivalent amount of such profits or income and, in the case of Denmark, is an amount that is analogous to the dividend equivalent amount.

9. The tax referred to in paragraph 8 shall not be imposed at a rate exceeding the rate specified in subparagraph a) of paragraph 2. In any case, it shall not be imposed on a company that:

a)   satisfies the conditions of clause (i), (ii) or(iii) of subparagraph c) of paragraph 2 of Article 22 (Limitation of Benefits);

b)   satisfies the conditions of clauses i) and ii) of subparagraph f) of paragraph 2 of Article 22, provided that the company satisfies the conditions described in paragraph 4 of that Article with respect to an item of income, profit or gain described in paragraph 8 of this Article;

c)   is entitled under paragraph 3 of Article 22 to benefits with respect to an item of income, profit or gain described in paragraph 8 of this Article; or

d)   has received a determination pursuant to paragraph 7 of Article 22 with respect to this paragraph.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## Article 11

### Interest

1. Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2. The term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums or prizes attaching to such securities, bonds, or debentures, and all other income that is subjected to the same taxation treatment as income from money lent by the taxation law of the Contracting State in which the income arises. Income dealt with in Article 10 (Dividends) and penalty charges for late payment shall not be regarded as interest for the purposes of this Article.

3. The provisions of paragraph 1 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State in which the interest arises, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the interest is attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business profits) or Article 14 (Independent personal services), as the case may be, shall apply.

4. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each State, due regard being had to the other provisions of this Convention.

5. Notwithstanding the provisions of paragraph 1:

(a)     interest paid by a resident of a Contracting State and that is determined with reference to receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor or a related person or to any dividend, partnership distribution or similar payment made by the debtor to a related person, and paid to a resident of the other State also may be taxed in the Contracting State in which it arises, and according to the laws of that State, but if the beneficial owner is a resident of the other Contracting State, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article 10 (Dividends); and

(b)     interest that is an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit may be taxed by each State in accordance with its domestic law.

## Article 12

### Royalties

1. Royalties arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2. The term "royalties" as used in this Article means:

(a)     any consideration for the use of, or the right to use, any copyright of literary, artistic, scientific or other work (including computer software, cinematographic films, audio or video tapes or disks, and other means of image or sound reproduction), any patent, trademark, design or model, plan, secret formula or process, or other like right or property, or for information concerning industrial, commercial or scientific experience; and

(b)     gain derived from the alienation of any property described in subparagraph (a), provided that such gain is contingent on the productivity, use or disposition of the property.

3. The provisions of paragraph 1 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State in which the royalties arise, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the royalties are attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business profits) or Article 14 (Independent personal services), as the case may be, shall apply.

4. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to the use, right, or information for which they are paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

## Article 13

### Capital gains

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

1. Gains derived by a resident of a Contracting State that are attributable to the alienation of real property situated in the other Contracting State may be taxed in that other State.

2. For the purposes of this Article, the term "real property situated in the other Contracting State" shall include:

(a)    real property referred to in Article 6 (Income from real property);

(b)    a United States real property interest; and

(c)    an equivalent interest in real property situated in Denmark.

3. Gains from the alienation of personal property that are attributable to a permanent establishment that an enterprise of a Contracting State has in the other Contracting State or that are attributable to a fixed base that is available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services, and gains from the alienation of such a permanent establishment (alone or with the whole enterprise) or of such a fixed base, may be taxed in that other State.

4. Notwithstanding the provisions of paragraph 3, gains derived by an enterprise of a Contracting State from the alienation of ships, boats, aircraft, or containers operated or used in international traffic or personal property pertaining to the operation or use of such ships, boats, aircraft, or containers shall be taxable only in that State.

5. Gains derived by an enterprise of a Contracting State from the deemed alienation of an installation, drilling rig, or ship used in the other Contracting State for the exploration for or exploitation of oil and gas resources may be taxed in that other State in accordance with its law, but only to the extent of any depreciation taken in that other State.

6. Gains from the alienation of any property, other than that referred to in paragraphs 1 through 5, shall be taxable only in the Contracting State of which the alienator is a resident.

7. If a resident of a Contracting State is subject to income taxation in both Contracting States on a disposition of property and is treated as having alienated property with respect to which a gain is recognized under the income tax laws of the other Contracting State, then the resident not otherwise required to do so may elect in his annual return of income for the year of the alienation to be liable to tax in the residence State in that year as if he had, immediately before that time, sold and repurchased such property for an amount equal to its fair market value at that time. Such an election shall apply to all property described in this paragraph that is alienated by the resident in the taxable year for which the election is made or at any time thereafter.

8. Where a resident of a Contracting State alienates property in the course of a corporate or other organization, reorganization, amalgamation, division or similar transaction and profit, gain or income with respect to such alienation is not recognized for the purpose of taxation in that State, the competent authority of the other Contracting State may agree, if requested to do so by the person who acquires the property, in order to avoid double taxation and subject to terms and conditions satisfactory to such competent authority, to defer the recognition of the profit, gain or income with respect to such property for the purpose of taxation in that other State until such time and in such manner as may be stipulated in the agreement.

**Article 14**

**Independent personal services**

1. Income derived by an individual who is a resident of a Contracting State in respect of the performance of personal services of an independent character shall be taxable only in that State, unless the individual has a fixed base regularly available to him in the other Contracting State for the purpose of performing his activities. If he has such a fixed base, the income attributable to the fixed base that is derived in respect of services performed in that other State also may be taxed by that other State.

2. For purposes of paragraph 1, the income that is taxable in the other Contracting State shall be determined under the principles of paragraph 3 of Article 7 (Business profits).

**Article 15**

**Dependent personal services**

1. Subject to the provisions of Articles 16 (Directors' fees), 18 (Pensions, social security, annuities, alimony and child support payments), and 19 (Government service), salaries, wages and other remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2. Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

(a)    the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in any twelve month period commencing or ending in the taxable year concerned; and

(b)    the remuneration is paid by, or on behalf of, an employer who is not a resident of the other State; and

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(c)  the remuneration is not borne by a permanent establishment or a fixed base which the employer has in the other State.

3. Notwithstanding the preceding provisions of this Article, remuneration described in paragraph 1 that is derived by a resident of a Contracting State in respect of an employment as a member of the regular complement of a ship or aircraft operated in international traffic shall be taxable only in that State.

## Article 16

### Directors' fees

Directors' fees and other similar payments derived by a resident of a Contracting State in his capacity as a member of the board of directors of a company which is a resident of the other Contracting State may be taxed in that other State.

## Article 17

### Artistes and sportsmen

1. Income derived by a resident of a Contracting State as an entertainer, such as a theater, motion picture, radio, or television artiste, or a musician, or as a sportsman, from his personal activities as such exercised in the other Contracting State, which income would be exempt from tax in that other Contracting State under the provisions of Articles 14 (Independent personal services) and 15 (Dependent personal services), may be taxed in that other State, except where the amount of the gross receipts derived by such entertainer or sportsman, including expenses reimbursed to him, or borne on his behalf, from such activities does not exceed twenty thousand United States dollars ($20,000) or its equivalent in Danish kroner for the taxable year concerned.

2. Where income in respect of activities exercised by an entertainer or a sportsman in his capacity as such accrues not to the entertainer or sportsman himself but to another person, that income may, notwithstanding the provisions of Articles 7 (Business profits) and 14 (Independent personal services), be taxed in the Contracting State in which the activities of the entertainer or sportsman are exercised, unless the entertainer or sportsman establishes that neither the entertainer or sportsman nor persons related thereto participate directly or indirectly in the profits of that other person in any manner, including the receipt of deferred remuneration, bonuses, fees, dividends, partnership distributions, or other distributions.

## Article 18

### Pensions, social security, annuities, alimony and child support payments

1. Subject to the provisions of paragraph 2 of Article 19 (Government service),

(a)  Except as provided in subparagraph (b), pension distributions arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in the State in which they arise.

(b)  If, prior to the time of entry into force of this Convention, a person was a resident of a Contracting State and was receiving pension distributions arising in the other Contracting State, that person shall be taxable on pension distributions referred to in subparagraph (a) only in the first-mentioned Contracting State.

(c)  Pension distributions shall be deemed to arise in a Contracting State only if paid by a pension scheme established in that State.

(d)  For purposes of this paragraph, pension distributions means pension distributions and other similar remuneration, whether paid periodically or as a single sum.

2. Notwithstanding the provisions of paragraph 1, payments made by a Contracting State under provisions of the social security or similar legislation of that Contracting State to a resident of the other Contracting State or to a citizen of the United States shall be taxable only in the first-mentioned State.

3. Annuities derived and beneficially owned by an individual resident of a Contracting State shall be taxable only in that State. The term "annuities" as used in this paragraph means a stated sum paid periodically at stated times during a specified number of years or for life under an obligation to make the payments in return for adequate and full consideration (other than services rendered).

4. Alimony paid by a resident of a Contracting State, and deductible therein, to a resident of the other Contracting State shall be taxable only in that other Contracting State. The term "alimony" as used in this paragraph means periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, which payments are taxable to the recipient under the laws of the State of which he is a resident.

5. Periodic payments, not dealt with in paragraph 4, for the support of a child made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, paid by a resident of a Contracting State to a resident of the other Contracting State, shall be taxable only in the first-mentioned Contracting State.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## Article 19

**Government service**

1. Notwithstanding the provisions of Articles 14 (Independent personal services), 15 (Dependent personal services), 16 (Directors' fees) and 17 (Artistes and sportsmen):

(a) Salaries, wages and other remuneration, other than a pension, paid from the public funds of a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority in the discharge of functions of a governmental nature shall, subject to the provisions of subparagraph (b), be taxable only in that State;

(b) such remuneration, however, shall be taxable only in the other Contracting State if the services are rendered in that State and the individual is a resident of that State who:

    (i) is a national of that State; or

    (ii) did not become a resident of that State solely for the purpose of rendering the services.

(a) Any pension paid from the public funds of a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority in the discharge of functions of a governmental nature (other than a payment described in paragraph 2 of Article 18 (Pensions, social security, annuities, alimony and child support payments)) shall, subject to the provisions of subparagraph (b), be taxable only in that State;

(b) such pension, however, shall be taxable only in the other Contracting State if the individual is a resident and a national of that State.

3. The provisions of Articles 15 (Dependent personal services), 16 (Directors' fees), 17 (Artistes and sportsmen) and 18 (Pensions, social security, annuities, alimony and child support payments) shall apply to remuneration and pensions in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof.

## Article 20

**Students and trainees**

Payments received by a student, apprentice, or business trainee who is, or was immediately before visiting a Contracting State, a resident of the other Contracting State, and who is present in the first-mentioned State for the purpose of his full-time education at an accredited educational institution, or for his full-time training, shall not be taxed in that State, provided that such payments arise outside that State, and are for the purpose of his maintenance, education or training. The exemption from tax provided by this Article shall apply to an apprentice or business trainee only for a period of time not exceeding three years from the date he first arrives in the first-mentioned Contracting State for the purpose of his training. The provisions of this paragraph shall not apply to income from research if such research is undertaken not in the public interest but primarily for the private benefit of a specific person or persons.

## Article 21

**Other income**

1. Items of income beneficially owned by a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State.

2. The provisions of paragraph 1 shall not apply to income, other than income from real property as defined in paragraph 2 of Article 6 (Income from real property), if the beneficial owner of such income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein, or performs in the other State independent personal services from a fixed base situated therein, and the income is attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business profits) or Article 14 (Independent personal services), as the case may be, shall apply.

## Article 22

**Limitation of benefits**

1. A resident of a Contracting State shall be entitled to benefits otherwise accorded to residents of a Contracting State by this Convention only to the extent provided in this Article.

2. A resident of a Contracting State shall be entitled to all the benefits of this Convention only if such resident is:

a) an individual;

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

b) a Contracting State, a political subdivision, or local authority thereof, or an agency of instrumentality of that State, subdivision, or authority;

c) a company, if:

(i) its principal class of shares (and any disproportionate class of shares) is regularly traded on one or more recognized stock exchanges, and either:

A) its principal class of shares is primarily traded on a recognized stock exchange located in the Contracting State of which the company is a resident (or, in the case of a company resident in Denmark, on a recognized stock exchange located within the European Union or in any other European Economic Area state or, in the case of a company resident in the United States, on a recognized stock exchange located in another state that is a party to the North American Free Trade Agreement); or

B) the company's primary place of management and control is in the Contracting State of which it is a resident;

(ii) in the case of a company that is a resident of Denmark, one or more taxable nonstock corporations entitled to benefits under subparagraph g) own shares representing more than 50 percent of the voting power of the company and all other shares are listed on a recognized stock exchange and are primarily traded on a recognized stock exchange located within the European Union or in any other European Economic Area state; or

(iii) at least 50 percent of the aggregate voting power and value of the shares (and at least 50 percent of any disproportionate class of shares) in the company are owned directly or indirectly by five or fewer companies entitled to benefits under clause (i) or (ii), or any combination thereof, provided that, in the case of indirect ownership, each intermediate owner is a resident of either Contracting State;

d) a charitable organization or other legal person described in subparagraph b)(i) of paragraph 1 of Article 4 (Residence) of this Convention,

e) a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan, provided that more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State; or

f) a person other than an individual, if:

(i) on at least half the days of the taxable year at least 50 percent of each class of shares or other beneficial interests in the person is owned, directly or indirectly, by residents of the Contracting State of which that person is a resident that are entitled to the benefits of this Convention under subparagraph a), subparagraph b), clause i) of subparagraph c), or subparagraphs d) or e) of this paragraph, provided that, in the case of indirect ownership, each intermediate owner is a resident of that Contracting State; and

(ii) less than 50 percent of the person's gross income for the taxable year, as determined in the person's State of residence, is paid or accrued, directly or indirectly, to persons who are not residents of either Contracting State entitled to the benefits of this Convention under subparagraph a), subparagraph b), clause i) of subparagraph c), or subparagraphs d) or e) of this paragraph in the form of payments that are deductible for purposes of the taxes covered by this Convention in the person's State of residence (but not including arm's length payments in the ordinary course of business for services or tangible property and payments in respect of financial obligations to a bank that is not related to the payor);

g) in the case of Denmark, a taxable nonstock corporation if:

(i) the amount paid or accrued in the form of deductible payments (but not including arms length payments in the ordinary course of its activities of a charitable nature and authorized by the Danish laws on taxable non-stock companies (lov om erhvervsmæssige fonde and lov om fonde og visse foreninger) for services or tangible property) in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a) or b), clause (i) of subparagraph c), or subparagraphs d) or e), does not exceed 50 percent of its gross income, as determined under Danish law (excluding its tax-exempt income); and

(ii) the amount paid or accrued, in the form of both deductible payments (but not including arms length payments in the ordinary course of its activities of a charitable nature and authorized by the Danish laws on taxable non-stock companies (lov om erhvervsmæssige fonde and lov om fonde og visse foreninger) for services or tangible property) and non-deductible distributions, in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a) or b), clause (i) of subparagraph c), or subparagraphs d) or e), does not exceed 50 percent of the amount of its total income (including its tax-exempt income).

3. A company that is a resident of a Contracting State shall also be entitled to the benefits of the Convention if:

a) at least 95 percent of the aggregate voting power and value of its shares (and at least 50 percent of any disproportionate class of shares) is owned, directly or indirectly, by seven or fewer persons that are equivalent beneficiaries; and

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

b) less than 50 percent of the company's gross income, as determined in the company's State of residence, for the taxable year is paid or accrued, directly or indirectly, to persons who are not equivalent beneficiaries, in the form of payments (but not including arm's length payments in the ordinary course of business for services or tangible property and payments in respect of financial obligations to a bank that is not related to the payor), that are deductible for the purposes of the taxes covered by this Convention in the company's State of residence.

a) A resident of a Contracting State will be entitled to benefits of the Convention with respect to an item of income derived from the other State, regardless of whether the resident is entitled to benefits under paragraph 2 or 3 of this Article, if the resident is engaged in the active conduct of a trade or business in the first-mentioned State (other than the business of making or managing investments for the resident's own account, unless these activities are banking, insurance or securities activities carried on by a bank, insurance company or registered securities dealer), and the income derived from the other Contracting State is derived in connection with, or is incidental to, that trade or business.

b) If a resident of a Contracting State derives an item of income from a trade or business activity in the other Contracting State, or derives an item of income arising in the other Contracting State from an associated enterprise, subparagraph a) of this paragraph shall apply to such item only if the trade or business activity in the first-mentioned State is substantial in relation to the trade or business activity in the other State. Whether a trade or business activity is substantial for purposes of this paragraph will be determined based on all the facts and circumstances.

c) In determining whether a person is "engaged in the active conduct of a trade or business" in a Contracting State under subparagraph a) of this paragraph, activities conducted by persons connected to such person shall be deemed to be conducted by such person. A person shall be connected to another if one possesses at least 50 percent of the beneficial interest in the other (or, in the case of a company, at least 50 percent of the aggregate vote and at least 50 percent of the aggregate value of the shares in the company or of the beneficial equity interest in the company) or another person possesses, directly or indirectly, at least 50 percent of the beneficial interest (or, in the case of a company, at least 50 percent of the aggregate vote and at least 50 percent of the aggregate value of the shares in the company or of the beneficial equity interest in the company) in each person. In any case, a person shall be considered to be connected to another if, based on all the relevant facts and circumstances, one has control of the other or both are under the control of the same person or persons.

5. A resident of one of the Contracting States that derives from the other Contracting State income mentioned in Article 8 (Shipping and Air Transport) and that is not entitled to the benefits of this Convention because of the foregoing paragraphs, shall nevertheless be entitled to the benefits of this Convention with respect to such income if at least 50 percent of the beneficial interest in such person (or, in the case of a company, at least 50 percent of the aggregate vote and value of the stock of such company) is owned directly or indirectly:

a) by persons described in subparagraphs a) or b), or clause (i) of subparagraph c), or subparagraphs d) or e) of paragraph 2, or citizens of the United States, or individuals who are residents of a third state; or

b) by a company or combination of companies the stock of which is primarily and regularly traded on an established securities market in a third state;

provided that such third state grants an exemption under similar terms for profits as mentioned in Article 8 (Shipping and Air Transport) of this Convention to citizens and corporations of the other Contracting State either under its national law or in common agreement with that other Contracting State or under a convention between that third state and the other Contracting State.

6. Notwithstanding the preceding provisions of this Article, where an enterprise of Denmark derives interest or royalties from the United States, and the income consisting of such interest or royalties is exempt from taxation in Denmark because it is attributable to a permanent establishment which that enterprise has in a third state, the tax benefits that would otherwise apply under the other provisions of the Convention will not apply to such income if the tax that is actually paid with respect to such income in the third state is less than 60 percent of the tax that would have been payable in Denmark if the income were earned in Denmark by the enterprise and were not attributable to the permanent establishment in the third state. Any interest or royalties to which the provisions of this paragraph apply may be taxed in the United States at a rate that shall not exceed 15 percent of the gross amount thereof. The provisions of this paragraph shall not apply if:

a) in the case of interest, the income derived from the United States is derived in connection with, or is incidental to, the active conduct of a trade or business carried on by the permanent establishment in the third state (other than the business of making, managing or simply holding investments for the person's own account, unless these activities are banking or securities activities carried on by a bank or registered securities dealer); or

b) in the case of royalties, the royalties are received as compensation for the use of, or the right to use, intangible property produced or developed by the permanent establishment itself.

7. A resident of a Contracting State that is not entitled to benefits pursuant to the preceding paragraphs of this Article shall, nevertheless, be granted benefits of the Convention if the competent authority of the other Contracting State determines that the establishment, acquisition or maintenance of such person and the conduct of its operations did not have as one of its principal purposes the obtaining of benefits under the Convention. The competent authority of the other Contracting State

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

shall consult with the competent authority of the first-mentioned State before denying the benefits of the Convention under this paragraph.

8. For the purposes of this Article,

a) the term "principal class of shares" means the ordinary or common shares of the company, provided that such class of shares represents the majority of the voting power and value of the company. If no single class of ordinary or common shares represents the majority of the aggregate voting power and value of the company, the "principal class of shares" is that class or those classes that in the aggregate represent a majority of the aggregate voting power and value of the company.

b) the term "disproportionate class of shares" means any class of shares of a company resident in one of the States that entitles the shareholder to disproportionately higher participation, through dividends, redemption payments or otherwise, in the earnings generated in the other State by particular assets or activities of the company;

c) the term "shares" shall include depository receipts thereof;

d) the term "recognized stock exchange" means:

 (i) the NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under the U.S. Securities Exchange Act of 1934;

 (ii) the Copenhagen Stock Exchange;

 (iii) the stock exchanges of Amsterdam, Brussels, Frankfurt, Hamburg, Helsinki, London, Oslo, Paris, Stockholm, Sydney, Tokyo and Toronto; and

 (iv) any other stock exchanges agreed upon by the competent authorities of the Contracting States.

e) the term "taxable nonstock corporation" as used in paragraph 2 means a foundation that is taxable in accordance with paragraph 1 of Article 1 of the Danish Act on Taxable Nonstock Corporations (fonde der beskattes efter fondsbeskatningsloven);

f) (i) for the purposes of paragraph 2, the shares in a class of shares are considered to be regularly traded on one or more recognized stock exchanges in a taxable year if:

   (A) trades in such class are effected on one or more of such stock exchanges other than in de minimis quantities during every quarter; and

   (B) the aggregate number of shares or units of that class traded on such stock exchange or exchanges during the previous taxable year is at least 6 percent of the average number of shares or units outstanding in that class (including shares held by taxable nonstock corporations) during that taxable year; and

 (ii) for purposes of determining whether a company satisfies the requirements of clause c) (ii) of paragraph 2, clause (i) of this paragraph shall be applied as if all the shares issued by the company were one class of shares and shares held by taxable nonstock corporations will be considered outstanding for purposes of determining whether 6 percent of the outstanding shares have been traded during a taxable year.

g) a company's primary place of management and control will be in the State of which it is a resident only if executive officers and senior management employees exercise day-to-day responsibility for more of the strategic, financial and operational policy decision making for the company (including its direct and indirect subsidiaries) in that State than in any other state, and the staffs conduct more of the day-to-day activities necessary for preparing and making those decisions in that State than in any other state;

h) the term "equivalent beneficiary" means a resident of a member state of the European Union or of any other European Economic Area state or of a party to the North American Free Trade Agreement, or of Switzerland, but only if that resident:

 (i) A) would be entitled to all the benefits of a comprehensive convention for the avoidance of double taxation between any member state of the European Union or any other European Economic Area state or any party to the North American Free Trade Agreement, or Switzerland, and the State from which the benefits of this Convention are claimed under provisions analogous to subparagraphs a), b), clause i) of subparagraph c) or subparagraphs d) or e) of paragraph 2 of this Article, provided that if such convention does not contain a comprehensive limitation on benefits article, the person would be entitled to the benefits of this Convention by reason of subparagraph a), b), clause i) of subparagraph c) or subparagraphs d) or e) of paragraph 2 of this Article if such person were a resident of one of the States under Article 4 (Residence) of this Convention; and

   B) with respect to income referred to in Article 10 (Dividends), 11 (Interest) or 12 (Royalties) of this Convention, would be entitled under such convention to a rate of tax with respect to the particular class of income for which benefits are being claimed under this Convention that is at least as low as the rate applicable under this Convention; or

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(ii) is a resident of a Contracting State that is entitled to the benefits of this Convention by reason of subparagraph a), b), clause i) of subparagraph c) or subparagraphs d) or e) of paragraph 2 of this Article.

For the purposes of applying paragraph 3 of Article 10 (Dividends) in order to determine whether a person, owning shares, directly or indirectly, in the company claiming the benefits of this Convention, is an equivalent beneficiary, such person shall be deemed to hold the same voting power in the company paying the dividend as the company claiming the benefits holds in such company;

i)   with respect to dividends, interest or royalties arising in Denmark and beneficially owned by a company that is a resident of the United States, a company that is a resident of a member state of the European Union will be treated as satisfying the requirements of subparagraph h)(i) B) for purposes of determining whether such United States resident is entitled to benefits under this paragraph if a payment of dividends, interest or royalties arising in Denmark and paid directly to such resident of a member state of the European Union would have been exempt from tax pursuant to any directive of the European Union, notwithstanding that the income tax convention between Denmark and that other member state of the European Union would provide for a higher rate of tax with respect to such payment than the rate of tax applicable to such United States company under Article 10 (Dividends), 11 (Interest), or 12 (Royalties) of this Convention.

**Article 23**

**Relief from double taxation**

1. In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a resident or citizen of the United States as a credit against the United States tax on income:

(a)   the income tax paid or accrued to Denmark by or on behalf of such resident or citizen; and

(b)   in the case of a United States company owning at least 10 percent of the voting stock of a company that is a resident of Denmark and from which the United States company receives dividends, the income tax paid or accrued to Denmark by or on behalf of the payer with respect to the profits out of which the dividends are paid.

(c)   (i)   Subject to the provisions of clause (ii), in the case of a resident or national of the United States subject to the taxes imposed by the Hydrocarbon Tax Act that are referred to in subparagraph (b)(iv) of paragraph 1 of Article 2 (Taxes covered), the United States shall allow as a credit against the United States tax on income, the appropriate amount of tax paid or accrued to Denmark by or on behalf of such resident or national pursuant to the Hydrocarbon Tax Act on oil and gas extraction income from oil or gas wells in Denmark. However, the appropriate amount allowed as a credit shall not exceed the product of the maximum statutory United States tax rate applicable to such resident or national for such taxable year, and the amount of income separately assessed under the Hydrocarbon Tax Act.

(ii)   The appropriate amount is also subject to any other limitations imposed by the law of the United States, as it may be amended from time to time, that apply to creditable taxes under section 901 or 903 of the Internal Revenue Code for persons claiming benefits under this Convention. Any taxes paid on income assessed separately under the Hydrocarbon Tax Act in excess of the appropriate amount may be used only as a credit in another taxable year, and only against United States tax on income assessed separately under the Hydrocarbon Tax Act.

(iii)   The provisions of clauses (i) and (ii) shall apply separately, in the same way, to the amount of tax paid or accrued to Denmark pursuant to the Hydrocarbon Tax Act on

(1)   Danish source oil related income not described in clause (i); and

(2)   other Danish source income.

For the purposes of this Article, the Danish taxes referred to in paragraphs 1(b) and 2 of Article 2 (Taxes covered) shall be considered income taxes and shall be allowed as a credit against the United States tax on income, subject to all the provisions and limitations of this paragraph.

2. Where a United States citizen is a resident of Denmark:

(a)   with respect to items of income that under the provisions of this Convention are exempt from United States tax or that are subject to a reduced rate of United States tax when derived by a resident of Denmark who is not a United States citizen, Denmark shall allow as a credit against Danish tax only the tax paid, if any, that the United States may impose under the provisions of this Convention, other than taxes that may be imposed solely by reason of citizenship under the saving clause of paragraph 4 of Article 1 (General scope);

(b)   for purposes of computing United States tax on those items of income referred to in subparagraph (a), the United States shall allow as a credit against United States tax the income tax paid to Denmark after the credit referred to in subparagraph (a); the credit so allowed shall not reduce the portion of the United States tax that is creditable against the Danish tax in accordance with subparagraph (a); and

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(c) for the exclusive purpose of relieving double taxation in the United States under subparagraph (b), items of income referred to in subparagraph (a) shall be deemed to arise in Denmark to the extent necessary to avoid double taxation of such income under subparagraph (b).

3. In the case of Denmark, double taxation shall be avoided as follows:

(a) When a resident of Denmark derives income which, in accordance with the provisions of this Convention, may be taxed in the United States, Denmark shall allow as a deduction from the tax on the income of that resident an amount equal to the income tax paid in the United States;

(b) Such deduction shall not, however, exceed that part of the income tax, as computed before the deduction is given, which is attributable to the income that may be taxed in the United States.

(c) When a resident of Denmark derives income which, in accordance with the provisions of this Convention, shall be taxable only in the United States, Denmark may include this income in the tax base but shall allow as a deduction from income tax that part of the income tax which is attributable to the income derived from the United States.

For the purposes of this paragraph, the United States taxes referred to in paragraphs 1(a) and 2 of Article 2 (Taxes covered) shall be considered income taxes, and shall be allowed as a credit against the Danish tax on income.

## Article 24

### Non-discrimination

1. Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which citizens of that other State in the same circumstances, particularly with respect to taxation of worldwide income, are or may be subjected. This provision shall also apply to persons who are not residents of one or both of the Contracting States.

2. The taxation on a permanent establishment or fixed base that a resident or enterprise of a Contracting State has in the other Contracting State shall not be less favorably levied in that other State than the taxation levied on enterprises or residents of that other State carrying on the same activities. The provisions of this paragraph shall not be construed as obliging a Contracting State to grant to residents of the other Contracting State any personal allowances, reliefs, and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents.

3. Except where the provisions of paragraph 1 of Article 9 (Associated enterprises), paragraph 4 of Article 11 (Interest), or paragraph 4 of Article 12 (Royalties) apply, interest, royalties and other disbursements paid by an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable profits of such enterprise, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State. Similarly, any debts of an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable capital of the first-mentioned resident, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State.

4. Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned State are or may be subjected.

5. Nothing in this Article shall be construed as preventing either Contracting State from imposing a tax as described in paragraph 8 of Article 10 (Dividends).

6. The provisions of this Article shall, notwithstanding the provisions of Article 2 (Taxes covered), apply to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof.

## Article 25

### Mutual agreement procedure

1. Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States and the time limits prescribed in such laws for presentation of claims for refund, present his case to the competent authority of the Contracting State of which he is a resident or national.

2. The competent authority shall endeavour, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention. Any agreement reached shall be implemented notwithstanding any time limits in the domestic law of the Contracting States. Assessment and collection procedures shall be suspended during the pendency of any mutual agreement proceeding.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

3. The competent authorities of the Contracting States shall endeavour to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular the competent authorities of the Contracting States may agree:

(a)  to the same attribution of income, deductions, credits, or allowances of an enterprise of a Contracting State to its permanent establishment situated in the other Contracting State;

(b)  to the same allocation of income, deductions, credits, or allowances between persons;

(c)  to the same characterization of particular items of income, including the same characterization of income that is assimilated to income from shares by the taxation law of one of the Contracting States and that is treated as a different class of income in the other State;

(d)  to the same characterization of persons;

(e)  to the same application of source rules with respect to particular items of income;

(f)  to a common meaning of a term;

(g)  to advance pricing arrangements; and

(h)  to the application of the provisions of domestic law regarding penalties, fines, and interest in a manner consistent with the purposes of the Convention.

They may also consult together for the elimination of double taxation in cases not provided for in the Convention.

4. The competent authorities also may agree to increases in any specific dollar amounts referred to in the Convention to reflect economic or monetary developments.

5. The competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement in the sense of the preceding paragraphs.

## Article 26

### Exchange of information

1. The competent authorities of the Contracting States shall exchange such information as is relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention insofar as the taxation thereunder is not contrary to the Convention, including information relating to the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention. The exchange of information is not restricted by Article 1 (General scope). Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention or the oversight of the above. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions.

2. In no case shall the provisions of paragraph 1 be construed so as to impose on a Contracting State the obligation:

(a)  to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

(b)  to supply information which is not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State; or

(c)  to supply information which would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public).

3. Notwithstanding paragraph 2, the competent authority of the requested State shall have the authority to obtain and provide information held by financial institutions, nominees or persons acting in an agency or fiduciary capacity, or respecting interests in a person. If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall obtain that information in the same manner and to the same extent as if the tax of the first-mentioned State were the tax of that other State and were being imposed by that other State, notwithstanding that the other State may not, at that time, need such information for purposes of its own tax. If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, and writings), to the same extent such depositions and documents can be obtained under the laws and administrative practices of that other State with respect to its own taxes.

4. For purposes of this Article, the Convention shall apply, notwithstanding the provisions of Article 2 (Taxes covered), to taxes of every kind imposed by a Contracting State.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## Article 27

### Administrative assistance

1. The Contracting States undertake to lend assistance to each other in the collection of taxes referred to in Article 2 (Taxes covered), together with interest, costs, additions to such taxes, and civil penalties, referred to in this Article as a "revenue claim".

2. An application for assistance in the collection of a revenue claim shall include a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

3. A revenue claim of the applicant State that has been finally determined may be accepted for collection by the competent authority of the requested State and, subject to the provisions of paragraph 7, if accepted shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes.

4. Where an application for collection of a revenue claim in respect of a taxpayer is accepted:

(a)   by the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received; and

(b)   by Denmark, the revenue claim shall be treated by Denmark as an assessment under Danish laws against the taxpayer as of the time the application is received.

5. Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State, based on any such rights that may be available under the laws of either Contracting State. If, at any time pending execution of a request for assistance under this Article, the applicant State loses the right under its internal law to collect the revenue claim, the competent authority of the applicant State shall promptly withdraw the request for assistance in collection.

6. Subject to this paragraph, amounts collected by the requested State pursuant to this Article shall be forwarded to the competent authority of the applicant State. Unless the competent authorities of the Contracting States otherwise agree, the ordinary costs incurred in providing collection assistance shall be borne by the requested State and any extraordinary costs so incurred shall be borne by the applicant State.

7. A revenue claim of an applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested State.

8. No assistance shall be provided under this Article for a revenue claim in respect of a taxpayer to the extent that the taxpayer can demonstrate that

(a)   where the taxpayer is an individual, the revenue claim relates to a taxable period in which the taxpayer was a citizen of the requested State, and

(b)   where the taxpayer is an entity that is a company, estate or trust, the revenue claim relates to a taxable period in which the taxpayer derived its status as such an entity from the laws in force in the requested State.

9. Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto.

10. Nothing in this Article shall be construed as imposing on either Contracting State the obligation to carry out administrative measures of a different nature from those used in the collection of its own taxes or that would be contrary to its public policy (ordre public).

11. The competent authorities of the Contracting States shall agree upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States.

12. The requested State shall not be obliged to accede to the request of the applicant State:

(a)   if the applicant State has not pursued all appropriate collection action in its own jurisdiction; or

(b)   in those cases where the administrative burden for the requested State is disproportionate to the benefit to be derived by the applicant State.

## Article 28

### Diplomatic agents and consular officers

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Nothing in this Convention shall affect the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements.

**Article 29**

**Entry into force**

1. The Contracting States shall notify each other when the requirements for the entry into force of this Convention have been complied with.

2. The Convention shall enter into force on the date of the receipt of the later of such notifications, and its provisions shall have effect:

(a)   in respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;

(b)   in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Convention enters into force.

3. Subject to paragraph 4, the Convention between Denmark and the United States for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income signed at Washington, D.C., on May 6, 1948 (hereinafter referred to as "the 1948 Convention") shall cease to have effect when the provisions of this Convention take effect in accordance with paragraph 2 or 4.

4. Where the 1948 Convention would have afforded any person any greater relief from tax than this Convention, the 1948 Convention shall, at the election of any person that was entitled to benefits under the prior Convention, continue to have effect in its entirety for one year after the date on which the provisions of this Convention would otherwise first have effect pursuant to paragraph 2.

5. The 1948 Convention shall terminate on the last date on which it has effect in accordance with the foregoing provisions of this Article.

**Article 30**

**Termination**

This Convention shall remain in force until terminated by a Contracting State. Either Contracting State may terminate the Convention by giving notice of termination through diplomatic channels. In such event, the Convention shall cease to have effect:

(a)   in respect of taxes withheld at source, for amounts paid or credited after the expiration of the 6-month period beginning on the date on which notice of termination was given; and

(b)   in respect of other taxes, for taxable periods beginning on or after the expiration of the 6-month period beginning on the date on which notice of termination was given.

In witness whereof, the undersigned, being duly authorized by their respective Governments, have signed this Convention.

Done at Washington in the English language, this 19th day of August, 1999.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

# Protocol

At the signing today of the Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income ("the Convention"), the undersigned have agreed on the following provisions, which shall form an integral part of the Convention.

1. Scandinavian Airlines System (SAS) is a consortium within the meaning of Article 8 (Shipping and air transport), its participating members being SAS Danmark A/S, SAS Norge ASA and SAS Sverige AB. In order to avoid the problems inherent in operating in the United States through a consortium, the members of the consortium in 1946 established a New York corporation, Scandinavian Airlines System, Inc. (SAS, Inc.) to act on their behalf in the United States pursuant to an agency agreement dated September 18, 1946. A similar agreement was entered into by SAS directly and SAS, Inc., on March 14, 1951. Pursuant to the agency agreement, SAS, Inc., is authorized to perform only such functions as SAS assigns to it, all in connection with international air traffic. Under that agreement, all revenues collected by SAS, Inc., are automatically credited to SAS. Operation expenses incurred by SAS, Inc., are debited to SAS in accordance with the terms of the agency agreement. SAS is obligated under the terms of the agency agreement to reimburse SAS, Inc. for all of its expenses irrespective of the revenues of SAS, Inc. SAS, Inc., does not perform any functions except those connected with or incidental to the business of SAS as an operator of aircraft in international traffic.

In view of the special nature of the SAS consortium and in view of the agency agreement as described above, the United States for purposes of Article 8 (Shipping and air transport) of the Convention shall treat all of the income earned by SAS, Inc., that is derived from the operation in international traffic of aircraft as the income of the SAS consortium.

2. This Convention may be extended either in its entirety or with any necessary modifications to any part of Denmark to which the Convention does not apply and which imposes taxes substantially similar in character to those to which the Convention applies. Such extension shall take effect from such date, shall be subject to such modification and conditions as may be specified in a supplementary Convention agreed between the Contracting States, and shall enter into force in accordance with their constitutional procedures.

3. Articles 7 (Business profits) and 24 (Non-discrimination) shall not prevent Denmark from continuing to tax permanent establishments of United States insurance companies in accordance with section 12, paragraph 3, of the Danish Company Tax law nor shall it prevent the United States from continuing to tax permanent establishments of Danish insurance companies in accordance with section 842(b) of the Internal Revenue Code.

(a)    A payment shall be treated as a pension distribution under paragraph 1 of Article 18 (Pensions, social security, annuities, alimony and child support payments) if it is a payment under a pension scheme recognized for tax purposes in the Contracting State where the pension scheme is established.

(b)    For this purpose, pension schemes recognized for tax purposes shall include the following and any identical or substantially similar schemes which are imposed after the date of signature of the Convention:

    (i)    Under United States law, qualified plans under section 401(a) of the Internal Revenue Code, individual retirement plans (including individual retirement plans that are part of a simplified employee pension plan that satisfies section 408(k), individual retirement accounts, individual retirement annuities, section 408(p) accounts, and Roth IRAs under section 408A), section 403(a) qualified annuity plans, and section 403(b) plans.

    (ii)    Under the law of Denmark, pension schemes under Section I of the Act on Taxation of Pension Schemes (pensionsbeskatningslovens afsnit I).

In witness whereof, the undersigned, being duly authorized by their respective Governments, have signed this Protocol.

Done at Washington in the English language, this 19th day of August, 1999.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

**Denmark - United States**
**Income Tax Treaty**

(1999)

| |
|---|
| **Status:** In Force<br>**Conclusion Date:** 19 August 1999.<br>**Entry into Force:** 31 March 2000.<br>**Effective Date:** 1 January 2001 (see Article 29 ). |

**CONVENTION BETWEEN**
**THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND**
**THE GOVERNMENT OF THE KINGDOM OF DENMARK**
**FOR THE AVOIDANCE OF DOUBLE TAXATION AND**
**THE PREVENTION OF FISCAL EVASION**
**WITH RESPECT TO TAXES ON INCOME**

**Preamble**

The Government of the United States of America and the Government of the Kingdom of Denmark, desiring to conclude a Convention for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income, have agreed as follows:

**Article 1**

**General scope**

1. Except as otherwise provided in this Convention, this Convention shall apply to persons who are residents of one or both of the Contracting States.

2. This Convention shall not restrict in any manner any benefit now or hereafter accorded:

(a)   by the laws of either Contracting State; or

(b)   by any other agreement between the Contracting States.

3. Notwithstanding the provisions of subparagraph 2(b):

(a)   the provisions of Article 25 (Mutual agreement procedure) of this Convention exclusively shall apply to any dispute concerning whether a measure is within the scope of this Convention, and the procedures under this Convention exclusively shall apply to that dispute; and

(b)   unless the competent authorities determine that a taxation measure is not within the scope of this Convention, the non-discrimination obligations of this Convention exclusively shall apply with respect to that measure, except for such national treatment or most-favored-nation obligations as may apply to trade in goods under the General Agreement on Tariffs and Trade. No national treatment or most-favored-nation obligation under any other agreement shall apply with respect to that measure.

(c)   For the purpose of this paragraph, a "measure" is a law, regulation, rule, procedure, decision, administrative action, or any similar provision or action.

4. Notwithstanding any provision of the Convention except paragraph 5 of this Article, a Contracting State may tax its residents (as determined under Article 4 (Residence)), and by reason of citizenship may tax its citizens, as if the Convention had not come into effect. For this purpose, the term "citizen" shall include a former citizen or long-term resident whose loss of such status had as one of its principal purposes the avoidance of tax (as defined under the laws of the Contracting State of which the person was a citizen or long-term resident), but only for a period of 10 years following such loss.

5. The provisions of paragraph 4 shall not affect:

(a)   the benefits conferred by a Contracting State under paragraph 2 of Article 9 (Associated enterprises), paragraphs 7 and 8 of Article 13 (Capital gains), paragraphs 1(c), 2 and 5 of Article 18 (Pensions, social security, annuities, alimony and child support payments), and Articles 23 (Relief from double taxation), 24 (Non-discrimination), and 25 (Mutual agreement procedure); and

(b)   the benefits conferred by a Contracting State under Articles 19 (Government service), 20 (Students and trainees) and 28 (Diplomatic agents and consular officers), upon individuals who are neither citizens of, nor have been admitted for permanent residence in, that State.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

**Article 2**

**Taxes covered**

1. The existing taxes to which this Convention applies are:

(a)   in the United States:

(i)   the Federal income taxes imposed by the Internal Revenue Code (but excluding social security taxes); and

(ii)  the Federal excise taxes imposed with respect to private foundations;

(b)   in Denmark:

(i)   the income tax to the State (indkomstskatten til staten);

(ii)  the municipal income tax (den kommunale indkomstskat);

(iii) the income tax to the county municipalities (den amtskommunale indkomstskat); and

(iv)  taxes imposed under the Hydrocarbon Tax Act (skatter i henhold til kulbrinteskatteloven).

2. The Convention shall apply also to any identical or substantially similar taxes which are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes. The competent authorities of the Contracting States shall notify each other of any significant changes that have been made in their respective taxation laws or other laws affecting their obligations under the Convention, and of any official published material concerning the application of this Convention, including explanations, regulations, rulings, or judicial decisions.

**Article 3**

**General definitions**

1. For the purposes of this Convention, unless the context otherwise requires:

(a)   the term "person" includes an individual, an estate, a trust, a partnership, a company and any other body of persons;

(b)   the term "company" means any body corporate or any entity which is treated as a body corporate for tax purposes according to the laws of the state in which it is organized;

(c)   the terms "enterprise of a Contracting State" and "enterprise of the other Contracting State" mean respectively an enterprise carried on by a resident of a Contracting State, and an enterprise carried on by a resident of the other Contracting State; the terms also include an enterprise carried on by a resident of a Contracting State through an entity that is treated as fiscally transparent in that Contracting State;

(d)   the term "international traffic" means any transport by a ship or aircraft, except when such transport is solely between places in a Contracting State;

(e)   the term "competent authority" means:

(i)   in the United States: the Secretary of the Treasury or his delegate; and

(ii)  in Denmark: the Minister for Taxation or his authorized representative;

(f)   the term "United States" means the United States of America, and includes the states thereof and the District of Columbia; such term also includes the territorial sea thereof and the sea bed and subsoil of the submarine areas adjacent to that territorial sea, over which the United States exercises sovereign rights in accordance with international law; the term, however, does not include Puerto Rico, the Virgin Islands, Guam or any other United States possession or territory;

(g)   the term "Denmark" means the Kingdom of Denmark, including any area outside the territorial sea of Denmark which in accordance with international law has been or may hereafter be designated under Danish laws as an area within which Denmark may exercise sovereign rights with respect to the exploration and exploitation of the natural resources of the sea-bed or its subsoil and the superjacent waters and with respect to other activities for the exploration and economic exploitation of the area; the term "Denmark" does not comprise the Faroe Islands or Greenland;

(h)   the term "national of a Contracting State", means:

(i)   any individual possessing the nationality or citizenship of that State; and

(ii)  any legal person, partnership or association deriving its status as such from the laws in force in that State;

(i)   the term "qualified governmental entity" means:

(i)   any person or body of persons that constitutes a governing body of a Contracting State, or of a political subdivision or local authority of a Contracting State;

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(ii) a person that is wholly owned, directly or indirectly, by a Contracting State or political subdivision or local authority of a Contracting State, provided it is organized under the laws of the Contracting State, its earnings are credited to its own account with no portion of its income inuring to the benefit of any private person, and its assets vest in the Contracting State, political subdivision or local authority upon dissolution; and

(iii) a pension trust or fund of a person described in clause (i) or (ii) that is constituted and operated exclusively to administer or provide pension benefits described in Article 19 (Government service); provided that an entity described in clause (ii) or (iii) does not carry on commercial activities.

2. As regards the application of the Convention at any time by a Contracting State any term not defined therein shall, unless the context otherwise requires, or the competent authorities agree to a common meaning pursuant to the provisions of Article 25 (Mutual agreement procedure), have the meaning which it has at that time under the law of that State for the purposes of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

## Article 4

### Residence

1. Except as provided in this paragraph, for the purposes of this Convention, the term "resident of a Contracting State" means any person who, under the laws of that State, is liable to tax therein by reason of his domicile, residence, citizenship, place of management, place of incorporation, or any other criterion of a similar nature.

(a)   The term "resident of a Contracting State" does not include any person who is liable to tax in that State in respect only of income from sources in that State or of profits attributable to a permanent establishment in that State.

(b)   A legal person organized under the laws of a Contracting State and that is generally exempt from tax in that State and is established and maintained in that State either:

(i)   exclusively for a religious, charitable, educational, scientific, or other similar purpose; or

(ii)   to provide pensions or other similar benefits to employees, including self-employed individuals, pursuant to a plan, is to be treated for purposes of this paragraph as a resident of that Contracting State.

(c)   A qualified governmental entity is to be treated as a resident of the Contracting State where it is established.

(d)   An item of income, profit or gain derived through an entity that is fiscally transparent under the laws of either Contracting State shall be considered to be derived by a resident of a State to the extent that the item is treated for purposes of the taxation law of such Contracting State as the income, profit or gain of a resident.

2. Where by reason of the provisions of paragraph 1 an individual is a resident of both Contracting States, then his status shall be determined as follows:

(a)   the individual shall be deemed to be a resident of the State in which he has a permanent home available to him; if such individual has a permanent home available to him in both States, he shall be deemed to be a resident of the State with which his personal and economic relations are closer (center of vital interests);

(b)   if the State in which the individual has his center of vital interests cannot be determined, or if he has no permanent home available to him in either State, he shall be deemed to be a resident of the State in which he has an habitual abode;

(c)   if the individual has an habitual abode in both States or in neither of them, he shall be deemed to be a resident of the State of which he is a national;

(d)   if he is a national of both States or of neither of them, the competent authorities of the Contracting States shall endeavor to settle the question by mutual agreement.

3. Where by reason of the provisions of paragraph 1 a person other than an individual is a resident of both Contracting States, the competent authorities of the Contracting States shall by mutual agreement endeavor to settle the question and to determine the mode of application of the Convention to such person.

4. A United States citizen or an alien lawfully admitted for permanent residence in the United States is a resident of the United States, but only if such person has a substantial presence, permanent home or habitual abode in the United States.

## Article 5

### Permanent establishment

1. For the purposes of this Convention, the term "permanent establishment" means a fixed place of business through which the business of an enterprise is wholly or partly carried on.

2. The term "permanent establishment" includes especially:

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(a)  a place of management;

(b)  a branch;

(c)  an office;

(d)  a factory;

(e)  a workshop; and

(f)  a mine, an oil or gas well, a quarry, or any other place of extraction of natural resources.

3. A building site or construction or installation project, or an installation or drilling rig or ship used for the exploration of natural resources, constitutes a permanent establishment only if it lasts, or the activity continues for, more than 12 months. For the purpose of this paragraph, activities carried on by an enterprise related to another enterprise, within the meaning of Article 9 (Associated enterprises), shall be regarded as carried on by the enterprise to which it is related if the activities in question:

(a)  are substantially the same as those carried on by the last- mentioned enterprise; and

(b)  are concerned with the same project or operation; except to the extent that those activities are carried on at the same time.

4. Notwithstanding the preceding provisions of this Article, the term "permanent establishment" shall be deemed not to include:

(a)  the use of facilities solely for the purpose of storage, display, or delivery of goods or merchandise belonging to the enterprise;

(b)  the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of storage, display, or delivery;

(c)  the maintenance of a stock of goods or merchandise belonging to the enterprise solely for the purpose of processing by another enterprise;

(d)  the maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise, or of collecting information, for the enterprise;

(e)  the maintenance of a fixed place of business solely for the purpose of carrying on, for the enterprise, any other activity of a preparatory or auxiliary character;

(f)  the maintenance of a fixed place of business solely for any combination of the activities mentioned in subparagraphs (a) to (e) of this paragraph, provided that the overall activity of the fixed place of business resulting from the combination is of a preparatory or auxiliary character.

5. Notwithstanding the provisions of paragraphs 1 and 2, where a person -- other than an agent of an independent status to whom paragraph 6 applies -- is acting on behalf of an enterprise and has and habitually exercises in a Contracting State an authority to conclude contracts in the name of the enterprise, that enterprise shall be deemed to have a permanent establishment in that State in respect of any activities which that person undertakes for the enterprise, unless the activities of such person are limited to those mentioned in paragraph 4 which, if exercised through a fixed place of business, would not make this fixed place of business a permanent establishment under the provisions of that paragraph.

6. An enterprise shall not be deemed to have a permanent establishment in a Contracting State merely because it carries on business in that State through a broker, general commission agent, or any other agent of an independent status, provided that such persons are acting in the ordinary course of their business as independent agents.

7. The fact that a company that is a resident of a Contracting State controls or is controlled by a company that is a resident of the other Contracting State, or which carries on business in that other State (whether through a permanent establishment or otherwise), shall not constitute either company a permanent establishment of the other.

## Article 6

### Income from real property

1. Income derived by a resident of a Contracting State from real property (including income from agriculture or forestry) situated in the other Contracting State may be taxed in that other State.

2. The term "real property" shall have the meaning which it has under the law of the Contracting State in which the property in question is situated. The term shall in any case include property accessory to real property, livestock and equipment used in agriculture and forestry, rights to which the provisions of general law respecting landed property apply, usufruct of real property, and rights to variable or fixed payments as consideration for the working of, or the right to work, mineral deposits, sources and other natural resources; ships, boats and aircraft shall not be regarded as real property.

3. The provisions of paragraph 1 shall apply to income derived from the direct use, letting, or use in any other form of real property.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

4. The provisions of paragraphs 1 and 3 shall also apply to the income from real property of an enterprise and to income from real property used for the performance of independent personal services.

5. A resident of a Contracting State who is liable to tax in the other Contracting State on income from real property situated in the other Contracting State may elect for any taxable year to compute the tax on such income on a net basis as if such income were business profits attributable to a permanent establishment in such other State. Any such election shall be binding for the taxable year of the election and all subsequent taxable years unless the competent authority of the Contracting State in which the property is situated agrees to terminate the election.

## Article 7

### Business profits

1. The business profits of an enterprise of a Contracting State shall be taxable only in that State unless the enterprise carries on business in the other Contracting State through a permanent establishment situated therein. If the enterprise carries on business as aforesaid, the business profits of the enterprise may be taxed in the other State but only so much of them as is attributable to that permanent establishment.

2. Subject to the provisions of paragraph 3, where an enterprise of a Contracting State carries on business in the other Contracting State through a permanent establishment situated therein, there shall in each Contracting State be attributed to that permanent establishment the business profits which it might be expected to make if it were a distinct and independent enterprise engaged in the same or similar activities under the same or similar conditions. For this purpose, the business profits to be attributed to the permanent establishment shall include only the profits derived from the assets or activities of the permanent establishment.

3. In determining the business profits of a permanent establishment, there shall be allowed as deductions expenses which are incurred for the purposes of the permanent establishment, including a reasonable allocation of executive and general administrative expenses, research and development expenses, interest, and other expenses incurred for the purposes of the enterprise as a whole (or the part thereof which includes the permanent establishment), whether incurred in the State in which the permanent establishment is situated or elsewhere.

4. No business profits shall be attributed to a permanent establishment by reason of the mere purchase by that permanent establishment of goods or merchandise for the enterprise.

5. For the purposes of the preceding paragraphs, the profits to be attributed to the permanent establishment shall be determined by the same method year by year unless there is good and sufficient reason to the contrary.

6. Where business profits include items of income which are dealt with separately in other Articles of this Convention, then the provisions of those Articles shall not be affected by the provisions of this Article.

7. For the purposes of this Convention, the term "business profits" means income from any trade or business, including income derived by an enterprise from the performance of personal services, and from the rental of tangible personal property.

8. In applying paragraphs 1 and 2 of Article 7 (Business profits), paragraph 6 of Article 10 (Dividends), paragraph 3 of Article 11 (Interest), paragraph 3 of Article 12 (Royalties), paragraph 3 of Article 13 (Capital gains), Article 14 (Independent personal services), and paragraph 2 of Article 21 (Other income), any income or gain attributable to a permanent establishment or fixed base during its existence is taxable in the Contracting State where such permanent establishment or fixed base is situated even if the payments are deferred until such permanent establishment or fixed base has ceased to exist.

## Article 8

### Shipping and air transport

1. Profits of an enterprise of a Contracting State from the operation in international traffic of ships or aircraft shall be taxable only in that State.

2. For the purposes of this Article, profits from the operation of ships or aircraft include profits derived from the rental of ships or aircraft on a full (time or voyage) basis. They also include profits from the rental of ships or aircraft on a bareboat basis if such ships or aircraft are operated in international traffic by the lessee, or if the rental income is incidental to profits from the operation of ships or aircraft in international traffic. Profits derived by an enterprise from the inland transport of property or passengers within either Contracting State, shall be treated as profits from the operation of ships or aircraft in international traffic if such transport is undertaken as part of international traffic.

3. Profits of an enterprise of a Contracting State from the use, maintenance or rental of containers (including trailers, barges, and related equipment for the transport of containers) used in international traffic shall be taxable only in that State.

4. The provisions of paragraphs 1 and 3 shall also apply to profits from the participation in a consortium, a pool, a joint business, or an international operating agency.

5. Notwithstanding the provisions of subparagraph 2(f) and paragraph 3 of Article 5 (Permanent establishment), the profits of an enterprise of a Contracting State from the transport by ships or aircraft of supplies or personnel to a location where offshore

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

activities in connection with the exploration or exploitation of natural resources are being carried on in the other Contracting State, or from the operation of tugboats and similar vessels in connection with such activities, shall be taxable only in the first-mentioned State.

## Article 9

### Associated enterprises

1. Where

(a)  an enterprise of a Contracting State participates, directly or indirectly, in the management, control, or capital of an enterprise of the other Contracting State, or

(b)  the same persons participate directly or indirectly in the management, control, or capital of an enterprise of a Contracting State and an enterprise of the other Contracting State,

and in either case conditions are made or imposed between the two enterprises in their commercial or financial relations which differ from those which would be made between independent enterprises, then any profits which, but for those conditions, would have accrued to one of the enterprises, but by reason of those conditions, have not so accrued, may be included in the profits of that enterprise and taxed accordingly.

2. Where a Contracting State includes in the profits of an enterprise of that State, and taxes accordingly, profits on which an enterprise of the other Contracting State has been charged to tax in that other State, and the other Contracting State agrees that the profits so included are profits that would have accrued to the enterprise of the first-mentioned State if the conditions made between the two enterprises had been those which would have been made between independent enterprises, then that other State shall make an appropriate adjustment to the amount of the tax charged therein on those profits. In determining such adjustment, due regard shall be had to the other provisions of this Convention and the competent authorities of the Contracting States shall if necessary consult each other.

## Article 10

### Dividends

1. Dividends paid by a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State the tax so charged shall not exceed:

(a)  5 percent of the gross amount of the dividends if the beneficial owner is a company which holds directly at least 10 percent of the share capital of the company paying the dividends;

(b)  15 percent of the gross amount of the dividends in all other cases.

This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3. Subparagraph (a) of paragraph 2 shall not apply in the case of dividends paid by a United States Regulated Investment Company (RIC) or United States Real Estate Investment Trust (REIT). In the case of dividends from a RIC, subparagraph (b) of paragraph 2 shall apply. In the case of dividends paid by a REIT, subparagraph (b) of paragraph 2 shall apply only if:

(a)  the beneficial owner of the dividends is an individual holding an interest of not more than 10 percent in the REIT;

(b)  the dividends are paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent of any class of the REIT's stock; or

(c)  the beneficial owner of the dividends is a person holding an interest of not more than 10 percent in the REIT and the REIT is diversified.

4. Notwithstanding paragraph 2, dividends may not be taxed in the Contracting State of which the payer is a resident if the beneficial owner of the dividends is a resident of the other Contracting State that is a qualified governmental entity that does not control the payer of the dividend.

5. The term "dividends" as used in this Article means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subject to the same taxation treatment as income from shares by the laws of the State of which the payer is a resident.

6. The provisions of paragraphs 1 and 2 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State of which the payer is a resident, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

dividends are attributable to such permanent establishment or fixed base. In such case, the provisions of Article 7 (Business profits) or Article 14 (Independent personal services), as the case may be, shall apply.

7. A Contracting State may not impose any tax on dividends paid by a resident of the other State, except insofar as the dividends are paid to a resident of the first-mentioned State or the dividends are attributable to a permanent establishment or a fixed base situated in that State, nor may it impose tax on a corporation's undistributed profits, except as provided in paragraph 8, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in that State.

8. A corporation that is a resident of one of the States and that has a permanent establishment in the other State or that is subject to tax in the other State on a net basis on its income that may be taxed in the other State under Article 6 (Income from real property) or under paragraph 1 of Article 13 (Capital gains) may be subject in that other State to a tax in addition to the tax allowable under the other provisions of this Convention. Such tax, however, may be imposed on only the portion of the business profits of the corporation attributable to the permanent establishment and the portion of the income referred to in the preceding sentence that is subject to tax under Article 6 (Income from real property) or under paragraph 1 of Article 13 (Capital gains) that, in the case of the United States, represents the dividend equivalent amount of such profits or income and, in the case of Denmark, is an amount that is analogous to the dividend equivalent amount.

9. The tax referred to in paragraph 8 may not be imposed at a rate in excess of the rate specified in subparagraph (a) of paragraph 2.

## Article 11

### Interest

1. Interest arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2. The term "interest" as used in this Article means income from debt-claims of every kind, whether or not secured by mortgage, and whether or not carrying a right to participate in the debtor's profits, and in particular, income from government securities and income from bonds or debentures, including premiums or prizes attaching to such securities, bonds, or debentures, and all other income that is subjected to the same taxation treatment as income from money lent by the taxation law of the Contracting State in which the income arises. Income dealt with in Article 10 (Dividends) and penalty charges for late payment shall not be regarded as interest for the purposes of this Article.

3. The provisions of paragraph 1 shall not apply if the beneficial owner of the interest, being a resident of a Contracting State, carries on business in the other Contracting State in which the interest arises, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the interest is attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business profits) or Article 14 (Independent personal services), as the case may be, shall apply.

4. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest, having regard to the debt-claim for which it is paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each State, due regard being had to the other provisions of this Convention.

5. Notwithstanding the provisions of paragraph 1:

(a)  interest paid by a resident of a Contracting State and that is determined with reference to receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor or a related person or to any dividend, partnership distribution or similar payment made by the debtor to a related person, and paid to a resident of the other State also may be taxed in the Contracting State in which it arises, and according to the laws of that State, but if the beneficial owner is a resident of the other Contracting State, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article 10 (Dividends); and

(b)  interest that is an excess inclusion with respect to a residual interest in a real estate mortgage investment conduit may be taxed by each State in accordance with its domestic law.

## Article 12

### Royalties

1. Royalties arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in that other State.

2. The term "royalties" as used in this Article means:

(a)  any consideration for the use of, or the right to use, any copyright of literary, artistic, scientific or other work (including computer software, cinematographic films, audio or video tapes or disks, and other means of image or sound

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

reproduction), any patent, trademark, design or model, plan, secret formula or process, or other like right or property, or for information concerning industrial, commercial or scientific experience; and

(b)  gain derived from the alienation of any property described in subparagraph (a), provided that such gain is contingent on the productivity, use or disposition of the property.

3. The provisions of paragraph 1 shall not apply if the beneficial owner of the royalties, being a resident of a Contracting State, carries on business in the other Contracting State in which the royalties arise, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the royalties are attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business profits) or Article 14 (Independent personal services), as the case may be, shall apply.

4. Where, by reason of a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the royalties, having regard to the use, right, or information for which they are paid, exceeds the amount which would have been agreed upon by the payer and the beneficial owner in the absence of such relationship, the provisions of this Article shall apply only to the last-mentioned amount. In such case, the excess part of the payments shall remain taxable according to the laws of each Contracting State, due regard being had to the other provisions of this Convention.

## Article 13

### Capital gains

1. Gains derived by a resident of a Contracting State that are attributable to the alienation of real property situated in the other Contracting State may be taxed in that other State.

2. For the purposes of this Article, the term "real property situated in the other Contracting State" shall include:

(a)  real property referred to in Article 6 (Income from real property);

(b)  a United States real property interest; and

(c)  an equivalent interest in real property situated in Denmark.

3. Gains from the alienation of personal property that are attributable to a permanent establishment that an enterprise of a Contracting State has in the other Contracting State or that are attributable to a fixed base that is available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services, and gains from the alienation of such a permanent establishment (alone or with the whole enterprise) or of such a fixed base, may be taxed in that other State.

4. Notwithstanding the provisions of paragraph 3, gains derived by an enterprise of a Contracting State from the alienation of ships, boats, aircraft, or containers operated or used in international traffic or personal property pertaining to the operation or use of such ships, boats, aircraft, or containers shall be taxable only in that State.

5. Gains derived by an enterprise of a Contracting State from the deemed alienation of an installation, drilling rig, or ship used in the other Contracting State for the exploration for or exploitation of oil and gas resources may be taxed in that other State in accordance with its law, but only to the extent of any depreciation taken in that other State.

6. Gains from the alienation of any property, other than that referred to in paragraphs 1 through 5, shall be taxable only in the Contracting State of which the alienator is a resident.

7. If a resident of a Contracting State is subject to income taxation in both Contracting States on a disposition of property and is treated as having alienated property with respect to which a gain is recognized under the income tax laws of the other Contracting State, then the resident not otherwise required to do so may elect in his annual return of income for the year of the alienation to be liable to tax in the residence State in that year as if he had, immediately before that time, sold and repurchased such property for an amount equal to its fair market value at that time. Such an election shall apply to all property described in this paragraph that is alienated by the resident in the taxable year for which the election is made or at any time thereafter.

8. Where a resident of a Contracting State alienates property in the course of a corporate or other organization, reorganization, amalgamation, division or similar transaction and profit, gain or income with respect to such alienation is not recognized for the purpose of taxation in that State, the competent authority of the other Contracting State may agree, if requested to do so by the person who acquires the property, in order to avoid double taxation and subject to terms and conditions satisfactory to such competent authority, to defer the recognition of the profit, gain or income with respect to such property for the purpose of taxation in that other State until such time and in such manner as may be stipulated in the agreement.

## Article 14

### Independent personal services

1. Income derived by an individual who is a resident of a Contracting State in respect of the performance of personal services of an independent character shall be taxable only in that State, unless the individual has a fixed base regularly available to him

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Denmark - United States - Tax Treaty

in the other Contracting State for the purpose of performing his activities. If he has such a fixed base, the income attributable to the fixed base that is derived in respect of services performed in that other State also may be taxed by that other State.

2. For purposes of paragraph 1, the income that is taxable in the other Contracting State shall be determined under the principles of paragraph 3 of Article 7 (Business profits).

## Article 15

### Dependent personal services

1. Subject to the provisions of Articles 16 (Directors' fees), 18 (Pensions, social security, annuities, alimony and child support payments), and 19 (Government service), salaries, wages and other remuneration derived by a resident of a Contracting State in respect of an employment shall be taxable only in that State unless the employment is exercised in the other Contracting State. If the employment is so exercised, such remuneration as is derived therefrom may be taxed in that other State.

2. Notwithstanding the provisions of paragraph 1, remuneration derived by a resident of a Contracting State in respect of an employment exercised in the other Contracting State shall be taxable only in the first-mentioned State if:

(a)  the recipient is present in the other State for a period or periods not exceeding in the aggregate 183 days in any twelve month period commencing or ending in the taxable year concerned; and

(b)  the remuneration is paid by, or on behalf of, an employer who is not a resident of the other State; and

(c)  the remuneration is not borne by a permanent establishment or a fixed base which the employer has in the other State.

3. Notwithstanding the preceding provisions of this Article, remuneration described in paragraph 1 that is derived by a resident of a Contracting State in respect of an employment as a member of the regular complement of a ship or aircraft operated in international traffic shall be taxable only in that State.

## Article 16

### Directors' fees

Directors' fees and other similar payments derived by a resident of a Contracting State in his capacity as a member of the board of directors of a company which is a resident of the other Contracting State may be taxed in that other State.

## Article 17

### Artistes and sportsmen

1. Income derived by a resident of a Contracting State as an entertainer, such as a theater, motion picture, radio, or television artiste, or a musician, or as a sportsman, from his personal activities as such exercised in the other Contracting State, which income would be exempt from tax in that other Contracting State under the provisions of Articles 14 (Independent personal services) and 15 (Dependent personal services), may be taxed in that other State, except where the amount of the gross receipts derived by such entertainer or sportsman, including expenses reimbursed to him, or borne on his behalf, from such activities does not exceed twenty thousand United States dollars ($20,000) or its equivalent in Danish kroner for the taxable year concerned.

2. Where income in respect of activities exercised by an entertainer or a sportsman in his capacity as such accrues not to the entertainer or sportsman himself but to another person, that income may, notwithstanding the provisions of Articles 7 (Business profits) and 14 (Independent personal services), be taxed in the Contracting State in which the activities of the entertainer or sportsman are exercised, unless the entertainer or sportsman establishes that neither the entertainer or sportsman nor persons related thereto participate directly or indirectly in the profits of that other person in any manner, including the receipt of deferred remuneration, bonuses, fees, dividends, partnership distributions, or other distributions.

## Article 18

### Pensions, social security, annuities, alimony and child support payments

1. Subject to the provisions of paragraph 2 of Article 19 (Government service),

(a)  Except as provided in subparagraph (b), pension distributions arising in a Contracting State and beneficially owned by a resident of the other Contracting State shall be taxable only in the State in which they arise.

(b)  If, prior to the time of entry into force of this Convention, a person was a resident of a Contracting State and was receiving pension distributions arising in the other Contracting State, that person shall be taxable on pension distributions referred to in subparagraph (a) only in the first-mentioned Contracting State.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(c) Pension distributions shall be deemed to arise in a Contracting State only if paid by a pension scheme established in that State.

(d) For purposes of this paragraph, pension distributions means pension distributions and other similar remuneration, whether paid periodically or as a single sum.

2. Notwithstanding the provisions of paragraph 1, payments made by a Contracting State under provisions of the social security or similar legislation of that Contracting State to a resident of the other Contracting State or to a citizen of the United States shall be taxable only in the first-mentioned State.

3. Annuities derived and beneficially owned by an individual resident of a Contracting State shall be taxable only in that State. The term "annuities" as used in this paragraph means a stated sum paid periodically at stated times during a specified number of years or for life under an obligation to make the payments in return for adequate and full consideration (other than services rendered).

4. Alimony paid by a resident of a Contracting State, and deductible therein, to a resident of the other Contracting State shall be taxable only in that other Contracting State. The term "alimony" as used in this paragraph means periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, which payments are taxable to the recipient under the laws of the State of which he is a resident.

5. Periodic payments, not dealt with in paragraph 4, for the support of a child made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support, paid by a resident of a Contracting State to a resident of the other Contracting State, shall be taxable only in the first-mentioned Contracting State.

**Article 19**

**Government service**

1. Notwithstanding the provisions of Articles 14 (Independent personal services), 15 (Dependent personal services), 16 (Directors' fees) and 17 (Artistes and sportsmen):

(a) Salaries, wages and other remuneration, other than a pension, paid from the public funds of a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority in the discharge of functions of a governmental nature shall, subject to the provisions of subparagraph (b), be taxable only in that State;

(b) such remuneration, however, shall be taxable only in the other Contracting State if the services are rendered in that State and the individual is a resident of that State who:

(i) is a national of that State; or

(ii) did not become a resident of that State solely for the purpose of rendering the services.

(a) Any pension paid from the public funds of a Contracting State or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority in the discharge of functions of a governmental nature (other than a payment described in paragraph 2 of Article 18 (Pensions, social security, annuities, alimony and child support payments)) shall, subject to the provisions of subparagraph (b), be taxable only in that State;

(b) such pension, however, shall be taxable only in the other Contracting State if the individual is a resident or a national of that State.

3. The provisions of Articles 15 (Dependent personal services), 16 (Directors' fees), 17 (Artistes and sportsmen) and 18 (Pensions, social security, annuities, alimony and child support payments) shall apply to remuneration and pensions in respect of services rendered in connection with a business carried on by a Contracting State or a political subdivision or a local authority thereof.

**Article 20**

**Students and trainees**

Payments received by a student, apprentice, or business trainee who is, or was immediately before visiting a Contracting State, a resident of the other Contracting State, and who is present in the first-mentioned State for the purpose of his full-time education at an accredited educational institution, or for his full-time training, shall not be taxed in that State, provided that such payments arise outside that State, and are for the purpose of his maintenance, education or training. The exemption from tax provided by this Article shall apply to an apprentice or business trainee only for a period of time not exceeding three years from the date he first arrives in the first-mentioned Contracting State for the purpose of his training. The provisions of this paragraph shall not apply to income from research if such research is undertaken not in the public interest but primarily for the private benefit of a specific person or persons.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

## Article 21

### Other income

1. Items of income beneficially owned by a resident of a Contracting State, wherever arising, not dealt with in the foregoing Articles of this Convention shall be taxable only in that State.

2. The provisions of paragraph 1 shall not apply to income, other than income from real property as defined in paragraph 2 of Article 6 (Income from real property), if the beneficial owner of such income, being a resident of a Contracting State, carries on business in the other Contracting State through a permanent establishment situated therein, or performs in the other State independent personal services from a fixed base situated therein, and the income is attributable to such permanent establishment or fixed base. In such case the provisions of Article 7 (Business profits) or Article 14 (Independent personal services), as the case may be, shall apply.

## Article 22

### Limitation of benefits

1. A resident of a Contracting State shall be entitled to the benefits of this Convention only to the extent provided in this Article.

2. A resident of a Contracting State shall be entitled to all the benefits of this Convention only if such resident is:

(a)    an individual;

(b)    a Contracting State, a political subdivision, or local authority thereof, or an agency or instrumentality of that State, subdivision, or authority;

(c)    a company if:

   (i)    all the shares in the class or classes of shares representing more than 50 percent of the vote and value are listed on a recognized stock exchange and are substantially and regularly traded on one or more recognized stock exchanges;

   (ii)   one or more taxable nonstock corporations entitled to benefits under paragraph (g) own shares representing more than 50 percent of the voting power of the company and all other shares are listed on a recognized stock exchange and are substantially and regularly traded on one or more recognized stock exchanges; or

   (iii)  at least 50 percent of each class of shares in the company is owned, directly or indirectly, by five or fewer companies entitled to benefits under clause (i) or (ii), or any combination thereof, provided that in the case of indirect ownership, each intermediate owner is a person entitled to benefits of the Convention under this paragraph;

(d)    a charitable organization or other legal person described in subparagraph (b)(i) of paragraph 1 of Article 4 (Residence);

(e)    a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan, provided that more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State; or

(f)    a person, other than an individual, if

   (i)    on at least half the days of the taxable year, persons described in subparagraphs (a), (b), (c), (d), or (e) own, directly or indirectly (through a chain of ownership in which each person is entitled to the benefits of the Convention under this paragraph), at least 50 percent of the beneficial interest in such person (or, in the case of a company, at least 50 percent of the vote and value of the company's shares); and

   (ii)   less than 50 percent of the person's gross income for the taxable year is paid or accrued, in the form of deductible payments, directly or indirectly, to persons who are not residents of either Contracting State (unless the payment is attributable to a permanent establishment situated in either State);

(g)    in the case of Denmark, a taxable nonstock corporation if

   (i)    the amount paid or accrued in the form of deductible payments in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs (a), (b), (c)(i), (c)(iii), (d) or (e) by virtue of (c)(i), (d) or (e), does not exceed 50 percent of the amount of its gross income (excluding its tax-exempt income); and

   (ii)   the amount paid or accrued, in the form of both deductible payments and non-deductible distributions, in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs (a), (b), (c)(i), (c)(iii) by virtue of (c)(i), (d), or (e), does not exceed 50 percent of the amount of its total income (including its tax-exempt income).

(a)    A resident of a Contracting State not otherwise entitled to benefits shall be entitled to the benefits of this Convention with respect to an item of income derived from the other Contracting State if:

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(i)   the resident is engaged in the active conduct of a trade or business in the first-mentioned Contracting State;

(ii)  the income is connected with or incidental to the trade or business in the first-mentioned Contracting State; and

(iii) the trade or business is substantial in relation to the activity in the other State generating the income.

(b)  For purposes of this paragraph, the business of making or managing investments will not be considered an active trade or business, unless the activity is banking, insurance or securities activities carried on by a bank, insurance company, or registered securities dealer.

(c)  Whether a trade or business is substantial for purposes of this paragraph will be determined based on all the facts and circumstances. In any case, however, a trade or business will be deemed substantial if, for the preceding taxable year, or for the average of the three preceding taxable years, the asset value, the gross income, and the payroll expense that are related to the trade or business in the first-mentioned State equal at least 7.5 percent of the resident's (and any related parties') proportionate share of the asset value, gross income and payroll expense, respectively, that are related to the activity that generated the income in the other State, and the average of the three ratios exceeds 10 percent. In determining the above ratios, assets, income, and payroll expense shall be taken into account only to the extent of the resident's direct or indirect ownership interest in the activity in the other State. If neither the resident nor any of its associated enterprises has an ownership interest in the activity in the other State, the resident's trade or business in the first-mentioned State shall be considered substantial in relation to such activity.

(d)  Income is derived in connection with a trade or business if the activity in the other State generating the income is a line of business that forms part of or is complementary to the trade or business. Income is incidental to a trade or business if it facilitates the conduct of the trade or business in the other State.

(a)  A company that is a resident of a Contracting State shall also be entitled to all of the benefits of the Convention if:

(i)   at least 95 percent of the aggregate vote and value of all its shares is owned, directly or indirectly, by seven or fewer persons that are residents of Member States of the European Union, or of the European Economic Area, or of parties to the North American Free Trade Agreement (NAFTA) that, in any case, meet the requirements of subparagraph (c), or any combination thereof; and

(ii)  less than 50 percent of the company's gross income for the taxable year is paid or accrued, in the form of deductible payments, directly or indirectly, to persons who are not residents of Member States of the European Union, or of the European Economic Area, or of parties to the North American Free Trade Agreement that, in any case, meet the requirements of subparagraph (c), or any combination thereof.

(b)  However, a company otherwise entitled to benefits under subparagraph (a) will not be entitled to the benefits of this Convention if that company, or a company that controls such company, has outstanding a class of shares:

(i)   the terms of which, or which is subject to other arrangements that, entitle its holders to a portion of the income of the company derived from the other Contracting State that is larger than the portion such holders would receive absent such terms or arrangements; and

(ii)  50 percent or more of the vote or value of which is owned by persons who are not residents of a Member State of the European Union or the European Economic Area or a party to the North American Free Trade Agreement that, in any case, meet the requirements of subparagraph (c), or any combination thereof.

(c)  For purposes of subparagraphs (a) and (b), a person will be treated as a resident of a Member State of the European Union or of the European Economic Area or of a party to the North American Free Trade Agreement only if such person:

(i)   would be entitled to the benefits of a comprehensive income tax convention in force between any Member State of the European Union or of the European Economic Area or a party to the North American Free Trade Agreement and the Contracting State from which the benefits of this Convention are claimed, provided that if such other convention does not contain a comprehensive limitation on benefits article (including provisions similar to those of subparagraphs (c) and (f) of paragraph 2 and paragraph 3 of this Article), the person would be entitled to the benefits of this Convention under the principles of paragraph 2 if such person were a resident of one of the Contracting States under Article 4 (Residence) of this Convention; and

(ii)  with respect to income referred to in Articles 10 (Dividends), 11 (Interest) or 12 (Royalties), would be entitled under such other convention to a rate of tax with respect to the particular class of income for which benefits are being claimed under this Convention that is at least as low as the rate applicable under this Convention.

5. A resident of one of the Contracting States that derives from the other Contracting State income mentioned in Article 8 (Shipping and air transport) and that is not entitled to the benefits of this Convention because of the foregoing paragraphs, shall nevertheless be entitled to the benefits of this Convention with respect to such income if at least 50 percent of the beneficial interest in such person (or in the case of a company, at least 50 percent of the aggregate vote and value of the stock of such company) is owned directly or indirectly:

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(a)   by persons described in subparagraphs (a), (b), (c), (d), or (e) of paragraph 2, or citizens of the United States, or individuals who are residents of a third state; or

(b)   by a company or combination of companies the stock of which is primarily and regularly traded on an established securities market in a third state, provided that such third state grants an exemption under similar terms for profits as mentioned in Article 8 (Shipping and air transport) of this Convention to citizens and corporations of the other Contracting State either under its national law or in common agreement with that other Contracting State or under a convention between that third state and the other Contracting State.

6. The following rules and definitions shall apply for purposes of this Article:

(a)   in measuring "gross income", as used in subparagraph (f) of paragraph 2, the term means gross income for the first taxable period preceding the current taxable period, provided that the amount of gross income for the first taxable period preceding the current taxable period shall be deemed to be no less than the average of the annual amounts of gross income for the four taxable periods preceding the current taxable period;

(b)   the term "deductible payments"

   (i)   as used in subparagraphs (f) and (g) of paragraph 2 and subparagraph (a) of paragraph 4 includes payments for interest or royalties, but does not include payments at arm's length for the purchase or use of or the right to use tangible property in the ordinary course of business or remuneration at arm's length for services performed in the Contracting State in which the person making such payments is a resident; and

   (ii)   as used in subparagraph (g) of paragraph 2 also includes deductible distributions made by a taxable nonstock corporation.

   Types of payments may be added to, or eliminated from, the exceptions mentioned in the preceding definition of "deductible payments" by mutual agreement of the competent authorities;

(c)   For the purposes of this Article, the term "recognized stock exchange" means:

   (i)   the NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange for purposes of the U.S. Securities Exchange Act of 1934;

   (ii)   the Copenhagen Stock Exchange and the stock exchanges of Amsterdam, Brussels, Frankfurt, Hamburg, London, Paris, Stockholm, Sydney, Tokyo and Toronto;

   (iii)   any other stock exchanges agreed upon by the competent authorities of both Contracting States;

(d)   the term "engaged in the active conduct of a trade or business" in a Contracting State as used in paragraph 3, applies to a person that is directly so engaged, or is a partner in a partnership that is so engaged, or is so engaged through one or more associated enterprises (wherever resident);

(e)   the term "taxable nonstock corporation" as used in paragraph 2 means a foundation that is taxable in accordance with paragraph 1 of Article 1 of the Danish Act on Taxable Nonstock Corporations (fonde der beskattes efter fondsbeskatningsloven).

(f)   (i)   For the purposes of paragraph 2, the shares in a class of shares are considered to be substantially and regularly traded on one or more recognized stock exchanges in a taxable year if:

      (1)   trades in such class are effected on one or more of such stock exchanges other than in de minimis quantities during every quarter; and

      (2)   the aggregate number of shares or units of that class traded on such stock exchange or exchanges during the previous taxable year is at least 6 percent of the average number of shares or units outstanding in that class (including shares held by taxable nonstock corporations) during that taxable year.

   (ii)   For purposes of determining whether a company satisfies the requirements of clause (c)(ii) of paragraph 2, clause (i) of this subparagraph shall be applied as if all the shares issued by the company were one class of shares, and shares held by taxable nonstock corporations will be considered outstanding for purposes of determining whether 6 percent of the outstanding shares have been traded during a taxable year.

7. A resident of a Contracting State that is not entitled to the benefits of the Convention under the provisions of the preceding paragraphs of this Article shall, nevertheless, be granted the benefits of the Convention if the competent authority of the other Contracting State so determines.

**Article 23**

**Relief from double taxation**

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

1. In accordance with the provisions and subject to the limitations of the law of the United States (as it may be amended from time to time without changing the general principle hereof), the United States shall allow to a resident or citizen of the United States as a credit against the United States tax on income:

(a)   the income tax paid or accrued to Denmark by or on behalf of such resident or citizen; and

(b)   in the case of a United States company owning at least 10 percent of the voting stock of a company that is a resident of Denmark and from which the United States company receives dividends, the income tax paid or accrued to Denmark by or on behalf of the payer with respect to the profits out of which the dividends are paid.

(c)   (i)    Subject to the provisions of clause (ii), in the case of a resident or national of the United States subject to the taxes imposed by the Hydrocarbon Tax Act that are referred to in subparagraph (b)(iv) of paragraph 1 of Article 2 (Taxes covered), the United States shall allow as a credit against the United States tax on income, the appropriate amount of tax paid or accrued to Denmark by or on behalf of such resident or national pursuant to the Hydrocarbon Tax Act on oil and gas extraction income from oil or gas wells in Denmark. However, the appropriate amount allowed as a credit shall not exceed the product of the maximum statutory United States tax rate applicable to such resident or national for such taxable year, and the amount of income separately assessed under the Hydrocarbon Tax Act.

(ii)   The appropriate amount is also subject to any other limitations imposed by the law of the United States, as it may be amended from time to time, that apply to creditable taxes under section 901 or 903 of the Internal Revenue Code for persons claiming benefits under this Convention. Any taxes paid on income assessed separately under the Hydrocarbon Tax Act in excess of the appropriate amount may be used only as a credit in another taxable year, and only against United States tax on income assessed separately under the Hydrocarbon Tax Act.

(iii)  The provisions of clauses (i) and (ii) shall apply separately, in the same way, to the amount of tax paid or accrued to Denmark pursuant to the Hydrocarbon Tax Act on

(1)   Danish source oil related income not described in clause (i); and

(2)   other Danish source income.

For the purposes of this Article, the Danish taxes referred to in paragraphs 1(b) and 2 of Article 2 (Taxes covered) shall be considered income taxes and shall be allowed as a credit against the United States tax on income, subject to all the provisions and limitations of this paragraph.

2. Where a United States citizen is a resident of Denmark:

(a)   with respect to items of income that under the provisions of this Convention are exempt from United States tax or that are subject to a reduced rate of United States tax when derived by a resident of Denmark who is not a United States citizen, Denmark shall allow as a credit against Danish tax only the tax paid, if any, that the United States may impose under the provisions of this Convention, other than taxes that may be imposed solely by reason of citizenship under the saving clause of paragraph 4 of Article 1 (General scope);

(b)   for purposes of computing United States tax on those items of income referred to in subparagraph (a), the United States shall allow as a credit against United States tax the income tax paid to Denmark after the credit referred to in subparagraph (a); the credit so allowed shall not reduce the portion of the United States tax that is creditable against the Danish tax in accordance with subparagraph (a); and

(c)   for the exclusive purpose of relieving double taxation in the United States under subparagraph (b), items of income referred to in subparagraph (a) shall be deemed to arise in Denmark to the extent necessary to avoid double taxation of such income under subparagraph (b).

3. In the case of Denmark, double taxation shall be avoided as follows:

(a)   When a resident of Denmark derives income which, in accordance with the provisions of this Convention, may be taxed in the United States, Denmark shall allow as a deduction from the tax on the income of that resident an amount equal to the income tax paid in the United States;

(b)   Such deduction shall not, however, exceed that part of the income tax, as computed before the deduction is given, which is attributable to the income that may be taxed in the United States.

(c)   When a resident of Denmark derives income which, in accordance with the provisions of this Convention, shall be taxable only in the United States, Denmark may include this income in the tax base but shall allow as a deduction from income tax that part of the income tax which is attributable to the income derived from the United States.

For the purposes of this paragraph, the United States taxes referred to in paragraphs 1(a) and 2 of Article 2 (Taxes covered) shall be considered income taxes, and shall be allowed as a credit against the Danish tax on income.

**Article 24**

**Non-discrimination**

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

1. Nationals of a Contracting State shall not be subjected in the other Contracting State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which citizens of that other State in the same circumstances, particularly with respect to taxation of worldwide income, are or may be subjected. This provision shall also apply to persons who are not residents of one or both of the Contracting States.

2. The taxation on a permanent establishment or fixed base that a resident or enterprise of a Contracting State has in the other Contracting State shall not be less favorably levied in that other State than the taxation levied on enterprises or residents of that other State carrying on the same activities. The provisions of this paragraph shall not be construed as obliging a Contracting State to grant to residents of the other Contracting State any personal allowances, reliefs, and reductions for taxation purposes on account of civil status or family responsibilities which it grants to its own residents.

3. Except where the provisions of paragraph 1 of Article 9 (Associated enterprises), paragraph 4 of Article 11 (Interest), or paragraph 4 of Article 12 (Royalties) apply, interest, royalties and other disbursements paid by an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable profits of such enterprise, be deductible under the same conditions as if they had been paid to a resident of the first-mentioned State. Similarly, any debts of an enterprise of a Contracting State to a resident of the other Contracting State shall, for the purpose of determining the taxable capital of the first-mentioned resident, be deductible under the same conditions as if they had been contracted to a resident of the first-mentioned State.

4. Enterprises of a Contracting State, the capital of which is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, shall not be subjected in the first-mentioned State to any taxation or any requirement connected therewith that is more burdensome than the taxation and connected requirements to which other similar enterprises of the first-mentioned State are or may be subjected.

5. Nothing in this Article shall be construed as preventing either Contracting State from imposing a tax as described in paragraph 8 of Article 10 (Dividends).

6. The provisions of this Article shall, notwithstanding the provisions of Article 2 (Taxes covered), apply to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof.


**Article 25**

**Mutual agreement procedure**

1. Where a person considers that the actions of one or both of the Contracting States result or will result for him in taxation not in accordance with the provisions of this Convention, he may, irrespective of the remedies provided by the domestic law of those States and the time limits prescribed in such laws for presentation of claims for refund, present his case to the competent authority of the Contracting State of which he is a resident or national.

2. The competent authority shall endeavour, if the objection appears to it to be justified and if it is not itself able to arrive at a satisfactory solution, to resolve the case by mutual agreement with the competent authority of the other Contracting State, with a view to the avoidance of taxation which is not in accordance with the Convention. Any agreement reached shall be implemented notwithstanding any time limits in the domestic law of the Contracting States. Assessment and collection procedures shall be suspended during the pendency of any mutual agreement proceeding.

3. The competent authorities of the Contracting States shall endeavour to resolve by mutual agreement any difficulties or doubts arising as to the interpretation or application of the Convention. In particular the competent authorities of the Contracting States may agree:

(a)  to the same attribution of income, deductions, credits, or allowances of an enterprise of a Contracting State to its permanent establishment situated in the other Contracting State;

(b)  to the same allocation of income, deductions, credits, or allowances between persons;

(c)  to the same characterization of particular items of income, including the same characterization of income that is assimilated to income from shares by the taxation law of one of the Contracting States and that is treated as a different class of income in the other State;

(d)  to the same characterization of persons;

(e)  to the same application of source rules with respect to particular items of income;

(f)  to a common meaning of a term;

(g)  to advance pricing arrangements; and

(h)  to the application of the provisions of domestic law regarding penalties, fines, and interest in a manner consistent with the purposes of the Convention.

They may also consult together for the elimination of double taxation in cases not provided for in the Convention.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

4. The competent authorities also may agree to increases in any specific dollar amounts referred to in the Convention to reflect economic or monetary developments.

5. The competent authorities of the Contracting States may communicate with each other directly for the purpose of reaching an agreement in the sense of the preceding paragraphs.

## Article 26

### Exchange of information

1. The competent authorities of the Contracting States shall exchange such information as is relevant for carrying out the provisions of this Convention or of the domestic laws of the Contracting States concerning taxes covered by the Convention insofar as the taxation thereunder is not contrary to the Convention, including information relating to the assessment or collection of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention. The exchange of information is not restricted by Article 1 (General scope). Any information received by a Contracting State shall be treated as secret in the same manner as information obtained under the domestic laws of that State and shall be disclosed only to persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, the taxes covered by the Convention or the oversight of the above. Such persons or authorities shall use the information only for such purposes. They may disclose the information in public court proceedings or in judicial decisions.

2. In no case shall the provisions of paragraph 1 be construed so as to impose on a Contracting State the obligation:

(a)   to carry out administrative measures at variance with the laws and administrative practice of that or of the other Contracting State;

(b)   to supply information which is not obtainable under the laws or in the normal course of the administration of that or of the other Contracting State; or

(c)   to supply information which would disclose any trade, business, industrial, commercial, or professional secret or trade process, or information the disclosure of which would be contrary to public policy (ordre public).

3. Notwithstanding paragraph 2, the competent authority of the requested State shall have the authority to obtain and provide information held by financial institutions, nominees or persons acting in an agency or fiduciary capacity, or respecting interests in a person. If information is requested by a Contracting State in accordance with this Article, the other Contracting State shall obtain that information in the same manner and to the same extent as if the tax of the first-mentioned State were the tax of that other State and were being imposed by that other State, notwithstanding that the other State may not, at that time, need such information for purposes of its own tax. If specifically requested by the competent authority of a Contracting State, the competent authority of the other Contracting State shall provide information under this Article in the form of depositions of witnesses and authenticated copies of unedited original documents (including books, papers, statements, records, accounts, and writings), to the same extent such depositions and documents can be obtained under the laws and administrative practices of that other State with respect to its own taxes.

4. For purposes of this Article, the Convention shall apply, notwithstanding the provisions of Article 2 (Taxes covered), to taxes of every kind imposed by a Contracting State.

## Article 27

### Administrative assistance

1. The Contracting States undertake to lend assistance to each other in the collection of taxes referred to in Article 2 (Taxes covered), together with interest, costs, additions to such taxes, and civil penalties, referred to in this Article as a "revenue claim".

2. An application for assistance in the collection of a revenue claim shall include a certification by the competent authority of the applicant State that, under the laws of that State, the revenue claim has been finally determined. For the purposes of this Article, a revenue claim is finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

3. A revenue claim of the applicant State that has been finally determined may be accepted for collection by the competent authority of the requested State and, subject to the provisions of paragraph 7, if accepted shall be collected by the requested State as though such revenue claim were the requested State's own revenue claim finally determined in accordance with the laws applicable to the collection of the requested State's own taxes.

4. Where an application for collection of a revenue claim in respect of a taxpayer is accepted:

(a)   by the United States, the revenue claim shall be treated by the United States as an assessment under United States laws against the taxpayer as of the time the application is received; and

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(b)  by Denmark, the revenue claim shall be treated by Denmark as an assessment under Danish laws against the taxpayer as of the time the application is received.

5. Nothing in this Article shall be construed as creating or providing any rights of administrative or judicial review of the applicant State's finally determined revenue claim by the requested State, based on any such rights that may be available under the laws of either Contracting State. If, at any time pending execution of a request for assistance under this Article, the applicant State loses the right under its internal law to collect the revenue claim, the competent authority of the applicant State shall promptly withdraw the request for assistance in collection.

6. Subject to this paragraph, amounts collected by the requested State pursuant to this Article shall be forwarded to the competent authority of the applicant State. Unless the competent authorities of the Contracting States otherwise agree, the ordinary costs incurred in providing collection assistance shall be borne by the requested State and any extraordinary costs so incurred shall be borne by the applicant State.

7. A revenue claim of an applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested State.

8. No assistance shall be provided under this Article for a revenue claim in respect of a taxpayer to the extent that the taxpayer can demonstrate that

(a)  where the taxpayer is an individual, the revenue claim relates to a taxable period in which the taxpayer was a citizen of the requested State, and

(b)  where the taxpayer is an entity that is a company, estate or trust, the revenue claim relates to a taxable period in which the taxpayer derived its status as such an entity from the laws in force in the requested State.

9. Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto.

10. Nothing in this Article shall be construed as imposing on either Contracting State the obligation to carry out administrative measures of a different nature from those used in the collection of its own taxes or that would be contrary to its public policy (ordre public).

11. The competent authorities of the Contracting States shall agree upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States.

12. The requested State shall not be obliged to accede to the request of the applicant State:

(a)  if the applicant State has not pursued all appropriate collection action in its own jurisdiction; or

(b)  in those cases where the administrative burden for the requested State is disproportionate to the benefit to be derived by the applicant State.

**Article 28**

**Diplomatic agents and consular officers**

Nothing in this Convention shall affect the fiscal privileges of diplomatic agents or consular officers under the general rules of international law or under the provisions of special agreements.

**Article 29**

**Entry into force**

1. The Contracting States shall notify each other when the requirements for the entry into force of this Convention have been complied with.

2. The Convention shall enter into force on the date of the receipt of the later of such notifications, and its provisions shall have effect:

(a)  in respect of taxes withheld at source, for amounts paid or credited on or after the first day of the second month next following the date on which the Convention enters into force;

(b)  in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Convention enters into force.

3. Subject to paragraph 4, the Convention between Denmark and the United States for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income signed at Washington, D.C., on May 6, 1948 (hereinafter referred to as "the 1948 Convention") shall cease to have effect when the provisions of this Convention take effect in accordance with paragraph 2 or 4.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

4. Where the 1948 Convention would have afforded any person any greater relief from tax than this Convention, the 1948 Convention shall, at the election of any person that was entitled to benefits under the prior Convention, continue to have effect in its entirety for one year after the date on which the provisions of this Convention would otherwise first have effect pursuant to paragraph 2.

5. The 1948 Convention shall terminate on the last date on which it has effect in accordance with the foregoing provisions of this Article.

**Article 30**

**Termination**

This Convention shall remain in force until terminated by a Contracting State. Either Contracting State may terminate the Convention by giving notice of termination through diplomatic channels. In such event, the Convention shall cease to have effect:

(a)   in respect of taxes withheld at source, for amounts paid or credited after the expiration of the 6-month period beginning on the date on which notice of termination was given; and

(b)   in respect of other taxes, for taxable periods beginning on or after the expiration of the 6-month period beginning on the date on which notice of termination was given.

In witness whereof, the undersigned, being duly authorized by their respective Governments, have signed this Convention.

Done at Washington in the English language, this 19th day of August, 1999.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Denmark - United States

# Protocol

At the signing today of the Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income ("the Convention"), the undersigned have agreed on the following provisions, which shall form an integral part of the Convention.

1. Scandinavian Airlines System (SAS) is a consortium within the meaning of Article 8 (Shipping and air transport), its participating members being SAS Danmark A/S, SAS Norge ASA and SAS Sverige AB. In order to avoid the problems inherent in operating in the United States through a consortium, the members of the consortium in 1946 established a New York corporation, Scandinavian Airlines System, Inc. (SAS, Inc.) to act on their behalf in the United States pursuant to an agency agreement dated September 18, 1946. A similar agreement was entered into by SAS directly and SAS, Inc., on March 14, 1951. Pursuant to the agency agreement, SAS, Inc., is authorized to perform only such functions as SAS assigns to it, all in connection with international air traffic. Under that agreement, all revenues collected by SAS, Inc., are automatically credited to SAS. Operation expenses incurred by SAS, Inc., are debited to SAS in accordance with the terms of the agency agreement. SAS is obligated under the terms of the agency agreement to reimburse SAS, Inc. for all of its expenses irrespective of the revenues of SAS, Inc. SAS, Inc., does not perform any functions except those connected with or incidental to the business of SAS as an operator of aircraft in international traffic.

In view of the special nature of the SAS consortium and in view of the agency agreement as described above, the United States for purposes of Article 8 (Shipping and air transport) of the Convention shall treat all of the income earned by SAS, Inc., that is derived from the operation in international traffic of aircraft as the income of the SAS consortium.

2. This Convention may be extended either in its entirety or with any necessary modifications to any part of Denmark to which the Convention does not apply and which imposes taxes substantially similar in character to those to which the Convention applies. Such extension shall take effect from such date, shall be subject to such modification and conditions as may be specified in a supplementary Convention agreed between the Contracting States, and shall enter into force in accordance with their constitutional procedures.

3. Articles 7 (Business profits) and 24 (Non-discrimination) shall not prevent Denmark from continuing to tax permanent establishments of United States insurance companies in accordance with section 12, paragraph 3, of the Danish Company Tax law nor shall it prevent the United States from continuing to tax permanent establishments of Danish insurance companies in accordance with section 842(b) of the Internal Revenue Code.

(a)   A payment shall be treated as a pension distribution under paragraph 1 of Article 18 (Pensions, social security, annuities, alimony and child support payments) if it is a payment under a pension scheme recognized for tax purposes in the Contracting State where the pension scheme is established.

(b)   For this purpose, pension schemes recognized for tax purposes shall include the following and any identical or substantially similar schemes which are imposed after the date of signature of the Convention:

   (i)   Under United States law, qualified plans under section 401(a) of the Internal Revenue Code, individual retirement plans (including individual retirement plans that are part of a simplified employee pension plan that satisfies section 408(k), individual retirement accounts, individual retirement annuities, section 408(p) accounts, and Roth IRAs under section 408A), section 403(a) qualified annuity plans, and section 403(b) plans.

   (ii)   Under the law of Denmark, pension schemes under Section I of the Act on Taxation of Pension Schemes (pensionsbeskatningslovens afsnit I).

In witness whereof, the undersigned, being duly authorized by their respective Governments, have signed this Protocol.

Done at Washington in the English language, this 19th day of August, 1999.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

**Denmark - United States**
**Technical Explanation to the 1999 Treaty (1999)**

**Status:** In Force
**Conclusion Date:** 27 October 1999.
**Entry into Force:** Not applicable
**Effective Date:** Not applicable.

DEPARTMENT OF THE TREASURY
TECHNICAL EXPLANATION OF THE CONVENTION BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND
THE GOVERNMENT OF THE KINGDOM OF DENMARK
FOR THE AVOIDANCE OF DOUBLE TAXATION AND
THE PREVENTION OF FISCAL EVASION
WITH RESPECT TO TAXES ON INCOME
SIGNED AT WASHINGTON, AUGUST 19, 1999

**Preamble**

**INTRODUCTION**

This is a Technical Explanation of the Convention and Protocol between the United States and Denmark signed at Washington on August 19, 1999 (the "Convention" and "Protocol"). References are made to the Convention between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income signed at Washington, D.C., on May 6, 1948 (the "prior Convention"). The Convention replaces the prior Convention.

Negotiations took into account the U.S. Treasury Department's current tax treaty policy, as reflected in the U.S. Treasury Department's Model Income Tax Convention of September 20, 1996 (the "U.S. Model") and its recently negotiated tax treaties, the Model Income Tax Convention on Income and on Capital, published by the OECD in 1992 and amended in 1994, 1995 and 1997 (the "OECD Model"), and recent tax treaties concluded by Denmark.

The Technical Explanation is an official guide to the Convention and Protocol. It reflects the policies behind particular Convention provisions, as well as understandings reached with respect to the application and interpretation of the Convention and Protocol. In the discussions of each Article in this explanation, the relevant portions of the Protocol are discussed. This Technical Explanation has been provided to Denmark. References in the Technical Explanation to "he" or "his" should be read to mean "he or she" and "his or her."

**ARTICLE 1**

**General Scope**

*Paragraph 1*

Paragraph 1 of Article 1 provides that the Convention applies to residents of the United States or Denmark, except where the terms of the Convention provide otherwise. Under Article 4 (Residence), a person is generally treated as a resident of a Contracting State if that person is, under the laws of that Contracting State, liable to tax therein by reason of his domicile or other similar criteria. If, however, a person is considered a resident of both Contracting States, Article 4 provides rules for determining a single state of residence (or no state of residence). This determination governs for all purposes of the Convention.

Certain provisions are applicable to persons who may not be residents of either Contracting State. For example, Article 19 (Government Service) may apply to an employee of a Contracting State who is resident in neither State. Paragraph 1 of Article 24 (Non-Discrimination) applies to nationals of the Contracting States. Under Article 26 (Exchange of Information), information may be exchanged with respect to residents of third states.

*Paragraph 2*

Paragraph 2 states the generally accepted relationship both between the Convention and domestic law and between the Convention and other agreements between the Contracting States (i.e., that no provision in the Convention may restrict any exclusion, exemption, deduction, credit or other benefit accorded by the tax laws of the Contracting States, or by any other agreement between the Contracting States). The relationship between the non-discrimination provisions of the Convention and other agreements is not addressed in paragraph 2 but in paragraph 3.

For example, if a deduction would be allowed under the U.S. Internal Revenue Code (the "Code") in computing the U.S. taxable income of a resident of Denmark, the deduction also is allowed to that person in computing taxable income under the Convention. Paragraph 2 also means that the Convention may not increase the tax burden on a resident of a Contracting

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

State beyond the burden determined under domestic law. Thus, a right to tax given by the Convention cannot be exercised unless that right also exists under internal law.

It follows that under the principle of paragraph 2 a taxpayer's liability to U.S. tax need not be determined under the Convention if the Code would produce a more favorable result. A taxpayer may not, however, choose among the provisions of the Code and the Convention in an inconsistent manner in order to minimize tax. For example, assume that a resident of Denmark has three separate businesses in the United States. One is a profitable permanent establishment and the other two are trades or businesses that would earn taxable income under the Code but that do not meet the permanent establishment threshold tests of the Convention. One is profitable and the other incurs a loss. Under the Convention, the income of the permanent establishment is taxable, and both the profit and loss of the other two businesses are ignored. Under the Code, all three would be subject to tax, but the loss would be offset against the profits of the two profitable ventures. The taxpayer may not invoke the Convention to exclude the profits of the profitable trade or business and invoke the Code to claim the loss of the loss trade or business against the profit of the permanent establishment. (See Rev. Rul. 84-17, 1984-1 C.B. 308.) If, however, the taxpayer invokes the Code for the taxation of all three ventures, he would not be precluded from invoking the Convention with respect, for example, to any dividend income he may receive from the United States that is not effectively connected with any of his business activities in the United States.

Similarly, nothing in the Convention can be used to deny any benefit granted by any other agreement between the United States and Denmark. For example, if certain benefits are provided for military personnel or military contractors under a Status of Forces Agreement between the United States and Denmark, those benefits or protections will be available to residents of the Contracting States regardless of any provisions to the contrary (or silence) in the Convention.

*Paragraph 3*

Paragraph 3 specifically relates to non-discrimination obligations of the Contracting States under other agreements. The provisions of paragraph 3 are an exception to the rule provided in paragraph 2 of this Article under which the Convention shall not restrict in any manner any benefit now or hereafter accorded by any other agreement between the Contracting States.

Subparagraph (a) of paragraph 3 provides that, notwithstanding any other agreement to which the Contracting States may be parties, a dispute concerning whether a measure is within the scope of this Convention shall be considered only by the competent authorities of the Contracting States, and the procedures under this Convention exclusively shall apply to the dispute. Thus, procedures for dealing with disputes that may be incorporated into trade, investment, or other agreements between the Contracting States shall not apply for the purpose of determining the scope of the Convention.

Subparagraph (b) of paragraph 3 provides that, unless the competent authorities determine that a taxation measure is not within the scope of this Convention, the non-discrimination obligations of this Convention exclusively shall apply with respect to that measure, except for such national treatment or most-favored-nation ("MFN") obligations as may apply to trade in goods under the General Agreement on Tariffs and Trade ("GATT"). No national treatment or MFN obligation under any other agreement shall apply with respect to that measure. Thus, unless the competent authorities agree otherwise, any national treatment and MFN obligations undertaken by the Contracting States under agreements other than the Convention shall not apply to a taxation measure, with the exception of GATT as applicable to trade in goods.

Subparagraph (c) of paragraph 3 defines a "measure" broadly. It would include, for example, a law, regulation, rule, procedure, decision, administrative action or guidance, or any other form of governmental action or guidance.

*Paragraph 4*

Paragraph 4 contains the traditional saving clause found in U.S. tax treaties. The Contracting States reserve their rights, except as provided in paragraph 5, to tax their residents and citizens as provided in their internal laws, notwithstanding any provisions of the Convention to the contrary. For example, if a resident of Denmark performs independent personal services in the United States and the income from the services is not attributable to a fixed base in the United States, Article 14 (Independent Personal Services) would by its terms prevent the United States from taxing the income. If, however, the resident of Denmark is also a citizen of the United States, the saving clause permits the United States to include the remuneration in the worldwide income of the citizen and subject it to tax under the normal Code rules (i.e., without regard to Code section 894(a)). However, paragraph 5(a) of this Article preserves the benefits of special foreign tax credit rules applicable to the U.S. taxation of certain U.S. income of its citizens resident in Denmark. See paragraph 2 of Article 23 (Relief from Double Taxation).

For purposes of the saving clause, "residence" is determined under Article 4 (Residence). Thus, if an individual who is not a U.S. citizen is a resident of the United States under the Code, and is also a resident of Denmark under its law, and that individual has a permanent home available to him in Denmark and not in the United States, he would be treated as a resident of Denmark under Article 4 and for purposes of the saving clause. The United States would not be permitted to apply its statutory rules to that person if they are inconsistent with the treaty. Thus, an individual who is a U.S. resident under the Internal Revenue Code but who is deemed to be a resident of Denmark under the tie-breaker rules of Article 4 (Residence) would be subject to U.S. tax only to the extent permitted by the Convention. However, the person would be treated as a U.S. resident for U.S. tax purposes other than determining the individual's U.S. tax liability. For example, in determining under Code section 957 whether a foreign corporation is a controlled foreign corporation, shares in that corporation held by the individual would be considered to be held by a U.S. resident. As a result, other U.S. citizens or residents might be deemed to be United States shareholders of a controlled foreign corporation subject to current inclusion of Subpart F income recognized by the corporation. See Treas. Reg. section 301.7701(b)-7(a)(3).

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Under paragraph 4 each Contracting State also reserves its right to tax former citizens and long-term residents whose loss of citizenship or long-term residence had as one of its principal purposes the avoidance of tax. The United States generally treats an individual as having a principal purpose to avoid tax if:

(a) the average annual net income tax of such individual for the period of 5 taxable years ending before the date of the loss of status is greater than $100,000; or

(b) the net worth of such individual as of such date is $500,000 or more.

An individual shall not be treated as a lawful permanent resident for any taxable year if such individual is treated as a resident of the foreign country under the provisions of a tax treaty between the United States and the foreign country and the individual does not waive the benefits of such treaty applicable to residents of the foreign country. This provision may be applied for a period of 10 years following such loss. In the United States, such a former citizen or long-term resident is taxable in accordance with the provisions of section 877 of the Code.

Some provisions are intended to provide benefits to citizens and residents even if such benefits do not exist under internal law. Paragraph 5 sets forth certain exceptions to the saving clause that preserve these benefits for citizens and residents of the Contracting States. Subparagraph (a) lists certain provisions of the Convention that are applicable to all citizens and residents of a Contracting State, despite the general saving clause rule of paragraph 3:

(i) Paragraph 2 of Article 9 (Associated Enterprises) grants the right to a correlative adjustment with respect to income tax due on profits reallocated under Article 9;

(ii) Paragraph 7 of Article 13 (Capital Gains) allows a resident to elect to be treated in his State of residence as having alienated and repurchased a property where the gain has been subject to tax in the other State, and paragraph 8 permits the competent authorities to coordinate the timing of the recognition of gain with respect to cross-border reorganizations;

(iii) Paragraphs 1(c), 2 and 5 of Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support Payments) deal with certain pension benefits, social security benefits and child support payments, respectively. Subparagraph 1(c) requires a Contracting State to treat certain pension benefits as arising in the other Contracting State, even if they would otherwise be treated as arising in the first-mentioned State under its domestic law. The inclusion of paragraph 2 in the exceptions to the saving clause means that the granting of exclusive taxing right of social security benefits to the paying country applies to deny, for example, to the United States the right to tax its citizens and residents on social security benefits paid by Denmark. The inclusion of paragraph 5, which exempts child support payments from taxation by the State of residence of the recipient, means that if a resident of Denmark pays child support to a citizen or resident of the United States, the United States may not tax the recipient;

(iv) Article 23 (Relief from Double Taxation) confirms the benefit of a credit to citizens and residents of one Contracting State for income taxes paid to the other;

(v) Article 24 (Non-Discrimination) requires one Contracting State to grant national treatment to residents and citizens of Denmark in certain circumstances. Excepting this Article from the saving clause requires, for example, that the United States give such benefits to a resident or citizen of Denmark even if that person is a citizen of the United States;

(vi) Article 25 (Mutual Agreement Procedure) may confer benefits on citizens and residents of the Contracting States.

For example, the statute of limitations may be waived for refunds and the competent authorities are permitted to use a definition of a term that differs from the internal law definition. As with the foreign tax credit, these benefits are intended to be granted by a Contracting State to its citizens and residents.

Subparagraph (b) of paragraph 5 provides a different set of exceptions to the saving clause. The benefits referred to are all intended to be granted to temporary residents of a Contracting State (for example, in the case of the United States, holders of non-immigrant visas), but not to citizens or to persons who have acquired permanent residence in the other Contracting State. If beneficiaries of these provisions travel from one of the Contracting States to the other, and remain in the other long enough to become residents under its internal law, but do not acquire permanent residence status (i.e., in the U.S. context, they do not become "green card" holders) and are not citizens of the other Contracting State, the host State will continue to grant these benefits even if they conflict with the statutory rules. The benefits preserved by this paragraph are the host country exemptions for the following items of income: government service salaries and pensions under Article 19 (Government Service); certain income of visiting students and trainees under Article 20 (Students and Trainees); and the income of diplomatic agents and consular officers under Article 28 (Diplomatic Agents and Consular Officers).

## ARTICLE 2

### Taxes Covered

This Article specifies the U.S. taxes and the Danish taxes to which the Convention applies. Unlike Article 2 in the OECD Model, this Article does not contain a general description of the types of taxes that are covered (i.e., income taxes), but only a listing of the specific taxes covered for both of the Contracting States. With two exceptions, the taxes specified in Article 2 are the covered taxes for all purposes of the Convention. A broader coverage applies, however, for purposes of Articles

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

24 (Non-Discrimination) and 26 (Exchange of Information). Article 24 (Non-Discrimination) applies with respect to all taxes, including those imposed by state and local governments. Article 26 (Exchange of Information) applies with respect to all taxes imposed at the national level.

Subparagraph 1(a) provides that the United States covered taxes are the Federal income taxes imposed by the Code, together with the excise taxes imposed with respect to private foundations (Code sections 4940 through 4948). Although they may be regarded as income taxes, social security taxes (Code sections 1401, 3101, 3111 and 3301) are specifically excluded from coverage. It is expected that social security taxes will be dealt with in bilateral Social Security Totalization Agreements, which are negotiated and administered by the Social Security Administration. Except with respect to Article 24 (Non-Discrimination), state and local taxes in the United States are not covered by the Convention.

In this Convention, like the U.S. Model, the Accumulated Earnings Tax and the Personal Holding Companies Tax are covered taxes because they are income taxes and they are not otherwise excluded from coverage. Under the Code, these taxes will not apply to most foreign corporations because of a statutory exclusion or the corporation's failure to meet a statutory requirement.

Subparagraph 1(b) specifies the existing taxes of Denmark that are covered by the Convention. These taxes are the income tax to the State (indkomstskatten til staten), the municipal income tax (den kommunale indkomstskat); the income tax to the county municipalities (den amtskommunale indkomstskat); and the taxes imposed under the Hydrocarbon Tax Act (skatter i henhold til kulbrinteskatteloven).

Under paragraph 2, the Convention will apply to any taxes that are identical, or substantially similar, to those enumerated in paragraph 1, and which are imposed in addition to, or in place of, the existing taxes after the date of signature of the Convention. The paragraph also provides that the competent authorities of the Contracting States will notify each other of significant changes in their taxation laws or of other laws that affect their obligations under the Convention. The use of the term "significant" means that changes must be reported that are of significance to the operation of the Convention. Other laws that may affect a Contracting State's obligations under the Convention may include, for example, laws affecting bank secrecy.

The competent authorities are also obligated to notify each other of official published materials concerning the application of the Convention. This requirement encompasses materials such as technical explanations, regulations, rulings and judicial decisions relating to the Convention.

## ARTICLE 3

### General Definitions

Paragraph 1 defines a number of basic terms used in the Convention. Certain others are defined in other Articles of the Convention. For example, the term "resident of a Contracting State" is defined in Article 4 (Residence). The term "permanent establishment" is defined in Article 5 (Permanent Establishment). The terms "dividends," "interest" and "royalties" are defined in Articles 10, 11 and 12, respectively. The introduction to paragraph 1 makes clear that these definitions apply for all purposes of the Convention, unless the context requires otherwise. This latter condition allows flexibility in the interpretation of the treaty in order to avoid unintended results. Terms that are not defined in the Convention are dealt with in paragraph 2.

Subparagraph 1(a) defines the term "person" to include an individual, an estate, a trust, a partnership, a company and any other body of persons. The definition is significant for a variety of reasons. For example, under Article 4, only a "person" can be a "resident" and therefore eligible for most benefits under the treaty. Also, all "persons" are eligible to claim relief under Article 25 (Mutual Agreement Procedure).

The term "company" is defined in subparagraph 1(b) as a body corporate or an entity treated as a body corporate for tax purposes according to the laws of the state where it is organized.

The terms "enterprise of a Contracting State" and "enterprise of Denmark" are defined in subparagraph 1(c) as an enterprise carried on by a resident of a Contracting State and an enterprise carried on by a resident of Denmark. The term "enterprise" is not defined in the Convention, nor is it defined in the OECD Model or its Commentaries. Despite the absence of a clear, generally accepted meaning for the term "enterprise," the term is understood to refer to any activity or set of activities that constitute a trade or business.

Like the U.S. Model, subparagraph 1(c) also provides that these terms also encompass an enterprise conducted through an entity (such as a partnership) that is treated as fiscally transparent in the Contracting State where the entity's owner is resident. This phrase has been included in the Convention in order to address more explicitly some of the problems presented by fiscally transparent entities. In accordance with Article 4 (Residence), entities that are fiscally transparent in the country in which their owners are resident are not considered to be residents of a Contracting State (although income derived by such entities may be taxed as the income of a resident, if taxed in the hands of resident partners or other owners). Given the approach taken in Article 4, an enterprise conducted by such an entity arguably could not qualify as an enterprise of a Contracting State under the OECD Model because the OECD definition of enterprise requires that the enterprise be conducted by a resident, although most countries would attribute the enterprise to the owners of the entity in such circumstances. The definition in the Convention is intended to make clear that an enterprise conducted by such an entity will be treated as carried on by a resident of a Contracting State to the extent its partners or other owners are residents. This approach is consistent with the Code, which under section 875 attributes a trade or business conducted by a partnership to its partners and a trade or business conducted by an estate or trust to its beneficiaries.

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

An enterprise of a Contracting State need not be carried on in that State. It may be carried on in the other Contracting State or in a third state (e.g., a U.S. corporation doing all of its business in Denmark would still be a U.S. enterprise).

Subparagraph 1(d) defines the term "international traffic." The term generally means any transport by a ship or aircraft except when transport is solely between places within a Contracting State. This definition is applicable principally in the context of Article 8 (Shipping and Air Transport). The definition in the OECD Model refers to the operator of the ship or aircraft having its place of effective management in a Contracting State (i.e., being a resident of that State). The present Convention does not include this limitation. The broader definition combines with paragraphs 2 and 3 of Article 8 to exempt from tax by the source State income from the rental of ships, aircraft or containers that is earned both by lessors that are operators of ships and aircraft and by those lessors that are not (e.g., banks or container leasing companies).

The exclusion from international traffic of transport solely between places within one of the Contracting States means, for example, that carriage of goods or passengers solely between New York and Chicago would not be treated as international traffic, even if carried by a Danish carrier. The substantive taxing rules of the Convention relating to the taxation of income from transport, principally Article 8 (Shipping and Air Transport), therefore, would not apply to income from such carriage. Thus, if the carrier engaged in internal U.S. traffic were a resident of Denmark (assuming that were possible under U.S. law), the United States would not be required to exempt the income from that transport under Article 8. The income would, however, be treated as business profits under Article 7 (Business Profits), and therefore would be taxable in the United States only if attributable to a U.S. permanent establishment of the foreign carrier, and then only on a net basis. The gross basis U.S. tax imposed by section 887 would never apply under the circumstances described.

If, however, goods or passengers are carried by a carrier resident in Denmark from a non-U.S. port to, for example, New York, and some of the goods or passengers continue on to Chicago, the entire transport would be international traffic. This would be true if the international carrier transferred the goods at the U.S. port of entry from a ship to a land vehicle, or even if the overland portion of the trip in the United States was handled by an independent carrier under contract with the original international carrier, so long as both parts of the trip were reflected in original bills of lading. For this reason, the Convention, like the U.S. Model, refers, in the definition of "international traffic," to "such transport" being solely between places in that State, while the OECD Model refers to the ship or aircraft being operated solely between such places. The Convention definition is intended to make clear that, as in the above example, even if the goods are carried on a different aircraft for the internal portion of the international voyage than is used for the overseas portion of the trip, the definition applies to that internal portion as well as the external portion.

Finally, a "cruise to nowhere," i.e., a cruise beginning and ending in a port in the same Contracting State with no stops in a foreign port, would not constitute international traffic.

Subparagraphs 1(e)(i) and (ii) define the term "competent authority" for the United States and Denmark, respectively. The U.S. competent authority is the Secretary of the Treasury or his delegate. The Secretary of the Treasury has delegated the competent authority function to the Commissioner of Internal Revenue, who in turn has delegated the authority to the Assistant Commissioner (International). With respect to interpretative issues, the Assistant Commissioner acts with the concurrence of the Associate Chief Counsel (International) of the Internal Revenue Service. The Danish competent authority is the Minister for Taxation or his authorized representative.

The term "United States" is defined in subparagraph 1(f) to mean the United States of America, including the states, the District of Columbia and the territorial sea of the United States. The term does not include Puerto Rico, the Virgin Islands, Guam or any other U.S. possession or territory. This Convention explicitly includes certain areas under the sea within the definition of the United States. For certain purposes, the definition is extended to include the seabed and subsoil of undersea areas adjacent to the territorial sea of the United States. This extension applies to the extent that the United States exercises sovereignty in accordance with international law for the purpose of natural resource exploration and exploitation of such areas. This extension of the definition applies, however, only if the person, property or activity to which the Convention is being applied is connected with such natural resource exploration or exploitation. Thus, it would not include any activity involving the sea floor of an area over which the United States exercised sovereignty for natural resource purposes if that activity was unrelated to the exploration and exploitation of natural resources.

The term "Denmark" is defined in subparagraph 1(g). It means the Kingdom of Denmark, including any area outside the territorial sea of Denmark which in accordance with international law has been or may hereafter be designated under Danish laws as an area within which Denmark may exercise sovereign rights with respect to the exploration and exploitation of the natural resources of the sea-bed or its subsoil and the superjacent waters and with respect to other activities for the exploration and economic exploitation of the area.

Thus, the Convention defines each of the countries as including its continental shelf. At the time the prior Convention was negotiated, the concept of the "continental shelf" as included within the definition of a country was just emerging. Denmark did not claim rights over its continental shelf until 1963; in the United States, a similar situation pertained. However, over the past three decades each country has imposed taxes on oil and gas exploration and exploitation activities on its continental shelf. The Convention simply clarifies the practice of both parties under the present treaty in terms consistent with modern international law and with the domestic laws of both countries.

The term "Denmark" does not comprise the Faroe Islands or Greenland. Paragraph 2 of the Protocol provides that the Convention may be extended to any territory or U.S. possession which imposes taxes substantially similar to those covered

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

by the Convention. Such an extension would require the conclusion of a supplementary Convention which would be subject to ratification in the case of the United States, and approval in accordance with Denmark's constitutional procedures.

The term "national," as it relates to the United States and Denmark, is defined in subparagraphs 1(h)(i) and (ii), respectively. This term is relevant for purposes of Articles 19 (Government Service) and 24 (Non-Discrimination). A national of one of the Contracting States is:

(1)   an individual who is a citizen or national of that State; and

(2)   any legal person, partnership or association deriving its status as such from the law in force in the State where it is established.

This definition is closely analogous to that found in the OECD Model.

The term "qualified governmental entity" is defined in subparagraph 1(i). This definition is relevant for purposes of Articles 4 (Residence) and 10 (Dividends). The term means:

(i)    the Government of a Contracting State or of a political subdivision or local authority of the Contracting State;

(ii)   A person wholly owned by a governmental entity described in subparagraph (i), that satisfies certain organizational and funding standards; and

(iii)  a pension fund that meets the standards of subparagraphs (i) and (ii) and that provides government service pension benefits, described in Article 19 (Government Service).

A qualified governmental entity described in subparagraphs (ii) and (iii) may not engage in any commercial activity.

Paragraph 2 provides that in the application of the Convention, any term used but not defined in the Convention will have the meaning that it has under the law of the Contracting State whose tax is being applied, unless the context requires otherwise. The paragraph makes clear that if the term is defined under both the tax and non-tax laws of a Contracting State, the definition in the tax law will take precedence over the definition in the non-tax laws. Finally, there also may be cases where the tax laws of a State contain multiple definitions of the same term. In such a case, the definition used for purposes of the particular provision at issue, if any, should be used.

If the meaning of a term cannot be readily determined under the law of a Contracting State, or if there is a conflict in meaning under the laws of the two States that creates difficulties in the application of the Convention, the competent authorities, as indicated in Article 25 (Mutual Agreement Procedure), may establish a common meaning in order to prevent double taxation or to further any other purpose of the Convention. This common meaning need not conform to the meaning of the term under the laws of either Contracting State.

The language of paragraph 2 makes clear that the reference to the internal law of a Contracting State means the law in effect at the time the Convention is being applied, not the law as in effect at the time the Convention was signed. The use of "ambulatory" definitions, however, may lead to results that are at variance with the intentions of the negotiators and of the Contracting States when the Convention was negotiated and ratified. The reference in both paragraphs 1 and 2 to the caveat "unless the context otherwise requires" a definition different from the treaty definition, in paragraph 1, or from the internal law definition of the Contracting State whose tax is being imposed, under paragraph 2, refers to a circumstance where the result intended by the negotiators or by the Contracting States is different from the result that would obtain under either the paragraph 1 definition or the statutory definition. Thus, flexibility in defining terms is necessary and permitted.

## ARTICLE 4

### Residence

This Article sets forth rules for determining whether a person is a resident of a Contracting State for purposes of the Convention. As a general matter, only residents of the Contracting States may claim the benefits of the Convention. The treaty definition of residence is to be used only for purposes of the Convention. The fact that a person is determined to be a resident of a Contracting State under Article 4 does not necessarily entitle that person to the benefits of the Convention. In addition to being a resident, a person also must qualify for benefits under Article 22 (Limitation on Benefits) in order to receive benefits conferred on residents of a Contracting State.

The determination of residence for treaty purposes looks first to a person's liability to tax as a resident under the respective taxation laws of the Contracting States. As a general matter, a person who, under those laws, is a resident of one Contracting State and not of the other need look no further. For purposes of the Convention, that person is a resident of the State in which he is resident under internal law. If, however, a person is resident in both Contracting States under their respective taxation laws, the Article proceeds, where possible, to use tie-breaker rules to assign a single State of residence to such a person for purposes of the Convention.

### Paragraph 1

The term "resident of a Contracting State" is defined in paragraph 1. In general, this definition incorporates the definitions of residence in U.S. and Danish law by referring to a resident as a person who, under the laws of a Contracting State, is subject

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

to tax there by reason of his domicile, residence, citizenship, place of management, place of incorporation, or any other similar criterion. Thus, residents of the United States include aliens who are considered U.S. residents under Code section 7701(b). Subparagraphs (a) through (d) each address special cases that may arise in the context of Article 4.

Certain entities that are nominally subject to tax but that in practice rarely pay tax also would generally be treated as residents and therefore accorded treaty benefits. For example, RICs, REITs and REMICs are all residents of the United States for purposes of the treaty. Although the income earned by these entities normally is not subject to U.S. tax in the hands of the entity, they are taxable to the extent that they do not currently distribute their profits, and therefore may be regarded as "liable to tax". They also must satisfy a number of requirements under the Code in order to be entitled to special tax treatment.

Subparagraph (a) provides that a person who is liable to tax in a Contracting State only in respect of income from sources within that Contracting State will not be treated as a resident of that Contracting State for purposes of the Convention. Thus, a consular official of Denmark who is posted in the United States, who may be subject to U.S. tax on U.S. source investment income, but is not taxable in the United States on non-U.S. source income, would not be considered a resident of the United States for purposes of the Convention. (See Code section 7701(b)(5)(B)). Similarly, an enterprise of Denmark with a permanent establishment in the United States is not, by virtue of that permanent establishment, a resident of the United States. The enterprise generally is subject to U.S. tax only with respect to its income that is attributable to the U.S. permanent establishment, not with respect to its worldwide income, as it would be if it were a U.S. resident.

Subparagraph (b) provides that certain tax-exempt entities such as pension funds and charitable organizations will be regarded as residents regardless of whether they are generally liable for income tax in the State where they are established. An entity will be described in this subparagraph if it is generally exempt from tax by reason of the fact that it is organized and operated exclusively to perform a charitable or similar purpose or to provide pension or similar benefits to employees, including self-employed individuals. The reference to "similar benefits" is intended to encompass employee benefits, such as health and disability benefits.

The inclusion of this provision is intended to clarify the generally accepted practice of treating an entity that would be liable for tax as a resident under the internal law of a State but for a specific exemption from tax (either complete or partial) as a resident of that Contracting State for purposes of paragraph 1. The reference to a general exemption is intended to reflect the fact that under U.S. law, certain organizations that generally are considered to be tax-exempt entities may be subject to certain excise taxes or to income tax on their unrelated business income. Thus, a U.S. pension trust, or an exempt section 501(c) organization (such as a U.S. charity) that is generally exempt from tax under U.S. law is considered a resident of the United States for all purposes of the treaty.

Subparagraph (c) specifies that a qualified governmental entity (as defined in Article 3) is to be treated as a resident of the Contracting State when it is established.

Subparagraph (d) addresses special issues presented by fiscally transparent entities such as partnerships and certain estates and trusts. This subparagraph applies to any resident of a Contracting State who is entitled to income derived through an entity that is treated as fiscally transparent under the laws of either Contracting State. Entities falling under this description in the United States would include partnerships, common investment trusts under section 584 and grantor trusts. This paragraph also applies to U.S. limited liability companies ("LLC"s) that are treated as partnerships for U.S. tax purposes.

Subparagraph (d) provides that an item of income derived by such a fiscally transparent entity will be considered to be derived by a resident of a Contracting State if the resident is treated under the taxation laws of the State where he is resident as deriving the item of income. For example, if a corporation resident in Denmark distributes a dividend to an entity that is treated as fiscally transparent for U.S. tax purposes, the dividend will be considered derived by a resident of the United States only to the extent that the taxation laws of the United States treat one or more U.S. residents (whose status as U.S. residents is determined, for this purpose, under U.S. tax laws) as deriving the dividend income for U.S. tax purposes. In the case of a partnership, the persons who are, under U.S. tax laws, treated as partners of the entity would normally be the persons whom the U.S. tax laws would treat as deriving the dividend income through the partnership. Thus, it also follows that persons whom the U.S. treats as partners but who are not U.S. residents for U.S. tax purposes may not claim a benefit for the dividend paid to the entity under the Convention. Although these partners are treated as deriving the income for U.S. tax purposes, they are not residents of the United States for purposes of the treaty. If, however, they are treated as residents of a third country under the provisions of an income tax convention which that country has with Denmark, they may be entitled to claim a benefit under that convention. In contrast, if an entity is organized under U.S. laws and is classified as a corporation for U.S. tax purposes, dividends paid by a corporation resident in the other Contracting State to the U.S. entity will be considered derived by a resident of the United States since the U.S. corporation is treated under U.S. taxation laws as a resident of the United States and as deriving the income.

These results would obtain even if the entity were viewed differently under the tax laws of Denmark (e.g., as not fiscally transparent in the first example above where the entity is treated as a partnership for U.S. tax purposes or as fiscally transparent in the second example where the entity is viewed as not fiscally transparent for U.S. tax purposes). These results also follow regardless of where the entity is organized, i.e., in the United States, Denmark, or in a third country. For example, income from sources in Denmark received by an entity organized under the laws of Denmark, which is treated for U.S. tax purposes as a corporation and is owned by a U.S. shareholder who is a U.S. resident for U.S. tax purposes, is not considered derived by the shareholder of that corporation even if, under the tax laws of the other State, the entity is treated as fiscally transparent. Rather, for purposes of the treaty, the income is treated as derived by an entity resident in Denmark. These results also follow

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

regardless of whether the entity is disregarded as a separate entity under the laws of one jurisdiction but not the other, such as a single owner entity that is viewed as a branch for U.S. tax purposes and as a corporation for tax purposes of Denmark.

The taxation laws of a Contracting State may treat an item of income, profit or gain as income, profit or gain of a resident of that State even if, under the taxation laws of that State, the resident is not subject to tax on that particular item of income, profit or gain. For example, U.S.-source dividends would be regarded as income or gain of a resident of Denmark who otherwise derived the income or gain, despite the fact that the resident could be exempt from tax in Denmark on the dividend because of Denmark's participation exemption.

Where income is derived through an entity organized in a third state that has owners resident in one of the Contracting States, the characterization of the entity in that third state is irrelevant for purposes of determining whether the resident is entitled to treaty benefits with respect to income derived by the entity.

These principles also apply to trusts to the extent that they are fiscally transparent in either Contracting State. For example, if X, a resident of Denmark, creates a revocable trust and names persons resident in a third country as the beneficiaries of the trust, X would be treated as the beneficial owner of income derived from the United States under the Code's rules. If Denmark has no rules comparable to those in sections 671 through 679 then it is possible that under Denmark's law neither X nor the trust would be taxed on the income derived from the United States. In these cases subparagraph (d) provides that the trust's income would be regarded as being derived by a resident of the other Contracting State only to the extent that the laws of that State treat residents of that State as deriving the income for tax purposes.

*Paragraph 2*

If, under the laws of the two Contracting States, and, thus, under paragraph 1, an individual is deemed to be a resident of both Contracting States, a series of tie-breaker rules are provided to determine a single State of residence for that individual. These tests are to be applied in the order in which they are stated. The first test is based on where the individual has a permanent home. If that test is inconclusive because the individual has a permanent home available to him in both States, he will be considered to be a resident of the Contracting State where his personal and economic relations are closest (i.e., the location of his "center of vital interests"). If that test is also inconclusive, or if he does not have a permanent home available to him in either State, he will be treated as a resident of the Contracting State where he maintains an habitual abode. If he has an habitual abode in both States or in neither of them, he will be treated as a resident of the State of which he is a national. If he is a national of both States or of neither, the competent authorities shall endeavor to settle the question by mutual agreement.

*Paragraph 3*

Paragraph 3 seeks to settle dual-residence issues for a person other than an individual. Such a person is treated as resident in the United States if it is created or organized under the laws of the United States or a political subdivision. Denmark employs two criteria to determine corporate residence, only one of which has to be satisfied in order for a corporate entity to be considered a resident of Denmark. The first is the same as the United States' "place-of-incorporation" rule. Alternatively, a corporation is also considered a resident of Denmark if its seat of management is located in Denmark. For this "seat-of-management" test, the location of the day-to-day management is normally decisive. Denmark's seat-of-management test coupled with the United States' rule could lead to cases of dual corporate residence, in the case of a company incorporated in the United States with its seat of management located in Denmark. Under paragraph 3, the residence of such a company will be considered by the competent authorities, who will endeavor to settle the question and to determine the mode of application of the Convention to such person.

*Paragraph 4*

Paragraph 4 provides that a U.S. citizen or alien lawfully admitted for permanent residence in the United States (i.e., a "green card" holder) will be treated as a resident of the United States for purposes of the Convention, and, thereby entitled to treaty benefits, only if he has a substantial presence (see section 7701(b)(3)), permanent home or habitual abode in the United States. If, however, such an individual is a resident of both the United States and Denmark under the general rule of paragraph 1, whether he is to be treated as a resident of the United States or of Denmark for purposes of the Convention is determined by the tie-breaker rules of paragraph 4 of the Article, regardless of how close his nexus to the United States may be. If, however, he is resident in the United States and not Denmark but has ties to a third State, in the absence of paragraph 4 he would always be a resident of the United States, no matter how tenuous his relationship with the United States relative to that with the third State. However, the fact that a U.S. citizen who does not have close ties to the United States may not be treated as a U.S. resident under the Convention does not alter the application of the saving clause of paragraph 4 of Article 1 (General Scope) to that citizen. For example, a U.S. citizen who pursuant to the "citizen/green card holder" rule is not considered to be a resident of the United States still is taxable on his worldwide income under the generally applicable rules of the Code.

## ARTICLE 5

### Permanent Establishment

This Article defines the term "permanent establishment," a term that is significant for several Articles of the Convention. The existence of a permanent establishment in a Contracting State is necessary under Article 7 (Business Profits) for the taxation by Denmark of the business profits of a resident of Denmark. Since the term "fixed base" in Article 14 (Independent Personal Services) is understood by reference to the definition of "permanent establishment," this Article is also relevant for purposes

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

of Article 14. Articles 10, 11 and 12 (dealing with dividends, interest, and royalties, respectively) provide for reduced rates of tax at source on payments of these items of income to a resident of the other State only when the income is not attributable to a permanent establishment or fixed base that the recipient has in the source State. The concept is also relevant in determining which Contracting State may tax certain gains under Article 13 (Capital Gains) and certain "other income" under Article 21 (Other Income).

*Paragraph 1*

The basic definition of the term "permanent establishment" is contained in paragraph 1. As used in the Convention, the term means a fixed place of business through which the business of an enterprise is wholly or partly carried on. As indicated in the OECD Commentaries (see paragraphs 4 through 8), a general principle to be observed in determining whether a permanent establishment exists is that the place of business must be "fixed" in the sense that a particular building or physical location is used by the enterprise for the conduct of its business, and that it must be foreseeable that the enterprise's use of this building or other physical location will be more than temporary.

*Paragraph 2*

Paragraph 2 lists a number of types of fixed places of business that constitute a permanent establishment. This list is illustrative and non-exclusive. According to paragraph 2, the term permanent establishment includes a place of management, a branch, an office, a factory, a workshop, and a mine, oil or gas well, quarry or other place of extraction of natural resources.

*Paragraph 3*

This paragraph provides rules to determine whether a building site or a construction, assembly or installation project, or an installation or drilling rig or ship used for the exploration of natural resources constitutes a permanent establishment for the contractor, driller, etc. An activity does not create a permanent establishment unless the site, project, etc. lasts or continues for more than twelve months. It is only necessary to refer to "exploration" and not "exploitation" in this context because exploitation activities are defined to constitute a permanent establishment under subparagraph (f) of paragraph 2. Thus, a drilling rig does not constitute a permanent establishment if a well is drilled in only six months, but if production begins in the following month the well becomes a permanent establishment as of the date on which production begins.

The twelve-month test applies separately to each site or project. The twelve-month period begins when work (including preparatory work carried on by the enterprise) physically begins in a Contracting State. A series of contracts or projects by a contractor that are interdependent both commercially and geographically are to be treated as a single project for purposes of applying the twelve-month threshold test. For example, the construction of a housing development would be considered as a single project even if each house were constructed for a different purchaser. Several drilling rigs operated by a drilling contractor in the same sector of the continental shelf also normally would be treated as a single project.

If the twelve-month threshold is exceeded, the site or project constitutes a permanent establishment from the first day of activity. In applying this paragraph, time spent by a subcontractor on a building site is counted as time spent by the general contractor at the site for purposes of determining whether the general contractor has a permanent establishment. However, for the sub-contractor itself to be treated as having a permanent establishment, the subcontractor's activities at the site must last for more than 12 months. If a sub-contractor is on a site intermittently then, for purposes of applying the 12-month rule, time is measured from the first day the sub-contractor is on the site until the last day (i.e., intervening days that the sub-contractor is not on the site are counted).

The second sentence of paragraph 3, which includes subparagraphs (a) and (b), further provides that, for purposes of this paragraph, if a resident of a Contracting State is carrying on activities described in paragraph 3 in the other Contracting State and another person that is associated with the first mentioned resident is also carrying on activities that are substantially the same as those carried on by the last-mentioned enterprise and are concerned with the same project or operation, that other person's activities will be regarded as having been carried on by the first-mentioned resident. This rule does not apply to the extent that these activities are carried on at the same time. This rule is intended to prevent taxpayers from avoiding the time threshold by artificially splitting activities between different entities. Thus, the rule will not apply to the extent that the activities of the two persons are being carried on at the same time. If the principal and the related person each exceed the time threshold, both will be considered to have a permanent establishment. If the principal is present for, say, 11 months, and the related party is present for 2 months, during which time period the principal is not present, the principal will have a permanent establishment, but the related party will not.

These interpretations of the Article are based on the Commentary to paragraph 3 of Article 5 of the OECD Model, which contains language substantially the same as that in the Convention (except for the absence in the OECD Model of a rule for drilling rigs). These interpretations are consistent with the generally accepted international interpretation of the relevant language in paragraph 3 of Article 5 of the Convention.

Paragraph 5 of Article 8 (Shipping and Air Transport) confirms that the treatment of profits of an enterprise of a Contracting State from the transport by ships or aircraft of supplies or personnel to a location where offshore activities in connection with the operation or exploitation of natural resources are being carried on in the other Contracting State, or from the operation of tugboats and similar vessels in connection with such activities are taxable only in the Contracting State of the enterprise.

*Paragraph 4*

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

This paragraph contains exceptions to the general rule of paragraph 1, listing a number of activities that may be carried on through a fixed place of business, but which nevertheless do not create a permanent establishment. The use of facilities solely to store, display or deliver merchandise belonging to an enterprise does not constitute a permanent establishment of that enterprise. The maintenance of a stock of goods belonging to an enterprise solely for the purpose of storage, display or delivery, or solely for the purpose of processing by another enterprise does not give rise to a permanent establishment of the first-mentioned enterprise. The maintenance of a fixed place of business solely for the purpose of purchasing goods or merchandise, or for collecting information, for the enterprise, or for other activities that have a preparatory or auxiliary character for the enterprise, such as advertising, or the supply of information do not constitute a permanent establishment of the enterprise. Thus, a news bureau of a newspaper would not constitute a permanent establishment of the newspaper.

Subparagraph 4(f) provides that a combination of the activities described in the other subparagraphs of paragraph 4 will not give rise to a permanent establishment if the combination results in an overall activity that is of a preparatory or auxiliary character. This combination rule, derived from the OECD Model, differs from that in the U.S. Model. In the U.S. Model, any combination of otherwise excepted activities is not deemed to give rise to a permanent establishment, without the additional requirement that the combination, as distinct from each constituent activity, be preparatory or auxiliary. It is assumed that if preparatory or auxiliary activities are combined, the combination generally will also be of a character that is preparatory or auxiliary. If, however, this is not the case, a permanent establishment may result from a combination of activities.

*Paragraphs 5 and 6*

Paragraphs 5 and 6 specify when activities carried on by an agent on behalf of an enterprise create a permanent establishment of that enterprise. Under paragraph 5, a dependent agent of an enterprise is deemed to be a permanent establishment of the enterprise if the agent has and habitually exercises an authority to conclude contracts in the name of the enterprise. If, however, the agent's activities are limited to those activities specified in paragraph 4 which would not constitute a permanent establishment if carried on by the enterprise through a fixed place of business, the agent is not a permanent establishment of the enterprise.

The Convention uses the OECD Model term "in the name of that enterprise," rather than the term "binding on the enterprise," which is the term used in the U.S. Model. There is no substantive difference. As indicated in paragraph 32 to the OECD Commentaries on Article 5, the application of paragraph 5 of the Article is not limited to an agent who enters into contracts literally in the name of the enterprise; the paragraph applies equally to an agent who concludes contracts which are binding on the enterprise, even if those contracts are not actually in the name of the enterprise".

The contracts referred to in paragraph 5 are those relating to the essential business operations of the enterprise, rather than ancillary activities. For example, if the agent has no authority to conclude contracts in the name of the enterprise with its customers for, say, the sale of the goods produced by the enterprise, but it can enter into service contracts in the name of the enterprise for the enterprise's business equipment used in the agent's office, this contracting authority would not fall within the scope of the paragraph, even if exercised regularly.

Under paragraph 6, an enterprise is not deemed to have a permanent establishment in a Contracting State merely because it carries on business in the other Contracting State through an independent agent, including a broker or general commission agent, if the agent is acting in the ordinary course of his business as an independent agent. Thus, there are two conditions that must be satisfied: the agent must be both legally and economically independent of the enterprise, and the agent must be acting in the ordinary course of its business in carrying out activities on behalf of the enterprise.

Whether the agent and the enterprise are independent is a factual determination. Among the questions to be considered are the extent to which the agent operates on the basis of instructions from the enterprise. An agent that is subject to detailed instructions regarding the conduct of its operations or comprehensive control by the enterprise is not legally independent.

In determining whether the agent is economically independent, a relevant factor is the extent to which the agent bears business risk. Business risk refers primarily to risk of loss. An independent agent typically bears risk of loss from its own activities. In the absence of other factors that would establish dependence, an agent that shares business risk with the enterprise, or has its own business risk, is economically independent because its business activities are not integrated with those of the principal. Conversely, an agent that bears little or no risk from the activities it performs is not economically independent and is not described in paragraph 6.

Another relevant factor in determining whether an agent is economically independent is whether the agent has an exclusive or nearly exclusive relationship with the principal. Such a relationship may indicate that the principal has economic control over the agent. A number of principals acting in concert also may have economic control over an agent. The limited scope of the agent's activities and the agent's dependence on a single source of income may indicate that the agent lacks economic independence. It should be borne in mind, however, that exclusivity is not in itself a conclusive test: an agent may be economically independent notwithstanding an exclusive relationship with the principal if it has the capacity to diversify and acquire other clients without substantial modifications to its current business and without substantial harm to its business profits. Thus, exclusivity should be viewed merely as a pointer to further investigation of the relationship between the principal and the agent. Each case must be addressed on the basis of its own facts and circumstances.

*Paragraph 7*

This paragraph clarifies that a company that is a resident of a Contracting State is not deemed to have a permanent establishment in Denmark merely because it controls, or is controlled by, a company that is a resident of that other Contracting

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

State, or that carries on business in that other Contracting State. The determination whether a permanent establishment exists is made solely on the basis of the factors described in paragraphs 1 through 6 of the Article. Whether a company is a permanent establishment of a related company, therefore, is based solely on those factors and not on the ownership or control relationship between the companies.

## ARTICLE 6

### Income from Real Property

*Paragraph 1*

Paragraph 1 states the general rule that income of a resident of a Contracting State derived from real property situated in the other Contracting State may be taxed in the Contracting State in which the property is situated. The paragraph specifies that income from real property includes income from agriculture and forestry. Income from agriculture and forestry are dealt with in Article 6 rather than in Article 7 (Business Profits) in order to conform the U.S. Model to the OECD Model. Given the availability of the net election in paragraph 5, taxpayers generally should be able to obtain the same tax treatment in the situs State regardless of whether the income is treated as business profits or real property income. Paragraph 3 clarifies that the income referred to in paragraph 1 also means income from any use of real property, including, but not limited to, income from direct use by the owner (in which case income may be imputed to the owner for tax purposes) and rental income from the letting of real property.

This Article does not grant an exclusive taxing right to the situs State; the situs State is merely given the primary right to tax. The Article does not impose any limitation in terms of rate or form of tax on the situs State, except that, as provided in paragraph 5, the situs State must allow the taxpayer an election to be taxed on a net basis.

*Paragraph 2*

The term "real property" is defined in paragraph 2 by reference to the internal law definition in the situs State. In the case of the United States, the term has the meaning given to it by Reg. § 1.897-1(b). In addition to the statutory definitions in the two Contracting States, the paragraph specifies certain additional classes of property that, regardless of internal law definitions, are to be included within the meaning of the term for purposes of the Convention. This expanded definition conforms to that in the OECD Model. The definition of "real property" for purposes of Article 6 is more limited than the expansive definition of "real property situated in the Other Contracting State" in paragraph 2 of Article 13 (Capital Gains). The Article 13 term includes not only immovable property as defined in Article 6 but certain other interests in real property.

*Paragraph 3*

Paragraph 3 makes clear that all forms of income derived from the exploitation of real property are taxable in the Contracting State in which the property is situated. In the case of a net lease of real property, if a net taxation election has not been made, the gross rental payment (before deductible expenses incurred by the lessee) is treated as income from the property. Income from the disposition of an interest in real property, however, is not considered "derived" from real property and is not dealt with in this Article. The taxation of that income is addressed in Article 13 (Capital Gains). Also, the interest paid on a mortgage on real property and distributions by a United States real estate investment trust are not dealt with in Article 6. Such payments would fall under Articles 10 (Dividends), 11 (Interest) or 13 (Capital Gains). Finally, dividends paid by a United States real property holding corporation are not considered to be income from the exploitation of real property: such payments would fall under Article 10 or 13.

*Paragraph 4*

Paragraph 4 specifies that the basic rule of paragraph 1 (as elaborated in paragraph 3) applies to income from real property of an enterprise and to income from real property used for the performance of independent personal services. This clarifies that the situs State may tax the real property income (including rental income) of a resident of the other Contracting State in the absence of attribution to a permanent establishment or fixed base in the situs State. This provision represents an exception to the general rule under Articles 7 (Business Profits) and 14 (Independent Personal Services) that income must be attributable to a permanent establishment or fixed base, respectively, in order to be taxable in the situs State.

*Paragraph 5*

Paragraph 5 provides that a resident of one Contracting State that derives real property income from the other may elect, for any taxable year, to be subject to tax in that other State on a net basis, as though the income were attributable to a permanent establishment in that other State. The election may be terminated with the consent of the competent authority of the situs State. In the United States, revocation will be granted in accordance with the provisions of Treas. Reg.

## ARTICLE 7

### Business Profits

This Article provides rules for the taxation by a Contracting State of the business profits of an enterprise of the other Contracting State.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

*Paragraph 1*

Paragraph 1 states the general rule that business profits (as defined in paragraph 7) of an enterprise of one Contracting State may not be taxed by the other Contracting State unless the enterprise carries on business in that other Contracting State through a permanent establishment (as defined in Article 5 (Permanent Establishment)) situated therein. When that condition is met, the State in which the permanent establishment is situated may tax the enterprise, but only on a net basis and only on the income that is attributable to the permanent establishment. This paragraph is identical to paragraph 1 of Article 7 of the OECD Model.

*Paragraph 2*

Paragraph 2 provides rules for the attribution of business profits to a permanent establishment. The Contracting States will attribute to a permanent establishment the profits that it would have earned had it been an independent enterprise engaged in the same or similar activities under the same or similar circumstances. This language incorporates the arm's length standard for purposes of determining the profits attributable to a permanent establishment. The computation of business profits attributable to a permanent establishment under this paragraph is subject to the rules of paragraph 3 for the allowance of expenses incurred for the purposes of earning the profits.

The "attributable to" concept of paragraph 2 is analogous but not entirely equivalent to the "effectively connected" concept in Code section 864(c). The profits attributable to a permanent establishment may be from sources within or without a Contracting State.

Paragraph 2 also provides that the business profits attributed to a permanent establishment include only those profits derived from that permanent establishment's assets or activities. This rule is consistent with the "asset-use" and "business activities" test of Code section 864(c)(2).

This Article does not contain a provision corresponding to paragraph 4 of Article 7 of the OECD Model. That paragraph provides that a Contracting State in certain circumstances may determine the profits attributable to a permanent establishment on the basis of an apportionment of the total profits of the enterprise. Any such approach, however, must be designed to approximate an arm's length result. This paragraph has not been included in the Convention because it is unnecessary. The U.S. view is that paragraphs 2 and 3 of Article 7 authorize the use of such approaches independently of paragraph 4 of Article 7 of the OECD Model because total profits methods are acceptable methods for determining the arm's length profits of associated enterprises under Article 9 (Associated Enterprises). Accordingly, it is understood that, under paragraph 2 of this Article, it is permissible to use methods other than separate accounting to determine the arm's length profits of a permanent establishment where it is necessary to do so for practical reasons, such as when the affairs of the permanent establishment are so closely bound up with those of the head office that it would be impossible to disentangle them on any strict basis of accounts. This view is confirmed by paragraph 3 of the Protocol, which states that nothing in Article 7 or in Article 24 (Non-Discrimination) prevents either of the Contracting States from applying their special rules dealing with the taxation of insurance companies. In the United States, the applicable rules are found in Code sections 842 (a) and (b).

*Paragraph 3*

Paragraph 3 provides that in determining the business profits of a permanent establishment, deductions shall be allowed for the expenses incurred for the purposes of the permanent establishment, ensuring that business profits will be taxed on a net basis. This rule is not limited to expenses incurred exclusively for the purposes of the permanent establishment, but includes a reasonable allocation of expenses incurred for the purposes of the enterprise as a whole, or that part of the enterprise that includes the permanent establishment. Deductions are to be allowed regardless of which accounting unit of the enterprise books the expenses, so long as they are incurred for the purposes of the permanent establishment. For example, a portion of the interest expense recorded on the books of the home office in one State may be deducted by a permanent establishment in the other if properly allocable thereto.

The paragraph specifies that the expenses that may be considered to be incurred for the purposes of the permanent establishment are expenses for research and development, interest and other similar expenses, as well as a reasonable amount of executive and general administrative expenses. This rule permits (but does not require) each Contracting State to apply the type of expense allocation rules provided by U.S. law (such as in Treas. Reg. sections 1.861-8 and 1.882-5).

Paragraph 3 does not permit a deduction for expenses charged to a permanent establishment by another unit of the enterprise. Thus, a permanent establishment may not deduct a royalty deemed paid to the head office. Similarly, a permanent establishment may not increase its business profits by the amount of any notional fees for ancillary services performed for another unit of the enterprise, but also should not receive a deduction for the expense of providing such services, since those expenses would be incurred for purposes of a business unit other than the permanent establishment.

*Paragraph 4*

Paragraph 4 provides that no business profits can be attributed to a permanent establishment merely because it purchases goods or merchandise for the enterprise of which it is a part. This rule applies only to an office that performs functions for the enterprise in addition to purchasing. The income attribution issue does not arise if the sole activity of the permanent establishment is the purchase of goods or merchandise because such activity does not give rise to a permanent establishment under Article 5 (Permanent Establishment). A common situation in which paragraph 4 is relevant is one in which a permanent establishment purchases raw materials for the enterprise's manufacturing operation conducted outside the United States and

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

sells the manufactured product. While business profits may be attributable to the permanent establishment with respect to its sales activities, no profits are attributable to it with respect to its purchasing activities.

*Paragraph 5*

Paragraph 5 provides that profits shall be determined by the same method each year, unless there is good reason to change the method used. This rule assures consistent tax treatment over time for permanent establishments. It limits the ability of both the Contracting State and the enterprise to change accounting methods to be applied to the permanent establishment. It does not, however, restrict a Contracting State from imposing additional requirements, such as the rules under Code section 481, to prevent amounts from being duplicated or omitted following a change in accounting method.

*Paragraph 6*

Paragraph 6 coordinates the provisions of Article 7 and other provisions of the Convention. Under this paragraph, when business profits include items of income that are dealt with separately under other Articles of the Convention, the provisions of those Articles will, except when they specifically provide to the contrary, take precedence over the provisions of Article 7. For example, the taxation of dividends will be determined by the rules of Article 10 (Dividends), and not by Article 7, except where, as provided in paragraph 6 of Article 10, the dividend is attributable to a permanent establishment or fixed base. In the latter case the provisions of Articles 7 or 14 (Independent Personal Services) apply. Thus, an enterprise of one State deriving dividends from the other State may not rely on Article 7 to exempt those dividends from tax at source if they are not attributable to a permanent establishment of the enterprise in the other State. By the same token, if the dividends are attributable to a permanent establishment in the other State, the dividends may be taxed on a net income basis at the source State's full corporate tax rate, rather than on a gross basis under Article 10 (Dividends).

As provided in Article 8 (Shipping and Air Transport), income derived from shipping and air transport activities in international traffic described in that Article is taxable only in the country of residence of the enterprise regardless of whether it is attributable to a permanent establishment situated in the source State.

*Paragraph 7*

The term "business profits" is defined generally in paragraph 7 to mean income derived from any trade or business. In accordance with this broad definition, the term "business profits" includes income attributable to notional principal contracts and other financial instruments to the extent the income is attributable to a trade or business of dealing in such instruments, or is otherwise related to a trade or business (as in the case of a notional principal contract entered into for the purpose of hedging currency risk arising from an active trade or business). Any other income derived from such instruments is, unless specifically covered in another Article, dealt with under Article 21 (Other Income).

The paragraph states the longstanding U.S. view that income earned by an enterprise from the furnishing of personal services is business profits. Thus, a consulting firm resident in one State whose employees perform services in the other State through a permanent establishment may be taxed in that other State on a net basis under Article 7, and not under Article 14 (Independent Personal Services), which applies only to individuals or groups of individuals. The salaries of the employees would be subject to the rules of Article 15 (Dependent Personal Services).

The paragraph also specifies that the term "business profits" includes income derived by an enterprise from the rental of tangible personal property. The inclusion of income derived by an enterprise from the rental of tangible personal property in business profits means that such income earned by a resident of a Contracting State can be taxed by the other Contracting State only if the income is attributable to a permanent establishment maintained by the resident in that other State, and, if the income is taxable, it can be taxed only on a net basis. Income from the rental of tangible personal property that is not derived in connection with a trade or business is dealt with in Article 21 (Other Income).

*Paragraph 8*

Paragraph 8 incorporates into the Convention the rule of Code section 864(c)(6). Like the Code section on which it is based, paragraph 8 provides that any income or gain attributable to a permanent establishment or a fixed base during its existence is taxable in the Contracting State where the permanent establishment or fixed base is situated, even if the payment of that income or gain is deferred until after the permanent establishment or fixed base ceases to exist. This rule applies with respect to paragraphs 1 and 2 of Article 7 (Business Profits), paragraph 6 of Article 10 (Dividends), paragraph 3 of Articles 11 (Interest), 12 (Royalties) and 13 (Gains), Article 14 (Independent Personal Services) and paragraph 2 of Article 21 (Other Income).

The effect of this rule can be illustrated by the following example. Assume a company that is a resident of Denmark and that maintains a permanent establishment in the United States winds up the permanent establishment's business and sells the permanent establishment's inventory and assets to a U.S. buyer at the end of year 1 in exchange for an interest-bearing installment obligation payable in full at the end of year 3. Despite the fact that Article 13's threshold requirement for U.S. taxation is not met in year 3 because the company has no permanent establishment in the United States, the United States may tax the deferred income payment recognized by the company in year 3.

*Relation to Other Articles*

This Article is subject to the saving clause of paragraph 4 of Article 1 (General Scope) of the Model. Thus, if a citizen of the United States who is a resident of Denmark under the treaty derives business profits from the United States that are not attributable to a permanent establishment in the United States, the United States may, subject to the special foreign tax credit

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

rules of paragraph 3 of Article 23 (Relief from Double Taxation), tax those profits, notwithstanding the provision of paragraph 1 of this Article which would exempt the income from U.S. tax.

The benefits of this Article are also subject to Article 22 (Limitation on Benefits). Thus, an enterprise of Denmark that derives income effectively connected with a U.S. trade or business may not claim the benefits of Article 7 unless the resident carrying on the enterprise qualifies for such benefits under Article 22.

## ARTICLE 8

### Shipping And Air Transport

This Article governs the taxation of profits from the operation of ships and aircraft in international traffic. The term "international traffic" is defined in subparagraph 1(d) of Article 3 (General Definitions). The taxation of gains from the alienation of ships, aircraft or containers is not dealt with in this Article but in paragraph 4 of Article 13 (Gains).

*Paragraph 1*

Paragraph 1 provides that profits derived by an enterprise of a Contracting State from the operation in international traffic of ships or aircraft are taxable only in that Contracting State. Because paragraph 6 of Article 7 (Business Profits) defers to Article 8 with respect to shipping income, such income derived by a resident of one of the Contracting States may not be taxed in the other State even if the enterprise has a permanent establishment in that other State. Thus, if a U.S. airline has a ticket office in the other State, Denmark may not tax the airline's profits attributable to that office under Article 7. Since entities engaged in international transportation activities normally will have many permanent establishments in a number of countries, the rule avoids difficulties that would be encountered in attributing income to multiple permanent establishments if the income were covered by Article 7 (Business Profits).

*Paragraph 2*

The income from the operation of ships or aircraft in international traffic that is exempt from tax under paragraph 1 is defined in paragraph 2.

In addition to income derived directly from the operation of ships and aircraft in international traffic, this definition also includes certain items of rental income that are closely related to those activities. First, income of an enterprise of a Contracting State from the rental of ships or aircraft on a full basis (i.e., with crew) when such ships or aircraft are used in international traffic is income of the lessor from the operation of ships and aircraft in international traffic and, therefore, is exempt from tax in the other Contracting State under paragraph 1. Also, paragraph 2 encompasses income from the lease of ships or aircraft on a bareboat basis (i.e., without crew), either when the ships or aircraft are operated in international traffic by the lessee, or when the income is incidental to other income of the lessor from the operation of ships or aircraft in international traffic. The scope of Article 8 is thus the same as the U.S. Model, but broader than that of the OECD Model as it covers rentals from bareboat leasing that are not incidental to the operation of ships or aircraft by the resident itself.

Paragraph 2 also clarifies, consistent with the Commentary to Article 8 of the OECD Model, that income earned by an enterprise from the inland transport of property or passengers within either Contracting State falls within Article 8 if the transport is undertaken as part of the international transport of property or passengers by the enterprise. Thus, if a U.S. shipping company contracts to carry property from Denmark to a U.S. city and, as part of that contract, it transports the property by truck from its point of origin to an airport in Denmark (or it contracts with a trucking company to carry the property to the airport) the income earned by the U.S. shipping company from the overland leg of the journey would be taxable only in the United States. Similarly, Article 8 also would apply to income from lighterage undertaken as part of the international transport of goods.

Finally, certain non-transport activities that are an integral part of the services performed by a transport company are understood to be covered in paragraph 1, though they are not specified in paragraph 2. These include, for example, the performance of some maintenance or catering services by one airline for another airline, if these services are incidental to the provision of those services by the airline for itself. Income earned by concessionaires, however, is not covered by Article 8.

*Paragraph 3*

Under this paragraph, profits of an enterprise of a Contracting State from the use, maintenance or rental of containers (including equipment for their transport) that are used for the transport of goods in international traffic are exempt from tax in the other Contracting State. This result obtains under paragraph 3 regardless of whether the recipient of the income is engaged in the operation of ships or aircraft in international traffic, and regardless of whether the enterprise has a permanent establishment in the other Contracting State. By contrast, Article 8 of the OECD Model covers only income from the use, maintenance or rental of containers that is incidental to other income from international traffic.

*Paragraph 4*

This paragraph clarifies that the provisions of paragraphs 1 and 3 also apply to profits derived by an enterprise of a Contracting State from participation in a consortium, pool, joint business or international operating agency. This refers to various arrangements for international cooperation by carriers in shipping and air transport. For example, airlines from two countries may agree to share the transport of passengers between the two countries. They each will fly the same number of flights per week and share the revenues from that route equally, regardless of the number of passengers that each airline

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

actually transports. Paragraph 4 makes clear that with respect to each carrier the income dealt with in the Article is that carrier's share of the total transport, not the income derived from the passengers actually carried by the airline.

According to paragraph 1 of the Protocol, the Scandinavian Airlines System (SAS) is a consortium within the meaning of Article 8, its participating members being SAS Danmark A/S, SAS Norge ASA and SAS Sverige AB. Thus, the income share of SAS Danmark A/S from the participation in SAS is subject to the provisions of Article 8 in accordance with paragraphs 1, 3 and 5.

*Paragraph 5*

This paragraph clarifies that, notwithstanding the provisions of paragraph 2(f) and paragraph 3 of Article 5 (Permanent Establishment), the profits of an enterprise of a Contracting State from the transport by ships or aircraft of supplies or personnel to a location where offshore activities in connection with the exploration or exploitation of natural resources are being carried on in the other Contracting State, or from the operation of tugboats and similar vessels in connection with such activities, shall be taxable only in the first-mentioned State. This clarification is similar to a clarification as to the tax treatment of these activities in the Danish Model Income Tax Treaty.

*Relation to Other Articles*

As with other benefits of the Convention, the benefit of exclusive residence country taxation under Article 8 is available to an enterprise only if it is entitled to benefits under Article 22 (Limitation on Benefits).

This Article also is subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if a citizen of the United States who is a resident of Denmark derives profits from the operation of ships or aircraft in international traffic, notwithstanding the exclusive residence country taxation in paragraph 1 of Article 8, the United States may, subject to the special foreign tax credit rules of paragraph 2 of Article 23 (Relief from Double Taxation), tax those profits as part of the worldwide income of the citizen. (This is an unlikely situation, however, because non-tax considerations (e.g., insurance) generally result in shipping activities being carried on in corporate form.)

## ARTICLE 9

### Associated Enterprises

This Article incorporates in the Convention the arm's length principle reflected in the U.S. domestic transfer pricing provisions, particularly Code section 482. It provides that when related enterprises engage in a transaction on terms that are not arm's length, the Contracting States may make appropriate adjustments to the taxable income and tax liability of such related enterprises to reflect what the income and tax of these enterprises with respect to the transaction would have been had there been an arm's length relationship between them.

*Paragraph 1*

This paragraph addresses the situation where an enterprise of a Contracting State is related to an enterprise of the other Contracting State, and there are arrangements or conditions imposed between the enterprises in their commercial or financial relations that are different from those that would have existed in the absence of the relationship. Under these circumstances, the Contracting States may adjust the income (or loss) of the enterprise to reflect what it would have been in the absence of such a relationship.

The paragraph identifies the relationships between enterprises that serve as a prerequisite to application of the Article. The necessary element in these relationships is effective control, which is also the standard for purposes of section 482. Thus, the Article applies if an enterprise of one State participates directly or indirectly in the management, control, or capital of the enterprise of the other State. Also, the Article applies if any third person or persons participate directly or indirectly in the management, control, or capital of enterprises of different States. For this purpose, all types of control are included, i.e., whether or not legally enforceable and however exercised or exercisable.

The fact that a transaction is entered into between such related enterprises does not, in and of itself, mean that a Contracting State may adjust the income (or loss) of one or both of the enterprises under the provisions of this Article. If the conditions of the transaction are consistent with those that would be made between independent persons, the income arising from that transaction should not be subject to adjustment under this Article.

Similarly, the fact that associated enterprises may have concluded arrangements, such as cost sharing arrangements or general services agreements, is not in itself an indication that the two enterprises have entered into a non-arm's length transaction that should give rise to an adjustment under paragraph 1. Both related and unrelated parties enter into such arrangements (e.g., joint venturers may share some development costs). As with any other kind of transaction, when related parties enter into an arrangement, the specific arrangement must be examined to see whether or not it meets the arm's length standard. In the event that it does not, an appropriate adjustment may be made, which may include modifying the terms of the agreement or re-characterizing the transaction to reflect its substance.

It is understood that the "commensurate with income" standard for determining appropriate transfer prices for intangibles, added to Code section 482 by the Tax Reform Act of 1986, was designed to operate consistently with the arm's-length standard. The implementation of this standard in the section 482 regulations is in accordance with the general principles of paragraph 1 of Article 9 of the Convention, as interpreted by the OECD Transfer Pricing Guidelines.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The Contracting States preserve their rights to apply internal law provisions relating to adjustments between related parties. They also reserve the right to make adjustments in cases involving tax evasion or fraud. Such adjustments -- the distribution, apportionment, or allocation of income, deductions, credits or allowances -- are permitted even if they are different from, or go beyond, those authorized by paragraph 1 of the Article, as long as they accord with the general principles of paragraph 1, i.e., that the adjustment reflects what would have transpired had the related parties been acting at arm's length. For example, while paragraph 1 explicitly allows adjustments of deductions in computing taxable income, it does not deal with adjustments to tax credits. It does not, however, preclude such adjustments if they can be made under internal law.

This Article also permits tax authorities to deal with thin capitalization issues. They may, in the context of Article 9, scrutinize more than the rate of interest charged on a loan between related persons. They also may examine the capital structure of an enterprise, whether a payment in respect of that loan should be treated as interest, and, if it is treated as interest, under what circumstances interest deductions should be allowed to the payor. Paragraph 2 of the Commentary to Article 9 of the OECD Model, together with the U.S. observation set forth in Paragraph 15 thereof, sets forth a similar understanding of the scope of Article 9 in the context of thin capitalization.

*Paragraph 2*

When a Contracting State has made an adjustment that is consistent with the provisions of paragraph 1, and the other Contracting State agrees that the adjustment was appropriate to reflect arm's-length conditions, that other Contracting State is obligated to make a correlative adjustment (sometimes referred to as a "corresponding adjustment") to the tax liability of the related person in that other Contracting State.

Article 9 leaves the treatment of "secondary adjustments" to the laws of the Contracting States. When an adjustment under Article 9 has been made, one of the parties will have in its possession funds that it would not have had at arm's length. The question arises as to how to treat these funds. In the United States the general practice is to treat such funds as a dividend or contribution to capital, depending on the relationship between the parties. Under certain circumstances, the parties may be permitted to restore the funds to the party that would have the funds at arm's length, and to establish an account payable pending restoration of the funds. See Rev. Proc. 65-17, 1965-1 C.B. 833.

The Contracting State making a secondary adjustment will take the other provisions of the Convention, where relevant, into account. For example, if the effect of a secondary adjustment is to treat a U.S. corporation as having made a distribution of profits to its parent corporation in Denmark, the provisions of Article 10 (Dividends) will apply, and the United States may impose a 5 percent withholding tax on the dividend. Also, if under Article 23 (Relief from Double Taxation) the other State generally gives a credit for taxes paid with respect to such dividends, it would also be required to do so in this case.

The competent authorities are authorized by paragraph 2 to consult, if necessary, to resolve any differences in the application of these provisions. For example, there may be a disagreement over whether an adjustment made by a Contracting State under paragraph 1 was appropriate.

If a correlative adjustment is made under paragraph 2, it is to be implemented, pursuant to paragraph 2 of Article 25 (Mutual Agreement Procedure), notwithstanding any time limits or other procedural limitations in the law of the Contracting State making the adjustment. If a taxpayer has entered a closing agreement (or other written settlement) with the United States prior to bringing a case to the competent authorities, the U.S. competent authority will endeavor only to obtain a correlative adjustment from Denmark. See Rev. Proc. 96-13, 1996-13 I.R.B. 31, Section 7.05.

*Relationship to Other Articles*

The saving clause of paragraph 4 of Article 1 (General Scope) does not apply to paragraph 2 of Article 9 by virtue of the exceptions to the saving clause in paragraph 5(a) of Article 1. Thus, even if the statute of limitations has run, a refund of tax can be made in order to implement a correlative adjustment. Statutory or procedural limitations, however, cannot be overridden to impose additional tax, because paragraph 2 of Article 1 provides that the Convention cannot restrict any statutory benefit.


**ARTICLE 10**

**Dividends**

Article 10 provides rules for the taxation of dividends paid by a resident of one Contracting State to a beneficial owner that is a resident of the other Contracting State. The Article provides for full residence country taxation of such dividends and a limited source-State right to tax. Article 10 also provides rules for the imposition of a tax on branch profits by the State of source. Finally, the Article prohibits a Contracting State from imposing a tax on dividends paid by companies resident in the other Contracting State and from imposing taxes, other than a branch profits tax, on undistributed earnings.

*Paragraph 1*

The right of a shareholder's country of residence to tax dividends arising in the source country is preserved by paragraph 1, which permits a Contracting State to tax its residents on dividends paid to them by a resident of the other Contracting State. For dividends from any other source paid to a resident, Article 21 (Other Income) grants the residence country exclusive taxing jurisdiction (other than for dividends attributable to a permanent establishment or fixed base in the other State).

*Paragraph 2*

---

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD. Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The State of source may also tax dividends beneficially owned by a resident of the other State, subject to the limitations in paragraph 2. Generally, the source State's tax is limited to 15 percent of the gross amount of the dividend paid. If, however, the beneficial owner of the dividends is a company resident in the other State that holds at least 10 percent of the voting shares of the company paying the dividend, then the source State's tax is limited to 5 percent of the gross amount of the dividend. Indirect ownership of voting shares (through tiers of corporations) and direct ownership of non-voting shares are not taken into account for purposes of determining eligibility for the 5 percent direct dividend rate. Shares are considered voting shares if they provide the power to elect, appoint or replace any person vested with the powers ordinarily exercised by the board of directors of a U.S. corporation.

The benefits of paragraph 2 may be granted at the time of payment by means of reduced withholding at source. It also is consistent with the paragraph for tax to be withheld at the time of payment at full statutory rates, and the treaty benefit to be granted by means of a subsequent refund so long as such procedures are applied in a reasonable manner.

Paragraph 2 does not affect the taxation of the profits out of which the dividends are paid. The taxation by a Contracting State of the income of its resident companies is governed by the internal law of the Contracting State, subject to the provisions of paragraph 4 of Article 24 (Non-Discrimination).

The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (i.e., the source country). The beneficial owner of the dividend for purposes of Article 10 is the person to which the dividend income is attributable for tax purposes under the laws of the source State. Thus, if a dividend paid by a corporation that is a resident of one of the States (as determined under Article 4 (Residence)) is received by a nominee or agent that is a resident of the other State on behalf of a person that is not a resident of that other State, the dividend is not entitled to the benefits of this Article. However, a dividend received by a nominee on behalf of a resident of that other State would be entitled to benefits. These limitations are confirmed by paragraph 12 of the OECD Commentaries to Article 10. See also, paragraph 24 of the OECD Commentaries to Article 1 (General Scope).

Companies holding shares through fiscally transparent entities such as partnerships are considered for purposes of this paragraph to hold their proportionate interest in the shares held by the intermediate entity. As a result, companies holding shares through such entities may be able to claim the benefits of subparagraph (a) under certain circumstances. The lower rate applies when the company's proportionate share of the shares held by the intermediate entity meets the 10 percent voting stock threshold. Whether this ownership threshold is satisfied may be difficult to determine and often will require an analysis of the partnership or trust agreement.

*Paragraph 3*

Paragraph 3 provides rules that modify the maximum rates of tax at source provided in paragraph 2 in particular cases. The first sentence of paragraph 3 denies the lower direct investment withholding rate of paragraph 2(a) for dividends paid by a U.S. Regulated Investment Company (RIC) or a U.S. Real Estate Investment Trust (REIT). The second sentence states that dividends paid by a RIC will qualify for the 15 percent rate provided by paragraph 2(b).

The third sentence denies the benefits of both subparagraphs (a) and (b) of paragraph 2 to dividends paid by REITs in certain circumstances, allowing them to be taxed at the U.S. statutory rate (30 percent). The United States limits the source tax on dividends paid by a REIT to the 15 percent rate only when the beneficial owner of the dividend satisfies one or more of three criteria. First, the dividend may qualify if the beneficial owner is an individual resident of the other State who owns a not more than 10 percent interest in the REIT. Second, the dividend may qualify for the 15% rate if it is paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent of any class of the REIT's stock. Finally, the dividend may qualify for the 15 percent rate if the beneficial owner of the dividend is a person holding an interest of not more than 10 percent of the REIT and the REIT is diversified.

For this purpose, a REIT will be considered diversified if the value of no single interest in the REIT's real property exceeds 10 percent of the REIT's total interests in real property. For purposes of this rule, foreclosure property and mortgages will not be considered an interest in real property unless, in the case of a mortgage, it has substantial equity components. With respect to partnership interests held by a REIT, the REIT will be treated as owning directly the interests in real property held by the partnership.

The denial of the 5 percent withholding rate at source to all RIC and REIT shareholders, and the denial of the 15 percent rate to REIT shareholders that do not meet one of the 3 tests described above, is intended to prevent the use of these entities to gain unjustifiable source taxation benefits for certain shareholders resident in the other Contracting State. For example, a corporation resident in Denmark that wishes to hold a diversified portfolio of U.S. corporate shares may hold the portfolio directly and pay a U.S. withholding tax of 15 percent on all of the dividends that it receives. Alternatively, it may acquire a diversified portfolio by purchasing a 10 percent or more of the interests in a RIC. Since the RIC may be a pure conduit, there may be no U.S. tax costs to interposing the RIC in the chain of ownership. Absent the special rule in paragraph 3, such use of the RIC could transform portfolio dividends, taxable in the United States under the Convention at 15 percent, into direct investment dividends taxable only at 5 percent.

Similarly, a resident of Denmark directly holding U.S. real property would pay U.S. tax either at a 30 percent rate on the gross income or at graduated rates on the net income. As in the preceding example, by placing the real property in a REIT, the investor could transform real estate income into dividend income, taxable at the rates provided in Article 10, significantly reducing the U.S. tax that otherwise would be imposed. This policy avoids a disparity between the taxation of direct real estate

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

investments and real estate investments made through REIT conduits. In the cases covered by the exceptions, the holding in the REIT is not considered the equivalent of a direct holding in the underlying real property.

*Paragraph 4*

Exemption from tax in the state of source is provided for dividends paid to qualified governmental entities. The exemption of paragraph 4 is analogous to that provided to foreign governments under section 892 of the Code. Paragraph 4 makes that exemption reciprocal. A qualified governmental entity is defined in paragraph 1(i) of Article 3 (General Definitions). The definition does not include a governmental entity that carries on commercial activity. Further, a dividend paid by a company engaged in commercial activity that is controlled (within the meaning of Treas. Reg. section 1.892-5T) by a qualified governmental entity that is the beneficial owner of the dividend is not exempt at source under paragraph 4 because ownership of a controlled company is viewed as a substitute for carrying on a business directly.

*Paragraph 5*

Paragraph 5 defines the term dividends broadly and flexibly. The definition is intended to cover all arrangements that yield a return on an equity investment in a corporation as determined under the tax law of the state of source, as well as arrangements that might be developed in the future.

The term "dividends" includes income from shares, or other corporate rights that are not treated as debt under the law of the source State, that participate in the profits of the company. The term also includes income that is subject to the same tax treatment as income from shares by the law of the State of source. Thus, a constructive dividend that results from a non-arm's length transaction between a corporation and a related party is a dividend. In the case of the United States the term dividend includes amounts treated as a dividend under U.S. law upon the sale or redemption of shares or upon a transfer of shares in a reorganization. See, e.g., Rev. Rul. 92-85, 1992-2 C.B. 69 (sale of foreign subsidiary's stock to U.S. sister company is a deemed dividend to extent of subsidiary's and sister's earnings and profits). Further, a distribution from a U.S. publicly traded limited partnership, which is taxed as a corporation under U.S. law, is a dividend for purposes of Article 10. However, a distribution by a limited liability company is not characterized by the United States as a dividend and therefore is not a dividend for purposes of Article 10, provided the limited liability company is not characterized as an association taxable as a corporation under U.S. law. Finally, a payment denominated as interest that is made by a thinly capitalized corporation may be treated as a dividend to the extent that the debt is re-characterized as equity under the laws of the source State.

*Paragraph 6*

Paragraph 6 excludes from the general source country limitations under paragraph 2 dividends paid with respect to holdings that form part of the business property of a permanent establishment or a fixed base. Such dividends will be taxed on a net basis using the rates and rules of taxation generally applicable to residents of the State in which the permanent establishment or fixed base is located, as modified by the Convention. An example of dividends paid with respect to the business property of a permanent establishment would be dividends derived by a dealer in stock or securities from stock or securities that the dealer held for sale to customers.

In the case of a permanent establishment or fixed base that once existed in the State but that no longer exists, the provisions of paragraph 6 also apply, by virtue of paragraph 8 of Article 7 (Business Profits), to dividends that would be attributable to such a permanent establishment or fixed base if it did exist in the year of payment or accrual. See the Technical Explanation of paragraph 8 of Article 7.

*Paragraph 7*

A State's right to tax dividends paid by a company that is a resident of the other State is restricted by paragraph 7 to cases in which the dividends are paid to a resident of that State or are attributable to a permanent establishment or fixed base in that State. Thus, a State may not impose a "secondary" withholding tax on dividends paid by a nonresident company out of earnings and profits from that State. In the case of the United States, paragraph 7, therefore, overrides the ability to impose taxes under sections 871 and 882(a) on dividends paid by foreign corporations that have a U.S. source under section 861(a)(2)(B).

The paragraph also restricts a State's right to impose corporate level taxes on undistributed profits, other than a branch profits tax. The accumulated earnings tax and the personal holding company taxes are taxes covered in Article 2 (Covered Taxes). Accordingly, under the provisions of Article 7 (Business Profits), the United States may not impose those taxes on the income of a resident of the other State except to the extent that income is attributable to a permanent establishment in the United States. Paragraph 7 also confirms the denial of the U.S. authority to impose those taxes. The paragraph does not restrict a State's right to tax its resident shareholders on undistributed earnings of a corporation resident in the other State. Thus, the U.S. authority to impose the foreign personal holding company tax, its taxes on subpart F income and on an increase in earnings invested in U.S. property, and its tax on income of a passive foreign investment company that is a qualified electing fund is in no way restricted by this provision.

*Paragraph 8*

Paragraph 8 permits a State to impose a branch profits tax on a corporation resident in the other State. The tax is in addition to other taxes permitted by the Convention. Since the term "corporation" is not defined in the Convention, it will be defined for this purpose under the law of the first-mentioned (i.e., source) State.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

A State may impose a branch profits tax on a corporation if the corporation has income attributable to a permanent establishment in that State, derives income from real property in that State that is taxed on a net basis under Article 6, or realizes gains taxable in that State under paragraph 1 of Article 13. The tax is limited, however, to the aforementioned items of income that are included in the "dividend equivalent amount."

Paragraph 8 permits the United States generally to impose its branch profits tax on a corporation resident in the other State to the extent of the corporation's

(i)     business profits that are attributable to a permanent establishment in the United States;

(ii)    income that is subject to taxation on a net basis because the corporation has elected under section 882(d) of the Code to treat income from real property not otherwise taxed on a net basis as effectively connected income; and

(iii)   gain from the disposition of a United States real property interest, other than an interest in a United States real property holding corporation.

The United States may not impose its branch profits tax on the business profits of a corporation resident in Denmark that are effectively connected with a U.S. trade or business but that are not attributable to a permanent establishment and are not otherwise subject to U.S. taxation under Article 6 (Income from Real Property) or paragraph 1 of Article 13 (Capital Gains).

The term "dividend equivalent amount" used in paragraph 8 has the same meaning that it has under section 884 of the Code, as amended from time to time, provided the amendments are consistent with the purpose of the branch profits tax. Generally, the dividend equivalent amount for a particular year is the income described above that is included in the corporation's effectively connected earnings and profits for that year, after payment of the corporate tax under Articles 6, 7 or 13, reduced for any increase in the branch's U.S. net equity during the year or increased for any reduction in its U.S. net equity during the year. U.S. net equity is U.S. assets less U.S. liabilities. See Treas. Reg. section 1.884-1. The dividend equivalent amount for any year approximates the dividend that a U.S. branch office would have paid during the year if the branch had been operated as a separate U.S. subsidiary company. If in the future Denmark were to impose a branch profits tax, the base of its tax is limited to an amount that is analogous to the dividend equivalent amount.

*Paragraph 9*

Paragraph 9 provides that the branch profits tax permitted by paragraph 8 shall not be imposed at a rate exceeding the direct investment dividend withholding rate of five percent specified in subparagraph 2(a).

*Relation to Other Articles*

Notwithstanding the foregoing limitations on source country taxation of dividends, the saving clause of paragraph 4 of Article 1 permits the United States to tax dividends received by its residents and citizens, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), as if the Convention had not come into effect.

The benefits of this Article are also subject to the provisions of Article 22 (Limitation on Benefits). Thus, if a resident of Denmark is the beneficial owner of dividends paid by a U.S. corporation, the shareholder must qualify for treaty benefits under at least one of the tests of Article 22 in order to receive the benefits of this Article.


**ARTICLE 11**

**Interest**

Article 11 specifies the taxing jurisdiction over interest income of the States of source and residence and defines the terms necessary to apply the Article.

*Paragraph 1*

This paragraph grants to the State of residence the exclusive right, subject to exceptions provided in paragraphs 3 and 5, to tax interest beneficially owned by its residents and arising in the other Contracting State. The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (i.e., the source country). The beneficial owner of the interest for purposes of Article 11 is the person to which the interest income is attributable for tax purposes under the laws of the source State. Thus, if interest arising in a Contracting State is received by a nominee or agent that is a resident of the other State on behalf of a person that is not a resident of that other State, the interest is not entitled to the benefits of this Article. However, interest received by a nominee on behalf of a resident of that other State would be entitled to benefits. These limitations are confirmed by paragraph 24 of the OECD Commentaries to Article 11. See also paragraph 24 of the OECD Commentaries to Article 1 (General Scope).

*Paragraph 2*

The term "interest" as used in Article 11 is defined in paragraph 2 to include, inter alia, income from debt claims of every kind, whether or not secured by a mortgage. Penalty charges for late payment are excluded from the definition of interest. Interest that is paid or accrued subject to a contingency is within the ambit of Article 11. This includes income from a debt obligation carrying the right to participate in profits. The term does not, however, include amounts that are treated as dividends under Article 10 (Dividends).

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The term "interest" also includes amounts subject to the same tax treatment as income from money lent under the law of the State in which the income arises. Thus, amounts that the United States will treat as interest include:

(i)     the difference between the issue price and the stated redemption price at maturity of a debt instrument, i.e., original issue discount (OID), which may be wholly or partially realized on the disposition of a debt instrument (section 1273);

(ii)    amounts that are imputed interest on a deferred sales contract (section 483);

(iii)   amounts treated as interest or OID under the stripped bond rules (section 1286);

(iv)    amounts treated as original issue discount under the below-market interest rate rules (section 7872);

(v)     a partner's distributive share of a partnership's interest income (section 702);

(vi)    the interest portion of periodic payments made under a "finance lease" or similar contractual arrangement that in substance is a borrowing by the nominal lessee to finance the acquisition of property;

(vii)   amounts included in the income of a holder of a residual interest in a REMIC (section 860E), because these amounts generally are subject to the same taxation treatment as interest under U.S. tax law, and

(viii)  embedded interest with respect to notional principal contracts.

*Paragraph 3*

Paragraph 3 provides an exception to the exclusive residence taxation rule of paragraph 1 in cases where the beneficial owner of the interest carries on business through a permanent establishment in the State of source or performs independent personal services from a fixed base situated in that State and the interest is attributable to that permanent establishment or fixed base. In such cases the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services) will apply and the State of source will retain the right to impose tax on such interest income on a net basis.

In the case of a permanent establishment or fixed base that once existed in the State but that no longer exists, the provisions of paragraph 3 also apply, by virtue of paragraph 8 of Article 7 (Business Profits), to interest that would be attributable to such a permanent establishment or fixed base if it did exist in the year of payment or accrual. See the Technical Explanation of paragraph 8 of Article 7.

*Paragraph 4*

Paragraph 4 provides that in cases involving special relationships between persons, Article 11 applies only to that portion of the total interest payments that would have been made absent such special relationships (i.e., an arm's length interest payment). Any excess amount of interest paid remains taxable according to the laws of the United States and Denmark, respectively, with due regard to the other provisions of the Convention. Thus, if the excess amount would be treated under the source country's law as a distribution of profits by a corporation, such amount could be taxed as a dividend rather than as interest, but the tax would be subject, if appropriate, to the rate limitations of paragraph 2 of Article 10 (Dividends).

The term "special relationship" is not defined in the Convention. In applying this paragraph the United States considers the term to include the relationships described in Article 9, which in turn correspond to the definition of "control" for purposes of section 482 of the Code.

This paragraph does not address cases where, owing to a special relationship between the payer and the beneficial owner or between both of them and some other person, the amount of the interest is less than an arm's length amount. In those cases a transaction may be characterized to reflect its substance and interest may be imputed consistent with the definition of interest in paragraph 2. Consistent with Article 9 (Associated Enterprises), the United States would apply section 482 or 7872 of the Code to determine the amount of imputed interest in those cases.

*Paragraph 5*

Paragraph 5 provides anti-abuse exceptions to the source-country exemption in paragraph 1 for two classes of interest payments.

The first exception, in subparagraph (a) of paragraph 5, deals with so-called "contingent interest." Under this provision interest arising in one of the Contracting States that is determined by reference to the receipts, sales, income, profits or other cash flow of the debtor or a related person, to any change in the value of any property of the debtor or a related person or to any dividend, partnership distribution or similar payment made by the debtor to a related person also may be taxed in the Contracting State in which it arises, and according to the laws of that State, but if the beneficial owner is a resident of the other Contracting State, the gross amount of the interest may be taxed at a rate not exceeding the rate prescribed in subparagraph (b) of paragraph 2 of Article 10 (Dividends).

The second exception, in subparagraph (b) of paragraph 5, is consistent with the policy of Code sections 860E(e) and 860G(b) that excess inclusions with respect to a real estate mortgage investment conduit (REMIC) should bear full U.S. tax in all cases. Without a full tax at source foreign purchasers of residual interests would have a competitive advantage over U.S. purchasers at the time these interests are initially offered. Also, absent this rule the U.S. FISC would suffer a revenue loss with respect to mortgages held in a REMIC because of opportunities for tax avoidance created by differences in the timing of taxable and economic income produced by these interests.

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

*Relation to Other Articles*

Notwithstanding the foregoing limitations on source country taxation of interest, the saving clause of paragraph 4 of Article 1 permits the United States to tax its residents and citizens, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), as if the Convention had not come into force.

As with other benefits of the Convention, the benefits of exclusive residence State taxation of interest under paragraph 1 or limited source taxation under paragraph 5(b) of this Article are available to a resident of the other State only if that resident is entitled to those benefits under the provisions of Article 22 (Limitation on Benefits).

## ARTICLE 12

### Royalties

Article 12 specifies the taxing jurisdiction over royalties of the States of residence and source and defines the terms necessary to apply the Article.

*Paragraph 1*

Paragraph 1 grants to the State of residence the exclusive right, subject to the exception in paragraph 3, to tax royalties beneficially owned by its residents and arising in the other Contracting State.

The term "beneficial owner" is not defined in the Convention, and is, therefore, defined as under the internal law of the country imposing tax (i.e., the source country). The beneficial owner of the royalty for purposes of Article 12 is the person to which the royalty income is attributable for tax purposes under the laws of the source State. Thus, if a royalty arising in a Contracting State is received by a nominee or agent that is a resident of the other State on behalf of a person that is not a resident of that other State, the royalty is not entitled to the benefits of this Article. However, a royalty received by a nominee on behalf of a resident of that other State would be entitled to benefits. These limitations are confirmed by paragraph 4 of the OECD Commentaries to Article 12. See also paragraph 24 of the OECD Commentaries to Article 1 (General Scope).

*Paragraph 2*

Paragraph 2 defines the term "royalties" as used in this Article to include payments of any kind received as a consideration for the use of, or the right to use, any copyright of a literary, artistic, scientific or other work; for the use of, or the right to use, any patent, trademark, design or model, plan, secret formula or process, or other like right or property; or for information concerning industrial, commercial, or scientific experience. It does not include income from leasing personal property.

The term royalties is defined in the Convention and therefore is generally independent of domestic law. Certain terms used in the definition are not defined in the Convention, but these may be defined under domestic tax law. For example, the term "secret process or formulas" is found in the U.S. Internal Revenue Code, and its meaning has been elaborated in the context of sections 351 and 367. See Rev. Rul. 55-17, 1955-1 C.B. 388; Rev. Rul. 64-56, 1964-1 C.B. 133; Rev. Proc. 69-19, 1969-2 C.B. 301.

Consideration for the use or right to use cinematographic films, or works on film, tape, or other means of reproduction in radio or television broadcasting is specifically included in the definition of royalties. It is intended that subsequent technological advances in the field of radio and television broadcasting will not affect the inclusion of payments relating to the use of such means of reproduction in the definition of royalties.

If an artist who is resident in one Contracting State records a performance in the other Contracting State, retains a copyrighted interest in a recording, and receives payments for the right to use the recording based on the sale or public playing of the recording, then the right of such other Contracting State to tax those payments is governed by Article 12. See Boulez v. Commissioner, 83 T.C. 584 (1984), aff'd, 810 F.2d 209 (D.C. Cir. 1986).

Computer software generally is protected by copyright laws around the world. Under the Convention, consideration received for the use, or the right to use, computer software is treated either as royalties or as business profits, depending on the facts and circumstances of the transaction giving rise to the payment.

The primary factor in determining whether consideration received for the use, or the right to use, computer software is treated as royalties or as business profits is the nature of the rights transferred. See Treas. Reg. section 1.861-18. The fact that the transaction is characterized as a license for copyright law purposes is not dispositive. For example, a typical retail sale of "shrink wrap" software generally will not be considered to give rise to royalty income, even though for copyright law purposes it may be characterized as a license.

The means by which the computer software is transferred are not relevant for purposes of the analysis. Consequently, if software is electronically transferred but the rights obtained by the transferee are substantially equivalent to rights in a program copy, the payment will be considered business profits.

The term "royalties" also includes gain derived from the alienation of any right or property that would give rise to royalties, to the extent the gain is contingent on the productivity, use, or further alienation thereof. Gains that are not so contingent are dealt with under Article 13 (Gains).

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The term "industrial, commercial, or scientific experience" (sometimes referred to as "know-how") has the meaning ascribed to it in paragraph 11 of the Commentary to Article 12 of the OECD Model Convention. Consistent with that meaning, the term may include information that is ancillary to a right otherwise giving rise to royalties, such as a patent or secret process.

Know-how also may include, in limited cases, technical information that is conveyed through technical or consultancy services. It does not include general educational training of the user's employees, nor does it include information developed especially for the user, such as a technical plan or design developed according to the user's specifications. Thus, as provided in paragraph 11 of the Commentary to Article 12 of the OECD Model, the term "royalties" does not include payments received as consideration for after-sales service, for services rendered by a seller to a purchaser under a guarantee, or for pure technical assistance.

The term "royalties" also does not include payments for professional services (such as architectural, engineering, legal, managerial, medical, software development services). For example, income from the design of a refinery by an engineer (even if the engineer employed know-how in the process of rendering the design) or the production of a legal brief by a lawyer is not income from the transfer of know-how taxable under Article 12, but is income from services taxable under either Article 14 (Independent Personal Services) or Article 15 (Dependent Personal Services). Professional services may be embodied in property that gives rise to royalties, however. Thus, if a professional contracts to develop patentable property and retains rights in the resulting property under the development contract, subsequent license payments made for those rights would be royalties.

*Paragraph 3*

This paragraph provides an exception to the rule of paragraph 1 that gives the state of residence exclusive taxing jurisdiction in cases where the beneficial owner of the royalties carries on business through a permanent establishment in the state of source or performs independent personal services from a fixed base situated in that State and the royalties are attributable to that permanent establishment or fixed base. In such cases the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services) will apply.

The provisions of paragraph 8 of Article 7 (Business Profits) apply to this paragraph. For example, royalty income that is attributable to a permanent establishment or a fixed base and that accrues during the existence of the permanent establishment or fixed base, but is received after the permanent establishment or fixed base no longer exists, remains taxable under the provisions of Articles 7 (Business Profits) or 14 (Independent Personal Services), respectively, and not under this Article.

*Paragraph 4*

Paragraph 4 provides that in cases involving special relationships between the payor and beneficial owner of royalties, Article 12 applies only to the extent the royalties would have been paid absent such special relationships (i.e., an arm's length royalty). Any excess amount of royalties paid remains taxable according to the laws of the two Contracting States with due regard to the other provisions of the Convention. If, for example, the excess amount is treated as a distribution of corporate profits under domestic law, such excess amount will be taxed as a dividend rather than as royalties, but the tax imposed on the dividend payment will be subject to the rate limitations of paragraph 2 of Article 10 (Dividends).

*Relation to Other Articles*

Notwithstanding the foregoing limitations on source country taxation of royalties, the saving clause of paragraph 4 of Article 1 (General Scope) permits the United States to tax its residents and citizens, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation), as if the Convention had not come into force.

As with other benefits of the Convention, the benefits of exclusive residence State taxation of royalties under paragraph 1 of Article 12 are available to a resident of the other State only if that resident is entitled to those benefits under Article 22 (Limitation on Benefits).

## ARTICLE 13

### Capital Gains

Article 13 assigns either primary or exclusive taxing jurisdiction over gains from the alienation of property to the State of residence or the State of source and defines the terms necessary to apply the Article.

*Paragraph 1*

Paragraph 1 preserves the non-exclusive right of the State of source to tax gains attributable to the alienation of real property situated in that State. The paragraph therefore permits the United States to apply section 897 of the Internal Revenue Code to tax gains derived by a resident of Denmark that are attributable to the alienation of real property situated in the United States (as defined in paragraph 2). Gains attributable to the alienation of real property include gain from any other property that is treated as a real property interest within the meaning of paragraph 2.

*Paragraph 2*

This paragraph defines the term "real property situated in the other Contracting State." The term includes real property referred to in Article 6 (i.e., an interest in the real property itself), a "United States real property interest" (when the United States is the other Contracting State under paragraph 1), and an equivalent interest in real property situated in Denmark.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Under section 897(c) of the Code the term "United States real property interest" includes shares in a U.S. corporation that owns sufficient U.S. real property interests to satisfy an asset-ratio test on certain testing dates. The term also includes certain foreign corporations that have elected to be treated as U.S. corporations for this purpose. Section 897(i). In applying paragraph 1 the United States will look through distributions made by a REIT. Accordingly, distributions made by a REIT are taxable under paragraph 1 of Article 13 (not under Article 10 (Dividends)) when they are attributable to gains derived from the alienation of real property.

*Paragraph 3*

Paragraph 3 deals with the taxation of certain gains from the alienation of movable property forming part of the business property of a permanent establishment that an enterprise of a Contracting State has in the other Contracting State or of movable property pertaining to a fixed base available to a resident of a Contracting State in the other Contracting State for the purpose of performing independent personal services. This also includes gains from the alienation of such a permanent establishment (alone or with the whole enterprise) or of such fixed base. Such gains may be taxed in the State in which the permanent establishment or fixed base is located.

A resident of Denmark that is a partner in a partnership doing business in the United States generally will have a permanent establishment in the United States as a result of the activities of the partnership, assuming that the activities of the partnership rise to the level of a permanent establishment. Rev. Rul. 91-32, 1991-1 C.B. 107. Further, under paragraph 3, the United States generally may tax a partner's distributive share of income realized by a partnership on the disposition of movable property forming part of the business property of the partnership in the United States.

Paragraph 8 of Article 7 (Business Profits) refers to paragraph 3 of Article 13. That rule clarifies that income that is attributable to a permanent establishment or a fixed base, but that is deferred and received after the permanent establishment or fixed base no longer exists, may nevertheless be taxed by the State in which the permanent establishment or fixed base was located. Thus, under Article 13, gains derived by a resident of a Contracting State from the sale of movable property forming part of the business property of a permanent establishment in the other Contracting State may be taxed by that other State even if the income is deferred and received after the permanent establishment no longer exists.

*Paragraph 4*

Paragraph 4 limits the taxing jurisdiction of the state of source with respect to gains from the alienation of ships, boats, aircraft or containers operated or used in international traffic or movable property pertaining to the operation or use of such ships, boats, aircraft or containers. Under paragraph 4, when such income is derived by an enterprise of a Contracting State, it is taxable only in that Contracting State. Notwithstanding paragraph 3, the rules of this paragraph apply even if the income is attributable to a permanent establishment maintained by the enterprise in the other Contracting State. This result is consistent with the general rule under Article 8 (Shipping and Air Transport) that confers exclusive taxing rights over international shipping and air transport income on the state of residence of the enterprise deriving such income.

*Paragraph 5*

Paragraph 5 preserves the right of a Contracting State (the host State) to tax the gains derived by an enterprise of the other Contracting State from the deemed alienation of an installation, drilling rig, or ship used in the host State for the exploration for or exploitation of oil and gas resources, but only to the extent of any depreciation taken in the host State. Thus, at the time of deemed alienation of the property under the law of the host State, an enterprise of the other Contracting State may be required to recapture the depreciation claimed in the host State of an oil or gas exploration or exploitation installation, drilling rig or ship. Because the amount that may be taxable is limited to the amount of any gain, depreciation will be recaptured only to the extent it has reduced the basis of the property below its fair market value.

Paragraph 5 is included in order to permit Denmark to impose its income tax, to the extent permitted under paragraph 5, at the time that an oil or gas exploration or exploitation installation, drilling rig or ship is deemed alienated under the income tax laws of Denmark. However, an accompanying provision is included under paragraph 7 in order to prevent double taxation that might otherwise result from the rule. Under this provision, which is discussed more fully below, a person who is subject to taxation on gain in connection with property deemed alienated can elect to be liable to tax in the residence State in the same year as if he had sold and repurchased the property, thus reducing the risk of double taxation because of timing differences.

*Paragraph 6*

Paragraph 6 grants to the State of residence of the alienator the exclusive right to tax gains from the alienation of property other than property referred to in paragraphs 1 through 5. For example, gain derived from shares, other than shares described in paragraphs 2 or 3, debt instruments and various financial instruments, may be taxed only in the State of residence, to the extent such income is not otherwise characterized as income taxable under another Article (e.g., Article 10 (Dividends) or Article 11 (Interest)). Similarly, gain derived from the alienation of tangible personal property, other than tangible personal property described in paragraphs 3 or 4, may be taxed only in the State of residence of the alienator. Gain derived from the alienation of any property, such as a patent or copyright, that produces income taxable under Article 12 (Royalties) is taxable under Article 12 and not under this Article, provided that such gain is of the type described in paragraph 2(b) of Article 12 (i.e., it is contingent on the productivity, use, or disposition of the property). Thus, under either Article such gain is taxable only in the State of residence of the alienator. Sales by a resident of a Contracting State of real property located in a third state are not taxable in the other Contracting State, even if the sale is attributable to a permanent establishment located in the other Contracting State.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

*Paragraph 7*

Both paragraphs 7 and paragraph 8 provide rules intended to coordinate the timing of the recognition of income under the U.S. and Danish tax systems.

Paragraph 7 provides a rule to coordinate U.S. and Danish taxation of gains in circumstances where a resident of one of the Contracting States is subject to tax in both Contracting States and one Contracting State deems a taxable alienation of property by such resident to have occurred, while the other Contracting State at that time does not find a realization, recognition or recognition of income and thus defers, but does not forgive, taxation. In such a case the resident may elect in the annual return of income for the year of such alienation to be liable to tax in the latter Contracting State as if he had sold and repurchased the property for an amount equal to its fair market value at a time immediately prior to the deemed alienation. This provision would be useful in a case where a U.S. corporation transfers its drilling rig in Denmark, on which depreciation has been taken in Denmark, to its home office in the United States. Under the provisions of paragraph 5, Denmark could tax the built-in gain (limited to the amount of depreciation taken in Denmark) upon the deemed alienation. However, absent paragraph 7, the United States would defer taxation of any gain until the property was actually sold. If the period for foreign tax credit carry-overs had already run at the time of actual disposition, the U.S. corporation might not receive a foreign tax credit, resulting in double taxation. If the U.S. corporation elected the benefits of paragraph 7, it would be subject to U.S. tax currently on the built-in gain, and take a new tax basis in the property.

Unlike paragraph 8, paragraph 7 is self-executing and does not require the agreement of the relevant competent authority. However, if in one Contracting State there are losses and gains from deemed alienation of different properties, then paragraph 7 must be applied consistently in the other Contracting State within the taxable period with respect to all such properties. Paragraph 7 only applies, however, if the deemed alienation of the properties results in a net gain.

*Paragraph 8*

Paragraph 8 deals with the treatment of gain on alienation of property in the course of a corporate or other reorganization. Under this provision, if a transaction is tax-deferred in the State of residence, then the transferee may ask the competent authority of the source State to enter into an agreement to defer tax to the extent necessary to avoid double taxation.

Paragraph 8 provides authority for coordination of Danish and U.S. rules with respect to the non-recognition of gain on corporate organizations, reorganizations, mergers, or similar transactions. Where a resident of one of the Contracting States alienates property in such a transaction, and profit, gain or income with respect to such alienation is not recognized for income tax purposes in the Contracting State of residence, the competent authority of the other State may agree, pursuant to paragraph 8, if requested by the person acquiring the property, to defer the recognition of the profit, gain or income with respect to such property. This deferral shall be for such time and under such conditions as may be stipulated in the agreement.

One situation in which this provision might be useful is the merger of two companies that are resident in one Contracting State, both of which have permanent establishments in the other Contracting State. For example, if two U.S. resident corporations, each with a permanent establishment in Denmark, merged in a transaction that qualified as a tax-free reorganization under section 368 but was taxable in Denmark, Denmark could tax built-in gain on assets of the permanent establishments. When those assets eventually were sold, the United States might also tax the gain, but without a foreign tax credit if the period for tax credit carry-overs had already run. In that case, the company surviving the merger could request that the Danish competent authority defer recognition of the gain until actual disposition of the assets, in order to assure a U.S. foreign tax credit for the Danish tax. Whether deferral should be granted is a matter entirely within the discretion of the competent authority.

*Relation to Other Articles*

Notwithstanding the foregoing limitations on taxation of certain gains by the State of source, the saving clause of paragraph 4 of Article 1 (General Scope) permits the United States to tax its citizens and residents as if the Convention had not come into effect. Thus, any limitation in this Article on the right of the United States to tax gains does not apply to gains of a U.S. citizen or resident. However, paragraphs 7 and 8 are excepted from the saving clause by virtue of paragraph 5(a) of Article 1. Thus, under paragraph 7, a U.S. corporation that is subject to tax upon a transfer of property from its Danish permanent establishment to it U.S. head office may elect to be subject to tax in the United States on the built-in gain and receive a step-up in basis for U.S. tax purposes. In addition, a U.S. citizen resident in Denmark may, subject to the discretion of the U.S. competent authority, obtain relief under paragraph 8 in the form of deferred recognition of profit, gain or income that is otherwise recognized or included in income under the Code but not under Danish law.

The benefits of this Article are also subject to the provisions of Article 22 (Limitation of Benefits). Thus, only a resident of a Contracting State that satisfies one of the conditions in Article 22 is entitled to the benefits of this Article.

## ARTICLE 14

### Independent Personal Services

The Convention deals in separate Articles with different classes of income from personal services. Article 14 deals with the general class of income from independent personal services and Article 15 deals with the general class of income from dependent personal services. Articles 16 through 20 provide exceptions and additions to these general rules for directors' fees (Article 16); performance income of artistes and sportsmen (Article 17); pensions in respect of personal service income,

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD. Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

social security benefits, annuities, alimony, and child support payments (Article 18); government service salaries and pensions (Article 19); and certain income of students and trainees (Article 20).

*Paragraph 1*

Paragraph 1 provides the general rule that an individual who is a resident of a Contracting State and who derives income from performing personal services in an independent capacity will be exempt from tax in respect of that income by the other Contracting State. The income may be taxed in the other Contracting State only if the services are performed there and the income is attributable to a fixed base that is regularly available to the individual in that other State for the purpose of performing his services.

Income derived by persons other than individuals or groups of individuals from the performance of independent personal services is not covered by Article 14. Such income generally would be business profits taxable in accordance with Article 7 (Business Profits). Income derived by employees of such persons generally would be taxable in accordance with Article 15 (Dependent Personal Services).

The term "fixed base" is not defined in the Convention, but its meaning is understood to be similar, but not identical, to that of the term "permanent establishment," as defined in Article 5 (Permanent Establishment). The term "regularly available" also is not defined in the Convention. Whether a fixed base is regularly available to a person will be determined based on all the facts and circumstances. In general, the term encompasses situations where a fixed base is at the disposal of the individual whenever he performs services in that State. It is not necessary that the individual regularly use the fixed base, only that the fixed base be regularly available to him. For example, a U.S. resident partner in a law firm that has offices in Denmark would be considered to have a fixed base regularly available to him in Denmark if work space in those offices (whether or not the same space) were made available to him whenever he wished to conduct business in Denmark, regardless of how frequently he conducted business in Denmark. On the other hand, an individual who had no office in Denmark and occasionally rented a hotel room to serve as a temporary office would not be considered to have a fixed base regularly available to him.

It is not necessary that the individual actually use the fixed base. It is only necessary that the fixed base be regularly available to him. For example, if an individual resident in the U.S. has an office in Denmark that he can use if he chooses when he is present in Denmark, that fixed base will be considered to be regularly available to him regardless of whether he conducts his activities there.

The term "personal services of an independent character" is not defined. It clearly includes those activities listed in paragraph 2 of Article 14 of the OECD Model, such as independent scientific, literary, artistic, educational or teaching activities, as well as the independent activities of physicians, lawyers, engineers, architects, dentists, and accountants. That list, however, is not exhaustive. The term includes all personal services performed by an individual for his own account, whether as a sole proprietor or a partner, where he receives the income and bears the risk of loss arising from the services. The taxation of income of an individual from those types of independent services which are covered by Articles 16 through 20 is governed by the provisions of those Articles. For example, taxation of the income of a corporate director would be governed by Article 16 (Directors' Fees) rather than Article 14.

This Article applies to income derived by a partner resident in the Contracting State that is attributable to personal services of an independent character performed in the other State through a partnership that has a fixed base in that other Contracting State. Income which may be taxed under this Article includes all income attributable to the fixed base in respect of the performance of the personal services carried on by the partnership (whether by the partner himself, other partners in the partnership, or by employees assisting the partners) and any income from activities ancillary to the performance of those services (for example, charges for facsimile services). Income that is not derived from the performance of personal services and that is not ancillary thereto (for example, rental income from subletting office space), will be governed by other Articles of the Convention.

The application of Article 14 to a service partnership may be illustrated by the following example: a partnership formed in Denmark has five partners (who agree to split profits equally), four of whom are resident and perform personal services only in Denmark at Office A, and one of whom performs personal services from Office B, a fixed base in the United States. In this case, the four partners of the partnership resident in Denmark may be taxed in the United States in respect of their share of the income attributable to the fixed base, Office B. The services giving rise to income which may be attributed to the fixed base would include not only the services performed by the one resident partner, but also, for example, if one of the four other partners came to the United States and worked on an Office B matter there, the income in respect of those services also. As noted above, this would be the case regardless of whether the partner from Denmark actually visited or used Office B when performing services in the United States.

Paragraph 8 of Article 7 (Business Profits) refers to Article 14. That rule clarifies that income that is attributable to a permanent establishment or a fixed base, but that is deferred and received after the permanent establishment or fixed base no longer exists, may nevertheless be taxed by the State in which the permanent establishment or fixed base was located. Thus, under Article 14, income derived by an individual resident of the United States from services performed in Denmark and attributable to a fixed base there may be taxed by Denmark even if the income is deferred and received after there is no longer a fixed base available to the resident in Denmark.

*Paragraph 2*

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Paragraph 2 incorporates the principles of paragraph 3 of Article 7 (Business Profits) into Article 14. Thus, all relevant expenses, including expenses not incurred in the Contracting State where the fixed base is located, must be allowed as deductions in computing the net income from services subject to tax in the Contracting State where the fixed base is located.

*Relation to Other Articles*

If an individual resident of Denmark who is also a U.S. citizen performs independent personal services in the United States, the United States may, by virtue of the saving clause of paragraph 4 of Article 1 (General Scope) tax his income without regard to the restrictions of this Article, subject to the special foreign tax credit rules of paragraph 3 of Article 23 (Relief from Double Taxation).

## ARTICLE 15

## Dependent Personal Services

Article 15 apportions taxing jurisdiction over remuneration derived by a resident of a Contracting State as an employee between the States of source and residence.

*Paragraph 1*

Paragraph 1 contains the general rule of Article 15. Remuneration derived by a resident of a Contracting State as an employee may be taxed by the State of residence, and the remuneration also may be taxed by that other Contracting State to the extent derived from employment exercised (i.e., services performed) in the other Contracting State. Paragraph 1 also provides that the more specific rules of Articles 16 (Directors' Fees), 18 (Pensions, Social Security, Annuities, Alimony and Child Support), and 19 (Government Service) apply in the case of employment income described in one of these Articles. Thus, even though the State of source has a right to tax employment income under Article 15, it may not have the right to tax that income under the Convention if the income is described, e.g., in Article 18 (Pensions, Social Security, Annuities, Alimony and Child Support) and is not taxable in the State of source under the provisions of that Article.

Article 15 applies to "salaries, wages and other remuneration." Article 15 applies to any form of compensation for employment, including payments in kind, regardless of whether the remuneration is "similar" to salaries and wages. The U.S. position on in-kind payments was confirmed by the addition of paragraph 2.1 to the Commentary to Article 15 of the OECD Model in 1997.

Consistent with Code section 864(c)(6), Article 15 also applies regardless of the timing of actual payment for services. Thus, a bonus paid to a resident of the United States with respect to services performed in Denmark with respect to a particular taxable year would be subject to Article 15 for that year even if it was paid after the close of the year. Similarly, an annuity received for services performed in a taxable year would be subject to Article 15 despite the fact that it was paid in subsequent years. In either case, whether such payments were taxable in the State where the employment was exercised would depend on whether the tests of paragraph 2 were satisfied. Consequently, a person who receives the right to a future payment in consideration for services rendered in a Contracting State would be taxable in that State even if the payment is received at a time when the recipient is a resident of the other Contracting State.

*Paragraph 2*

Paragraph 2 sets forth an exception to the general rule that employment income may be taxed in the State where the employment is exercised. Under paragraph 2, the State where the employment is exercised may not tax the income from the employment if three conditions are satisfied:

(a)   the individual is present in the other Contracting State for a period or periods not exceeding 183 days in any 12-month period that begins or ends during the relevant (i.e., the year in which the services are performed) calendar year;

(b)   the remuneration is paid by, or on behalf of, an employer who is not a resident of that other Contracting State; and

(c)   the remuneration is not borne as a deductible expense by a permanent establishment or fixed base that the employer has in that other State.

In order for the remuneration to be exempt from tax in the source State, all three conditions must be satisfied. This exception is identical to that set forth in the OECD Model.

The 183-day period in condition (a) is to be measured using the "days of physical presence" method. Under this method, the days that are counted include any day in which a part of the day is spent in the host country. (Rev. Rul. 56-24, 1956-1 C.B. 851.) Thus, days that are counted include the days of arrival and departure; weekends and holidays on which the employee does not work but is present within the country; vacation days spent in the country before, during or after the employment period, unless the individual's presence before or after the employment can be shown to be independent of his presence there for employment purposes; and time during periods of sickness, training periods, strikes, etc., when the individual is present but not working. If illness prevented the individual from leaving the country in sufficient time to qualify for the benefit, those days will not count. Also, any part of a day spent in the host country while in transit between two points outside the host country is not counted. These rules are consistent with the description of the 183-day period in paragraph 5 of the Commentary to Article 15 in the OECD Model.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Conditions (b) and (c) are intended to ensure that a Contracting State will not be required to allow a deduction to the payor for compensation paid and at the same time to exempt the employee on the amount received. Accordingly, if a foreign person pays the salary of an employee who is employed in the host State, but a host State corporation or permanent establishment reimburses the payor with a payment that can be identified as a reimbursement, neither condition (b) nor (c), as the case may be, will be considered to have been fulfilled.

The reference to remuneration "borne by" a permanent establishment or fixed base is understood to encompass all expenses that economically are incurred and not merely expenses that are currently deductible for tax purposes. Accordingly, the expenses referred to include expenses that are capitalizable as well as those that are currently deductible. Further, salaries paid by residents that are exempt from income taxation may be considered to be borne by a permanent establishment or fixed base notwithstanding the fact that the expenses will be neither deductible nor capitalizable since the payor is exempt from tax.

*Paragraph 3*

Paragraph 3 contains a special rule applicable to remuneration for services performed by a resident of a Contracting State as an employee aboard a ship or aircraft operated in international traffic. Such remuneration may be taxed only in the State of residence of the employee if the services are performed as a member of the regular complement of the ship or aircraft. The "regular complement" includes the crew. In the case of a cruise ship, for example, it may also include others, such as entertainers, lecturers, etc., employed by the shipping company to serve on the ship throughout its voyage. The use of the term "regular complement" is intended to clarify that a person who exercises his employment as, for example, an insurance salesman while aboard a ship or aircraft is not covered by this paragraph. This paragraph does not apply to persons dealt with in Article 14 (Independent Personal Services).

*Relation to Other Articles*

If a U.S. citizen who is resident in Denmark performs services as an employee in the United States and meets the conditions of paragraph 2 for source country exemption, he nevertheless is taxable in the United States by virtue of the saving clause of paragraph 4 of Article 1 (General Scope), subject to the special foreign tax credit rule of paragraph 3 of Article 23 (Relief from Double Taxation).

## ARTICLE 16

### Directors' Fees

This Article follows the OECD Model and provides that fees and other payments derived by a resident of a Contracting State in his capacity as a member of the board of directors of a company that is a resident of the other Contracting State may be taxed in that other State. This rule is an exception to the more general rules of Articles 14 (Independent Personal Services) and 15 (Dependent Personal Services). Thus, for example, in determining whether a director's fee paid to a non-employee director is subject to tax in the country of residence of the corporation, it is not relevant to establish whether the fee is attributable to a fixed base in that State.

The provision in the Convention is identical to the analogous provision in the OECD Model. The U.S. Model reached a different result, providing that the State of residence of the company may tax nonresident directors with no time or dollar threshold, but only with respect to remuneration for services performed in that State.

Because this Article does not restrict taxation by either Contracting State, the saving clause of paragraph 4 of Article 1 (General Scope) is irrelevant. If a U.S. citizen who is a Danish resident is a director of a Danish corporation, the United States may tax his full remuneration for those services, subject, however, to the special provisions of paragraph 3 of Article 23 (Relief from Double Taxation).

## ARTICLE 17

### Artistes and Sportsmen

This Article deals with the taxation in a Contracting State of artistes (i.e., performing artists and entertainers) and sportsmen resident in the other Contracting State from the performance of their services as such. The Article applies both to the income of an entertainer or sportsman who performs services on his own behalf and one who performs services on behalf of another person, either as an employee of that person, or pursuant to any other arrangement. The rules of this Article take precedence, in some circumstances, over those of Articles 14 (Independent Personal Services) and 15 (Dependent Personal Services).

This Article applies only with respect to the income of performing artists and sportsmen. Others involved in a performance or athletic event, such as producers, directors, technicians, managers, coaches, etc., remain subject to the provisions of Articles 14 and 15. In addition, except as provided in paragraph 2, income earned by juridical persons is not covered by this Article.

*Paragraph 1*

Paragraph 1 describes the circumstances in which a Contracting State may tax the performance income of an entertainer or sportsman who is a resident of the other Contracting State. Under the paragraph, income derived by an individual resident of a Contracting State from activities as an entertainer or sportsman exercised in the other Contracting State may be taxed in that other State if the amount of the gross receipts derived by the performer exceeds $20,000 (or its equivalent in Danish

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

kroner) for the taxable year. The $20,000 includes expenses reimbursed to the individual or borne on his behalf. If the gross receipts exceed $20,000, the full amount, not just the excess, may be taxed in the State of performance.

Tax may be imposed under paragraph 1 even if the performer would have been exempt from tax under Articles 14 (Independent Personal Services) or 15 (Dependent Personal Services). On the other hand, if the performer would be exempt from host-country tax under this Article, but would be taxable under either Article 14 or 15, tax may be imposed under either of those Articles. Thus, for example, if a performer derives remuneration from his activities in an independent capacity, and the remuneration is not attributable to a fixed base, he may be taxed by the host State in accordance with this Article if his remuneration exceeds $20,000 annually, despite the fact that he generally would be exempt from host State taxation under Article 14. However, a performer who receives less than the $20,000 threshold amount and therefore is not taxable under Article 17, nevertheless may be subject to tax in the host country under Articles 14 or 15 if the tests for host-country taxability under those Articles are met. For example, if an entertainer who is an independent contractor earns $19,000 of income in a State for the calendar year, but the income is attributable to a fixed base regularly available to him in the State of performance, that State may tax his income under Article 14.

Since it frequently is not possible to know until year-end whether the income an entertainer or sportsman derived from performances in a Contracting State will exceed $20,000, nothing in the Convention precludes that Contracting State from withholding tax during the year and refunding after the close of the year if the taxability threshold has not been met.

Article 17 applies to all income connected with a performance by the entertainer, such as appearance fees, award or prize money, and a share of the gate receipts. Income derived from a Contracting State by a performer who is a resident of the other Contracting State from other than actual performance, such as royalties from record sales and payments for product endorsements, is not covered by this Article, but by other Articles of the Convention, such as Article 12 (Royalties) or Article 14. For example, if an entertainer receives royalty income from the sale of live recordings, the royalty income would be exempt from source country tax under Article 12, even if the performance was conducted in the source country, although he could be taxed in the source country with respect to income from the performance itself under this Article if the dollar threshold is exceeded.

In determining whether income falls under this Article or another Article, the controlling factor will be whether the income in question is predominantly attributable to the performance itself or other activities or property rights. For instance, a fee paid to a performer for endorsement of a performance in which the performer will participate would be considered to be so closely associated with the performance itself that it normally would fall within this Article. Similarly, a sponsorship fee paid by a business in return for the right to attach its name to the performance would be so closely associated with the performance that it would fall under this Article as well. A cancellation fee would not be considered to fall within this Article but would be dealt with under Article 7 (Business Profits), 14 or 15.

Where an individual fulfills a dual role as performer and non-performer (such as a player-coach or an actor-director), but his role in one of the two capacities is negligible, the predominant character of the individual's activities should control the characterization of those activities. In other cases there should be an apportionment between the performance-related compensation and other compensation.

Consistent with Article 15, Article 17 also applies regardless of the timing of actual payment for services. Thus, a bonus paid to a resident of a Contracting State with respect to a performance in Denmark with respect to a particular taxable year would be subject to Article 17 for that year even if it was paid after the close of the year.

*Paragraph 2*

Paragraph 2 is intended to deal with the potential for abuse when a performer's income does not accrue directly to the performer himself, but to another person. Foreign performers frequently perform in the United States as employees of, or under contract with, a company or other person.

The relationship may truly be one of employee and employer, with no abuse of the tax system either intended or realized. On the other hand, the "employer" may, for example, be a company established and owned by the performer, which is merely acting as the nominal income recipient in respect of the remuneration for the performance (a "star company"). The performer may act as an "employee," receive a modest salary, and arrange to receive the remainder of the income from his performance in another form or at a later time. In such case, absent the provisions of paragraph 2, the income arguably could escape host-country tax because the company earns business profits but has no permanent establishment in that country. The performer may largely or entirely escape host-country tax by receiving only a small salary in the year the services are performed, perhaps small enough to place him below the dollar threshold in paragraph 1. The performer might arrange to receive further payments in a later year, when he is not subject to host-country tax, perhaps as deferred salary payments, dividends or liquidating distributions.

Paragraph 2 seeks to prevent this type of abuse while at the same time protecting the taxpayers' rights to the benefits of the Convention when there is a legitimate employee-employer relationship between the performer and the person providing his services. Under paragraph 2, when the income accrues to a person other than the performer, and the performer or related persons participate, directly or indirectly, in the receipts or profits of that other person, the income may be taxed in the Contracting State where the performer's services are exercised, without regard to the provisions of the Convention concerning business profits (Article 7) or independent personal services (Article 14). Thus, even if the "employer" has no permanent establishment or fixed base in the host country, its income may be subject to tax there under the provisions of paragraph 2. Taxation under paragraph 2 is on the person providing the services of the performer. This paragraph does not affect the rules

---

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD. Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

of paragraph 1, which apply to the performer himself. The income taxable by virtue of paragraph 2 is reduced to the extent of salary payments to the performer, which fall under paragraph 1.

For purposes of paragraph 2, income is deemed to accrue to another person (i.e., the person providing the services of the performer) if that other person has control over, or the right to receive, gross income in respect of the services of the performer. Direct or indirect participation in the profits of a person may include, but is not limited to, the accrual or receipt of deferred remuneration, bonuses, fees, dividends, partnership income or other income or distributions.

Paragraph 2 does not apply if the performer establishes that neither he nor any persons related to him participate directly or indirectly in the receipts or profits of the person providing the services of the performer. Assume, for example, that a circus owned by a U.S. corporation performs in Denmark, and promoters of the performance in Denmark pay the circus, which, in turn, pays salaries to the circus performers. The circus is determined to have no permanent establishment in Denmark. Since the circus performers do not participate in the profits of the circus, but merely receive their salaries out of the circus' gross receipts, the circus is protected by Article 7 and its income is not subject to host-country tax. Whether the salaries of the circus performers are subject to host-country tax under this Article depends on whether they exceed the $20,000 threshold in paragraph 1.

Since pursuant to Article 1 (General Scope) the Convention only applies to persons who are residents of one of the Contracting States, if the star company is not a resident of one of the Contracting States then taxation of the income is not affected by Article 17 or any other provision of the Convention.

*Relationship to Other Articles*

This Article is subject to the provisions of the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if an entertainer or a sportsman who is resident in Denmark is a citizen of the United States, the United States may tax all of his income from performances in the United States without regard to the provisions of this Article, subject, however, to the special foreign tax credit provisions of paragraph 3 of Article 23 (Relief from Double Taxation). In addition, benefits of this Article are subject to the provisions of Article 22 (Limitation on Benefits).

**ARTICLE 18**

**Pensions, Social Security, Annuities, Alimony and Child Support Payments**

This Article deals with the taxation of private (i.e., non-government service) pensions and annuities, social security benefits, alimony and child support payments.

*Paragraph 1*

Subparagraph 1(a) provides that, except as provided in subparagraph (b), distributions from pensions and other similar remuneration beneficially owned by a resident of a Contracting State in consideration of past employment are taxable only in the State in which they arise. Paragraph 4 of the Protocol defines a payment that is treated as a pension distribution under paragraph 1. Paragraph 4(a) provides that a payment shall be treated as a pension distribution for this purpose if it is a payment under a pension scheme recognized for tax purposes in the Contracting State where the pension scheme is established. Paragraph 4(b) provides that, for this purpose, pension schemes recognized for tax purposes shall include the schemes listed under clause (i) in the case of the United States and under clause (ii) in the case of Denmark. With reference to U.S. Law, clause (i) lists qualified plans under section 401(a), individual retirement plans (including individual retirement plans that are part of a simplified employee pension plan that satisfies section 408(k), individual retirement accounts, individual retirement annuities, section 408(p) accounts and Roth IRAs under section 408A), section 403(a) qualified plans, and section 403(b) plans. With reference to Danish law, clause (ii) lists pension schemes under Section I of the Act on Taxation of Pension Schemes (pensionsbeskatningslovens afsnit I). Subparagraph 1(d) makes explicit the fact that the term "pension distributions and other similar remuneration" includes both periodic and lump sum payments.

Under the prior Convention, distributions were taxable only in the country of residence. Since many retirees may have relied on the old rule when deciding to move from one Contracting State to another, subparagraph 1(b) provides a grandfather rule to prevent the tax burden of such retirees from being suddenly increased. This rule states that, if prior to the time of entry into force of this Convention, a person was a resident of a Contracting State and was receiving pension distributions arising in the other Contracting State, that person shall be taxable on pension distributions referred to in subparagraph (a) only in the first-mentioned State. Thus, subparagraph (b) provides for taxation only in the residence State, rather than taxation only in the source State, in the case of a pension distribution received by a citizen of one Contracting State who, before this Convention enters into force, is receiving a pension distribution arising in the other Contracting State.

Subparagraph 1(c) provides a rule for administrative convenience under which pension distributions shall be deemed to arise in a Contracting State only if paid by a pension scheme established in that State. This rule eliminates the necessity of dividing pension distributions between different countries on the basis of services performed in the various countries.

*Paragraph 2*

The treatment of social security benefits is dealt with in paragraph 2. This paragraph provides that, notwithstanding the provision of paragraph 1, payments made by one of the Contracting States under the provisions of its social security or similar legislation to a resident of the other Contracting State or to a citizen of the United States will be taxable only in the Contracting

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

State making the payment. This paragraph applies to social security beneficiaries whether they have contributed to the system as private sector or Government employees.

The phrase "similar legislation" is intended to refer to United States tier 1 Railroad Retirement benefits. The reference to U.S. citizens is necessary to ensure that a social security payment by Denmark to a U.S. citizen who is not resident in the United States will not be taxable by the United States.

*Paragraph 3*

Under paragraph 3, annuities that are derived and beneficially owned by an individual resident of a Contracting State are taxable only in that State. An annuity, as the term is used in this paragraph, means a stated sum paid periodically at stated times during a specified number of years, or for life, under an obligation to make the payment in return for adequate and full consideration (other than for services rendered). An annuity received in consideration for services rendered would be treated as deferred compensation and generally taxable in accordance with Article 15 (Dependent Personal Services).

*Paragraphs 4 and 5*

Paragraphs 4 and 5 deal with alimony and child support payments, respectively. Alimony and child support payments are defined as periodic payments made pursuant to a written separation agreement or a decree of divorce, separate maintenance, or compulsory support. Paragraph 4, however, deals only with payments of that type that are deductible to the payor and taxable to the payee. Under that paragraph, alimony (i.e., a deductible payment that is taxable in the hands of the recipient) paid by a resident of a Contracting State to a resident of the other Contracting State is taxable under the Convention only in the State of residence of the recipient. Paragraph 5 deals with those periodic payments that are for the support of a child and that are not covered by paragraph 4 (i.e., those payments that either are not deductible to the payor or not taxable to the payee). These types of payments by a resident of a Contracting State to a resident of the other Contracting State shall be taxable only in the first-mentioned Contracting State.

*Relationship to Other Articles*

Paragraphs 3 and 4 of Article 18 are subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, a U.S. citizen who is resident in Denmark, and receives either an annuity or alimony payment from the United States, may be subject to U.S. tax on the payment, notwithstanding the rules in those two paragraphs that give the State of residence of the recipient the exclusive taxing right. Paragraph 1, with the exception of subparagraph (c), also is subject to the saving clause. Therefore, a U.S. citizen who is resident in Denmark, and receives a pension payment from a pension scheme established in Denmark may be subject to U.S. tax on the payment, but the United States will treat that payment as arising in Denmark for foreign tax credit purposes. Paragraphs 2 and 5 are excepted from the saving clause by virtue of paragraph 5(a) of Article 1. Thus, the United States will allow U.S. citizens and residents the benefits of paragraph 2 and 5.

## ARTICLE 19

### Government Service

*Paragraph 1*

Subparagraphs (a) and (b) of paragraph 1 deal with the taxation of government compensation (other than a pension addressed in paragraph 2). Subparagraph (a) provides that remuneration paid from the public funds of one of the States or its political subdivisions or local authorities to any individual who is rendering services to that State, political subdivision or local authority, which are in the discharge of governmental functions, is exempt from tax by the other State. Under subparagraph (b), such payments are, however, taxable exclusively in the other State (i.e., the host State) if the services are rendered in that other State and the individual is a resident of that State who is either a national of that State or a person who did not become resident of that State solely for purposes of rendering the services. The paragraph applies both to government employees and to independent contractors engaged by governments to perform services for them.

The remuneration described in paragraph 1 is subject to the provisions of this paragraph and not to those of Articles 14 (Independent Personal Services), 15 (Dependent Personal Services), 16 (Director's Fees) or 17 (Artistes and Sportsmen). If, however, the conditions of paragraph 1 are not satisfied, those other Articles will apply. Thus, if a local government sponsors a basketball team in an international tournament, and pays the athletes from public funds, the compensation of the players is covered by Article 17 and not Article 19, because the athletes are not engaging in a governmental function when they play basketball.

*Paragraph 2*

Paragraph 2 deals with the taxation of a pension paid from the public funds of one of the States or a political subdivision or a local authority thereof to an individual in respect of services rendered to that State or subdivision or authority in the discharge of governmental functions. Subparagraph (a) provides that such a pension is taxable only in that State. Subparagraph (b) provides an exception under which such a pension is taxable only in the other State if the individual is a resident of, and a national of, that other State. Pensions paid to retired civilian and military employees of a Government of either State are intended to be covered under paragraph 2. Subparagraph 2 (b) is to be interpreted and applied consistently with the U.S., Danish and OECD Models. When benefits paid by a State in respect of services rendered to that State or a subdivision or authority are in the form of social security benefits, however, those payments are covered by paragraph 2 of Article 18

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(Pensions, Social Security, Annuities, Alimony and Child Support). As a general matter, the result will be the same whether Article 18 or 19 applies, since social security benefits are taxable exclusively by the source country and so are government pensions. The result will differ only when the payment is made to a citizen and resident of the other Contracting State, who is not also a citizen of the paying State. In such a case, social security benefits continue to be taxable at source while government pensions become taxable only in the residence country.

The phrase "functions of a governmental nature" is not defined. In general it is understood to encompass functions traditionally carried on by a government. It generally would not include functions that commonly are found in the private sector (e.g., education, health care, utilities). Rather, it is limited to functions that generally are carried on solely by the government (e.g., military, diplomatic service, tax administrators) and activities that directly support the carrying out of those functions.

The use of the phrase "paid from the public funds of a Contracting State" is intended to clarify that remuneration and pensions paid by such entities as government-owned corporations are covered by the Article, as long as the other conditions of the Article are satisfied.

*Paragraph 3*

Paragraph 3 provides that if the services are performed in connection with a business carried on by the State or individual subdivision or local authority, then paragraphs 1 and 2 do not apply. In such cases, the ordinary rules apply: Article 15 for wages and salaries, Article 16 for directors fees and other similar payments, Article 17 for artistes and sportsmen, and Article 18 for pensions.

*Relation to Other Articles*

Under paragraph 5(b) of Article 1 (General Scope), the saving clause (paragraph 4 of Article 1) does not apply to the benefits conferred by one of the States under Article 19 if the recipient of the benefits is neither a citizen of Denmark, nor a person who has been admitted for permanent residence there (i.e., in the United States, a "green card" holder). Thus, a resident of a Contracting State who in the course of performing functions of a governmental nature becomes a resident of the other State (but not a permanent resident), would be entitled to the benefits of this Article. However, an individual who receives a pension paid by the Government of Denmark in respect of services rendered to that Government is taxable on that pension only in Denmark unless the individual is a U.S. citizen or acquires a U.S. green card.


**ARTICLE 20**

**Student and Trainees**

This Article provides rules for host-country taxation of visiting students, apprentices or business trainees. Persons who meet the tests of the Article will be exempt from tax in the State that they are visiting with respect to designated classes of income. Several conditions must be satisfied in order for an individual to be entitled to the benefits of this Article.

First, the visitor must have been, either at the time of his arrival in the host State or immediately before, a resident of the other Contracting State.

Second, the purpose of the visit must be the full-time education or training of the visitor. Thus, if the visitor comes principally to work in the host State but also is a part-time student, he would not be entitled to the benefits of this Article, even with respect to any payments he may receive from abroad for his maintenance or education, and regardless of whether or not he is in a degree program. Whether a student is to be considered full-time will be determined by the rules of the educational institution at which he is studying. Similarly, a person who visits the host State for the purpose of obtaining business training and who also receives a salary from his employer for providing services would not be considered a trainee and would not be entitled to the benefits of this Article.

Third, a student must be studying at an accredited educational institution. (This requirement does not apply to business trainees or apprentices.) An educational institution is understood to be an institution that normally maintains a regular faculty and normally has a regular body of students in attendance at the place where the educational activities are carried on. An educational institution will be considered to be accredited if it is accredited by an authority that generally is responsible for accreditation of institutions in the particular field of study.

The host-country exemption in the Article applies only to payments received by the student, apprentice or business trainee for the purpose of his maintenance, education or training that arise outside the host State. A payment will be considered to arise outside the host State if the payor is located outside the host State. Thus, for example, if an employer from one Contracting State sends an employee to the other State for training, the payments the trainee receives from abroad from his employer for his maintenance or training while he is present in the host State will be exempt from host country tax. In all cases substance over form will prevail in determining the identity of the payor. Consequently, payments made directly or indirectly by the U.S. person with whom the visitor is training, but which have been routed through a non-host-country source, such as, for example, a foreign bank account, would not be treated as arising outside the United States for this purpose. Moreover, if a U.S. person reimbursed a foreign person for payments by the foreign person to the visitor, the payments by the foreign person would not be treated as arising outside the United States.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

In the case of an apprentice or business trainee, the benefits of the Article will extend for a period of three years from the time that the visitor first arrives in the host country. If, however, an apprentice or trainee remains in the host country for a fourth year, thus losing the benefits of the Article, he would not retroactively lose the benefits of the Article for the first three years.

Finally, the exemption only applies to income from research undertaken in the public interest. Income from research undertaken for private benefit does not qualify for the exemption.

The saving clause of paragraph 4 of Article 1 (General Scope) does not apply to this Article with respect to an individual who is neither a citizen of the host State nor has been admitted for permanent residence there. The saving clause, however, does apply with respect to citizens and permanent residents of the host State. Thus, a U.S. citizen who is a resident of Denmark and who visits the United States as a full-time student at an accredited university will not be exempt from U.S. tax on remittances from abroad that otherwise constitute U.S. taxable income. A person, however, who is not a U.S. citizen, and who visits the United States as a student and remains long enough to become a resident under U.S. law, but does not become a permanent resident (i.e., does not acquire a green card), will be entitled to the full benefits of the Article.

## ARTICLE 21

### Other Income

Article 21 generally assigns taxing jurisdiction over income not dealt with in the other Articles (Articles 6 through 20) of the Convention to the State of residence of the beneficial owner of the income and defines the terms necessary to apply the Article. An item of income is "dealt with" in another Article if it is the type of income described in the Article and it has its source in a Contracting State. For example, all royalty income that arises in a Contracting State and that is beneficially owned by a resident of the other Contracting State is "dealt with" in Article 12 (Royalties).

Examples of items of income covered by Article 21 include income from gambling, punitive (but not compensatory) damages, covenants not to compete, and income from certain financial instruments to the extent derived by persons not engaged in the trade or business of dealing in such instruments (unless the transaction giving rise to the income is related to a trade or business, in which case it is dealt with under Article 7 (Business Profits)). The Article also applies to items of income that are not dealt with in the other Articles because of their source or some other characteristic. For example, Article 11 (Interest) addresses only the taxation of interest arising in a Contracting State. Interest arising in a third State that is not attributable to a permanent establishment, therefore, is subject to this Article.

Distributions from partnerships and distributions from trusts are not generally dealt with under this Article because partnership and trust distributions generally do not constitute income. Under the U.S. Internal Revenue Code, partners include in income their distributive share of partnership income annually, and partnership distributions themselves generally do not give rise to income. Also, under the Code, trust income and distributions have the character of the associated distributable net income and therefore would generally be covered by another Article of the Convention.

### Paragraph 1

Paragraph 1 contains the general rule of Article 21. Items of income not dealt with in other Articles and beneficially owned by a resident of a Contracting State will be taxable only in the State of residence. This exclusive right of residence State taxation applies whether or not the residence State exercises its right to tax the income covered by the Article.

This paragraph refers to "items of income beneficially owned by a resident of a Contracting State" rather than simply to "items of income of a resident of a Contracting State." This reference makes explicit the implicit understanding in other treaties that the exclusive residence taxation provided by paragraph 1 applies only when a resident of a Contracting State is the beneficial owner of the income. This should also be understood from the phrase "income of a resident of a Contracting State." The addition of a reference to beneficial ownership merely removes any possible ambiguity. Thus, source taxation of income not dealt with in other Articles of the Convention is not limited by paragraph 1 if it is nominally paid to a resident of the other Contracting State, but is beneficially owned by a resident of a third State.

### Paragraph 2

Paragraph 2 provides an exception to the general rule of paragraph 1 for income, other than income from real property, that is attributable to a permanent establishment or fixed base maintained in a Contracting State by a resident of the other Contracting State. The taxation of such income is governed by the provisions of Articles 7 (Business Profits) and 14 (Independent Personal Services). Therefore, income arising outside the United States that is attributable to a permanent establishment maintained in the United States by a resident of Denmark generally would be taxable by the United States under the provisions of Article 7. This would be true even if the income is sourced in a third State.

There is an exception to this general rule with respect to income a resident of a Contracting State derives from real property located outside the other Contracting State (whether in the first-mentioned Contracting State or in a third State) that is attributable to the resident's permanent establishment or fixed base in the other Contracting State. In such a case, only the first-mentioned Contracting State (i.e., the State of residence of the person deriving the income) and not the host State of the permanent establishment or fixed base may tax that income. This special rule for foreign-situs property is consistent with the general rule, also reflected in Article 6 (Income from Real Property (Immovable Property)), that only the situs and residence States may tax real property and real property income. Even if such property is part of the property of a permanent

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

establishment or fixed base in a Contracting State, that State may not tax it if neither the situs of the property nor the residence of the owner is in that State.

*Relation to Other Articles*

This Article is subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, the United States may tax the income of a resident of Denmark that is not dealt with elsewhere in the Convention, if that resident is a citizen of the United States. The Article is also subject to the provisions of Article 22 (Limitation on Benefits). Thus, if a resident of Denmark earns income that falls within the scope of paragraph 1 of Article 21, but that is taxable by the United States under U.S. law, the income would be exempt from U.S. tax under the provisions of Article 21 only if the resident satisfies one of the tests of Article 22 for entitlement to benefits.

## ARTICLE 22

## Limitation of Benefits

*Purpose of Limitation of Benefits Provisions*

The United States views an income tax treaty as a vehicle for providing treaty benefits to residents of the two Contracting States. This statement begs the question of who is to be treated as a resident of a Contracting State for the purpose of being granted treaty benefits. The Commentaries to the OECD Model authorize a tax authority to deny benefits, under substance over-form principles, to a nominee in one State deriving income from the other on behalf of a third-country resident. In addition, although the text of the OECD Model does not contain express anti-abuse provisions, the Commentaries to Article 1 contain an extensive discussion approving the use of such provisions in tax treaties in order to limit the ability of third-state residents to obtain treaty benefits. The United States holds strongly to the view that tax treaties should include provisions that specifically prevent misuse of treaties by residents of third countries. Consequently, all recent U.S. income tax treaties contain comprehensive Limitation on Benefits provisions.

A treaty that provides treaty benefits to any resident of a Contracting State permits "treaty shopping": the use, by residents of third states, of legal entities established in a Contracting State with a principal purpose to obtain the benefits of a tax treaty between the United States and the other Contracting State. It is important to note that this definition of treaty shopping does not encompass every case in which a third-state resident establishes an entity in a U.S. treaty partner, and that entity enjoys treaty benefits to which the third-state resident would not itself be entitled. If the third- country resident had substantial reasons for establishing the structure that were unrelated to obtaining treaty benefits, the structure would not fall within the definition of treaty shopping set forth above.

Of course, the fundamental problem presented by this approach is that it is based on the taxpayer's intent, which a tax administrator is normally ill-equipped to identify. In order to avoid the necessity of making this subjective determination, Article 22 sets forth a series of objective tests. The assumption underlying each of these tests is that a taxpayer that satisfies the requirements of any of the tests probably has a real business purpose for the structure it has adopted, or has a sufficiently strong nexus to the other Contracting State (e.g., a resident individual) to warrant benefits even in the absence of a business connection, and that this business purpose or connection is sufficient to justify the conclusion that obtaining the benefits of the Convention is not a principal purpose of establishing or maintaining residence.

For instance, the assumption underlying the "active trade or business" test under paragraph 3 is that a third-country resident that establishes a "substantial" operation in the other State and that derives income from a related activity in the United States would not do so primarily to avail itself of the benefits of the Convention; it is presumed in such a case that the investor had a valid business purpose for investing in the other State, and that the link between that trade or business and the U.S. activity that generates the treaty-benefited income manifests a business purpose for placing the U.S. investments in the entity in the other State. It is considered unlikely that the investor would incur the expense of establishing a substantial trade or business in the other State simply to obtain the benefits of the Convention. A similar rationale underlies other tests in Article 22.

While these tests provide useful surrogates for identifying actual intent, these mechanical tests cannot account for every case in which the taxpayer was not treaty shopping. Accordingly, Article 22 also includes a provision (paragraph 7) authorizing the competent authority of a Contracting State to grant benefits. While an analysis under paragraph 7 may well differ from that under one of the other tests of Article 22, its objective is the same: to identify investors whose residence in the other State can be justified by factors other than a purpose to derive treaty benefits.

Article 22 and the anti-abuse provisions of domestic law complement each other, as Article 22 effectively determines whether an entity has a sufficient nexus to the Contracting State to be treated as a resident for treaty purposes, while domestic anti-abuse provisions (e.g., business purpose, substance-over-form, step transaction or conduit principles) determine whether a particular transaction should be recast in accordance with its substance. Thus, internal law principles of the source State may be applied to identify the beneficial owner of an item of income, and Article 22 then will be applied to the beneficial owner to determine if that person is entitled to the benefits of the Convention with respect to such income.

*Structure of the Article*

The structure of the Article is as follows: Paragraph 1 states the general rule that residents are entitled to benefits otherwise accorded to residents only to the extent provided in the Article. Paragraph 2 lists a series of attributes of a resident of a Contracting State, the presence of any one of which will entitle that person to all the benefits of the Convention. Paragraph

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

3 provides that, with respect to a person not entitled to benefits under paragraph 2, benefits nonetheless may be granted to that person with regard to certain types of income. Paragraph 4 describes the general "derivative benefits" test. Paragraph 5 provides for limited "derivative benefits" for shipping and air transport income. Paragraph 6 provides definitions. Paragraph 7 discusses the competent authorities' discretionary powers.

*Paragraph 1*

Paragraph 1 provides that a resident of a Contracting State will be entitled to the benefits otherwise accorded to residents of a Contracting State under the Convention only to the extent provided in the Article. The benefits otherwise accorded to residents under the Convention include all limitations on source-based taxation under Articles 6 through 21, the treaty-based relief from double taxation provided by Article 23 (Relief from Double Taxation), and the protection afforded to residents of a Contracting State under Article 24 (Non-Discrimination). Some provisions do not require that a person be a resident in order to enjoy the benefits of those provisions. These include paragraph 1 of Article 24 (Non-Discrimination), Article 25 (Mutual Agreement Procedure), and Article 28 (Diplomatic Agents and Consular Officers). Article 22 accordingly does not limit the availability of the benefits of these provisions.

*Paragraph 2*

Paragraph 2 has seven subparagraphs, each of which describes a category of residents that are entitled to all benefits of the Convention. It is intended that the provisions of paragraph 2 will be self executing. Unlike the provisions of paragraph 7, discussed below, claiming benefits under paragraph 2 does not require advance competent authority ruling or approval. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

*Individuals -- Subparagraph 2(a)*

Subparagraph 2(a) provides that individual residents of a Contracting State will be entitled to all treaty benefits. If such an individual receives income as a nominee on behalf of a third country resident, benefits may be denied under the respective Articles of the Convention by the requirement that the beneficial owner of the income be a resident of a Contracting State.

*Governmental Entities -- Subparagraph 2(b)*

Subparagraph 2(b) provides that a Contracting State, a political subdivision or local authorities thereof, or any agency or instrumentality of such State, subdivision or authority, will be entitled to all benefits of the Convention.

*Publicly-Traded Corporations -- Subparagraph 2(c)(i) and 2(c)(ii)*

Subparagraph 2(c) applies to two categories of corporations: publicly-traded corporations and subsidiaries of publicly-traded corporations. Clause (i) of subparagraph 2(c) provides that a company will be entitled to all the benefits of the Convention if all the shares in the class or classes of shares that represent more than 50 percent of the voting power and value of the company are listed on a recognized stock exchange and substantially and regularly traded on one or more "recognized stock exchanges". Paragraph 6(c) provides that the term "recognized stock exchange" means:

(i)    the NASDAQ System owned by the National Association of Securities Dealers, and any stock exchange registered with the Securities and Exchange Commission as a national securities exchange for purposes of the Securities Exchange Act of 1934;

(ii)   the Copenhagen Stock Exchange and the stock exchanges of Amsterdam, Brussels, Frankfurt, Hamburg, London, Paris, Stockholm, Sydney, Tokyo and Toronto; and

(iii)  any other stock exchanges agreed upon by the competent authorities of both Contracting States.

If a company has only one class of shares, it is only necessary to consider whether the shares of that class are regularly traded on a recognized stock exchange. If the company has more than one class of shares, it is necessary as an initial matter to determine whether one of the classes accounts for more than half of the voting power and value of the company. If so, then only those shares are considered for purposes of the regular trading requirement. If no single class of shares accounts for more than half of the company's voting power and value, it is necessary to identify a group of two or more classes of the company's shares that account for more than half of the company's voting power and value, and then to determine whether each class of shares in this group satisfies the regular trading requirement. Although in a particular case involving a company with several classes of shares it is conceivable that more than one group of classes could be identified that account for more than 50% of the company's voting power and value, it is only necessary for one such group to satisfy the requirements of this subparagraph in order for the company to be entitled to benefits. Benefits would not be denied to the company even if a second, non-qualifying, group of shares with more than half of the company's voting power and value could be identified.

The term "substantially and regularly traded" is defined in the Convention under paragraph 6 (f)(i) and (ii). Under paragraph (f)(i) of the convention a class is considered to be "substantially and regularly traded" if two requirements are met: trades in the class of shares are effected on one or more recognized stock exchanges in other than de minimis quantities during every quarter, and the aggregate number of shares of that class traded on stock exchange or exchanges during the previous fiscal year is at least 6 percent of the average number of shares or units outstanding in that class (including shares held by taxable nonstock corporations) during that taxable year.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

The "substantially and regularly traded" requirement can be met by trading on any recognized exchange or exchanges located in either State. Trading on one or more recognized stock exchanges may be aggregated for purposes of this requirement. Thus, a U.S. company could satisfy the regularly traded requirement through trading, in whole or in part, on a recognized stock exchange located in Denmark.

Clause (ii) of subparagraph 2 (c) provides a test under which certain companies that are directly or indirectly controlled by taxable nonstock corporations ("TNCs") entitled to benefits under paragraph (g) but that otherwise would meet the publicly-traded test may be entitled to the benefits of the Convention. This test is necessary because it is common for a TNC to hold 100% of the "Class A" shares of another company (either a holding company or an operating company). The Class A shares have a disproportionate amount of the voting power but have little or no rights to dividends. The subsidiary operating company or holding company also issues "Class B" shares, which have preferential treatment as to dividends. Class A shares held by TNCs are listed but not traded on the Copenhagen stock exchange. Any class A shares that are not held by TNCs and all Class B shares are both listed and traded on the Copenhagen stock exchange. This rule is included to ensure that a corporation whose voting shares are substantially owned by a Danish TNC is not precluded from qualifying as a publicly-traded company, so long as there is sufficient trading in the rest of its shares.

A company will qualify under this test if one or more such TNCs own shares representing more than 50 percent of the voting power of the company and all other shares are listed on a recognized stock exchange and are substantially and regularly traded on one or more recognized stock exchanges. For purposes of determining whether a company satisfies the requirements of clause (c)(ii) of paragraph 2, the term "substantially and regularly traded" in paragraph 6 (f)(i) is applied as if all the shares issued by the company were one class of shares, and shares held by taxable non-stock corporations will be considered outstanding for purposes of determining whether 6 percent of the outstanding shares have been traded during a taxable year. Without this rule, it might be possible for a small class of shares to qualify a company as substantially and regularly traded.

*Subsidiaries of Publicly-Traded Corporations -- Subparagraph 2(c)(iii)*

Clause (iii) of subparagraph 2(c) provides a test under which certain companies that are directly or indirectly controlled by companies satisfying the publicly-traded test of subparagraph 2(c)(i) or (ii) may be entitled to the benefits of the Convention. Under this test, a company will be entitled to the benefits of the Convention if at least 50 percent of each class of shares in the company is directly or indirectly owned by five or fewer companies entitled to benefits under subparagraph 2(c)(i) or (ii), or any combination thereof.

The test under clause (iii) differs from that under subparagraph 2(c)(i) in that at least 50 percent of each class of the company's shares, not merely the class or classes accounting for more than 50 percent of the company's votes and value, must be held by publicly-traded companies described in subparagraph 2(c)(i). Thus, the test under subparagraph 2(c)(iii) considers the ownership of every class of shares outstanding, while the test under subparagraph 2(c)(i) only considers those classes that account for a majority of the company's voting power and value.

Clause (iii) permits indirect ownership. Consequently, the ownership by five or fewer publicly-traded companies described in clause (i) or (ii), or any combination thereof, need not be direct. However, any intermediate owners in the chain of ownership must themselves be entitled to benefits under paragraph 2.

*Tax Exempt Organizations -- Subparagraph 2(d)*

Subparagraph 2(d) provides that the tax exempt organizations described 8in subparagraph 1(b)(i) of Article 4 (Residence) will be entitled to all the benefits of the Convention. These entities are entities that generally are exempt from tax in their State of residence and that are organized and operated exclusively to fulfill religious, educational, scientific and other charitable purposes. Like the U.S. Model, this provision does not limit the uses to which the charity may put its funds. Thus, a Danish charity would qualify even if all of its funds were used to provide humanitarian relief to refugees in a third country.

*Pension Funds -- Subparagraph 2(e)*

Subparagraph 2(e) provides that a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan, will be entitled to all the benefits of the Convention, provided that more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State. In the United States, these are the tax-exempt organizations described in subparagraph 1(b)(ii) of Article 4 (Residence). However, Denmark now taxes some pension funds, so the U.S. Model language was modified. For purposes of this provision, the term "beneficiaries" should be understood to refer to the persons receiving benefits from the organization.

*Ownership/Base Erosion -- Subparagraph 2(f)*

Subparagraph 2(f) provides a two-part test, the so-called ownership and base erosion test. This test applies to any form of legal entity that is a resident of a Contracting State. Both parts of the test must be satisfied for the resident to be entitled to benefits under subparagraph 2(f).

The ownership part of the test, under clause (i), requires that 50 percent or more of the beneficial interest in the person (in the case of a corporation, 50 percent or more of the vote and value of the company's shares) be owned on at least half the days of the person's taxable year by persons who are themselves entitled to benefits under other tests of paragraph 2 (i.e., subparagraphs (a), (b), (c), (d), or (e)). The ownership may be indirect through other persons themselves entitled to benefits under paragraph 2.

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Trusts may be entitled to benefits under this provision if they are treated as residents under Article 4 (Residence) and they otherwise satisfy the requirements of this subparagraph. For purposes of this subparagraph, the beneficial interests in a trust will be considered to be owned by its beneficiaries in proportion to each beneficiary's actuarial interest in the trust. The interest of a remainder beneficiary will be equal to 100 percent less the aggregate percentages held by income beneficiaries. A beneficiary's interest in a trust will not be considered to be owned by a person entitled to benefits under the other provisions of paragraph 2 if it is not possible to determine the beneficiary's actuarial interest. Consequently, if it is not possible to determine the actuarial interest of any beneficiaries in a trust, the ownership test under clause i) cannot be satisfied, unless all beneficiaries are persons entitled to benefits under the other subparagraphs of paragraph 2.

The base erosion part of the test under subparagraph 2(f) requires that less than 50 percent of the person's gross income for the taxable year be paid or accrued, in the form of payments that are deductible for tax purposes in the entity's State of residence directly or indirectly, to nonresidents of either State (unless the payment is attributable to a permanent establishment situated in either Contracting State).

Paragraph 6 (a) provides that "gross income" for purposes of subparagraph 2 (f) will be gross income for the first taxable period preceding the current taxable period, provided that the amount of gross income for the first taxable period preceding the current taxable period shall be deemed to be no less than the average of the annual amounts of gross income for the four taxable periods preceding the current taxable period.

Paragraph 6 (b)(i) provides that the term "deductible payments" for purposes of subparagraph 2(f) includes payments for interest or royalties, but does not include payments at arm's length for the purchase or use of or the right to use tangible property in the ordinary course of business or remuneration at arm's length for services performed in the Contracting State in which the person making such payments is a resident.

To the extent they are deductible from the taxable base, trust distributions would be considered deductible payments. Depreciation and amortization deductions, which are not "payments," are disregarded for this purpose. The purpose of this provision is to determine whether the income derived from the source State is in fact subject to the tax regime of either State. Consequently, payments to any resident of either State, as well as payments that are attributable to permanent establishments in either State, are not considered base-eroding payments for this purpose (to the extent that these recipients do not themselves base erode to non-residents).

*Danish Taxable Nonstock Corporations -- Subparagraph 2(g)*

Paragraph 2(g) provides a special rule for a Danish TNC, which is a vehicle to preserve control of operating companies by the TNC through its control of voting shares, with public shareholders receiving most rights to dividends of the operating company. A TNC may qualify for all the benefits of the Convention if it meets specific requirements under a two-part test.

Under paragraph 6(e), the term "taxable non-stock corporation" ("TNC") as used in paragraph 2 means a foundation that is taxable in accordance with paragraph 1 of Article 1 of the Danish Act on Taxable Non-stock Corporations (fonde der beskattes efter fondsbeskatningsloven)." A TNC is a legal person that is controlled by a professional board of directors, the majority of which must be unrelated to the persons that founded the TNC. As a foundation, a TNC must have a charter governing the corporation's operations and identifying any TNC beneficiaries and their entitlement to distributions from the TNC. One TNC cannot own another. A TNC's capital is irrevocably separated from the control of any person ("founder") contributing assets to the TNC at the time the TNC is established. A TNC's assets can never be inherited nor can such assets be paid out in liquidation except to creditors. TNCs are subject to income tax at the same rate (32%) and in exactly the same way as Danish corporations, except that a TNC can deduct charitable contributions, whereas a regular Danish corporation cannot deduct them, and a TNC, like any other foundation, can deduct distributions to members of the founder's family provided that these family members are resident in Denmark and are taxable in Denmark at the full rate, which is from 45% to 59%. Distributions to other persons, e.g., Danish nonresidents, are not deductible.

The two-part test in subparagraph (g) is a modification of the ownership-base erosion test that is necessary because TNCs do not have owners and thus cannot be subject to any ownership test. This test was included for TNCs in order to treat them as similarly as possible to other Danish corporations.

The first part of the test under subparagraph (g)(i) is satisfied if no more than 50% of the amount of its gross income (excluding the TNC's tax-exempt income) is paid or accrued in the form of deductible payments in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs (a), b), ((i), (c)(iii) by virtue of (c)(i), (d) or (e). This means that no more than 50% of the amount of the TNC's gross income (excluding its tax-exempt income) can be paid to persons other than residents of either Contracting State that qualify for treaty benefits as an individual (subparagraph (a)), a Contracting State, etc. (subparagraph b)), a company that is publicly traded (subparagraph (c) (i)), a corporation that is owned directly or indirectly by publicly traded companies (subparagraph (c)(iii) by virtue of subparagraph (c)(i)), a charitable organization, etc. (subparagraph (d)) or a pension plan (subparagraph (e).

The second part of the test under subparagraph (g)(ii) is satisfied if no more than 50% of the amount of the total income of the TNC (including its tax-exempt income) is paid or accrued, in the form of deductible payments and non-deductible distributions, in the taxable year and in each of the preceding three taxable years, directly, or indirectly to persons who are not entitled to benefits under subparagraphs (a), b), c)(i), (c)(iii) by virtue of (c)(i), (d), or (e).

The term "gross income" is not defined in the Convention. Thus, in accordance with paragraph 2 of Article 3 (General Definitions), in determining whether a person deriving income from United States sources is entitled to the benefits of the

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD. Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Convention, the United States will ascribe the meaning to the term that it has in the United States. In such cases, "gross income" means gross receipts, or where an enterprise is engaged in a business which includes the manufacture or production of goods, gross receipts reduced by the direct costs of labor and materials attributable to such manufacture or production and paid or payable out of such receipts.

For purposes of paragraph 2 (g), the term "deductible payments" is defined, under paragraph 6 (b)(i), to include payments for interest or royalties, but not payments at arm's length for the purchase or use of or the right to use tangible property in the ordinary course of business or remuneration at arm's length for services performed in the Contracting State in which the person making the payments is a resident and, under paragraph 6 b)(ii), to include deductible distributions made by a taxable non-stock corporation.

*Paragraph 3*

Paragraph 3 sets forth a test under which a resident of a Contracting State that is not generally entitled to benefits of the Convention under paragraph 2 may receive treaty benefits with respect to certain items of income that are connected to an active trade or business conducted in its State of residence. Paragraph 3 provides an alternative test for any entity that satisfies its terms.

Subparagraph 3(a) sets forth a three-pronged test that must be satisfied in order for a resident of a Contracting State to be entitled to the benefits of the Convention with respect to a particular item of income. First, the resident must be engaged in the active conduct of a trade or business in its State of residence. Second, the income derived from the other State must be derived in connection with, or be incidental to, that trade or business. Third, if there is common ownership of the activities in both States, the trade or business must be substantial in relation to the activity in the other State that generated the item of income. These determinations are made separately for each item of income derived from the other State. It therefore is possible that a person would be entitled to the benefits of the Convention with respect to one item of income but not with respect to another. If a resident of a Contracting State is entitled to treaty benefits with respect to a particular item of income under paragraph 3, the resident is entitled to all benefits of the Convention insofar as they affect the taxation of that item of income in the other State. Set forth below is a discussion of each of the three prongs of the test under paragraph 3.

*Trade or Business -- Subparagraphs 3(a)(i) and (b)*

The term "trade or business" is not defined in the Convention. Pursuant to paragraph 2 of Article 3 (General Definitions), when determining whether a resident of the other State is entitled to the benefits of the Convention under paragraph 3 with respect to income derived from U.S. sources, the United States will ascribe to this term the meaning that it has under the law of the United States. Accordingly, the United States competent authority will refer to the regulations issued under section 367(a) for the definition of the term "trade or business." In general, therefore, a trade or business will be considered to be a specific unified group of activities that constitute or could constitute an independent economic enterprise carried on for profit. Furthermore, a corporation generally will be considered to carry on a trade or business only if the officers and employees of the corporation conduct substantial managerial and operational activities. See Code section 367(a)(3) and the regulations thereunder.

Notwithstanding this general definition of trade or business, subparagraph 3(b) provides that the business of making or managing investments will be considered to be a trade or business only when part of banking, insurance or securities activities conducted by a bank, insurance company, or registered securities dealer. Conversely, such activities conducted by a person other than a bank, insurance company or registered securities dealer will not be considered to be the conduct of an active trade or business, nor would they be considered to be the conduct of an active trade or business if conducted by a banking or insurance company or registered securities dealer but not as part of the company's banking, insurance or dealer business.

Because a headquarters operation is in the business of managing investments, a company that functions solely as a headquarters company will not be considered to be engaged in an active trade or business for purposes of paragraph 3.

*Derived in Connection With Requirement -- Subparagraphs 3(a)(ii) and (d)*

Subparagraph 3(d) provides that income is derived in connection with a trade or business if the income-producing activity in the other State is a line of business that forms a part of or is complementary to the trade or business conducted in the State of residence by the income recipient. Although no definition of the terms "forms a part of" or "complementary" is set forth in the Convention, it is intended that a business activity generally will be considered to "form a part of" a business activity conducted in the other State if the two activities involve the design, manufacture or sale of the same products or type of products, or the provision of similar services. In order for two activities to be considered to be "complementary," the activities need not relate to the same types of products or services, but they should be part of the same overall industry and be related in the sense that the success or failure of one activity will tend to result in success or failure for the other. In cases in which more than one trade or business is conducted in the other State and only one of the trades or businesses forms a part of or is complementary to a trade or business conducted in the State of residence, it is necessary to identify the trade or business to which an item of income is attributable. Royalties generally will be considered to be derived in connection with the trade or business to which the underlying intangible property is attributable. Dividends will be deemed to be derived first out of earnings and profits of the treaty-benefited trade or business, and then out of other earnings and profits. Interest income may be allocated under any reasonable method consistently applied. A method that conforms to U.S. principles for expense allocation will be considered a reasonable method.

Finally, a resident in one of the States also will be entitled to the benefits of the Convention with respect to income derived from the other State if the income is "incidental" to the trade or business conducted in the recipient's State of residence.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Subparagraph 3(d) provides that income derived from a State will be incidental to a trade or business conducted in the other State if the production of such income facilitates the conduct of the trade or business in the other State. An example of incidental income is the temporary investment of working capital derived from a trade or business.

*Substantiality -- Subparagraphs 3(a)(iii) and (c)*

As indicated above, subparagraph 3(a)(iii) provides that income that a resident of a State derives from the other State will be entitled to the benefits of the Convention under paragraph 3 only if the income is derived in connection with a trade or business conducted in the recipient's State of residence and that trade or business is "substantial" in relation to the income-producing activity in the other State. Subparagraph 3(c) provides that whether the trade or business of the income recipient is substantial will be determined based on all the facts and circumstances. These circumstances generally would include the relative scale of the activities conducted in the two States and the relative contributions made to the conduct of the trade or businesses in the two States.

In addition to this subjective rule, subparagraph 3(c) provides a safe harbor under which the trade or business of the income recipient may be deemed to be substantial based on three ratios that compare the size of the recipient's activities to those conducted in the other State. The three ratios compare: the value of the assets in the recipient's State to the assets used in the other State; the gross income derived in the recipient's State to the gross income derived in the other State; and the payroll expense in the recipient's State to the payroll expense in the other State. The average of the three ratios with respect to the preceding taxable year must exceed 10 percent, and each individual ratio must exceed 7.5 percent. If any individual ratio does not exceed 7.5 percent for the preceding taxable year, the average for the three preceding taxable years may be used instead. Thus, if the taxable year is 1998, the preceding year is 1997. If one of the ratios for 1997 is not greater than 7.5 percent, the average ratio for 1995, 1996, and 1997 with respect to that item may be used.

The term "value" also is not defined in the Convention. Therefore, this term also will be defined under U.S. law for purposes of determining whether a person deriving income from United States sources is entitled to the benefits of the Convention. In such cases, "value" generally will be defined using the method used by the taxpayer in keeping its books for purposes of financial reporting in its country of residence. See Treas. Reg. §1.884-5(e)(3)(ii)(A).

Only items actually located or incurred in the two Contracting States are included in the computation of the ratios. If the person from whom the income in the other State is derived is not wholly-owned by the recipient (and parties related thereto) then the items included in the computation with respect to such person must be reduced by a percentage equal to the percentage control held by persons not related to the recipient. For instance, if a United States corporation derives income from a corporation in the other State in which it holds 80 percent of the shares, and unrelated parties hold the remaining shares, for purposes of subparagraph 3(c) only 80 percent of the assets, payroll and gross income of the company in the other State would be taken into account.

Consequently, if neither the recipient nor a person related to the recipient has an ownership interest in the person from whom the income is derived, the substantiality test always will be satisfied (the denominator in the computation of each ratio will be zero and the numerator will be a positive number). Of course, the other two prongs of the test under paragraph 3 would have to be satisfied in order for the recipient of the item of income to receive treaty benefits with respect to that income. For example, assume that a resident of a Contracting State is in the business of banking in Denmark. The bank loans money to unrelated residents of the United States. The bank would satisfy the substantiality requirement of this subparagraph with respect to interest paid on the loans because it has no ownership interest in the payers.

The substantiality requirement is intended to prevent a narrow case of treaty-shopping abuses in which a company attempts to qualify for benefits by engaging in de minimis connected business activities in the treaty country in which it is resident, i.e., activities that have little economic cost or effect with respect to the company's business as a whole.

The application of the substantiality test only to income from related parties focuses only on potential abuse cases, and does not hamper certain other kinds of non-abusive activities, even though the income recipient resident in a Contracting State may be very small in relation to the entity generating income in the other Contracting State. For example, if a small U.S. research firm develops a process that it license to a very large, unrelated, Danish pharmaceutical manufacturer, the size of the U.S. research firm would not have to be tested against the size of the Danish manufacturer. Similarly, a small U.S. bank that makes a loan to a very large unrelated Danish business would not have to pass a substantiality test to receive treaty benefits under subparagraph (c).

*Paragraph 4*

Paragraph 4 sets forth a limited derivative benefits test that applies to all treaty benefits. In general, a derivative benefits test entitles the resident of a state to treaty benefits if the beneficial owner of the resident would have been entitled to the same benefit had the income in question flowed directly to that owner. Paragraph 4 provides a derivative benefits test under which a company that is a resident of a Contracting State would be entitled to some or all of the benefits of the Convention. In order to be entitled to all the benefits of the Convention under this paragraph, the company must meet an ownership test, a base reduction test, and a derivative benefits test. These tests are described below.

Subparagraph 4(a)(i) sets forth the ownership test. Under this test, at least 95 percent of the aggregate vote and value of the company's shares must be owned by any combination of seven or fewer persons that are entitled to all of the benefits of the Convention under paragraph 2 or are residents of member states of the European Union or of the European Economic Area or of parties to NAFTA and that meet the requirements of subparagraph (c). Ownership may be direct or indirect.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Subparagraph 4(a)(ii) sets forth the base reduction test. This test is the same as the base reduction test in subparagraph 2(c)(iii), except that for purposes of this test amounts paid or accrued to persons that are residents of a member state of the European Union or the European Economic Area or of a party to NAFTA are excluded from deductible payments. Subparagraph 6 b)(i), which defines the term "deductible payments" for certain purposes, applies for purposes of paragraph 4. Therefore, under the base reduction test of paragraph 4, the term "deductible payments" includes payments for interest or royalties, but does not include payments at arm's length for the purchase or use of or the right to use tangible property in the ordinary course of business or remuneration at arm's length for services performed in the Contracting State in which the person making such payments is a resident.

However, under subparagraph 4(b), this ownership test will not be met, and benefits will not be granted, if the majority of a "disproportionate" class of shares is held by persons other than residents of a member state of the European Union or of the European Economic Area or a party to the North American Free Trade Agreement that meet the requirements of subparagraph (c). In general, a class of shares is "disproportionate" for these purposes if they entitle the shareholder to a disproportionately higher participation in the earnings that the company generates in the other State through particular assets or activities of the company. Such participation may take any form, including dividends or redemption payments. Such a class of shares would include so-called alphabet stock or tracking stock that entitles the holder to earnings produced by a particular division or subsidiary of the company in the source State. This provision applies if the disproportionate class of shares is issued by the company claiming benefits, or by a company that controls the company claiming benefits. In this context, control does not require majority ownership.

Pursuant to subparagraph 4(c)(i), a person will be considered a resident of a member state of the European Union, the European Economic Area, or of a party to NAFTA for purposes of this paragraph only if the person would be entitled to the benefits of a comprehensive income tax convention in force between any Member State of the European Union or of the European Economic Area or a party to the North American Free Trade Agreement and the Contracting State from which the benefits of this Convention are claimed. However, if that treaty does not contain a comprehensive limitation on benefits provision including provisions similar to those of subparagraphs (c) and (f) of paragraph 2 and paragraph 3 of this Article) then that person must be a person who would have qualified for the benefits of that treaty under provisions analogous to the provisions of paragraph 2 of this Article had that treaty contained a limitation on benefits provision with those provisions.

Notwithstanding subparagraph 4(a), subparagraph 4(c)(ii) sets forth an additional requirement that must be satisfied in order for a company that is a resident of a Contracting State to be entitled to the benefits of the Convention accorded under Articles 10 (Dividends), 11 (Interest) or 12 (Royalties). This provision requires a comparison of the rate of tax imposed on a particular payment under the Convention to the rate of tax that would be imposed under the income tax convention between the source state and any European Union or European Economic Area member state or party to NAFTA whose residents account for some of the ownership interest described in subparagraph 4(a)(i). Benefits will be extended with respect to such a payment under this provision only if at least 95 percent of the company's shares are owned by persons resident in a European Union or European Economic Area member state or a party to NAFTA for which the rate (or rates) of withholding tax provided in the income tax convention between the source state and such state is less than or equal to the rate or rates imposed under the Convention. This rate comparison is by definition satisfied for persons owning shares that are entitled to benefits under paragraph 2 of this Article. If for a particular payment less than 95 percent of the ownership interest is accounted for by persons that satisfy the rate comparison, then paragraph 4 does not apply to that payment (although it may apply to other payments and would apply to items of income, profit or gain other than those referred to in subparagraph 4(b)).

The rates of tax to be compared under this paragraph are the rate of withholding tax that the source State would impose under the Convention and the rate that would be imposed had the European Union, European Economic Area or NAFTA resident directly received its proportionate share of the dividend, interest or royalty payment. For example, assume that a U.S. company pays interest to DanCo, a company resident in Denmark. DanCo has two equal shareholders, a corporation resident in Canada and a corporation resident in Denmark. Each person's proportionate share of the interest payment is 50 percent of the interest. If the Canadian corporation had received this portion of the interest directly, it would be subject to a withholding tax of 10 percent under the income tax treaty between the United States and Canada. If the Danish corporation had received its portion of the interest directly, it would be subject to a withholding tax of 0 percent under the Convention. These rates are not the same rates that would apply under the Convention. Therefore, the test under subparagraph 4 is not satisfied with respect to these interest payments.

The provisions of paragraph 4 are intended to be self executing. Unlike the provisions of paragraph 7, discussed below, claiming benefits under paragraph 4 does not require advance competent authority ruling or approval. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

*Paragraph 5*

Paragraph 5 provides that a resident of one of the States that derives income from the other State described in Article 8 (Shipping and Air Transport) and that is not entitled to the benefits of the Convention under paragraphs 1 through 3, shall nonetheless be entitled to the benefits of the Convention with respect to income described in Article 8 if it meets one of two tests. These tests in substance duplicate the rules set forth under Code section 883 and therefore afford little additional benefit beyond those provided by the Code. These tests are described below.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

First, a resident of one of the States will be entitled to the benefits of the Convention with respect to income described in Article 8 if at least 50 percent of the beneficial interest in the person (in the case of a company, at least 50 percent of the aggregate vote and value of the stock of the company) is owned, directly or indirectly, by qualified persons or citizens of the United States or individuals who are residents of a third state that grants by law, common agreement, or convention an exemption under similar terms for profits as mentioned in Article 8 to citizens and corporations of the other State. This provision is analogous to the relief provided under Code section 883(c)(1).

Alternatively, a resident of one of the States will be entitled to the benefits of the Convention with respect to income described in Article 8 if at least 50 percent of the beneficial of the person (in the case of a company, at least 50 percent of the aggregate vote and value of the stock of the company) is owned directly or indirectly by a company or combination of companies the stock of which is substantially and regularly traded on an established securities market in a third state, provided that the third state grants by law, common agreement or convention an exemption under similar terms for profits as mentioned in Article 8 to citizens and corporations of the other State. This provision is analogous to the relief provided under Code section 883(c)(3).

The provisions of paragraph 5 are intended to be self executing. Unlike the provisions of paragraph 7, discussed below, claiming benefits under paragraph 5 does not require advance competent authority ruling or approval. The tax authorities may, of course, on review, determine that the taxpayer has improperly interpreted the paragraph and is not entitled to the benefits claimed.

A resident of a Contracting State that derives income from the other State described in Article 8 (Shipping and Air Transport) but that does not meet all the requirements of paragraph 5 will nevertheless qualify for treaty benefits if it meets the requirements of any other test under Article 22, i.e., the test under paragraph 2(c)(publicly traded test) or the test under paragraph 3 (active trade or business test).

*Paragraph 6*

Paragraph 6 defines certain terms used in this Article, which are discussed above in connection with the relevant paragraphs.

*Paragraph 7*

Paragraph 7 provides that a resident of one of the States that is not otherwise entitled to the benefits of the Convention may be granted benefits under the Convention if the competent authority of the other Contracting State so determines. This discretionary provision is included in recognition of the fact that, with the increasing scope and diversity of international economic relations, there may be cases where significant participation by third country residents in an enterprise of a Contracting State is warranted by sound business practice or long-standing business structures and does not necessarily indicate a motive of attempting to derive unintended Convention benefits.

The competent authority of a State will base a determination under this paragraph on whether the establishment, acquisition, or maintenance of the person seeking benefits under the Convention, or the conduct of such person's operations, has or had as one of its principal purposes the obtaining of benefits under the Convention. Thus, persons that establish operations in one of the States with the principal purpose of obtaining the benefits of the Convention ordinarily will not be granted relief under paragraph 7.

The competent authority may determine to grant all benefits of the Convention, or it may determine to grant only certain benefits. For instance, it may determine to grant benefits only with respect to a particular item of income in a manner similar to paragraph 3. Further, the competent authority may set time limits on the duration of any relief granted.

It is assumed that, for purposes of implementing paragraph 7, a taxpayer will not be required to wait until the tax authorities of one of the States have determined that benefits are denied before he will be permitted to seek a determination under this paragraph. In these circumstances, it is also expected that if the competent authority determines that benefits are to be allowed, they will be allowed retroactively to the time of entry into force of the relevant treaty provision or the establishment of the structure in question, whichever is later.

Finally, there may be cases in which a resident of a Contracting State may apply for discretionary relief to the competent authority of his State of residence. For instance, a resident of a State could apply to the competent authority of his State of residence in a case in which he had been denied a treaty-based credit under Article 23, (Relief from Double Taxation) on the grounds that he was not entitled to benefits of the Article under Article 22.

## ARTICLE 23

**Relief from Double Taxation**

This Article describes the manner in which each Contracting State undertakes to relieve double taxation. Both the United States and Denmark use the foreign tax credit method under its internal law, and by treaty.

*Paragraph 1*

The United States agrees, in paragraph 1, to allow to its citizens and residents a credit against U.S. tax for income taxes paid or accrued to Denmark. Paragraph 1 also provides that Denmark's covered taxes are income taxes for U.S. purposes.

In most cases, the credit under the Convention is allowed in accordance with the provisions and subject to the limitations of U.S. law, as that law may be amended over time, so long as the general principle of this Article, i.e., the allowance of a

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

credit, is retained. Thus, although the Convention provides for a foreign tax credit, the terms of the credit are determined by the provisions, at the time a credit is given, of the U.S. statutory credit.

As indicated, the U.S. credit under the Convention is subject to the various limitations of U.S. law (see Code sections 901 - 908). For example, the credit against U.S. tax generally is limited to the amount of U.S. tax due with respect to net foreign source income within the relevant foreign tax credit limitation category (see Code section 904(a) and (d)), and the dollar amount of the credit is determined in accordance with U.S. currency translation rules (see, e.g., Code section 986). Similarly, U.S. law applies to determine carryover periods for excess credits and other inter-year adjustments. When the alternative minimum tax is due, the alternative minimum tax foreign tax credit generally is limited in accordance with U.S. law to 90 percent of alternative minimum tax liability. Furthermore, nothing in the Convention prevents the limitation of the U.S. credit from being applied on a per-country basis (should internal law be changed), an overall basis, or to particular categories of income (see, e.g., Code section 865(h)).

Subparagraph (b) provides for a deemed-paid credit, consistent with section 902 of the Code, to a U.S. corporation in respect of dividends received from a corporation resident in Denmark of which the U.S. corporation owns at least 10 percent of the voting stock. This credit is for the tax paid by the corporation of Denmark on the profits out of which the dividends are considered paid.

The provisions of subparagraph (c) refer to taxes paid to Denmark by residents or nationals of the United States under the Danish Hydrocarbon Tax Act, and may allow for greater foreign tax credits than under U.S. statutory law. The Danish Hydrocarbon Tax Act encompasses a number of different taxes. First, under Section 4 of the Act, taxpayers with oil and gas concessions are required to pay a company tax at the same rate (currently 32 percent) as other companies, which is assessed under ordinary rules, but with additional limitations. For example, income subject to tax under Section 4, and thus potentially subject to the Hydrocarbon Tax is calculated under a special "separate assessment," under which losses from other activities cannot be used to offset income derived from the extraction of hydrocarbons in Denmark (Danish law, however, does permit the use of losses from hydrocarbon extraction activities to offset income from other activities). In addition, taxpayers with income at or above a certain level (i.e., income exceeding 250% of their investment) are required to pay the Hydrocarbon Tax (currently 70 percent).

The Hydrocarbon Tax Act also encompasses taxes on other income earned in relation to oil and gas activities, including: wages, income of companies without concessions, income of persons engaged in the liberal professions of every kind, including consultants, income of a personally owned business (unincorporated businesses) and on the income of estates of persons subject to the tax. However, a person subject to these provisions of the Hydrocarbon Tax Act is not considered as having derived income that is separately assessed, and therefore is not subject to the provisions of subparagraph (c). Such persons would be subject to the normal rules of this Article.

Under subparagraph (c)(i), the United States agrees to allow to its nationals and residents, as a direct or a deemed-paid credit against their U.S. tax, the appropriate amount of taxes (as defined below) paid or accrued to Denmark by or on behalf of such nationals or residents on income separately assessed under the Hydrocarbon Tax Act. However, theses credits are subject to the following limitations imposed by subparagraphs (c)(i) and (c)(iii) for persons claiming credits under the Convention:

(1) With respect to income taxes paid or accrued to Denmark on oil and gas extraction income from oil or gas wells in Denmark, the appropriate amount allowed as a credit for a taxable year shall not exceed the maximum U.S. statutory corporate tax rate for the taxable year to which such U.S. resident or national is subject, multiplied by the amount of Danish source oil and gas extraction income.

(2) With respect to income taxes paid or accrued to Denmark on Danish source oil-related income (other than oil and gas extraction income from oil or gas wells in Denmark), the appropriate amount allowed as a credit for the taxable year shall not exceed the maximum U.S. statutory corporate tax rate to which the U.S. resident or national is subject, multiplied by the amount of Danish source oil-related income.

(3) With respect to income taxes paid or accrued to Denmark on other separately assessed Danish source income (other than oil and gas extraction income from oil or gas wells in Denmark and other Danish source oil-related income), the appropriate amount allowed as a credit for a taxable year shall not exceed the maximum U.S. statutory corporate tax rate to which the U.S. resident or national is subject, multiplied by the amount of such other Danish source income.

In addition to these limitations, subparagraph (c) (ii) states that the appropriate amounts described above are subject to the limitations imposed under the law of the United States that apply to creditable taxes under sections 901 and 903 under the Code. Thus, as is generally the case under U.S. income tax conventions, provisions such as Code sections 901(c), 902, 904, 905, 907, 908 and 911 apply for purposes of computing the allowable credit under subparagraphs (c).

The amount of Danish source oil and gas extraction income from oil or gas wells in Denmark is determined under the principles of section 907(c) of the Code. U.S. principles are also used to determine the amount of Danish source oil-related income and other Danish source income.

Subparagraph (c) (ii) imposes a limit on the carryover of credits for taxes paid or accrued to Denmark on oil and gas extraction income from oil or gas wells in Denmark separately assessed under the Hydrocarbons Tax Act which are in excess of the amount allowed as a credit in subparagraph (c)(i). These excess credits may only be used as a credit in another taxable year (subject to the carryover rules under U.S. domestic law), and only against U.S. taxes on other oil and gas extraction income separately assessed under the Hydrocarbon Tax Act. The carryover credits are allowable in the year in which deemed paid

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD. Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

or accrued subject to any relevant limitations provided by the Code, such as those of sections 904(a) and 907(b). The same limitations apply to the carryover of credits for taxes paid or accrued to Denmark on Danish source oil-related income and other Danish source income separately assessed under the Hydrocarbon Tax Act.

If the provisions of the Convention are relied upon to claim a foreign tax credit for Danish income taxes paid by a person earning income separately assessed under the Hydrocarbon Tax Act, and any such payments would not otherwise be creditable under the Code, then the limitations of subparagraph (c) apply, whether or not the tax is paid in the taxable year, and all such Danish income taxes must be treated as provided in the Convention.

If the taxes paid or accrued to Denmark by a person earning income separately assessed under the Hydrocarbon Tax Act are creditable under the Code, and such taxes exceed the proportion of U.S. tax that taxable income attributable to Danish sources (as determined under the Convention) bears to entire income, such taxes are creditable under the Code against U.S. tax with respect to income from other foreign sources on the same basis as other creditable taxes and subject to the limitations of the Code. Moreover, if a person earning income separately assessed under the Hydrocarbon Tax Act chooses in a year not to rely upon the provisions of the Convention relevant to a claim for a foreign tax credit for any amounts paid to Denmark, then the Convention limitations contained in subparagraph (c) would not apply in that year and, pursuant to the current overall foreign tax credit limitation of the Code, Danish taxes creditable under the Code and creditable taxes paid to any other country can offset U.S. tax on income from Danish and other foreign sources.

Finally, paragraph 1 provides that for the purposes of this Article, the Danish taxes referred to in paragraphs 1 (b) and 2 of Article 2 (Taxes Covered) are considered to be income taxes and are allowed as credits against U.S. tax on income, subject to all of the provisions and limitations of this paragraph.

*Paragraph 2*

Paragraph 2 provides special rules for the tax treatment in both States of certain types of income derived from U.S. sources by U.S. citizens who are resident in Denmark. Since U.S. citizens, regardless of residence, are subject to United States tax at ordinary progressive rates on their worldwide income, the U.S. tax on the U.S. source income of a U.S. citizen resident in Denmark may exceed the U.S. tax that may be imposed under the Convention on an item of U.S. source income derived by a resident of Denmark who is not a U.S. citizen.

Subparagraph (a) provides special credit rules for Denmark with respect to items of income that are either exempt from U.S. tax or subject to reduced rates of U.S. tax under the provisions of the Convention when received by residents of Denmark who are not U.S. citizens. The tax credit of Denmark allowed by paragraph 3(a) under these circumstances, to the extent consistent with the law of Denmark, need not exceed the U.S. tax that may be imposed under the provisions of the Convention, other than tax imposed solely by reason of the U.S. citizenship of the taxpayer under the provisions of the saving clause of paragraph 4 of Article 1 (General Scope). Thus, if a U.S. citizen resident in Denmark receives U.S. source portfolio dividends, the foreign tax credit granted by Denmark would be limited to 15 percent of the dividend -- the U.S. tax that may be imposed under subparagraph (b) of Article 10 (Dividends) -- even if the shareholder is subject to U.S. net income tax because of his U.S. citizenship. For interest and royalty income that is exempt under the provisions of Articles 11 (Interest) and 12 (Royalties), Denmark would be permitted to tax the entire amount.

Paragraph 2(b) eliminates the potential for double taxation that can arise because subparagraph 2(a) provides that Denmark need not provide full relief for the U.S. tax imposed on its citizens resident in Denmark. The subparagraph provides that the United States will credit the income tax paid or accrued to Denmark, after the application of subparagraph 2(a). It further provides that in allowing the credit, the United States will not reduce its tax below the amount that is taken into account in Denmark in applying subparagraph 2(a).

Since the income described in paragraph 2 is U.S. source income, special rules are required to resource some of the income to Denmark in order for the United States to be able to credit Denmark's tax. This resourcing is provided for in subparagraph 2(c), which deems the items of income referred to in subparagraph 2(a) to be from foreign sources to the extent necessary to avoid double taxation under paragraph 2(b). The rules of paragraph 2(c) apply only for purposes of determining U.S. foreign tax credits with respect to taxes referred to in paragraphs 1(b) and 2 of Article 2 (Taxes Covered).

The following two examples illustrate the application of paragraph 2 in the case of a U.S. source portfolio dividend received by a U.S. citizen resident in Denmark. In both examples, the U.S. rate of tax on residents of Denmark under paragraph 2(b) of Article 10 (Dividends) of the Convention is 15 percent. In both examples the U.S. income tax rate on the U.S. citizen is 36 percent. In example I, Denmark's income tax rate on its resident (the U.S. citizen) is 25 percent (below the U.S. rate), and in example II, the rate on its resident is 40 percent (above the U.S. rate).

| Paragraph 2(a) | Example I | Example II |
|---|---|---|
| U.S. dividend declared | $100.00 | $100.00 |
| Notional U.S. withholding tax per Article 10(2)(b) | 15.00 | 15.00 |
| Danish taxable income | 100.00 | 100.00 |
| Danish tax before credit | 25.00 | 40.00 |
| Danish foreign tax credit | 15.00 | 15.00 |
| Net post-credit Danish tax | 10.00 | 25.00 |

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

| Paragraphs 2(b) and (c) | | |
|---|---|---|
| U.S. pre-tax income | $100.00 | $100.00 |
| U.S. pre-credit citizenship tax | 36.00 | 36.00 |
| Notional U.S. withholding tax | 15.00 | 15.00 |
| U.S. tax available for credit | 21.00 | 21.00 |
| Income re-sourced from U.S. to Denmark | 27.77 | 58.33 |
| U.S. tax on re-sourced income | 10.00 | 21.00 |
| U.S. credit for other Denmark tax | 10.00 | 21.00 |
| Net post-credit U.S. tax | 11.00 | 0.00 |
| **Total U.S. tax** | 26.00 | 15.00 |
| **Total Danish tax** | 10.00 | 25.00 |

In both examples, in the application of paragraph 2(a), Denmark credits a 15 percent U.S. tax against its residence tax on the U.S. citizen.

In example I, the net Danish tax after foreign tax credit is $10.00; in the second example it is $25.00. In the application of paragraphs 2(b) and 2(c), from the U.S. tax due before credit of $36.00, the United States subtracts the amount of the U.S. source tax of $15.00, against which no U.S. foreign tax credit is to be allowed. This provision assures that the United States will collect the tax that it is due under the Convention as the source country. In both examples, the maximum amount of U.S. tax against which credit for Danish tax may be claimed is $21.00. Initially, all of the income in these examples was U.S. source. In order for a U.S. credit to be allowed for the full amount of the Danish tax, an appropriate amount of the income must be re-sourced. The amount that must be resourced depends on the amount of Danish tax for which the U.S. citizen is claiming a U.S. foreign tax credit. In example I, the Danish tax was $10.00. In order for this amount to be creditable against U.S. tax, $27.77 ($10 divided by .36) must be resourced as foreign source. When the Danish tax is credited against the U.S. tax on the resourced income, there is a net U.S. tax of $11.00 due after credit. In example II, the Danish tax was $25 but, because the amount available for credit is reduced under subparagraph 3(c) by the amount of the U.S. source tax, only $21.00 is eligible for credit. Accordingly, the amount that must be resourced is limited to the amount necessary to ensure a foreign tax credit for $21 of Danish tax, or $58.33 ($21 divided by 0.36). Thus, even though other State tax was $25.00 and the U.S. tax available for credit was $21.00, there is no excess credit available for carryover.

*Paragraph 3*

Specific rules are provided in paragraph 3 under which Denmark, in imposing tax on its residents, provides relief for U.S. taxes paid by those residents. Subparagraph (a) provides that when a resident of Denmark derives income which, in accordance with the provisions of the Convention, may be taxed by the United States, Denmark shall allow as a credit against Danish income taxes an amount equal to those taxes paid to the United States.

Subparagraph (b) limits the credits against Danish taxes to those taxes which are attributable to the income that has been taxed by the United States. This restriction based on the U.S. tax is consistent with the "per-country" foreign tax credit limitations imposed under Denmark's domestic law.

Subparagraph (c) provides that when a resident of Denmark derives income which, in accordance with the provisions of the Convention, may be taxed by the United States, Denmark shall allow the credit against Danish tax described in subparagraph (b). However, subparagraph (c) also permits Denmark to include the income corresponding to the U.S. tax in the resident's tax base for purposes of determining the Danish tax. This rule is a variation of the "exemption with progression rule," adapted to accommodate Denmark's credit system. It is also similar to U.S. domestic law, which permits credits for foreign taxes paid, while at the same time taxing residents on worldwide income. Finally, subparagraph (c) provides that for the purposes of this Article, the U.S. taxes referred to in paragraphs 1(a) and 2 of Article 2 (Taxes Covered) are considered to be income taxes and are allowed as credits against Danish tax on income, subject to all of the provisions and limitations of this paragraph.

*Relation to Other Articles*

By virtue of the exceptions in subparagraph 5(a) of Article 1 this Article is not subject to the saving clause of paragraph 4 of Article 1 (General Scope). Thus, the United States will allow a credit to its citizens and residents in accordance with the Article, even if such credit were to provide a benefit not available under the Code.

**ARTICLE 24**

**Non-Discrimination**

This Article assures that nationals of a Contracting State, in the case of paragraph 1, and residents of a Contracting State, in the case of paragraphs 2 through 4, will not be subject, directly or indirectly, to discriminatory taxation in the other Contracting State. For this purpose, nondiscrimination means providing national treatment. Not all differences in tax treatment, either as between nationals of the two States, or between residents of the two States, are violations of this national treatment standard.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Rather, the national treatment obligation of this Article applies only if the nationals or residents of the two States are comparably situated.

Each of the relevant paragraphs of the Article provides that two persons that are comparably situated must be treated similarly. Although the actual words differ from paragraph to paragraph (e.g., paragraph 1 refers to two nationals "in the same circumstances," paragraph 2 refers to two enterprises "carrying on the same activities" and paragraph 4 refers to two enterprises that are "similar"), the common underlying premise is that if the difference in treatment is directly related to a tax-relevant difference in the situations of the domestic and foreign persons being compared, that difference is not to be treated as discriminatory (e.g., if one person is taxable in a Contracting State on worldwide income and the other is not, or tax may be collectible from one person at a later stage, but not from the other, distinctions in treatment would be justified under paragraph 1). Other examples of such factors that can lead to nondiscriminatory differences in treatment will be noted in the discussions of each paragraph.

The operative paragraphs of the Article also use different language to identify the kinds of differences in taxation treatment that will be considered discriminatory. For example, paragraphs 1 and 4 speak of "any taxation or any requirement connected therewith that is more burdensome", while paragraph 2 specifies that a tax "shall not be less favorably levied." Regardless of these differences in language, only differences in tax treatment that materially disadvantage the foreign person relative to the domestic person are properly the subject of the Article.

*Paragraph 1*

Paragraph 1 provides that a national of one Contracting State may not be subject to taxation or connected requirements in the other Contracting State that are more burdensome than the taxes and connected requirements imposed upon a national of that other State in the same circumstances. The definition of "national" extends beyond citizens to cover juridical persons that are nationals of a Contracting State as well.

A national of a Contracting State is afforded protection under this paragraph even if the national is not a resident of either Contracting State. Thus, a U.S. citizen who is resident in a third country is entitled, under this paragraph, to the same treatment in Denmark as a national of Denmark who is in similar circumstances (i.e., presumably one who is resident in a third State). The term "national" in relation to a Contracting State is defined in subparagraph 1(h) of Article 3 (General Definitions) as any individual possessing the nationality or citizenship of that State and any legal person, partnership, or association deriving its status as such from the laws in force in that State.

Because the relevant circumstances referred to in the paragraph relate, among other things, to taxation on worldwide income, paragraph 1 does not obligate the United States to apply the same taxing regime to a national of Denmark who is not resident in the United States and a U.S. national who is not resident in the United States. United States citizens who are not residents of the United States but who are, nevertheless, subject to United States tax on their worldwide income are not in the same circumstances with respect to United States taxation as citizens of Denmark who are not United States residents. Thus, for example, Article 24 would not entitle a national of Denmark resident in a third country to taxation at graduated rates of U.S. source dividends or other investment income that applies to a U.S. citizen resident in the same third country.

*Paragraph 2*

Paragraph 2 provides that a Contracting State may not tax a permanent establishment or fixed base of an enterprise of the other Contracting State less favorably than an enterprise of that first-mentioned State that is carrying on the same activities. This provision, however, does not obligate a Contracting State to grant to a resident of the other Contracting State any tax allowances, reliefs, etc., that it grants to its own residents on account of their civil status or family responsibilities. Thus, if a sole proprietor who is a resident of Denmark has a permanent establishment in the United States, in assessing income tax on the profits attributable to the permanent establishment, the United States is not obligated to allow to the resident of Denmark the personal allowances for himself and his family that he would be permitted to take if the permanent establishment were a sole proprietorship owned and operated by a U.S. resident, despite the fact that the individual income tax rates would apply.

The fact that a U.S. permanent establishment of an enterprise of Denmark is subject to U.S. tax only on income that is attributable to the permanent establishment, while a U.S. corporation engaged in the same activities is taxable on its worldwide income is not, in itself, a sufficient difference to deny national treatment to the permanent establishment. There are cases, however, where the two enterprises would not be similarly situated and differences in treatment may be warranted. For instance, it would not be a violation of the non-discrimination protection of paragraph 2 to require the foreign enterprise to provide information in a reasonable manner that may be different from the information requirements imposed on a resident enterprise, because information may not be as readily available to the Internal Revenue Service from a foreign as from a domestic enterprise. Similarly, it would not be a violation of paragraph 2 to impose penalties on persons who fail to comply with such a requirement (see, e.g., sections 874(a) and 882(c)(2)). Further, a determination that income and expenses have been attributed or allocated to a permanent establishment in conformity with the principles of Article 7 (Business Profits) implies that the attribution or allocation was not discriminatory.

Section 1446 of the Code imposes on any partnership with income that is effectively connected with a U.S. trade or business the obligation to withhold tax on amounts allocable to a foreign partner. In the context of the Convention, this obligation applies with respect to a share of the partnership income of a partner resident in Denmark, and attributable to a U.S. permanent establishment. There is no similar obligation with respect to the distributive shares of U.S. resident partners. It is understood, however, that this distinction is not a form of discrimination within the meaning of paragraph 2 of the Article. No distinction is

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

made between U.S. and non-U.S. partnerships, since the law requires that partnerships of both U.S. and non-U.S. domicile withhold tax in respect of the partnership shares of non-U.S. partners. Furthermore, in distinguishing between U.S. and non-U.S. partners, the requirement to withhold on the non-U.S. but not the U.S. partner's share is not discriminatory taxation, but, like other withholding on nonresident aliens, is merely a reasonable method for the collection of tax from persons who are not continually present in the United States, and as to whom it otherwise may be difficult for the United States to enforce its tax jurisdiction. If tax has been over-withheld, the partner can, as in other cases of over- withholding, file for a refund. (The relationship between paragraph 2 and the imposition of the branch tax is dealt with below in the discussion of paragraph 5.)

Paragraph 2 obligates the host State to provide national treatment not only to permanent establishments of an enterprise of the other Contracting State, but also to other residents of that State that are taxable in the host State on a net basis because they derive income from independent personal services performed in the host State that is attributable to a fixed base in Denmark. Thus, an individual resident of Denmark who performs independent personal services in the United States, and who is subject to U.S. income tax on the income from those services that is attributable to a fixed base in the United States, is entitled to no less favorable tax treatment in the United States than a U.S. resident engaged in the same kinds of activities. With such a rule in a treaty, the host State cannot tax its own residents on a net basis, but disallow deductions (other than personal allowances, etc.) with respect to the income attributable to the fixed base. Similarly, in accordance with paragraph 5 of Article 6 (Income from Real Property), the situs State would be required to allow deductions to a resident of the other State with respect to income derived from real property located in the situs State to the same extent that deductions are allowed to residents of the situs State with respect to income derived from real property located in the situs State.

*Paragraph 3*

Paragraph 3 prohibits discrimination in the allowance of deductions. When an enterprise of a Contracting State pays interest, royalties or other disbursements to a resident of the other Contracting State, the first-mentioned Contracting State must allow a deduction for those payments in computing the taxable profits of the enterprise as if the payment had been made under the same conditions to a resident of the first-mentioned Contracting State. An exception to this rule is provided for cases where the provisions of paragraph 1 of Article 9 (Associated Enterprises), paragraph 4 of Article 11 (Interest) or paragraph 4 of Article 12 (Royalties) apply, because in those situations, the related parties have entered into transactions on a non-arm's length basis. This exception would include the denial or deferral of certain interest deductions under Code section 163(j).

The term "other disbursements" is understood to include a reasonable allocation of executive and general administrative expenses, research and development expenses and other expenses incurred for the benefit of a group of related persons that includes the person incurring the expense.

Paragraph 3 also provides that any debts of an enterprise of a Contracting State to a resident of the other Contracting State are deductible in the first-mentioned Contracting State for computing the capital tax of the enterprise under the same conditions as if the debt had been contracted to a resident of the first-mentioned Contracting State. Even though, for general purposes, the Convention covers only income taxes, under paragraph 6 of this Article, the non discrimination provisions apply to all taxes levied in both Contracting States, at all levels of government. Thus, this provision may be relevant for both States. Although Denmark may have eliminated its capital taxes, in the United States such taxes are imposed by some local governments.

*Paragraph 4*

Paragraph 4 requires that a Contracting State not impose more burdensome taxation or connected requirements on an enterprise of the other Contracting State that is wholly or partly owned or controlled, directly or indirectly, by one or more residents of the other Contracting State, than the taxation or connected requirements that it imposes on other similar enterprises of that first-mentioned Contracting State. For this purpose it is understood that "similar" refers to similar activities or ownership of the enterprise.

This rule, like all non-discrimination provisions, does not prohibit differing treatment of entities that are in differing circumstances. Rather, a protected enterprise is only required to be treated in the same manner as other enterprises that, from the point of view of the application of the tax law, are in substantially similar circumstances both in law and in fact. The taxation of a distributing corporation under section 367(e) on an applicable distribution to foreign shareholders does not violate paragraph 4 of the Article because a foreign-owned corporation is not similar to a domestically-owned corporation that is accorded non-recognition treatment under sections 337 and 355.

For the reasons given above in connection with the discussion of paragraph 2 of the Article, it is also understood that the provision in section 1446 of the Code for withholding of tax on non-U.S. partners does not violate paragraph 4 of the Article.

It is further understood that the ineligibility of a U.S. corporation with nonresident alien shareholders to make an election to be an "S" corporation does not violate paragraph 4 of the Article. If a corporation elects to be an S corporation (requiring 75 or fewer shareholders), it is generally not subject to income tax and the shareholders take into account their pro rata shares of the corporation's items of income, loss, deduction or credit. (The purpose of the provision is to allow an individual or small group of individuals to conduct business in corporate form while paying taxes at individual rates as if the business were conducted directly.) A nonresident alien does not pay U.S. tax on a net basis, and, thus, does not generally take into account items of loss, deduction or credit. Thus, the S corporation provisions do not exclude corporations with nonresident alien shareholders because such shareholders are foreign, but only because they are not net-basis taxpayers. Similarly, the provisions exclude corporations with other types of shareholders where the purpose of the provisions cannot be fulfilled or their mechanics

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

implemented. For example, corporations with corporate shareholders are excluded because the purpose of the provisions to permit individuals to conduct a business in corporate form at individual tax rates would not be furthered by their inclusion.

*Paragraph 5*

Paragraph 5 confirms that no provision of the Article will prevent either Contracting State from imposing the branch tax described in paragraph 8 of Article 10 (Dividends). Since imposition of the branch tax is specifically sanctioned by paragraph 8 of Article 10 (Dividends), its imposition could not be precluded by Article 24, even without paragraph 5. Under the generally accepted rule of construction that the specific takes precedence over the more general, the specific branch tax provision of Article 10 would take precedence over the more general national treatment provision of Article 24.

*Paragraph 6*

As noted above, notwithstanding the specification in Article 2 (Taxes Covered) of taxes covered by the Convention for general purposes, for purposes of providing non-discrimination protection this Article applies to taxes of every kind and description imposed by a Contracting State or a political subdivision or local authority thereof. Customs duties are not considered to be taxes for this purpose.

*Relation to Other Articles*

The saving clause of paragraph 4 of Article 1 (General Scope) does not apply to this Article, by virtue of the exceptions in paragraph 5(a) of Article 1. Thus, for example, a U.S. citizen who is a resident of Denmark may claim benefits in the United States under this Article.

Nationals of a Contracting State may claim the benefits of paragraph 1 regardless of whether they are entitled to benefits under Article 22 (Limitation of Benefits), because that paragraph applies to nationals and not residents. They may not claim the benefits of the other paragraphs of this Article with respect to an item of income unless they are generally entitled to treaty benefits with respect to that income under a provision of Article 22.

## ARTICLE 25

## Mutual Agreement Procedure

This Article provides the mechanism for taxpayers to bring to the attention of the competent authorities issues and problems that may arise under the Convention. It also provides a mechanism for cooperation between the competent authorities of the Contracting States to resolve disputes and clarify issues that may arise under the Convention and to resolve cases of double taxation not provided for in the Convention. The competent authorities of the two Contracting States are identified in paragraph 1(e) of Article 3 (General Definitions).

*Paragraph 1*

This paragraph provides that where a resident of a Contracting State considers that the actions of one or both Contracting States will result in taxation that is not in accordance with the Convention he may present his case to the competent authority of the Contracting State of which he is a resident or national.

Although the typical cases brought under this paragraph will involve economic double taxation arising from transfer pricing adjustments, the scope of this paragraph is not limited to such cases. For example, if the United States treats income derived by a company resident in Denmark as attributable to a permanent establishment in the United States, and the resident believes that the income is not attributable to a permanent establishment, or that no permanent establishment exists, the resident may bring a complaint under paragraph 1 to the competent authority of Denmark.

It is not necessary for a person bringing a complaint first to have exhausted the remedies provided under the national laws of the Contracting States before presenting a case to the competent authorities, nor does the fact that the statute of limitations may have passed for seeking a refund preclude bringing a case to the competent authority. No time limit is provided within which a case must be brought, and assessment and collection procedures and suspended during the pendency of the mutual agreement proceeding.

*Paragraph 2*

This paragraph instructs the competent authorities in dealing with cases brought by taxpayers under paragraph 1. It provides that if the competent authority of the Contracting State to which the case is presented judges the case to have merit, and cannot reach a unilateral solution, it shall seek an agreement with the competent authority of the other Contracting State pursuant to which taxation not in accordance with the Convention will be avoided. During the period that a proceeding under this Article is pending, any assessment and collection procedures shall be suspended. Any agreement is to be implemented even if such implementation otherwise would be barred by the statute of limitations or by some other procedural limitation, such as a closing agreement. In a case where the taxpayer has entered a closing agreement (or other written settlement) with the United States prior to bringing a case to the competent authorities, the U.S. competent authority will endeavor only to obtain a correlative adjustment from Denmark. See Rev. Proc. 96-13, 1996-3 I.R.B. 31, section 7.05. Because, as specified in paragraph 2 of Article 1 (General Scope), the Convention cannot operate to increase a taxpayer's liability, time or other procedural limitations can be overridden only for the purpose of making refunds and not to impose additional tax.

*Paragraph 3*

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Paragraph 3 authorizes the competent authorities to resolve difficulties or doubts that may arise as to the application or interpretation of the Convention. The paragraph includes a non-exhaustive list of examples of the kinds of matters about which the competent authorities may reach agreement. This list is purely illustrative; it does not grant any authority that is not implicitly present as a result of the introductory sentence of paragraph 3. The competent authorities may, for example, agree to the same attribution of income, deductions, credits or allowances between an enterprise in one Contracting State and its permanent establishment in the other (subparagraph (a)) or between related persons (subparagraph (b)). These allocations are to be made in accordance with the arm's length principle underlying Article 7 (Business Profits) and Article 9 (Associated Enterprises). Agreements reached under these subparagraphs may include agreement on a methodology for determining an appropriate transfer price, common treatment of a taxpayer's cost sharing arrangement, or upon an acceptable range of results under that methodology. Subparagraph (g) makes clear that they may also agree to apply this methodology and range of results prospectively to future transactions and time periods pursuant to advance pricing agreements.

As indicated in subparagraphs (c), (d), (e) and (f), the competent authorities also may agree to settle a variety of conflicting applications of the Convention. They may agree to characterize particular items of income in the same way (subparagraph (c)), to characterize entities in a particular way (subparagraph (d)), to apply the same source rules to particular items of income (subparagraph (e)), and to adopt a common meaning of a term (subparagraph (f)). Subparagraph (h) makes clear that the competent authorities can agree to the common application, consistent with the objective of avoiding double taxation, of procedural provisions of the internal laws of the Contracting States, including those regarding penalties, fines and interest.

Since the list under paragraph 3 is not exhaustive, the competent authorities may reach agreement on issues not enumerated in paragraph 3 if necessary to avoid double taxation. For example, the competent authorities may seek agreement on a uniform set of standards for the use of exchange rates, or agree on consistent timing of gain recognition with respect to a transaction to the extent necessary to avoid double taxation. Agreements reached by the competent authorities under paragraph 3 need not conform to the internal law provisions of either Contracting State.

Finally, paragraph 3 authorizes the competent authorities to consult for the purpose of eliminating double taxation in cases not provided for in the Convention and to resolve any difficulties or doubts arising as to the interpretation or application of the Convention. This provision is intended to permit the competent authorities to implement the treaty in particular cases in a manner that is consistent with its expressed general purposes. It permits the competent authorities to deal with cases that are within the spirit of the provisions but that are not specifically covered. An example of such a case might be double taxation arising from a transfer pricing adjustment between two permanent establishments of a third-country resident, one in the United States and one in Denmark. Since no resident of a Contracting State is involved in the case, the Convention does not apply, but the competent authorities nevertheless may use the authority of the Convention to prevent the double taxation.

*Paragraph 4*

Paragraph 4 authorizes the competent authorities to increase any dollar amounts referred to in the Convention to reflect economic or monetary developments. Under the Convention, this refers only to Article 17 (Artistes and Sportsmen). The rule under paragraph 4 is intended to operate as follows: if, for example, after the Convention has been in force for some time, inflation rates have been such as to make the $20,000 exemption threshold for entertainers unrealistically low in terms of the original objectives intended in setting the threshold, the competent authorities may agree to a higher threshold without the need for formal amendment to the treaty and ratification by the Contracting States. This authority can be exercised, however, only to the extent necessary to restore those original objectives. This provision can be applied only to the benefit of taxpayers, i.e., only to increase thresholds, not to reduce them.

*Paragraph 5*

Paragraph 5 provides that the competent authorities may communicate with each other for the purpose of reaching an agreement. This makes clear that the competent authorities of the two Contracting States may communicate without going through diplomatic channels. Such communication may be in various forms, including, where appropriate, through face-to-face meetings of the competent authorities or their representatives.

*Other Issues*

*Treaty effective dates and termination in relation to competent authority dispute resolution*

A case may be raised by a taxpayer under a treaty with respect to a year for which a treaty was in force after the treaty has been terminated. In such a case the ability of the competent authorities to act is limited. They may not exchange confidential information, nor may they reach a solution that varies from that specified in its law.

A case also may be brought to a competent authority under the Convention with respect to a year when the prior Convention was in force. The scope of the competent authorities to address such a case is not constrained by the fact that the Convention was not in force when the transactions at issue occurred, and the competent authorities have available to them the full range of remedies afforded under this Article to the extent that they exceed those available under the prior Convention.

*Triangular competent authority solutions*

International tax cases may involve more than two taxing jurisdictions (e.g., transactions among a parent corporation resident in country A and its subsidiaries resident in countries B and C). As long as there is a complete network of treaties among the three countries, it should be possible, under the full combination of bilateral authorities, for the competent authorities of the three States to work together on a three-sided solution. Although country A may not be able to give information received

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

under Article 26 (Exchange of Information) from country B to the authorities of country C, if the competent authorities of the three countries are working together, it should not be a problem for them to arrange for the authorities of country B to give the necessary information directly to the tax authorities of country C, as well as to those of country A. Each bilateral part of the trilateral solution must, of course, not exceed the scope of the authority of the competent authorities under the relevant bilateral treaty.

*Relation to Other Articles*

This Article is not subject to the saving clause of paragraph 4 of Article 1 (General Scope) by virtue of the exceptions in paragraph 5(a) of that Article. Thus, rules, definitions, procedures, etc. that are agreed upon by the competent authorities under this Article may be applied by the United States with respect to its citizens and residents even if they differ from the comparable Code provisions. Similarly, as indicated above, U.S. law may be overridden to provide refunds of tax to a U.S. citizen or resident under this Article. A person may seek relief under Article 25 regardless of whether he is generally entitled to benefits under Article 22 (Limitation on Benefits). As in all other cases, the competent authority is vested with the discretion to decide whether the claim for relief is justified.

## ARTICLE 26

## Exchange of Information

*Paragraph 1*

This Article provides for the exchange of information between the competent authorities of the Contracting States. The information to be exchanged is that which is relevant for carrying out the provisions of the Convention or the domestic laws of the United States or of Denmark concerning the taxes covered by the Convention. The language differs from that of the OECD Model which refers to information that is "necessary" for carrying out the provisions of the Convention, etc. This term consistently has been interpreted as being equivalent to "relevant", and as not requiring a requesting State to demonstrate that it would be unable to enforce its tax laws unless it obtained a particular item of information. To remove any potentially wrong impression that the term "necessary" created a higher threshold than relevance, the U.S. Model and the Convention adopt the term "relevant."

The taxes covered by the Convention for purposes of this Article constitute a broader category of taxes than those referred to in Article 2 (Taxes Covered). As provided in paragraph 4, for purposes of exchange of information, covered taxes include all taxes imposed by the Contracting States. Exchange of information with respect to domestic law is authorized insofar as the taxation under those domestic laws is not contrary to the Convention. Thus, for example, information may be exchanged with respect to a covered tax, even if the transaction to which the information relates is a purely domestic transaction in the requesting State and, therefore, the exchange is not made for the purpose of carrying out the Convention.

An example of such a case is provided in the OECD Commentary: A company resident in the United States and a company resident in the other Contracting State transact business between themselves through a third-country resident company. Neither Contracting State has a treaty with the third State. In order to enforce their internal laws with respect to transactions of their residents with the third-country company (since there is no relevant treaty in force), the Contracting State may exchange information regarding the prices that their residents paid in their transactions with the third-country resident.

Paragraph 1 states that information exchange is not restricted by Article 1 (General Scope). Accordingly, information may be requested and provided under this Article with respect to persons who are not residents of either Contracting State. For example, if a third-country resident has a permanent establishment in Denmark which engages in transactions with a U.S. enterprise, the United States could request information with respect to that permanent establishment, even though it is not a resident of either Contracting State. Similarly, if a third-country resident maintains a bank account in Denmark, and the Internal Revenue Service has reason to believe that funds in that account should have been reported for U.S. tax purposes but have not been so reported, information can be requested from Denmark with respect to that person's account.

Paragraph 1 also provides assurances that any information exchanged will be treated as secret, subject to the same disclosure constraints as information obtained under the laws of the requesting State. Information received may be disclosed only to persons, including courts and administrative bodies, involved with the assessment, collection, enforcement or prosecution in respect of the taxes to which the information relates, or to persons involved with the administration of these taxes or with the oversight of such activities. The information must be used by these persons in connection with these designated functions. Persons in the United States involved with the oversight of the administration of taxes include legislative bodies, such as the tax-writing committees of Congress and the General Accounting Office. Information received by these bodies must be for use in the performance of their role in overseeing the administration of U.S. tax laws. Information received may be disclosed in public court proceedings or in judicial decisions.

The Article authorizes the competent authorities to exchange information on a routine basis, on request in relation to a specific case, or spontaneously. It is contemplated that the Contracting States will utilize this authority to engage in all of these forms of information exchange, as appropriate.

*Paragraph 2*

Paragraph 2 provides that the obligations undertaken in paragraph 1 to exchange information do not require a Contracting State to carry out administrative measures that are at variance with the laws or administrative practice of either State. Nor is a

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Contracting State required to supply information not obtainable under the laws or administrative practice of either State, or to disclose trade secrets or other information, the disclosure of which would be contrary to public policy. Thus, a requesting State may be denied information from the other State if the information would be obtained pursuant to procedures or measures that are broader than those available in the requesting State.

While paragraph 2 states conditions under which a Contracting State is not obligated to comply with a request from the other Contracting State for information, the requested State is not precluded from providing such information, and may, at its discretion, do so subject to the limitations of its internal law.

*Paragraph 3*

Paragraph 3 sets forth two exceptions from the dispensations described in paragraph 2. First, the first sentence of the paragraph provides that the competent authority has the authority to obtain and provide information held by financial institutions or intermediaries. This includes the disclosure of information regarding the beneficial owner of an interest in a person.

Second, paragraph 3 provides that when information is requested by a Contracting State in accordance with this Article, the other Contracting State is obligated to obtain the requested information as if the tax in question were the tax of the requested State, even if the other Contracting State has no direct tax interest in the case to which the request relates. The OECD Model does not state explicitly in the Article that the requested State is obligated to respond to a request even if it does not have a direct tax interest in the information. The OECD Commentary, however, makes clear that this is to be understood as implicit in the OECD Model.

Paragraph 3 further provides that the requesting State may specify the form in which information is to be provided (e.g., depositions of witnesses and authenticated copies of original documents) so that the information is usable in the judicial proceedings of the requesting State. The requested State should, if possible, provide the information in the form requested to the same extent that it can obtain information in that form under its own laws and administrative practices with respect to its own taxes.

*Paragraph 4*

As noted above in the discussion of paragraph 1, the exchange of information provisions of the Convention apply to all taxes imposed by a Contracting State, not just to those taxes designated as covered taxes under Article 2 (Taxes Covered). The U.S. competent authority may, therefore, request information for purposes of, for example, estate and gift taxes or federal excise taxes.

*Treaty Effective Dates and Termination in Relation to Information Exchange*

A tax administration may seek information with respect to a year for which a treaty was in force after the treaty has been terminated. In such a case the ability of the other tax administration to act is limited. The treaty no longer provides authority for the tax administrations to exchange confidential information. They may only exchange information pursuant to domestic law.

The competent authority also may seek information under the Convention, but with respect to a year in which the prior Convention was in force. The scope of the competent authorities to address such a case is not constrained by the fact that the prior Convention was in force when the transactions at issue occurred, and the competent authorities have available to them the full range of information exchange provisions afforded under this Article to the extent they exceed those under the prior Convention.


**ARTICLE 27**

**Administrative Assistance**

*Paragraph 1*

This Article obligates the Contracting States to undertake to lend assistance to each other in the collection of taxes referred to in Article 2 (Taxes Covered), together with interest, costs, additions to such taxes, and civil penalties, which are referred to in the Article as a "revenue claim". This provision is similar in scope to Article XVIII (Administrative Assistance) of the income tax treaty between the United States and Denmark signed on May 6, 1948. The differences between that treaty and the text of this Convention reflect changes incorporated into the administrative assistance provisions of newer U.S. tax treaties, such as with the Netherlands and with Canada.

*Paragraph 2*

Paragraph 2 requires a Contracting State applying for collection assistance (the "applicant State") to certify that the revenue claim for which collection assistance is sought has been "finally determined." Under paragraph 2 a revenue claim has been finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted.

*Paragraph 3*

Paragraph 3 of the Article clarifies that the Contracting State from which assistance was requested (the "requested State") has discretion as to whether to accept a particular application for collection assistance. However, if the application for assistance is accepted, paragraph 3 requires that the requested State grant assistance under its existing procedures as though the

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

claim were the requested State's own revenue claim finally determined under the laws of that State. This obligation under paragraph 3 is limited by paragraph 7 of the Article, which provides that, although generally treated as a revenue claim of the requested State, a claim for which collection assistance is granted shall not have any priority accorded to the revenue claim of the requested State.

*Paragraph 4*

Paragraph 4 provides that, when the United States accepts a request for assistance in collection, the claim will be treated by the United States as an assessment as of the time the application was received. Similarly, when Denmark accepts a request, a revenue claim shall be treated by Denmark as an assessment under Danish laws against the taxpayer as of the time the application is received.

*Paragraph 5*

Paragraph 5 provides that nothing in the Article shall be construed as creating in the requested State any rights of administrative or judicial review of the applicant State's finally determined revenue claim. Thus, when an application for collection assistance has been accepted, the substantive validity of the applicant State's revenue claim cannot be challenged in an action in the requested State. Paragraph 5 further provides that, if the applicant's State's revenue claim ceases to be finally determined, the applicant State is obligated to withdraw promptly any request that had been based on that claim.

*Paragraph 6*

Paragraph 6 provides that, as a general rule, the requested State is to forward the entire amount collected to the competent authority of the applicant State. The ordinary costs incurred in providing collection assistance will normally be borne by the requested State and only extraordinary costs will be borne by the applicant State. The application of this paragraph, including rules specifying which collection costs are to be borne by each State and the time and manner of payment of the amounts collected, will be agreed upon by the competent authorities, as provided for in paragraph 11.

*Paragraph 7*

Paragraph 7 provides that a revenue claim of the applicant State accepted for collection shall not have in the requested State any priority accorded to the revenue claims of the requested State. Thus, in bankruptcy proceedings, such claim would be treated in the same way as the claim of any other unsecured creditor.

*Paragraph 8*

Paragraph 8 provides that no assistance is to be given under this Article for a claim in respect of an individual taxpayer, to the extent that the taxpayer can demonstrate that he was a citizen of the requested State during the taxable period to which the revenue claim relates. Similarly, in the case of a company, estate, or trust, no assistance is to be given to the extent that the entity can demonstrate that it derived its status as such under the laws in force in the requested State during the taxable period to which the claim relates.

*Paragraph 9*

Paragraph 9 provides that each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such amounts as may be necessary to ensure that relief granted by the Convention from taxation imposed by that other State does not inure to the benefit of persons not entitled thereto. For example, if a U.S. source dividend is paid to an addressee in a treaty partner, the withholding agent probably will withhold at the treaty's portfolio dividend rate of 15 percent. If, however, the addressee is merely acting as a nominee on behalf of a third country resident, paragraph 9 would obligate the other Contracting State to withhold and remit to the United States the additional tax that should have been collected by the U.S. withholding agent.

*Paragraph 10*

Paragraph 10 makes clear that the Contracting State asked to collect the tax is not obligated, in the process of providing collection assistance, to carry out administrative measures that are different from those used in the collection of its own taxes, or that would be contrary to its public policy (ordre public).

*Paragraph 11*

Paragraph 11 requires the competent authorities to agree upon the mode of application of this Article, including agreement to ensure comparable levels of assistance to each of the Contracting States.

*Paragraph 12*

Paragraph 12 provides that the Contracting State asked to collect the tax is not obligated to accede to the request of the applicant State if the applicant State has not pursued all appropriate collection in its own jurisdiction or in those cases where the administrative burden for the requested State is disproportionate to the benefit to be derived by the applicant State.

*Treaty Effective Dates and Termination in Relation to Administrative Assistance*

A tax administration may request administrative assistance with respect to a year for which a treaty was in force after the treaty has been terminated. In such a case the ability of the other tax administration to act is limited. The treaty no longer

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

provides authority for the tax administrations to provide administrative assistance. They may only provide such assistance pursuant to domestic law.

The competent authority also may seek administrative assistance information under the Convention, but with respect to a year in which the prior Convention was in force. The scope of the competent authorities to address such a case is not constrained by the fact that the prior Convention was in force when the transactions at issue occurred, and the competent authorities have available to them the full range of administrative assistance provisions afforded under this Article to the extent they exceed those under the prior Convention.

## ARTICLE 28

### Diplomatic Agents and Consular Officers

This Article confirms that any fiscal privileges to which diplomatic or consular officials are entitled under general provisions of international law or under special agreements will apply notwithstanding any provisions to the contrary in the Convention. The agreements referred to include any bilateral agreements, such as the Vienna Convention on Diplomatic Relations and the Vienna Convention on Consular Relations. The United States generally adheres to the latter because its terms are consistent with customary international law.

The Article does not independently provide any benefits to diplomatic agents and consular officers. Article 19 (Government Service) does so, as do Code section 893 and a number of bilateral and multilateral agreements. In the event that there is a conflict between the tax treaty and international law or such other treaties, under which the diplomatic agent or consular official is entitled to greater benefits under the latter, the latter laws or agreements shall have precedence. Conversely, if the tax treaty confers a greater benefit than another agreement, the affected person could claim the benefit of the tax treaty.

Pursuant to subparagraph 5(b) of Article 1 (General Scope), the saving clause of paragraph 4 of Article 1 does not apply to override any benefits of this Article available to an individual who is neither a citizen of the United States nor has immigrant status in the United States.

## ARTICLE 29

### Entry into Force

This Article contains the rules for bringing the Convention into force and giving effect to its provisions.

*Paragraph 1*

Paragraph 1 provides that each State shall notify the other as soon as its requirements for entry into force have been complied with.

In the United States, the process leading to ratification and entry into force is as follows: Once a treaty has been signed by authorized representatives of the two Contracting States, the Department of State sends the treaty to the President who formally transmits it to the Senate for its advice and consent to ratification, which requires approval by two-thirds of the Senators present and voting. Prior to this vote, however, it generally has been the practice for the Senate Committee on Foreign Relations to hold hearings on the treaty and make a recommendation regarding its approval to the full Senate. Both Government and private sector witnesses may testify at these hearings. After receiving the Senate's advice and consent to ratification, the treaty is returned to the President for his signature on the ratification document. The President's signature on the document completes the process in the United States.

*Paragraph 2*

Paragraph 2 provides that the Convention will enter into force on the date on which the second of the two notifications of the completion of requirements for the entry into force of the Convention has been received. The date on which a treaty enters into force is not necessarily the date on which its provisions take effect. Paragraph 2, therefore, also contains rules that determine when the provisions of the treaty will have effect. Under paragraph 2(a), the Convention will have effect with respect to taxes withheld at source (principally dividends, interest and royalties) for amounts paid or credited on or after the first day of the second month following the date on which the Convention enters into force. For example, if the second notification is received on April 25 of a given year, the withholding rates specified in paragraph 2 of Article 10 (Dividends) would be applicable to any dividends paid or credited on or after June 1 of that year. This rule allows the benefits of the withholding reductions to be put into effect without waiting until the following year. The delay of one to two months is required to allow sufficient time for withholding agents to be informed about the change in withholding rates. If for some reason a withholding agent withholds at a higher rate than that provided by the Convention (perhaps because it was not able to re-program its computers before the payment is made), a beneficial owner of the income that is a resident of the other Contracting State may make a claim for refund pursuant to section 1464 of the Code.

For all other taxes, paragraph 2(b) specifies that the Convention will have effect for taxable periods beginning on or after January 1 of the year following entry into force.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

As discussed under Articles 25 (Mutual Agreement Procedure), 26 (Exchange of Information) and 27 (Administrative Assistance), the powers afforded the competent authority under these Articles apply retroactively to taxable periods preceding entry into force.

*Paragraph 3*

Paragraph 3 provides that the prior Convention will cease to have effect at the time this Convention takes effect under the provisions of paragraphs 2 and 4 of this Article. The prior Convention shall terminate on the last date on which it has effect in accordance with the foregoing provisions of this Article.

*Paragraph 4*

Paragraph 4 provides a general exception to the effective date rules of paragraph 2. Under this paragraph, if the prior Convention would have afforded any greater relief from tax than this Convention, the prior Convention shall, at the election of any person that was entitled to benefits under the prior Convention, continue to have effect in its entirety for one year after the date on which the provisions of this Convention would otherwise first have had effect under the provisions of paragraph 2 of this Article.

Thus, a taxpayer may elect to extend the benefits of the prior Convention for one year from the date on which the relevant provision of the new Convention would first take effect. For example, suppose the instruments of ratification are exchanged on February 1, 2000 and the Convention thus enters into force on that date. The new Convention would take effect with respect to taxes withheld at source for amounts paid or credited on or after April 1, 2000. If the election is made, the provisions of the prior Convention regarding withholding would continue to have effect for amounts paid or credited at any time prior to April 1, 2001. With regard to assessed taxes, the new Convention would be applicable for fiscal periods beginning on or after January 1, 2001. Therefore, with respect to the branch tax, which is imposed on an assessment basis, an election would allow the prior Convention to continue, thus preventing the imposition of the branch tax until the first taxable year beginning on or after January 1, 2002.

*Paragraph 5*

Paragraph 5 provides that the prior Convention terminates on the last date on which it has effect in accordance with the foregoing provisions of this Article.

**ARTICLE 30**

**Termination**

The Convention is to remain in effect indefinitely, unless terminated by one of the Contracting States in accordance with the provisions of Article 30. The Convention may be terminated by giving notice of termination through diplomatic channels at any time after the year in which the Convention enters into force. If notice of termination is given, the provisions of the Convention with respect to withholding at source will cease to have effect for amounts paid or credited after the expiration of a period of six months beginning with the delivery of notice of termination. For other taxes, the Convention will cease to have effect as of taxable periods beginning after the expiration of this six month period.

A treaty performs certain specific and necessary functions regarding information exchange and mutual agreement. In the case of information exchange the treaty's function is to override confidentiality rules relating to taxpayer information. In the case of mutual agreement its function is to allow competent authorities to modify internal law in order to prevent double taxation and tax avoidance. With respect to the effective termination dates for these aspects of the treaty, therefore, if a treaty is terminated as of January 1 of a given year, no otherwise confidential information can be exchanged after that date, regardless of whether the treaty was in force for the taxable year to which the request relates. Similarly, no mutual agreement departing from internal law can be implemented after that date, regardless of the taxable year to which the agreement relates. Therefore, for the competent authorities to be allowed to exchange otherwise confidential information or to reach a mutual agreement that departs from internal law, a treaty must be in force at the time those actions are taken and any existing competent authority agreement ceases to apply.

Article 30 relates only to unilateral termination of the Convention by a Contracting State. Nothing in this Article should be construed as preventing the Contracting States from concluding a new bilateral agreement, subject to ratification, that supersedes, amends or terminates provisions of the Convention without the six-month notification period.

Customary international law observed by the United States and other countries, as reflected in the Vienna Convention on Treaties, allows termination by one Contracting State at any time in the event of a "material breach" of the agreement by the other Contracting State.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

**Denmark - United States**
**Protocol to the 1999 Treaty (2006)**

---

**Status:** In Force
**Conclusion Date:** 2 May 2006.
**Entry into Force:** 28 December 2007.
**Effective Date:** 1 January 2008 (other taxes),1 February 2008 (withholding taxes) (see Article V ).

---

**PROTOCOL AMENDING THE CONVENTION BETWEEN**
**THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND**
**THE GOVERNMENT OF THE KINGDOM OF DENMARK**
**FOR THE AVOIDANCE OF DOUBLE TAXATION AND**
**THE PREVENTION OF FISCAL EVASION**
**WITH RESPECT TO TAXES ON INCOME**

**Preamble**

The Government of the United States of America and the Government of the Kingdom of Denmark, desiring to amend the Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income, signed at Washington on August 19, 1999 (hereinafter referred to as "the Convention"),

Have agreed as follows:

**ARTICLE I**

Paragraph 4 of Article 1 (General Scope) of the Convention is omitted and the following paragraph is substituted:

"4. Except to the extent provided in paragraph 5, this Convention shall not affect the taxation by a Contracting State of its residents (as determined under Article 4 (Residence)) and its citizens. Notwithstanding the other provisions of this Convention, a former citizen or long-term resident of a Contracting State may, for the period of ten years following the loss of such status, be taxed in accordance with the laws of that Contracting State."

**ARTICLE II**

1. Article 10 (Dividends) of the Convention shall be omitted and the following shall be substituted:

"ARTICLE 10

Dividends

1. Dividends paid by a resident of a Contracting State to a resident of the other Contracting State may be taxed in that other State.

2. However, such dividends may also be taxed in the Contracting State of which the company paying the dividends is a resident, and according to the laws of that State, but if the beneficial owner of the dividends is a resident of the other Contracting State, the tax so charged shall not exceed:

a)    5 percent of the gross amount of the dividends if the beneficial owner is a company which holds directly at least 10 percent of the share capital of the company paying the dividends;

b)    15 percent of the gross amount of the dividends in all other cases.

This paragraph shall not affect the taxation of the company in respect of the profits out of which the dividends are paid.

3. Notwithstanding the provisions of paragraph 2, such dividends shall not be taxed in the Contracting State of which the company paying the dividends is a resident if the beneficial owner is:

a)    a company that is a resident of the other Contracting State that has owned, directly or indirectly through one or more residents of either Contracting State, shares representing 80 percent or more of the voting power in the company paying the dividends for a 12-month period ending on the date on which entitlement to the dividends is determined and:

   (i)    satisfies the conditions of clause (i),(ii) or (iii) of subparagraph c) of paragraph 2 of Article 22 (Limitation of Benefits);

   (ii)    satisfies the conditions of clauses (i) and (ii) of subparagraph f) of paragraph 2 of Article 22, provided that the company satisfies the conditions described in paragraph 4 of that Article with respect to the dividends;

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(iii) is entitled to benefits with respect to the dividends under paragraph 3 of Article 22; or

(iv) has received a determination pursuant to paragraph 7 of Article 22 with respect to this paragraph; or

b)  a qualified governmental entity that is a resident of the other Contracting State and that does not control the payor of the dividend; or

c)  a pension fund, which is described in subparagraph e) of paragraph 2 of Article 22 (Limitation of Benefits), that is a resident of the other Contracting State, provided that such dividends are not derived from the carrying on of a business by the pension fund or through an associated enterprise.

a)  Subparagraph a) of paragraph 2 and subparagraph a) of paragraph 3 shall not apply in the case of dividends paid by a U.S. Regulated Investment Company (RIC) or a U.S. Real Estate Investment Trust (REIT). In the case of dividends paid by a RIC, subparagraph b) of paragraph 2 and subparagraphs b) and c) of paragraph 3 shall apply. In the case of dividends paid by a REIT, subparagraph b) of paragraph 2 and subparagraphs b) and c) of paragraph 3 shall apply only if:

(i)   the beneficial owner of the dividends is an individual or pension fund, in either case holding an interest of not more than 10 percent in the REIT;

(ii)  the dividends are paid with respect to a class of stock that is publicly traded and the beneficial owner of the dividends is a person holding an interest of not more than 5 percent of any class of the REIT's stock; or

(iii) the beneficial owner of the dividends is a person holding an interest of not more than 10 percent in the REIT and the REIT is "diversified."

The rules of this paragraph shall also apply to dividends paid by companies resident in Denmark that are similar to the United States companies referred to in this paragraph. Whether companies that are residents of Denmark are similar to the United States companies referred to in this paragraph will be determined by mutual agreement of the competent authorities.

b)  For purposes of this paragraph, a REIT shall be diversified if the value of no single interest in real property exceeds 10 percent of its total interests in real property. For the purposes of this rule, foreclosure property shall not be considered an interest in real property. Where a REIT holds an interest in a partnership, it shall be treated as owning directly a proportion of the partnership's interests in real property corresponding to its interest in the partnership.

5. The term "dividends" as used in this Article means income from shares or other rights, not being debt-claims, participating in profits, as well as income that is subject to the same taxation treatment as income from shares by the laws of the State of which the payor is a resident.

6. The provisions of paragraphs 2 and 3 shall not apply if the beneficial owner of the dividends, being a resident of a Contracting State, carries on business in the other Contracting State, of which the company paying the dividends is a resident, through a permanent establishment situated therein, or performs in that other State independent personal services from a fixed base situated therein, and the dividends are attributable to such permanent establishment or fixed base. In such case, the provisions of Article 7 (Business Profits) or Article 14 (Independent Personal Services), as the case may be, shall apply.

7. A Contracting State may not impose any tax on dividends paid by a company which is not a resident of that State, except insofar as the dividends are paid to a resident of that Contracting State or the dividends are attributable to a permanent establishment or a fixed base situated in that State, nor may it impose tax on a corporation's undistributed profits, except as provided in paragraph 8, even if the dividends paid or the undistributed profits consist wholly or partly of profits or income arising in that State.

8. A company that is a resident of a Contracting State and that has a permanent establishment in the other Contracting State, or that is subject to tax in that other Contracting State on a net basis on its income that may be taxed in that other State under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Capital Gains) may be subject in that other Contracting State to a tax in addition to the tax allowable under the other provisions of this Convention. Such tax, however, may be imposed on only the portion of the business profits of the corporation attributable to the permanent establishment, and the portion of the income referred to in the preceding sentence that is subject to tax under Article 6 (Income from Real Property) or under paragraph 1 of Article 13 (Capital Gains) that, in the case of the United States, represents the dividend equivalent amount of such profits or income and, in the case of Denmark, is an amount that is analogous to the dividend equivalent amount.

9. The tax referred to in paragraph 8 shall not be imposed at a rate exceeding the rate specified in subparagraph a) of paragraph 2. In any case, it shall not be imposed on a company that:

a)  satisfies the conditions of clause (i), (ii) or(iii) of subparagraph c) of paragraph 2 of Article 22 (Limitation of Benefits);

b)  satisfies the conditions of clauses i) and ii) of subparagraph f) of paragraph 2 of Article 22, provided that the company satisfies the conditions described in paragraph 4 of that Article with respect to an item of income, profit or gain described in paragraph 8 of this Article;

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

c)   is entitled under paragraph 3 of Article 22 to benefits with respect to an item of income, profit or gain described in paragraph 8 of this Article; or

d)   has received a determination pursuant to paragraph 7 of Article 22 with respect to this paragraph."

**ARTICLE III**

Subparagraph b) of paragraph 2 of Article 19 (Government Service) of the Convention is amended by omitting the words "a resident or a national" and substituting "a resident and a national".

**ARTICLE IV**

Article 22 (Limitation of Benefits) of the Convention shall be omitted and the following Article substituted:

"ARTICLE 22

Limitation of Benefits

1. A resident of a Contracting State shall be entitled to benefits otherwise accorded to residents of a Contracting State by this Convention only to the extent provided in this Article.

2. A resident of a Contracting State shall be entitled to all the benefits of this Convention only if such resident is:

a)   an individual;

b)   a Contracting State, a political subdivision, or local authority thereof, or an agency of instrumentality of that State, subdivision, or authority;

c)   a company, if:

   (i)   its principal class of shares (and any disproportionate class of shares) is regularly traded on one or more recognized stock exchanges, and either:

      A)   its principal class of shares is primarily traded on a recognized stock exchange located in the Contracting State of which the company is a resident (or, in the case of a company resident in Denmark, on a recognized stock exchange located within the European Union or in any other European Economic Area state or, in the case of a company resident in the United States, on a recognized stock exchange located in another state that is a party to the North American Free Trade Agreement); or

      B)   the company's primary place of management and control is in the Contracting State of which it is a resident;

   (ii)   in the case of a company that is a resident of Denmark, one or more taxable nonstock corporations entitled to benefits under subparagraph g) own shares representing more than 50 percent of the voting power of the company and all other shares are listed on a recognized stock exchange and are primarily traded on a recognized stock exchange located within the European Union or in any other European Economic Area state; or

   (iii)   at least 50 percent of the aggregate voting power and value of the shares (and at least 50 percent of any disproportionate class of shares) in the company are owned directly or indirectly by five or fewer companies entitled to benefits under clause (i) or (ii), or any combination thereof, provided that, in the case of indirect ownership, each intermediate owner is a resident of either Contracting State;

d)   a charitable organization or other legal person described in subparagraph b)(i) paragraph 1 of Article 4 (Residence) of this Convention,

e)   a legal person, whether or not exempt from tax, organized under the laws of a Contracting State to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan, provided that more than 50 percent of the person's beneficiaries, members or participants are individuals resident in either Contracting State; or

f)   a person other than an individual, if:

   (i)   on at least half the days of the taxable year at least 50 percent of each class of shares or other beneficial interests in the person is owned, directly or indirectly, by residents of the Contracting State of which that person is a resident that are entitled to the benefits of this Convention under subparagraph a), subparagraph b), clause i) of subparagraph c), or subparagraphs d) or e) of this paragraph, provided that, in the case of indirect ownership, each intermediate owner is a resident of that Contracting State; and

   (ii)   less than 50 percent of the person's gross income for the taxable year, as determined in the person's State of residence, is paid or accrued, directly or indirectly, to persons who are not residents of either Contracting State entitled to the benefits of this Convention under subparagraph a), subparagraph b), clause i) of subparagraph c), or subparagraphs d) or e) of this paragraph in the form of payments that are deductible for purposes of the taxes

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

covered by this Convention in the person's State of residence (but not including arm's length payments in the ordinary course of business for services or tangible property and payments in respect of financial obligations to a bank that is not related to the payor);

g)    in the case of Denmark, a taxable nonstock corporation if:

    (i)    the amount paid or accrued in the form of deductible payments (but not including arms length payments in the ordinary course of its activities of a charitable nature and authorized by the Danish laws on taxable non-stock companies (lov om erhvervsmæssige fonde and lov om fonde og visse foreninger) for services or tangible property) in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a) or b), clause (i) of subparagraph c), or subparagraphs d) or e), does not exceed 50 percent of its gross income, as determined under Danish law (excluding its tax-exempt income); and

    (ii)    the amount paid or accrued, in the form of both deductible payments (but not including arms length payments in the ordinary course of its activities of a charitable nature and authorized by the Danish laws on taxable non-stock companies (lov om erhvervsmæssige fonde and lov om fonde og visse foreninger) for services or tangible property) and non-deductible distributions, in the taxable year and in each of the preceding three taxable years, directly or indirectly, to persons who are not entitled to benefits under subparagraphs a) or b), clause (i) of subparagraph c), or subparagraphs d) or e), does not exceed 50 percent of the amount of its total income (including its tax-exempt income).

3. A company that is a resident of a Contracting State shall also be entitled to the benefits of the Convention if:

a)    at least 95 percent of the aggregate voting power and value of its shares (and at least 50 percent of any disproportionate class of shares) is owned, directly or indirectly, by seven or fewer persons that are equivalent beneficiaries; and

b)    less than 50 percent of the company's gross income, as determined in the company's State of residence, for the taxable year is paid or accrued, directly or indirectly, to persons who are not equivalent beneficiaries, in the form of payments (but not including arm's length payments in the ordinary course of business for services or tangible property and payments in respect of financial obligations to a bank that is not related to the payor), that are deductible for the purposes of the taxes covered by this Convention in the company's State of residence.

a)    A resident of a Contracting State will be entitled to benefits of the Convention with respect to an item of income derived from the other State, regardless of whether the resident is entitled to benefits under paragraph 2 or 3 of this Article, if the resident is engaged in the active conduct of a trade or business in the first-mentioned State (other than the business of making or managing investments for the resident's own account, unless these activities are banking, insurance or securities activities carried on by a bank, insurance company or registered securities dealer), and the income derived from the other Contracting State is derived in connection with, or is incidental to, that trade or business.

b)    If a resident of a Contracting State derives an item of income from a trade or business activity in the other Contracting State, or derives an item of income arising in the other Contracting State from an associated enterprise, subparagraph a) of this paragraph shall apply to such item only if the trade or business activity in the first-mentioned State is substantial in relation to the trade or business activity in the other State. Whether a trade or business activity is substantial for purposes of this paragraph will be determined based on all the facts and circumstances.

c)    In determining whether a person is "engaged in the active conduct of a trade or business" in a Contracting State under subparagraph a) of this paragraph, activities conducted by persons connected to such person shall be deemed to be conducted by such person. A person shall be connected to another if one possesses at least 50 percent of the beneficial interest in the other (or, in the case of a company, at least 50 percent of the aggregate vote and at least 50 percent of the aggregate value of the shares in the company or of the beneficial equity interest in the company) or another person possesses, directly or indirectly, at least 50 percent of the beneficial interest (or, in the case of a company, at least 50 percent of the aggregate vote and at least 50 percent of the aggregate value of the shares in the company or of the beneficial equity interest in the company) in each person. In any case, a person shall be considered to be connected to another if, based on all the relevant facts and circumstances, one has control of the other or both are under the control of the same person or persons.

5. A resident of one of the Contracting States that derives from the other Contracting State income mentioned in Article 8 (Shipping and Air Transport) and that is not entitled to the benefits of this Convention because of the foregoing paragraphs, shall nevertheless be entitled to the benefits of this Convention with respect to such income if at least 50 percent of the beneficial interest in such person (or, in the case of a company, at least 50 percent of the aggregate vote and value of the stock of such company) is owned directly or indirectly:

a)    by persons described in subparagraphs a) or b), or clause (i) of subparagraph c), or subparagraphs d) or e) of paragraph 2, or citizens of the United States, or individuals who are residents of a third state; or

b)    by a company or combination of companies the stock of which is primarily and regularly traded on an established securities market in a third state;

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

provided that such third state grants an exemption under similar terms for profits as mentioned in Article 8 (Shipping and Air Transport) of this Convention to citizens and corporations of the other Contracting State either under its national law or in common agreement with that other Contracting State or under a convention between that third state and the other Contracting State.

6. Notwithstanding the preceding provisions of this Article, where an enterprise of Denmark derives interest or royalties from the United States, and the income consisting of such interest or royalties is exempt from taxation in Denmark because it is attributable to a permanent establishment which that enterprise has in a third state, the tax benefits that would otherwise apply under the other provisions of the Convention will not apply to such income if the tax that is actually paid with respect to such income in the third state is less than 60 percent of the tax that would have been payable in Denmark if the income were earned in Denmark by the enterprise and were not attributable to the permanent establishment in the third state. Any interest or royalties to which the provisions of this paragraph apply may be taxed in the United States at a rate that shall not exceed 15 percent of the gross amount thereof. The provisions of this paragraph shall not apply if:

a) in the case of interest, the income derived from the United States is derived in connection with, or is incidental to, the active conduct of a trade or business carried on by the permanent establishment in the third state (other than the business of making, managing or simply holding investments for the person's own account, unless these activities are banking or securities activities carried on by a bank or registered securities dealer); or

b) in the case of royalties, the royalties are received as compensation for the use of, or the right to use, intangible property produced or developed by the permanent establishment itself.

7. A resident of a Contracting State that is not entitled to benefits pursuant to the preceding paragraphs of this Article shall, nevertheless, be granted benefits of the Convention if the competent authority of the other Contracting State determines that the establishment, acquisition or maintenance of such person and the conduct of its operations did not have as one of its principal purposes the obtaining of benefits under the Convention. The competent authority of the other Contracting State shall consult with the competent authority of the first-mentioned State before denying the benefits of the Convention under this paragraph.

8. For the purposes of this Article,

a) the term "principal class of shares" means the ordinary or common shares of the company, provided that such class of shares represents the majority of the voting power and value of the company. If no single class of ordinary or common shares represents the majority of the aggregate voting power and value of the company, the "principal class of shares" is that class or those classes that in the aggregate represent a majority of the aggregate voting power and value of the company.

b) the term "disproportionate class of shares" means any class of shares of a company resident in one of the States that entitles the shareholder to disproportionately higher participation, through dividends, redemption payments or otherwise, in the earnings generated in the other State by particular assets or activities of the company;

c) the term "shares" shall include depository receipts thereof;

d) the term "recognized stock exchange" means:

   (i) the NASDAQ System owned by the National Association of Securities Dealers, Inc. and any stock exchange registered with the U.S. Securities and Exchange Commission as a national securities exchange under the U.S. Securities Exchange Act of 1934;

   (ii) the Copenhagen Stock Exchange;

   (iii) the stock exchanges of Amsterdam, Brussels, Frankfurt, Hamburg, Helsinki, London, Oslo, Paris, Stockholm, Sydney, Tokyo and Toronto; and

   (iv) any other stock exchanges agreed upon by the competent authorities of the Contracting States.

e) the term "taxable nonstock corporation" as used in paragraph 2 means a foundation that is taxable in accordance with paragraph 1 of Article 1 of the Danish Act on Taxable Nonstock Corporations (fonde der beskattes efter fondsbeskatningsloven);

f) (i) for the purposes of paragraph 2, the shares in a class of shares are considered to be regularly traded on one or more recognized stock exchanges in a taxable year if:

      (A) trades in such class are effected on one or more of such stock exchanges other than in de minimis quantities during every quarter; and

      (B) the aggregate number of shares or units of that class traded on such stock exchange or exchanges during the previous taxable year is at least 6 percent of the average number of shares or units outstanding in that class (including shares held by taxable nonstock corporations) during that taxable year; and

© Copyright 2020 IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

(ii)  for purposes of determining whether a company satisfies the requirements of clause c) (ii) of paragraph 2, clause (i) of this paragraph shall be applied as if all the shares issued by the company were one class of shares and shares held by taxable nonstock corporations will be considered outstanding for purposes of determining whether 6 percent of the outstanding shares have been traded during a taxable year.

g)  a company's primary place of management and control will be in the State of which it is a resident only if executive officers and senior management employees exercise day-to-day responsibility for more of the strategic, financial and operational policy decision making for the company (including its direct and indirect subsidiaries) in that State than in any other state, and the staffs conduct more of the day-to-day activities necessary for preparing and making those decisions in that State than in any other state;

h)  the term "equivalent beneficiary" means a resident of a member state of the European Union or of any other European Economic Area state or of a party to the North American Free Trade Agreement, or of Switzerland, but only if that resident:

(i)  A)  would be entitled to all the benefits of a comprehensive convention for the avoidance of double taxation between any member state of the European Union or any other European Economic Area state or any party to the North American Free Trade Agreement, or Switzerland, and the State from which the benefits of this Convention are claimed under provisions analogous to subparagraphs a), b), clause i) of subparagraph c) or subparagraphs d) or e) of paragraph 2 of this Article, provided that if such convention does not contain a comprehensive limitation on benefits article, the person would be entitled to the benefits of this Convention by reason of subparagraph a), b), clause i) of subparagraph c) or subparagraphs d) or e) of paragraph 2 of this Article if such person were a resident of one of the States under Article 4 (Residence) of this Convention; and

B)  with respect to income referred to in Article 10 (Dividends), 11 (Interest) or 12 (Royalties) of this Convention, would be entitled under such convention to a rate of tax with respect to the particular class of income for which benefits are being claimed under this Convention that is at least as low as the rate applicable under this Convention; or

(ii)  is a resident of a Contracting State that is entitled to the benefits of this Convention by reason of subparagraph a), b), clause i) of subparagraph c) or subparagraphs d) or e) of paragraph 2 of this Article.

For the purposes of applying paragraph 3 of Article 10 (Dividends) in order to determine whether a person, owning shares, directly or indirectly, in the company claiming the benefits of this Convention, is an equivalent beneficiary, such person shall be deemed to hold the same voting power in the company paying the dividend as the company claiming the benefits holds in such company;

i)  with respect to dividends, interest or royalties arising in Denmark and beneficially owned by a company that is a resident of the United States, a company that is a resident of a member state of the European Union will be treated as satisfying the requirements of subparagraph h)(i) B) for purposes of determining whether such United States resident is entitled to benefits under this paragraph if a payment of dividends, interest or royalties arising in Denmark and paid directly to such resident of a member state of the European Union would have been exempt from tax pursuant to any directive of the European Union, notwithstanding that the income tax convention between Denmark and that other member state of the European Union would provide for a higher rate of tax with respect to such payment than the rate of tax applicable to such United States company under Article 10 (Dividends), 11 (Interest), or 12 (Royalties) of this Convention."

**ARTICLE V**

1. The Contracting States shall notify each other when the requirements for the entry into force of this Protocol have been complied with.

2. This Protocol shall enter into force upon the date of the receipt of the later of such notifications, and its provisions shall have effect:

a)  in respect of taxes withheld at source, on income derived on or after the first day of the second month next following the date on which the Protocol enters into force; and

b)  in respect of other taxes, for taxable periods beginning on or after the first day of January next following the date on which the Protocol enters into force.

3. This Protocol shall remain in force for so long as the Convention shall remain in force.

IN WITNESS WHEREOF the undersigned, duly authorized thereto by their respective Governments, have signed this Protocol.

DONE in duplicate at Copenhagen on the second day of May, 2006, in the English language.

**Exchange of Notes**

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

I

His Excellency

Per Stig Møller,

Minister of Foreign Affairs,

The Kingdom of Denmark.

EMBASSY OF THE

UNITED STATES OF AMERICA

Copenhagen, May 2, 2006

Excellency,

I have the honor to refer to the Protocol signed today between the Government of the United States of America and the Government of the Kingdom of Denmark Amending the Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, and to confirm, on behalf of the Government of the United States of America, the following understandings reached between our two Governments.

In reference to clause a) (iv) of paragraph 3 of Article 10 (Dividends) of the Convention, as amended by the Protocol, it is understood that the U.S. competent authority generally will exercise its discretion to grant benefits under such paragraph to a company that is a resident of Denmark if:

1) the company meets the requirements of paragraph 4 of Article 22 (Limitation of Benefits) regarding the active conduct of a trade or business in Denmark;

2) the company meets the base erosion test of clause f) (ii) of paragraph 2 of Article 22; and

3) more than 80 percent of the voting power and the value of the shares in the company is owned by one or more taxable nonstock corporations that meet the requirements of subparagraph h) of paragraph 2 of Article 22.

However, the competent authority may choose not to grant benefits pursuant to this paragraph if he determines that a significant percentage or amount of the income qualifying for benefits under such paragraph will inure to the benefit of a private person who is not a resident of Denmark.

In reference to paragraph 4 of Article 10 (Dividends) of the Convention, as amended by the Protocol, it is understood that a Danish undertaking for collective investment in transferable securities that is required to currently distribute its income will be treated as a company that is similar to a U.S. regulated investment company for purposes of this paragraph, while such an undertaking that is permitted to accumulate its income will not be so treated.

If this is in accordance with your understanding, I would appreciate an acknowledgment from you to that effect.

Accept, Excellency, the renewed assurances of my highest consideration.

James P. Cain

II

To Ambassador James P. Cain

Embassy of the United States

Copenhagen, 2nd May, 2006

Excellency:

I have the honor to acknowledge receipt of your note of 2nd May, 2006, which reads as follows:

[see I]

I have the honor to confirm that the foregoing understandings are also shared by the Government of the Kingdom of Denmark.

Accept, Excellency, the renewed assurances of my highest consideration.

Kristian Jensen

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

**Denmark - United States**

**US Document - Explanation of proposed treaty and protocol (JCS-8-99)**

**Status:** Not Applicable

**Conclusion Date:** 8 October 1999.

**(JCS-8-99) EXPLANATION OF PROPOSED INCOME TAX TREATY AND**
**PROPOSED PROTOCOL BETWEEN**
**THE UNITED STATES AND THE KINGDOM OF DENMARK**

A pdf version of the English text is available here.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

**Denmark - United States**

**US Document - Testimony of staff of Joint Committee on Taxation (JCX-76-99)**

**Status:** Not Applicable
**Conclusion Date:** 25 October 1999.

**(JCX-76-99) TESTIMONY OF THE STAFF OF**
**THE JOINT COMMITTEE ON TAXATION BEFORE**
**THE SENATE COMMITTEE ON FOREIGN RELATIONS**
**HEARING ON THE PROPOSED TREATY WITH DENMARK**

A pdf version of the English text is available here.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

Case 1:18-cv-03865-LAK   Document 408-3   Filed 05/10/22

**Denmark - United States**

**US Document - Committee on Foreign Relations Report (106-9)**

| |
|---|
| **Status:** Not Applicable |
| **Conclusion Date:** 3 November 1999. |

**(106-9) COMMITTEE ON FOREIGN RELATIONS REPORT ON**
**TAX CONVENTION WITH DENMARK**

A pdf version of the English text is available here.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

**Denmark - United States**

**US Document - Explanation of proposed protocol (JCX-46-07)**

**Status:** Not Applicable
**Conclusion Date:** 17 July 2007.

**(JCX-46-07) EXPLANATION OF PROPOSED PROTOCOL**
**TO THE INCOME TAX TREATY BETWEEN**
**THE UNITED STATES AND DENMARK**

A pdf version of the English text is available here.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

**Denmark - United States**

**US Document - Testimony of staff of Joint Committee on Taxation (JCX-51-07)**

**Status:** Not Applicable
**Conclusion Date:** 17 July 2007.

**(JCX-51-07) TESTIMONY OF THE STAFF OF
THE JOINT COMMITTEE ON TAXATION BEFORE
THE SENATE COMMITTEE ON FOREIGN RELATIONS
HEARING ON THE PROPOSED TAX PROTOCOL WITH DENMARK**

A pdf version of the English text is available here.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

**Denmark - United States**

**US Document - Committee on Foreign Relations Report (110-3)**

**Status:** Not Applicable

**Conclusion Date:** 14 November 2007.

**(110-3) COMMITTEE ON FOREIGN RELATIONS REPORT ON PROTOCOL AMENDING TAX CONVENTION WITH DENMARK**

A pdf version of the English text is available here.

© Copyright 2020  IBFD: No part of this information may be reproduced or distributed without permission of IBFD.
Disclaimer: IBFD will not be liable for any damages arising from the use of this information.

# Exhibit 5

356 F.Supp.3d 300
United States District Court, S.D. New York.

IN RE SKAT TAX REFUND

SCHEME LITIGATION

This Paper Applies to: 18-4047 (LAK),
18-4049 (LAK), 18-4050 (LAK),
18-4051 (LAK), 18-4052 (LAK), 18-4430
(LAK), 18-4434 (LAK), 18-4522 (LAK),
18-4531 (LAK), 18-4536 (LAK), 18-4538
(LAK), 18-4541 (LAK), 18-4543 (LAK),
18-4767 (LAK), 18-4770 (LAK), 18-4771
(LAK), 18-4833 (LAK), 18-4890
(LAK), 18-4892 (LAK), 18-4894 (LAK),
18-4896 (LAK), 18-4898 (LAK),
18-4899 (LAK), 18-4900 (LAK),
18-5045 (LAK), 18-5053 (LAK), 18-5057
(LAK), 18-5147 (LAK), 18-5150 (LAK),
18-5151 (LAK), 18-5158 (LAK), 18-5164
(LAK), 18-5180 (LAK), 18-5183 (LAK),
18-5185 (LAK), 18-5186 (LAK), 18-5188
(LAK), 18-5189 (LAK), 18-5190 (LAK),
18-5192 (LAK), 18-5193 (LAK), 18-5194
(LAK), 18-5299 (LAK), 18-5300 (LAK),
18-5305 (LAK), 18-5307 (LAK), 18-5308
(LAK), 18-5309 (LAK), 18-5374 (LAK).

18-md-2865 (LAK)
|
Signed 01/09/2019

**Synopsis**
**Background:** Customs and Tax Administration of Kingdom
of Denmark brought action claiming that pension plans
in United States, their authorized representatives, and
incorporator involved in creating plans defrauded it of
millions of dollars by submitting tax refund claims in which
they falsely claimed to own stocks in Danish companies that
had paid dividends net of withholding tax. Defendants moved
to dismiss.

**Holdings:** The District Court, Lewis A. Kaplan, J., held that:

[1] Customs and Tax Administration did not seek direct
enforcement of Danish tax law, and therefore revenue rule did
not apply;

[2] defendants did not provide competent evidence to rebut
allegations of lack of stock ownership, and therefore court
could not apply revenue rule;

[3] fraud claims by Customs and Tax Administration did not
require consideration of Danish tax law or laws concerning
beneficial stock ownership under revenue rule;

[4] Convention for the Avoidance of Double Taxation and
the Prevention of Fiscal Evasion with Respect to Taxes on
Income and its provisions for "assistance in the collection of
a revenue claim" was not relevant to claims by Customs and
Tax Administration;

[5] factual issue existed regarding existence of principal-agent
relationship between authorized representatives of pension
plans and payment agents;

[6] incorporator reasonably could be inferred to have
controlled very existence of companies affiliated with pension
plans and that he created them for purpose of receiving tax
refunds, on claim for individual liability for tax fraud under
alter ego doctrine;

[7] Customs and Tax Administration stated circumstances
constituting fraud with particularity; and

[8] Customs and Tax Administration stated aiding and
abetting claim.

Motion denied.

West Headnotes (39)

**[1]    Federal Courts** 👉 **Foreign states or
sovereigns**

In the context of a motion to dismiss, the act
of state doctrine is a substantive rather than
jurisdictional defense. Fed. R. Civ. P. 12(b).

**[2]**    **Federal Courts**    Necessity of Objection; Power and Duty of Court

A court will dismiss a claim for lack of subject matter jurisdiction if it determines that it lacks constitutional or statutory power to adjudicate it. Fed. R. Civ. P. 12(b)(1).

**[3]**    **Federal Courts**    Presumptions and burden of proof

A plaintiff asserting subject matter jurisdiction has the burden on a motion to dismiss of proving by a preponderance of the evidence that it exists. Fed. R. Civ. P. 12(b)(1).

**[4]**    **Federal Courts**    Pleadings and motions

On a motion to dismiss, a court must take all facts alleged in a complaint as true but will not draw inferences in the plaintiff's favor when determining whether there is jurisdiction. Fed. R. Civ. P. 12(b).

**[5]**    **Federal Courts**    Evidence; Affidavits

A court may consider evidence outside the pleadings on a motion to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

**[6]**    **International Law**    Taxation and revenue

The revenue rule prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws; its purpose is to ensure respect for sovereignty by keeping courts out of the business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices, and it also serves also to preserve separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement, which can implicate foreign relations and are better left to the political branches of government.

**[7]**    **International Law**    Taxation and revenue

A suit directly seeks to enforce foreign tax laws, implicating the revenue rule that prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws, when a judgment in favor of the plaintiffs would require the defendants to reimburse them for lost tax revenue.

**[8]**    **International Law**    Taxation and revenue

An action that seeks a remedy that would give extraterritorial effect to a foreign state's tax laws is one for indirect enforcement, within the meaning of the revenue rule that prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws.

**[9]**    **International Law**    Taxation and revenue

A court looks to the substance of the claim to determine whether it is one for tax revenues within the meaning of the revenue rule that prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws.

**[10]**    **International Law**    Taxation and revenue

A suit seeking damages based on law enforcement costs is an attempt to shift the cost of enforcing the tax laws, and therefore would require a court indirectly to enforce the tax laws, within the meaning of the revenue rule that prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws.

**[11]**    **International Law**    Taxation and revenue

Customs and Tax Administration of Kingdom of Denmark did not seek direct enforcement of Danish tax law through claim that pension plans in United States, their authorized representatives, and incorporator involved in creating plans defrauded it of millions of dollars by submitting

tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax, and therefore revenue rule that prohibited courts from hearing claims by foreign sovereigns that sought direct or indirect enforcement of their tax laws did not apply to claim; only reason money was lost was because defendants in effect allegedly stole it, and only reason it supposedly concerned tax revenue was because defendants' alleged victim was Danish tax authority.

[12]    **Federal Courts** 👉 Foreign states or sovereigns

Assertion of hypothetical ways in which market participant could "own" shares without paying for them with its own cash, and assertion that document that was alleged to be part of fraud existed which stated that defendants owned shares, was not competent evidence to rebut allegations of lack of ownership, beneficial, legal, or otherwise, and therefore there was no basis on motion to dismiss to apply revenue rule that prohibited courts from hearing claims by foreign sovereigns that sought direct or indirect enforcement of their tax laws to complaint by Customs and Tax Administration of Kingdom of Denmark alleging that pension plans in United States, their authorized representatives, and incorporator involved in creating plans defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax. Fed. R. Civ. P. 12(b)(1).

[13]    **Federal Courts** 👉 Foreign states or sovereigns

A court applying the revenue rule that prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws has the responsibility to correctly identify and apply relevant provisions of foreign law. Fed. R. Civ. P. 44.1.

[14]    **Federal Civil Procedure** 👉 Hearing, evidence, and presentation of arguments

While a court is free to engage in its own research and consider any relevant material thus found, it is not required to do a party's homework for them.

[15]    **Internal Revenue** 👉 Effect of State Laws and Judicial Decisions

In the application of the federal revenue code, state law controls in determining the nature of the legal interest which the taxpayer had in the property; a federal statute does not create any property rights but merely attaches consequences, federally defined, to rights created under state law.

[16]    **International Law** 👉 Taxation and revenue

Claims by Customs and Tax Administration of Kingdom of Denmark that pension plans in United States, their authorized representatives and incorporator involved in creating plans defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax did not require consideration of Danish tax law or laws concerning beneficial stock ownership under revenue rule that prohibited courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws.

[17]    **International Law** 👉 Taxation and revenue

Rendering a decision under foreign law contrary to an opinion of an administrative or judicial body in the foreign country deciding the same question would be exactly the type of harm or embarrassment against which the revenue rule is designed to protect which prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws.

[18]    **International Law** 👉 Taxation and revenue

Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and its provisions for "assistance in the collection of a revenue claim" was not relevant to claim under revenue rule that prohibited courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws in action by Customs and Tax Administration of Kingdom of Denmark alleging that pension plans in United States, their authorized representatives and incorporator involved in creating plans defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax, since plaintiff did not seek to collect tax owed by defendants that was covered by treaty. T.I.A.S. No. 13056.

**[19]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

If a complaint alleges fraud, it must comply with the rule requiring the plaintiff to plead the circumstances constituting fraud with particularity, but allows malice, intent, knowledge, and other conditions of mind to be averred generally. Fed. R. Civ. P. 9(b).

**[20]    Federal Civil Procedure** 🔑 Matters considered in general

**Federal Civil Procedure** 🔑 Motion

When material outside the pleadings is presented on a motion to dismiss for failure to state a claim upon which relief can be granted, a court may consider the material if it chooses to treat the motion as one for summary judgment. Fed. R. Civ. P. 12(b)(6), 56.

**[21]    Federal Civil Procedure** 🔑 Tort cases in general

Genuine issue of material fact existed regarding existence of principal-agent relationship between authorized representatives of pension plans in United States and payment agents, precluding summary judgment on claims

of fraud, aiding and abetting fraud, and negligent misrepresentation to hold authorized representatives and incorporator involved in creating plans vicariously liable under New York law for acts of non-party payment agents or broker custodians in action brought by Customs and Tax Administration of Kingdom of Denmark claiming that pension plans, their authorized representatives, and incorporator defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax. Fed. R. Civ. P. 56.

**[22]    Principal and Agent** 🔑 Nature of the relation in general

To establish a principal-agent relationship under New York law, the plaintiff must allege: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking.

**[23]    Principal and Agent** 🔑 Nature of the relation in general

To establish a principal-agent relationship under New York law, a party must allege that the agent acts subject to the principal's direction and control.

**[24]    Principal and Agent** 🔑 Construction of letters or powers of attorney

Under New York law, powers of attorney were, in substance, proposals for payment agents to act for authorized representatives of pension plans and subject to their control, to which payment agents agreed, to extent that plans acted through their authorized representatives and authorized representatives practically directed actions of payment agents, on claim by Customs and Tax Administration of Kingdom of Denmark claiming that pension plans, their authorized representatives, and incorporator defrauded it

of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax.

**[25]  Corporations and Business Organizations** 🔑 Presumptions and burden of proof

Incorporator involved in creating pension plans that defrauded taxing authority of millions of dollars reasonably could be inferred to have controlled very existence of companies affiliated with pension plans and that he created them for purpose of receiving tax refunds, on claim under New York law for individual liability for tax fraud under alter ego doctrine, on allegations that incorporator "participated in incorporating limited liability companies associated with fifteen different claimants" that were created shortly before claimants submitted their initial tax refund claims and incorporator had hand in dissolving those same entities, all on same date; second inference was permitted on basis that incorporator's home address was same as addresses listed by at least five pension plans.

**[26]  Corporations and Business Organizations** 🔑 Justice and equity in general

**Corporations and Business Organizations** 🔑 Fraud or illegal acts in general

**Corporations and Business Organizations** 🔑 Domination or control by shareholder

To plead alter ego liability under New York law, the plaintiff must allege that: (1) the person exercised dominion and control with respect to the transaction attacked such that the corporation had no separate will of its own; and (2) the domination was used to commit a fraud or wrong against the plaintiff, which proximately caused the plaintiff's injuries.

**[27]  Corporations and Business Organizations** 🔑 Presumptions and burden of proof

Authorized representatives of pension plans that defrauded taxing authority of millions of dollars reasonably could be inferred to have controlled existence of companies affiliated with pension plans, on claim under New York law for individual liability for tax fraud under alter ego doctrine, on allegations that authorized representative's home address was same as addresses listed by at least five pension plans, incorporator involved in creating pension plans "participated in incorporating limited liability companies associated with fifteen different claimants" that were created shortly before claimants submitted their initial tax refund claims, and incorporator had hand in dissolving those same entities, all on same date.

**[28]  Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

A strong inference of fraudulent intent under the rule requiring a party to state the circumstances constituting fraud with particularity is one that is cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Fed. R. Civ. P. 9(b).

**[29]  Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

A plaintiff can meet the burden of stating the circumstances constituting fraud with particularity by alleging facts to show that defendants had both motive and opportunity to commit fraud, or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. Fed. R. Civ. P. 9(b).

**[30]  Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Customs and Tax Administration of Kingdom of Denmark stated circumstances constituting fraud with particularity, in action claiming that

pension plans in United States, their authorized representatives, and incorporator involved in creating plans defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax; motive was alleged by stating, for example, that plan claimed refunds in amount of $11 million dollars or more, and received payments from plaintiff on those claims, and requisite opportunity to commit fraud was stated by describing each defendant's role in scheme. Fed. R. Civ. P. 9(b).

**[31]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Customs and Tax Administration of Kingdom of Denmark stated circumstances constituting fraud with particularity, in action claiming that pension plans in United States, their authorized representatives, and incorporator involved in creating plans defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax; plans allegedly provided documentation to plaintiff including claim forms that represented, contrary to fact, that plans owned shares and had received dividends net of withholding tax, and were entitled to refund. Fed. R. Civ. P. 9(b).

**[32]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Customs and Tax Administration of Kingdom of Denmark stated circumstances constituting fraud with particularity, in action claiming that pension plans in United States, their authorized representatives, and incorporator involved in creating plans defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax; authorized representatives allegedly effectuated scheme by acting "on behalf of the claimants with respect to the

dividend withholding tax refund claims," and signed powers of attorney appointing payment agents for singular purpose of acting on plans' behalf to obtain and receive the tax refunds, payment agents submitted, signed, and stamped claim forms, certifying that plans owned shares that entitled them to tax refunds, and incorporator created and dissolved entities associated with submission of applications for tax refunds and receipt of those refunds. Fed. R. Civ. P. 9(b).

**[33]    Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Customs and Tax Administration of Kingdom of Denmark sufficiently alleged strong circumstantial evidence of conscious misbehavior or recklessness under rule requiring party to state the circumstances constituting fraud with particularity, in action claiming that pension plans in United States, their authorized representatives, and incorporator involved in creating plans defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax, on allegations that plans were one-participant plans, they claimed to own shares that were worth hundreds of millions of dollars, and they claimed to be entitled to refunds that were over 44 times greater than total value of plans' assets. Fed. R. Civ. P. 9(b).

**[34]    Corporations and Business Organizations** 🔑 Liability to third persons

**Corporations and Business Organizations** 🔑 Fraud

Customs and Tax Administration of Kingdom of Denmark stated aiding and abetting claim under New York law, in action claiming that pension plans in United States, their authorized representatives, and incorporator involved in creating plans defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax, on allegations that defendants

acted in concert to carry out scheme and each directly contributed to alleged fraud.

**[35]**   **Federal Civil Procedure** 🗝️ Alternate, Hypothetical and Inconsistent Claims

Claims for fraud and negligent misrepresentation theoretically could fail, and therefore unjust enrichment claim under New York law could not be dismissed at pleading stage on basis that it was duplicative of fraud and negligent misrepresentation claims, since both scienter and liability for alleged misrepresentations were disputed.

**[36]**   **Federal Civil Procedure** 🗝️ Alternate, Hypothetical and Inconsistent Claims

A plaintiff may not plead the same claim more than once, which would constitute a duplicative claim, but may plead claims that provide alternative bases for relief.

1 Cases that cite this headnote

**[37]**   **Federal Civil Procedure** 🗝️ Alternate, Hypothetical and Inconsistent Claims

A claim is alternative and not duplicative if a plaintiff may fail on one but still prevail on the other.

2 Cases that cite this headnote

**[38]**   **Federal Civil Procedure** 🗝️ Alternate, Hypothetical and Inconsistent Claims

If fraud and unjust enrichment claims rest on the same facts and the plaintiff prevails on the fraud claim, then the unjust enrichment claim becomes duplicative.

2 Cases that cite this headnote

**[39]**   **Federal Civil Procedure** 🗝️ Alternate, Hypothetical and Inconsistent Claims

Claim for money had and received was not duplicative of unjust enrichment claim under New York law, even though those claims rested

on same facts; money had and received claim was considered action at law even though it rested on equitable principles.

1 Cases that cite this headnote

## Attorneys and Law Firms

**\*306** Sarah Loomis Cave, William R. Maguire, John Thomas McGoey, Marc Alan Weinstein, Hughes Hubbard & Reed LLP, Attorneys for Plaintiff.

Mark David Allison, Zhanna A. Ziering, Caplin & Drysdale, Chartered, Attorneys for Defendants The Bradley London Pension Plan and Doston Bradley, Ackview Solo 401 K Plan and Sean Driscoll, NYCATX LLC Solo 401 K Plan and Carl Andrew Vergari, Sanford Villa Pension Plan and Roger Lehman, The Aria Pension Plan, Roger Lehman, and Gavin Crescenzo, The Aston Advisors LLC 401 K Plan and Roger Lehman, The Atlantic DHR 401 K Plan and Doston Bradley, The Beleforte Pension Plan, Roger Lehman, and Gavin Crescenzo, The Bravos Advisors 401 K Plan, Roger Lehman, and Gavin Crescenzo, The Busby Black 401 K Plan and Doston Bradley, The Canada Rock LLC 401 K Plan and Doston Bradley, The Costello Advisors Pension Plan, Roger Lehman, and Gavin Crescenzo, The DMR Pension Plan and Doston Bradley, The Dosmon Bly Pension Plan and Doston Bradley, The Eskin Pension Plan, Roger Lehman, and Gavin Crescenzo, The Fieldcrest Pension Plan, Roger Lehman, and Gavin Crescenzo, The Houston Rocco LLC 401 K Plan and Doston Bradley, The India Bombay LLC 401 K Plan and Doston Bradley, The ISDB Pension Plan and Doston Bradley, The KASV Group Pension Plan, Roger Lehman, and Svetlin Petkov, The Kodiak Capital Pension Plan, Roger Lehman, and Gavin Crescenzo, The Krabi Holdings LLC 401 K Plan and Gavin Crescenzo, The Kyber Pension Plan, Roger Lehman, and Gavin Crescenzo, The LBR Capital Pension Plan and Doston Bradley, The Lerici Capital Pension Plan, Roger Lehman, and Gavin Crescenzo, The Ludlow Holdings 401 K Plan, Roger Lehman, and Gavin Crescenzo, The M2F Wellness LLC 401 K Plan and Mitchell Protass, The Monin Amper Pension Plan and Doston Bradley, The MPQ Holdings LLC 401 K Plan and Mitchell Protass, The NYC Stanismore Pension Plan and Doston Bradley, The Petkov Management LLC 401 K Plan and Svetlin Petkov, The Petkov Partners Pension Plan, Roger Lehman, and Svetlin Petkov, The Proper Pacific LLC 401 K Plan and Doston Bradley, The Regoleth Pension Plan, Roger Lehman, and Gavin Crescenzo, The

Saba Capital LLC 401 K Plan, Roger Lehman, and Gavin Crescenzo, The Sector 230 LLC 401 K Plan, The SPKK LLC 401 K Plan, Roger Lehman, and Svetlin Petkov, The Stark Pension Plan, Roger Lehman, and Gavin Crescenzo, The Stor Capital Consulting LLC 401 K Plan and Michael Ben-Jacob, The SVP 401 K Plan, Roger Lehman, and Svetlin Petkov, The Texas Rocco LLC 401 K Plan and Doston Bradley, The TKKJ LLC 401 K Plan and Thomas Kertelits, The West River Pension Plan, Roger Lehman, and Gavin Crescenzo, The Westport Advisors LLC 401 K Plan, Roger Lehman, and Gavin Crescenzo.

Stephen D. Andrews, Amy McKinlay, Williams & Connolly LLP, Attorneys for Defendant Sander Gerber Pension Plan.

Bryan C. Skarlatos, Juliet L. Fink, Kostelanetz & Fink LLP, Attorneys for Defendants Sterling Alpha LLC 401(K) Profit Sharing Plan, John C. Doscas, Sander Gerber Pension Plan, Del Mar Asset Management Saving & Retirement Plan, David W. Freelove.

Edward M. Spiro, Audrey Feldman, Morvillo Abramowitz Grand Iason & Anello P.C., Attorneys for Defendant Adam LaRosa.

Martin H. Kaplan, Joseph Christopher Albanese, Gusrae, Kaplan, Nusbaum, PLLC, Attorneys for Defendants Goldstein Law Group PC 401(k) Profit Sharing Plan and Sheldon Goldstein.

**MEMORANDUM OPINION**

Lewis A. Kaplan, District Judge.

 **\*307** The motions now before the Court concern the "revenue rule," a common law principle that prohibits courts from hearing actions by foreign nations to enforce their foreign tax laws, whether directly or indirectly.

Danish companies are required by law to withhold a certain percentage of dividends distributed to shareholders as tax, which may be refunded to shareholders in certain circumstances under a double taxation treaty. The Kingdom of Denmark here claims that the defendants defrauded it of millions of dollars by submitting tax refund claims in which they falsely claimed to own stocks in Danish companies that had paid dividends net of withholding tax. In fact, the complaints allege, the defendants did not own those stocks and had **\*308** had no taxes withheld from any dividends. Nevertheless, the defendants allegedly obtained

many millions of dollars in tax refunds from the Danish treasury under false and fraudulent pretenses.

Defendants, relying on the revenue rule, seek dismissal of these actions at the outset. If plaintiff can prove that the defendants never in fact owned the relevant Danish stocks – and the Court is obliged to accept their allegations as true for present purposes – the revenue rule would not apply because the substance of the claims would be for garden variety commercial fraud. Accordingly, the motion to dismiss is denied. Whether in light of discovery and a fuller presentation, the revenue rule will be of greater aid to the defendants must await developments.

*Background*

The plaintiff is the Customs and Tax Administration of the Kingdom of Denmark ("SKAT"). It is the agency responsible for assessing and collecting taxes in Denmark and issuing tax refunds to claimants under certain double taxation treaties between Denmark and other countries.[1] The defendants are U.S. pension plans, their authorized representatives and, in at least one case, the incorporator involved in creating plans involved in the alleged scheme.[2] The scheme involved also payment agents and broker custodians who are not named as defendants.

We start from the fact that, under Danish law, "Danish companies are required to withhold 27% of the dividend" distributed to shareholders.[3] A treaty between the United States and Denmark ("U.S.-Denmark Treaty") provides for the refund of tax withheld on dividend payments to shareholders that are U.S. pension plans, which are exempt from taxation.[4]

According to the complaints, the defendants and non-parties participated in a coordinated scheme to submit fraudulent applications to SKAT for tax refunds.[5] First, the incorporator created limited liability companies associated with the plans that would submit tax refund applications to SKAT.[6] Second, the authorized representatives signed powers of attorney on behalf of the plans authorizing the non-party payment agents to act on behalf of the plans in relation to the refund claims.[7] The payment agents then completed and submitted the applications, each of which included, among other things, a claim form.[8] The claim form represented that the claimant:

In re Skat Tax Refund Scheme Litigation, 356 F.Supp.3d 300 (2019)

123 A.F.T.R.2d 2019-415, 2019-1 USTC P 50,130

(1) owned shares in a Danish company; (2) had received dividends net of withholding tax; (3) was entitled to a refund under the U.S.-Denmark Treaty; and (4) was a U.S. pension plan exempt from U.S. taxation.[9] The first representation was made through a "credit advice," "income advice," "tax voucher," or other similar document provided by a non-party broker custodian.[10] Finally, the payment **\*309** agents received the tax refunds from SKAT and "distributed the proceeds to the claimants and other participants in the fraud."[11]

SKAT alleges that these refund claims were fraudulent because the defendant plans did not own shares in the Danish companies that they purported to own.[12] It argues that it was not possible for the plans to have owned the shares they purported to own because many, including The Bradley London Pension Plan ("Bradley Plan"), were single-participant 401(k) plans limited to approximately \$116,500 in contributions per year, yet they claimed to own millions of dollars of stock in Danish companies within the first year of their existence.[13] The numbers, the plaintiff argues, simply do not add up. The defendants therefore were not entitled to the dividends they claimed to have earned and were not entitled to the tax refunds they claimed under the U.S.-Denmark Treaty.[14] SKAT allegedly paid out approximately \$2.1 billion as a result of this fraudulent tax refund scheme.[15]

SKAT brings this action for damages asserting six common law claims against the defendants. Counts One and Two allege fraud and aiding and abetting fraud.[16] Count Six alleges negligent misrepresentation.[17] And Counts Three through Five allege payment by mistake, unjust enrichment, and money had and received.[18]

The defendants move to dismiss on five grounds. First, they contend that the Court lacks subject matter jurisdiction, arguing that the revenue rule and U.S.-Denmark Treaty bar the suit.[19] They argue next that the Court should dismiss Counts One, Two, and Six for failure to allege a false representation of material fact by the authorized representatives and incorporators.[20] Third, they contend that Counts One and Two fail adequately to plead *scienter* under Rule 9(b).[21] Fourth, defendants argue that Count Two fails to allege "substantial assistance" by the defendants necessary to support a claim for aiding and abetting.[22] Finally, the

defendants move to dismiss Counts Three through Five as duplicative.[23]

*Discussion*

*I. Subject Matter Jurisdiction*[24]

*A. Legal Standard*

**[1]** **[2]** **[3]** **[4]** **[5]** A court will dismiss a claim pursuant to Rule 12(b)(1) for lack of subject **\*310** matter jurisdiction if it determines that it lacks constitutional or statutory power to adjudicate it.[25] "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."[26] The Court must take all facts alleged in the complaints as true but will not draw inferences in the plaintiff's favor when determining whether there is jurisdiction.[27] The Court may consider evidence outside the pleadings on a Rule 12(b)(1) motion.[28]

*B. Analysis*

The defendants move to dismiss the entire action on the ground that it is barred by the revenue rule and that the Court therefore lacks subject matter jurisdiction.

**[6]** As noted, the revenue rule prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws.[29] Its purpose is to ensure respect for sovereignty by keeping courts out of the business of adjudicating and enforcing foreign states' tax laws that embody their moral and political choices.[30] The rule serves also to preserve separation of powers by carving out from courts' jurisdiction disputes regarding extraterritorial tax enforcement, which can implicate foreign relations and are better left to the political branches of government.[31]

**[7]** **[8]** **[9]** **[10]** "A suit directly seeks to enforce foreign tax laws when a judgment in favor of the plaintiffs would require the defendants to reimburse them for lost tax revenue."[32] An action that "seeks a remedy that would give extraterritorial effect" to a foreign state's tax laws is one for indirect **\*311** enforcement.[33] Courts look to the "substance of the claim" to determine whether it is one for tax revenues.[34]

The defendants contend that the plaintiff's actions seek both direct and indirect enforcement of Danish tax law.

*1. Direct Enforcement*

 [11]  The defendants argue that the present actions, if successful, would enforce Danish tax law directly because the plaintiff's claims are nothing more than an attempt to recover lost tax revenue. The argument goes as follows: the defendants allegedly caused SKAT to pay fraudulent tax refund claims that should not have been disbursed. Those tax refunds amounted to lost tax revenue. SKAT seeks to recover the amount it paid defendants and, if it prevails, defendants would be forced to reimburse SKAT for lost tax revenue.[35]

The plaintiff responds that the rule does not bar the actions because they do not seek unpaid taxes. They seek to recover for what amounted to theft, which "[t]he revenue rule does not protect."[36] Indeed, the defendants, SKAT alleges, have "no legitimate connection to the Danish tax system."[37] According to the complaints, the defendants defrauded SKAT by falsely representing that they owned shares in Danish corporations that paid dividends subject to a withholding tax which, if true, would have entitled the defendants to refunds under the U.S.-Denmark Treaty.[38]

These actions plainly do not seek direct enforcement of Danish tax law. The defendants' attempt to frame them as seeking to recover lost tax revenue – when the only reason the money was lost is because the defendants in effect allegedly stole it, and the only reason it supposedly concerns tax revenue is because the defendants' alleged victim was the Danish tax authority – is too clever by half.[39] The defendants' brief admits as much when it drastically mischaracterizes the nature of the plaintiff's claims in an effort to bring them within the revenue rule. They characterize the claims as seeking to recover for "harms suffered as a result of the *evasion* of a foreign sovereign's tax laws,"[40] when in fact the plaintiff has not alleged a single instance of tax evasion – it alleges fraud, pure and simple. Defendants' mischaracterization betrays their knowledge that tax evasion is a crucial ingredient in cases barred by the revenue rule in this circuit.[41] Indeed, each case they cite and discuss in support of their position involves an underlying scheme of tax evasion.[42]

 **\*312**  Finally, defendants insist that these actions must be regarded as seeking to collect taxes because SKAT "can *only* be a party in a court proceeding"[43] in three limited circumstances: "collection," "calculation of inheritance tax," or "additional payment and compensation."[44] The argument is based on Section A.A.10.3.2 of a document the defendants refer to as the Legal Guide and, to a lesser degree, the Danish Tax Administration Act. But nothing in those texts indicates that SKAT may never be a party to any civil case in any jurisdiction in the world outside of those three areas.

*2. Indirect Enforcement*

The defendants argue in the alternative that the actions seek indirect enforcement of Danish tax law because the Court would be obliged to determine whether the defendants owned shares in the Danish corporations from which they claimed to have received dividends, a determination which – defendants contend – would require the Court to "examine and interpret, and potentially enforce," Danish tax law.[45] The argument has three prongs: (1) the issue of ownership is one of beneficial ownership;[46] (2) the Court must decide whether defendants owned the shares by analyzing, interpreting, and applying at least (a) Section 23.1 of the Danish Capital Gains Tax Act and Section C.B.2.1.6.1 of the Legal Guide published by the Danish tax authorities; (b) Sections (2)(1)(c) and 2(3) of the Danish Companies Act; (c) Section 16A(1) of the Danish Tax Assessment Act; and (d) Sections 65(1) and 69B(1) of the Individual Income Tax Act;[47] and (3) engaging in such an analysis would constitute enforcement of Danish tax law and is "precisely the type of meddling in foreign affairs the Revenue Rule forbids."[48]

The Court disagrees, at least given the record before it.

*a. The Type of Ownership at Issue*

The first prong of the defendants' argument is that the defendants might have been beneficial owners of the shares even if they did not own the shares in any other respect.[49] The defendants place great emphasis on this distinction. Indeed it is the fulcrum on which their argument rests. And, according to defendants, it creates an issue the resolution of which could require  **\*313**  the Court to apply Danish tax law and thus run afoul of the revenue rule.

Defendants' assertion that the issue is one of beneficial ownership ignores the allegations of the complaints and,

perhaps more significantly, would not result automatically in a jurisdictional bar even if defendants were correct. As the Court will discuss in more detail below, the defendants have provided no authoritative information on how property interests are determined under Danish law, and even if the Court were required to decide the issue of beneficial ownership under Danish *tax* law, the revenue rule would not prevent the Court from recognizing – though not enforcing – such a law or laws.

As an initial matter, the allegations in the complaints belie defendants' argument that the issue before the Court is solely one of beneficial ownership. The plaintiff alleges that:

> "The entities, acting through their agents and representatives, applied to SKAT claiming repayments of tax withheld on dividends that they purported to have earned on shares of Danish companies. *These applications were fraudulent because the claimants did not own the shares that they claimed to own, they did not earn the dividends they claimed to have earned,* and they were not entitled to the tax refunds they claimed."[50]

Thus, the complaints draw no distinction between legal and beneficial ownership. To the contrary, they permit proof that the defendants had neither legal nor equitable ownership of the relevant shares.

 **[12]**  Defendants have offered no *evidence* to the contrary. Rather, they have merely *argued* that: (1) their ownership of the shares is confirmed by "*bona fide* documentation issued by the Broker Custodian," but they have not provided either that documentation or any evidence of ownership, either in an affidavit or otherwise; (2) there are "many means to obtain liquidity to purchase shares (such as through financing transactions)," but they have not provided any evidence that the defendants used any such means or entered into a single such financing transaction; and (3) the "lack of registration with [the central securities depository in Denmark] is of no significance in determining either legal or fiscal ownership of the shares (for example, because such shares may have been held in omnibus or custodian accounts)," but they have provided no evidence that the defendants owned the shares legally, fiscally, or through an omnibus or custodian account.[51] That is to say, the defendants – in an effort to avoid the complaints' allegations that the defendants did not own the shares – have (1) put forward only hypothetical ways in which a market participant could "own" shares without paying for them with its own cash, and (2) asserted that a document (that is alleged to be part of the fraud) exists that states that the

defendants owned the shares. But the Court assumes the truth of the complaints' **\*314** allegations of lack of ownership, at least in the absence of competent evidence to the contrary. Accordingly, there is no need on this motion to engage Danish tax or other law to decide any issue of ownership, beneficial or otherwise.

The defendants attempt to cast suspicion on plaintiff's allegations of non-ownership by pointing to differences in language between these complaints and those filed in the United Kingdom.[52] The defendants contend that the word "beneficial" is conspicuously absent from SKAT's complaints here as compared to those filed in the United Kingdom. They urge the Court to infer from this difference that the plaintiff knows that its claims require a determination of beneficial ownership under Danish tax law and therefore are barred by the revenue rule.[53]

The Court is not persuaded. The U.K. filing referred to by the defendants states: "[t]he foreign entity was not the beneficial owner of, or *did not own shares in*, a Danish company as represented...."[54] The complaints here allege that the entities "did not own the shares that they claimed to own."[55] The Court reads this allegation as an assertion that the defendants did not own the shares in any respect – beneficial, legal, or otherwise. Thus the U.K. and U.S. filings allege the same thing or at least plausibly may be so read. There is no basis to jump to the unfounded conclusion that the plaintiff knows that its claims are barred by the revenue rule.[56]

*b. Whether and How Danish Tax Law is Relevant to Beneficial Ownership*

Assuming *arguendo* that the Court would have to consider the issue of beneficial ownership in order to decide this motion, the Court addresses the second prong of the defendants' argument regarding the Danish laws the Court could need to interpret, apply, or enforce.

For all the breath spent on beneficial ownership, the defendants fail to explain how beneficial ownership is distinct under Danish law from other kinds of ownership and the basis for their assertion that it is Danish *tax* law, and not some other category of Danish law, that defines the distinction.[57] Of the seven provisions of Danish law mentioned by the defendants as relevant to the "disputed issue of beneficial ownership,"[58]

five of them appear to be completely irrelevant: Section 16A(1) **\*315** of the Danish Tax Assessment Act, Sections 65(1) and 69(B)(1) of the Individual Income Tax Act, and Sections 2(1)(c) and 2(3) of the Danish Companies Act. The first states that dividends are included in taxable income.[59] The second provides for a "dividend tax" of 27 percent that Danish corporations withhold from the dividends distributed to shareholders.[60] The third states that certain individuals may be entitled to a refund of the tax withheld on dividends if they are covered by a double taxation agreement or certain other directives.[61] The fourth, with certain enumerated exceptions, states that a company or entity with its "registered office in another country [is] also liable for tax, insofar as [it] receive[s] dividends according to § 16a, para. 1 and 2 of the Danish Tax Assessment Act."[62] The fifth provides, among other things, for a discount on the tax withheld from dividends from 27 percent to 15 percent for companies or entities registered in a state that must "exchange information with Danish authorities under a double taxation agreement," or other agreement on tax assistance.[63]

That leaves only Section 23 of the Capital Gains Tax Act of Denmark and Section C.B.2.1.6.1 of the Legal Guide. The Court notes that the defendants have failed to provide a copy of or excerpt from Section 23. They have provided only a copy of a commentary that accompanies it,[64] so the argument for the section's relevance is not immediately clear. However, the Court assumes from defendants' brief that they contend that the Court must apply this section concerning the timing of acquisitions of shares to determine whether the defendants owned the shares at a time that would entitle them to the tax refund.[65] Such an argument is baseless.

There is nothing in the complaints indicating that the defendants owned the shares at issue at one point but not another. Likewise, the defendants do not allege that they in fact owned the shares at one point in time and have introduced no evidence to that effect. The Court is obliged to take the facts in the complaints as true unless placed in dispute by other evidence that the Court may consider on this motion. The defendants have not placed the fact, or timing, of ownership in dispute. The Court notes also that it is not clear how, if at all, the timing argument is related to the question of beneficial ownership as distinct from any other kind of ownership.

 **[13]**   **[14]**   Beyond the apparent irrelevance of the sections of Danish tax law on which the defendants rely, there are

two additional problems. First, the defendants' insistence that beneficial ownership must and will be decided under Danish tax law does not make it so. With respect to issues of foreign law properly noticed under Rule 44.1, the responsibility correctly to identify and apply relevant provisions of foreign **\*316** law is that of the Court.[66] And while the Court is free to "engage in its own research and consider any relevant material thus found," it is not required, and does not propose, to do the defendants' homework for them and scour Danish tax law for a provision that may or may not entitle defendants to a dismissal on this motion.[67] Among other reasons, the Danish language is not among the Court's abilities.

 **[15]**   Second, and relatedly, the Court would need to know a good deal more about Danish law to determine whether the defendants' argument could have merit. For example, in the United States, in the application of the federal revenue code, "state law controls in determining the nature of the legal interest which the taxpayer had in the property."[68] "This follows from the fact that the federal statute creates no property rights but merely attaches consequences, federally defined, to rights created under state law."[69] The same may be true in Denmark in the sense that a body of law other than tax law defines a taxpayer's interest in property. Or it may very well be that Danish tax law defines property rights as well as the tax consequences that flow from those rights. But the defendants cannot prevail on this motion based on the mere possibility that such is the case.

*c. Whether Analyzing the Issue of Beneficial Ownership Under Danish Tax Law is Prohibited by the Revenue Rule*

 **[16]**   As noted earlier, even if there were a Danish tax law or laws concerning beneficial ownership, the Court's consideration of those laws in determining whether the defendants owned the shares in any respect would not necessarily implicate the revenue rule.

*i. Enforcement vs. Recognition of Foreign Tax Law*

"From its earliest days, the revenue rule never proscribed all enforcement [or adjudication] of foreign revenue law."[70] But no binding authority has clarified the extent to which the revenue rule prohibits courts from recognizing or applying, as opposed to enforcing, foreign tax laws.[71] The Second Circuit

In re Skat Tax Refund Scheme Litigation, 356 F.Supp.3d 300 (2019)
123 A.F.T.R.2d 2019-415, 2019-1 USTC P 50,130

indicated in its discussion in the *Canada* case of a pair of cases from the U.K. House of Lords that the revenue rule does not apply to a claim involving *recognition* but not *enforcement* of foreign revenue laws.[72] While the *Canada* court **\*317** did not explicitly endorse this position, it did not reject it either.[73] Indeed, it made a point of distinguishing the two English cases from the one before it by pointing out that the English courts merely recognized foreign revenue law without allowing "damages that would serve as a substitute for previously unpaid taxes to be paid ... to a foreign sovereign."[74] More recently, the Supreme Court suggested in *Pasquantino* that the distinction between recognition and enforcement of a foreign sovereign's tax law is determinative of the scope of the revenue rule's application.[75]

In *Republic of Colombia v. Diageo North America Inc.*, the court addressed this very issue.[76] It found that claims requiring courts to consider or "pass on" a foreign tax law fall along a continuum with explicit enforcement of a foreign revenue law – barred by the revenue rule – at one end, and "mere recognition of a foreign tax law" at the other.[77] Whether "lesser forms of consideration of a foreign revenue law – for example, recognition or application – are permissible depends on the extent to which the consideration of the foreign revenue law raises separation of powers and sovereignty concerns."[78] The Court adopts this test here.

The Second Circuit has described the key policy concerns that trigger the revenue rule as the need both to avoid "complications and embarrassment [that] may follow when one nation's courts analyze the validity of another nation's tax laws," and to respect the executive branch's responsibility to "decide when our nation will aid others in enforcing their tax laws."[79] Neither concern is present in this case.

First, the Court need not pass on the validity of any of Denmark's tax laws to determine whether the defendants were the beneficial owners of the shares. The Court merely would recognize any relevant **\*318** law and determine its effect.[80]

Second, the plaintiff's claims have no bearing on the executive branch's responsibility to decide when to aid other sovereigns in enforcing their tax laws because, as addressed in the discussion regarding direct enforcement, nothing in the complaints seeks enforcement of Danish tax law. The claims, as pleaded, are not ones for tax revenue but for money stolen from the plaintiff by fraud. Any argument that an action is

one for "enforcement" if it involves the determination that defendants were not eligible for or entitled to tax refunds under Danish law is foreclosed by the case law discussed above. Mere recognition or even application of foreign tax law is not the same as enforcement.[81]

### ii. The Danger of Meddling in Foreign Affairs

Contrary to defendants' assertions, rendering a determination with respect to beneficial ownership under Danish tax law would not thrust the Court into the middle of "ongoing, politically-contentious Danish administrative tax proceedings" on the same issue.[82]

**[17]** Defendants rightly point out that rendering a decision under Danish law on the question of beneficial ownership contrary to an opinion of an administrative or judicial body in Denmark deciding the same question would be exactly the type of harm or embarrassment against which the revenue rule is designed to protect. But at this stage of the litigation, and based on the present submissions, there is no reason to expect that this is likely to occur.

The most obvious reason for this already has been discussed. The defendants' submissions have not placed the fact of ownership in dispute. The less obvious reason is that – as far as the Court can tell – beneficial ownership as a specific inquiry under Danish tax law is not even in issue in the proceedings in Denmark at present. The SKAT determination letters, now the subject of appeal in Denmark, do not address the concept of beneficial ownership or turn on a finding specific to that term under Danish law.[83] Instead, they turn on SKAT's finding that the defendants "[did] not own and never [have] owned the shares listed in the claims."[84] Even more tellingly, defendants' appeal of those determinations asserts that "there is no basis for challenging the *fiscal* ownership of the shares in question."[85] Elsewhere in the appeal, defendants describe their ownership as "rightful" or "legal."[86] The only place that the word "beneficial" appears is on Form 06.003, titled "Claim to Relief **\*319** from Danish Dividend Tax."[87] The question on appeal in Denmark does not appear to be whether the defendants beneficially owned the shares at issue except insofar as that language is used on Form 06.003 to refer to the owner. Instead, the primary if not only issue there is whether the defendants owned the shares, or owned and lent them to a third party, *at all.*

Accordingly, there is no indication at this point that the Court potentially will render a determination with respect to Danish tax law that might conflict with a determination by an administrative or judicial body in Denmark. Absent this prospect, the revenue rule provides no grounds to oust this Court of jurisdiction and the defendants' motion is denied. If, however, as the proceedings continue and discovery unfolds, the prospect of inconsistent tax law determinations by this Court and a Danish administrative or judicial body becomes a more tangible possibility, then it may be appropriate to revisit the issue, at which time the defendants may file an appropriate motion.

As noted earlier, even if the issue of ownership is not decided in this proceeding or one in Denmark under Danish *tax* law, a different body of Danish law may apply. In that scenario, the possibility remains that this Court and a Danish body might draw different conclusions after applying the same Danish law. The harm and embarrassment that could result from such an outcome could be of the kind that the revenue rule is meant to avert. The Court mentions this issue not to decide how it would proceed in those circumstances, but to clarify a separate instance in which foreign affairs may be implicated and another motion – though not one based on the revenue rule – may be appropriate.

### 3. Defendants' Other Arguments

The defendants make five additional arguments, viz. that: (1) the commercial actor exception to the revenue rule does not apply;[88] (2) the U.S.-Denmark Treaty bars the action;[89] (3) the plaintiff is attempting to intimidate the defendants and abuse the U.S. court system to conduct expedited discovery for use in ongoing Danish proceedings;[90] (4) the plaintiff has sought and received information pursuant to the U.S.-Denmark Treaty, which in itself indicates that the action is one for tax enforcement;[91] and (5) the availability of an administrative appeal to the Tax Appeals Agency, which defendants are pursuing, further demonstrates that the action seeks to enforce Danish tax law.[92]

The Court need not address the first argument at any length because the plaintiff does not allege that it is a commercial actor. The defendants' assertion to the contrary is a red herring.[93]

[18]  The second merits only a point of clarification: the U.S.-Denmark Treaty and its provisions for "assistance in the collection of a revenue claim" are irrelevant **\*320** because the plaintiff's claims do not seek to collect tax owed by the defendants and covered by the treaty.[94] The Danish taxes that make up a "revenue claim" under Article 27 of the treaty include only the following "together with interest, costs, additions to such taxes, and civil penalties":[95] "(1) the income tax to the State; (2) the municipal income tax; (3) the income tax to the county municipalities; and (4) taxes imposed under the Hydrocarbon Tax Act," as well as "any identical or substantially similar taxes which are imposed after the date of signature of the Convention in addition to, or in place of, the existing taxes."[96] Money obtained by fraud from SKAT is none of these things.

There is no evidence that supports the defendants' third argument. Moreover, the report that the defendants rely on to support their claim that SKAT is seeking a discovery shortcut suggests that SKAT may have little need for such a shortcut, if indeed the process in this Court is one, which the Court does not believe that it is.[97]

The Court does not consider the fourth argument because the propriety of obtaining information pursuant to the U.S.-Denmark Treaty is not before it.

Finally, the Court will not countenance defendants' attempts to use the status of the victim they allegedly chose to target in this fraud to block the victim from obtaining relief.[98] The Court does not expect SKAT to sit idly by, and it sees no inconsistency in SKAT's decision to withdraw its prior decision to refund dividend taxes, leading to administrative appeals in Denmark, and to file the complaints alleging fraud and seeking relief in this Court. Defendants are completely correct to note that "it is the method by which the alleged fraud occurred" that matters – not the chosen victim.[99]

### II. Failure to State a Claim

#### A. Legal Standard

[19]  To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, state a claim for relief that is plausible on its face.[100] If a complaint alleges fraud, it must comply with Rule 9(b), which requires the plaintiff to plead the circumstances constituting fraud with particularity, but

123 A.F.T.R.2d 2019-415, 2019-1 USTC P 50,130

allows "[m]alice, intent, knowledge, and other condition[s] of mind to be averred generally."[101]

[20]  The Court will dismiss a complaint on a Rule 12(b)(6) motion only if it appears beyond doubt "that the plaintiff can prove no set of facts" in support of its  *321  claim that would entitle it to relief.[102]  In resolving a Rule 12(b)(6) motion, the Court accepts as true all factual allegations set forth in the complaints and draws all reasonable inferences in the plaintiff's favor.[103]  When material outside the pleadings is presented on a Rule 12(b)(6) motion, the Court may consider the material if it chooses to treat the motion as one for summary judgment under Rule 56.[104]

In deciding this Rule 12(b)(6) motion, the Court considers all affidavits and exhibits submitted by the parties with their motion papers, thereby transforming the motion into one for summary judgment except where such material outside the complaints has no bearing. In those instances, the Court applies the standard for a Rule 12(b)(6) motion. In the others, the Court applies the standard for a Rule 56 motion. That standard requires the moving party to show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.[105]  The moving party bears the initial burden of demonstrating an absence of a question of material fact.[106]  If the moving party meets this burden, then "the opposing party must establish a genuine issue of fact by citing to particular parts of materials in the record" to survive the motion.[107]  "In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the [non-moving party]."[108]

### B. False Representations of Material Fact

[21]  The defendants move to dismiss the claims of fraud, aiding and abetting fraud, and negligent misrepresentation against the authorized representatives and incorporator on the grounds that neither made a material misrepresentation or omission of fact. The defendants attempt to cabin the authorized representatives' roles to the act of signing the powers of attorney, which defendants point out the complaints do not allege to be false. Likewise, the defendants argue that the only allegation regarding the incorporator is that he "incorporated and dissolved certain companies, activities which are *not* alleged to be misrepresentations."[109]

[22]  [23]  The crux of the defendants' argument is that the authorized representatives and incorporator cannot be liable vicariously for the acts of the non-party payment agents or broker custodians because the defendants did not have a principal-agent relationship with those actors, but were merely co-agents. To establish a principal-agent relationship, the plaintiff must allege: (1) "the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking."[110]  Additionally, "a  *322  party must allege that the agent acts subject to the principal's direction and control."[111]

### 1. Authorized Representatives

Defense Exhibit 3 includes a copy of the power of attorney signed by authorized representative Doston Bradley and is therefore relevant to this issue. The Court considers the motion with respect to authorized representatives under Rule 56.

[24]  Drawing all reasonable inferences and resolving all ambiguities in the plaintiff's favor, the Court concludes that there is a genuine and disputed question of material fact regarding the existence of a principal-agent relationship between the authorized representatives and the payment agents. According to the complaints, the plans, acting through their respective authorized representatives, granted the payment agents authority to act on the plans' behalf,[112] and the powers of attorney that granted the payment agents this authority did so "subject to the control of the [plans]."[113] However, the limited power of attorney signed by authorized representative Bradley nowhere states that the payment agent will act "subject to the control" of the plans. Instead, it states that the plan appoints the payment agent "as its true and lawful attorney-in-fact and *agent*."[114] There is ambiguity surrounding the degree of control the plans retained over the payment agents under the power of attorney. That ambiguity must be resolved in favor of the plaintiff for purposes of this motion. The Court therefore concludes that because the complaints allege that the plans acted through their authorized representatives[115] and the authorized representatives would be the ones practically directing the actions of the payment agents,[116] the powers of attorney were,

in substance, proposals for the payment agents to act for the authorized representatives and subject to their control, to which the payment agents agreed.

### 2. Incorporator

[25]   None of the material outside the complaints supplies the Court with unpleaded facts relevant to this issue. The Court therefore considers the motion with respect to incorporators under Rule 12(b)(6).

The Court concludes that the complaints fail to allege facts sufficient to find a principal-agent relationship between the incorporator, Crescenzo, and the payment agents, but allege facts sufficient to plead a claim for individual liability under the *alter ego* doctrine.

[26]   To plead *alter ego* liability, the plaintiff must allege that: (1) the person exercised dominion and control with respect to the transaction attacked such that the corporation had no separate will of its own; and (2) the domination was used to commit a fraud or wrong against the plaintiff,  **\*323**  which proximately caused the plaintiff's injuries.[117]

[27]   According to the Aria Complaint and others, Crescenzo "participated in incorporating limited liability companies associated with fifteen different claimants" that were created shortly before the claimants submitted their initial tax refund claims to SKAT and that Crescenzo had a hand in dissolving those same entities, all on the same date.[118] It is reasonable to infer from these allegations that Crescenzo controlled the very existence of the companies affiliated with the pension plans and indeed that he created them for the purpose of receiving tax refunds. This inference, coupled with the allegation that Crescenzo's home address is the same as the addresses listed by at least five pension plans including the Aria Plan,[119] permits a second inference: Crescenzo controlled the pension plans themselves.[120]

At this stage of the litigation there are a number of open questions regarding incorporator control of the Aria Plan and others that concern the nature of Crescenzo's relationship to the authorized representative and the plans and the degree to which Crescenzo controlled or possibly shared control of the plans. If indeed Crescenzo shared control of the plans, then *alter ego* liability may not lie. But because the plaintiff has

pleaded a set of facts, accepted as true, that state a plausible claim for relief, the motion to dismiss is denied.

### C. Fraud Claims

### 1. Scienter

Defendants argue that the complaints fail sufficiently to plead the defendants' knowledge or intent to defraud and therefore do not meet the pleading requirements of Rule 9(b). Material outside the complaints submitted by the parties bears on this issue, which the Court will consider in deciding this motion under Rule 56.

[28]   [29]   Rule 9(b) provides that the plaintiff may allege malice, intent, knowledge, and other conditions of the mind generally,[121] though the facts alleged in the complaint must "give rise to a strong inference of fraudulent intent."[122] A strong inference is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[123] A plaintiff can meet this burden either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence  **\*324**  of conscious misbehavior or recklessness."[124]

[30]   [31]   [32]   The plaintiff has met its burden under both tests. First, the complaints clearly allege motive by stating, for example, that the Bradley Plan claimed refunds in the amount of $11 million dollars or more, and received payments from SKAT on those claims.[125] The complaints adequately allege that all defendants had the requisite opportunity to commit the fraud by describing each's role in the scheme. With respect to the plan defendants, the complaints allege that the plans provided documentation to SKAT including claim forms that represented, contrary to fact, that the plans: (1) owned shares and had received dividends net of withholding tax, and (2) were entitled to a refund.[126] With respect to the authorized representatives, the complaints allege that they effectuated the scheme by acting "on behalf of the claimants with respect to the dividend withholding tax refund claims,"[127] and signed powers of attorney appointing payment agents for the singular purpose of acting on the plans' behalf to obtain and receive the tax refunds.[128] The payment agents submitted, signed, and stamped the claim forms, certifying that the plans owned shares that entitled them to tax refunds.[129] Finally, the

incorporator created and dissolved entities associated with the submission of applications for tax refunds and receipt of those refunds.[130]

**[33]** Second, the plaintiff sufficiently alleges strong circumstantial evidence of conscious misbehavior or recklessness. Indeed, the most plausible inference one could draw from the facts is that the defendants knew exactly what they were doing and that what they were doing was fraudulent. SKAT points out that the Bradley Plan is a one-participant 401(k) plan with a cap of approximately $116,000 on annual contributions, and yet it claimed to own hundreds of millions of dollars of shares in Danish corporations within the first year of its existence.[131] Moreover, the Bradley Plan did not file a Form 5500-EZ[132] with the IRS in 2015 – the year in which Bradley submitted the refund claims to SKAT and received payments on those claims.[133] A one-participant plan such as the Bradley Plan does not have to file the form if "the total of the plan's assets and the assets of all other one-participant plans maintained by the employer at the end of the [ ] plan year does not exceed $250,000."[134] It strains credulity to claim that defendants – one-participant plans and their agents – did not know whether the plans owned shares that were worth hundreds of millions of dollars or whether they were entitled to refunds from SKAT that were over 44 times greater than the total value of the plans' assets.

Having considered the material outside the complaints relevant to this question submitted by the parties, the Court concludes that the defendants have not met **\*325** their burden under Rule 56 and the plaintiff has established a genuine issue of fact with respect to *scienter*,[135] including by citing to particular parts of materials in the record.

### 2. Aider and Abetter Liability

**[34]** The defendants argue that the aiding and abetting claims should be dismissed because the complaints fail to allege substantial assistance on the part of any defendant. None of the material outside the complaints supplies the Court with unpleaded facts relevant to this issue. The Court therefore considers it under Rule 12(b)(6).

The defendants' argument fails because as discussed above, the plaintiff has alleged that the defendants acted in concert to carry out the scheme and each directly contributed to the alleged fraud. The motion to dismiss the aiding and abetting

claims is denied, substantially for the reasons set forth in the plaintiff's brief.[136]

### D. Restitution Claims

**[35]** The defendants argue that the unjust enrichment claim should be dismissed because it is duplicative of the fraud and misrepresentation claims. Defendants likewise argue that the money had and received and payment by mistake claims are duplicative of the unjust enrichment claim. None of the materials outside the complaints supplies the Court with facts relevant to this issue. The Court therefore considers it under Rule 12(b)(6).

**[36]   [37]   [38]** A plaintiff may not plead the same claim more than once, which would constitute a duplicative claim, but may plead claims that provide alternative bases for relief.[137] A claim is alternative and not duplicative if a plaintiff may fail on one but still prevail on the other.[138] However, if the fraud and unjust enrichment claims rest on the same facts and the plaintiff prevails on the fraud claim, then the unjust enrichment claim becomes duplicative.[139]

The unjust enrichment claim alleges an alternative basis for relief from the fraud and negligent misrepresentation claims because both *scienter* and the defendants' liability for the alleged misrepresentations are disputed. The plaintiff's claims for fraud and negligent misrepresentation theoretically could fail and it still could prevail on the unjust enrichment claim. The defendants' motion with respect to the unjust **\*326** enrichment claim therefore is denied as premature.

**[39]** The defendants' motion with respect to the money had and received claim is denied also. Courts in this circuit and district have found that claims for money had and received and unjust enrichment are not duplicative of each other even when they rest on the same facts on the grounds that money had and received is a claim that "has been considered an action at law" even though it rests on equitable principles,[140] and the claims, while similar, are not identical.[141] Moreover, the motion is premature.[142]

For the same reasons, the motion with respect to the payment by mistake claim is denied.

### Conclusion

The defendants' motion to dismiss the complaints is denied in all respects.

SO ORDERED.

**All Citations**

356 F.Supp.3d 300, 123 A.F.T.R.2d 2019-415, 2019-1 USTC P 50,130

## Footnotes

1   SKAT v. The Bradley London Pension Plan & Doston Bradley, 18-cv-4047, Complaint [hereinafter "Bradley Compl."] [DI 1] ¶¶ 1, 19-24.

2   *See* Bradley Compl. ¶¶ 9, 17-18; SKAT v. The Aria Pension Plan, Roger Lehman, and Gavin Crescenzo, 18-cv-5147, Complaint [hereinafter "Aria Compl."] [DI 1] ¶¶ 19, 40-42.

3   Bradley Compl. ¶ 20.

4   *Id.* ¶¶ 21-22.

5   *Id.* ¶ 25.

6   Aria Compl. ¶ 41.

7   Bradley Compl. ¶¶ 39-40.

8   *Id.* ¶¶ 26, 28, 43-44.

9   *Id.* ¶ 28.

10   *Id.* ¶¶ 46-47.

11   *Id.* ¶ 45.

12   *Id.* ¶ 5.

13   Pl. Br. [18-cv-4047, DI 47] at 5-6.

14   *Id.*

15   Bradley Compl. ¶¶ 2-3.

16   *Id.* ¶¶ 50-61.

17   *Id.* ¶¶ 76-80.

18   *Id.* ¶¶ 62-75.

19   Def. Br. [18-cv-4047, DI 35] at 6, 9.

20   *Id.* at 24-25.

21   *Id.* at 19.

22   *Id.* at 23.

23   *Id.* at 25-26.

24   Defendants move to dismiss these actions under Rule 12(b)(1) on the premise that the revenue rule ousts federal district courts of jurisdiction to entertain cases that are within the rule's prohibitions. At least one court in this circuit has held that Rule 12(b)(1) is "an appropriate basis on which to make such a motion." *Republic of Colombia v. Diageo North America Inc.*, 531 F.Supp.2d 365, 381 (E.D.N.Y. 2007). The Second Circuit has not so ruled, though it has heard a number of cases concerning motions to dismiss based on the revenue rule. In those cases, the Second Circuit did not clarify the subsection of Rule 12(b) under which a party must bring a motion to dismiss based on the revenue rule. *See, e.g., Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 108 (2d Cir. 2001); *United States v. Trapilo*, 130 F.3d 547, 550-51 (2d Cir. 1997).

   This Court is not convinced that the defendants' premise here is correct because the Second Circuit pointed out in *Canada* that the revenue rule is a "time-honored common law prudential rule" that "appears to share" the same "constitutional underpinnings" as the act of state doctrine. 268 F.3d at 125-26, 129. The act of state doctrine is a "substantive rather than jurisdictional defense." *Petersen Energia Inversora S.A.U. v. Argentine Republic and YPF S.A.*, 895 F.3d 194, 212 (2d Cir. 2018) (*quoting Daventree Ltd. v. Republic of Azerbaijan*, 349 F.Supp.2d 736, 755 (S.D.N.Y. 2004) ).

   Nonetheless, the Court, without deciding the issue, analyzes this motion under Rule 12(b)(1), as it is cognizant that the Second Circuit has not limited litigants to one subsection of Rule 12(b) or another with respect to the revenue rule. Moreover, the Court notes that, in addition to the act of state doctrine, the rule shares constitutional underpinnings with the political question doctrine – a doctrine the Second Circuit has described as "a function of the constitutional

framework of separation of powers" that is "essentially a constitutional limitation" on courts' jurisdiction. *767 Third Ave. Assoc. v. Consulate Gen. of Socialist Fed. Republic of Yugoslavia*, 218 F.3d 152, 164 (2d Cir. 2000). In any case, the result here would be identical regardless of whether the revenue rule is appropriately invoked under Rule 12(b)(1) or 12(b)(6).

25    *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008).

26    *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

27    *Morrison*, 547 F.3d at 170.

28    *Id.*

29    *Canada*, 268 F.3d at 130-31.

30    *Id.* at 111-13.

31    *Id.* at 113-14.

32    *European Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123, 131 (2d Cir. 2004), *cert. granted, judgment vacated and remanded*, 544 U.S. 1012, 125 S.Ct. 1968, 161 L.Ed.2d 845 (2005).

33    *Id.* For example, "a suit seeking damages based on law enforcement costs is an attempt to shift the cost of enforcing the tax laws onto the defendants, and would therefore require the court indirectly to enforce the tax laws." *Id.*

34    *Id.*

35    Def. Br. [18-cv-4047, DI 35] at 9.

36    Pl. Br. [18-cv-4047, DI 47] at 2.

37    *Id.* at 8.

38    Bradley Compl. ¶¶ 3-4.

39    *Cf. Canada*, 268 F.3d 103 (dismissing part of the action as one for direct enforcement of Canadian tax laws because Canada sought damages for defendants' evasion of customs and excise taxes).

40    Def. Br. [18-cv-4047, DI 35] at 10 (*quoting Colombia*, 531 F.Supp.2d at 394) (emphasis added).

41    *See, e.g., Canada*, 268 F.3d 103.

42    *See Republic of Honduras v. Philip Morris Cos.*, 341 F.3d 1253, 1255 (11th Cir. 2003) ("In this appeal, we address the issue of whether the revenue rule prevents a foreign sovereign from bringing suit in federal court for violations of [RICO] involving schemes to avoid the sovereign's tax laws."); *Canada*, 268 F.3d at 105-06 (involving an action brought by Canada under RICO to recover "revenue that it lost" as a result of an alleged conspiracy to "avoid various Canadian cigarette taxes by smuggling cigarettes across the United States Canadian border for sale on the Canadian black market"); *Colombia*, 531 F.Supp.2d at 391 (barring claims for damages resulting from lost liquor taxes on imported liquor that was smuggled into Colombia); *Republic of Ecuador v. Philip Morris Cos.*, 188 F.Supp.2d 1359, 1360, 1362 (S.D. Fla. 2002) (barring RICO and state law claims brought by Ecuador against the tobacco industry to recover from defendants' conspiracy to smuggle tobacco into the country thereby evading taxes). While the revenue rule's bar against actions to enforce foreign tax laws and collect damages resulting from tax evasion is clearly established, it is not clear that those types of actions are the only ones barred by the revenue rule. *Colombia*, 531 F.Supp.2d at 387 (stating that there is "no binding authority" on "the extent to which the revenue rule prohibits courts from considering the validity of or recognizing foreign tax laws" outside the context of "claims for costs resulting from enforcement of foreign tax laws").

43    Def. Reply Br. [18-md-2865, DI 11] at 3.

44    *Id.* Ex. 63A; *see also id.* Ex. 64A.

45    Def. Br. [18-cv-4047, DI 35] at 10.

46    *Id.* at 4.

47    *Id.* at 10-11, Ex. 7-13; Def. Reply Br. [18-md-2865, DI 11] at 1.

48    Def. Br. [18-cv-4047, DI 35] at 11 (*quoting Canada*, 268 F.3d at 108).

49    *See, e.g.*, Def. Reply Br. [18-md-2865, DI 11] at 3.

50    *E.g.*, Bradley Compl. ¶ 4 (emphasis added).

51    Def. Br. [18-cv-4047, DI 35] at 11 (*citing id.* Ex. 5A at 2-7). The material cited by the defendants is their own appeal to the Danish Tax Appeals Agency submitted in response to the plaintiff's decision to rescind the refunds paid to the defendants as a result of the alleged scheme. The pages cited rehash the arguments advanced here in points two and three except at much greater length. Other than providing the Danish Tax Appeals Agency, and now this Court, with a primer on different mechanisms buyers can avail themselves of to purchase stock, none of which has any apparent relevance to this case,

Defense Exhibit 5A does nothing to further the defendants' argument as the exhibit contains no statement of fact or allegation specific to the issue of defendants' *actual* ownership, beneficial or otherwise, of the shares at issue in this case.

52    Def. Reply Br. [18-md-2865, DI 11] at 2.

53    *Id.*

54    *Id.* Ex. 62 ¶ 8 (emphasis added).

55    Bradley Compl. ¶ 4.

56    Moreover, the Court will not indulge the defendants' wish that it view unfavorably the plaintiff's decision to dismiss voluntarily a complaint in this case against one authorized representative and re-file it in the United Kingdom using the same wording as other U.K. filings. *See* Def. Reply Br. [18-md-2865, DI 11] at 2-3. The plaintiff is not obliged to bring an action in a particular forum.

57    Defendants mention only that the distinction between beneficial ownership and other types of ownership "is critical because a shareholder may have beneficial ownership of an asset for tax purposes as a result of their economic or possessory interest or other attributes in such asset, even if there is not legal ownership of the asset." Def. Reply Br. [18-md-2865, DI 11] at 3. The brief goes on to state that beneficial ownership of shares subject to the withholding tax is determined by the laws of Denmark and that such a determination "often involves a challenging consideration of legal and factual issues." *Id.* at 3 n.3. The footnote is befuddling as it cites U.S. cases regarding U.S. tax determinations that have nothing to do either with the facts of this case or the determination of beneficial ownership under Danish law.

58    *Id.* at 1.

59    Def. Br. [18-cv-4047, DI 35] Ex. 9A.

60    *Id.* Ex. 10A.

61    *Id.* Ex. 11A.

62    *Id.* Ex. 7A.

63    *Id.* Ex. 8A.

64    *Id.* Ex. 12A. The commentary to Section 23 of the Capital Gains Tax Act defines the date of sale and date of acquisition for shares traded on the stock exchange, and Section C.B.2.1.6.1 of the Legal Guide describes when a share has been purchased or sold. *Id.* Ex. 12A, 13A.

65    *Id.* at 10 (stating that "resolution of this case would require the Court to determine whether under *Danish* tax law the Plans 'owned' or were deemed to own shares of Danish companies at the time the dividends were paid").

66    *Rationis Enterprises Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 586 (2d Cir. 2005). Rule 44.1 requires a party "who intends to raise an issue about a foreign country's law" to "give notice by a pleading or other writing." Fed. R. Civ. P. 44.1. Under the rule, notice differs from argument in the follow respect. Notice "merely call[s] attention to the fact that the issue will be raised, whereas argument lays out, *inter alia*, the provisions of foreign law, the basis for its relevance, and the application of the foreign law to the facts of the case." *Rationis Enterprises*, 426 F.3d at 585-86.

67    Fed. R. Civ. P. 44.1.

68    *United States v. National Bank of Commerce*, 472 U.S. 713, 722, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985).

69    *Id.* (internal quotations and citations omitted).

70    *Pasquantino v. United States*, 544 U.S. 349, 366, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005). For example, English courts (from which the revenue rule derives) "considered void foreign contracts that lacked tax stamps required under foreign revenue law." *Id.* at 367, 125 S.Ct. 1766. These cases "no doubt 'enforced' foreign revenue law in the sense that they encouraged the payment of foreign taxes; yet they fell outside the revenue rule's scope." *Id.*

71    *Colombia*, 531 F.Supp.2d at 387.

72    *Canada*, 268 F.3d at 133-34. The revenue rule is a common law doctrine with roots in eighteenth-century English law. *See id.* at 110.

73    *Id.* at 133-34. Elsewhere in the *Canada* opinion, the court stated that "to pursue its claim for damages relating to lost tax revenue, Canada will have to prove, and the Court will have to pass on, the validity of the Canadian revenue laws and their applicability hereto and the Court would be, in essence, enforcing Canadian revenue laws." *Id.* at 108. This could be read to indicate that a court is barred from applying or even determining whether foreign revenue laws apply to the defendants before it. The better reading, and the one that this Court adopts, is as an acknowledgment that the process leading to enforcement of a foreign sovereign's tax law in *Canada* would have involved considering and applying foreign

tax law, which alone, absent the end result of enforcement, would not necessarily be a problem under the revenue rule. This reading is consistent with the court's discussion of the House of Lords cases and its holding. *See also Colombia*, 531 F.Supp.2d at 388 (stating that other than the passage discussed above, "nothing in *Amazonas* [which relied on *Canada* ] supports the proposition that any time an action forces a court to consider a foreign revenue law, the action constitutes an attempt to indirectly enforce a foreign revenue law that is proscribed by the revenue rule").

74    *Canada*, 268 F.3d at 133-34.

75    *Pasquantino*, 544 U.S. at 368, 125 S.Ct. 1766 ("Indirect enforcement is ... easier to describe than to define, and it is sometimes difficult to draw the line between an issue involving merely recognition of a foreign law and indirect enforcement of it.") (internal citations and quotations omitted).

76    531 F.Supp.2d 365, 388 (E.D.N.Y. 2007).

77    *Id.*

78    *Id.*

79    *European Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175, 180 (2d Cir. 2005), *cert. denied*, 546 U.S. 1092, 126 S.Ct. 1045, 163 L.Ed.2d 858 (2006).

80    *See Colombia*, 531 F.Supp.2d at 396 (finding that the revenue rule did not bar consideration of the plaintiffs' claims for lost revenues and profits resulting from the defendants' money laundering enterprise because the "court's consideration of Colombia tax laws will be limited to recognizing their applicability and determining their economic effect").

81    *See, e.g., id.* at 388.

82    Def. Reply Br. [18-md-2865, DI 11] at 1.

83    Def. Br. [18-cv-4047, DI 35] Ex. 4A at 1. *But see id.* Ex. 4A at 5 ("Form 06.003 states that Bradley is the *rightful* owner of the stocks and that it is subject to the Convention for the Avoidance of Double Taxation between Denmark and the United States.") (emphasis added).

84    *Id.* Ex. 4A at 1.

85    *Id.* Ex. 5A at 2 (emphasis added).

86    *See, e.g., id.* Ex. 5A at 6-7.
     The Court notes that the defendants argue to the Tax Appeals Agency in Denmark that they were the legal owners of the shares but before this Court, the defendants argue that they potentially were the beneficial owners of the shares even if they were not the legal owners of the shares. *See* Def. Reply Br. [18-md-2865, DI 11] at 3.

87    Def. Br. [18-cv-4047, DI 35] Ex. 3 at 2.

88    Def. Br. [18-cv-4047, DI 35] at 13-14.

89    *Id.* at 16-18.

90    *Id.* at 18.

91    Def. Reply Br. [18-md-2865, DI 11] at 3-4.

92    *Id.* at 4.

93    The *Colombia* court did not hold that an action brought by a plaintiff in its sovereign capacity automatically is barred by the revenue rule or that a sovereign plaintiff must bring a claim in its commercial capacity to avoid triggering the rule. The court stated that the test for when a claim will result in indirect enforcement of another sovereign's tax laws is whether the "sovereignty and separation of powers concerns that inform the rule are implicated by the substance of a plaintiff's claims." 531 F.Supp.2d at 389.

94    Def. Br. [18-cv-4047, DI 35] at 15.

95    Convention for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income [hereinafter U.S.-Denmark Treaty], U.S.-Den., art. 27, Aug. 19, 1999, T.I.A.S. No. 13056.

96    U.S.-Denmark Treaty, art. 2.

97    Def. Br. [18-cv-4047, DI 35] Ex. 14A. For example, the report states that in some cases, "access is given to entire case files or many documents, e.g.: ... in specific cases data is disclosed between the Danish State Prosecutor for Serious Economic and International Crime and the Danish tax authorities in a manner that is almost routine." *Id.* Ex. 14A at 27.

98    *See* Def. Reply Br. [18-md-2865, DI 11] at 4.

99    *Id.*

100    *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

101    *Stern v. Leucadia Nat. Corp.*, 844 F.2d 997, 1004 (2d Cir. 1988) (internal quotations omitted).

102    *Hoover v. Ronwin*, 466 U.S. 558, 587, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984).

103    *United States v. The Baylor Univ. Med. Ctr.*, 469 F.3d 263, 267 (2d Cir. 2006).

104    *Braka v. Bancomer, S.A.*, 589 F.Supp. 1465, 1468 (S.D.N.Y. 1984).

105    Fed. R. Civ. P. 56(a).

106    *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

107    *Hart v. Rick's Cabaret Intern., Inc.*, 967 F.Supp.2d 901, 911 (S.D.N.Y. 2013) (internal quotations and citations omitted); *see also Holcomb*, 521 F.3d at 137.

108    *Holcomb*, 521 F.3d at 137.

109    Def. Br. [18-cv-4047, DI 35] at 25.

110    *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03-cv-0613 (GBD), 2004 WL 112948 at *4 (S.D.N.Y. Jan. 22, 2004).

111    *Id.* at *5 (internal quotations and citations omitted).

112    Bradley Compl. ¶ 39.

113    *Id.* ¶ 42 ("By means of the Power of Attorney described in paragraphs 39-40 above, each claimant authorized its respective Payment Agent to act on behalf of and subject to control of the claimant with respect to submitting the withholding tax refund claims.").

114    Def. Br. [18-cv-4047, DI 35] Ex. 3 at 6 (emphasis added).

115    Bradley Compl. ¶¶ 34, 39.

116    *Id.* ¶ 41 ("The Payment Agents submitted the fraudulent withholding tax refund claims at the direction of the claimants and Authorized Representatives and on behalf of the claimants.").

117    *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).

118    Aria Compl. ¶¶ 41-42; *see also* The Bravos Advisors 401K Plan, Roger Lehman, and Gavin Crescenzo, 18-cv-5151, Complaint [hereinafter "Bravos Compl." [DI 1] ¶¶ 41-42; The Costello Advisors Pension Plan, Roger Lehman, and Gavin Crescenzo, 18-cv-5158, Complaint [DI 1] ¶¶ 41-42.

119    Aria Compl. ¶ 19; Bravos Compl. ¶ 19.

120    *See Leykis v. NYP Holdings, Inc.*, 899 F.Supp. 986, 992 (E.D.N.Y. 1995) (listing as a factor courts weigh to determine whether a person or entity is an alter ego "common office space, address and telephone numbers"). For those plans that list the same address as the home address of the authorized representative, *alter ego* liability is an additional and alternative basis upon which the Court finds those particular authorized representatives liable. *See* Allison Decl. [18-cv-4047, DI 36] Ex. 31 ¶¶ 17, 18.

121    *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

122    *Id.*

123    *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 176-77 (2d Cir. 2015).

124    *Acito*, 47 F.3d at 52.

125    Bradley Compl. ¶¶ 36, 38.

126    *Id.* ¶¶ 4, 28.

127    *Id.* ¶ 34.

128    *Id.* ¶¶ 4, 34, 39-40.

129    *Id.* ¶¶ 4, 43.

130    Aria Compl. ¶¶ 41-42.

131    Pl. Br. [18-cv-4047, DI 47] at 5-6, 17; Allison Decl. [18-cv-4047, DI 36] Ex. 4A at 6-7, Ex. 5A at 7-8.

132    Def. Br. [18-cv-4047, DI 35] Ex. 4A at 6-7.

133    Bradley Compl. ¶¶ 36, 38.

134    Def. Br. [18-cv-4047, DI 35] Ex. 4A at 6.

135    *See Press v. Chemical Inv. Services Corp.*, 166 F.3d 529, 537-38 (2d Cir. 1999) (finding that the plaintiff adequately pleaded *scienter* by alleging motive and opportunity such that the issue could not be taken from the fact finder).

136    Pl. Br. [18-cv-4047, DI 47] at 20-21.

137    *See, e.g., Allstate Ins. Co. v. Nazarov*, No. 11-cv-6187 (PCK), 2015 WL 5774459 at *16 (E.D.N.Y. Sept. 30, 2015). *But see Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 944 N.Y.S.2d 732, 967 N.E.2d 1177, 1185 (2012) (stating that unjust enrichment is not a "catchall cause of action to be used when others fail" and that it is unavailable when it simply duplicates, or replaces, a conventional contract or tort claim).

138  *See Allstate*, No. 11-cv-6187 (PCK), 2015 WL 5774459 at *16. (stating that unjust enrichment claims would be appropriate alternative claims to the plaintiffs' common law fraud claims had the plaintiffs failed to establish liability on the fraud claims); *Aramony v. United Way of America*, 949 F.Supp. 1080, 1084 (S.D.N.Y. 1996) (finding that the plaintiff may plead unjust enrichment as an alternative theory to its ERISA claims when the defendants questioned the existence of an enforceable ERISA plan).

139  *See Allstate*, No. 11-cv-6187 (PCK), 2015 WL 5774459 at *16 ("However, as Plaintiffs have established the [ ] Defendants' liability for common law fraud, Plaintiffs have not adequately pled a claim for unjust enrichment because that claim would rely on duplicative facts.").

140  *Bangkok Crafts Corp. v. Capitolo Di San Pietro in Vaticano*, No. 03-cv-15 (RWS), 2007 WL 1687044 at *10 (S.D.N.Y. June 11, 2007) (internal quotations and citations omitted).

141  *N. Shipping Funds I, LLC v. Icon Capital Corp.*, 998 F.Supp.2d 301, 328 n.9 (S.D.N.Y. 2014). The Court notes, however, that courts in this district have found that unjust enrichment and money had and received claims are duplicative under the laws of other states. *E.g., U.S. ex rel. Kester v. Novartis Pharm. Corp.*, No. 11-cv-8196 (CM), 2014 WL 4401275 at *13-14 (S.D.N.Y. Sept. 4, 2014) (finding that money had and received and unjust enrichment claims are duplicative under Washington law).

142  *Marini v. Adamo*, 644 Fed. App'x 33, 35-36 (2d Cir. 2016) (summary order) (finding claims for unjust enrichment and money had and received duplicative of common law fraud and breach of fiduciary duty claims on which the defendants had been found liable).

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SKATTEFORVALTNINGEN, | Civil Action No. 19-cv-10713 |
| Plaintiff, | Honorable Lewis A. Kaplan |
| vs. | April 27, 2020 |
| JOHN VAN MERKENSTEIJN, RICHARD MARKOWITZ, BERNINA PENSION PLAN TRUST, RJM CAPITAL PENSION PLAN TRUST, 2321 CAPITAL PENSION PLAN, BOWLINE MANAGEMENT PENSION PLAN, CALIFORNIA CATALOG COMPANY PENSION PLAN, CLOVE PENSION PLAN, DAVIN INVESTMENTS PENSION PLAN, DELVIAN LLC PENSION PLAN, DFL INVESTMENTS PENSION PLAN, LAEGELER ASSET MANAGEMENT PENSION PLAN, LION ADVISORY INC. PENSION PLAN, MILL RIVER CAPITAL MANAGEMENT PENSION PLAN, NEXT LEVEL PENSION PLAN, RAJAN INVESTMENTS LLC PENSION PLAN, SPIRIT ON THE WATER PENSION PLAN, and TRADEN INVESTMENTS PENSION PLAN, | **AMENDED COMPLAINT** **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Skatteforvaltningen[1] ("**SKAT**"), which is the Customs and Tax Administration of the Kingdom of Denmark, by its attorneys Hughes Hubbard & Reed LLP, alleges against Defendants John van Merkensteijn ("**van Merkensteijn**"), individually and in his role as trustee

---

1. At the time of the events alleged in this Amended Complaint, Plaintiff was known as "SKAT," and thereafter, pursuant to Danish legal order 804, entered on June 6, 2018, Plaintiff changed its legal name to Skatteforvaltningen, effective July 1, 2018.

of Defendant Bernina Pension Plan Trust, Richard Markowitz ("**Markowitz**"), individually and in his role as trustee of Defendant RJM Capital Pension Plan Trust, Bernina Pension Plan Trust ("**Bernina**"), RJM Capital Pension Plan Trust ("**RJM Capital**"), 2321 Capital Pension Plan ("**2321 Capital**"), Bowline Management Pension Plan ("**Bowline**"), California Catalog Company Pension Plan ("**California Catalog**"), Clove Pension Plan ("**Clove**"), Davin Investments Pension Plan ("**Davin Investments**"), Delvian LLC Pension Plan ("**Delvian**"), DFL Investments Pension Plan ("**DFL Investments**"), Laegeler Asset Management Pension Plan ("**Laegeler**"), Lion Advisory Inc. Pension Plan ("**Lion Advisory**"), Mill River Capital Management Pension Plan ("**Mill River**"), Next Level Pension Plan ("**Next Level**"), Rajan Investments LLC Pension Plan ("**Rajan Investments**"), Spirit on the Water Pension Plan ("**Spirit on the Water**"), and Traden Investments Pension Plan ("**Traden Investments**"), as follows:

## I.   INTRODUCTION

1.      Plaintiff SKAT is the agency of the government of Denmark charged with the assessment and collection of Danish taxes.

2.      This case stems from a fraudulent tax refund scheme that deceived SKAT into paying out over 12.7 billion Danish Kroner ("**DKK**"), the equivalent of approximately $2.1 billion (US), of allegedly withheld dividend tax.

3.      The essence of the fraudulent scheme is that each of over 300 entities pretended to own shares in Danish companies listed on the OMX Copenhagen 20 Index, the 20 most-traded stocks in Denmark.  The Danish companies are required to withhold 27% tax on dividends they pay to shareholders.  Under certain double taxation treaties between Denmark and other countries, including the United States, this tax is reimbursable to non-Danish shareholders that meet certain qualifications.

4.     The entities, acting through their agents and representatives, applied to SKAT claiming repayments of tax withheld on dividends that they purported to have earned on shares of Danish companies.  These applications were fraudulent because the claimants did not own the shares that they claimed to own, did not earn the dividends they claimed to have earned, and were not entitled to the tax refunds they claimed.  These applications were also fraudulent because the claimants falsely represented that they met the qualifications set forth in the double taxation treaty between Denmark and the United States for a full repayment of the tax withheld on dividends.

5.     The claimants effectuated the scheme by appointing agents to apply to SKAT for refunds in respect of shares in Danish companies that they did not own.  The agents submitted the fraudulent applications on behalf of the claimants and their authorized representatives, with false documentation representing that the claimants owned substantial shares in Danish companies, had earned substantial dividends for which tax had been withheld, and were entitled to a tax refund. The agents obtained over $2.1 billion in refunds from SKAT, and distributed the proceeds of the scheme to the claimants and other participants in the fraud.  During the period 2012 to 2015, SKAT received fraudulent requests for tax refunds from several agents on behalf of 277 pension plans in the United States, as well as entities in the United Kingdom, Canada, Malaysia, and Luxembourg.

6.     On June 15, 2015, SKAT received information indicating that certain claimants may have submitted fraudulent tax refund claims based on the double taxation treaty between Denmark and Malaysia.  Based on this information, SKAT undertook an investigation and subsequently discovered that the claimants had submitted requests for tax refunds by misrepresenting that they owned shares in Danish companies, had earned substantial dividend income on their shares, and were entitled to refunds of tax withheld in respect of those dividends.

Through its investigation, SKAT discovered that these representations were false: the claimants did not own the shares and they were not entitled to a refund of withholding tax.

7.    As a result of these false claims, the claimants and their agents received cash payments of what were supposed to be "refunds" of tax to which they were not entitled.  During the course of its investigation, SKAT also learned that the scheme involved entities and individuals not just in Malaysia, but also in the United States, Canada, the United Kingdom, and Luxembourg.

8.    On or about August 24, 2015, SKAT stopped paying all claims for refunds of dividend withholding tax while it investigated the fraudulent scheme.

9.    The claimants obtained substantial assistance in the fraudulent scheme from several other entities and individuals, including, but not limited to:

    a.    The Authorized Representatives of the claimants, who, among other things, executed at the direction of, and on behalf of, the claimants documents authorizing the Payment Agents to submit the claimants' tax refund claims and to receive from SKAT payments in respect of those claims;

    b.    The non-party Payment Agents, which are companies that submitted fraudulent tax refund claims to SKAT at the direction of, and on behalf of, the claimants and Authorized Representatives;

    c.    The non-party Broker-Custodians, which are financial institutions that provided statements falsely representing that the claimants owned shares in Danish companies and had earned dividends on those shares; and

    d.    The Partners of the claimants, such as Defendants van Merkensteijn, Markowitz, Bernina, and RJM Capital (together, the "**Partner Defendants**").  The Partner Defendants are individuals and entities who formed partnerships with the claimants, helped

structure the scheme, and coordinated the submission of fraudulent tax refund claims to SKAT in exchange for the lion's share of the refunds. The claimant pension plans ultimately retained approximately 1% to 10% of the refund payments that SKAT made as a result of their false claims.

10. The Defendants did know or should have known that these false representations would cause SKAT to make payments to which the Defendants were not entitled.

11. SKAT made all the payments to the claimants' Payment Agents, which, on information and belief, distributed the proceeds to other participants in the fraud, including the claimants, in some cases the claimants' Partners, and the Authorized Representatives.

12. As a result of the overall fraudulent scheme, SKAT paid baseless withholding tax refund claims of approximately $2.1 billion (US).

13. As a result of the fraudulent claims submitted by the 14 pension plan Defendants in this action, SKAT paid baseless withholding tax refund claims and was damaged in the amount of DKK 820,015,992.76, or at least $120,615,000 (US)[2], plus interest.

## II.   JURISDICTION & VENUE

14. Pursuant to 28 U.S.C. § 1332(a)(4), this Court has jurisdiction over all claims because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between an agency or instrumentality of a foreign state and citizens of a state or of different states.

---

2. This amount is the result of a conversion from DKK to U.S. Dollars performed on October 4, 2019, utilizing a conversion rate of 1 U.S. Dollar to 6.7986 DKK.

15. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District. In the alternative, venue is proper because at least one of the Defendants is subject to the jurisdiction of this Court.

III. **PARTIES**

16. Plaintiff SKAT is the agency of the government of Denmark charged with the assessment and collection of Danish taxes. SKAT is located at Østbanegade 123, 2200 København Ø, Denmark. During the period material to the events described in this Amended Complaint, SKAT used a mailing address of Skattecenter Høje-Taastrup, Postboks 60, DK-2630 Taastrup, Denmark.

17. Defendant van Merkensteijn is a citizen of the State of New York. At all times relevant to the allegations in this Amended Complaint, Defendant van Merkensteijn owned, controlled, and was the sole trustee for Defendant Bernina, and used Defendant Bernina to participate in the submission of fraudulent refund claims to SKAT.

18. Defendant Markowitz is a citizen of the State of New York. At all times relevant to the allegations in this Amended Complaint, Defendant Markowitz owned, controlled, and was the sole trustee for Defendant RJM Capital, and used Defendant RJM Capital to participate in the submission of fraudulent refund claims to SKAT.

19. Defendant Bernina is a trust associated with non-party Bernina Pension Plan, which, in the plan's requests to SKAT for tax refunds, listed its address as 211 Central Park West, Apartment 2G, New York, NY 10024, USA, which is also Defendant van Merkensteijn's former New York home address. On information and belief, Defendant van Merkensteijn is the sole trustee and beneficiary of Defendant Bernina, and the sole participant, or member, of Bernina Pension Plan.

20.     Defendant RJM Capital is a trust associated with non-party RJM Capital Pension Plan, which, in the plan's requests to SKAT for tax refunds, listed its address as 1010 Fifth Avenue, Suite 1D, New York, NY 10028, USA, which is also Defendant Markowitz's current or former New York home address.  On information and belief, Defendant Markowitz is the sole trustee and beneficiary of Defendant RJM Capital, and the sole participant, or member, of RJM Capital Pension Plan.

21.     Defendant 2321 Capital is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 23 East 10th Street, Apartment 220, New York, NY 10003, USA.  On information and belief, the sole participant, or member, of Defendant 2321 Capital is a citizen of a State of the United States.

22.     Defendant Bowline is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 66 West 88th Street, Unit 5B, New York, NY 10024, USA.  On information and belief, the sole participant, or member, of Defendant Bowline is a citizen of a State of the United States.

23.      Defendant California Catalog is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 212 Cognewaugh Road, Cos Cob, CT 068078, USA.  On information and belief, the sole participant, or member, of Defendant California Catalog is a citizen of a State of the United States.

24.     Defendant Clove is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 27 Sage Street, Holmdel, NJ 07733, USA.  On information and belief, the sole participant, or member, of Defendant Clove is a citizen of a State of the United States.

25.     Defendant Davin Investments is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 77 Fifth Avenue, Suite 17D, New York, NY 10003, USA.  On

information and belief, the sole participant, or member, of Defendant Davin Investments is a citizen of a State of the United States.

26.     Defendant Delvian is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 40 West 57th Street, 20th Floor, New York, NY 10019, USA.  On information and belief, the sole participant, or member, of Defendant Delvian is a citizen of a State of the United States.

27.      Defendant DFL Investments is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 11 Hughes Street, Rockville Centre, New York 11570, USA.  On information and belief, the sole participant, or member, of Defendant DFL Investments is a citizen of a State of the United States.

28.     Defendant Laegeler is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 441 West Menomonee Street, Chicago, IL 60614, USA.  On information and belief, each participant, or member, of Defendant Laegeler is a citizen of a State of the United States.

29.     Defendant Lion Advisory is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 45 Perry Street, Suite BW, New York, NY 10014, USA.  On information and belief, the sole participant, or member, of Defendant Lion Advisory is a citizen of a State of the United States.

30.     Defendant Mill River is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 40 West 57th Street, 20th Floor, New York, NY 10019.  On information and belief, the sole participant, or member, of Defendant Mill River is a citizen of a State of the United States.

31.     Defendant Next Level is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 211 Central Park West, Apartment 2G, New York, NY 10024, USA, which is also Defendant van Merkensteijn's former New York home address.  On information and belief, the sole participant, or member, of Defendant Next Level is a citizen of a State or Territory of the United States.

32.     Defendant Rajan Investments is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 4506 West Hutchinson, Chicago, IL 60641, USA.  On information and belief, the sole participant, or member, of Defendant Rajan Investments is a citizen of a State of the United States.

33.     Defendant Spirit on the Water is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 211 Central Park West, Apartment 2G, New York, NY 10024, USA, which is also Defendant van Merkensteijn's former New York home address.   On information and belief, the sole participant, or member, of Defendant Spirit on the Water is a citizen of a State or Territory of the United States.

34.     Defendant Traden Investments is a pension plan which, in its requests to SKAT for tax refunds, listed its address as 40 West 57th Street, 20th Floor, New York, NY 10019, USA.  On information and belief, the sole participant, or member, of Defendant Traden Investments is a citizen of a State of the United States.

35.     At all times material to the allegations in this Amended Complaint, each of the Defendant Pension Plans purported to be a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the United States Internal Revenue Code, exempt from taxation under section 501(a) of the United States Internal Revenue Code, and residents of the United States of America for purposes of U.S. taxation.

## IV.    FACTUAL ALLEGATIONS

### A.    The Danish Withholding Tax System

36.    Withholding tax is a common fiscal device by which taxes are deducted at the source by a payer of income, and are reported to the relevant tax authority.  In this case, the relevant tax authority is SKAT.

37.    Under the Danish Withholding Tax Act section 65, Danish companies are required to withhold 27% of the dividend distributed as to their shares.

38.    Foreign shareholders may be entitled to a refund if the withheld tax exceeds the amount of tax owed according to a double taxation treaty between Denmark and the shareholder's country of residence.

39.    A double taxation treaty between Denmark and the United States[3] ("**the Treaty**") allows for a full refund of tax withheld on dividends paid by Danish companies to qualified U.S. pension plans, which are exempt from taxation.  In order to qualify for a full refund under the Treaty, the U.S. pension plans must possess tax-qualified status under section 401(a) of the Internal Revenue Code and the dividend serving as the basis of the refund request cannot arise from the carrying on of a business by the pension fund.  For the reasons set forth in further detail below, the pension plan claimants, including the plan Defendants in this action, did not satisfy these requirements and were therefore not entitled under the Treaty to the refunds they claimed from SKAT.

40.    SKAT paid claims for refunds of dividend withholding tax made by claimants who represented that they were qualified pension plans, had shareholdings in Danish companies, and

---

3.    Protocol Amending Tax Convention with Denmark, U.S.-Den., art. 10, ¶ 3(c), May 2, 2006, S. Treaty Doc. No. 109-19 (amending Convention and Protocol Between the United States and Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-Den., Aug. 19, 1999, S. Treaty Doc. No. 106-12).

had received dividends on those shareholdings net of the tax.  The claimants submitted refund claims seeking the full 27% withholding tax that had allegedly been withheld from distributions on shares that the claimants purported to own.

41.    It was SKAT's normal practice to accept claims from designated payment agents and to transmit refunds to claimants through their designated payment agents.

**B.    The Fraudulent Scheme**

42.    As a result of its investigation, SKAT determined that, during the period 2012 through 2015, it received fraudulent dividend withholding tax refund claims as part of a scheme involving (i) a pension plan or other claimant, (ii) an Authorized Representative, (iii) a Payment Agent, and (iv) a Broker-Custodian.  The respective roles of each of these participants are described in further detail in paragraphs 50 through 117 below.

**1.    The Fraudulent Refund Claims Process**

43.    The claimants submitted fraudulent claims to SKAT through Payment Agents, including non-parties Acupay System LLC ("**Acupay**") and Goal TaxBack Limited ("**Goal**"), each of which submitted claims by mail or by email transmissions.

44.    The claimants received payments with respect to their refund claims from their designated Payment Agents, to which SKAT transmitted payment by bank transfer.

45.    Each of the claimants provided the following documentation to SKAT through their designated agents:

a.    a short cover letter, printed on a Payment Agent's letterhead and addressed to SKAT in Taastrup, Denmark;

b.    a SKAT "Claim to Relief from Danish Dividend Tax" form (the "**Claim Form**"), which set out:

11

   i. the identity of the claimant representing that it owned the relevant shares and had received dividends net of withholding tax;

   ii. the amount of the tax refund claim;

   iii. a certification that the claimant was covered by the relevant double taxation treaty between Denmark and the country in which the claimant was resident; and

   iv. the bank account to which SKAT should pay the claim;

  c. a "credit advice" note purporting to describe the shareholding (or security) and the amount of dividend tax withheld;

  d. a signed Power of Attorney, by which the claimant's Authorized Representative appointed a Payment Agent to act on behalf of the stated claimant; and

  e. in respect of United States-based pension plans, a statement from the Internal Revenue Service ("**IRS**"), certifying that each pension plan was (I) a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the United States Internal Revenue Code (the "**Code**"), (II) exempt from U.S. taxation under section 501(a) of the Code, and (III) resident in the United States for purposes of United States taxation.

46. By filing a refund application requesting the full 27% refund and enclosing the statement from the IRS, the United States pension plan claimants falsely represented to SKAT that they were qualified U.S. pension plans entitled to the maximum refunds provided by the Treaty.

47. The fraudulent claims alleged shareholdings in some of the largest Danish listed companies belonging to the OMX Copenhagen 20 Index in Denmark.

48.     It was SKAT's practice to pay claims that included the required supporting documentation.

49.     SKAT made payments by bank transfer to the Payment Agents for the benefit of the claimants.

### 2.     The Role of the Claimants

50.     Out of the over 300 claimants that SKAT has, to date, determined were participants in the fraudulent scheme, 277 were in the United States.

51.     Each of the claimants made withholding tax refund claims through their Payment Agents, as described in paragraphs 43 through 45, above.

52.     As part of the fraudulent claims, each of the Authorized Representatives confirmed to SKAT that they were agents of the claimants and were authorized to act on behalf of the claimants with respect to the dividend withholding tax refund claims.

53.     As part of their fraudulent claims, each of the claimants designated one of the Payment Agents as its agent to act on behalf of that claimant with respect to the claim.

54.     Each of the claimants represented to SKAT that they held shares in, and received dividends net of withholding tax from, large Danish listed companies.  Between August 20, 2012 and September 17, 2014, the Defendants in this action caused 327 separate withholding tax refund claims to be submitted to SKAT, representing that fourteen claimants were entitled to refunds totaling DKK 820,015,992.76, or at least $120,615,000 (US).

55.     Defendant 2321 Capital made twenty-three (23) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 59,259,338.98.  These refund claims were submitted to SKAT on the following dates:  April 19, 2013; May 16, 2013; September 20, 2013; December 10, 2013; January 6, 2014; March 20, 2014; April 17, 2014; May 27, 2014; and September 4, 2014.

56.    Based on the false refund claims listed in paragraph 55, SKAT made payments totaling DKK 59,259,338.98 to Defendant 2321 Capital on the following dates:  May 13, 2013; June 10, 2013; October 17, 2013; December 20, 2013; January 28, 2014; May 9, 2014; May 28, 2014; July 3, 2014; and October 9, 2014.

57.    Defendant Bowline made thirteen (13) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 32,623,807.40.  These refund claims were submitted to SKAT on the following dates:  December 11, 2013; January 6, 2014; March 20, 2014; April 17, 2014; May 27, 2014; and September 4, 2014.

58.    Based on the false refund claims listed in paragraph 57, SKAT made payments totaling DKK 32,623,807.40 to Defendant Bowline on the following dates:  December 20, 2013; January 28, 2014; May 9, 2014; May 28, 2014; July 3, 2014; and October 9, 2014.

59.    Defendant California Catalog made twenty-seven (27) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 68,239,884.94.  These refund claims were submitted to SKAT on the following dates:  August 20, 2012; December 10, 2012; December 31, 2012; March 19, 2013; April 19, 2013; May 16, 2013; August 29, 2013; December 10, 2013; January 6, 2014; May 16, 2014; May 27, 2014; and September 4, 2014.

60.    Based on the false refund claims listed in paragraph 59, SKAT made payments totaling DKK 68,239,884.94 to Defendant California Catalog on September 19, 2012; January 15, 2013; April 10, 2013; May 13, 2013; June 10, 2013; October 1, 2013; December 20, 2013; January 28, 2014; July 3, 2014; and October 9, 2014.

61.    Defendant Clove made fourteen (14) separate withholding tax refund claims and represented that it was entitled to refunds totaling DKK 36,671,823.15.  These refund claims were submitted to SKAT on the following dates: December 6, 2013; December 13, 2013; March 20,

2014; March 24, 2014; March 25, 2014; March 26, 2014; March 28, 2014; April 8, 2014; April 10, 2014; April 24, 2014; May 19, 2014; and September 15, 2014.

62.     Based on the false refund claims listed in paragraph 61, SKAT made payments totaling DKK 36,671,823.15 to Defendant Clove on the following dates: December 17, 2013; December 20, 2013; April 23, 2014; April 24, 2014; May 6, 2014; June 17, 2014; and October 9, 2014.

63.     Defendant Davin Investments made twenty-four (24) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 62,335,426.34.  These refund claims were submitted to SKAT on the following dates:  June 12, 2013; September 20, 2013; December 10, 2013; January 6, 2014; March 20, 2014; April 17, 2014; May 27, 2014; and September 17, 2014.

64.     Based on the false refund claims listed in paragraph 63, SKAT made payments totaling DKK 62,335,426.34 to Defendant Davin Investments on the following dates:  June 21, 2013; October 17, 2013; December 20, 2013; January 28, 2014; May 9, 2014; May 28, 2014; July 3, 2014; and October 9, 2014.

65.     Defendant Delvian made twenty-eight (28) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 67,197,056.32.  These refund claims were submitted to SKAT on the following dates:  August 31, 2012; December 14, 2012; December 21, 2012; March 12, 2013; March 21, 2013; April 8, 2013; April 12, 2013; April 17, 2013; April 23, 2013; April 26, 2013; May 8, 2013; August 28, 2013; December 6, 2013; December 13, 2013; March 14, 2014; March 24, 2014; March 25, 2014; March 26, 2014; March 28, 2014; April 8, 2014; April 10, 2014; April 24, 2014; May 19, 2014; and August 15, 2014.

66.     Based on the false refund claims listed in paragraph 65, SKAT made payments totaling DKK 67,197,056.32 to Defendant Delvian on the following dates:  September 19, 2012; January 15, 2013; April 10, 2013; April 15, 2013; April 29, 2013; May 7, 2013; June 11, 2013; September 9, 2013; December 17, 2013; December 20, 2013; March 26, 2014; April 23, 2014; April 24, 2014; May 6, 2014; June 17, 2014; and September 3, 2014.

67.     Defendant DFL Investments made twenty-three (23) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 58,539,511.97.  These refund claims were submitted to SKAT on the following dates:  April 19, 2013; May 16, 2013; August 29, 2013; December 10, 2013; January 6, 2014; March 20, 2014; April 17, 2014; May 27, 2014; and September 17, 2014.

68.     Based on the false refund claims listed in paragraph 67, SKAT made payments totaling DKK 58,539,511.97 to Defendant DFL Investments on the following dates:  May 13, 2013; June 10, 2013; October 1, 2013; December 20, 2013; January 28, 2014; May 9, 2014; May 28, 2014; July 3, 2014; and October 9, 2014.

69.     Defendant Laegeler made twenty-three (23) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 58,152,480.95.  These refund claims were submitted to SKAT on the following dates: April 19, 2013; May 16, 2013; August 29, 2013; December 10, 2013; January 6, 2014; March 20, 2014; April 17, 2014; May 27, 2014; and September 17, 2014.

70.     Based on the false refund claims listed in paragraph 69, SKAT made payments totaling DKK 58,152,480.95 to Defendant Laegeler on the following dates: May 13, 2013; June 10, 2013; October 1, 2013; December 20, 2013; January 28, 2014; May 9, 2014; May 28, 2014; July 3, 2014; and October 9, 2014.

71.     Defendant Lion Advisory made twenty-eight (28) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 71,184,845.65.  These refund claims were submitted to SKAT on the following dates: August 31, 2012; December 14, 2012; December 21, 2012; April 11, 2013; April 17, 2013; April 23, 2013; April 26, 2013; August 28, 2013; December 6, 2013; December 13, 2013; April 1, 2014; April 8, 2014; April 10, 2014; April 24, 2014; May 19, 2014; and August 15, 2014.

72.     Based on the false refund claims listed in paragraph 71, SKAT made payments totaling DKK 71,184,845.65 to Defendant Lion Advisory on the following dates: September 19, 2012; January 15, 2013; April 22, 2013; April 29, 2013; May 7, 2013; September 9, 2013; December 17, 2013; December 20, 2013; April 24, 2014; May 6, 2014; June 17, 2014; and September 3, 2014.

73.     Defendant Mill River made twenty-eight (28) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 68,724,181.76.  These refund claims were submitted to SKAT on the following dates:  August 31, 2012; December 14, 2012; December 21, 2012; March 12, 2013; March 21, 2013; April 8, 2013; April 12, 2013; April 17, 2013; April 23, 2013; April 26, 2013; May 8, 2013; August 21, 2013; December 6, 2013; December 13, 2013; March 14, 2014; March 24, 2014; March 25, 2014; March 26, 2014; March 28, 2014; April 8, 2014; April 10, 2014; April 24, 2014; May 19, 2014; and August 15, 2014.

74.     Based on the false refund claims listed in paragraph 73, SKAT made payments totaling DKK 68,724,181.76 to Defendant Mill River on the following dates:  September 12, 2012; January 15, 2013; April 10, 2013; April 15, 2013; April 29, 2013; May 7, 2013; June 11, 2013; September 9, 2013; December 17, 2013; December 20, 2013; March 26, 2014; April 23, 2014; April 24, 2014; May 6, 2014; June 17, 2014; and September 3, 2014.

75.     Defendant Next Level made twenty-three (23) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 60,406,334.19.  These refund claims were submitted to SKAT on the following dates:  April 19, 2013; May 16, 2013; August 29, 2013; December 10, 2013; January 6, 2014; March 20, 2014; April 17, 2014; May 27, 2014; and August 19, 2014.

76.     Based on the false refund claims listed in paragraph 75, SKAT made payments totaling DKK 60,406,334.19 to Defendant Next Level on the following dates:  May 13, 2013; June 10, 2013; October 1, 2013; December 20, 2013; January 28, 2014; May 9, 2014; May 28, 2014; July 3, 2014; and August 29, 2014.

77.     Defendant Rajan Investments made twenty-six (26) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 59,742,677.42.  These refund claims were submitted to SKAT on the following dates: February 14, 2013; March 19, 2013; April 19, 2013; May 16, 2013; August 29, 2013; December 10, 2013; January 6, 2014; March 20, 2014; April 17, 2014; May 27, 2014; and September 17, 2014.

78.     Based on the false refund claims listed in paragraph 77, SKAT made payments totaling DKK 59,742,677.42 to Defendant Rajan Investments on the following dates: March 1, 2013; April 10, 2013; May 13, 2013; June 10, 2013; October 1, 2013; December 20, 2013; January 28, 2014; May 9, 2014; May 28, 2014; July 3, 2014; and October 9, 2014.

79.     Defendant Spirit on the Water made twenty-three (23) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 60,248,127.87.  These refund claims were submitted to SKAT on the following dates:  April 19, 2013; May 16, 2013, September 20, 2013; December 10, 2013; January 6, 2014; March 20, 2014; April 17, 2014; May 28, 2014; August 19, 2014.

80.     Based on the false refund claims listed in paragraph 79, SKAT made payments totaling DKK 60,248,127.87 to Defendant Spirit on the Water on the following dates:  May 13, 2013; June 10, 2013; October 17, 2013; December 20, 2013; January 28, 2014; May 9, 2014; May 28, 2014; July 3, 2014; and August 29, 2014.

81.     Defendant Traden Investments made twenty-four (24) separate withholding tax refund claims, and represented that it was entitled to refunds totaling DKK 56,690,495.82.  These refund claims were submitted to SKAT on the following dates:  April 3, 2013; April 8, 2013; April 12, 2013; April 17, 2013; April 23, 2013; April 26, 2013; April 30, 2013; August 21, 2013; December 6, 2013; December 13, 2013; March 20, 2014; March 24, 2014; March 25, 2014; March 26, 2014; March 28, 2014; April 8, 2014; April 10, 2014; April 24, 2014; May 19, 2014; and September 15, 2014.

82.     Based on the false refund claims listed in paragraph 81, SKAT made payments totaling DKK 56,690,495.82 to Defendant Traden Investments on the following dates:  April 15, 2013; April 29, 2013; May 7, 2013; May 13, 2013; September 9, 2013; December 17, 2013; December 20, 2013; April 23, 2014; April 24, 2014; May 6, 2014; June 17, 2014; and October 9, 2014.

83.     In fact, these pension plan Defendants did not own the shares they represented to SKAT that they owned, and had no dividend tax withheld.

84.     In addition to falsely representing that they owned the shares that were the subject of the refund claims, each of the Defendant plans falsely represented to SKAT in each refund claim that they were qualified U.S. pension plans entitled to a full refund under the Treaty.  This representation was false because the plans did not meet the criteria for qualified pension plans set

forth in section 401(a) of the Internal Revenue Code and purportedly carried on debt-financed activities in breach of the Treaty's prohibition on such activities by a pension plan.

85. Far from being qualified pension plans, Defendants 2321 Capital, Bowline, Clove, Davin Investments, Delvian, DFL Investments, Lion Advisory, Rajan Investments, and Traden Investments were sham entities sponsored by shell companies, non-parties 2321 Capital LLC, Bowline Management LLC, Clove Hitch LLC, Davin Investments LLC, Delvian LLC, DFL Investments LLC, Lion Advisory Inc., Rajan Investments LLC, and Traden Investments LLC, respectively. These plan sponsors conducted no trade or business and had no employees. Further, these plan sponsors and plans were established shortly before the Defendants submitted their first refund claims to SKAT. As a result, the Defendant plans cannot have satisfied the requirements in section 401(a) of the Internal Revenue Code to be a qualified pension plan.

86. Defendants 2321 Capital, Bowline, California Catalog, Clove, Davin Investments, Delvian, DFL Investments, Laegeler, Lion Advisory, Mill River, Next Level, Rajan Investments, Spirit on the Water, and Traden Investments' representations that they were qualified pension plans were false because they did not operate for the exclusive benefit of their sponsoring entities' employees and their beneficiaries. Rather, the Defendant plans were maintained principally for the benefit of their custodian, Solo Capital Partners LLP, the Partner Defendants, and/or other entities and individuals who were participants in the fraud. After SKAT paid the amounts requested in the Defendant plans' refund claims, the plans subsequently directed or permitted the transfer of the large majority of the illicit proceeds of the scheme to these other individuals and entities.

87. The Defendant plans' representations that they were qualified pension plans were also false because they were not established with the intent that they be "permanent" programs.

Each of the 14 Defendant plans named in this Amended Complaint was created for the sole purpose of serving as a vehicle for making fraudulent refund claims to SKAT, and was only intended to operate for as long as the fraudulent scheme was undiscovered and ongoing.  Each of the 14 plans was formed less than 10 months before they submitted their first claims to SKAT, including Defendants 2321 Capital, DFL Investments, Laegeler, Next Level, Spirit on the Water, and Traden Investments, which were each formed less than three months before submitting their initial claims to SKAT.

88.     The Defendant plans' representations that that they were qualified pension plans were also false because they were not properly funded.  As entities established by shell corporations that conducted no trade or business and therefore had no employees, Defendants 2321 Capital, Bowline, Clove, Davin Investments, Delvian, DFL Investments, Lion Advisory, Rajan Investments, and Traden Investments cannot have obtained funding from a proper source and cannot have complied with the contribution rules in section 401(a) of the Internal Revenue Code.  Similarly, the number of shares in Danish companies that Defendants California Catalog, Laegeler, Mill River, Next Level, and Spirit on the Water claimed to have owned would have required funding from sources outside of contributions from the employees of their plan sponsors and matching contributions from the plan sponsors.  To the extent that the Defendant plans received funding from sources outside of their plan sponsors, such activity would violate the funding requirements of the Internal Revenue Code and disqualify them from being qualified pension plans.

89.     The Defendant plans also falsely represented to SKAT that they were entitled to a full refund under the Treaty to the extent that they engaged in any activities that were debt-

financed, in breach of the Treaty's prohibition on the carrying on of leveraged investment activities by a pension fund.

90.    Based on the false representations in the refund claims described in paragraphs 54 through 89 above, SKAT paid the Defendant plans DKK 820,015,992.76, or at least $120,615,000 (US), between September 19, 2012 and October 9, 2014.  The plans distributed a significant portion of these funds to the Partner Defendants.

### 3.    The Role of the Partner Defendants

91.    Defendants van Merkensteijn and Markowitz, using Defendants Bernina, RJM Capital, or other entities, formed partnerships with the fourteen Defendant plans (or identically named trusts created for the plans) and other partners not named as defendants herein, through which Defendants van Merkensteijn and Markowitz caused the fraudulent refund claims to be submitted to SKAT.

92.    In exchange for their participation in the fraudulent scheme through these partnerships, the Partner Defendants and other partners not named as defendants herein received the lion's share of the refunds, while the pension plan Defendants retained a small percentage of the refunds.  The Partner Defendants and the other partners not named as defendants herein received the large majority of the refunds despite the fact that none of the partners or the individuals who owned and controlled the partner entities were members of the pension plans that purported to own shares in Danish companies and to be entitled to refunds from SKAT.

93.    Pursuant to the partnership agreements entered into with each of 2321 Capital, Bowline, California Catalog, Clove, Delvian, DFL Investments, Lion Advisory, Next Level, Rajan Investments, Spirit on the Water, and Traden Investments (or identically named trusts created for the plans), Defendants Markowitz and van Merkensteijn each received, either directly or through Defendant Bernina (for Defendant van Merkensteijn) and Defendant RJM Capital (for Defendant

Markowitz) or other entities owned and controlled by Defendants Markowitz and van Merkensteijn, 23.75% of the refund claims paid by SKAT.

94. Pursuant to the partnership agreements entered into with each of Davin Investments, Laegeler, and Mill River (or identically named trusts created for the plans), Defendants Markowitz and van Merkensteijn each received, either directly or through Defendant Bernina (for Defendant van Merkensteijn) and Defendant RJM Capital (for Defendant Markowitz) or other entities owned and controlled by Defendants Markowitz and van Merkensteijn, 22.50% of the refund claims paid by SKAT.

95. The Partner Defendants and other partners not named as defendants herein controlled the Defendant plans through the partnerships they formed, and used the claimants to perpetrate the fraud against SKAT. Through these partnerships, the Partner Defendants conspired with the Defendant plans to defraud SKAT. Each of the partnership agreements was executed by the relevant plan participant, who signed on behalf of the plan, or in some cases, on behalf of an affiliated trust that was created to hold the plan's assets.

96. Pursuant to their partnership agreements with the claimants, the Partner Defendants provided a nominal capital contribution to the partnership, which established the refund percentage each partner would receive. For example, under the "General Partnership Agreement of Delvian General Partnership," signed by Defendant Markowitz and Defendant Delvian's plan participant on May 22, 2012, an entity controlled by the Partner Defendants and two other partners provided an initial capital contribution to the partnership of $95, and Defendant Delvian provided a contribution of $5. Thereafter, the Partner Defendants and the two other partners received 95% (or 23.75% each) of the refund amounts initially obtained by Defendant Delvian, whereas Defendant Delvian received only 5%.

97.     The Partner Defendants were instrumental in setting up the fraudulent scheme, and coordinated the creation and submission to SKAT of the fraudulent documents purporting to show the fourteen plan Defendants' ownership of Danish shares.

98.     At times relevant to the allegations in this Amended Complaint, Defendants van Merkensteijn and Markowitz served as Directors of a financial services firm based at 40 West 57th Street, 20th Floor, New York, NY 10019.  Each of the executed partnership agreements entered into between the Partner Defendants and plan Defendants listed the firm's 40 West 57th Street address as the address of the partnership.  In addition, at least nine different claimants listed that firm's West 57th Street address in their fraudulent refund claims to SKAT, including Defendants Delvian, Mill River, and Traden Investments.

99.     Four of the other fourteen Defendant plans, Defendants Bowline, Clove, DFL Investments, and Lion Advisory, listed the home addresses of employees and/or directors of that financial firm in their fraudulent claims to SKAT.  Two additional plan Defendants, Defendants Next Level and Spirit on the Water, listed Defendant van Merkensteijn's former New York home address in their fraudulent claims to SKAT.

100.    In addition to partnering with the fourteen pension plan Defendants (or identically named trusts created for the plans) listed above, Defendant van Merkensteijn was the sole participant in six additional pension plans, including non-party Bernina Pension Plan, that submitted fraudulent refund claims to SKAT, and was a participant with three other individuals, including Defendant Markowitz, in three additional plans.  Defendant van Merkensteijn's wife was also the sole participant in a pension plan that submitted fraudulent refund claims to SKAT.

101.    Defendant van Merkensteijn signed Power of Attorney documents as the Authorized Representative of at least six different claimants, including signing as the "authorised signer" of non-party Bernina Pension Plan with respect to its own fraudulent claims to SKAT.

102.    In addition to partnering with the fourteen pension plan Defendants listed above (or identically named trusts created for the plans), Defendant Markowitz was the sole participant in six additional pension plans, including non-party RJM Capital Pension Plan, that submitted fraudulent refund claims to SKAT, and was a participant with three other individuals, including Defendant van Merkensteijn, in three additional plans.

103.    Defendant Markowitz incorporated non-party RJM Capital LLC, the plan sponsor for non-party claimant RJM Capital Pension Plan, in 2007.  Defendant Markowitz signed RJM Capital LLC's Certificate of Formation filed with the State of Delaware listing him as the "Authorized Person" of the LLC.

104.    Each of Defendant Markowitz's wife, his sister, and his brother-in-law, was the sole participant in a pension plan that submitted fraudulent refund claims to SKAT.

105.    Defendant Markowitz signed Power of Attorney documents as the Authorized Representative of at least four different claimants that submitted fraudulent refund claims to SKAT.

### 4.    The Role of the Claimants' Authorized Representatives

106.    Each Authorized Representative executed at the direction of, and on behalf of, the claimant for which he or she was the Authorized Representative a form entitled "Power of

Attorney." By the Power of Attorney, the claimant, acting through its respective Authorized Representative, granted the Payment Agent authority to act on behalf of the claimant.

107. The Authorized Representatives for the fourteen claimants that formed partnerships with the Partner Defendants executed power of attorney documents appointing either non-party Acupay or non-party Goal as the Payment Agent for the plan.

108. For example, one of the Authorized Representatives executed on behalf of Defendant 2321 Capital a "Special Power of Attorney" dated March 26, 2013, that granted to non-party Acupay authority "to pursue and file for reductions in rates of tax withholding in [the plan's] name for which [the plan is] eligible, to oversee this process, and to collect refunds of excess withholding tax to which [the plan is] entitled on [the plan's] behalf." The Authorized Representative described himself as the "authorised signer" of Defendant 2321 Capital.

109. Another Authorized Representative executed on behalf of Defendant Delvian a "Power of Attorney" dated August 3, 2012, that granted to non-party Goal authority "to be the attorney of [the plan] and in [the plan's] name and otherwise on [the plan's] behalf and as [the plan's] act and deed to sign, seal, execute, deliver, perfect and do all deeds, instruments, acts and things which may be required (or which [Goal] shall consider requisite) for or in connection with the provision of any tax services provided to [the plan] from time to time, including the reclaiming from any taxation authority in any jurisdiction (as appropriate) amounts in respect of payments made to [the plan] or through [Goal] on behalf of [the plan]." The Authorized Representative described herself as the "Trustee" of Defendant Delvian.

### 5. The Role of the Payment Agents

110. The Payment Agents submitted the fraudulent withholding tax refund claims at the direction of the claimants and Authorized Representatives and on behalf of the claimants.

111. By means of the Power of Attorney described in paragraphs 106 through 109 above, each claimant and Authorized Representative authorized their respective Payment Agent to act on their behalf and be subject to their control with respect to submitting the withholding tax refund claims.

112. With each claim, the Payment Agents submitted substantially similar cover letters attaching the documentation described in paragraph 45 above. Payment Agent Acupay's cover letter also contained the false statement that the relevant plan was a "qualifying U.S. pension fund within the meaning of the Double Taxation Convention," and was therefore entitled to a "full refund of Danish dividend tax." Additionally, the documentation submitted with the Acupay and Goal cover letters falsely represented to SKAT that the Defendant plans were qualified pension plans that satisfied the criteria under the Treaty and were therefore entitled to full 27% refunds.

113. In connection with each Claim Form, the Payment Agent:

    a.    provided its email address as the contact address for the claimant on whose behalf it was acting;

    b.    signed and stamped the form, and stated it was applying on behalf of the claimant;

    c.    enclosed the Power of Attorney executed by the claimant's Authorized Representative; and

    d.    requested that SKAT pay the claim to its bank account.

114. As per the directions included in the submission to SKAT, the Payment Agents received payment of the refunds from SKAT on behalf of the claimants. The Payment Agents

subsequently distributed the proceeds to the claimants and the other participants in the fraud, including the Authorized Representatives, the Partner Defendants, and the Payment Agents themselves.

### 6. The Role of the Broker-Custodians

115. Each entity claiming a withholding tax refund submitted to SKAT a "credit advice," "income advice," "tax voucher" or similar document from a Broker-Custodian that purported to show the claimant's ownership of shares in Danish companies listed on the OMX Copenhagen 20 Index.

116. By way of example, with respect to Defendant 2321 Capital, one example of a "Dividend Credit Advice":

    a.     is made out by Solo Capital Partners LLP;

    b.     is dated August 13, 2014;

    c.     purports to certify the plan's ownership of 3,340,952 shares in TDC A/S (a genuine company), whose shares were (and are) publicly traded on the OMX Copenhagen 20 Index in Denmark; and

    d.     states an International Securities Identification Number ("**ISIN**") for TDC A/S shares as "DK0060228559".  An ISIN is a twelve-character alpha-numeric code that uniquely identifies securities for trading and settlement purposes.

117. Defendant 2321 Capital, which, like the other plan Defendants, was not a qualified U.S. pension plan for purposes of the Treaty, never owned the shares described above, never received any dividend from Danish companies in which it was a purported shareholder, and was not entitled to claim a refund of dividend withholding tax.  The other claims that the Defendant plans and the Partner Defendants submitted or caused to be submitted to SKAT were similarly fraudulent.

## CAUSES OF ACTION

### COUNT I

#### (Fraud – Against All Defendants)

118.     SKAT repeats and realleges paragraphs 1 through 117 above as if fully set forth herein.

119.     Defendants intentionally, knowingly and/or recklessly made or caused to be made the material, false and fraudulent statements described in paragraphs 45 through 47, 54 through 89, and 115 through 117 to support claims for withholding tax refund payments.

120.     Defendants intentionally, knowingly, and/or recklessly made or caused to be made these false and fraudulent statements to induce SKAT to pay the claims, including through a civil conspiracy in furtherance of the fraud.

121.     In reliance on the false and fraudulent misrepresentations, SKAT paid baseless withholding tax refund claims of DKK 820,015,992.76, or at least $120,615,000 (US), and thereby suffered damages of that amount, plus interest.

122.     Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty, entitling SKAT to punitive damages.

### COUNT II

#### (Aiding and Abetting Fraud – Against All Defendants)

123.     SKAT repeats and realleges paragraphs 1 through 122 above as if fully set forth herein.

124.     As alleged above, a massive fraud was perpetrated on SKAT by the claimants and their partners, the Authorized Representatives, the Payment Agents, and/or other non-parties.

125.     As alleged in paragraphs 42 through 117 above, the Defendants, with knowledge, participated in the massive fraud on SKAT.

126. The Defendants acted with knowledge, willful blindness, and/or recklessness in participating in the submission of claims for refunds of dividend withholding tax to SKAT with knowledge that they were not entitled to receive any refunds.

127. The Defendants intentionally furthered the fraud and substantially assisted the fraud through their conduct described in paragraphs 42 through 117 above.

128. As a direct and natural cause of the Defendants' aiding and abetting of the fraudulent scheme, SKAT has suffered substantial damages.

129. Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty, entitling SKAT to punitive damages.

## COUNT III

### (Negligent Misrepresentation – Against All Defendants)

130. SKAT repeats and realleges paragraphs 1 through 129 above as if fully set forth herein.

131. In submitting claims for withholding tax refund payments, Defendants had a duty to SKAT to provide claims information that was truthful, accurate, and complete in all material respects.

132. Defendants made material misstatements described in paragraphs 45 through 47, 54 through 89, and 115 through 117 above in connection with the withholding tax refund claims they submitted or caused to be submitted to SKAT. Defendants knew, or should have known, that these statements were inaccurate.

133. Defendants intended their material misstatements to induce SKAT to rely upon them, and Defendants expected SKAT to rely upon them.

134.    SKAT reasonably relied on the misstatements while reviewing Defendants' claims, and as a direct and proximate result incurred damages of DKK 820,015,992.76, or at least $120,615,000 (US), plus interest.

## COUNT IV

### (Payment By Mistake – Against All Defendants)

135.    SKAT repeats and realleges paragraphs 1 through 134 above as if fully set forth herein.

136.    This is a claim for monies SKAT paid to the Defendants because of mistaken understandings of fact.

137.    SKAT paid the Defendants the amounts claimed as withholding tax refunds with the mistaken belief that the claimants had submitted valid claims with valid supporting documentation.

138.    SKAT's mistaken belief was material to its decision to pay the claims.

139.    SKAT suffered a loss as a result of its mistaken payments.

140.    The Defendants are liable to account and pay to SKAT the payments that SKAT made in error to the Defendants, plus interest.

## COUNT V

### (Unjust Enrichment – Against All Defendants)

141.    SKAT repeats and realleges paragraphs 1 through 140 above as if fully set forth herein.

142.    This is a claim by SKAT for recovery of monies by which the Defendants were unjustly enriched.

143.    By obtaining proceeds from withholding tax refund claims, directly or indirectly, to which they were not entitled, the Defendants were unjustly enriched.

144.     SKAT suffered a loss because of the Defendants' unjust enrichment.

145.     The Defendants are liable to account and pay to SKAT the amount of dividend withholding tax refund payments they received from SKAT to which they were not entitled, plus interest.

## COUNT VI

### (Money Had & Received – Against All Defendants)

146.     SKAT repeats and realleges paragraphs 1 through 145 above as if fully set forth herein.

147.     As a result of their false refund claims, Defendants received proceeds from withholding tax refunds to which they were not entitled.

148.     It is against equity and good conscience to permit Defendants to keep these monies, and they should account for and pay to SKAT the amount of withholding tax refund payments they received to which they were not entitled, plus interest.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff SKAT requests that this Court enter judgment in its favor against Defendants as follows:

1.      For Counts I, II, and III, for fraud, aiding and abetting fraud, and negligent misrepresentation, the damages sustained by SKAT as a result of the Defendants' wrongful acts, plus pre-judgment interest, fees, costs and expenses.

2.      For Counts IV, V, and VI, for payment by mistake, unjust enrichment, and money had and received, the damages sustained or the amounts by which the Defendants were paid by mistake or unjustly enriched, or by which the Defendants received

money to which they were not entitled, plus pre-judgment interest, fees, costs and expenses.

3.      For Counts I, II, punitive damages.

4.      The costs of this action.

5.      All other and further relief that is just and proper.

## **JURY DEMAND**

Plaintiff SKAT demands a jury trial on all issues so triable.

Respectfully submitted,


HUGHES HUBBARD & REED LLP


 /s/ Marc A. Weinstein
William R. Maguire
Marc A. Weinstein
John T. McGoey
One Battery Park Plaza
New York, New York  10004-1482
(212) 837-6000 (t)
(212) 422-4726 (f)
Bill.maguire@hugheshubbard.com
Marc.weinstein@hugheshubbard.com
John.mcgoey@hugheshubbard.com

Counsel for Plaintiff Skatteforvaltningen
(Customs and Tax Administration of the
Kingdom of Denmark)

# Exhibit 7



International Fiscal Association
2018
Seoul Congress

# cahiers

de droit fiscal
international

## VOLUME 103

B: Withholding tax
in the era of BEPS,
CIVs and the
digital economy

1938-2018

**Denmark**

Branch Reporter
Jakob Bundgaard[1]

## Summary and conclusions

Within the context of Danish taxation, withholding tax plays a significant role. In a domestic setting withholding tax is widely applied as a collection mechanism. Besides alleviating the administrative burden placed on the individual taxpayer, it also ensures that the overall collection of taxes is handled with as little uncertainty as possible. As most taxes are handled by a withholding mechanism and are subject to a final annual tax assessment, the overall result of these withholding mechanisms is that you pay as you earn throughout the year. This ideally yields a final assessment, which does not deviate too much from what has actually been paid.

In an international context, withholding tax is applied essentially as a tool to prevent base erosion, i.e. revenue going outside Denmark is taxed by a withholding mechanism to ensure that income created in Denmark is taxable in Denmark. Unlike the domestic withholding taxes, most cross-border payments to non-residents are imposed as a final tax and therefore are not subject to any final assessment. It is possible to apply for individual refunds for withholding tax levied on dividends, which is then handled as an individual assessment. But, broadly speaking, there is no final correction of the taxes paid throughout the year.

Denmark has no official treaty policy but does follow a predetermined approach when negotiating and entering into tax treaties. Moreover, it can be said that Denmark generally applies the OECD Model Convention as a blueprint when negotiating such treaties, although there is a certain willingness to take into account the UN Model Convention when negotiating treaties with developing countries.

Furthermore, Denmark has entered into a significant number of Tax Information Exchange Agreements ("TIEA") since 2008, which came to its natural conclusion in 2015 with the signing of a TIEA between Denmark and the United Arab Emirates. This was due to a political agreement identifying the need for international cooperation towards safeguarding the tax base of the country and due to a public demand for transparency in international taxation.

In summary, Denmark has taken upon itself an active role in establishing a broad network of tax treaties to protect revenue and to provide Danish corporations and foreign investors some tax certainty when doing business in Denmark. This is evident from the vast number of current tax treaties, active participation in the OECD, including being an original signatory of the OECD/G20 Multilateral Instrument, as well as seeking to enter TIEAs.

No legislative attention has been paid to the use of Collective Investment Vehicles ("CIVs") from a tax perspective. As such, Danish tax law currently has no special tax rules

[1]    Managing director, honorary professor, PhD. The author would like to extent his gratitude to Lars Bo Aarup and Louise Fjord Kjærsgaard (both associates at CORIT Advisory) for their valuable assistance in preparing this report.

DENMARK

targeting such entities and they are treated as any other investor would be. Denmark has previously taken an aggressive stance towards applying a beneficial ownership requirement when applying benefits to outbound payments, but this is currently pending before the ECJ and, as such, the future of relying on beneficial ownership requirements is awaiting the ruling of the Court. While this does not present an actual regime for CIVs, beneficial ownership requirements could certainly be applied as a viable tool to limit the most aggressive setups of such investment vehicles.

As with CIVs, the digital economy has not yet materialised itself in any legislative creations designed to counter any negative effects on the tax base arising from the increasing digitalisation of the economy. With respect to withholding tax, the only cash flows arising from digital business models that are encompassed by Danish withholding tax are royalty payments. Although it should be noted that the Danish definition for a royalty is not specifically designed to encompass payments arising from digital infrastructure, platforms and software.

Even though Denmark follows the OECD Model Convention and the official Commentary for it, the implementation of the server-PE has not, thus far, given rise to any real guidelines as to what and how one is constituted.

# Part One: Overview of tax

## 1.1 General overview of income tax system

### 1.1.1 A brief introduction to Danish income tax

Danish income taxation is based on a global income principle.[2] Denmark thus considers itself to have jurisdiction to tax Danish residents on their worldwide sourced income. While this principle is imposed to its full extent on individuals, an exception is made for companies. In general, these are taxed on their worldwide income,[3] with the exception that income allocated to foreign PEs are outside the scope of Danish taxation.[4] A modified territorial principle could therefore reasonably be stated to be in effect for corporations resident in Denmark.

For individuals, income is divided into personal income and capital income.[5] Personal income arising from labour is subject to a withholding mechanism at source[6] and handled exclusively by the employer. Capital income is payable by the individual taxpayer. One exception to this is dividend payments which are subject to a withholding mechanism at source handled by the paying company.[7]

For corporations, tax on account is payable in two equally sized instalments, which are

---

[2]    Cf. The State Tax Act § 4.
[3]    Cf. The Corporate Tax Act § 8.1.
[4]    Cf. The Corporate Tax Act § 8, para. 2.
[5]    Cf. The Taxation of Individuals Act § 3 and 4.
[6]    Cf. The Taxation at Source Act § 46.
[7]    Cf. The Taxation at Source Act. § 65.

due twice a year.[8] The taxable income for corporations is computed on their net income from all sources. As such, corporations do not report income from different sources, but all income is instead reported as one. Corporations are nevertheless subject to the rules regarding withholding tax as contained in this report.

### 1.1.2 Tax rates

In general, the tax rates for individuals are based on an individual calculation, as there are different rates depending on certain factors regarding residence, health care and religion. The tax rate is progressive to the extent that personal income exceeds DKK 479,600, in which case the part of the income exceeding that limit will be subject to an additional 15 per cent tax. The marginal tax rate for personal income is 56.4 per cent (2017-level).

Furthermore, share income is subject to a progressive tax rate of 27 per cent for income not exceeding DKK 51,700 (2017) and 42 per cent for any income above that threshold.[9]

The Danish corporate income tax is levied at 22 per cent of the net income.[10]

## 1.2 The role of withholding tax in the domestic setting: collection mechanism v. final tax

In a domestic setting, withholding tax is widely employed as a collection mechanism. As such, most withholding tax is paid on a preliminary basis and is therefore subject to a final tax assessment. However, there are certain exceptions to this, such as the special tax regime for sailors and withholding tax levied on dividends paid to non-resident companies and individuals, as well as individuals with share income below DKK 51,700.

The withholding regime in domestic tax law is contained in § 65 of the Taxation at Source Act, which contains rules regarding royalties, dividends, interest and salaries.

### 1.2.1 Post-withholding procedure

Except for the examples of final taxes mentioned above, all withholding taxes paid are subject to a final assessment. For corporations and individuals alike, this assessment is due once a year. When the final computation of taxable income and taxes paid is undertaken, either a residual tax payable is imposed or excessive tax paid is refunded.

For individuals, income is reported on a type-by-type basis, as personal and capital income, which are subject to diverging tax rates. When making the final assessment, all income is computed within the same framework to come to the total tax liability for the year. It should be noted, that for individuals with share income not exceeding DKK 51,700 (2017), the withholding tax on dividends is levied as a final tax and will not be subjected to the annual tax assessment.[11]

---

8    Cf. The Collection of Taxes Act § 16.
9    http://www.skm.dk/skattetal/beregning/skatteberegning/skatteberegning-hovedtraekkene-i-personbeskat-ningen-2017.
10   The corporate tax rate has been 22 per cent since the FY2016, cf. The Corporate Tax Act § 17.
11   Cf. The Taxation of Physical Individuals Act § 8A, cf. The Taxation at Source Act § 67, para. 1.

DENMARK

Most income reporting is undertaken by legal persons, who have access to the information required to make the tax assessment. This follows from the Control of Taxation Act[12], which founded the basis for the issuance of executive order number 890 of 10 July 2015[13] and which contains detailed rules regarding the reporting of a broad variety of income types, e.g. interest,[14] insurance savings,[15] dividends[16] and salaries.[17] As such, the taxpayer is not responsible for reporting income to the tax authorities. This removes the lion's share of the administrative burden from the taxpayer, which has been deemed an appropriate solution towards ensuring enhanced compliance with tax legislation.

### 1.2.2 Corporate liability to Danish withholding tax

Foreign corporations are subject to withholding tax on certain cross-border payments, which will be further analysed in part two of this report.

For resident companies, a withholding tax is levied on certain types of income, notably dividend payments.[18] The rules regarding withholding tax on dividends is non-discriminatory, but is instead subject to certain exceptions, e.g. dividend from own shares, dividend which is not taxable as a result of the Parent-/Subsidiary Directive and dividends which do not form part of the taxable income. The withholding tax on dividends is handled solely by the issuing company. As such, corporations and individuals alike receive a net payment of dividends, i.e. dividend minus taxes due.

It is possible to obtain an exemption from withholding tax[19] for minimum taxation investment funds,[20] "no. 6 co-operations"[21] and self-owning institutions and companies that are generally tax-exempt.[22] Should such an entity be in possession of an exemption, the issuing company is alleviated of its obligation to withhold tax on the dividend payment.

For companies that are liable to Danish tax and have received dividend payments from a Danish company subject to withholding tax, the tax so withheld is set off against the taxable income for the year in which the withholding tax was levied.[23]

The implied political reason for this regime has been to streamline the taxation of dividends and create a level playing field, in the sense that tax neutrality should be maintained, notwithstanding any choice on part of the taxpayer as to how and when to incorporate itself. Furthermore, it is desirable to have only one party responsible for handling the taxation of dividends. Indeed, there is an added burden of administration in handling the individual refund claims, but as these are handled alongside the annual tax assessment, the added burden for the administration is deemed the less intrusive solution with regard to

---

[12]    https://www.retsinformation.dk/forms/r0710.aspx?id=152434.
[13]    https://www.retsinformation.dk/Forms/R0710.aspx?id=173148.
[14]    Cf. § 38 of the order.
[15]    Cf. Chapter 10-12 of the order.
[16]    Cf. § 45 of the order.
[17]    Cf. § 10 of the order.
[18]    They are however subject to a lower rate of 22 per cent, cf.. 6 of the Taxation at Source Act § 65, par. 6.
[19]    Cf. Executive order no. 499 of 27 March 2015, § 31.
[20]    Cf. Tax Assessment Act § 16 C.
[21]    Cf. The Corporate Tax Act § 1 para. 1, no. 6.
[22]    Cf. The Corporate Tax Act § 3.
[23]    Cf. The Taxation at Source Act § 67, para. 2.

the handling of dividend payments.

## 1.3 Legal status of the withholding agent

### 1.3.1 Rules concerning the role of the withholding agent

There are no rules in Danish tax law governing the role or responsibility of the withholding agent. Beyond being jointly liable for any failure to withhold taxes on subjected income, the law is silent on the role of the withholding agent.

### 1.3.2 The liability of the withholding agent

Should the party responsible for withholding – be it a company or an individual – fail to uphold his responsibility to collect and remit taxes, he is considered jointly liable for the non-remitted taxes alongside the taxpayer. As the Danish tax authority disregards the relationship between the withholding agent and the taxpayer, any failure to remit by the agent could result in either the company or the taxpayer being the target of claims for missing tax payments.

A conflict between the agent and the taxpayer would then have to be settled in civil court, as any claim arising from a breach of contract would be handled by private law and, as such, is not subjected to tax law. As such, there is no provision regarding the relationship between the agent and the taxpayer, leaving this relationship entirely governed by the individual agreement and private law.

The Danish tax authority has reiterated this point in SKM 2006.394.SKAT subsection 4, stating clearly, "*In case the non-resident taxpayer potentially has paid the amount due to the agent does not result in any changes as regards liability, as the relationship between the taxpayer and the agent is of no concern to SKAT.*"

## 1.4 Procedural issues

### 1.4.1 Refund procedures for over-withheld tax

In Denmark, over-withheld taxes are in most cases subject to a final tax assessment and are eligible for a refund should the amount of withholding tax paid exceed the tax amount due. As mentioned under subsection 1.2.1, for any individuals with share income not exceeding DKK 51,700, any withheld tax is not subject to the annual assessment.

For companies, any withheld dividend tax is set off against the taxable income for the income year in which the withholding tax was levied. As such, the final tax burden is lessened by the amount of withholding tax already paid.

Companies whose income subjected to withholding tax does constitute taxable income,

DENMARK

have the possibility to apply for a separate refund of withheld dividend tax.[24]

Likewise, for individuals not resident in Denmark, it is possible to apply for a refund of any withholding taxes paid on dividend payments from Denmark. This will be analysed further in part two of this report, although it should be noted at this point that the refund of dividend tax has become a matter of intense political interest in light of recent abuse scandals.

### 1.4.1.1 Interest on refundable tax

In general, all excess tax paid is refunded with interest accrued. One exception to this concerns particular companies – whose income that is subject to withholding tax is tax-exempt – applying for a refund. For these companies no interest is payable.

The current interest rate on excessive tax paid is a monthly rate of 0.8 per cent for companies and 0.5 per cent for individuals. This interest rate is subject to annual assessment and is based on a computation of available similar interest rates.[25]

Currently, the market interest rate is negative. As such, the interest rate offered by the tax authorities is favourable compared with the market interest rate.

### 1.4.2 Recourse for revenue authorities

Any tax subject to a withholding mechanism is handled in its entirety separately from the taxpayer to whom the income is attributed, thus leaving him/her outside the scope of any collection of non-remitted withheld tax. In his place is the person liable to remit withheld tax, i.e. the payor. As such, the Danish tax authority is limited to collecting taxes due from the payor as the responsible party in collecting taxes subject to withholding.

## 2. Withholding tax for international transactions

### 2.1 Under domestic law

### 2.1.1 General overview of the Danish tax system

Denmark employs withholding tax as a collection mechanism for a variety of income types paid to non-resident recipients.[26]

In general, companies and individuals not resident in Denmark are taxable in Denmark on the income sourced therein. The liability is incurred by virtue of earning taxable income in Denmark and is levied as a withholding tax.

Under Danish law, it is a general requirement that companies and individuals that are

[24] See the Taxation at Source Act § 67, para. 6 cf. § 65, para. 3.
[25] Cf. The Collection of Taxes Act § 7, para. 2.
[26] Liability to Danish withholding tax for non-residents is called *limited tax liability* and is regulated in the Taxation at Source Act § 2 for Individuals and the Corporate Tax Act § 2 for companies.

liable to Danish taxation must file a tax return. However, in the case of individuals, the exception to mandatory filing is employees who are stationed in Denmark or who have received dividends or royalties.[27] In situations where Danish tax liability arises solely on the basis of one of these income types, there is no requirement to file tax returns.

Non-resident companies are only required to file tax returns to the extent that they have a permanent establishment in Denmark, if they accrue income from real estate or if they receive income from specific types of claims.[28] Conversely, if a company only receives dividends, royalties or interest payments from Danish sources, they are not required to file a tax return under Danish law.[29]

### 2.1.2 Types of income subject to withholding

Denmark imposes withholding tax on a wide array of income sourced in Denmark. In general, the income subject to Danish withholding tax is found in § 2 of the Corporate Tax Act for companies and § 2 of the Taxation at Source Act for individuals. Furthermore, the rules allowing for the withholding of tax are found in the Taxation at Source Act, §§ 65-65D for companies and in chapter V of the same act for individuals.

For clarity, we will initially cover the income types for which companies are subject to withholding tax, followed by a list of the withholding taxes imposed on individuals.

### The Corporate Tax Act § 2

### § 2, para. 1, litra c: Dividends

Dividends paid by a Danish company to a non-resident recipient are subject to withholding tax. The treatment for non-resident recipients is similar to that for Danish tax residents and is handled by the issuing company.

The main exception to the general taxation of dividends issued to non-residents is the Parent-Subsidiary Directive, 2011/96/EU, which exempts dividends paid from subsidiaries to non-resident parent companies, provided they are resident in the EU and thus eligible to claim the benefits of said directive. If the parent entity is resident in the EU and able to claim the benefits, Denmark waives the right to collect withholding tax on the dividend payment. Furthermore, if a given double taxation treaty either gives the resident state the sole right to tax dividends or if the individual treaty mandates a lower rate of withholding or waives withholding tax in its entirety, then Danish law allows for such dividends not to be taxed.

Also included under the concept of dividends for the purposes of non-resident company taxation are the capital gains realised as part of a buyback programme. Because these programmes can form a natural way of issuing dividend payments, lawmakers decided to include it in the concept of dividends, as Denmark has no system of taxation on capital gains earned by non-residents.

---

[27]     Cf. The Control of Taxation Act § 2, no. 2.
[28]     Cf. The Corporate Tax Act § 2, para. 1, litra h.
[29]     Cf. The Control of Taxation Act § 2, no. 3.

DENMARK

*§ 2, para. 1, litra d: Interest*[30]

Interest arising from controlled debt payable is subject to Danish withholding tax, unless specified otherwise by either the Interest-Royalty Directive or a tax treaty. There are a few further exceptions, notably when the subsidiary of a non-resident who is resident in a country with which Denmark has a tax treaty makes interest payments to a foreign parent company and that country has a CFC regime under which the interest paid is taxable, and when then the non-resident taxpayer documents that the income is taxed at a rate of not less than 3/4's of Danish CIT in the home jurisdictions of the parent company.

If a non-resident company is the recipient of an interest payment, but has chosen to have a Danish company receive and remit said interest payment, then the intermediary will be the executor for the withholding tax and thus liable to collect tax on the payment, thereby alleviating the original issuer of the interest payment of his withholding obligation. This is a procedural rule and, as such, does not impose more onerous obligations than would apply if the interest payment had been made without an intermediary.

*§ 2 para. 1, litra g: Royalty*

All royalty payments from Danish sources are liable to Danish taxation levied as a withholding tax. Income for royalty purposes in Denmark is defined as "*payments of any kind received for the use of or the right to use any patent, trademark, design or model, drawing, secret formula or process, or as payment for Industrial, Scientific or Commercial knowledge.*"[31]

Notably the "*use of or right to use Industrial, Scientific or Commercial equipment*" is absent, on a par with the current OECD Model Convention, meaning that leasing or rental fees for tangible property are not subject to withholding tax as a royalty.

*The Taxation at Source Act § 2*

*§ 2, para. 1, no. 1: Remuneration arising from employment*

If a Danish employer pays salary to a non-resident employee for work carried out in Denmark, then that salary is subject to withholding tax on a par with the salary of an employee resident in Denmark. As the taxation of salaries in Denmark is entirely handled by the *A-skat* system, this withholding is imposed on resident and non-resident salaried employees alike and therefore does not discriminate based on the residence of the taxpayer.

In general, *A-skat* is imposed on any income arising as a consequence of employment in Denmark. Such income is pooled into what is called *A-income*. Aside from income arising as a direct result of employment, income arising from board membership, employee stock programmes and income which stationed employees accrue in Denmark are included in the pool. The Taxation at Source act § 43, paragraph 2 contains a list of income sources that are contained in the A-income pool and thus are subject to Danish withholding tax.

*§ 2, para. 1, no. 6: Dividends*

Individuals are subject to withholding tax on dividends to the same extent as companies,

---

[30]　Cf. The Corporate Tax Act § 2, para. 1, litra d. It should be noted that only corporate taxpayers are subjected to withholding tax on interest. As such, withholding tax is not levied on interest payments received by individuals.

[31]　Cf. The Taxation at Source Act § 65C, para. 4 which contains the general royalty definition in Danish tax law.

as mentioned elsewhere in this report. The mechanism and rules are the same as those for companies.[32]

*§ 2, para. 1, no. 8: Royalties*

As with dividends, individuals are subject to withholding tax on royalties to the same extent as companies. The mechanism for withholding such taxes is the same one used for companies.[33]

*2.1.3 Source rules for different types of income*

Companies are required to register a Danish address in order to be registered as Danish, only such companies can be held liable to withhold tax on dividend payments. As such, determining whether or not a company is liable to withhold tax on dividend payments should usually present little difficulty.[34],[35]

For royalties, the key to determining whether a payer should withhold tax is whether the recipient of the payment is liable to Danish withholding tax.[36] As such, the status of the payee is the determining factor when assessing whether or not withholding tax should be collected and remitted on royalty payments.

The determination regarding withholding tax on interest payments is conducted on the same basis as the one for royalties, i.e. it is the tax liability of the recipient which determines whether or not such payments are subject to withholding tax.[37]

*2.1.4 Tax base and tax rates (gross v. net income)*

*2.1.4.1 The tax base of income subjected to withholding tax*

Withholding tax is levied against the "*total payment*", making it a gross tax. This holds true for dividends, interest and royalty payments.

Because the only function specified by the legislature for the withholding agent is to be jointly responsible for the collection and payment of withholding tax and because all withholding tax is levied against the gross amounts payable, there is no requirement that (s)he engages in any effort to identify net amounts.

One notable exception to this is withholding tax on salaries, which is levied against net income. This net income is calculated by deducting the total monthly allowance from the taxable income, which is again computed based on a variety of factors, including total yearly

---

[32]   Cf. The Taxation at Source Act § 40, second sentence.
[33]   Cf. The Taxation at Source Act § 40, last sentence.
[34]   Cf. The Taxation at Source Act § 65, which contains a list of companies liable to collect and remit withholding tax on dividends.
[35]   It follows from § 16 of the executive order 499 of 27 March 2015 on withholding tax that anyone who is liable to collect and remit withholding tax under the Taxation at Source Act must register as the Company Register no later than eight days after such liability has arisen.
[36]   See note 26 for taxpayers liable to withholding tax on royalties.
[37]   Cf. The Taxation at Source Act § 65D.

DENMARK

salary, health care choices, religion and place of residence. As the computation of available deductions is carried out on an individual basis, it is not possible to state anything general regarding net tax rates for individuals. It should be noted that this individually computed tax rate does not in practice give rise to complications, as the Danish tax authority issues *Tax cards* for all individuals that are subject to Danish taxation. Any tax withheld must be done in correlation with the individual tax cards, which contains information regarding deductions, personal information about the taxpayer, etc. As such, salary taxation for individuals (*A-income*) in Denmark is a closed system, which makes it easy to administer for the liable collectors of *A-tax*.

*2.1.4.2 Tax rates for income types subject to withholding tax*

The rate at which withholding tax is levied varies depending on the type of income. In general terms, for payments such as dividends, royalties and interest, taxes are levied at a rate of 22 per cent, subject to certain exceptions, while employment income tax is levied at an individually computed rate.

*Dividends*
Dividend payments are subject to diverging rates of withholding tax, depending on the recipient of the payments. It follows from the general rule, that such tax must be levied at 27 per cent.[38] Due to the variety of exemptions to this rule, the 27 per cent rate is mostly applicable to individuals who are recipients of dividend payments.
For corporate taxpayers, the rate of withholding tax on dividend payments can be lowered to 22 per cent, which reflects the corporate tax rate. As withholding tax paid on dividends can be set off against other taxable income, this reflects the wish on the part of the tax authorities to collect the appropriate amount of tax without imposing undue burdens on the taxpayer. This rate can be further lowered to 15.4 per cent on portfolio shares.[39] These lowered rates are subject to certain documentation requirements set forth by the Minister of Taxation.[40]

*Royalties and interest payments*
Withholding tax is levied on payments qualified as interest and/or royalties at a rate of 22 per cent.

*Personal income*
As mentioned previously in this report, personal income in the form of salaries is subject to an individually computed tax rate depending on a variety of factors. As such, no fixed tax rate exists for salaried employees. However, it should be noted that the marginal tax rate for the income year 2017 is 56.4 per cent.

---

[38]    Cf. The Taxation at Source Act § 65.
[39]    Cf. The Taxation at Source Act. § 65, ss. 6 cf. The Corporate Tax Act § 13, para. 2.
[40]    Cf. The Taxation at Source Act § 65, ss. 6, last sentence.

*2.1.5 Withholding tax obligation for non-resident payors*

To our knowledge, no such obligation exists.

*2.1.6 Recourse for revenue authorities*

As mentioned previously in this report, the liability to pay non-remitted withholding tax is imposed on the withholding agent and the taxable entity. As such, the tax authorities are confined to pursuing these parties in their efforts to collect outstanding claims.

*2.1.7 Money laundering*

There are no such rules under Danish law.

**2.2 Withholding tax under treaty law**

*2.2.1 Withholding tax in Danish tax treaties*

In general, Denmark adheres to the OECD Model Convention ("MC") as a basis for negotiating bilateral tax treaties and relies heavily on the OECD Commentaries when formulating and interpreting treaty provisions. As such, most Danish treaties since the publication of the first MC in 1962 have been based on the prevailing MC at the time of negotiation of a given tax treaty. Denmark has, however, shown a willingness to rely on the UN Convention when negotiating tax treaties with developing countries which, as net importers of capital, have an added significant emphasis on and interest in protecting the rights of the source country to tax.[41]

Denmark has a string of official reservations to the MC, most of which relate to the search and exploitation of hydrocarbons and the taxation of social pensions. Especially the latter has given rise to some tension, because the bilateral treaties with France and Spain were repealed due to not being able to find common ground on who had the right to tax retirees and receivers of Danish social pensions.

Furthermore, Denmark has reservations regarding the buyback of shares. Under Danish law, the income arising from shares sold back to the issuing company is treated as dividend payments for a non-resident recipient. As mentioned in 2.1.2, the reasoning behind this is that buyback programmes provide an ideal way for companies to adjust their capital while issuing dividends to shareholders. As Denmark does not levy any withholding tax on capital gains from shares, the legislature has, in order to impose such taxation, made reservations to articles 10 and 13 of the MC, which is reflected in the network of treaties entered into.

When taking the above into consideration, it is worth noting that tax treaties entered into by Denmark generally follow the OECD MC and, as such, contain provisions giving rise to withholding tax on dividend, interest and royalty payments. In general, Denmark does

---

[41]    See Niels Winther-Sørensen et. al. In Skatteretten 3, p. 32 et seq.

DENMARK

not impose withholding tax on service fees, although it should be noted that in at least one example, Brazil, the definition of royalty is extended to include income earned in relation to the providing of technical services and assistance.[42]

The table below provides an overview of some of Denmark's tax treaties and their respective positions on the applicability of withholding tax in relation to some of the common payments that arise from international trade.

| Country | Dividends | WHT Rate | Interest | WHT Rate | Royalties | WHT Rate |
|---------|-----------|----------|----------|----------|-----------|----------|
| Australia | x | 15 | x | 10 | x | 10 |
| Brazil | x | 25 | x | 15 | x | 15/25[1] |
| Germany | x | 5/15[2] | | | | |
| India | x | 15/25[3] | x | 10/15[4] | x | 20 |
| Mexico | x | 0/15[5] | | 5/15[6] | | 10 |
| Nordics | x | 0/15[7] | | | | |
| Republic of Korea | x | 15 | x | 15 | x | 10/15[8] |
| USA | x | 5/15[9] | | (15)[10] | | |

[1]    The rate for trademarks is 25 per cent.
[2]    The rate is reduced to five per cent if the dividend recipient is the beneficial owner and owns more than 10 per cent of the issuing company.
[3]    15 per cent rate is subject to a beneficial ownership of 25 per cent of the capital of the issuing company.
[4]    10 per cent rate is for interest payments related to loans issued by banks.
[5]    Zero per cent rate is subject to a beneficial ownership of 25 per cent of the capital of the issuing company.
[6]    Five per cent rate is for interest payments related to loans issued by banks.
[7]    Zero per cent rate is subject to a beneficial ownership of 10 per cent of the capital of the issuing company.
[8]    10 per cent rate is for royalties arising from "*industrial investments.*"
[9]    Five per cent is subject to a beneficial ownership of 10 per cent of the capital of the issuing company.
[10]   Interest payments arising from debt with equity features are subject to treatment as dividends under § 10(2)(b) of the treaty.

In a recent article, associate professor Peter Koerver-Schmidt of Copenhagen Business School conducted an extensive survey of Danish treaty policies in a historic perspective. He concluded: "Despite the fact that the anti-abuse agenda has been a main focal point since the 1970s and remains one today, mainly in light of the BEPS project, this does not change the general tendency, which continuously has pointed in the direction of an ever-increasing network of Danish tax treaties. Even though Denmark, in many ways, has followed the underlying current [in international tax], it has still succeeded in leaving its mark on the international stage by actively participating in the work of the OECD and not in the least by being a part of the world's first multilateral tax treaty entered into with the other Nordic

42    § 3 in the Protocol to the Convention between the Government of the Kingdom of Denmark and the Government of the Republic of Brazil for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on income, signed August 1974.

countries."[43]

### 2.2.2 Withholding obligations for non-resident payors

Not to our knowledge.

### 2.2.3 Money laundering

There are no rules under current anti-money laundering legislation which impose any levies on cross-border payments. As a new law to combat money laundering and the funding of terrorism was enacted in 2017, it is considered unlikely that any such rules will be introduced in the foreseeable future.

## 2.3 Procedural aspects of withholding tax in international settings

### 2.3.1 Mitigation of the responsibility of the withholding agent

As mentioned elsewhere in this report, the role of the withholding agent is largely unregulated. As such, (s)he is under no obligation nor empowered to act in any other capacity, as his/her sole function is to be jointly liable for any amount of due taxes arising in Denmark for a non-resident payer of such income.

### 2.3.1.1 Legal rights of withholding agent

See above.

### 2.3.1.2 Consequences for failing to withhold and remit

The failure to comply with the withholding tax regime will incur the consequences imposed on a resident payer. There is no special treatment for non-residents under Danish tax law.

### 2.3.2 Applicability of tax treaties

In Denmark, the payor decides the *prima facie* application of tax treaties. As such, payors can rely on the withholding rate found herein and the payee must subsequently apply for more beneficial treatment should such be contained in domestic law.

---

[43]    Danish Tax Treaties and their Historic Evolution, Peter Koerver-Schmidt, Associate Professor, Copenhagen Business School.

**2.4 Possible new trend(s) in tax withholding under enhanced co-operation between countries in the area of information exchange, assistance in tax collection, joint-audit, etc.**

No such trends are currently identified in Danish tax law, although it should be noted that Denmark has actively sought to establish TIEAs with the so-called *tax haven* jurisdictions as a result of a political agreement dating back to 2008. In 2015, a TIEA was concluded with the United Arab Emirates, which marked the last of the countries with which Denmark actively sought to enter such agreements.

## 3. Withholding tax on CIVs

### 3.1 Special procedure for treaty applicability to CIVs

There is currently no special regime in Danish tax law regarding CIVs.

### 3.2 In the absence of special rules for CIVs

In the past, the Danish tax authorities have aggressively pursued a beneficial ownership requirement in relation to cross-border dividend payments, with multiple cases currently pending before the CJEU. As no ruling has been given to date, it is unclear to what extent the tax authorities were entitled to apply such a course of action, and whether or not one will be applied in the future awaits the decisions of the CJEU in the cases pending.

*3.2.1 When the payor is unable to gather adequate information*

Not applicable.

## 4. Withholding tax in the digital economy

### 4.1 General overview of actual or potential revenue loss caused by the advent of the digital economy

There is a general perception among decision-makers and the Danish tax authorities that globalisation is leading to revenue loss in Denmark. There is also a perception that the risk of revenue loss is being exacerbated by the digitalisation of the economy. However, this perception has not yet manifested itself in any specific digital economy legislation.

Danish domestic tax law includes both specific and general anti-avoidance regulations (GAARs). None of the anti-avoidance rules are specifically designed to target digital transactions. However, it is certain that digital transactions are affected by the rules and that the rules should be carefully assessed before taking part in any transactions, including digital transactions.

18

The specific anti-avoidance rules include, but are not limited to: transfer pricing, limitation of interest deduction, CFC and anti-hybrid mismatch on entities.

In 2015, a GAAR was introduced[44] as part of the implementation of the GAAR agreed on in the Parent-Subsidiary Directive.[45] This was expanded to also include benefits resulting from the Interest and Royalty Directive[46], Merger Directive[47] and any tax treaty that Denmark is a part of – regardless of when such treaty took effect. According to the GAAR, a taxpayer shall "not be granted the benefits of the Directives and tax treaty if an arrangement or a series of arrangements have been put into place for the main purpose or one of the main purposes of obtaining a tax advantage that defeats the object or purpose of the Directives or tax treaty and such arrangements are not genuine, having regard to all relevant facts and circumstances." An arrangement or a series of arrangements shall be regarded as not being genuine to the extent that they are not put into place for valid commercial reasons that reflect economic reality.

Under Danish domestic tax law, the term 'permanent establishment' should be interpreted according to the definition used in the OECD Model Tax Convention and its Commentary. Even though the commentary now includes a server as a potential place of business, the National Tax Board ruled in the beginning of 2016 that the activities performed by a foreign parent company with respect to a website hosted on a data centre owned by its subsidiary in Denmark would *not* constitute a PE.[48] In line with this, the National Tax Board has handed down three other rulings with respect to server PEs[49] for cases in which the activities did not constitute a server-PE and all results point to the fact that the activities do not lead to a server PE.

## 4.2 Classification of income from digital transactions

### 4.2.1 One-time download of computer software and other digital content

Generally speaking, income from downloads of computer software will not qualify as royalty

---

[44]  § 3 of the Danish Tax Assessment Act, Act no. 540 of 29 April 2015 (L 167) 21 April 2015.

[45]  Council Directive (EU) 2015/121 of 27 January 2015 amending Directive 2011/96/EU on the common system of taxation applicable in the case of parent companies and subsidiaries of different member states.

[46]  Council Directive 2003/49/EC of 3 June 2003 on a common system of taxation applicable to interest and royalty payments made between associated companies of different member states.

[47]  Council Directive 2009/133/EC of 19 October 2009 on the common system of taxation applicable to mergers, divisions, partial divisions, transfers of assets and exchanges of shares concerning companies of different member states and to the transfer of the registered office of an SE or SCE between member states.

[48]  SKM2016.188.SR: The activities of the foreign parent company included a remote access, which belonged to the employees of the foreign parent company who were outside of Denmark. These employees could: 1) Monitor hardware and software performance. 2) Install and uninstall applications. 3) Carry out maintenance of the hosted applications. 4) Manage software and data. 5) Close a server that does not work properly and redirect data traffic to other servers. 6) In emergencies, turn off specific servers or other specific equipment in the data centre. 7) In emergencies put such servers out of order. Furthermore, employees of the foreign parent company will only have limited access to the data centre and will be accompanied by employees from the Danish company when they visit the data centre.

[49]  SKM2011.828.SR, SKM2014.268.SR and SKM2015.369.SR.

DENMARK

because of the definition of royalties under Danish domestic tax, which reads as follows:[50]

*"Royalties means payments of any kind received as a consideration for the use of or the right to use any patent, trademark, pattern or model, plan, secret formula or process, or payments for information concerning industrial, commercial or scientific experience."* (Unofficial translation)

Consequently, to compare it with the definition included in the OECD Model Tax Convention, the definition excludes *payments of any kind received as a consideration for the use of or the right to use any copyright of literary, artistic or scientific work including cinematographic films.* This is of great importance, since EDB,[51] including software, is categorised as literary work according to the Danish Copyright Act § 1 (3).

Therefore, if software is not protected by a patent, downloads of computer software should *not* be qualified as royalties for Danish domestic tax purposes.

The Danish tax authority has stated that the OECD commentary represents the Danish interpretation of Danish tax treaties similar to the OECD Model Tax convention, unless reservations have been taken.[52]

### 4.2.2 Cloud-computing: continual use of computer software and other digital content

The tax authorities have not issued any specific guidance on how payments for cloud computing-as-a-service should be qualified for Danish tax purposes, nor does any Danish case law exist.

Furthermore, no guidance exists on whether cloud computing-as-a-service should be treated as mixed contracts, and there is no general principle in Danish domestic tax law on whether to decompose or integrate mixed contracts. As a result, the appropriate course to take with a mixed contract is likely to follow the OECD commentaries. In principle, a mixed contract should be broken down on the basis of the information contained in the contract or by means of a reasonable apportionment of the whole amount of the stipulated consideration according to the various parts of what is being provided under the contract, and then to apply to each part of it so determined the taxation treatment proper thereto. If, however, one part of what is being provided constitutes by far the principal purpose of the contract and the other parts stipulated therein are only of an ancillary and largely unimportant character, then the treatment applicable to the principal part should generally be applied to the whole amount of the consideration.[53]

Since software payments of any kind received as a consideration for the use of or the right to use copyright of literary work, including software, will not qualify as royalties for Danish domestic tax purposes, the only way that payments made for the use of cloud computing-as-a-service could be qualified as royalty from a Danish domestic tax perspective is if this should qualify as payment for the use of or the right to use software protected as a patent.

Consequently, there could be differences between the qualification of payments for the different kinds of cloud computing-as-a-service, e.g. SaaS (Software as a Service), IaaS (Infra-

---

[50]    Cf. the Act on Taxation at Source §65 C (4).
[51]    Danish abbreviation for a group of assets equal to those covered by "Information Technology."
[52]    Den Juridiske vejledning section C.F.8.2.1.
[53]    Ss. 11.6 and 17 of the commentaries to art. 12 (2) of the 2014 OECD Model Tax Convention.

structure as a Service), and PaaS (Platform as a Service). The determining factor depends on what kind of intangible assets are involved in the transaction and whether the payment is actually consideration *for the use of or the right to use* the intangible assets. Since there is no real guidance under Danish domestic tax law with respect to cloud computing-as-a-service, it is uncertain what position the Danish tax authorities will take. However, in the view of this author, the payments are likely *not* to qualify as royalties.

## 4.3 Applicability of withholding tax

### 4.3.1 Widening the scope of the royalty definition to accommodate for digital business models

There is no tendency towards interpreting and applying domestic law or treaty law in the direction of expanding the scope of the royalties, which is the only type of income (among business profits, service fees and royalties), which is subject to Danish withholding tax.

### 4.3.1.1 Elaboration on such tendencies

Not applicable.

### 4.3.1.2 Problems connected with broadening the definition of royalty

Not applicable.

### 4.3.1.3 Changing withholding tax to accommodate digital business models

There is no discussion in Denmark on whether some changes to withholding tax are needed so that withholding tax may play a more important role in the collection of tax on what has traditionally been regarded as business income.

### 4.3.2 Withholding obligation for consumers in B2C transactions

As no such tendency exists, no such withholding obligation is extended to the resident end-consumer. Furthermore, financial intermediaries (such as a credit company or a remitting bank) are not obligated to withhold tax from the cross-border payments in which it is involved. Instead, any withholding obligation will be imposed on the payer of the transaction.

### 4.3.3 Information reporting and net-basis taxation

Not applicable.



International Fiscal Association

ISBN 978 90 12 40205 7

9 789012 402057

Sdu

# Exhibit 8

# CERTIFICATION OF TRUST

I, **Richard J Markowitz**, trustee of the **RJM Capital Pension Plan Trust** confirm the following facts:

1. The **RJM Capital Pension Plan Trust** is currently in existence and was created on **January 29, 2013**.

2. The settlor/grantor/trustor of the trust is:
   **RJM Capital LLC**

3. The currently acting trustee of the trust is:
   **Richard J Markowitz**

4. The address of the trustee is:
   **1010 Fifth Ave**
   **Apt 1D**
   **New York, NY 10028**

5. The power of the trustee includes: **The powers to sell, convey, exchange, borrow money, and encumber the trust property with a deed of trust or mortgage.**

6. Type of Trust: **Irrevocable**

7. The federal ID number of the trust is: **46-1910855**

8. Title to trust assets shall be taken in the following fashion:
   **RJM Capital Pension Plan Trust**

9. The Successor Trustee(s) is/are: _____

The undersigned trustee hereby declares that the trust has not been revoked, modified, or amended in any manner which would cause the representations contained herein to be incorrect.

_____
Richard J Markowitz

Feßruary 1, 2013
Date

(This form must be acknowledged before a notary public)

State of _New York_
County of _New York_

On this, the 1st day of February, 20 13, before me a notary public, the undersigned, personally appeared Richard J. Markowitz, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

_____
Notary Public Signature

Notary Public Seal:

VICTER I ROUBION
Notary Public, State of New York
No. 01RO6191772
Qualified in Bronx County
Commission Expires April 30, 2.15

# Exhibit 9

Original Plan

# The RJM Capital Pension Plan

CONFIDENTIAL

# **TABLE OF CONTENTS**

<u>Page</u>

I.    PLAN SPECIFICATIONS .................................................................................I-1

   A.    Name.................................................................................................I-1
   B.    Exclusive Benefit. ...........................................................................I-1
   C.    Effective Date. .................................................................................I-1
   D.    Plan Year. ........................................................................................I-1
   E.    Limitation Year. ...............................................................................I-1

   ELIGIBILITY AND PARTICIPATION .............................................................I-1

   F.    Eligible Employee. ..........................................................................I-2
   G.    Entry Date. ......................................................................................I-3

   CONTRIBUTIONS ...........................................................................................I-3

   H.    Types of Employer Contributions....................................................I-3
   I.    Reserved. .........................................................................................I-4
   J.    Required Minimum Benefits. ..........................................................I-4
   K.    Compensation. ................................................................................I-4
   L.    Highly Compensated Employees and Current or Prior Testing
         Methods............................................................................................I-5

   ALLOCATIONS TO CONTRIBUTION ACCOUNTS .....................................I-5

   M.    Allocation of Employer Contributions..............................................I-5
   N.    Excess Compensation......................................................................I-6
   O.    Participant Forfeitures. ...................................................................I-6
   P.    Allocation Requirements – Last Day Employment and Service
         Requirements. .................................................................................I-6
   Q.    Allocation of Excess Annual Additions............................................I-7
   R.    Employee After-Tax and Deemed IRA Contributions. ....................I-7
   S.    Rollover Contributions and Transferred Benefits............................I-7

CONFIDENTIAL

WH_MDL_00331779

T.    Early Retirement Age and Normal Retirement Age. ...............................I-8

VESTING ...........................................................................................I-8

U.    Vesting. ..............................................................................I-8
V.    Required Top-Heavy Minimum Vesting. ...............................................I-8
W.    Years of Vesting Service. ...........................................................I-8
X.    Years of Service – Break-in-Service. ...................................................I-8
Y.    Service with the Predecessor Employer. ...............................................I-8
Z.    Vesting at Death or Total Disability.................................................I-8

DISTRIBUTION OF BENEFITS ..............................................................I-9

AA.    Participant Loans..................................................................I-9
BB.    Hardship Withdrawals..............................................................I-9
CC.    In-Service Distributions Other Than Hardship. ....................................I-10
DD.    Cash-Out Options.................................................................I-10
EE.    Time of Distribution Upon Employment Termination. ............................I-11
FF.    Right to Defer Receipt of Benefits After Normal Retirement Age and
       Age 70½. ........................................................................I-11
GG.    Minimum Required Distributions under Final and Temporary
       Regulations. ...................................................................I-11
HH.    Accrued Benefits Not Subject to REACT Annuity Requirements.........I-12
II.    Reserved. ........................................................................I-12
JJ.    Alternate Forms of Benefits Payments. ..........................................I-12
KK.    Distributions of Roth Contributions. .............................................I-13
LL.    Total Disability. ..................................................................I-13

MISCELLANEOUS...........................................................................I-13

MM.    Participant Directed Accounts. ..................................................I-13
NN.    Valuation Date....................................................................I-14
OO.    Special Disaggregation Rule. ....................................................I-14
PP.    Co-Trustees.......................................................................

II.   DEFINITIONS ....................................................................II-1

A.    Terms Defined In This Article II. ..................................................II-1
B.    Terms Not Defined in Article I and II of this Plan. .............................II-22

III.  PARTICIPATION AND MEMBERSHIP ......................................III-1

A.    Participation Date.................................................................III-1
B.    Leave of Absence.................................................................III-1

CONFIDENTIAL

WH_MDL_00331780

C.  Enrollment. ...................................................................................III-2
D.  Waiver of Participation. ................................................................III-2
E.  Omission of Eligible Employee. ...................................................III-2
F.  Inclusion of Ineligible Employee. .................................................III-2

IV.  EMPLOYER CONTRIBUTIONS ............................................................... IV-1

A.  In General. ................................................................................... IV-1
B.  Special Make-up Contribution. ..................................................... IV-1
C.  Corrective Contributions. .............................................................. IV-1
D.  Profit Sharing and Retirement Savings (401(k)) Contributions. .......... IV-1
E.  Actual Deferral Percentage Limitation. ......................................... IV-4
F.  Safe Harbor Contributions. ........................................................... IV-6
G.  Simple 401(k) Plans. .................................................................... IV-9
H.  Limitation on Elective Deferrals. ................................................... IV-9
I.  Reserved. ..................................................................................... IV-10
J.  Correction of Excess Contributions. .............................................. IV-10
K.  Coordination of Excess Contributions with Excess Deferrals. .......... IV-15
L.  Income Allowable to Excess Contribution. .................................... IV-16
M.  Correction of Excess Deferrals. .................................................... IV-16
N.  Income Allowable to Excess Deferrals. ......................................... IV-17
O.  Coordination of Excess Deferrals with Distribution or
    Recharacterization of Excess Contributions. ................................. IV-17
P.  Distribution of Amounts Attributed to Elective Contributions. .......... IV-17
Q.  Hardship Withdrawals. .................................................................. IV-18
R.  Aggregation of Employer's Plans. ................................................ IV-19
S.  Universal Availability Requirements of Catch-Up Contributions. ...... IV-21
T.  Multiple Plan Limits on Catch-Up Contributions. .......................... IV-23

V.  ALLOCATIONS TO PARTICIPANTS' ACCOUNTS ..................................... V-1

A.  Maintenance of Accounts. ............................................................. V-1
B.  Valuation of Trust. ........................................................................ V-1
C.  Allocation of Trust Earnings. ......................................................... V-1
D.  Allocation to Contribution Accounts. ............................................. V-2
E.  Limitation on Allocation of Employer Contributions and Forfeitures. ... V-4
F.  Allocation Priorities if Limitations Exceeded. ................................. V-5
G.  Key Man Insurance Proceeds. ....................................................... V-6

VI.  VESTING AND BENEFIT ENTITLEMENT ................................................. VI-1

A.  Vesting. ........................................................................................ VI-1
B.  Forfeitures. ................................................................................... VI-1

-iii-

C.    Re-Vesting in Forfeitures Upon Re-Employment.................................. VI-3
D.    Limitation on Vesting Upon Re-Employment. ..................................... VI-3
E.    Vesting Upon Change of Employment Status. .................................... VI-4
F.    Vested Interest Not Distributed............................................................ VI-4
G.    Break-in-Service While Still Employed. .............................................. VI-4
H.    Effect of Break-in-Service – Vested Participant.................................. VI-4
I.    Reserved. ............................................................................................ VI-4
J.    Effect of Break-in-Service – Non-Vested Participant. ......................... VI-4
K.    Limitation on Right to Amend Vesting Schedule................................. VI-5

VII.    DISTRIBUTION OF BENEFITS ................................................................... VII-1

A.    Definitions............................................................................................ VII-1
B.    Distribution With Annuity Option – Other Than Death. ....................... VII-3
C.    Distribution at Death........................................................................... VII-12
D.    Transitional Rules............................................................................... VII-16
E.    Non-Annuity Rules.............................................................................. VII-17
F.    Time of Distribution............................................................................ VII-18
G.    Pre-TEFRA Designations. .................................................................. VII-18
H.    Loans to Participants.......................................................................... VII-19
I.    Reserved. ........................................................................................... VII-21
J.    Distributions to Incompetent Persons. ............................................... VII-21
K.    Nonliability. ......................................................................................... VII-21
L.    Benefit Claims Procedure. .................................................................. VII-22
M.    Income Tax Withholding. ..................................................................... VII-23
N.    Qualified Domestic Relations Orders.................................................. VII-23
O.    Overpayment of Vested Interest. ........................................................ VII-23

VIII.    TOP-HEAVY LIMITATIONS ...................................................................... VIII-1

A.    Definitions........................................................................................... VIII-1
B.    Aggregation Groups. .......................................................................... VIII-2
C.    60% Test – Special Rules. ................................................................. VIII-3
D.    Minimum Vesting Requirements......................................................... VIII-4
E.    Minimum Benefit Requirement. .......................................................... VIII-5
F.    Annual Section 415 Compensation. ................................................... VIII-7
G.    Multiple Plans. .................................................................................... VIII-7

IX.    DESIGNATED BENEFICIARIES................................................................. IX-1

X.    CONTRIBUTIONS BY PARTICIPANTS....................................................... X-1

A.    Employee After-Tax Contributions....................................................... X-1

CONFIDENTIAL

WH_MDL_00331782

B.      Rollover Contributions. ............................................................. X-1
C.      Separate Administration and Accounts for Participant Contributions. . X-2
D.      Vesting. ................................................................................. X-2
E.      Withdrawal of Contributions. ..................................................... X-2
F.      Distribution of Rollover Contribution Accounts. ........................... X-2
G.      Limitations on Section 401(m) Contributions. .............................. X-3
H.      Correction of Excess Aggregate Contributions. ........................... X-5
I.      Reserved. ............................................................................... X-6
J.      Distribution of Income. ............................................................. X-6
K.      Coordination with Section 401(a)(4) of the Code. ......................... X-7
L.      Additional Qualified Nonelective Employer Contributions. ............... X-7
M.      Correction of Excess Aggregate Contribution Prior to the Plan Year. X-10
N.      Coordination with Correction of Excess Contributions and Excess
         Deferrals. ............................................................................. X-10
O.      Aggregation Rules for Section 401(m) Contributions. ..................... X-10

XI.     LIFE INSURANCE POLICIES ........................................................ XI-1

A.      Investment and Ownership of Life Insurance Policies. ..................... XI-1
B.      Payment of Premiums. .............................................................. XI-1
C.      Accounting for Policies. ............................................................ XI-1
D.      Discrimination. ....................................................................... XI-1
E.      Disposition Upon Retirement or Total Disability. ............................ XI-1
F.      Disposition Upon Other Separation From Service. .......................... XI-2
G.      Policy Loans. .......................................................................... XI-2
H.      Insurer Not a Party. ................................................................. XI-2
I.      Reserved. ............................................................................... XI-3
J.      Insurance Limitations. .............................................................. XI-3

XII.    TRUST ...................................................................................... XII-1

A.      Payment of Contributions. ........................................................ XII-1
B.      Participant Directed Accounts. ................................................... XII-1
C.      Expenses Charged to Participants' Accounts. ................................ XII-1
D.      Prudent Man Rule. ................................................................... XII-2

XIII.   THE ADMINISTRATIVE COMMITTEE ............................................ XIII-1

A.      Committee Membership. ........................................................... XIII-1
B.      Named Fiduciary and Plan Administration. .................................... XIII-1
C.      Compensation. ........................................................................ XIII-1
D.      Delegation of Duties. ................................................................ XIII-1
E.      Bonding of Fiduciaries. ............................................................. XIII-2

CONFIDENTIAL

WH_MDL_00331783

F.   Action By Committee Members. ......................................................... XIII-2

XIV.  AMENDMENT AND TERMINATION; RETURN OF EMPLOYER
      CONTRIBUTIONS; PARTICIPATING EMPLOYERS ................................. XIV-1

      A.   Amendment. ............................................................................... XIV-1
      B.   Authority of Volume Submitter  Practitioner to Amend for Adopting
           Employers. .................................................................................. XIV-1
      C.   Impact of Change To Individually Designed Plan. ........................... XIV-2
      D.   Termination or Partial Termination or Complete Discontinuance of
           Contributions. ............................................................................. XIV-2
      E.   Return of Employer Contributions.................................................. XIV-3
      F.   Procedure for Adoption and Withdrawal by Participating Employers.XIV-3

XV.   STANDARD OF CONDUCT OF FIDUCIARIES .......................................... XV-1

      A.   Fiduciaries. .................................................................................. XV-1
      B.   Fiduciary Duties............................................................................ XV-1

XVI.  MERGERS, CONSOLIDATIONS AND TRANSFERS OF ASSETS ............ XVI-1

      A.   Merger or Consolidation of the Plan. .............................................. XVI-1
      B.   Transfers From Other Qualified Plans – Rollovers. .......................... XVI-1
      C.   Transfer To Eligible Retirement Plans. ............................................ XVI-1
      D.   Transfer or Merger of Money Purchase Pension Plan to this Plan. .. XVI-1

XVII. MISCELLANEOUS.............................................................................. XVII-1

      A.   Limitation of Rights and Employment Relationship.......................... XVII-1
      B.   Payments to Missing Persons. ....................................................... XVII-1
      C.   Spendthrift Provisions................................................................... XVII-1
      D.   Indemnification. ........................................................................... XVII-2
      E.   Applicable Laws; Severability. ....................................................... XVII-2
      F.   Inapplicability of Certain Provisions if Plan is Not an ERISA Plan......XVII-2

CONFIDENTIAL                                                                    WH_MDL_00331784

# The RJM Capital Pension Plan

RJM Capital LLC, a DE LLC (the "Employer"), has adopted this Profit Sharing and Retirement Savings Plan to allow its Employees who are eligible to participate in the Plan to share in the growth of the Employer in accordance with the terms and conditions set forth below, in order to (i) promote in the Employees an interest in the successful operation of the Employer's business and in the increased efficiency of their work; (ii) provide the participating Employees with benefits upon their retirement; and (iii) provide their Beneficiaries with death benefits.

## I.    PLAN SPECIFICATIONS

### A.    Name.

This 401(k) Plan shall be known as the "The RJM Capital Pension Plan."

### B.    Exclusive Benefit.

This Plan shall be maintained for the exclusive benefit of the Participants and their Beneficiaries and is intended to qualify as a defined contribution plan under the appropriate provisions of ERISA and the Code.

### C.    Effective Date.

"Effective Date" means the first day of the first Plan Year in which this plan is adopted by the Employer.

### D.    Plan Year.

"Plan Year" means each 12 consecutive month period ending on 12/31.

### E.    Limitation Year.

"Limitation Year" means each 12 consecutive month period ending on the last day of the Plan Year.

## ELIGIBILITY AND PARTICIPATION

ARTICLE I                                    I-1

CONFIDENTIAL                                    WH_MDL_00331785

F.    <u>Eligible Employee</u>.

"<u>Eligible Employee</u>" means, with respect to any Plan Year, every Employee of the Employer who meets the following requirements:

1.    <u>Minimum Age</u>:

None.

2.    <u>Service</u>:

None.

3.    <u>Years of Service – Break-in-Service</u>.

The Hour of Service requirement of Paragraphs A.8 and A.94 of Article II shall not be modified.

This Plan shall not use the elapsed time method, as described in Paragraph A.94 of Article II, for crediting Years of Service for eligibility purposes.

4.    <u>Service with the Predecessor Employer</u>.

Service with a Predecessor Employer is not applicable.

5.    <u>Subsequent Eligibility Computation Period</u>.

"<u>Subsequent Eligibility Computation Period</u>" means the Plan Year including the first anniversary of the Employee's Employment Commencement Date and any subsequent Plan Year.

6.    <u>Class Exclusions</u>.

None.

7.    <u>Waiver of Participation</u>.

Waiver of Participation shall not be permitted.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                              WH_MDL_00331786

G.    <u>Entry Date</u>.

Immediate entry for all Contributions.. However, an Eligible Employee shall enter the Plan no later than the earlier of the first day of the Plan Year or six (6) months following the day he or she becomes an Eligible Employee.

<div align="center">CONTRIBUTIONS</div>

H.    <u>Types of Employer Contributions</u>.

1.    <u>Elective Contributions Without Safe Harbor Provisions</u>.

Each Participant may elect, by completing the appropriate forms acceptable to the Committee, to reduce and defer the receipt of up to 100% of his or her Compensation. In no event shall any Participant be permitted to make Elective Contributions in excess of the limitation on Elective Deferrals described in Paragraph H of Article IV. The Employer shall contribute the amount so deferred subject to the limitations described in Articles IV and V, to the Plan.

Effective on and after January 1, 2002, catch-up contributions described in Paragraph D.2 of Article IV shall apply. The Employer provided limit on Elective Contributions stated in the preceding paragraph shall not apply to catch up contributions.

Effective on or after January 1, 2006 a Participant may designate all or a part of his or her Elective Contributions as Roth Contributions.

2.    <u>Matching Contributions</u>.

The Employer shall not make Matching Contributions.

3.    <u>Nonelective Employer Contributions</u>.

For each Plan Year, the Employer may make contributions to the Trust in one (1) or more installments without regard to its Net Profits for such year in such amounts as the Board may determine in its sole discretion.

4.    <u>Qualified Matching Contributions</u>.

The Employer shall not make Qualified Matching Contributions.

5.    <u>Qualified Nonelective Employer Contributions</u>.

<div align="center">ARTICLE I</div>

I-3

CONFIDENTIAL

WH_MDL_00331787

The Employer shall not make Qualified Nonelective Employer Contributions.

6. **Safe Harbor Matching Contributions**.

The Employer shall not make Safe Harbor Matching Contributions.

7. **Safe Harbor Nonelective Employer Contributions**.

The Employer shall not make Safe Harbor Nonelective Employer Contributions.

8. **Simple 401(k) Contributions**.

The Employer shall not make Simple 401(k) Contributions.

I. **Reserved**.

J. **Required Minimum Benefits**.

1. The top-heavy minimum benefit shall be three percent (3%) of Section 415 Compensation.

2. Key Employees shall be entitled to top-heavy minimum benefits under this Plan.

K. **Compensation**.

"Compensation" means Section 415 Compensation, not to exceed the Compensation Limitation, paid by the Employer to an Employee during a Plan Year, excluding all Employee expenses allowances, reimbursements and other fringe benefit allowances paid during the Plan Year which are subject to withholding of income tax under Section 3401(a) of the Code, and further modified by the following:

Modifications of Compensation

Including wages which are not currently includable in the Participant's gross income by reason of the application of Sections 125, 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b), 408(p)(2)(A)(i) and 457 of the Code.

Effective for Plan Years beginning on and after January 1, 2002 and Limitation Years beginning on and after January 1, 2002, for purposes of the definition of

ARTICLE I                                    I-4

CONFIDENTIAL                                    WH_MDL_00331788

Compensation under this Paragraph K, Paragraphs A.28, A.38 and A.75 of Article II, Paragraph E.1 of Article V and Paragraphs A.2 and E of Article VIII, amounts under Section 125 of the Code include any amounts not available to a Participant in cash in lieu of group health coverage because the Participant is unable to certify that he or she has other health coverage.  An amount will be treated as an amount under Section 125 of the Code only if the Employer does not request or collect information regarding the Participant's other health coverage as part of the enrollment process for the health plan.

For purposes of Paragraph A.75 of Article II, Section 415 Compensation means subparagraph (c) of Paragraph A.75 of Article II.

L.    <u>Highly Compensated Employees and Current or Prior Testing Methods</u>.

For purposes of identifying Highly Compensated Employees, the Employer has elected the following:

1.    A Highly Compensated Employee shall be determined based upon the Look-Back Year.

2.    A Highly Compensated Employee need not be a member of the Top-Paid Group.

3.    The determination of the Actual Deferral Percentage, for the group of Eligible Participants who are Non-Highly Compensated Employees shall be based upon the current Plan Year data.

<u>ALLOCATIONS TO CONTRIBUTION ACCOUNTS</u>

M.    <u>Allocation of Employer Contributions</u>.

Subject to the provisions of Articles IV, V and X:

1.    <u>Matching Contributions</u>.

Not Applicable.

2.    <u>Nonelective Employer Contributions</u>.

<u>Ratio of Compensation Formula</u>

Nonelective Employer Contributions for each Plan Year shall be allocated to the Nonelective Employer Contribution Accounts of each Participant eligible

ARTICLE I                          I-5

CONFIDENTIAL                                                      WH_MDL_00331789

for an allocation in the proportion that each such Participant's Compensation bears to the Compensation of all such Participants for the Plan Year.

    3.    <u>Qualified Matching Contributions</u>.

    Not Applicable.

    4.    <u>Qualified Nonelective Employer Contributions</u>.

    Not Applicable.

    5.    <u>Safe Harbor Matching Contributions</u>.

    Not Applicable.

    6.    <u>Safe Harbor Nonelective Employer Contributions</u>.

    Not Applicable.

    7.    <u>Simple 401(k) Contributions</u>.

    Not Applicable.

N.    <u>Excess Compensation</u>.

Not Applicable.

O.    <u>Participant Forfeitures</u>.

Not Applicable.

P.    <u>Allocation Requirements – Last Day Employment and Service Requirements</u>.

    1.    <u>Last Day Employment and Service – Not Required</u>

    Allocations of Nonelective Employer Contributions shall be made to the appropriate Accounts of Eligible Participants during the Plan Year without regard to any last day of employment or service requirements, if any, applicable to other types of contributions provided under this Plan.

    2.    <u>Special Rule For Certain Contributions</u>.

<div align="center">ARTICLE I</div>

I-6

CONFIDENTIAL

WH_MDL_00331790

Allocations of Elective Contributions, including Roth Contributions if any shall be made to the appropriate Accounts of eligible Participants during the Plan Year without regard to any last day of employment or Hour of Service requirement that may apply to other types of contributions, if any.

Q.    <u>Allocation of Excess Annual Additions</u>.

If an allocation to a Participant would result in an excess Annual Addition, such excess Annual Addition shall be held in suspense accounts and applied to reduce Employer contributions for the next succeeding Limitation Year.

R.    <u>Employee After-Tax and Deemed IRA Contributions</u>.

1.    Employee After-Tax Contributions are not allowed.

2.    Deemed IRA Contributions are not allowed.

S.    <u>Rollover Contributions and Transferred Benefits</u>.

Rollover Contributions are allowed from the types of plans specified below:

A qualified plan described in Section 401(a) or 403(a) of the Code excluding Employee After-Tax Contributions and including a direct rollover of Roth Contributions.

An annuity contract described in Section 403(b) of the Code.

An eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state.

An individual retirement account or annuity described in Section 408(a) or 408(b) of the Code that is eligible to be rolled over and would otherwise be includible in gross income.

Rollover Contributions can only be made by Participants.

Transferred Benefits are allowed.

ARTICLE I                                    I-7

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                    WH_MDL_00331791

T.    Early Retirement Age and Normal Retirement Age.

Early Retirement Age.

Not Applicable.

Normal Retirement Age.

"Normal Retirement Age" means the Participant's 65th birthday. A Participant who continues in the employ of the Employer after he or she attains Normal Retirement Age shall remain a Participant while so employed, and be entitled to all Plan benefits to the extent he or she would be entitled thereto if he or she had not yet attained Normal Retirement Age, including allocation of any type of Employer contribution and forfeiture, if any.

<p style="text-align:center">VESTING</p>

U.    Vesting.

A Participant shall be fully vested in his or her Elective Contribution, Nonelective Employer Contribution and Roth Contribution Account(s) at all times.

V.    Required Top-Heavy Minimum Vesting.

Not Applicable.

W.    Years of Vesting Service.

Not Applicable

X.    Years of Service – Break-in-Service.

Not Applicable.

Y.    Service with the Predecessor Employer.

Service with a Predecessor Employer is not applicable.

Z.    Vesting at Death or Total Disability.

Not Applicable.

<p style="text-align:center">ARTICLE I</p>

I-8

CONFIDENTIAL

## DISTRIBUTION OF BENEFITS

AA.  <u>Participant Loans</u>.

      Loans to Participants are available. Loans will be treated as directed investments of Participants' Accounts. Loans shall not be repaid by payroll deductions. Loans to Inactive Participants are available under the same procedures and provisions as are applicable to active Participants with the exception of loan repayments by payroll deductions, if applicable. Loan repayments shall be suspended by reason of Section 414(u) of the Code.

BB.  <u>Hardship Withdrawals</u>.

      Hardship withdrawals of Elective contributions including Roth Contributions and Nonelective Employer contributions to the extent vested shall be allowed. For these purposes, an "<u>event of hardship</u>" means:

      Payment for (or necessary to obtain) medical care that would be described under Section 213(d) of the Code determined without regard to whether the expenses exceed seven and one-half percent (7.5%) of adjusted gross income.

      Cost directly related to the purchase of a principal residence, but not including mortgage payments, by the Employee.

      Payment of tuition, room and board, and related educational fees for up to the next 12 months of post-secondary education for the Employee, the Employee's Spouse, children or dependents (as defined in Section 152 of the Code, and for taxable years beginning on or after January 1, 2005 without regard to Sections 152(b)(1), 152(b)(2) and 152(d)(1)(B) of the Code).

      The need to prevent eviction of the Employee from his or her principal residence or foreclosure on the mortgage of the Employee's principal residence.

      Payments for burial or funeral expenses for the Employee's deceased parent, Spouse, children or dependents (as defined in Section 152 of the Code, and for taxable years beginning on or after January 1, 2005 without regard to Section 152(d)(1)(B) of the Code).

      Payments of expenses for the repair of damage to the Employee's principal residence that would qualify for the casualty deduction under Section 165 of the Code (determined without regard to whether the loss exceeds ten percent (10%) of adjusted gross income).

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL        WH_MDL_00331793

CC.    In-Service Distributions Other Than Hardship.

In-service distributions of the vested portion of a Participant's Nonelective Employer Contribution Account shall be allowed if vested amounts that have been held in the Trust for at least two (2) years.

In-service distributions of the vested portion of a Participant's Elective Contribution Account and Transferred Benefits Account subject to only Section 401(k) of the Code shall be allowed at or after age 59½.

In-service distributions of a Participant's Roth Contribution Account shall be allowed at or after age 59 ½.

In-service distributions of the vested portion of a Participant's Transferred Benefits Account that have been held in a qualified trust for at least two (2) years and are not subject to Section 401(k) of the Code or Paragraph D of Article XVI shall be allowed at any time.

In-service distributions of a Participant's Rollover Contribution Account shall be allowed at any time.

DD.    Cash-Out Options.

1.    The involuntary cash-out distribution limit of this Plan is $5,000. Effective for distributions made on or after March 28, 2005 the involuntary cash-out limit, including Rollover Contributions, shall be reduced to $1,000.

2.    If applicable, this Plan shall exclude Rollover Contributions (and earnings allocable thereto) in determining the value of the Participant's vested Accrued Benefit for purposes of the involuntary cash-out distribution limit of $5,000 for distributions made after December 31, 2001 to Participants.

3.    For purposes of determining whether a distribution is subject to Sections 401(a)(11) and 417 of the Code, the dollar amount described in the first paragraph of Paragraph B.5 of Article VII shall be $5,000.

4.    An immediate forfeiture of a partial cash-out as provided in Paragraph B.4 of Article VI is not applicable.

5.    If a Participant is rehired prior to five (5) consecutive one year Breaks-in-Service, he or she shall not be required to repay the Plan the amounts previously distributed to the Participant for the Participant's non-vested Accrued Benefits to be restored.

<div align="center">ARTICLE I</div>

I-10

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

WH_MDL_00331794

6.    The alternative separate account formula X=P(AB + (RxD)) − (RxD) as stated in Paragraph C of Article VI shall not apply.

EE.    <u>Time of Distribution Upon Employment Termination</u>.

1.    Distributions of vested Accounts to Participants upon employment termination prior to Normal Retirement Age shall be made as soon as administratively feasible after employment termination date.

2.    Distribution upon severance from employment shall apply for distributions after December 31, 2001 regardless of when the severance from employment occurred.

FF.    <u>Right to Defer Receipt of Benefits After Normal Retirement Age and Age 70½</u>.

1.    Upon separation from service, a Participant shall have the right to defer receipt of benefits after Normal Retirement Age or age 62, if later.

2.    The required beginning date for minimum required distributions for a non-5% Owner is the April 1 of the calendar year following the calendar year in which such Participant attains age 70½.

GG.    <u>Minimum Required Distributions under Final and Temporary Regulations</u>.

1.    <u>Effective Date of Final and Temporary Regulations</u>.

Notwithstanding any inconsistent provisions of the Plan, for purposes of determining required minimum distributions for Distribution Calendar Years beginning with the 2003 calendar year, this Plan will apply the minimum distribution requirements of Section 401(a)(9) of the Code in accordance with the Final and Temporary Regulations issued on April 17, 2002.

2.    <u>Election to Apply 5-Year Rule to Distributions to Designated Beneficiaries</u>.

The provisions of subparagraph C.2(a) of Article VII of the Plan will not be modified.

3.    <u>Election to allow Participants or Beneficiaries to elect the 5-Year Rule</u>.

ARTICLE I                                    I-11

Participants or Beneficiaries may elect on an individual basis whether the 5-year rule or the life expectancy rule in subparagraph C.2(a), (d), (e) and (f) of Article VII of the Plan applies to distributions after the death of a Participant who has a Designated Beneficiary. The election must be made no later than the earlier of September 30 of the calendar year in which distribution would be required to begin under subparagraph C.2(a) of Article VII of the Plan, or by September 30 of the calendar which contains the fifth anniversary of the Participant's (or, if applicable, Surviving Spouse's) death. If neither the Participant nor Beneficiary makes an election under this paragraph, distributions will be made in accordance with subparagraphs C.2(a), (d), (e) and (f) of Article VII of the Plan and, if applicable, the elections in Paragraph GG.2 of this Article I.

 4. <u>Election to Allow Designated Beneficiary Receiving Distributions Under 5-Year Rule to Elect Life Expectancy Distributions</u>.

A Designated Beneficiary who is receiving payments under the 5-year rule may not make a new election to receive payments under the life expectancy rule until December 31, 2003.

HH. <u>Accrued Benefits Not Subject to REACT Annuity Requirements.</u>

Participants' Accrued Benefits shall not be subject to the Qualified Joint and Survivor Annuity and Qualified Preretirement Survivor Annuity requirements of REACT as provided in Paragraphs A, B and C of Article VII.

II. <u>Reserved</u>.

JJ. <u>Alternate Forms of Benefits Payments</u>.

The following alternate forms of benefit payment are available:

<u>Single Sum</u>. The payment of all or a portion of the Participant's vested Accrued Benefit in a single sum in cash or in kind.

<u>Installments</u>. The payment of the Participant's vested Accrued Benefit in a series of installments payable monthly.

KK. <u>Distributions of Roth Contributions</u>.

If a Participant receives a partial distribution of his or her Accounts for any reason (other than a return of Excess Contributions, Excess Aggregate Contributions or Excess Deferrals), the Participant shall be allowed to designate all or a part of such distribution to be disbursed from his or her Roth Contribution Account.

<div align="center">ARTICLE I</div>

<div align="right">I-12</div>

CONFIDENTIAL

<div align="right">WH_MDL_00331796</div>

If a Highly Compensated Employee is required to receive a return of Excess Contributions and his or her Elective Contributions include both pre-tax Elective Contributions and designated Roth Contributions, such Highly Compensated Employee shall be allowed to designate whether such Excess Contributions shall be disbursed from his or her pre-tax Elective Contributions or Roth Contributions.

If an Employee is required to receive a return of Excess Deferrals and his or her Elective Contributions include both pre-tax Elective Contributions and designated Roth Contributions, such Employee shall be allowed to designate whether such Excess Deferrals shall be disbursed from his or her pre-tax Elective Contributions or Roth Contributions.

With respect to the special rule of Section 1.401(a)(31)-1 Q&A-11 of Treasury Regulations, Roth Contribution Account shall be treated as a separate plan within the meaning of Section 414(l) of the Code and for purposes of subparagraph B.3(e) of Article VII.

If an Employee is required to receive a refund pursuant to Paragraph F of Article V because the Annual Addition Limitation is exceeded, such Employee shall be entitled to elect a refund of pre-tax Elective Deferrals prior to any refund of Roth Contributions. If such Employee does not make such election, then Roth Contributions shall be refunded in the second step of Paragraph F of Article V.

LL.    <u>Total Disability</u>.

"<u>Total Disability</u>" shall have the same meaning as defined in Article II.

<div align="center"><u>MISCELLANEOUS</u></div>

MM.    <u>Participant Directed Accounts</u>.

Each Participant shall be entitled to direct the investment of his or her Accrued Benefits in accordance with Article XII.

NN.    <u>Valuation Date</u>.

For Accounts that are self-directed by Participants, Valuation Date(s) shall mean the end of each "business" day unless the investment option or the per share value of a particular investment is not valued daily. If the particular investment is not valued daily, then Valuation Date shall mean the date(s), upon which such investment is actually valued or any other date that the Committee designates. However, in no event shall a Valuation Date occur less frequently than annually, with the last day of each Plan Year serving as a Valuation Date (or one of the Valuation Dates).

<div align="center">ARTICLE I</div>

I-13

CONFIDENTIAL

WH_MDL_00331797

OO.    <u>Special Disaggregation Rule</u>.

Not Applicable.

PP.    <u>Co-Trustees</u>.

If there is more than one (1) Trustee, any one of such Co-Trustees shall have the right to make any decision, undertake any action or execute any documents affecting this Trust without the approval of the remaining Co-Trustees. Any directions to any person or organization shall be executed by any one of the Co-Trustees. For purposes of this Plan and Trust, "directions" shall mean any certification, notice, authorization, application or instruction of the Co-Trustee.

ARTICLE I                                    I-14

BROAD FINANCIAL  (800) 395-5200

## II.  DEFINITIONS

A.  Terms Defined In This Article II. As used in this Plan, the following terms have the following meanings.

1.  "Account(s)" means, where applicable, a Participant's Elective Contribution Account, Employee After-Tax Contribution Account, Matching Contribution Account, Nonelective Employer Contribution Account, Qualified Matching Contribution Account, Qualified Nonelective Employer Contribution Account, Rollover Contribution Account, Roth Contribution Account, Safe Harbor Matching Contribution Account, Safe Harbor Nonelective Employer Contribution Account, Simple 401(k) Contribution Account and/or Transferred Benefits Account.

2.  "Accrued Benefit" means, where applicable at any date, the value of a Participant's Accounts.

3.  "Actual Deferral Percentage" means with respect to (i) the group of Highly Compensated Employees who are Eligible Participants and (ii) the group of all other Eligible Participants, the average of the actual deferral ratios of each group, calculated separately for each Eligible Participant in each group, of the amount of the Qualifying Section 401(k) Contributions made on behalf of each Eligible Participant for the Plan Year divided by the Eligible Participant's Compensation for the Plan Year. The actual deferral ratio of an Eligible Participant who did not make or receive any Qualifying Section 401(k) Contribution is zero (0). The actual deferral ratio for each Eligible Participant shall be calculated to the nearest one-hundredth (.01) of one percent (1%). Unless otherwise elected in Paragraph K of Article I, Compensation includes Compensation received for the entire Plan Year regardless of whether the Eligible Participant was a Participant for the entire Plan Year.

Elective Contributions that are treated as catch-up contributions pursuant to Section 414(v) of the Code because they exceed a statutory limit imposed by Section 401(a)(30), 402(h), 403(b), 408, 415(c) or 457(b)(2) of the Code (without regard to Section 414(v) or 457((b)(3) of the Code) or an Employer-provided limit stated in Paragraph H.1 of Article I or J.6 of Article IV (without regard to Section 414(v) of the Code) are subtracted from the Participant's Elective Contributions for the Plan Year for purposes of determining such Participant's actual deferral ratio

4.  "Anniversary Date" means the last day of the Plan Year.

5.  "Annual Addition" means the amounts allocated to a Participant's Accounts during any relevant Limitation Year that constitute:

ARTICLE II

II-1

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

WH_MDL_00331799

(a) Employer contributions; provided, however, that Employer contributions or prior forfeited amounts which are used to restore the non-vested portion of a Participant's Accrued Benefit that was previously cashed-out and forfeited shall not be considered an Annual Addition;

(b) Employee After-Tax Contributions; provided, however, that Employee After-Tax Contributions not in excess of the greater of (i) six percent (6%) of Section 415 Compensation or (ii) one-half (½) of the Employee After-Tax Contributions shall not be considered as Annual Additions for any Limitation Year beginning before January 1, 1987;

(c) Forfeitures;

(d) Excess Contributions and Excess Aggregate Contributions, whether or not corrected by distribution or recharacterization;

(e) Excess Deferrals; provided, however, that Excess Deferrals which are distributed in accordance with Section 1.402(1)-1(e)(2) or (3) of the Treasury Regulations are not Annual Additions. Additionally, Elective Deferrals which are returned pursuant to Section 415 of the Code are not Annual Additions and are disregarded for purposes of Sections 401(k), 401(m)(2) and 402(g) of the Code;

(f) Amounts allocated after March 31, 1984, to an individual medical account, as described in Section 415(l)(2) of the Code, which is part of a pension or annuity plan maintained by the Employer;

(g) Amounts derived from contributions paid or accrued after December 31, 1985, in taxable years ending after such date, which are attributable to post-retirement medical benefits, allocated to separate accounts of a Key Employee, as defined in Section 419A(d)(3) of the Code, under a welfare benefit fund, as defined in Section 419(e) of the Code, maintained by the Employer; and

(h) Amounts allocated under a simplified employee pension plan pursuant to Section 408(k) of the Code.

6. "Average Contribution Percentage" means with respect to (i) the group of Highly Compensated Employees who are Eligible Participants and (ii) the group of all other Eligible Participants, the average of the contribution ratios of each group, calculated separately for each Eligible Participant in each group, of the amount of Qualifying Section 401(m) Contributions made on behalf of each Eligible Participant for the Plan Year divided by the Eligible Participant's Compensation. The Average Contribution Percentage shall be calculated to the nearest one-hundredth (.01) of one percent (1%). The determination of Compensation for an Eligible Participant during the

ARTICLE II                                                                II-2

CONFIDENTIAL                                                           WH_MDL_00331800

Plan Year shall be made in the same manner as for the Actual Deferral Percentage limitation.

7.    "Board" means the Board of Directors of the Employer, if a corporation. If such corporation is later dissolved, Board continues to mean such Board of Directors of the Employer if empowered to continue to act as a board in settling the affairs of the dissolved corporation under local law. If no such power exists, then in the case of a corporation that is dissolved, Board means the Trustee of the Trust, until such time as a new employer adopts and sponsors the Plan or until all assets are distributed. If the Employer is not a corporation, Board means the managing partner(s) of a partnership, the manager of a limited liability company, the trustee(s) of a trust, the sole proprietor of an unincorporated business or the elected or designated representative(s) of an unincorporated association.

8.    "Break-in-Service" means that an Employee did not complete more than 500 Hours of Service, or such lesser amount if elected in Article I, in the applicable Computation Period. For purposes of determining whether a Break-in-Service has occurred in a Computation Period, an Employee who is granted a Maternity or Paternity Leave of Absence shall receive credit for eight (8) Hours of Service per day of such absence. To the extent provided in Paragraphs A.43 and A.47 of this Article II and Paragraph B of Article III, Leaves of Absence shall not cause a Break-in-Service. Unless otherwise elected in Article I, if the Plan Year is less than 12 months, no Break-in-Service shall occur in such Plan Year. For purposes of the elapsed time method, Break-in-Service means a "One-Year Period of Severance."

9.    "Code" means the Internal Revenue Code of 1986, as amended from time to time.

10.    "Committee" means the administrative committee appointed by the Sponsoring Employer's Board.

11.    "Compensation Limitation" means the limitation imposed by Section 401(a)(17) of the Code, as described below.

(a)    The annual Compensation of each Participant taken into account in determining allocations for any Plan Year shall not exceed $200,000. The Compensation Limitation shall be adjusted for cost-of-living increases in accordance with Section 401(a)(17)(B) of the Code. Annual Compensation means Compensation during the Plan Year or such other consecutive 12-month period over which Compensation is otherwise determined under the Plan (the determination period). The cost-of-living adjustment in effect for a calendar year applies to annual Compensation for the determination period that begins with or within such calendar year.

ARTICLE II                                                                          II-3

CONFIDENTIAL                                                      WH_MDL_00331801

(b)    If a determination period is less than 12 months, the Compensation Limitation described in the preceding subparagraph (a) above will be multiplied by a fraction, the numerator of which is the number of months in the determination period, and the denominator of which is 12.

12.    "Contribution Percentage" means the ratio (expressed as a percentage) of the Qualifying Section 401(m) contributions under the Plan on behalf of the Eligible Participant for the Plan Year to the Eligible Participant's Compensation for the Plan Year.

13.    "Controlled Group" means the Employer and all members of its controlled or affiliated group of trades or businesses whether or not incorporated (including an affiliated service group) as defined in Section 414(b), (c), (m) or (o) of the Code; provided, however, that any member of a Controlled Group shall be disregarded for all purposes under the Plan for any period when such member was not a member of the Controlled Group unless expressly provided to the contrary herein.

14.    "Defined Contribution Dollar Limitation" means $40,000 for Limitation Years beginning after December 31, 2001 as adjusted by Section 415(d) of the Code.  If a Limitation Year is less than 12 months, the Defined Contribution Dollar Limitation for that year shall be multiplied by one-twelfth (1/12) of the number of months in such year.

15.    "DEFRA" means the Deficit Reduction Act of 1984, as amended from time to time.

16.    "Designated Beneficiary" or "Beneficiary" means the person(s) or entity(ies) designated by the Participant or, in the absence thereof, the person(s) or entity(ies) entitled under the provisions of this Plan to receive benefits as a result of the death of the Participant.

17.    "Direct Rollover" means a payment by the Plan to an Eligible Retirement Plan specified by a Distributee.

18.    "Distributee" means an Employee, former Employee, an Employee's or former Employee's Surviving Spouse or an Employee's or former Employee's Spouse or former Spouse who is an Alternate Payee under a Qualified Domestic Relations Order.

19.    "Distribution Calendar Year" means a calendar year for which a minimum distribution is required.  For distributions beginning before the Participant's death, the first Distribution Calendar Year is the calendar year immediately preceding the calendar year which contains the Participant's required beginning date.  For

<div align="center">ARTICLE II</div>

<div align="right">II-4</div>

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

WH_MDL_00331802

distributions beginning after the Participant's death, the first Distribution Calendar Year is the calendar year in which distributions are required to begin under subparagraph C.2(a) of Article VII. The required minimum distribution for the Participant's first Distribution Calendar Year will be made on or before the Participant's required beginning date. The required minimum distribution for other Distribution Calendar Years, including the required minimum distribution for the Distribution Calendar Year in which the Participant's required beginning date occurs, will be made on or before December 31 of that Distribution Calendar Year.

20.    "Earned Income" means the net earnings of a Self-Employed Individual from self-employment (as defined in Section 1402(a) of the Code), determined after taking into account (i) deductible contributions to the Plan and any other qualified plans maintained by the Employer; and (ii) all other adjustments required by Section 401(c)(2) of the Code; but (iii) only if the services of the Self-Employed Individual to the Employer's business are a material income-producing factor as determined in accordance with Section 1.401-10(c) of the Treasury Regulations. Net earnings shall be further reduced by the deductions allowed to the taxpayer by Section 164(f) of the Code.

21.    "Elective Contributions" means in any Plan Year the amount of a Participant's Compensation elected by him or her to be reduced and deferred pursuant to Article I. Catch-up contributions and Roth Contributions will be treated as Elective Contributions. Roth Contributions and pre-tax Elective Contributions may not be reclassified as the other type of contribution. Any amount that the Employee could not have elected to receive in cash or any amount that has become currently available to a Participant or that is designated or treated at the time of the deferral or contribution as an Employee After-Tax Contribution shall not be treated as an Elective Contribution

Except on account of bona fide administrative considerations that are not for the purpose of accelerating deductions, as described in Section 1.401(k)-1(a)(3)(iii)(C)(2) of the Treasury Regulations, Elective Contributions must be deposited to the Trust after the Employee's performance of services.

22.    "Elective Contribution Account" means the account maintained to record the Participant's Elective Contributions, other than Roth Contributions, and any other adjustments as required under Article IV, V or X of the Plan.

23.    "Elective Deferrals" means the sum of the amounts deferred pursuant to an individual's election to defer income for a taxable year pursuant to the following:

(a)    Elective Contributions under this Plan and any qualified cash or deferred arrangement as defined in Section 401(k) of the Code which is not

ARTICLE II                                                    II-5

CONFIDENTIAL                                              WH_MDL_00331803

includable in the individual's gross income for the taxable year on account of Section 402(e)(3) of the Code.

(b)    Any Employer contribution to a simplified employee pension plan as defined in Section 408(k) of the Code which is not includable in the individual's income for the taxable year on account of Section 402(h)(1)(B) of the Code.

(c)    Any Employer contribution to an annuity contract under Section 403(b) of the Code under a salary reduction agreement within the meaning of Section 312(a)(5)(D) of the Code which is not includable in the individual's gross income for the taxable year on account of Section 403(b) of the Code.  For purposes of the preceding sentence, a contribution to a Section 403(b) annuity made pursuant to a one-time irrevocable election to contribute at time of eligibility to participate shall not be included.

(d)    Any Employee contribution designated as deductible in a trust described in Section 501(c)(18) of the Code which is deducted from such individual's income for the taxable year on account of Section 501(c)(18) of the Code.

(e)    Any elective Employer contribution made under Section 408(p)(2)(A)(i) of the Code.

(f)    Any catch-up contributions made under Section 414(v) of the Code.

24.    "Eligibility Computation Period" means the initial 12 consecutive month period commencing on an Employee's Employment Commencement Date and the Subsequent Eligibility Computation Period as elected in Article I.

25.    "Eligible Participant" means for purposes of computing the Actual Deferral Percentage, any Employee who is directly or indirectly eligible to make an election to reduce and defer his or her Compensation under the Plan during all or a portion of a Plan Year, including (i) any Employee who would be a Participant but for the failure to make any Elective Contributions or other required contributions; (ii) any Employee whose eligibility to make Elective Contributions has been suspended due to a hardship distribution or other distribution, a loan, or an election not to participate, other than a one-time irrevocable election made no later than the Employee's first becoming eligible under the Plan or any plan or arrangement of the Employer described in Section 219(g)(5)(A) of the Code (whether or not such other plan or arrangement has terminated) to have contributions equal to a specified amount or percentage of Compensation (including no amount of Compensation) made by the Employer to this Plan and any other plan maintained by the Employer (including plans not yet established) for the duration of the Employee's employment; (iii) any Employee who is

<div align="center">ARTICLE II</div>

<div align="right">II-6</div>

CONFIDENTIAL

unable to receive an additional Annual Addition on account of Section 415(c)(1) of the Code; and (iv) any Employee who is unable to make an Elective Contribution because his or her Compensation is less than a stated dollar amount.

For purposes of computing the Average Contribution Percentage, "Eligible Participant" means any Employee who is directly or indirectly eligible to make an Employee After-Tax Contribution or to receive an allocation of Matching Contributions, including Matching Contributions derived from forfeitures under the Plan during all or a portion of a Plan Year including (i) any Employee who is unable to make an Employee After-Tax Contribution or receive an allocation of Matching Contributions merely because his Compensation is less than a stated amount; (ii) any Employee who would be eligible to make Employee After-Tax Contributions or receive Matching Contributions except for a suspension due to a hardship distribution or other distribution, a loan or an election not to participate in the Plan, other than a one-time irrevocable election made no later than the date the Employee first becomes eligible under the Plan or any plan or arrangement of the Employer described in Section 219(g)(5)(A) of the Code not to be eligible to make Employee After-Tax Contributions or receive an allocation of Matching Contributions under the Plan or any other plan maintained by the Employer (including plans not yet established) for the duration of the Employee's employment; (iii) and any Employee who is unable to receive additional Annual Additions because of Section 415(c)(1) of the Code.

26.    "Eligible Retirement Plan" means an eligible plan under Section 457(b) of the Code which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan, an individual retirement account described in Section 408(a) of the Code, an individual retirement annuity described in Section 408(b) of the Code, an annuity plan described in Section 403(a) of the Code, an annuity contract described in Section 403(b) of the Code or a qualified trust described in Section 401(a) of the Code, that accepts the Distributee's Eligible Rollover Distribution.

Notwithstanding the preceding paragraph, for purposes of Roth Contributions, an Eligible Retirement Plan means an applicable retirement plan described in Section 402A(e)(1) of the Code or a Roth IRA described in Section 408A of the Code, and only to the extent the direct rollover is permitted under Section 402(c) of the Code.

If elected in Article I, this Plan will accept direct rollovers of Roth Contributions provided such rollover satisfies the requirements of the preceding paragraph.

<div align="center">ARTICLE II</div>

II-7

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

WH_MDL_00331805

27.    "Eligible Rollover Distribution" means any distribution of $200 or more of the Distributee's vested Accrued Benefit except that an Eligible Rollover Distribution does not include (i) any distribution that is one of a series of substantially equal periodic payments made (not less frequently than annually) for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's Designated Beneficiary, or for a specified period of 10 years or more; (ii) any distribution to the extent such distribution is required under Section 401(a)(9) of the Code; (iii) the portion of any distribution that is not includable in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities); and (iv) any hardship distributions.

Any amount that is distributed on account of hardship shall not be an Eligible Rollover Distribution and the Distributee may not elect to have any portion of such a distribution paid directly to an Eligible Retirement Plan. However, if a Participant would have been entitled to receive his or her Accounts regardless of hardship (i.e., age 59½), then such amounts shall qualify as an Eligible Rollover Distribution.

If a portion of a distribution that includes a hardship distribution is not includible in gross income, the portion of the distribution that is not includible in gross income is first allocated to the hardship distribution and then any remaining portion not includible in gross income is allocated to the portion of the distribution that is not a hardship distribution.

A portion of a distribution shall not fail to be an Eligible Rollover Distribution merely because the portion consists of Employee After-Tax Contributions which are not includible in gross income. However, such portion may be transferred only to a traditional individual retirement account or annuity described in Section 408(a) or (b) of the Code, or to a qualified defined contribution plan described in Section 401(a) or 403(a) of the Code that agrees to separately account for amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible. If an Eligible Rollover Distribution includes both pretax and Employee After-Tax Contributions, the portion of such Eligible Rollover Distribution is treated as consisting first of pretax amounts.

28.    "Employee" means every person employed by the Employer whose income is subject to withholding of income tax or for whom Social Security contributions are made by the Employer. Unless the Plan is amended to provide otherwise, the special rule for certain dispositions or acquisitions of Section 410(b)(6)(C) of the Code shall apply. Thus, the Plan may be treated as satisfying Section 410(b) of the Code for a limited period of time after an acquisition or disposition if the Plan satisfies Section 410(b) of the Code (without regard to the special rule) immediately before the acquisition or disposition and there is no significant change in the Plan or in the

ARTICLE II                                      II-8

CONFIDENTIAL                                      WH_MDL_00331806

coverage of the Plan other than the acquisition or disposition. If the Employer is an Unincorporated Entity, Employee also means a Self-Employed Individual.

Employee shall include Leased Employees; provided, however, that a Leased Employee shall not be considered an Employee if:

(a)    The Leased Employee is covered by a money purchase pension plan providing (i) a nonintegrated employer contribution rate of at least 10% of compensation, as defined in Section 415(c)(3) of the Code, but including amounts contributed by the employer pursuant to a salary reduction agreement which are excludable from the Leased Employee's gross income under Section 125, 132(f)(4), 402(e)(3), 402(h)(1)(B), 403(b), 408(p)(2)(A)(i) or 457 of the Code; (ii) immediate participation; and (iii) full and immediate vesting; and

(b)    Leased Employees do not constitute more than 20% of the Employer's non-highly compensated workforce.

Leased Employees may become Eligible Employees unless excluded in Article I.

29.    "Employee After-Tax Contribution" means any contributions, other than Roth Contributions, made to a plan that are designated or treated at the time of deferral or contributions as employee after-tax contributions and are allocated to a separate account to which the attributed earnings and losses are allocated. Such term includes (i) Employee contributions to a defined contribution plan described in Section 414(k) of the Code; (ii) Employee contributions made to a defined benefit plan which provides for a cost of living arrangement as described in Section 415(k)(2)(B) of the Code; (iii) Employee contributions applied to the purchase of whole life insurance protection, or survivor benefits protection under a defined contribution plan; (iv) amounts attributed to Excess Contributions within the meaning of Section 401(k)(8)(B) of the Code which are recharacterized as Employee contributions; and (v) and Employee contributions to a contract described in Section 403(b) of the Code. Employee After-Tax Contributions do not include repayment of loans, buy-backs of benefits previously forfeited, or Employee After-Tax Contributions which were transferred to this Plan and are held pursuant to Article XVI.

30.    "Employee After-Tax Contribution Account" means the Account maintained to record a Participant's allocation of Employee Contributions and other adjustments as required under Article IV, V or X of the Plan.

31.    "Employer" means the entity or entities adopting the Plan, and any other members of the Controlled Group and any successor thereto which have adopted the Plan in accordance with the provisions of Paragraph F of Article XIV. Employer also

<div align="center">ARTICLE II</div>

II-9

CONFIDENTIAL

WH_MDL_00331807

means any other entities that have adopted this Plan and any successor thereto that are not members of a Controlled Group. The "Sponsoring Employer" shall be the Employer who is responsible for the administration of the Plan. Each other entity which adopts this Plan as provided herein shall be a "Participating Employer"; provided, however, that only members of a Controlled Group may be Participating Employers unless the preamble of Article I designates a non-Controlled Group entity as a Participating Employer.

32.    "Employment Commencement Date" means the date upon which an Employee first completes one (1) Hour of Service.

33.    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

34.    "Excess Aggregate Contributions" means, with respect to any Plan Year, the excess of the aggregate amount of Qualifying Section 401(m) Contributions actually made on behalf of Highly Compensated Employees for such Plan Year over the maximum amount of such contributions permitted under the Contribution Percentage limitation.

35.    "Excess Contributions" means, with respect to any Plan Year, the excess of the aggregate amount of Qualifying Section 401(k) Contributions actually made on behalf of Highly Compensated Employees for the Plan Year over the maximum amount of such contributions permitted under the Actual Deferral Percentage limitation.

36.    "Excess Deferrals" means those Elective Deferrals made by an individual during his or her taxable year which exceed $11,000 ($7,000 if a Simple 401(k) Plan) or such other amount that is adjusted under Section 415(d) of the Code. The special adjustments for Section 403(b) annuity contracts and other rules concerning Section 402(g) of the Code are incorporated herein by reference.

37.    "5%-Owner" means any person who owns directly or indirectly as defined in Section 416(i)(1)(B) of the Code (i) more than five percent (5%) of the outstanding stock of the Employer; or (ii) stock possessing more than five percent (5%) of the total combined voting power of all stock of the Employer. If the Employer is not a corporation, 5%-Owner means any person who owns more than five percent (5%) of the capital or profits interests in the Employer.

For purposes of Section 401(a)(9) of the Code, a Participant shall be considered a 5%-Owner if such Participant is a 5%-Owner at any time during the Plan Year ending with or within the calendar year in which such 5%-Owner attains age 70½.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                          WH_MDL_00331808

38.    "Highly Compensated Employee" or "Highly Compensated Participant" means:

(a)    Any Employee who performs services during the Plan Year; and

(i)    Was a 5%-Owner of the Employer or a Controlled Group member during the Plan Year or Look-Back Year; or

(ii)    Received Section 415 Compensation including elective or salary reduction contributions to a cafeteria plan, cash or deferred arrangement or tax sheltered annuity from the Employer and all entities which are members of a Controlled Group with the Employer shall be treated as a single Employer in excess of $80,000 (as adjusted pursuant to Section 415(d) of the Code, in effect on the first day of any relevant Plan Year except that the base period shall be the calendar quarter ending September 30, 1996) during the Look-Back Year or, if elected in Article I, during the calendar year beginning with or within the Look-Back Year and, if elected in Article I, was also in the Top Paid Group.

(b)    Any former Employee who separated from service prior to the Plan Year, who performs no services for the Employer during the Plan Year and was a Highly Compensated Employee who performed services for the Employer during either the year the Employee separated from service or any Plan Year on or after the Employee's 55th birthday.

39.    "Hour of Service" means:

(a)    Each hour for which an Employee is directly or indirectly paid, or entitled to payment.  These hours shall be credited to the Employee for the computation period(s) in which the services are performed and not when paid, if different; and

(b)    Each hour for which an Employee is directly or indirectly paid, or entitled to payment, by the Employer for a period of time during which no services are performed (without regard to whether the employment relationship between the Employee and the Employer has terminated) due to vacation, holiday, illness, incapacity, disability, layoff, jury duty, military duty, or Leave of Absence with pay.  The hours shall be credited to the Employee in the computation period to which non-performance of duties relates and not in which paid, if different; and

(c)    Each hour for which an Employee has been awarded or for which the Employer has agreed to pay, directly or indirectly, back pay (without regard to

ARTICLE II                                II-11

CONFIDENTIAL                                                                WH_MDL_00331809

damages). These hours shall be credited to the Employee in the computation period to which the award or agreement pertains, not the period in which paid, if different.

Notwithstanding the foregoing, (i) no more than 501 Hours of Service shall be credited to an Employee under subparagraph (b) or (c) of this Paragraph A.39 for any single continuous period of time during which no services are performed; (ii) an hour for which an Employee is directly or indirectly paid for a period during which no services are performed shall not constitute an Hour of Service, if such payment is paid or due under a plan maintained solely for the purpose of complying with applicable worker's compensation, unemployment compensation, or disability insurance laws; (iii) Hours of Service shall not be credited for payments which solely reimburse an Employee for medical or medically related expenses; (iv) the same Hours of Service shall not be credited to an Employee both under subparagraph (a) or (b) and subparagraph (c); and (v) Hours of Service to be credited under subparagraph (b) above shall be determined based upon the number of regularly scheduled working hours included in the units of time on the basis of which payment is calculated.

Unless otherwise elected in Article I, the Employer shall determine Hours of Service based upon days of employment in a computation period by crediting an Employee with 10 Hours of Service for each day for which the Employee would be required to be credited with at least one (1) Hour of Service under subparagraphs (a), (b) and (c) of this Paragraph A.39. The preceding sentence shall only apply if the Employer uses the hourly method to credit service for an Employee and does not count actual hours for which an Employee is paid or entitled to payment and the Employer does not elect an alternative equivalency in Article I.

The Committee shall determine Hours of Service to be credited to an Employee under the foregoing rules in a uniform and non-discriminatory manner and in accordance with Section 2530.200b-2 of the Department of Labor Regulations (as amended from time to time), which are incorporated herein by this reference.

40.    "Inactive Participant" means a Participant whose participation in the Plan is suspended because of a change of employment status, including (i) terminating employment; (ii) incurring a Break-in-Service; or (iii) becoming a member of a class of Employees which has been excluded from participation, but whose total benefits have not been distributed.

41.    "Investment Manager" means a fiduciary designated by the Employer or the Committee, to whom has been delegated the responsibility and authority to manage, acquire or dispose of the Trust assets, and (i) who is (A) registered as an investment advisor under the Investment Advisors Act of 1940; (B) a bank, as defined in that Act; or (C) an insurance company qualified to perform investment advisory services under the laws of more than one (1) state; and (ii) who has

BROAD FINANCIAL  (800) 395-5200

acknowledged in writing that he or she is a fiduciary with respect to the management, acquisition and control of the Trust assets.

42.    "Leased Employee" means any person (other than an Employee of the Employer) who, pursuant to an agreement between the Employer and any other person ("leasing organization"), has performed services for the Employer (or for related persons determined in accordance with Section 414(n)(6) of the Code) on a substantially full-time basis for a period of at least one (1) year, and such services are under the primary direction or control of the Employer.  Contributions or benefits provided to a Leased Employee by the leasing organization which are attributable to services performed for the Employer shall be treated as provided by the Employer.

43.    "Leave of Absence" means a leave granted by the Employer, in its sole discretion, in accordance with rules uniformly applied to all Employees, for reasons of health or public service or for reasons determined by the Employer to be in its best interests.

Effective December 12, 1994, contribution, benefit and service credit with respect to qualified military service will be provided in accordance with Section 414(u) of the Code.  If elected in Article I or by the Plan's loan policy, the Committee shall suspend loan repayments during any Participant's periods of qualified military service.

Additional Employee After-Tax Contributions, Elective Contributions, or Matching Contributions made by reason of an Eligible Employee's qualified military service under Section 414(u) of the Code are not taken into account for purposes of the Actual Deferral Percentage limitation or Contribution Percentage limitation for the Plan Year in which such contributions are made or for any other Plan Year.

44.    "Look-Back Year" means the 12-month period immediately preceding any relevant Plan Year.

45.    "Matching Contribution" means an Employer contribution made to the Plan or a defined contribution plan maintained by the Employer on account of an Employee After-Tax Contribution or an Elective Contribution, and any reallocated forfeiture allocated on the basis of an Employee After-Tax Contribution, Matching Contribution or Elective Contribution.

46.    "Matching Contribution Account" means the account maintained separately to record each Participant's Matching Contributions and other adjustments as required under Article V or X of the Plan.

47.    "Maternity or Paternity Leave of Absence" means an absence (i) because of the Employee's pregnancy; (ii) because of the birth of a child of the

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                                      WH_MDL_00331811

Employee; (iii) because of the adoption of a child by, and placement of the child with, the Employee; or (iv) for purposes of caring for such child for a period beginning immediately following such birth or placement. The Hours of Service credited under this Paragraph A.47 shall be credited (i) in the Eligibility Computation Period and/or Vesting Computation Period in which the absence begins if the crediting is necessary to prevent a Break-in-Service in that computation period; or (ii) in all other cases, in the following Eligibility Computation Period and/or Vesting Computation Period. No Hours of Service for Maternity or Paternity Leave of Absence shall be credited to a Participant unless he or she timely furnishes to the Committee such information as the Committee may request to establish that the absence is for a Maternity or Paternity Leave of Absence and the number of days of such absence. The total Hours of Service to be credited for Maternity or Paternity Leave of Absence shall not exceed 501 in any computation period.

48.    "Net Profits" means the net income of the Employer as determined for federal income tax purposes without any deduction for taxes based upon income or for contributions made by the Employer under this Plan or any other qualified plan maintained by the Employer. For a Self-Employed Individual, Net Profits mean Earned Income, as determined under Section 404(a)(8) of the Code.

49.    "Nonelective Employer Contributions" means Employer contributions other than Matching Contributions with respect to which the Employee may not elect to have the contributions paid to the Employee in cash or other benefits.

50.    "Nonelective Employer Contribution Account" means the Account maintained to record a Participant's allocations of Nonelective Employer Contributions, forfeitures, if any, and other adjustments as required under Article V of the Plan.

51.    "Non-Highly Compensated Employee" or "Non-Highly Compensated Participant" means an Employee who is not a Highly Compensated Employee.

52.    "One-Year Period of Service" means each 12 month Period of Service beginning on the Employee's Employment Commencement Date.

53.    "One-Year Period of Severance" means each 12 consecutive month Period of Severance, beginning on the Severance from Service Date.

54.    "Owner-Employee" means a Self-Employed Individual who owns the entire interest of a sole proprietorship, or a partner or member who owns more than a 10% capital or profits interest in a partnership or limited liability company.

BROAD FINANCIAL (800) 395-5200

CONFIDENTIAL                                                                    WH_MDL_00331812

55.    "Participant" means any Eligible Employee who enters the Plan and who has not received payment of his or her total vested Accrued Benefit.

56.    "Period of Service" means a period beginning on the Employment Commencement Date or, for a former Employee, the date on which he or she first performs an Hour of Service after re-hire and ending with the Severance from Service Date.

57.    "Period of Severance" means a period during which an Employee does not perform an Hour of Service, beginning on the Severance from Service Date and ending when an Employee again performs an Hour of Service.

58.    "Plan" means this 401(k) Plan as identified in Article I.

59.    "Qualified Domestic Relations Order" means a judgment, decree or order (including approval of a property settlement agreement) that (i) relates to the provision of child support, alimony payments or marital property rights to an alternate payee; (ii) is made pursuant to a state domestic relations law (including community property law); (iii) creates or recognizes the existence of an alternate payee's right, or assigns to an alternate payee the right, to receive all or a portion of the benefits payable to the Participant under the Plan; (iv) specifies the information required by Section 414(p) of the Code; (v) does not alter the amount or form of Plan benefits; and (vi) complies with all other relevant provisions of Section 414(p) of the Code. For such purposes, an "Alternate Payee" is a Spouse, former Spouse, child or other dependent of a Participant who is recognized by a domestic relations order as having a right to receive all or a portion of the benefits payable with respect to a Participant under the Plan.

60.    "Qualified Matching Contributions" means Matching Contributions, other than Safe Harbor Matching Contributions or Simple 401(k) Contributions that satisfy the vesting and distribution requirements of Elective Contributions.

61.    "Qualified Matching Contribution Account" means the account maintained to record separately a Participant's allocation of a Qualified Matching Contribution, and other adjustments as required under Article IV, V or X of the Plan.

62.    "Qualified Nonelective Employer Contributions" means Employer contributions, other than Elective Contributions, including Roth Contributions, Matching Contributions, Safe Harbor Nonelective Employer Contributions, Safe Harbor Matching Contributions or Simple 401(k) Contributions, that satisfy the vesting and distribution requirements of Elective Contributions.

ARTICLE II                                              II-15

CONFIDENTIAL                                              WH_MDL_00331813

63. "Qualified Nonelective Employer Contribution Account" means the account maintained to record a Participant's allocation of Qualified Nonelective Employer Contributions, and other adjustments as required under Article IV, V or X of the Plan.

64. "Qualifying Section 401(k) Contributions" means Elective Contributions, including Roth Contributions, in combination with Qualified Nonelective Employer Contributions and Qualified Matching Contributions that are treated as Elective Contributions to satisfy the Actual Deferral Percentage limitation.

65. "Qualifying Section 401(m) Contributions" means Employee After-Tax Contributions and Employer Matching Contributions in combination with Qualified Nonelective Employer Contributions and Elective Contributions that are treated as Employee After-Tax Contributions to satisfy the Contribution Percentage limitation.

66. "REACT" means the Retirement Equity Act of 1984, as amended from time to time.

67. "Rollover Contributions" means contributions within the meaning of Section 402(c), 403(a)(4) or 408(d)(3) of the Code.

68. "Rollover Contribution Account" means the account maintained to record a Participant's Rollover Contribution and other adjustments as required in Article IV, V or X of the Plan.

69. "Roth Contributions" means Elective Contributions that are designated irrevocably by the Participant at the time of the cash and deferred election as Roth Contributions and treated by the Employer as includible in the Participant's income as if the Participant did not make the cash or deferred election. Roth Contributions shall be accounted for separately in a Roth Contribution Account.

70. "Roth Contribution Account" means the account maintained to record a Participant's Roth Contributions and other adjustments as required in Article IV, V or X of the Plan.

71. "Safe Harbor Matching Contributions" means Matching Contributions made to this Plan, or to another defined contribution plan maintained by the Employer, to satisfy the Average Deferred Percentage limitation or Average Contribution limitation that are (i) fully vested; (ii) subject to the withdrawal restrictions of Elective Contributions but not available to hardship withdrawals; and (iii) used to satisfy the allocation requirements of Section 401(k)(12)(B) of the Code and the notice requirements of Section 401(k)(12)(D) of the Code without regard to Section 401(l) of

ARTICLE II                                                    II-16

CONFIDENTIAL                                              WH_MDL_00331814

the Code. If Safe Harbor Matching Contributions are made to another defined contribution plan maintained by the Employer, such plan must have the same Plan Year as this Plan.

The rate of Safe Harbor Matching Contributions allocated to Participants cannot increase as a Participant's rate of Elective Contributions increase. The rate of Safe Harbor Matching Contributions allocation to Non-Highly Compensated Participants must at least equal to the rate of Safe Harbor Matching Contributions allocated to Highly Compensated Participants. The preceding sentence shall also apply separately with respect to Matching Contributions and Qualified Matching Contributions.

72.    "Safe Harbor Matching Contribution Account" means the account maintained to record the Participant's Safe Harbor Matching Contributions and any other adjustments as required under Article IV, V or X of the Plan.

73.    "Safe Harbor Nonelective Employer Contributions" means Nonelective Employer Contributions made to this Plan, or to another defined contribution plan maintained by the Employer, to satisfy the Actual Deferred Percentage limitation, that are (i) fully vested; (ii) subject to the withdrawal restrictions of Elective Contributions but not available for hardship withdrawals; and (iii) used to satisfy the allocation requirements of Section 401(k)(12)(C) of the Code and the notice requirements of Section 401(k)(12)(D) of the Code without regard to Section 401(l) of the Code. If Safe Harbor Nonelective Employer Contributions are made to another defined contribution plan maintained by the Employer, such plan must have the same Plan Year as this Plan.

74.    "Safe Harbor Nonelective Employer Contribution Account" means the account maintained to record the Participant's Safe Harbor Nonelective Employer Contributions and any other adjustments as required under Article IV, V or X of the Plan.

75.    "Section 415 Compensation" means, with respect to any Participant, either (a), (b) or (c) below as elected in Article I:

(a)    Information required to be reported under Sections 6041, 6051, and 6052 of the Code (wages, tips and other compensation as reported on Form W-2). Compensation is defined as wages within the meaning of Section 3401(a) of the Code and all other payments of compensation to an Employee by the Employer (in the course of the Employer's trade or business) for which the Employer is required to furnish the Employee a written statement under Sections 6041(d), 6051(a)(3), and 6052 of the Code. Compensation must be determined without regard to any rules under Section 3401(a) of the Code that limit the remuneration included in wages based on the

<div align="center">ARTICLE II</div>

<div align="right">II-17</div>

CONFIDENTIAL

nature or location of the employment or the services performed (such as the exception for agricultural labor in Section 3401(a)(2) of the Code).

(b)    Wages as defined in Section 3401(a) of the Code for the purpose of income tax withholding but determined without regard to any rules that limit the remuneration included in wages based on the nature or location of the employment or the services performed (such as the exception for agricultural labor in Section 3401(a)(2) of the Code).

(c)    A Participant's wages, salaries, and fees for professional services, and other amounts received for personal services actually rendered in the course of employment with the Employer maintaining the Plan (including, but not limited to, commissions paid salesmen, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, bonuses, fringe benefits, and reimbursement or other expense allowances under a nonaccountable plan.    The following items are excluded from Section 415 Compensation under this subparagraph (c):

(i)    Employer contributions to a plan of deferred compensation which are not included in the Employee's gross income for the taxable year in which contributed or Employer contributions under a simplified employee pension plan to the extent such contributions are deductible by the Employee, or any distributions from a plan of deferred compensation;

(ii)    Amounts realized from the exercise of a nonqualified stock option, or when restricted stock (or property) held by the Employee either becomes freely transferable or is no longer subject to a substantial risk of forfeiture;

(iii)    Amounts realized from the sale, exchange or other disposition of stock acquired under a qualified stock option; and

(iv)    Other amounts which received special tax benefits, or contributions made by the Employer (whether or not under a salary reduction agreement) towards the purchase of an annuity described in Section 403(b) of the Code (whether or not the amounts are actually excludable from the gross income of the Employee).

If the Employee is a Self-Employed Individual, his or her Section 415 Compensation includes his or her Earned Income derived from the trade or business for which the Plan is established.

<div align="center">ARTICLE II</div>

II-18

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

WH_MDL_00331816

Section 415 Compensation shall include any Elective Deferrals and any amount deferred by an Employee which is not includable in gross income by reasons of Section 125, 132(f)(4), or 457 of the Code.

76.    "Self-Employed Individual" means a person who has Earned Income for the taxable year from the trade or business for which the Plan is established and includes an individual who would have had Earned Income but for the fact that the trade or business had no Net Profits for the taxable year.

77.    "Severance from Service Date" means the date which is the earlier of the date on which an Employee voluntarily leaves (quits) employment, retires, is discharged or dies, or the first anniversary of the first date the Employee is absent for any other reason.  However, for purposes of Maternity or Paternity Leave of Absence, Severance from Service Date of an Employee who is absent beyond the first anniversary of such absence means the second anniversary of the first date of such absence.  The period between the first and second anniversary of a Maternity or Paternity Leave of Absence is neither a Period of Service nor a Period of Severance.

78.    "Shareholder-Employee" means an employee of a subchapter S corporation (Section 1361, et seq., of the Code) who owns more than five percent (5%) of the outstanding stock of such corporation.

79.    "Simple 401(k) Contributions" means Matching Contributions that satisfy the allocation requirements of Section 401(k)(11)(B)(i)(II) of the Code or Nonelective Employer Contributions that satisfy the allocation requirements of Section 401(k)(11)(B)(ii) of the Code.  Simple 401(k) Contributions must satisfy the administrative and notice requirements of Section 401(k)(11)(B)(iii) of the Code and the fully vested requirements of Section 408(p)(3) of the Code.

80.    "Simple 401(k) Contribution Account" means the account maintained to record the Participant's Simple 401(k) Contributions and any other adjustments as required under Article IV, V or X of the Plan.

81.    "Simple 401(k) Plan" means a plan intended to satisfy the requirements of Section 401(k)(11) of the Code.  If the Employer elects in Article I that this Plan is intended to satisfy the requirements of a Simple 401(k) Plan, Employees covered under this Plan shall not be eligible to participate under any other plan maintained by the Employer.  Except as stated below, if an Employer employs more than 100 Employees who earn at least $5,000 of Section 415 Compensation during the prior year, such Employer shall not be eligible to maintain a Simple 401(k) Plan.  A Simple 401(k) Plan must have a calendar year as its Plan Year.

ARTICLE II                    II-19

CONFIDENTIAL                    WH_MDL_00331817

An eligible Employer that maintains a Simple 401(k) Plan and later fails to be an eligible Employer for any subsequent year, shall be treated as an eligible Employer for the two (2) years following the last year the Employer was an eligible Employer. If the failure is due to any acquisition, disposition, or similar transaction involving an eligible Employer, the preceding sentence applies only if the provisions of Section 410(b)(6)(C)(i) of the Code are satisfied.

If this Plan is a Simple 401(k) Plan as elected in Article I, the Employer shall be required to make Simple 401(k) Contributions as described in Article I. No other contributions may be made to the Plan other than Elective Contributions and Simple 401(k) Contributions and to the extent that any other provision of the Plan is inconsistent with the provision of a Simple 401(k) Plan, the provisions of the Simple 401(k) Plan shall apply.

82. "Single Employer Plan" means a plan maintained by one (1) Employer, or a plan maintained by more than one (1) Employer, all of which are members of a Controlled Group, and which is designed to comply with the provisions of Sections 414(b), 414(c) and 414(m) of the Code and the Treasury Regulations promulgated thereunder.

83. "Social Security Retirement Age" means age 65 for a Participant born before January 1, 1938; age 66 for a Participant born after December 31, 1937 and before January 1, 1955; and age 67 for a Participant born after December 31, 1954.

84. "Social Security Wage Base" means, with respect to any Plan Year, the maximum amount of earnings which may be considered wages under Section 3121(a) of the Code for the calendar year in which falls the beginning of such Plan Year as in effect on the first day of such Plan Year.

85. "TEFRA" means the Tax Equity and Fiscal Responsibility Act of 1982, as amended from time to time.

86. "Top Paid Group" means the group consisting of the top 20% of the Employees when ranked on the basis of Section 415 Compensation during either the Look-Back Year or the calendar year beginning with or within the Look-Back Year as selected in Article I. Employees described in Section 414(q)(5) of the Code and Q&A 9(b) of Section 1.414(q)-1T of the Regulations are included or excluded to the extent provided in Article I.

87. "TRA '86" means the Tax Reform Act of 1986, as amended from time to time.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                      WH_MDL_00331818

88.    "Total Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months, as determined by a licensed physician selected or approved by the Committee, or such other definition as elected in Article I.

89.    "Transferred Benefits Account" means the Account maintained to record a Participant's Transferred Benefit, forfeitures, if any, and other adjustments required under Article IV, V or X of the Plan.

90.    "Trust" means the Trust Agreement entered into between the Employer and the Trustee.  A Trust may include a custodial agreement or insurance contract, if applicable.

91.    "Trustee" means the trustee(s) named under the Trust or any successor Trustee named in a written instrument of the Board.

92.    "Unincorporated Entity" means a sole proprietorship, a partnership or a limited liability company.

93.    "Vesting Computation Period" means the 12 consecutive month period ending on the last day of the Plan Year that includes an Employee's Employment Commencement Date and the last day of each subsequent Plan Year.

If elected in Article I or if the elapsed time method is selected in Article I, Vesting Computation Period means each 12 consecutive month period beginning on the Employee's Employment Commencement Date and any subsequent 12 consecutive month period commencing on any anniversary date of the Employee's Employment Commencement Date.

94.    "Year of Service" means an Eligibility Computation Period or Vesting Computation Period during which an Employee completes 1,000 or more Hours of Service or such lesser amount, if elected in Article I, with the Employer.  With respect to any Eligibility Computation Period and any Vesting Computation Period, Hours of Service with any member of a Controlled Group shall be credited to the relevant Computation Period.  Unless elected otherwise in Article I, for purposes of eligibility and vesting, if a Plan Year is less than 12 months and an Employee has less than 1,000 Hours of Service during such short Plan Year but has completed 1,000 Hours of Service or such lesser amount, if elected in Article I, during the 12 consecutive month period ending on the last day of such short Plan Year, the Employee will be credited with one (1) Year of Service for the Plan Year.  If such Plan Year is not an Eligibility

ARTICLE II                                    II-21

CONFIDENTIAL                                                      WH_MDL_00331819

Computation Period for an Employee, the preceding sentence shall not apply for eligibility purposes.

For purposes of the elapsed time method, a "Year of Service" means a One-Year Period of Service with the Employer. An Employee will receive credit for the aggregate of all time period(s) commencing with the Employee's Employment Commencement Date or the date such Employee is credited with an Hour of Service upon re-employment and ending on the date a One-Year Period of Severance begins. An Employee will also receive credit for any Period of Severance of less than 12 consecutive months. Fractional portions of a year will be expressed in terms of days.

B.    Terms Not Defined in Article I and II of this Plan.  The following terms are defined in the Paragraphs and Articles specified below.

1.    Annuity Starting Date – See Paragraph A.1 of Article VII.

2.    Determination Date – See Paragraph A.1 of Article VIII.

3.    Election Period – See Paragraph A.2 of Article VII.

4.    Key Employee – See Paragraph A.2 of Article VIII.

5.    Non-Key Employee – See Paragraph A.3 of Article VIII.

6.    Qualified Joint and Survivor Annuity – See Paragraph A.3 of Article VII.

7.    Qualified Preretirement Survivor Annuity – See Paragraph A.4 of Article VII.

8.    Required and Permissive Aggregation Groups – See Paragraphs A.6 and B of Article VIII.

9.    Spouse or Surviving Spouse – See Paragraph A.5 of Article VII.

10.    Top-heavy Group – See Paragraph A.5 of Article VIII.

11.    Top-heavy Plan – See Paragraph A.4 of Article VIII.

12.    Transferred Benefits – See Paragraph A.6 of Article VII.

13.    Waiver Election – See Paragraph A.7 of Article VII.

ARTICLE II

II-22

CONFIDENTIAL

## III.    PARTICIPATION AND MEMBERSHIP

A.    Participation Date.  Each Eligible Employee shall become a Participant on the Entry Date specified in Article I if he or she is employed on such Entry Date.

1.    Vested Participants.  Any vested Participant who terminates employment and who is subsequently re-employed, shall be readmitted as a Participant as of the first day or his or her re-employment.

2.    Non-Vested Participants.  Any non-vested Participant who terminates employment and who is subsequently re-employed shall be considered a new Employee, and must again satisfy the requirements to become an Eligible Employee if his or her period of consecutive one-year Breaks-in-Service equals or exceeds the greater of (i) five (5); or (ii) the aggregate number of Years of Service completed before such termination of employment.  If such former Participant is not considered a new Employee pursuant to this Paragraph A.2, such former Participant shall participate in the Plan immediately upon his or her re-employment.

3.    Employee Not a Participant.  Any Employee who terminates employment prior to his or her Entry Date, but after satisfying the eligibility requirements of Article I, and who is re-hired prior to incurring five (5) consecutive Breaks-in-Service shall become a Participant on the later of (i) his or her date of re-employment; or (ii) the first Entry Date following the date he or she becomes an Eligible Employee.  If this Plan provides for immediate full vesting of all Accounts, then an Employee who did not satisfy the Plan's service requirement and has incurred a one-year Break-in-Service shall have his or her prior service disregarded.  Any Employee who terminates employment prior to his or her Entry Date and who is re-hired after incurring five (5) consecutive Breaks-in-Service shall be considered a new Employee.

4.    Change in Employment Status.  Any Employee who is not a member of an eligible class of employees and becomes a member of an eligible class will participate immediately if such Employee would have otherwise previously become a Participant.

If a Participant becomes an Inactive Participant and has not incurred a one-year Break-in-Service, such Employee will participate immediately upon returning to an eligible class of employees.  If such Participant incurs a one-year Break-in-Service, eligibility will be determined under the Break-in-Service rules of this Article III.

B.    Leave of Absence.  For purposes of eligibility, no Employee shall be deemed to have suffered a Break-in-Service if his or her employment is interrupted because such Employee has been on a Leave of Absence.  For purposes of eligibility, a

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                    WH_MDL_00331821

Break-in-Service shall not be deemed to have occurred while an Employee is a member of the armed forces of the United States, provided that he or she returns to the service of the Employer within 90 days (or such longer period as may be prescribed by law) from the date he or she first became entitled to his or her discharge.

C.    Enrollment.  The Employer shall, from time to time as requested by the Committee, provide a list of all of its Employees, their names and ages, the number of Hours of Service completed by each during the current Plan Year or other applicable Computation Period, their dates of hire, and any additional information the Committee may require.  The Committee shall determine from such lists which Employees are Eligible Employees and their Entry Dates for participation under the Plan.

D.    Waiver of Participation.  If waiver of participation is permitted in Article I, the Plan may treat Employees who waive participation in the Plan as a nondiscriminatory class of Employees who are ineligible to participate.  A waiver made by an Employee must be irrevocable.  A waiver of participation shall not become effective if it would constitute a cash or deferred arrangement within the meaning of Section 401(k) of the Code.  A waiver of participation shall not be considered a cash or deferred arrangement if it is irrevocable, applies to all plans maintained by the Employer, and is made prior to the date on which the Employee is first eligible to participate in the Plan.  The Committee shall establish uniform and nondiscriminatory procedures as it deems necessary to carry out this provision including, but not limited to, rules prescribing the timing and filing of elections to waive participation.  The Committee, in its sole discretion, shall determine the propriety of any such waiver.

E.    Omission of Eligible Employee.  If, in any Plan Year, any Employee who should be included as a Participant in the Plan is erroneously omitted or an error caused a Participant to be credited with less than his or her full allocation, the Committee shall determine the amounts (or additional amounts) which should have been credited to such Participant's Account.  Any correction by the Committee regarding the omission of an Eligible Employee for a Plan Year will be consistent with the correction methods used under the Internal Revenue Service Employee Plans Completion Resolution System.

F.    Inclusion of Ineligible Employee.  Any correction by the Committee regarding the inclusion of an ineligible Employer for a Plan Year will be consistent with the correction method used under the Internal Revenue Service Employee Plan Compliance Resolution System.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                        WH_MDL_00331822

## IV.    EMPLOYER CONTRIBUTIONS

A.    In General.  For each Plan Year in which this Plan is in effect, the Employer shall make contributions to the Trust in one (1) or more installments in such amounts, if any, as provided in Article I; provided that (i) the Plan Year for which each contribution is made shall be designated at the time of the contribution or upon the income tax return of the Employer for any relevant Plan Year; (ii) no contribution to this Plan for any Plan Year shall exceed an amount which the Employer estimates will be deductible under Sections 404(a) and 404(j) of the Code; (iii) no contribution for any Plan Year shall cause the limitations on the Annual Addition of any Participant to be exceeded for such Plan Year; and (iv) no contribution shall be made for any Participant who did not complete a Year of Service during the relevant Plan Year unless Article I provides otherwise.

Contributions made to an Owner-Employee may be made only from such Owner-Employee's Earned Income derived from the trade or business for which the Plan is established.

B.    Special Make-up Contribution.  A previously forfeited Account Balance shall be restored in accordance with Article I.

C.    Corrective Contributions.  Subject to all applicable limitations of the Code, the Employer may make additional contributions to the Plan as needed to correct any errors in administration which may occur from time to time.  Such corrective contributions shall be limited to the extent necessary (including earnings as applicable) to place affected Participants in the position they would have been in but for such error or errors, and shall be allocated to the account or accounts from which the error was made, subject to all rules and procedures otherwise applicable to such Accounts.  Corrective contributions made for a Plan Year will be consistent with the corrective methods used under the Internal Revenue Service Employee Plans Compliance Resolution System.

D.    Profit Sharing and Retirement Savings (401(k)) Contributions.  The provisions of this Paragraph D shall apply to contributions made pursuant to the cash or deferred feature of the Plan.

1.    Qualifying Section 401(k) Contributions.  The Employer intends that all Qualifying Employer Contributions shall satisfy all of the requirements of Section 401(k) of the Code and the Treasury Regulations promulgated there under as constituting a qualified cash or deferred arrangement.  Each Participant shall be fully vested in his or her Qualifying Section 401(k) Contributions at all times.

2.    Participant Elective Contributions.  As permitted in Paragraph H.1 of Article I, a Participant may elect to reduce and defer the receipt of his or her Compensation, the Employer shall reduce such Participant's Compensation in the

ARTICLE IV                                    IV-1

CONFIDENTIAL                                                            WH_MDL_00331823

elected amount through payroll withholding and contribute to the Plan on behalf of each such electing Participant an amount equal to the Compensation to be reduced and deferred. A Participant's Elective Contributions shall be credited to his or her Elective Contribution Account, and generally will be paid by the Employer to the Plan no later than the 15th business day following the month in which the amount was withheld from the Participant's payroll.

(a)    If provided in Paragraph H.1 of Article I, Employees who are eligible to make Elective Contributions under this Plan and who have attained age 50 by the end of the calendar year shall be eligible to make catch-up contributions at the beginning of the calendar year in accordance with, and subject to the limitations of, Section 414(v) of the Code. Such catch-up contributions shall not be taken into account for purposes of the provisions of the Plan implementing the required limitations of Sections 402(g) and 415(c) of the Code. The Plan shall not be treated as failing to satisfy the provisions of the Plan implementing the requirements of Section 401(a)(4), 401(k)(3), 401(k)(11), 410(b), or 416 of the Code, as applicable, by reason of making of such catch-up contributions. For purposes of Section 410(b) and the average benefit percentage test under Treasury Regulation Section 1.410(b)-5, catch-up contributions for the current Plan Year are disregarded. However, catch-up contributions made to the Plan in prior years are taken into account for purposes of Section 410(b) and the average benefit test under Treasury Regulation Section 1.410(b)-5. Those Plan provisions that relate to Sections 1.414(v)-1(a) through (h) of the Treasury Regulations are effective for Plan Years beginning after December 31, 2003.

(b)    If provided in Paragraph H.1 of Article I, Employees who are eligible to make Elective Contributions under this Plan may designate all or part of his or her Elective Contributions as Roth Contributions. Forfeitures may not be allocated to a Roth Contribution Account. No contributions other than designated Roth Contributions and rollover contributions described in Section 402(A)(c)(3)(A) of the Code are permitted to be allocated to the Roth Contribution Account. The separate accounting requirement of a Roth Contribution Account shall continue to apply until the designated Roth Contributions are completely distributed to the Participant. Any gains, losses, credits or changes must be separately allocated on a reasonable and consistent basis to the Participant's Roth Contribution Account and other Accounts under the Plan to ensure that the Roth Contribution Account maintains a record of the Participant's investment in the contract. For purposes of Section 401(a)(31) of the Code, a Roth Contribution Account can only be rolled over to another designated Roth account under an Eligible Retirement Plan.

3.    <u>Changes in Elective Contributions</u>. A Participant will be given a reasonable period at least once each Plan Year to elect to make Elective Contributions or Roth Contributions. Such election may not be retroactive. A Participant may suspend his or her Elective Contributions or Roth Contributions at any time. The rules and

<div align="center">ARTICLE IV</div>

IV-2

CONFIDENTIAL

WH_MDL_00331824

procedures for allowing Participants to defer and reduce their Compensation under Paragraph H.1 of Article I and this Paragraph D.3 and to decrease (or increase) such reductions and deferrals shall be established by the Committee, in its sole discretion; provided, however, that the Committee shall exercise its discretion in a uniform and nondiscriminatory manner. Such rules and procedures shall be the same for pre-tax Elective Contributions and Roth Contributions, if applicable. If this Plan provides for Safe Harbor Matching Contributions, a Participant shall have a reasonable opportunity and a reasonable period of time to increase, decrease, or resume his or her Elective Contributions. A 30 day period shall be deemed a reasonable period of time.

     4.   <u>Automatic Enrollment</u>. The Employer may elect in Article I to apply the automatic enrollment provisions. If elected, the following provisions shall apply:

     (a)   The Employer shall elect in Article I to apply the automatic enrollment provisions either to current and future Participants or only to future Participants hired on or after the automatic enrollment provisions are effective. If the Employer elects to have these provisions apply to current and future Participants, then the Employer will apply the automatic enrollment provisions to current Participants who are deferring at less than the amount elected in Article I, unless such Participants make an affirmative election to receive their Compensation in cash.

     (b)   After satisfying the Plan's eligibility requirements, each affected Participant shall have his or her Compensation automatically reduced by the percentage elected in Article I and such amount shall be contributed to the Plan.

     (c)   Notwithstanding the foregoing, an election by a Participant not to make Elective Deferrals or to contribute a different percentage may be made at any time. Such election, if filed when the Participant is hired, or within a reasonable time before the Compensation payable for the first pay period is currently made available, shall be effective for the first pay period and subsequent pay periods until superseded by a subsequent Deferral Election, including an election to defer zero Compensation. Elections filed at a later date shall be effective for payroll periods beginning in the month next following the date the election is filed with the Plan.

     (d)   If a Participant has Elective Deferrals withheld pursuant to automatic enrollment and no investment directive has been received by the Plan, such Participant's contributions shall be invested in accordance with Article I and XII of the Plan and the procedures established by the Committee.

     (e)   For current Participants who are deferring at a percentage or dollar amount less than the amount elected in Article I, the Employer shall, in the first payroll period after the date of the automatic provisions are effective, reduce the

<div align="center">ARTICLE IV</div>

<div align="right">IV-3</div>

BROAD FINANCIAL (800) 395-5200

Participant's Compensation by the difference between the Participant's current Deferral Election and the amount elected in Article I.

(f)      At the time an Employee is hired, the Committee shall provide the Employee with a notice that explains the automatic enrollment provisions. This notice shall also explain the Employee's right to elect to have no Elective Contributions made to the Plan or to change the amount of his or her Elective Contributions. Such notice will include the procedure for exercising the right and the timing for implementation of any such election.

(g)      The Committee shall provide each Participant in the Plan with an annual notice of his or her Elective Contribution percentage and each Participant's right to change the percentage, including the procedure for exercising these rights and the timing for implementation of any such election. Prior to a Participant's automatic enrollment becoming effective, the Committee will provide such Participant with appropriate guidance as to the procedures then in effect for the Participant to make alternative elections referenced above. Each Participant deferring Compensation pursuant to the automatic enrollment provisions shall be deemed to have consented to an Elective Deferral contribution in the amount specified by the Employer as provided in Article I, unless he or she has filed an election to the contrary with the Committee.

(h)      As stated in Article I, Elective Deferrals made pursuant to the automatic enrollment provisions shall be treated as either pre-tax Elective Contributions or Roth Contributions.

5.    Simple 401(k) Plans.  If this is a Simple 401(k) Plan, in addition to any other election periods, each Employee may make or modify his or her salary reduction election during the 60-day period immediately preceding each January 1. If the Employee elects to suspend his or her Elective Contributions during the Plan Year, the Committee may require the Employee to wait until the beginning of the next Plan Year before he or she may resume his or her Elective Contributions. The Employer shall notify each Eligible Employee of his or her election rights within a reasonable time prior to the 60-day election period and shall indicate the type and amount of the Simple 401(k) Contribution to be made.

E.    Actual Deferral Percentage Limitation.

1.    General Limitation.

The amount of Qualifying Section 401(k) Contributions made on behalf of the group consisting of Highly Compensated Employees shall not result in an Actual Deferral Percentage that exceeds the greater of:

ARTICLE IV                                                        IV-4

CONFIDENTIAL                                                                                     WH_MDL_00331826

(a)    The Actual Deferral Percentage limitation for the group of Eligible Participants who are Highly Compensated Employees for the current Plan Year shall not exceed the Actual Deferral Percentage for the group of Eligible Participants who are Non-Highly Compensated Employees for the current or preceding Plan Year as elected in Article I multiplied by 1.25; or

(b)    The Actual Deferral Percentage for the group of Eligible Participants who are Highly Compensated Employees for the current Plan Year shall not exceed the Average Deferral Percentage for Eligible Participants who are Non-Highly Compensated Employees for the current or preceding Plan Year as elected in Article I, multiplied by two (2), and provided that the Actual Deferral Percentage for the group of Eligible Participants who are Highly Compensated Employees does not exceed the Actual Deferral Percentage for the group of Eligible Participants who are Non-Highly Compensated Employees for the current or preceding Plan Year, as elected in Article I, by more than two (2) percentage points.

2.    Prior Year Testing.

If the Plan provides for the prior year testing method, the Actual Deferral Percentage shall be determined without regard to changes in the group of Non-Highly Compensated Employees who are Eligible Participants during the testing year.

3.    First Plan Year Testing.

For the first Plan Year in which the Plan (other than a successor plan) provides for a cash or deferred arrangement, the Actual Deferral Percentage of eligible Non-Highly Compensated Employees under the prior year testing method shall be either three percent (3%) or the Actual Deferral Percentage of the Non-Highly Compensated Employee for such Plan Year as elected in Article I.

4.    Special Rules.

An Elective Contribution, Roth Contribution, Safe Harbor Nonelective Employer Contribution or Safe Harbor Matching Contribution will be taken into account under the Actual Deferral Percentage limitation for the Plan Year only if it is allocated to the Employee as of any date within the Plan Year. An Elective Contribution, Roth Contribution, Safe Harbor Nonelective Contribution and Safe Harbor Matching Contribution is considered allocated as of any date within a Plan Year if the allocation is not contingent on participation or performance of services after such date and the Elective Contribution is actually paid to the Trust no later than 12 months after the close of the Plan Year to which such contributions relate. Additionally, an Elective Contribution must relate to Compensation that either would have been received by the Employee during the Plan Year, except for the Employee election to defer, or is

ARTICLE IV                                    IV-5

CONFIDENTIAL

attributable to the performance of services during the Plan Year that would have become payable within 2½ months after the close of the Plan Year, except for the Employee election to defer.

F.    Safe Harbor Contributions.    If the Employer provides for Safe Harbor Matching Contributions or Safe Harbor Nonelective Employer Contributions during a Plan Year that satisfy the requirements of Section 401(k)(12) of the Code, the Actual Deferral Percentage limitation shall be deemed satisfied for such Plan Year if the requirements of this Paragraph F are satisfied

1.    Current Year Testing Method.    If Safe Harbor Nonelective Employer Contributions or Safe Harbor Matching Contributions are made to the Plan to satisfy the Actual Deferral Percentage limitation or the Average Contribution Percentage limitation for a Plan Year, the Plan shall be required to use the current year testing method for Non-Highly Compensated Participants in any such Plan Year.  Such contributions, like Elective Contributions and Matching Contributions, shall be subject to rules relating to changes from current year testing to prior year testing, and the anti-abuse provisions that prevent the repeated changes to the Plan testing procedures or Plan provisions that have the effect of distorting the Actual Deferral Percentage or Average Contribution Percentage so as to increase significantly the permitted Actual Deferral Percentage ratio or Average Contribution Percentage ratio for Highly Compensated Employees and the principal purpose of the change was to achieve such a result.

2.    Compensation.    Any Compensation definition elected in Article I must state a uniform definition of Compensation and comply with Section 1.401(k) - 6 of the Treasury Regulations which incorporates the definition of Section 414(s) compensation and Section 1.414(s)-1 of the Treasury Regulations; provided, however, the last sentence of Section 1.414(s)-1(d)(2)(iii) of the Treasury Regulations pertaining to compensation above a specified dollar amount shall not apply to a Non-Highly Compensated Employee.

3.    Plan Year.    A Plan Year must be a 12 consecutive month period or if the Plan is a newly established plan (other than a successor plan where fifty percent (50%) or more of the Employees for the first Plan Year were eligible under another 401(k) plan or 401(m) plan maintained by the Employer in the prior year), a period of at least three (3) consecutive months (or, a shorter period if the Employer is a newly established Employer and this Plan is established as soon as administratively feasible after the establishment of the Employer).  Notwithstanding the preceding sentence, in the case of a cash or deferred arrangement that is added to an existing profit-sharing, stock bonus, or pre-ERISA money purchase pension plan for the first time during a Plan Year, the Average Deferral Percentage test and Average Contribution Percentage test, if applicable, will be treated as being satisfied for the entire Plan Year and the cash or deferred arrangement will not be treated as failing to satisfy the requirement that a Plan

<div align="center">ARTICLE IV</div>

IV-6

CONFIDENTIAL

WH_MDL_00331828

Year must be twelve (12) consecutive months, provided (i) the Plan is not a successor plan (as described above), (ii) the cash or deferred arrangement is made effective no later than three (3) months prior to the end of the Plan Year, and (iii) the requirements of Safe Harbor Nonelective Contributions or Safe Harbor Matching Contributions are satisfied for the period from the effective date of the cash or deferred arrangement to the end of the Plan Year.

      4.   <u>Notice Requirements</u>.  To satisfy the notice requirements with regard to Safe Harbor Matching Contributions or Safe Harbor Nonelective Employer Contributions, the notice given by the Committee to Employees must be sufficiently accurate and comprehensive to inform the Employee of his or her rights and obligations under the Plan and must be written in a manner that can be understood by the average Employee eligible to participate in the Plan.  In addition, the notice must meet the following requirements:

      (a)   The notice must accurately describe (i) the Safe Harbor Matching Contribution formula or Safe Harbor Nonelective Employer Contribution formula used under the Plan (including a description of the level of Matching Contributions, if any, available under the Plan); (ii) any other contributions under the Plan (including Nonelective Employer Contributions and discretionary Matching Contributions), the condition and allocation requirements to receive such contributions; (iii) the Plan to which safe harbor contributions will be made if other than this Plan; (iv) the type and amount of Compensation that may be deferred under the Plan; (v) how to make a cash deferred election, including any administrative requirements that apply to Elective Contributions; (vi) the periods available under the Plan for making cash or deferred elections; and (vii) withdrawal and vesting provisions pertaining to each contribution made under the Plan.

      (b)   A plan will not fail to satisfy the content requirement of (ii), (iii), (iv) and (vii) of the preceding paragraph if the notice instead cross-references to the relevant portions of an up-to-date summary plan description that has been provided (or concurrently is provided) to the Employee.  However, the notice must still accurately describe (i) the Safe Harbor Matching Contribution or Safe Harbor Nonelective Contribution formula used under the Plan (including a description of the levels of Matching Contributions, if any, available under the Plan) and state that these contributions (as well as Elective Contributions) are fully vested when made and (ii) how to make Elective Contributions (including any administrative requirements that apply to such elections) and the periods available under the Plan for making such elections.  In addition, the notice must also provide information that makes it easy for Eligible Employees to obtain additional information about the Plan (including an additional copy of the summary plan description) such as telephone numbers, addresses and, if applicable, electronic addresses, of the individuals or offices from whom Employees can obtain such plan information.  For Plan Years beginning after December 31, 2006, the

<div align="center">ARTICLE IV</div>

<div align="right">IV-7</div>

CONFIDENTIAL

notice can only make references to the relevant portions of an up-to-date summary plan description in regard to the content requirements of (ii), (iii) and (iv) of the preceding paragraph.

(c)    The notice described above may be given through an electronic medium if reasonably accessible to the Employee, provided that (i) the system under which the electronic notice is provided is reasonably designed to provide the notice in a manner no less understandable to the Employee than a written paper document, and (ii) at the time the electronic notice is given, the Employee is advised that he or she may request and obtain a written paper document at no charge.

(d)    The notice requirements must be given within a reasonable time before the beginning of each Plan Year (or, if an Employee becomes eligible after the preceding notice has been given, within a reasonable period before the Employee is eligible). If the notice is given at least 30 days and no more than 90 days before the beginning of each Plan Year, the notice requirements shall be deemed timely. If an Employee became eligible to participate after the 90th day before the beginning of the Plan Year, notice shall be deemed timely if given to such Employee no more than 90 days before he or she becomes eligible to participate and no later than the Employee's Entry Date. The preceding sentence shall also apply for a newly established 401(k) plan.

5.    <u>Safe Harbor Matching Formula</u>.    Any Safe Harbor Matching Contribution formula elected in Article I must, at any rate of Elective Contributions, provide an aggregate amount of Safe Harbor Matching Contributions to Non-Highly Compensated Participants at least equal to the aggregate amount of Safe Harbor Matching Contributions that would have been provided under Section 401(k)(12)(B)(i) of the Code.

6.    <u>Timely Adoption of Safe Harbor Provisions</u>.    For Plan Years beginning after September 30, 2003 or such other date required by the Internal Revenue Service, safe harbor provisions under Section 401(k)(12) of the Code must be adopted prior to the first day of the Plan Year in which such provisions became effective.

Notwithstanding the preceding paragraph, if the Plan provides for the current year testing method for the Actual Deferral Percentage and the Average Contribution Percentage, if applicable, the Plan may be amended to provide Safe Harbor Nonelective Employer Contributions as late as 30 days prior to the last day of the Plan Year if Eligible Employees receive notice prior to the beginning of such Plan Year that the Employer may provide Safe Harbor Nonelective Employer Contributions of at least three percent (3%) of Compensation. If the Employer provides for Safe Harbor Nonelective Employer Contributions, the notice requirements of subparagraph F.4

ARTICLE IV                                IV-8

CONFIDENTIAL                                                      WH_MDL_00331830

above shall apply and Eligible Employees must be given a supplemental notice at least 30 days before the end of the Plan Year that Safe Harbor Nonelective Employer Contributions of at least three percent (3%) of Compensation will be made.

       7.    Limitations On Use of Safe Harbor Contributions.  Safe Harbor Matching Contributions and Safe Harbor Nonelective Employer Contributions shall not be used as Qualified Nonelective Employer Contributions or Qualified Matching Contributions.

       8.    Multiple Plans.  If Safe Harbor Matching Contributions or Safe Harbor Nonelective Employer Contributions are provided in another defined contribution plan maintained by the Employer, any Eligible Employee under the plan that provides for a cash or deferred arrangement must be an Eligible Employee under the plan that provides for Safe Harbor Matching Contributions or Safe Harbor Nonelective Employer Contributions.  Safe Harbor Matching Contributions and Safe Harbor Nonelective Employer Contributions cannot be used to satisfy the safe harbor requirements of Notice 98-52 Section V.B or the applicable Final Treasury Regulations, with respect to more than one plan.

      G.    Simple 401(k) Plans.  If this Plan is a Simple 401(k) Plan, the Actual Deferral Percentage limitation shall be deemed satisfied provided that the following additional requirements are satisfied:

       1.    Changes in Deferral Elections.  Each Participant may elect, during the 60 day period immediately preceding each January 1st (and 60 days before the first day an Employee is first eligible to participate); to increase, decrease or resume his or her Elective Contributions.  The Committee shall notify each Participant within a reasonable period of time prior to the 60 day election period that an Employee can modify his or her election to defer and the Employee's rights to participate under the Plan.  If an Employee becomes eligible after the 60 day election period, the 60 day election period shall be deemed satisfied if the Employee may make or modify a salary reduction election during a 60 day period that includes either the date the Employee becomes eligible to participate or the day before the Employee's Entry Date

       2.    Timing of Adoption.  If this Plan is a newly established 401(k) plan containing Simple 401(k) Plan provisions as elected in Article I, the Plan may be effective as of any date during the Plan Year, but in no event later than October 1st of the year in which adopted.  An Employer amending an existing 401(k) plan to provide for Simple 401(k) Plan provisions must make such provisions effective as of the following January 1st.

      H.    Limitation on Elective Deferrals.  No Participant shall be permitted to have Elective Deferrals made under this Plan, or any other qualified plan maintained by the

<div align="center">ARTICLE IV             IV-9</div>

CONFIDENTIAL           WH_MDL_00331831

Employer during a taxable year in excess of the dollar limitation of Section 402(g) of the Code in effect for such taxable year or, if this is a Simple 401(k) Plan, Section 408(p)(2)(a)(ii) of the Code for the calendar year..

      1.     <u>Deferral Limit For Catch-Up Contributions</u>. The applicable dollar limit of $11,000 for the calendar year 2002 under Section 402(g)(1)(B) of the Code (as increased under Section 402(g)(7) of the Code, to the extent applicable) shall be further increased by the applicable dollar catch-up limit as set forth in Section 1.414(v)-1(c)(2) of the Treasury Regulations ($1,000 for the calendar year 2002) with respect to eligible Participants entitled to make catch-up contributions.

      2.     <u>Deferral Limit For Multiple Plans</u>. The preceding paragraph applies without regard to whether the applicable Employer plan (within the meaning of Section 414(v)(6) of the Code) treats the Elective Deferrals as catch-up contributions. Thus, a catch-up eligible Participant who makes Elective Deferrals under applicable employer plans of two (2) or more Employers that in total exceed the applicable dollar amount under Section 402(g)(1) of the Code by an amount that does not exceed the applicable dollar catch-up limit under either plan may exclude the Elective Deferrals from gross income, even if neither applicable Employer plan treats those Elective Deferrals as catch-up contributions.

      3.     <u>Adjustments in Deferral Limits</u>. For taxable years beginning after December 31, 2006, the limitations under Sections 402(g), Section 408(p)(2)(A)(ii) and 414(v) of the Code shall be adjusted at the same time and in the same manner as Section 415(d) of the Code, except the base period taken into account shall be the calendar quarter beginning July 1, 2005, and any increase under this Paragraph H which is not a multiple of $500 shall be rounded to the next lowest multiple of $500.

I.     <u>Reserved</u>.

J.     <u>Correction of Excess Contributions</u>.

      1.     <u>Return of Excess Contributions</u>. If the Committee determines that for any Plan Year the maximum aggregate Actual Deferral Percentage of Qualifying Section 401(k) Contributions made by or on behalf of the group consisting of Highly Compensated Employees has been exceeded, the Committee may reduce by corrective distribution to the extent necessary the amount of Excess Contributions made to the group consisting of Highly Compensated Employees to satisfy the Actual Deferral Percentage limitation. The Committee shall designate such distributions to Highly Compensated Employees as Excess Contributions and allowable income thereof which shall be distributed to the appropriate Highly Compensated Employees after the close of the Plan Year but not later than 12 months after the close of the Plan Year.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL            WH_MDL_00331832

2.    Determination of Corrective Distributions.

(a)    The determination of corrective distributions shall be made as follows:

Step 1.    The Committee shall calculate the dollar amount of Excess Contributions for each affected Highly Compensated Employee. The amount of Excess Contributions (if any) for a Highly Compensated Employee for a Plan Year is the amount (if any) by which the Employee's Elective Contributions, including Roth Contributions, must be reduced for the Employee's actual deferral ratio to equal the highest permitted actual deferral ratio under the Plan.

Step 2.    The Committee shall determine the total of the dollar amounts calculated in step 1 ("total Excess Contributions").

Step 3.    The Elective Contributions of the Highly Compensate Employee with the highest dollar amount of Elective Contributions shall be reduced by the amount required to cause such Highly Compensated Employee's Elective Contributions to equal the dollar amount of the Elective Contributions of the Highly Compensated Employee with the next highest dollar amount of Elective Contributions. This amount is then distributed to the Highly Compensated Employee with the highest dollar amount of Excess Contributions. However, if a lesser reduction, when added to the total dollar amount already described under this step, would equal the total Excess Contributions, the lesser reduction amount is distributed.

Step 4.    If the total amount distributed is less than the total Excess Contributions, step 3 is repeated.

If the above distributions are made, the cash or deferred arrangement is treated as meeting the non-discrimination test of Section 401(k)(3) of the Code regardless of whether the Actual Deferral Percentage, if recalculated after such distributions, would satisfy Section 401(k)(3) of the Code.

(b)    Notwithstanding subparagraph (a) above, if the Plan fails the Actual Deferral Percentage limitation the amount to be refunded to a Participant who is eligible to make catch-up contributions pursuant to Paragraph D of this Article IV is first offset by the amount of the dollar catch-up limit. The catch-up amount due to the Actual Deferral Percentage limitation is calculated after the Actual Deferral Percentage limitation has been determined for the Plan Year. Amounts eligible for disbursement under Section 401(k)(8) or 408(k)(6)(C) of the Code must be re-categorized as catch-up contributions up to the dollar catch-up limit of Section 414(v)(2)(B) of the Code. However, Elective Contributions that are not distributed because they are re-categorized as catch-up contributions are still considered to be Excess Contributions for

ARTICLE IV                                IV-11

CONFIDENTIAL                                                    WH_MDL_00331833

purposes of Section 401(k)(8) of the Code. Thus, Matching Contributions with respect to such Elective Contributions are permitted to be forfeited pursuant to Section 411(a)(3)(G) of the Code and Paragraph K of Article X provided that catch-up contributions are not matched pursuant to Article I of the Plan.

(c) For purposes of determining the maximum amount of permitted catch-up contributions for a catch-up eligible Participant, the determination of whether an Elective Contribution is a catch-up contribution is made as of the last day of the Plan Year (or in the case of Section 415 of the Code, as of the last day of the Limitation Year), except that, with respect to Elective Contributions in excess of an applicable limit that is tested on the basis of the taxable year or calendar year (such as the limit of Section 401(a)(30) of the Code on Elective Deferrals), the determination of whether such Elective Contributions are treated as catch-up contributions is made at the time they are deferred.

3. <u>Corrections by Additional Contributions</u>. The Employer may in its sole discretion and subject to the limitation contained in Article V of the Plan, make additional Qualified Nonelective Employer Contributions or Qualified Matching Contributions that are treated as Elective Contributions and which in combination with the Elective Contributions, satisfy the Actual Deferral Percentage limitation. Such Nonelective Employer Contributions and Qualified Matching Contributions must be nonforfeitable as of the date made and subject to the same distribution restrictions that apply to Elective Contributions. Qualified Nonelective Employer Contributions and Qualified Matching Contributions which are treated as Elective Contributions must satisfy these requirements without regard to whether they are actually taken into account as Elective Contributions. A Qualified Matching Contribution is not treated as forfeited merely because the contribution to which it relates is an Excess Deferral, or Excess Contribution thereby causing forfeiture of such Qualified Matching Contribution.

4. <u>Additional Requirements</u>. Qualified Nonelective Employer Contributions and Qualified Matching Contributions which are treated as Elective Contributions must satisfy the following additional requirements:

(a) The Nonelective Employer Contributions, including Qualified Nonelective Employer Contributions, must satisfy the requirements of Section 401(a)(4) of the Code and Section 1.401(a)(4)-1(b)(2) of the Treasury Regulations.

(b) The Nonelective Employer Contributions, excluding Qualified Nonelective Employer Contributions treated as Elective Contributions for purposes of the Actual Deferral Percentage limitation and Qualified Nonelective Employer Contributions treated as Matching Contributions for purposes of the Contribution

ARTICLE IV                                                    IV-12

CONFIDENTIAL                                                    WH_MDL_00331834

Percentage limitation, must satisfy the requirements of Section 401(a)(4) of the Code and Section 1.401(a)(4)-1(b)(2) of the Treasury Regulations.

(c)    If the Employer is applying the special rule for employer-wide plans in Section 1.414(r)-1(c)(2)(ii) of the Treasury Regulations with respect to a cash or deferred arrangement, the determination of whether the Qualified Nonelective Employer Contributions satisfy the requirements of subparagraphs (a) and (b) of this Paragraph J.4 must be made on an employer-wide basis regardless of whether the plans to which the Qualified Nonelective Employer Contributions are made are satisfying the requirements of Section 410(b) of the Code on an employer-wide basis. Conversely, in the case of an employer that is treated as operating qualified separate lines of business, and does not apply the special rule for employer-wide plans in Section 1.414(r)-1(c)(2)(ii) of the Treasury Regulations with respect to a cash or deferred arrangement, then the determination of whether the Qualified Nonelective Employer Contributions satisfy the requirements of this subparagraphs (a) and (b) of this Paragraph J.4 is not permitted to be made on an employer-wide basis regardless of whether the plans to which the Qualified Nonelective Employer Contributions are made satisfy the requirements of Section 410(b) of the Code on that basis.

(d)    Qualified Nonelective Employer Contributions and Qualified Matching Contributions made for the Plan Year must satisfy the allocation requirements of Elective Contributions.

(e)    The plan that takes Qualified Nonelective Employer Contributions and Qualified Matching Contributions into account in determining whether Elective Contributions satisfy the Actual Deferral Percentage limitation must have the same Plan Year as the plan or plans to which the Qualified Matching Contributions and Qualified Nonelective Employer Contributions were made. If the Plan Year is changed to satisfy this requirement, such contributions may be taken into account during the Short Plan Year only if they could have been taken into account under the Actual Deferred Percentage limitation for a plan with the same Short Plan Year.

(f)    If the Employer has elected to apply the prior year testing method to calculate the Actual Deferral Percentage limitation, Qualified Matching Contributions or Qualified Nonelective Employer Contributions must be made no later than twelve (12) months following the last day of the Plan Year preceding the current Plan Year to satisfy the Actual Deferral Percentage limitation. If the Employer has elected to apply the current year testing method to calculate the Actual Deferral Percentage limitation, Qualified Matching Contributions or Qualified Nonelective Employer Contributions must be made no later than twelve (12) months following the close of the current Plan Year to satisfy the Actual Deferral limitation.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

WH_MDL_00331835

(g)    Effective as stated in Article I, Qualified Nonelective Employer Contributions cannot be taken into account for a Plan Year for a Non-Highly Compensated Participant to the extent such contributions exceed the product of that Non-Highly Compensated Participant's Compensation and the greater of (i) five percent (5%) or (ii) two (2) times the Plan's representative contribution rate. Any Qualified Nonelective Employer Contribution taken into account under the Contribution Percentage limitation under Paragraph L of Article X (including the determination of the representative contribution rate for purposes Section 1.401(m)-2(a)(6)(v)(B) of the Treasury Regulations), is not taken into account for purposes of this Paragraph J.4 (including the determination of the representative contribution rate under this subparagraph J.4(g)).

For purposes of this subparagraph J.4(g) the Plan's representative contribution rate is the lowest applicable contribution rate of any eligible Non-Highly Compensated Participant among a group of eligible Non-highly Compensated Participants that consists of half of all eligible Non-Highly Compensated Participants for the Plan Year (or, if greater, the lowest applicable contribution rate of any eligible Non Highly Compensated Participant in the group of all eligible Non-Highly Compensated Participant for the Plan Year and who is employed by the Employer on the last day of the Plan Year).

The applicable contribution rate for an eligible Non-Highly Compensated Participant is the sum of the Qualified Matching Contributions taken into account under this Paragraph J.4 for the eligible Non-Highly Compensated Participant for the Plan Year and the Qualified Nonelective Employer Contributions made for that eligible Non-Highly Compensated Participant for the Plan Year, divided by that eligible Non-Highly Compensated Participant's Compensation for such Plan Year.

Notwithstanding this subparagraph J.4(g), Qualified Nonelective Employer Contributions that are made in connection with an employer's obligation to pay prevailing wages under the Davis-Bacon Act, the Service Contract Act of 1965 or similar legislation, can be taken into account for a Plan Year to the extent such contributions do not exceed ten percent (10%) of such Non-Highly Compensated Participant's Compensation.

(h)    Qualified Matching Contributions satisfy this Paragraph J.4 only to the extent that such Qualified Matching Contributions are Matching Contributions that are not precluded from being taken into account under the Contribution Percentage limitation for the Plan Year under the rules of Section 1.401(m)-2(a)(5)(ii) of the Treasury Regulations.

(i)    Qualified Matching Contributions and Qualified Nonelective Employer Contributions can not be taken into account under this Paragraphs J.4 to the

ARTICLE IV                                                    IV-14

CONFIDENTIAL                                              WH_MDL_00331836

extent such contributions are taken into account for purposes of satisfying any other Actual Deferral Percentage limitation, Contribution Percentage limitation, or the requirements of Sections 1.401(k)-3, 1.401(m)-3 or 1.401(k)-4 of the Treasury Regulations.

5.    Recharacterization of Excess Contributions.  If Article I allows for Employee After-Tax Contributions, the Committee may recharacterize Excess Contributions as Employee After-Tax Contributions. Such recharacterized contributions shall remain subject to the nonforfeitable requirements and distribution limitations that apply to Elective Contributions.  The Committee cannot recharacterize any Excess Contributions after 2½ months after the close of the Plan Year.  Further Excess Contributions will not be recharacterized with respect to a Highly Compensated Employee to the extent that the recharacterized amounts, in combination with Employee After-Tax Contributions actually made by the Employee, exceeds a maximum amount of Employee After-Tax Contributions that the Employee is permitted to make under the Plan in the absence of recharacterization determined prior to the application of the Contribution Percentage limitation.  Such recharacterized amounts will be considered as Annual Additions under the limitations imposed by Section 415 of the Code and shall be subject to Section 401(m) of the Code.  The dollar leveling method, as described in Paragraph J.2 of this Article IV, with respect to the return of Excess Contributions to Highly Compensated Employees shall apply to this corrective procedure.

The amount of Excess Contributions to be recharacterized for a Plan Year shall not exceed the amount of Elective Contributions made on behalf of such Highly Compensated Employee.

6.    Correction of Excess Contributions by Reduction Prior to the End of the Plan Year.  If the Committee determines that the Actual Deferral Percentage limitation is being exceeded during a Plan Year, the Committee may suspend the group of Highly Compensated Employees' future Elective Deferrals of Qualifying 401(k) Contributions for such Plan Year to enable the Plan to satisfy the Actual Deferral Percentage limitation.  Any such suspension shall be considered an Employer-provided limit for purposes of Paragraph A.3 of Article II relating to catch-up contributions.  The Committee shall give notice to such Employees of the amount to be suspended.

The determination of the reduction shall be made either in accordance with the dollar leveling method used for reduction of Excess Contributions or on a pro rata basis as determined by the Committee.

K.    Coordination of Excess Contributions with Excess Deferrals. The amount of Excess Contributions to be distributed or recharacterized with respect to Highly

ARTICLE IV                                    IV-15

CONFIDENTIAL                                    WH_MDL_00331837

Compensated Employees shall be reduced by any Excess Deferrals previously distributed to such Employee for the Employee's taxable year ending in such Plan Year.

L.    <u>Income Allowable to Excess Contribution</u>.    The distribution of Excess Contributions shall include the income allocated thereto.  The income allocable to Excess Contributions is determined by applying the same method as used for the correction of Excess Aggregate Contributions described in Paragraph J of Article X.

A distribution of Excess Contributions is not includable in gross income of an Employee to the extent it represents a distribution of designated Roth Contributions. However, the income allocable to a corrective distribution of Excess Contributions that are designated Roth Contributions is included in gross income in the same manner as correction distributions of Excess Contributions that are pre-tax Elective Contributions.

M.    <u>Correction of Excess Deferrals</u>.  Not later than the first April 15th after the close of the Employee's taxable year, the Employee must notify the Committee of each Plan under which deferrals were made, how much Excess Deferrals were received by such plan and each plan may distribute to the Employee the amount of Excess Deferrals plus any earnings thereof.  An Employee may receive a corrective distribution of Excess Deferrals during the same taxable year.

1.    <u>Requirements for Corrective Distributions</u>.  A corrective distribution may be made only if all of the following conditions are satisfied:

(a)    The Employee designates the distribution as an Excess Deferral.  An Employee is deemed to have designated the distribution as an Excess Deferral to the extent the Employee has Excess Deferrals for the taxable year, taking into account only Elective Deferrals under this Plan and any other plan maintained by the Employer.

(b)    The corrective distribution is made after the date in which the plan received the Excess Deferral.

(c)    The plan designates the distribution as a distribution of Excess Deferrals.

2.    <u>Roth Election</u>. To the extent elected in Article I, if an Employee's Elective Deferrals include both pre-tax Elective Contributions and designated Roth Contributions, the Committee may permit the Employee to elect whether Excess Deferrals are attributed to pre-tax Elective Contributions or Roth Contributions.  If there is no election made by the Employee, then the Committee shall determine whether Excess Deferrals are attributed to pre-tax Elective Contributions or Roth Contributions. This Paragraph M.2 shall also apply to Excess Contributions and Excess Aggregate

<div align="center">ARTICLE IV</div>

IV-16

CONFIDENTIAL

WH_MDL_00331838

Contributions in regard to the return of such contributions to Highly Compensated Employee's and other distributions to Employees as elected in Paragraph KK of Article I.

N.    <u>Income Allowable to Excess Deferrals</u>.  The distribution of Excess Deferrals shall include the income allocated thereto.  The income allocable to Excess Deferrals for the taxable year is determined by applying the same method as used for correction of Excess Aggregate Contributions described in Paragraph J of Article X.

O.    <u>Coordination of Excess Deferrals with Distribution or Recharacterization of Excess Contributions</u>.  The amount of Excess Deferrals that may be distributable with respect to an Employee for a taxable year shall be reduced by any Excess Contributions previously distributed or recharacterized with respect to such Employee for the Plan Year beginning with or within such taxable year.  In the event of reduction under this Paragraph O, the amount of Excess Contributions included in the gross income of the Employee and reported by the Employer as a distribution of Excess Contributions shall be reduced by the amount of the reduction under this paragraph.  The amount of the reduction under this Paragraph O shall be reported as a distribution of Excess Deferrals. In no case may an Employee receive from the Plan as a corrective distribution for a taxable year an Excess Deferral which exceeds the Employee's total Elective Deferrals under the Plan for the Employee's taxable year.

P.    <u>Distribution of Amounts Attributed to Elective Contributions</u>.  Except for the correction of Excess Contributions, Excess Aggregate Contributions and Excess Deferrals, Elective Contributions, Qualified Nonelective Employer Contributions, Qualified Matching Contributions, Roth Contributions, Safe Harbor Matching Contributions and Safe Harbor Nonelective Employer Contributions and earnings resulting from these contributions may not be distributed earlier than upon one (1) of the following events:

1.    The Employee's retirement, death, disability or separation from service;

2.    The termination of the Plan without establishment or maintenance of another defined contribution plan (other than an employer stock ownership plan, a simple IRA plan or a simple employer plan);

3.    The Employee's attainment of age 59½;

4.    Distributions on account of hardship but for Plan Years beginning after December 31, 1988, only amounts deferred by the Employee as Elective Contributions or Roth Contributions, disregarding any gains or losses, may be distributed; provided, however, that in no event shall the amount of such hardship

ARTICLE IV                                    IV-17

CONFIDENTIAL                                                          WH_MDL_00331839

distribution result in a value less than zero (0) in a Participant's Elective Contribution Account determined as of the immediately preceding Valuation Date;

5.    If provided in Article I, this paragraph shall apply for distributions and severances from employment occurring after the dates specified in Article I.  A Participant's Elective Contributions, Qualified Nonelective Employer Contributions, Qualified Matching Contributions, Roth Contributions, Safe Harbor Matching Contributions and Safe Harbor Nonelective Employer Contributions and earnings attributable to such contributions shall be distributed on account of the Participant's severance from employment.  However, such distributions shall be subject to the other provisions of the Plan regarding distributions, other than provisions that require a separation from service before such amounts may be distributed.

Q.    <u>Hardship Withdrawals</u>.  If allowed under Article I of this Plan, the Participant may apply for a hardship withdrawal of his or her Elective Contributions, Roth Contributions or Nonelective Employer Contributions, if applicable, by filing a written application with the Committee.  In granting a hardship withdrawal, the Committee shall follow nondiscriminatory and objective standards in determining whether a Participant is entitled to a hardship withdrawal..

1.    <u>General Rule</u>.  Any hardship withdrawal may only be made if it is necessary to satisfy an immediate and heavy financial need of the Participant.  A hardship withdrawal shall not exceed the amount necessary to relieve the need nor shall such hardship withdrawal be made to the extent the need may be satisfied from other financial resources reasonably available to the Employee.

2.    <u>Determination of Financial Need</u>.  A withdrawal on account of hardship may be treated as necessary to satisfy a financial need if the Committee reasonably relies upon the Employee's representation that the need cannot be relieved by:

(a)    Reimbursement or compensation by insurance or otherwise;

(b)    Reasonable liquidation of the Employee's assets to the extent such liquidation would not itself cause any immediate and heavy financial need;

(c)    Cessation of Elective Contributions or Employee Contributions under the plans of the Employer; or

(d)    Other currently available distributions (including distribution of ESOP dividends under Section 404(k) of the Code) or nontaxable loans from plans maintained by the Employer, or by any other Employer, or by borrowing from commercial sources on reasonable commercial terms.  An Employee's resources shall

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                        WH_MDL_00331840

be deemed to include those assets of his or her Spouse and minor children that are reasonably available to the Employee.

        3.    <u>Determination of Necessity for Hardship Withdrawal</u>.  A hardship withdrawal will be deemed necessary to satisfy the financial need if it meets the following conditions:

        (a)    The hardship withdrawal is not in excess of the amount of the immediate and heavy financial need of the Employee.  The amount of an immediate and heavy financial need may include amounts necessary to pay any federal, state or local income taxes or penalties reasonably anticipated to result from such hardship withdrawal.

        (b)    The Employee has obtained all distributions (including distribution of ESOP dividends under Section 404(k) of the Code), other than hardship withdrawals of Elective Contributions, and all nontaxable loans currently available under all plans maintained by the Employer.

        (c)    The Employee's Elective Contributions, Roth Contributions, and Employee After-Tax Contributions, other than mandatory Employee contributions made to a defined benefit plan, will be suspended for six (6) months after receipt of the hardship withdrawal under this Plan and all other qualified and non-qualified plans of deferred compensation, including the cash and deferred arrangement that is part of a cafeteria plan and excluding any health or welfare plans, including one that is part of a cafeteria plan, maintained by the Employer.

        R.    <u>Aggregation of Employer's Plans</u>.

        1.    <u>In General</u>.  Elective Contributions that are made under two (2) or more plans of the Employer that are aggregated for purposes of Section 401(a)(4) or Section 410(b) of the Code, other than Section 410(b)(2)(A)(ii) of the Code, are to be treated as made under a single plan and if two (2) or more plans are permissibly aggregated for purposes of Section 401(k) of the Code, the aggregated plans must satisfy Sections 401(a)(4), 401(k) and 410(b) of the Code as though such aggregated plans were a single plan.  Whenever a Highly Compensated Employee is eligible under two (2) or more plans of the Employer which are subject to Section 401(k) of the Code, in calculating the Actual Deferral Percentage limitation, the actual deferral ratio of such Highly Compensated Employee will be determined by treating all such plans in which such Highly Compensated Employee is an Eligible Participant as a single plan.

        For purposes of this Paragraph R, the term plan means a plan within the meaning of Section 1.410(b)-7(a) and (b) of the Treasury Regulations, after application of the mandatory disaggregation rules of Section 1.410(b)-7(c) of the Treasury

<div align="center">ARTICLE IV</div>

<div align="right">IV-19</div>

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

Regulations and the permissive aggregation rules of Section 1.410(b)-7(d) of the Treasury Regulations, as modified by Paragraph R.4 of this Article IV. Thus, if two (2) plans are treated as a single plan pursuant to the permissive aggregation rules of Section 1.410(b)-7(d) of the Treasury Regulation, then such plans are treated as a single plan for purposes of Sections 401(k) and 401(m) of the Code.

    2. <u>Plans with Inconsistent 401(k) Testing Methods</u>.  In applying the permissive aggregation rules of Section 1.410(b)-7(d) of the Treasury Regulations, an Employer may not aggregate plans within the meaning of Section 1.410(b)-7(b) of the Treasury Regulations that apply inconsistent testing methods.  Thus, a plan that applies the current year testing method may not be aggregated with another plan of the Employer that applies the prior year testing method.  Similarly, an Employer may not aggregate a plan using the safe harbor provisions of Section 401(k)(12) of the Code and another plan that is required to be tested under Section 401(k)(3) of the Code.

    3. <u>Disaggregation of Plans and Separate Testing</u>.  If a cash or deferred arrangement is included in a plan within the meaning of Section 1.410(b)-7(b) of the Treasury Regulations that is mandatorily disaggregated under Section 410(b) of the Code (as modified by Paragraph R.4 of this Article IV), the cash or deferred arrangement must be disaggregated in a consistent manner.  Thus, in the case of an Employer that is treated as operating qualified separate lines of business under Section 414(r) of the Code, if the eligible Employees under a cash or deferred arrangement are in more than one qualified separate line of business, only those Employees within each qualified separate line of business may be taken into account in determining whether each disaggregated portion of the plan complies with the requirements of Section 401(k) of the Code, unless the Employer is applying the special rule for employer-wide plans in Section 1.414(r)-1(c)(2)(ii) of the Treasury Regulations with respect to the plan.  Similarly, if a cash or deferred arrangement under which Employees are permitted to participate before they have completed the minimum age and service requirements of Section 410(a)(1) of the Code applies Section 410(b)(4)(B) of the Code for determining whether the plan complies with Section 410(b)(1) of the Code, then the arrangement must be treated as two separate arrangements, one comprising all eligible employees who have met the age and service requirements of Section 410(a)(1) of the Code and one comprising all eligible Employees who have not met the age and service requirements of Section 410(a)(1) of the Code unless the Plan uses the rule that allows for the aggregation of all eligible Employees regardless of age and service.

    Restructuring under Section 1.401(a)(4)-9(c) of the Treasury Regulations may not be used to satisfy the requirements of Section 401(k) of the Code.

    4. <u>Certain Disaggregation Rules Not Applicable</u>.  The mandatory disaggregation rules relating to Section 401(k) plans and Section 401(m) plans set forth in Section 1.410(b)-7(c)(1) of the Treasury Regulations and an employee stock

ARTICLE IV        IV-20

BROAD FINANCIAL  (800) 395-5200

        **WH_MDL_00331842**

ownership plan and non-employee stock ownership plan portions of a plan set forth in Section 1.410(b)-7(c)(2) of the Treasury Regulations shall not apply for purposes of this Paragraph R.  Accordingly, notwithstanding Section 1.410(b)-7(d)(2) of the Treasury Regulations, an employee stock ownership plan and a non-employee stock ownership plan which are different plans (within the meaning of Section 1.410(b)-7(b)) of the Treasury Regulations) are permitted to be aggregated for purposes of Section 401(k) of the Code.

     5.    <u>Permissive Aggregation of Collective Bargaining Units</u>. Notwithstanding the general rule under Section 410(b) of the Code and Section 1.410(b)-7(c) of the Treasury Regulations, a plan that benefits Employees that are covered by a collective bargaining agreement and Employees who are not included in the collective bargaining unit are treated as comprising separate plans.  An Employer can treat two or more separate collective bargaining units as a single collective bargaining unit for purposes of this Paragraph R.5 and this Article IV, provided that the combination of units are determined on a basis that is reasonably consistent from year to year.

     6.    <u>Multiemployer Plan</u>.  Notwithstanding Section 1.410(b)-7(c)(4)(ii)(C) of the Treasury Regulations, the portion of the plan that is maintained pursuant to a collective bargaining agreement (within the meaning of Section 1.413-1(a)(2)) of the Treasury Regulations) is treated as a single plan maintained by a Single Employer that employs all the Employees benefiting under the same benefit computation formula and covered pursuant to that collective bargaining agreement.  The rules of Paragraph R.5 of this Article IV (including the permissive aggregation of collective bargaining units) apply to the resulting deemed single plan in the same manner as if the Plan was a Single Employer Plan.  The noncollectively bargained portion of the plan is treated as maintained by one or more Employers, depending on whether the noncollectively bargaining unit employees who benefit under the plan are employed by one or more Employers.

     7.    <u>Safe-Harbor Contributions</u>.  The rules regarding aggregation and disaggregation of cash or deferred arrangements and plans shall also apply for purposes of Sections 401(k)(12) and 401(m)(11) of the Code.  The anti-discrimination test under Section 401(k)(3) of the Code shall apply to Employees who are eligible to make Elective Contributions but not yet eligible to receive Safe Harbor Matching Contributions or Safe Harbor Nonelective Employer Contributions.

S.    <u>Universal Availability Requirements of Catch-Up Contributions</u>.

     1.    <u>General Rule</u>.  If the Employer maintains a plan that offers catch-up contributions and that is otherwise subject to Section 401(a)(4) of the Code (including a plan that is subject to Section 401(a)(4) of the Code pursuant to Section 403(b)(12) of

<div align="center">ARTICLE IV            IV-21</div>

CONFIDENTIAL            **WH_MDL_00331843**

the Code), such plan will not satisfy the requirements of Section 401(a)(4) of the Code unless all catch-up eligible Participants who participate under any plan maintained by the Employer are provided with an effective opportunity to make the same dollar amount of catch-up contributions. A plan fails to provide an effective opportunity to make catch-up contributions if it has an applicable limit (e.g., an Employer-provided limit) that applies to a catch-up eligible Participant and does not permit the Participant to make Elective Deferrals in excess of that limit. An applicable Employer plan does not fail to satisfy the universal availability requirement of this Paragraph S solely because an Employer-provided limit does not apply to all Employees or different limits apply to different groups of Employees as permitted by Section 1.414(v)-1(b)(2)(i) of the Treasury Regulations. However, a plan may not provide lower Employer-provided limits for catch-up eligible Participants.

2.    _Payroll Period Exception_.  An applicable Employer plan does not fail to satisfy the universal availability requirement of this Paragraph S merely because the plan allows Participants to defer an amount equal to a specified percentage of Compensation for each payroll period and for each payroll period permits each catch up eligible Participant to defer a pro-rata share of the applicable catch-up limit in addition to that amount.

3.    _Cash Availability Exception_.  An Employer plan does not fail to satisfy the universal availability requirement of this Paragraph S merely because it restricts the Elective Deferrals of any Employee (including a catch-up eligible Participant) to amounts available after other withholding from the Employee's pay (e.g., after deduction of all applicable income and employment taxes). For this purpose, an Employer-provided limit of 75% of Compensation or higher will be treated as limiting Employees to amounts available after other withholdings.

4.    _Class Exclusion Exception_.  An applicable employer does not fail to satisfy the universal availability requirement of this Paragraph S merely because Employees described in Section 410(b)(3) of the Code are not provided the opportunity to make catch-up contributions.

5.    _Exception for Certain Types of Plans_.  An applicable Employer plan does not fail to satisfy the universal availability requirement merely because another applicable Employer plan that is a Section 457 eligible governmental plan does not provide for catch-up contributions to the extent set forth in Sections 414(v)(6)(C) and 457(b)(3).

6.    _Acquisition and Disposition Exception_.  If an applicable Employer plan satisfies the universal availability requirement of this Paragraph S before an acquisition or disposition described in Section 1.410(b)-2(f) of the Treasury Regulations and would fail to satisfy the universal availability requirement of this Paragraph because

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

of such acquisition or disposition, then the applicable Employer plan shall continue to be treated as satisfying the universal availability requirement through the end of the transition period described under Section 410(b)(6)(C)(ii) of the Code.

T.  Multiple Plan Limits on Catch-Up Contributions.

1.  General Rule.  For purposes of Paragraph H of this Article IV, all applicable Employer plans, other than Section 457 eligible governmental plans, maintained by the same Employer are treated as one plan and all Section 457 eligible governmental plans maintained by the same Employer are treated as one plan.  Thus, the total amount of catch-up contributions under all applicable Employer plans of an Employer (other than Section 457 eligible governmental plans) is limited to the applicable dollar catch-up limit for the relevant taxable year and the total amount of catch-up contributions for all Section 457 eligible governmental plans of an Employer is limited to the applicable dollar catch-up limit for the relevant taxable year.

2.  Coordination of Employer-Provided Limits within Plans.  An applicable Employer plan is permitted to allow a catch-up eligible Participant to defer in excess of an Employer-provided limit under that plan without regard to whether Elective Deferrals made by the Participant have been treated as catch-up contributions for the taxable year under another applicable Employer plan aggregated with such plan under this Paragraph T.  However, to the extent Elective Deferrals under another plan maintained by the Employer have already been treated as catch-up contributions during the taxable year, the Elective Deferrals under the plan may be treated as catch-up contributions only up to the amount remaining under the catch-up limit for the taxable year.  Any other Elective Deferrals that exceed the Employer-provided limit must satisfy the benefits, rights and features current and effective availability requirements of Section 1.401(a)(4)-4 of the Treasury Regulations to the extent that the contributions are not catch-up contributions.  Elective Deferrals in excess of the Employer-provided limit are taken into account under the Actual Deferral Percentage limitation to the extent they are not catch-up contributions.

3.  Allocation Rules.  If a catch-up eligible Participant makes additional Elective Deferrals in excess of an applicable limit described in Paragraph H of this Article IV under more than one applicable Employer plan that is aggregated under the rules of this Paragraph T, then the applicable Employer plan under which Elective Deferrals in excess of an applicable limit are treated as catch-up contributions is permitted to be determined in any manner that is not inconsistent with the manner in which such amounts were actually deferred under the applicable plan.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                    WH_MDL_00331845

## V.    ALLOCATIONS TO PARTICIPANTS' ACCOUNTS

A.    <u>Maintenance of Accounts</u>.    The Committee shall, where applicable, establish and maintain a Elective Contribution Account, Employee After-Tax Contribution Account, Matching Contribution Account, Nonelective Employer Contribution Account, Qualified Matching Contribution Account, Qualified Nonelective Employer Contribution Account, Rollover Contribution Account, Roth Contribution Account, Safe Harbor Matching Contribution Account, Safe Harbor Nonelective Employer Contribution Account, Simple 401(k) Account and/or Transferred Benefits Account in the name of each Participant.

B.    <u>Valuation of Trust</u>.

1.    <u>Date for Valuation</u>.    As soon as administratively feasible after any Valuation Date, the Trustee shall value the Trust assets and liabilities on the basis of fair market values as of such Valuation Date.

2.    <u>Instructions for Valuation</u>.    If the Trustee, in making such valuations, shall determine that the Trust consists, in whole or in part, of property not traded freely on a recognized market, or that information necessary to ascertain the fair market value of any Trust assets or liabilities is not readily available to the Trustee, the Trustee may request the Committee to instruct the Trustee as to such fair market value for all purposes under the Plan; and in such event the fair market value determined by the Committee shall be binding and conclusive.    If the Committee fails or refuses to instruct the Trustee as to such fair market value within a reasonable time after receipt of the Trustee's request, the Trustee shall take such action as it deems necessary or advisable to ascertain such fair market value, including the retention of such counsel and independent appraisers as it considers necessary; and in such event the fair market value determined by the Trustee shall be binding and conclusive.    The expenses incurred in retaining such counsel and/or independent appraisers shall be paid by the Trust.

C.    <u>Allocation of Trust Earnings</u>.

1.    <u>General</u>.    As of each Valuation Date and prior to the allocation of Employer contributions, Employee After-Tax Contributions and, if applicable, forfeitures for the Plan Year, the Committee shall allocate the increment of Trust net income to or charge Trust net losses against, as the case may be, the respective Accounts of the Participants in proportion to the balances (minus any distributions made to the Participant and any forfeitures declared in such Account after the immediately preceding Valuation Date) of such Accounts as of the immediately preceding Valuation Date.

2.    <u>Segregated and Directed Accounts</u>.    Notwithstanding the foregoing, segregated Accounts of a Participant held in accordance with the provisions of

ARTICLE V                                               V-1

CONFIDENTIAL                                               WH_MDL_00331846

Paragraph B.4(a) of Article VII and Paragraph B of Article XII, if provided for in Article I, shall be valued separately on each Valuation Date, and the increment of Trust net income shall be allocated to or Trust net loss shall be charged against, as the case may be, such Accounts on a segregated basis.

   3. <u>Elective Contribution Accounts</u>. Unless otherwise elected in Paragraph MM, Elective Contributions, Roth Contributions and After-Tax Contributions made by a Participant and deposited throughout a Plan Year to his or her Elective Contribution Account, Roth Contribution Account and Employee After-Tax Contribution Account shall have allocated to them a proportionate share of Trust net income or net losses attributable to all such Accounts on any reasonable basis established by the Committee at its sole discretion.  The frequency or method with which Trust net income and net losses are allocated to these Accounts may be established and changed at the discretion of the Committee, but only in a uniform and nondiscriminatory manner.

  D. <u>Allocation to Contribution Accounts</u>.

   1. <u>General</u>.  Amounts contributed by the Employer for any Plan Year (and, if applicable, any previously unallocated forfeitures) shall be allocated to the appropriate Accounts in accordance with the manner provided in Article I as of each Anniversary Date.

   2. <u>Permitted Disparity Limits</u>.  For any Plan Year this Plan benefits any Participant who benefits under another qualified plan or simplified employee pension, as defined in Section 408 (k) of the Code, maintained by the Employer that provides for permitted disparity (or imputes disparity), the Employer will contribute for each Participant who is eligible for an allocation of Nonelective Employer Contributions pursuant to Paragraph P of Article I an amount equal to the excess contribution percentage multiplied by the Participant's Section 415 Compensation.  Such amounts shall be allocated to the Nonelective Employer Contributions Accounts of each eligible Participant in the proportion that each such Participant's 415 Compensation bears to the 415 Compensation of all eligible Participants.

   If this Plan provides for permitted disparity, then for Plan Years beginning on or after January 1, 1995, the number of years credited to the Participant for allocation or accrual purposes under this Plan, any other qualified or simplified employee pension plan (whether or not terminated) ever maintained by the Employer shall be limited to a total cumulation of permitted disparity of 35 years.  For purposes of determining the participant's cumulative permitted disparity limit, all years ending in the same calendar year are treated as the same year.  If the Participant has not benefited under a defined benefit or target benefit plan for any year beginning on or after January 1, 1994, the Participant has no cumulative disparity limit.

<div align="center">ARTICLE V</div>

<div align="right">V-2</div>

CONFIDENTIAL

3.   <u>Allocations That Rely On Cross-Testing</u>.   If the allocation under Article I relies on the cross-testing rules of Section 1.401(a)(4)-8 of the Treasury Regulations, then for purposes of the last paragraph of Paragraph M.2 of Article I, the Plan has broadly available allocation rates for the Plan Year if each allocation rate under the Plan is currently available during the Plan Year to a group of Employees that satisfies Section 410(b) of the Code (without regard to the average benefit percentage test).   For this purpose, if two allocation rates can be permissibly aggregated under Section 1.401(a)(4)-4(d)(4) of the Treasury Regulations, assuming the allocation rates were treated as benefits, rights or features, they may be aggregated and treated as a single allocation rate.   In addition, the disregard of age and service conditions rules of in Section 1.401(a)(4)-4(b)(2)(ii)(A) of the Treasury Regulations do not apply for purposes of this paragraph.

The Plan has a gradual age or service schedule for the Plan Year if the allocation formula for all Employees under the plan provides for a single schedule of allocation rates under which (i) The schedule defines a series of bands based solely on age, Years of Service, or the number of points representing the sum of age and Years of Service (age and service points), under which the same allocation rate applies to all Employees whose age, Years of Service, or age and service points are within each band; and (ii) The allocation rates under the schedule increase smoothly at regular intervals.   A schedule of allocation rates increases smoothly if the allocation rate for each band within the schedule is greater than the allocation rate for the immediately preceding band but, by no more than five (5) percentage points.   However, a schedule of allocation rates will not be treated as increasing smoothly if the ratio of the allocation rate for any band to the rate for the immediately preceding band is more than 2.0 or if it exceeds the ratio of allocation rates between the two immediately preceding bands.

A schedule of allocation rates has regular intervals of age, Years of Service or age and service points, if each band, other than the band associated with the highest age, Years of Service, or age and service points, is the same length.   For this purpose, if the schedule is based on age, the first band is deemed to be of the same length as the other bands if it ends at or before age 25.   If the first age band ends after age 25, then, in determining whether the length of the first band is the same as the length of other bands, the starting age for the first age band is permitted to be treated as age 25 or any age earlier than 25.   For a schedule of allocation rates based on age and service points, the rules of the preceding two sentences are applied by substitution 25 age and service points for age 25.   For a schedule of allocation rates based on service, the starting service for the first service band is permitted to be treated as one (1) Year of Service or any lesser amount of service.

Minimum allocation rates are permitted.   A schedule of allocation rates under a plan does not fail to increase smoothly at regular intervals merely because a minimum uniform allocation rate is provided for all Employees or the minimum benefit

ARTICLE V                              V-3

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                            WH_MDL_00331848

described in Section 416(c)(2) of the Code is provided for all Non-Key Employees (either because the Plan is a Top-heavy Plan or without regard to whether the Plan is a Top-heavy Plan) if the schedule satisfies one of the following conditions: (i) the allocation rates under a plan are greater than the minimum allocation rate can be included in a hypothetical schedule of allocation rates that increases smoothly at regular intervals, within the meaning of this Paragraph D.3, where the hypothetical schedule has a lowest allocation rate no lower than one percent (1%) of Compensation; or (ii) for a plan using a schedule of allocation rates based on age, for each age band in the schedule that provides an allocation rate greater than the minimum allocation rate, there could be an Employee in that age band with an equivalent accrual rate that is less than or equal to the equivalent accrual rate that would apply to an Employee whose age is the highest age for which the allocation rate equals the minimum allocation rate.

4.    <u>Suspension of Benefits if Participant Changes Employee Status</u>.  If a Participant continues in the employ of the Employer, but changes his or her employment status to a class of employees that is ineligible for participation, such termination of participation shall not constitute a termination of employment for purposes of this Plan.  An otherwise eligible Participant shall accrue benefits in the Plan for the Plan Year in which he or she changes his or her employment status based on his or her Compensation received before the change in status.  However, such Inactive Participant shall not accrue further benefits under the Plan until the date he or she again becomes a participant; provided, however, that Compensation received prior to his or her again becoming a Participant shall be disregarded.

5.    <u>Amendments to The Plan – Preservation of Accrued Benefit</u>. Notwithstanding anything to the contrary contained in this Plan, no amendment to the Plan shall be effective to the extent that it has the effect of (i) decreasing a Participant's Accrued Benefit derived from Employer contributions; or (ii) except as provided by Treasury Regulations, eliminating an optional form of benefit, with respect to benefits attributable to Years of Service before the amendment; provided, however, that a Participant's Accrued Benefit may be reduced to the extent required as a condition of meeting the standards for qualification of the Plan.  Furthermore, no amendment to the Plan shall have the effect of decreasing a Participant's vested interest in his or her Accrued Benefit determined without regard to such amendment as of the later of the date such amendment was adopted, or becomes effective.

E.    <u>Limitation on Allocation of Employer Contributions and Forfeitures</u>.

1.    <u>Dollar Amount and Percentage Limitations</u>.  Except to the extent permitted under Paragraph H.1 of Article I relating to catch-up contributions and Section 414(v) of the Code, the Annual Addition allocated to a Participant's Accounts shall not exceed the lesser of:

ARTICLE V                                V-4

CONFIDENTIAL

(a)    The Defined Contribution Dollar Limitation; or

(b)    100% of the Participant's Section 415 Compensation for the Limitation Year; provided, however, that this compensation limitation shall not apply to:

(i)    Any contribution for medical benefits (within the meaning of Section 401(h) or 419A(f)(2) of the Code) after separation from service which is otherwise treated as an Annual Addition; or

(ii)    Any amount otherwise treated as an Annual Addition under Section 415(l)(1) of the Code.

(c)    For purposes of applying the limitation described in this Paragraph E, Section 415 Compensation shall include elective amounts not includible in the gross earnings of the Employee by reason of Section 132(f)(4) of the Code.

2.    <u>Multiple Defined Contribution Plans and Welfare Benefit Fund Limitation</u>.  If, in a Plan Year, a Participant also participates in a defined contribution plan or a welfare benefit fund maintained by the Employer or by another member of the Controlled Group, the limitations set forth in this Article V with respect to such Participant shall apply as if the Annual Additions accrued to such Participant under all defined contribution plans and welfare benefit funds in which the Participant has participated were derived from one Plan.

F.    <u>Allocation Priorities if Limitations Exceeded</u>.  If the Annual Addition for a Participant is exceeded due to the allocation of forfeitures, a reasonable error in estimating a Participant's Compensation, or a reasonable error in determining the amount of Elective Deferrals with respect to any Plan Year, then compliance with such limitation shall be accomplished as follows: First, the amount of the Participant's Employee After-Tax Contributions for that Plan Year which were included in the Annual Addition shall be refunded to him or her; second, unless the Participant elects a refund of pre-tax Elective Deferrals, any Roth Contributions shall be refunded to the Participant to the extent the distribution would reduce the excess amount in the Participant's Account; third, any pre-tax Elective Deferrals shall be refunded to the Participant to the extent the distribution would reduce the excess amount in the Participant's Account;  fourth, the excess of Employer contributions which cannot be allocated to any Participant for such Plan Year shall either be (i) allocated to the remaining Participants' Accounts with any remaining unallocable Annual Additions held in a suspense account to reduce Employer contributions for the subsequent Limitation Year; or (ii) held in suspense accounts and applied to reduce future Employer contributions during the next Limitation Year, as elected in Article I.

ARTICLE V                                V-5

CONFIDENTIAL

G.    <u>Key Man Insurance Proceeds</u>.    Any proceeds of key man insurance received by the Trust during any Plan Year shall be allocated to the Employer Contribution Accounts of the Participants who are otherwise eligible to receive an allocation of Employer contributions on the Anniversary Date of the Plan Year in which the insured died.    Such proceeds shall be allocated to each Participant in the ratio that each Participant's Accrued Benefits as of the first day of the Plan Year in which the proceeds are received bears to the value of all such Participants' Accrued Benefits.    The allocation of such amounts shall be treated as an investment gain of the Trust.

ARTICLE V                                    V-6

CONFIDENTIAL                                                  WH_MDL_00331851

## VI.    VESTING AND BENEFIT ENTITLEMENT

A.    <u>Vesting</u>.  The Accrued Benefit credited to any Participant shall vest in him or her as follows:

1.    <u>Full Vesting</u>.  As specified in Article I, a Participant's Accrued Benefit shall be fully vested at his or her Normal Retirement Age.  A Participant will become fully vested no later than the later of the Participant's 65th birthday or the fifth anniversary commencing the participation under the Plan.  Such Accrued Benefit shall also be fully vested upon a complete discontinuance of Employer Contributions or complete or partial termination of the Plan to the extent provided in Paragraph B of Article XIV.

2.    <u>Section 401(k) Contributions</u>.  A Participant shall be fully vested in his or her Elective Contribution, Qualifying Matching Contribution, Qualifying Nonelective Contribution and Roth Contribution Accounts at all times.

3.    <u>Safe Harbor Contributions</u>.  A Participant shall be fully vested in his or her Safe Harbor Matching Contribution and Safe Harbor Nonelective Employer Contribution Accounts at all times.

4.    <u>Simple 401(k) Contributions</u>.  A Participant shall be fully vested in his or her Simple 401(k) Account at all times.

5.    <u>Partial Vesting</u>.    The Nonelective Employer Contributions and Matching Contributions of a Participant whose employment terminates, or who suffers a Break-in-Service prior to his or her Normal Retirement Age for reasons other than death or Total Disability, shall vest in him or her in accordance with the vesting provisions contained in Article I.

6.    <u>Vesting with the Controlled Group</u>.  If the Employer is a member of a Controlled Group, then vesting credit shall be granted to an Employee for each Year of Service completed with the Employer and each other member of the Controlled Group.

B.    <u>Forfeitures</u>.  Non-vested Accrued Benefits shall be forfeited in accordance with the following provisions:

1.    <u>Cash-Out of $5,000 or Less</u>.   Subject to Paragraph B.3 of this Article VI, a Participant who terminates employment with the Employer in any Plan Year with a vested Accrued Benefit equal to or less than $5,000, will be paid a distribution of the value of his or her entire vested Accrued Benefit as soon as administratively feasible after the event elected in Article I and forfeited unless a later date for the forfeiture of

ARTICLE VI                                      VI-1

CONFIDENTIAL                                                    WH_MDL_00331852

non-vested Accrued Benefits is elected in Article I. For purposes of this Paragraph B.1, if the value of a Participant's vested Accrued Benefit is zero (0), the Participant shall be deemed to have received a distribution of such zero (0) vested Accrued Benefit immediately upon employment termination or, if later, at the time the forfeiture occurs as elected in Article I.

       2.   <u>Cash-Out of More Than $5,000</u>. Subject to Paragraph B.3 of this Article VI, a Participant who terminates employment with the Employer with a vested Accrued Benefit greater than $5,000, may elect to receive the entire value of his or her vested Accrued Benefit as soon as administratively feasible after the event elected in Article I, and the non-vested Accrued Benefit will be immediately forfeited unless a later date for the forfeiture of non-vested Accrued Benefits is elected in Article I.

       3.   <u>$3,500 Cash-Out</u>. If and to the extent elected in Article I, the involuntary cash-out limit of $5,000 described above shall be $3,500.

       4.   <u>Partial Cash-Outs of Vested Benefits</u>. If the Participant receives a distribution of less than his or her entire vested Accrued Benefit during a Plan Year, the portion of the non-vested Accrued Benefit that will be immediately forfeited (unless Article I does not provide for a forfeiture of a partial cash-out distribution or a later date for the forfeiture of non-vested Accrued Benefits is elected in Article I) is the total non-vested Accrued Benefit multiplied by a fraction, the numerator of which is the amount of the vested Accrued Benefit that was distributed and the denominator of which is the total vested Accrued Benefit.

       5.   <u>Value of Rollover Contributions</u>. If provided in Article I, for purposes of this Paragraph B and Paragraph B.5 of Article VII, the value of a Participant's vested Accrued Benefit shall be determined without regard to that portion of the vested Accrued Benefit that is attributed to Rollover Contributions (and earnings allocable thereto).

       6.   <u>Rehire After Cash-Out</u>. If a Participant receives a distribution pursuant to this Paragraphs B, resumes employment covered under this Plan and, if required by Article I, repays to the Plan the full amount distributed to the Participant before the earlier of five (5) years after the first date on which the Participant is subsequently re-employed by the Employer, or the date on which the Participant incurs five (5) consecutive one-year Breaks-in-Service following the date of the previous distribution, then the amount that was forfeited shall be restored. If a terminated Participant who had no vested Accrued Benefit and was deemed to have received a distribution later resumes covered employment before the date the Participant incurs five (5) consecutive one-year Breaks-in-Service, the amount that was previously forfeited by such Participant will be restored to his or her account.

<div align="center">ARTICLE VI</div>

<div align="right">VI-2</div>

CONFIDENTIAL

7.    <u>Delayed Forfeiture</u>.  If the Employer elects in Article I to delay forfeiture of non-vested Accrued Benefits until after the Plan Year of distribution, the separate account rule in Paragraph C of this Article VI shall apply until the forfeiture actually occurs.  If the forfeiture occurs prior to five (5) consecutive one-year Breaks-in-Service, then the above rules of this Paragraph B will apply after Paragraph C of this Article VI no longer applies.

8.    <u>Separate Account on In-Service Distribution</u>.  If this Plan allows for a distribution on account of hardship or other in-service distributions at any time when a Participant has a non-forfeitable right to less than 100% of the Accrued Benefit, and the Participant may increase the non-forfeitable percentage in his or her Account, a separate account as provided in Paragraph C of this Article VI will be established for the non-vested portion of the Accrued Benefit of the Participant who receives an in-service distribution.

9.    <u>Accumulated Deductible Contributions</u>.  For Plan Years beginning after December 31, 1988, a Participant's vested Accrued Benefit shall include accumulated deductible employee contributions within the meaning of Section 72(o)(5)(B) of the Code for purposes of the cash-out provisions of this Article VI.

C.    <u>Re-Vesting in Forfeitures Upon Re-Employment</u>.  If a Participant receives a distribution of his or her vested Accrued Benefit at a time when such Participant's vested interest is less than 100% and if, at the time of payment to the Participant, the Participant's non-vested benefit has not been forfeited, a separate account shall be established for the non-vested portion of the Participant's interest in the Plan as of the time of the distribution, and if he or she returns to the employ of the Employer prior to the time he or she suffers five (5) consecutive one-year Breaks-in-Service or an earlier forfeitable event as elected in Article I, then at any "Relevant Time" the Participant's vested  portion of the separate account shall be an amount ("X") determined by the formula $X = P(AB + D) - D$ or if elected in Article I determined by the formula $X=P(AB+(RxD))-(RxD)$.  For purposes of applying either formula, P is the vested percentage at the Relevant Time; AB is the account balance at the Relevant Time; D is the amount of the distribution; and R is the ratio of the account balance at the Relevant Time to the account balance after distribution. If a Participant returns to the employ of the Employer prior to incurring five (5) consecutive one-year Breaks-in-Service, or an earlier forfeitable event, he or she shall continue on the vesting schedule set forth in Paragraph A.5 of this Article VI as if he or she had not left, and he or she shall be a Participant as of his or her date of rehire.

D.    <u>Limitation on Vesting Upon Re-Employment</u>.  If a terminated Participant is re-employed by the Employer, then, except as provided for in this Article VI, all of the Participant's Years of Service before his or her re-employment shall be considered as Years of Service after his or her re-employment for the purpose of determining the

ARTICLE VI                                                VI-3

CONFIDENTIAL                                                                    WH_MDL_00331854

Participant's Accrued Benefit under the Plan derived from Employer contributions allocated to the Participant subsequent to his or her date of re-employment.

E.    <u>Vesting Upon Change of Employment Status</u>.  If a Participant becomes an Inactive Participant, his or her Accrued Benefit shall continue to vest as long as he or she is an Employee of the Employer or its Controlled Group and has not incurred a Break-in-Service.

F.    <u>Vested Interest Not Distributed</u>.  If a terminated Participant has not received a distribution or a deemed distribution of his or her vested Accrued Benefit, then his or her Accrued Benefit shall be credited with its share of Trust net earnings, gains, or losses and changes in the fair market value of the Trust assets through the Valuation Date next preceding actual distribution and forfeitures, if any.

G.    <u>Break-in-Service While Still Employed</u>.  If a Participant incurs a Break-in-Service but does not terminate employment with the Employer, his or her Accrued Benefit shall remain in the Trust and shall be credited with its share of Trust net earnings, gains, or losses and changes in the fair market value through the Valuation Date next preceding distribution and forfeitures, if any.

H.    <u>Effect of Break-in-Service – Vested Participant</u>.  If a Participant has five (5) consecutive one-year Breaks-in-Service, he or she shall not have credited to him or her Years of Service accrued subsequent to such Break-in-Service for purposes of determining his or her vested interest in his or her Accrued Benefit derived from Employer contributions credited prior to such Break-in-Service.

I.    <u>Reserved</u>.

J.    <u>Effect of Break-in-Service – Non-Vested Participant.</u>  If a Participant does not have a vested interest in any portion of his or her Accrued Benefit at the time a Break-in-Service occurs, Years of Service prior to the Break-in-Service shall not be taken into account in determining the Participant's vested interest in his or her Accrued Benefit if the number of consecutive one-year Breaks-in-Service equals or exceeds the greater of five (5) or the aggregate number of Years of Service prior to the Break-in-Service.

If a former Participant has five (5) or more consecutive one-year Breaks-in-Service, his or her Years of Service prior to such Breaks-in-Service shall be taken into account in determining the former Participant's vested interest in his or her Accrued benefit only if either:

1.    Such former Participant had a vested interest in his or her Accrued Benefit at the time of his or her termination of employment; or

ARTICLE VI                                VI-4

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                                    WH_MDL_00331855

2.      Upon his or her re-employment, the number of consecutive one-year Breaks-in-Service is less than the number of Years of Service completed prior to the Break-in-Service.

Separate Accounts shall be maintained for the Participant's pre-Break and post-Break Accrued Benefit and both Accounts shall share in the allocation of Trust earnings and losses as provided in Article V of the Plan.

With respect to any former Participant whose prior service is not disregarded under the break-in-service rules in effect prior to the first Plan Year beginning after December 31, 1984, whether the Plan may subsequently disregard the years of service is governed by the provisions of this Paragraph J.

K.      Limitation on Right to Amend Vesting Schedule.    Any amendment changing the vesting schedule shall:

1.      Not cause any Participant's vested interest in such Participant's Accrued Benefit to be less than such Participant's vested interest on the day before such amendment becomes effective; and

2.      Permit any Participant having at least three (3) Years of Service at the end of the election period the option to elect, irrevocably, within a reasonable period after the adoption of such amendment, to have such Participant's vested interest determined without regard to said amendment (that is, in accordance with the vesting schedule in effect prior to such amendment).  The election period shall begin on the date the amendment is adopted and end not earlier than 60 days after the latest of (i) the adoption date; (ii) the effective date; or (iii) the date written notice of the right of election is given to the Participant.

If a Participant does not elect a vesting schedule, then he or she will vest in accordance with the most favorable vesting schedule.

ARTICLE VI

VI-5

CONFIDENTIAL

## VII.    DISTRIBUTION OF BENEFITS

A.    Definitions.

1.    "Annuity Starting Date" means the first day of the first period for which an amount is payable as an annuity to a Participant, or in the case of a benefit not payable in the form of an annuity, the first day on which all events have occurred which entitle the Participant to a benefit.  For purposes of the preceding sentence, the first day of the first period for which a benefit is to be received on account of separation from service by reason of disability shall be treated as the Annuity Starting Date only if such disability benefit is not an auxiliary benefit.

2.    "Election Period" means, with respect to a Qualified Joint and Survivor Annuity, the 90-day period ending on the Annuity Starting Date.  With respect to a Qualified Preretirement Survivor Annuity, Election Period means the period beginning on the first day of the Plan Year in which Participant attains age 35 and ending on the date of the Participant's death.  If a Participant separates from service prior to age 35, the Election Period shall begin on the date of separation from service with respect to benefits accrued as of that date.

A Participant who has not attained age 35 as of the end of any Plan Year may make a special Waiver Election to waive the Qualified Preretirement Survivor Annuity for the period beginning on the date of such election and ending on the first day of the Plan Year in which the Participant will attain age 35.  Such election will not be valid unless the Participant receives a written explanation of the Qualified Preretirement Survivor Annuity.  The Qualified Preretirement Survivor Annuity coverage will be automatically reinstated as of the first day of the Plan Year in which the Participant attains age 35.  Any new Waiver Election on or after such date shall be subject to the full requirements of this Article VII.

3.    "Qualified Joint and Survivor Annuity" means, with respect to a married Participant, an immediate annuity for the life of the Participant with a survivor annuity for the life of his or her Spouse which is 50%, or a greater percentage as elected in Article I, of the amount of the annuity paid for the joint lives of the Participant and his or her Spouse and which is the actuarial equivalent of a single annuity for the life of the Participant.  With respect to an unmarried Participant, a Qualified Joint and Survivor Annuity means an annuity for the life of the Participant.

4.    "Qualified Preretirement Survivor Annuity" means an immediate annuity for the life of the Participant's Spouse, the payment under which is equal to 50%, or a greater percentage as elected in Article I, of the sum of the Participant's Accrued Benefit and any insurance proceeds payable upon death of the Participant; any security interest held by the Plan by reason of an outstanding loan to the Participant

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                        WH_MDL_00331857

shall be taken into account in determining the amount of the Qualified Preretirement Survivor Annuity.

5.      "Spouse" or "Surviving Spouse" means a person who has been married to the Participant throughout the one-year period (unless otherwise elected in Article I) ending on the earlier of the date of the Participant's death or such Participant's Annuity Starting Date; provided, however, that a former Spouse shall be treated as the Spouse or Surviving Spouse to the extent required under a Qualified Domestic Relations Order.  The one-year marriage requirement does not apply to the payment of a Qualified Joint and Survivor Annuity.

6.      "Transferred Benefits" mean the benefits of a Participant derived from another qualified plan that are involuntarily transferred to this Plan subject to the requirements of Section 414(l) of the Code and, where applicable, the annuity and survivor annuity requirements of Sections 401(a)(11) and 417 of the Code.  A Participant shall vest in his or her Transferred Benefits Account in accordance with Article I, but subject to the vesting requirements of Section 411(a)(10) of the Code.  A rollover and voluntary transfer described in Q&A 3 of Section 1.411(d)-4 of the Treasury Regulations will not be deemed a transfer of benefits.

7.      "Waiver Election" means a written election by a Participant during the Election Period to receive the payment of the Participant's vested Accrued Benefit in a manner other than a Qualified Joint and Survivor Annuity or a Qualified Preretirement Survivor Annuity.  A Waiver Election must be consented to by the Participant's Spouse. The Spouse's consent must acknowledge the effect of the waiver and must be witnessed by either the Plan representative or a notary public as required at the sole discretion of the Committee.  The Spouse's consent will be deemed made if the Participant establishes to the satisfaction of the Committee that (i) there is no Spouse; or (ii) the Spouse cannot be located.  If the Spouse is legally incompetent to give consent, the Spouse's legal guardian, even if the guardian is the Participant, may give consent.  Also, if the Participant is legally separated or the Participant has been abandoned (within the meaning of local law) and the Participant has a court order to such effect, spousal consent is not required unless a Qualified Domestic Relations Order provides otherwise.  Similar rules apply to a plan subject to the requirements of Section 401(a)(11)(B)(iii)(l) of the Code.   Any consent made or deemed made hereunder shall be valid only with respect to the Spouse who signs, or is deemed to have signed, the consent.  The Waiver Election of a Qualified Preretirement Survivor Annuity shall identify the Beneficiary or class of Beneficiaries or any contingent Beneficiaries.  The Waiver Election of a Qualified Joint and Survivor Annuity shall identify the Beneficiary or class of Beneficiaries or contingent Beneficiary, if applicable, and the method of payment.  Any change in the Waiver Election shall require a new spousal consent, unless the original consent of the Spouse expressly permits designations by the Participant without any requirement of further consent by the

<div align="center">ARTICLE VII</div>                                  VII-2

CONFIDENTIAL                                                    WH_MDL_00331858

Spouse and acknowledges that the more restrictive consent could have been given. A revocation of a prior waiver may be made by a Participant without the consent of the Spouse at any time before the Annuity Starting Date. The Participant may revoke a Waiver Election at any time, but any new Waiver Election must comply with the requirements of this Paragraph A.7. A former Spouse's consent to a Waiver Election shall not be binding on a new Spouse.

B.    <u>Distribution With Annuity Option – Other Than Death</u>. If this Plan provides for an annuity option as selected in Article I, the Committee shall direct the Trustee to distribute to a Participant the amount of his or her vested Accrued Benefit as a result of the Participant's termination of employment, including (i) termination of employment for any reason other than death; (ii) Total Disability before Normal Retirement Age; or (iii) retirement on or after Normal Retirement Age in accordance with this Paragraph B. Such Accrued Benefit shall be determined as of the Valuation Date preceding the date of the Participant's distribution.

1.    <u>Payment of Qualified Joint and Survivor Annuity</u>. A Participant shall automatically receive his or her vested Accrued Benefit in the form of a Qualified Joint and Survivor Annuity unless the Participant makes a Waiver Election during the applicable Election Period.

2.    <u>Notice Requirements</u>. The Committee shall provide to each Participant within a period of time of no less than 30 days and no more than 90 days prior to the Annuity Starting Date, a written explanation of (i) the terms and conditions of a Qualified Joint and Survivor Annuity; (ii) the Participant's right to make, and the effect of, a Waiver Election waiving the Qualified Joint and Survivor form of benefit; (iii) the rights of a Spouse to consent to any Waiver Election which waives his or her rights to such form of Annuity; and (iv) the right to make, and the effect of, a revocation of a previously made Waiver Election.

The Participant shall be furnished with a general description of all the eligibility conditions and other material features of the optional forms of benefits and information explaining the relative values of the various optional forms of benefits that are available under the terms of the Plan in a like manner and within the time period as stated in the preceding paragraph. The requirement to provide relative values of the optional forms of benefits shall only apply to plans that offer a life annuity form of payment. Written consent of the Participant to a distribution must be made after the Participant receives such notice and must not be made more than 90 days before the Annuity Starting Date.

(a)    If a distribution is one to which Sections 401(a)(11) and 417 of the Code do not apply, such distribution may commence less than 30 days after the

<div align="center">ARTICLE VII</div>

VII-3

CONFIDENTIAL    WH_MDL_00331859

notice required under Section 1.411(a)-11(c) of the Income Tax Regulations is given, provided that:

(i)    The Committee clearly informs the Participant that the Participant has a right to a period of at least 30 days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option); and

(ii)    The Participant, after receiving the notice, affirmatively elects a distribution.

(b)    If a distribution is one to which Sections 401(a)(11) and 417 of the Code apply, such distribution may commence less than 30 days after the notice is given provided that:

(i)    The Committee provides information to the Participant clearly indicating that the Participant has a right to at least 30 days to consider whether to waive the Qualified Joint and Survivor Annuity and consent to a form of distribution other than a Qualified Joint and Survivor Annuity;

(ii)    The Participant is permitted to revoke an affirmative distribution election at least until the Annuity Starting Date, or if later, at any time prior to the expiration of the seven (7) day period that begins the day after the explanation of the Qualified Joint and Survivor Annuity is provided to the Participant;

(iii)    The Annuity Starting Date is after the date that the explanation of the Qualified Joint and Survivor Annuity is provided to the Participant. However, for distributions made after December 31, 1996, the Annuity Starting Date may be before the date that the written explanation is given to the Participant, provided that the distribution does not commence until at least 30 days after such written explanation is provided to such Participant; and

(iv)    Distribution in accordance with the affirmative election does not commence before the expiration of the seven (7) day period that begins the day after the explanation of the Qualified Joint and Survivor Annuity is provided to the Participant.

3.    <u>Alternate Forms of Benefit Payments</u>.    During any time that a Waiver Election is in effect, the Participant shall elect to have his or her vested Accrued Benefit distributable in one (1) of the alternate forms of payment described in subparagraphs (a) through (e) of this Paragraph B.3 as permitted in Article I.    The Committee shall instruct the Trustee to distribute the benefits in such form.    If a Waiver Election is in effect when benefits are distributed, but no method of distribution is

ARTICLE VII                                    VII-4

CONFIDENTIAL                                                        WH_MDL_00331860

otherwise selected by the Participant, then the Committee shall make reasonable efforts to obtain an election of a method of distribution from such Participant. If the Committee is unable to obtain an election for a method of distribution from such Participant, then the benefits shall be deferred until the later of Normal Retirement Age or age 62, at which time the benefits shall be paid in the form of a Qualified Joint and Survivor Annuity if required, or in the form of a cash lump sum in all other cases.

(a)    The payment of the Participant's vested Accrued Benefit in a single sum in cash or in kind.

(b)    Except as provided in subparagraph 4(a) of this Paragraph B, the payment of the Participant's vested Accrued Benefit as an annuity, in a series of monthly payments, variable or fixed, with or without a period certain for his or her life or for the joint lives of the Participant and his or her spouse or Designated Beneficiary.

(c)    The payment of the Participant's vested Accrued Benefit in a series of installments.

(d)    Any combination of the methods described above.

(e)    If the distribution constitutes an Eligible Rollover Distribution, the payment of the Participant's vested Accrued Benefit in a total or partial direct transfer to an Eligible Retirement Plan; provided that a partial direct transfer shall be equal to at least $500. If elected in Article I, Roth Contributions will be treated as a separate plan for purposes of this subparagraph B.3(e).

4.    <u>Restriction on Alternate Form of Benefits</u>.

(a)    If this Plan does not provided for a Qualified Joint and Survivor Annuity, no distributions shall be made in the form of a life annuity. In-kind distributions requested by a Participant, if permitted under Article I, shall be made available in a non-discriminatory manner under Section 401(a)(4) of the Code and if permitted by the issuer of the particular asset. If a Participant elects installments, his or her installment payments shall be payable not less frequently than annually over a period not to exceed any one (1) of the following permissible periods:

(i)    A period certain not extending beyond the life expectancy of the Participant; or

(ii)    A period certain not extending beyond the joint and last survivor expectancy of the Participant and a Designated Beneficiary.

<div align="center">ARTICLE VII</div>

<div align="right">VII-5</div>

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

WH_MDL_00331861

The Trustee may segregate the unpaid balance of the Participant's vested Accrued Benefit in one (1) or more banks, trust companies, savings and loan associations or similar institutions, including the Trust or any of its affiliates, if applicable, for investment in savings accounts, certificates of deposit, government bonds, bankers' acceptances or similar securities. Unless violative of Section 401(a)(9) of the Code, net earnings on the unpaid vested Accrued Benefit shall be distributed with the last payment.

(b)    Any deferred distribution from an annuity contract in a form other than a Qualified Joint and Survivor Annuity shall require a Waiver Election. The annuity contract shall provide for the notice provisions of REACT and shall comply with the requirements of this Plan, including the Participant's rights to optional forms of benefits and the distribution requirement of Section 401(a)(9) of the Code and the regulations thereunder. Any annuity contract distributed hereunder must be non-transferable.

5.    <u>Distribution Consent Requirements</u>.   Subject to subparagraph (g) below of this Paragraph B.5, if the Participant's vested Accrued Benefit exceeds $5,000, the Participant and the Participant's Spouse or the survivor of the two must consent to any distribution of such vested Accrued Benefit if the form of benefit is payable in other than a Qualified Joint and Survivor Annuity.

(a)    Notwithstanding the foregoing, if this Plan is not subject to Section 401(a)(11) and 417 of the Code, only the Participant's consent is required. Written consent of the Participant or the Participant's Spouse is not required if the vested Accrued Benefit does not exceed $5,000 at the date of distribution. However, if a Participant has begun to receive distributions pursuant to an optional form of benefit that provides for a schedule of periodic distribution, consent will be required even if the Participant's remaining vested Accrued Benefit is less than $5,000.

(b)    If this Plan is subject to Sections 401(a)(11) and 417 of the Code, a distribution may not be made after the Annuity Starting Date unless the Participant and the Spouse of the Participant or the Surviving Spouse consent in writing to such distribution even if the vested Accrued Benefit is less than or equal to $5,000.

(c)    If the Participant separates from service with a vested Accrued Benefit of at least $200 but not more than $5,000, such Participant shall be entitled to elect a direct transfer or partial direct transfer of his or her Accrued Benefit as described in Paragraph B.3 of this Article VII. If the Participant fails to make such election, his or her vested Accrued Benefit shall be paid to him or her in a single sum payment subject to mandatory federal income tax withholding. Such payment shall occur 30 days after the receipt of the notice described in Paragraph B.2 of this Article VII but before the 90 day period described in such Paragraph B.2 has expired.

<div align="center">ARTICLE VII</div>

<div align="right">VII-6</div>

BROAD FINANCIAL  (800) 395-5200

(d)    Notwithstanding the preceding subparagraph (c), for distributions made on or after March 28, 2005 if the Participant's vested Accrued Benefit, including any Rollover Contributions, is greater than $1,000 (or a lesser amount if elected in Article I), the Committee shall establish an individual retirement account for the benefit of the Employee unless otherwise elected in Article I. Such transfer shall occur 30 days after the receipt of the notice described in Paragraph B.2 of this Article VII but before the 90 day period described in such Paragraph B.2 has expired.

(e)    If elected in Article I, the involuntary cash-out distribution limit of $5,000 described above shall be reduced.  The determination of whether Rollover Contributions (and earnings allowable thereto) are included in the value of the Participant's vested Accrued Benefit for purposes of the involuntary cash-out distribution limit but not for purposes of automatic rollover to an individual retirement account for mandatory distribution shall be made in accordance with Article I.

(f)    If the Participant's vested Accrued Benefit is less than $200, it shall be paid to him or her in a single sum payment as soon as administratively feasible after the date elected in Article I unless the direct payment of a distribution to a Participant has been reduced below $200 pursuant to Article I.  If elected in Article I, Roth Contributions will be treated as a separate plan for purposes of this subparagraph B.5(f).  In that case, the Plan will not provide for a direct rollover (including an automatic rollover) for distributions from a Participant's Roth Contribution Account if the amount of the distributions that are Eligible Rollover Distributions are reasonably expected to total less than $200 during a Plan Year.  In addition, any distribution from a Participant's Roth Contribution Account is not taken into account in determining whether distributions from a Participant's other Accounts are reasonably expected to total less than $200 during a Plan Year.  However, Eligible Rollover Distributions from a Participant's Roth Contribution Accounts are taken into account in determining whether the total amount of the Participant's Accrued Benefit exceeds $1,000 for purposes of subparagraph B.5(d) of this Article VII.

(g)    If and to the extent elected in Article I, the $5,000 dollar amount described in the first paragraph of this Paragraph B.5 shall be $3,500.

6.    <u>Special Rules</u>.  The Committee shall notify the Participant and the Participant's Spouse of the right to defer benefits to the later of age 62 or the Normal Retirement Age under the Plan and the right to optional forms of benefit as described in Paragraph B.3 of this Article VII.  The notice to defer benefits and the explanation of the optional forms of benefits shall comply with Paragraph B.2 of this Article VII.  If the benefit is payable commencing before the later of age 62 or the Normal Retirement Age, in a Qualified Joint and Survivor Annuity, or if this Plan does not provide for the survivor annuity requirements of REACT, only the Participant's consent is required.  If this Plan is terminated and an annuity that may be purchased from a commercial

<div align="center">ARTICLE VII</div>

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

provider is not offered as an optional form of distribution, the Participant's Accrued Benefit payable upon termination may be distributed to the Participant without his or her consent.  The preceding sentence shall not apply if the Employer maintains another defined contribution plan within the Controlled Group other than an employee stock ownership plan as defined in Section 4975(e)(7) of the Code to which benefits are transferred from the terminated Plan.  However, the transfer need not require Participant consent.  All transfers shall comply with the rules of Section 411(d)(6) of the Code.  The consent requirements of this Paragraph B.6 do not apply to the extent that a distribution is required to satisfy the requirements of Sections 401(a)(9) and 415 of the Code.

7.    <u>Accumulated Deductible Employee Contributions</u>.  Before the first day of the first Plan Year beginning after December 31, 1989, the Participant's vested Accrued Benefit shall not include accumulated deductible employee contributions within the meaning of Section 72(o)(5)(B) of the Code.  These employee contributions, if any, shall be maintained in a separate account.

8.    <u>Incidental Benefit Rule</u>.  The Committee shall ensure that all distributions required under this Article VII shall be made and determined in accordance with Section 401(a)(9) of the Code and the regulations issued thereunder, including the minimum distribution and incidental benefit requirements of Section 401(a)(9)(G) of the Code.

9.    <u>Commencement of Benefits</u>.  Distribution to any Participant of his or her vested Accrued Benefit shall commence not later than the April 1 of the calendar year following the calendar year in which he or she attains age 70½.

(a)    Notwithstanding the foregoing, if elected in Article I, the required beginning date for minimum required distributions for any Participant (other than a 5%-Owner) is the April 1 of the calendar year following the later of the calendar year in which such Participant attains age 70½ or the calendar year in which such Participant retires.

(b)    If elected in Article I, the required beginning date for minimum required distributions is the April 1 of the calendar year following the calendar year in which the Participant attains age 70½, except that benefit distributions to a Participant (other than a 5%-Owner) with respect to benefits accrued after the later of the adoption or effective date of an amendment to the Plan must commence by the later of the April 1 of the calendar year following the calendar year in which the Participant attains age 70½ or retires.

(c)    If elected in Article I, any Participant (other than a 5%-Owner) who attained age 70½ prior to January 1, 1997 and who is still employed by the

ARTICLE VII                                    VII-8

CONFIDENTIAL                                    WH_MDL_00331864

Employer, may elect, in accordance with the administrative procedures established by the Committee, to stop receiving minimum required distributions until April 1 of the calendar year following retirement. If provided in Article I, there shall be a new Annuity Starting Date upon recommencement. Any such election shall not affect a new Participant's right to elect an in-service distribution pursuant to Article I of the Plan. The election to stop receiving minimum required distributions shall also apply to any Participant who is currently receiving minimum required distributions and has not been given the right to elect to stop such distributions.

(d)     If provided in Article I, any Participant (other than a 5%-Owner) who attains age 70½ after 1995 and is still employed by the Employer may elect, in accordance with the administrative procedures established by the Committee, to defer receiving minimum required distributions until the calendar year following retirement. Such election must be made by the April 1 of the calendar year following the calendar year in which the Participant attained age 70½ (i.e., by April 1, 1997 if the Participant attained age 70½ in 1996) unless such Participant has not been given the right to elect to defer such distributions. If a Participant fails to make such election, such Participant will begin receiving a minimum required distribution by the April 1 of the calendar year following the calendar year in which the Participant attains age 70½ (i.e., by April 1, 1997 if the Participant attained age 70½ in 1996).

(e)     If elected in Article I, the preretirement age 70½ distribution option is only eliminated with respect to Participants who attain age 70½ in or after a calendar year that begins after the later of December 31, 1998, or the adoption date of this amendment. This provision shall not affect the Participant's right to receive an in-service distribution pursuant to Article I of the Plan.

(f)     Any amendment made to an existing plan to eliminate distributions after age 70½ shall not apply if the amendment is not adopted by the last day of the remedial amendment period that applies to such plan due to changes made by the Small Business Job Protection Act of 1996.

(g)     If this document establishes a new plan and if elected in Article I, any Participant (other than a 5%-Owner) who is still employed by the Employer and who has attained age 70½ will not be entitled to receive distributions until the April 1 of the calendar year following retirement. This provision shall not affect the Participant's right to elect an in-service distribution pursuant to Article I of the Plan.

(h)     Notwithstanding the above, once minimum required distributions have commenced to a 5%-Owner under this Paragraph B.9, such distributions shall continue.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                    WH_MDL_00331865

10.    <u>Coordination with Minimum Distribution Requirements Previously in Effect</u>. If Article I specifies an effective date to apply the Final and Temporary Regulations under Section 401(a)(9) of the Code that is earlier than calendar years beginning with the 2003 calendar year, required minimum distributions for 2002 under this Article VII will be determined as follows:

(a)    If the total amount of 2002 required minimum distributions under the Plan made to the Distributee or Designated Beneficiary prior to the effective date stated in Paragraph GG.1 of Article I equals or exceeds the required minimum distributions determined after the effective date in such Paragraph, then no additional distributions will be required to be made for 2002 on or after such date to the Distributee or Designated Beneficiary.

(b)    If the total amount of 2002 required minimum distributions under the Plan made to the Distributee or Designated Beneficiary prior to the effective date of Paragraph GG.1 of Article I is less than the amount determined after the effective date of such Paragraph, then required minimum distributions for 2002 on and after such date will be determined so that the total amount of required minimum distributions for 2002 made to the Distributee or Designated Beneficiary will be the amount determined after the effective date specified in Paragraph GG.1 of Article I.

(c)    With respect to distributions under the Plan made prior to the effective date specified in Paragraph GG.1 of Article I but no earlier than the calendar year beginning January 1, 2001, the Plan will apply the minimum distribution requirements of Section 401(a)(9) of the Code in accordance with the regulations under Section 401(a)(9) of the Code that were proposed on January 17, 2001, notwithstanding any provision of the Plan to the contrary.

(d)    Notwithstanding the other provisions of this Article VII, distributions may be made under a designation made before January 1, 1984, in accordance with Section 242(b)(2) of TEFRA and the provisions of Paragraph G of this Article VII.

11.    <u>Amount of Required Minimum Distribution During the Participant's Lifetime</u>.

(a)    During the Participant's lifetime, the minimum amount that will be distributed for each Distribution Calendar Year is the lesser of:

(i)    the quotient obtained by dividing the Participant's account balance by the distribution period in the Uniform Lifetime Table set forth in Section 1.401(a)(9)-9 of the Final Treasury Regulations, using the Participant's age as of the Participant's birthday in the Distribution Calendar Year; or

<div align="center">ARTICLE VII</div>

VII-10

CONFIDENTIAL

WH_MDL_00331866

(ii)    if the Participant's sole Designated Beneficiary for the Distribution Calendar Year is the Participant's Spouse, the quotient obtained by dividing the Participant's account balance by the number in the Joint and Last Survivor Table set forth in Section 1.401(a)(9)-9 of the Final Treasury Regulations, using the Participant's and Spouse's attained ages as of the Participant's and Spouse's birthdays in the Distribution Calendar Year.

(b)    For purposes of Paragraphs B and C of this Article VII, a Participant's account balance shall equal his or her Accrued Benefit as of the last Valuation Date in the calendar year immediately preceding the Distribution Calendar Year (valuation calendar year) increased by the amount of any contributions made and allocated or forfeitures allocated to the account balance as of dates in the valuation calendar year after the Valuation Date and decreased by distributions made in the valuation calendar year after the Valuation Date. The account balance for the valuation calendar year includes any amounts rolled over or transferred to the Plan either in the valuation calendar year or in the Distribution Calendar Year if distributed or transferred in the valuation calendar year.

(c)    For purposes of required minimum distributions, life expectancy, where applicable, shall be computed by use of the Single Life Table in Section 1.401(a)(9)-9 of the Final Treasury Regulations.

(d)    For the purposes of Paragraphs B and C of this Article VII, Designated Beneficiary means the individual who is designated as the Beneficiary as described in Paragraph A.16 of Article II and is the Designated Beneficiary under Section 401(a)(9) of the Code and Section 1.401(a)(9)-4 of the Final Treasury Regulations.

(e)    Required minimum distributions will be determined under this Paragraph B.11 beginning with the first Distribution Calendar Year and up to and including the Distribution Calendar Year that includes the Participant's date of death.

12.    <u>Forms of Distribution</u>. Unless the Participant's interest is distributed in the form of an annuity purchased from an insurance company or in a single sum on or before the required beginning date, as of the first Distribution Calendar Year distributions will be made in accordance with Paragraph B.11 and subparagraphs C.2(b), (c), (d), (e) and (f) of this Article VII. If the Participant's interest is distributed in the form of an annuity purchased from an insurance company, distributions thereunder will be made in accordance with the requirements of Section 401(a)(9) of the Code and the Final and Temporary Treasury Regulations issued on April 17, 2002.

<div align="center">ARTICLE VII</div>

CONFIDENTIAL

13.    <u>Distribution on Total Disability</u>.  Notwithstanding any delay in the timing of distributions pursuant to Article I, if a Participant terminates employment as a result of Total Disability, he or she shall be eligible for the immediate commencement of his or her vested Accrued Benefit as soon as administratively feasible after such termination; provided that the Participant shall make a written application for and submit to the Committee sufficient evidence to establish his or her Total Disability.  The Committee, in its sole discretion, may demand further examination by an independent physician acceptable to it to determine the Participant's Total Disability before approving or denying any such claim.  If permitted in Article I, a Participant may receive an in-service distribution of his or her vested Accrued Benefit on account of Total Disability.

C.    <u>Distribution at Death</u>.  If this Plan provides for an annuity option as selected in Article I, and if a Participant ceases participation under the Plan by reason of his or her death prior to the Annuity Starting Date, unless there has been a valid Waiver Election during the applicable Election Period, a Qualified Preretirement Survivor Annuity shall be paid to the Surviving Spouse commencing on the later of the Normal Retirement Age or on the date that a Participant would have attained age 62 unless an alternate form of benefit is selected.  The Surviving Spouse may elect to have such annuity distributed within a reasonable time after the Participant's death, subject to an adjustment on account of an earlier distribution, if any.

1.    <u>Notice Requirements and Alternate Forms of Death Benefits</u>.

(a)    The Committee shall provide each Participant a written explanation of the Qualified Preretirement Survivor Annuity in such terms and in such manner as would be comparable to the explanations provided for meeting the notice requirements of Paragraph B.2 of this Article VII applicable to a Qualified Joint and Survivor Annuity.  Except for separation from service prior to age 35, the applicable period for a written explanation to a Participant is whichever of the following periods ends last:  (i) the period beginning with the first day of the Plan Year in which the Participant attained age 32 and ending with the close of the Plan Year preceding the Plan Year in which the Participant attained age 35; (ii) a reasonable period ending after an Employee becomes a Participant; (iii) a reasonable period ending after the Plan no longer fully subsidizes the benefit; or (iv) a reasonable period ending after Section 401(a)(11) of the Code first applies to the Participant.  For purposes of applying clauses (ii), (iii) and (iv), a reasonable period ending after the last of these events have occurred means the end of the two-year period beginning one (1) year prior to the date the applicable event occurs, and ending one (1) year after that date.

(b)    if a Participant separates from service before the Plan Year in which the Participant attains age 35, notice shall be provided within the two-year period beginning one (1) year prior to separation and ending one (1) year after separation.  If the Participant thereafter returns to employment with the Employer, the

ARTICLE VII                                    VII-12

CONFIDENTIAL                                                      WH_MDL_00331868

applicable period for such Participant shall be redetermined as described in clauses (i), (ii), (iii) and (iv) of this Paragraph C.1(a).

(c)     During any time that a Waiver Election is in force, the Participant may elect to have his or her death benefit distributed in any one of the ways permitted by Paragraph JJ of this Article I, including without limitation, a total or partial direct transfer to an Eligible Retirement Plan, if the distribution constitutes an Eligible Rollover Distribution.

(d)     If, at the death of a Participant, his or her death benefit is payable in the form of a Qualified Preretirement Survivor Annuity, the Participant's Surviving Spouse shall be entitled to select by written election an alternate form of benefit payment in any of the ways permitted by Paragraph JJ of Article I, including without limitation, a total or partial direct transfer to an Eligible Retirement Plan, if the distribution constitutes an Eligible Rollover Distribution.

2.     <u>Time of Distribution Upon Death</u>.  Upon the death of a Participant, the following distribution provisions shall apply:

(a)     If the Participant dies before distributions begin, the Participant's entire interest will be distributed, or begin to be distributed, no later than as follows:

(i)     If the Participant's Surviving Spouse is the Participant's sole Designated Beneficiary, then, except as provided in Article I, distributions to the Surviving Spouse will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died, or by December 31 of the calendar year in which the Participant would have attained age 70½, if later.

(ii)     If the Participant's Surviving Spouse is not the Participant's sole Designated Beneficiary, then, except as provided in Article I, distributions to the Designated Beneficiary will begin by December 31 of the calendar year immediately following the calendar year in which the Participant died.

(iii)     If there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, the Participant's entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(iv)     If the Participant's Surviving Spouse is the Participant's sole Designated Beneficiary and the Surviving Spouse dies after the Participant but before distributions to the Surviving Spouse begin, this subparagraph

ARTICLE VII                                        VII-13

CONFIDENTIAL                                                          WH_MDL_00331869

C.2(a), other than subparagraph C.2(a)(i), will apply as if the Surviving Spouse were the Participant.

For purposes of this Paragraph C.2, unless subparagraph C.2(a)(iv) applies, distributions are considered to begin on the Participant's required beginning date. If subparagraph C.2(a)(iv) applies, distributions are considered to begin on the date distributions are required to begin to the Surviving Spouse under subparagraph C.2(a)(i). If distributions under an annuity purchased from an insurance company irrevocably commence to the Participant before the Participant's required beginning date (or to the Participant's Surviving Spouse before the date distributions are required to begin to the Surviving Spouse under subparagraph C.2(a)(i)), the date distributions are considered to begin is the date distributions actually commence.

(b)     If the Participant dies on or after the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the longer of the remaining life expectancy of the Participant or the remaining life expectancy of the Participant's Designated Beneficiary, determined as follows:

(i)     The Participant's remaining life expectancy is calculated using the age of the Participant in the year of death, reduced by one (1) for each subsequent year.

(ii)     If the Participant's Surviving Spouse is the Participant's sole Designated Beneficiary, the remaining life expectancy of the Surviving Spouse is calculated for each Distribution Calendar Year after the year of the Participant's death using the Surviving Spouse's age as of the Spouse's birthday in that year. For Distribution Calendar Years after the year of the Surviving Spouse's death, the remaining life expectancy of the Surviving Spouse is calculated using the age of the Surviving Spouse as of the Spouse's birthday in the calendar year of the Spouse's death, reduced by one (1) for each subsequent calendar year.

(iii)     If the Participant's Surviving Spouse is not the Participant's sole Designated Beneficiary, the Designated Beneficiary's remaining life expectancy is calculated using the age of the Beneficiary in the year following the year of the Participant's death, reduced by one (1) for each subsequent year.

(c)     If the Participant dies on or after the date distributions begin and there is no Designated Beneficiary as of September 30 of the year after the year of the Participant's death, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the Participant's remaining life expectancy

<div align="center">ARTICLE VII</div>

VII-14

CONFIDENTIAL

WH_MDL_00331870

calculated using the age of the Participant in the year of death, reduced by one (1) for each subsequent year.

(d)     Except as provided in Article I, if the Participant dies before the date distributions begin and there is a Designated Beneficiary, the minimum amount that will be distributed for each Distribution Calendar Year after the year of the Participant's death is the quotient obtained by dividing the Participant's account balance by the remaining life expectancy of the Participant's Designated Beneficiary, determined as provided in subparagraph C.2(b) and (c) of this Article VII.

(e)     If the Participant dies before the date distributions begin and there is no Designated Beneficiary as of September 30 of the year following the year of the Participant's death, distribution of the Participant's entire interest will be completed by December 31 of the calendar year containing the fifth anniversary of the Participant's death.

(f)     If the Participant dies before the date distributions begin, the Participant's Surviving Spouse is the Participant's sole Designated Beneficiary, and the Surviving Spouse dies before distributions are required to begin to the Surviving Spouse under subparagraph C.2(a)(i), then subparagraphs C.2(d), (e) and (f) of this Article VII will apply as if the Surviving Spouse were the Participant.

3.     <u>REACT Death Benefit</u>.  If the Plan is subject to REACT Surviving Spouse protection, the amount of death benefits to be paid to the Participant's Surviving Spouse shall be a Qualified Preretirement Survivor Annuity determined in accordance with Article I and this Article VII. Any remaining Accrued Benefit shall be paid in accordance with the Participant's Beneficiary designation.  If this Plan does not provide for an annuity option, the special rule as provided in Paragraph E of this Article VII shall apply.

4.     <u>Death Benefits</u>.  The death benefit payable under this Plan shall be equal to the face amount of any life insurance policies, if any (excluding key man insurance) on such Participant's life in effect on his or her date of death, plus such Participant's Accrued Benefit.

5.     <u>Lack of Designation</u>.  If such deceased Participant had filed with the Committee a document naming a Designated Beneficiary, but failed to designate the form in which benefit payments are to be made, then the Committee shall direct the Trustee to distribute to such Designated Beneficiary the unpaid amount of the Participant's Accrued Benefit as determined above, in such one (1) or more ways as permissible under Paragraph B.3 of this Article VII.  If such deceased Participant failed to name a Designated Beneficiary, or if no Designated Beneficiary survives him or her,

<div align="center">ARTICLE VII                    VII-15</div>

CONFIDENTIAL                                    WH_MDL_00331871

then the unpaid amount of the Participant's Accrued Benefit shall be paid to the Designated Beneficiary pursuant to the priorities set forth in Article IX of the Plan.

6.    Proof of Death.  Upon the death of a Participant, the Committee may, but need not, require the personal representative of the Participant's estate and/or the Designated Beneficiary to furnish proof of death and such tax release forms and any other forms, papers or documents as are deemed appropriate by the Committee prior to making any payment of death benefits.

7.    Proof of Surviving Spouse.  The Committee shall withhold and shall not authorize the distribution of death benefits until such time as the Committee can determine the existence and/or identity of a Surviving Spouse or any other non-spouse Beneficiary.  If the Committee cannot determine to its reasonable satisfaction the identity of the person or persons to whom such death benefits should be distributed within a reasonable time after the date of death of the Participant, then the Committee shall not authorize the distribution of such death benefits but shall hold such death benefits in trust until the identity of such Surviving Spouse or other Beneficiary is finally determined.  If necessary as determined by the Committee in its sole discretion, the Committee may file a complaint for interpleader or declaratory relief requesting that the court determine the identity of any persons who are entitled to payment of such benefits.  In such a case, the death benefits may be deposited with the court pending the outcome.

8.    Death of Beneficiary.  A Beneficiary shall not have any rights to benefits under the Plan unless he or she survives the Participant.  If the Participant and his or her Beneficiary die simultaneously and it is not possible to determine who died first, it is presumed that the Participant survived the Beneficiary, regardless of any finding to the contrary by a state court or pursuant to any state law.

D.    Transitional Rules.  The Qualified Joint and Survivor Annuity and Qualified Preretirement Survivor Annuity provisions of this Article VII, to the extent that they are applicable under this Plan, shall apply only to Participants who complete an Hour of Service on or after August 23, 1984.

1.    Service On or After January 1, 1976.  Any Inactive Participant not receiving benefits on August 23, 1984, shall be given the opportunity to make a Waiver Election for a Qualified Preretirement Survivor Annuity if such Inactive Participant (i) completed at least one (1) Hour of Service with the Employer under this Plan (or a Predecessor Plan) in a Plan Year beginning on or after January 1, 1976; and (ii) had completed at least 10 Years of Vested Service when he or she terminated employment.

2.    Service On or After September 2, 1974 and Before January 1, 1976.  Any Inactive Participant not receiving benefits on August 23, 1984, who

<div align="center">ARTICLE VII</div>                                VII-16

CONFIDENTIAL                                      WH_MDL_00331872

completed at least one (1) Hour of Service with the Employer under this Plan (or a Predecessor Plan) on or after September 2, 1974, but who did not complete an Hour of Service in a Plan Year beginning on or after January 1, 1976, shall be given the opportunity to have his or her benefits paid in accordance with the distributive provisions and the Qualified Joint and Survivor Annuity provisions of this Plan in effect before August 23, 1984, as required by Section 303(e) of REACT.

Any election available to an Inactive Participant under this Paragraph D.2 may be made during the period commencing on August 23, 1984, and ending on such former Participant's Annuity Starting Date.

E.    <u>Non-Annuity Rules</u>.

1.    <u>No Annuities</u>.  If this Plan does not provide for an annuity option as selected in Article I, then the Participant shall not be entitled to the payment of his or her vested Accrued Benefit in the form of annuity.  Furthermore, the Qualified Joint and Survivor Annuity and Qualified Preretirement Survivor Annuity provisions of Paragraphs B and C of this Article VII shall not be applicable to this Plan, but all of the remaining provisions of such Paragraphs B and C relating to distribution forms and time of commencement of distributions shall be applicable to the Participant and his or her Surviving Spouse and/or Designated Beneficiary.  On the death of the Participant, all of his or her death benefit shall be paid to his or her Surviving Spouse within a reasonable time.  The Surviving Spouse may elect to receive the deceased Participant's benefits under the Plan within 90 days after the date of death.  If there is no Surviving Spouse or if the Surviving Spouse consents in writing in a manner prescribed under Paragraph A.7 of this Article VII, then the Participant's death benefit shall be paid to the Designated Beneficiary.

2.    <u>Transferred Benefits</u>.  Irrespective of any lack of  selection of the annuity option in Article I, the Qualified Joint and Survivor Annuity and Qualified Preretirement Survivor Annuity provisions of Paragraphs B and C of this Article VII shall apply to Transferred Benefits which are neither rollover benefits nor voluntary transfers under Q&A 3 of Section 1.411(d)-4 of the Treasury Regulations.

3.    <u>Offset of Annuity Plans</u>.  If this Plan would not otherwise be subject to the survivor annuity requirements of Section 401(a)(11) and 417 of the Code, but its benefits are used to offset benefits in a plan subject to such requirements, than the survivor annuity requirements will apply to those Participants whose benefits are offset.

4.    <u>QDRO Distributions</u>.  Qualified Domestic Relations Orders may order the distribution of an Alternate Payee's interest in all or a portion of a Participant's vested Accrued Benefit to be distributed in one of the alternate forms of distribution set forth in Paragraph JJ of Article I, including without limitation, a partial or total direct

<div align="center">ARTICLE VII</div>

VII-17

CONFIDENTIAL

WH_MDL_00331873

transfer to an Eligible Retirement Plan, if the distribution constitutes an Eligible Rollover Distribution.

F.    Time of Distribution.    Unless Article I allows Participants to defer commencement of benefits, distribution to a Participant shall occur no later than 60 days after the close of the Plan Year in which the Participant reaches Normal Retirement Age or terminates employment, whichever is later.  However, the failure of a Participant and his or her Spouse, where applicable, to consent to a distribution, shall be deemed to be an election to defer the commencement of a payment of any benefits to the later of age 62 or the Normal Retirement Age.  Notwithstanding anything herein to the contrary, any deferral of benefit shall not violate Sections 401(a)(9) and 415 of the Code including the failure to consent to a distribution by the Participant and the Spouse where applicable.

G.    Pre-TEFRA Designations.    Notwithstanding Paragraphs B and C of this Article VII, each Participant or his or her Designated Beneficiary who made a timely designation pursuant to Section 242(b)(2) of TEFRA shall have had the right and power to elect by written designation delivered to the Committee, the time for commencement of and the form of distribution of his or her Accrued Benefits; provided, however, that any such designation must have been consistent with the provisions of ERISA, the Code and Notice 83-23 in effect at the time the designation was made and shall comply with the spousal consent requirements of REACT; provided, further, however, that such Participant or his or her Designated Beneficiary may have selected any form of distribution available under the terms of the Plan as in effect at the time of execution of such designation and the form selected by each Participant is hereby incorporated by reference.  The following form of distribution is also available pursuant to such designation, in addition to those forms of distribution set forth above by reference and elsewhere in the Plan:

Payment in a series of cash installments, not less frequently than annually, over a period of time equal to twice the future life expectancy of the Participant determined as of the date payments of benefits commence, or if the Participant is married at such date, over the greater of twice the life expectancy of the Participant or his or her Spouse.  Expected return multiple Tables V and VI of Section 1.72-9 of the Treasury Regulations shall determine the number of years of future life expectancy.

If a designation is revoked subsequent to the date distributions are required to commence, the Trust must distribute by the end of the calendar year following the calendar year in which the revocation occurs the total amount not yet distributed which would have been required to have been distributed to satisfy Section 401(a)(9) of the Code and the proposed regulations thereunder, but for the Section 242(b)(2) election.  For calendar years beginning after December 31, 1988, such distributions must meet the minimum distribution incidental benefit requirements in Section 1.401(a)(9)-2 of the Proposed Regulations.  Any changes in the designation will be considered to be a revocation of the designation.  However, the mere substitution or

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                          WH_MDL_00331874

addition of another Beneficiary (one not named in the designation) under the designation will not be considered to be a revocation of the designation, so long as such substitution or addition does not alter the period over which distributions are to be made under the designation, directly or indirectly (such as altering the relevant measuring life). If an amount is transferred or rolled over from one plan to another, the rules in Q&A J-2 and Q&A J-3 of Section 1.401(a)(9)-1 of the Proposed Regulations shall apply.

H.    Loans to Participants.  If allowed under Article I, the Committee may, in its sole discretion and upon written application of a Participant (or, if allowable under Article I or by the Plan's loan policy, an Inactive Participant) on a form provided by the Committee, direct the Trustee to make a loan to such Participant in accordance with the provisions of this Paragraph H.

1.    Limitation on Amount of Loan.  The total amount of such loan shall not exceed the lesser of (i) $50,000 reduced by the excess, if any, of the highest outstanding balance of loans made to the Participant from the Plan during the one (1) year period ending on the day before the date on which such loan is made, over the outstanding balance of loans from the Plan to the Participant on the date on which such loan was made or (ii) 50% of the Participant's vested Accrued Benefit. In determining such limitation, the Committee shall take into account the balance of such loan and the outstanding balance of all other loans to the Participant from the Plan or any other qualified plan of the Employer.

2.    Nondiscrimination.  The Plan's policies with respect to making any such loans shall be uniformly and non-discriminatorily applied and such loans shall not be made available to Highly Compensated Employees, officers or shareholders in an amount greater than the amount made available to other Employees.

3.    Aggregation Rules.  For purposes of the preceding subparagraphs 1. and 2., Section 414(b), (c), (m) and (o) of the Code shall apply.

4.    Committee Determination.    The Committee shall give due consideration to the type of security given for the loan and the creditworthiness of the Participant/borrower in determining whether to approve or disapprove a loan.  In no event shall the Committee be required to make any such loans.

5.    Designation of Investment in Loan.  Unless loans are designated as a directed investment of the Participant's Account pursuant to Article I, any loan or loans made to a Participant shall be treated as an investment of the Trust.

6.    Documentary Requirements.  Any loans shall be evidenced by the Participant's promissory note which shall:

ARTICLE VII                                          VII-19

CONFIDENTIAL                                                                    WH_MDL_00331875

       (a)    be for a specific term, which shall not exceed five (5) years unless the Participant certifies in writing to the Committee that the proceeds of the loan will be applied to acquire the Participant's principal residence; and

       (b)    specify that the Participant's vested Accrued Benefit shall serve as security in the event of a default, plus other collateral if the Committee reasonably determines that additional collateral is necessary in order for the loan to be adequately secured; and

       (c)    bear interest at the rate equal to the prevailing interest rate charged by persons in the business of lending money for loans made under similar circumstances.

    7.    <u>Loan Procedures</u>.  The Committee shall establish a written program which contains the following information:

       (a)    The identity of the person(s) authorized to administer the loan program.

       (b)    A procedure for applying for a loan.

       (c)    The basis on which loans will be approved or denied.

       (d)    Limitations, if any, on the types and amount of the loan offered.

       (e)    The procedures for determining a reasonable rate of interest.

       (f)    The type of collateral which may secure a Participant's loan.

       (g)    The events constituting default and causing acceleration and the steps that will be taken to preserve plan assets in the event of any such events.

    8.    <u>Other Acceleration</u>.  In addition to any acceleration provisions contained in the promissory note, a Participant's loan shall immediately become due and payable if such Participant is entitled to and elects to receive a distribution from the Plan, other than a hardship distribution.  In this case, the Committee shall immediately request payment of the outstanding principal balance and accrued but unpaid interest on the loan.  If the Participant does not repay such amount within a reasonable time after such request, the Committee shall have the right to offset and reduce the Participant's vested Accrued Benefit which was used for security for such loan by such amount.  If the Participant's vested Accrued Benefit is less than the amount due, the Committee shall take appropriate steps to collect the balance due directly from the

<div align="center">ARTICLE VII               VII-20</div>

CONFIDENTIAL        WH_MDL_00331876

Participant.   Notwithstanding the foregoing, the Committee may allow an Inactive Participant who has terminated employment to elect to transfer his or her outstanding loan to a plan described in Section 401(a) or 403(a) of the Code, provided that the loan is not in default at the time of the transfer.

9.     Procedures Upon Default.  Upon default of a loan, the Participant's Accrued Benefit shall be reduced by the outstanding principal balance of the loan plus accrued but unpaid interest.   However, if the Participant's Account is subject to the withdrawal restrictions of Section 401(k) of the Code or if this Plan is subject to Section 417 of the Code, the Participant's Accrued Benefit shall not be reduced until a distributable event occurs under the terms of the Plan.  During any time that a loan is in default under the terms of the promissory note and the borrowing Participant's vested Accrued Benefit is not distributable, such loan shall be treated as a directed investment of such Participant's Account, regardless of whether directed investments are permitted in Article I.

10.     Spousal Consent.  If the Plan provides for distribution of benefits in the form of an annuity, and if a Participant taking a loan pursuant to this Paragraph H is married, the Committee shall require that such Participant obtain his or her Spouse's consent to the loan and the possible reduction in such Participant's Accrued Benefit.  Such consent shall be obtained within the 90-day period prior to the making of the loan and shall be in writing and shall acknowledge the effect of the loan and shall be witnessed by a Plan representative or notary public.   If the Plan does not provide for annuities, spousal consent shall not be required.

I.     Reserved.

J.     Distributions to Incompetent Persons.   The Committee may direct the Trustee to distribute the benefits of any Participant pursuant to the instructions of any person named by such Participant in a durable power of attorney which, on its face, appears to be valid and enforceable, or a court-appointed legal guardian or conservator of such Participant.

K.     Nonliability.  Any payment to a Participant or Designated Beneficiary, or to the legal representative of a Participant or Designated Beneficiary, in accordance with the provisions of this Plan, shall to the extent thereof be in full satisfaction of all claims under this Plan against the Trustee, the Committee and the Employer, any of whom may require such Participant, legal representative or Designated Beneficiary, as a condition precedent to such payment, to execute a receipt and release therefore in such form as shall be determined by the Trustee, the Committee, or the Employer, as the case may be.   The Employer does not guarantee the Trust, the Participants, former Participants or their Designated Beneficiaries against loss of or depreciation in value of any right or benefit that any of them may acquire under the terms of this Plan.  All of the benefits payable under

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                          WH_MDL_00331877

this Plan shall be paid or provided solely from the Trust, and the Employer does not assume any liability or responsibility for payment of such benefits.

L.     Benefit Claims Procedure.

1.     Applications.  All applications for benefits under the Plan shall be submitted to the Committee at the Employer's principal place of business.  Applications for benefits must be in writing on forms acceptable by the Committee and must be signed by the Participant and his or her Spouse, or in the case of a death benefit, by the Designated Beneficiary or legal representative of the deceased Participant.    The Committee reserves the right to require the Participant to furnish proof of his or her marital status, age, and the age of his or her Spouse, if any, prior to processing any application.  Each application shall be acted upon and approved or disapproved by the Committee within 90 days following its receipt by the responsible officer of the Employer.  If any application for benefits is denied, in whole or in part, the Committee shall notify the applicant in writing of such denial and of his or her right to a review by the Committee and shall set forth, in a manner calculated to be understood by the applicant, the specific reasons for such denial, the specific references to pertinent Plan provisions on which the denial is based, a description of any additional material or information necessary for the applicant to perfect his or her application, an explanation of why such material or information is necessary, and an explanation of the Plan's review procedure.

2.     Review of Denials.  Any person whose application for benefits is denied in whole or in part may appeal to the Committee for a review of the decision by submitting a written statement to the Committee within 60 days after receiving written notice from the Committee of the denial of his or her claim (i) requesting a review by the Committee of his or her application for benefits; (ii) setting forth all of the grounds upon which his or her request for review is based and any facts in support of such request; and (iii) setting forth any issues or comments which the applicant deems pertinent to his or her application.  The Committee shall meet as required to review appeals of denials of applications for benefits submitted to it.  The Committee shall act upon each appeal within 60 days after receipt of the applicant's request for review by the Committee.  The Committee shall make a full and fair review of each such application and any written material submitted by the applicant or the Employer in connection with such review and may require the Employer or the applicant to submit such additional facts, documents, or other evidence as the Committee, in its sole discretion, deems necessary or advisable in making such a review.  On the basis of its review, the Committee shall make an independent determination of the applicant's eligibility for benefits under the Plan.  The decision of the Committee on any application for benefits shall be final and conclusive upon all persons if supported by substantial evidence in the records.

ARTICLE VII                                    VII-22

CONFIDENTIAL                                    WH_MDL_00331878

M.    <u>Income Tax Withholding</u>.    Distributions made under the Plan to any Participant or his or her Designated Beneficiary shall be subject to the income tax withholding rules set forth in Section 3405 of the Code and the Treasury Regulations promulgated thereunder.

N.    <u>Qualified Domestic Relations Orders</u>.    Notwithstanding anything to the contrary contained herein, the Committee shall direct the Trustee to make distribution to an Alternate Payee in accordance with a Qualified Domestic Relations Order, and such distribution may be made, notwithstanding the age or continued employment of the Participant who is a party to such Order, at any time as specified in the Order, provided the Order is filed with the court, served on the Plan, approved by the Committee and the alternate payee executes release forms, withholding forms and any other documents, forms or papers that the Committee deems necessary and desirable.

O.    <u>Overpayment of Vested Interest</u>.    If a Participant or Beneficiary is erroneously paid benefits greater than the Participant's vested Accrued Benefit, the Committee may, in its sole discretion exercised in the best interests of Participants and Beneficiaries, demand from the Participant or Beneficiary repayment of such overpayment. If the Participant or Beneficiary refuses to make repayment, the Committee may take legal action to recover the amount of the overpayment, plus interest, and costs of collection including reasonable attorneys' fees.  If the Participant returns to employment and the overpayment has not been repaid to the Plan, the Committee may offset the overpayment against future Plan benefits.

ARTICLE VII                                        VII-23

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                        WH_MDL_00331879

## VIII.  TOP-HEAVY LIMITATIONS

If in any Plan Year the Plan is a Top-heavy Plan as defined in Paragraph A below, the limitations and requirements set forth in this Article VIII shall apply to the Plan, unless this is a Simple 401(k) Plan within the meaning of Section 401(k)(11) of the Code.

The Top-heavy requirement of Section 416 of the Code and Paragraph E of this Article VIII shall not apply, if the Plan consists solely of a cash or deferred arrangement which meets the requirements of Section 401(k)(12) of the Code and Matching Contributions that comply with the requirement of Section 401(m)(11) of the Code.

A.    Definitions.

1.    "Determination Date" means with respect to any Plan Year the last day of the preceding Plan Year or, in the case of the first Plan Year, the last day of such Plan Year, provided that the Employer did not previously establish another qualified plan that is part of a Required Aggregation Group.

2.    "Key Employee" means any Participant who at any time during the Plan Year containing the Determination Date is:

(a)    An officer of the Employer having Section 415 Compensation greater than $130,000 (as adjusted under Section 416(i)(I) of the Code for Plan Years beginning after December 31, 2002); provided, however, that no more than 50 Employees or, if lesser, the greater of three (3) or 10% of the Employees shall be treated as officers; provided further that if the total number of officers exceeds this limitation, only the highest compensated officers shall be included;

(b)    A 5%-Owner of the Employer;

(c)    A 1%-Owner of the Employer whose Section 415 Compensation exceeds $150,000; or

(d)    A Beneficiary of a Key Employee or a former Key Employee.

For purposes of this Paragraph A.2, Section 415 Compensation shall include amounts contributed by the Employer pursuant to a salary reduction agreement which are excludable from the Employee's gross income under Section 125, 132(f)(4), 402(e)(3), 402 (g)(3), 402(h), 403(b), 408(p)(2)(A)(i) or 457 of the Code.

ARTICLE VIII                                              VIII-1

CONFIDENTIAL                                              WH_MDL_00331880

An Employee shall be deemed a "1%-Owner" if he or she (i) owns more than one percent (1%) of the outstanding stock or owns stock possessing more than one percent (1%) of the total combined voting power of all classes of stock, if the Employer is a corporation; or (ii) owns more than one percent (1%) of the capital or profit interests in the Employer if the Employer is not a corporation.  In making the determination of a 1%-Owner or a 5%-Owner, Section 416(i)(1)(B)(iii) of the Code modifies Section 318(a)(2) of the Code, the corporate attribution rule.  The business aggregation rules of Section 414 of the Code shall not be applied to determine ownership in the Employer.

3.     "Non-Key Employee" means any Employee who is not a Key Employee.

4.     "Top-heavy Plan" means, with respect to any Plan Year, (i) any defined benefit pension plan maintained by the Employer if, as of the Determination Date, the present value of cumulative Accrued Benefits under the plan for Key Employees exceeds 60% of the present value of cumulative Accrued Benefits under the Plan for all Employees; and (ii) any defined contribution plan, other than a Simple 401(k) Plan, maintained by the Employer if, as of the Determination Date, the aggregate of the Accounts of Key Employees under the Plan exceeds 60% of the aggregate of the Accounts of all Employees under the Plan.  This rule is referred to herein as the "60% Test."

5.     "Top-heavy Group" means any Aggregation Group if the sum of the present value of cumulative Accrued Benefits for Key Employees under all defined benefit pension plans included in the Aggregation Group, and the sum of the accounts of Key Employees under all defined contribution plans included in the Aggregation Group, exceed 60% of a similar sum determined for all Employees.  An "Aggregation Group" means either a Required Aggregation Group or a Permissive Aggregation Group.

6.     "Required Aggregation Group" means each qualified plan of the Employer in which a Key Employee is a participant, and each other qualified plan of the Employer which enables the qualified plan or plans containing a Key Employee to meet the anti-discrimination requirements of Section 401(a)(4) or 410 of the Code.  A Required Aggregation Group includes any qualified plan of the Employer that has terminated within the one (1) year period ending on the Determination Date.

B.     Aggregation Groups.

1.     Required Aggregation Group.  Each qualified plan of the Employer required to be included in a Required Aggregation Group shall be treated as a Top-heavy Plan if the Required Aggregation Group is a Top-heavy Group.

ARTICLE VIII                                      VIII-2

CONFIDENTIAL                                                      WH_MDL_00331881

2.    Permissive Aggregation Group. For purposes of determining the existence of a Top-heavy Group, the Employer may elect to include in the Required Aggregation Group any other qualified plan of the Employer not otherwise required to be included, if such Group after the election would continue to meet the anti-discrimination requirements of Sections 401(a)(4) and 410 of the Code; provided, however, that any such qualified plan will not be otherwise deemed a Top-heavy Plan by reason of such election.

If the Permissive Aggregation Group is a Top-heavy Group, each qualified plan of the Employer that is a part of a Required Aggregation Group will be considered a Top-heavy Plan. If the Permissive Aggregation Group is not a Top-heavy Group, no qualified plan in the Permissive Aggregation Group will be considered a Top-heavy Plan.

3.    Plans Aggregated. Only those qualified plans of the Employer in which the Determination Dates fall within the calendar year shall be aggregated to determine whether the qualified plans (or the Aggregation Group) are Top-heavy Plans (or a Top-heavy Group).

C.    60% Test – Special Rules. For purposes of the 60% Test, the following special rules of this Paragraph C shall apply.

1.    Participant Contributions. Benefits derived from both Participant contributions (whether voluntary or mandatory, but not deductible contributions) and Employer contributions shall be taken into account for the 60% Test.

2.    Distributions. In determining the present value of cumulative Accrued Benefits of any Participant or the Account of any Participant under the Plan (or plans which form the Aggregation Group), such present value or Account shall be increased by the aggregate of distributions made to such Participant from the Plan (or plans forming the Aggregation Group) during the one (1) year period ending on the Determination Date. For this purpose, the term "Participant" shall include an Employee who is no longer employed by the Employer. The foregoing shall also apply to distributions under a terminated qualified plan of the Employer which, if it had not been terminated, would have been required to be included in an Aggregation Group. In the case of a distribution made for reasons other than separation from employment, death, or Total Disability, this provision shall be applied by substitution five (5) year period for one (1) year period.

3.    Rollover Contributions. Except as otherwise provided in the Treasury Regulations, any rollover contribution or similar transfer made by an Employee to the Plan after December 31, 1983 shall not be taken into account; provided, however,

<div align="center">ARTICLE VIII</div>

VIII-3

CONFIDENTIAL    WH_MDL_00331882

that this transfer rule shall not apply to mergers or consolidations of several plans, the division of one (1) plan, or rollovers between plans of the Employer or related employers.

4.    Change of Status.  The cumulative Accrued Benefit or Account of a Participant who was formerly a Key Employee, but who ceases to be a Key Employee for a Plan Year, shall not be taken into account for purposes of the 60% Test for the Plan Year in which he or she is not a Key Employee.

5.    Non-Performance of Service.  The Accounts and Accrued Benefits of a Participant who has not performed services for the Employer maintaining the Plan during the one (1) year period ending on the Determination Date shall be disregarded.

6.    Determination of Present Value.  The present value of cumulative Accrued Benefits under any aggregated defined benefit pension plan maintained by the Employer shall be determined by applying the actuarial equivalents set forth in such defined benefit pension plan.

7.    Determination of Accrued Benefit.  Solely for the purpose of determining if the Plan, or any other plan included in a Required Aggregation Group of which this Plan is a part, is top-heavy (within the meaning of Section 416(g) of the Code) the Accrued Benefit of an Employee other than a Key Employee (within the meaning of Section 416(i)(1) of the Code) shall be determined under (i) the method, if any, that uniformly applies for accrual purposes under all plans maintained by the Controlled Group; or (ii) if there is no such method, as if such benefit accrued not more rapidly than the  slowest accrual rate permitted under the fractional accrual rate of Section 411(b)(1)(C) of the Code.

8.    Catch-Up Contributions.  Catch-up  contributions  made  in accordance with Section 414(v) of the Code with respect to the current Plan Year are not taken into account for purposes of top-heavy testing under Section 416 of the Code. However, catch-up contributions made to the Plan in prior years are taken into account in determining whether the Plan is top-heavy under Section 416 of the Code.

D.    Minimum Vesting Requirements.  If the Plan is a Top-heavy Plan, then the partial vesting provisions of Paragraph A.5 of Article VI are modified to the extent necessary to provide for vesting at a faster rate during the relevant Plan Year under either of the following vesting schedules, as elected in Paragraph V of Article I:

1.    3-Year Cliff Vesting.  Each Employee who has completed three (3) Years of Vested Service with the Employer shall be 100% vested in his or her Accrued Benefit.

<div align="center">ARTICLE VIII</div>

VIII-4

CONFIDENTIAL

WH_MDL_00331883

2.   <u>6-Year Graded Vesting</u>.   Each Employee shall have a non-forfeitable vested interest in his or her Accrued Benefit determined under the following schedule:

| Years of Vesting Service | Vested Percentage of the Participant's Accrued Benefit |
|---|---|
| less than 2 | 0% |
| 2 | 20% |
| 3 | 40% |
| 4 | 60% |
| 5 | 80% |
| 6 or more | 100% |

3.   <u>Limitations on Right to Amend Vesting Schedule</u>.  The limitations of Paragraph K of Article VI regarding the right to amend the vesting schedule shall apply to any change in the vesting schedule caused by the Plan becoming a Top-heavy Plan, or ceasing to be a Top-heavy Plan.

E.   <u>Minimum Benefit Requirement</u>.  If the Plan is a Top-heavy Plan, then to the extent that the Plan benefits do not meet the minimum benefit requirements set forth below, each Participant who is not a Key Employee shall be provided with such minimum benefits.  Key Employees shall share in the allocation of Top-heavy minimum benefits, if any, as described in this Paragraph E, if elected in Article I.  Such minimum benefits shall be determined without taking into account Employer contributions to or a Participant's benefits under the Social Security Act.   To the extent that the minimum benefit of any Participant is vested in accordance with Paragraph D of this Article VIII, such minimum Accrued Benefit may not be forfeited or suspended under Section 411(a)(3)(B) or 411(a)(3)(D) of the Code.

1.   <u>3% Benefit</u>.  Each Participant who is not a Key Employee shall receive an allocation of Employer contributions (and forfeitures, if applicable) of not less than three percent (3%) or such higher percentage of such Participant's Section 415 Compensation as elected in Article I; provided, however, that if there is an allocation of Employer contributions (and forfeitures, if applicable) of less than three percent (3%) of Section 415 Compensation in any Plan Year for all Key Employees, the allocation of such contributions (and forfeitures, if applicable) need not exceed the highest percentage of Section 415 Compensation at which such contributions (and forfeitures, if applicable) are allocated or required to be allocated under the Plan for any Key Employee.  Elective Contributions made by Key Employees shall be included in determining the Key Employee percentage of contribution.  If a Key Employee participates in a defined benefit plan which is included with this Plan in a Top-heavy

<div align="center">ARTICLE VIII</div>

VIII-5

CONFIDENTIAL

WH_MDL_00331884

CONFIDENTIAL

Group, a three percent (3%) minimum benefit will be provided to each Non-Key Employee who only participates in this Plan.

All defined contribution plans required to be included in an Aggregation Group shall be treated as one (1) plan; provided, however, that any defined contribution plan required to be included in an Aggregation Group where such plan enables a defined benefit pension plan to meet the anti-discrimination requirements of Sections 401(a)(4) and 410 of the Code shall not be taken into account.

2.    Persons Covered.    Notwithstanding anything to the contrary contained in this Plan, each person who is a Participant (other than an Inactive Participant, a Participant in an excluded class or a Participant who has waived participation under the Plan) on the last day of the Plan Year shall have allocated to his or her Employer Contribution Account the minimum benefits provided under this Paragraph E even if such Participant (i) fails to complete 1,000 Hours of Service during the Plan Year; (ii) refuses to make mandatory contributions to the Plan, if applicable; or (iii) is excluded from participation under the Plan because his or her Section 415 Compensation is less than a stated amount.

3.    Profit Sharing and Retirement Savings Plans.    Participant Elective Contributions made pursuant to Paragraph H.1 of Article I shall be taken into account in determining the minimum benefit requirements of Paragraph E of this Article VIII.

Elective Contributions shall be treated as contributions for purposes of determining the minimum contribution or benefits allocated to Key Employees under Section 416 of the Code but will not be treated as satisfying the minimum contribution or benefit requirements of Section 416 of the Code for Non-Key Employees. However, Qualified Nonelective Employer Contributions described in Section 401(m)(4)(C) of the Code may be used to satisfy minimum contribution requirements for Non-Key Employees.

For Plan Years beginning after December 31, 2001, Matching Contributions and Qualified Matching Contributions shall be taken into account for purposes of satisfying the top-heavy minimum contribution requirements of Section 416(c)(2) of the Code and the Plan. The preceding sentence shall apply with respect to Matching Contributions and Qualified Matching Contributions under this Plan or, if Article I provides that the minimum contribution requirement shall be met in another plan, such other plan. Matching Contributions that are used to satisfy the minimum contribution requirements shall be treated as Matching Contributions for purposes of the Contribution Percentage test and other requirements of Section 401(m) of the Code.

ARTICLE VIII                                         VIII-6

CONFIDENTIAL

F.    <u>Annual Section 415 Compensation</u>.    Section 415 Compensation shall be limited to the Compensation Limitation.

G.    <u>Multiple Plans</u>.    If this Plan is the only qualified plan of the Employer in which a Participant who is a Non-Key Employee participates, the minimum benefits required by Paragraph E.1 of this Article VIII shall be provided under this Plan.    If such Participant participates in this Plan and a defined benefit plan included in a Top-heavy Group or in another defined contribution plan of the Employer included in a Top-heavy Group, top-heavy minimum benefits shall be provided under the Plan designated in Article I.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                    WH_MDL_00331887

## IX.    DESIGNATED BENEFICIARIES

Each Participant and Inactive Participant may name a Designated Beneficiary to receive his or her death benefits by completing a form acceptable to the Committee. Participants shall have the right at any time to revoke such designation or to substitute another Designated Beneficiary.  If at the death of a Participant or a Designated Beneficiary, the name of a Designated Beneficiary or contingent Designated Beneficiary is not on file with the Committee, the Participant shall be deemed to have named the following Designated Beneficiary, in order of priority:

    (i)             The Surviving Spouse (as defined in Paragraph A.5 of Article VII, without regard to the one-year marriage requirement);

    (ii)           If the Participant is not survived by a Surviving Spouse, the trustees of the revocable living trust established by the Participant during his or her lifetime;

    (iii)          The Participant's children, per stirpes;

    (iv)           The Participant's estate.

The Committee's determination as to which persons, if any, qualify within the aforementioned categories shall be final and conclusive upon all persons.

ARTICLE IX          IX-1

CONFIDENTIAL

X.    CONTRIBUTIONS BY PARTICIPANTS

A.    Employee After-Tax Contributions.

1.    Eligibility.  If allowed under Article I, all Participants are eligible to make Employee After-Tax Contributions to the Plan by submitting an application on forms acceptable to the Committee.  All such applications shall include the Participant's acceptance of the relevant terms and conditions of this Plan.  If such contributions are to be made by payroll deduction, such application shall state the Participant's designation of the proportion of his or her Section 415 Compensation which he or she shall contribute, and his or her consent to the withholding of such contributions by the Employer.  Contributions may also be made by the Participant in a single-sum form by direct contribution.   A Participant may continue to make Employee After-Tax Contributions throughout the period he or she is a Participant; provided, however, that a Participant shall have the absolute right to discontinue payroll deduction Employee After-Tax Contributions as of the end of any month following the month in which he or she gives written notice thereof to the Employer.

2.    Amount of Contributions.  A Participant may contribute to the Trust such amounts as he or she shall determine as set forth in his or her written election; provided, however, that such amounts shall not exceed the limitations of Paragraph E of Article V.  A Participant may change the amount of his or her Employee After-Tax Contributions withheld by payroll deduction once during each Plan Year, and any other time permitted by the Committee, with respect to future contributions by filing a written election with the Committee.

3.    Collection of Contributions.   All contributions received by the Employer, whether by withholding or by direct payment from the Participant, shall be paid over by the Employer to the Trustee.

B.    Rollover Contributions.  If allowed under Article I, any Employee who is a Participant during any Plan Year, or any Employee who the Committee reasonably anticipates will become a Participant, may make qualified Rollover Contributions to the Plan.  If the Committee shall determine, subsequent to any such contribution, that such contribution did not in fact constitute a qualified Rollover Contribution, the amount of such contribution shall be returned to the Employee as soon thereafter as reasonably practicable.  Any such qualified Rollover Contributions shall be allocated and held on behalf of the Participant in a Rollover Contribution Account.  Said Account shall be deemed a part of the Participant's Accrued Benefit and shall be subject to the distribution provisions of Article VII of the Plan.

ARTICLE X                                      X-1

CONFIDENTIAL                                      WH_MDL_00331889

If provided in Article I, this Plan will accept Rollover Contributions and direct rollover of Eligible Rollover Distributions from the types of plans specified in Article I, beginning on the effective date specified in Article I.

C.    <u>Separate Administration and Accounts for Participant Contributions</u>.  The Employee After-Tax Contributions and the Rollover Contributions of a Participant shall be accounted for separately.    The Committee shall establish an Employee After-Tax Contribution Account for each Participant's Employee After-Tax Contributions and a Rollover Contribution Account for his or her Rollover Contributions.  Unless Participant Directed Accounts are allowed under Article I, a Participant's Employee After-Tax Contribution Account and Rollover Contribution Account shall be invested in the general Trust Fund.  On each Valuation Date, the Committee shall determine the fair market value of such Accounts and (subject to the following sentence) shall allocate income or losses to the respective Accounts in proportion to the amounts therein as of the Valuation Date.  For the purpose of allocating income and losses, the Accounts to which Participants' contributions are allocated shall be valued by including only a portion of current year contributions and taking into account Participant withdrawals, which portion shall be determined on a weighted basis by considering the length of time (in complete months) since the making of the contribution (or withdrawal) in relation to the number of complete months elapsed since the last Valuation Date.

D.    <u>Vesting</u>.  A Participant's Employee After-Tax Contribution Account and Rollover Contribution Account shall at all times be fully vested.

E.    <u>Withdrawal of Contributions</u>.    The balance of the Employee After-Tax Contribution Account as of any Anniversary Date may be withdrawn upon 90 days written notice to the Committee, severance of employment being automatically deemed such notice; provided, however, that such 90 day period may be extended by the Committee to satisfy liquidity needs of the Trust.  Any Participant who withdraws 90% of his or her Employee After-Tax Contribution Account within one (1) Plan Year must withdraw his or her entire Employee After-Tax Contribution Account and shall be ineligible to make Employee After-Tax Contributions for the period ending on the Anniversary Date following one (1) year from the date of the last such withdrawal.  If this Plan is subject to Section 417 of the Code, the withdrawal of all or any portion of a Participant's Employee After-Tax Contributions shall be subject to the annuity provisions of Article VII of the Plan.

F.    <u>Distribution of Rollover Contribution Accounts</u>.    When a Participant terminates employment for any reason, his or her Rollover Contribution Accounts shall be distributed to him or her (or in the case of death, to his or her Designated Beneficiary) in the form designated by the Participant as required pursuant to the provisions of Article VII of the Plan.  If elected in Article I, a Participant may receive his or her Rollover Contribution Account prior to termination of employment.

<div align="center">ARTICLE X</div>

X-2

CONFIDENTIAL

WH_MDL_00331890

G.    <u>Limitations on Section 401(m) Contributions</u>.

    1.    <u>Contribution Percentage Limitation</u>.

        (a)    The amount of Qualifying Section 401(m) Contributions made on behalf of the group consisting of Highly Compensated Employees shall not result in an Actual Deferral Percentage that exceeds the greater of the following:

          (i)    The Average Contribution Percentage for Eligible Participants who are Highly Compensated Employees for the current Plan Year shall not exceed the Average Contribution Percentage for Eligible Participants who are Non-Highly Compensated Employees for the current or the preceding Plan Year, as elected in Article I, multiplied by 1.25; or

          (ii)    The Average Contribution Percentage for Eligible Participants who are Highly Compensated Employees for the Plan Year shall not exceed the Average Contribution Percentage for Eligible Participants who are Non-Highly Compensated Employees for the current or the preceding Plan Year, as elected in Article I, multiplied by two (2); provided that the Average Contribution Percentage for Eligible Participants who are Highly Compensated Employees does not exceed the Average Contribution Percentage for Eligible Participants who are Non-Highly Compensated Employees for the current or preceding Plan Year, as elected in Article I, by more than two (2) percentage points or such lesser amount as the Secretary of the Treasury shall prescribe to prevent the multiple use of this alternative limitation with respect to any Highly Compensated Employee.

        (b)    For the first Plan Year in which the Plan (other than a successor plan) provides for a Matching Contribution or After-Tax Employer Contribution, the Average Contribution Percentage of Non-Highly Compensated Employees under the prior year testing method shall be either three percent (3%) or the Average Contribution Percentage of the Non-Highly Compensated Employees for such Plan Year as elected in Article I.

        If the Plan provides for the prior year testing method, the Average Contribution Percentage shall be determined without regard to changes in the group of Non-Highly Compensated Employees who are Eligible Participants during the testing year.

    2.    <u>Matching Contributions</u>.    If elected in Article I, Matching Contributions may be made to the Plan. Such Matching Contributions shall be allocated in accordance with Article I.

<div align="center">ARTICLE X</div>

<div align="right">X-3</div>

CONFIDENTIAL

3.    <u>Safe Harbor Matching Contributions and Safe Harbor Nonelective Employer Contributions</u>.    If Safe Harbor Matching Contributions or Safe Harbor Nonelective Employer Contributions are made to this Plan, the Average Contribution Percentage shall be deemed satisfied but only with respect to Matching Contributions provided that the following requirements are met:

(a)    Each Non-Highly Compensated Employee who is eligible to receive an allocation of Safe Harbor Matching Contributions or Safe Harbor Nonelective Employer Contributions under the Plan must be an Eligible Participant under the Plan's cash or deferred arrangement;

(b)    The Plan provides for a Safe Harbor Matching Contribution formula as described in either Section 401(k)(12)(B)(i) of the Code (the "<u>Basic Matching Formula</u>" as described in Article I) or Section 401(m)(11)(B)(ii) of the Code (the "<u>Enhanced Matching Formula</u>" as described in Article I); provided, however, that with respect to the Enhanced Matching Formula in Article I, the Safe Harbor Matching Contributions are only made with respect to Elective Contributions or Employee After-Tax Contributions that do not exceed six percent (6%) of the Employee's Compensation and no other required Matching Contributions are provided under this Plan. Alternatively, the Plan provides for a Safe Harbor Nonelective Employer Contribution formula that satisfies Section 401(k)(12)(C) of the Code and any required Matching Contributions do not exceed six percent (6%) of Compensation;

(c)    Matching Contributions made at the Employer's discretion on behalf of any Participant may not exceed a dollar amount greater than four percent (4%) of such Participant's Compensation and are only made with respect to Elective Contributions or Employee's After-Tax Contributions that do not exceed six percent (6%) of the Participant's Compensation;

(d)    If Safe Harbor Matching Contributions are made on a payroll period method rather than on an annual method, then such Safe Harbor Matching Contributions must be contributed to the Plan by the last day of the following Plan Year quarter; and

(e)    Safe Harbor Matching Contributions must also satisfy the requirements of Paragraph F of Article IV.

4.    <u>Simple 401(k) Plan</u>.    A Simple 401(k) Plan shall not be subject to the Contribution Percentage limitation.

5.    <u>Special Rules</u>.

<div align="center">ARTICLE X</div>

X-4

CONFIDENTIAL    WH_MDL_00331892

(a)    For purposes of determining the Contribution Percentage limitation, Employee After-Tax Contributions are taken into account for a Plan Year in which such amounts were contributed to the trust or paid to an agent of the Plan and transmitted to the trust within a reasonable time after the payment to the agent. Excess Contributions that are recharacterized are taken into account as Employee After-Tax Contributions for the Plan Year that includes the period for which such Excess Contributions are includable in the gross income of the Employee.

(b)    A Matching Contribution or Safe Harbor Matching Contribution will be taken into account under the Contribution Percentage limitation for the Plan Year only if such contribution is (i) allocated to the Employee's Account under the terms of the Plan as of any date within the Plan Year; (ii) actually paid to the trust no later than the end of the 12-month period beginning on the date after the close of the Plan Year; and (iii) made on behalf of the Employee on account of such Employee's Elective Contributions or Employee After-Tax Contributions for the Plan Year. Safe Harbor Matching Contributions may be allocated only to Non-Highly Compensated Participants. Matching Contributions and Safe Harbor Matching Contributions that do not satisfy all of the preceding requirements of this subparagraph (b) may not be taken in account for purposes of the Average Contribution Percentage limitation. Instead, the contribution must satisfy Section 401(a)(4) of the Code without regard to the special non-discrimination rule in this paragraph for the Plan Year in which allocated as if they were irrevocable contributions and were the only Nonelective Employer Contributions made for the Plan Year.

(c)    A Matching Contribution with respect to an Elective Contribution for a Non-Highly Compensated Employee is not taken into account under the Actual Contribution Percentage limitation to the extent such Matching Contribution exceeds the greater of (i) five percent (5%) of the Employee's Compensation; (ii) the Employee's Elective Contributions to the Plan Year; and (iii) the product of two (2) times the Plan's representative matching rate, as described is Section 1.401(m)-2(a)(5)(ii)(B) and (C) of the Treasury Regulations, and the Employee's Elective Contributions for the Plan Year.

H.    <u>Correction of Excess Aggregate Contributions</u>.    If the Committee recharacterizes Excess Contributions as described in Paragraph J.5 of Article IV, the recharacterized amount shall be subject to the Contribution Percentage limitation of Section 401(m) of the Code. Excess Contributions recharacterized as Employee After-Tax Contributions shall be included in determining the amount of Excess Aggregate Contributions for the Plan Year that ends with or within the Plan Year for which the Contribution Percentage limitation is applied.

The Committee may correct Excess Aggregate Contributions by distributing the Excess Aggregate Contributions and income allocated thereto to the

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                    WH_MDL_00331893

appropriate Highly Compensated Employee after the close of the Plan Year but not more than 12 months after the close of the Plan Year.  The return of Excess Aggregate Contributions to the Highly Compensated Employee shall be determined using the same method applied to the return of Excess Contributions.

      The Committee may correct Excess Aggregate Contributions by the forfeiture of nonvested Matching Contributions (and income allocable thereto).  Such forfeitures shall be made only to the extent necessary to avoid failure of the Contribution Percentage limitation.  The forfeiture of Excess Aggregate Contributions to the Highly Compensated Employee shall be determined using the same method applied to the return of Excess Contributions.

      I.    <u>Reserved</u>.

      J.    <u>Distribution of Income</u>.  Any distribution or forfeiture of Excess Aggregate Contributions must include the income or loss allocated to such contributions.  Allocable income or loss includes income or loss both from the Plan Year in which the Contribution Percentage limitation was exceeded and for the gap period between the end of the Plan Year and the date of distribution.  Allocable income or loss for the Plan Year is determined by multiplying the income or loss for the Plan Year allocable to Qualifying Section 401(m) Contributions by a fraction, the numerator of which is the Excess Aggregate Contributions made on behalf of an Employee for the Plan Year and the denominator of which is the total Account balance attributed to Qualifying Section 401(m) Contributions as of the end of the Plan Year minus the income or plus the loss allocable to such account balance for the Plan Year.  The Committee may determine the allocable income or loss for the gap period by using the fractional method, as prescribed in the preceding sentence, for the period between the end of the Plan Year and the last day of the month preceding the distribution date that is allocable to Qualifying 401(m) Contributions.  Alternatively the Committee may determine income or loss for the gap period under a safe-harbor method, under which income on Excess Aggregate Contributions for the gap period is equal to 10% of the income or loss allocable to Excess Aggregate Contributions calculated under the fractional method as described above in this paragraph for the Plan Year, times the number of calendar months between the end of the Plan Year and the date of distribution counting whole months only and treating distributions made on or before the 15th day of the month as made on the last day of the preceding month and distributions made after the first 15 days of the month as occurring on the first day of the next month.  Notwithstanding the preceding, for Plan Years beginning prior to the effective date of Final Treasury Regulations under 401(k) of the Code as elected in Article I, or if no election is made, no later than Plan Years beginning after December 31, 2005, the Committee can exclude gap period that is allocated to the Participant's Accounts distribution so long as such exclusion is applied consistently to all Participants and corrective distributions for the Plan Year.  For Plan Years in which Final Treasury Regulations under 401(k) are effective gap period income can only be excluded as permitted under Section 1.401(k)-(2)(b) of the

<div align="center">ARTICLE X</div>

X-6

CONFIDENTIAL

Treasury Regulations.  The income allowable to Excess Aggregate Contributions resulting from the recharacterization of Elective Contributions shall be determined and distributed as if such recharacterized Elective Contributions had been distributed as Excess Contributions.

For Plan Years in which the Final Treasury Regulations under 401(k) of the Code are effective, if gap period income is required to be allocated, the Committee may determine the income allocable to Excess Aggregated Contributions on a date that is no more than seven (7) days before the distribution.

A distribution of Excess Aggregate Contributions is not includible in gross income to the extent it represents a distribution of designated Roth Contributions. However, the income allocable to a corrective distribution of Excess Aggregate Contributions that are designated Roth Contributions are included in gross income in the same manner as income allocable to a corrective distribution of Excess Aggregate Contributions that are not designated as Roth Contributions.

K.    Coordination with Section 401(a)(4) of the Code.  Matching Contributions attributable to Employee After-Tax Contributions or Elective Contributions which are returned to the Highly Compensated Employee shall not remain allocated to the Highly Compensated Employee.  The distribution of a matched Employee After-Tax Contribution or Elective Contribution to a Highly Compensated Employee must include the corresponding Matching Contribution.  Unmatched Employee After-Tax Contributions shall be distributed first.  To the extent necessary, matched Employee After-Tax Contributions shall be distributed, in which case the distribution must be made proportionately from the matched and Matching Contributions. A Matching Contribution that is forfeited to cover an Excess Aggregate Contribution is not taken into account under the Contribution Percentage limitation.

If an Elective Contribution is returned to a Highly Compensated Employee and a corresponding Matching Contribution relates to such Elective Contribution, the Committee may forfeit such Matching Contribution regardless of vesting in order to satisfy Section 401(a)(4) of the Code.

L.    Additional Qualified Nonelective Employer Contributions.  Rather than returning Excess Aggregate Contributions, the Committee, in its sole discretion, may make additional Qualified Nonelective Employer Contributions or may apply Elective Contributions to satisfy the Contribution Percentage limitation provided that the Qualified Nonelective Employer Contributions and Elective Contributions that will be treated as Matching Contributions are made with respect to Employees who are Eligible Participants under the Plan

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                                   WH_MDL_00331895

1.    <u>Conditions for Additional QNECs</u>.  Qualified Nonelective Employer Contributions will be treated as Matching Contributions only if the additional requirements described below are satisfied:

(a)    The Nonelective Employer Contributions including Qualified Nonelective Employer Contributions treated as Matching Contributions shall satisfy Section 401(a)(4) of the Code and Section 1.401(a)(4)-1(b)(2) of the Treasury Regulations.

(b)    The Nonelective Employer Contributions excluding Qualified Nonelective Employer Contributions treated as Matching Contributions for the Contribution Percentage limitation and Qualified Nonelective Employer Contributions treated as Elective Contributions for the Actual Deferral Percentage limitation shall satisfy Section 401(a)(4) of the Code and Section 1.401(a)(4)-1(b)(2) of the Treasury Regulations.

(c)    If the Employer is applying the special rule for employer-wide plans in Section 1.414(r)-1(c)(2)(ii) of the Treasury Regulations with respect to a cash or deferred arrangement, the determination of whether the Qualified Nonelective Employer Contributions satisfy the requirements of subparagraphs (a) and (b) of this Paragraph L must be made on an employer-wide basis regardless of whether the plans to which the Qualified Nonelective Employer Contributions are made are satisfying the requirements of Section 410(b) of the Code on an employer-wide basis.  Conversely, in the case of an employer that is treated as operating qualified separate lines of business, and does not apply the special rule for employer-wide plans in Section 1.414(r)-1(c)(2)(ii) of the Treasury Regulations with respect to a cash or deferred arrangement, then the determination of whether the Qualified Nonelective Employer Contributions satisfy the requirements of subparagraphs (a) and (b) of this Paragraph L is not permitted to be made on an employer-wide basis regardless of whether the plans to which the Qualified Nonelective Employer Contributions are made are satisfying the requirements of Section 410(b) of the Code on that basis.

(d)    The Elective Contributions including those treated as Matching Contributions for purposes of the Contribution Percentage limitation shall satisfy Section 401(k)(3) of the Code.

(e)    Qualified Nonelective Employer Contributions shall be allocated to the Employee within the Plan Year, and the Elective Contributions shall relate to Compensation for the Plan Year or Compensation that would have been received within 2½ months after the Plan Year and are allocated within the Plan Year.

(f)    The plan which treats Qualified Nonelective Employer Contributions and Elective Contributions as Matching Contributions and the plan to

ARTICLE X                                            X-8

CONFIDENTIAL                                                    **WH_MDL_00331896**

which the Qualified Nonelective Employer Contributions and Elective Contributions are made must have the same Plan Year.  If the Plan Year is changed to satisfy this requirement, such contributions may be taken into account during the Short Plan Years only if they could have been taken into account under the Contribution Percentage limitation for a plan with the same Short Plan Year.

(g)     If the Employer has elected to apply the prior year testing method to calculate the Contribution Percentage limitation, Qualified Nonelective Employer Contributions must be made no later than twelve (12) months following the last day of the Plan Year preceding the current Plan Year to satisfy the Contribution Percentage limitation.  If the Employer has elected to apply the current year testing method to calculate the Contribution Percentage limitation, Qualified Nonelective Employer Contributions must be made no later than twelve (12) months following the close of the current Plan Year to satisfy the Contribution Percentage limitation.

(h)     Effective as stated in Article I, Qualified Nonelective Employer Contributions cannot be taken into account for a Plan Year for a Non-Highly Compensated Participant to the extent such contributions exceed the product of that Non-Highly Compensated Participant's Compensation and the greater of (i) five percent (5%) or (ii) two (2) times the Plan's representative contribution rate.  Any Qualified Nonelective Employer Contribution taken into account under the Actual Deferral Percentage limitation under Paragraph J.4 of Article IV (including the determination of the representative contribution rate for purposes Section 1.401(k)-2(a)(6)(iv)(B) of the Treasury Regulations), is not taken into account for purposes of this Paragraph L (including the determination of the representative contribution rate for purposes of this subparagraph (h)).

For purposes of this subparagraph (h), the Plan's representative contribution rate is the lowest applicable contribution rate of any eligible Non-Highly Compensated Participant among a group of eligible Non-highly Compensated Participants that consists of half of all eligible Non-Highly Compensated Participants for the Plan Year (or, if greater, the lowest applicable contribution rate of any eligible Non Highly Compensated Participant in the group of all eligible Non-Highly Compensated Participant for the Plan Year and who is employed by the Employer on the last day of the Plan Year).

The applicable contribution rate for an eligible Non-Highly Compensated Participant is the sum of the Matching Contributions taken into account under this Paragraph L for the eligible Non-Highly Compensated Participant for the Plan Year and the Qualified Nonelective Employer Contributions made for that eligible Non-Highly Compensated Participant for the Plan Year, divided by that eligible Non-Highly Compensated Participant's Compensation for such Plan Year.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                            WH_MDL_00331897

Notwithstanding this subparagraph (h), Qualified Nonelective Employer Contributions that are made in connection with an Employer's obligation to pay prevailing wages under the Davis-Bacon Act, Service Contract of 1965 or similar legislation, can be taken into account for a Plan Year to the extent such contributions do not exceed ten percent (10%) of the Non-Highly Compensated Participant's Compensation.

2.    <u>Qualified Nonelective Employer Contributions Not Taken Into Account</u>.  Qualified Nonelective Employer Contributions can not be taken into account under this Paragraph L to the extent such contributions are taken into account for purposes of satisfying any other Actual Deferral Percentage limitation, Contribution Percentage limitation, or the requirements of Sections 1.401(k)-3, 1.401(m)-3 or 1.401(k)-4 of the Treasury Regulations.

M.    <u>Correction of Excess Aggregate Contribution Prior to the Plan Year</u>.  If the Committee determines that the Contribution Percentage is being exceeded during the Plan Year, the Committee may suspend the group of Highly Compensated Employees by suspending Matching Contributions or Employee After-Tax Contributions or any other contributions which result in additional contributions under Section 401(m) of the Code to satisfy the Contribution Percentage limitation.  The Committee shall give notice to such Employees of the amounts to be reduced.  The determination of the reduction shall be made in accordance with the same method used for the return of Excess Aggregate Contributions or on a pro rata basis as determined by the Committee.

N.    <u>Coordination with Correction of Excess Contributions and Excess Deferrals</u>.  The determination of the amount of Excess Aggregate Contributions with respect to a Plan Year shall be made after determining the Excess Contribution, if any, to be treated as an Employee After-Tax Contribution due to recharacterization under Section 401(k) of the Code for the Plan Year subject to Section 401(k) of the Code ending with the Plan Year being tested under Section 401(m) of the Code.  Excess Aggregate Contributions attributed to amounts other than Employee After-Tax Contributions, including forfeited Matching Contributions, shall be treated as Employer Contributions for purposes of Sections 404 and 415 of the Code even if distributed from the Plan.

O.    <u>Aggregation Rules for Section 401(m) Contributions</u>.

1.    <u>In General</u>.  If the Employer maintains two (2) or more plans to which Employee After-Tax Contributions or Matching Contributions are made, then the plans may be considered as a single plan for purposes of determining whether or not such plans satisfy Sections 401(a)(4), 401(m) or 410(b) of the Code, other than Section 410(b)(2)(A) of the Code.  In such case, the aggregated plans must satisfy the Contribution Percentage limitation with respect to the amount of the Employee After-Tax Contributions and Matching Contributions and additionally must satisfy

<div align="center">ARTICLE X                              X-10</div>

CONFIDENTIAL

Sections 401(a)(4) and 410(b) of the Code as though such aggregated plans were a single plan. Whenever a Highly Compensated Employee is eligible under two (2) or more plans of the Employer which are subject to Section 401(m) of the Code, in calculating the Contribution Percentage limitation, the actual contribution ratio of such Highly Compensated Employee will be determined by treating all such plans in which such Highly Compensated Employee is an Eligible Participant as a single plan.

For purposes of this Paragraph O, the term plan means a plan within the meaning of Section 1.410(b)-7(a) and (b) of the Treasury Regulations, after application of the mandatory disaggregation rules of Section 1.410(b)-7(c) of the Treasury Regulations and the permissive aggregation rules of Section 1.410(b)-7(d) of the Treasury Regulations, as modified by Paragraph O.4 of this Article X. Thus, if two (2) plans are treated as a single plan pursuant to the permissive aggregation rules of Section 1.410(b)-7(d) of the Treasury Regulations, then such plans are treated as a single plan for purposes of Sections 401(k) and 401(m) of the Code.

2.    <u>Plans with Inconsistent 401(k) Testing Methods</u>.  In applying the permissive aggregation rules of Section 1.410(b)-7(d) of the Treasury Regulations, an Employer may not aggregate plans within the meaning of Section 1.410(b)-7(b) of the Treasury Regulations that apply inconsistent testing methods. Thus, a plan that applies the current year testing method may not be aggregated with another plan of the Employer that applies the prior year testing method. Similarly, an Employer may not aggregate a plan using the safe harbor provisions of Section 401(m)(11) of the Code and another plan that is required to be tested under Section 401(m)(2) of the Code.

3.    <u>Disaggregation of Plans and Separate Testing</u>.  If Employee After-Tax Contributions or Matching Contributions are included in a plan within the meaning of Section 1.410(b)-7(b) of the Treasury Regulations that is mandatorily disaggregated under Section 410(b) of the Code (as modified by Paragraph O.4 of this Article X), the Employee After-Tax Contributions or Matching Contributions must be disaggregated in a consistent manner. Thus, in the case of an Employer that is treated as operating qualified separate lines of business under Section 414(r) of the Code, if the eligible Employees under a plan which provides for Employee After-Tax Contributions or Matching Contributions are in more than one qualified separate line of business, only those Employees within each qualified separate line of business may be taken into account in determining whether each disaggregated portion of the plan complies with the requirements of Section 401(m) of the Code, unless the Employer is applying the special rule for employer-wide plans in Section 1.414(r)-1(c)(2)(ii) of the Treasury Regulations with respect to the plan. Similarly, if a plan provides for Employee After-Tax Contributions or Matching Contributions under which Employees are permitted to participate before they have completed the minimum age and service requirements of Section 410(a)(1) of the Code applies Section 410(b)(4)(B) of the Code for determining whether the plan complies with Section 410(b)(1) of the Code, then the plan must be

ARTICLE X                                          X-11

BROAD FINANCIAL (800) 395-5200

CONFIDENTIAL                                                              WH_MDL_00331899

treated as two separate plans, one comprising all eligible employees who have met the age and service requirements of Section 410(a)(1) of the Code and one comprising all eligible Employees who have not met the age and service requirements of Section 410(a)(1) of the Code unless the Plan uses the rule that allows for the aggregation of all eligible Employees regardless of age and service.

Restructuring under Section 1.401(a)(4)-9(c) of the Treasury Regulations may not be used to satisfy the requirements of Section 401(m) of the Code.

4.    <u>Certain Disaggregation Rules Not Applicable</u>.    The mandatory disaggregation rules relating to Section 401(k) plans and Section 401(m) plans set forth in Section 1.410(b)-7(c)(1) of the Treasury Regulations and an employee stock ownership plan and non-employee stock ownership plan portions of a plan set forth in Section 1.410(b)-7(c)(2) of the Treasury Regulations shall not apply for purposes of this Paragraph O.    Accordingly, notwithstanding Section 1.410(b)-7(d)(2) of the Treasury Regulations, an employee stock ownership plan and a non-employee stock ownership plan which are different plans (within the meaning of Section 1.410(b)-7(b)) of the Treasury Regulations) are permitted to be aggregated for purposes of Section 401(m) of the Code.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                             WH_MDL_00331900

## XI.    LIFE INSURANCE POLICIES

A.    <u>Investment and Ownership of Life Insurance Policies</u>.  The Committee may direct the Trustee to purchase life insurance policies on the life of a Participant or on a member of the Participant's family or on the joint life expectancy of a Participant and a member of the Participant's family.  The Trustee shall be the applicant for any policies purchased, and each Participant for whom such policy is purchased shall direct in writing that the Trustee shall be recognized by the insurer as the owner of the policy having the power to exercise all rights, privileges, options, elections and other incidents of ownership granted by or permitted under the policy.  The Trustee may also be named as the Beneficiary in the application for such policy; provided, however, that the Participant shall have the right to nominate the Designated Beneficiary pursuant to Article IX of the Plan. Upon the death of the Participant, the Trustee shall pay all proceeds of the policies to the Participant's Designated Beneficiary or if there is no Designated Beneficiary then in accordance with Article IX.

B.    <u>Payment of Premiums</u>.  Upon receipt of notice of the premiums due the insurer for the initial premium on policies purchased pursuant to this Article XI and upon direction of the Committee, the Trustee shall pay such premiums to said insurer.  The policies shall be delivered to the Trustee, and any notices of premiums falling due under such policies thereafter shall be addressed to and such premiums shall be paid by the Trustee.

C.    <u>Accounting for Policies</u>.  The value of any policies purchased by the Trustee pursuant to this Article XI shall be included in the annual valuations of the Plan.

D.    <u>Discrimination</u>.  To the extent that policies are purchased, there shall be no discrimination between Participants as to the form, optional methods of settlement, or other provisions of said policies.  However, any Participant may refuse any offer to purchase contracts for his or her benefit.  Such refusal must be in writing and, when tendered, shall satisfy the anti-discrimination intent of the first sentence of this Paragraph D.

E.    <u>Disposition Upon Retirement or Total Disability</u>.  If any Participant with respect to whom a policy is held by the Trustee ceases to be a Participant as a result of termination of employment  (other than by death) on or after Normal Retirement Age or Total Disability, the Trustee pursuant to the direction and discretion of the Committee shall either  (i) dispose of, or convert, such policy or policies to the extent necessary or desirable in order that the proceeds of such disposition or conversion may be used to provide retirement or disability benefits to the Participant in accordance with the provisions of this Plan; or (ii) distribute such policy or policies to the Participant, provided such policy complies with Paragraph B.4(b) of Article VII.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                                    WH_MDL_00331901

F.    <u>Disposition Upon Other Separation From Service</u>.  Death benefits payable from policies on the life of a Participant shall cease as of the date of the Participant's separation from service for any reason other than death, Total Disability or termination of employment on or after Normal Retirement Age.  In such event, the Trustee, subject to the direction and discretion of the Committee, shall make one (1) of the following dispositions of such policy or policies:

1.    Surrender each such policy to cash or designate itself as Beneficiary of each such policy.

2.    Offer to such Participant all such policies at a price (hereafter referred to as the "purchase price") equal to the cash value if the policy is whole life or accumulation value if the policy is interest sensitive or universal life.  If the Participant accepts such offer, the purchase price shall be charged against his or her vested interest in that portion of the value of his or her Accrued Benefit not represented by such policies, and any excess of such purchase price over such vested interest shall be paid by the Participant to the Trustee in cash within 10 days after accepting such offer.  If the offer is so accepted and any required payment made, the Trustee shall transfer ownership of such policies to such Participant.  If such Participant does not accept such offer within 30 days after written notice from the Committee, the Trustee shall take such action as the Committee may direct to liquidate such policies in order to distribute to such Participant the amount to which he or she is entitled pursuant to this Plan.

3.    Effect a policy loan upon all such policies from the insurer on the sole security of the policies in an amount determined by applying to the then cash value of each such policy a percentage equal to the excess of 100% over the percent vested in such Participant in accordance with the schedule of vesting set forth in this Plan.  The loan proceeds shall go to and become the property of the Trust, and the Trustee shall, after effecting such loan, deliver such policy to the Participant subject to such loan.

G.    <u>Policy Loans</u>.  Except as provided in Paragraph F.3 of this Article XI, policy loans under the loan provisions, if any, may be made by the Trustee proportionately against all contracts held by the Trust and solely for the purpose of paying premiums under such contracts.  No loan shall be made on any policy on the life of any Participant to pay premiums on the life of any other Participant.

H.    <u>Insurer Not a Party</u>.  The insurer shall not be deemed a party to this Plan, and its obligation shall be measured and determined solely by the terms of its policies. The insurer shall deal with the Trustee as the sole and absolute owner of the policies, and the insurer shall be under no obligation of inquiring or determining whether any action or failure to act on the part of the Trustee is in accordance with or authorized by the terms of this Plan.  The insurer shall be fully discharged from any and all liability for any action taken or any amount paid in accordance with the direction of the Trustee, and the insurer

ARTICLE XI                                           XI-2

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                      WH_MDL_00331902

shall not be obligated to see to the distribution or application of any money so paid. The insurer shall be fully discharged of all liability in dealing with the Trustee, as indicated on its records, until such time as it shall receive satisfactory evidence of the appointment and acceptance of a successor Trustee.

    I.    <u>Reserved</u>.

    J.    <u>Insurance Limitations</u>. If the Committee directs the Trustee to purchase life insurance, the following limitations shall apply:

        1.    The cumulative premium for ordinary life insurance contracts shall be less than 50% of the aggregate Employer contributions allocated to any Participant;

        2.    The cumulative premium for term and universal life insurance shall be less than 25% of the aggregate Employer contributions allocated to any Participant;

        3.    The cumulative premium for a combination of ordinary life insurance and term and universal life insurance contracts shall be less than 25% of the aggregate Employer contributions allocated to any Participant. However, for purposes of this Paragraph J.3, 50% of the premium paid for the ordinary life insurance policies shall be excluded from the calculations.

        4.    If the level annual premiums (with respect to a Participant) required to be paid on account of life insurance policies exceed the limitations described in this Paragraph J, then at the election of the Committee:

        (a)    Employee contributions of the Participant, if available, shall be used to sustain the level of such premiums, and if not available, the insurer shall adjust the face amount of the policies to a basis consistent with the reduced contributions applicable to payment of premiums and shall credit resulting excess cash values to succeeding premiums due under the policies; or

        (b)    The Committee may direct the Trustee to request the insurer to convert the existing insurance policies to paid-up policies other than term insurance and issue new policies for the lower premiums at the attained age of the Participant; or to pay over the entire cash values to the Trustee upon surrender of the policies.

<div align="center">ARTICLE XI</div>

<div align="right">XI-3</div>

CONFIDENTIAL

XII.    <u>TRUST</u>

A.    <u>Payment of Contributions</u>.  All contributions under this Plan shall be paid to the Trustee to be held in trust under a Trust Agreement executed by the Employer and the Trustee, which Trust Agreement shall be incorporated herein by this reference.

B.    <u>Participant Directed Accounts</u>.  If allowed under Article I, each Participant shall have the right and power to direct the investment of all assets of the designated Accounts which have been allocated to and set aside in his or her name.  Such power to direct investments shall be made in accordance with the provisions of the Trust Agreement and shall not include the power to invest in "collectibles" as defined in Section 408(m) of the Code and may be limited as described in the following paragraph.

The Committee may establish nondiscriminatory rules and procedures relating to Participants directing investments, Participants selecting brokers, Participants appointing investment managers and Plan fiduciaries meeting their duties under ERISA Section 404(c) and its regulations.

The Committee shall have the sole discretion to modify and replace any and all of these rules and procedures without further amendment to the Plan or Trust. The Committee shall notify the Trustee and Participants within a reasonable time after the adoption of any change to these rules and procedures.  Inactive Participants are solely responsible for informing the Committee of current addresses where changes in these rules and procedures may be sent.

The Participant's right to direct the investment of their Accounts may be limited by the Committee's selection of investment options.  The Committee shall have the sole discretion to delete or substitute investment options without further amendment to the Plan or Trust.  Notice shall be given to Participants within a reasonable time after the adoption by the Committee of any changes in investment options.  Inactive Participants shall have the sole responsibility for keeping the Committee informed of their current addresses for the Committee's use in informing such Inactive Participants of any changes in investment options.

C.    <u>Expenses Charged to Participants' Accounts</u>.

1.    <u>Loans</u>.  For the processing and preparation of loan documents.

2.    <u>QDROs</u>.  For the review and processing of a Qualified Domestic Relations Order.

3.    <u>Distribution Calculations</u>.  To calculate the different distribution options available under the Plan.

ARTICLE XII                                    XII-1

CONFIDENTIAL                                    WH_MDL_00331904

4.   <u>Hardship Withdrawals</u>.   For the processing and determination of a hardship withdrawal.

5.   <u>Periodic Payments</u>.   For each distribution made to a Participant who has elected to receive his or her retirement benefits on a periodic basis.

6.   <u>Inactive Participants' Accounts</u>.   To the extent not paid by the Employer, reasonable administrative expenses attributed to vested Participants who have separated from service but have yet to commence payments of their retirement benefits may be charged to their Accounts.   Such expenses shall be applied to such Participants' Accounts on either a pro rata basis or per capita basis as determined by the Committee.

7.   <u>Expenses of Administration</u>.   To the extent not paid by the Employer, reasonable administrative expenses may be charged to the Participant's Accounts on a pro rata basis or per capita as determined by the Committee.

D.   <u>Prudent Man Rule</u>.   Subject to Sections 403 (c) and (d), 404 (c) 4042 and 4044 of ERISA, a fiduciary shall discharge her of her duties with respect to the Plan solely in the interest of its Participants and Beneficiaries and shall act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL

WH_MDL_00331905

XIII.    THE ADMINISTRATIVE COMMITTEE

A.    Committee Membership.    The Sponsoring Employer shall appoint an administrative Committee of one (1) or more persons, some or all of whom may be officers or involved in management of the Employer; provided, however, that the Committee may be comprised of members of the Board, and the Employer may designate its Board to serve as the Committee as the same may be constituted from time to time.    The Committee is granted broad discretion to interpret and construe the Plan and to carry out its responsibilities hereunder.    The Employer shall certify to the Trustee the names and specimen signatures of the members of the Committee.    The Committee shall serve at the pleasure of the Employer and any members of the Committee may resign by written instrument addressed to the Employer and may be removed by the Employer with or without cause.    While a vacancy exists, the remaining member(s) of the Committee may perform any act which the Committee is authorized to perform.

B.    Named Fiduciary and Plan Administration.    The Sponsoring Employer is the named fiduciary, administrator of the Plan, and agent to receive service of legal process and, except as otherwise provided for herein, shall have full authority and discretion to control and manage the operation and administration of the Plan and to interpret the Plan.    The Committee, as agent for the administrator and subject to the administrator's approval, shall make such rules, regulations, interpretations and computations and shall take such other action to administer the Plan as the Committee may deem appropriate in its sole and exclusive discretion.    The Committee shall administer the Plan in a non-discriminatory manner consistent with the requirements of Section 401(a) of the Code.    The Committee shall resolve by majority vote all questions involving the interpretation, application and administration of the Plan.    The Committee's resolution of such questions shall be final and binding upon the Participants, their Beneficiaries, and the successors, assigns, heirs and personal representatives of any of them and shall be entitled to judicial deference and shall be upheld unless found to be arbitrary and capricious.    Subject to the provisions of Paragraph B of Article XII and the Committee's right to delegate responsibility as set forth in the Trust, the Committee shall direct the investment of the assets of the Trust by written direction to the Trustee.

C.    Compensation.    The members of the Committee shall receive no compensation for acting as such, but the Employer shall reimburse the Committee for all necessary and proper expenses incurred in administering this Plan.

D.    Delegation of Duties.    The Committee may, from time to time, allocate to one (1) or more of its members and may delegate to any other persons or organizations any of its rights, powers, duties and responsibilities with respect to the operation and administration of the Plan.    Any such allocation and delegation of responsibilities shall be reviewed at least annually by the Committee and shall be revocable upon such notice as the Committee, in its sole discretion, deems reasonable and prudent under the

ARTICLE XIII                                        XIII-1

CONFIDENTIAL                                        WH_MDL_00331906

circumstances. The Committee, on its own behalf or on behalf of the Trustee, may employ such persons or organizations to render advice or perform services with respect to responsibilities of the Committee under the Plan as the Committee, in its sole discretion, determines to be necessary and appropriate; provided, however, that the Committee must employ an enrolled actuary to perform the actuarial functions required by ERISA. Such persons or organizations may include, without limitation, attorneys, accountants and financial and administrative consultants.

All or any portion of the expenses incurred for such services or advice shall be borne by the Employer, if it so elects, and if the Employer does not so elect, such expenses shall be borne by the Trust. Expenses incurred for the administration of the Plan shall be deemed a liability of the Plan until such time as the expenses are paid by the Plan either as direct payments to the service providers or as reimbursements to the Employer in cases where the Employer has directly paid the service providers; provided, however, that reimbursements paid to the Employer must occur by the last day of the Plan Year following the later of the Plan Year during which such services were performed or the Plan Year during which the Employer paid such expenses.

E.    <u>Bonding of Fiduciaries</u>.  The Committee shall be responsible for seeing that every fiduciary of the Plan and Trust and every person who handles Trust assets shall be bonded to the extent required by the provisions of Section 412 of ERISA. The cost of such bond shall be paid by the Trustee out of Trust assets, upon direction of the Committee, if the cost thereof shall not be timely paid by the Employer.

F.    <u>Action By Committee Members</u>.  If the Committee is comprised of more than one (1) member, any one (1) member may execute any form, document or other paper on behalf of the Committee and thereby bind the Committee, if the Board or the other Committee members unanimously delegate such authority in writing.

ARTICLE XIII                                                    XIII-2

CONFIDENTIAL                                                    WH_MDL_00331907

## XIV.   AMENDMENT AND TERMINATION; RETURN OF EMPLOYER CONTRIBUTIONS; PARTICIPATING EMPLOYERS

A.    **Amendment**.  The Sponsoring Employer reserves the right to amend this Plan by written instrument, at any time and from time to time, in whole or in part, including without limitation, retroactive amendments necessary or advisable to qualify this Plan and the Trust under the provisions of Section 401(a) of the Code.   However, no such amendment shall (i) reduce the Accrued Benefit of any Participant to the date the amendment is adopted, except to the extent that a reduction may be permitted or required by ERISA and the Code; or (ii) divert any part of the Trust assets to purposes other than for the exclusive benefit of the Participants, retired Participants or their joint annuitants or Beneficiaries who have an interest in the Plan or for the purpose of defraying reasonable expenses of administering the Plan.   Further, no amendment of the Plan shall alter, change or modify the duties, powers or liabilities of the Trustee without its consent, or permit any part of the Trust to be used to pay premiums or contributions of the Employer under any other plan maintained by the Employer for the benefit of its Employees.

If this Plan is an amendment and restatement of a prior Plan that provided for an optional form of benefit after July 30, 1994 that is not provided herein, and such form of benefit cannot be eliminated under Section 411(d)(6) of the Code and Treasury Regulations issued pursuant thereto, then such optional form of benefit shall continue to be available under this Plan to the extent necessary to satisfy Section 411(d)(6) of the Code.

B.    **Authority of Volume Submitter  Practitioner to Amend for Adopting Employers**.  The Volume Submitter Practitioner within the meaning of Revenue Procedure 2005-16 is the entity (including any successor entity) that has received an IRS opinion letter on the lead documents.   Effective on and after the date of the Volume Submitter Practitioner advisory letter, the Volume Submitter Practitioner may amend the plan on behalf of all adopting employers, including those employers who have adopted the plan prior to the amendment, for changes in the Code, regulations, revenue rulings, other statements published by the Internal Revenue Service, including model, sample or other required good faith amendments and for corrections of prior approved plans, but only if their adoption will not cause such plan to be individually designed.   These amendments will be applied to all employers who have adopted the plan, except for any plan that does not permit amendments by the Volume Submitter Practitioner in Article I of such plan.   The Volume Submitter Practitioner will maintain, or have maintained on its behalf, a record of the employers that have adopted the plan, and the volume practitioner will make reasonable and diligent efforts to ensure that adopting employers have actually received and are aware of all plan amendments and that such employers adopt new documents when necessary.

<div align="center">ARTICLE XIV</div>

<div align="right">XIV-1</div>

CONFIDENTIAL

C.    <u>Impact of Change To Individually Designed Plan</u>.  The Volume Submitter Practitioner will no longer have the authority to amend the plan on behalf of any adopting employer as of either:  (1) the date the Internal Revenue Service requires the employer to file Form 5300 as an individually designed plan as a result of an employer amendment to the plan to incorporate a type of plan not allowable in the IRS volume submitter program, as described in Revenue Procedures 2005-16, or (2) as of the date the plan is otherwise considered an individually designed plan due to the nature and extent of the amendments. If the employer is required to obtain a determination letter for any reason in order to maintain reliance on the volume advisory letter, the practitioner's authority to amend the plan on behalf of the adopting employer is conditioned on the plan receiving a favorable determination letter.

D.    <u>Termination or Partial Termination or Complete Discontinuance of Contributions</u>.  The Employer has established the Plan with a bona fide intention and expectation that it will be able to make contributions indefinitely.  Nevertheless, the Employer is not and shall not be under any obligation or liability whatsoever to continue making contributions or to maintain the Plan for any given length of time.  The Employer may in its sole and exclusive discretion discontinue such contributions, or terminate or partially terminate the Plan in accordance with its provisions, the Code and ERISA, if applicable, at any time without any liability whatsoever for any such discontinuance, termination or partial termination.  If the Plan shall be terminated, partially terminated or the contributions of the Employer shall be completely discontinued, the rights of all affected Participants in their Accrued Benefits shall thereupon become fully vested and nonforfeitable notwithstanding any other provisions of this Plan.  However, the Trust shall continue until all Participants' Accounts have been completely distributed to or for the benefit of the Participants or their Designated Beneficiaries in accordance with this Plan, unless the Board specifies that distributions shall occur as a result of such Plan termination.

Notwithstanding the foregoing, in the event the Plan is terminated, the administrative Committee shall remain in existence and all of the provisions of the Plan which in the opinion of said Committee are necessary to effectuate the termination of the Plan and the administration and distribution of Plan benefits shall remain in force.  In addition, the Board of Directors and the Committee reserve the right to further amend or modify the Plan, including the adoption of any retroactive amendments or modifications, to the extent necessary or desirable to effectuate the termination of the Plan or if necessary or appropriate to qualify or maintain the Plan and the Trust Fund as a plan and trust meeting the requirements of Sections 401(a) and 501(a) of the Code or any other applicable law (including ERISA) and the Regulations issued thereunder, and any amendment necessary or advisable to conform the Plan to prior administrative practice shall be retroactive.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                              WH_MDL_00331909

E.    <u>Return of Employer Contributions</u>.  Except as set forth in Paragraphs E.1, 2, 3 and 4 of this Article XIV, the assets of the Plan and Trust shall never inure to the benefit of the Employer and the same shall be held for the exclusive purpose of providing benefits to Participants and their Designated Beneficiaries and defraying reasonable expenses of administering the Plan and Trust.

1.    <u>Mistake of Fact</u>.  If a contribution is made by the Employer by a mistake of fact, the Trustee shall, on written direction of the Committee, return such contribution to the Employer, provided such return of contribution is made within one (1) year after the payment of such contribution.

2.    <u>Initial Qualification</u>.  Employer contributions shall be conditioned on the initial qualification of the Plan under Section 401 of the Code.  If it is finally determined that the Plan is not initially qualified by the Commissioner of Internal Revenue, then such contributions shall be returned to the Employer no later than one (1) year after such final determination but only if the application for determination was filed by the time prescribed by law for filing the Employer's return for the taxable year in which the Plan is adopted or such later date as the Secretary of the Treasury may prescribe.

3.    <u>Deductibility</u>.  Employer contributions shall be conditioned upon the deductibility of such contributions under Section 404 of the Code.  If such deductions are disallowed, then such contributions (to the extent disallowed) shall be returned to the Employer no later than one (1) year after the final disallowance of the deductions.

4.    <u>Suspense Accounts</u>.  If, upon termination of the Plan, there remain Trust assets held in suspense accounts because of the application of Section 415 of the Code, the Trustee shall return such assets to the Employer.

F.    <u>Procedure for Adoption and Withdrawal by Participating Employers</u>.

1.    <u>Adoption of the Plan</u>.  Any member or future member of the Controlled Group, which is not already a Participating Employer under this Plan may, with the consent and approval of the Sponsoring Employer, adopt this Plan as a Participating Employer for all or any classification of persons in its employ.  The adoption of this Plan by a Participating Employer shall be effected by resolution of its board of directors or other written instrument if the Participating Employer is an Unincorporated Entity.  It shall not be necessary for any adopting Participating Employer to formally execute the Plan or Trust as then in effect.  As to the Participating Employer, the effective date of its participation shall be stated in its resolutions, and it shall assume all the rights, obligations and liabilities of a Participating Employer under the Plan and Trust.

ARTICLE XIV                                          XIV-3

CONFIDENTIAL                                                              WH_MDL_00331910

2.    <u>Withdrawal from the Plan</u>.  At any time, a Participating Employer, by resolution of its board of directors and notice to the Sponsoring Employer and Trustee, may withdraw from participation under the Plan.  A withdrawing Participating Employer may arrange for the continuation of this Plan and Trust in a separate form for its own employees.   The withdrawing Participating Employer may arrange for continuation of the Plan and Trust by merger with an existing plan and trust and may request, subject to the Sponsoring Employer's consent, the transfer to such plan and trust of all Trust assets representing the benefits of its employees.

3.    <u>Continued Qualification of the Plan</u>.  The Sponsoring Employer may request a determination from the appropriate District Director of the Internal Revenue Service to the effect that the Plan and Trust as adopted (and amended, as the case may be) by the Participating Employer continues to meet the requirements of tax-qualified status.   If such determination is denied, the adoption by the Participating Employer shall become void and inoperative and any contributions made by or for the Participating Employer shall be promptly refunded by the Trustee.  Furthermore, if the Plan or the Trust in its operation becomes disqualified under the Code for any reason because of the Plan's adoption by any Participating Employer, the portion of the Trust allocable to Participants employed by such Participating Employer shall be segregated as soon as is administratively feasible, pending the:

(a)    Correction of the conditions which caused the Plan's disqualification to the satisfaction of the Internal Revenue Service; or

(b)    Re-qualification of the Plan; or

(c)    Withdrawal of such Participating Employer from the Plan and a continuation by itself or its successor of a separate qualified plan, or by merger with another existing qualified plan; or

(d)    Termination of the Plan and Trust as to such Participating Employer and its Employees.

ARTICLE XIV                              XIV-4

CONFIDENTIAL

## XV.    STANDARD OF CONDUCT OF FIDUCIARIES

A.    <u>Fiduciaries</u>.  Each member of the Board and of the Committee and any other person to whom any fiduciary responsibility with respect to the Plan or Trust is allocated or delegated shall discharge his or her duties and responsibilities with respect to the Plan or Trust in accordance with the standards set forth in Section 401(a)(1) of ERISA and Paragraph B of this Article XV.

B.    <u>Fiduciary Duties</u>.  Subject to Sections 403(c) and (d), 4042, and 4044 of ERISA, a fiduciary shall discharge his or her duties with respect to the Plan solely in the interest of the Participants and Beneficiaries and:

1.    For the exclusive purpose of:

(a)    Providing benefits to Participants and their Beneficiaries; and

(b)    Defraying reasonable expenses of administering the Plan;

2.    With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

3.    By diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

4.    In accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with the provisions of this title.

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                    WH_MDL_00331912

XVI.    <u>MERGERS, CONSOLIDATIONS AND TRANSFERS OF ASSETS</u>

A.    <u>Merger or Consolidation of the Plan</u>.  If this Plan and its Trust merge or consolidate with, or transfer assets or liabilities to, any other qualified plan of deferred compensation, no Participant shall, solely on account of such merger, consolidation or transfer, be entitled to a benefit on the date following such event which is less than the benefit to which he or she was entitled on the date preceding such event, such benefits to be determined as if the Plan had terminated on the date preceding such event (except that there shall be no grant of full vesting).

B.    <u>Transfers From Other Qualified Plans – Rollovers</u>.    There may be transferred to the Trustee, subject to the approval of the Employer, all or any of the assets held (whether by a trustee, custodian or otherwise) on behalf of any other plan which satisfies the applicable requirements of Section 401(a) of the Code, or any qualified Rollover Contributions which are maintained for the benefit of any persons who are or are about to become Participants.  The Employer may require proof that a prior determination was made by the Internal Revenue Service that such transfer will not affect the qualified status of the Plan and Trust.  Any such transfer of assets or Rollovers shall be held and administered in accordance with Article X of the Plan.

C.    <u>Transfer To Eligible Retirement Plans</u>.  Upon direction of the Participant delivered to the Committee, the Trustee is hereby authorized to transfer the assets representing the Vested Accrued Benefit of any Participant under this Plan to the Trustee of an Eligible Retirement Plan.

D.    <u>Transfer or Merger of Money Purchase Pension Plan to this Plan</u>. Notwithstanding any provision of this Plan to the contrary, to the extent that any optional form of benefit under this Plan permits a distribution prior to Normal Retirement Age, death, disability, severance from employment or Plan termination, such optional form of benefit shall not be available with respect to benefits attributable to assets (including the earnings thereon) and liabilities that are transferred, within the meaning of Section 414(l) of the Code, to this Plan from a money purchase pension plan qualified under Section 401(a) of the Code (other than any portion of those assets and liabilities attributable to voluntary employee contributions).

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                                                            WH_MDL_00331913

XVII.  <u>MISCELLANEOUS</u>

A.  <u>Limitation of Rights and Employment Relationship</u>.  Neither the establishment of the Plan and Trust nor any modification thereof, nor the creating of any fund or account, nor the payment of any benefits shall be construed as giving to any Participant or other person any legal or equitable right against the Employer or the Trustee except as provided in the Plan and Trust Agreement; and in no event shall the terms of employment of any Employee or Participant be modified or in any way be affected by the provisions of the Plan or Trust Agreement.

B.  <u>Payments to Missing Persons</u>.  If the Trustee is unable to effect deliver of any distribution to the person entitled to receive it or, upon such person's death, to such person's Designated Beneficiary, it shall so advise the Committee and the Committee shall give written notice to such person at his or her last known address as shown in the Employer's records.  If such person shall not have presented himself or herself to the Employer after one (1) year from the date of mailing such notice, then such distribution shall be forfeited and applied to reduce current and future Employer contributions or allocated if Article I so provides.  Alternatively, the Trustee shall have the discretion to use other means to protect the Participant's or Beneficiary's vested Accrued Benefit.  A missing Participant's vested Accrued Benefit shall be reinstated if a claim is later made by the Participant or Beneficiary of the Participant for the forfeited benefit and such claim is approved by the Committee.

C.  <u>Spendthrift Provisions</u>.  Except with respect to a Participant loan, neither the Employer nor the Trustee shall recognize any transfer, mortgage, pledge, hypothecation, order or assignment by any Participant or Beneficiary of all or any part of his or her interest under the Plan and Trust.  Any attempt by a Participant or Beneficiary to assign, alienate, sell, transfer, pledge or encumber his or her benefits shall be void.  A Participant's or Beneficiary's interest shall not be subject in any manner to transfer by operation of law, and shall be exempt from the claims of creditors or other claimants (including but not limited to, debts, contracts, liabilities or torts) from all orders, decrees, levies, garnishments and/or executions and other legal or equitable process or proceedings against such Participant or Beneficiary to the full extent which may be permitted by law.

Notwithstanding the foregoing, this Paragraph C shall also apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a Participant pursuant to a domestic relations order, unless such order is determined to be a Qualified Domestic Relations Order within the meaning of Section 414(p) of the Code and Section 206(d)(3) ERISA, if applicable.  The Committee shall determine whether any domestic relations order submitted with respect to a Participant's benefits is a Qualified Domestic Relations Order and shall establish procedures for making such determination and notifying interested parties of its ruling.  A domestic relations order entered into before January 1, 1985 (i) shall be treated as a Qualified Domestic

<div align="center">ARTICLE XVII                    XVII-1</div>

CONFIDENTIAL

Relations Order if the payment of benefits pursuant to the order has commenced as of such date; or (ii) at the Committee's discretion, may be treated as a Qualified Domestic Relations Order if the payment of benefits has not commenced as of January 1, 1985, even though the order does not satisfy the requirements of Section 414(p) of the Code.

D.    <u>Indemnification</u>.    The Employer shall indemnify and hold harmless the members of the Board of Directors and the Committee to whom any fiduciary responsibility with respect to the Plan is allocated or delegated, from and against any and all liabilities, costs and expenses incurred by such persons as a result of any act, or omission to act, in connection with the performance of their duties, responsibilities and obligations under the Plan and under ERISA, other than such liabilities, costs and expenses as may result from the bad faith or criminal acts of such persons.

E.    <u>Applicable Laws; Severability</u>.    The provisions of the Plan shall be construed and enforced according to ERISA and the Code and, to the extent applicable, according to the laws of the state in which the Sponsoring Employer maintains its principal place of business; provided, further, that if any provision is susceptible to more than one (1) interpretation, such interpretation shall be given thereto as is consistent with the Plan being a qualified employees' profit sharing or pension plan within the meaning of the Code. If any provision of this instrument shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions shall continue to be fully effective.

F.    <u>Inapplicability of Certain Provisions if Plan is Not an ERISA Plan</u>. Notwithstanding any other provision of the this Plan, at such times that the Plan is not an "employee benefit plan," within the meaning of Section 3(3) of ERISA, or is not subject to Part 4 of Title I of ERISA, Paragraphs B and D of Article XII, Paragraph E of Article XIII, the entirety of Article XV, and any reference in this Agreement to ERISA shall be inapplicable: provided however, to the extent any provision of the foregoing Paragraphs or Articles is required to be retained for the purpose of the Plan being tax-qualified under Section 401(a) of the Code or avoiding a prohibited transaction under Section 4975 of the Code, such provision shall remain applicable but only for such purpose.

The Employer has executed this Plan on the 1st Day of February , 20 13 .

RJM Capital LLC

By: _____

Richard J Markowitz

<u>ADDRESS:</u>

███████████████

New York, NY 10028

ARTICLE I                                                                    I-1

BROAD FINANCIAL  (800) 395-5200

CONFIDENTIAL                                                 WH_MDL_00331915

# Exhibit 10

# Trust Agreement Under

# The RJM Capital Pension Plan

CONFIDENTIAL

# TABLE OF CONTENTS

Page

I.   NAME, PURPOSE AND DEFINITIONS ................................................................. 1

   A.   Name. ................................................................................................... 1
   B.   Purpose. ............................................................................................... 1
   C.   Definitions. ........................................................................................... 1
   D.   Conflict with Plan. ................................................................................ 1
   E.   Co-Trustees. ......................................................................................... 1
   F.   Effective Date. ...................................................................................... 1

II.  ESTABLISHMENT OF TRUST .......................................................................... 2

   A.   Establishment. ...................................................................................... 2
   B.   Administration. ...................................................................................... 2
   C.   Contributions. ....................................................................................... 2
   D.   Return of Employer Contributions. ........................................................ 2
   E.   Transfers from Other Qualified Plans; Rollovers. .................................. 2
   F.   Transfer From Employer's Qualified Plans. ........................................... 3
   G.   Transfer To Eligible Retirement Plans. .................................................. 3
   H.   Deemed IRA Contributions. .................................................................. 3

III. INVESTMENT OF TRUST ASSETS ................................................................... 3

   A.   Funding Policy. ..................................................................................... 3
   B.   Authority to Direct Investments. ............................................................ 3
   C.   Investments – Liability of Trustee. ........................................................ 4
   D.   Combination with Assets of Other Trusts. ............................................. 5
   E.   Qualifying Employer Securities or Real Property. ................................. 6

-i-

SKAT_MDL_00000347

F.     Participant Directed Accounts. .................................................................. 6
G.    Indicia of Ownership; Foreign Assets. ....................................................... 7
H.    Loans to Participants. ................................................................................. 7

IV.    POWERS OF THE TRUSTEE. ............................................................................ 7

A.    General Powers. .......................................................................................... 7
B.    Multiple Trustees. ....................................................................................... 9

V.    BOOKS AND RECORDS ..................................................................................... 9

VI.    VALUATIONS AND ACCOUNTINGS ................................................................ 10

VII.    LIFE INSURANCE ............................................................................................. 10

A.    Application; Policy. ..................................................................................... 10
B.    Exercise of Rights ..................................................................................... 10
C.    Premiums. ................................................................................................. 11
D.    Beneficiary Designation. ........................................................................... 11
E.    Liability of Insurance Company. ................................................................ 11

VIII.    DISTRIBUTIONS .............................................................................................. 11

A.    In General. ................................................................................................. 11
B.    Payments Before Notice of Event. ............................................................ 11
C.    Payments to Missing Persons. .................................................................. 12
D.    Death of Participant. ................................................................................. 12
E.    Income Tax Withholding. ........................................................................... 12
F.    Distributions to Incompetent Persons. ..................................................... 12
G.    Qualified Domestic Relations Orders. ...................................................... 12

IX.    RESIGNATION OR REMOVAL AND APPOINTMENT OF TRUSTEE ............ 12

X.    TAXES, EXPENSES AND COMPENSATION OF THE TRUSTEE ................. 13

CONFIDENTIAL

SKAT_MDL_00000348

    A.    Taxes. ................................................................................ 13
    B.    Expenses; Compensation. ................................................ 13

XI.   IRREVOCABILITY; AMENDMENT AND TERMINATION ................................. 13

XII.  STANDARD OF CONDUCT OF FIDUCIARIES ................................................ 13

    A.    Fiduciaries. ........................................................................ 13
    B.    Fiduciary Duties. ............................................................... 13

XIII.  MISCELLANEOUS ....................................................................................... 15

    A.    Request for Instructions. ................................................... 15
    B.    Liability of Trustee. ........................................................... 15
    C.    Controversy. ..................................................................... 15
    D.    Joinder of Parties. ............................................................ 15
    E.    Spendthrift Provisions. ..................................................... 15
    F.    Diversion of Assets Prohibited. ........................................ 15
    G.    Gender and Number. ........................................................ 16
    H.    Applicable Law; Severability. ............................................ 16
    I.    Headings. .......................................................................... 16
    J.    Inapplicability of Certain Provisions If Plan is Not an ERISA Plan ......... 16
    K.    Successor Trustee(s) ....................................................... 16

CONFIDENTIAL

SKAT_MDL_00000349

# Trust Agreement Under

# The RJM Capital Pension Plan

This Trust Agreement (the "Trust" or "Agreement") is entered into by and between RJM Capital LLC, a DE LLC, as "Employer", and Richard J Markowitz, as "Trustee." This Trust is intended to provide for the funding of the Plan which has been adopted by the Employer, and to accomplish this purpose, the Employer and the Trustee agree as follows:

## I.    NAME, PURPOSE AND DEFINITIONS

A.    Name.  The name of the Trust shall be RJM Capital Pension Plan Trust.  The RJM Capital Pension Plan (the "Plan") is incorporated as a part of this Agreement by this reference.

B.    Purpose.  This Trust is created for the purpose of receiving contributions made under the Plan, accumulating, managing and investing those contributions, and providing benefits to the Participants and their Beneficiaries.  This Trust shall be administered for the exclusive purpose of providing benefits to the Participants and their Beneficiaries and defraying reasonable costs of administration.  This Trust and the Plan are intended to satisfy all of the requirements for a qualified retirement plan under the appropriate provisions of the Internal Revenue Code, ERISA and other applicable federal and state laws.

C.    Definitions.  All specifically defined terms used in this Agreement shall have the meanings as defined in the Plan.

D.    Conflict with Plan.  If the provisions of this Agreement conflict with any of the provisions of the Plan, this Agreement shall control as it relates to the duties and obligations of the Trustee.

E.    Co-Trustees.  If there is more than one (1) Trustee, any one of such Co-Trustees shall have the right to make any decision, undertake any action or execute any documents affecting this Trust without the approval of the remaining Trustees.  Any directions to any person or organization shall be executed by any one of the Co-Trustees.  For purposes of this Trust and the Plan, "directions" shall mean any certification, notice, authorization, application or instruction of the Trustee.

F.    Effective Date.  This Trust Agreement shall be effective on the first day of the first Plan Year in which this plan is adopted by the Employer.

-1-

SKAT_MDL_00000350

## II.    ESTABLISHMENT OF TRUST

### A. Establishment.

This Agreement establishes a trust as to such funds as shall be from time to time deposited with the Trustee by or on behalf of the Employer or Participants pursuant to the Plan, together with income generated by such funds. The Trustee agrees to receive and hold such funds and income in trust in accordance with the terms of this Agreement. The Trustee shall not be individually liable to any person for any obligation or liability incurred on behalf of the Trust, and all persons shall look solely to the Trust assets for satisfaction of such obligations or liabilities.

### B. Administration.

The Plan shall be administered by the Committee, and the Trustee shall have no duties with respect to the administration of the Plan. The Employer shall certify to the Trustee the names and signatures of the members of the Committee acting from time to time. The Committee shall comply with any reasonable requirements of the Trustee.

### C. Contributions.

The Employer shall transmit to the Trustee all of its contributions and all contributions of the Participants. All contributions shall be in cash or if this is a profit sharing plan or stock bonus plan then contributions may be made by Employer stock or other property valued at fair market value and acceptable to the Trustee. The Trustee shall have no duty to determine or inquire whether any contributions to this Trust are in compliance with the Plan; nor shall the Trustee have any duty or authority to compute the amount of any such contributions; nor shall the Trustee be responsible for the collection or adequacy of any contributions to the Trust or for the adequacy of the Trust to meet and discharge liabilities under the Plan. Any premiums on life insurance policies owned by this Trust which are paid by the Employer directly to an insurance carrier shall be deemed to have passed through the Trust, even though not reflected on the books and records of the Trustee.

### D. Return of Employer Contributions.

Except as specifically permitted under the terms of the Plan, the assets of the Plan and Trust shall never inure to the benefit of the Employer, and these assets shall be held for the exclusive purpose of providing benefits to Participants and their Beneficiaries and defraying reasonable expenses of administering the Plan and Trust.

### E. Transfers from Other Qualified Plans; Rollovers.

If specifically permitted under the terms of the Plan, there may be transferred to the Trustee, subject to the approval of the Employer and Trustee, all or any of the assets held (whether by a trustee, custodian, or otherwise) on behalf of any other plan which satisfies the applicable requirements of Section 401(a) of the Code, or qualified rollover contributions, and which is maintained for the benefit of any persons who are or are about to become Participants. The Employer or Trustee may require a prior determination by the Internal Revenue Service that such transfer will not affect the qualified status of the Plan and Trust. Any such transfer of assets or Rollovers shall be held and administered in accordance with the provisions of the Plan relating to the administration of Employee and Rollover Contributions.

-2-

SKAT_MDL_00000351

F. Transfer From Employer's Qualified Plans.
Upon direction of a Participant delivered to the Committee and the Trustee, the Trustee is authorized to receive the assets representing the value of any Participant's benefits earned under any other qualified plan maintained by the Employer. Upon receipt of such benefits, the Committee and the Trustee shall hold and maintain such benefits as a Rollover Contribution Account in connection with the relevant provisions of Article X of this Plan to be distributed in accordance with the provisions of Article VII of this Plan. Assets transferred and held in Rollover Contribution Accounts shall be deemed to be a part of the Participant's Accrued Benefit.

G. Transfer To Eligible Retirement Plans.
Upon direction of the Participant delivered to the Committee and the Trustee of this Plan, the Trustee is hereby authorized to transfer the assets representing the vested Accrued Benefit of any Participant under this Plan to the Trustee of an Eligible Retirement Plan.

H. Deemed IRA Contributions. If permitted under the terms of the Plan, a Participant may be entitled to make Deemed IRA Contributions. The IRA Trustee shall be responsible for the administration of the Deemed IRA Contributions in accordance with the terms of the Plan.

III.    INVESTMENT OF TRUST ASSETS

A. Funding Policy. The Plan's funding policy and method, as determined from time to time by the Committee, shall be communicated to the fiduciary responsible for managing and investing the Trust assets (and each Investment Manager if selected in the manner set forth in Paragraph B1 or B2 below) in a timely manner so that the fiduciary (and each Investment Manager, if any) may coordinate the investment policies of this Trust with such funding policy and method. In investing and reinvesting the Trust assets, the fiduciary (and each Investment Manager, if any) shall have due regard for the Plan's funding policy and method, but in no event shall the fiduciary (or any such Investment Manager) have any responsibility for the establishment or adequacy of such funding policy and method.

B. Authority to Direct Investments. Except as provided in Paragraphs 1 and 2 below or in Paragraph F of this Article III, the Committee shall be the fiduciary responsible for directing the investment and management of the Trust assets.

1. Employer Appointment of Trustee or Investment Manager. The Employer may, by resolution of its Board, terminate the Committee's right to direct the investment and management of all or any portion of the Trust assets by transferring to the Trustee or an Investment Manager the authority and duty to direct the investment and management of all or any portion of the Trust assets.

2. Committee Appointment of Trustee or Investment Manager. As long as the Employer has not taken any action under Paragraph 1 above, the Committee

-3-

CONFIDENTIAL

may, but need not, appoint the Trustee or an Investment Manager to direct the investment and management of all or any portion of the Trust assets.

3. <u>Manner of Appointment, etc.</u>. A certified copy of any Board resolution or resolution of appointment pursuant to Paragraphs 1 or 2 above shall be delivered to the Trustee, whereupon the Trustee or the Investment Manager, as the case may be, shall become the fiduciary with respect to the investment and management of such Trust assets. Any transfer of investment and management authority to the Trustee or to an Investment Manager shall be revoked upon receipt by the Trustee (and Investment Manager, if any) of a notice to that effect from the Employer through its Board or from the Committee, as the case may be. The appointment, selection, and retention of an Investment Manager shall be the sole responsibility of the Committee or the Employer, as the case may be. The Trustee is authorized to rely upon the fact that the Investment Manager is at all times a qualified Investment Manager (as defined in Section 3(38) of ERISA) until such time as the Trustee has received written notice from the Employer or Committee to the contrary. The Trustee is also authorized and entitled to rely upon the fact that the Investment Manager is authorized to direct the investment and management of the Trust assets until such time as the Employer or Committee, as the case may be, shall notify the Trustee in writing that another Investment Manager has been appointed in place of the Investment Manager named or, in the alternative, that the Investment Manager named has been removed and the responsibility for the investment and management of the Trust assets has been assumed by the Committee or has been transferred to the Trustee, as the case may be.

C. <u>Investments – Liability of Trustee</u>.
During such period or periods of time, if any, as the Committee, an Investment Manager, or a Participant is authorized to direct the investment and management of the Trust assets, the Trustee shall (subject to the overriding limitations set forth below) effect and change investments of the Trust as directed in writing (or by telephonic or other electronic instruction if so authorized by the Committee) by Investment Manager, the Committee or Participant, as the case may be, and shall neither affect nor change any such investments without such direction and shall have no right, duty, or responsibility to recommend investment or investment changes. Such direction may be either general or specific in its terms and may be given on an "until revoked" basis. The following provisions shall govern the Trustee during such period or periods:

1. <u>Signature; Reliance on Directions</u>. All written directions concerning investment and management made by the Committee, Investment Manager or Participant shall be signed by the authorized person or persons acting on behalf of the Committee or the Investment Manager, or by the Participant, as the case may be. The Trustee shall be entitled to rely upon such directions, as well as directions received by telephone or other electronic media if so authorized by the Committee, when purported to come from such authorized person or persons, or from the Participant.

2. <u>No Liability for Committee Actions</u>. As long as the Committee possesses full power and responsibility to direct the Trustee with respect to the investment and management of all or any portion of the Trust assets, the Trustee shall not be liable or responsible in any way for any losses or other unfavorable results

-4-

CONFIDENTIAL

arising from the Trustee's compliance with the directions of the Committee which are made in accordance with the terms of the Trust and which are not contrary to the provisions of any applicable federal or state statute regulating such investment and management of the assets of an employee benefit trust.

3. <u>No Liability for Investment Manager Actions</u>. If an Investment Manager is given full authority and responsibility to direct the investment and management of all or a portion of the Trust assets, the Trustee shall not be liable or responsible in any way for any losses or other unfavorable results arising from the Trustee's compliance with the directions of the Investment Manager. In such event, to the extent Section 405(b)(3)(B) of ERISA so permits, the Committee shall also not be liable or responsible in any way for any losses or other unfavorable results arising from the Trustee's compliance with the directions of the Investment Manager.

4. <u>No Duties Other Than Compliance With Directions</u>. The Trustee shall be neither under a duty to question any directions of the Committee, Investment Manager or Participant, nor to review any securities or other property constituting Trust assets with respect to which the Committee, Investment Manager or Participant has investment responsibility, nor to make any suggestions to the Committee, Investment Manager or Participant in connection with such assets. The Trustee shall not be liable, in any manner or for any reason, for the making or retention of any investment pursuant to such direction, nor shall the Trustee be liable for its failure to invest any or all of the Trust funds in the absence of such directions. The Trustee shall, as promptly as possible, comply with any directions given by the Committee, Investment Manager or Participant.

5. <u>No Duty to Investigate</u>. During such period or periods of time, if any, as the Committee, an Investment Manager or Participant is authorized to direct the Trustee, the Trustee shall have no obligation to determine the existence of any conversion, redemption, exchange, subscription, or other right relating to any securities purchased of which notice was given prior to the purchase of such securities; and it shall have no obligation to exercise any such right unless the Trustee is informed of the existence of the right and is instructed to exercise such right, in writing, by the Committee, the Investment Manager or Participant, as the case may be, within a reasonable time prior to the expiration of such right.

6. <u>No ERISA Liability</u>. The Trustee shall not be liable under Section 405(b) of ERISA for following any instructions of the Committee that are referred to in Section 403(a)(1) of ERISA.

7. <u>No Impermissible Investments</u>. Neither the Committee, any Investment Manager nor Participant shall direct the purchase, sale or retention of any Trust assets if such directions are not in compliance with the applicable provisions of the Code and ERISA and any regulations or rulings issued thereunder.

D. <u>Combination with Assets of Other Trusts</u>. The Trustee may combine the Trust assets for investment purposes with the assets of any other trusts established by the Employer pursuant to the provisions of any qualified employee benefit plan. In such

-5-

SKAT_MDL_00000354

event, the Trustee shall keep separate records of the amounts allocable to each such fund. The Trustee shall have full power and authority to transfer Trust assets to any bank, trust company or savings and loan association, including the Trustee or any of its affiliates, licensed to do business in the state in which the Sponsoring Employer maintains its principal place of business, as trustee of any investment fund or funds consisting exclusively of assets of pension and profit-sharing trusts. In such event, the instrument or instruments creating and governing such fund or funds shall become a part hereof as fully as if set forth at length herein. Trust assets invested in said fund or funds shall be held and administered by the trustee thereof strictly in accordance with the terms and under the powers granted in said instrument or instruments.

E. <u>Qualifying Employer Securities or Real Property</u>. Unless permitted under ERISA, the Trustee shall neither invest in any security issued by the Employer which is not a "Qualifying Employer Security," as defined in this Paragraph E, nor in any real property which is leased to the Employer which is not a "Qualifying Employer Real Property" as defined in this Paragraph E. Unless the Plan is a profit-sharing plan, stock bonus plan or employee stock ownership plan, no investment of any Trust assets shall at any time be made in any Qualifying Employer Security if by reason of such investment the aggregate fair market value of all Qualifying Employer Securities (and Qualifying Employer Real Property) held in the Trust immediately after such investment shall exceed 10% of the then fair market value of the Trust assets. A profit-sharing plan, stock bonus plan or employee stock ownership plan may invest all Trust assets in Qualifying Employer Real Property and Qualifying Employer Securities, unless limited by provisions of the Plan. A "Qualifying Employer Security" means stock of the Employer and any bond, debenture, note, certificate, or other evidence of indebtedness of the Employer which is a "marketable obligation" as defined in Section 407(e) of ERISA. "Qualifying Employer Real Property" means qualifying real property as defined in Section 407 of ERISA.

F. <u>Participant Directed Accounts</u>. If, pursuant to the provisions of the Plan relating to this Trust, the Participants are empowered to direct and manage the share of the Trust assets held in their Accounts, then the Trustee shall, upon written direction from the Committee, segregate assets representing the value of a Participant's Accounts under the Plan to allow the Participant to manage the investment of those assets attributable to his or her Accounts within the limitations set forth in the Plan. The Trustee shall have no obligation to invest or otherwise manage assets earmarked for a Participant's Accounts until written notice is received from the Committee terminating the Participant's power to direct the investment of his or her Accounts. Following the death of a Participant, any rights and obligations of a Participant with respect to his or her directed Accounts may be held and assumed by his or her Beneficiary to the extent permitted under the terms of the Plan.

1. <u>Participant Direction</u>. A Participant shall exercise his or her investment rights by directing the Trustee or its authorized representative, either directly or through an investment manager appointed by the Participant, to enter into investment transactions. The Trustee shall ensure that the Participant receives written confirmation of his or her investment directions, when so requested by the Participant. At all times, the Trustee shall hold title to all investments held in the Participant's segregated

<center>-6-</center>

Accounts. The Trustee shall have no duty to oversee the Participant's investments; provided, however, that the Participant shall be precluded from investing in collectibles as defined in Section 408(m) of the Code. Neither the Trustee nor any other fiduciary shall be liable or responsible in any way for any losses or other unfavorable results arising from the Trustee's compliance with the Participant's directions with respect to the assets segregated in his or her Accounts.

2. <u>Limitations on Participant Direction</u>. The Trustee may decline to implement any investment direction that the Trustee determines does not comply with rules and procedures established by the Committee. The Trustee may decline to implement any investment direction that the Trustee determines (if implemented):

(a) would result in a prohibited transaction;
(b) would jeopardize the Plan's tax qualified status;
(c) would not be in accordance with Plan documents;
(d) would generate unrelated business taxable income;
(e) could result in a loss exceeding the Participant's account balance; or

(f) would cause the indicia of ownership of plan assets to be outside the jurisdiction of the district courts of the United States, other than as permitted under ERISA Section 404(b) and its regulations.

G. <u>Indicia of Ownership; Foreign Assets</u>. Except as otherwise permitted by regulation, the Trustee shall not maintain the indicia of ownership of any Trust assets outside the jurisdiction of the District Courts of the United States.

H. <u>Loans to Participants</u>. If permitted under the terms of the Plan, the Committee shall direct the Trustee to make a loan or loans to a Participant, or a beneficiary of a Participant, in accordance with the provisions governing such loans in the Plan.

IV.     <u>POWERS OF THE TRUSTEE</u>

A. <u>General Powers</u>. Subject to the provisions of Article III of this Agreement and any other limitations contained in this Agreement, the Trustee shall have all the powers necessary to hold in trust and administer all Trust assets including, but not by way of limitation, the power:

1. To invest and re-invest Trust assets and to purchase or acquire and retain for the account of the Trust such properties as people of prudence, discretion and intelligence purchase for their own account, in accordance with the standards set forth in Article XII of this Agreement. The assets purchased, acquired and retained by the Trustee for investment may include, but not by way of limitation, every kind of property, real, personal and mixed and interests therein, specifically including, but not by way of limitation, government obligations, corporate obligations of every kind, preferred and common stocks (including the stock of a corporate Trustee), buy and sell call and put options, and limited partnership interests, all in a manner conforming with the then existing law.

-7-

SKAT_MDL_00000356

2.  In making such investments, the Trustee shall take into consideration any income tax effects resulting from investments yielding unrelated business taxable income.

3.  To lease Trust assets for terms within or beyond the term of the Trust, for any purpose, including exploration for and removal of gas, oil and other minerals; and to enter into community oil leases, pooling and unitization agreements.

4.  To abandon any real or personal property which the Trustee shall deem to be worthless or not of sufficient value to warrant keeping or protecting; to abstain from the payment of taxes, water rents, assessments, and the expenses of repairs, maintenance and upkeep of any such property; to permit any such property to be lost by tax sale or other proceedings, or to convey any such property for a nominal consideration or without consideration.

5.  To remove all or any part of the Trust assets and to transfer the place of administration of the Trust to any location outside of the state in which the Sponsoring Employer maintains its principal place of business, provided it is within the United States of America.

6.  To collect and receive the income of the Trust and any and all money, securities and other property, or any kind or nature due, owning or belonging to the Trust.

7.  To deposit, hold and invest, without liability for interest thereon, any monies in any bank, trust company, or savings and loan association, including the Trustee or any of its affiliates including, without limitation, through purchase of or investment in, savings accounts, checking accounts, certificates of deposit and bankers acceptances.  Notwithstanding the foregoing, any such investment in or purchase through the Trustee or any of its affiliates shall bear a reasonable rate of interest during such time as the Trustee is the fiduciary for the investment and management of the Trust assets so invested.

8.  To sell, exchange or otherwise dispose of any securities or other property at any time or times and on such terms and conditions as the Trustee may deem appropriate, and to contract or grant options for the purchase, exchange or other disposition thereof.

9.  To exercise, respecting bonds, shares of stock and other securities, all of the rights, powers and privileges of an owner, including holding securities in its own name (or in the name of a nominee with or without disclosure of the Trust), voting, giving proxies, making payments of costs, assessments or other sums deemed by the Trustee as expedient for the protection of the Trust, exchanging securities, selling or exercising subscription rights, exercising conversion rights, consenting to, and participating in foreclosures, reorganizations, consolidations, mergers, liquidations, pooling agreements and voting trusts, and assenting to corporate sales, leases and encumbrances.

-8-

CONFIDENTIAL

10. To extend the time of payment of any obligation at any time owing to the Trust; to deposit any securities or other property with any protective, reorganization, or similar committee, to delegate discretionary powers to any such committee, and to pay and agree to pay a portion of the expenses and compensation of any such committee and any assessments levied with respect to any such securities or other property so deposited.

11. To borrow money and to issue promissory notes evidencing any such borrowings or advances and to secure the repayment of such borrowings by mortgage, deed of trust, or pledge of any securities or other property constituting trust assets; and to pay and discharge any indebtedness of the Trust or any lien or other charge against the Trust.

12. To enforce any mortgage, deed of trust, pledge or other security interest held to secure Trust loans, and to purchase at any sale thereunder any property subject to such encumbrances.

13. To sue or defend in connection with any and all securities or other property at any time received or held by or for the Trust, and all costs and attorney's fees in connection therewith shall be charged against the Trust.

14. To settle, compromise or submit to arbitration any claims, debts or damages due or owing to or from the Trust; to commence or defend legal proceedings for or against the Trust; and to represent the Trust in all proceedings in any court of law or equity or before any other body or tribunal.

15. To create reserves of cash or other assets of the Trust for the payment of expenses, or for distributions pursuant to the Plan, or for any other purposes in connection with this Agreement.

16. To employ agents, including without limitation, investment advisors, appraisers, attorneys (including counsel for the Employer) and accountants and to rely on advice given by them.

17. To loan Trust assets on reasonable terms and interest rates securing such loans with adequate security.

B. <u>Multiple Trustees</u>. Unless otherwise provided in the Plan, a power vested in two or more Trustees may only be exercised by their unanimous action.

## V.    <u>BOOKS AND RECORDS</u>

The Trustee shall keep accurate and detailed accounts of all investments, receipts and disbursements, and any other transactions engaged in on behalf of the Trust; and all accounts, books and records relating thereto shall be open to inspection at all reasonable times by the Committee or its designated representative.

-9-

## VI.    VALUATIONS AND ACCOUNTINGS

As soon as administratively feasible after the Valuation Date, within 60 days after the removal or resignation of any Trustee and whenever so requested in writing by the Committee, the Trustee shall value the Trust assets and shall file with the Committee a written accounting reflecting the fair market value of the assets and liabilities of the Trust and the receipts and disbursements of the Trust since the last statement filed with the Committee. If the Trustee, in making any such valuation, determines that the Trust consists, in whole or in part, of property not traded freely on a recognized market, or that information necessary to ascertain the fair market value of any Trust assets or liabilities is not readily available to the Trustee, the Trustee may request the Committee to instruct the Trustee as to such fair market value for all purposes under the Plan; and in such event, the fair market value determined by the Committee shall be binding and conclusive. If the Committee fails or refuses to instruct the Trustee as to such fair market value within a reasonable time after receipt of the Trustee's request, the Trustee shall take such action as it deems necessary or advisable to ascertain such fair market value, including the retention of such counsel and independent appraisers as it considers necessary; and in such event the fair market value determined by the Trustee shall be binding and conclusive. Except for the Trustee's negligence, willful misconduct or lack of good faith, upon the expiration of 90 days from the filing of such accounting, the Trustee shall be forever released and discharged from all liability and accountability to anyone with respect to the propriety of its acts or transactions as set forth in such accounting, unless written objection is filed with the Trustee within said 90 day period by any person interested in the Trust.

## VII.    LIFE INSURANCE

As directed in writing by the Committee and subject to such direction, the Trustee shall have the following powers and duties with respect to any investments in life insurance and annuity contracts:

A. Application; Policy.  The Trustee may apply for a policy or policies of life insurance and/or annuity to be issued on the life of any Participant in an amount to be determined by the Committee on a non-discriminatory basis; provided, that the aggregate of premiums with respect to each such Participant must comply with the provisions of the Plan relating to life insurance at any particular time. Any policy shall be of a form customarily used for employee benefit trusts, issued by any legal reserve life insurance company selected by the Committee and qualified to do business in the state in which the Sponsoring Employer maintains its principal place of business. Each such policy shall be a contract between the insurance company and the Trustee and shall be owned and held by the Trustee as an asset of the Trust.

B. Exercise of Rights  The Trustee may exercise any rights and options provided by any such policy or permitted by the issuing insurance company with respect to such policy, including the right to change any provision which shall become operative upon the termination of employment of any Participant. When a Participant's employment is terminated by retirement, Total Disability, death or otherwise, the Trustee may convert such policy into an annuity contract or cash for the benefit of the Trust or shall, at the

-10-

SKAT_MDL_00000359

written direction of the Committee, assign and deliver the policy to the Participant or his or her Beneficiary.

C. Premiums.  At the written direction of the Committee, the Trustee shall pay the premiums on any policy held in the Trust out of Trust assets.  The Trustee shall apply dividends in reduction of premiums.  Any dividends payable with respect to any policy as to which there shall be no further premiums due shall be paid in cash to the Trustee and added to the Trust.

D. Beneficiary Designation.  At the written direction of the Committee and subject to the provisions of the Plan relating to life insurance, the Trust shall be designated as the beneficiary under any such policy.

E. Liability of Insurance Company.  No insurance company which issues any policy as provided above shall be a party to this Agreement, or have any responsibility for the validity of this Trust.  The liability of any such insurance company shall be only as provided in any policy which it may issue.  Any insurance company shall be fully protected from all liability in accepting premium payments from the Trustee and in making payments to or on the direction of the Trustee, without liability as to the application of such payments.  Such insurance company shall be fully protected in dealing with the Trustee as the sole owner of policies held under this Trust, and it shall not be liable in assuming that the Trust has not been amended or terminated until notice of any amendment or termination of the Trust has been received by the insurance company at its home office.  No amendment of the Trust shall deprive the insurance company of any protection except as to policies issued by it after receipt at its home office of notice of the terms of such amendment.  The insurance company shall be fully protected in dealing with the Trustee according to the latest notification received by it at its home office.

VIII.    DISTRIBUTIONS

A. In General.  The Trustee shall from time to time, at the written direction of the Committee, make a distribution from the Trust to such persons, in such manner (that is, in cash or in kind), in such amounts and for such purposes as may be specified in such directions. Any such directions shall be signed by a majority of the then members, or by any such person or persons as may be from time to time designated by the Committee acting by a majority of its members.  The Trustee shall incur no liability for any distribution made by it pursuant to the direction of the Committee, and the Trustee shall be under no duty to inquire as to whether any distribution directed by the Committee is made pursuant to the provisions of the Plan.  The Trustee may make any cash distribution by mailing its check for the amount of such distribution, and may make any in kind distribution by mailing such property, to the person to whom such distribution is to be made at the address furnished by the Committee, or if no such address shall have been furnished, to such person in care of the Employer at its principal office.

B. Payments Before Notice of Event.  Until the Committee shall receive written notice of any birth, marriage, death, or any other event upon which the right to payments from this Trust may depend, the Committee shall incur no liability to persons

-11-

CONFIDENTIAL

SKAT_MDL_00000360

whose interests may have been affected by the event for disbursements made in good faith.

C. <u>Payments to Missing Persons</u>. If the Trustee is unable to effect delivery of any distribution to the person or entity entitled to receive it, it shall so advise the Committee and the Committee shall determine the method of distribution or forfeiture of such benefit in accordance with the Plan provisions and shall so instruct the Trustee.

D. <u>Death of Participant</u>. Upon the death of a Participant, the Committee may, but need not, require the personal representative of the Participant's estate and/or the Beneficiary to furnish proof of death and such tax release forms as are deemed appropriate by the Committee prior to making any payment of death benefits.

E. <u>Income Tax Withholding</u>. Distributions to any Participant or his or her Beneficiary shall be subject to any applicable tax withholding rules, including without limitation those set forth in Section 3405 of the Code and the Treasury Regulations promulgated thereunder.

F. <u>Distributions to Incompetent Persons</u>. The Committee may direct the Trustee to distribute the benefits of any Participant pursuant to the instructions of any person named by such Participant in a durable power of attorney which, on its face, appears to be valid and enforceable, or a court-appointed legal guardian or conservator of such Participant.

G. <u>Qualified Domestic Relations Orders</u>. Notwithstanding anything to the contrary contained herein, the Committee may direct the Trustee to make distribution to a Participant's Spouse or former Spouse in accordance with a Qualified Domestic Relations Order and in accordance with the terms of the Plan.

## IX. RESIGNATION OR REMOVAL AND APPOINTMENT OF TRUSTEE

Any Trustee may resign at any time upon the giving of 60 days' written notice to the Employer, and any Trustee may be removed by the Employer at any time upon the giving of 60 days' written notice to all Trustees. Such 60-day period may be reduced by mutual agreement between the Employer and Trustee. The resignation or removal shall become effective upon the expiration of such 60 day period or an earlier date agreed to by the Employer and Trustee and thereupon the Employer shall, if there was but a sole Trustee, or may, if there was before such resignation or removal at least two Trustees, appoint a successor Trustee or Trustees which may be a corporation, one or more individuals or a combination thereof. Upon failure of the Employer to appoint a successor Trustee by the effective date of the resignation or removal, the Board shall become successor Trustee until another successor is appointed. Any successor Trustee shall have the same rights, powers and duties as he would have had as an original Trustee. In addition to the foregoing, with the consent of the Trustee, the Employer may appoint a co-Trustee or co-Trustees.

-12-

CONFIDENTIAL

X.    TAXES, EXPENSES AND COMPENSATION OF THE TRUSTEE

A. <u>Taxes</u>. The Trustee shall deduct from and charge against the Trust assets any taxes paid by it which may be imposed upon the Trust or the income of the Trust or which the Trustee is required to pay with respect to the interest of any person in the Trust, in which latter event the deduction and charges shall be against the Account or Accounts of such person.

B. <u>Expenses; Compensation</u>. The Trustee shall not receive any compensation, or other form of remuneration, for its services. The Trustee shall have the power to pay out of the Trust assets all reasonable expenses of administration including, without limitation, fees paid to accountants, actuaries, appraisers and attorneys.

XI.    IRREVOCABILITY; AMENDMENT AND TERMINATION

Except for such amendments that are permitted under this Article XI, the Trust created under this Agreement is irrevocable. However, the Employer may terminate this Trust at any time without the consent of the Trustee or any beneficiary, and the Trust may be amended at any time by written agreement of the Employer and the Trustee; provided, however, that except in accordance with the provisions of the Plan and this Trust, such termination or amendment may not (i) deprive any Participant, any former Participant or the joint annuitants of any such Participant, or their personal representatives or designated Beneficiaries, of any interest which has vested under the terms of the Plan, nor (ii) cause or permit any portion of the Trust assets to be diverted to purposes other than for the exclusive benefit of the Participants, the former Participants and their joint annuitants, or their personal representatives or Beneficiaries, and defraying reasonable administrative expenses, nor (iii) cause or permit any portion of the Trust assets to revert to or become the property of the Employer unless required under the terms of the Plan. Further, the Employer may at any time in its sole and absolute discretion discontinue making contributions to the Trust.

XII.    STANDARD OF CONDUCT OF FIDUCIARIES

A. <u>Fiduciaries</u>. Each member of the Board and of the Committee and any other person to whom any fiduciary responsibility with respect to the Plan or Trust is allocated or delegated shall discharge his or her duties and responsibilities with respect to the Plan and Trust in accordance with the standards set forth in Section 401(a)(1) of ERISA and Paragraph B of this Article XII.

B. <u>Fiduciary Duties</u>. Subject to Sections 403(c) and (d), 404(c), 4042, and 4044 of ERISA, a fiduciary shall discharge his or her duties with respect to the Plan solely in the interest of the Participants and Beneficiaries and:

1. For the exclusive purpose of:

-13-

CONFIDENTIAL

(a) Providing benefits to Participants and their Beneficiaries;

(b) Defraying reasonable expenses of administering the Plan;

2. With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

3. By diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and

4. In accordance with the documents and instruments governing the Plan insofar as such documents and instruments are consistent with the provisions of this title.

-14-

SKAT_MDL_00000363

## XIII.    MISCELLANEOUS

A. Request for Instructions.  In addition to instructions relating to valuations, at any time the Trustee may, by written request, seek instructions from the Committee on any matter and may await the written instructions from the Committee without incurring any liability whatsoever.  The Trustee shall be fully protected and shall have no liability for acting in accordance with such instructions.  If at any time the Committee fails to give instructions to the Trustee, the Trustee may act, and shall be protected in acting without such instructions, in such manner as in its discretion seems appropriate and advisable under the circumstances for carrying out the purposes of this Trust.

B. Liability of Trustee.  In addition to any other limitations on liability set forth in the Agreement, the Trustee shall not be liable for any losses which may be incurred with respect to the Trust, except to the extent that such losses shall have been caused by its negligence, bad faith or willful misconduct, and the Trustee shall be fully protected for actions taken or not taken pursuant to the provisions of this Agreement.

C. Controversy.  If any controversy arises with respect to this Trust, the Trustee shall, subject to the provisions of ERISA or the Code, take action as directed by the Committee or, in the absence of such direction, as it deems advisable in that circumstance.

D. Joinder of Parties.  In any action affecting this Trust, only the Trustee, the Committee, and the Employer shall be joined as parties, and no Participant or other persons having any interest in this Trust shall be entitled to any notice or service of process unless otherwise required by law.  Any judgment entered in such action shall be binding on all persons claiming under this Trust.  Nothing in this Agreement shall be construed as to deprive a Participant of the right to seek adjudication of his or her rights under ERISA.

E. Spendthrift Provisions.   Except with respect to a Participant loan or a Qualified Domestic Relations Order, neither the Employer nor the Trustee shall recognize any transfer, mortgage, pledge, hypothecation, order or assignment by any Participant or Beneficiary of all or any part of his or her interest under the Trust.  Any attempt by a Participant or Beneficiary to assign, alienate, sell, transfer, pledge or encumber his or her benefits shall be void.  A Participant's or Beneficiary's interest shall not be subject in any manner to transfer by operation of law, and shall be exempt from the claims of his or her creditors or other claimants (including but not limited to, debts, contracts, liabilities or torts) from all orders, decrees, levies, garnishments and/or executions and other legal or equitable process or proceedings against such Participant or Beneficiary to the full extent which may be permitted by law.

F. Diversion of Assets Prohibited.  Except as provided in Paragraphs C and D of Article II of this Agreement, no portion of the Trust assets shall revert to or become the property of the Employer or be diverted to purposes other than for the exclusive benefit of Participants, former Participants or their joint annuitants, or their personal representatives or Beneficiaries, and defraying reasonable administrative expenses.

-15-

SKAT_MDL_00000364

G. <u>Gender and Number</u>. As used in this Agreement, the masculine, feminine or neuter gender, the single or plural number, and the use of the collective shall each be deemed to include the others whenever the context so indicates.

H. <u>Applicable Law; Severability</u>. This Agreement shall be construed and enforced in accordance with ERISA and the Code, to the extent applicable, and otherwise in accordance with the laws of the state in which the Sponsoring Employer maintains its principal place of business. If any provision of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions; and this Agreement shall be construed and enforced as if such provision had not been included.

I. <u>Headings</u>. Headings used in this Agreement are inserted for convenience or reference only and any conflict between such headings and the provision of this Agreement shall be resolved in favor of the provisions.

J. <u>Inapplicability of Certain Provisions If Plan is Not an ERISA Plan</u>. Notwithstanding any other provision of the this Agreement, at such times that the Plan is not an "employee benefit plan," within the meaning of Section 3(3) of ERISA, or is not subject to Part 4 of Title I of ERISA, Paragraphs B,C, E, F and G of Article III, the entirety of Article XII, and any reference to ERISA in this Agreement shall be inapplicable, and the Trustee shall have the authority to direct the investment and management of Trust assets."

K. <u>Successor Trustee(s)</u>. If the trustee(s) of this trust is/are unable or refuse to serve for any reason whatsoever, then _____ is/are nominated to serve as successor trustee(s). *[Please fill in the blank]*

This Agreement is entered into this <u>1st</u> day of <u>February</u>, 20<u>13</u>.

RJM Capital LLC

By: _____
Richard J Markowitz

Trustee:

Richard J Markowitz
_____

-16-

SKAT_MDL_00000365

# Exhibit 11

Form **8802**

(Rev. April 2012)
Department of the Treasury
Internal Revenue Service

## Application for United States Residency Certification

► See separate instructions.

OMB No. 1545-1817

| For IRS use only: |
|---|
| Pmt Amt $ |
| Deposit Date: ___ /___ /___ |
| Date Pmt Vrfd: ___ /___ /___ |

**Important.** For applications filed after March 31, 2012, the user fee is $85 per application.

☐ **Additional request** (see instructions)          ☐ **Foreign claim form attached**

**Electronic payment confirmation no.** ► 74541406141

| Applicant's name | Applicant's U.S. taxpayer identification number |
|---|---|
| RJM CAPITAL PENSION PLAN | 46-1910855 |
| If a joint return was filed, spouse's name (see instructions) | If a joint return was filed, spouse's U.S. taxpayer identification number |
| If a separate certification is needed for spouse, check here ►  ☐ | |

**1**  Applicant's name and taxpayer identification number as it should appear on the certification if different from above

**2**  Applicant's address during the calendar year for which certification is requested, including country and ZIP or postal code. If a P.O. box, see instructions.

1010 FIFTH AVE, SUITE 1D, NEW YORK, NY  10028

**3a**  Mail Form 6166 to the following address:
RJM CAPITAL PENSION PLAN
C/O RICHARD MARKOWITZ
1010 FIFTH AVE, SUITE 1D
NEW YORK, NY  10028

**b**  Appointee Information (see instructions):
Appointee Name ► ADAM LAROSA                              CAF No. ►
Phone No. ► ( 732 )  272-4445                             Fax No. ► (          )

**4**  Applicant is (check appropriate box(es)):
**a** ☐ Individual. Check all applicable boxes.
    ☐ U.S. citizen          ☐ U.S. lawful permanent resident (green card holder)          ☐ Sole proprietor
    ☐ Other U.S. resident alien. Type of entry visa ► _____
    Current nonimmigrant status ► _____ and date of change (see instructions) ► _____
    ☐ Dual-status U.S. resident (see instructions). From ► _____ to ► _____
    ☐ Partial-year Form 2555 filer (see instructions). U.S. resident from ► _____ to ► _____
**b** ☐ Partnership. Check all applicable boxes.      ☐ U.S.      ☐ Foreign      ☐ LLC
**c** ☐ Trust. Check if:  ☐ Grantor (U.S.)    ☐ Simple    ☐ Rev. Rul. 81-100 Trust    ☐ IRA (for Individual)
    ☐ Grantor (foreign)    ☐ Complex    ☐ Section 584    ☐ IRA (for Financial Institution)
**d** ☐ Estate
**e** ☐ Corporation. If incorporated in the United States only, go to line 5. Otherwise, continue.
    Check if:  ☐ Section 269B    ☐ Section 943(e)(1)    ☐ Section 953(d)    ☐ Section 1504(d)
    Country or countries of incorporation ► _____
    If a dual-resident corporation, specify other country of residence ► _____
    If included on a consolidated return, attach page 1 of Form 1120 and Form 851.
**f** ☐ S corporation
**g** ☑ Employee benefit plan/trust. Plan number, if applicable ► _____
    Check if:  ☑ Section 401(a)    ☐ Section 403(b)    ☐ Section 457(b)
**h** ☐ Exempt organization. If organized in the United States, check all applicable boxes.
    ☐ Section 501(c)    ☐ Section 501(c)(3)    ☐ Governmental entity
    ☐ Indian tribe    ☐ Other (specify) ► _____
**i** ☐ Disregarded entity. Check if:  ☐ LLC    ☐ LP    ☐ LLP    ☐ Other (specify) ►
**j** ☐ Nominee applicant (must specify the type of entity/individual for whom the nominee is acting) ►

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.          Cat. No. 10003D          Form **8802** (Rev. 4-2012)

Form 8802 (Rev. 4-2012)                                                                                          Page **2**

Applicant name:    **RJM CAPITAL PENSION PLAN - TIN 46-1910855**

---

**5**    Was the applicant required to file a U.S. tax form for the tax period(s) on which certification will be based?

   **Yes.**    Check the appropriate box for the form filed and **go to line 7.**

   ☐ 990   ☐ 990-T   ☐ 1040   ☐ 1041   ☐ 1065   ☐ 1120   ☐ 1120S   ☐ 3520-A   ☐ 5227   ☑ 5500

   ☐ Other (specify) ▶ _____

   **No.**    Attach explanation (see instructions). Check applicable box and go to line 6.

   ☐ Minor child   ☐ QSub   ☐ U.S. DRE   ☐ Foreign DRE   ☐ Section 761(a) election

   ☐ FASIT   ☐ Foreign partnership   ☐ Other ▶

---

**6**    Was the applicant's parent, parent organization or owner required to file a U.S. tax form? **(Complete this line only if you checked "No" on line 5.)**

   **Yes.**    Check the appropriate box for the form filed by the parent.

   ☐ 990   ☐ 990-T   ☐ 1040   ☐ 1041   ☐ 1065   ☐ 1120   ☐ 1120S   ☐ 5500

   ☐ Other (specify) ▶

   Parent's/owner's name and address ▶ _____

   and U.S. taxpayer identification number ▶ _____

   **No.**    Attach explanation (see instructions).

---

**7**    Calendar year(s) for which certification is requested.

   **Note. If certification is for the current calendar year or a year for which a tax return is not yet required to be filed, a penalties of perjury statement from Table 2 of the instructions must be entered on line 10 or attached to Form 8802 (see instructions).**

   2014

**8**    Tax period(s) on which certification will be based (see instructions).

   201312

**9**    Purpose of certification. Must check applicable box (see instructions).

   ☑ Income tax    ☐ VAT (specify NAICS codes) ▶ _____

   ☐ Other (must specify) ▶ _____

---

**10**   Enter penalties of perjury statements and any additional required information here (see instructions).

   RJM CAPITAL PENSION PLAN IS A U.S. RESIDENT AND WILL CONTINUE TO BE THROUGHOUT THE CURRENT TAX YEAR.

   RJM CAPITAL PENSION PLAN WAS FORMED IN 2013 AND AS SUCH HAS NOT FILED FORM 5500 AS OF THIS DATE AS IT IS NOT DUE AT THIS TIME.

---

**Sign here**

Under penalties of perjury, I declare that I have examined this application and accompanying attachments, and to the best of my knowledge and belief, they are true, correct, and complete. If I have designated a third party to receive the residency certification(s), I declare that the certification(s) will be used only for obtaining information or assistance from that person relating to matters designated on line 9.

Applicant's signature (or individual authorized to sign for the applicant)                Applicant's daytime phone no.:

Keep a copy for your records. ▶

_____          **12/11/2013**        **212-247-2600**
Signature                                              Date

**RICHARD MARKOWITZ - TRUSTEE**
Name and title (print or type)

_____
Spouse's signature. If a joint application, **both** must sign.

_____
Name (print or type)

Form **8802** (Rev. 4-2012)

Form 8802 (Rev. 4-2012) **Worksheet for U.S. Residency Certification Application** Page **3**

| Applicant Name | Applicant TIN |
|---|---|
| RJM CAPITAL PENSION PLAN | 46-1910855 |
| Appointee Name (If Applicable) | |

Calendar year(s) for which certification is requested (must be the same year(s) indicated on line 7)

2014

**11**   Enter the number of certifications needed in the column to the right of each country for which certification is requested.

**Note.** If you are requesting certifications for more than one calendar year per country, enter the total number of certifications for all years for each country (see instructions).

| Column A | | | Column B | | | Column C | | | Column D | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Country | CC | # | Country | CC | # | Country | CC | # | Country | CC | # |
| Armenia | AM | | Finland | FI | | Latvia | LG | | South Africa | SF | |
| Australia | AS | | France | FR | 4 | Lithuania | LH | | Spain | SP | 4 |
| Austria | AU | 4 | Georgia | GG | | Luxembourg | LU | 4 | Sri Lanka | CE | |
| Azerbaijan | AJ | | Germany | GM | 4 | Mexico | MX | | Sweden | SW | 4 |
| Bangladesh | BG | | Greece | GR | | Moldova | MD | | Switzerland | SZ | 4 |
| Barbados | BB | | Hungary | HU | | Morocco | MO | | Tajikistan | TI | |
| Belarus | BO | | Iceland | IC | | Netherlands | NL | 4 | Thailand | TH | |
| Belgium | BE | 4 | India | IN | | New Zealand | NZ | | Trinidad and Tobago | TD | |
| Bermuda | BD | | Indonesia | ID | | Norway | NO | | Tunisia | TS | |
| Bulgaria | BU | | Ireland | EI | | Pakistan | PK | | Turkey | TU | |
| Canada | CA | 4 | Israel | IS | | Philippines | RP | | Turkmenistan | TX | |
| China | CH | | Italy | IT | 4 | Poland | PL | | Ukraine | UP | |
| Cyprus | CY | | Jamaica | JM | | Portugal | PO | 4 | United Kingdom | UK | |
| Czech Republic | EZ | | Japan | JA | 4 | Romania | RO | | Uzbekistan | UZ | |
| Denmark | DA | 4 | Kazakhstan | KZ | | Russia | RS | | Venezuela | VE | 12 |
| Egypt | EG | | Korea, South | KS | | Slovak Republic | LO | | | | |
| Estonia | EN | | Kyrgyzstan | KG | | Slovenia | SI | | | | |
| **Column A - Total** | | 16 | **Column B - Total** | | 16 | **Column C - Total** | | 12 | **Column D - Total** | | |

**12**   Enter the total number of certifications requested (add columns A, B, C, and D of line 11) . . . . . . . . . . . ▶ | 66

CONFIDENTIAL     **WH_MDL_00033721**

# Exhibit 12

54-14-194-315



**SKAT**

Claim to Relief from Danish Dividend Tax

☐ In my capacity as beneficial owner          ☒ On behalf of the beneficial owner

Claim is made for refund of Danish dividend tax, in total DKK:          825567.80

**Beneficial Owner**

Full name
RJM Capital Pension Plan

Full address
1010  Fifth Avenue - Suite 1D,  New York
NY 10028
USA

E-mail
clientservices@goalgroup.com

Signature
Beneficial owner/applicant

*If the claim is made on behalf of the beneficial owner the applicant's power of attorney shall be enclosed*

As documentation is enclosed dividend advice(s), number:          1

*(This documentation is obligatory)*

**Financial institution**

The amount is requested to be paid to:

Name and address
Goal TaxBack Ltd
NatWest Bank
High Street Branch Croydon

34015159

Reg. no          Account no

NWBKGB2L          IBAN GB88NWBK60730134015159

SWIFT          BLZ          IBAN

On reclaim please quote:-000 DK 152

**Certification of the competent authority**

It is hereby certified that the beneficial owner is covered by the Double Taxation Convention concluded between Denmark and          U.S.A.

Date          Official stamp and signature

When signed to be forwarded to:          **Skattecenter Høje-Taastrup**
Postboks 60
DK-2630 Taastrup

2010.07 (gl.nr. U 20x)

**06.003 ENG**

54-14-194-316



## Claim to Relief from Danish Dividend Tax

| | ☐ In my capacity as beneficial owner | ☒ On behalf of the beneficial owner |
|---|---|---|

Claim is made for refund of Danish dividend tax, in total DKK:   **2141783.64**

**Beneficial Owner**

Full name
RJM Capital Pension Plan

Full address
1010  Fifth Avenue - Suite 1D,  New York
NY 10028
USA

E-mail
clientservices@goalgroup.com

Signature
Beneficial owner/applicant

goal

*If the claim is made on behalf of the beneficial owner the applicant's power of attorney shall be enclosed*

As documentation is enclosed dividend advice(s), number:   1

*(This documentation is obligatory)*

**Financial institution**

The amount is requested to be paid to:

Name and address
Goal TaxBack Ltd
NatWest Bank
High Street Branch Croydon

34015159

| Reg. no | Account no |
|---|---|

| NWBKGB2L | IBAN GB88NWBK60730134015159 |
|---|---|
| SWIFT | BLZ | IBAN |

On reclaim please quote:-000 DK 141

**Certification of the competent authority**

It is hereby certified that the beneficial owner is covered by the Double Taxation Convention concluded between Denmark and                    U.S.A.
.................................................................

Date          Official stamp and signature

When signed to be forwarded to:      **Skattecenter Høje-Taastrup**
Postboks 60
DK-2630 Taastrup

2010.07 (gl.nr. U 20x)

**06.003 ENG**

Confidential Pursuant to Protective Order

54-14-194-317



**SKAT**

## Claim to Relief from Danish Dividend Tax

☐ In my capacity as beneficial owner     ☒ On behalf of the beneficial owner

Claim is made for refund of Danish dividend tax, in total DKK:     2363610.94

**Beneficial Owner**

Full name
RJM Capital Pension Plan

Full address
1010  Fifth Avenue - Suite 1D,  New York
NY 10028
USA

E-mail
clientservices@goalgroup.com

Signature
Beneficial owner/applicant

goal

*If the claim is made on behalf of the beneficial owner the applicant's power of attorney shall be enclosed*

As documentation is enclosed dividend advice(s), number:     1

*(This documentation is obligatory)*

**Financial institution**

The amount is requested to be paid to:

Name and address
Goal TaxBack Ltd
NatWest Bank
High Street Branch Croydon

34015159

| Reg. no | Account no | |
|---|---|---|
| | NWBKGB2L | IBAN GB88NWBK60730134015159 |
| SWIFT | BLZ | IBAN |

On reclaim please quote:-000 DK 130

**Certification of the competent authority**

It is hereby certified that the beneficial owner is covered by the Double Taxation Convention concluded between Denmark and                                    U.S.A.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Date          Official stamp and signature

When signed to be forwarded to:     **Skattecenter Høje-Taastrup**
Postboks 60
DK-2630 Taastrup

2010.07 (gl.nr. U 20a)

**06.003 ENG**

Confidential Pursuant to Protective Order                                    SKAT_MDL_001_00265428

54-14-194-318



# Solo Capital

10 Exchange Square,
Primrose Street, London, EC2A 2EN

---

## DIVIDEND CREDIT ADVICE
### Issue Date: 25-03-2014, Issue No: 1,104

---

**RJM Capital LLC Pension Plan**
1010 Fifth Avenue
Apt 1D
New York
NY 10028

**Date: 25-03-2014**

Dear Sirs,

Please be advised that we have credited your account RJM01, for the value date of 25-03-2014. This payment represents the dividend as shown below:

| | |
|---|---|
| **Security Name:** | **PANDORA A/S** |
| **Sedol:** | **B44XTX8** |
| **ISIN:** | **DK0060252690** |
| **Ex Date:** | 20-03-2014 |
| **Record Date:** | 24-03-2014 |
| **Pay Date:** | 25-03-2014 |
| **Dividend Per Share:** | DKK 6.50 |
| **No of Shares:** | 470,409 |
| **Gross Dividend:** | DKK 3,057,658.50 |
| **Tax:** | DKK 825,567.80 |
| **Net Dividend:** | DKK 2,232,090.70 |

...../..........................................................

Name: Sanjay Shah
Solo Capital Partners LLP

Solo Capital Partners LLP is authorised and regulated by the Financial Conduct Authority of the United Kingdom (FCA Registration Number 566533, Company Number OC367979, VAT Registration Number 123 4462 461)

Confidential Pursuant to Protective Order

SKAT_MDL_001_00265429

54-14-194-319



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
PHILADELPHIA, PA 19255

CERTIFICATION
PROGRAM

Date: March 3, 2014



001221

Taxpayer: RJM CAPITAL PENSION PLAN
      TIN: 46-1910855
Tax Year: 2014

I certify that, to the best of our knowledge, the above-named entity is
a trust forming part of a pension, profit sharing, or stock bonus plan
qualified under section 401(a) of the U.S. Internal Revenue Code, which
is exempt from U.S. taxation under section 501(a), and is a resident of
the United States of America for purposes of U.S. taxation.

Nancy J. Aiello
Field Director, Accounts Management

Form **6166** (Rev. 6-2008)
Catalog Number 43134V

Confidential Pursuant to Protective Order

SKAT_MDL_001_00265430

**RJM Capital Pension Plan**
**1010 Fifth Avenue – Suite 1D**
**New York, NY 10028**

**Power of Attorney**

THIS POWER OF ATTORNEY, made this 21st day of March 2013 by RJM Capital Pension Plan ("the Pension Plan") WITNESSETH AS FOLLOWS:-

1.  The Pension Plan hereby appoints Goal TaxBack, ("GTB") to be the attorney of the Pension Plan and in the Pension Plan's name and otherwise on the Pension Plan's behalf and as the Pension Plan's act and deed to sign, seal, execute, deliver, perfect and do all deeds, instruments, acts and things which may be required (or which GTB shall consider requisite) for or in connection with the provision of any tax services provided to the Pension Plan from time to time, including the reclaiming from any taxation authority in any jurisdiction (as appropriate) amounts in respect of payments made to the Pension Plan, or through GTB on behalf of the Pension Plan. The Pension Plan also authorises GTB to set the procedure to collect the amounts claimed.

2.  The Pension Plan shall ratify and confirm all transactions entered into, documents executed and things done by GTB or its delegates by virtue of the Power Of Attorney given by Clause 1 of this deed unless it is proved that GTB or its delegates have acted with negligence, willful default or fraud.

3.  The Pension Plan agrees to indemnify GTB against all costs, liabilities and expenses including (without limitation) any reasonable legal fees and disbursements arising directly or indirectly out of the exercise or purported exercise of GTB's powers under this deed PROVIDED THAT GTB shall not be indemnified against any such liabilities, costs and expenses arising out of GTB or any nominee's or agent's or delegates own willful default, negligence or fraud.

4.  The Pension Plan declares that any person dealing with GTB shall not be concerned to see or enquire as to the proprietary or expediency of any act, deed, matter or thing which GTB may do or perform in the Pension Plan's name by virtue of this deed.

5.  This deed shall be revocable on the unilateral act of the Pension Plan, provided that GTB is given at least 5 working days notice of such revocation. The provisions of Clauses 2 and 3 shall survive termination of this deed.

6.  This deed shall be governed by and construed in accordance with English law, and the Pension Plan hereby irrevocable submits to the non-exclusive jurisdiction of the English courts.

(contd)

Confidential Pursuant to Protective Order

IN WITNESS whereof this deed has been executed by the Pension Plan and is intended to be and is hereby delivered on the date above written.

**Execution of a deed by a pension plan incorporated outside Great Britain**

*Executed as a deed by -*

*Name of pension plan:*          RJM Capital Pension Plan

*Acting by name(s) of:*          Adam LaRosa – Authorized
                                 Representative

*Duly authorised*
*signatory(ies):*

54-14-194-322



SKAT
P.O. Box 60
2630 Taastrup
DENMARK

**Our Ref:** BDK000152
**Tax Ref:** 46-1910855

26 March 2014

Dear Sir or Madam,

<div align="center">RE: A/C RJM Capital Pension Plan RJM01</div>

Please find enclosed a tax reclaim form, together with evidence of payment and tax deduction paid on the above client's securities.

Kindly arrange for the reclaim payment to be credited to the account of Goal TaxBack Limited, details as follows:

***NatWest Bank***
***High Street Branch Croydon Surrey***
***BIC NWBKGB2L***
***IBAN GB88 NWBK 6073 0134 0151 59***

Please quote reference**ARG BDK000152**.

Would you please confirm safe receipt of this reclaim by sending an email to clientservices@goalgroup.com or by signing the attached copy of this letter and returning to the address shown below.

Yours faithfully,

Charlotte Benge
Tax Operations Manager

GOAL TAXBACK LIMITED    7th Floor, 69 Park Lane, Croydon, Surrey, CR9 1BG    Registered in England & Wales Reg No. 3701795
t +44 (0)208 760 7130   f +44 (0)208 681 2854    Registered Office: 7th Floor, 69 Park Lane, Croydon, Surrey, CR9 1BG, UK
e info@goalgroup.com    Registered for VAT under number: 744 1757 24

Philadelphia                    London                    Hong Kong                    Melbourne

Confidential Pursuant to Protective Order