# Exhibit 8_C

## G    REPLY TO DETAILED RESPONSE TO PARTICULARS OF CLAIM

45.    As to paragraph 71, if Mr Nielsen was a fraudulent participant in the fraud alleged in these proceedings (which is not admitted), as a matter of Danish law:

    45.1    Mr Nielsen's state of mind and/or actions are not attributable to SKAT; and

    45.2    SKAT is not vicariously liable for Mr Nielsen's conduct.

46.    As to paragraph 126:

    46.1    As set out in paragraph 9 above, it is admitted that SKAT's decisions to accept the WHT Applications were administrative decisions under Danish tax or administrative law.

    46.2    Whether such decisions were valid and effectual under Danish administrative law is immaterial to SKAT's ability to bring its claims under both English and Danish law:

        (a)    In relation to SKAT's claims under English law, this will be the subject of legal submissions in due course.

        (b)    As to SKAT's claims under Danish law, as a matter of Danish civil law such claims can be brought regardless of the validity under Danish administrative law of: (a) SKAT's decisions to accept the WHT Applications; and (b) SKAT's decisions to annul or reverse those decisions. Further, as a matter of Danish law, SKAT's civil claims are not predicated upon, and can be brought independently of, SKAT's decisions to annul or reverse its decisions to accept the WHT Applications.

    46.3    It is denied that there can be no tortious liability "outside the administrative law regime" (the meaning of which is unclear and is not explained), whether as a matter of Danish law or otherwise.

47.    As to paragraph 145.1, it is inferred that the allegation that "*the Claimant has admitted and accepted*" the matters pleaded in this paragraph is based on Response 15 of the RFI Response. If so:

34

47.1 Response 15 confirmed that "*[SKAT] does not allege that CK/JH conspired with any Alleged Fraud Defendants other than those identified at paragraph 19 of the Further Particulars*".

47.2 Paragraph 19 of the Further Particulars alleges that "*Mr Knott and Hoogewerf tacitly combined with Mr Sanjay Shah, Ms Stratford, each other, and (respectively) Old Park Lane and West Point to achieve the common end of the continued conduct of the WHT Scheme*".

47.3 Accordingly, there is no basis for the allegation (and it is denied) that SKAT has "*admitted and accepted that… allegations in relation to the alleged Principal WHT Scheme do not concern [CK and JH]*".

48. As to paragraphs 145.2 and 172.1:

48.1 The allegation that "*the Claimant has abandoned any case that CK/JH conspired with the Alleged Fraud Defendants*" is denied.

48.2 Each of Mr Sanjay Shah, Ms Stratford, Old Park Lane and West Point are Alleged Fraud Defendants.

49. As to CK's and JH's reliance on Response 15 of the RFI Response, paragraph 47 above is repeated.

50. As to paragraphs 149.4 to 149.7 and 151.2:

50.1 SKAT's primary case is that as a matter of both English and Danish law it is not necessary to rescind any "transactions". As to English law, the requirement that a transaction be rescinded is limited to payments made pursuant to contractual obligations or obligations arising from deeds. The requirement does not exist where: (a) there is no relevant private law obligation which needs to be "set aside" (for example in the case of a mere mistaken payment or a non-contractual payment induced by fraud); and/or (b) the purported obligation was itself an instrument of fraud. This will be the subject of legal submissions in due course. As to Danish law, there is no requirement that SKAT rescind or annul any decision made in relation to the WHT Applications. Paragraph 46.2(b) above is repeated.

35

50.2 In the alternative, if it is necessary as a matter of English law for rescission to occur, the question is whether (as a matter of English law) SKAT has conveyed by words or conduct an intention to disaffirm the payments which it made (which are the relevant "transactions"). In that regard, SKAT relies (only) on the fact that it issued the preliminary and final decisions to the WHT Applicants as expressions of such an intention as a matter of English law.

50.3 The question is not whether SKAT's decisions to accept the WHT Applications are invalid or have been validly annulled as a matter of Danish administrative law. It is therefore denied that the English Court will be required to adjudicate upon such matters.

50.4 In the further alternative, in the event that (a) rescission is necessary and (b) the Court is unable to adjudicate on the effectiveness of the preliminary and final decisions issued between September 2016 and April 2020 as acts of rescission (such that paragraph 53 of the Particulars of Claim stands struck out), then SKAT's case is that rescission occurred by the Particulars of Claim in September 2018.

51. As to paragraph 150, paragraph 46 above is repeated. Further:

51.1 Paragraph 150.1 does not accurately reflect SKAT's case and is in any event denied.

51.2 Paragraph 150.2 is denied. The Court is not being asked to adjudicate on the validity of the preliminary and final decisions as a matter of Danish administrative law. For the same reasons, the facts and matters set out in paragraph 150.3 and 150.5 are irrelevant.

51.3 As to paragraph 150.4, it is denied as a matter of law that there was any transaction as between SKAT and CK/JH which needed to or could be rescinded (and the Particulars of Claim does not allege as much or purport to do so).

51.4 Paragraph 150.6 is denied.

52. As to paragraph 153, it is denied that SKAT's claims against CK and JH are barred by Dicey Rule 3, for the reasons set out in paragraph 5 above.

36

53.  As to paragraph 173.1, it is denied that SKAT's claim is or ought to be characterised as one which alleges a conspiracy to contravene Denmark's revenue law and rules. In any event, it is denied that such characterisation would be determinative of the applicability of Dicey Rule 3.

54.  As to paragraphs 156.5 and 174, it is denied that any tax is due to or claimed by SKAT for the reasons set out in paragraph 5.1(b) above. In particular, it is denied, if alleged, that SKAT's preliminary and final decisions which annulled SKAT's decision to accept the WHT Applications (and the subsequent challenges to those preliminary and final annulment decisions in Danish administrative proceedings) do or could give rise to any liability on the part of the WHT Applicants to pay tax or any money to SKAT (save potentially in respect of the legal costs of those administrative proceedings). It is therefore denied, as alleged in paragraph 214, that any credit for recovery must be given following the making of the preliminary and final annulment decisions.

## H    CONTRIBUTORY NEGLIGENCE

55.  As to paragraph 205, if SKAT's claims against CK and JH are governed by Danish law (which is denied):

 55.1    it is denied that contributory negligence is a defence to such claims; and

 55.2    it is denied that contributory negligence is capable of reducing or setting-off such claims.

## I    DANISH LIABILITY FOR DAMAGES ACT

56.  As to paragraph 209:

 56.1    It is admitted that under section 24 of the Danish Liability for Damages Act, liability for damages may be reduced or eliminated if the liability will have an unreasonably onerous impact on the defendant.

 56.2    Any decision under section 24 of the Danish Liability for Damages Act must take into account the degree of injury suffered by the injured person, the nature of the liability, the circumstances of the person causing the injury, the interests

37

of the injured person, any insurance cover taken out and any other relevant circumstance.

56.3    In evaluating whether liability for damages may have an unreasonably onerous impact on the defendant, the Court will consider the degree of *culpa* of the defendant.

56.4    CK and JH are required to prove that their liability is to be eliminated (alternatively reduced) under section 24 of the Danish Liability for Damages Act.

Michael Fealy QC

Jamie Goldsmith QC

Sam O'Leary

Abra Bompas

James Ruddell

KV Krishnaprasad

One Essex Court

3 March 2021

## STATEMENT OF TRUTH

The Claimant believes that the facts stated in this Reply are true. I am duly authorised by the Claimant to sign this statement on its behalf. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed    ………………………………………

Name:    Gry Ahlefeld-Engel

Position:    Director at Skattestyrelsen, part of Skatteforvaltningen (the Danish Customs and Tax Administration)

Date:    3 March 2021

38

## SCHEDULE 1

## REPLY TO CK'S DEFENCE TO THE AMENDED SCHEDULE 5Z

1.   Paragraph 13.4 is admitted. The allegation in paragraph 8 of Schedule 5A is only in respect of the sum of €2,760,000.

39

**SCHEDULE 2**

**REPLY TO JH'S DEFENCE TO THE AMENDED SCHEDULE 5AA**

1.    Paragraph 5.2 is denied:

   (a)    The amendment to paragraph 14 of the Further Particulars clarifies that the allegation that *"Mr Knott and Mr Hoogewerf accepted senior positions… in entities that they knew were involved in the production of Credit Advice Notes"* is not made in respect of JH's involvement in West Point.

   (b)    This does not constitute an acceptance that *"no allegation of deceit is made against JH in respect of West Point"*.

2.    The second sentence of paragraph 7 is admitted. The relevant date is 31 March 2014.

3.    Paragraph 13.4 is admitted. The allegation in paragraph 8 of Schedule 5AA is only in respect of the sum of €2,760,000.

**SCHEDULE 3**

**REPLY TO CK'S AND JH'S DEFENCE TO THE FURTHER PARTICULARS**

1.   Paragraph 1 is denied. Paragraph 4 of the Reply is repeated.

2.   The first sentence of paragraph 3 is denied. Paragraph 42 of the Reply is repeated.

3.   The last sentence of paragraph 14.1 and paragraph 14.3 are denied. Without prejudice
     to SKAT's primary position that the loans agreements were shams:

     (a)   Clause 2.2 of the settlement agreement between JH and West Point addresses
           "*loans owing from the Employee to the Company*". The "*Company*" is defined
           as West Point Derivatives Limited.

     (b)   It is inferred that, similarly, clause 2.2 of the settlement agreement between
           CK and SCP applies to loans owed by CK to SCP.

     (c)   Accordingly, neither provision addresses (alleged) loans owed by CK/JH to
           Mr Sanjay Shah.

4.   As to the allegation in paragraph 24.2 that "*no allegation of deceit is now pursued
     against JH in respect of West Point*", paragraph 1 of Schedule 2 above is repeated.

5.   As to paragraphs 26.1 and 26.2:

     (a)   Paragraph 14(ii) of the Further Particulars alleges that CK and JH "*accepted
           these positions… to make the respective entities appear to the outside world
           and to SKAT as genuine businesses with experienced individuals in senior
           management positions*".

     (b)   That is not an "*allegation that SKAT was aware of CK/JH during the Relevant
           Period*". Paragraph 26.1 is denied.

     (c)   Accordingly, the assertion in paragraph 26.2 that "*the Claimant knew both of
           the alleged fraud and CK/JH more than three years before the Third Claim
           Form*" does not follow and is denied.

41

**SCHEDULE 4**

| Document | Description |
|---|---|
| First Affidavit of Jonathan Fortnam ("**Fortnam A1**")/ 22(a), 96-97, 101, 110, 113, 121 | These paragraphs refer to and place some reliance on the content of preliminary and final administrative decisions taken by SKAT to annul its decisions to accept the WHT Applications, which in turn relied upon documents or information provided by the IRS or IRBM.[1] <br><br> The following documents were exhibited: <br> 1. Preliminary administrative decision in relation to Blue Ocean Equity LLC Retirement Plan & Trust ("Blue Ocean") (translated into English) in relation to a pending application: JRFA1/481-495.[2] <br> 2. Preliminary administrative decision in relation to Blue Ocean (translated into English) in relation to previously accepted WHT Applications: JRFA1/496-511.[3] <br> 3. Final administrative decision in relation to Blue Ocean (in Danish) in relation to a pending application: JRFA1/518-534. <br> 4. Final administrative decision in relation to Blue Ocean Blue Ocean (in Danish and translated into English) in relation to previously accepted WHT Applications: JRFA1/537-554, 560-578[4] <br> 5. Preliminary administrative decision in relation to DWM Pension Plan (translated into English): JRFA1/656-666. <br> 6. Preliminary administrative decision in relation to Loggerhead Services LLC Roth 401K Plan (in Danish): JRFA1/1723-1733. English translation provided subsequently: JRFA3/38-48. <br> 7. Preliminary administrative decision in relation to Argyle Smith Ltd (in Danish): JRFA1/1734-1744. English translation provided subsequently: JRFA3/16-26. <br> 8. Final administrative decision in relation to Argyle Smith Ltd (in Danish): JRFA1/1745-1755. English translation provided subsequently: JRFA3/27-37.[5] |
| Fortnam A1/94-95 | These paragraphs rely on the content of information provided by the IRS to SKAT, namely Blue Ocean's publicly available Form 5500-EZ for 2013 (which was provided by the IRS spontaneously |

---

[1] Such matters were also relied on in SKAT's skeleton argument for the hearing on 26-27 June 2018 (the "**WFO Skeleton**") at paragraphs 28, 29, 37-39, and at the hearing on 26-27 June 2018 at Day 1/Page 39/Line 14-Page 40/Line 8; Page 53/Line 13-Page 54/Line 8; and (by way of full and frank disclosure) Page 55/Line 12-Page 56/10.

[2] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 41/Line 6-Page 45/Line 10 (mistakenly identified as a decision in respect of a payment which had already been made).

[3] Also relied on in the WFO Skeleton at paragraph 37 and at the hearing on 26-27 June 2018 at Day 1/Page 46/Lines 6-20, Page 47/Lines 11-16 (mistakenly identified as the final decision in relation to previously accepted WHT Applications).

[4] Referred to at the hearing on 26-27 June 2018 at Day 1/Page 47/Line 23-Page 48/Line 12.

[5] Also referred to in the hearing on 26-27 June 2018 at Day 1/Page 55/Line 11- Page 57/Line 14 by way of full and frank disclosure.

B/108.5/42

|  | and not pursuant to a request by SKAT under Article 26 of the Denmark/USA Double Taxation Agreement) and the fact that Blue Ocean did not file a (publicly available) tax return in 2014. The following documents were exhibited: <br> 1. Cover letter from the IRS providing the Form 8802 and 5500-EZ of Blue Ocean referred to below: JRFA1/462- 464.[6] <br> 2. IRS Form 8802 in relation to Blue Ocean, provided by the IRS: JRFA1/465-467. This has been disclosed in the US Proceedings.[7] <br> 3. IRS Form 5500-EZ in relation to Blue Ocean for 2013, provided by the IRS, but which is stated on its face to be open to public inspection: JRFA1/468-469.[8] This has been disclosed in the US Proceedings. <br> 4. Transaction Detail Results document in relation to Blue Ocean provided by the IRS: JRFA1/470. <br> 5. IRS guidance on 401(k) Plans sent to SKAT, but also available on the IRS's publicly available website: JRFA1/471-477.[9] <br> 6. Redacted letter from the IRS to SKAT with (illegible) attachment: JRFA1/478-480. |
|---|---|
| Fortnam A1/116 | This paragraph refers to the fact that only 27 out of 227 (later corrected to 277 in Fortnam A2/5(c)) pension plans had filed tax returns in the USA, which was based on information provided by the IRS (but concerned publicly available documents). |
| Fortnam A1/374-376 | These paragraphs refer in general terms to correspondence with the IRS or IRBM as part of a section on the chronology of the claims which was relevant to full and frank disclosure on limitation (see Fortnam A1/242). |
| Fortnam A1/Schedule 4 | This schedule refers in the entries for Mankash Jain and Paul Preston to the fact that they were owners of various Malaysian WHT Applicants (which was based on information from the IRBM). SKAT did not rely on such information when pleading its claims against Messrs Preston and Jain and therefore originally made no claim against them by reason of their ownership of such entities. SKAT only later (based on information from other sources) made such an allegation, which was admitted by the Messrs Jain and Preston. <br> A further updated version of this schedule (but with no material changes for present purposes) was provided at JRFA4/460. |

---

[6] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 35/Lines 7-14.
[7] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 35/Line 15.
[8] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 35/Line 15-Page 38/Line 16.
[9] Also relied on at the hearing on 26-27 June 2018 at Day 1/Page 38/Line 17-Page 39/Line 12.

# Exhibit 15

Claimant
**Alan John Sheeley**
Eighth
Exhibit "AJS27"
13 November 2020

Claim Nos. CL-2018-000297, CL-2018-000404,
CL-2018-000590 & CL-2019-000487 (consolidated)

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND & WALES

QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

BETWEEN:-

**SKATTEFORVALTNINGEN**

(THE DANISH CUSTOMS AND TAX ADMINISTRATION)

Claimant

and

**SOLO CAPITAL PARTNERS LLP (IN SPECIAL ADMINISTRATION) AND OTHERS**

**Defendants**

_____

**EXHIBIT AJS27**

_____

This is the exhibit marked **AJS27** referred to in the Eighth Witness Statement of **ALAN JOHN SHEELEY**.

Signed............................

**Alan John Sheeley**

Dated: 13 November 2020



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

COMMISSIONER
LARGE BUSINESS AND
INTERNATIONAL DIVISION

BY EMAIL ONLY: Bent.Bertelsen@SKTST.DK

October 12, 2020

Mr. Bent Bertelsen
Chief Counsellor / Exchange Officer DLO
Danish Customs and Tax Administration
Denmark

Re: Pinsent Masons LLP request for consent to disclose IRS documents

Dear Mr. Bertelsen:

Thank you for your letter of October 5, 2020. In response to your letter from Pinsent Masons LLP, counsel for SKAT, I provide you with the enclosed information addressing your request for the consent of the IRS to disclose certain IRS Documents to the Defendants in the English Proceedings.

As I am addressing Pinsent Masons request, my response is not an official exchange of information. If you require a formal exchange of information, please let me know and we will seek to perform the exchange pursuant to the exchange of information provisions of our income tax treaty.

If you have any questions or would like to discuss this further, please contact ███████
██████ at the email address of ████████████ or by phone at ████████████.

Sincerely,

███████████████

Enclosure

1

Page 2

**Subject:** Pinsent Masons LLP request for consent to disclose IRS documents pertaining to the Dividend Withholding Tax Refund scheme worked between the United States (U.S.) tax administration and the Danish Customs and Tax administration, ("SKAT").

### Information Requested:
SKAT, via Pinsent Masons counsel, respectfully seeks the consent of the IRS to disclose the IRS Documents to the Defendants in the English Proceedings.

### U.S. Response:
Information exchanged pursuant to the Convention between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income (1999) (hereinafter "Convention") is subject to the confidentiality and use restrictions set forth in Article 26 of the Convention. In relevant part, Article 26 restricts the disclosure of information exchanged pursuant to the Convention to "persons or authorities (including courts and administrative bodies) involved in the assessment, collection, or administration of, the enforcement or prosecution in respect of, or the determination of appeals in relation to, taxes covered by the Convention or oversight of the above." Information exchanged can be used only for such purposes, with one such use by such persons being "in public court proceedings". The Convention establishes a mutual international legal obligation to preserve the confidentiality of information exchanged pursuant to the Convention and to disclose and use it only as permitted by the Convention.

Both taxpayer-specific and non-taxpayer-specific information provided to Denmark pursuant to the Convention is subject to the disclosure and use rules of Article 26 of the Convention. Such information may be disclosed only to "persons involved" in a tax administration matter concerning taxes covered by the Convention and used only for such purposes. This rule applies to all disclosures, whether in the context of judicial proceedings or to parties involved in such proceedings.

As noted in your letter, in addition to having the force of law, the use and disclosure provisions of the Convention are essential to ensure the utility and effectiveness of the Convention's exchange-of-information provisions and to preserve the working relationship between Denmark and the United States as treaty partners. See, e.g., Commentary to Article 26 of the OECD Model Tax Convention (2017), paragraph 11. Failure to honor the confidentiality obligations of the Convention could disrupt each government's confidence in the exchange-of-information process and could chill cooperation.

In our view, the pending UK judicial proceedings (CL-2018-000297, CL-2018-000404, CL-2018-000590, and CL-2019-000487) arise out of and are inextricably linked to a dividend tax fraud scheme. Consequently, for purposes of the Convention, they are judicial proceedings concerning the administration of covered taxes, and the disclosure of information in those proceedings would be for tax administration purposes. This does not mean, however, that all of the data identified in Annex E may be disclosed. The treaty-exchanged information in Annex E can be disclosed only to "persons involved" in a tax administration matter in which the information is pertinent to and potentially could be used in the resolution of a claim or issue in

2

the proceeding. This rule implicates two limitations on disclosure that are applicable to this case:

1. Information concerning third parties who are not involved in the current UK proceedings should be redacted from the treaty-exchanged information Denmark received from the IRS prior to production to the court and to the "Recipients", as that term is defined in the Draft IRS Confidentiality Agreement and Order. For example, if there are third parties identified in the treaty-exchanged information who are not defendants in the pending proceeding or involved in specific transactions relevant to the current proceeding, such identifying information should not be disclosed. Similarly, financial records, tax forms, and other information concerning such third parties should be redacted or withheld to the extent such information is not relevant to the resolution of an issue in the pending proceedings.

   Accordingly, Denmark SKAT should redact from the documents to be produced any information relating to third parties who are neither defendants in the pending proceeding nor involved in specific transactions at issue in the pending proceeding. The IRS would like to review such redactions prior to production.

2. Information concerning U.S. exchange-of-information requests involving U.S. domestic law enforcement activities should not be disclosed except as necessary to obtain or provide the requested information. As explained in the Commentary to Article 26 of the OECD Model Tax Convention (2017), paragraph 11:

   > [T]he confidentiality rules cover, for instance, competent authority letters, including the letter requesting information. At the same time, it is understood that the requested State can disclose the minimum information contained in a competent authority letter (but not the letter itself) necessary for the requested State to be able to obtain or provide the requested information to the requesting State, without frustrating the efforts of the requesting State. If, however, court proceedings or the like under the domestic laws of the requested State necessitate the disclosure of the competent authority letter itself, the competent authority of the requested State may disclose such a letter unless the requesting State otherwise specifies.

   In the ordinary case, neither courts nor taxpayers are "persons involved" with respect to competent authority correspondence, including requests and transmittal letters. Such communications are exchanged in connection with the administration of the Convention, and they do not typically have a bearing on the outcome of a tax matter. In this case, however, we understand that certain competent authority correspondence, including transmittal letters, is pertinent to the substantive issues in the UK proceedings because the correspondence may be probative of when SKAT learned about the fraud scheme. This, in turn, affects whether SKAT's claims are time-barred. Accordingly, we believe that disclosure of transmittal letters accompanying the documents sent from the IRS to SKAT is authorized by the terms of the Convention.

   By contrast, neither the Court nor the defendants are "persons involved" with respect to the outbound U.S. request described at Document #10 of Annex D or the U.S. domestic tax enforcement proceeding giving rise to that request. Disclosure of this request could adversely impact U.S. domestic tax enforcement efforts. In addition, it is not clear to us how this request may be potentially relevant to the pending UK proceedings.

Accordingly, the outbound U.S. request described in Annex D is not to be disclosed in connection with the pending proceeding. If SKAT believes that disclosure is essential in connection with the pending UK proceeding because it is somehow relevant, we would be willing to further discuss this issue and explore whether a narrow disclosure can be made in a way that sufficiently protects U.S. tax enforcement interests (e.g., establishing the necessary facts through a declaration or sworn statement issued by Denmark SKAT in lieu of disclosing the U.S. request for information, making additional redactions, and/or submitting the document on an *ex parte* basis for review by the Court only).

In addition, as we previously discussed, we expect that the identities of IRS and U.S. government personnel reflected in the documents, as well as their contact information (physical addresses, email addresses, and telephone numbers), will be redacted from the documents prior to disclosure. Redacting this information from documents to be disclosed in connection with a judicial proceeding is consistent with standard exchange-of-information practice in the tax context.

Provided the redactions described herein are made, the IRS does not object to the disclosure of the documents described in Annex D, except for the United States' request for information (#10 of Annex D), in connection with the pending UK proceedings. The IRS views such disclosures as being consistent with the use and disclosure rules of the Convention. We agree that seeking a Confidentiality Agreement and Order (hereinafter "protective order") with respect to the information that is produced would be appropriate in this case, particularly considering that the information to be produced concerns a number of entities and individuals and includes competent authority correspondence.

The following table, which aligns with the Annex D of your letter dated October 5, 2020, reflects our position with respect to the particular documents at issue:

| # | Information | IRS position regarding disclosure |
|---|---|---|
| 1 | Spreadsheet of approximately 150 entities, identifying information, and entity-level data | May be disclosed subject to the protective order, provided that information regarding third parties identified in the treaty-exchanged information who are not defendants in the pending proceeding or involved in specific transactions relevant to the current proceeding ("unrelated third parties") is redacted. |
| 2 | Spreadsheet of several entities, identifying information, and entity-level data | May be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted. |
| 3 | Financial and/or tax information relating to certain entities and individuals | May be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted. |
| 4 | Financial and/or tax information relating to certain entities and individuals | May be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted. |
| 5 | Table of several entities and associated individuals, with identifying information and entity-level data | May be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted. |

4

| 6 | Spreadsheet of several entities, identifying information, entity-level data | Taxpayer-specific information may be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted. |
| | Form 5500-EZ Instructions | Forms and other non-taxpayer-specific information may be produced subject to the protective order. |
| 7 | Financial and/or tax information relating to certain entities and individuals | May be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted |
| 8 | Financial and/or tax information relating to certain entities and individuals | May be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted. |
| 9 | General non-taxpayer-specific information regarding the entities described in IRS Revenue Rule 81-100 | Non-taxpayer-specific information may be disclosed subject to the protective order. |
| | Response to Form 5500 inquiry concerning a particular entity | Taxpayer-specific information may be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted |
| 10 | IRS request for information to Denmark SKAT | May not be produced. |
| 11 | Spreadsheet of several entities, identifying information, and entity-level data | May be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted. |
| | Financial and/or tax information relating to certain entities | |
| 12 | Spreadsheet of several entities, identifying information, and entity-level data | May be disclosed subject to the protective order, provided that information regarding unrelated third parties is redacted |
| | Financial and/or tax information relating to certain entities | |
| 13 | PowerPoint presentation providing an overview of rules concerning U.S. retirement plans | May be disclosed subject to the protective order. |
| 14 | Agenda for a meeting taking place on February 24 and 25 | May be disclosed subject to the protective order.  Note that page one of the agenda identifies a number of U.S. government personnel, and their identities should be redacted. |

5



**SKATTE**
STYRELSEN

**By encrypted E-mail (bluewhale)**

IRS
Competent Authority
Att.:
JITSIC Team leader
Greenville, SC
USA

Competent Authority
Antifraud Unie

Helgeshøj Allé 9
DK - 2630 Taastrup
Denmark

Phone +(45) 72 22 18 18
SKAT.DK

Your file no
Our file no [Sagsnr ]

Bent Bertelsen

Direct phone: +45 72369672
E-mail: bent.bertelsen@sktst.dk

*October 30th 2020*

**Update on the request for a wider use of exchanged tax information**
*Danish reference: 20-1118586BB*

Dear

Further to our letter dated October 5th 2020 and your kind reply dated October 12th 2020, please find enclosed an note on our proposal on how to handle the confidentiality in connection with the disclosure procedure we face in the UK, together with two exhibits to show the proposed method.

As stated, we are of course willing to have an conference call if you find it useful to move ahead on the subject. Please let me know and I will make the arrangement in this end.

Please confirm the receipt of the exchange by e-mail to me stating the reference number.

I wish you a nice weekend.

Kind Regards
Bent

**Bent Bertelsen**
Exchange Officer DLO
Competent Authority
Danish Tax Agency

**K1/58/7**



Note

Danish Tax Agency
(SKAT)
Antifraud Unit
Competent
Authority

Helgeshøj Allé 9
DK - 2630 Taastrup
Denmark

**SKATTEFORVALTNINGEN (THE DANISH CUSTOMS AND TAX ADMINISTRATION) ("SKAT") V. SOLO CAPITAL PARTNERS LLP (IN SPECIAL ADMINISTRATION) AND OTHERS CLAIMS CL-2018-000297, CL-2018-000404, CL-2018-000590 and CL-2019-000487 (the "ENGLISH PROCEEDINGS")**

### RDISCLOSURE OBLIGATIONS IN THE ENGLISH PROCEEDINGS IN RELATION TO DOCUMENTS HELD BY SKAT RECEIVED FROM IRS

We write further to the IRS's letter dated 12 October 2020. Thank you for responding so promptly to our letter of 5 October 2020. We greatly appreciate your ongoing cooperation in this matter, and the constructive approach you are taking with regards to SKAT's request for consent to the disclosure of the IRS Documents in the English Proceedings.

As we have explained, SKAT is obliged to give disclosure of the IRS Documents in the English Proceedings pursuant to its disclosure obligations in civil proceedings, and it will now make an application to the English Court so that it can disclose the IRS Documents on the terms of the draft confidentiality order enclosed with our letter of 5 October 2020 (the "**IRS Confidentiality Application**").

In the interests of time, we respond only to the practical matters raised by your letter and to set out the next steps relating to the IRS Confidentiality Application. We do not respond to any substantive points in your letter, as to which SKAT's position is reserved.

As requested, we have given further consideration to Document 10, as identified in Annex D to our letter dated 5 October 2020. We agree that as Document 10 is a request from the IRS to SKAT, it is not relevant to the issues in the English Proceedings. We confirm that we will not be disclosing Document 10 in the English Proceedings.

As requested in your letter, we can confirm that SKAT will redact confidential information contained within the IRS Documents that is not relevant to the English Proceedings, namely (i) information relating to third parties who are not involved in the English Proceedings or in the transactions the subject of the English Proceedings, and (ii) the identities and contact information of the IRS representatives and US government employees identified in the correspondence with SKAT.

We enclose two sample redacted documents for your consideration reflecting these redactions:

1) The first is a letter from the IRS to SKAT dated 13 December 2016.

   a. On page 1, our lawyers have redacted the name of the relevant IRS representative as well as his contact details. As foreshadowed in our letter dated 5 October 2020, our lawyers have added a cipher ("Mr A") so that the Defendants in the English Proceedings can identify that this document was sent by a particular IRS Representative that may have

also sent other documents to SKAT but without revealing the identity of the IRS Representative.[1]

b. Our lawyers have also redacted information relating to third parties who have no involvement in the English Proceedings or the transactions the subject of the English Proceedings. This redaction appears on pages 5. Please note that all the redactions applied by SKAT are in the **red** in order to distinguish them from redactions applied by the IRS (in black) prior to sending the communications to SKAT in the first place.

2) The second document is a letter from the IRS to SKAT dated 16 March 2016:

a. Our lawyers have again redacted the name and contact details of the IRS representatives at pages 1, 7 and 11 (in this case Mr B and C at pages 1 and 7 and Mr A at page 11).

Once the type of information to be redacted has been agreed with the IRS, our lawyers will apply the same redactions to all the other disclosable IRS Documents and provide them for your review. We are happy to discuss this further on a telephone call which our lawyers could attend.

In the meantime, we confirm that SKAT issued an application on 16 October 2020 to extend the date by which it must disclose the IRS Documents to 8 January 2021 so that we can finalise the redactions to the IRS Documents to be disclosed. To meet this revised deadline, SKAT will need to issue its application for a confidentiality order in respect of the disclosure of the IRS Documents by 13 November 2020 at the latest.

Please let us know whether you are content with the redactions applied or when it would be convenient to hold another telephone discussion to discuss the redactions.

---

[1] This would then enable the Defendants in the English Proceedings to argue that it was significant for their limitation defences that a particular proportion of the information came from a small group of people at the IRS (as they case may be). We do not suggest that any such point would be a good one; but the use of ciphers enables the Defendants to make such points if they wish.



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

COMMISSIONER
LARGE BUSINESS AND
INTERNATIONAL DIVISION

BY EMAIL ONLY: Bent.Bertelsen@SKTST.DK

November 3, 2020

Mr. Bent Bertelsen
Chief Counsellor / Exchange Officer DLO
Danish Customs and Tax Administration
Denmark

Re: Update on the request for a wider use of exchanged tax information
Danish reference: 20-1118586BB

Dear Mr. Bertelsen:

Thank you for your letter dated October 30, 2020. We have reviewed the Note on the agreed upon proposal on how to handle the confidentiality issue in connection with the disclosure procedure Denmark's tax administration (SKAT) face in the UK. We have also examined the two exhibits associated with the Note to evidence how the proposed method is performed.

We thank you for your confirmation that SKAT will redact confidential information contained within the IRS Documents that is not relevant to the English Proceedings, namely (i) information relating to third parties who are not involved in the English Proceedings or in the transactions subject of the English Proceedings, and (ii) the identities and contact information of the IRS representatives and US government employees identified in the correspondence with SKAT. Further, we appreciate your consideration and confirmation that Document 10 (identified in Annex D in your letter dated October 5, 2020) is not relevant to the issues in the English Proceedings and will not be disclosing Document 10 in the English Proceedings.

After carefully reading the Note and examining the redactions provided in the two exhibits, we are comfortable with the redactions and believe the redactions adhere to the agreed upon terms outlined in our letter dated October 12, 2020. We also agree that your lawyers should apply the same redactions to all the other disclosable IRS Documents.

9

My response is not an official exchange of information. If you require a formal exchange of information, please let me know and we will seek to perform the exchange pursuant to the exchange of information provisions of our income tax treaty.

We do not have any further questions or concerns and do not believe a phone call is necessary.

If you have any questions or would like to discuss this further, please contact ███ ███ at the email address of ████████ or by phone ██████████.

████████

Joint International Taskforce on Shared Intelligence and Collaboration (JITSIC)

███████████

# Exhibit 16

CONFIDENTIAL
Christian Ekstrand - May 6, 2021

```
1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK
2                   MASTER DOCKET 18-MD-2865(LAK)
                        CASE NO. 18-CV-09797
3
   _____
4                                           )
     IN RE:                                 )
5                                           )
     CUSTOMS AND TAX ADMINISTRATION OF      )
6    THE KINGDOM OF DENMARK                 )
     (SKATTEFORVALTNINGEN) TAX REFUND       )
7    SCHEME LITIGATION                      )
                                            )
8    _____)

9

10

11

12          ************************************
            *                                  *
13          *           CONFIDENTIAL           *
            *                                  *
14          ************************************

15

16

17      REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

18                    EXAMINATION OF

19              CHRISTIAN EKSTRAND - VOLUME I

20                   DATE: May 6, 2021

21

22

23

24

25      REPORTED BY:   CHARLENE FRIEDMAN, CCR, RPR, CRR
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

```
 1    tax payer concludes that he has been refunded
 2    more than he has been entitled to, and he
 3    remits payment to SKAT, is he returning tax
 4    money to SKAT?
 5            MR. WEINSTEIN:  Objection.  You
 6    just asked him a question that could have one
 7    thousand just different circumstances to it.
 8            Just not an appropriate question
 9    for this witness.
10            MR. SCHOENFELD:  Well, why don't
11    you let him answer if he can?
12            MR. WEINSTEIN:  Because he's not
13    here -- he's not here in any capacity to
14    answer that question, either individual or as
15    a 30(b)(6) witness.
16            MR. SCHOENFELD:  Are you directing
17    him not to answer the question?
18            MR. WEINSTEIN:  Mr. Ekstrand, if --
19    certainly as a 30(b)(6) witness, I'm
20    directing him not to answer that question.
21            MR. SCHOENFELD:  Okay.  So I'm
22    going to be clear.  This is in his capacity
23    as a fact witness.
24       Q    Mr. Ekstrand, can you answer that
25    question?
```

```
1              THE INTERPRETER:  Can you restate
2     the question, please?
3              MR. SCHOENFELD:  Sure.
4         Q    When someone -- when a taxpayer
5     concludes that he has been refunded more than
6     he's entitled to, and he remits payment to
7     SKAT, is he returning tax money to SKAT?
8              MR. WEINSTEIN:  Objection to form.
9         A    There seems to be speculation, I
10    think.  But in this area, we, as part of the
11    Danish authorities, do not have the -- do not
12    have legal grounds to reclaim this money.
13             That means that if money is repaid,
14    it is not -- it will not be defined as taxes
15    due.  In order to collect taxes, there has to
16    be -- there have to be taxes due.  Since
17    these are not taxes due, that is not
18    something that we can collect.
19             Nevertheless, it is possible to
20    repay the money.
21        Q    Okay.  Focusing on the period
22    2012 -- so we're shifting gears here.  So
23    we're focusing on the period 2012 to 2015.
24             Describe to me the process for
25    Danish corporations' payment of dividend
```

```
1     withholding tax.
2              THE INTERPRETER:  I'm sorry.  Can I
3     hear the last part of what you said?
4     "Describe for me the process of" —
5          Q    For Danish companies' payment of
6     dividend withholding tax?
7          A    So first of all, the company needs
8     to decide that they are going to pay out part
9     of their profits as dividends.  They do that
10    by convening a general meeting.
11             At the general meeting, they then
12    make a decision whether or not to pay
13    dividends.  Once the decision is made at the
14    meeting, then the process is that the
15    shareholders, a few days after, will receive
16    dividends.  And that is done in the way that
17    we discussed earlier, that a company sets
18    aside some money with the bank.
19             What happened is that VP, based on
20    who the owners of the shares are as of the
21    date of the general meeting, there will be a
22    record date which is two days later, and then
23    this will be recorded, who the owners are and
24    who will receive the dividends.  And this
25    will then be paid to them the day after or
```

```
 1    there are pending applications by parties who
 2    are suspected to have engaged in the fraud?
 3         A    So on August 6, 2015, we decided to
 4    stop making refunds.  And we were aware that
 5    we currently, at the time, had applications
 6    for refunds.
 7             We did not have a full
 8    understanding of how many applications were
 9    involved.  And that's where we spent the
10    following period to — to find out.
11         Q    And did you first make the decision
12    to not pay pending reclaims before you made
13    the decision to cancel prior-approved
14    reclaims?
15         A    So on August 6th, and that is when
16    we discovered that there was actually
17    substance to those things that we had
18    received from various parties of fraudulent
19    behavior, which is why we decided to stop
20    refunding applications and decided to go
21    through the — the many applications that we
22    had and tried to calculate the amount in
23    question of the fraud that had been going on.
24             And then, once we had calculated
25    the amount involved in the fraud, then we
```

```
 1   would begin to review the applications for
 2   refund that had yet to be paid out, where a
 3   refund had yet to be made.
 4        Q    As part of that review --
 5             MR. WEINSTEIN:  Hey, Alan?  Let me
 6   just -- just because it's getting a little
 7   late, if I can have you just tell
 8   Mr. Ekstrand to try to cut his answers into
 9   pieces to make it easier for you to
10   translate?
11        Q    As part of the review you just
12   described, SKAT reached out to the IRS for
13   additional information about each of the
14   pension plans, correct?
15             THE INTERPRETER:  About each of the
16   what?  Sorry.
17             MR. SCHOENFELD:  The pension plans.
18        A    Correct.
19        Q    And under the treaty, the IRS was
20   obligated to provide Denmark with the
21   information that was requested, correct?
22             MR. WEINSTEIN:  Object to the form
23   and to the extent it asks for a legal
24   conclusion.
25        A    Overall, yes.
```

```
1        Q     In the period 2012 to 2015, if SKAT
2    believed it needed additional information
3    about a withholding tax applicant from the
4    IRS, did it have the ability to request that
5    information?
6        A     Yes.  Under the treaty we have the
7    possibility to request such information.
8        Q     So between 2012 and 2015, who would
9    have made the decision to request additional
10   information from the IRS?
11           MR. WEINSTEIN:  Objection to form.
12       A     So that could have been a
13   verification you need where what you need to
14   keep in mind was that -- where the case was
15   being processed at the time was at an
16   administrative unit.
17           That unit carried out whatever
18   verification was relevant at the time, and at
19   that meeting said we had a certificate from
20   the IRS saying that this pension plan was
21   taxable in the U.S. and we had third-party
22   information.
23       Q     What are the powers of an
24   administrative unit within SKAT?
25       A     Their job was to process these
```

1     applications.  If they did not live up to the
2     verification processes that they did, then
3     they would be in a situation where they would
4     be able to reject the application.
5            If they believed that further
6     verification was needed, then they would hand
7     it over to a control unit.
8         Q    Do you know whether any dividend
9     withholding tax refund applications were
10    turned over from the administrative unit to a
11    control unit during the period 2012 to 2015?
12        A    I have no knowledge about that.  I
13    do not find that likely because with the
14    criteria that we had, they would review the
15    application and they would review the
16    application to see if it lived up to the
17    criteria, or the application was rejected.
18        Q    Are you aware of any instance,
19    between 2012 and 2015, of SKAT asking any
20    pension plan defendant for additional
21    information in connection with their reclaim
22    application?
23        A    No.
24        Q    Let's take a look at Exhibit 3077.
25             (Above-mentioned document marked

CONFIDENTIAL
Christian Ekstrand - May 6, 2021

```
 1     for Identification.)
 2          Q    Do you have the document in front
 3     of you?
 4          A    Yes.
 5          Q    Okay.  Do you recognize this
 6     document?
 7          A    Yes.
 8          Q    What is it?
 9          A    So this is a decision made in our
10     unit about a recall of previous decisions on
11     withholding tax refunds.
12          Q    Can you describe the process that
13     SKAT undertook to reach the decision to issue
14     this determination?
15          A    So this is a decision made about
16     recall and cancellation of previous
17     decisions.  In connection with review of
18     requests that had yet to be paid out, we
19     contacted all pension plans asking them about
20     the documentation of ownership.
21               We also contacted the U.S.
22     authorities to get more information about
23     the — these pension plans, about the
24     ownership.
25               So we then determined that we had
```

1    documentation that in these cases where we

2    rejected the application, that they did not

3    have ownership of the shares that were the

4    focus of their application, and there were

5    several repetitions within this group of

6    people being denied who were also — there

7    were several repetitions within this group of

8    companies that were being denied who had

9    already had application approved and paid out

10   previously.

11          Thus we decided to review decisions

12   that had already led to refunds.  That means

13   that we contacted the American RS.  We got

14   information about the various pension plans,

15   about their capital foundation, whether they

16   had filed tax returns, et cetera.

17          And on the basis of this, we — we

18   reopened our case review of these

19   applications and we contacted the — the

20   pension plans in question.  We wrote to them

21   that we were planning to cancel the refunds

22   and that we would be requesting repayment of

23   the refunds.

24          So the process is that you write

25   them, right, to say "this is what we are

1    planning to do," and then give them the

2    opportunity to make objections.  And they can

3    then, maybe, whatever they want to do, submit

4    further documentation stating that they

5    have -- that this is what they're demanding.

6           But if we did not receive any

7    documentation or anything, then we would then

8    be able to approve.  And then we would go

9    ahead and make a decision on recalling the

10   refund.

11        Q    Anything else?

12        A    So, by and large, that is the

13   process.

14        Q    On Page 10 of this letter, the

15   second paragraph from the bottom, the

16   paragraph starting -- I'll read it in

17   English.

18           Do you see that paragraph,

19   Mr. Ekstrand, the second from the bottom?

20        A    Yes.

21        Q    How did SKAT come to the decision

22   that the plan here did not own -- "does not

23   own and did not own the shares mentioned in

24   the claim forms and did not receive dividends

25   on the shares mentioned on the claim forms?"

CONFIDENTIAL
Christian Ekstrand — May 6, 2021

1          A      This was based on our investigation
2     into this matter.   And this is a — the
3     pension plan in question here was newly
4     established, meaning that they have very
5     limited funds, which is why we find it
6     unlikely that they thought — that the
7     establishment would be able to invest
8     hundreds of millions in Danish shares.
9                We cannot see that the dividends
10    that they say to have obtained have been
11    transferred to their pension plan.   So,
12    therefore, we see them as not being the
13    beneficial owners of the securities that
14    formed the basis of their application.
15         Q      When you say "we can't see" — so
16    let me start with the first of these.
17                How would you determine that they
18    had limited funds?
19         A      We had been informed that this
20    pension plan was newly established.   This is
21    what is referred to as a "one participant
22    pension plan" and we —
23                THE INTERPRETER:   Just one second,
24    please.
25         A      So a "one participant pension

```
 1    plan," and, therefore, with a limited capital
 2    payment of $12,500 up until $53,000,
 3    depending on how old you are.
 4             So if you're talking about a newly
 5    established pension plan and that you only
 6    have $12,500 to work with, we find it highly
 7    unlikely that you would be able to invest.
 8             We announced that, I stated, in
 9    Section 1.3 in this decision.
10        Q    You also rely on the fact that the
11    plan didn't submit a Form 5500 to the IRS,
12    correct?
13        A    What we had been informed was that
14    you need to file a tax return if you have
15    more than 250,000 U.S. dollars in your
16    pension plan.
17        Q    Who informed you of that?
18        A    This is information that we got
19    from the IRS.
20        Q    And based on your conversations
21    with the IRS, what was your understanding of
22    who was required to file a Form 5500?
23        A    The pension plans had to file the
24    Form 5500.
25        Q    And the basis for your
```

```
 1    understanding of that requirement is

 2    discussions with the IRS.

 3              Is that right?

 4       A    Yes.

 5       Q    And did you specifically ask the

 6    IRS to produce the Form 5500 at the pension

 7    plan?

 8       A    So, as far as I remember, we have a

 9    standard request with the -- with the IRS

10    about the pension plans, about the time

11    that -- the day that they were established,

12    whether they have submitted any kind of tax

13    return.

14       Q    Did you ask for any tax information

15    as associated with the employer associated

16    with the pension plan?

17       A    We did not know.

18       Q    Did you ask for any information

19    regarding the plan administrator associated

20    with the pension plan?

21       A    No.

22       Q    You also said that -- you also said

23    that you reached a determination that the

24    dividends had not been paid to these pension

25    plans, correct?
```

```
 1        A     What I said was that we weren't
 2   able to determine that dividends had been
 3   paid to these pension plans, and this was not
 4   stated anywhere.
 5        Q     What process did you undertake to
 6   determine whether dividends had been paid to
 7   any of the pension plans?
 8        A     So, first of all, we looked again
 9   to the IRS to find -- to uncover whether
10   there was any kind of income information for
11   these pension plans.  Then, of course, we
12   weren't able to locate their custodian
13   anywhere.
14            So there are various explanations
15   to this.  The pension plans did not explain
16   where the custodian could be found in this
17   connection.
18        Q     What do you mean, that there are
19   "various explanations" to the pension plans?
20        A     So our main argument is that we do
21   not believe that they owned the shares
22   because they do not have the necessary
23   capital.  There is no tax returns stating
24   where income or capital would have come from.
25            So then we investigated to see if
```

```
 1    we could find a custodian.  Then, we -- next,
 2    we tried to find a custodian of Solo Capital.
 3            And there may be good reasons that
 4    they had their custodian registered with an
 5    omnibus account.
 6            THE INTERPRETER:  Hold on one
 7    second.  So I -- the last part of my answer
 8    was -- the last part I translated was
 9    incorrect.  So here goes the correct version.
10        A    We tried to determine whether there
11    was a custodian account.  We weren't able to
12    find that, and there may be an explanation as
13    it could be in an omnibus account.
14            So we have not seen any
15    documentation showing that there is a
16    custodian account, which would include quite
17    a significant amount of shares as a -- or
18    related to a significant amount of shares, as
19    a number of pension plans was -- were went
20    through at this time with a substantial
21    amount of Danish shares.
22        Q    Is that referenced anywhere in the
23    cancellation order?
24        A    If you look at 1.4, it says that
25    they were looking for and were unable to
```

1                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
2                MASTER DOCKET 18-MD-2865(LAK)
                  CASE NO. 18-CV-09797
3

4  _____
                               )
  IN RE:                      )
5                                )
  CUSTOMS AND TAX ADMINISTRATION OF   )
6  THE KINGDOM OF DENMARK          )
  (SKATTEFORVALTNINGEN) TAX REFUND   )
7  SCHEME LITIGATION             )
                                )
8  _____)

9

10

11

12        *************************************
        *                             *
13        *        CONFIDENTIAL       *
        *                             *
14        *************************************

15

16

17    REMOTE VTC VIDEOTAPED DEPOSITION UNDER ORAL

18              EXAMINATION OF

19        CHRISTIAN EKSTRAND — VOLUME II

20           DATE: May 7, 2021

21

22

23

24

25    REPORTED BY: CHARLENE FRIEDMAN, CCR, RPR, CRR

1   or someone else?

2       A   Mr. Bertelsen only works for the

3   Danish tax agency, but had any -- anything

4   been spent, had there been any communications

5   sent to us, the natural recipient would have

6   been Bent Bertelsen.

7       Q   When did SKAT -- I apologize.

8       A   But just to follow up, if there was

9   any further correspondence in connection with

10  legislation, it should be with the Ministry.

11      Q   When did SKAT first communicate

12  with the IRS about these cases?

13      A   I believe they did that quite early

14  on.  I can't remember the specific date, but

15  it should be apparent from the documentation.

16      Q   Did SKAT first approach the IRS, or

17  did the IRS first approach SKAT?

18      A   SKAT contacted IRS.

19      Q   Were you part of those

20  conversations yourself?

21      A   Not initially.  We had delegated

22  the job.  As far as I remember, Bent

23  Bertelsen was the point of contact, and

24  another auditor in my unit called Lars.

25          He was present for the first

```
 1    discussions.
 2         Q    What was the purpose in reaching
 3    out to the IRS?
 4         A    To get knowledge about American
 5    pension plans.
 6         Q    What did you hope — I apologize.
 7         A    And exchange information.
 8         Q    What did you hope to learn about
 9    American pension plans in communicating with
10    the IRS?
11         A    So once you're informed that there
12    is a fraud case, you go through the documents
13    of the case, and then you come across a
14    Form 6166, which is a tax certificate.
15              And when you've been informed that
16    there's been fraud going on, you ask about
17    various elements, amongst others, this form.
18    And the idea behind our questioning was that
19    maybe the 6166 was not the correct version
20    and that the pension plan maybe did not even
21    exist.
22              And that is why we initially
23    reached out to them.  And they were then able
24    to confirm for us that the 6166 form was, in
25    fact, the correct form, and the pension plans
```

1    in question actually did exist.

2              And that's quite standard in those

3    kinds of cases, that you would look for this

4    type of information.

5         Q    When you spoke or when SKAT spoke

6    with the IRS, what information did SKAT

7    provide about the situation in Denmark to

8    the IRS?

9         A    So as far as I remember, we, of

10   course, informed them that we had a potential

11   fraud case where American pension plans were

12   the means of obtaining a tax refund.

13   Therefore, we were getting information about

14   these pension plans, were these large pension

15   plans, what rules they had to follow, what

16   addresses are they located at, and so forth

17   and so on.

18              VIDEO OPERATOR:  Stand by.  The

19   time is 10:20 a.m. New York time and we're

20   going off the record.

21              (Brief recess taken.)

22              VIDEO OPERATOR:  The time is

23   10:38 a.m. New York time and we're back on

24   record.

25        Q    Mr. Ekstrand, I have one

```
1      housekeeping question for you.
2              In the binder of documents that
3      your lawyer provided to you, can you turn to
4      Page 125?
5          A    Yes.
6          Q    And can you confirm for me that
7      this is SKAT's website concerning dividend
8      withholding tax refunds as of 2012?
9          A    Yes.
10         Q    Do you know a precise period of
11     time covered — the precise period of time
12     during which this was the portion of SKAT's
13     website addressing dividend withholding tax?
14         A    I do not know.
15         Q    Sorry.  I had it printed in
16     English.  I'm just looking at it in Danish.
17             It says at the top of Page 125 that
18     this is dated June 11, 2012.
19             Do you see that?
20         A    Yes.
21         Q    And so, am I correct that this is
22     SKAT's website concerning a refund of
23     dividend withholding tax as of June 11, 2012?
24         A    I don't know exactly.  This seems
25     to be a print of old website pages.
```

```
1        Q    Well, you reviewed this for

2   purposes of preparing for this deposition,

3   correct?

4        A    I have -- I've looked at these

5   pages, yes, but I have not verified whether

6   the dates are correct.

7        Q    Is your understanding that Page 125

8   is SKAT's website concerning dividend

9   withholding tax from June of 2012?

10       A    Yes, this is my impression.

11       Q    And the next page is SKAT's website

12  from January 2013?

13       A    Correct.

14       Q    And the next page is SKAT's website

15  from September of 2014, correct?

16       A    Correct.

17       Q    Then one other housekeeping

18  question.

19            You testified yesterday that SKAT

20  periodically conducts audits of taxpayers,

21  including random audits, right?

22            THE INTERPRETER:  Can I ask you to

23  repeat the question?  The audit taxpayers and

24  then you added something else.

25            MR. SCHOENFELD:  Sure.  I said
```

1      that -- I wanted him to confirm that he

2      testified yesterday that SKAT conducts audits

3      of taxpayers, including random audits.

4              THE INTERPRETER:  Okay.

5          A    There are various different

6      processes of how we audit taxpayers.  But one

7      of them is by random selection.

8          Q    Did Accounting 2 ever perform

9      random audits of information received by any

10     of the pension plan applicants?

11         A    No.  Account 2 was solely an

12     administrative unit processing applications.

13     And also, to keep in mind, whenever we

14     perform audits, it is our taxpayers residing

15     in Denmark.

16             And here we are talking about

17     non-resident's pension plans, without

18     domicile in Denmark, seeking to have refunds

19     of -- seeking to have two larger refunds.

20         Q    Okay.  Mr. Ekstrand, let's look at

21     Exhibit 3075.

22             (Above-mentioned document marked

23     for Identification.)

24         Q    Are you there?

25         A    Yes.

```
1         Q    Okay.  As I understand it, the
2    attachment to this is a PowerPoint
3    presentation that was used in February of
4    2016 for a meeting between SKAT and the
5    United States IRS.
6              Is that correct?
7         A    I -- I'm not quite sure whether
8    this is the final version, but it is correct
9    that we did have a PowerPoint presentation
10   and it contained this information.
11        Q    Was -- did you attend the meeting
12   between SKAT and the United States IRS where
13   some version of this presentation was used?
14        A    Yes, I did.
15        Q    Was it in person or remotely?
16        A    I -- I participated in person.
17        Q    In the United States or in Denmark?
18        A    In the United States.
19        Q    So if you go to Slide 3 of the
20   presentation?
21        A    Yes.
22        Q    You -- it looks like you're
23   responsible for giving an overall description
24   of the withholding tax reclaim process.
25              Is that correct?
```

```
 1        A    Correct.
 2        Q    And part of your presentation is on
 3   amounts and figures?
 4        A    Yes.
 5        Q    Where it says, "Examples on Numbers
 6   of Shares," do you recall what you discussed?
 7        A    Not — not exactly.
 8        Q    Do you recall generally?
 9        A    So, as I remember this, this was in
10   relation to reclaims paid to American pension
11   plans.
12        Q    So in the — under the heading of
13   "Amounts and Figures," it says "Reclaims
14   Paid," "Reclaims Not Paid Yet," and then
15   "Examples on Numbers of Shares."
16        A    Yes.
17        Q    And so do you -- do you recall what
18   data you presented for each of those three
19   sort of subheadings?
20        A    No, actually not.
21        Q    Do you recall using any written
22   materials other than this PowerPoint
23   presentation for your meeting with the IRS?
24        A    There was a PowerPoint presentation
25   to this.
```

```
1          Q     Are you referring to something
2    other than the document you're looking at?
3          A     Yes.   There was a PowerPoint
4    presentation which forms the basis of this.
5          Q     So a separate PowerPoint
6    presentation from this one, right?
7          A     Correct.
8          Q     Okay.   On the next slide, it refers
9    to -- I'm looking at the entries for 12:30
10   and 1:30.
11              Were those presentations given by
12   the IRS?
13         A     Yes.
14         Q     What did the IRS discuss in that
15   hour dedicated to the certification program?
16         A     So as far as I remember, we had
17   people coming in who were in charge of
18   registration of the pension plans.  So they
19   told us how to become a pension plan, and
20   that you would need to fill out a form to
21   describe the -- how to become a pension plan.
22              You need to fill out Form
23   88-something, something.  I can't remember
24   the exact number of that form.  I think it
25   was 8802.
```

```
 1              Oh, 81, sorry.  8102, I think.
 2        Q     Did the IRS confirm during these
 3    presentations that the pension plans had been
 4    properly formed under U.S. law?
 5              MR. WEINSTEIN:  Objection to form.
 6        A     As far as I remember, we went
 7    through the criterias of becoming a pension
 8    plan.  But as far as I know, under American
 9    law, you need to audit the pension plan and
10    that doesn't — that does not happen
11    automatically.
12              But in our function, that by
13    filling out this form, you gave valid
14    information to the effect that you were a
15    pension plan.
16        Q     Turn to Slide 12, please.
17              The heading is "Does 6166 Confirm,"
18    and then it looks like there's a series of
19    questions underneath that heading.
20              Am I reading that correctly?
21        A     Yes.
22        Q     So SKAT is asking the IRS — SKAT
23    is asking the IRS to confirm that the
24    Form 6166 confirms particular facts,
25    including that there's an active employer,
```

```
1    there's an active pension plan, and there are
2    payments from the participants, correct?
3              MR. WEINSTEIN:  Objection as to
4    form.
5         A    So I can't remember specifically.
6    But we are saying to confirm these things.
7              I know that these were questions
8    that we had.
9         Q    Did SKAT not know the answer to
10   these questions before the meeting with the
11   IRS?
12        A    No.
13        Q    Mr. Ekstrand, I may be done with my
14   questions.  So if you'll give me two minutes
15   to look at my notes and organize my thoughts,
16   I may be able to release you, at least to the
17   other defendants.
18             MR. SCHOENFELD:  So let's take a
19   two-minute break.
20             VIDEO OPERATOR:  Stand by.  The
21   time is 10:57 a.m. New York time and we're
22   going off the record.
23             (Brief recess taken.)
24             VIDEO OPERATOR:  The time is
25   11:02 a.m. New York time and we're back on
```

CONFIDENTIAL
Christian Ekstrand - May 7, 2021

1    record.

2              MR. SCHOENFELD:  Mr. Ekstrand, I

3    have no further questions, and I thank you

4    for your time.

5              I understand that Mr. Binder has

6    some questions for you.

7    EXAMINATION BY MR. BINDER:

8        Q    Good afternoon, Mr. Ekstrand.

9        A    Good afternoon.

10       Q    My name is Neil Binder.  I'm with

11   the law firm of Binder & Schwartz and we

12   represent ED&F Man Capital Markets, Limited.

13             THE INTERPRETER:  Can you give me

14   the name again of your client, please?

15             MR. BINDER:  ED&F Man Capital

16   Markets, Limited.

17       Q    You testified yesterday, in 2015,

18   SKAT made a determination to cancel dividend

19   withholding requested by U.S. pension plans.

20             Do you recall that?

21             THE INTERPRETER:  I'm sorry.  You

22   were breaking up.

23             Can you repeat the question?

24       Q    You testified yesterday that in

25   2015, SKAT made a deformation to cancel

# Exhibit 17

| Pious: | /o=customs tax/ou=customs tax/cn=recipients/cn=w12234 |
| --- | --- |
| Two: | Lars Andersen <lars.andersen@skat.dk>; Bent Bertelsen <bent.bertelsen@skat.dk>; Lill Helene Drost (Lill.Drost@Skat.dk) <lill.drost@skat.dk>; Christian Baden Ekstrand <christian.ekstrand@skat.dk> |
| Cc: | Bente Frellesen <bente.frellesen@skat.dk>; Gitte Jeanette Kierkegaard <gitte.kierkegaard@skat.dk>; Katrine Basballe <katrine.basballe@skat.dk> |
| Subject: | PRESENTATION to post US SCHEME - Reclaim on withhold dividend tax.pptx |
| Attachments: | SCHEME - Reclaim on withhold dividend tax.pptx |

Hello Everyone

Here is the first draft of our post w.m. to the IRS

Of course, we must be able to move along the way depending on what the IRS offers.

I should just like to point out that we are fully aware not of criticising the United States and their records, but of constantly setting the way for cooperation, since we believe that there are also tax challenges for the United States.

I would like some input to be made to the attached one.

Greetings Lars

Confidential Pursuant to Protective Order

SKAT_MDL_001_00468547_T