# Exhibit 8_D



**Danish Tax and customs administration Competent Authority**

**SCHEME - Reclaim on withhold dividend tax**

# SCHEME - Reclaim on withhold dividend tax



## 09:00 AGENDA – Danish delegation

- Presentation
  - Lars Andersen - SPOC
  - Bent Bertelsen – Competent authority
  - Lill Helene Drost – In charge of Task Force Dividend - Reclaim
  - Christian Ekstrand – Antifraud unit
  - Lars M. Nielsen – Antifraud unit
- Organisation
  - Danish Tax-Department -   Lars Andersen
  - JitSic and Competent Authority  -   Bent Bertelsen
  - Antifraud Unit  -  Lill Helene Drost

29. september 2021

# SCHEME - Reclaim on withhold dividend tax



## 09:30  SCHEME – Danish Delegation

Overall Description – Christian Ekstrand

    Withhold tax – reclaim

        Double Treasure agreement USA – Danish Legislation - 15/27%

        Ordinary claimant - persons

        Reclaims received only from Pension funds – 27 %

        Set-up    Agents / Custodians / shareholders

        Public prosecutor

    Amount and Figures

        Reclaims paid

        Reclaims – not paid yet – attempt to fraud

        Examples on numbers of shares

29. september 2021

# SCHEME - Reclaim on withhold dividend tax

SKAT

## 12:30 IRS – Certification program

No question ?

## 01:30 IRS – 401k pension plan

No question ?

## 03:00 Treaty implications

1) Dividends
2) Pensions
3) Other jurisdictions

29. september 2021

## SCHEME - Reclaim on withhold dividend tax

SKAT

# 04:00 Jitsic Project

1) Review / Approve Project template

2) Process / Procedure / Timeline

3) Expected outcomes / Reports (Alerts)

**Dette må vel være – resultatsøgning til vores fremadrettede formål – så her er det muligvis Lill og Christian, der skal være frontløbere.**

**Vægten skal vel lægges på indholdet/værdien af erklæring 6166 eller i mangel heraf – hvordan SKAT kan sikre sig, at man ikke udbetaler på et mangelfuldt grundlag.**

# SCHEME - Reclaim on withhold dividend tax



Day 2 – 09:00 Specific case – Unpaid claims

## Control - overall:

- Power of attorney
  - 2015
  - Correct trustee
- TIN and Form 6166
- Pension Plan
  - Active
  - Employer
  - Members taxable in DK or US > 50%
  - Do the pension fund own the shares and have the rights to dividend
  - Did they get earlier payouts from DK
- Working data – spreadsheet
  - Data showing – there has to be something wrong

29. september 2021

# SCHEME - Reclaim on withhold dividend tax



Day 2 – 09:00 Specific case – Unpaid claims

## 4 scenarios:

1) Reclaims without reaction at all
2) Old entities – addresses at 5532 Lillehammer Lane
3) Danish representative – Letters "Return to sender" – no power of attorney
4) Danish representative – trustee Donald Donaldson – no power of attorney

In general      SKAT hasn't got one single reaction for late or non payout.

There are no request for payouts on 12 %

Only one shareholder entity has react directly

# SCHEME - Reclaim on withhold dividend tax



Day 2 – 09:00 Specific case – Unpaid claims

1) Reclaims without reaction at all

- Numbers of reclaims 71 stk. 547 mio DKK / 90 mio $
- Addresses verified of USA IRS
- Post return to sender
- No reminder to the tax-department for the money
- There has to be some money between the entities or persons - as long as we know there is an agreement on split of the withhold tax 20/80
- Specific reclaim: nr. 41 – 15-2925947

29. september 2021

# SCHEME - Reclaim on withhold dividend tax



Day 2 – 09:00 Specific case – Unpaid claims

2) Old entities – 5532 Lillehammer Lane

- Numbers of reclaims 10 older than 2012 – 8 entities
- All 8 entities are related by Stacey Kaminer or/and a bankruptcy in 2011.
- Address is a resident house
- Are they active entities, who are able to trade for these amounts
- There has to be some money between the entities or persons - as long as we know there is an agreement on split of the withhold tax 20/80
- Specific reclaim: nr. 121 – 15-2930642

29. september 2021

## SCHEME - Reclaim on withhold dividend tax



Day 2 – 09:00 Specific case – Unpaid claims

3) Danish representative – Letters "Return to sender" – no power of attorney

- SKAT has asked the danish representative for a power of attourney – with no result – but he has sent documents.
- Letters only for shareholder - "Return to sender"
- The "Return to sender" from the reclaim is given by Donald Donaldson – who is a representative for 48 other entities with reclaims.
- Address is a resident house
- Young entity who invest for big amounts.
- There has to be some money between the entities or persons - as long as we know there is an agreement on split of the withhold tax 20/80
- Specific reclaim: nr. 149 – 15-3077184

29. september 2021

# SCHEME - Reclaim on withhold dividend tax



Day 2 – 09:00 Specific case – Unpaid claims

4) Danish representative – Letters "Return to sender" – no power of attorney

- · SKAT has asked the danish representative for a power of attourney – with no result – but he has sent documents.
- · US – address at a big law firm – C/O Kaye Scholer together with at least 25 other entities with reclaims.
- · Agent silent for now.
- · Case 49 - 15-2926024

29. september 2021

# SCHEME - Reclaim on withhold dividend tax



What do we need:

---

- Does 6166 confirm:
  - The entity is resident and taxable to US – but exempt for US taxation.
  - => 50% of the participants are resident and taxable in US or Denmark – The Treaty article 10 – It is possible to participate even you ain't taxable to US og DK
    Therefor is:
    - There an **active** employer
    - There an active pension plan
    - There payments from the participants, and they are used in the investment scheme
      - investments for > 100 mio DKK
      - As we can see it – there is a opportunity for the participant to invest private money in the Plan withhold from the pension calculating.
      - The employer can be a participant
      - A sole company can be an employer in the pension plan.

29. september 2021

# Exhibit 18

1     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
2     MASTER DOCKET 18-MD-2865(LAK)

3

4  _____
              )
5  IN RE:          )
              )
  CUSTOMS AND TAX ADMINISTRATION OF )
6  THE KINGDOM OF DENMARK    )
  (SKATTEFORVALTNINGEN) TAX REFUND )
7  SCHEME LITIGATION      )
              )
8  _____)

9

10

11

12      C O N F I D E N T I A L

13

14

15       VIDEO DEPOSITION OF

16        LILL DROST

17      Copenhagen, Denmark

18     Friday, October 1, 2021

19

20

21

22

23

24

25  Reported by: CHRISTINE MYERLY

1    correct?

2         A    Yes.

3         Q    And the meeting with the U.S. tax

4    authorities was part of the backward-looking control

5    effort, correct?

6         MR. OXFORD:  Object to the form.

7         A    Yes.  Yes, and as we just read, it

8    was also to do with a bit of what was going to

9    happen going forward.

10   BY MR. DULBERG:

11        Q    I thought Mr. Ekstrand suggested

12   that it couldn't be used for backward-looking

13   purposes.

14        MR. OXFORD:  Object to the form.  Drew,

15   that is a statement you just made.  Would you like

16   to phrase it as a question so the witness can answer

17   it?

18        MR. DULBERG:  No, and if you have an

19   objection, I prefer you to limit it to the word

20   "objection."

21        MR. OXFORD:  Objection to form.  You can

22   answer the question.

23   BY MR. DULBERG:

24        Q    If you understood the question,

25   you may answer it.

```
 1                 A        I need for you to repeat it, then.

 2                 Q        Hadn't Mr. Ekstrand suggested that

 3     the only purpose -- withdrawn.  Hadn't Mr. Ekstrand

 4     suggested that SKAT could not have a

 5     backward-looking purpose in meeting with the IRS?

 6                 MR. OXFORD:  Objection to form.

 7                 A        No, I don't think so.

 8     BY MR. DULBERG:

 9                 Q        Do you recall that being an issue

10     raised by the legal department?

11                 MR. OXFORD:  Objection to form.

12                 A        I don't even know what we are

13     talking about now.

14     BY MR. DULBERG:

15                 Q        Did you ultimately attend the

16     meeting with the IRS?

17                 MR. OXFORD:  Objection to form.

18                 A        Yes.

19     BY MR. DULBERG:

20                 Q        That meeting took place under the

21     JITSIC umbrella, correct?

22                 A        And now I can say yes to this,

23     because I can see that Lars Andersen was there

24     and -- so, I can say yes because I can see Lars

25     Andersen was there and he was under the umbrella of
```

1    JITSIC, and Bent Bertelsen, he was there from

2    competent authority.

3              Q        The meeting took place in

4    Washington D.C., correct?

5              A        Yes.

6              Q        And can you tell me everyone who

7    attended on behalf of SKAT?

8              A        Yes.  So, I — I was there,

9    Christian Ekstrand, Lars Andersen, Bent Bertelsen

10   and Bente Frellesen.  I might have forgotten one.

11   As well as Lars M□ller Neilsen.

12             Q        Six people in total?

13             A        That is what I remember.  I may

14   not remember this correctly.  This is long ago.

15             Q        Did you all fly together from

16   Denmark?

17             A        Yes.  I don't know about Lars

18   Andersen, but I think so.

19             Q        Do you know who paid for the

20   flights?

21             A        SKAT.  SKAT, I assume.  I don't

22   know.  Yes, they did.

23             Q        Certainly you did not pay for your

24   own trip to Washington D.C., correct?

25             A        No.

CONFIDENTIAL
Lill Drost - October 1, 2021

1          Q       SKAT paid, right?

2          A       Yes.

3          Q       Where did you stay?

4          A       I don't remember the name of the

5     hotel, but we have a unit in charge of booking

6     hotels nearby the venue.

7          Q       What do you recall in terms of the

8     substance of the meeting with the IRS?

9          A       So, as a manager, it is always

10    nice to go out and meet other tax authorities.  And

11    I found out that my staff also had very fruitful

12    discussions.

13         Q       At any time do you remember the

14    IRS saying that there was a problem or deficiency

15    with any U.S. pension plan?

16         MR. OXFORD:  Objection to form.

17         A       I don't remember the details, but

18    I remember that my staff had their -- some of their

19    suspicions confirmed, and that we gained a better

20    understanding of the relevant rules.

21    BY MR. DULBERG:

22         Q       Can you identify any information

23    the IRS provided that confirmed a suspicion held by

24    any member of your staff?

25         A       I don't remember.

```
 1             Q       There were minutes maintained by
 2    SKAT summarizing this meeting, correct?
 3             A       I don't remember.  But usually
 4    that is what we do.
 5             Q       If you can find Exhibit 4024, I
 6    think you will find those minutes.  Do you see
 7    Exhibit 4024?
 8             A       Yes.
 9             Q       Is this an e-mail you received
10    from Bent Bertelsen?
11             A       Yes.
12             Q       You sent it to a group that
13    attended the meeting with the IRS, correct?
14             A       Yes.  Then he has cc-ed his boss.
15             Q       That is Kai Jacobsen?
16             A       Yes.
17             Q       He attached his notes from his
18    meeting with the IRS, correct?
19             MR. OXFORD:  Objection to the form.
20             A       Yes.  Well, I can't really see
21    whether it is his.
22    BY MR. DULBERG:
23             Q       Well, it is notes that he has
24    combined with comments of Lars Andersen and Lars
25    Neilsen based on his e-mail, correct?
```

```
1                    MR. OXFORD:  Objection to form.

2            A       Yes, that is what it says.

3    BY MR. DULBERG:

4            Q       If you can turn to the page ending

5    in 702.

6            A       Yes.

7            Q       The third paragraph talks about

8    something called Form 5500, do you see that?

9            A       Yes.

10           Q       And it explains that typically a

11   retirement plan will use the TIN, parentheses EIN,

12   closed parentheses, number that the underlying

13   employer uses, plus three numbers, do you see that?

14           A       Yes.

15           Q       That is information the IRS

16   provided to SKAT at this meeting, correct?

17           A       That is what it seems.

18           Q       If you go to the very last page of

19   this exhibit, do you find a series of questions?

20           A       Yes.

21           Q       The first question is whether

22   American contact with the participants would destroy

23   a Danish police action, is that right?

24           A       Well, I have no comments to that.

25           Q       Do you understand what that
```

CONFIDENTIAL
Lill Drost - October 1, 2021

1    question is asking?

2            A       I don't know why they are asking

3    the question.

4            Q       Then in the very last sentence it

5    says that "The Americans will produce a JITSIC

6    project description covering the meeting between us

7    and IRS and the exchange that is taking place." Do

8    you see that?

9            A       Yes.

10           Q       And after this meeting that you

11   attended, did SKAT continue to work with the IRS

12   under the JITSIC framework?

13           A       I don't remember.

14           Q       Did you have a chance to edit

15   these notes before they were finalized?

16           MR. OXFORD:  Object to the form.

17           A       I don't remember.

18   BY MR. DULBERG:

19           Q       If you thought that Mr. Bertelsen

20   had misstated anything, would you have responded to

21   this e-mail?

22           MR. OXFORD:  Objection to form.

23           A       I would probably have said

24   something if I had noted some apparent mistakes.

25

| 1 | BY MR. DULBERG: |
| 2 | Q        And is it fair to say that these |
| 3 | notes reflect your staff's best summary of the |
| 4 | meeting with the IRS? |
| 5 | MR. OXFORD:  Object to the form.  Is this |
| 6 | the final document, Drew, that we produced to you? |
| 7 | MR. DULBERG:  I will ask the questions, |
| 8 | Mr. Oxford.  The witness can answer that. |
| 9 | A        I don't know. |
| 10 | BY MR. DULBERG: |
| 11 | Q        It is your staff's summary of the |
| 12 | meeting with the IRS, correct? |
| 13 | MR. OXFORD:  Objection to the form. |
| 14 | A        No, it is from Bent Bertelsen. |
| 15 | Q        Sure.  The — |
| 16 | A        He is from competent authority. |
| 17 | Q        Competent authority is the group |
| 18 | responsible for coordinating with other governments, |
| 19 | correct? |
| 20 | MR. OXFORD:  Object to the form. |
| 21 | A        Yes. |
| 22 | BY MR. DULBERG: |
| 23 | Q        And these notes reflect his |
| 24 | summary of the meeting with the IRS, correct? |
| 25 | MR. OXFORD:  Object to the form.  You can |

1    answer.

2         A    Yes.  This is a summary where --

3    combined with comments from Lars Andersen and Lars

4    M□ller, so — so Lars M□ller Neilsen from my unit

5    was involved.

6    BY MR. DULBERG:

7         Q    Did you take notes during —

8         MR. OXFORD:  Hold on, Drew.  The witness

9    wasn't finished with her answer.  Madam Interpreter,

10   would you mind --

11        A    He would have been able to make

12   comments.

13   BY MR. DULBERG:

14        Q    Did you take notes at the meeting

15   you attended with the IRS?

16        A    No, I don't think that I did.  I

17   don't remember.

18        Q    Could you turn to Exhibit 4026.

19   Do you find an e-mail from Kai Jacobsen?

20        A    Yes.

21        Q    This was Bent Bertelsen's boss,

22   correct?

23        A    Yes.

24        Q    Mr. Jacobsen worked in competent

25   authority, correct?

CONFIDENTIAL
Lill Drost - October 1, 2021

```
1              A      Yes.
2              Q      And he was summarizing the work of
3     competent authority during the first quarter of
4     2016, correct?
5              MR. OXFORD:  Object to form.
6              A      That is what it says.
7     BY MR. DULBERG:
8              Q      If you turn to the first slide, do
9     you understand what this information represents?
10             A      I am not that familiar with this
11    business area.
12             Q      Do you know why you received this
13    e-mail?
14             A      I am receiving this because Anne
15    Munksgaard is the supervisor -- or is the superior
16    of Tove Lill, Christina Morten, Vagn Carsten, and
17    then Susanne at the end is a secretary, and then
18    there is Niels and Kai that are cc-ed from competent
19    authority, and I am receiving this -- I am receiving
20    this as for your information.
21             Q      For your information, right?
22             MR. OXFORD:  Hold on.  The witness is on
23    the wrong document, I think.  Are we on Exhibit
24    4026?
25             MR. DULBERG:  Yes.
```

```
 1                MR. OXFORD:  Sorry, she has a color
 2    version.  My mistake.  Please continue.
 3    BY MR. DULBERG:
 4           Q       If you'd turn to the second slide,
 5    numbered 2.
 6           A       Yes.
 7           Q       It refers to a few conference
 8    calls and key documents exchanged with the United
 9    States, do you see that?
10           A       Yes.
11           Q       It talks about a large amount of
12    data being exchanged both ways, correct?
13           A       That is what it says, yes.
14           Q       This is about American pension
15    plans and Danish dividend tax, right?
16                MR. OXFORD:  Object to the form.
17           A       I don't know where it says
18    "dividend tax."
19    BY MR. DULBERG:
20           Q       You understand the reason that
21    SKAT was interested in information about American
22    pension plans was that they had invested in Danish
23    companies and requested refunds of dividend tax,
24    correct?
25                MR. OXFORD:  Object to the form.
```

```
 1            A       Yes.   Yes.   But this is what --
 2      the production of competent authority in the first
 3      quarter of 2016.
 4      BY MR. DULBERG:
 5            Q       Right.   And the paragraph we are
 6      looking at describes a meeting in Washington D.C.,
 7      correct?
 8            A       Yes, for competent authority.
 9            Q       That is the meeting you attended,
10      correct?
11            A       Yes.
12            Q       And it says, "Their cooperation
13      has been exemplary and our American colleagues have
14      been incredibly helpful."  Correct?
15            A       Yes, that is the conclusion made
16      by competent authority that are working with these
17      issues.
18            Q       Do you agree with that conclusion,
19      having personally met with representatives of the
20      IRS?
21            A       Definitely.   I found them very
22      accommodating.
23            Q       Under number 2, it goes on to talk
24      about working with Swedish colleagues on the control
25      of deliveries of sweets from Sweden to Denmark,
```

1    correct?

2              A      Yes.

3              Q      That is another example of the

4    work that competent authority does on behalf of

5    SKAT, right?

6              A      Yes.

7              Q      Who makes requests to competent

8    authority to engage with other agencies?

9         MR. OXFORD:  Object to the form.

10             A      Caseworkers.

11   BY MR. DULBERG:

12             Q      In this case, did you ask

13   competent authority to obtain information from the

14   IRS?

15        MR. OXFORD:  Object to the form.

16             A      No, my staff did.

17   BY MR. DULBERG:

18             Q      Do you know if Mr. Ekstrand made

19   that request?

20             A      I don't remember who did.

21             Q      I want to turn to a different

22   subject, which is the decision to revoke previous

23   decisions to approve reclaim applications.

24        MR. OXFORD:  Drew, just before, since you

25   are changing tack, we have been going about an hour

```
 1    and ten minutes.  Would you mind if we take a short
 2    break, please?
 3              MR. DULBERG:  I don't mind.
 4              MR. OXFORD:  Thank you.
 5              THE VIDEOGRAPHER:  Standby.  The time is
 6    9:33 a.m.  New York time and we are going off the
 7    record.
 8                   (Off the record.)
 9              THE VIDEOGRAPHER:  The time is 9:47 a.m.
10    New York time and we are back on record.
11    BY MR. DULBERG:
12         Q      Are you familiar with the decision
13    by SKAT to revoke SKAT's earlier decisions to
14    approve reclaim applications?
15              MR. OXFORD:  Objection to form.
16         A      Yes.
17    BY MR. DULBERG:
18         Q      What does it mean to revoke
19    reclaims that were previously issued?
20              MR. OXFORD:  Objection to the form.
21         A      It means that we believe to have
22    made a decision on a wrongful basis and therefore we
23    are revoking our decision.
24    BY MR. DULBERG:
25         Q      What role did you play with
```

```
 1      respect to decisions to revoke previous decisions to

 2      pay out dividend withholding tax?

 3              MR. OXFORD:  Objection to form.

 4          A       So, my role is that I am the

 5      functional manager, and I supervise and approve more

 6      significant decisions.

 7      BY MR. DULBERG:

 8          Q       As a functional manager, you are

 9      responsible for the work of your staff, correct?

10          A       Correct.

11          Q       SKAT expects you to evaluate

12      recommendations of your staff, correct?

13              MR. OXFORD:  Objection to form.

14                  (Danish clarification.)

15              THE INTERPRETER:  Can I ask you to repeat

16      the question?  Just to say that the witness did not

17      understand.  I was having a discussion about the

18      translation.  So if I can ask you to maybe put it in

19      a different way?

20      BY MR. DULBERG:

21          Q       Absolutely.  Thank you, Kirsten.

22      SKAT expects its managers to carefully consider

23      conclusions that staff propose, is that right?

24              MR. OXFORD:  Objection to form.

25          A       My role in 2016 was and still is
```

# Exhibit 19



# Danish Tax and Customs Administration

Special Review 3
Kratbjerg 236
3480 Fredensborg
Denmark
www.skat.dk
April 6, 2018
Ref: Captia no.: 16-1672145
TIN: 47-1864702

The Bradley London Pension Plan
31 W 21st Street Apt2n
New York, NY 10010
USA

## Decision – Withdrawal of Prior Decisions to Refund Dividend Taxes

In connection with payments of dividend taxes, the Danish Customs and Tax Administration ("SKAT") previously decided to refund dividend taxes to The Bradley London Pension Plan (hereinafter "Bradley"). The payments pertain to the following claims for refund of dividend taxes, which SKAT has received from Syntax GIS on behalf of Bradley:

| Claim dated | April 13, 2015 | DKK 29,614,463 |
|---|---|---|
| Claim dated | April 16, 2015 | DKK 21,196,331 |
| Claim dated | April 21, 2015 | DKK 7,059,987 |
| Claim dated | April 23, 2015 | DKK 2,365,369 |
| Claim dated | April 28, 2015 | DKK 4,454,041 |
| Claim dated | April 30, 2015 | DKK 2,749,192 |
| Claim dated | May 15, 2015 | DKK 1,778,057 |
| Total | | DKK 69,217,440 |

SKAT hereby revokes the previous decisions to refund dividend taxes to Bradley for a total of DKK 69,217,440 since Bradley was not entitled to receive the funds.

It is SKAT's assessment that:
- Bradley does not own and never has owned the shares listed in the claims.
- The dividends associated with the shares listed in the claims were never sent to Bradley.

Furthermore, SKAT has determined that Bradley did not have the necessary capital to make the Danish stock investments that form the basis for the claims for refund of dividend taxes.

During the assessment, SKAT emphasized that Bradley has not provided any documentation to show that Bradley owned the shares. In addition, Bradley has failed to provide documentation to show that the retirement plan ever received any dividends from the shares. The information in the case does not establish a basis for such significant investments in Danish stocks.



EXHIBIT
4A

1

SKAT has emphasized that:
- Bradley is a newly established retirement plan.
- Bradley has only one participant with the associated limited contributions.
- Bradley has not filed Form 5500 in the U.S. This suggests that Bradley's assets were less than USD 250,000 at the end of the applicable fiscal years.
- Based on the investigation conducted thus far, State Prosecutor for Serious Economic and International Crime ("SØIK") is unable to confirm that Bradley has ever owned Danish stocks or has received stock dividends as a result of owning Danish stocks.

Based on the currently available information, SKAT is of the opinion that Bradley has not had financial opportunities to own stocks to the extent indicated in Bradley's claims for refund of Danish dividend taxes. Among other things, this is reflected in that:

- In less than three months after it was established, Bradley had invested DKK 221,009,195 in the CHR Hansen Holding A/S stock.

- On March 19, 2015, Bradley owned shares in Novo Nordisk A/S for a total value of DKK 2,078,867,904

Thus, Bradley has failed to document that Bradley meets the requirements for receiving a refund of the withheld dividend taxes from Danish stocks (cf., Article 10 of the Convention for the Avoidance of Double Taxation between Denmark and the United States).

In its objections to SKAT's proposal from March 24, 2017, Bradley's legal representative, TVC Advokatfirma, has not provided any information or documentation in support of Bradley having owned the stocks and having received the stock dividends as indicated in the claims.

Thus, SKAT's decisions to refund dividend taxes to Bradley are based on false premises. For this reason, SKAT is withdrawing its prior decisions to refund dividend taxes

SKAT is not demanding payment of the incorrectly issued dividend tax refund in connection with this decision. This is a departure from the previously proposed decision that SKAT sent to Bradley on March 24, 2017. On behalf of SKAT, legal counsel for the Danish government is going to send a writ with a demand for reimbursement and compensation from Bradley.

For further foundation, please refer to the statement of claim below.

Please refer to Exhibits 25-1-1 to 25-11-5, as provided previously, as well as Exhibits 25-A-1 to 25-A-5, which are attached to this decision.

## Statement of Claim and Argument

## Table of Contents

| 1. | Factual Considerations | 4 |
|---|---|---|
| 1.1 | Case Description | 4 |
| 1.2 | Background for Reopening Case | 4 |
| 1.3 | Description of Retirement Plan | 4 |
| 1.4 | Refunded Dividend Taxes | 5 |
| 1.5 | Calculation of Investments | 6 |
| 1.6 | Information from the IRS in the U.S. | 6 |
| 1.7 | Information from the State Prosecutor for Serious Economic and International Crime | 7 |
| 2. | Rules of Law | 8 |
| 2.1 | Consolidated Acts | 8 |
| 2.2 | Convention for the Avoidance of Double Taxation | 8 |
| 2.3 | Caselaw | 8 |
| 3. | Remarks by SKAT | 9 |
| 3.1 | Legal Basis | 9 |
| 3.2 | Reopening of Case | 9 |
| 3.3 | Capital Basis for Retirement Plan's Investments | 10 |
| 3.4 | Retirement Plan | 11 |
| 4. | SKAT's Provisional Decision | 11 |
| 5. | Retirement Plan's Remarks to SKAT's Proposal | 12 |
| 6. | Remarks by SKAT | 15 |
| 7. | SKAT's Final Decision | 16 |
| | Appeals Process | 17 |
| | Rules and Statutes | 18 |

## 1. Factual Considerations

### 1.1. Case Description

During the period April 13, 2015, to May 15, 2015, Syntax GIS sent claims to SKAT on behalf of Bradley to obtain refunds of withheld dividend taxes from Danish stocks for a total of DKK 69,217,440.

On this basis, SKAT paid the requested sums to Bradley via Syntax GIS's bank account, no. 46065800, in Barclays Bank Plc, England.

### 1.2. Background for Reopening Case

On May 25, 2016, SKAT declined Bradley's claim dated August 24, 2015, for refund of dividend taxes withheld. During the pendency of the case, SKAT requested further documentation from Bradley. However, Bradley has not reacted to SKAT's inquiries. There is no indication of any appeal of SKAT's decision from May 25, 2016.

It should be noted that SKAT's decision from May 25, 2016, was returned to SKAT.

Since Bradley did not respond to SKAT's inquiries, SKAT has obtained additional tax return and registration information from the IRS in the United States through a Competent Authority. The information indicates that:
- Bradley is a newly established retirement plan[1].
- Bradley has not filed Form 5500 (tax returns); thus, Bradley has acknowledged to the IRS that its assets at the end of 2014 and 2015 were less than $250,000.[2]
- The annual contributions are limited to between $12,500 and $53,000, depending on the age of the contributor[3].

Based on the information from the IRS, SKAT has reopened Bradley's previous claims for refund of dividend taxes whereby Bradley received refunds of withheld dividend taxes from Danish stocks.

### 1.3. Description of Retirement Plan

Bradley is registered as a retirement plan in the United States[4].

Bradley was established in September 2014[5].

---

[1] Exhibits 25-1-1 to 25-1-2
[2] Exhibits 25-2-1 to 25-2-13 and Exhibits 25-3-1 to 25-3-2
[3] Exhibits 25-4-1 to 25-4-9
[4] Exhibits 25-1-1 to 25-1-2
[5] Exhibits 25-1-1 to 25-1-2

## 1.4 Refunded Dividend Taxes

With reference to the Convention for the Avoidance of Double Taxation between Denmark and the United States, Syntax GIS (acting as an agent on behalf of Bradley) has filed claims for and has received refunds for the withheld dividend taxes associated with the following stocks[6]:

| SKAT's batch no. | Date of claim | Stock | Number of shares | Ex-date | Total dividends DKK | Dividend taxes refunded DKK |
|---|---|---|---|---|---|---|
| 25915 | 4/13/2015 | Novo Nordisk A/S B | 6,080,339 | 3/20/2015 | 30,401,695 | 8,208,457 |
| 25915 | 4/13/2015 | A.P. Møller Mærsk A/S B | 40,224 | 3/31/2015 | 79,281,504 | 21,406,006 |
| 33315 | 4/21/2015 | DSV A/S | 631,034 | 3/13/2015 | 1,009,654 | 272,606 |
| 33315 | 4/21/2015 | Danske Bank A/S | 3,114,709 | 3/19/2015 | 17,130,899 | 4,625,342 |
| 33315 | 4/21/2015 | Carlsberg A/S - B | 889,728 | 3/27/2015 | 8,007,552 | 2,162,039 |
| 33415 | 4/23/2015 | Novozymes A/S B | 792,196 | 2/26/2015 | 2,376,588 | 641,678 |
| 33415 | 4/23/2015 | TDC A/S | 2,522,928 | 3/6/2015 | 2,522,928 | 681,190 |
| 33415 | 4/23/2015 | Pandora A/S | 429,013 | 3/19/2015 | 3,861,117 | 1,042,501 |
| 33515 | 4/16/2015 | A.P. Møller Mærsk A/S A | 39,830 | 3/31/2015 | 78,504,930 | 21,196,331 |
| 37515 | 4/28/2015 | Gn Store Nord A/S | 570,760 | 3/20/2015 | 513,684 | 138,694 |
| 37515 | 4/28/2015 | Tryg A/S | 174,481 | 3/26/2015 | 5,059,949 | 1,366,186 |
| 37515 | 4/28/2015 | FL Smidth & CO A/S | 400,369 | 3/27/2015 | 3,603,321 | 972,896 |
| 37515 | 4/28/2015 | Vestas Wind Systems A/S | 1,876,795 | 3/31/2015 | 7,319,500 | 1,976,265 |
| 37815 | 4/30/2015 | CHR. Hansen Holding A/S | 853,647 | 11/28/14 | 3,218,249 | 868,927 |
| 37815 | 4/30/2015 | Coloplast A/S - B | 928,526 | 12/5/14 | 6,963,945 | 1,880,265 |
| 60115 | 5/15/2015 | Coloplast A/S - B | 1,463,422 | 5/7/2015 | 6,585,399 | 1,778,057 |
| Total | | | | | 256,360,914 | 69,217,440 |

The claims included the appendices indicated below[7].

1. Form 06.003 ENG – Claim to [sic] Relief from Danish Dividend Tax
2. Credit Advices
3. FORM 6166 from the Internal Revenue Service (IRS) – Certification of U.S. Tax Residency (issued by the U.S. tax authorities)
4. Limited Power of Attorney to Syntax GIS

Item 1: Form 06.003 states that Bradley is the rightful owner of the stocks and that it is subject the Convention for the Avoidance of Double Taxation between Denmark and the United States.

Item 2. According to Credit Advices prepared by the custodian (Old Park Lane Capital PLC or Solo Capital Partners LLP), Bradley has received net dividends from the shares.

Item 3: The Certification of [U.S. Tax] Residenc[y] (Form 6166) that was received, and which was issued by the U.S. Department of the Treasury, states as follows:

*"I certify that, **to the best of our knowledge**, the above-named entity is a trust forming part of a pension, profit sharing, or stock bonus plan qualified under section 401(a) of the U.S. Internal Revenue Code, which is exempt from U.S. taxation under section 501(a) and is a resident of the United States of America for purposes of U.S. taxation."*

---

[6] Exhibits 25-5-1 to 25-11-5
[7] Exhibits 25-5-1 to 25-11-5

## 1.5 Calculation of Investments

Based on that Bradley must own the shares the day before the ex-dividend date, the purchase rates for Bradley's purchase of the shares listed in the claims[8] are calculated based on the closing rate on the last trading day prior to the ex-dividend date[9].

| SKAT's batch no. | Stock | Date of rate | Number of shares | Rate | Calculated purchase rate DKK |
|---|---|---|---|---|---|
| 37815 | CHR. Hansen Holding A/S | 11/27/2014 | 853,647 | 258.90 | 221,009,195 |
| 37815 | Coloplast A/S - B | 12/4/2014 | 928,526 | 527.00 | 489,333,202 |
| 33415 | Novozymes A/S B | 2/25/2015 | 792,196 | 322.50 | 255,483,210 |
| 33415 | TDC A/S | 3/5/2015 | 2,522,928 | 54.00 | 136,238,112 |
| 33315 | DSV A/S | 3/12/2015 | 631,034 | 219.20 | 138,322,598 |
| 33315 | Danske Bank A/S | 3/18/2015 | 3,114,709 | 175.30 | 546,008,472 |
| 33415 | Pandora A/S | 3/18/2015 | 429,013 | 614.50 | 263,628,489 |
| 37515 | Gn Store Nord A/S | 3/19/2015 | 570,760 | 154.20 | 88,011,192 |
| 25915 | Novo Nordisk A/S B | 3/19/2015 | 6,080,339 | 341.90 | 2,078,867,904 |
| 37515 | Tryg A/S | 3/25/2015 | 174,481 | 868.50 | 151,536,749 |
| 37515 | FL Smidth & CO A/S | 3/26/2015 | 400,369 | 314.00 | 125,715,866 |
| 33315 | Carlsberg A/S - B | 3/26/2015 | 889,728 | 571.50 | 508,479,552 |
| 33515 | A.P. Møller Mærsk A/S A | 3/30/2015 | 39,830 | 15,810.00 | 629,712,300 |
| 37515 | Vestas Wind Systems A/S | 3/30/2015 | 1,876,795 | 290.20 | 544,645,872 |
| 25915 | A.P. Møller Mærsk A/S B | 3/30/2015 | 40,224 | 16,410.00 | 660,075,840 |
| 60115 | Coloplast A/S - B | 5/6/2015 | 1,463,422 | 510.00 | 746,345,220 |

## 1.6 Information from the IRS in the U.S.

SKAT has received information from the IRS in the U.S. through the Competent Authorities in Denmark and the U.S.

In a letter dated December 4, 2015, the IRS states as follows[10]:
- Bradley was established in September 2014.
- Bradley's address is the same address that Bradley provided to SKAT.

In a meeting with SKAT and the Competent Authority at the end of February 2016, the IRS stated as follows:
- Form 6166 (Certification of U.S. Tax Residency) is issued by the IRS when the retirement plan submits Form 8802 (Application for United States Residency Certification). The information on Form 8802 is provided under penalty of perjury and is not verified by the IRS when issuing Form 6166.

In a letter dated June 13, 2016, the IRS attached Instructions for Form 5500-EZ, which, among other things, state as follows[11]:
- *"Who Does Not Have To File Form 5500-EZ*
  *"You do not have to file Form 5500-EZ for the 2015 plan year for a one-participant plan if the total of the plan's assets and the assets of all other one-participant plans maintained by the employer at the end of the 2015 plan year does not exceed $250,000, unless 2015 is the*

---

[8] Exhibits 25-5-1 to 25-11-5
[9] The rate is listed on the NASDAQ website at http://www.nasdaqomxnordic.com
[10] Exhibits 25-1-1 to 25-1-2
[11] Exhibits 25-2-1 to 25-2-13

6

*final plan year of the plan. For more information on final plan years, see Final Return later."*

Based on the information from the IRS, SKAT has determined that this is a case of "one-participant (owners and their spouses) retirement plan".

In a letter from December 13, 2016, the IRS stated that[12]:
* The IRS does not have any tax returns (Form 5500) for Bradley since no tax returns were filed for 2014 or 2015.

With regard to general questions about retirement plans and contributions to retirement plans, the IRS provided links to the IRS website regarding "Topics for Retirement Plans"[13]. Among other things, the website states that:
* A one-participant 401(k) plan covers a business owner with no employees other than that person and his or her nearest relative.
* The annual contributions are limited to between \$12,500 and \$53,000, depending on the age of the contributor (age 50 or younger).

## 1.7. Information from the State Prosecutor for Serious Economic and International Crime

On August 28, 2017, SKAT requested the State Prosecutor for Serious Economic and International Crime ("SØIK") to:

1. confirm or rule out that the retirement plan received the dividends in question;

2. state whether the seized material contains deposit statements from financial institutions that indicate deposits belonging to the retirement plan.

In a letter dated November 23, 2017, the State Prosecutor for Serious Economic and International Crime partially met SKAT's request. Among other things, it reads as follows[14]:

*"In response to SKAT's inquiries, SØIK states that as a general rule, information from a pending criminal case is never provided to parties not involved in the criminal case. Below is an explanation for this in relation to the request in question for the providing of information from the ongoing criminal investigation.*

*However, in light of the highly extraordinary nature of the case and SKAT's exceptional need to receive information to be used for the ongoing tax case, SØIK is able to disclose the following without any adverse effect on the investigation:*

*Item 1.*

*Based on the investigation conducted thus far, SØIK is unable to confirm that the American retirement plans listed in the emails mentioned above have ever received stock dividends as a result of owning Danish stocks.*

---

[12] Exhibits 25-3-1 to 25-3-2
[13] Exhibits 25-4-1 to 25-4-9
[14] Exhibits 25-A-1 to 25-A-5

7

*Item 2.*

*Based on the investigation conducted thus far, SØIK is unable to confirm that the retirement plans listed in the emails mentioned above have ever owned Danish stocks. Likewise, upon inquiry, no information was ever received from VP-Securities A/S regarding stock ownership that, based on the information currently available, can confirm that the retirement plans in question have ever owned any Danish stocks."*

## 2. Rules of Law

### 2.1.   Consolidated Acts
The Danish Companies Act, Consolidated Act no. 1082 of November 14, 2012, and no. 680 of May 20, 2015:
   •   Section 2, subsection 1, paragraph c, and subsection 3, no. 2

The Danish Tax Assessment Act, Consolidated Act no. 405 of April 22, 2013, as amended:
   •   Section 16 A, subsection 1.

The Individual Income Tax Act, Consolidated Act no. 1403 of December 7, 2010, as amended:
   •   Section 65, subsection 1, and Section 69B, subsection 1.

Statute of Limitations Act, Law no. 522 of June 6, 2007, as amended:
   •   Section 2, subsection 1, and Section 3, subsections 1 and 2.

### 2.2.   Convention for the Avoidance of Double Taxation
Executive Order no. 13 of 4/14/2000 of the Convention dated 8/19/1999 Between the Government of the United States of America and the Government of the Kingdom of Denmark for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income. As amended pursuant to Executive Order no. 1 of 2/18/2008 of the protocol of 5/2/2006:
   •   Articles 10 and 22.

### 2.3.   Caselaw
SKM 2010.266 SR. The binding reply from the Danish Tax Assessment Council dated January 26, 2010.
In the case of stock lending, the Danish Tax Assessment Council considers the lender to still be the owner of the shares from a taxation perspective. Thus, the dividends are taxable pursuant to the rules that apply to the lender, including any double taxation treaty between Denmark and the lender's country of residence.

For this reason, taxes on dividends from borrowed shares are payable by the lender.

# 3. Remarks by SKAT

## 3.1. Legal Basis
The Danish Companies Act and the Individual Income Tax Act
A foreign company that receives dividends from a Danish company has limited tax liability in Denmark, according to the Danish Corporate Tax Act, Section 2(1)(c).

In 2014 and 2015, a foreign company with limited tax liability in Denmark had a 27% tax liability on its dividends (see the Danish Corporate Tax Act, Section 2(3)), and the Danish company that pays the dividends will thus withhold 27%. This is pursuant to Section 65 of the Individual Income Tax Act.

Convention for the Avoidance of Double Taxation
Pursuant to Article 10(2)(b) of the Convention for the Avoidance of Double Taxation between Denmark and the United States, Denmark can tax dividends paid by a company that is domiciled in Denmark to a person domiciled in the United States at a rate of 15% of the gross amount.

However, Denmark cannot tax dividends paid to a company that is domiciled in the United States if the legal owner is a retirement plan, as set forth in Article 22(2)(e) (see Article 10(3)(c) of the Convention for the Avoidance of Double Taxation).

According to Article 22(2)(e), a retirement plan is a legal person, whether or not exempt from tax, organized under the laws of a contracting state to provide a pension or other similar benefits to employees, including self-employed individuals, pursuant to a plan, provided that more than 50 percent of the person's beneficiaries, members, or participants are individuals resident in either contracting state.

Statute of Limitations Act
According to the Statute of Limitations Act, Section 2(1), the statute of limitations period is calculated from a point in time no sooner than the time when the claimant might demand fulfillment of the claim, unless otherwise stated in other rules.

As a general rule, recall of the paid amount is subject to the three-year statute of limitations period; see Section 3(1) of the Statute of Limitations Act.

The three-year statute of limitations period is suspended if the claimant had no knowledge of the debt or the debtor. In such case, the statute of limitations period is calculated no sooner than as of the day when the claimant became or should have become aware of the matter; see Statute of Limitations Act, Section 3(2).

## 3.2. Reopening of Case
SKAT is reopening Bradley's previous claims for refund of dividend taxes since SKAT has received information regarding Bradley from the IRS in the United States.

As a general rule, repeated collection of the paid amount is subject to the three-year statute of limitations period (see Section 3(1) of the Statute of Limitations Act). The statute of limitations period is calculated from the time when the claimant (SKAT) could demand fulfillment of the debt (see Statute of Limitations Act, Section 2(1).

9

Thus, SKAT's claim will still fall within the statute of limitations period until three years after payment to Bradley of the amount that SKAT wishes to recover.

The three-year statute of limitations period is suspended if the claimant (SKAT) had no knowledge of the debt or the debtor. In such case, the statute of limitations period is calculated no sooner than as of the day when the claimant (SKAT) became or should have become aware of the matter; see Statute of Limitations Act, Section 3(2).

On December 4, 2015, it came to the attention of SKAT that it was a newly established retirement plan.

On June 13, 2016, it came to the attention of SKAT that 401(k) retirement plans only have one participant – with the inherent limited contribution amounts (between \$12,500 and \$53,000 per year, depending on the age of the contributor) – and that retirement plans are not required to file tax returns if the assets of the retirement plans are below \$250,000.

On December 13, 2016, it came to the attention of SKAT that Bradley had not filed tax returns for 2014 and 2015. By not filing Form 5500 (tax returns), Bradley has acknowledged to the IRS that its assets at the end of 2014 and 2015 were less than \$250,000.

According to the above, the debt did not come to the attention of SKAT until June 13, 2016, when SKAT had information about that it was a newly established retirement plan, as well as that 401(k) retirement plans only have one participant with the inherent limited contribution amounts. Hence, SKAT's claim does not expire until June 13, 2019.

## 3.3   Capital Basis for Retirement Plan's Investments
Bradley was established in September 2014[15].

According to information from the U.S. Government, the issue at hand is a retirement plan with only one participant, who can contribute a maximum annual amount of \$12,500/\$53,000[16] (approximately DKK 85,375/361,990)[17]

By not filing Form 5500 (tax returns) for 2014 and 2015, Bradley has acknowledged to the IRS that its assets at the end of 2014 and 2015 were less than \$250,000. [18](DKK 1,530,350/ DKK 1,707,500)[19]

From the time it was established in September 2014 and until May 2015, Bradley has received dividends for a total of DKK 256,360,914[20], according to the submitted Credit Advices. Based on the information above about the retirement plan's assets, these funds do not seem to have been received by the retirement plan. Out of this amount, the amount of refunded dividend taxes that are now being collected total DKK 69,217,440[21].

---

[15] Exhibits 25-4-1 to 25-1-2
[16] Exhibits 25-4-1 to 25-4-9
[17] Rate at the end of 2015: 683.00 (source: www.nationalbanken.dk).
[18] Exhibits 25-2-1 to 25-2-13 and Exhibits 25-3-1 to 25-3-2
[19] Rate at the end of 2014 (612.14) and 2015 (683.00), according to www.nationalbanken.dk.
[20] Section 1.4
[21] Section 1.4

Based on the Credit Advices received, SKAT has estimated the entirety of Bradley's investments in Danish stocks[22]. to significantly exceed Bradley's capital base Among other things, they indicate that:

- In less than four months after it was established, Bradley had invested DKK 221,009,195 in the CHR. Hansen Holding A/S stock.

- On March 19, 2015, Bradley owned shares in Novo Nordisk A/S for a total value of DKK 2,078,867,904.

On this basis, it is SKAT's assessment that Bradley – as a newly established retirement plan that was not allowed to contribute more than $53,000 (DKK 361,990) annually, and with a capital base of less than $250,000 at the end of 2014 and 2015 (DKK 1,530,350/1,707,500) – did not have the necessary capital to make the investments that form the basis for Bradley's claims.

It should be pointed out that in the event that the shares were borrowed, Bradley could not be held liable for repayment of any refunds of dividend taxes from these shares, according to SKM 2010.266 SR.

## 3.4 Retirement Plan

The U.S. tax authorities (IRS) have reported that upon issuance of a Certification of U.S. Tax Residency (Form 6166), the information provided in the Application for United States Residency Certification (Form 8802) is not verified.

Hence, the Certification of U.S. Tax Residency (Form 6166) is not sufficient to document that Bradley is a retirement plan eligible for claiming a refund for the full dividend taxes pursuant to the Convention for the Avoidance of Double Taxation between Denmark and the United States, Article 22(2)(e).

## 4. SKAT's Provisional Decision

SKAT proposes that Bradley repay the total refunded dividend taxes of DKK 69,217,440, inasmuch as the information received from the IRS indicates that:

- Bradley did not have the capital base to purchase/own the shares listed in the claims;
- The dividends associated with the shares listed in the claims were never sent to Bradley.
- The refunded dividend taxes were not sent to Bradley.

It is SKAT's impression that Bradley – as a newly established retirement plan with a single participant and the inherent limited contribution amounts, and with less than $250,000 in total assets at the end of 2014 and 2015 – did not have the capital necessary to make the investments that form the basis for the claims.

For this reason, Bradley cannot be the rightful owner of the shares from which they have been refunded the dividend taxes that were withheld.

---

[22] Section 1.5

Consequently, SKAT refunded the stated dividend taxes to Bradley based on incorrect/wrong information.

Thus, Bradley does not meet the requirements for receiving a refund of the withheld dividend taxes from Danish stocks (cf., Article 10 of the Convention for the Avoidance of Double Taxation between Denmark and the United States).

For this reason, SKAT is charging Bradley for the previously refunded dividend taxes pursuant to Section 69B(1) of the Individual Income Tax Act (see Convention for the Avoidance of Double Taxation, Article 10).

As a general rule, repeated collection of the paid amount is subject to the three-year statute of limitations period (see Section 3(1) of the Statute of Limitations Act). The statute of limitations period is calculated from the time when the claimant (SKAT) could demand fulfillment of the debt (see Statute of Limitations Act, Section 2(1).

Thus, SKAT's claim will still fall within the statute of limitations period until three years after payment to Bradley of the amount that SKAT wishes to recover.

The three-year statute of limitations period is suspended if the claimant (SKAT) had no knowledge of the debt or the debtor. In such case, the statute of limitations period is calculated no sooner than as of the day when the claimant (SKAT) became or should have become aware of the matter; see Statute of Limitations Act, Section 3(2).

On December 4, 2015, it came to the attention of SKAT that it was a newly established retirement plan.

On June 13, 2016, it came to the attention of SKAT that 401(k) retirement plans only have one participant – with the inherent limited contribution amounts (between \$12,500 and \$53,000 per fiscal year, depending on the age of the contributor) – and that retirement plans are not required to file tax returns if the assets of the retirement plans are below \$250,000.

On December 13, 2016, it came to the attention of SKAT that Bradley had not filed tax returns for 2014 and 2015. By not filing Form 5500 (tax returns), Bradley has acknowledged to the IRS that its assets at the end of 2014 and 2015 were less than \$250,000.

According to the above, the debt did not come to the attention of SKAT until June 13, 2016, when SKAT had information about that it was a newly established retirement plan, as well as that 401(k) retirement plans only have one participant with the inherent limited contribution amounts. Hence, SKAT's claim does not expire until June 13, 2019.

## 5. Retirement Plan's Remarks to SKAT's Proposal
In a letter dated August 21, 2017, the law firm TVC (TVC Advokatfirma) made the following comments on behalf of Bradley regarding SKAT's previous proposal from March 24, 2017:

*"... In its proposed decisions, SKAT has given special consideration to the following factors:*

1. *The retirement plans did not have the capital to buy the shares that were owned.*
2. *The paid dividends were not sent to the retirement plans.*

12

3. *The retirement plans have not been filing U.S. tax returns; hence, the assets of each retirement plan must be less than USD 250,000.*

4. *The retirement plans are newly established and have only one participant each.*

*"Please find our comments below with regard to each item in SKAT's proposed decision*

## 1.   LACK OF CAPITAL

*"We dispute the statement that the retirement plans did not have the financial ability to acquire the shares from which dividends were paid, and which were subsequently requested to be refunded.*

*"In that respect, we point out that on the global financial markets, retirement plans have countless financing options for the purchase of stock without using their equity. In addition to the option of obtaining classic financing through loans, several other financial instruments exist that can be used to obtain the necessary financing to acquire financial and legal ownership of the shares.*

*"For example, in order to trade on the stock market, all that the retirement plans have to do is to open bank accounts and separate deposit accounts for holding the shares. Subsequent to that, the retirement plans can enter into so-called Global Master Securities Lending Agreements (GMSLAs), which give the retirement plans access to a securities lending facility that is governed by a so-called Prime Broker Agreement or a Repurchase Agreement Facility.*

*"Such agreements enable retirement plans to acquire the shares without using their equity; concurrent with the acquisition of the applicable shares, the retirement plans lend the shares to a third party. The payment that retirement plans receive for the loan generates sufficient cash flow to enable them to pay for the shares on the payment date since there is typically a two-day time difference between purchase and payment typically for standard transactions.*

*"Furthermore, such a transaction means that the retirement plans provide the deposit account (where the shares are held) as collateral for the lender. The only right that the lender acquires at this point is the option to sell the shares in the event that the borrower becomes insolvent or is not able to relinquish its claim on the shares when payment is due.*

*"Thus, in accordance with the resolution by the Danish Tax Assessment Council in SKM 2010.26.SR, as lenders of the shares to a third party, it is the retirement plans that are entitled to receive the dividends in these cases.*

*"It is therefore not correct that the retirement plans were not able to finance the trades in question.*

## 2.   THE DIVIDENDS ASSOCIATED WITH THE STOCKS LISTED IN THE CLAIMS AND AS THE ASSERTION THAT THE REFUNDED DIVIDEND TAXES WERE NOT SENT TO THE RETIREMENT PLANS

*"We wholeheartedly deny the assertion that the retirement plans did not receive the disputed dividends or that the refunded dividend taxes were not sent to the retirement plans.*

*"In its proposed decisions, SKAT provided nothing further to support this viewpoint and did not document that the retirement plans did not receive any dividends or refund.*

13

*"In this regard, it is noteworthy that the State Prosecutor for Serious Economic and International Crime has seized a large amount of data from Solo Capital in London, which among other things documents the receipt of the dividends and the dividend taxes. However, since this information is highly inaccessible for the retirement plans, thus far it has not been possible to document this.*

## 3. MISSING U.S. TAX RETURN

*"In this regard, it should be pointed out that according to U.S. law, a retirement plan is exempt from filing tax returns if its assets do not exceed the threshold of USD 250,000 on the last day of the fiscal year.*

*"Thus, it is possible for the retirement plans' assets to have exceeded the threshold during the year, as long as the assets were below the threshold on the last day of the fiscal year.*

*"There can be a large number of concrete reasons why the assets of the retirement plans were less than USD 250,000 on the last day of the fiscal year.*

*"For example, on that date any stock transactions will typically have been completed (purchase and sale have been completed), with the effect that the shares were no longer on deposit.*

*"In addition, there is a series of expenses associated with the completed transactions, which likewise result in a reduction of the assets of the retirement plans.*

*"It is likewise possible that funds were distributed from the retirement plans, with the effect that the assets were below USD 250,000 on the reporting day.*

*"Finally, we point out that even if the retirement plans erroneously failed to file a U.S. tax return, there is no way that any missing tax return might cause the retirement plans to not be the legal owners of the shares for which they have filed for dividend refund.*

*"In this regard, it should be pointed out that the retirement plans are legally registered in the United States and have formal as well as actual legal personality.*

## 4. NEWLY ESTABLISHED RETIREMENT PLANS WITH ONE PARTICIPANT

*"As an overriding principle, it should be pointed out that the retirement plans in question are newly established – or have only one participant each – has no bearing on whether the retirement plans are entitled to receive a refund on their dividend taxes.*

*"If the retirement plans meet the requirements of the Convention for the Avoidance of Double Taxation between Denmark and the United States, as set forth in Article 22(2)(e) and Article 10(3)(c), then according to the Convention, the retirement plans are entitled to a refund of the dividend taxes.*

*"According to the Convention, Denmark and the United States make their own definition for what constitutes a retirement plan, which – as is also stated in SKAT's own proposal – is understood to be as follows:*

    *"A legal person, whether or not exempt from tax, organized under the laws of a contracting state to provide a pension or other similar benefits to employees,*

14

*including self-employed individuals, pursuant to a plan, provided that more than 50% of the person's beneficiary members are individuals resident in either contracting state."*

*"Since the retirement plans are established legally and lawfully according to U.S. law and are covered by the Convention, Denmark must acknowledge that the retirement plans are entitled to a refund of the dividend taxes. In this regard, it should be pointed out that, apparently, the U.S. authorities have not informed SKAT that the retirement plans are not legally established, etc., inasmuch as SKAT has made no reference to this in the proposed decisions.*

*"Furthermore, according to OECD's comments regarding American double taxation conventions, each and every 401(k) retirement plan with one participant is presumed to be covered by the American conventions. This can also be documented in documents from the United States Congress in connection with the vote on the ratification of the U.S. double taxation convention.*

\* \* \* \* \* \*

*"Based on the above, in our opinion there is no basis for making decisions such as SKAT's proposed decision dated March 24, 2017…"*

## 6.    Remarks by SKAT

On behalf of Bradley, the law firm TVC (TVC Advokatfirma) has disputed the statement that the retirement plan did not have the financial ability to acquire the shares from which dividends were paid, and for which dividend taxes were subsequently refunded. It has been pointed out that on the global financial markets, the retirement plan has countless financing options for the purchase of stock without using its equity. The law firm has not submitted any documentation to support that the retirement plan has obtained financing for the purchase of stock without the use of equity.

The law firm further disputes the assertion that the retirement plan did not receive the disputed dividends or that the refunded dividend taxes were not sent to the retirement plans. The law firm has not submitted any documentation in support of this, inasmuch as the law firm states that the State Prosecutor for Serious Economic and International Crime ("SØIK") has seized a large amount of data from Solo Capital in London; hence, it has not been possible to submit documentation for that.

SKAT can confirm that no documentation has been submitted in support of:
*   The retirement plan having acquired the shares – with or without the use of equity
*   The retirement plan having received dividends from the shares
*   Dividend tax having been withheld from the stock dividends

In addition, SØIK has stated that it is unable to confirm – based on the investigation carried out thus far – that the retirement plan has ever owned Danish stocks or has received stock dividends as a result of owning Danish stocks.

Hence, the law firm cannot argue that it is because SØIK has possession of the relevant material.

On this basis, SKAT has determined that Bradley still has not documented that the retirement plan met the requirements for receiving a refund of withheld dividend taxes from the shares in question.

15

## 7. SKAT's Final Decision

SKAT hereby revokes the previous decisions to refund dividend taxes to Bradley for a total of DKK 69,217,440 since Bradley was not entitled to receive the funds.

It is SKAT's assessment that:

- Bradley does not own and never has owned the shares listed in the claims.

- The dividends associated with the shares listed in the claims were never sent to Bradley.

Furthermore, SKAT has determined that Bradley did not have the necessary capital to make the Danish stock investments that form the basis for the claims for refund of dividend taxes.

During the assessment, SKAT emphasized that Bradley has not provided any documentation to show that Bradley owned the shares. In addition, Bradley has failed to provide documentation to show that the retirement plan ever received any dividends from the shares. The information in the case does not establish a basis for such significant investments in Danish stocks.

SKAT has emphasized that:
- Bradley is a newly established retirement plan.
- Bradley has only one participant with the associated limited contributions.
- Bradley has not filed Form 5500 in the U.S. This suggests that Bradley's assets were less than USD 250,000 at the end of the applicable fiscal years.
- Based on the investigation conducted thus far, SØIK is unable to confirm that Bradley has ever owned Danish stocks or has received stock dividends as a result of owning Danish stocks.

Based on the currently available information, SKAT is of the opinion that Bradley has not had financial opportunities to own stocks to the extent indicated in Bradley's claims for refund of Danish dividend taxes. Among other things, this is reflected in the fact that:

- In less than three months after it was established, Bradley had invested DKK 221,009,195 in the CHR. Hansen Holding A/S stock.

- On March 19, 2015, Bradley owned shares in Novo Nordisk A/S for a total value of DKK 2,078,867,904

Thus, Bradley has failed to document that Bradley meets the requirements for receiving a refund of the withheld dividend taxes from Danish stocks (cf., Article 10 of the Convention for the Avoidance of Double Taxation between Denmark and the United States).

In its objections to SKAT's proposal from March 24, 2017, Bradley's legal representative, TVC Advokatfirma, has not provided any information or documentation in support of Bradley having owned the stocks and having received the stock dividends as indicated in the claims.

Thus, SKAT's decisions to refund dividend taxes to Bradley are based on false premises. For this reason, SKAT is withdrawing its prior decisions to refund dividend taxes

SKAT is not demanding payment of the incorrectly issued dividend tax refund in connection with this decision. This is a departure from the previously proposed decision that SKAT sent to Bradley

on March 24, 2017. On behalf of SKAT, legal counsel for the Danish government is going to send a writ with a demand for reimbursement and compensation from Bradley.

## Appeals Process

### If you wish to appeal

To appeal, you will need to write to the Danish Tax Appeals Agency no later than three months after the date you received this decision.

Include all the items that you wish to appeal. For each item, state the reason why you believe that the decision is incorrect. Attach the decision and the statement of claim. Please also attach any documents you might have that support and substantiate your appeal. If you would like to meet with a case worker from the Danish Tax Appeals Agency, you can enter your phone number in the appeal.

The fee for an appeal is DKK 400. You will receive that money back if your appeal is granted in part or in whole.

### How to submit and pay for the appeal

An appeal can be submitted

- Electronically by using the appeals Danish Tax Appeals Agency's appeals form at skatteankestyrelsen.dk, where you will also be asked to pay with a credit/debit card or Mobile Pay.
- By digital mail at borger.dk or virk.dk. To make a payment, transfer DKK 400 to the account with registration no. 0216, account no. 4069029361, and write your name and TIN no. in the message field.
- By sending a letter to the Danish Tax Appeals Agency, Ved Vesterport 6, 4. sal, 1612, Copenhagen V. To make a payment, transfer DKK 400 to the account with registration no. 0216, account no. 4069029361, and write your name and TIN no. in the message field.
- Payments from abroad can be made by transferring the amount to 0216 (bank registration number), 4069029361 (account number), IBAN DK 0502164069029361, SWIFT DABADKKK.

### Payment of Counsel

If you receive legal assistance for your appeal, you can apply to have the legal assistance paid in part or in whole if the case is subject to the rules in Chapter 19 of the Danish Tax Administration Act. You can read more about this option at skat.dk/omkostningsgodtgørelse.

**Rules and Statutes**

The statutes and decisions that are referenced are available at skat.dk/love or skat.dk/afgørelser. Additional information about/instructions on appeals are available at skat.dk/klage or skatteankestyrelsen.dk/english

Sincerely,

**Katrine Basballe**
Advisor

Email: katrine.basballe@skat.dk
Phone no.: (+45) 72 37 02 38

**Dorthe Frederiksen**
Advisor

Email: dorthe.frederiksen@skat.dk
Phone no.: (+45) 72 38 29 23

**Lill Drost**
Manager

Email: lill.drost@skat.dk

A copy of the decision and the attachments have been sent to TVC Advokatfirma, Havneholmen 25, 9., 1561 Copenhagen V.

**Exhibit 20**



Neutral Citation Number: [2021] EWHC 974 (Comm)

Case No: CL-2018-000297

## IN THE HIGH COURT OF JUSTICE
## BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES
## QUEEN'S BENCH DIVISION
## COMMERCIAL COURT

Royal Courts of Justice
Rolls Building, Fetter Lane, London EC4A 1NL

Date: 27 April 2021

**Before** :

## MR JUSTICE ANDREW BAKER
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| **SKATTEFORVALTNINGEN (the Danish Customs and Tax Administration)** | **Claimant** |
| - and - | |
| **SOLO CAPITAL PARTNERS LLP (in special administration) and many others** | **Defendants** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Michael Fealy QC, Jamie Goldsmith QC, Abra Bompas, James Ruddell, James Fox &
K V Krishnaprasad** (instructed by **Pinsent Masons LLP**) for the **Claimant**
**Nigel Jones QC, Lisa Freeman & Laurence Page** (instructed by **Meaby & Co**) for **the
Sanjay Shah Defendants**
**Alison Macdonald QC, Tom De Vecchi, Luke Tattersall & Sophia Dzwig** (instructed by
**DWF Law**) for **the DWF Defendants**
**Philip Baker QC** (instructed by **David Rosen**, solicitor and general counsel) for **Acupay
System LLC**
**Adam Zellick QC & Ian Bergson** (instructed by **Reed Smith LLP**) for **Messrs Knott &
Hoogewerf**
**Daniel Edmonds** (instructed by **Stewarts Law**) for **the PS/GoC Defendants**
**Jas Bains, Daniel Fletcher, Jonathan Godson, Mankash Jain** and **Anthony Patterson**
appeared in person
The **Edo Barac Defendants**, **ED&F Man Capital Markets Ltd**, **Indigo Global Partners Ltd**,
and the **HK Defendants**, were represented by their respective solicitors, **Brown Rudnick LLP**,
**Rosenblatt Ltd**, **Keystone Law LLP** and **Howard Kennedy LLP**
The **Other Defendants** did not appear and were not represented at this trial

Hearing dates: 22, 23, 24, 25 March 2021

--------------------

# Approved Judgment

This is a reserved judgment to which CPR PD 40E has applied.
Copies of this version as handed down may be treated as authentic.

## Covid-19 Protocol:

This judgment was handed down by the judge remotely by circulation to the parties'
representatives by email and release to Bailii. The date and time for hand-down is deemed to
be 10.00 am on 27 April 2021.

..............................

MR JUSTICE ANDREW BAKER

## Mr Justice Andrew Baker :

### Introduction

1.  The claimant is the Danish national tax authority, which (without deciding the point) I understand to mean it is not a separate legal person from the Kingdom of Denmark. I refer to the claimant as 'SKAT' without by doing so deciding any question of its true legal nature or identity going beyond what I have just said.

2.  SKAT claims to have been induced by misrepresentations, over a three-year period from August 2012 to July 2015, to pay out as tax refunds it was not liable to pay, over DKK12.5 billion (c.£1.5 billion), 90% or more of which in the second half of that period, from March 2014. Five separate Claims have been consolidated into one action: CL-2018-000297 (70 defendants); CL-2018-000404 (25 defendants); CL-2018-000590 (8 defendants); CL-2019-000487 (9 defendants); and CL-2020-000369 (7 defendants). Allowing for overlap (some defendants are party to more than one Claim), in total 114 defendants were named. Taking account of common legal representation where that exists, at the time of this first preliminary issue trial, there were 21 separate legal teams from 18 firms of solicitors responding to SKAT's various claims, representing between them 74 of the defendants.

3.  The remaining 40 defendants, at the time of this trial hearing, were:

    (i)   14 individuals litigating in person;

    (ii)  12 corporate defendants litigating without representation (one of which, Acupay System LLC, acting by its general counsel, who is a qualified solicitor, instructed leading counsel for this preliminary issue argument though in general it does not presently have external legal representation);

    (iii) 7 corporate defendants against whom judgment in default had been entered;

    (iv)  3 corporate defendants that no longer exist (2 dissolved, 1 liquidated);

    (v)   1 corporate defendant which had not yet acknowledged service;

    (vi)  2 defendants (1 individual and 1 corporation) with whom SKAT had settled; and

    (vii) 1 individual defendant against whom SKAT had discontinued.

4.  I was appointed as designated judge for the litigation, pursuant to section D4 of the Commercial Court Guide, in good time before the first main CMC in January 2020, at and after which I have sought actively to manage the case, with Bryan J initially, Foxton J more recently, as alternate. I described the structure of SKAT's claims and what they would involve in a ruling at the second main CMC in July 2020, [2020] EWHC 2022 (Comm). The main case management decision taken then, for the reasons given in that judgment, was that there should be three trial hearings:

    (i)   Firstly, the trial of a preliminary issue whether SKAT's claims offend against 'Dicey Rule 3', which states that:

"*English courts have no jurisdiction to entertain an action:
(1) for the enforcement, either directly or indirectly, of a penal, revenue or
other public law of a foreign State; or
(2) founded upon an act of state*"
(*Dicey, Morris & Collins on the Conflict of Laws*, 15th Ed., R5-019)".

This is the judgment on that first trial, the 'Revenue Rule Trial', for which the
issue ordered to be tried is in these terms:

"*Are any of SKAT's claims, as alleged, inadmissible in this court under the
rule of law stated, e.g., as Dicey Rule 3 (Dicey, Morris & Collins on the
Conflict of Laws, 15ᵗʰ Ed., para 5R-019)? If so, which claims are inadmissible
and why?*"

(ii)     Secondly, the 'Validity Trial', a trial of preliminary issues defined to
determine foundational aspects of SKAT's allegations that the tax refund
claims it says it should not have paid were not valid claims under Danish tax
law. The Validity Trial has been fixed for 4-6 weeks in Michaelmas Term
2021.

(iii)    Thirdly, the 'Main Trial', a massive final trial that, subject to further orders
hereafter splitting it up or managing how and when different parts of the case
will be considered at trial, would be designed to determine all remaining issues
across all the claims SKAT has made. The Main Trial has been fixed to
commence at the start of Hilary Term 2023 and to occupy the whole of 2023
plus Hilary Term 2024.

5.    SKAT submitted that the Revenue Rule Trial had to proceed, or ought to proceed, on
the basis that it will prove the essential facts of its case at trial, in particular because of
the way the issue for trial was defined (see paragraph 4(i) above). That submission
generated rather more heat than light, including at a pre-trial review hearing. The real
issue was whether it would be fair to seek to resolve a disputed point of fact, if it
would be necessary to do so in order to judge whether Dicey Rule 3 applied so as to
defeat some or all of SKAT's claims, on the basis of the factual material put before
the court on this trial, in the light of its case management history. In the event, I have
not found it necessary to resolve contentious matters of fact to reach a final decision
concerning Dicey Rule 3.

### Background

6.    The case concerns Danish withholding tax ('WHT') deducted at source by Danish
companies because under Danish tax law they had to pay SKAT 27% of dividends
they declared, paying out for shareholders, net of that deduction, only 73% of the
declared dividend. SKAT maintains a system for processing and paying claims for
WHT refunds to which foreign (non-Danish) resident parties may be entitled under
Danish tax legislation giving effect to Denmark's obligations under double taxation
agreements ('DTAs') concluded by it, including DTAs particularly relevant to this
litigation with the USA and Malaysia. For instance, a tax-exempt US pension plan
with shares in (say) Carlsberg A/S such that it received 73% of a declared dividend on
that investment would be entitled to claim a full refund of the 27% WHT paid by
Carlsberg to SKAT in respect of those shares.

7.     The WHT refund system as operated by SKAT included more than one scheme. This
       case concerns the 'Forms Scheme', which operated by reference to a standard paper
       form produced by SKAT, Form No. 06.003, which had to be completed and submitted
       by post with supporting documents, for approval or rejection by SKAT's 'Accounting
       2' department, managed at the material time by Mr Sven Nielsen. An example of a
       Form 06.003 was exhibited to my judgment on a summary judgment application
       brought by Goal Taxback Ltd ('Goal'), one of the defendants accused only of
       negligence, [2020] EWHC 1624 (Comm), [2020] 4 WLR 98.

8.     SKAT says it received under the Forms Scheme, and in error approved and paid,
       thousands of WHT refund claims that were not valid claims, in that the transactions
       (or purported transactions) relating to shares in Danish companies that underlay the
       claims did not give the applicants the WHT refund entitlement they claimed, at all (in
       most cases), or in the amount claimed (in some cases). By its claims, SKAT therefore
       seeks the return of amounts it says it was wrongly induced to pay out as tax refunds.

9.     As I have just done, I shall refer variously, in discussing SKAT's claims, to the
       'return' of a tax refund wrongly paid, or to SKAT seeking to 'claw back' or 'recoup'
       such a refund. I think that a natural use of language, but to be clear (and of course) I
       do not mean the return to SKAT *in specie* of anything it transferred, or the delivery to
       SKAT of anything that was ever its property in Denmark. The case concerns
       payments by bank transfer made by SKAT by way of tax refund (as it thought). Such
       payments do not involve a transfer of ownership of any kind in any property owned
       by the payor. They involve the discharge of a debt owed to the payor by its bank and
       the creation of a debt owed to the payee by its bank, via intermediate 'transfers' in the
       inter-bank payment system.

10.    The principal focus of the main fraud allegation is the activity of Mr Sanjay Shah
       through his business, Solo Capital Partners LLP ('Solo'), together with other entities
       associated or said to be associated with Solo, at the time an apparently reputable
       financial services operation authorised and regulated by the FSA, later the FCA. There
       are further significant fraud allegations relating to the activities of individuals
       initially employed within Solo who, it is said by SKAT, came to use the same or
       similar, and allegedly fraudulent, methods of procuring SKAT to make payments
       using the Forms Scheme. I shall refer compendiously to the WHT applications alleged
       by SKAT to have been fraudulent as the 'Solo etc Applications'.

11.    The fraud allegation, and associated allegations of conspiracy, says at its core that the
       WHT refund claims in which defendants who are said to have been dishonest had an
       involvement were bad claims, and that those defendants must have realised that at the
       time. The primary focus, of all the causes of action said by SKAT to arise, is the
       information said by SKAT to be conveyed to it by a completed WHT refund claim
       form and the documents sent with it, and what SKAT's Accounting 2 department did
       with that information. It is said that misrepresentations were made thereby to SKAT
       that induced the approval and payment of claims, in particular because of a strong
       culture in Denmark of presuming the taxpayer's honesty in its dealings with SKAT.

12.    There are also claims by SKAT against various parties (e.g. Goal, as mentioned in
       paragraph 7 above) alleging only a liability in negligence. They include claims against
       parties, such as Goal, that played a part in the submission to SKAT of Solo etc
       Applications involving WHT refund claims now alleged to have been dishonest, and

also claims relating to WHT refund claims organised by ED&F Man Capital Markets Ltd in which no allegation of dishonesty is made against anyone ('ED&F Man Applications'). Finally, for the purposes of this introduction, there are claims by SKAT against various parties alleged to have received proceeds of or derived from SKAT's mistaken payment (as it alleges) of WHT refund claims, founded upon allegations of 'knowing receipt' or unjust enrichment. Those claims include 'proprietary claims', in which SKAT claims that assets belonging to defendants that are traceably the proceeds of fraud against it are held on trust for SKAT.

13.    As well as being different in not being said to have involved dishonesty by anyone, the ED&F Man Applications differ from the Solo etc Applications in that SKAT advances a case, it may be strictly in the alternative, that is different to its case in respect of the Solo etc Applications. For most of the ED&F Man Applications (336 of 400) SKAT advances a case that if (which SKAT does not admit) the WHT refund applicant in question obtained Danish dividends, then they (the applicant) were the party with a tax liability in respect of which WHT at 27% was deducted at source, but ED&F Man and not the applicant was the beneficial owner of dividends, and for that reason the applicant was not entitled to the WHT refund paid (or any refund). In most of those cases (320 of 336), ED&F Man does not admit that any refund was paid that was not due. In the other 16 cases, ED&F Man admits that the full refund claimed and paid was not due, but says these were excessive refund claims only, where applicants with valid claims for lesser refunds sought and were paid by SKAT a full refund and therefore received more than they were due. (In the remaining 64 instances (of 400), ED&F Man admits that the applicant did not receive the dividend referred to in the refund claim and so had no valid refund claim at all.)

*Dicey Rule 3*

14.    The basis for Dicey Rule 3 has been a subject for debate. The editors of *Dicey* submit that the reason foreign revenue claims are not entertained is that the assertion of such claims is an extension of a sovereign power of taxation and, *per* Lord Keith of Avonholm in *Government of India v Taylor* [1955] A.C. 491, 511: "*an assertion of sovereign authority by one State within the territory of another, as distinct from a patrimonial claim by a foreign sovereign, is (treaty or convention apart) contrary to all concepts of independent sovereignties*". I respectfully agree that that is a sound basis, and the true basis, for the rule, at all events so far as it could apply in this case.

15.    A *dictum* of Learned Hand J in *Moore v Mitchell* (1929) 30 F. (2d) 600, at 604 is also often cited, including by Lord Keith, *ibid*, which has two facets: first, and akin to Lord Keith's own formulation, that "*to pass upon the provisions for the public order of another State is, or at any rate should be, beyond the powers of the court; it involves the relations between the States themselves, with which courts are incompetent to deal, and which are intrusted to other authorities*"; second, that to 'pass upon' such provisions "*may commit the domestic State [i.e. through its courts] to a position which would seriously embarrass its neighbour. ... No court ought to undertake an inquiry which it cannot prosecute without determining whether those laws [i.e. for the public order of another State] are consonant with its own notions of what is proper*".

16.    Contrary to certain of the submissions by the defendants, the second facet of Learned Hand J's rationale does not arise here. It does *not* mean that SKAT's claims stand to

be dismissed because (if this be the case) the court, in order to determine them, might have to consider whether SKAT's WHT refund application system was incompetently designed or administered, or whether Mr Nielsen did an incompetent job, or perhaps even was dishonest. There is no question here of sitting in judgment over the propriety, assessed by some standard set by this court, of the Danish tax legislation that falls to be considered, or the DTAs concluded by the Kingdom of Denmark with various counterparties. The question is whether SKAT's claims seek, directly or indirectly, to enforce that tax legislation or in some other way the exercise of Danish sovereign authority.

17.    The following high level statements of principle were agreed:

(i)     Dicey Rule 3 is not a rule of jurisdiction, despite the language in which it is articulated in *Dicey*. It is a substantive rule of English law leading to the dismissal of claims falling within it, on the ground that the court will not entertain them because they involve an attempt to have the court enforce extra-territorially the exercise of sovereign authority.

(ii)    The rule demands an analysis of the substance of the claim rather than the form: the court must look past the cause(s) of action pleaded, or even (though not relevant here) the identity of the claimant, to the substance of the right sought to be vindicated, or the nature of the acts or actions upon which the claim is founded.

(iii)   Dicey Rule 3 is a rule of English law applicable whether or not English law will govern the merits more generally by reference to English law conflict of laws rules; and it is for the court to decide for itself whether, given its substance, a claim falls within Dicey Rule 3. That is not a question for Danish law, for example, even if in this case Danish law is the governing law of a particular claim.

(iv)    Whether Dicey Rule 3 applies in this case involves a question of characterisation, for any given claim, whether it is a claim to enforce, directly or indirectly, Danish revenue law, so as to fall within (as it has often been called) the rule in *Government of India* (after *Government of India v Taylor*, *supra*) and/or whether in some other way it amounts in substance to an attempt to exercise sovereign power extra-territorially.

(v)     There is a distinction to be drawn between "*an exercise of sovereign power and an action brought by a sovereign state which might equally be brought by an individual to recover losses for damage to property*" (*Mbasogo v Logo* [2006] EWCA Civ 1370, [2007] QB 846 at [67]). The latter of these has been referred to, after *inter alia* Lord Keith in *Government of India*, as a 'patrimonial' claim; "*when a state owns property in the same way as a private citizen there is no impediment to recovery*" (*Iran v Barakat Galleries Ltd* [2007] EWCA Civ 1374, [2009] QB 22 at [136]).

(vi)    There is a distinction between mere recognition of foreign penal, revenue or other public laws, or sovereign acts, including recognising the effects or consequences of the past exercise of sovereign power in the sovereign territory, for example the vesting of title to property by an act of expropriation

completed in the territory of the expropriating sovereign, on the one hand, and enforcement, on the other hand. Dicey Rule 3 is not designed to preclude or prohibit the former.

18. It follows that Dicey Rule 3 is not avoided because SKAT's claims are for damages, personal restitutionary remedies, or proprietary remedies in respect of traceable proceeds, and the defendants are not the WHT refund applicants themselves. Dicey Rule 3 would apply to a damages claim against a party involved in the submission by a taxpayer of erroneous tax returns or in a tax evasion scheme for that taxpayer, even if the defendant's conduct involved all the ingredients of a private law cause of action, such as a damages claim for a tort, because in substance the claim would seek to enforce the underlying right to tax the miscreant taxpayer. Likewise if Dicey Rule 3 would apply, in a case of tax refunds wrongly claimed, to the foreign sovereign's claim against the refund applicant erroneously paid, then a claim by the foreign sovereign against those culpably involved in the making of the claim is equally inadmissible in this court. This was also common ground.

19. I have included as an Appendix a fuller summary of the arguments set out by the parties in their written submissions and developed in oral argument in relation to Dicey Rule 3. The significance of this preliminary issue to the case and the resources devoted to it notwithstanding, the point raised on Dicey Rule 3 is ultimately a narrow one, and the arguments on both sides became a touch repetitive or tangential. I have not lengthened this judgment, therefore, by dealing *seriatim* with every individual argument advanced; but in preparing it, I carefully re-read and considered all of them.

## *Brussels-Lugano*

20. By the 'Brussels-Lugano regime', I refer to the system for the allocation of jurisdiction over defendants and the mutual recognition and enforcement of judgments in 'civil and commercial matters', under the Brussels Regulation (recast), Regulation (EU) 1215/2012, and the Lugano Convention. Many of the defendants were domiciled in Brussels-Lugano member states when these proceedings were served on them ('Brussels-Lugano defendants').

21. Article 1(1) of the Brussels Regulation (recast) provides that it applies "*in civil and commercial matters whatever the nature of the court or tribunal. It shall not extend, in particular, to revenue, customs or administrative matters or to the liability of the State for acts and omissions in the exercise of State authority (acta iure imperii)*"; Article 1(1) of the Lugano Convention, to similar effect so far as material, provides that the Convention applies "*in civil and commercial matters whatever the nature of the court or tribunal. It shall not extend, in particular, to revenue, customs or administrative matters.*"

22. SKAT argued that: (i) this is a 'civil and commercial matter', not a 'revenue, customs or administrative matter', under Article 1(1); and (ii) it is therefore not possible to invoke Dicey Rule 3 to dismiss its claims against Brussels-Lugano defendants, because to do so would be to decline to exercise a jurisdiction conferred by the Brussels-Lugano regime otherwise than in accordance with its rules. If that were correct, then any claims falling within Dicey Rule 3 would proceed against Brussels-Lugano defendants while being dismissed against other defendants.