# Exhibit 8_F

behind their pursuit, the Kingdom of Denmark's sovereign rights of taxation rather than interests of a private law character.

127. In my judgment, there is something in Mr Baker QC's point, even though Mr Fealy QC was also correct to submit that there need not be a perfect antithesis between the scope of Dicey Rule 3, as regards foreign taxes, and the scope of any given supranational instrument relating to cross-border taxation. There is something in Mr Baker QC's point nonetheless because it focuses not so much on the specifics of whether a particular cross-border instrument does apply but on an overarching international understanding that clawing back tax refunds or credits or reliefs is taxation. Since that was my conclusion, so far as concerns Dicey Rule 3, in any event, I shall not attempt the intellectual gymnastics of saying whether Mr Baker QC's point had enough about it to tip the argument on Dicey Rule 3 in his favour if he had not been winning it anyway.

*Coda – Buchanan v McVey again*

128. I said in paragraph 88 above that the prior authorities on Dicey Rule 3 do not decide the case of a claim to recoup a tax refund said to have been paid in error. That was in fact common ground. A theme of this judgment, though, is the need to confront the implications of the doctrine of indirect enforcement (of *inter alia* foreign revenue laws), and the idea of a central interest served by the bringing of private law claims, first strikingly illustrated by *Buchanan v McVey*, as approved by the House of Lords in *Government of India* (even if, as I remarked in paragraph 28 above, there was a degree less indirectness on the facts in the latter case).

129. If my analysis of the implications of the case law on Dicey Rule 3 as it stands is correct, then SKAT's difficulty, ultimately, may be the turn English law thus took in 1955, which is not something that SKAT said it wished to question, or that I would be entitled to question. Indeed, Mr Fealy QC confirmed SKAT's position to be that "*Dicey Rule 3, as a matter of common law, is the same now as it was 50 years ago*".

## Brussels-Lugano

130. SKAT submitted that (i) these proceedings are a 'civil and commercial matter' under the Brussels-Lugano regime and (ii) the English court therefore cannot dismiss SKAT's claims against Brussels-Lugano defendants by reference to Dicey Rule 3. For (i), SKAT accepted that the use of public powers can transform what would otherwise be a civil or commercial matter into a public law matter outside the Brussels-Lugano regime, but said that was so only if public powers would be used so as to rely on substantive or procedural rules of law applicable in the litigation that confer special privileges upon the claimant by reason of its status as a public body or upon evidence deployed by the claimant by reason of its public powers source. There has been and could be no such use of public law powers in these proceedings. For example, material obtained by SKAT through the use of public law powers, such as through assistance from foreign tax authorities under DTAs, would be treated like any other documentary evidence. For (ii), SKAT argued that to refuse to admit its claims under Dicey Rule 3 would derogate from and impair the effectiveness of the Brussels-Lugano regime.

131.   The defendants say that the Brussels-Lugano regime is irrelevant. It governed the
       question whether SKAT could bring Brussels-Lugano defendants before the court,
       given the types of claims that as a matter of form SKAT has pleaded, but not whether
       those claims are of a type this court will admit or uphold. Dicey Rule 3 is a rule of
       substance, not a rule as to jurisdiction in the sense dealt with by the Brussels-Lugano
       regime. If that is wrong, then the defendants argued that:

       (i)     essentially for the same reasons as they said led to the application of Dicey
               Rule 3 at common law, these proceedings should be recognised as a revenue
               matter and not a 'civil and commercial matter' under the Brussels-Lugano
               regime, and

       (ii)    even if that would not otherwise be correct, it becomes correct, i.e. these
               proceedings must be seen as a public law matter, not a civil and commercial
               matter, because of the use by SKAT of public law powers in the investigation
               and gathering of evidence, and its use of some of the information and evidence
               gathered as a result, for the purpose of, and in the course of, the proceedings.

*Compatibility of Dicey Rule 3*

132.   I note at the outset that the Brussels-Lugano regime's concept of a 'civil and
       commercial matter', and by contrast a 'revenue, customs or administrative matter', is
       a classification of types of court proceedings. That is clear from the full language of
       the first sentence of Article 1(1) – the subject matter of the Brussels-Lugano regime is
       "*civil and commercial matters whatever the nature of the court or tribunal*" (my
       emphasis). The Brussels-Lugano regime then ensures that in civil or commercial
       proceedings, as opposed to criminal proceedings or (civil rather than criminal) public
       law proceedings, a common set of rules will apply in all Brussels-Lugano member
       states as regards personal jurisdiction (i.e. whether a particular defendant can be sued
       in a particular court) and the recognition and enforcement of resulting judgments.

133.   It is well established that Article 1(1) is to be given an autonomous meaning, but it
       may be observed that its origins lie in continental legal systems in which public law
       proceedings are not classified as civil matters, whereas here public law proceedings
       (e.g. judicial review) would generally be classified as a species of civil proceedings.
       Thus, the inapplicability of the Brussels-Lugano regime to 'revenue, customs or
       administrative matters' is because they are treated as not 'civil and commercial
       matters'. They are not excepted types of 'civil and commercial matters' requiring to
       be excluded by Article 1(2) if the regime is not to apply to them (as with, e.g.,
       bankruptcy or arbitration).

134.   The purpose of the Brussels-Lugano regime is not the harmonisation of the
       substantive laws of member states, i.e. their rules of law determining whether a claim
       will succeed or fail, or their choice of law rules for ascertaining the system of law
       whose substantive rules of law govern any given claim. The former, so far as material
       to this case, given the causes of action alleged, have not been subject to EU
       harmonisation; the latter, again so far as material, are harmonised by the Rome II
       Regulation, Regulation (EC) No 864/2007, on the law applicable to non-contractual
       obligations.

135.   In *In re Norway's Application (Nos. 1 & 2)* [1990] 1 AC 723, the House of Lords had
       to consider letters rogatory issued by a Norwegian court requesting the examination of
       two witnesses before the English court for the purpose of a tax claim in respect of
       Norwegian taxes being pursued in the Norwegian court against the estate of a wealthy
       Norwegian shipowner. The central question was whether the proceedings in Norway
       were "*proceedings in any civil or commercial matter*" within s.9(1) of the Evidence
       (Proceedings in Other Jurisdictions) Act 1975, because by s.1(b) of that Act the power
       that was sought to be exercised was only available if the evidence sought was to be
       obtained "*for the purposes of civil proceedings*" in the requesting court, and s.9(1)
       was the applicable definition of "*civil proceedings*".

136.   In that purely English law context, the House of Lords concluded that the 1975 Act
       distinguished by ss.1(b)/9(1) between civil and criminal proceedings, and did not have
       in mind any further distinction between private law and public law matters (*cf*
       paragraph 133 above). Meanwhile, Dicey Rule 3 was not engaged, even though the
       ultimate goal was avowedly the recovery of foreign tax, because, *per* Lord Goff at
       809F-G, "*I cannot see any extraterritorial exercise of sovereign authority in seeking
       the assistance of the courts of this country in obtaining evidence which will be used
       for the enforcement of the revenue laws of Norway in Norway itself.*" The House of
       Lords' decision thus confirms, as Mr Fealy QC submitted, that Dicey Rule 3 does not
       apply merely because there is some connection between a claim brought here and
       foreign tax or a foreign revenue system; the nature of the connection needs to be
       examined to assess whether, in substance, the claim is, directly or indirectly, an
       attempt to enforce here the foreign sovereign's right to tax.

137.   In paragraph 29 above, I referred to *QRS v Frandsen* for its confirmation that the case
       of an asset-stripped company or its liquidator suing the company's former owner for
       breaches of the latter's duties to the company, in substance to secure the recovery by a
       foreign sovereign tax authority of taxes due from and unpaid by the company, fell
       within Dicey Rule 3. The matter arose on an application by the defendant to strike out
       the claims against him of his former companies on the ground that they were bound to
       fail. The claims were struck out at first instance; the Court of Appeal dismissed an
       appeal.

138.   The Court of Appeal confirmed that Dicey Rule 3 applied, indeed the contrary was
       barely argued, as I noted in paragraph 29 above. The substantial argument against the
       striking out of the claims, therefore, was not that Dicey Rule 3 would not apply to
       them at common law, but was instead an argument that:

       (i)    the proceedings were a 'civil and commercial matter', not a 'revenue, customs
              or administrative matter', within Article 1(1) of the Brussels Convention (then
              the governing Brussels-Lugano instrument);

              and

       (ii)   it was incompatible with the Brussels Convention to apply Dicey Rule 3 to
              dismiss a claim, and therefore impossible to strike a claim out as bound to fail
              by reference to the Rule.

139.  The Court of Appeal concluded:

(i)    that the proceedings were a 'revenue [etc] matter' and not a 'civil and commercial matter' for the purpose of the Brussels Convention, in that:

(a)    the claims brought were in substance (though not in form) indirect revenue claims, as had been held in relation to such claims in *Buchanan v McVey*, the plaintiffs having sought to argue that they were private law claims "*not merely in form but in substance*" (see at 2174F-G), and

(b)    the consequent characterisation of the claims as revenue matters would be accepted (the Court of Appeal suggested) by all member states under the Convention (see at 2177C);

and, *obiter*

(ii)   that had the proceedings been a 'civil and commercial matter' for the purpose of the Brussels Convention, then the claims could not have been struck out, on the logic that "*under article 2 there is jurisdiction to bring [the claims] in England against the defendant as someone domiciled here, [and therefore] rule 3 of Dicey & Morris cannot properly be invoked so that the court immediately then declines to exercise its jurisdiction: such an application of rule 3 of Dicey & Morris would clearly "impair the effectiveness of the Convention""*, *per* Simon Brown LJ at [1999] 1 WLR 2178C-D, stating the plaintiffs' argument which at 2178E he said was "*plainly right*".

140.  Commenting on *QRS v Frandsen* in *The British Year Book of International Law 1999*, Professor Briggs argued for a reconsideration of Dicey Rule 3 in which a claim such as that in *Buchanan v McVey* or *QRS v Frandsen* would be admitted (*ibid*, at pp.341-343). Prof Briggs' comment as regards the Brussels Convention (*ibid*, at p.343-344) was that:

(i)    the conclusion that the proceedings were a 'revenue [etc] matter' was debateable, and

(ii)   the notion that Dicey Rule 3 would be displaced by a conclusion that the proceedings were a 'civil and commercial matter' was wrong.

On the latter aspect, Prof Briggs' view was expressed in trenchant terms but on rather complex reasoning: "*Now it must be conceded that the question was artificial, and that Simon Brown LJ was dealing with it only for good measure. But it is inconceivable that he was right. If revenue matters had been within the scope of the Convention, it is as certain as certain can be that they would have been made subject to exclusive jurisdiction of the taxing State. ... That no such exclusive jurisdiction was created for revenue claims is perhaps the clearest indication that such claims were always intended to be outside the scope of the Convention. ... [As] there is no exclusive jurisdiction, nor Webb exception [a reference to C-294/92, Webb v Webb [1994] ECR I-1717], it would be unacceptable for them to be brought within the scope of the Convention. It was therefore an exercise in artificiality for Simon Brown LJ to opine that Rule 3 would have been required to be set aside, for there was never*

*any plausible chance that an English court should have been asked to enforce a
Danish tax law.*"

141.    The Editors of *Dicey* also take the view that Simon Brown LJ's *obiter* view in *QRS v
Frandsen* is wrong, but for a simpler reason. Dicey Rule 3, they say, is not affected by
the Brussels-Lugano regime, the contrary view expressed by Simon Brown LJ being
"*open to the criticism that Rule 3 … is not really a rule of jurisdiction, but a
substantive rule of law*" (15th Edition, para 5-022). The 15th Edition of *Dicey* pre-dates
the decision of the CJEU in *Sunico* (C-49/12, *Revenue and Customs Commissioners v
Sunico ApS* [2014] QB 391), to which I turn next; but the view I have just quoted has
not been altered in the *Dicey* Supplement noting that decision.

142.    In *Sunico*, the CJEU considered claims brought by HMRC alleging missing trader
VAT carousel frauds that also led to the litigation in Singapore in *HMRC v
Shahdadpuri* (see paragraph 58 above). The substantive claims, for damages at
common law for an alleged tortious conspiracy to defraud, were pursued here against
defendants domiciled in Denmark. HMRC also brought ancillary proceedings in
Denmark to attach assets with a view to enforcing any damages judgment obtained in
England. Those Danish proceedings were objected to on the basis that they were a
'revenue [etc] matter' excluded from the Brussels Regulation, Regulation No
44/2001, then the Brussels-Lugano instrument in force. The Danish court referred the
matter to the CJEU.

143.    The CJEU applied a principle stated in these terms, at [34]-[35], namely that
"*although certain actions between a public authority and a person governed by
private law may come within the scope of Regulation No 44/2001, it is otherwise
where the public authority is acting in the exercise of its public powers …*" and that
"*to determine whether that is the case in a dispute such as that in the main
proceedings [i.e. the Danish ancillary relief proceedings], it is necessary to examine
the basis of, and the detailed rules applicable to, the action brought by the
commissioners, in the United Kingdom, before the High Court of Justice …*". Thus,
the Brussels-Lugano classification of the Danish proceedings for ancillary relief was
to be that of the English proceedings to which they were ancillary.

144.    Focusing exclusively on matters of form, as they would be characterised by Dicey
Rule 3, at [36]-[40], the CJEU concluded at [41]-[43], essentially, that because the
claim was framed in tort and not as a claim under a tax law, the proceedings were a
'civil and commercial matter' and not a 'revenue [etc] matter' for the purpose of
Article 1(1) of the Brussels Regulation, so long as "*the commissioners were in the
same position as a person governed by private law in their action against Sunico and
the other non-residents sued in the High Court of Justice*" (*ibid* at [43]). That last
qualification harks back to the requirement, within the principle stated at [35], to
examine the rules applicable to the action brought by HMRC, to see whether it was a
public law claim after all. It concerns the possibility of the use of sovereign (public
law) powers in connection with proceedings that would otherwise be a 'civil and
commercial matter' transforming them into public law proceedings.

145.    The CJEU considered it a matter for the referring Danish court, not clear on the
material before the CJEU, whether HMRC was in the same position as would be a
private litigant in the English proceedings. I was shown that the Danish court
concluded, when the proceedings resumed before it, that HMRC was materially *not* in

the same position as a private litigant, but that decision seems to have been based upon a misunderstanding of the 'public law powers' qualification, the meaning and extent of which was clarified by the later CJEU decisions in C-597/17, *BUAK Bauarbeiter-Urlaubs u.Abfertigungskasse v Gradgenistvo Korana d.o.o.* [2019] I.L.Pr. 12, and C-73/19, *Belgische Staat v Movic BV*. I shall come back to that below.

146.    For now, what matters is that this 'public law powers' qualification within the CJEU case-law on the meaning of 'civil and commercial matters' reinforces the view that it has reference to the type of proceedings before the court, and that the substantive rules of law (including choice of law rules to determine the system of law that will govern the decision) by which claims properly brought before the court (so far as concerns the court's jurisdiction over the defendants) either succeed or fail are a matter for the national court (save where they have been harmonised by other instruments, e.g. Rome II).

147.    I agree with the Editors of *Dicey* that Dicey Rule 3 is a substantive rule of English law unaffected by the Brussels-Lugano regime. As is clear from the oldest of *dicta* (see paragraph 24 above), Dicey Rule 3 has never concerned personal jurisdiction in the conflict of laws sense, i.e. which defendants can be brought before the court to answer a claim of a given type. Rather, it is a rule of English law, available to be invoked by a defendant amenable to the jurisdiction of the court when answering a suit. It is an overriding or mandatory rule of English law as the *lex fori*, a substantive rule of law that applies even if the applicable choice of law rule says that, in general, the suit in question is not governed by English law.

148.    Dicey Rule 3 has sometimes been referred to as a rule of judicial self-restraint whereby the court declines to exercise the jurisdiction it has, but that is to distinguish it from rules of non-justiciability that identify questions the court is incapable of addressing; and, that said, the label of justiciability has also been used (in *Mbasogo v Logo*, for example). Labels ought not to be determinative, but for what they may be worth, I have preferred 'admissibility': English law, as a mandatory rule of the *lex fori* overriding ordinary choice of law rules, does not admit claims that are, in substance, attempts by a foreign sovereign, directly or indirectly, to exercise their sovereign power through the English courts. I do not agree with a submission SKAT made on the compatibility issue that Dicey Rule 3 is, or is akin to, a doctrine of *forum conveniens*. Nor was that SKAT's submission when addressing Dicey Rule 3, the submission there, with which I agree, being that "*the existence of parallel proceedings may engage the forum non conveniens doctrine. It may engage the res judicata doctrine or the abuse or process doctrine, but it doesn't engage Dicey Rule 3.*"

149.    The decision of the Court of Appeal in *QRS v Frandsen* that the proceedings there were not a 'civil and commercial matter' appears to me to be inconsistent with the CJEU's decision in *Sunico*, subject to the use of public powers point, and therefore no longer binding on me, although it was part of the *ratio*. But in my judgment, the decision in the case, to strike out the claims, was still correct because, contrary to the view expressed, *obiter*, by Simon Brown LJ, the classification of proceedings as a 'civil and commercial matter' or a 'revenue [etc] matter' for the purpose of applying the Brussels-Lugano regime does not touch the question whether Dicey Rule 3 applies so as to defeat the claim.

150. There is of course an overlap: there will be claims the form of which would make proceedings upon them a 'revenue matter' under the Brussels-Lugano regime and the substance of which from the point of view of Dicey Rule 3, because it matches the form, would engage the Rule. But precisely because Dicey Rule 3 is a rule of substance, the applicability of which is determined by reference to an assessment that looks beyond the way in which a claim is framed, whereas the Brussels-Lugano classification is formalistic, as Mr Goldsmith QC for SKAT accepted, a claim may be, in substance, a revenue claim, from the perspective of Dicey Rule 3, brought in proceedings that are a 'civil and commercial matter' from the perspective of the Brussels-Lugano regime. In my view, there is nothing in that regime that purports to exclude the application of Dicey Rule 3 to such a case.

151. The Brussels-Lugano classification of proceedings is also used by the Rome II Regulation, which thus also applies in 'civil and commercial matters' and not in 'revenue [etc] matters'. It follows from *Sunico*, again subject to the use of public powers point, that proceedings pursuing claims in tort for damages for a VAT carousel fraud, or proceedings pursuing causes of action such as those pleaded in *Buchanan v McVey* or *QRS v Frandsen*, will be, and, given the causes of action pleaded by SKAT, these proceedings are, a 'civil and commercial matter' within the Brussels-Lugano regime and the Rome II Regulation. Dicey Rule 3 continues to operate however, and if applicable will lead to the dismissal of the claims brought, because (a) the Brussels-Lugano regime does not preclude such a dismissal and (b) even if under Rome II the governing law is, in general, not English law, Dicey Rule 3, if applicable, will apply under Article 16, which provides that: "*Nothing in this Regulation shall restrict the application of the provisions of the law of the forum in a situation where they are mandatory irrespective of the law otherwise applicable to the non-contractual obligation.*"

152. Following *Sunico*, Prof Briggs proposed in "*Private International Law in English Courts*" (2014), at 2.118, that *QRS v Frandsen* must now be regarded as wrongly decided, i.e. the claim in that case now could not be struck out under Dicey Rule 3. That view is also taken by *Cheshire, North & Fawcett*, "*Private International Law*", 15th Ed. at pp.125-126. Prof Briggs' argument was that because proceedings upon a claim for damages for a VAT carousel fraud would be a 'civil and commercial matter' (see *Sunico*):

    (i)    a foreign court's judgment upon such a claim would have to be enforced under the Brussels-Lugano regime "*and the contention that the enforcement of the judgment would involve the enforcement of a foreign penal law is apparently irrelevant unless it triggers a defence in terms of public policy*", and

    (ii)   "*It ought to follow that a claim by a company against a corporate officer who has stolen or diverted corporate assets may be brought and the relevant rule of foreign law applied, even if the company is bringing the claim at the behest of a receiver or administrator ... with a view to discharging the tax liability of the company ...*";

and at 2.119, Prof Briggs proposed, as further consequence, that "*Where, therefore, the court has personal jurisdiction over a claim according to the Brussels I Regulation, or is required by the rules set out in the Rome I or Rome II Regulation to apply a particular foreign law, the proposition that the court may still invoke a*

*common law principle of English private international law to derail the conclusion
which it is heading towards must surely be wrong.*"

153. I respectfully disagree with those views. *Sunico* may mean that a foreign judgment on
a VAT carousel fraud damages claim would have to be enforced here subject only to a
public policy defence (it is not necessary to take a final view on that), but Dicey Rule
3 is by nature an English law public policy rule. In any event, in my view it does not
follow from the proposition that such a judgment would have to be enforced (if that
were the position) that an English court seized of the foreign sovereign authority's
claim could not apply Dicey Rule 3 to dismiss it.

154. The view that it "*must surely be wrong*" to invoke Dicey Rule 3 where Rome II
provides for a system of law other than English law to be the governing law of a claim
is tempered somewhat later in the same paragraph, 2.119. Prof Briggs acknowledges
that the issue is not foreclosed without more by characterising the proceedings as a
'civil and commercial matter', but rather, as he says, the question then arises "*whether
the application of a rule of Danish law that a wrongdoer pay compensation for his
wrong would, in circumstances in which the indirect but admitted beneficiary of doing
so would be the Danish tax authority, be contrary to the fundamental principles of
English law, or be contrary to a rule of English law which is of fundamental
importance to the legal system.*" Prof Briggs contends that "*It is hard to see how the
answer to that question could be an affirmative one, though the point would, no
doubt, be liable to be argued. But, as is always the case, the important thing is to
formulate the right question.*"

155. I agree with that last observation, of course, the importance of formulating the correct
question. On the point itself, I respectfully do not find it difficult to see how the
answer to the question Prof Briggs identified as the right question to ask should be in
the affirmative, and that is how I answer it. Although, as I have noted above, Dicey
Rule 3 did not require the rejection of the claim in *In re Norway's Application (Nos 1
& 2)*, it was described by Lord Goff at 808D as a "*fundamental rule of English law*", a
description I respectfully adopt.

156. It is apparent from Prof Briggs' writing that he would have English law reconsider
radically the scope of Dicey Rule 3, restricting it so far as concerns revenue laws to
causes of action that are, in terms, claims for sums due under a foreign tax law and so,
e.g., departing from *Buchanan v McVey*. That is not a path open to me even if SKAT
proposed it and I had an inclination to follow it. Assuming however that there might
be room to debate the appropriate breadth of the rule, that does not affect its nature
and importance. Even if some may feel it is of wider scope than it should be, that does
not make it any less fundamental a rule of English law, as *lex fori*, that is to say it is
no less a mandatory and overriding principle of English law, applicable even though
English choice of law rules provide generally for a different system of law to govern a
claim, if, as at all events Prof Briggs contends, there is room to debate whether its
scope should be reconsidered. Here, as I have said, the English choice of law rules in
question, in this litigation, are those of the Rome II Regulation; and Article 16 of
Rome II caters for a rule such as Dicey Rule 3.

157. This issue of compatibility – or "*The inter-action of English and EU law*" – is given
thoughtful consideration in *Dickinson*, "*Acts of state and the frontiers of private
(international) law*" (2018) 14 J.Pr.Int.L 1, at 25*ff*. Professor Dickinson notes, at 26,

that "*the subject matter of proceedings may be characterised as "civil and commercial", and within the material scope of the EU instruments [Brussels-Lugano, Rome I and Rome II], notwithstanding that a governmental or other sovereign act is in some sense "in play"*", and mentions Blair J's decision in *The Law Debenture Trust Corporation plc v Ukraine* [2017] EWHC 655 (Comm), at [258]-[313], that the English law act of state doctrine as explained in *Belhaj et al v Straw et al* [2017] UKSC 3 still fell to be applied although the Rome I Regulation governed the question of applicable law, the issue being whether a contract was voidable for duress.

158.    At 26-27, Prof Dickinson turns to Dicey Rule 3, *QRS v Frandsen* and *Mbasogo v Logo*. He proposes (as I have concluded) that the Court of Appeal's view in *QRS v Frandsen* that "*the Brussels Convention ... did not apply to a claim to recover [damages for] lost tax revenue by means of a private law action*" cannot sit with *Sunico*, and suggests that the claim in *Mbasogo* could not have been said to fall outside Brussels-Lugano, which I think is also correct: the claim was framed as a private law claim for damages for a tortious conspiracy to injure; the sovereign interest in play (and sufficient, as the Court of Appeal held, to engage Dicey Rule 3) would not have changed the rules of the litigation game if the claim had not been struck out. I note that it does not appear to have occurred to anyone involved in *Mbasogo v Logo* (or to the Privy Council in *President of Equatorial Guinea*) that the Brussels-Lugano regime had anything to say on whether the claim should be struck out under Dicey Rule 3. If the incompatibility argument be correct, however, the claim in *Mbasogo v Logo* should not have been struck out against defendants domiciled here.

159.    Prof Dickinson continues thus:

"*In cases of this kind, there is undoubtedly a potential dissonance between EU and English law. The European Court has held that the rules of private international law contained in the relevant EU legislative instruments are mandatory and exhaustive in character. Furthermore, the principle of effectiveness in EU law operates to restrain the application of rules of domestic law if their application would be such as to make the application of a relevant provision of EU law impossible or excessively difficult, even though the domestic rules in question may be of a different character to those harmonised by EU law.*"; citing, *inter alia*, C-159/02, *Turner v Grovit* [2004] ECR I-3565 at [29], for that last proposition.

160.    At 28, Prof Dickinson notes that in *Lucasfilm v Ainsworth* [2011] UKSC 39, [2012] 1 AC 208, *obiter* at [112], Lord Collins and Lord Walker appear to take the view that Brussels-Lugano could not require the English court to adjudicate on its primary merits a claim that the English law act of state doctrine would hold to be non-justiciable here. The claim there was for infringement of a foreign copyright and was held to fall outside the act of state doctrine. Prof Dickinson is critical of the reasoning of Lord Collins and Lord Walker, to the extent it suggested that it would be "*contrary to international law (or, perhaps more accurately, put the United Kingdom in breach of international law)*" for the English court to be required, by virtue of the Brussels-Lugano regime, to adjudicate upon a claim it would otherwise have said was non-justiciable under the act of state doctrine (*ibid*, at 29), and therefore proposes that the questions properly to be addressed are these:

"*First, is the rule of English law relied on of such a character that its application is excluded in terms by the relevant EU instrument? Secondly, assuming a negative answer to the first question, does the application of the rule of English law relied on nevertheless make it impossible or excessively difficult to apply any relevant provision within an EU legislative instrument, so as to engage the principle of effectiveness?*"

161.  At 30-35, Prof Dickinson discusses those two questions, as regards the act of state doctrine (rather than Dicey Rule 3), concluding that the first is to be answered in the negative but suggesting that there is a strong argument for answering the second in the affirmative. I agree with the first conclusion, and do not need to take a view on the second. That discussion leads Prof Dickinson, at 35*ff*, to turn back to Dicey Rule 3 and to suggest that the Editors of *Dicey* "*too readily reject the contention that the mandatory and exhaustive nature of the rules of jurisdiction, applicable law and recognition and enforcement of judgments within the Brussels I, Rome I and Rome II Regulations, coupled with [the] principle of effectiveness under EU law, dictate that the rules and principles falling within the scope of the Rule will operate in such cases only at the margins, when those instruments incorporate rules of national law or permit derogation on public policy or other grounds.*" The more fully considered resolution of the compatibility issue he suggests is "*that the first limb of Rule 3 is best understood as a choice of law rule covering the range of matters which, for reasons which have their roots in the constitution, fall within the exclusive dominion of English public law. In such cases, a foreign legal rule is incapable of creating a right of a kind that is actionable in the English courts.*"

162.  I agree, and apprehend that this essentially matches the conclusion to which I have come. So far as material to the present case, Dicey Rule 3 operates in the realm of the Rome II Regulation, and its continued application by the English court in proceedings notwithstanding that they are a 'civil and commercial matter' for Brussels-Lugano and Rome II purposes is authorised by Article 16 of Rome II.

*Civil and commercial matter or revenue matter*

163.  In point of form, SKAT has commenced ordinary civil litigation in this court, and has pleaded only private law causes of action. Whether or not, as I have concluded, the claims are to be regarded for the purpose of Dicey Rule 3 as claims brought, in substance, indirectly to enforce Danish tax law and/or sovereign authority, these proceedings are a 'civil and commercial matter' for the purpose of the Brussels-Lugano regime, unless the use of public powers qualification in the CJEU case-law concerning that concept makes them public law proceedings after all.

164.  I have effectively explained that already in dealing, above, with the question of the compatibility of Dicey Rule 3 with EU law. In short, if *QRS v Frandsen* remained good law to the effect (essentially) that 'revenue [etc] matters' within Article 1(1) of the Brussels-Lugano regime encompassed any proceedings in which the claim fell foul of Dicey Rule 3, then the position would be different. My conclusion on Dicey Rule 3 would then also dictate the answer on Article 1(1). But *QRS v Frandsen* is not now authority for that proposition, because it is inconsistent with the decision of the CJEU in *Sunico*. Unless the use of public powers qualification expressed in *Sunico* and clarified by the decisions in *BUAK* and *Movic* changes things, these proceedings are a 'civil and commercial matter', not a 'revenue [etc] matter', within Article 1(1),

*even though* they are proceedings in which SKAT pursues claims that are inadmissible here under Dicey Rule 3.

*Use of public powers*

165.    There was an ambiguity in *Sunico* about the nature of the use of public powers qualification upon its basic doctrine of judging whether proceedings are a 'civil and commercial matter' by the way in which the claim in question has been framed. The ambiguity arose in this way:

    (i)    The established case-law by the time of *Sunico* had already established, as A-G Kokott put it in her opinion at [41], that in order to say whether proceedings relate to civil and commercial matters, "*it is ... necessary to identify the legal relationship between the parties to the dispute and to examine the basis and the detailed rules governing the bringing of the action ...*". The legal relationship asserted by the claim, and the basis for and rules governing the pursuit of the claim, must both not have a public law nature, if the proceedings are to be a 'civil and commercial matter'.

    (ii)    In relation to the basis for and rules governing the pursuit of the claim, it was submitted (*ibid* at [44]) that HMRC were not exercising powers going beyond those of ordinary civil litigation: "*The same procedural rules apply as for anyone else, and the proceedings are governed by civil procedure. In particular, contrary to customary practice in the exercise of public powers and especially in tax law, the commissioners cannot ... enforce and execute the claim but must pursue it through the general courts of law.*"

    (iii)    A-G Kokott, at [45], noting that HMRC had used public law powers not available to a private litigant to obtain information from the Danish authorities, expressed the opinion that "*if it were admissible in national procedural law for the commissioners to use that information and evidence obtained in the exercise of its powers in the proceedings before the High Court of Justice, the commissioners would not be acting against the defendants as a private person. Whether and to what extent that is the case must be determined by the referring court.*"

    (iv)    Depending on what A-G Kokott meant by it being "*admissible ... for the commissioners to use that information*", that may have been a view that if evidence obtained using a public law power (e.g. through Treaty request for assistance from a fellow sovereign) can be adduced in the proceedings, then they cannot be a 'civil and commercial matter'.

    (v)    If that was A-G Kokott's meaning, then the Court expressed the public law powers qualification rather differently, noting at [42] that it could not say whether evidence obtained using public law powers had been used in the proceedings, and concluding at [43] that it was "*for the referring court to ascertain whether that was the case and, if appropriate, whether the commissioners were in the same position as a person governed by private law in their action against Sunico and the other non-residents sued in the High Court of Justice.*"

- (vi) In my view, the sense of "*if appropriate*" in that formulation of principle is "*if so*". The Court was saying that it is *not* enough, as A-G Kokott might be taken to have suggested, that evidence obtained using a public law power could be deployed in the proceedings. What is required to transform what appear to be civil and commercial proceedings into something else is the use of such material in such a way as to change the character of the process.

- (vii) However, the Court prefaced what it said at [43] (as quoted in (v) above) with "*… as the Advocate General has stated at point 45 of her opinion*". If that were endorsement of more than A-G Kokott's view that the case had to be referred back to the Danish court, and if A-G Kokott was suggesting a wider test for when the use of public powers will take a case outside the Brussels-Lugano regime, then it might be considered that the Court endorsed her wider test, even though the Court's own formulation would seem to indicate otherwise.

166. It is not necessary to decide how far the CJEU's reference to A-G Kokott's view was intended to go, or exactly what A-G Kokott meant by her [45]. That is because the subsequent decisions in *BUAK* and *Movic*, *supra*, make clear that the relevant doctrine is narrower than A-G Kokott might be read as suggesting. The use of public law powers unavailable to a private entity, to investigate and gather evidence that can be deployed in support of a claim is, without more, irrelevant to the classification of the proceedings as a 'civil and commercial matter' or 'revenue [etc] matter'. What tips the scales, if present, is deployment of material such that, under the substantive or procedural rules that will be applied by the national court, it has some different status, as deployed by the public body litigant, than it would have if deployed by a private entity.

167. The real touchstone, in other words, is whether the rules of the litigation game will be different, because the public body is what it is or because of its use of public law powers in relation to the claim (and I note that is how, in effect, A-G Saugmandsgaard Øe understood the CJEU case-law in C-186/19, *Supreme Site Services GmbH v Supreme Headquarters Allied Powers Europe* [2021] 1 WLR 955 at 971-972, [89]-[92]). SKAT being able to use public law powers that a private litigant would not have in connection with the claims it has brought here does not change the rules of the game in this litigation. For example, it does not turn what would be the burden upon a private legal person as claimant to prove the ingredients of each cause of action asserted into some sort of limited judicial review of SKAT's decisions that the WHT refund applicants had not been entitled to the WHT refunds SKAT paid that are now the subject of its claims in the litigation.

168. In *BUAK*, claims were brought by an Austrian public body to pursue annual leave pay for non-resident workers. The determinative question was not whether BUAK had and/or exercised public law powers to investigate and/or pursue the claim. As the CJEU later put it in *Movic*, at [56]: "*to hold that proceedings brought by a public authority are outside the scope of [the Brussels Regulation (recast)] merely because of the use by that authority of evidence gathered by virtue of its public powers would undermine the practical effectiveness of one of the models of implementation of consumer protection envisaged by the EU legislature [in which], in contrast to the [model] in which it is the administrative authority itself that determines the consequences that are to follow from an infringement, … the public authority is*

*assigned the task of defending the interests of consumers before the courts*". What mattered was whether the claims brought would fall to be judged in the same way as they would if brought by individual workers or a private law collective body taking action on workers' behalf.

169. It was contentious between the parties whether under a certain provision of the applicable Austrian statute, "*the court's powers are limited to a simple examination of the conditions for the application of that provision, with the result that, if those conditions are satisfied, the court cannot carry out a detailed examination of the accuracy of the claim relied on by BUAK*" (*BUAK*, at [57]). The decision of the CJEU, at [60]-[61], was that if and only if *was* the position, that would place BUAK "*in a legal position which derogates from the rules of general law regulating the exercise of an action for payment, by attributing a constitutive effect to the determination by it of the claim and by excluding … the possibility for the court hearing such an action to control the validity of the information on which that determination is based*", so that in pursuing the claim BUAK would be acting "*under a public law prerogative of its own conferred by law*" and the proceedings would be a public law matter (in effect judicial review proceedings) and not a 'civil and commercial matter'.

170. By contrast, BUAK's powers of investigation did *not* confer a public law character on the proceedings; they did not influence "*the capacity in which BUAK acts in the context of a procedure such as that in the main proceedings*" and did not "*modify the nature or determine the evolution thereof*" (*ibid* at [64]).

171. Most recently, in *Movic*, proceedings were commenced by Belgian public authorities aimed at determining and stopping unfair commercial practices in the context of live event ticket resales. The CJEU confirmed that by nature such proceedings were 'civil and commercial matters', subject to the use of public powers qualification (*ibid*, at [42]-[43]). The rules by which the court would judge whether the Belgian authorities had a sufficient interest to bring the claim were comparable to the rules that would apply were such a claim brought by a private law consumer protection association (*ibid*, at [[48]-[51]).

172. Critically for my purpose, at [55]-[58], the CJEU rejected the contention that the use by the Belgian authorities of their own reports and investigative findings, generated through public powers, meant that the proceedings were public law proceedings and not a 'civil and commercial matter' after all. In particular, the principle was clearly stated as follows at [57]: "*Only where, due to the use to which a public authority has put certain pieces of evidence, it is not specifically in the same position as a person governed by private law in the context of a similar action, would it be appropriate to make a finding that such an authority has, in a particular case, exercised public powers.*"

173. The proceedings brought by the Belgian authorities were therefore a 'civil and commercial matter', notwithstanding the availability and use of public law investigative, evidence-gathering or evidence-generating powers, except only that, at [62], "*as regards the application by the Belgian authorities to the referring court that it should be granted the power to determine future infringements simply by means of a report issued, on oath, by an official of the Directorate-General for Economic Inspection, …, such an application cannot be said to come within the scope of 'civil*

*and commercial matters', as that application relates in actual fact to special powers
that go beyond those arising from the ordinary legal rules applicable to relationships
between private individuals.*"

174. In the present litigation, I agree with the defendants that it is, as they put it, blindingly
obvious that SKAT made use, and might well have continued to make use, of powers
it has as a sovereign tax authority that no private litigant would have, to investigate
and obtain evidence that it could use if it wished in the litigation and has to a material
extent already used in the litigation. On the authority of *BUAK* and *Movic*, however,
that is beside the point. SKAT was neither attempting nor able to change the rules of
the litigation game, either as to the substantive rules of law that would apply in
determining its claims, or as regards the procedural rules applicable in the litigation,
or as regards the status or effect of any of the evidence it might deploy or disclose.
SKAT was not by this litigation pursuing public law proceedings, in which liabilities
are determined as if this were a judicial review of SKAT's actions, decisions or
exercise of public law powers, rather than upon the same legal basis, substantive and
procedural, as claims of the kind it seeks to pursue, e.g. for damages for deceit or for
negligence, brought by a private law entity.

## Conclusion

175. That brings me full circle to Dicey Rule 3. It can apply (and, I have concluded, does
apply), notwithstanding that in form SKAT does not assert tax law causes of action
and that these are civil litigation proceedings subject to the ordinary rules of such
proceedings, because Dicey Rule 3, as an overriding rule of English law as the *lex
fori*, looks beyond such matters of form to examine the substance, in the sense of the
central interest in bringing the claim of the sovereign authority by which or in whose
interests the claim is brought (and I have concluded that the central interest here is the
Kingdom of Denmark's sovereign right to tax Danish company dividends). But the
fact that SKAT asserted, in point of form, only private law causes of action, not tax
claims, in civil litigation proceedings that are subject to the ordinary rules of such
proceedings, means the proceedings are a 'civil and commercial' matter, not a
'revenue [etc] matter' within Article 1(1) of the Brussels-Lugano regime.

176. To the extent that SKAT relied on the Brussels-Lugano regime as the basis for this
court having jurisdiction over the Brussels-Lugano defendants that have been sued,
including it may be for serving proceedings out of the jurisdiction, in my judgment it
was right to do so. But its having been entitled to do so did not oust or disapply Dicey
Rule 3 in respect of those defendants.

## Result

177. The result is that by the application of Dicey Rule 3 in these proceedings, all of
SKAT's claims fall to be dismissed.

## SKAT – Revenue Rule Trial

### Appendix:

### Rival Contentions on Dicey Rule 3

#### SKAT

178. SKAT made the following substantive points about Dicey Rule 3:

   (i)   A foreign state can sue in the English courts for recovery of state property or compensation for its loss.

   (ii)  Dicey Rule 3 is only concerned with the *enforcement* of sovereign rights. Mere *recognition* of a foreign rule of law or its effect falls outside Dicey Rule 3. In the revenue law context, for the Rule to apply there must be an outstanding and unsatisfied foreign tax claim sought to be satisfied by the claim brought here. It is irrelevant if, in connection with or as background to the claim advanced, there was a sovereign act that had already been completed or a previously satisfied sovereign claim.

   (iii) If SKAT's claims do not infringe the rule in *Government of India*, there are no proper grounds to say that they infringe any wider principle. Given the revenue nature of the case (stated in general terms), the rule in *Government of India* states and delimits the relevant policy of English law, so that if the claim is not within that rule there is no reason to subject it to any further scrutiny. No defendant points to any non-revenue sovereign power as providing the foundation of the claim.

   (iv)  The rule in *Government of India* is absolute: if the claim is in substance (directly or indirectly) a revenue claim, there is no room for discretion on the part of the English court to adjudicate the claim.

   (v)   However, there is a public policy exemption in the wider rule: a claim will not infringe Dicey Rule 3 if it would be contrary to public policy for the Court to decline to hear it.

179. SKAT argued that its claims are of the same character as claims that could be bought by a private law entity that made payments in response to fraud, false representations of fact or otherwise by mistake; it is not claiming for unpaid taxes, and no outstanding tax debts are pursued by these claims. It is irrelevant that the sums paid by SKAT may in some sense represent the proceeds of sums originally collected as taxes, or that the relevant inducement by the defendants was for SKAT to pay a tax refund. If that is not sufficient to take all of its claims outside Dicey Rule 3, then on any view its proprietary claims are not caught, in which SKAT asserts that traceable proceeds of fraud are held on trust for it.

180. SKAT says in its claim that the dividend arbitrage trading transactions or purported transactions upon which the Solo etc Applications or the ED&F Man Applications were based did not result in the beneficial ownership of shares or receipt of dividends

net of WHT deductions required for the WHT refund claims in question to have been
valid claims on the part of the applicants making the claims. Thus, SKAT says, the
WHT applicants had not been liable to tax in Denmark; the tax, a refund in respect of
which was claimed, had not been withheld from the applicants making the refund
claims, so no withheld tax could validly be reclaimed by them; there is no claim (by
SKAT) that those applicants had or have an unpaid tax liability under Danish law,
there was no relevant tax relationship; any obligation SKAT mistakenly considered
itself to owe was the consequence of the applicants' voluntary conduct in applying for
a WHT refund, rather than an exercise of sovereign authority to tax them. As such, the
claims do not directly or indirectly enforce Danish revenue law.

181.   SKAT contended that neither do their claims constitute the exercise or assertion of a
sovereign right for the purpose of Dicey Rule 3 more broadly. That the Danish tax
regime was the setting for a fraud *on* SKAT (or the setting for the non-fraud
defendants' negligence or receipt of funds) does not mean that the claim involves the
exercise or assertion of a sovereign right *by* SKAT. The running of a tax system is not
a sovereign act; the relevant refunds, and therefore SKAT's losses, are due to
administrative acts triggered by the applicants' misstatements, not the exercise of
sovereign power, and this is a patrimonial claim for the recovery of state property, or
compensation for its loss, not a claim to enforce sovereign rights.

182.   SKAT again submitted, in the alternative, that if that is not sufficient to take all of its
claims outside Dicey Rule 3, then on any view its proprietary claims are not caught by
it.

183.   The use of public investigative powers cannot engage Dicey Rule 3, the sole focus of
which is the nature of the claim brought. It is irrelevant whether the claimant has used
sovereign powers to obtain information or evidence with a view to deploying it in
support of SKAT's claims, or which has been, will be, or could be so deployed.

184.   If SKAT's claims are patrimonial claims, they are admissible in an English court even
if the issues that will fall to be determined in them have the potential for
embarrassment that an English court may have to rule on the soundness of the
administration of the Danish tax system, or the competence (or perhaps even the
honesty) of officials involved in that administration. The court is called upon to make
findings critical of public institutions of foreign states on occasion. Just as the 'act of
state' doctrine must not "*degenerate into a mere immunity against international
embarrassment*" (*Belhaj, supra, per* Lord Sumption JSC at [240]), so Dicey Rule 3 is
not concerned with causing or not causing international offence or embarrassment, it
is concerned with the type of claim being brought.

185.   Whether there are alternative remedies under international tax instruments, for
example MARD, or bilateral arrangements such as individual DTAs, is nothing to the
point. They provide additional rights and do not purport to remove rights that a
sovereign entity would otherwise have. They may be concluded against a background
of the general international unavailability of private law actions for the extra-
territorial recovery of taxes, but they do not purport to define the limits of any such
doctrine under any given domestic legal system. SKAT's position was that these
alternative routes for vindicating its rights to recover (the value of) WHT refunds
erroneously paid in fact were not available to it, but even if they were, enforcement

through MARD or international treaty, and enforcement in private law, are not mutually exclusive – they are not the opposite sides of a single coin.

## Defendants

186.   The nine defendants or defendant groups who made submissions in this trial, written or oral or both, pursued arguments that overlap or complement each other. They divide into two lines of attack, and all the defendants participated to a degree in each:

   (i)   SKAT's claims are revenue claims in disguise (i.e. fall foul of the rule in *Government of India*);

   (ii)   only a sovereign power would be in the position to bring the claims SKAT brings (i.e. the claim is born of the exercise of sovereign powers rather than being a patrimonial claim).

187.   There were also arguments about the rationale for Dicey Rule 3, which it was said should influence the conclusion in a number of ways.

### Disguised Revenue Claim

188.   Acupay dealt in some detail with the mechanism and workings of cross-border taxation and WHT schemes in particular. There are sovereign choices to be made on how to levy tax on dividends declared by companies liable to taxation in the sovereign's state while honouring DTAs the sovereign may have concluded. At the material time, the Danish sovereign choice, so far as material, was for SKAT to receive as tax 27% of dividends declared by a Danish company, paid by the company to SKAT, i.e. a WHT system, and to operate a WHT refund system available to legal persons tax resident in states with which Denmark had concluded a DTA (the primary focus in this case being Denmark's DTAs with the USA and Malaysia).

189.   The Sanjay Shah Defendants presented the most detailed analysis of SKAT's claims, as pleaded by SKAT, though the defendants were all agreed on their conclusions. The claims bought by SKAT are premised on allegations of erroneous refunds of WHT paid to the WHT applicants. On SKAT's pleaded case, these refunds were paid because the applicants misrepresented to SKAT matters relevant to their entitlement to a payment under Denmark's WHT refund system administered by SKAT. So the foundation and basis for all of the claims made is an allegedly erroneous assessment by SKAT of the applicants' liability to tax, in light of the information provided. The substance of SKAT's claims, whatever their form (i.e. whatever private law causes of action it says the facts of the case may fit), is to enforce an element of the Danish dividend tax regime enacted by Danish tax legislation and administered by SKAT as the Danish sovereign tax authority.

190.   Further, the alleged invalidity of the WHT reclaim applications is the founding premise for all of SKAT's various claims here, rather than being sufficient in itself to justify those claims, only because the claims brought here are not the simple claims against the WHT refund applicants for a return of refunds wrongly paid to them that is the most obvious cause of action SKAT might have. A direct attempt to claw back tax refund payments made to WHT refund applicants would be, in substance, an attempt to collect tax. What are in essence revenue claims within Dicey Rule 3 do not have a

different character because SKAT has sued in respect of it parties against whom
additional ingredients must be established for there to be liability.

191. Acupay submitted that it makes no sense from a tax lawyer's perspective to
distinguish between an action to recover unpaid tax and an action to recover a WHT
refund. This is as true, the defendants submitted, of SKAT's claims for proprietary
remedies as it is of claims for damages or personal restitutionary remedies. Those
'proprietary claims' are still revenue claims, because they all depend on the prior
finding as to the true position under Danish tax law and the voidability, on the basis
thereof, of decisions by SKAT to make tax refund payments (or as to the amounts to
be paid as tax refunds). The possible vesting of beneficial entitlements in SKAT in
assets situated outside Denmark, as a remedy in respect of SKAT's having been
induced to make tax refund payments in error, is an extra-territorial enforcement of
SKAT's rights in relation to its WHT refund system, i.e. sovereign rights under
Danish tax law, just as much as would be an award of damages.

192. Messrs Knott & Hoogewerf also raised the point that, under English law, it is at least
an open question whether there is a constructive trust prior to the court imposing one
where equity requires it as a remedy. As such, SKAT may not currently have a
proprietary right to the funds paid out. This was raised not to resolve the issue, but to
reinforce the point on characterisation.

193. Messrs Knott & Hoogewerf further submitted that SKAT's claims constitute the
enforcement of Danish revenue law because they are premised on an allegation of a
contravention of that law; but when tested, that added nothing to the debate. It was
accepted on their behalf, certain language in their written submissions
notwithstanding, that SKAT's claims did not allege breach of an obligation imposed
on the WHT refund applicants by the WHT Act in submitting, if they did, invalid
WHT refund claims. The sense in which there was a 'contravention' of Danish tax
law was that, as alleged by SKAT, the WHT refund applicants had induced tax refund
payments to be made by SKAT in circumstances when they should not have been
paid, which just returns the argument to the question whether English law should
characterise SKAT's resulting claim to claw back its payment as a tax claim, for the
purpose of Dicey Rule 3. This was therefore, in reality, the same argument as made by
Messrs Fletcher, Jain and Godson, summarised in the next paragraph.

194. Messrs Fletcher, Jain and Godson, representing themselves, argued that the natural
characterisation of SKAT's claim is to say it sues for a tax fraud, and pointed out that
in a number of other jurisdictions that is how SKAT itself has categorised the case.
The effect of Dicey Rule 3, they submitted, as epitomised by cases such as *Buchanan
v McVey*, is that there is no cause of action in the English court for fraud on a foreign
revenue, any more than for the collection of foreign tax debts. SKAT, they submitted,
seeks artificially to re-characterise the case as one of commercial fraud.

195. Those defendants variously addressed also, at least in outline, their respective
contentions on the merits why their US pension plans (in the case of Mr Fletcher and
Mr Godson) or Malaysian (Labuan) companies (in the case of Mr Jain) *were*, they
say, relevant beneficial owners entitled to dividend payments in a sense sufficient to
be able to claim to have had dividend tax withheld by operation of the Danish WHT
system so as to found valid claims for refunds under that system; and they noted that

the validity of their entities' positions is the subject of pending Danish tax tribunal proceedings (or court proceedings on appeal therefrom).

196. As I explained after hearing those submissions, and so that there was no need for SKAT to take up time replying to them, the correctness or otherwise of those submissions is beyond the scope of this trial. That debate, or important particular elements of it at least, is the subject matter of the Validity Trial fixed for later this year for any of SKAT's claims that survive this first preliminary issue trial. The fact that that is the foundational debate underpinning all of SKAT's claims is relevant for present purposes, the essential question being whether that means that SKAT is, in substance, seeking outside the Kingdom of Denmark to enforce Danish revenue law or otherwise to vindicate the exercise of Danish sovereign power.

*Uniquely Sovereign Circumstances*

197. The defendants pointed to matters they say indicate that SKAT's position is and can only be that of a sovereign authority, not a position that in substance could arise for a private litigant. As Ms Macdonald QC put it in the course of her oral submissions, the proper question is "*the importance of the mechanism by which the loss was sustained and whether there was a sovereign mechanism or sovereign decision in play.*" This is preferable to SKAT's formalistic distinction between a wrong extracting a payment from SKAT, and a wrong causing SKAT to be underpaid, in which the former does not engage Dicey Rule 3 while the latter does. She also submitted that for Dicey Rule 3 to apply sovereign acts or decisions need not have been the sole cause of loss; *Mbasogo v Logo* shows that it is sufficient if sovereign decisions or acts are one of several contributing causes.

198. The indicia, then, that SKAT's claims are sovereign, not patrimonial, were said to be these, namely that:

   (i)   SKAT is a function of the Danish Government, and is acting on behalf of the Kingdom of Denmark.

   (ii)  Imposing, administering and giving refunds of tax are sovereign acts which could not be delegated. A private individual could not suffer loss by paying out tax refunds not properly due (or not properly due in the full amount paid out).

   (iii) SKAT's claims are advanced on the basis of SKAT's statutory right to tax in its capacity as the competent fiscal authority of Denmark. This is a paradigmatic exercise of sovereignty, with no non-governmental interest involved.

   (iv)  The losses are the Danish Treasury's, and any amount recovered will be for the Danish Treasury, not just in the formal sense that since SKAT is an organ of the Danish state, all 'its' assets in fact belong to the Kingdom of Denmark, but in the sense that recoveries from this litigation will rightly be considered to be direct credits to the Danish *fisc*, repairing a net under-collection of dividend taxes for the tax years in question so that it is properly in line (as SKAT alleges it was not at the time) with the DTAs Denmark then had in place. It is to be noted that SKAT acknowledges it must give credit for any recoveries

made from the WHT applicants following determination of the validity (or as SKAT says, invalidity) of their refund claims by the Danish tax tribunal system (or on appeal therefrom).

(v) SKAT seeks to infer falsity from its own preliminary decisions taken under Danish law annulling its previous decisions to accept the WHT Applications. The claim relies on SKAT's own sovereign acts.

(vi) The claims critically and necessarily invoke SKAT's sovereign powers and allege that the WHT refunds paid out were not properly due under Danish law; and in pursuit of those claims SKAT has used and can be expected to use investigative powers and entitlements to mutual assistance from foreign sovereign authorities that only a sovereign might possess.

199. SKAT used sovereign powers to gather information as to how large sums came to be paid out by way of (as it says) WHT refunds that it was not liable to make, and relied on information so obtained when seeking and obtaining freezing orders and an order in Dubai giving it access to a mass of Solo-related documents, and when pleading its claims. The defendants argued that this gives the proceedings a sovereign character and that SKAT cannot avoid that conclusion by noting that there may have been routes by which a private party could have obtained the same evidence.

*Comity*

200. The Sanjay Shah, Lui and DWF Defendants, and Acupay, supported their various submissions by raising the issue of comity. I did not understand any of them to be contending for a freestanding rule that a claim must be dismissed, or Dicey Rule 3 must be treated as applicable, if it would infringe notions of comity to entertain the claim. The defendants thus appeared to me ultimately all to share the stance adopted by Messrs Knott & Hoogewerf, namely that comity is an aspect of the single, unitary rule that is Dicey Rule 3 and its need to characterise a claim as either sovereign or patrimonial, the greater the seeming affront to comity the more likely the conclusion that as a matter of substance the claim is sovereign in nature.

201. In oral argument the DWF Defendants took the lead on the comity issue, whatever its relevance to the present decision. Dicey Rule 3 is predicated on a foundational principle of public international law, *viz.* that there are territorial limits to sovereignty. The live issues in these proceedings would inevitably mean this court making judgments on the legality and adequacy of Danish sovereign acts on Danish soil. This would require the English court, in substance, to sit in judgment over the internal affairs of the Danish sovereign state, in breach of the principle of comity.

202. As an adjunct to this argument, the Sanjay Shah and DWF Defendants submitted that the court ought to consider the claim as a whole, by which they meant not just SKAT's pleaded case but also the matters raised in the various Defences. If that be right, then the defendants pointed to the following matters which, they say, would have to be determined at a full trial of all issues:

(i) whether there had been a valid, lawful and reasonable exercise of sovereign power to tax by Denmark;

(ii)     whether SKAT, as the Danish tax authority, was aware of market practice in trading and owning shares and receiving dividends relevant to the operation of any WHT system;

(iii)    whether SKAT failed to interpret, apply and adhere to Danish and international tax law and its own guidelines or failed to take account of prevalent market practice;

(iv)     whether SKAT's WHT reclaim procedure was inadequate, including the vetting and oversight of the implementation of that regime;

(v)      whether the actions, decisions and internal administrative procedures undertaken to approve the relevant WHT refunds and later reverse those same decisions were adequate or lawful;

(vi)     whether despite making available and participating in Danish tax tribunal proceedings to determine the validity of the WHT refund applicants' claims, the Kingdom of Denmark should not have treated these matters as tax matters at all;

(vii)    whether SKAT's interpretation of Denmark's obligations under the relevant DTAs was correct and whether Denmark's treaty obligations thereunder were complied with;

(viii)   whether Denmark's differential treatment of Danish and non-Danish resident taxpayers under the WHT Act is compatible with the Article 63 TFEU, the free movement of capital.

203.  Further, Acupay submitted that Dicey Rule 3 ensures cross-border assistance is kept in its proper place with regards to the separation of powers. Cross-border assistance should be the exclusive preserve of arrangements between states on the international plane, which can regulate these issues by agreement between them, including appropriate safeguards. This includes bi-lateral treaties, multilateral conventions and MARD.

*Act of State*

204.  The DWF Defendants, supported by the Sanjay Shah Defendants, further submitted in writing that the 'act of state' doctrine applies to render SKAT's claims non-justiciable, by which I understood them to be referring to the second of the rules of law sometimes given that label, as described by Lord Neuberger in *Belhaj*, *supra*, at [122]. But this was not developed separately in oral argument, and in my judgment cannot provide a defence against claims brought by SKAT, disavowing its acceptance of WHT tax refund claims as having been by mistake induced by misrepresentation and asking the court to consider and determine whatever issues properly arose. If SKAT's claims are to be dismissed on the basis of an overriding conflict of laws rule, it must be Dicey Rule 3, not the act of state doctrine.

## Discretion

205.    The defendants made common cause that if (as a matter of substance) SKAT's claims
         fall within Dicey Rule 3, then there is no room for a further exercise of discretion, or
         assessment as a matter of public policy, as to whether or not the claims should be
         enforced here. The Rule is an absolute, exclusionary rule, and represents the
         applicable public policy. That Denmark may lose this case because of it is nothing to
         the point. The Rule supports and respects the practice of international relations
         between sovereigns.

**Exhibit 21**



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Denmark Suffers Blow To Dubai Arm Of $2B Tax Fraud Case

By **Richard Crump**

Law360, London (August 13, 2020, 9:08 PM BST) -- A Dubai court has dismissed Denmark's lawsuit against a British hedge fund founder alleged to be the mastermind behind a $1.9 billion tax fraud against the Danish government, dealing a setback to the European country's attempt to recover lost tax revenues through litigation in jurisdictions around the world.



Denmark's government, based in Copenhagen, suffered a setback when a Dubai court dismissed a lawsuit against a British hedge founder accused of orchestrating a fraudulent trading scheme. (AP)

Denmark's tax authority failed to provide documents to support allegations that Sanjay Shah, the founder of Solo Capital Partners, orchestrated a fraudulent dividend trading scheme between 2012 and 2015 used to cheat the country out of reimbursed taxes, according to a Wednesday ruling by Dubai's Court of First Instance.

"The plaintiff did not submit the documents supporting to its lawsuit ... therefore, the case has no proof on the basis of what the plaintiff claimed," First Instance Court Judge Ahmed Moheey El-Deen Hegazy said, according to an English translation of the original ruling in Arabic.

According to the ruling, the tax agency, known as SKAT, failed to provide certain documents to an expert panel set up by the court to review the evidence. SKAT, which is also suing two of Shah's companies in Dubai's offshore courts, said it has appealed the decision.

"The agency's representatives understand the decision is not a rejection of the agency's claim on the merits, but as argued on more procedural deficiencies in the documentation relating to the claim, which the agency does not agree with," a SKAT spokesman said in a statement Thursday. "As the decision has been appealed it does not affect the agency's claims with the courts."

SKAT is pursuing litigation in England, the U.S., Dubai and Malaysia against hundreds of finance firms, pension funds and individuals over their alleged role in an international scheme that used a loophole on dividend payouts to trick authorities into refunding dividend tax that had never actually been paid.

SKAT claims Shah, who is based in Dubai and is the subject of a worldwide freezing order, is the **"primary individual"** responsible for the fraudulent scheme. Shah has denied the claims and maintained his trades were legitimate and used a **"legal loophole"** common among European

banks.

"Mr. Shah followed established market practice, used lawyers across several jurisdictions and hired experts in their field from various investment banks, law firms and the big four audit firms," Shah's spokesman Jack Irvine said. "I have said repeatedly that the Danish tax system is dysfunctional and this long, drawn out, affair clogging up court rooms throughout the world goes to underline my thesis."

The case is part of a **widening scandal** over a controversial dividend-stripping scheme, known as cum-ex, that has allegedly cost national European treasuries €55 billion ($65 billion) and has sparked probes into some of the region's biggest banks. The fraud has hit Denmark, France, Germany and Italy.

In a cum-ex transaction, shares of a company are sold or swapped just before a dividend payout, followed by claims for refunds or rebates of capital gains taxes.

SKAT is suing nearly 100 defendants in the English courts over the scheme, which it says was used by firms that pretended to own shares in Danish companies to claim tax refunds they were not entitled to.

The **first of three trials** in England's High Court is due to take place in January, with the final trial set to be heard in 2023.

Sanjay Shah is represented by Samir Halim Kanaan of Kanaan Advocates & Legal Consultants. Counsel information for SKAT was not available.

The case is Skatteforvaltningen (the Danish Customs and Tax Administration) v. Sanjay Shah, case number 1758/2018/20, in the Courts of First Instance of Dubai.

--Editing by Marygrace Murphy.

---

All Content © 2003-2021, Portfolio Media, Inc.

# Exhibit 22

Case 1:18-md-02865-LAK    Document 808-13    Filed 05/12/22    Page 28 of 29
Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103 (2001)

RICO Bus.Disp.Guide 10,172

KeyCite Yellow Flag - Negative Treatment
Called into Doubt by   Republic of Colombia v. Diageo North America Inc.,
E.D.N.Y.,  June 19, 2007

268 F.3d 103
United States Court of Appeals,
Second Circuit.

The ATTORNEY GENERAL OF
CANADA, Plaintiff–Appellant,

v.

R.J. REYNOLDS TOBACCO HOLDINGS, INC.,
R.J. Reynolds Tobacco Co., R.J. Reynolds Tobacco
International, Inc., RJR–MacDonald, Inc., R.J.
Reynolds Tobacco Company, Puerto Rico, Northern
Brands International, Inc., and Canadian Tobacco
Manufacturers Council, Defendants–Appellees.

Docket No. 00–7972.
|
Argued May 30, 2001.
|
Decided Oct. 12, 2001.

**Synopsis**
Canada brought action under Racketeer Influenced and
Corrupt Organizations Act (RICO) against cigarette
manufacturer and others to recover costs incurred as result
of alleged conspiracy to smuggle cigarettes into Canada for
sale on the black market. The United States District Court for
the Northern District of New York, Thomas J. McAvoy, J.,
103 F.Supp.2d 134, dismissed suit, and Canada appealed. The
Court of Appeals, Katzmann, Circuit Judge, held that revenue
rule barred claim.

Affirmed.

Calabresi, Circuit Judge, dissented and filed opinion.

**Procedural Posture(s):** On Appeal; Motion to Dismiss;
Motion to Dismiss for Failure to State a Claim.

West Headnotes (10)

**[1]    Judgment ◆ Judgments of Courts of Foreign
Countries**

"Revenue rule" holds that courts of one
sovereign will not enforce tax judgments or
claims of another sovereign.

7 Cases that cite this headnote

**[2]    Racketeer Influenced and Corrupt
Organizations ◆ Elements of violation in
general**

To establish claim under Racketeer Influenced
and Corrupt Organizations Act (RICO), plaintiff
must show: (1) violation of RICO statute; (2)
injury to business or property; and (3) that
injury was caused by the RICO violation. 18
U.S.C.A. § 1962.

37 Cases that cite this headnote

**[3]    International Law ◆ Taxation and revenue**

Revenue rule barred suit by Canada under
Racketeer Influenced and Corrupt Organizations
Act (RICO) against cigarette manufacturer and
others to recover costs incurred as result of
alleged conspiracy to smuggle cigarettes into
Canada for sale on the black market; Canada
was directly seeking to enforce its tax laws, and
United States government had negotiated and
signed treaty with Canada providing for limited
extraterritorial tax enforcement assistance but
stopping well short of the type of assistance
requested. 18 U.S.C.A. § 1962.

14 Cases that cite this headnote

**[4]    International Law ◆ Act-of-state doctrine**

Under "act-of-state doctrine," court presumes
validity of foreign state's laws within that state's
territory.

2 Cases that cite this headnote

**[5]    Racketeer Influenced and Corrupt
Organizations ◆ Foreign activity**

Racketeer Influenced and Corrupt Organizations
Act (RICO) did not abrogate revenue rule, under
which United States courts abstain from assisting
foreign sovereign plaintiffs with extraterritorial

Case 1:18-md-02865-LAK    Document 808-13    Filed 05/12/22    Page 29 of 29
Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc., 268 F.3d 103 (2001)
RICO Bus.Disp.Guide 10,172

tax enforcement; language and structure of RICO and its legislative history revealed no Congressional intent that RICO afford civil remedy to foreign nations for evasion of foreign taxes or any intent to abrogate revenue rule.

18 U.S.C.A. § 1962.

28 Cases that cite this headnote

[6]  **Statutes** ⮕ Common or Civil Law

Where common-law principle is well established courts may take it as given that Congress has legislated with expectation that principle will apply except when statutory purpose to contrary is evident.

3 Cases that cite this headnote

[7]  **Statutes** ⮕ Common or civil law

Statutes which invade common law are to be read with presumption favoring retention of long-established and familiar principles, except when statutory purpose to the contrary is evident.

3 Cases that cite this headnote

[8]  **Statutes** ⮕ Plain, literal, or clear meaning of statute; ambiguity

In order to abrogate common-law principle, statute must speak directly to question addressed by the common law.

1 Cases that cite this headnote

[9]  **Statutes** ⮕ Burden of proof

Party contending that legislative action changed settled law has burden of showing that legislature intended such change.

[10]  **International Law** ⮕ Taxation and revenue

When presented with request by foreign government which potentially implicates revenue rule, court must examine whether substance of the claim is, either directly or indirectly, one for tax revenues; what matters is not form of the action, but substance of the claim.

13 Cases that cite this headnote

**Attorneys and Law Firms**

*105 Philip S. Beck (Fred H. Bartlit, Jr., Jason L. Peltz, Lester C. Houtz, Christopher D. Landgraff, Karma M. Giulianelli, on the brief), Bartlit Beck Herman Palenchar & Scott, Chicago, IL; G. Robert Blakey, Notre Dame, IN; Robert A. Barrer, Hiscock & Barclay, LLP, Syracuse, NY, on behalf of Plaintiff–Appellant The Attorney General of Canada.

Jeffrey S. Sutton, Jones, Day, Reavis & Pogue, Columbus, OH; Timothy J. Finn, Christopher F. Dugan, Jones, Day, Reavis & Pogue, Washington, DC; Alan S. Burstein, Scolaro, Shulman, Cohen, Lawler & Burstein, P.C., Syracuse, NY, on behalf of Defendants–Appellees R.J. Reynolds Tobacco Holdings, Inc. and R.J. Reynolds Tobacco Co.

William C. Hendricks, III, King & Spalding, Washington, DC; Richard A. Schneider, King & Spalding, Atlanta, GA; Patricia A. Griffin & Danielle Sallah, King & Spalding, New York, NY, on behalf of Defendant–Appellee The Canadian Tobacco Manufacturers Council.

C. Stephen Heard, Jr. (Charles Sullivan, Kerry S. Sullivan, Edmund M. O'Toole, on the brief), Sullivan & Heard LLP, New York, NY, on behalf of Defendants–Appellees R.J. Reynolds Tobacco International, Inc., R.J. Reynolds Tobacco Company, PR, RJR–MacDonald, Inc., and Northern Brands International, Inc.

John J. Halloran, Jr. (Frank H. Granito, III, Frank H. Granito, Jr., Kenneth P. Nolan, on the brief), Speiser Krause Nolan & Granito, New York, NY; Kevin A. Malone & Carlos A. Acevedo, Krupnick Campbell Malone Roselli Buser Slama Hancock McNelis Liberman & McKee, Fort Lauderdale, FL; Andrew B. Sacks, Stuart H. Smith, John K. Weston, Sacks and Smith, L.L.C., New Orleans, LA, on behalf of Amicus Curiae The European Community.

Jan Amundson, National Association of Manufacturers, Washington, DC, Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, DC, Theodore B. Olson (Thomas G. Hungar, Jeffrey A. Wadsworth, on the brief), Gibson, Dunn & Crutcher LLP, Washington, DC, on behalf of Amici Curiae The National Association of Manufacturers and The United States Chamber of Commerce.