# Exhibit 18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:
CUSTOMS AND TAX ADMINISTRATION
OF THE KINGDOM OF DENMARK
(SKATTEFORVALTNINGEN) TAX
REFUND LITIGATION

MASTER DOCKET
18-md-2865 (LAK)

**EXPERT REPORT OF RICHARD SALTER QC**

*1 February 2022*

I, **RICHARD STANLEY SALTER**, Barrister and one of Her Majesty's Counsel, of 3 Verulam Buildings, Gray's Inn, London WC1R 5NT, **DECLARE** as follows:

## (A)   Introduction

### (A1)   *The issues on which I have been asked to state my opinion*

1.    I have been asked by Binder & Schwartz LLP  on behalf of  ED&F Man Capital Markets, Ltd. ("**ED&F**") and by K&L Gates LLP on behalf of Acer Investment Group, LLC and the pension plan entities listed in Schedule A (together "**the Acer Defendants**") to state my opinion for the assistance of the United States District Court for the Southern District of New York ("**the New York Court**") on the issues of the law of England and Wales ("**English law**") discussed in the Expert Report dated 17 December 2021 of Felicity Toube QC.

2.    The documents which I have been shown for the purpose of this Declaration are listed in Schedule B below.

### (A2)   *My qualifications to express this opinion*

3.    I am a member of the Bar of England and Wales.  I was called to the Bar by the Honourable Society of the Inner Temple in 1975 and have been continuously in practice at the Bar in

London since completing my pupillage in 1976.  I became a Master of the Bench of the Inner Temple in 1991[1] and was appointed one of Her Majesty's Counsel in 1995[2].

4.    I specialise in commercial law, and regularly appear as counsel before the Commercial Court in London, and before the other judges of the Queen's Bench Division and the Chancery Division of the High Court.  I have also acted as counsel on many occasions before the Court of Appeal and have appeared in leading cases before the Judicial Committee of the House of Lords, its successor, the Supreme Court of the United Kingdom (which is the final court of appeal in the UK for civil cases), and the Privy Council (which is the final court of appeal for several Commonwealth countries)[3].

5.    In addition to my work in litigation, I have a substantial advisory practice.  Over the course of my career, I have provided advice to many of the major banks and other entities involved in the London and international financial markets.

6.    I have been a Recorder[4] of the Crown Court since 2000, and since 2010 have been authorised under the Senior Courts Act 1981 s 9[5] to sit (and do sit) as a deputy judge in the Queen's Bench Division and (since 2016) in the Commercial Court[6] of the High Court.

---

[1]    The Inner Temple is one of the four Inns of Court.  All barristers are called to the Bar by, and are members of, one of the four Inns.  "Master of the Bench" (or "Bencher") is the title give to a member of the governing body of an Inn.

[2]    The rank of Queen's Counsel dates back over 400 years.  Queen's Counsel are senior lawyers – barristers or solicitors – who are recognised experts in a particular field of law. The rank of QC is a status, conferred by the Crown, that is recognised by the courts.  Members have the privilege of sitting within the bar of the court and, when robed, of wearing silk gowns.  The award of Queen's Counsel is therefore known informally as taking silk, and QCs are often colloquially called silks.  When I was appointed, recommendations were made (on application) by the Lord Chancellor.  Since 2005, appointments have been made (again on application) on the recommendation of an independent body, Queen's Counsel Appointments, under a process agreed between the Bar Council and the Law Society and approved by the Lord Chancellor and Secretary of State for Constitutional Affairs in 2004.

[3]    The Senior Courts of England and Wales consist of the Court of Appeal, the High Court of Justice and the Crown Court: see the Senior Courts Act 1981 s 1 (as amended).   The High Court of Justice is a superior court of record: ibid s 19(1).  It is the court of first instance for the trial of more substantial or complex civil disputes.   Appeals from the High Court lie to the Court of Appeal, and from the Court of Appeal to the Supreme Court.   Less substantial civil cases are dealt with by the County Courts.   The Crown deals with the more serious criminal cases.  Less serious criminal case are dealt with by the Magistrates Courts.

[4]    A Recorder is a fee-paid part-time judge, appointed by the Crown on the recommendation of the Lord Chancellor, under The Courts Act 1971 s 21.  Recorders are required to sit as judges for between 15 and 30 days in each year.

[5]    In civil matters, Recorders usually sit as judges only in the County Court.  Section 9(1) of the Senior Courts Act 1981 provides (*inter alia*) for the Lord Chief Justice, or his nominee (usually the Heads of Division) to authorise a Recorder also to sit as a judge in the High Court.

[6]    The Commercial Court is a sub-division of the Queen's Bench Division of the High Court of Justice.  The work of the Court encompasses all aspects of commercial disputes, in the fields of banking and finance, shipping, insurance and reinsurance, and commodities. The Court is also the principal supervisory court for international arbitrations with a seat in England and Wales.

7.      I have written and lectured academically on many occasions on various commercial law topics.  I hold the honorary title of Visiting Professor in the Law Faculty of the University of Oxford, where (when the requirements of my practice permit) I assist with the teaching of post-graduate courses entitled "Corporate Finance Law" and "Legal Concepts in Financial Law".  This academic year, I have also assisted with the teaching of the post-graduate course on "English, Comparative and Transnational Secured Transactions Law" at the University of Cambridge.

8.      A more detailed curriculum vitae is attached as Appendix 1.  A list of all publications I have authored in the previous 10 years is attached as Appendix 2.  Although I have prepared expert reports in other cases, I have not actually testified as an expert, either at trial or by deposition in the last 4 years.

9.      I understand that my duty in providing this Declaration is to help the Court, and that this duty overrides any obligation to the parties by whom I have been engaged or the people who are liable to pay me. I confirm that I have complied and will continue to comply with this duty.  I have no connection with the Plaintiff, Skatteforvaltningen ("**SKAT**"), or with ED&F or any of the Acer Defendants other than my instructions in connection with this case.  My fee for my work in connection with this Report and any testimony in this action is £950 per hour plus normal reimbursable expenses.  My compensation does not in any way depend on the opinions I express or the outcome of this litigation.


## (B)     Summary of Opinion.

10.     In order to assist the Court, I have divided the main part of this Report into four sections:

10.1    In **Section C**, I summarize the basic approach to the interpretation of contracts which is followed by the English courts and the guiding principles used by English courts to assist them in the task of ascertaining the meaning of a document, highlighting a number of leading decisions on the question of contractual interpretation;

10.2    In **Section D**, I discuss three additional areas of English law that provide necessary context for my evaluation of the opinions of Ms Toube and for my analysis of the particular issues on which I have been asked to state my views: (1) rectification and estoppel; (2) intermediated securities; and (3) financial collateral arrangements.

10.3    In **Section E**, I apply these principles of English law to the interpretation of the agreements which make up what Ms Toube terms the "Contract Suite"; and

3

10.4    In **Section F**, I summarize my conclusions.

11.    By way of very brief summary, it is my opinion (on the basis of the limited information presently available to me and for the reasons explained in more detail in the following sections of this Report) that an English Court would be likely to hold, on the true interpretation of the agreements which make up the "Contract Suite", that the interests in the shares which are the subject matter of these proceedings ("**the Danish Shares**") acquired by ED&F on behalf of the Acer Defendants for the purposes of the dividend arbitrage strategy were at the material times (that is, on the relevant Reference Dates[7]) held in custody on bare trust for the relevant Acer Defendants and were beneficially owned by the Acer Defendants, not by ED&F, consistently with the commercial purpose of the transactions and the clearly expressed common understanding of the parties.

## (C)    The interpretation of contracts.

### (C1.)  *The basic approach*

12.    It is, of course, impossible fully to explain the English law relating to the interpretation of contracts in a Report such as this.  Since Lord Hoffmann made his well-known re-statement of the principles of interpretation in 1997 in *Investors Compensation Scheme Ltd v West Bromwich Building Society*[8] ("**ICS**"), the House of Lords and the Supreme Court have returned to the issue on many occasions[9].  There are currently at least 5 lengthy textbooks devoted to the topic[10], and many learned articles including a number written by distinguished serving or retired judges[11].

---

[7]    See fn 93 below.

[8]    [1998] 1 WLR 896 at 912h-913e.

[9]    *Bank of Credit and Commerce International SA v Ali*  [2001] UKHL 8 ,[2002] 1 AC 251, HL; *Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, [2009] AC 1101, HL; *Attorney General of Belize v Belize Telecom Ltd* [2009] UKPC 10, [2009] 1 WLR 1988, PC; *Rainy Sky SA v Kookmin Bank* [2011] UKSC 50, [2011] 1 WLR 2900, SC(E); *Multi-Link Leisure Developments Ltd v North Lanarkshire Council* [2010] UKSC 47; [2011] 1 All ER 175 SC(S); *Marley v Rawlings* [2014] UKSC 2, [2015] AC 129, SC(E); *Arnold v Britton* [2015] UKSC 36, [2015] AC 1619, SC(E); *BNY Mellon Corporate Trustee Services Ltd v LBG Capital No1 Plc* [2016] UKSC 29, [2016] Bus LR 725, SC(E); *Wood v Capita Insurance Services Ltd* [2017] UKSC 24, [2017] AC 1173, SC(E).

[10]    The leading practitioners' work is probably Lewison, *The Interpretation of Contracts* (7th edn, Sweet & Maxwell 2020): but see also Carter, *The Construction of Commercial Contracts* (Hart Publishing, 2013); Calnan, *Principles of Contractual Interpretation* (2nd edn, OUP 2017); McMeel, *McMeel on the Construction of Contracts: Interpretation, Implication and Rectification* (3rd edn, OUP 2017); Catterwell, *A Unified Approach to Contact Interpretation* (Hart Publishing, 2020).

[11]    See eg (in recent years) McLauchlan, 'The Lingering Confusion and Uncertainty in the Law of Contract Interpretation' (2015) LMCLQ 406; Leggatt 'Making Sense of Contracts: The Rational Choice Theory' (2015) 131 LQR 454 (Lord Leggatt is now a justice of the Supreme Court); McLauchlan 'A better way

13.    The basic approach to the interpretation of contracts which is followed by the English courts is, however, "tolerably clear"[12] and "not in doubt"[13].  It is correctly stated by Ms Toube in paragraphs 21 and 22 of her Expert Report.  In the well-known words of Lord Hoffmann in ICS[14]:

> **.. Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract ..**

More recently, in *Rainy Sky SA v Kookmin Bank*[15] Lord Clarke JSC put the same point in these terms:

> **.. the exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other ..**

---

of making sense of contracts?' (2016) 132 LQR 577; Sumption, 'A Question of Taste: The Supreme Court and the Interpretation of Contracts' (2017) 17 OUCLJ 301 (Lord Sumption is a retired Justice of the Supreme Court); Vos 'Contractual Interpretation: Do judges sometimes say one thing and do another?' (2017) 23 Canterbury L Rev 1 (Sir Geoffrey Vos MR is the Master of the Rolls, the President of the Civil Division of the Court of Appeal of England and Wales and Head of Civil Justice, second in seniority in England and Wales only to the Lord Chief Justice); McLauchlan, 'Some Fallacies Concerning the Law of Contract Interpretation' [2017] LMCLQ 506; Havelock, 'Some Fallacies Concerning the Law of Contract Interpretation: a reply to Professor McLauchlan' [2018] LMCLQ 40; McLaughlan, 'Some fallacies concerning the law of contract interpretation: a riposte to Mr Havelock' [201] LMCLQ 46; Hoffmann 'Language and lawyers' (2018) 134 LQR 553 (Lord Hoffmann is a retired Law Lord); Mason, 'A continuity of confusion rather than a helpful synthesis: the UK Supreme Court's failure to clarify the correct approach to contract interpretation' (2018) 39(1) Bus LR 25; Catterwell, 'Striking a balance in contract interpretation: the primacy of the text' (2019) 23(1) Edin. LR 52.

[12]    "While the answer in a particular case is by no means always easy to work out, the applicable principles are tolerably clear": *Actavis UK Ltd v Eli Lilly & Co* [2017] UKSC 48, [2018] 1 All ER 171 at [58], per Lord Neuberger of Abbotsbury PSC

[13]    See eg *Re Sigma Finance Corp* [2009] UKSC 2, [2010] 1 All ER 571 at [9], per Lord Mance.

[14]    *ICS* (fn 8 above) at 912H.  Lord Hoffman repeated this formulation in substantially the same words in *Chartbrook Ltd v Persimmon Homes Ltd* (fn 9 above) at [14].

[15]    (Fn 9 above) at 21f.  In *Wood v Capita Insurance Services Ltd* (fn 9 above) at Lord Hodge JSC said that this "elegantly summarised" the relevant principles.

### *(C2)   The two overlapping tensions in approach*

14.   Unfortunately, although this basic general principle is easy to state, its practical application to the facts of any particular case and the words of any given contract is (as Lord Neuberger has noted[16]) often not straightforward.  Part of the problem is that the principle involves two overlapping tensions in approach. The first is between the subjective and the objective: the second is between the purposive and the literal.

### *(C2.1)   Objective/Subjective*

15.   As for the tension between the subjective and the objective aspects of this principle, it has been said that the reference in these formulations to what "*a reasonable person* would have understood the parties to have meant" encapsulates:

> **.. the fundamental philosophy underlying the English approach to the interpretation of contracts .. [which] .. is that interpretation does not involve the search for the actual intentions of the parties, but for an objective meaning. The purpose of interpretation is not to find out what the parties intended, but what the language of the contract would signify to a properly informed ordinary speaker of English ..**[17]

16.   It is, however, also clear that the language used in a contract is not to be interpreted in a vacuum[18], but in the context as known (or as should have been known) to the actual parties themselves when they made their contract.  The hypothetical "reasonable man" whose objective interpretation of the parties' contract is to be divined by the court is one who is notionally in the shared subjective position of the particular parties at the relevant time and "who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract".

17.   This background knowledge is sometimes referred to as the "matrix of fact", the "factual matrix" or the "factual background" of the contract: but, as Lord Hoffmann stated in ICS:

> **.. this phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception [that it excludes the previous negotiations of the parties and their declarations of subjective intent] it includes absolutely anything which would have**

---

[16]   See fn 12 above.

[17]   Lewison, *The Interpretation of Contracts* (fn 10 above) para 1.18.

[18]   "[C]ourts will never construe words in a vacuum": *Arbuthnott v Fagan* [1995] CLC 1396 at 1400, per Sir Thomas Bingham MR.

> **affected the way in which the language of the document would have been understood by a reasonable man.**

18. As Lord Neuberger of Abbotsbury PSC has more recently re-iterated in *Arnold v Britton*[19], the factual background that is admissible in aid of interpretation is limited to that which existed at the time when the contract was made[20] and which was (or should have been) known at that point to both – and not just one – of the parties.

> **When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.**

19. Speaking of a clause in a commercial lease, Lord Neuberger explained the correct approach in these terms[21]:

> **.. When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean .. And it does so by focussing on the meaning of the relevant words .. in their documentary, factual and commercial context.**
>
> **That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding subjective evidence of any party's intentions ..**

---

[19]   (Fn 9 above) at [21].

[20]   That generally includes the subsequent statements or conduct of the parties.: see Lewison, *The Interpretation Of Contracts* (fn 10 above) Ch 3(19).  "[I]t is not legitimate to use as an aid in the construction of the contract anything which the parties said or did after it was made. Otherwise one might have the result that a contract meant one thing the day it was signed, but by reason of subsequent events meant something different a month or a year later": *Whitworth Street Estates (Manchester) Ltd. v. James Miller & Partners Ltd*[1970] AC 583 at 603, per Lord Reid.  See also *Schuler (G) AG v Wickman Machine Tool Sales Ltd* [1974] AC 235.

[21]   (Fn 9 above) at [15].  Lord Neuberger had previously said much the same thing in *Marley v Rawlings* (Fn 9 above) at [19].

### (C2.2)    Literal and purposive

20.    The second tension embodied in the basic principle set out in paragraph 13 above is that between the literal approach to interpretation, which concentrates primarily on the words actually used and their "natural and ordinary meaning", and the purposive approach, which concentrates on the overall purpose of the clause and the contract.

21.    In *ICS*, Lord Hoffman appeared definitively to champion the purposive approach over the literalist[22]:

> **The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax**

> **.. The "rule" that words should be given their "natural and ordinary meaning" reflects the common sense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had ..**

22.    Similarly, in *Rainy Sky SA v Kookmin Bank*[23] Lord Clarke JSC observed that:

> **It is not in my judgment necessary to conclude that, unless the most natural meaning of the words produces a result so extreme as to suggest that it was unintended, the court must give effect to that meaning.**

> **The language used by the parties will often have more than one potential meaning .. [T]he court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other.**

In that connection, Lord Clarke cited with approval (inter alia) the following observations of Lord Steyn:

---

[22]    *ICS* (fn 8 above) at 913B-E.

[23]    (Fn 9 above) at [20]-[21].  In *Wood v Capita Insurance Services Ltd* (fn 9 above) at Lord Hodge JSC said that this "elegantly summarised" the relevant principles.

> **.. Often there is no obvious or ordinary meaning of the language under consideration. There are competing interpretations to be considered. In choosing between alternatives a court should primarily be guided by the contextual scene in which the stipulation in question appears. And *speaking generally, commercially minded judges would regard the commercial purpose of the contract as more important than niceties of language*. And, in the event of doubt, the working assumption will be that a fair construction best matches the reasonable expectations of the parties ..**[24]

23.     The *Rainy Sky* case was decided in 2011.  When *Arnold v Britton*[25] was decided four years later, in 2015, it was widely thought that it represented a change in emphasis, away from the purposive approach and in favour of the literalist.  In the passages of his judgment which follow that quoted in paragraph 18 above, Lord Neuberger "stressed the importance of the words of the contract, and what appeared to be their primacy over surrounding circumstances or business common sense. This led to the widespread perception in lower courts that *Arnold v Britton* heralded a return to more conventional principles of interpretation"[26].

24.     However, in its 2017 decision in *Wood v Capita Insurance Services Ltd*[27] the Supreme Court firmly rejected the suggestion that *Arnold v Britton* represented any "recalibration of the approach summarised the *Rainy Sky* case".  Lord Hodge explained:

> **.. The court's task is to ascertain the objective meaning of the language which the parties have chosen to express their agreement. It has long been accepted that this is not a literalist exercise focused solely on a parsing of the wording of the particular clause but that the court must consider the contract as a whole and, depending on the nature, formality and quality of drafting of the contract, give more or less weight to elements of the wider context in reaching its view as to that objective meaning ..**

> **.. This unitary exercise involves an iterative process by which each suggested interpretation is checked against the provisions of the contract and its commercial consequences are investigated .. To my mind once one**

---

[24]    'Contract law: Fulfilling the reasonable expectations of honest men' (1997) 13 LQR 433 at 441 (emphasis added).

[25]    (Fn 9 above).

[26]    Lewison, *The Interpretation of Contracts* (fn 10 above) para 1.04. As Lewison notes at para 1.14 (referring to some of the learned articles cited in fn 11 above) "Commentators were divided over whether there had been a retreat from Lord Hoffmann's principles. Sir Geoffrey Vos considers that there had been.  Professor McLauchlan, on the other hand, does not. Lord Sumption has discussed the shifts in emphasis .. [and] .. Lord Hoffmann has defended his original approach":

[27]    (Fn 9 above) at [8] to [15].

has read the language in dispute and the relevant parts of the contract that provide its context, it does not matter whether the more detailed analysis commences with the factual background and the implications of rival constructions or a close examination of the relevant language in the contract, so long as the court balances the indications given by each.

Textualism and contextualism are not conflicting paradigms in a battle for exclusive occupation of the eld of contractual interpretation. Rather, the lawyer and the judge, when interpreting any contract, can use them as tools to ascertain the objective meaning of the language which the parties have chosen to express their agreement. The extent to which each tool will assist the court in its task will vary according to the circumstances of the particular agreement or agreements.

### (C3)   The significance of the purpose of the contract for its interpretation

25.    It is well-established that for "reasons of practical policy", "the law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent"[28]: and it has been said that:

> .. Although the task of the court is to ascertain the intentions of the parties as expressed in the language in which they have chosen to frame the grant, *the one area of evidence that is wholly inadmissible for that purpose is the direct evidence of what the parties, or either of them, actually intended by it*. That is not part of the admissible background evidence ..[29]

As a result, the Court may sometimes conclude that the true meaning of a provision in a contract is "one which .. was never intended by the framer of it to have the meaning" attributed to it by the court[30].

26.    However, it is not usual for the English courts to interpret a contract in such a way as to defeat the overall commercial purpose of the transaction. That is because it is well-established that interpretation generally involves (*inter alia*) a consideration of the overall purpose of the transaction[31].

---

[28]    *ICS* (fn 8 above) at 913A-B, per Lord Hoffmann. See also *Chartbrook Ltd v Persimmon Homes Ltd* (fn 9 above) at [32]- [41].

[29]    *Brooks v Young* [2008] EWCA Civ 816,  [2008] 3 EGLR 27 at 12, per Rimer LJ (emphasis added).   See also the discussions in Lewison, *The Interpretation of Contracts* (fn 10 above) at 2.17 and 2.36-2.42, where the author expresses the view that "For the purpose of the interpretation of contracts, the intention of the parties is the meaning of the contract.  There is no intention independent of that meaning".

[30]    See *Smith v Lucas* (1881) 18 Ch D 531.

[31]    See eg item (iii) in Lord Neuberger's list, quoted in paragraph 18 above.

> **.. It is of course both useful and frequently necessary when construing a clause in a contract to have regard to the overall commercial purpose of the contract in the broad sense of its type and general content, the relationship of the parties and such *common* commercial purpose as may clearly emerge from such an exercise ..**[32]

27.    This approach is by no means new.  In the nineteenth century case of *Glynn v Margetson & Co*[33] (which was concerned with a printed form bill of lading for the shipment of a cargo of oranges from Malaga to Liverpool), Lord Herschell said:

> **.. Where general words are used in a printed form which are obviously intended to apply, so far as they are applicable, to the circumstances of a particular contract, which particular contract is to be embodied in or introduced into that printed form, I think you are justified in looking at the main object and intent of the contract and in limiting the general words used, having in view that object and intent ..**

and Lord Halsbury LC added

> **.. Looking at the whole of the instrument, and seeing what one must regard .. as its main purpose, one must reject words, indeed whole provisions, if they are inconsistent with what one assumes to be the main purpose of the contract ..**

28.    More recent cases have also emphasised that, in interpreting complex commercial agreements or suites of documents, it is dangerous to focus too narrowly on particular words or phrases, because the overall commercial purpose of the transaction is often a safer guide to the true meaning of particular provisions.

> **.. *Of much greater importance* in my view, in the ascertainment of the meaning that the deed would convey to a reasonable person with the relevant background knowledge, *is an understanding of its overall scheme and a reading of its individual sentences and phrases which places them in the context of that overall scheme*. Ultimately, that is where I differ from the conclusion reached by the courts below. In my opinion, *their conclusion elevates a subsidiary provision* for the interim discharge of debts "so far as possible" *to a level of pre-dominance which it was not***

---

[32]    *Mitsubishi Heavy Industries Ltd v Gulf Bank KSC* [1997] 1 Lloyd's Rep 343 at 605, per Potter LJ (emphasis in the original).

[33]    [1893] AC 351 at 355 and 357.  As Sir Kim Lewison has noted, "In that case, the main object of the contract [ie the carriage of oranges from Malaga to Liverpool] was clear from the terms of the contract itself.  Moreover, the contract was a standard printed form rather than a contract which had been negotiated in detail by the parties themselves (or their solicitors).  *These points, however, do not seem to matter*"; Lewison, *The Interpretation of Contracts* (fn 10 above) at 2-50 (emphasis added).

> *designed to have in a context where, if given that pre-dominance, it conflicts with the basic scheme of the deed ..*
>
> *..* **In complex documents of the kind in issue there are bound to be ambiguities, infelicities and inconsistencies.** *An over-literal interpretation of one provision without regard to the whole may distort or frustrate the commercial purpose ..* [34]

29.    It is similarly established law that, by way of exception to the exclusionary rule stated in paragraph 25 above, previous documents can be looked at to show the  surrounding circumstances and, by that means, to explain the overall commercial or business object (the "genesis" and "aim") of a contract[35].

30.    The classic statement of the principle that evidence of the "genesis" and "aim" of the contract is admissible is that of Lord Wilberforce in *Prenn v Simmonds*[36]: and, as Leggatt LJ has recently explained in *Merthyr (South Wales) Limited v Merthyr Tydfil County Borough Council*[37]:

> **The phrase "genesis and aim of the transaction" is a composite phrase taken by Lord Wilberforce from the judgment of Cardozo J in *Utica City National Bank v Gunn*, 222 NY 204 (1918), a decision of the New York Court of Appeals, which Lord Wilberforce described as following "precisely the English line" and as a judgment which "combines classicism with intelligent realism" .. The approach followed by Cardozo J was, by considering the circumstances which led to the execution of the contract, to identify the purpose of the transaction and to construe the language used in the light of that purpose. Cardozo J concluded (at 208):**
>
> > **"To take the primary or strict meaning is to make the whole transaction futile. To take the secondary or loose meaning, is to give it efficacy and purpose. In such a situation, the genesis and aim of the transaction may rightly guide our choice."**

31.    The distinction drawn by the courts is between referring to previous communications in order to identify the overall commercial or business object of the transaction (for which purpose such communications are admissible) and relying on such evidence to show what the parties intended a particular provision in a contract to mean (where they are inadmissible): and, as the Court of Appeal accepted, "There may be borderline cases in

---

[34]    *Re Sigma Finance Corp* (fn 13 above) at [12] per Lord Mance, and at [35] per Lord Collins (emphasis added).   (Ms Toube appeared as junior counsel in that case)

[35]    *Merthyr (South Wales) Limited v Merthyr Tydfil County Borough Council* [2019] EWCA Civ 526 at [52], per Leggatt LJ.

[36]    [1971] 1 WLR 1381 at 1385.

[37]    (Fn 35 above) at [53]

which the line .. may be hard to draw".  But, by way of illustration, the Court of Appeal in that case admitted evidence to show that the overall commercial purpose of the transaction in question was to establish a fund of money which would provide security for the mining company's obligations to carry out restoration works, but excluded evidence  of a provisional agreement about one aspect of the proposed arrangements showing that the parties had a common intention regarding what should happen in the event that the mining company was unable to make a quarterly payment into the account because its mining operations had not generated sufficient cash to fund the payment.

32.  This approach - that a contract should so far as possible be interpreted so as to give effect to the main object and intent, ie the commercial purpose, of the contract - overlaps with the preference of the courts (referred to in paragraph 22 above) for interpretations of commercial contracts which (again where possible) accord with "business common-sense".

### (C4)   The other principles listed in paragraphs 19 to 25 of Ms Toube's Expert Report

33.  The basic principle of interpretation in English law is that which Ms Toube states in paragraphs 21 and 22 of her Expert Report, as explained in rather more detail in the previous sections of this responsive Report.

34.  The other "principles" of interpretation listed in paragraphs 19, 20 and 23 to 25 of Ms Toube's Expert Report are established by the authorities which she cites.  To a very large extent, they are simply matters of logic or common-sense[38].  However, the function of these "canons of construction" (as they are sometimes called) is, simply to act as guides to assist the court, in an appropriate case, in its task of applying the basic principle stated in paragraph 13 above.

35.  It is that basic principle which defines the task of the court and which has primacy: and unlike that principle, these canons are not rules of law, but simply adjuncts which (depending on the circumstances) may or may not be helpful to the court in its task.

> **.. The canons of construction are no more than pointers to ascertaining the meaning of a written contract. They are not to be slavishly applied, and where they point in different directions the court must select those which will produce a reasonable and just result ..**[39]

As Lord Clyde said in *BCCI v Ali*[40]

---

[38]  The canons embody logic or common sense .. Provided that it is remembered that the canons exist to illuminate and help, but not to constrain or inhibit, they remain of real value": *Cusack v Harrow LBC* [2013] UKSC 40; [2013] 1 WLR 2022 at [60], per Lord Neuberger of Abbotsbury

[39]  Lewison, *The Interpretation of Contracts* (fn 10 above) Ch 7.

[40]  (Fn 9 above) at [79].

> **.. Such guides to construction as have been identified in the past should not be allowed to constrain an approach to construction which looks to commercial reality or common sense. If they are elevated to anything approaching the status of rules they would deservedly be regarded as impedimenta in the task of construction. But they may be seen as reflections upon the way in which people may ordinarily be expected to express themselves. Generally people will say what they mean ..**

36.     The way in which the "applicable English Legal Principles" of contractual construction are set out in paragraphs 19 to 25 of Ms Toube's Expert Report may perhaps give the impression that each of them is of equal importance to the others. Any such impression would, in my opinion, be incorrect.

*(C5)    The process of interpretation*

37.     In *Re Sigma Finance*[41], Lord Mance noted that:

> **.. The resolution of an issue of interpretation in a case like the present is an iterative process, involving "checking each of the rival meanings against other provisions of the document and investigating its commercial consequences" ..**

38.     As to how that iterative process is usually caried out, in *Morrells of Oxford Ltd v Oxford United FC Ltd*[42] Robert Walker LJ offered the following insight:

> **.. any description of the requisite mental process is likely to be metaphorical and inexact. The judicial mind does not in practice proceed in an orderly series of immutable choices in order to reach a conclusion on a question of construction. In practice it scans repeatedly from one point or proposition to another, often forming and rejecting provisional views in the search for the most satisfactory (or least unsatisfactory) resolution ..**

## (D)    Other legal issues

39.     It may be helpful to the New York Court for me briefly to mention three other areas of English law, in order to provide some further context to the issues on which I have been asked to state my views. Those areas are: (1) rectification and estoppel; (2) intermediated securities; and (3) financial collateral arrangements.

---

[41]     (Fn 13 above) at [12]. See also *Arnold v Britton* (fn 9 above).) at [77], per Lord Hodge.

[42]     [2001] Ch 459 at 468.

*(D1)   Rectification and estoppel*

40.    The interpretation of the agreements in the "Contracts Suite" for which Ms Toube argues is (as I explain later in this Report) disputed by ED&F and the Acer Defendants on the basis that that interpretation is inconsistent with the overall purpose of the transaction and/or is inconsistent with the way in which the various trades were operated and/or documented by them at the time.  It may therefore be helpful for me briefly to mention the English law doctrines of rectification and estoppel.

41.    These brief summaries are not intended as a comprehensive statement of English law in relation to these doctrines, but simply to assist the New York Court by indicating their broad scope.

*(D1.1)   Rectification*

42.    Rectification is "a process by which the document is made to conform to what was actually agreed between the parties, or what the law, applying the objective principle, treats as being their agreement"[43].  The requirements of the doctrine were summarised by Leggatt LJ, giving the judgment of the Court of Appeal, in the recent case of *FSHC Group Holdings Ltd v GLAS Trust Corpn Ltd*[44]:

> **.. before a written contract may be rectified on the basis of a common mistake, it is necessary to show either (1) that the document fails to give effect to a prior concluded contract or (2) that, when they executed the document, the parties had a common intention in respect of a particular matter which, by mistake, the document did not accurately record. In the latter case it is necessary to show not only that each party to the contract had the same actual intention with regard to the relevant matter, but also that there was an 'outward expression of accord' meaning that, as a result of communication between them, the parties understood each other to share that intention.**

43.    The burden of proof is on the party seeking rectification.  That party must produce "convincing proof" not only that the document to be rectified was not in accordance with the parties' true intentions at the time of its execution, but also that the document in its proposed form does accord with their intentions[45].  However, the evidential rule excluding evidence of prior negotiations does not apply to actions for rectification[46].

---

[43]    Beale (ed), *Chitty on Contracts* (34th edn, Sweet & Maxwell 2021) para 5-057.

[44]    [2019] EWCA Civ 1361, [2020] Ch 365 at [176].

[45]    Beale (ed), *Chitty on Contracts* (fn 43 above) at [5-095].

[46]    "The rule .. does not exclude the use of such evidence for other purposes: for example .. to support a claim for rectification or estoppel": *Chartbrook Ltd v Persimmon Homes Ltd* (fn 9 above) per Lord Hoffmann.

44.   If, therefore, ED&F and/or the Acer Defendants could show either that one or more of the agreements in the "Contract Suite" failed to give effect to a prior concluded contract between them or that, when they executed those agreements, the parties had a common intention in respect of a particular matter (in relation to which there was a sufficient 'outward expression of accord' passing between them) which, by mistake, the document (or documents) did not accurately record, then they could in principle be entitled to rectification of the documents so as to record that agreement or shared intention.

45.   Because rectification is an equitable remedy, a claim for rectification could be precluded by equitable defences such as delay or acquiescence or the impossibility of restoring the parties to their former positions.   The remedy is also discretionary and terms may sometimes be imposed[47].

   (D1.2)   Estoppel

46.   Two kinds of estoppel could perhaps be relevant in the present case: estoppel by representation, and estoppel by convention.

   *(D1.2.1) Estoppel by representation*

47.   As I understand the position, it is part of ED&F's case and of the Acer Defendants' case that ED&F on a daily basis sent statements of account by email to or for the various Acer Defendants, showing which of the Danish Shares were held in custody for them[48].

48.   In English law, such account statements issued by a custodian are *prima facie* evidence against the custodian itself, and may sometimes found an estoppel in favour of the client, preventing the custodian from denying what has been there represented.

49.   An account statement furnished by a custodian to a client can (in English law) amount to a representation of fact which, if relied upon by the client representee to that client's detriment, could found an estoppel preventing the custodian representor from denying

---

[47]   See generally Beale (ed), Chitty on Contracts (fn 41 above) at [5-087] to [5-101].

[48]   Paragraph 19.2 of the Draft Statement of Agreed Facts (prepared for the proceedings before the Commercial Court in London ("**the English Proceedings**")) states that "ED&F Man opened records for each of the PPs custody accounts [in accordance with 2(b) of the Custody Agreements] (comprising (1) cash account statements (the 'PP Cash Account'), which provided a detailed running ledger of cash and share transactions carried out on behalf of the PPs and the GPs over time by reference to (inter alia) (a) date (b) journal type (c) description (buy/sell specified shares) (d) amount and (f) running balance (in credit/overdrawn); and (2) equity account statements (the 'PP Equity Account') .. which showed the daily position of the PP's shares (including Danish shares) holdings at ED&F Man (together the 'PP Custody Accounts'))".   At pages 326 to 328 of the Transcript of his Deposition, Mr Hashemi confirms that this draft "reflects [ED&F's] position".

the facts set out in the statement[49].  The position of a custodian may in this respect be considered analogous to that of a bank which has posted a credit to a customer's statement:

> **.. While it was considered that entries to the credit of the customer in the passbook were only *prima facie* evidence against the bank, it has been held that if the customer believes themselves to have been accurately credited with a particular sum and acts upon such belief to their prejudice, the customer may be entitled to rely upon the entry not merely as evidence in their favour but as a representation which, if not corrected before acting upon, the bank is estopped from disputing ..[50]**

50.    For example, in *United Overseas Bank v Jiwani*[51] the bank mistakenly credited Mr. Jiwani with the same amount twice, and sent him a credit advice to that effect.  His plea of estoppel failed on the facts on the issue of detriment.  However, Mackenna J said this with regard to the principle:

> **.. T]here are three conditions to be satisfied by him if he is to make good this estoppel. First, he must show that either the plaintiffs were under a duty to give him accurate information about the state of this account and that in breach of this duty they gave him inaccurate information, or that in some other way there was a misrepresentation made to him about the state of the account for which the plaintiffs are responsible. Secondly, he must show that this inaccurate information misled him about the state of the account and caused him to believe that the plaintiffs were his debtors for a larger sum than was the case and to make the transfer to Mr. Pirani in that mistaken belief. Thirdly, he must show that because of his mistaken belief he changed his position in a way which would make it inequitable to require him to repay the money.  I have no doubt that the**

---

[49]    "An estoppel in pais may arise from an untrue representation of fact, not only when the representation is made fraudulently, but also when it is made mistakenly or innocently. In order to raise such an estoppel, the following five conditions must be satisfied. First, there must be a representation of fact .. Secondly, the representation must be precise and unambiguous. An estoppel will arise on a document if, on its construction as a whole, it is capable of being reasonably understood in a particular sense by the person to whom it is addressed.  A person cannot, however, seek the protection of an estoppel based on a statement which was induced by his own misrepresentation or concealment. Thirdly, there must have been an intention, or some conduct giving rise to a reasonable presumption of an intention, that the other party was to act in reliance on the truthfulness of the representation.  Fourthly, the party relying on the representation must have acted on it to his own detriment. Fifthly, the misstatement must have been the proximate cause of the detriment or, perhaps more strictly, of the action which caused the detriment. This requirement may be able to be restated in the form of a proposition that the representee must have relied on the truth of the representation; however, it may instead be the case that, once the representation has been proved, there is a presumption of reliance.": H M Malek, *Phipson on Evidence* (19th edn, Sweet & Maxwell 2017) para 5-29.

[50]    Cresswell et al, *Encyclopaedia of Banking Law* para C[408], citing *Holland v Manchester & Liverpool District Banking Co Ltd* (1909) 25 TLR 386, and *United Overseas Bank v Jiwani* [1977] 1 All ER 733

[51]    [1977] 1 All ER 733.

**first of these requirements is satisfied. I shall assume for the moment that he has satisfied the second, .. He has, I think, completely failed to establish the essential third condition.**

*(D1.2.2) Estoppel by convention*

51.    An English court will not generally look at the subsequent statements or conduct of the parties in order to interpret a written agreement[52].  However, this exclusionary rule does not prevent the use of such evidence to support a claim for rectification or estoppel (or to establish some further or collateral contract to the effect represented)[53].

52.    Estoppels resulting from such subsequent statements or conduct are known in English law as "estoppels by convention".  An estoppel by convention

> **.. may arise where both parties to a transaction "act on assumed state of facts or law, the assumption being either shared by both or made by one and acquiesced in by the other". The parties are then precluded from denying the truth of that assumption, if it would be unjust or unconscionable (typically because the party claiming the benefit has been "materially influenced" by the common assumption) to allow them (or one of them) to go back on it.**

> **Such an estoppel differs from estoppel by representation and from promissory estoppel in that it does not depend on any representation or promise. It can arise by virtue of a common assumption which was not induced by the party alleged to be estopped but which was based on a mistake spontaneously made by the party relying on it and acquiesced in by the other party. It seems, however, that the assumption resembles the representation required to give rise to other forms of estoppel to the extent that it must be "unambiguous and unequivocal"; and this common feature can make it hard to distinguish between these two forms of estoppel ..[54]**

53.    In *Tinkler v Revenue and Customs*[55] Lord Burrows cited with approval the following passage from the judgment of Briggs J in *Revenue and Customs Commissioners v Benchdollar Ltd*[56]:

---

52    See paragraph 18 above.

53    See fn 46 above, and Lewison, *The Interpretation of Contracts* (fn 10 above) at [3.183] –[3.188]

54    Beale (ed), *Chitty on Contracts* (fn 43 above) at [6-116].

55    [2021] UKSC 39 at [45]

56    [2009] EWHC 1310 (Ch), [2010] 1 All ER 174 at [52].

**(i) It is not enough that the common assumption upon which the estoppel is based is merely understood by the parties in the same way. It must be expressly shared between them.**

**(ii) The expression of the common assumption by the party alleged to be estopped must be such that he may properly be said to have assumed some element of responsibility for it, in the sense of conveying to the other party an understanding that he expected the other party to rely upon it.**

**(iii) The person alleging the estoppel must in fact have relied upon the common assumption, to a sufficient extent, rather than merely upon his own independent view of the matter.**

**(iv) That reliance must have occurred in connection with some subsequent mutual dealing between the parties.**

**(v) Some detriment must thereby have been suffered by the person alleging the estoppel, or benefit thereby have been conferred upon the person alleged to be estopped, sufficient to make it unjust or unconscionable for the latter to assert the true legal (or factual) position.**

54. Again, if ED&F and/or the Acer Defendants could show that their actions and/or communications brought them within the scope of this doctrine, it could perhaps preclude the other from asserting the contrary. However, an estoppel by convention does not "prevent a party from relying on the true legal effect (as opposed to the meaning) of an admitted contract merely because the parties have entered into it under a mistaken view as to that effect"[57]. I am also not presently aware of any estoppel by convention case in the Law Reports in which the parties to the contract are themselves in agreement as to its effect, and the dispute is raised (as here) by a stranger to the contract.

*(D2)   Intermediated securities*

*(D2.1)    Intermediation*

55. It is very common in the London market for investors to hold securities in "intermediated" form through a chain of custodians or sub-custodians[58]. As Christopher

---

[57]    Beale (ed), *Chitty on Contracts* (fn 43 above) at [6-125]

[58]    See generally Gullifer and Payne, *Corporate Finance Law: Principles and Policy* (3rd edn, Hart Publishing 2020) ("***Corporate Finance Law***") para [4.6.4] "Shares held through an intermediary".

Twemlow, the Chief Legal Officer of Euroclear UK & Ireland noted in the chapter which he contributed to *Intermediation and Beyond*,[59]:

> **.. Much more commonly, securities are held in intermediated form (referred to as intermediated securities). An intermediary is a person, such as an investment firm, which provides safekeeping, administration or securities account services. Securities are held in intermediated form when an intermediary is interposed between the issuer and the end investor.**
>
> **Intermediated holding fundamentally alters the nature of the entitlement of the holder as they will have an interest in or in relation to securities rather than hold them directly. They generally do not have direct rights against the issuer of the security governed by the law of constitution of the security. Rather they have rights against the intermediary account operator, governed by the law and rules of the book-entry system in which their interests are recorded.**
>
> **.. [A]n intermediary can hold on behalf of either the end investor, or on behalf of another intermediary. That second intermediary may in turn hold on behalf of another intermediary, and so on until the final intermediary who holds on behalf of the end investor. There may therefore be a 'holding chain' of intermediaries between the top tier book-entry records and the end investor, with the end investor being the ultimate account holder ..**

56.    In English law[60], the accepted analysis is that an investor who holds securities through a chain of intermediaries in this way has a beneficial interest in whatever its own intermediary holds on trust or sub-trust for it.

> **.. In each case, the first tier intermediary holds the securities to which it has the legal title on trust for its account holders. If an account holder is itself an intermediary, it will hold its beneficial title under that trust on a sub-trust for its own account holders. This analysis has been approved in a number of decisions, and can safely be said to represent English law ..**[61]

---

[59]    Payne and Gullifer (eds), *Intermediation and Beyond* (Hart Publishing, 2019) ("***Intermediation and Beyond***") Chapter 4 page 86.

[60]    In this respect, there is a significant divergence between the position under English law and that under US law. English law has no direct equivalent to the statutory "Securities Interest" created by Article 8 of the Uniform Commercial Code.

[61]    *Corporate Finance Law* para [4.6.4], citing *Re Lehman Brothers International (Europe) (In Administration) ('Rascals')* [2010] EWHC 2914 (Ch) at [226], per Briggs J; affirmed (without comment on this particular point) [2011] EWCA Civ 1544. (The name 'Rascals'" derives from the semi-acronymic title given by LBIE to its global settlements procedure 'Regulation and Administration of Safe Custody and Global Settlement'); *In re Lehman Brothers International (Europe) Re Lehman Brothers International (Europe) (in administration)* [2012] EWHC 2997 (Ch), [2014] 2 BCLC 295 at [163], per

57.    When securities are held through intermediaries in this way, the ultimate account holder has no direct connection with (and so cannot sue) the company that has issued those securities.  Its rights are only against the intermediaries above (and below, if any) in the chain.  This is usually referred to as the "no look through principle"[62].

> **.. Intermediation separates the person who is economically or .. beneficially entitled to a security (the end investor or ultimate account holder) from the person who, under the statutory or contractual regime that constitutes the security, is recognised (and for some purposes exclusively recognised) as the holder of it, and therefore as entitled to exercise and enjoy the rights attached to or flowing from it ..[63]**

As a result:

> **.. Investors think they continue to own shares, debt, or hybrid securities. They receive statements showing that certain securities are held for them. Such communications suggest that, while these securities are now mostly held indirectly, investors still have what they had when such assets were held in paper form. It is true that investors who hold securities through custodians own something, but that may not be what they think they own ..**

> **.. investors used to have their names entered on the issuer register and were legal owners of the securities. The investor holding through the chain above has an equitable interest in another equitable interest of another equitable interest of a legal interest. From the perspective of the investor, legal rights have been replaced with equitable rights.[64]**

58.    Even so, the system generally works well in practice.

---

Briggs J; and *Secure Capital SA v Credit Suisse AG* [2017] EWCA Civ 1486, [2018] 1 BCLC 325.  Cf also now *SL Claimants v Tesco Plc* [2019] EWHC 2858 (Ch), [2020] Bus LR 250, where Hildyard J (adopting the analysis of Professors McFarlane and Stevens in their chapter in Gullifer and Payne (eds) *Intermediated Securities: Legal Problems and Practical Issues* (Hart Publishing, 2010)) describes (at [19] and [79]) intermediated investors as being given "the benefit of a right without holding the right itself" .. "a right to a right".

[62]    See eg  *Secure Capital SA v Credit Suisse AG* (fn 61 above) at [9]-10].  That case involved immobilised debt securities rather than shares, but the principle is the same.

[63]    Guy Morton in *Intermediation and Beyond*, Chapter 2 p 27.

[64]    Eva Micheler, 'Custody chains and asset values: why crypto-securities are worth contemplating' [2015] CLJ 505 at 506.

> **.. Intermediation has arisen in securities holding chains for a number of sensible reasons, bringing benefits to both ultimate account holders and the wider financial system ..**[65]

While all parties remain solvent and functioning, dividends (or coupon and redemption payments) will automatically flow down the chain to the Ultimate Account Holder, and voting instructions, *etc.*, will be passed up. Even if one of the intermediaries becomes insolvent, the chain of trusts and sub-trusts will usually ensure that this payment flow occurs. For most practical purposes, the Ultimate Account Holder need not and will not consciously be aware of the intermediated nature of their "ownership" of their shares.

### (D2.2)  Segregated and pooled accounts

59.    There are two main ways in which a custodian or other intermediary can structure the accounts which it holds for its investor clients. The first is that all the securities held by the intermediary (except those designated in any house account) can be held in a "pooled" or "omnibus" client account for all its own account holders.   Another possibility is that each intermediary holds the number of securities held for each ultimate account holder in a segregated account.  This is in one sense less risky for the clients, since there is less likelihood of a shortfall.  However, if there is a shortfall it will fall entirely on the particular clients concerned.  It is also administratively complex, and so is rarely encountered in practice.

60.    As I understand the position, it is ED&F's case that all of its customers' interest in the Danish shares which are the subject of these proceedings were in intermediated form and were held in pooled omnibus accounts at BNP and SEB[66].

61.    One of the advantages of the use of "pooled" or "omnibus" accounts is that it enables transfers to be made at the lowest common tier, without them having to be recorded all the way up the chain. Further

> **.. [T]hrough aggregation and netting it reduces the number of actual transfers that have to be made in the system to far fewer than the number of actual transactions.  Another advantage is that the resulting large pools of securities can be used for securities lending, for repos and as**

---

[65]    Christopher Twemlow in *Intermediation and Beyond,* Chapter 4 p 107.

[66]    "In relation to the holding of Danish shares on behalf of the PPs, [ED&F] set up accounts with its sub-custodians [as defined in clause 2.2 of the Custody Agreement]  BNP Paribas S.A. ("**BNP**") and Skandinaviska Enskilda Banken AB (Denmark) ("**SEB**") for the purpose of holding client shares and client cash (in DKK) which: (1) (between August 2012 and April 2013) were held in segregated client accounts at BNP in the name of each PP .. ; and (2) (after April 2013) were held in single pooled Danish share and DKK omnibus accounts at BNP and SEB": draft Schedule of Agreed Facts in the English Proceedings, para 24.  See also para 10.5 of the Re-Amended Defence and para 4.2.4.2 of the Defence to Re-Amended Schedule 5T.

> **collateral, which has the effect of earning money for the intermediaries and reducing the cost of the holding system for the account holders ..**[67]

62.     As indicated in paragraph 56 above, an investor whose securities are held in such a pooled account has a beneficial interest in whatever its own intermediary holds on trust or sub-trust for it, either in an unallocated part of the bulk[68] or (more probably) as a beneficial co-ownership interest in the whole pool[69]. One consequence of the intermediated system is that the transfer of such an interest will sometimes require no more than accounting entries in the books of the common custodian.

> **.. To take the simplest case, where the transferor and the transferee have accounts with the same intermediary, a debit entry is made in the account of the transferor and a credit entry in the account of the transferee. The effect of these entries is that the transferee replaces the transferor (as regards the securities transferred) as a co-beneficiary under the trust whereby the intermediary holds its own co-ownership interest on trust for those of its account holders who own those particular securities ..**[70]

63.     In other cases:

> **The book entries become more complicated when the parties have accounts with different intermediaries, since debit and credit entries must be made up the chain until two intermediaries have accounts with the same higher-tier intermediary, but the effect is the same: the transferor ceases to be a beneficiary in relation to that co-ownership interest and the transferee becomes a beneficiary ..**[71]

64.     The frequent use of netting in the settlement of securities transactions means that there is rarely a straight 'transfer' from A to B.  As a result:

> **.. unless the transferor and transferee both have accounts with the same intermediary, the operation of the tiered system, and in particular the occurrence of netting, means that the intermediary of the transferee will make a credit entry without knowing where the 'securities' it is crediting come from ..**

---

[67]     Louise Gullifer and Jennifer Payne in *Intermediation and Beyond*, Chapter 1 page 12.

[68]     Cf *Hunter v Moss* [1994] 1 WLR 452)

[69]     This was the analysis of Briggs J in the *Rascals* case (fn 60 above): and see Victoria Dixon in *Intermediation and Beyond* Chapter 3 pages 64 to 66.

[70]     *Corporate Finance Law* para [9.2.6.2] "Transfer of Intermediated Securities", which argues that "the most appropriate analysis would seem to be some sort of novation, in that the transferor's beneficial interest no longer exists and has been replaced by the new beneficial interest of the transferee".  See to similar effect, Smith and Leslie, *The Law of Assignment* (3rd edn, OUP 2018) para 19.148

[71]     *Corporate Finance Law* para [9.2.6.2].

> **.. because of the use of netting in the settlement system, it is often difficult or impossible to track the exact recipient of 'transferred' securities ..** [72]

65.    As the authorities referred to in the footnotes to paragraphs 61 to 64 above indicate, the law relating to the transfer of title of the sort of book-entry interests which result from the intermediation of securities is not straightforward, and (so far as I am aware) has not been fully considered in any decided case.  However, it seems to me to be at least well-arguable (as the quotations set out above illustrate[73]) that such a transfer (even in the case of a financial collateral arrangement) requires accounting entries to be made in the (usually computerised) records of the relevant intermediary or intermediaries in order to be effective[74].

### (D3)    Financial Collateral Arrangements

66.    Until 2003, the UK did not have a special regime covering security taken over money, shares, debt securities and the like.  However in 2003 the UK, as a Member State of the European Union, became obliged to implement Directive 2002/47/EC of the European Parliament and of the Council of 6 June 2002 on financial collateral arrangements[75] ("the **FCD**").  It did so (and, in the process "gold-plated" the requirements of the FCD so as to extend beyond the capital markets) by the Financial Collateral Arrangements (No 2) Regulations 2003[76] ("the **FCARs**").

67.    The FCARs introduced into UK law the concept of a "financial collateral arrangement" and, in relation to such "financial collateral arrangements", (a) disapplied or modified various provisions of the law relating to formalities, (b) disapplied or modified various provisions of English insolvency law, (c) recognised or formalised the concept of security by title transfer, and (d) in relation to other forms of security, introduced or

---

[72]    *Ibid*.

[73]    See also Smith and Leslie, The Law of Assignment (fn 70 above) paras 19.136 to 149.  Cf *SL Claimants v Tesco plc* [2019] EWHC 2858 (Ch), [2020] Bus LR 250 at [20].per Hildyard J (speaking of dematerialised securities). Because a TTFCA involves a transfer of title from the collateral provider to the collateral taker, it requires something more than would be required for the kind of charge (which leaves ownership with the charger) considered by Briggs J in *Re Lehman Brothers International Europe* [2012] EWHC 2997 (Ch).

[74]    This is also a regulatory requirement: see paras 75 and 76 below.  It also appears to have been a requirement of ED&F's own CMA Policy (see paras 94 and 95 below) and to be ED&F's case as to what ED&F actually did in practice: see paras 60.2  and 63 of the draft Schedule of Agreed Facts in the English Proceedings.

[75]    Subsequently amended by Directive 2009/44/EC.

[76]    SI 2003 No 3226, as subsequently amended by SI 2009 No 2462, SI 2010 No 2993, and SI 2014 No 3348.   The Financial Markets and Insolvency (Amendment and Transitional Provision) (EU Exit) Regulations 2019, SI 2019 No 341 amended the Regulations, by removing references to EU law. Pursuant to the provisions of the European Union Withdrawal Act 2018, the Regulations (as "EU-derived domestic legislation") continue to apply under UK domestic law.

confirmed the validity of "right of use" provisions, and introduced the remedy of "appropriation".

68.     In the FCARs, "financial collateral" is defined as meaning cash[77], financial instruments[78] or (from 2011) credit claims[79]: and a "financial collateral arrangement" is defined as either:

68.1    A title transfer financial collateral arrangement (a "**TTFCA**") – defined as: ".. an agreement or arrangement, including a repurchase agreement, evidenced in writing, where—(a) the purpose of the agreement or arrangement is to secure or otherwise cover the relevant financial obligations owed to the collateral-taker; (b) the collateral-provider transfers legal and beneficial ownership in financial collateral to a collateral-taker on terms that when the relevant financial obligations are discharged the collateral-taker must transfer legal and beneficial ownership of equivalent financial collateral to the collateral-provider; and (c) the collateral-provider and the collateral-taker are both non-natural persons.. ";

        or

68.2    A security financial collateral arrangement (a "**Security FCA**") – defined as: ".. an agreement or arrangement, evidenced in writing, where—(a) the purpose of the agreement or arrangement is to secure the relevant financial obligations owed to the collateral-taker; (b) the collateral-provider creates or there arises a security interest in financial collateral to secure those obligations; (c) the financial collateral is delivered, transferred, held, registered or otherwise designated so as to be in the possession or under the control of the collateral-taker or a person acting on its behalf; any right of the collateral-provider to substitute financial collateral of the same or greater value or withdraw excess

---

[77]    "'Cash' means money in any currency, credited to an account, or a similar claim for repayment of money and includes money market deposits and sums due or payable to, or received between the parties in connection with the operation of a financial collateral arrangement or a close-out netting provision": FCARs reg 3.

[78]    "'Financial instruments' means (a) shares in companies and other securities equivalent to shares in companies; (b) bonds and other forms of instruments giving rise to or acknowledging indebtedness if these are tradeable on the capital market; and (c)any other securities which are normally dealt in and which give the right to acquire any such shares, bonds, instruments or other securities by subscription, purchase or exchange or which give rise to a cash settlement (excluding instruments of payment) and includes units of a collective investment scheme within the meaning of [FSMA 2000], eligible debt securities within the meaning of the Uncertificated Securities Regulations 2001, money market instruments, claims relating to or rights in or in respect of any of the financial instruments included in this definition and any rights, privileges or benefits attached to or arising from any such financial instruments": FCARs reg 3. This definition is wide enough to include interests in dematerialised and/or intermediated securities.

[79]    "'Credit claims' means pecuniary claims which arise out of an agreement whereby a credit institution .. grants credit in the form of a loan": FCARs reg 3.

financial collateral or to collect the proceeds of credit claims until further notice shall not prevent the financial collateral being in the possession or under the control of the collateral-taker; and (d) the collateral-provider and the collateral-taker are both non-natural persons"

whether or not these are covered by a master agreement or general terms and conditions.

69.  A TTFCA involves the transfer of "legal and beneficial ownership" of the financial collateral to the collateral taker, on terms that "when the relevant financial obligations are discharged the collateral-taker must transfer legal and beneficial ownership of equivalent financial collateral[80] to the collateral-provider". By contrast, a Security FCA gives the collateral taker only a security interest[81] in the financial collateral. Under a TTFCA, the collateral provider is therefore exposed to the credit risk of the collateral taker, and does not have the security (eg in the insolvency of the collateral taker) of a continuing proprietary interest in the collateral.

70.  However, where the terms of the financial collateral agreement so provide, Reg 16 of the FCARs equates the position under a Security FCA to that under a TTFCA, by allowing the parties to agree that the collateral taker (although it only has a security interest) can nevertheless use and dispose of the financial collateral as if it were the owner of it[82]:

> **(1) If a security financial collateral arrangement provides for the collateral-taker to use and dispose of any financial collateral provided under the arrangement, as if it were the owner of it, the collateral-taker may do so in accordance with the terms of the arrangement.**

---

[80]  "'Equivalent financial collateral' means— (a) in relation to cash, a payment of the same amount and in the same currency; (b) in relation to financial instruments, financial instruments of the same issuer or debtor, forming part of the same issue or class and of the same nominal amount, currency and description or, where the financial collateral arrangement provides for the transfer of other assets following the occurrence of any event relating to or affecting any financial instruments provided as financial collateral, those other assets; and includes the original financial collateral provided under the arrangement": FCARs Reg 3.

[81]  "'Security interest' means any legal or equitable interest or any right in security, other than a title transfer financial collateral arrangement, created or otherwise arising by way of security including—(a) a pledge; (b) a mortgage; (c) a fixed charge; (d) a charge created as a floating charge where the financial collateral charged is delivered, transferred, held, registered or otherwise designated so as to be in the possession or under the control of the collateral-taker or a person acting on its behalf; any right of the collateral-provider to substitute financial collateral of the same or greater value or withdraw excess financial collateral or to collect the proceeds of credit claims until further notice shall not prevent the financial collateral being in the possession or under the control of the collateral-taker; or (e) a lien": FCARs Reg 3.

[82]  In *Re Lehman Brothers International (Europe) (In Administration)* [2009] EWHC 2545 (Ch) Briggs J held that such a right of use is not inconsistent with existence of the trust on which a custodian generally holds its clients' securities. See M Yates, 'Custody, prime brokerage and right of use: a problematic coalition?' (2010) 7 JIBFL 397; and R Salter, 'Securities lending: does a "right of use" prevent the existence of a trust?' (2020) 12 JIBFL 738.

> **(2) If a collateral-taker exercises such a right of use, it is obliged to replace the original financial collateral by transferring equivalent financial collateral on or before the due date for the performance of the relevant financial obligations covered by the arrangement or, if the arrangement so provides, it may set off the value of the equivalent financial collateral against or apply it in discharge of the relevant financial obligations in accordance with the terms of the arrangement.**

> **(3) The equivalent financial collateral which is transferred in discharge of an obligation as described in paragraph (2), shall be subject to the same terms of the security financial collateral arrangement as the original financial collateral was subject to and shall be treated as having been provided under the security financial collateral arrangement at the same time as the original financial collateral was first provided.**

71.     The potential significance of this for the present case is that, under the FCARs, it is possible in principle for the collateral taker to have the right to re-hypothecate or otherwise deal with the collateral, whether that collateral has been provided under a TTFCA or under a Security FCA.

72.     The FCD introduced the concept of "book entry securities collateral', which is defined in Article 1(g) to mean:

> **.. financial collateral provided under a financial collateral arrangement which consists of financial instruments, *title to which is evidenced by entries in a register or account maintained by or on behalf of an intermediary* ..**[83]

Article 1.5 goes on to state that:

> **5. This Directive applies to financial collateral once it has been provided and if that provision can be evidenced in writing.**

> ***The evidencing of the provision of financial collateral must allow for the identification of the financial collateral to which it applies. For this purpose, it is sufficient to prove that the book entry securities collateral has been credited to, or forms a credit in, the relevant account* and that the cash collateral has been credited to, or forms a credit in, a designated account**[84].

---

[83]     Emphasis added.

[84]     Emphasis added.

27

73. These provisions are reflected in the FCARs, which contain a similar definition of "book entry securities collateral"[85], and a definition of "relevant account":

> **"relevant account" means, in relation to book entry securities collateral which is subject to a financial collateral arrangement, *the register or account*, which may be maintained by the collateral-taker, *in which entries are made, by which that book entry securities collateral is transferred or designated* so as to be in the possession or under the control of the collateral-taker or a person acting on its behalf**

74. These provisions of the FCD and the FCARs seem to me to be consistent with the proposition which I have advanced in paragraph 65 above - that a transfer of a book-entry interest in intermediated securities, even in the case of a financial collateral arrangement, requires accounting entries to be made in the computerised records of the relevant intermediary or intermediaries in order to be effective – and to have been drafted on the assumption that that proposition is correct.

75. Another indication of the correctness of that proposition is to be found in the regulatory provisions covering ED&F's activities. The activities with which this case is concerned were regulated activities for the purposes of the Financial Services and Markets Act 2000 ("**FSMA**")[86] and (in 2012) ED&F was authorised and regulated in carrying on those activities by the Financial Services Authority[87]. The relevant regulatory rules were contained in the "**CASS**" section of the FSA's Handbook. Two provisions of CASS are, in my view, of particular relevance to this case.

---

[85]    "[F]inancial collateral subject to a financial collateral arrangement which consists of financial instruments, title to which is evidenced by entries in a register or account maintained by or on behalf of an intermediary"; FCARs Reg 3(1).

[86]    The Financial Services and Markets Act 2000 (Regulated Activities) Order 2001 ("the **RAO**") specifies the kinds of activities which fall within FSMA s 22(1) and which (if carried on by way of business and relating to an investment of a kind specified in Part III of the RAO) will therefore be regulated activities for the purposes of the Act. Article 40 of the RAO makes the safeguarding and administering of investments, generally speaking, a regulated activity for the purposes of FSMA.

[87]    In the aftermath of the financial crisis of 2007-2008, the UK government decided to restructure financial regulation and to replace the FSA with two new regulatory agencies, the Financial Conduct Authority and the Prudential Regulation Authority of the Bank of England. These changes were effected by the Financial Services Act 2012, and came into force from 1 April 2013.

75.1    First, CASS 6.5.[88] required a regulated firm such as ED&F clearly to distinguish in its records and accounts between those assets which belonged to its clients and those which belonged to ED&F itself[89].

75.2    Secondly (and consistent with that approach), the guidance in CASS 3.1.7[90] assumed that a firm exercising its rights under a TTFCA to treat what would otherwise be a client asset as its own would do so by "clearly so identifying the asset in its own books and records": and the guidance in CASS 3.2.3[91] indicated that, unless and until the firm so exercised its rights, the custody rules in CASS 6 would continue to apply.

76.    The significance of this for the present case is that (in addition to the considerations dealt with in paragraphs 65 and 74 above) it also suggests that relevant entries would have been needed to have been made in ED&F's records and accounts before title to the interests in the Danish Shares could have passed under the TTFCA provisions in Clause 10(b)(ii) from the relevant Acer Defendant to ED&F.

---

[88]    CASS 6.5.1 and 6.5.2 provided that "A firm must keep such records and accounts as necessary to enable it at any time and without delay to distinguish safe custody assets held for one client from safe custody assets held for any other client, and from the firm's own applicable assets. A firm must maintain its records and accounts in a way that ensures their accuracy, and in particular their correspondence to the safe custody assets held for clients".

[89]    Other provisions of the FSA Handbook dealt with communications with clients, to ensure their accuracy. Inter alia, COBS 4.3 required ED&F to ensure that any "communication [in relation to designated investment business such as safeguarding and administering investments in securities] is fair, clear and not misleading"  COBS 16.3.1 provided that "(1) If a firm is managing investments on behalf of a client, it must provide the client with a periodic statement in a durable medium unless such a statement is provided by another person".  COBS 16.3.3 Provided that "1) If the client elects to receive information about executed transactions on a transaction-by-transaction basis, a firm managing investments must provide promptly to the client, on the execution of a transaction, the essential information concerning that transaction in a durable medium."  SUP 17 Annex 1 specified the minimum content of a transaction report.  See also COBS 16.1 which provided that "A firm must ensure in relation to MiFID or equivalent third country business that a client receives adequate reports on the services provided to it by the firm".

[90]    Which provided that ".. under a 'right to use arrangement', the client has transferred to the firm the legal title and associated rights to the asset, so that when the firm exercises its right to treat the asset as its own, the asset ceases to belong to the client and in effect becomes the firm's asset and is no longer in need of the full range of client asset protection. The firm may exercise its right to treat the asset as its own by, for example, clearly so identifying the asset in its own books and records" (emphasis added).

[91]    Which provided that "If the firm has the right to use the client's asset under a 'right to use arrangement' but has not yet exercised its right to treat the asset as its own, the client money rules or the custody rules will continue to apply as appropriate until such time as the firm exercises its right".

## (E)    Interpreting the agreements in the "Contract Suite"

### (E1)    *The role of an expert witness*

77.    Under the laws of evidence and the rules of procedure that are applicable in the English courts it would not usually be the role of an expert witness to express a view as to the way in which a foreign court would (or should) interpret the documents in issue.

78.    I have nevertheless been told that the rules of procedure in the New York Court are different, and that the New York Court may consider all relevant opinions on issues of foreign law, even where such opinion is not evidence.  Thus, I understand that it could help the Court for me (like Ms Toube) to express my view on the interpretation which an English court would be likely to put on the documents in this case.

79.    Since the process of contractual interpretation under English law requires the court to consider the wider documentary, factual and commercial context, including "all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract"[92], I have asked to be provided with copies of a representative selection (which I have listed in Schedule B) of relevant background documents.  The documents with which I have been supplied include copies of a small selection of the Account Statements produced by ED&F for the Acer Defendants.  I note that, in paragraph 35 of her Expert Report, Ms Toube states that she has not seen copies of any of these.  I also note that she does not refer to (and so may perhaps not have seen) many of the background documents which I consider to be highly relevant to the issues upon which we have both been asked to express our views.

80.    In order to avoid confusion, I will adopt the capitalised abbreviations used by Ms Toube.

### (E2)    *Ms Toube's views.*

81.    Ms Toube's views appear to me to be summarised in the subheadings to subsection B of the Analysis section of her Expert Report:

81.1    "(a) Pursuant to the Terms, all right title and interest to the Securities transferred to ED&F when financing was provided to the [Acer Defendants]"

81.2    "(b) The Custody Agreement is not applicable when ED&F provided financing for the purchase of the Danish shares"

---

[92]    *See* paragraphs 16 to 18 above.

81.3    "(c) Title to the Securities transferred to ED&F"

81.4    "(d) The Security Deed supplemented and did not supersede the Terms"

82.    In short, it appears to be Ms Toube's view that, on the true interpretation of the agreements making up the Contract Suite:

82.1    Securities purchased using funds advanced by ED&F would not be held as safe custody assets pursuant to the Custody Agreement.

82.2    Instead, all right title and interest to those securities would pass automatically (and without any further action on the part of ED&F) at the moment those securities or interests were delivered to ED&F, pursuant to the TTFCA provisions in clause 10(b)(ii) of the Terms.

83.    I respectfully disagree.   In my opinion an English court would be likely to hold that the rights conferred on ED&F by clause 10(b)(ii) of the Terms required some act of exercise on the part of ED&F before title would pass from the Acer Defendant concerned to ED&F.   Until that point, the assets of the relevant Acer Defendant would remain the property of that Acer Defendant, held in custody by ED&F pursuant to the Custody Agreement (and subject to the Security Deed).   In my view, that is the effect in English law and the correct interpretation of these contractual provisions. It is also, unlike the interpretation for which Ms Toube contends, a result which accords with business common sense by giving effect to the aim and overall shared commercial purpose of these arrangements.

*(E3)*   *The case advanced by ED&F and the Acer Defendants*

84.    As I understand the position, it is not the case of ED&F or of the Acer Defendants that clause 10(b)(ii) of the Terms has no application at all to the present case.   Their case is, instead, that no transfer of title under clause 10(b)(ii) would occur until ED&F asserted its rights, and that ED&F had agreed with the Acer Defendants not to do so (and, in fact, did not do so) in any particular case until after the relevant Reference Date[93], thus ensuring that the Danish Shares were held in custody for (and so were beneficially owned by) the relevant Acer Defendant on that date.

---

[93]    The Reference Date refers to the date at which the holder of a dividend-bearing share needed to have acquired (and continued to hold) the share in order to be eligible for the dividend.  See Response 1 of ED&F Man's Response to Claimant's Request Dated 2 March 2021 for Further Information under Part 18.

85.   In paragraph 10.4 of its Re-Amended Defence in the English Proceedings, ED&F pleads that the acquisition and subsequent sale by the Acer Defendants of the securities which are in issue in this case took place (in general) by the following process:

> **10.4.1. on a date prior to the Reference Date ("the Trade Date"), ED&F Man would**
>
> **(1) (upon instruction from the PP's Investment Manager) purchase the Security by means of an over-the-counter transaction;**
>
> **(2) on a principal to principal basis, on sell the Security to the PP; and**
>
> **(3) enable the PP to enter into a transaction to hedge the risk of adverse market movements in the value of the Security ("the Hedge");**
>
> **alternatively**
>
> **10.4.2. on the Trade Date, the PP would recall the Security from ED&F Man by way of redelivery of equivalent securities pursuant to ED&F Man's obligation to replace securities provided by the PP to ED&F Man as financial collateral;**
>
> **10.4.3. from the Trade Date (and pursuant to (1) [The Custody Agreement] (utilising the client securities and cash accounts defined therein (together "the Custody Account")); and (2) [the Security Deed] .. ED&F Man would (1) hold the Security as a bare trustee on behalf of the PP in the Custody Account; and (2) hold a charge over the Security and the Custody Account; accordingly**
>
> **10.4.4. on the Reference Date, which would fall at least one day after the Trade Date, ED&F Man would hold the Security as a bare trustee on behalf of the PP in the Custody Account;**

86.   According to paragraph 34 and following of the draft Schedule of Agreed Facts in the English Proceedings, each of these stages would be evidenced in the trading records held by ED&F. In particular:

   86.1   The purchase mentioned in paragraph 10.4.1 would result in an entry to ED&F's settlement system (called "Shadow", with the entry being referred to as a "Shadow Entry"[94]) and a "Purchase Entry" in the relevant Acer Defendant's Equity Account[95].

---

94      See para 53 of the draft Schedule of Agreed Facts.

95      See para 40 of the draft Schedule of Agreed Facts.

86.2    The "recall" mentioned in paragraph 10.4.2 would result in a "Recall Entry". This is described in paragraph 41 of the draft Schedule of Agreed Facts as arising:

> **.. in the context of (1) ED&F Man having exercised its right (in accordance with Clause 10 (b) (ii) of the ED&F Man Terms) to transfer to itself assets purchased by the PP (the Danish shares) in order to cover debts owed by the PP to ED&F Man; and (2) the PP having exercised its right (in accordance with the same Clause 10(b)(ii)) to request the re-transfer of equivalent assets to the Danish shares. The Recall Entry then records a commensurate reduction in the Danish shares previously transferred to and held by ED&F Man.**

87.    Thereafter (according to paragraphs 60 and 64 of the draft Schedule of Agreed Facts), at some point after the Reference Date, ED&F would either sell Danish Shares on the instructions of the Investment Manager for the relevant Acer Defendant, or:

> **.. exercise .. its right to transfer title to the [Danish Shares] to itself pursuant to Clause 10(b)(ii) of the ED&F Man Terms; and record .. this as a "borrow" in the PP's B-loan account (with the PP retaining its right, also pursuant to Clause 10 (b) (ii) of the ED&F Man Terms, to a retransfer of equivalent assets .. upon request).**

88.    The issue in dispute is therefore a comparatively narrow one, as to whether (as SKAT now contends) transfer of title under clause 10(b)(ii) takes place automatically whenever the purchase of the security is funded by ED&F or the relevant Acer Defendant is otherwise indebted to ED&F; or whether (as ED&F and the Acer Defendants contend), the transfer of title does not take place unless and until ED&F in fact exercises its rights.

## (E4)    *The facts assumed by Ms Toube*

89.    In paragraphs 12 to 18 of her Expert Report, Ms Toube sets out her understanding (which she says has been derived from the documents with which she has been provided) of the factual background on which she appears to base her views.    My comments on the factual matters set out in those paragraphs are these:

89.1    The matters set out by Ms Toube in sub paragraphs (1) to (3) of paragraph 12 of her Expert Report accord with my understanding (from the various documents with which I also have been provided) of the background to this dispute.

89.2    I understand that the statement in sub-paragraph 12(4), that ED&F "generated 'tax voucher' documents for the Pension Plans' applications," and the statement in sub-paragraph 12(5), that "at all material times there were sums owed by [the Acer Defendants] to ED&F" may at least to some extent be in dispute[96]. However, it is not my function as an expert witness to resolve disputed issues of fact. For the sake of simplicity and consistency, I will therefore assume, simply for the purposes of this Report, that these matters are also correct.

89.3    In paragraphs 13 and 14 of her Expert Report, Ms Toube sets out her understanding of the documents making up what she terms the "Contract Suite" of relevant agreements between ED&F and the Acer Defendants. With three additions, this again accords with my understanding of the identity of the various contractual documents (other than those related to specific transactions) which at various points were entered into between ED&F and the Acer Defendants. Those additions are:

89.3.1.    The Application Form signed on behalf of each of the Acer Defendants[97]. This states that the relevant Acer Defendant intends to place stock with ED&F on a Custody basis. It also states that "By completing and signing this Application Form we acknowledge that .. We accept [the Terms] and in particular we: .. (v) accept that assets placed with [ED&F] will be dealt with in accordance with of Clause 10(b) of [the Terms] (Assets Transferred) and confirmed in our Cover Letter or unless otherwise agreed separately".

89.3.2.    The letter dated 13 June 2012 which (inter alia) confirms authority to enter into the ISDA Master Agreement, the GMSLA 2000 Agreement, the Security Deed and the Custody Agreement.

89.3.3.    The Fee Agreement Letter dated 21 June 2012 (mentioned by Ms Toube in footnote 7 but not in the body of her Expert Report). This provided for the payment by the Acer Defendants of a "Custodian Fee" "in consideration of the custodian and related services provided by [ED&F]" in connection with the [Security Deed], the ISDA Master Agreement, the Custody Agreement and [the Terms]".

---

[96]    At the Deposition Transcript references given by Ms Toube, pages 81-88 of the Transcript, Mr. Shahab Hashemi of ED&F says "One of the services the equity finance desk provided was securities financing to the pension plans .. providing the capital for the pension plans to acquire shares". That is not, at least in terms, a statement that sums were owing at all material times.

[97]    I have only seen a copy of the Riverside Associates Defined Benefit Plan form, but understand that all of the Acer Defendants executed substantially identical versions.

89.4    In paragraph 15 of her Expert Report, Ms Toube refers to ED&F's CMA Policy. I have seen no evidence that a copy of the CMA Policy was provided by ED&F to the Acer Defendants at any relevant time, and Ms Toube does not say in her Expert Report that it was. For the reasons explained in paragraph 18 above, the CMA Policy would not (in English law) be relevant or admissible as an aid to the interpretation of any of the documents in the Contract Suite unless it was known or reasonably available, not just to ED&F, but to the relevant Acer Defendant, before they entered into the relevant agreement[98].

89.5    As Ms Toube says in paragraph 16 of her Expert Report, it is also my understanding that all the relevant agreements were governed by English law.

89.6    Paragraph 17 appears to be a conclusion with regard to the interrelationship between the Terms and the other documents in the Contract Suite - specifically the Custody Agreement and the Security Deed. My own (contrary) conclusions on that issue are set out later in this Report.

89.7    Paragraph 18 of Ms Toube's Expert Report states a number of matters of fact which she says are "common ground". I understand that at least some of these matters may be in dispute and so are not truly "common ground". However, for the sake of simplicity and consistency, I shall again assume the correctness of these matters for the purposes of this Report.

90.    The facts summarised by Ms Toube, and the information with which she appears to have been provided, seem to me to be limited to that necessary to support the interpretation for which she argues. In paragraphs 114 and 115 below, I set out a number of further matters which I believe that an English court would also regard as relevant to the issues of interpretation on which I have been asked to state my views.

*(E3)    Ms Toube's opinion*

91.    In paragraphs 26 to 29, Ms Toube sets out extracts from the Terms, the two Variation Letters, and the Client Categorisation Letter. From this material, she derives two conclusions:

91.1    That the Acer Defendants had agreed to and were bound by the Terms; and

91.2    That the Terms include (in clause 10(b)(ii)) a TTFCA provision.

92.    To the extent set out in paragraph 91 above, I agree with both of those conclusions.

---

[98]    For an explanation of why the CMA Policy is, in any event, not helpful to SKAT's case, see paragraphs 94 and 95 below.

92.1    As to the first, apart from the matters referred to by Ms Toube:

    92.1.1.    The Application Forms referred to in paragraph 89.3.1 above specifically state that "By completing and signing this Application Form we acknowledge that ..  We accept [ED&F] Terms of Business";

    92.1.2.    The Fee Agreement Letter referred to in paragraph 89.3.3 above refers to "any applicable terms of business under which you receive services from us in any capacity";

    92.1.3.    Clause 20(j) of the Custody Agreement refers to "any Terms of Business (as defined in the [Security Deed])";

    92.1.4.    The Security Deed defined "Terms of Business" as meaning "any applicable terms of business under which the Chargee, in any capacity, provides services to the Chargor", includes "Terms of Business" as one of the "Transaction Documents" and refers (in clause 14(b)) to the rights of set-off conferred by that clause being "in addition to the Chargee's rights under any Terms of Business".

92.2    As to the second, it is plain from the terms of clauses 10(b)(ii) and 10(c) that they make provision for a TTFCA in relation to any financial collateral client assets to which those clauses apply.  The issue, of course, is as how and when this TTFCA provision is intended to operate.

93.    I do not, however, agree with Ms Toube's conclusion in paragraph 31 of her Expert Report, that the Terms are "the general provisions that govern the relationships between ED&F and the [Acer Defendants] in relation to the holding of collateral, and provide for collateral to be held subject to the [TTFCA] in the Terms" - at least in relation to the transactions which are the subject-matter of this case.  Of the four reasons given for this conclusion by Ms Toube in paragraph 31:

93.1    The first is an application of one of the "canons of construction". As such it is simply a pointer (as I have tried to explain in paragraphs 34 and 35 above) which - depending upon the circumstances - may or may not be useful as an aid to interpretation.

93.2    The second and third look only at the wording of the Terms and the Variation Letters. As I explain later in this Report, this (in my view) ignores crucial aspects of the wider documentary, factual and commercial context

36

93.3    The fourth reason given by Ms Toube (which relies on the terms of the CMA Policy) is, for the reasons explained in paragraphs 18 and 89.4 above, based upon something which (in my opinion) an English court would not take into account or regard as admissible as an aid to interpretation.

94.    It may, perhaps, be helpful nevertheless to say a little more at this point about the CMA Policy, since Ms Toube relies upon it, not just here but also in paragraph 43 of her Expert Report.    As stated in sub-paragraph 93.3 above, since this document does not appear to have been seen by the Acer Defendants, an English court would not regard it as admissible as an aid to interpretation of the agreements in the Contract Suite. However, were it nevertheless to be treated as an admissible aid to interpretation, it would not (in my opinion) assist SKAT's argument in the way suggested in these paragraphs of Ms Toube's Expert Report.

94.1    As Ms Toube correctly points out, Section III Clause 1.1 of the CMA Policy (Purpose) provides that:

> **"In the course of its regulated business, MCM holds and controls non-cash assets on behalf of clients either as collateral or in custody arrangements. The FCA CASS rules (the "rules") in particular CASS 3 (collateral) and CASS 6 (Custody) requires the firm to have in place organisational arrangements to ensure an adequate level of protection is afforded to non-cash assets deposited with the firm.**

As Ms Toube says in paragraph 43 of her Expert Report, this (unsurprisingly) indicates that ED&F treated assets held in custody and assets held as collateral separately and distinctly from each other.

94.2    That distinction is reflected in Section III Clause 2 (Non-Cash Collateral) of the CMA Policy, which (as required by CASS 3.1.7[99] and CASS 6.5[100]) provides for non-cash assets that are to be held as collateral under TTFCAs to be transferred into ED&F's own name, and for ED&F to maintain records to ensure that clients (such as the Acer Defendants) are able to distinguish those assets held as collateral and those assets held in safe custody in the daily statements sent to them.

> **2.1 [ED&F] will, as part of its business activities, accept non-cash assets from nonretail Clients under the Title Transfer**

---

[99]    See fn 90 above.

[100]    See fn 88 above.

Collateral Provisions (TTCA) of CASS 6.1.6[101] and CASS 7.2.3[102] (respectively) which it uses to secure obligations from those clients ("Collateral").

**2.2 In respect of [ED&F] Clients, <u>the non-cash assets held by [ED&F] shall be transferred into the firm's name upon receipt</u> with only an obligation to return equivalent assets to the client concerned upon satisfaction of a client's obligations to the firm.**

**2.3 [ED&F] will maintain records to ensure that collateral held is identifiable and <u>clients are able to distinguish those assets held as collateral and those assets held in safe custody in the periodic statements sent to them</u>**.[103]

94.3    That distinction is also reflected in Section III Clauses 3.1 and 3.2 (Custody) of the CMA Policy which provide that:

**3.1 [ED&F] maintains separate internal accounts for safe custody assets received from each individual client to whom a custody facility is made available. At each Custodian MCM maintains a separate account for safe custody assets belonging to clients to ensure that such safe custody assets are identifiable from those of the firm.**

**3.2 In relation to [ED&F] Clients who have duly executed the [Security Deed], safe custody assets will be held as custody until such time as the fixed and/or floating charge upon them is exercised.**

94.4    As I understand the facts of the present case[104]:

94.4.1.    The Danish Shares were not transferred into ED&F's name upon receipt;

94.4.2.    Nor did ED&F maintain records which identified the Danish Shares as collateral on the relevant Reference Dates. On the contrary,

---

[101]    Which provided that "The custody rules do not apply where a client transfers full ownership of a safe custody asset to a firm for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations".

[102]    Which provided that "Where a client transfers full ownership of money to a firm for the purpose of securing or otherwise covering present or future, actual or contingent or prospective obligations, such money should no longer be regarded as client money".

[103]    Emphasis added.

[104]    See paragraph 98 below.

38

ED&F's own records and the periodic statements sent to the Acer Defendants indicated that, on those dates, the Danish Shares were held in safe custody for (ie were owned beneficially by) the Acer Defendants.

95.    It therefore seems to me that, were an English court to take the CMA Policy into account, it would be likely to hold that it supported the case of ED&F and of the Acer Defendants that the Danish Shares were in fact being held by ED&F, in accordance with these provisions of the CMA Policy, "as custody" under the terms of the Custody Agreement and the Security Deed.

96.    For each and all of these reasons, I therefore do not agree with the conclusions stated in paragraph 32 of Ms Toube's Expert Report, which derive from her paragraph 31 conclusions.

97.    In paragraphs 33 and 34, Ms Toube sets out ED&F's position, as explained in a letter dated 13 July 2020 from ED&F's London solicitors, Rosenblatt.  As recorded in that letter, part of the case being advanced on behalf of ED&F is that the (intermediated book-entry) interests in the Danish Shares and their dividends were at the material times (ie over the relevant Reference Dates) treated and recorded (both in the records which ED&F was required to keep and in the client statements which it was required to provide to the Acer Defendants) as being held in custody by ED&F for,  and beneficially owned by, the Acer Defendants, and not as being owned by ED&F.

98.    This letter reflects that fact that it is part of ED&F's case and of the Acer Defendants' case that:

   98.1    Under clause 2 of the Custody Agreement

      98.1.1.    Each Acer Defendant appointed ED&F "to act as bare trustee for the purposes of safekeeping" (inter alia) "any securities (including evidence thereof, evidence of title thereto and all rights in respect thereof) deposited or transferred by the Client or on the Client's behalf to the Custodian or a Sub-Custodian or collected by the Custodian or a Sub-Custodian for the Client's account"; and

      98.1.2.    ED&F agreed to do so, and to open (inter alia) one or more custody accounts to record those client securities.

   98.2    Thereafter (as noted in paragraphs 47 and 85 to 87 and footnote 66 above), ED&F:

98.2.1.  Did in fact open such custody accounts for the Acer Defendants;

98.2.2.  Did in fact credit the Danish Shares to the custody accounts so opened;

98.2.3.  Did in fact hold the Danish shares (until April 2013) in segregated client accounts at BNP in the name of each of the Acer Defendants, and thereafter held them in single pooled Danish Share client accounts at BNP and SEB;

98.2.4.  Did in fact record the Danish Shares in its own records as being held in custody for the Acer Defendants; and

98.2.5.  On a daily basis, did in fact send statements of account by email to or for the various Acer Defendants, showing that the Danish Shares were held in custody for them.

99.  Unlike Ms Toube, I have seen a copy of a small selection of these statements, which appear on their face to be entirely consistent with these contentions as to the way in which the Danish Shares were in fact dealt with and recorded.

100.  In paragraph 35 of her Expert Report, Ms Toube says that she does not "regard such *ex post facto* statements as being relevant to (or detracting from) the question of the transfer of title pursuant to the Terms".  As I have explained in paragraph 18 above, one can only take into account as an aid to interpretation facts or circumstances which existed at the time that the contract was made: and, to that extent, Ms Toube is correct. However, in my opinion, it would not be right to characterise these facts as therefore "irrelevant".

101.  First of all, as explained in paragraphs 39 to 54 above, these facts would be admissible in, and well-capable of supporting, claims for rectification or estoppel.

101.1  In the unusual context of this case, it is SKAT rather than ED&F which is arguing that ED&F had much greater rights (and the Acer Defendants lesser rights) than those which were reflected in the parties' mutual dealings and communications at the material time.  It seems to me that, unless SKAT could establish that ED&F was itself party to some wrongful conspiracy with the Acer Defendants (so that all of these dealings and communications were part of an elaborate scheme of deception on their part), SKAT can be in no better position to argue for ED&F to have those greater rights against the Acer Defendants than ED&F itself would be.

101.2 On the facts as I understand them to be, it seems to me that an English court, having regard to (what I understand to have been) the parties' dealings and communications, would be likely to regard ED&F as being precluded by its statements and conduct from advancing that argument. It is therefore likely that an English court would similarly regard SKAT, as a non-party to the agreements, as precluded from advancing such an argument (absent proof of some common intention to deceive on the part of ED&F and the Acer Defendants).

102. Secondly, Ms Toube says that "the transfer of all right, title and interest would have occurred automatically at the moment of any Securities (or other assets) were delivered to ED&F". I do not agree.

103. This is the central issue about which Ms Toube and I disagree. My reasons for disagreeing, in summary, are these:

103.1 First of all, I am not sure that that Ms Toube's statement would be right simply as a statement of English law in relation to transfers of "book-entry" interests in intermediated securities such as are in issue on the present case. It seems to me to be probable that such a transfer (even in the case of a financial collateral arrangement) requires the making of some kind of accounting entry to be effective: see paragraphs 65 and 74 above.

103.2 Secondly, both the regulatory provisions of CASS 3.1.7 and CASS 6.5[105] and the provisions of ED&F's own CMA Policy (which implement those regulatory provisions)[106] would have required such a transfer to have been shown in ED&F's own records and to have been reflected in the account statements sent to the Acer Defendants.

103.2.1. These regulatory provisions form part of the admissible background in aid of interpretation.

103.2.2. As I have noted in paragraph 98 above, it is ED&F's case and the Acer Defendants' case (which is consistent with the documents which I have seen) that no such transfer of the Danish Shares to ED&F as at the Reference Date was ever recorded in ED&F's own records or in the account statements that were sent.

---

[105]    See paragraphs 75 and 76 above.

[106]    See paragraphs 94 and 95 above.

41

103.2.3. While the subsequent conduct of the parties is strictly inadmissible in aid of interpretation[107], it seems to me to be very likely that the English court would be apprised of these facts (assuming them to be facts) in the context of an alternative claim for rectification or on the basis of estoppel, were ED&F's and the Acer Defendants' arguments on the issue of interpretation to fail. It seems to me that, as a purely practical matter, these facts would make most English judges at least pause before deciding that the true interpretation of the document was so very different from that which the parties, by their actions, had shown that they believed to be the case at the time.

103.3 Thirdly, that does not seem to me to be what is actually contemplated by the terms of clause 10(b)(ii) itself.

103.3.1. After excepting assets in respect of which notification has been given under clause 10(b)(i), clause 10(b)(ii) states that:

> **.. all assets, whether cash or financial instruments, received by us either from you or in respect of your account will be actually or potentially in respect of margin or collateral for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations and full ownership in such assets will be absolutely transferred to us, and all right, title and interest in and to such assets will pass to us outright and absolutely for the purposes of covering your obligations to us ..**

It seems to me that an English judge would be likely to interpret the reference to such assets being "actually or *potentially*" for the purpose of securing the client's obligations as an indication that ED&F is to have a choice whether, and if so, when to treat such assets as collateral.

103.3.2. Clause 10(b)(ii) then continues:

> **Upon such transfer we will become obliged, subject to the following provisions, to re-transfer to you assets equivalent, but not necessarily identical, to the assets so transferred to us. Our obligation will be reduced to the extent that such assets are applied, in accordance with the**

---

[107]    See paragraph 18 above.

> **margin and collateral arrangements in place between us, in discharge of your obligations to us.**

> It seems to me that an English judge would also be likely to interpret the words "will be .. transferred" and "upon such transfer" as indicating that some separate act of transfer is to take place *after* the relevant assets have been "received" by ED&F.

103.3.3.  Clause 10(b)(ii) concludes by providing:

> **We will re-transfer assets to you either: (i) at our absolute discretion; or (ii) at your request, but only if and when we determine in our absolute discretion that you have no present or future, actual, contingent or prospective obligations to us or to the extent that we determine in our absolute discretion that such liability is adequately covered by collateral or margin remaining held by us.**

> It is difficult to envisage how, as a matter of logic, there can be a re-transfer of assets from the collateral taker to the collateral provider if there has been no actual transfer from the collateral provider to the collateral taker in the first place. It therefore seems to me that an English judge would be likely to view this provision as a further indication that some positive act by ED&F is required to effect a title transfer, beyond the mere fact of receipt.

103.4  Finally (as I shall explain later in this Report), the interpretation contended for by SKAT would be entirely inconsistent with (and indeed would defeat) the common aim and object of the transaction

104.  In paragraph 36 of her Expert Report, Ms Toube sets out some of the provisions of the Custody Agreement and, in paragraphs 37 to 39, sets out some of the regulatory background. I do not dissent from the view expressed by Ms Toube that the Custody Agreement "was intended to ensure that ED&F complied with its obligations pursuant to the FCA Rules[108], in circumstances where it may have been holding custody assets .. belonging to" the Acer Defendants (though it seems to me that that was probably not the sole purpose of the Custody Agreement).

105.  In paragraph 41 to 42 of her Expert Report, Ms Toube expresses the view that the Custody Agreement applies to assets held in custody and not to assets the title to which

---

[108]     In 2012, when the Custody Agreement was signed, these would have been the FSA Rules. The FCA did not take over from the FSA until 1 April 2013. The difference is, however, not material, since the FCA (for practical purposes) took over the FSA Rules and Handbook.

has been transferred to ED&F under a TTFCA. I agree: but that simply begs the question of whether the assets of the Acer Defendants were held in custody for the Acer Defendants on the Reference Dates (as all parties appear to have thought at the time) or were held by ED&F on its own account under a TTFCA (as SKAT alone now asserts). In my opinion, that is not a question that can properly be answered simply by looking at the wording of the Terms or of the Custody Agreement in a vacuum, divorced from their context.

106.    In paragraph 43 of her Expert Report, Ms Toube once more (in my view, inadmissibly and incorrectly) places reliance on the CMA Policy in support of her interpretation[109].

107.    Paragraphs 44 to 46 of Ms Toube's Expert Report contain conclusions with which, since I disagree with the premises on which they are founded, I disagree.

108.    The argument in paragraphs 47 and 48 - that if the Custody Agreement and the Security Agreement governed all of the assets involved in the dividend arbitrage transactions in issue in the present case, the provisions of clause 10(b)(ii) of the terms would be redundant – in my opinion provides little or no support for Ms Toube's interpretation.

108.1   First of all, as Patten LJ recently said in *Al-Hasawi v Nottingham Forest Football Club Ltd*[110] "arguments based on surplusage or redundancy are rarely reliable or sure ground on issues of construction". As I shall explain later in this Report, the context and commercial purpose of the transactions strongly indicate that the Custody Agreement and the Security Deed were intended to be the governing instruments, not the Terms. In those circumstances, it is unsurprising that some parts of the standard form wording in the Terms should have little or no relevant application.

108.2   Secondly, the Application Form makes clear that the Acer Defendants at least have in mind the possibility of doing business other than simply dividend

---

[109]    For an explanation of why the CMA Policy is, in any event, not helpful to SKAT's case, see paragraphs 94 and 95 above.

[110]    [2019] EWCA Civ 2242 at [38]. Similarly, in *Merthyr (South Wales) Limited v Merthyr Tydfil County Borough Council* (Fn 35 above) at [39], Leggatt LJ said "It is, however, by no means uncommon, including in professionally drafted contracts, to find provisions which are unnecessary and could, without disadvantage to either party, have been omitted. For this reason, arguments from redundancy seldom carry great weight. Many judicial observations to that effect are collected in Sir Kim Lewison's book on *The Interpretation of Contracts* (6th edition, 2015) at para 7.03. For example, in *Arbuthnott v Fagan* [1995] CLC 1396 at 1404, Hoffmann LJ, discussing a Lloyds' agency agreement, said that "little weight should be given to an argument based on redundancy", as it is "a common consequence of a determination to make sure that one has obliterated the conceptual target." More generally, in *Total Transport Corp v Arcadia Petroleum Ltd* [1998] 1 Lloyds Rep 351 at 357, Staughton LJ, citing two judgments of Devlin J to similar effect, said: "It is well-established law that the presumption against surplusage is of little value in the interpretation of commercial contracts."

arbitrage transactions with ED&F. That business could well have been covered by the Terms, rather than by the Custody Agreement and the Security Deed. Furthermore clause 10(b)(ii) would still have effect as regards surplus cash, in the way contemplated by the Variation Letters.

109. In paragraph 48 of her Expert report, Ms Toube characterises the way in which ED&F in fact treated, recorded and reported to the Acer Defendants about the shares which are the subject-matter of this action as "an inconsistent course of operation", which she says cannot undo the "proper legal construction" of an agreement. It is, I accept, correct that, in English law, the subsequent conduct of the parties cannot be looked at in order to construe a written contract[111]. It can, however, be looked at if (as I have suggested in paragraph 98 above) its relevance is that it is the operation by the parties of the machinery laid down in the Contract Suite. It can also be looked at if (as I have suggested in paragraphs 40 to 54 above) it gives rise to an estoppel or provides evidence in support of a claim for rectification.

110. In any event, Ms Toube's characterisation begs the question of the correct interpretation of the contractual arrangements between the parties. If the true interpretation is as I have suggested, rather than as Ms Toube has argued, there is no inconsistency.

111. In paragraphs 49 to 58 of her Expert Report, Ms Toube finally considers the Security Deed. Again, she does so largely in isolation, without reference to the wider context. I particularly disagree with the suggestion in paragraph 56 that the construction for which Ms Toube contends "fits more clearly with business common sense". On the contrary, as I shall seek to demonstrate in what follows, both parties realised at the material time that clause 10(b)(ii) of the Terms, if it operated (or was operated) so as to transfer title to the Danish shares to ED&F as at the Reference Date, would be inconsistent with (and, indeed, would defeat) the aim and shared commercial purpose of these arrangements.

*(E4)   My view of the correct interpretation*

112. Like Ms Toube, I have seen a selection of the parties' Statements of Case. In addition, as set out in Schedule B, I have had the advantage (denied, I believe, to Ms Toube) of seeing not only a small selection of the Account Statements, but also of seeing a selection of relevant background documents, including a selection of the correspondence passing by email between the parties as the agreements in the "Contract Suite" were being negotiated.

113. In accordance with the principles discussed in paragraphs 25 to 32 above, these materials and other evidence would (in my opinion) not merely be admissible under English law to show the "genesis", "aim" and commercial purpose of the transactions,

---

[111]    See paragraph 18 above.

but would be regarded by an English judge as providing the best guide to the true meaning of those agreements. As noted in paragraph 22 above, "generally commercially minded judges would regard the commercial purpose of the contract as more important than niceties of language".

114.    Three things seem to me to be plain from the documents which I have seen:

114.1    First, that the dominant overall commercial purpose of these arrangements was to ensure that the Acer Defendants were the beneficial owners of the Danish Shares on the Reference Date, so as to entitle them to the dividend.

114.2    Secondly, that both parties were aware that a TTFCA under clause 10(b)(ii) of the Terms, if it operated (or was operated) so as to transfer title to the Danish Shares to ED&F as at the Reference Date, would be inconsistent with (and, indeed, would defeat) the aim and shared commercial purpose of these arrangements.

114.3    Thirdly, both parties intended that, on the Reference Date, the Danish shares should be held by ED&F in custody for the Acer Defendants under the Custody Agreement (and subject to the Security Deed), and should not be held by ED&F on its own account (whether pursuant to the TTFCA provisions in clause 10(b)(ii) or otherwise).

115.    It seems to me that these facts can be seen, *inter alia*, from:

115.1    Paragraph 4.2 of ED&F's Defence to Re-Amended Schedule 5T in the proceedings in the Commercial Court in London. This pleads that the origin of the arrangements between ED&F and (inter alia) the Acer Defendants was an approach made to ED&F "to set up brokerage and custody accounts for [pension plans] with a view to such [pension plans]: (1) acquiring the rights to shares in the Dividend Window .. (2) in companies domiciled in jurisdictions benefiting from a 'double taxation' treaty with the United States or Canada; and (3) for the purpose of receiving payment of the dividend (the 'the Dividend Arbitrage Strategy')." As a result, certain pension plans "became clients of [ED&F]; (2) instructed [ED&F] to acquire shares on their behalf in a variety of jurisdictions utilising a variety of different trades to implement their Dividend Arbitrage Strategy .. [ED&F's] role was limited to providing standard financial brokerage, settlement and custody services .. which involved in summary .. upon [ED&F's] retention by the [pension plans]: setting up client designated securities and cash accounts for the [pension plans] (the Custody Account) to receive and hold shares (the Security) and dividends in respect of the same .. "

46

115.2  Pages 19 to 21 and 164 to 170 of the Transcript of the Deposition of Stacey Kaminer, which explain the dividend arbitrage strategy and its origin;

115.3  The Application Forms signed on behalf of each of the Acer Defendants on about 20 March 2012, which state that the relevant Acer Defendant intends to place stock with ED&F on a Custody basis;

115.4  The email dated 4 May 2012 from Acer's lawyers, K&L Gates, to Acer, which explained that the effect of clause 10(b)(ii) of the Terms, together with the Variation Letter dated 26 March 2012, is that "all your money and assets in the hands of ED&F Man are, in fact, not your money and assets at all (but give you only a right of claim as an ordinary creditor), unless your specific instructions say otherwise .. for any such other categories of cash and non-cash you are an unsecured creditor only (ie the standard position applies)".

115.5  The email dated 16 May 2012 from KL Gates to ED&F's lawyers, Endeavour Advisory, which asked (inter-alia) for an explanation of the relationship between clause 2(a) of the Custody Agreement[112] (which provides for client assets to be held in custody on bare trust for the client) and clause 10(b)(ii) of the Terms (which is the TTFCA provision).

115.6  The reply received that same day from Endeavour Advisory, stating[113]:

> **In relation to the custody agreement, the terms of the custody agreement are intended to prevail over the terms and conditions of business in so far as they relate to custody (and we can include additional wording in the custody agreement to ensure this is clear). While the terms and conditions of business are generally applicable to ordinary course custody arrangements with ED&F Man, the custody agreement has been prepared to address the fact that: (a) aspects of the terms and conditions of business (such as absolute title transfer) may be inconsistent with certain objectives of the proposed transaction; and (b) ED&F Man does not have the ability to provide direct custody of securities in the relevant jurisdictions and, as such, is simply facilitating the use of it's own custodian in a manner which also provides ED&F Man with additional comfort from a security perspective.**

---

[112]  Which provides that "The Client hereby appoints the Custodian to act as bare trustee for the purposes of safekeeping the Client Property upon the terms of this Agreement and the Custodian agrees to act as such upon the terms and conditions set out in this Agreement."

[113]  Emphasis added.

47

I will respond to the specific queries regarding the custody agreement using your numbering below:

**1. As noted above, <u>the terms of the custody agreement are intended to prevail over the terms and conditions of business in so far as they relate to custody (and, as I understand, absolute transfer of title may be inconsistent with certain objectives of the proposed transaction).</u>**

**2. Given that, as I understand, the relevant securities will be held outside the United Kingdom, <u>they will be held, recorded, registered and segregated in accordance with the local rules and practice in the relevant jurisdiction</u>. As I understand, in most relevant jurisdictions, the securities will be registered in the name of the subcustodian (or a local subsidiary of the custodian in the jurisdiction).**

**3. The terms of the sub-custodian agreement will be the terms of the custody agreement between ED&F Man and its custodian. I can discuss with ED&F Man whether they are able to provide a copy of the agreement.**

**4. I do not expect ED&F Man would need to pool the securities in the proposed transaction nor use the securities for the account of another customer. As I understand, the securities will be held in a separate subaccount of ED&F Man's account at it's custodian but will be registered in the name of the custodian (or a local subsidiary of the custodian in the jurisdiction).**

115.7    The email from Ms Kaminer of Acer to Ms Foster of ED&F, forwarding to Ms Foster the entire email chain, starting with K & L Gates email dated 4 May 2012 and ending with the reply from Endeavour Advisory.

116.    For the reasons which I have sought to explain in the preceding sections of this Report, it is my opinion that an English court would be likely to hold that the rights conferred on ED&F by clause 10(b)(ii) of the Terms required some act of exercise on the part of ED&F before title would pass from the Acer Defendant concerned to ED&F. Until that point, the assets of the relevant Acer Defendant would remain the property of that Acer Defendant, held in custody by ED&F pursuant to the Custody Agreement (and subject to the Security Deed).

117.    In my opinion, an English judge will be likely to hold that the background facts referred to in paragraphs 114 and 115 above provide further powerful support in favour of that interpretation, and against the interpretation contended for by SKAT.

118.   The documents which I have seen clearly show that both parties were well aware that the application of the TTFCA provision in clause 10(b)(ii) to these assets would defeat the entire commercial purpose of the arrangements which the agreements in the "Contract Suite" were intended to document. In the circumstances, it seems to me that an English judge would regard the interpretation for which SKAT now contends as wholly inconsistent with the main aim of the transactions, contrary to business common sense, and therefore to be rejected. As Lord Halsbury said "one must reject words, indeed whole provisions, if they are inconsistent with what one assumes to be the main purpose of the contract"[114].

## (F)   Conclusion

119.   For these reasons, it is my opinion (on the basis of the limited information presently available to me) that an English Court would be likely to hold, on the true interpretation of the agreements in the "Contract Suite", that the interests in Danish shares acquired by ED&F on behalf of the Acer Defendants for the purposes of the dividend arbitrage strategy were (at the relevant time, ie on each Reference Date) held pursuant to the terms of clause 2(a) of the Custody Agreement in custody on bare trust for the relevant Acer Defendant, subject to the Security FCA created by the Security Deed.

120.   In my opinion, an English Court would <u>not</u> be likely to hold that those interests were (at the relevant time) owned beneficially by ED&F, pursuant to the TTFCA provisions of clause 10(b)(ii) of the Terms

121.   As I have explained above, it seems to me that an English judge would be likely to hold that:

121.1   On the true interpretation of Clause 10(b)(ii) in its contractual and commercial context, some further act (such as a suitable entry in ED&F's books showing the transfer) was required from ED&F to change the status of the Danish Shares from being held in custody pursuant to the Custody Agreement for the Acer Defendants to being held by ED&F for its own account.

121.2   In any event (as I understand the facts of the case), the shares were never in fact transferred into the name of ED&F, as (probably) required as a matter of English law and as (certainly) required by the regulatory requirements of CASS 3.1.7 and 6.5 and by the terms of ED&F's own CMA Policy. On the contrary (again as I understand the position), the shares were at the relevant times shown in ED&F's own records and in the account statements sent on a daily basis by ED&F to or for the Acer Defendants as being held by ED&F in custody for the

---

[114]   See paragraph 27 above.

Acer Defendants. There was therefore never any effective transfer of title from the Acer Defendants to ED&F.

122. Even were I to be wrong in my conclusions concerning the interpretation which an English Court would be likely to put upon these agreements, the parties (as I understand the facts) at all relevant times acted and communicated with each other upon the basis that the relevant interests were (at the relevant times) held in custody pursuant to the terms of clause 2(a) of the Custody Agreement and were beneficially owned by the Acer Defendants, not by ED&F. In those circumstances, it must be highly likely that a claim for rectification and/or a claim based upon estoppel would succeed, so as to give effect to the parties' clearly expressed common intention in precedence to the effect of clause 10(b)(ii) of the Terms.

123. I have carefully considered the contrary arguments propounded by Ms Toube. For the reasons explained above, I do not think that an English court would be persuaded by the arguments which she deploys and I therefore respectfully disagree with her conclusions.

**Richard Salter QC**

**3 Verulam Buildings**
**Grays' Inn**
**London WC1R 5NT**

1 February 2022

## SCHEDULE A: CLIENTS

**ED&F**

   i.   ED&F Man Capital Markets, Ltd,

**The Acer Defendants**

   ii.   Acer Investment Group, LLC,
   iii.   American Investment Group of New York LP Pension Plan,
   iv.   DW Construction, Inc. Retirement Plan,
   v.   Kamco Investments, Inc. Pension Plan,
   vi.   Kamco LP Profit Sharing Pension Plan,
   vii.   Linden Associates Defined Benefit Plan,
   viii.   Moira Associates LLC 401(K) Plan,
   ix.   Riverside Associates Defined Benefit Plan, and
   x.   Newsong Fellowship Church 401(k) Plan.

---

## Schedule B: Materials Considered

---

### Court Filings

- Amended Counterclaims of Third-Party Defendant ED&F Man Capital Markets, Ltd., *In re Customs & Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Litig.*, No. 1:18-md-02865 (S.D.N.Y. April 20, 2020)

- ED&F's Re-Amended Defence, *SKAT v. ED&F Man Capital Mkts. Ltd. & Ors*, Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487

- ED&F's Defence to Re-Amended Schedule 5T, *SKAT v. ED&F Man Capital Mkts. Ltd. & Ors*, Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487

- ED&F Man's Response to Claimant's Request Dated 2 March 2021 For Further Information Under Part 18, *SKAT v. ED&F Man Capital Mkts. Ltd. & Ors*, Claim Nos. CL-2018-000297; CL-2018-000404; CL-2018-000590; CL-2019-000487; CL-2020-000369

- *Skatteforvaltningen v. Solo Capital Partners LLP & Ors.*, [2020] EWHC 2022 (Comm) (June 26, 2020)

- *Skatteforvaltningen v. Solo Capital Partners LLP & Ors.*, [2021] EWHC 974 (Comm) (April 27, 2021). An appeal from this judgment was recently heard in the Court of Appeal. Judgment has not yet been handed down.

### Correspondence

- Letter dated 13 July 2020 from Rosenblatt to Pinsent Mason LLP

### Depositions & Deposition Materials

- Deposition Transcript of Stacey Kaminer, Vol. 1 & 2 (April 19-20, 2021)

- Deposition Transcript of Shahab Hashemi, Vol. 1 & 2 (October 7-8, 2021)

- Deposition of Shahab Hashemi, Exhibit 4430 ("[DRAFT] Schedule of Agreed Facts")

### Public Documents

- Strategic Report, Directors' Report & Financial Statements, for the financial year ended 30 September 2013

- Strategic Report, Directors' Report & Financial Statements, for the financial year ended 30 September 2014
- Strategic Report, Directors' Report & Financial Statements, for the financial year ended 30 September 2015

**Bates-Stamped Documents**

- ACER_00011097
- ACER_00011767
- ACER_00012450
- ACER_00015797
- ACER_00015860
- ACER_00015864
- ACER_00015884
- ACER_00016585
- ACER_00021895
- ACER_00022505
- ACER_00022658
- ACER_00022667
- ACER_00022678
- ACER_00022688
- ACER_00023936
- ACER_00024185
- ACER_00024425
- ACER_00024595
- ACER_00024600
- ACER_00024760
- AIG_00000605
- ED&F-00004163
- ED&F-00004164
- ED&F-00050166
- ED&F-00063483
- ED&F-00163519
- ED&F-00235805
- ED&F-00236974
- ED&F-00359222
- ED&F-00420923
- ED&F-00420925
- ED&F-00420927
- ED&F-00487859
- ED&F-00487877
- ED&F-00488048

- ED&F-00488066
- EDF00003458-0001[*]

---

[*] Produced in the MDL (18-md-2865) as ED&F-00004919.

—————————————————————————

## APPENDIX 1: DETAILED CV

—————————————————————————

## Richard Salter QC



Email Address: **rsalter@3vb.com**

Year Of Call: **1975**

Year Of Silk: **1995**

Richard Salter is regarded as one of the leading commercial silks at the bar - 'A *very considerable presence in court .. a very powerful advocate and a good cross examiner'* .. *'He has the ear of the court ..* 'a *wonderful command of the case, expertly handling the facts, the nuances, the contours and the evidence*.".. "He has seen it all before and has fantastic authority" .. "He is terrific". (Chambers & Partners Guides 2014 to 2020)

Richard's practice covers all aspects of commercial litigation and arbitration, including civil fraud. He is equally at home making legal submissions before the highest courts as he is conducting long, fact-heavy trials and arbitrations - *'Brilliant at unravelling the most complex deal and identifying the key legal issues', 'A man for the most difficult appeals'* (Legal 500, 2016).

Richard also has a particular speciality in matters relating to banking, corporate finance, financial services and insolvency, where he has a pre-eminent reputation both in court and in non-contentious advisory matters – *'one of the grandees of banking litigation. He has an encyclopaedic knowledge of the law in this area'* (Chambers & Partners Guide 2018). Richard was Chambers & Partners *Banking and Finance Silk of the Year* in 2012. In 2015, he was shortlisted for the Legal 500's *Insolvency Silk of the Year* award, and one of the commentators in Chambers & Partners said of him *'For high- powered finance and insolvency advice he is just a god among barristers. His brainpower is certainlyin the realms of genius'*. Richard assists with the post-graduate teaching of financial law subjects at the University of Oxford, where he holds the title of Visiting Professor.

In addition to his extensive high-profile work in London, Richard's practice has taken him all over the world.  He is a member of the Bar of the Eastern Caribbean Supreme Court and has appeared several times in the Commercial Court of the British Virgin Islands. He has been admitted pro hacvice for cases in the Bahamas (before the High Court and the Court of the Appeal), in the Cayman Islands (before the Grand Court and the Court of Appeal) and in the Isle of Man (before the High Court and the Staff of Government Division). He has also been involved in substantial advisory and litigious matters (both assisting local lawyers in court and  appearing himself before arbitral tribunals) in India, Hong Kong, Singapore (where he is   Registered foreign lawyer with SICC) and other common-law jurisdictions. Richard has also been  involved  in  proceedings at  the  DIFC,  and from 2017-2018 was Registered under Part II of the DIFC Register of Legal Practitioners.

Richard sits as a Deputy High Court Judge in the QBD and the Commercial Court and as a Recorder. He also sits as an Arbitrator in ICC, LCIA and other types of arbitrations. He is a trustee of *English Touring Opera* chairman of the Comité d'Honneur and a trustee of *Les Azuriales Opera*, and

Honorary Counsel to *The Musicians' Company*.

## Directory Quotes

> "He has a very considerable presence in court. He is a very powerful advocate and a good cross-examiner."

Chambers & Partners UK 2014

> 'A very big name in the market.'

Legal 500 UK 2015

## Expertise

## Banking & Finance - Wholesale Banking

*Re The Law Debenture Trust Corp plc* [2020] EWHC 1774 (Ch) (Birss J). (Acted for the claimant bond trustee in its successful application for approval of its intended course of action. The proceedings concerned a proposed settlement of various long running disputes arising from insolvencies of companies in the Bell Group in Western Australia and Curaçao. The claimant was the trustee of five sets of bonds issued in the late 1980s by companies in the Bell Group. It was a condition precedent to the effectiveness of that settlement that the trustee, although not itself a party to the settlement, should obtain a declaration from the English court that it would be acting properly as trustee of these bond issues in not taking steps to prevent or interfere with the proposed settlement.)

*Goldman Sachs International v Novo Banco SA; Guardians of New Zealand Superannuation as manager and administrator of the New Zealand Superannuation Fund v Novo Banco SA* [2018]UKSC 34, [2018] 1 WLR 3683; affirming [2016] EWCA Civ 1092, [2017] 2 BCLC 277; reversing [2015] EWHC 2371 (Comm), [2015] 2 CLC 475 (Acting for the bridge bank formed by Banco de Portugal to take over the business of Banco Espírito Santo, in a landmark dispute about the extent to which the English Court should recognise actions taken by Banco de Portugal as Resolution Authority under the Bank Recovery and Resolution Directive 2014/59/EU in relation to a USD 835m structured finance facility arranged by Goldman Sachs).

*Central Bank of Ecuador and ors v Conticorp SA* [2015] UKPC 11, [2016] 1 BCLC 26; reversing [2012] 3 BHS (BCA); [2010] 2 BHS J No 158 (three-month trial before Adderley J); [2010] 3 BHS J No63 (costs). (Acted for the plaintiffs, who were ultimately successful before the Privy Council in recovering from the dishonest former owners and controllers of a substantial Ecuadorian Bank the assets which those owners had wrongfully taken for themselves immediately prior to the collapse ofthe bank and its overseas subsidiaries).

*Citicorp Trustee Co Ltd v Barclays Bank Plc* [2013] EWHC 2608 (Ch) (Peter Smith J) (Acted for

Barclays in a dispute about the construction of the terms of two issues of commercial mortgage backed floating rate notes, forming part of a securitisation of an underlying GBP 660m loan portfolio. The points in dispute were whether Barclays' own notes were disenfranchised, and whether notes held by Rabobank were disenfranchised because a total return swap between Rabobank and Barclays meant that Barclays was the beneficial owner of Rabobank's notes).

*Standard Chartered Bank (Switzerland) S.A v. UBS (Bahamas) Ltd* [2013] 1 BHS J No 177 (Acted for SCB in the Bahamas Court of Appeal, in SCB's successful appeal against the striking out of a claim for the return of USD 32.4 million dollars, which SCB claimed had been paid conditionally upon the subsequent receipt by it of securities, the transfer of which could not be completed because of the discovery of the Madoff fraud).

*Gemini (Eclipse 2006-3) Plc v Danske Bank A/S* [2012] EWHC (Comm) (Cooke J) (Acted for the liquidity facility provider in a dispute about the construction of the terms of a GBP 900m bond-issue).

*AIG Capital Partners Inc v Republic of Kazakhstan* [2006] 1 WLR 1420. (Acted for the judgment creditor, in a dispute involving the construction of the State Immunity Act 1978 s 14(4), and the effect of ECHR Art 6 and Protocol 1 Art 1 on that construction, centring on the question whether the assets of a state acquire absolute immunity from execution if held on the state's behalf by its central bank).

*Camdex International v Bank of Zambia and ZCCM* [1997] CLC 714, CA. (Acted for the debtor in successfully resisting the making of a third party debt order over sums due from the debtor to its central bank under Zambian exchange control laws).

## Banking & Finance - Complex Financial Instruments

*Re The Law Debenture Trust Corp plc* [2020] EWHC 1774 (Ch) (Birss J). (Acted for the claimant bond trustee in its successful application for approval of its intended course of action. The proceedings concerned a proposed settlement of various long running disputes arising from insolvencies of companies in the Bell Group in Western Australia and Curaçao. The claimant was the trustee of five sets of bonds issued in the late 1980s by companies in the Bell Group. It was a condition precedent to the effectiveness of that settlement that the trustee, although not itself a party to the settlement, should obtain a declaration from the English court that it would be acting properly as trustee of these bond issues in not taking steps to prevent or interfere with the proposed settlement.)

*Re Lehman Brothers International (Europe) (in administration) (No 5) (Extended Liens)* [2012] EWHC 2997 (Ch), [2014] 2 BCLC 295 (Briggs J); (disclosure application [2011] EWHC 2022 (Ch); [2012] 1 BCLC 312) (Acted for LBF AG, the Swiss subsidiary of Lehman Brothers, in a dispute concerning the validity and effect of provisions in LBIE's standard documentation intended to give companies in the Lehman group priority in Lehman's insolvency over outside creditors. This involved consideration, inter alia, of the nature of security rights purporting to create a general lien over intangibles, the effect of the Financial Collateral Regulations on floating charges, and the applicability of the *British Eagle* principle to contracts involving foreign insolvent parties).

*Lehman Brothers Special Financing Inc v BNY Corporate Trustee Services and Landesbank Baden-*

*Wuttemberg* [settled shortly before trial in April 2012] (Acting for the claimant noteholders in litigation concerning the effect, in Lehman's insolvency, of certain of the terms in various structured finance products arranged by Lehman).

*Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd and Lehman Brothers Special Financing Inc* [2011] UKSC 38, [2012] 1 AC 383 (SC); affirming [2009] EWCA Civ 1160, [2010] Ch 347, CA; [2009] EWHC 1912 (Ch), [2009] 2 BCLC 400 (Sir Andrew Morritt C) (Acted for noteholders in successfully resisting Lehman's claim that Noteholder Priority switching provisions of Lehman's Dante series of synthetic CDOs infringed the anti-deprivation principle by reducing the value of the assets available to Lehman in its Chapter 11 proceedings).

*HSH Nordbank v Barclays Bank Plc* (Settled shortly before trial in the Commercial Court in February 2005) (Acted for the claimants in a high-profile action alleging that Barclays mis-sold USD 151mworth of synthetic collateralised debt obligations).

*Financiera Decaril SA v Prudential-Bache* (Settled shortly before a six-week trial in the Commercial Court in March 2003). (Acted for Claimants, who were Brazilian Investors, suing (in seven actions in the Commercial Court) a London investment bank and its Brazilian associate for mis-selling step-down reverse floating-rate notes).

*Credit Suisse First Boston (Europe) Ltd v MLC (Bermuda) Ltd* [1999] 1 Lloyd's Rep 767. (Acted for a hedge fund, resisting an anti-suit injunction in relation to its claims for mis-selling of derivatives).

## Banking & Finance - Retail Banking

*Highbury Pension Fund Management Co and another v Zirfin Investments Ltd* [2013] EWHC 238 (Ch); (reversed [2013] EWCA Civ 1283) [2014] Ch 359 (Acted for the SFO in seeking to resist a claimto invoke the doctrine of marshalling, to the prejudice of a Restraint Order, where a doubly-secured creditor had one charge over property belonging to the accused debtor, and another charge over a property owned by another party who was liable for the debt).

*Bank of Cyprus v Monte Properties* [Christopher Clarke J, December 2010] (Acted for the bank in litigation (settled at the end of term, after two weeks in court) concerning the bank's ability to enforce changes in its standard terms against existing customers).

The Bank Charges litigation (*Office of Fair Trading v Abbey National Plc and others*): First Preliminary Issues: [2009] UKSC 6, [2010] 1 AC 696, reversing [2009] EWCA (Civ) 116; [2010] 1 AC 696 (CA); [2008] EWHC 875 (Comm); [2008] 2 All ER (Comm) 625) (Andrew Smith J). Second Preliminary Issues [2008] EWHC 2325 (Comm), [2008] 2 All ER (Comm) 625 (Andrew Smith J). (Acting for Clydesdale Bank Plc in successfully defending the OFT's claim that the charges madeby the banks in connection with bounced cheques and unauthorized overdrafts are unenforceable as penalties at common law, or because the terms providing for them are unfair under the Unfair Terms in Consumer Contracts Regulations).

*Wilson v First County Trust (No 2)* [2002] QB 74, CA. (Acted for the claimant in a case concerned with the compatibility of the Consumer Credit Act 1974 s 127(3) with the creditor's Convention Rights under ECHR Art 6 and Protocol 1 Art 1).

*Christofi v Barclays Bank Plc* [2000] 1 WLR 937, CA. (Acted for the bank in successfully resisting claim for breach of banker's duty of confidentiality).

## Banking & Finance - Trade Finance and Guarantees

*Enka Insaat Ve Sanayi A.S v Banca Popolare Dell'Alto Adige SPA* [2009] EWHC 2410 (Comm), [2009] CILL 2777. (Whether it is necessary for the beneficiary, when making a demand under a performance bond, to believe that the amount demanded from the issuer is due to the beneficiary from the account party).

*Credit Industriel et Comercial v China Merchants Bank* [2002] 1 All ER (Comm) 427, QBD (Acted for the issuing bank in a dispute over what constitutes an "original" document for the purposes of UCP 500).

*Montrod Ltd v Grundkotter Fleischvertreibs GmbH* [2001] 1 All ER (Comm) 368, QBD. (Acted for the instructing bank in a dispute between banks as to whether English law recognises a "nullity" exception as well as a "fraud" exception to the obligation of a bank issuing a letter of credit to pay against apparently conforming documents).

*Habib Bank Ltd v Ahmed* [ 2002] 1 Lloyd's Rep 444, CA. (Acted for the guarantor in resisting enforcement of Pakistani guarantee judgment on grounds of fraud).

*Raiffeisen Zentralbank Osterreich AG v Crossseas Shipping Ltd* [2000] 1 WLR 1135, CA. (Acted for the guarantor in resisting enforcement of a guarantee on the ground that it had been avoided by material alteration).

*Tukan Timber Ltd v Barclays Bank PLC* [1987] 1 Lloyd's Rep 171. (Acted for the issuing bank in successfully resisting an injunction restraining payment under letter of credit).

## Civil Fraud

*Loches Capital Ltd v Goldman Sachs International* [2020] EWHC 2327 (Comm) (Stephen Hofmeyr QC) (Acted for the successful claimant in obtaining an order for pre-action disclosure against GSI in relation to a proposed claim for unlawful means conspiracy arising from the takeover in 2006 ofArcelor S.A. by Mittal Steel Company NV and the subsequent merger of the two companies in 2007 –the largest merger the steel industry has ever seen – in relation to which GSI's mergers and acquisitions team were a principal adviser to Mittal.)

*Abdullah Nasser Bin Obaid and others v Khalid Abdullah Al-Hezaimi and others* [2018] EWHC 243 (Ch) (interpretation of freezing injunction); [2019] EWHC 1953 (Ch) (where the court rejected an application, made by the defendant shortly before trial, to adduce in evidence confidential documents belonging to the claimant, which had been sent anonymously to the defendant'ssolicitors). (The main action, listed for a 4-week trial in summer 2019, settled after the first week). (Acted for claimants, who alleged that the defendants had defrauded them of GBP 35m intended for investment in UK property).

*In re BW Estates Ltd (No 2), Randhawa and another v Turpin and another (No 2)* [2017] EWCA Civ 1201, [2018] Ch 511 (Acted for the successful appellants, whose attempts to enforce a judgment in

their favour in a fraud claim against shares in a company had been frustrated by the appointment of administrators. The appointment had been made by the judgment debtor, who was the sole director and living shareholder of the company whose other shareholder had been dissolved and whose articles required a quorum of two. The appellants' challenge to the appointment, dismissed at first instance, was successful in the Court of Appeal, the case involving consideration (inter alia) of whether the company was to be treated as a single-member company, and of the Re Duomatic principle).

*Central Bank of Ecuador and ors v Conticorp SA* [2015] UKPC 11, [2016] 1 BCLC 26; reversing [2012] 3 BHS (BCA); [2010] 2 BHS J No 158 (three-month trial before Adderley J); [2010] 3 BHS J No63 (costs). (Acted for the plaintiffs, who were ultimately successful before the Privy Council in recovering from the dishonest former owners and controllers of a substantial Ecuadorian Bank the assets which those owners had wrongly taken for themselves immediately prior to the collapse ofthe bank and its overseas subsidiaries).

*Relfo Ltd v Varsani* [2014] EWCA Civ 360, [2014] 1 WLR 1402 (Acted in the Court of Appeal for the appellant defendant, seeking to set aside an order of Sales J holding him liable on the basis both of tracing and unjust enrichment, and arguing that tracing was not permissible because of the absence of any direct exchange, and that the claim in unjust enrichment should fail because there was no direct enrichment).

*Hirco v Hiranandani* (IoM Staff of Government Division, 26 September 2014; affirming IoM High Court, 21 February 2014) (Jurisdiction dispute in fraud claim against non-executive chairman of IoM company, arising out of investments made in India following its AIM listing in London. This dispute has also been the subject of LCIA arbitration proceedings in Singapore from 2014 to 2016).

*Abu Dhabi Investment Company v H Clarkson & Co Ltd and others* (Main action tried for 12 weeks at the end of 2006 before Tomlinson J in the Commercial Court [2007] EWHC 1267 (Comm). Successful appeal in 2008 ([2008] EWCA Civ 699) against the only aspect of the judgment on whichthe claimants lost. Preliminary issue tried in February 2006 before Morison J: [2006] 2 Lloyd's Rep 38.) (Acted for the claimants in an action alleging fraud against the vendor company and its directors, and negligence against the vendor's bankers and the claimants' own professional advisers, arising from a failed joint venture investment in setting up a container shipping line in the Gulf).

*Anglos Ltd v Kent and Brooks* (Settled in June 2007 after two weeks of trial before Evans-Lombe J). (Acted for the principal defendant to a claim for deceit and breach of fiduciary duty in connection with a management buy-out and immediate on-sale of a holiday company).

*Cable & Wireless Plc v Valentine and others* (Settled in December 2005, after nine weeks of trial before Gloster J) Acted for the administrators of the 11th Defendant (of 17), a Guernsey insurance company alleged to have been the vehicle used by members of the C&W risk management team tomake fraudulent secret profits from the reinsurance arrangements of C&W's captive insurer, Pender Insurance.

## Contract Disputes

*Loches Capital Ltd v Goldman Sachs International* [2020] EWHC 2327 (Comm) (Stephen Hofmeyr

QC) (Acted for the successful claimant in obtaining an order for pre-action disclosure against GSI in relation to a proposed claim for unlawful means conspiracy arising from the takeover in 2006 of Arcelor S.A. by Mittal Steel Company NV and the subsequent merger of the two companies in 2007 – the largest merger the steel industry has ever seen – in relation to which GSI's mergers and acquisitions team were a principal adviser to Mittal.)

*Abdullah Nasser Bin Obaid and others v Khalid Abdullah Al-Hezaimi and others* [2018] EWHC 243 (Ch) (interpretation of freezing injunction); [2019] EWHC 1953 (Ch) (where the court rejected an application, made by the defendant shortly before trial, to adduce in evidence confidential documents belonging to the claimant, which had been sent anonymously to the defendant's solicitors). (The main action, listed for a 4-week trial in summer 2019, settled after the first week). (Acted for claimants, who alleged that the defendants had defrauded them of GBP 35m intended for investment in UK property).

*Wright v Deccan Chargers Sporting Ventures Ltd* [2011] EWHC 1307 (QB) (Tugendhat J) (Jurisdiction dispute over venue for resolution of claims for wrongful dismissal of English chief executive of IPL team).

*Bright Asset Ltd v Lewis* [2011] EWCA (Civ) 122 (Acted for the appellant defendant in a dispute about success fees under a consultancy agreement).

*Murray v Leisureplay Plc* [2005] IRLR 946, CA (Acted for the respondents to an appeal concerning the enforceability of a liquidated damages clause in a former director's service contract, and the extent of the remedies available to the company under the Companies Act 1985 s 320 to recover its costs of preparations to acquire a non-cash asset from that director).

*Racing UK Plc v Doncaster MBC* [2005] EWCA Civ 999, CA (Acted for the appellants in an action concerning whether the Chief Executive of the independent management company of Doncaster Racecourse had ostensible authority to bind Doncaster Council, the owners of the racecourse, to a media rights agreement).

*MCI Worldcom Intl v Primus Telecommunications Inc* [2004] 2 All ER (Comm) 833, CA (Acted for respondent claimant in a dispute over telecommunications bandwidth contracts).

## Financial Services & Insolvency

*Goldman Sachs International v Novo Banco SA; Guardians of New Zealand Superannuation as manager and administrator of the New Zealand Superannuation Fund v Novo Banco SA* [2018] UKSC 34, [2018] 1 WLR 3683; affirming [2016] EWCA Civ 1092, [2017] 2 BCLC 277; reversing [2015] EWHC 2371 (Comm), [2015] 2 CLC 475. (Acting for the bridge bank formed by Banco de Portugal to take over the business of Banco Espírito Santo, in a landmark dispute about the extent to which the English Court should recognise actions taken by Banco de Portugal as Resolution Authority under the Bank Recovery and Resolution Directive 2014/59/EU in relation to a USD 835m structured finance facility arranged by Goldman Sachs).

*In re BW Estates Ltd (No 2), Randhawa and another v Turpin and another (No 2)* [2017] EWCA Civ 1201, [2018] Ch 511 (Acted for the successful appellants, whose attempts to enforce a judgment in their favour in a fraud claim against shares in a company had been frustrated by the appointment of

administrators. The appointment had been made by the judgment debtor, who was the sole director and living shareholder of the company whose other shareholder had been dissolved and whose articles required a quorum of two. The appellants' challenge to the appointment, dismissed at first instance, was successful in the Court of Appeal, the case involving consideration (inter alia) of whether the company was to be treated as a single-member company, and of the *Re Duomatic* principle).

*Central Bank of Ecuador and ors v Conticorp SA* [2015] UKPC 11, reversing [2012] 3 BHS (BCA); [2010] 2 BHS J No 158 (three-month trial before Adderley J); [2010] 3 BHS J No 63 (costs). (Acted for the plaintiffs, who were ultimately successful before the Privy Council in recovering from the dishonest former owners and controllers of a substantial Ecuadorian Bank the assets which those owners had wrongfully taken for themselves immediately prior to the collapse of the bank and its overseas subsidiaries).

*Re Re Lehman Brothers International (Europe) (in administration) (No 5) (Extended Liens)* [2012] EWHC 2997 (Ch), [2014] 2 BCLC 295 (Briggs J); (disclosure application [2011] EWHC 2022 (Ch); [2012] 1 BCLC 312) (Acted for LBF AG, the Swiss subsidiary of Lehman Brothers, in a dispute concerning the validity and effect of provisions in LBIE's standard documentation intended to give companies in the Lehman group priority in Lehman's insolvency over outside creditors. This involved consideration, inter alia, of the nature of security rights purporting to create a general lien over intangibles, the effect of the Financial Collateral Regulations on floating charges, and the applicability of the British Eagle principle to contracts involving foreign insolvent parties).

*Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd and Lehman Brothers Special Financing Inc* [2011] UKSC 38, [2012] 1 AC 383 (Supreme Court); affirming [2009] EWCA Civ 1160, [2010] Ch 347, CA; [2009] EWHC 1912 (Ch), [2009] 2 BCLC 400 (Sir Andrew Morritt C) (Acted for noteholders in successfully resisting Lehman's claim that Noteholder Priority switching provisions of Lehman's Dante series of synthetic CDOs infringed the anti-deprivation principle by reducing the value of the assets available to Lehman in its Chapter 11 proceedings).

*Re Thumb (China) Holdings Group Limited, The Bank of New York Mellon v Thumb (China) Holdings Group Limited* BVI HCV 2009/156 (Bannister J). (Acted for the trustee of a bond issue in winding up the defaulting issuer, despite the issuer's assertions that the trustee had sold the collateral at an undervalue).

*Lomax Leisure Limited v Miller and Bramston* [2007] EWHC 2508 (Ch); [2008] 1 BCLC 262, ChD. (Acted for successful defendant liquidators who were sued for breach of duty and on dividend cheques which they had issued, but then had stopped on discovering that their rejection of a substantial proof was the subject of an appeal to the court).

*LME v Englehard Metals* (LME Disciplinary Tribunal 2004). (Acted for successful defendant in a Disciplinary Tribunal hearing (chaired by Lord Mustill) concerning allegations of causing a disorderly market).

## International Arbitration

**As counsel:**

2012 - 2016

Major and document-heavy commercial arbitration in Delhi under LCIA (India) Rules, concerning an Indian property joint venture agreement.

2013 - 2016

Major and document-heavy commercial arbitration in Singapore under LCIA Rules, concerning the AIM floatation of an IoM company.

2003 - 2004

Ad hoc submission in Hong Kong concerning banking guarantees.

1998 - 2000

ICC Arbitration in Copenhagen concerning a commission agreement relating to oil exploration.

**As arbitrator:**

2018 2019

Panel member in an LCIA arbitration concerning the enforceability of a Subordinated Loan Agreement.

2017

One of the two QCs appointed to carry out the Unresolved Claims Determination Procedure under a Share Purchase Agreement in relation to the sale of a telecoms and media group.

2016 - 2017

Panel member in an LCIA arbitration concerning the enforceability of a Subordinated Loan Agreement.

2014 - 2015

Panel member in an ICC arbitration in London concerning a joint venture agreement.

2014 - 2015

Panel member in an LCIA arbitration concerning derivatives.

2008 - 2010

Sole arbitrator in an ICC arbitration in London concerning a joint venture agreement.

xiv

## Professional Negligence

*Clifton v Powergen Plc* (Settled in 1997 during trial before OR) (Acted for the defendants in a dispute about the environmental effects of burning an experimental fuel in a power station).

*Gefco v Powergen Plc*, (1996, QBD) (Acted for the defendants in a claim against their public liability insurers arising from the operation of a power station).

*Friends Provident Life Office v. Hillier Parker May & Rowden,* (Settled in 1995 during trial before OR) (Acted for the claimants seeking the return of overpayments to contractors or compensation from their professional advisers).

*Bovis International Inc v The Circle Limited Partnership* (1995) 49 Con LR 12, CA (Acted for the successful defendants/respondents in their counterclaim against their project managers arising from delays to the completion of a property development).

## High Court Judgments

*TKC London Ltd v Allianz Insurance plc* [2020] EWHC 2710 (Comm)

*Altera Voyageur Production Ltd v Premier Oil E&P UK Ltd* [2020] EWHC 1891 (Comm)

*Hall v Saunders Law Ltd* [2020] EWHC 404 (Comm), [2020] BLR 445

*Ventra Investments Ltd v Bank of Scotland* [2019] EWHC 2058 (Comm)

*Idemia France SAS v Decatur Europe* [2019] EWHC 946 (Comm), [2019] 2 All ER (Comm) 1020

*GPP Big Field LLP v Solar EPC Solutions SL* [2018] EWHC 2866 (Comm)

*AMT Futures Ltd v Boural and others* [2018] EWHC 750 (Comm), [2018] QB 1144

*Yukos International UK BV and others v Merinson* [2018] EWHC 335 (Comm), [2018] QB 1113 (affmd [2019] EWCA Civ 830, [2020] QB 336)

*O3B Africa Ltd v Interactive E-Solutions JLT* [2017] EWHC 3813 (Comm) (affmd [2018] EWCA Civ 62, [2018] BLR 167)

*McGann v Bisping* [2017] EWHC 2951 (Comm)

*Dalecroft Properties Ltd v Underwriters* [2017] EWHC 1263 (Comm), [2017] Lloyd's Rep IR 511

*Monde Petroleum SA v Westernzagros Limited* [2016] EWHC 1472 (Comm), [2017] 1 ALL ER (Comm) 1009 (affmd [2018] EWCA (Civ 25, [2018] 2 All ER (Comm) 867)

*St Vincent European General Partner Ltd v Robinson* [2016] EWHC 2920 (Comm), [2016] 2 CLC 807

*The Worshipful Company of Grocers v Keltbray Group Holdings Ltd* [2016] EWHC 1167 (QB)

*Eco Quest plc v GFI Consultants Ltd* [2014] EWHC 4329 (QB), [2015] BPIR 244

*Sunrise Brokers LLP v Rogers* [2014] EWHC 2633 (QB), [2014] IRLR 780 (affmd [2014] EWCA Civ 1373, [2015] IRLR 57)

*East England Schools CIC (t/a 4MYSCHOOLS) v Palmer* [2013] EWHC 4138 (QB); [2014] IRLR 191

*Doncaster Metropolitan Borough Council v AC and others* [2013] EWHC 45 (QB)

*B v Home Office* [2012] EWHC 226 (QB); [2012] 4 All ER 276

*Fairstate Ltd v General Enterprise and Management Ltd* [2010] EWHC 3072 (QB); [2011] 2 All ER (Comm) 497; 133 ConLR 112

## Appointments

Visiting Professor of Financial Law at the University of Oxford

Deputy High Court Judge in the QBD and the Commercial Court

A Recorder

Master of the Bench of the Inner Temple

Member of the Bar Council 2004 - 13; Chairman of the Bar Council Legal Services Committee 2010 - 13

Chairman, LCL&CBA 2004 - 2005

Admitted to the bar of the Eastern Caribbean Supreme Court 2009 -

Registered foreign lawyer, Singapore International Commercial Court (2017 -)

DIFC Registered Practioner (Part ll) (2017 - 2018)

Registered Practitioner with rights of audience at the AIFC, in Kazhakstan

## Publications

'The key banking and finance cases from the last decade': Part 1 - (2020) 1 JIBFL 3; Part 2 – (2020) 2 JIBFL 75

Ch 7 'Enforcing Debt Securities' in L Gullifer and J Payne (eds) *Intermediation and Beyond* (Hart Publishing, 2019)

Ch 16 'Guarantees' in S Paterson and R Zakrzewski (eds) *McKnight, Paterson and Zakrzewski on The Law of International Finance* (2nd edn, OUP 2017)

'Syndicated lending and the "purview doctrine": how to preserve guarantees when varying the guaranteed obligation' (2017) JIBFL 459

'Misrepresentation claims against the issuer by buyers in the secondary market: a cautionary tale' (2017) 3 JIBFL 130

'Intermediated securities and the rights of the ultimate investor' (2016) 3 JIBFL 153 Editor, *Legal Decisions Affecting Bankers*, Vols 12, 13 and 14 (Butterworths 2000, 2001)

'Recent Developments in UK Banking Law' (1999) 11 JIBFL 462; (2000) 1 JIBFL 6

'Developments in English Banking Law Over The Past Year' (1998) 6 JIBFL 222; (1998) 7 JIBFL 273 20 Halsbury's Laws (4th ed 1993 re-issue), title Guarantee and Indemnity

Contributor to Banks, Liabilities and Risk (1st ed 1991; 3rd ed 2001) and to Banks and Remedies (1st ed 1991; 2nd ed 1999)

Consulting editor, All England Commercial Cases 1999

## Languages

Working knowledge of French, rudimentary Russian, German and Italian.

_____

# APPENDIX 2: PUBLICATIONS

_____

**Journal Articles**

R Salter, '**Preserving guarantor liability: an update**' (2021) Journal of International Banking and Financial Law (2021) 11 JIBFL 747read more

R Salter, '**Securities lending: does a "right of use" prevent the existence of a trust?**' (2020) Journal of International Banking & Financial Law 738read more

R Salter, '**The key banking and finance cases from the last decade: Part 1**' (2020) Journal of International Banking & Financial Law 3read more

R Salter, '**The key banking and finance cases from the last decade: Part 2**' (2020) Journal of International Banking & Financial Law 75read more

R Salter, '**Misrepresentation claims against the issuer by buyers in the secondary market: a cautionary tale**' (2017) Journal of International Banking and Financial Law 130read more

R Salter, '**Syndicated lending and the "purview doctrine": how to preserve guarantees when varying the guaranteed obligation**' (2017) Journal of International Banking and Financial Law 459

R Salter, '**"Intermediated securities and the rights of the ultimate investor'** ' (2016) Journal of International Banking & Financial Law 153read more

R Salter, '**Recent Developments In UK Banking Law**' (2000) Journal of International Banking and Financial Law 6

R Salter, '**Recent Developments In UK Banking Law**' (1999) Journal of International Banking and Financial Law 462

R Salter, '**Developments In English Banking Law Over The Past Year**' (1998) Journal of International Banking and Financial Law 273

R Salter, '**Developments In English Banking Law Over The Past Year**' (1998) Journal of International Banking and Financial Law 222

## Book Chapters

R Salter, '**Enforcing Debt Securities**' in Louise Gullifer, Jennifer Payne (ed), *Intermediation and Beyond* (Hart Publishing 2019)read more

R Salter, '**Guarantees**' in McKnight, Paterson and Zakrzewski (eds), *Law of International Finance* (OUP 2017)read more

R Salter, 'Banks and Risk: Home Lending' in Cranston (ed), *Banks, Liability & Risk* (Lloyd's of London Press Ltd 2001)

R Salter, 'EC Remedies And English Law Remedies ' in Blair (ed), *Banks and Remedies* (Informa Law 1999)

R Salter, 'Guarantee and Indemnity' in (ed), *Halsbury 's Laws of England* (Butterworths 1993)

## Edited Books

J Benjamin, E McKendrick, R Salter and A Televantos (eds), *Financial Law* (2nd edn Oxford University Press 2022) (forthcoming)

R Salter, Odgers, Baylis and Gibaud (eds), *Legal Decision Affecting Bankers Vol 14* (Butterworths 2001)

R Salter, Odgers, Baylis and Gibaud (eds), *Legal Decisions Affecting Bankers Vol 12* (Butterworths 2000)

R Salter, Odgers, Baylis and Gibaud (eds), *Legal Decisions Affecting Bankers Vol 13* (Butterworths 2000)