# Exhibit 40

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒
                                  )
                                  )
In re                             )
                                  )
CUSTOMS AND TAX ADMINISTRATION )   MASTER DOCKET
OF THE KINGDOM OF DENMARK       )  18-MD-2865 (LAK)
(SKATTEFORVALTNINGEN) TAX         )
REFUND SCHEME LITIGATION          )
                                  )
This document relates             )
To:  All cases                    )
‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒‒)


          C O N F I D E N T I A L


          VIDEO DEPOSITION OF
            LISBETH ROMER
         Copenhagen, Denmark
       Thursday, June 3, 2021
        10:00 a.m.  (CEST)


          Taken at:
      Offices of Poul Schmith
   Kammeradvokaten, Kalvebod Brygge 32,
      1560 Copenhagen V, Denmark
      And WebEx via New York


Reported by:  FREDERICK WEISS, CSR, CM

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

7 (Pages 22 to 25)

## Page 22

1  your time at SKAT?
2       **A.**    I know that now.
3       **Q.**    Okay.  Let's talk a little bit
4  about your background.  Can you tell us what your
5  education is?
6       **A.**    (English)  I am a lawyer by
7  education, made law in Denmark, and I have done
8  civil — I worked as a lawyer to start, but then I
9  continued in the government service.  And I have
10 been there 40 years in the government service, of
11 which 35 in tax.  Sorry.
12            MS. MCCARTHY:  That's okay.  That's
13 all right.
14            MR. WEINSTEIN:  Whatever you're
15 comfortable with.
16 BY MS. MCCARTHY:
17      **Q.**    When did you start working at SKAT?
18      **A.**    In '79.
19      **Q.**    And what — what were the positions
20 that you held in SKAT?
21      **A.**    Oh, they were very different.  It
22 was a legal department that was established when
23 we introduced withheld tax.  That was introduced
24 in '70, and it was a whole new setup for taxation.
25            And I was working in the department

## Page 23

1  with penalties, bailiffs —
2            (Court reporter clarification.)
3            THE WITNESS:  Penalties and
4  bailiffs and —
5            (Court reporter clarification.)
6            THE WITNESS:  Yeah.
7            — things like that.
8  BY MS. MCCARTHY:
9       **Q.**    Okay.  At some point did you become
10 a manager?
11      **A.**    Yes.
12      **Q.**    When was that?
13      **A.**    '86, I think was the first time.
14      **Q.**    And what department were you a
15 manager in?
16      **A.**    That was also about financial
17 arrangements.  It was when we started with all the
18 hedging and —
19      **Q.**    Hedging?
20      **A.**    — and things like that.
21            Yeah.  We had a department for
22 that.  I am only there shortly.
23      **Q.**    When you say you had a department
24 that handled hedging, what do you mean?
25      **A.**    And other — other financial

## Page 24

1  instruments that called for some taxations that
2  people might not be aware of.  So...
3       **Q.**    So you had some familiarity with —
4  with trading?
5       **A.**    A little, yes.
6       **Q.**    Okay.  From the —
7       **A.**    It was very new and we were
8  starting it all up.
9       **Q.**    Okay.
10      **A.**    And I left quite rapidly because
11 tax and customs were merged in '90 and I went to
12 every general office where I was in the management
13 of this regional office.  And that was fully —
14 totally different.
15            (Court reporter clarification.)
16            THE WITNESS:  Very different.
17 BY MS. MCCARTHY:
18      **Q.**    Where was that regional office?
19      **A.**    Ballerup, in Copenhagen.
20            THE INTERPRETER:  B-A-L-L-E-R-U-P.
21 BY MS. MCCARTHY:
22      **Q.**    What did that regional office in
23 Ballerup handle?
24      **A.**    Everything.  We — when we set up
25 this thing, we had 30 regions in Denmark, more or

## Page 25

1  less handling the same things.  The general things
2  are tax and customs administration.  We had
3  accounts, we had registration, we had forced
4  recovery.  We had employees, things that we dealt
5  with.
6            We had a compromise thing, we had
7  control, audit.  And then we had a lot of tax
8  things also, small groups.
9       **Q.**    And did you manage the entire —
10      **A.**    No.
11      **Q.**    — group?
12            What did you manage?
13      **A.**    There was one boss and then we were
14 four under-bosses, and I was one of them.
15      **Q.**    And what were you — what was your
16 area of responsibility?
17      **A.**    I had some customs, import/export,
18 I had registration.  I had the — the public
19 service at the counter, and making help to people,
20 how to do and deal with new things.
21            MR. WEINSTEIN:  I'm sorry if you
22 aren't finished.  I just want to suggest, it's
23 fine if you're comfortable not using the
24 interpreter.  But if you're struggling to explain
25 something in English because you know how to say

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

Page 26

1  it in Danish, you should use the interpreter to
2  make sure you're explaining it fully.
3  BY MS. MCCARTHY:
4      Q.    I understand what you're saying.
5  So it's up to you.
6      A.    I find it easier, because when you
7  speak English, I turn to English also.
8      Q.    Okay.
9      A.    Sorry.
10     Q.    As you need it, obviously —
11     A.    Yes, thank you.
12     Q.    — the interpreter is here to
13  assist.
14           THE WITNESS: You follow me, okay?
15           THE INTERPRETER: Yes, I do. You
16  just let me know.
17  BY MS. MCCARTHY:
18     Q.    Okay. So you had many
19  responsibilities —
20     A.    Yes.
21     Q.    — then in that?
22           And who was your boss initially?
23     A.    That was a lady called Birthe Holm.
24           THE INTERPRETER: T-H?
25           THE WITNESS: T-H, yes.

Page 27

1           THE INTERPRETER: B-I-R-T-H-E,
2  first name. Last name, H-O-L-M.
3  BY MS. MCCARTHY:
4      Q.    Ms. Romer, did there come a point
5  when you became responsible for dividend tax?
6      A.    Not yet.
7      Q.    Okay. When did that happen?
8      A.    In 2002. Before that I had to go
9  to Bhutan. I was out three years for Danida, the
10  Danish aid system.
11           THE INTERPRETER: D-A-N-I-D-A,
12  Danida.
13  BY MS. MCCARTHY:
14     Q.    The Danish what system?
15     A.    Help for underdeveloped countries.
16     Q.    I see.
17     A.    Yeah.
18     Q.    And so you took three years in
19  Bhutan?
20     A.    I was there for three years, yes.
21     Q.    And what did you do there?
22     A.    I was in the tax and customs, I
23  made a personal income tax law that is still
24  working.
25     Q.    Wow. That's fantastic. Great.

Page 28

1           And then after three years in
2  Bhutan, you came back to —
3      A.    I came back one year, and then I
4  went to Vietnam for one year, and then I came
5  back. And shortly after I was assigned to go to
6  the dividend tax group in Naerum.
7           THE INTERPRETER: N-A-E-R-U-M.
8  BY MS. MCCARTHY:
9      Q.    Is that also in Copenhagen?
10     A.    Yes. It's the outskirts but it's
11  still Copenhagen, greater Copenhagen.
12     Q.    Okay. What were your
13  responsibilities there?
14     A.    Well, it was new that the whole
15  dividend tax was gathered. They had been in
16  different places. But interest in shares had
17  increased, so they put all the issues about
18  dividend tax together in a group. And, yeah.
19     Q.    Okay. What specifically were you
20  dealing with regarding dividend tax?
21     A.    Dividend tax was — it was a very
22  formal office. We were sent out from the — from
23  the central bookkeeping office, so we were a sort
24  of bookkeeping group.
25           Our main purpose was to key-in all

Page 29

1  the declarations from the companies that had
2  decided to pay out dividend. And then also to
3  receive information about the recipients of the
4  dividend.
5           (Court reporter clarification.)
6           THE WITNESS: Recipient, sorry.
7  Recipients of the dividend.
8  BY MS. MCCARTHY:
9      Q.    Okay. And you said that that was
10  just beginning. And what year was that that —
11  that that was just beginning?
12     A.    Well, they had had it, but minor —
13  the amount was increasing, because the interest in
14  shares was growing.
15     Q.    Okay. What year was that that you
16  went there?
17     A.    I went 2002.
18     Q.    2002?
19     A.    Yes.
20     Q.    Okay. And the — you said the
21  interest was growing?
22     A.    Yes.
23     Q.    And what — what was the interest
24  growing in?
25     A.    Owning shares.

## Page 30

1  Q.  Do you know why that was happening?
2  A.  That was an increase all over the
3 world that people got more money and more interest
4 in investing and things like that, I presume.
5  Q.  And it was interest in owning
6 shares of Danish companies, correct?
7  A.  Yes.
8  Q.  Okay.  And so you moved there in
9 2002?
10  A.  Yes.
11  Q.  What were your responsibilities --
12 it's my understanding that you became the head of
13 accounting, too, in January 2009, correct?
14  A.  Yes.
15  Q.  Between 2002 and January --
16  A.  Same job, new name.
17  Q.  Same job, new name?
18  A.  Yes.
19  MR. WEINSTEIN:  Just let her finish
20 her question.
21  THE WITNESS:  Sorry.
22  MR. WEINSTEIN:  Because it makes
23 his job harder.
24 BY MS. MCCARTHY:
25  Q.  All right.  So your

## Page 31

1 responsibilities were steady throughout that time?
2  A.  Yes.
3  Q.  All right.  And you called your
4 function in that unit "bookkeeping," correct?
5  A.  Yes.
6  Q.  Yet you -- you raised a lot of
7 issues while you were in that unit, correct?
8  A.  Yes.
9  Q.  Concerns that you were seeing --
10 you had about dividend reclaims being paid to
11 investors, correct?
12  A.  Also, yes.
13  Q.  Okay.  And -- and that was despite
14 being told that you had a bookkeeping function?
15  MR. WEINSTEIN:  Objection to form.
16 BY MS. MCCARTHY:
17  Q.  Correct?  You may answer.
18  A.  Yeah.  But since we were the only
19 one dealing with dividend tax, we were the only
20 one able to tell what was wrong maybe or what was
21 problems, or how we could improve things.
22  So of course, that was part of my
23 duty to do that.
24  Q.  Right.  And so you -- you felt
25 obligated to notify your superiors of issues that

## Page 32

1 you saw in the dividend tax unit, correct?
2  A.  Yes.
3  Q.  Okay.  And at some point, that
4 became called Accounting II.  And we are going to
5 come back to that and talk about that in more
6 detail.
7  But in just finishing your career,
8 it's correct that you retired from SKAT in
9 December of 2013, correct?
10  A.  Yes.
11  Q.  And was that because you had hit
12 retirement age --
13  A.  No.
14  Q.  -- or did you want to retire?
15  A.  I wanted to retire because it was
16 five years after the retirement date.
17  Q.  Sixty-five is the age in Denmark?
18  A.  Yes.  Yes.
19  Q.  That seems quite young as I get
20 closer to it.
21  So you stayed an extra five years?
22  A.  Yes.
23  Q.  Are you happy that you did that?
24  A.  Yeah, I love my job.
25  Q.  Okay.  As you just went over, you

## Page 33

1 identified a number of issues and problems when
2 you were working at SKAT, correct?
3  A.  Mm-Hmm.
4  Q.  And specifically, you saw problems
5 with SKAT's controls that made it likely that SKAT
6 would issue erroneous refunds, correct?
7  MR. WEINSTEIN:  Objection to form.
8  THE WITNESS:  I don't understand
9 that word.
10  THE INTERPRETER:  Erroneous?
11  THE WITNESS:  Yes.
12  (Interpreter Translating).
13  THE WITNESS:
14  A.  Well, if you have a system and you
15 can see possibilities, and I mean, Denmark was not
16 the only one, then you should tell that here truth
17 be something that was not good.  It is not good
18 administration not to know.
19  (Court reporter clarification.)
20  THE WITNESS:  Not to know.
21 BY MS. MCCARTHY:
22  Q.  Not to know what?
23  A.  What to -- that you could end with
24 some difficulties.
25  Q.  I want to try to understand what

CONFIDENTIAL
Lisbeth Romer – June 3, 2021

12 (Pages 42 to 45)

Page 42

1  office dealing with that.
2          So the interest of what happened in
3  our little world was not very big.  So it was
4  very, very difficult to get through and have
5  changes made.
6  BY MS. MCCARTHY:
7      Q.    Yet you kept trying?
8      A.    That's why there are so many
9  papers.
10     Q.    Right.  Because you kept trying?
11     A.    Yes.
12     Q.    Right?
13     A.    Yes.
14     Q.    With foreign -- with -- withdrawn.
15          Was it a priority of the Danish
16  government to encourage foreign investment in
17  Denmark?
18          MR. WEINSTEIN:  Objection to form.
19          THE WITNESS:
20     A.    I know that there's always an
21  encouragement, and there is a will to make it as
22  easy as possible for foreigners.  And I would
23  think that the net dividend tax was the best.  So
24  no problem, you get the money right away and you
25  have no problem with refund and everything.

Page 43

1          But it didn't -- it didn't happen.
2  BY MS. MCCARTHY:
3      Q.    With the net would have been a very
4  easy way; is that what you're saying?
5      A.    Yes.  Yes.
6      Q.    Yet there was resistance to that?
7      A.    Yes.
8      Q.    And is it fair to say that you were
9  encouraged to provide service to taxpayers -- to
10  shareholders, to investors?  Withdrawn.  I'm going
11  to try that again.
12          Is it fair to say that the
13  government valued providing service to foreign
14  investors?
15          MR. WEINSTEIN:  Objection to form.
16          THE WITNESS:
17     A.    I think our whole tax
18  administration is very much a service organization
19  to help all taxpayers, including shareholders.
20          And I think we've done a lot all
21  the time to talk with a lot of people, to make
22  things clear and easier and better, and help
23  people understand what we are thinking to make
24  everything go easy and smoothly.
25          And that, I think, is in -- in a

Page 44

1  way in the DNA of Denmark.
2  BY MS. MCCARTHY:
3      Q.    But at the same time, resources
4  were being cut within your division, correct?
5          MR. WEINSTEIN:  Objection to form.
6          THE WITNESS:
7      A.    Not only my division.  All over
8  tax, and that is because on 1st of November 2005,
9  the state tax administration merged with the local
10  authority tax administration.  Before that we had
11  a two-level system.  And that was merged to one
12  system.
13          And of course, when you merge two
14  things, you should have a benefit out of it.  So
15  that is partly also why we had to cut so many
16  things.
17  BY MS. MCCARTHY:
18     Q.    What impact did those cuts have on
19  your ability to review foreign claims for refunds?
20     A.    Well, it didn't had exactly an
21  impact on us.  But the all-around feeling in tax
22  was that everything was tighter and fewer people.
23          So being helpful, because what you
24  were doing, you had to do it -- it was very -- you
25  didn't have time to go out and help.  The way

Page 45

1  everything was organized was more strict and --
2  and you had less -- less possibility.  We were --
3  that I think in 2009 where we had established
4  seven pillars with different topics.  Mine was in
5  the account system, the bookkeeping system.
6          And it was very difficult to go
7  from one pillar to another to have them help -- if
8  I saw something I wanted investigated, we didn't
9  have any investigators in my group.
10          I had to wait for them to ask to do
11  it maybe the next year.  So everything got tighter
12  and more difficult.
13     Q.    So even if you recognized a
14  problem, a potential issue with a weekly --
15     A.    Of course.
16          MR. WEINSTEIN:  You have to let her
17  finish her question.
18          THE WITNESS:  Sorry.
19  BY MS. MCCARTHY:
20     Q.    Even if you -- you saw a problem
21  and you -- you sent it off for investigation, you
22  may still have to pay that reclaim, correct?
23          MR. WEINSTEIN:  Objection to form.
24          THE WITNESS:
25     A.    If I did such a thing, of course,

CONFIDENTIAL
Lisbeth Romer – June 3, 2021

16 (Pages 58 to 61)

Page 58

1             (Court reporter clarification.)
2             THE WITNESS:  Flew.
3        A.       It is not a certain amount that the
4  company is giving out as dividend.  It differs
5  from year to year.  And so it's rather difficult
6  to know beforehand how much should we expect.  If
7  things are going well, you expect more.  But you
8  are not certain which company is doing well or
9  not.
10            And then we had the financial
11  crisis, and Danish banks were not allowed to pay
12  out dividends for some years.  And of course, that
13  has an impact on all the dividends that we are
14  talking about.
15            It is -- you have to be very
16  interested in your work and to have a good nose
17  for what is happening in society to be able to
18  deal with this.
19            And I have said that I think -- I
20  really think that if the group of the good people
21  we were had been there, we would have discovered
22  this fraud before.  That is my point of view.
23            But I was not there, and the others
24  were not there.  There was only one left.
25

Page 59

1  BY MS. MCCARTHY:
2        Q.       Why did that happen?  Why was your
3  group disbanded?
4        A.       Because --
5             MR. WEINSTEIN:  Objection to form.
6             THE WITNESS:
7        A.       -- when we started in 1970 with the
8  withholding tax system, a lot of people were
9  employed, and many of those were still in my
10  group.
11            So if they were employed in '70, in
12  '10 or a little after, they were supposedly going
13  home, be retired.
14            So they saw a chance of -- and we
15  had -- we had installed a new keying-in system for
16  the companies, so we didn't have these piles of
17  paper anymore, everything was going into the
18  machine by the company.
19            So a lot of our tasks had
20  disappeared.  And so they said:  "Go home.  We are
21  not starting a new one.  We are not starting a new
22  group."
23            And actually, the refund of
24  dividend tax was almost the only task left as the
25  companies now were doing the work we had done

Page 60

1  before by keying in the declaration and
2  recipients.
3             (Court reporter clarification.)
4             THE WITNESS: Recipients.  Sorry.
5  BY MS. MCCARTHY:
6        Q.       What was Sven left to do then?
7        A.       Refund.
8        Q.       So he had to still review the --
9  the applications, correct?
10       A.       Yes.
11       Q.       And he was doing that all by
12  himself?
13       A.       Yes.
14       Q.       Did he have a supervisor?
15       A.       Yes.
16       Q.       Do you know who that was?
17       A.       I'm not sure because there were
18  several people involved.  And I didn't follow when
19  I left.  I left.  So I didn't know how the daily
20  work was when I had gone.
21       Q.       So -- imagine that it was fairly
22  frustrating for you to raise the concerns that you
23  raised within SKAT and to not have -- not to be
24  taken seriously?
25            MR. WEINSTEIN:  Objection to form.

Page 61

1             THE WITNESS:
2        A.       I must say that we also managed to
3  get a lot of things through.  This keying-in
4  self-system was solving a lot of problems.  Wow.
5  We got it made.  And a lot of other things that
6  were troubling our work, we also had changed into
7  the better.
8             The forms, when we arrived, had one
9  page, and a second page where the tax authority of
10  the country where the recipient is living, on the
11  second page.  So you could switch the first page
12  and nobody would know.
13            So we made it all in one page, so
14  it happens in one page.
15            I mean, small things, but we were
16  trying to tighten up loopholes and -- and get rid
17  of difficulties.
18       Q.       Mm-hmm.
19       A.       And then, of course, when you have
20  some victories, it's easier to continue than only
21  if you had notes all the time.
22       Q.       Right.  When you testified before
23  the Commission, you expressed your frustration
24  about not being listened to by your superiors,
25  correct?

Page 78

1  listed companies give to SKAT regarding
2  shareholders?
3      A.    They don't do it.  It is the
4  VP Securities that do it.
5      Q.    All right.  So is that a gap
6  then --
7      A.    No.
8      Q.    -- in the information --
9      A.    No.
10     Q.    -- that -- if you could let me
11 finish the question.
12          Because what I'm hearing is that if
13 the shareholder has an account in a Danish bank,
14 then VP Securities is able to report to SKAT what
15 amount of dividend was given to a specific
16 shareholder, correct?
17     A.    Correct.
18     Q.    However, if it's a foreign
19 shareholder without a Danish account and they
20 invest in a listed company, that the listed
21 company does not provide the shareholder
22 information to SKAT, correct?
23     A.    Correct.
24          MR. WEINSTEIN:  Objection to form.
25

Page 79

1  BY MS. MCCARTHY:
2      Q.    Is -- and I was asking you if that
3  constituted then a gap in information to SKAT?
4      A.    But it was as it had always been.
5  It was as it has always been.  Since the system
6  was put in place in the '80s, we didn't have any
7  information about shareholders not having a depot
8  in Denmark.
9      Q.    Okay.  So that was something
10 that -- that if SKAT then received a reclaim
11 application by a foreign shareholder without a
12 Danish bank account, how could you verify their --
13 that that shareholder received a dividend?
14     A.    I could only verify it by his claim
15 and by the invoice from the bank telling that he
16 had received that amount of dividend.
17     Q.    Okay.
18          MS. MCCARTHY:  So if we could go to
19 Exhibit 3051, if you could mark that,
20 Mr. Reporter.
21          3051 should be a form, Claim to
22 Relief from Danish dividend Tax.
23          Oh, I'm so sorry, it's 3016.  I
24 apologize.  I know, I sent you to -- I sent you to
25 a very big document.  I meant to send you to a

Page 80

1  very short document.
2          (Exhibit 3016 marked for
3  identification.)
4  BY MS. MCCARTHY:
5      Q.    Ms. Romer, do you see that
6  document?
7      A.    Yes.
8      Q.    Do you recognize it?
9      A.    Yes.
10     Q.    What is it?
11     A.    It is the form to Claim Relief from
12 Danish Dividend Tax.
13     Q.    And is this -- was this form
14 provided by SKAT in different languages?
15     A.    Yes.
16     Q.    And this is the English form,
17 correct?
18     A.    Yes.
19     Q.    Okay.  And is this the form that
20 you were talking about earlier today --
21     A.    Yes.
22     Q.    -- that a shareholder would fill
23 out when they were asking for --
24     A.    Refund.
25     Q.    -- refund of the tax withheld by

Page 81

1  SKAT, correct?
2      A.    Correct.
3      Q.    Okay.  And so can you go over again
4  for us what the circumstances needed to be in
5  order for a shareholder to use this specific form?
6          MR. WEINSTEIN:  Objection to form.
7          THE WITNESS:
8      A.    Of course.  The shareholder should
9  be a shareholder who was a beneficial owner of the
10 shares at the time where the dividend was decided
11 at the general assembly; and should be living in a
12 country with which Denmark had a double-taxation
13 treaty.
14          And should be a taxpayer in the
15 country that he was claiming he came from, as we
16 had different tax percentages in different tax --
17 double taxation agreements.  It was also important
18 that it was the right country that he claimed to
19 be taxpayer in.
20 BY MS. MCCARTHY:
21     Q.    Okay.  And before approving a
22 refund, SKAT would review the information provided
23 on this form, correct?
24     A.    Yes.
25     Q.    Okay.  And who was the employee

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

22 (Pages 82 to 85)

Page 82

1   that worked with you who was responsible for
2   reviewing these forms?
3        A.      That was Mr. Sven that we talked
4   about before.
5        Q.      Sven Nielsen?
6        A.      Yes.
7        Q.      N-I-E-L-S-E-N?
8        A.      Yes.
9        Q.      Okay.  And was Mr. Nielsen always
10  the person responsible for reviewing this form?
11       A.      Yes.
12       Q.      In the entire time you worked in
13  Accounting II?
14       A.      Yes.
15       Q.      Was there anyone else that did
16  this?
17       A.      Yes, there were people helping
18  because the amount was increasing.  And different
19  from the group helped him out with this.
20       Q.      Did you ever review these and help
21  him out?
22       A.      No.  No.
23       Q.      But you were familiar with the
24  form?
25       A.      Yes.

Page 83

1        Q.      Okay.  And could Mr. Nielsen read
2   English?
3        A.      Yes.
4        Q.      Okay.  And SKAT paid refunds only
5   if the information on the form was filled out,
6   correct?
7        A.      Yes.
8        Q.      And the required documentation was
9   attached?
10       A.      Yes.
11       Q.      All right.  Did SKAT do anything to
12  verify the information on the forms?
13       A.      But that was the thing, that we had
14  to rely on the information we got.  You have the
15  Claimant, and then you had the certification from
16  the financial institution that the dividend was
17  paid to this person.
18       Q.      Okay.  So it was -- the best you
19  could -- all you could do was rely on what was
20  provided to SKAT?
21       A.      Yes.
22            MR. WEINSTEIN:  Objection to form.
23  BY MS. MCCARTHY:
24       Q.      And if the information was
25  completely filled out and the attaching documents

Page 84

1   were there --
2        A.      Supporting.
3        Q.      -- supporting documents, then the
4   refund would be paid, correct?
5        A.      Yes.
6        Q.      And was this the same form that was
7   used from -- in the time that you were in
8   Accounting II?
9        A.      We improved the form, as I told,
10  that the certification from the tax authorities
11  was on a separate page which we found was not so
12  clever.  And therefore, we put it together so that
13  it could all be in one page.
14       Q.      And were you -- what was the
15  concern that you had by having the certification
16  on a separate page?
17       A.      You can substitute the first page.
18            (Court reporter clarification.)
19            THE WITNESS:
20       A.      You can substitute the first page
21  without the tax authorities knowing what you are
22  doing.
23  BY MS. MCCARTHY:
24       Q.      Okay.  So that change in your form
25  then was to try to reduce the risk of fraud,

Page 85

1   right?
2        A.      Yeah.
3        Q.      Okay.  If we can just go through
4   the form quickly.  The form says that the claim is
5   made for refund of Danish dividend tax, and then
6   it gives the total Danish kroner being sought at
7   the very top, right?
8        A.      Yes.
9        Q.      Did the reviewers do anything to
10  independently verify the accuracy of the total
11  Danish kroner amount?
12       A.      We calculated -- not always.  That
13  depended on the amount and the situation.
14            But we calculate it, of course, if
15  they had calculated the right way and if they had
16  used the right percentage from the double-taxation
17  treaty.  And...
18       Q.      Okay.  So it might depend upon the
19  country?
20       A.      Yes.
21       Q.      And the agreement between
22  Denmark --
23       A.      Yes.
24       Q.      -- and that country?
25            Are you familiar with the

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

23 (Pages 86 to 89)

Page 86

1  double-taxation treaty between Denmark and the
2  United States?
3       A.       I have fortunately forgotten,
4  sorry.
5       Q.       Was there a time when you were
6  familiar with it?
7       A.       Yeah.  When paragraph 10 was
8  introduced.
9       Q.       Paragraph 10?
10       THE INTERPRETER:  Section 10.
11       THE WITNESS:
12       A.       Section 10 was introduced when the
13  pension schemes in the States.  I think it was in
14  '10 it was introduced.
15  BY MS. MCCARTHY:
16       Q.       Okay.  Can you tell us about
17  Section 10?
18       A.       Yes.  But it was giving fully tax
19  exemption for pension schemes in the States.
20       Q.       Do you know when that went into
21  effect?
22       A.       '10.
23       Q.       2010?
24       A.       I think it was in '10.
25       Q.       Okay.  When Section 10 went into

Page 87

1  effect, did you see any increase in pension plans
2  making reclaim applications?
3       A.       Yes.
4       Q.       Was it a significant increase or
5  just a little bump?
6       A.       It was a significant increase.  And
7  I recall that this was new land for us, and we
8  would make a lot of new pension schemes.  And we
9  were curious, so we tried to look up the different
10  things.
11       But yeah, when something new
12  happens, you try to get familiar with things.  And
13  that we did, and it was -- it was a lot of extra
14  work at that time.
15       Q.       So when you say "we," who tried to
16  look them up?
17       A.       Those who were working with
18  refunds, Sven and his helpers.
19       Q.       How many people did that entail?
20       A.       I think there were two more than
21  Sven, two more, maybe three.
22       Q.       And did you participate in this
23  research?
24       A.       We were always -- we were having a
25  lot of meetings talking about what we were doing,

Page 88

1  so we were very familiar with what happened in our
2  little group and following each other.
3       So I was informed.
4       Q.       Okay.  You were informed.  But did
5  you participate in doing the research?
6       A.       No.
7       Q.       So it was Sven and maybe two other
8  people?
9       A.       Maybe two or three other people,
10  yes.
11       Q.       Do you know who the other two or
12  three were?  Do you remember?
13       A.       I remember the two of them.  There
14  was one called Bente.
15       THE INTERPRETER:  B-E-N-T-E.
16       THE WITNESS:  Fridberg.
17       THE INTERPRETER:  Last name,
18  Fridberg, F-R-I-D-B-E-R-G.
19       THE WITNESS:  And I think Jette
20  Hansen.
21       THE INTERPRETER:  And second,
22  Jette, J-E-T-T-E, last name Hansen, H-A-N-S-E-N.
23  BY MS. MCCARTHY:
24       Q.       And so those three people, I am not
25  going to repeat their names, all worked in

Page 89

1  Accounting II, correct?
2       A.       Yes.
3       Q.       What -- other than -- other than
4  helping in this research or pension plans, what
5  were each of their roles?
6       A.       Oh, but they had different roles in
7  all the paper, rekeying in all the documents that
8  we had at that time.
9       Q.       Because this was before TastSelv
10  went into effect, right?
11       A.       Yes.  Yes.
12       Q.       So you were receiving paper in --
13       A.       Lots of paper, lots of paper.
14       Q.       Did these dividend claim forms, did
15  those continue to be submitted in paper by the
16  time you retired?
17       A.       Yes.
18       Q.       Okay.  Was there an effort to make
19  these electronically available?
20       A.       No.  We didn't have that on our
21  agenda.
22       Q.       Okay.  So this paper continued?
23       A.       Yes.
24       Q.       Right.  And going back to the
25  Section 10 when US pension plans were given full

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

25 (Pages 94 to 97)

Page 94

1            MR. WEINSTEIN:  Objection to form.
2       THE WITNESS:
3            A.    That -- that was -- of course, it
4    had to be the beneficial owner, the one who was
5    entitled to the dividend at the beginning, and by
6    that also could claim a refund.
7    BY MS. MCCARTHY:
8            Q.    And did you have an understanding
9    of the term "beneficial ownership"?
10           A.    Yeah.  I had, I think the
11   understanding that we had in Denmark that you are
12   registered as an -- as an owner, and as long as
13   you are registered as an owner, you would be the
14   beneficial owner, considered the beneficial owner.
15           And for the dividend, it is the
16   time of where the dividend is decided at the
17   national -- at the general assembly, that is what
18   makes you beneficial owner.
19           Q.    So if you own the shares at the
20   time that the general assembly decides to issue
21   the dividend --
22           A.    You are the beneficial owner.
23           Q.    Okay.  And again, was there any way
24   to verify the beneficial ownership of shares
25   through this form?

Page 95

1            MR. WEINSTEIN:  Objection.  Asked
2    and answered.
3            MS. MCCARTHY:  So I don't believe
4    asked and answered is an appropriate objection.
5    If you have an objection to form, if you could
6    just say "objection to form."  It's not helpful,
7    frankly, and I think it's obstructive for you to
8    give your other reasons for objections.  I'm just
9    going to ask you not to do that anymore.
10           MR. WEINSTEIN:  Okay.  Well, I'll
11   ask you not to say:  And again, I'm going to ask
12   you the same question I just asked before.
13           I don't think that's appropriate
14   either.
15           MS. MCCARTHY:  I have to look back
16   and see what I was just saying.
17           THE WITNESS:  Beneficial owner.
18           MS. MCCARTHY:  Yes.  All right.
19   BY MS. MCCARTHY:
20           Q.    And then the form then says at the
21   bottom, there's a certification of the competent
22   authority, correct?
23           A.    Yes.
24           Q.    What is the competent authority?
25           A.    That is the tax authority in the

Page 96

1    country where the beneficial owner is supposed to
2    be taxpayer.
3            Q.    All right.  And what would you
4    expect to ses here?
5            A.    A stamp and a signature.
6            Q.    An official stamp from the tax
7    authority?
8            A.    Yes.
9            Q.    Okay.  And was there any way to
10   confirm the legitimacy of those stamps?
11           A.    We tried to make it, and when it's
12   from Japan it's quite difficult to know it's
13   upside down or what.  So it is -- it can be
14   difficult.
15           But normally we can sort of figure
16   out what the stamp is about and whether it seems
17   appropriate.
18           Q.    And what would happen if, for
19   instance, the form was submitted without one piece
20   of information that was required?
21           A.    We would not fulfill it.  We would
22   send it back.
23           Q.    Okay.  And were there -- are you
24   aware of any occasions when additional questions
25   were asked of the person who identified themselves

Page 97

1    as the beneficial owner?
2            A.    But if they had filled in this
3    correctly (indicating) and sent the invoice in as
4    well, and everything was tallying, was matching,
5    we wouldn't ask any more questions.
6            Q.    Okay.  Did SKAT have the ability,
7    though, if it wanted to, to ask the -- the
8    individual or the entity on the form for
9    additional information?
10           A.    Yes.
11           Q.    Okay.  You had -- withdrawn.
12           I think we discussed earlier the
13   fact that the government -- and you said Denmark
14   was a service-friendly country, right?
15           A.    Mm-Hmm.
16           Q.    Was there any hesitancy as your --
17   on behalf of the Accounting II to ask additional
18   questions of Claimants, in part because of that
19   view towards reducing burdens for taxpayers?
20           MR. WEINSTEIN:  Objection.
21           THE WITNESS:
22           A.    If we felt we had to do it, we will
23   do it.
24   BY MS. MCCARTHY:
25           Q.    Okay.

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

26 (Pages 98 to 101)

Page 98

1    A.    Still, we are dealing the money of
2  Denmark.  So we're not just closing our eyes.  If
3  we felt that something should be investigated,
4  maybe not our group, but somewhere else in the tax
5  system.
6    Q.    Okay.  So you could elevate it to
7  another --
8    A.    Yes.
9    Q.    -- level or to another --
10   A.    Yes.
11   Q.    -- unit, correct?
12   A.    Yes.  Yes.
13   Q.    Okay.  Have you heard of the term
14 KuMEX?
15   A.    No.
16   Q.    Did SKAT's practice for processing
17 refund claims change between January 2012 and the
18 time of your retirement in December of 2013?
19   A.    Sorry.  Could I have it again?
20   Q.    Sure.  Between January of 2012 and
21 when you retired --
22   A.    Yes.
23   Q.    -- in December of 2013, was there
24 any change made in the way that reclaim
25 applications were processed?

Page 99

1    A.    No.
2    Q.    Once a reclaim application was
3  filed with SKAT, was there a particular period of
4  time within which the refund needed to be paid?
5    A.    Yeah.
6    Q.    What was that?
7    A.    We -- at the beginning.  And I
8  don't recall when we changed it.  But at the
9  beginning, we had to make the refund within 30
10 days.  Otherwise, you had to pay interest to the
11 beneficial owner for not dealing with it fast
12 enough.
13        But that was changed to half a year
14 later on.  And I can't recall exactly when that
15 was.
16   Q.    Did you have anything to do with
17 getting that time period extended?
18   A.    Well, we thought it was quite good.
19 Because if the circumstances were right, you
20 should actually pay the claim of refund before the
21 tax was paid by the company.
22        So you paid out before you got the
23 money in, which we thought was not that clever.
24   Q.    You thought it wasn't that clever?
25   A.    No.

Page 100

1    Q.    So just to -- to make sure I
2  understand, when it was 30 days' time period --
3    A.    Yes.
4    Q.    -- then it could be that the
5  company had not paid its withholding tax in to the
6  treasure?
7    A.    Yes.
8    Q.    And so you would be sending money
9  out that hadn't been paid in yet?
10   A.    Exactly.
11   Q.    Okay.  So you were trying to he
12 eliminate that ability by extending the period to
13 six months?
14   A.    Correct.
15   Q.    And was that -- did that take some
16 time to get that period of time extended?
17   A.    Yes.  Because you had to -- you had
18 to have your laws in order, and it's quite
19 difficult.  It takes time.
20   Q.    Did that require a change in the
21 law?
22   A.    I don't recall if it was a law or
23 a --
24        THE INTERPRETER:  Executive order.
25        THE WITNESS:  I don't recall if it

Page 101

1  was one or the other.  But it took time.
2  BY MS. MCCARTHY:
3    Q.    Okay.  So when it was a 30-day
4  period, is it fair to say there was some pressure
5  in Accounting II to process these reclaims very
6  quickly?
7    A.    Yes.  Yes.
8    Q.    And was an employee's performance,
9  either under the 30-day deadline or the six-month
10 deadline, in any way measured by how quickly these
11 were processed?
12   A.    You could see it in our accounting
13 system.
14   Q.    And when was --
15   A.    When you paid out and how much.
16 And so from there, you will follow what is
17 happening.
18   Q.    Did that reflect an employee's
19 productivity, for instance?
20   A.    Well, we were so few, and we
21 didn't -- we numbered all the -- the forms here.
22 So we could actually always see where we were in
23 the process.  And -- but we were not -- we knew
24 that everybody was working hard.  We could see --
25 we also had a monthly talk about the situation

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

28 (Pages 106 to 109)

Page 106

1    talked about it as a hypothetical.
2              THE INTERPRETER: Hypothetical.
3              THE WITNESS: Hypothetical issue
4    that could be problems.
5    BY MS. MCCARTHY:
6         Q.    Okay. And one of the issues
7    identified in this report was that there was no
8    check on whether a refund is made twice, right?
9         A.    Yeah.
10        Q.    And that could be because there is
11   a -- there was a scheme called the bank scheme or
12   the spreadsheet scheme, right?
13        A.    Yes.
14        Q.    And can you tell us what that is?
15        A.    That was established before my time
16   and because, as I said, that there was a large
17   increase in the interest of Danish shares, and
18   therefore, more claim for refund.
19              And so we made a deal with two
20   banks in 2001 where the banks would send us the
21   claim from their customers, not by the individual
22   customer but as per the Danish companies, how many
23   were to claim refund from that company as a lump
24   sum.
25        Q.    So individual shareholders were not

Page 107

1    listed. It was a here's a dollar amount for the
2    total?
3         A.    Yes. For -- but of course, in our
4    agreement with the banks, we also said that at any
5    stage, any moment, we could ask for the full
6    documentation behind the spreadsheet.
7         Q.    Okay. And how frequently did that
8    happen?
9         A.    Oh, I don't recall how often. But
10   it happened, of course.
11        Q.    And did -- were problems ever seen
12   in the backup?
13        A.    Oh, banks do make mistakes also.
14   So sometimes they send the same spreadsheet twice.
15   I mean, we would discover that.
16        Q.    But there was a concern, was there
17   not, that a refund could be paid to the bank under
18   the spreadsheet, and then a paper application like
19   the one we just reviewed --
20        A.    Yes.
21        Q.    -- could also be submitted?
22        A.    That is the case. For instance,
23   you ask your bank to do it and you do it yourself
24   also. It may just be sheer you don't recall you
25   asked the bank. So that happens.

Page 108

1         Q.    So there was a risk that SKAT could
2    pay twice --
3         A.    Yes.
4         Q.    -- for a reclaim, yes?
5         A.    For individuals we had it in the
6    system, but for the spreadsheet it was not
7    possible.
8         Q.    Okay. It was not possible to put
9    that into the system?
10        A.    Yes.
11        Q.    Okay.
12        A.    Only as the totals.
13        Q.    And what sort of control did you
14   want to see implemented to address this
15   possibility of a double payment?
16        A.    We should like -- we should like
17   to -- you have to -- you can claim refund for 20
18   years.
19        Q.    That was the time period allowed
20   under Danish law?
21        A.    Yes. So you could gather several
22   years on the same claim. And when we key it in,
23   we can only key it in in the accounting year on
24   the date where we have that date where we refund.
25              So that also is -- is a thing that

Page 109

1    is very -- makes it very, very difficult to know
2    exactly whether you have the refund of the company
3    now as you may be claiming from years before.
4         Q.    So what -- what control did you
5    think needed to be implemented to avoid that?
6         A.    Well, we thought that the whole
7    system was not a good system. And I can only say
8    net taxing.
9         Q.    Net taxing, that was your overall
10   solution?
11        A.    Yeah. Because it was different
12   rules going in different directions and...
13        Q.    Did you propose the net taxing at
14   this time in 2004?
15        A.    No. It was growing, coming up. We
16   had many problems at that time here. So we had to
17   solve them first.
18        Q.    What were the other problems?
19        A.    Oh, but that was technical thing
20   about which system to use for a thing. They have
21   chosen a bad system, and two years after we got
22   our old system back. But that has nothing to do
23   with this.
24        Q.    That's the 3S system?
25        A.    Yeah. That's a good one.

Page 114

1  lending could be the reason --
2          THE WITNESS:  Oh, equity lending.
3  BY MS. MCCARTHY:
4      Q.      -- that it could be reclaimed from
5  this French bank?
6          MR. WEINSTEIN:  Objection.
7          THE WITNESS:
8      A.      Yes.
9  BY MS. MCCARTHY:
10     Q.      And -- and -- and so can you
11 explain that specific concern?
12     A.      The concern that money might float
13 where you are tax exempt even though you are not
14 entitled -- entitled to the exemption.
15     Q.      So the shares would flow to --
16     A.      Yes.
17     Q.      -- the tax exempt --
18     A.      Yes.
19     Q.      -- entity, right?
20          So this one was caught, correct?
21     A.      Yes.
22     Q.      Okay.  Was there any discussion
23 within SKAT at this time, in 2004, about how to
24 put controls in for this sort of issue?
25     A.      No.

Page 115

1      Q.      No?
2      A.      No.  And we -- double-taxation
3  agreement with France was cancelled some years
4  after.
5      Q.      Some years after.  Do you know how
6  long that took?
7      A.      But it was not only that issue.
8  There were other issues, but for many years we
9  didn't have a double-taxation agreement with
10 France.
11     Q.      Okay.
12     A.      Which was not good for the people
13 having houses in France also.  But it's a two-way
14 thing.
15     Q.      Okay.  Did -- did SKAT consider
16 including on the reclaim form a confirmation that
17 the shares were not subject to stock lending?
18          MR. WEINSTEIN:  Objection to form.
19          THE WITNESS:
20     A.      No.
21 BY MS. MCCARTHY:
22     Q.      Was that ever discussed within
23 SKAT?
24          MR. WEINSTEIN:  Objection to form.
25          THE WITNESS:

Page 116

1      A.      No.
2  BY MS. MCCARTHY:
3      Q.      But that was a concern, though, of
4  SKAT, correct?
5          MR. WEINSTEIN:  Objection.
6          THE WITNESS:
7      A.      Yes.  But not as much as to claim
8  it.
9  BY MS. MCCARTHY:
10     Q.      Not as much as to require the
11 beneficial owner to claim this?
12     A.      No.
13     Q.      How -- how could you -- could SKAT
14 then be sure that a beneficial owner was not
15 claiming a refund based upon lent shares?
16     A.      Normally you would not be able to
17 see it.  But if you sign yourself, you are the
18 beneficial owner.  And the bank is also saying you
19 are the beneficial owner, you got the money.  We
20 have to believe it.
21          MS. MCCARTHY:  I think we've been
22 going about an hour.  Would you like a break?
23          THE WITNESS:  Yes.  A little break.
24          MS. MCCARTHY:  Sure.  We can go off
25 the record.

Page 117

1          THE VIDEOGRAPHER:  Okay.  The time
2  is 7:07 a.m., New York time.  We are going off the
3  record.
4          (Short recess taken.)
5          THE VIDEOGRAPHER:  The time is
6  7:25 a.m. New York time, and we are back on
7  record.
8  BY MS. MCCARTHY:
9      Q.      Ms. Romer, if you could turn now to
10 Exhibit 3150.
11          (Exhibit 3150 was marked for
12 identification.)
13 BY MS. MCCARTHY:
14     Q.      It says
15 Udbytteskatteadministrationen.
16          Do you have that?
17     A.      No.
18          (Discussion off the record.)
19 BY MS. MCCARTHY:
20     Q.      All right.  Have you -- are you
21 familiar with this document?
22     A.      I don't recall it, but I'm sure I
23 made it.
24     Q.      Well, if you could -- let's see.
25 You are sure that you made it.  Why are you sure

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

Page 122

1   years.
2        Q.       Then if I could ask you to look at
3   page -- I think it's going to page 11.  Is there a
4   page number there?  Yes, page 11.  There is a --
5        A.       Yes.
6        Q.       -- problem listed, and it's my
7   understanding that what this translates to is:
8   "The Dividend Tax Administration does not normally
9   check before payment is made, the declaration
10  06.016 has been received or that the dividend tax
11  has been paid.  In some situations, refund
12  petitions are received before the declaration is
13  received.  As there is a one-month deadline for
14  the reimbursement payment before interest accrues,
15  payment may have to be made before the declaration
16  and payment deadline expires."
17           And then lower -- later on, it says
18  that:  "There is no possibility of checking
19  whether the claiming of the refund is the
20  recipient of the dividends."
21           And so this then you provide some
22  solutions, right?
23       A.       Yes.
24       Q.       And one of those is to change the
25  law so that a refund cannot be made until one

Page 123

1   month after the deadline for declaration and
2   reporting has expired.
3            So is this your first effort to
4   change that reporting?
5        A.       Yes.
6        Q.       I don't know if it's the first, but
7   this is the first big formal document.  And it
8   happened.
9        Q.       It happened.  How long did it take
10  for that to happen?
11       A.       Oh, it took some years.  And then
12  we got this six-month period, the one we were
13  talking about before.
14       Q.       Okay.  Well, this is -- this isn't
15  about the 30-day period, right?
16       A.       Yes.
17       Q.       It is?  One month after the
18  deadline for declaration and reporting?
19       A.       That is what I said.  You could pay
20  out the dividend before you got the money from the
21  company.
22       Q.       Okay.
23       A.       That's what this is talking about.
24       Q.       This addressed and would make it so
25  that the Danish Treasury would receive --

Page 124

1        A.       The money --
2        Q.       -- the money --
3        A.       -- before they refunded it.
4        Q.       -- from the corporation, before it
5   paid it back to the shareholder?
6        A.       Yes.
7        Q.       Okay.  And if you turn to page 14,
8   you see there is a section about the decentralized
9   administration of dividend tax?
10       A.       You said 14?
11       Q.       Page 15.  Page 15 on the green.
12       A.       Okay.  Thank you.
13       Q.       Can you explain what is being
14  discussed here in number 5 on page 15?
15       A.       I have to read it first because I
16  don't recall.
17           MR. WEINSTEIN:  I am sorry, do you
18  happen to know which page on the translation?
19           MS. MCCARTHY:  Yes.  It's under
20  page -- sorry.  ...fancy binder. (Retrieving
21  document).
22           MR. BAHNSEN:  It's page 14 of 19 in
23  the middle of the page.
24           MS. MCCARTHY:  Marc (showing
25  document).

Page 125

1            MR. WEINSTEIN:  Oh, okay.
2            THE WITNESS:
3        A.       Yes.
4   BY MS. MCCARTHY:
5        Q.       Okay.  So this talks about -- it's
6   referring to a responsibility diagram which
7   references 11 offices involved in the -- I believe
8   it says "the mini world of the dividend tax
9   administration"?
10       A.       Yes.  Yes.
11       Q.       And there are several activities
12  that do not agree on where to replace -- where to
13  place responsibility.  What is this about?
14       A.       This is about that the dividend tax
15  was the one and sole group in tax having this
16  responsibility --
17           (Court reporter clarification.)
18           THE WITNESS:  Sole.
19       A.       The only group that had this tax
20  responsibility, and we were involved actually in
21  11 different other offices in the headquarter.
22           And if you have 11 fathers, you
23  don't have any father.  So there was no one having
24  the responsibility of the things happening in
25  dividend tax.  And that was what we were trying to

Page 142

1  authorities were merged with tax state.  So they
2  all came to be with us.
3         Q.      The local authorities were
4  merged —
5         A.      We had two levels, and they were
6  all merged (indicating) so we were one level now.
7         Q.      Okay.
8         A.      Yes.
9         Q.      So when you say "local," you mean
10  the regional —
11         A.      The communities.
12         Q.      Okay.
13              THE INTERPRETER:  Municipalities.
14              THE WITNESS:  Municipalities,
15  sorry.
16              MS. MCCARTHY:  Municipalities?
17              THE INTERPRETER:  Municipalities.
18  Denmark is divided into municipalities.
19  BY MS. MCCARTHY:
20         Q.      I don't really know much about —
21              (Court reporter clarification.)
22              THE INTERPRETER:  Denmark is
23  divided into municipalities.
24  BY MS. MCCARTHY:
25         Q.      And each municipality then had

Page 143

1  somebody dealing with — with what, tax?
2         A.      With tax.
3         Q.      Just generally?
4         A.      Yes.  They received the tax
5  returns, they did the first surveys, they had
6  local knowledge and they were bailiffs and forced
7  payment, yeah.
8         Q.      So they were their own little SKAT?
9         A.      Yes.  And we were next level.  But
10  we said, no need of next level.  One level.
11         Q.      That was a centralization, then —
12         A.      Yes.
13         Q.      — of the tax reporting by everyone
14  in Denmark?
15         A.      Yes.  Yes.
16         Q.      Okay.  And that was November 1,
17  2005?
18         A.      Yes.
19         Q.      You remember?
20         A.      Yes.  And the audit was there.
21         Q.      Okay.  And what was — what was at
22  issue in this particular audit?
23         A.      Well, I had always considered audit
24  as my friends, because this is a director of TOLD
25  and SKAT.

Page 144

1              (Court reporter clarification.)
2              THE INTERPRETER:  Customs and tax
3  in Danish in is T-O-L-D and SKAT.  So that means
4  customs and tax.
5              THE WITNESS:
6         A.      And he's the director.  And I
7  always found it a beautiful opportunity to get my
8  message out.  So I was the one smiling when I got
9  the audit coming.  Others might have not smiled as
10  much.  So I never credited.  I felt it was an
11  opportunity to come with all my sorrows.
12  BY MS. MCCARTHY:
13         Q.      And do you remember the particular
14  sorrow that you were raising during this audit?
15         A.      I think it's —
16              MR. WEINSTEIN:  Objection to form.
17              THE WITNESS:
18         A.      — the same as ever.
19  BY MS. MCCARTHY:
20         Q.      If you see number 11.
21              Does that address — does that say:
22  Internal audit does not find it satisfactory that
23  in certain situations, it's possible for dividend
24  recipients to receive dividend tax even if the
25  company paying the dividend —

Page 145

1              (Court reporter clarification.)
2  BY MS. MCCARTHY:
3         Q.      — "it's possible for dividend
4  recipients to receive dividend tax even if the
5  company paying the dividend has not paid the
6  withheld dividend tax to SKAT.  According to the
7  dividend tax administration, a change in this
8  respect requires a change in legislation."  And
9  then it has a parenthetical, "See the dividend tax
10  administration note of 16 March 2005."
11              So is this again the same issue
12  that you were raising previously?
13         A.      Same.
14         Q.      Okay.  And was that something
15  that — is this typical for you when there was a
16  problem that you identified that it was something
17  that you needed to repeat to several different
18  outlets?
19              MR. WEINSTEIN:  Objection to form.
20              THE WITNESS:
21         A.      I can make a note.  I don't know
22  where it goes.  But talking to internal audit,
23  that goes to the director, away.
24  BY MS. MCCARTHY:
25         Q.      Okay.  So that was good for you?

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

38 (Pages 146 to 149)

Page 146

1    A.    Yes.
2    Q.    Do you know whether any actions
3  were taken by SKAT in response to this audit?
4    A.    Normally when there is such an
5  audit report, we sit down and look at the
6  recommendations, make a little task force, look
7  into it, how can we improve, change whatever with
8  more or less success.  That's what normally
9  happens.
10    Q.    And this issue of dividend
11  recipients being able to receive the dividend
12  TaxBack --
13    A.    Yes.
14    Q.    -- before the company pays the tax
15  in, that applied across every reclaim scheme,
16  correct?
17    A.    Yes.
18    Q.    Okay.  Are you familiar with a
19  document -- I am going to butcher this -- called
20  the "problem catalog"?
21    A.    Yeah.  I do remember it.
22    Q.    And you wrote that, correct?
23    A.    Yes.
24    Q.    Did you did you have help writing
25  that?

Page 147

1    A.    Of course we were a group.  Our
2  group, we were all participating in the different
3  areas of what they were experiencing in their work
4  to get a nice catalog of the different
5  difficulties.
6    Q.    And why was that document written?
7    A.    Because it would be easier maybe
8  for people to understand.  As I have told, we were
9  the only office dealing with dividend tax.
10    And dividend tax is not so easy.
11  There is a company, there is a taxpayer, there is
12  the recipient, there is the foreigner.  There are
13  so many different time limits and dates and things
14  you should keep track of to have all in place.
15    So a lot of people before I
16  finished my speech, they had left.
17    So in order to keep them, we made a
18  catalog, and we tried to also put in some
19  solutions so that they should not think of
20  everything themselves, but we tried to guide them
21  so it was easier to act.
22    Q.    Can I just go back to something you
23  just said, that before you finished your speech,
24  people have left?
25    What people?  Are you talking about

Page 148

1  meetings that you've attended?
2    A.    Yes.  I was just saying that people
3  did not understand it and they got tired, not
4  left.  They mentally left.  They didn't walk out.
5    Q.    Okay.  So you had a hard time
6  getting the problems --
7    A.    Yes, across.
8    Q.    -- across to people?
9    A.    Yes.
10    Q.    Okay.  And this was an effort to
11  organize it in a way that was understandable?
12    A.    Yes.
13    Q.    Okay.  And let's look at the
14  document.  It's 3052 in your binder.
15    (Exhibit 3052 marked for
16  identification.)
17  BY MS. MCCARTHY:
18    Q.    My first question for you,
19  Ms. Romer, is if could you just look at this and
20  tell me if this is the entirety of the document
21  that you just prepared?
22    A.    I think it's difficult to say
23  because it was a never ending document.  Things
24  might arise and you--
25    (Court reporter clarification.)

Page 149

1    THE INTERPRETER:  Things might
2  arise.
3  BY MS. MCCARTHY:
4    Q.    If you could look at the table of
5  contents which is at the beginning, you will see
6  that it goes through number 6.4.  Organization
7  SKAT is the topic.
8    A.    Mm-Hmm.
9    Q.    And then it has got four bullet
10  points.  And if you go to the back of this
11  document, you will see that it ends at subject
12  number 3.3.
13    A.    I am sorry.  I didn't get that.
14    (Interpreter Translating.)
15    It goes further and we have added
16  something, and maybe we didn't -- I have made so
17  many of them, I don't know whether it's...
18    Q.    So is it -- do you believe that
19  there is a longer version of this document
20  somewhere?
21    A.    I don't know.  Honestly, I don't
22  know.
23    Q.    So if you just look at back at the
24  index, the -- there are three topics there which
25  have specific subtopics.  Do you think that -- do

Page 150

1 you recall whether these topics were written
2 about?
3      **A.**     Because they were the main issues
4 that we were dealing with?
5      **Q.**     Yes.  For instance, reconciliation
6 in the dividend administration, number 5.
7      **A.**     Yes.
8      **Q.**     Do you recall writing about that in
9 the problem catalog?
10      **A.**     Yes.
11      **Q.**     Okay.  Do you know where SKAT could
12 look within its systems to find the rest of this
13 document?
14      **A.**     I don't know.  I don't know.
15      **Q.**     And you don't have any version of
16 this in your possession?
17      **A.**     I took nothing with me when I left.
18      **Q.**     So but as far as you know, it's
19 still sitting within SKAT's computer system,
20 right?
21      **A.**     Yes.
22      **MS. MCCARTHY:**  Okay.
23 Mr. Weinstein, I am going to ask that SKAT do a
24 search for the entirety of the problem catalog.
25      **MR. WEINSTEIN:**  Yes.  That request

Page 151

1 has been made before.  And as we responded, we did
2 a search and produced every version that is in the
3 system.
4      **MS. MCCARTHY:**  Well, I am renewing
5 my request.
6 BY MS. MCCARTHY:
7      **Q.**     Okay.  So over what period of time,
8 Ms. Romer, was this document drafted?
9      **A.**     As I see, it is the 6th,
10 November 6th.  It had taken some time to come to
11 November 6th because we had to have all these
12 different areas put into it, and I don't recall.
13      **Q.**     Okay.  Do you remember, did you
14 meet with the various people who contributed to
15 this, or did you speak on the phone?  How did you
16 organize?
17      **A.**     Both ways, because some of the
18 things had to have changes of law, and then you
19 had to talk to the people in the department who
20 was — were the lawmakers, and other things, you
21 had to go outside to the bank and to the VP.
22      I mean, those were meetings where
23 we might be able to improve the systems.  But also
24 that takes a lot of times.
25      **Q.**     Okay.  So this took time?

Page 152

1      **A.**     And then the VP, that is a private
2 organization, they have to have at least half a
3 year to implement changes in their systems.  So...
4      **Q.**     Okay.  Do you remember which
5 portions of this document you personally drafted?
6      **A.**     I can tell you I have been involved
7 in all the subjects here.
8      **Q.**     You have been involved in drafting
9 of them?
10      **A.**     Yes.  Yes.
11      **Q.**     Okay.  And if could look at the
12 very first page under "Problem."  I believe that
13 this is describing the same problem we've been
14 discussing about the timing of the receipt, of the
15 reclaims versus the timing of the receipt of
16 information from the companies, correct?
17      **A.**     Yes.
18      **Q.**     And as you will see in the middle
19 of the bottom paragraph there, it says:  "That
20 means that today the dividend tax administration
21 today is to a large extent administered blindly.
22 As the information on the actual distribution is
23 not known at the time, the administration conducts
24 its business operations.  This is the case, for
25 example, with recovery of dividend tax under the

Page 153

1 double-taxation agreements and with dividend tax
2 refunds, et cetera, just as a reconciliation of
3 the actual distributed amount with the
4 distributing company's declaration and tax return
5 is not possible until a much later point in time."
6      Do you remember that issue?
7      **A.**     Yes.
8      **Q.**     Okay.  And is it — this is number
9 1.1 of the problem catalog?
10      **A.**     Yes.
11      **Q.**     Is this a very important issue?
12      **A.**     It is the most important issue
13 within the Danish administration of the companies
14 for the Danish taxation purposes that we should
15 have the — and it is unnecessary that it was not
16 given on the same time.
17      I have always said that paying out
18 dividend is the one thing to do.  But
19 unfortunately, when we started with dividend tax
20 in Denmark, we put the dividend tax in so the
21 interest system that runs throughout the year, so
22 you can only put in a result at the end of the
23 year, and that is why we had to have the
24 declaration with the money that we want that once
25 and the information about the receiver of dividend

Page 154

1  after the 1st of January.
2      Q.    And that's what you wanted to
3  change?
4      A.    That's what I wanted to change.  I
5  wanted to be at the same time.
6      Q.    And were you hearing from the banks
7  that that was too difficult to do?
8      A.    Yes.  They said they had to tally
9  things.  They had to see --
10          (Court reporter clarification.)
11          THE INTERPRETER:  T-A-L-L-Y, tally.
12          THE WITNESS:
13      A.    They said they had to secure that
14  everything was all right.
15          But they had already paid out the
16  dividend.  So to me, that was not clear talk.
17  BY MS. MCCARTHY:
18      Q.    Okay.  And ultimately, were you
19  able to get that problem addressed?
20      A.    In '12.
21      Q.    2012?
22      A.    Yes.
23      Q.    So it took six years -- more than
24  six years, because you were raising this issue
25  earlier, correct?

Page 155

1      A.    Yes.
2      Q.    Okay.  What other problems were
3  identified here related to the payment of dividend
4  refunds?  Is there a recognition that nominee
5  accounts were a problem?
6      A.    Yes, as the omnibus.
7      Q.    Can you explain that, why that was
8  a problem?
9      A.    Because it was an anonymous place
10  where a lot of shareholders were together, but
11  just under the name of the bank that they were
12  actually having their depot, what you called it?
13          THE INTERPRETER:  Custody account.
14          THE WITNESS:  Custody, custody
15  account.
16      A.    So it was -- it was all the time.
17  And I mean, that is also what the OECD was working
18  on, that it should be revealed in a way or other.
19  BY MS. MCCARTHY:
20      Q.    If you go to point 1.6, page 2 of
21  3, which I believe is on page 16 of the document.
22  (Turning).
23          This talks about trading and
24  depositing securities nominally --
25      A.    I'm a little lost.

Page 156

1          (Interpreter assisting.)
2      Q.    It's subject number 1.6.  (Pause.)
3  What's the Bates number?  Okay.
4          It's the Bates should be ending
5  in -- the bottom right-hand corner.  The number
6  should be 17932.
7      A.    Yes.
8      Q.    Okay.  In the middle of that page,
9  could you just read that to yourself, starting
10  with:  "It is completely legal to trade and
11  deposit" --
12      A.    Yes.
13      Q.    Does that seem to you to be a
14  description of the Paris Opera Trading situation?
15      A.    No.
16      Q.    What is that?
17      A.    I'm not sure that they were
18  trading.
19      Q.    You're not sure that Paris Opera
20  was trading?
21      A.    No.
22      Q.    Okay.  So you just think that
23  was --
24      A.    I don't know.
25      Q.    You think that was just outright

Page 157

1  fraud?
2      A.    Yes.
3      Q.    Okay.  So what is -- what is being
4  addressed here, then, where it is said:  "It is
5  completely legal to trade and deposit securities
6  nominated through both Danish and foreign
7  banks/stock brokers including setting up offshore
8  companies as long as the activities are declared."
9      A.    But the threat is that it is not
10  declared and it is difficult to find it.
11      Q.    And it's not declared where?
12      A.    Yeah.  The threat is that this
13  is -- they forget to self-declare in their
14  homeland.
15      Q.    Okay.  So this is for a nonfiler in
16  the home country?
17      A.    Yes.
18      Q.    And then it goes on -- yeah.  Go
19  ahead.
20      A.    No.
21      Q.    It goes on to say:  "This
22  nontransparency together with the Danish rules for
23  share loans can be an obvious tool that, among
24  other things, can be used, for example, to channel
25  a dividend to a country" --

Page 158

1    A.    Yeah.
2    Q.    -- "where Denmark has lower or no
3  right to dividend tax under the double-taxation
4  agreement."
5    A.    Yes.
6    Q.    What is meant by that?
7    A.    That is meant that it should go to
8  France, for instance.  Or I think in Malaysia, we
9  also have a zero -- it is dangerous to merge
10 taxation and aid to developing countries.  I don't
11 know.
12   Q.    Okay.  The proposal below says:
13 "Politicians need to be made aware that there
14 actually is a problem that is a threat to the tax
15 system."
16        Do you know whether this issue was
17 brought to the attention of politicians?
18   A.    No.
19   Q.    You don't know?
20   A.    No.
21   Q.    But that was your goal?
22   A.    That was our goal, yes.
23   Q.    Okay.  And is it fair to say that
24 this problem catalog identifies other threats to
25 the tax system?

Page 159

1    A.    Yes.
2    Q.    Yes?
3        The next category is -- 3.2
4  discusses nominee, joint ownership, and ownership
5  status code in the custodian registration.
6        And is it -- is it -- withdrawn.
7        The -- under the problem, number
8  one, again, there's a nontransparency issue,
9  right?
10   A.    Yes.
11   Q.    That together with the Danish rules
12 for share loans, again, you say: "Can be an
13 obvious tool that, among other things, can be used
14 to channel a dividend to a country where Denmark
15 has lower or no right to dividend tax under the
16 double-taxation agreement."
17        And if you see down under
18 "applicable rules," what is described is a foreign
19 shareholder making a reclaim application using
20 that form that we reviewed before, correct?
21   A.    Mm-hmm, yes.
22   Q.    And then the proposal on the next
23 page under number 3, is specifically concerning
24 dividend tax:  "Stricter documentation
25 requirements should be established for the

Page 160

1  shareholding in the event of reimbursement/refund
2  of Danish dividend tax, so the dividend tax
3  administration can be sure of the ownership of the
4  actual distribution."
5        Correct?
6    A.    Mm-Hmm.
7    Q.    And again, that has to do with the
8  form we discussed?
9    A.    Yes.
10   Q.    Okay.  Since some of the pages are
11 missing, do you remember any of the other
12 proposals that were raised in this problem catalog
13 related to refunds?
14        (Court reporter clarification.)
15        THE WITNESS:
16   A.    I don't.
17 BY MS. MCCARTHY:
18   Q.    You don't remember?
19   A.    Right.
20        MS. MCCARTHY:  I'm being told that
21 we've been going for an hour.  Would you like a
22 break?
23        THE WITNESS:  Yes, please.
24        MS. MCCARTHY:  Okay.  Jose, we are
25 going off the record?

Page 161

1        THE VIDEOGRAPHER:  Stand by.  The
2  time is 8:26 a.m. New York time, and we are going
3  off the record.
4        (Short recess taken.)
5        THE VIDEOGRAPHER:  The time is 8:47
6  a.m. New York time, and we are back on record.
7  BY MS. MCCARTHY:
8    Q.    Ms. Romer, when we broke, we were
9  talking about the problem catalog.  Did anything
10 change as far as SKAT policy as a result of the
11 problem catalog?
12   A.    A lot of things have changed while
13 I was there, not a lot, but a lot of things have
14 changed, bigger or minor things.
15        So I must say that it had had some
16 impact.
17   Q.    Okay.
18   A.    Whether it would have happened
19 anyway, I don't know.
20   Q.    And when you say that was not
21 enough, what do you mean?  What did not change?
22   A.    That is, for instance, the Trace
23 project that didn't --
24        (Court reporter clarification.)
25        THE WITNESS:  T-R-A-C-E.

CONFIDENTIAL
Lisbeth Romer – June 3, 2021

Page 162

1    BY MS. MCCARTHY:
2         Q.    The OECD project?
3         A.    Yeah, the OECD project.
4         That everybody was dealing their
5    head on the solution there, and then in '16 they
6    gave up.
7         Q.    Mm-hmm.
8         A.    So that was really sad.
9         Q.    Did anything change in terms of
10   foreign shareholders and the ability to confirm,
11   for instance, beneficial ownership?
12        A.    No, because that was the Trace
13   project that should give that possibility.  We
14   only had what we had before, the beneficial owner
15   himself, herself, and the bank statement.
16        Q.    And when you -- you have said a
17   couple of times now that you believe that the
18   Paris Opera Trading situation was fraud, right?
19        A.    Yes.
20        Q.    And you informed people within SKAT
21   of that suspicion, right?
22        A.    Yes.
23        Q.    And yet, nothing was done?
24        A.    Well, I wouldn't say nothing was
25   done, because the banks were sending declarations,

Page 163

1    swearing that everything was okay and they were
2    the beneficial owners of everything.
3         And with that declaration
4    specifically to us, what could we do?
5         Q.    Okay.  Did you -- did you believe,
6    however, that more investigation could occur?
7         A.    I would have liked that it was
8    possible.  But as I said, the claim to be the
9    owners of more than half of all the free shares,
10   and that was really a lot, and it sounded unlikely
11   in my ears.  But maybe I'm too suspicious.
12        Q.    Too suspicious?
13        A.    Yes.  It comes with the job.  So...
14        Q.    Okay.  Did you, after preparing the
15   problem catalog, continue to push for changes
16   within SKAT?
17        A.    Yes.
18        Q.    Who is Carl Helman?
19        A.    He was in the department.  He
20   was -- I think he was not a member of the Trace
21   group, but I had long conversations with him to
22   make them aware of what I think they should be
23   aware of with the Trace project and where they
24   were going to set out the norms and standards.
25        Q.    And again, that project would have

Page 164

1    addressed issues related to the foreign
2    shareholders, right?
3         A.    Yes.
4         Q.    Okay.  And what was Mr. Helman's
5    reaction or response to your concerns?
6         A.    Fortunately, he was following me,
7    and also saying that it sounded -- sounded right.
8         But of course, we were not the only
9    ones.
10        Q.    Meaning there were other countries
11   involved that needed to cooperate?
12        A.    Oh, yes, there were other
13   countries, yes.
14        Q.    Okay.  So in your conversations
15   with Mr. Helman, you believe that the Trace
16   project had the support of the Danish government,
17   right?
18        A.    He was in the Danish government, so
19   yeah.
20        Q.    Okay.  Are you familiar with
21   something called "Project Lean," L-E-A-N?
22        A.    Yes.
23        Q.    And what was Project Lean?
24        A.    Project Lean is coming from Japan
25   from the Toyota car factories, how to optimate the

Page 165

1    process to avoid waste time.  And in my world, it
2    is difficult to compare making a car and dealing
3    with dividend tax.  So I think for us, because we
4    were rather streamlined already, for us the
5    outcome of Lean was not very much, but we all in
6    tax had to go through it, all units.
7         Q.    And when you say you had to go
8    through it, was there a particular efficiency rate
9    that you were supposed to try to achieve?
10        A.    No.  We were going through the
11   production, the way coming in, the declaration and
12   how it ended here and there and the different
13   processes and how could we cut.  And if you put
14   your paper in this shelf, it will be easier, you
15   can gain a second, you know.
16        Q.    Did somebody come in, a third party
17   come in --
18        A.    Yes.
19        Q.    -- and give advice?
20        A.    Yes.
21        Q.    Do you know who that was?
22        A.    Yeah.  I don't recall.  She was
23   from Horsens.
24        THE INTERPRETER:  She was from the
25   city of Horsens, H-O-R-S-E-N-S.

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

43 (Pages 166 to 169)

Page 166

1          THE WITNESS:
2          A.      That's where our director and our
3   main seat was for the accounting.
4   BY MS. MCCARTHY:
5          Q.      Was there a priority within the
6   Danish government at the time that Project Lean
7   was in effect to reduce the bureaucratic burden on
8   taxpayers?
9          MR. WEINSTEIN: Objection to form.
10         THE WITNESS:
11         A.      Yeah.  I mean, the meaning was of
12  course that we should try to save some time in
13  what we were doing.  And as I am sure, we spent
14  many days doing it, and the outcome was not big.
15  BY MS. MCCARTHY:
16         Q.      Are you familiar with the burden
17  barometer?
18         A.      No.
19         Q.      Was there a priority within the
20  Danish government to provide service to --
21  withdrawn.
22         -- to attract foreign investment in
23  Danish companies and to reduce the burden to
24  foreign investors?
25         MR. WEINSTEIN: Objection to form.

Page 167

1   BY MS. MCCARTHY:
2          Q.      Was there -- I am going to do it
3   again.  Was there priority within the Danish
4   government to attract foreign investment in Danish
5   businesses?
6          MR. WEINSTEIN: Objection.
7          THE WITNESS:
8          A.      I don't know.
9   BY MS. MCCARTHY:
10         Q.      Okay.  Was there a priority in the
11  Danish government to reduce the burden for
12  taxpayers?
13         MR. WEINSTEIN: Objection.
14         THE WITNESS:
15         A.      By making this new tax return
16  system, they have actually made it much easier to
17  be a taxpayer.  So there has been a name for the
18  tax ministry to do something good for the
19  taxpayers, and they succeeded.
20  BY MS. MCCARTHY:
21         Q.      Okay.  Did you feel that within
22  SKAT, there was a priority for service versus
23  control?
24         A.      I think we had to have both.  But
25  as I have already said, we were a service-minded

Page 168

1   organization, and we had a lot of public access to
2   SKAT all the time, very easy access.
3          (Court reporter clarification.)
4          THE INTERPRETER: Very easy access.
5   BY MS. MCCARTHY:
6          Q.      Did you consider all of the
7   shareholders in Danish companies to be taxpayers?
8          A.      At the end, there might be
9   taxpayers all, but some of them didn't pay
10  dividend tax, for instance, if it was a pension
11  scheme.  So you only got paid when you got out the
12  money.
13         Q.      And they would be paid with
14  withholding tax money, correct?
15         MR. WEINSTEIN: Objection.
16  BY MS. MCCARTHY:
17         Q.      If the pension plan put in a claim
18  of refund, what they were getting paid back to
19  them was the withholding tax paid into SKAT by the
20  corporation, correct?
21         A.      Not the corporation.  It would be
22  through the banks.  If you had the pension scheme,
23  it's very often in the bank.
24         And when the bank have to pay out
25  your money, we withhold.

Page 169

1          Q.      What's the source of the
2   withholding tax?
3          A.      The source is the shares and the
4   dividend that you have accumulated while you were
5   working and you get out when you are retired.
6          Q.      And the dividend is paid by the
7   corporation, correct?
8          A.      Always with help by the
9   corporation.
10         Q.      Okay.  But when a claim is made for
11  a refund, it's for a refund of withholding tax,
12  correct?  That was --
13         A.      Of the already withheld tax.
14         Q.      Correct.
15         (Court reporter clarification.)
16         THE INTERPRETER: Of the already
17  withheld tax.
18         THE WITNESS: Sorry, I am turning
19  my face that way and that is why it so difficult
20  for you.  Sorry.  Sorry.  Speak up, I'll do that.
21  BY MS. MCCARTHY:
22         Q.      I am going to just talk a little
23  bit more about control, and if I could get you to
24  turn to -- we are already there?  I am sorry.  One
25  moment, please.

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

---

Page 170

1           (Pause).
2           I am sorry.  Just give me a moment
3  to collect my thoughts here.  If you could turn to
4  Exhibit 3178, please.
5           (Exhibit 3178 marked for
6  identification.)
7  BY MS. MCCARTHY:
8      Q.      Do you recognize this document,
9  Ms. Romer?
10     A.      I recognize the content.
11     Q.      It appears to be a document that
12 was drafted by you in 2008 -- November 2008,
13 right?
14     A.      Yes.
15     Q.      Or is it August 2008?
16     A.      It is August.
17     Q.      August 11, 2008.  Sorry.  I am
18 reading as if it's an American date.  And this has
19 to do with what?  Is it lack of reconciliation --
20     A.      Yes.
21     Q.      -- between --
22     A.      Between --
23     Q.      Go ahead.
24     A.      -- the declaration from the company
25 and the recipients of the dividend.

---

Page 171

1      Q.      Okay.  And those would be the
2  beneficiaries, right, the beneficial owners?
3      A.      Yes.  Yes.
4      Q.      And is it correct that you've
5  identified an issue where foreign shareholders are
6  not part of the known system for reporting?  In
7  this document, if you look at under "Current
8  Administration" and read the last sentence.
9           Is that a fair description?
10     A.      It is not part of any system.
11     Q.      For the record of foreign
12 shareholding?
13     A.      As usual, we don't know.
14     Q.      Okay.  And so that was a problem,
15 correct?
16     A.      That was a problem.
17     Q.      Okay.  And so do you make any
18 recommendation in this document?
19     A.      No, because this was not about the
20 foreign shareholders.  This was about the Danish
21 system.
22     Q.      Can you explain then why there is a
23 reference to foreign shareholders?
24     A.      Because even though we make this
25 new system with the two different informations

---

Page 172

1  together, we would not have the foreign
2  shareholders.
3      Q.      So the proposed change --
4      A.      Would not solve this problem.
5      Q.      So that identifies then these
6  foreign shareholders as being outside of this
7  proposed solution?
8      A.      It was not a solution for them.  It
9  was for the whole system.
10     Q.      Did you ever come up with a
11 solution that you proposed to address the lack of
12 information for foreign shareholders?
13     A.      Only through the net taxation --
14     Q.      So again we are back to --
15     A.      -- and Trace.
16     Q.      -- OECD?
17     A.      Yes.
18     Q.      Okay.  If we could go to Exhibit --
19 I am sorry.  I don't have an exhibit.
20          Do you remember writing other memos
21 in 2009 about issues related to foreign
22 shareholders?
23     A.      I don't recall.
24     Q.      There are some references that if
25 you have read the Bech-Bruun report, you may have

---

Page 173

1  noticed some references --
2           (Court reporter clarification.)
3  BY MS. MCCARTHY:
4      Q.      -- Bech-Bruun report, you may have
5  noticed some references to you?
6      A.      That was also some years ago.
7           MR. WEINSTEIN:  Objection to form.
8  BY MS. MCCARTHY:
9      Q.      Right.  Okay.
10          Have you read the Bech-Bruun
11 report?
12     A.      Not the full content.
13     Q.      It's very large, right?
14     A.      Yes.  Only about myself.
15     Q.      Only about yourself?  There are a
16 fair number of references, correct?
17     A.      Yes.
18     Q.      And the work that you did while you
19 were at SKAT is described in detail, correct?
20     A.      Yes.
21     Q.      And one of the issues that the
22 Bech-Bruun report addresses is the issue of
23 foreign shareholders and the lack of transparency
24 into share ownership, correct?
25     A.      Yes.

---

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

45 (Pages 174 to 177)

## Page 174

1  Q.    Okay.  And this was an issue that
2  you were raising within SKAT through the years,
3  correct?
4  A.    Yes.
5  Q.    Okay.  Do you recall, Ms. Romer,
6  that in 2010, that there was another audit report
7  issued?
8  A.    Yes.
9  Q.    Would you like to talk about that
10 with me?
11 A.    Yes.  I have to.  I'm sorry.
12 Q.    If we can go to —
13       MR. WEINSTEIN:  She just gave you
14 the choice, right?  You can let her know.
15 BY MS. MCCARTHY:
16 Q.    Where is it?  I'll find it in a
17 moment.
18 A.    It was at the beginning.
19 Q.    It was at the beginning, correct.
20       MS. MCCARTHY:  It was Exhibit 3003.
21       (Exhibit 3003 marked for
22 identification.)
23 BY MS. MCCARTHY:
24 Q.    All right.  Do you have Exhibit
25 3003 in front of you?

## Page 175

1  A.    Yes.
2  Q.    Okay.  First of all, this is dated
3  May 10th, 2010, right?
4  A.    Mm-Hmm.
5  Q.    Yes?
6  A.    Yes.
7  Q.    And the person on the top is Peter
8  Loft.
9  A.    Yes.
10 Q.    Who is Peter Loft?
11 A.    He was the head of department.  He
12 was not the minister but he was the minister's
13 right hand.  He was not the director, but that was
14 per SKAT.  So this is the more legal department
15 for the minister.
16 Q.    Okay.  And did you have direct
17 communications with Peter Loft?
18 A.    Not really.  Not really.  Far away.
19 Q.    Who — who would have been your
20 conduit to Peter Loft?
21 A.    But that is the way through my
22 director, and then he should go maybe to the
23 director of tax, who would go to the head of
24 department.  And maybe he would go to the
25 minister.

## Page 176

1  Q.    Okay.  So it's several layers
2  below —
3  A.    Yes.
4  Q.    You're several layers below Peter
5  Loft?
6  A.    Oh, yes.
7  Q.    All right.  Do you know how this
8  2010 audit came about?
9  A.    Yes.  I don't know really, only
10 from —
11 Q.    From your memory?
12 A.    From what I might have heard.
13 Q.    Okay.
14 A.    It is — I was not told, other than
15 this is not a normal audit of dividend tax.  It is
16 only an investigation about foreigners and
17 dividend tax.  So it's a specific.  And I think it
18 came about through some withdrawals from the
19 systems where they ended up with some figures
20 saying that we had refunded more than we had got
21 in.
22       I had never seen it.  I followed
23 the figures every month.  So I wasn't that worried
24 I couldn't understand it.
25       But of course, if you are presented

## Page 177

1  that, you say now we have to look into this, so we
2  did.
3  Q.    Okay.  If I can ask you to just go
4  to a different document if a moment.  We'll hold
5  that thought.  Exhibit 3170.
6       (Exhibit 3170 marked for
7  identification.)
8  BY MS. MCCARTHY:
9  Q.    Are you familiar with that
10 document?
11 A.    Yes.  It's a high shot document.
12 Q.    It's a what kind of document?
13 A.    High shot.  It's from people above
14 my level.  (Indicating)
15 Q.    Okay.
16 A.    And there's two directors from
17 account that are notified that this investigation
18 is going to take place.
19 Q.    Okay.  So the two directors in
20 accounting are Jens S☐rensen and Lars N☐rding?
21 A.    Yes.
22 Q.    Okay.  And so they were — they
23 were above you?
24 A.    Oh, yes.
25 Q.    Okay.  And this memo is from Bo

## Page 178

1  Daugaard?
2      A.    Bo Daugaard, internal audit.
3      Q.    Okay.  And it -- it appears that
4  this audit is being done at the request of Peter
5  Loft.
6      A.    Because Peter Loft is the one who
7  had received the information, and therefore, he
8  said we had to investigate this.
9      Q.    Okay.  And again, the information
10  was that more -- can you tell us again what the
11  investigation was?
12      A.    I think that the issue was that
13  more money was refunded than received as dividend
14  tax, which, of course, should not happen.
15      Q.    And specifically, the first
16  sentence says that the audit is being -- is
17  conducting an investigation on the proceeds of
18  the withholding tax on foreigners/dividend tax,
19  right?
20      A.    Yes.
21      Q.    Okay.  And then it says that
22  there's a meeting -- that needs a meeting to hear
23  about the treatment of dividends according to
24  section 16(A) of the Danish Equation Act, and the
25  recovery of withholding tax?

## Page 179

1              (Court reporter clarification.)
2  BY MS. MCCARTHY:
3      Q.    Did you attend a meeting?
4      A.    Yes.
5      Q.    With audit?
6      A.    Yes.
7      Q.    Okay.  Do you remember when that
8  meeting was?
9      A.    I would say it was beginning of
10  March 2010.
11      Q.    Okay.
12      A.    We might have had some meetings
13  before that also.  But I especially recall
14  beginning of March 2010.
15      Q.    Did you prepare anything in advance
16  of that meeting to describe an overview of certain
17  practices within Accounting II?
18      A.    I have already written so much
19  about so many things that I think I could take out
20  anything they wanted and show them.
21              So I don't recall specifically
22  having prepared something for them.
23      Q.    Okay.  You'll notice that in the
24  document we've been looking at, 3170, it says:
25  "The purpose of the meeting is, among other

## Page 180

1  things, to create an overview practicing -- of the
2  practices of what information on dividends is
3  reported" -- right -- "to SKAT, the IT support,
4  the division of responsibility" --
5      A.    Yes.
6      Q.    -- "extraction and statistics from
7  the systems and IT support."
8      A.    Yes.
9      Q.    Okay.  So -- and I read those
10  correctly, right?
11      A.    Yes.
12      Q.    You agree, right?
13      A.    Yes.
14      Q.    If you can go to Exhibit 3171.
15              (Exhibit 3171 marked for
16  identification.)
17              THE WITNESS:
18      A.    So we had meetings before, as I
19  recall.
20  BY MS. MCCARTHY:
21      Q.    Do you recognize this document?
22      A.    Yes.  Yes, I don't recognize it --
23              (Court reporter clarification.)
24              THE WITNESS:
25      A.    But I have made so many, it's so

## Page 181

1  difficult too.
2  BY MS. MCCARTHY:
3      Q.    Well, you'll see, if you turn to
4  the back page, that you are the author.
5      A.    I saw it already.
6      Q.    And if you can tell us the date of
7  your report?  Is it December 2nd, 2009?
8      A.    Yes.
9      Q.    At the very end?
10      A.    Yeah, yeah.
11      Q.    Okay.  And what are you addressing
12  in this memo?
13      A.    I'm trying to answer the questions
14  that was sent to the -- to the directors.
15      Q.    That we just went over?
16      A.    Yes.
17      Q.    Okay.  And so if we could look at
18  the overview of the dividend tax administration on
19  the second page.
20      A.    Yes.
21      Q.    Which deals with the information
22  reported to SKAT about dividends.
23      A.    Mm-Hmm.
24      Q.    And again, it references the form
25  that we've reviewed, right, dividend declaration?

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

48 (Pages 186 to 189)

Page 186

1    Q.    And you will see again under
2  "objectives, background and presentation" that
3  this has been requested by Peter Loft to look at
4  the problem from the proceeds from the withholding
5  tax on foreigners, right?
6    A.    Yes.
7    Q.    Okay.  So that doesn't talk about
8  Danish shareholders, it's talking about
9  foreigners, right?
10    A.    The whole thing, yes.
11    Q.    Okay.  So this issue on the audit
12  was focused on foreigner shareholders, correct?
13          MR. WEINSTEIN:  Objection.
14          THE WITNESS:
15    A.    Yes.
16  BY MS. MCCARTHY:
17    Q.    Do you disagree with my description
18  of this audit as being focused on foreign
19  shareholders?
20    A.    No.
21    Q.    Okay.  And one of the issues
22  identified down at the bottom of the page under
23  number 2 is that "Accounting II has been
24  frustrated for several years by the fact that a
25  great deal of money is paid out in connection with

Page 187

1  dividends without there being a real possibility
2  of checking that only the correct amounts are paid
3  out."  And it says:  "It is regnskab 2's
4  assessment —
5          (Court reporter clarification.)
6          THE INTERPRETER:  Regnskab,
7  Accounts II.
8  BY MS. MCCARTHY:
9    Q.    — "assessments that there is a
10  huge gap in dividend taxation."
11          Do you see that?
12    A.    I'm not quite —
13    Q.    It's under number 2, "Review and
14  issues of end processes."
15    A.    Okay.  I am here.
16    Q.    All right.  Is that an accurate
17  description of the issue?
18    A.    Yes.
19    Q.    Okay.  And can you explain the
20  frustration?
21    A.    But the frustration is still the
22  frustration that even though we have quite good
23  information, both from the beneficial owner and
24  from the bank with the dividend invoice, we have
25  no way of seeing elsewhere what is going on.

Page 188

1          I mean —
2    Q.    What do you mean by "no way of
3  seeing elsewhere"?
4    A.    Because they are not shown in all
5  the reports and all the systems, the nominee and
6  the — how are they called — omnibus depots, the
7  shareholders there are unknown to us.
8    Q.    Okay.  And that was still in 2009?
9    A.    Still in 2009.
10    Q.    Okay.  And Accounting II did not
11  have the tools to investigate any further than —
12    A.    We were a bookkeeping unit, no
13  means of investigation skills, no nothing.  So we
14  were not able to do all that.
15    Q.    And do you recall sharing that
16  information with the audit group when you met with
17  them?
18    A.    I am sure I told them.
19    Q.    Okay.  In fact, in this report of
20  this meeting, on — under the heading of "Refund,"
21  maybe if you turn the page, the second page, and
22  then it says — there are three bullet points
23  under "Refund," and then underneath it says:  "The
24  task of Accounting II is purely administrative in
25  nature."

Page 189

1    A.    Yes.
2    Q.    Right?
3    A.    And that is because we were a
4  bookkeeping unit sent out from the central
5  audit — accounting unit.
6    Q.    And it goes on to say:  "No proper
7  checks are carried out on dividend reports or
8  payments"?
9    A.    The only information we get when we
10  get the claim.
11    Q.    Right.  And it says:  "However, it
12  shall be verified that the dividends adopted by
13  each company have been declared."  And then "All
14  other controls on dividend taxation lie in" — and
15  what's that word?  Indsats?
16          THE INTERPRETER:  I-N-D-S-A-T-S.
17  BY MS. MCCARTHY:
18    Q.    And that's the control group?
19    A.    Yes.
20    Q.    So that's the group that we started
21  the day talking about?
22    A.    Yes.
23    Q.    That you would send issues to when
24  investigation was required, right?
25    A.    Yes.  That's right.

CONFIDENTIAL
Lisbeth Romer – June 3, 2021

50 (Pages 194 to 197)

Page 194

1  process?
2        A.      It is a weakness because then there
3  is no one really responsible, as we saw with the
4  11 different units who all had a little share in
5  dividend tax, though nobody, nobody really was
6  responsible.  It continues.
7        Q.      It continues?
8        A.      Yes.  That there is no overall
9  responsibility for dividend tax.
10       Q.      Right.  And this -- in your view,
11 did this adversely affect the ability to control
12 the refund process?
13              MR. WEINSTEIN:  Objection to form.
14              THE WITNESS:
15       A.      It is a weakness that you have to
16 go so many places to have them listen to what is
17 wrong.  And since they only are partly involved,
18 they may not be supportive to correct it.
19 BY MS. MCCARTHY:
20       Q.      Right.
21       A.      And so, I consider it a weakness
22 that there is no really responsible.
23       Q.      And was there anything that was
24 done after this audit to centralize responsibility
25 of the dividend tax area?

Page 195

1        A.      They organized for the whole of
2  tax, a little different, but I wouldn't say it
3  helped a lot.  It didn't help a lot.
4        Q.      What did they do differently?
5        A.      But also, because now we are in the
6  time of Trace.  And that became just, wait for
7  Trace, wait for Trace, wait for Trace.
8              So it was difficult.
9        Q.      And you were told to wait for
10 Trace?
11       A.      Yes.
12       Q.      Who told you to wait for Trace?
13       A.      Every time I suggested anything,
14 oh, but when we have Trace, everything will be
15 solved.  So...
16       Q.      If we go to section 7.3.1 --
17       A.      Yes.
18       Q.      -- under "refund request," it
19 describes the dividend refund process.
20              And if you turn the page, there's a
21 paragraph that begins with the words "regnskab 2."
22       A.      Yes.
23       Q.      And that, I believe, says that:
24 "Accounting II does not carry out checks on
25 whether the investor in question is actually a

Page 196

1  shareholder in the company in question or whether
2  the investor in question isn't that liable for tax
3  in the foreign country.  The form is reviewed by
4  accounting to detect whether all the information
5  is included.  The refund is then paid."
6              Is that accurate what that says?
7        A.      Yes.  Because when we get the
8  declaration and the invoice, that is the
9  information that we can have.
10       Q.      And when you say "the invoice," are
11 you talking about --
12       A.      The bank note.
13       Q.      The bank note or something from a
14 custodian, correct?
15       A.      Yes.
16       Q.      Indicating that the shares --
17       A.      They had received the dividend of
18 these shares.
19       Q.      All right.  Okay.  And then it
20 talks, two paragraphs down, about omnibus and
21 nominee accounts indicating -- meaning that real
22 owners of the shares are not known so refunds are
23 paid without proof of ownership and actual
24 distribution, right?
25       A.      Yes.

Page 197

1        Q.      Okay.  And then if you go to the
2  final two pages, there are some conclusions.  And
3  I'm interested in the last four conclusions, if
4  you are able to tell us what those are, after
5  "internal audit further finds that" -- there are
6  six bullet points.
7        A.      Six bullet points?
8        Q.      Right above number 9,
9  "recommendation."
10       A.      I have to turn the page.
11 (Reading.)  Under the conclusion or the
12 recommendation?  I'm not sure --
13       Q.      Right above -- right above
14 "recommendation"?
15       A.      Okay.
16       Q.      The last four bullet points.
17       A.      Yes.  (Reading.)  Mm-Hmm.  Yeah.
18 Then we get the whole thing, "You can refund
19 before the tax is paid."  We have talked about
20 that.
21              MR. WEINSTEIN:  I'm sorry, is there
22 a question?
23              MS. MCCARTHY:  I asked her to
24 review it.
25              MR. WEINSTEIN:  Okay.

CONFIDENTIAL
Lisbeth Romer – June 3, 2021

51 (Pages 198 to 201)

Page 198

BY MS. MCCARTHY:

1  BY MS. MCCARTHY:
2      Q.      So the first -- the first one that
3  I asked you to read, is it fair that it says that:
4  "The dividend tax can be refunded before the tax
5  is paid or reported to SKAT."  Right?
6      A.      Yes.
7      Q.      Okay.  And you agree with that
8  finding, right?
9      A.      Yes.
10     Q.      And the second one is:  "The use of
11  omnibus accounts means that several dividend notes
12  are printed."
13             And then it says:  "Swift messages
14  for a single share."
15             (Court reporter clarification.)
16             THE WITNESS:
17     A.      Yes.
18  BY MS. MCCARTHY:
19     Q.      There is no check as to whether
20  dividend tax is requested more than once per
21  share, right?
22     A.      Yes.
23     Q.      And do you agree with that?
24     A.      That's possible.
25     Q.      So that's a possible risk?

Page 199

1      A.      Yes.
2      Q.      And then the next bullet point is:
3  "There are no checks in connection with refund
4  requests as to whether the investor is actually a
5  shareholder and whether the investor is, in fact,
6  liable for tax in Denmark or not."
7      A.      Yes.
8      Q.      Do you agree with that?
9      A.      We only have the claim and the bank
10  statement.
11     Q.      And then finally, it says:  "It
12  does not appear that the previous investigations
13  initiated by SKAT have been followed up on."
14             Do you agree with that?
15     A.      Yes.
16     Q.      And was that a source of
17  frustration for you?
18     A.      Yes.
19     Q.      And is that something that you
20  spent a lot of time trying to get people to listen
21  to these issues?
22     A.      Yes.
23     Q.      Did you have any expectation that
24  after this audit, there would be any changes in --
25  implemented within the dividend process?

Page 200

1      A.      Of course, the first one was
2  rectified, right?
3      Q.      Mm-Hmm.
4      A.      So that was one.
5      Q.      Okay.  And that was rectified when?
6  This is in 2009.
7      A.      Wasn't it '12?  I think it was.
8      Q.      Okay.  So three years later?
9      A.      Are we on '10?
10     Q.      This is, right, 2010, two years
11  later.
12     A.      Yes.
13     Q.      Correct.
14     A.      And the others, there were no --
15  that was what the Trace actually blocked that we
16  should do anything about it ourselves in Denmark,
17  unfortunately.
18     Q.      Okay.  So the other issues were
19  deferred --
20     A.      Yes.
21     Q.      -- for the passage of the Trace
22  project?
23     A.      Yes.
24     Q.      Okay.  Was there a working group
25  that was created after this audit?

Page 201

1      A.      Yes, I think there was.
2      Q.      Did you participate in that working
3  group?
4      A.      If there was a working group, I
5  participated.  But there were so many, and I can't
6  remember which one was which one.  Sorry.
7      Q.      When you say there were so many
8  working groups, can you give us a sense of how
9  many working groups you participated in?
10     A.      Every time we have any internal
11  audit, we were making -- work in groups.  And as
12  we didn't have the power ourselves to do anything,
13  and as we were not the luckiest in tax to have
14  somebody to send it to, it took time and not many
15  changes were made.
16             So after the next audit we started
17  a new working group with new people, because now
18  we had reorganized everything.  So it was uphill.
19  But we tried, and we got something through,
20  eventually.
21     Q.      In 2012, you got it changed --
22     A.      Yes.
23     Q.      -- that helped --
24     A.      But the TastSelv.
25     Q.      The what?

Page 206

1    management of investment funds.
2          Do you know what that issue has to
3    do with?
4          A.    Yes.  That has something to do with
5    the systems, because normally, you didn't in the
6    foreign investment funds tell who were the
7    investors but only the administrator of the
8    investment fund.  So that would not be enough in
9    this system to continue with the administrator,
10   since it was investors we wanted to know about,
11   those who were responsible for the tax.
12         Q.    Was there ever any attention paid
13   to that?
14         A.    I think it was solved, yes.
15         Q.    Do you recall when that was solved?
16         A.    No.
17         Q.    Do you recall how it was solved?
18         A.    I know its was solved through the
19   systems that we were implementing to have this
20   going, a new system should be developed.  So it
21   was good to notify problems that may arise if we
22   don't look into it right away.
23         Q.    Okay.  So between this period of
24   time in 2009 and 2013, you were very involved in
25   the OECD Trace Project, correct?

Page 207

1          A.    Yes.
2          Q.    And that required you to take many
3    trips to Paris, right?
4          A.    Yes.
5          Q.    All right.  And did you find that
6    those meetings were productive?
7          A.    I found that the Danes that were
8    there really tried to make some suggestions of how
9    to get around having all this information from
10   different banks all over the world.
11         I recall that we had a suggestion
12   about a central information that all banks, when
13   they have received some dividend from different
14   countries and of course that was given to the
15   shareholder, should key it in.
16         And then it should be possible now
17   from Denmark to key in the company, and then all
18   the different taxpayers who had received money
19   should come out.
20         But it was too complicated.  And
21   the security you should have on the different IT
22   systems and all that, and different systems in
23   different countries.
24         So it didn't work out.  But the
25   idea was very good, that when you pay out the

Page 208

1    dividend, you key it into the system, and then
2    from Copenhagen, we could suck in and get all the
3    information of all taxpayers that got money from
4    Novo, Maersk.  I don't know, so...
5          Q.    And would that system, would the
6    Trace system have obviated the need for the paper
7    reclaim forms?
8          A.    No.  But it could give us a tool so
9    we would know how much people had had.
10         Q.    So you could check the information
11   on the reclaim forms?
12         A.    At last.
13         Q.    And the inability to check the
14   information --
15         A.    Yes.
16         Q.    -- on the reclaim forms was --
17         A.    You have to rely --
18         Q.    -- was a weakness, correct?
19         A.    You had to rely on the beneficial
20   owner, you had to rely on the bank, as that was
21   what we got, and of course of the stamp of the
22   country, the tax authorities in the country to
23   secure that this was a double-taxation treaty like
24   this should be handled with, yes.
25         Q.    Is it fair to say that Trace was

Page 209

1    considered to be an antifraud measure?
2          A.    Yes, a secure proper taxation.
3          Q.    And again, that never went into
4    action, correct?
5          A.    Yes.  Correct.
6          Q.    Just one second.  I am trying to
7    cut out some questions here.  So that's good for
8    you.
9          A.    Thank you.
10         Q.    Were you in communication with
11   Bo Daugaard about your -- what was going on with
12   the Trace Project?
13         A.    I don't recall having any specific
14   talks about -- I had been talking to him several
15   times, but I don't recall to that extent what I
16   had been talking about.
17         Q.    Okay.  If you could turn to
18   tab 3153.
19         (Exhibit 3153 marked for
20   identification.)
21   BY MS. MCCARTHY:
22         Q.    Ms. Romer, do you recognize your
23   e-mail of January 14th, 2012 to Bo Daugaard about
24   dividend tax?
25         A.    Well, no.  I can see it's mine, but

CONFIDENTIAL
Lisbeth Romer – June 3, 2021

54 (Pages 210 to 213)

## Page 210

1  is that what I look at?
2          (Pause).
3          Q.    I have something different on mine.
4  I am so sorry.  It's January 9th, 2012.
5  Apologies.
6          A.    It took us time.
7          Q.    My document is messed up.  So my
8  apologies.  In this e-mail to Mister — first of
9  all, you sent an — you had an e-mail —
10         A.    Yes.
11         Q.    — that you had access to when you
12 worked at SKAT, correct?
13         A.    Yes.
14         Q.    And if you look at the top of this
15 document, you can see that Mr. Daugaard sent an
16 e-mail to you at lisbeth.r□mer@skat.dk.  Was that
17 your e-mail address?
18         A.    Yes.
19         Q.    Okay.  And having read the e-mail,
20 do you believe that this is an e-mail that you
21 drafted?
22         A.    I am sure I did, but I don't recall
23 it.
24         Q.    Sure.  Okay.  Is it correct that
25 you told Mr. Daugaard that there is no will to

## Page 211

1  change anything about foreign shareholders?
2          A.    Yes.
3          Q.    That's correct?
4          A.    Yes.
5          Q.    And you sit on a group in the OECD
6  that looks at the exchange of information on
7  dividend tax based on net settlement, right?
8          A.    Mm-Hmm.
9          Q.    "But it's going to be years before
10 it comes to anything."
11               And then you say:  "And until then,
12 we will refund you blindly."
13         A.    Blindly, that of course, we will
14 rely on the information we get, but we can
15 cross-check nowhere.  And when you are in the tax
16 administration, you know that cross-checking is
17 not a bad thing.
18         Q.    Because often there is fraud?
19         A.    The temptation is too big.  So we
20 rely on what we get, but we would love to be sure.
21         Q.    And you never got that, right?
22         A.    No.
23         Q.    Ms. Romer, there was another audit
24 in 2013, right?
25         A.    Yes.

## Page 212

1          Q.    And were the issues raised in the
2  2010 audit the same issues raised in the 2013
3  audit?
4          A.    More or less, since the same
5  problems were still pending, you could say.
6                So yeah.
7                MR. WEINSTEIN:  Is it time for a
8  break?
9                MS. MCCARTHY:  Oh, sure.  Yes.
10 Okay.  We are getting close.
11               THE VIDEOGRAPHER:  The time is
12 9:56 a.m. New York time, and we are going off the
13 record.
14               (Short recess taken.)
15               THE VIDEOGRAPHER:  The time is
16 10:21 a.m. New York time, and we are back on
17 record.
18 BY MS. MCCARTHY:
19         Q.    Ms. Romer, we are almost there.
20 You testified before the Commission on the inquiry
21 into tax in 2019, correct?
22         A.    Yes.
23         Q.    And you were called in twice to
24 testify, right?
25         A.    Yes.

## Page 213

1          Q.    Do you know why you were called in
2  twice?
3          A.    Because they had so many questions,
4  and we didn't finalize on the first day, so they
5  had to have a second day with me.
6          Q.    Okay.  And those were several
7  months apart, right?  June and then November?
8          A.    Yes.
9          Q.    Do you know if your testimony was
10 captured by a court reporter like it's being done
11 today?
12         A.    I am sure it was.  I think it was.
13         Q.    Okay.  Do you happen to have a copy
14 of your testimony?
15         A.    I have heard nothing.
16         Q.    Okay.  And can you tell us about
17 how you were treated by the Commission during your
18 testimony?
19               MR. WEINSTEIN:  Objection to form.
20               THE WITNESS:
21         A.    The first meeting was not that
22 pleasant.  They were having all the administrative
23 procedures, and we should have followed this, we
24 should have followed that.
25               And normally we didn't do because

CONFIDENTIAL
Lisbeth Romer - June 3, 2021

57 (Pages 222 to 225)

Page 222

1    would never have dreamt that that should happen.
2        Q.    Okay.  For each refund application
3    that is submitted, you have mentioned some things
4    that the applicant has to provide to SKAT.
5              And one of those is the form 06003;
6    is that right?
7        A.    023 --
8        Q.    023?
9        A.    -- I think it was.  It could be
10   003, okay.
11       Q.    Is it the form that you saw earlier
12   today?
13       A.    Yes.  Yes.
14       Q.    And that's the form where the
15   applicant states that they are the beneficial
16   owner of the shares for which they are asking for
17   a refund; is that right?
18       A.    Okay.  Yes.
19       Q.    And would the Accounts II team ever
20   approve a reclaim application if the only thing
21   that was submitted was that form?
22       A.    No.  We had to have the other
23   things.
24       Q.    Okay.  And the other things
25   included a statement from the bank?

Page 223

1        A.    Yes.
2        Q.    And that's the bank at which the
3    applicant held their shares?
4        A.    Yeah.  And from where they got the
5    dividend.
6        Q.    Okay.  Did -- if the applicant did
7    not provide that statement from the bank where
8    they got the dividends and held the shares, would
9    the team approve the application?
10       A.    No.  We would send it back.
11       Q.    Were there ever exceptions made to
12   that rule?
13       A.    Not to my knowledge.
14       Q.    You mentioned also that in addition
15   to the bank statement, the local tax authority had
16   to provide information; is that right?
17       A.    They had to sign that the
18   beneficial owner is a taxpayer in this country.
19       Q.    Okay.  Would the team approve an
20   application without that certification?
21       A.    No.  Because we wouldn't know under
22   which double-taxation agreement we should refund.
23       Q.    Did the team make exceptions to
24   that requirement?
25       A.    No, not to my knowledge.

Page 224

1        Q.    In your experience over time, were
2    any refund applications ever rejected?
3        A.    Yes.
4        Q.    For what kind of reasons were
5    refunds rejected?
6        A.    It could be that there was no bank
7    statement with it.
8        Q.    Any other reasons you can recall?
9        A.    That was mainly the reason.
10       Q.    Okay.  Did SKAT keep track of
11   rejections of reclaims in its system?
12       A.    No, I don't think we -- I don't
13   think we did.
14       Q.    Okay.
15       A.    But we had a track anyway because
16   every claim that we received got a number.  So
17   you could still find it if they were filing the
18   right things afterwards.
19       Q.    Right.  Okay.  So for ones --
20       A.    We stamped and gave a number.
21       Q.    Sorry.  For ones that were
22   eventually approved, they got a stamp number?
23       A.    We stamped it when we got it.
24       Q.    Okay.  Do you have personal
25   knowledge of how the alleged fraud in this case

Page 225

1    was conducted?
2        A.    No.  Because we never talked about
3    it while I was there because we hadn't discovered
4    it.
5        Q.    In 2012 or 2013, did you ever
6    believe that there were fraudulent reclaim
7    applications being submitted?
8        A.    No.
9        Q.    Did anyone bring to your attention
10   that they believed that there were fraudulent
11   reclaim applications in 2012 --
12       A.    No.
13       Q.    -- or 2013?
14       A.    No.
15       Q.    Do you know the details of how the
16   defendants in this case purchased the Danish
17   shares that they claimed to own?
18       A.    No.
19       Q.    If SKAT had called the third-party
20   banks that submitted those certifications for the
21   reclaims in this case, do you know what
22   documentation, if any, those banks would have
23   provided to SKAT?
24       A.    No.  I can only say by experience
25   that when we went to the banks to have some extra