# Exhibit 48

CONFIDENTIAL
Graham Wade - March 16, 2022

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO.  18-MD-2865 (LAK)

_____
                                   )
IN RE:                             )
                                   )
CUSTOMS AND TAX ADMINISTRATION OF  )
THE KINGDOM OF DENMARK             )
(SKATTEFORVALTNINGEN) TAX REFUND   )
SCHEME LITIGATION                  )
_____)


C O N F I D E N T I A L


REMOTE VTC VIDEOTAPED EXPERT DEPOSITION UNDER ORAL
EXAMINATION OF
GRAHAM WADE

DATE: March 16, 2022


REPORTED BY:  MICHAEL FRIEDMAN, CCR

CONFIDENTIAL
Graham Wade - March 16, 2022

42 (Pages 162 to 165)

Page 162

1  Q    Sorry, I --
2        MR. OXFORD: Hold on. Greg, you
3  asked him the question. Please let him
4  finish.
5  A    Sorry. Can we have the question
6  back again, please?
7  Q    I'll ask another question.
8        Is it your assertion that all
9  cum ex sales are short sales?
10       MR. OXFORD: Objection. You can
11  answer.
12  A    By that question, do you mean
13  generally or in the context of the specific
14  transactions which I've given opinions on?
15  Q    Let's start generally first.
16       Is it your assertion generally that
17  all cum ex sales are short sales?
18       MR. OXFORD: Object to the form.
19  A    I couldn't possibly give an opinion
20  on all cum ex sales that have ever been done,
21  but my point earlier is that, in my
22  experience, it would be somewhat unusual to
23  do a cum ex sale, because the only situation
24  which, in all my market experience I've ever
25  seen a cum ex sale being done, is in order to

Page 163

1  give rise to a tax reclaim on a contract,
2  which is the contract for delivery of
3  ex-dividend shares.
4        And if someone were long
5  immediately before doing a cum ex, so they
6  were doing a cum ex out of a long position,
7  that is not an impossible thing to happen,
8  but it would be a quite unusual thing to be
9  done.
10  Q    And what's the basis for that
11  testimony?
12  A    The basis for that testimony is
13  being responsible and working in the
14  structured finance industry for many years.
15  Q    Have you ever executed cum ex
16  transactions yourself?
17  A    No.
18  Q    Have you, as far as you're aware,
19  worked for an institution that ever entered
20  into cum ex transactions?
21       MR. OXFORD: Object to form.
22  A    I believe it's a matter of public
23  record that Barclays has executed cum ex
24  transactions, but limited to -- as I say in
25  my report, the nature of cum ex transactions

Page 164

1  changed significantly, so not in 2012.
2        In my experience, prior to my
3  involvement in this case, it was only ever my
4  understanding that cum ex transactions were
5  executed in Germany and prior to the various
6  legislative changes that were made in
7  Germany.
8  Q    Okay. So you, prior to this case,
9  had no understanding of cum ex transactions
10  being executed in any context other than in
11  the German market prior to 2012.
12       Is that right?
13       MR. OXFORD: Object to the form,
14  misstates his testimony.
15  A    Yeah. My answer was, I think, that
16  Barclays, to my knowledge, only undertook
17  cum ex transactions prior to the legislative
18  changes in Germany and only ever undertook
19  them in respect of German shares, the reason
20  for that being that based on my market
21  experience and extensive understanding of the
22  European securities, no market participant or
23  advisor who I ever dealt with ever considered
24  the outside of those parameters, that a
25  cum ex transaction was effective.

Page 165

1        So maybe they executed them
2  in -- nobody at Barclays would have executed
3  them. Let's put it that way.
4  Q    Okay. And so is your familiarity
5  with cum ex transactions limited to the
6  manner in which Barclays has executed them?
7        MR. OXFORD: Object to the form.
8  A    No. I -- over the course of my
9  time at Barclays, you are not just aware of
10  transactions that Barclays is executing. You
11  are aware of a wide range of practice going
12  on in the market.
13  Q    Okay. Well, what other executions
14  of cum ex transactions are you aware of in
15  the market?
16       MR. OXFORD: Object to form.
17  A    I think my -- my point is that up
18  until no later than the beginning of 2012,
19  there were a wide range of
20  counterparties -- I think this is a matter of
21  public record -- who were undertaking cum ex
22  transactions in Germany based on their
23  understanding of a very specific procedural
24  rule, but that outside of Germany and outside
25  of that very specific procedural rule, there

CONFIDENTIAL
Graham Wade - March 16, 2022

69 (Pages 270 to 273)

Page 270

1  A   There's -- there's two separate
2  questions.  There's who does the ultimate tax
3  liability fall on, and who is responsible for
4  the withholding of tax.
5       My general understanding is that
6  the -- it's the issuer or its paying agent
7  who is responsible for the withholding of
8  tax.  The withholding in general is not
9  always a final tax.
10      So the taxation of the income on
11 which that withholding relates is a question
12 of who the recipient is and on all the facts
13 and circumstances around how they
14 receive -- in what basis they receive the
15 income to which it relates.
16  Q   So is the process different in the
17 United States than it is in Denmark?
18      MR. OXFORD:  Object to the form.
19  A   Almost certainly there will be a
20 number of differences in how that operates.
21  Q   But when you say "almost
22 certainly," does that mean you're almost
23 certain or what do you mean by that?
24  A   I mean that in my -- in my
25 experience of looking at a number of

Page 271

1  different tax jurisdictions, it is -- it
2  would be almost inconceivable to me that the
3  Danish payment and collection process is
4  exactly the same as the U.S. payment and
5  collection process.
6   Q   But you don't know?
7       MR. OXFORD:  Objection to form.
8   A   I -- no, I'm not giving an opinion
9  on the exact details of either the U.S. tax
10 administration system or the Danish tax
11 administration system.  Hopefully, I've been
12 clear that that's not something I'm here
13 giving an opinion on.
14      But I think you previously asked
15 me, in general terms, what is my
16 understanding of how these processes work,
17 which is what I was trying to answer.
18  Q   Okay.  So you're not giving a
19 specific opinion on the details of the
20 administration of the Danish tax system.
21      Are you giving a general opinion on
22 the administration of the Danish tax system,
23 sir?
24      MR. OXFORD:  Object to the form.
25  A   I am not giving any opinion as

Page 272

1  regards Danish tax law or the administration
2  of the Danish tax system.
3   Q   I'd ask you to turn if you could
4  to --
5       MR. OXFORD:  Oh, sorry, Mike.  The
6       witness is asking to take a break.
7       We've been going a little over an hour.
8       Can we take a five to ten-minute break?
9       MR. BONGIORNO:  Sure.
10      THE VIDEOGRAPHER:  Stand by.  The
11      time is 2:55 p.m. New York time and
12      we're going off the record.
13      (Brief recess taken.)
14      THE VIDEOGRAPHER:  Stand by.  The
15      time is 3:15 p.m. New York time and
16      we're back on record.
17      MR. BONGIORNO:  So just to clarify
18      on the record, we have marked as
19      Exhibit 5100, the opening Carr report;
20      5101, the Carr rebuttal report; and
21      5102, the Carr reply report.
22      (Whereupon the above mentioned was
23      marked for Identification.)
24  Q   Mr. Wade, I would like you to go to
25 your reply report, which I think is

Page 273

1  Exhibit 5003.  You probably have that
2  somewhere nearby.
3   A   Yeah, got it.
4   Q   For some reason I'm not seeing you
5  on the screen, so hopefully -- well, I don't
6  know, hopefully or not, but perhaps you're
7  seeing me, but I'm not seeing you.
8       I don't know what we can do about
9  that.
10  A   I'm seeing you okay.
11  Q   Oh, there we go, there we go.
12 You're back.  Thank you.
13      So you have your reply report in
14 front of you, sir?
15  A   I do.
16  Q   Okay.  Could you go to
17 Paragraph 240, parenthesis "2?"
18      Sorry.  It's not a parentheses.
19 It's just a number "2."  It's on Page 114.
20      MR. OXFORD:  Yeah, I've got that.
21  Q   Do you have that in front of you?
22  A   I do.
23  Q   Okay.  I'd like you to read that
24 paragraph to yourself, and I want to -- and
25 then I'm going to focus you on the last

Page 274

1  sentence.
2          Let me know when you've completed
3  reading the paragraph to yourself.
4      A    (Witness reviewing.)
5          I've read it, yeah.
6      Q    I'm going to direct your attention
7  to the last sentence of that paragraph.  I'll
8  read it out loud.  Then I will have a
9  question for you.
10          "In particular, there's no basis to
11  claim receipt of a dividend (or any test
12  reclaim rights which derive from such
13  dividend) on what is, in effect, a derivative
14  position."
15          Do you see that?
16      A    I do see that.
17      Q    Okay.  Did I read that correctly?
18      A    I believe so, yeah.
19      Q    Okay.  What do you mean by "a
20  derivative position?"
21          What does that mean?
22      A    Well.  In the situation that this
23  relates to, based on the facts as I've
24  referenced in my report, if there are in fact
25  no shares, then irrespective of what

Page 275

1  the -- you know, the pension plan statement
2  may show, all they can possibly have is a
3  contractual claim against its prime broker,
4  which, when I use the word "derivative," I'm
5  using that in the market sense to mean if I
6  have a derivative in respect of the share,
7  that means a -- an asset which derives its
8  value from the price of a share, but it is
9  not, itself, the share.
10          That's all I mean by that.
11      Q    So by "derivative" you mean
12  a -- like a contract with -- a contract where
13  there aren't any shares?
14      A    Yeah.  I'm saying that if a -- if a
15  prime broker is somehow -- and this would not
16  be, in my experience, normal practice -- but
17  if somehow a prime broker is representing to
18  its client that he's created a position, but
19  in fact it never settled that position, then
20  if there is any position as between the
21  pension plan and its prime broker, it must be
22  some kind of contractual derivative, being a
23  contract which derives its price from the
24  value of a share.
25      Q    Okay.  I want to direct your

Page 276

1  attention to a different document now.
2          If you could go to that Wilmer Hale
3  notebook that I think you still have
4  somewhere nearby?
5          And if you'd go to the Tab 5105.2?
6          MR. BONGIORNO:  This will be
7      Exhibit Number 5105.
8          (Whereupon the above mentioned was
9      marked for Identification.)
10      A    So I've got 5105.  That's the tab.
11      Q    Is -- do you have something that
12  says 5105.2?
13      A    I don't believe so, no.  It goes
14  from 5105 to 5106.
15      Q    Okay.  So is there a blue sheet in
16  that 5105 in between the pages?
17      A    There is.
18      Q    Okay.  I'd like you to go to the
19  document that's behind the blue sheet.
20          Okay?  Is that a two-sided
21  document?
22      A    It is.
23      Q    Okay.  And does the back side of
24  that document have a Bates number that ends
25  in 5320?

Page 277

1      A    It does.
2      Q    Okay.  So I'd like to mark that
3  document as Exhibit 5105.
4          Okay?
5          (Whereupon a discussion was held
6      off the record.)
7      Q    So you have in front of you the
8  document that ends in Bates number 5320?
9      A    The one that says "Cash Equity
10  Confirmation."
11      Q    Exactly.  And that is Exhibit 5105.
12  So you have that in front of you.
13          Do you know whether or not this is
14  a document that you looked at in connection
15  with the preparation of your reports?
16      A    I don't specifically know whether
17  this is one that I looked at.
18      Q    Okay.  And you can see that this is
19  an e-mail from Execution@FGC Securities to
20  Adam@Delvian Group.
21          Right?
22          MR. OXFORD:  Object to the form.
23      Q    Sorry.  That's not the case, that's
24  the cover e-mail.  Okay.  I'm sorry.
25          The binders have gotten the best of