**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CUSTOMS AND TAX ADMINISTRATION OF THE KINGDOM OF DENMARK (SKATTEFORVALTNINGEN) TAX REFUND LITIGATION<br><br>This document relates to:<br><br>18-cv-09840 and 18-cv-09841 | MASTER DOCKET<br><br>Case No. 1:18-md-02865-LAK |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION *IN LIMINE*
TO EXCLUDE THE EXPERT OPINIONS AND TESTIMONY OF GRAHAM WADE**

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ..................................................................................................................... 1

    I.      Mr. Wade Is Not Qualified To Opine On "Cum Ex" Trading ............................... 1

    II.     Mr. Wade's Opinions Are Pervasively Improper ................................................... 3

    III.    Key Definitional Premises On Which The Wade Reports Rest Remain
             Unsupported .............................................................................................................. 5

          A.     Mr. Wade Fails To Distinguish Consistently Between A "Real"
                 Dividend And A "Dividend Compensation Payment" ............................. 5

          B.     Mr. Wade Fails To Explain Whether A "Market Claim" May
                 Convey A Dividend .................................................................................. 7

          C.     Mr. Wade's Definition Of A "Cum Ex" Transaction Is A Moving
                 Target ....................................................................................................... 7

    IV.    Mr. Wade's Analysis Is Conceptually And Methodologically Flawed ................. 8

    V.     The Motion Is Timely And Proper ........................................................................ 10

CONCLUSION ................................................................................................................ 10

# **TABLE OF AUTHORITIES**

**Cases**

*Alford v. United States*,
   No. 17 Civ. 5217 (JFK), 2020 WL 376749 (S.D.N.Y. Jan. 23, 2020) ..................................... 9

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
   303 F.3d 256 (2d Cir. 2002)........................................................................................................ 9

*Colon ex rel. Molina v. BIC USA, Inc.*,
   199 F. Supp. 2d 53 (S.D.N.Y. 2001)......................................................................................... 9

*Daubert v. Merrell Dow Pharms. Inc.*,
   509 U.S. 579 (1993).............................................................................................................. 1, 9

*Raskin v. Wyatt Co.*,
   125 F.3d 55 (2d Cir. 1997).......................................................................................................... 9

*S.E.C. v. Revelation Cap. Mgmt., Ltd.*,
   215 F. Supp. 3d 267 (S.D.N.Y. 2016)...................................................................................... 3

*S.E.C. v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013)...................................................................................... 3

**Rules**

Fed. R. Evid. 702. ....................................................................................................................... 9

**Reports**

*Corporate Finance Manual 74430 – Other tax rules on corporate finance:*
   *manufactured payments: payment made on or after 1 January 2014: introduction,*
   Her Majesty's Revenue & Customs (April 16, 2016),  https://www.gov.uk/hmrc-
   internal-manuals/corporate-finance-manual/cfm74430 ........................................................... 7

*T2S Corporate Actions Standards FAQs*,
   European Central Bank (March 8, 2018)
   https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg
   180308_T2SCAStandardsFAQsUpdatedMarch2018.en.pdf ..................................................... 2

*Final Report on Cum/Ex, Cum/Cum and Withholding Tax Reclaim Schemes*,
   Eur. Sec. & Mkts. Auth. (Sept. 23, 2020)
   https://www.esma.europa.eu/sites/default/files/library/esma70-155-
   10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclaim_sc
   hemes.pdf ................................................................................................................................. 2

The ED&F Bellwether Defendants and Third-Party Defendant ED&F respectfully submit this reply memorandum of law in further support of their motion *in limine* to exclude the proposed expert reports, opinions and testimony of Graham Wade from evidence.[1]

## PRELIMINARY STATEMENT

SKAT fundamentally fails to engage with the numerous criticisms that have been leveled against the proffered opinions of its expert, Graham Wade. Rather than confront the core deficiencies in Mr. Wade's analysis, SKAT urges this Court to defer resolution of the motion or to forgo *Daubert* review altogether. Rather than defend the myriad improprieties and conceptual inconsistencies in Mr. Wade's reports, SKAT asks this Court to look past what Mr. Wade wrote and replace it with SKAT's own unsupported argument concerning the transactions at issue. SKAT's efforts to recast or reimagine Mr. Wade's work serve only to highlight its flaws: Mr. Wade's analysis is methodologically unsound, conceptually incoherent, and shot through with impermissible conclusions of law and improper inferences about state of mind. Mr. Wade's opinions should be excluded in their entirety, and now is the time.

## ARGUMENT

### I. Mr. Wade Is Not Qualified To Opine On "Cum Ex" Trading

SKAT makes light of the suggestion that an expert in "Cum Ex" trading should have experience with "Cum Ex" trades, essentially arguing that "Cum Ex" trading is fraudulent *per se*, so it would be absurd to imagine that anyone need do it to be an expert. Opp. 10-11. But as Mr. Wade acknowledged in his initial report, the term "Cum Ex" itself is neutral, describing only the

---

[1] Capitalized terms not otherwise defined have the meaning given to them in the Memorandum of Law in Support of Motion In Limine To Exclude The Proposed Expert Reports, Opinions and Testimony of Graham Wade, dated June 6, 2022 (Dkt. No. 1:18-md-2865, ECF No. 812) (the "Memorandum" or "Mem."). SKAT's memorandum in opposition, dated June 30, 2022 (Dkt. No. 1:18-md-2865, ECF No. 848) is cited herein as "Opp." Mr. Wade's reports and the cited excerpts of his deposition testimony were filed as exhibits to the Declaration of Brandon R. Dillman, dated June 6, 2022 (Dkt. No. 1:18-md-2865, ECF No. 813).

timing of a transaction:  "A so-called Cum-Ex transaction is one where the transaction terms are agreed before the Ex- Dividend Date, but the settlement terms are modified so that settlement of the transaction is agreed to be after the Record Date." Wade Report ¶ 79.  Similarly, the September 2020 report of the European Securities and Markets Authority, on which both Mr. Wade and SKAT rely, expressly notes that the terms "Cum/Cum and Cum/Ex merely refer to the dates of the trade which establishes a position . . . and the dates of eventual delivery, settlement, unwind or financing of that trade . . . ."[2]

SKAT's suggestion that ESMA condemned "cum-ex transactions" as such, *see* Opp. 10, rests on a fundamental, if not deliberate, misreading of the text.  The ESMA Report summarized "information received from National Competent Authorities" regarding "*alleged* large-scale tax fraud schemes known as 'Cum/Ex'," *see* ESMA Report at 7 (emphasis added); *see also id.* ¶¶ 13-16, 70 (indicating that Denmark was among the responding nations).  While "Cum Ex" trading was a necessary element of the fraudulent "Cum/Ex schemes" described in the ESMA Report, the ESMA Report never stated that "Cum Ex" trading was *inherently* improper.

Indeed, market standards promulgated by the European Central Bank's T2S initiative— an authority cited by Mr. Wade himself, *see* Wade Report ¶ 31 n.39—expressly contemplate that trades can and will be executed on a "Cum Ex" basis, a plain enough indication that such trading is not inherently "abusive or fraudulent," as SKAT would have it.  Opp. 10.[3]  Moreover, some of

---

[2] *See Final Report on Cum/Ex, Cum/Cum and Withholding Tax Reclaim Schemes* (the "ESMA Report") ¶ 35, Eur. Sec. & Mkts. Auth. (Sept. 23, 2020), *available at* https://www.esma.europa.eu/sites/default/files/library/esma70-155-10272_final_report_on_cum_ex_and_other_multiple_withholding_tax_reclaim_schemes.pdf.

[3] *See T2S Corporate Actions Standards FAQs*, European Central Bank, 1.3, 1.5 (March 8, 2018) (describing transactions where trade date is prior to ex-date and intended settlement date is after record date), *available at* https://www.ecb.europa.eu/paym/target/t2s/governance/pdf/casg/ecb.targetseccasg180308_T2SCAStandardsFAQsUpdatedMarch2018.en.pdf.

Mr. Wade's own contemporaries at Barclays purportedly *did* have direct experience with "Cum Ex" trading;[4] Mr. Wade, by contrast, has never participated in or overseen the execution of a "Cum Ex" transaction of any kind. *See* Mem. 6-7. SKAT is left to cite caselaw suggesting that there may be circumstances where an expert's education and experience need not be "directly on point," *S.E.C. v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 274 (S.D.N.Y. 2016), but Mr. Wade's purported expertise in the general field of equity finance embraces "so broad a category as to become meaningless" in the context of the "very specific" trading at issue here. *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 677-78 (S.D.N.Y. 2013). Mr. Wade cannot profess to have an expert's insight into the expectations and objectives of investors engaged in "Cum Ex" trading when he has no such experience himself.[5]

## II.    Mr. Wade's Opinions Are Pervasively Improper

As discussed in detail in the Memorandum, Mr. Wade's reports are rife with impermissible state-of-mind opinions and conclusions of law. *See* Mem. 8-9. Rather than engage directly with these pervasive improprieties, SKAT seeks to paper them over by paraphrasing Mr. Wade's words in more anodyne terms. But even a cursory review gives the game away. SKAT may wish, for example, that Mr. Wade really had confined himself to "explanations as to the structure and economics of the transactions," Opp. 14, but in the cited

---

[4] Mr. Wade testified that it was a "matter of public record that Barclays executed certain cum ex transactions." *See* Wade Dep. 167:9-168:12; *see also id.* 163:18-165:12. SKAT is presumably not suggesting that the Barclays professionals who engaged in those trades have "so far evaded criminal indictment." Opp. 11.

[5] SKAT's assertion that Mr. Wade had a "specific mandate" to "ensur[e] that Barclays did not do the type of cum-ex trades that the Defendants used to defraud SKAT," Opp. at 5, 12, is not supported by the record. Mr. Wade claimed that he became responsible in 2012 for the "restructuring and management of a range of legacy activities at Barclays." Wade Report ¶ 4. If Mr. Wade was in fact involved in evaluating the propriety of "Cum Ex" trading, as part of the "recalibration of the bank's risk appetite," *see id.*, it is a fact that goes curiously unmentioned in the hundreds of pages of Mr. Wade's reports. Further, in making this assertion, SKAT implicitly acknowledges that at least some "type[s]" of "Cum Ex" trades are proper.

paragraphs of his report, Mr. Wade in fact purported to tell the fact-finder, among other things, what "all participants" in the trades "would have known," what their "regulatory and legal duty" would have been, that the trades were "deliberate[ly] coordinat[ed]" from the start, and that their sole purpose was to "generate a fabricated tax reclaim that was shared by the parties to the transaction."  Wade Report ¶¶ 15(b), 221.  Similarly, SKAT glibly characterizes Wade Report ¶ 15(d) as a mere "compari[son]" of "market practices for issuing tax vouchers to the actions taken by ED&F."  Opp. 15 n.20.  But the cited paragraph in fact contains no such comparison and makes no reference to "market practices"; what it actually says, among other things, is that the ED&F Bellwether Plans' tax vouchers were "fabricated," that the tax reclaims were "false," that "all participants" in the execution of the underlying trades would have been "fully aware of this," that ED&F was in "breach of its U.K. regulatory obligations," and that certain "tax opinions" issued by major accounting firms appeared to be mere "marketing opinions . . . used to provide cover for the participants."  Wade Report ¶ 15(d).

SKAT's misleading recharacterization of these and other paragraphs does not make the improper expert opinion go away.[6]  Indeed, time and again, SKAT's efforts to rehabilitate Mr. Wade's opinions are brought up short by Mr. Wade's own words.  SKAT claims that Mr. Wade made no "determinations as to the Defendants' intent," Opp. 12, but Mr. Wade expressly opined,

---

[6] The examples are too numerous to address individually.  To take just two more, SKAT characterizes Wade Report ¶ 169(a) as a harmless "summar[y]" of "Defendants' use of different pricing and structure for cum-cum and cum-ex transactions."  Opp. 14-15 n.19.  The cited paragraph contains no such summary.  What it actually says is that "all parties understood the difference between Cum-Cum and Cum-Ex transactions" and "would have fully understood the reasons" for alleged differences in "structuring and pricing."  Wade Report ¶ 169(a).  SKAT claims that Wade Report ¶ 208 "explain[ed] how the size of the transactions indicated that the transactions were circular and was inconsistent with standard market risk policies."  Opp. 14-15 n.19.  The cited paragraph contains no such explanation.  What it actually says (without citation to any authority) is that the "participants in these transactions" could not "credibl[y]" have described the transactions as "real investment positions" and that the transactions "would have materially moved the market and posed serious risk management considerations."  Wade Report ¶ 208.

among other things, that the "Investment Managers and Pension Plans *intended to manufacture false long term holdings*."  Wade Reply ¶ 189 (citing Wade Report ¶¶ 133-34) (emphasis added).  SKAT claims that Mr. Wade ventured no conclusions of law, Opp. 12, but Mr. Wade expressly opined, among other things, that ED&F was in "breach of its U.K. regulatory obligations."  Wade Report ¶¶ 15(d), 220-24.[7]  SKAT claims that Mr. Wade did not usurp the fact-finder's role with respect to ultimate questions, Opp. 13, but Mr. Wade in fact purports to instruct the fact-finder on several elements of common law fraud *in the space of a single sentence*, opining that the ED&F Bellwether Plans' tax vouchers "contained false representations," that those tax vouchers were "essential to filing false tax reclaims," and that the ED&F Bellwether Plans were themselves "fully aware" of the alleged falsehoods.  Wade Report ¶ 15(d); *see also id.* ¶ 220.

## III.    Key Definitional Premises On Which The Wade Reports Rest Remain Unsupported

### A.  Mr. Wade Fails To Distinguish Consistently Between A "Real" Dividend And A "Dividend Compensation Payment"

It is Mr. Wade's core position that payments received by the ED&F Bellwether Plans were not "real" dividends but were instead "dividend compensation payments."  This purported distinction is central to Mr. Wade's thinking, but Mr. Wade fails to define the concepts in a coherent way.  Mr. Wade opines that a "real" dividend—as opposed to a "dividend compensation payment"—involves a "direct" payment from a "share issuer" to a "shareholder of record," Wade Report ¶¶ 69-70, and suggests that a buyer of securities who is "not the registered holder on the Record Date . . . *does not receive a real dividend* . . . ."  *Id.* ¶¶ 80 (emphasis added), 93.  But Mr. Wade also allows just the opposite:  that an entity *other* than the registered holder may

---

[7] This legal conclusion is hard to miss—it is printed in boldface, in a subheading—but it is not the only one.  Mr. Wade also proposes, for example, to instruct the fact-finder on the "starting point of most laws," Wade Report ¶ 72, and to inform the fact-finder that "it is not possible"—presumably as a matter of Danish law—that any ED&F Bellwether Plan could have been "entitled to make a tax reclaim" absent a "real" dividend.  Wade Rebuttal ¶ 219.

receive a "real" dividend, *id.* ¶ 70, and that a "real" dividend may be received *indirectly*, *e.g.*, through a chain of custodians and sub-custodians. *Id.* ¶¶ 70, 211; *see also* Wade Dep. 102:5-103:13, 103:20-104:16 ("[I]t would typically be a custodian or sub-custodian who was the holder of record . . . ."). Mr. Wade further opines that a "dividend compensation payment"—as opposed to "real" dividend—is a "contractual payment" arising under a "contract for the sale or transfer of securities." *Id.* ¶ 71. But Mr. Wade also allows that a contract for the sale of securities may "contractually entitle[]" a buyer to a "real" dividend, even if the seller was the shareholder of record and even if the seller received the dividend directly from the issuer in the first instance. Wade Reply ¶¶ 67, 82, 93(2) ("[T]he seller must pass on the dividend.").

The result is pure confusion: If a "real" dividend may be paid directly or indirectly, to the "shareholder of record" or to another, by the "share issuer" or by another, down a chain of custodians or pursuant to a purchase contract, then where is the line drawn between a "real" dividend and a so-called "dividend compensation payment"? Looking to Mr. Wade's reports for answers is a tail-chasing exercise, and SKAT does not even attempt to explain how the contradictions are to be reconciled. Mr. Wade ultimately provides no basis for distinguishing a "real" dividend from a "dividend compensation payment" beyond his own *ipse dixit*: A payment is a "real" dividend when he says it is, because he says it is. Such expert opinion can offer no assistance to the fact-finder.[8]

---

[8] SKAT claims that the relevance of Mr. Wade's opinions is unchallenged, Opp. 8, but the ED&F Bellwether Defendants in fact expressly took issue with the irrelevance of Mr. Wade's proposed opinions. *See* Mem. 10, 21-22. Mr. Wade's purported distinction between a "real" dividend and a "dividend compensation payment" can be of no relevance to SKAT's claims inasmuch as nothing in the record establishes that a "dividend compensation payment"—however that term may be understood by Mr. Wade—would not have sufficed to entitle an applicant to a withholding tax refund under Danish tax law. *Id.* at 10. Likewise, Mr. Wade's discussion of purportedly "common characteristics" between the Annex E and non-Annex E transactions is of no relevance, because whatever structural similarities may have been shared by the trades executed by ED&F, such similarities shed no light on the only question that matters here: Whether ED&F's counterparties delivered shares with a dividend entitlement. *Id.*

**B.  Mr. Wade Fails To Explain Whether A "Market Claim" May Convey A Dividend**

SKAT purports to take issue with the ED&F Bellwether Defendants' use of the term

"market claim," *see* Opp. 22, but if it is error to treat a "market claim" as a "payment," rather

than a "process," then it is an error into which Mr. Wade himself falls, and not just once.[9]  In any

event, such hairsplitting avoids the central question:  If a "market claim" is a *process*, is it a

process that conveys a dividend?  SKAT appears to think not, *see id.*, but Mr. Wade offered no

clear answer in his reports, and he equivocated outright at deposition.  *See* Wade Dep. 190:1-21

("It does depend on the specific facts and circumstances of the position.").  Mr. Wade's

discomfort with the issue is no mystery, for according to one of Mr. Wade's own authorities,

there is no "dividend manufacture" where the seller of a share "simply passes on" to the buyer a

dividend received "merely because the company register has not been updated to reflect the

change of ownership," as would occur in connection with a market claim.[10]

**C.  Mr. Wade's Definition Of A "Cum Ex" Transaction Is A Moving Target**

SKAT claims to find no inconsistency in Mr. Wade's shifting definitions of a "Cum Ex"

trade, insisting that Mr. Wade's definition was clear and consistent from the start:  A "Cum-Ex"

trade is one where the "transaction terms are agreed before the Ex-Dividend Date" and where

---

at 21-22.  As discussed below, an investigation by ED&F's own counsel—the results of which were reported to the FCA—found no reason to suppose that the shares delivered by ED&F's counterparties were anything other than dividend-bearing (except in the limited case of the Annex E tax vouchers), and the unremarkable fact that ED&F's Annex E and non-Annex E "Cum Ex" trades were broadly similar in structure to one another (and, indeed, to the undisputedly dividend-bearing "Cum Cum" trades) does not warrant any different conclusion.

[9] *See* Wade Report ¶ 158 (describing a certain "Market Claim" as a "dividend compensation payment"); Wade Reply ¶ 94 (opining that "payment received by the Pension Plans was not a real dividend or even a market claim, but a dividend compensation payment…"); Wade Rebuttal ¶ 153 n.278 (referring to a SWIFT message as "evidence of the receipt of a real dividend as opposed to a market claim or manufactured dividend").

[10] *See Corporate Finance Manual 74430 – Other tax rules on corporate finance: manufactured payments: payment made on or after 1 January 2014: introduction,* Her Majesty's Revenue & Customs (April 16, 2016), *available at* https://www.gov.uk/hmrc-internal-manuals/corporate-finance-manual/cfm74430 (cited at Wade Report ¶ 73 n.68).

settlement is intended to occur "after the Record Date." Opp. 22-23 (quoting Wade Report ¶ 79). But on *this* definition, a "Cum Ex" transaction may settle with dividend-bearing shares, a result that is fatal to SKAT's argument. To get around this difficulty, Mr. Wade simply adjusts his definition along the way to suit SKAT's ends, maintaining in his rebuttal and reply reports, and in his deposition testimony, that a "Cum Ex" trade is one which, *by definition*, can only be settled with *non*-dividend-bearing shares. *See* Wade Rebuttal ¶¶ 141, 153 n.276 ("[B]y definition, a Cum-Ex purchase is a contract to acquire Ex-Dividend shares."); Wade Reply ¶ 95; *see also, e.g.,* Wade Dep. 154:9-22 ("[T]he very nature of a cum ex transaction is that what the seller is agreeing to do is to deliver ex-dividend shares, using the definition of cum ex in my report."). SKAT may choose to look the other way, but this was *not* Mr. Wade's starting definition of "Cum-Ex," *see* Wade Report ¶ 79, and neither SKAT nor Mr. Wade offers any justification for the drastic shift in the meaning of this key term.

## IV. Mr. Wade's Analysis Is Conceptually And Methodologically Flawed

SKAT also offers no substantive response to the numerous methodological deficiencies that the ED&F Bellwether Defendants have identified in Mr. Wade's analysis. SKAT does not even attempt to defend Mr. Wade's pricing analysis as statistically meaningful—*see* Mem. 22-26; Opp. 25-26—notwithstanding that this pricing analysis is Mr. Wade's closest approach to a purportedly empirical basis for suggesting that any of the non-Annex E trades carried no dividend entitlement. *See* Wade Report ¶¶ 160-66. Nor does SKAT make any real effort to justify Mr. Wade's use of an "inevitably arbitrary" benchmark in his trade volume analysis, or his reliance on partial data in computing the number of shares held by ED&F, or his willingness to draw conclusions about account records that, by his own admission, he did not fully understand. *Compare* Mem. 26-29 *with* Opp. 27-29. Instead, SKAT argues that questions of

sample size and statistical significance and methodological rigor are not properly considered on a motion to exclude, *see* Opp. 2-3, 17, 26-29, or, in the alternative, that such considerations should be deferred until trial. *See id*. 31.

In effect, SKAT urges this Court to ignore its basic gatekeeping function under *Daubert*, which requires a "rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).[11] Having relied extensively on Mr. Wade's opinions in arguing for summary judgment—*see, e.g.*, SKAT's Memorandum of Law, ECF No. 817, at 26, 29-34—SKAT cannot now argue that a determination on the admissibility of those opinions must await trial. *See Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 68 (S.D.N.Y. 2001) (where "a proffer of expert testimony is excluded as inadmissible pursuant to Rule 702, the court must make the summary judgment determination on a record that does not include that evidence").

SKAT also suggests that this Court may dispense with *Daubert* analysis on the ground that Mr. Wade's opinions have purportedly been vindicated by disclosures made by ED&F's counsel to the FCA. *See* Opp. 2, 24-25, 27-29.[12] The premise is a false one, for Mr. Wade's opinions are not at all consistent with ED&F's disclosures to the FCA. In fact, ED&F's counsel advised the FCA that it found "no reason to doubt the accuracy" of any of the tax vouchers

---

[11] SKAT's suggestion that the Court's gatekeeping function is "lessened" in the summary judgment context, Opp. 7-8, runs counter to Second Circuit precedent. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("principles governing admissibility of evidence do not change on a motion for summary judgment"). The case on which SKAT relies, *Alford v. United States*, is inapposite. In *Alford*, the court remarked in *dicta* that the gatekeeping function "may be" more relaxed in the "context of a *bench trial*," where the fact-finder *is* the gatekeeper. *See* No. 17 Civ. 5217 (JFK), 2020 WL 376749, at *15 (S.D.N.Y. Jan. 23, 2020) (emphasis added). Here, SKAT has demanded a jury trial and seeks to use expert testimony to obtain summary judgment in advance of that trial.

[12] The argument is logically unsound: A methodologically indefensible analysis would remain so even if it happened to yield a correct result, just as a broken clock remains broken even if it gives the correct time twice a day.

9

reviewed *except* those that were ultimately identified on Annex E, *see* Declaration of Neil J. Oxford ("Oxford Decl."), Ex. 12 (ECF No. 849-12) at 3, whereas Mr. Wade contends that so-called "non-Annex E" tax vouchers are inaccurate as well. *See* Wade Report ¶¶ 98, 145. And while ED&F's counsel concluded that the Annex E tax vouchers were inaccurate because the underlying shares received from MPT Dubai had not been "acquired from the market," *see* Oxford Decl., Ex. 12 at 10-11, Mr. Wade advances a different theory, maintaining that the Annex E tax vouchers would have been inaccurate even if MPT Dubai had held the shares. *See* Wade Report ¶¶ 115-16 ("[I]t makes no difference whether or not MPT Dubai held the shares because the payment that would be made had MPT Dubai owned the shares would have been a dividend compensation payment and not the real dividend."). Mr. Wade's analysis is thus at odds with the conclusions reached by ED&F's counsel in its reports to the FCA, which do not in any way "confirm the accuracy of Mr. Wade's opinions." Opp. 27.

## V. The Motion Is Timely And Proper

Finally, the Motion is neither overbroad nor premature. The ED&F Bellwether Defendants do not, as SKAT asserts, seek a "general exclusion based on an undifferentiated general objection." Opp. 30. Rather, the ED&F Bellwether Defendants have identified numerous specific deficiencies in Mr. Wade's proposed opinions. That these deficiencies are so fundamental and so pervasive that they warrant exclusion of Mr. Wade's opinions in full does not mean that the individual deficiencies have not been identified with particularity. Nor is the Motion untimely, for it was raised only after SKAT itself invoked Mr. Wade's opinions to seek summary judgment in its favor and to *prevent* a trial on the very issues that Mr. Wade purports to analyze.

10

## **CONCLUSION**

For the foregoing reasons, the ED&F Bellwether Defendants and ED&F respectfully request that the Court grant their motion *in limine* to exclude the expert reports, opinions and testimony of Graham Wade in their entirety.


Dated: July 14, 2022                                        Respectfully submitted,


/s/ John C. Blessington
John C. Blessington (*pro hac vice*)
Brandon R. Dillman (*pro hac vice*)
Michael R. Creta (*pro hac vice*)
John L. Gavin (*pro hac vice*)
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
Tel. (617) 261 3100
Fax: (617) 261 3175
john.blessington@klgates.com
brandon.dillman@klgates.com
michael.creta@klgates.com
john.gavin@klgates.com

*Attorneys for Bellwether Defendants American Investment Group of New York, L.P. Pension Plan, Riverside Associates Defined Benefit Plan, Robert Crema, David Schulman, Stacey Kaminer, and Acer Investment Group, LLC*


/s/ Neil S. Binder
Neil S. Binder
M. Tomas Murphy
Gregory C. Pruden
BINDER & SCHWARTZ, LLP
366 Madison Avenue, Sixth Floor
New York, NY 10017
Tel. (212) 510-7008
Fax: (212) 510-7299
nbinder@binderschwartz.com

11

tmurphy@binderschwartz.com
gpruden@binderschwartz.com

*Attorneys for Third-Party Defendant*
*ED&F Man Capital Markets, Ltd.*